**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 1:19-cv-02443-STV**

Jun Li, Qi Qin, Yi Liu, Jie Yang, Yuquan Ni, Li Fang,
Zhongzao Shi, Fang Sheng, Shunli Shao, Kaiyuan Wu,
Zhijian Wu, Zhongwei Li, and Yuwei Dong,

      Plaintiffs,

v.

Colorado Regional Center Project Solaris LLLP,
Colorado Regional Center I, LLC,
Solaris Property Owner LLC, and
Peter Knobel,

      Defendants.

---

## AFFIDAVIT OF RICK HAYES

---

    I, Rick Hayes, being of the age of majority, and with personal knowledge, hereby state as follows:

    1.    I am a managing partner of Colorado Regional Center, LLC ("CRC"), a Colorado limited liability company.

    2.    CRC is an approved EB-5 Regional Center, authorized by U.S. Citizenship and Immigration Services ("USCIS") to operate anywhere within the State of Colorado.

    3.    I am also a managing partner of Colorado Regional Center I, LLC ("CRC I"), a Colorado limited liability company, which is the general partner of Colorado Regional Center Project Solaris LLLP ("CRCPS"), a Colorado limited liability limited partnership.

**EXHIBIT A**

4.      Jun Li, Qi Qin, Yi Liu, Jie Yang, Yuquan Ni, Li Fang, Zhongzao Shi, Fang Sheng, Shunli Shao, Kaiyuan Wu, Zhijian Wu, Zhongwei Li, and Yuwei Dong (collectively, the "Plaintiffs") are Chinese investors who each purchased a limited partnership interest in CRCPS for $500,000, as part of an approved EB-5 Program through the USCIS to obtain a permanent residence visa, commonly referred to as a "green card."

5.      Plaintiffs are thirteen of a total of 165 original CRCPS limited partners.

6.      Under the terms of the partnership agreement, CRCPS loaned the proceeds of the investment, which totaled approximately $82.5 million, to SPO's assignee, Solaris Property Owner I, LLC ("SPO I").

7.      SPO is the developer of a residential and commercial development in Vail, Colorado, consisting of 79 high-end residential condominium units (the "Project").

8.      The proceeds of the loan were to be used by SPO to pay certain costs pertaining to the development of the Project.

9.      The loan was evidenced by a loan agreement and a promissory note and was funded in multiple advances over a period of time.

10.     To secure the loan, SPO granted a lien, evidenced by a deed of trust, to CRCPS for each of nineteen condominium units valued in the aggregate at approximately $82.5 million at the time of execution of the loan agreement (the "Property").

11.     Prior to the commencement this action, two of the nineteen units have been assigned to entities owned by certain limited partners of CRCPS in consideration of a redemption of their partnership interests.

12.     The loan accrued interest at a rate of 5.55% per annum.

**EXHIBIT A**

13. The principal balance together with all accrued and unpaid interest of each loan advance was due and payable five years after the date of each loan advance.

14. Pursuant to the terms of the loan agreement, three years following each loan advance, SPO had the right to prepay the amount of the loan advance by either paying cash or tendering a special warranty deed to one or more condominium units, which would reduce the principal balance of the loan, as set forth in the loan agreement and promissory note.

15. Prior to the first advance under the loan, SPO assigned all rights, obligations, title and interest related to the loan, note and Property to Solaris Property Owner I, LLC ("SPO I"), and SPO I assumed all obligations thereunder, thus becoming the borrower pursuant to the loan agreement.

16. Consistent with the terms of the loan agreement, SPO I delivered notice of its intention to exercise the right to collateral transfer with respect to each condominium unit to CRCPS in lieu of cash payment after three years following each loan advance.

17. Pursuant to the terms of an Agreement Regarding Collateral Units between CRCPS and SPO I, attached hereto as **Exhibit 1**, CRCPS has not yet been assigned title to the remaining units comprising the Property (other than two condominium units conveyed to CRCP's designees) because SPO I agreed to continue to hold title and, upon the instruction of CRCPS, to directly sell the units to a buyer designated by CRCPS.

18. Such deferral of title transfer benefits CRCPS because it avoids a significant municipal transfer tax, prepayment of HOA dues, and over $100,000 of working capital payments that would be due the HOA, which costs would be borne by the limited partners, including Plaintiffs (investors).

**EXHIBIT A**

19.     Accordingly, SPO I continues to hold title to the Property, as the successor in interest to SPO, and CRCPS continues to hold a first priority lien on the Property by means of the respective deeds of trust.

20.     On June 5, 2019, CRCPS entered into a Letter of Intent to sell all of the Property, comprised of 17 units, to a buyer in a transaction referred to as a bulk sale.

21.     The rationale of the bulk sale is to satisfy the demands of the limited partners for immediate liquidity and to monetize the assets of the limited partnership.

22.     The net proceeds of the bulk sale (after payment of transaction costs and accrued partnership expenses) will be distributed to limited partners, including Plaintiffs, as a return of capital.

///

Dated this ___ day of September, 2019.

_____
Rick Hayes

4

**EXHIBIT A**

STATE OF COLORADO )
                                    )ss.
COUNTY OF *Eagle* )

Subscribed and sworn to before me this _23rd_ day of _September_ , 2019 by Rick Hayes.

Witness my hand and official seal.

*Roberto Ramos Nolasco*
Notary Public   *Exp Nov 9, 2019*

My Commission Expires: *Nov 9, 2019*

[SEAL]

> **ROBERTO RAMOS NOLASCO**
> Notary Public
> State of Colorado
> **Notary ID 20154042634**
> **My Commission Expires Nov 9, 2019**

4852-8729-3606

**EXHIBIT A**

*EXECUTION VERSION*

## AGREEMENT REGARDING COLLATERAL UNITS

This Agreement Regarding Collateral Units (this "**Agreement**"), dated as of the 17th day of April, 2015, is by and among **Colorado Regional Center Project Solaris, LLLP** (the "**Lender**" or "**CRCPS**"), a Colorado limited liability limited partnership, **Solaris Property Owner I, LLC** ("**Borrower**"), a Delaware limited liability company, and, with respect to Section 2 only, **P.B.K. Real Estate, LLC d/b/a Solaris Real Estate LLC** ("**Broker**"), a Colorado limited liability company.

### Recitals

A.       Reference is hereby made to that certain Promissory Note dated April 18, 2012, executed by Borrower, as assignee of Solaris Property Owner, LLC, a Delaware limited liability company ("**Original Borrower**") pursuant to that certain Assignment of Loan Agreement dated October 12, 2011 by and between Original Borrower and Borrower, and payable to the order of Lender ("**Lender**") in the original maximum principal amount of One Hundred Million and No/100 Dollars ($100,000,000.00), as amended by that certain Allonge to Promissory Note dated of even date therewith by and between Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, collectively the "**Note**"), Borrower has become indebted to Lender with respect to a loan ("**Loan**") made pursuant to that certain Loan Agreement dated November 5, 2010 between Original Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), which Loan is secured by one of more Deeds of Trust recorded against the Collateral Units in the real property records of Eagle County, Colorado (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, each a "**Deed of Trust**" and collectively, the "**Deeds of Trust**"), and further evidenced, secured or governed by other instruments and documents executed in connection with the Loan, including, but not limited to (i) that certain Operating Payment Agreement dated November 5, 2010 by and between Borrower, as successor in interest to Original Borrower, and Lender (the "**Operating Payment Agreement**"), (ii) that certain Yield Enhancement Agreement dated November 5, 2010 by and between Borrower and Lender, (iii) that certain Memorandum of Understanding dated April 1, 2011 by and between Borrower, as successor in interest to Original Borrower, and Lender (the "**MOU**"), and (iv) that certain Guaranty Agreement dated April 18, 2012 by Peter Knobel for the benefit of Lender (the "**Guaranty**"), and as such loan documents were amended pursuant to that certain Omnibus Amendment to EB-5 Investment Documents dated March 8, 2012 by and between Original Borrower and Lender (the "**Omnibus Amendment**") (such other instruments and documents, Operating Payment Agreement, MOU, Guaranty, and Omnibus Amendment, together with the Note, the Loan Agreement and Deeds of Trust, as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, collectively, the "**Loan Documents**"). All capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Loan Documents.

B.       Pursuant to the Loan Documents, Borrower has the right to tender any Collateral Unit (as defined therein) to Lender in repayment of a corresponding Loan Advance commencing

on the applicable Prepayment Date, as more particularly set forth in the Loan Documents (each, a **"Collateral Unit Distribution"**).

      C.     Borrower has duly notified Lender that it intends to cause the occurrence of a Collateral Unit Distribution with respect to each of the Collateral Units on the applicable Prepayment Date. From and after the Prepayment Date for a Collateral Unit, such Collateral Unit may hereinafter be referred to each as an **"Eligible Unit"** and collectively as the **"Eligible Units."**

      D.     In lieu of accepting the conveyance of title to the Eligible Units pursuant to a Collateral Unit Distribution, the Lender and Borrower have determined that it is desirable for Borrower to continue to hold record title to the Eligible Units.

      E.     The effective date of each Collateral Unit Distribution is as follows:

|  |  |  |
| :---: | :---: | :---: |
| 6E West | April 18, 2012 | April 17, 2015 |
| 2A South | April 25, 2012 | April 24, 2015 |
| Penthouse E West | May 3, 2012 | May 2, 2015 |
| 6E East | May 30, 2012 | May 29, 2015 |
| Penthouse E East | June 15, 2012 | June 14, 2015 |
| 5E West | August 2, 2012 | August 1, 2015 |
| 4G West | August 24, 2012 | August 23, 2015 |
| 7E West | September 7, 2012 | September 6, 2015 |
| Penthouse C East | September 13, 2012 | September 12, 2015 |
| 6D East | October 2, 2012 | October 1, 2015 |
| 5C West | November 6, 2012 | November 5, 2015 |
| 6C West | November 27, 2012 | November 26, 2015 |
| 5G West | January 24, 2013 | January 23, 2016 |
| 3E East | January 29, 2013 | January 28, 2016 |
| 7E East | January 30, 2013 | January 29, 2016 |
| 4D East | March 6, 2013 | March 5, 2016 |
| Penthouse G West | May 20, 2013 | May 19, 2016 |
| Penthouse C West | May 30, 2013 | May 29, 2016 |
| 3C East | January 30, 2015 | January 29, 2018 |

      F.     Borrower has agreed to temporarily refrain from conveying title to the Eligible Units to Lender pursuant to a Collateral Unit Distribution on the condition that, for purposes of calculating interest under the Loan Documents, Borrower shall be deemed to have caused a Collateral Unit Distribution as of the Prepayment Date corresponding to each Eligible Unit and associated Loan Advance.

      The parties desire to set forth their mutual understanding concerning certain matters related to the listing and sale of the Eligible Units as more particularly described below.

## Agreement

Now, therefore, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Lender and Borrower agree as follows:

1.  <u>Collateral Unit Distribution</u>. For purposes of calculating interest (including any default interest) under the Loan Documents, with respect to each Eligible Unit and associated Loan Advance, Borrower shall be deemed to have caused a Collateral Unit Distribution as of the corresponding "Effective Date of Collateral Unit Distribution" set forth in <u>Recital E</u> above. Notwithstanding the occurrence of a Collateral Unit Distribution with respect to an Eligible Unit and anything in the Loan Documents to the contrary, the principal amount of the associated Loan Advance shall continue to constitute Indebtedness under the Loan; provided, however, (i) no interest (including default interest) shall accrue with respect to such Loan Advance from and after the applicable Effective Date of Collateral Unit Distribution (except as required by the Operating Payment Agreement) and (ii) in the event that a Loan Advance remains outstanding after the applicable Maturity Date, no default or Event of Default shall be deemed to have occurred as a result of a failure of Borrower to repay such Loan Advance on or before such Maturity Date, and Lender may not exercise any rights or remedies with respect to a default or Event of Default, unless and until it shall have provided Borrower with a notice and cure period in accordance with Section 17 of the Loan Agreement.

2.  <u>Listing of Eligible Units</u>.

    a.  Upon Lender's written request, Lender may authorize Borrower to enter into certain Listing Agreements with its affiliate, P.B.K. Real Estate, LLC, a Colorado limited liability company (d/b/a Solaris Real Estate, LLC) (**"Broker"**) to market an Eligible Unit(s) for sale for a total commission of five percent (5%) and on such other terms and conditions as are set forth in the Exclusive Right-To-Sell Listing Contract attached hereto as <u>Exhibit B</u> (each, a **"Listing Agreement"** and the Eligible Unit to which it pertains, a **"Listed Unit"**). The term of the Listing Agreement shall be defined therein. In no event shall Lender, Borrower, or Broker be obligated to enter into a Listing Agreement. The Listing Agreement shall provide that either party has the right to terminate the Listing Period (as defined in the Listing Agreement) upon ten (10) day's written notice to the other. Upon Lender's written request, Borrower shall exercise its right to terminate the Listing Period on the date set forth in Lender's written request that is no sooner than ten (10) days from the date of Borrower's receipt of such notice.

    b.  Upon Closing on a Listed Unit, Broker agrees to pay to Lender an amount equal to fifty percent (50%) of the Sale Commission (as defined in the Listing Agreement), net of any Cooperative Broker Compensation (as defined in the Listing Agreement), earned by Broker from the sale of such Listed Unit.

    c.  Borrower agrees that Lender shall have authority to make all decisions otherwise granted to Borrower in a Listing Agreement and Borrower shall consult Lender on all matters pertaining to the sale of the Eligible Units.

{00316124.DOCX / 1}

**3**

**EXHIBIT A**                                                    Exhibit 1

d.     Upon Lender's written request, Lender may authorize Borrower to enter into listing or co-listing agreements with third-party real estate brokers to market Eligible Unit(s). In no event shall Lender or Borrower be obligated to enter into such a listing agreement. Borrower agrees that Lender shall have authority to make all decisions otherwise granted to Borrower in such listing agreement and Borrower shall consult Lender on all matters pertaining to the sale of the Eligible Units.

3.     Listing of Borrower's Units. During the Listing Period (as defined in the Listing Agreement) for a Listed Unit, Borrower agrees that it will not cause Broker or any other third-party real estate broker to initiate an MLS listing for the sale of any residential unit in Solaris that is owned by Solaris Property Owner, LLC, a Delaware limited liability company, Solaris Property Owner II, LLC, a Delaware limited liability company, or other related entities other than Borrower (collectively, the **"Affiliated Solaris Owners"**) and (ii) is like-kind to an Eligible Unit. Borrower also agrees that any like-kind units owned by the Affiliated Solaris Owners that are currently listed on MLS shall be removed.

4.     Conveyance of Eligible Units.

a.     Sale to Third-Party. In the event that Borrower enters into a contract for the purchase and sale of an Eligible Unit that is approved by Lender (a "Purchase Agreement"), Borrower and Lender shall promptly execute and deliver to the other party a Transfer Agreement with respect to such Eligible Unit substantially in the form attached hereto as Exhibit A (each, a "Transfer Agreement"). The Closing Date under the Transfer Agreement shall be the date set forth in the Purchase Agreement.

b.     Tender to Lender. In the event that Borrower notifies Lender in writing that it intends to tender or otherwise convey any Eligible Unit to Lender or Lender notifies Borrower in writing that an Eligible Unit is to be tendered or otherwise conveyed to Lender, Borrower and Lender shall promptly execute and deliver to the other party a Transfer Agreement with respect to such Eligible Unit substantially in the form of the Transfer Agreement attached hereto as Exhibit A. The Closing Date under the applicable Transfer Agreement shall be the date set forth in the notice from Borrower to Lender that it intends to tender or otherwise convey the Eligible Unit to Lender or notice from Lender to Borrower that requests than the Eligible Unit be tendered or otherwise conveyed to Lender, as the case may be.

c.     Tender to Limited Partners of the Lender. In the event that Lender notifies and instructs Borrower to enter into a contract for the sale or conveyance of an Eligible Unit to an individual limited partner or group of limited partners of the Lender, the parties agree that any Sale Commission shall be waived.

5.     MISCELLANEOUS. This Agreement represents the entire and complete agreement between the parties. The Amendment shall not be amended or modified, except by an instrument in writing, signed by all parties. All terms and provisions hereof shall inure to the benefit of, and being binding upon the parties, and their respective successors and assigns. Wherever used in this Agreement, the singular shall include the plural, and the masculine shall include the feminine and neuter grammatical forms. Captions are included for convenient

reference only, and shall not be construed to alter or affect any terms or provisions of this Agreement.  This Agreement has been executed by the parties after discussions and negotiation, and shall be construed as having been drafted by both parties.  If any term of this Agreement is held to be invalid or unenforceable, such term shall be construed as being valid and enforceable to the fullest extent permitted by law, and all remaining terms shall remain full force and effect. This Agreement shall be construed and enforced in accordance with the laws of the State of Colorado. Each party hereto waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or any related document. If a party initiates any action to enforce or interpret this Agreement, the party determined by the court or arbiter, as the case may be, to be the prevailing party in such action will be entitled to receive from the non-prevailing party all reasonable costs and expenses, including all reasonable attorneys' fees incurred by the prevailing party in such action. This Agreement may be executed in electronic or facsimile counterparts, each of which when so executed shall be deemed to be an original, and all of which when taken together shall constitute one original signed agreement.

[SIGNATURE PAGE FOLLOWS]

**EXHIBIT A**                                    Exhibit 1

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the date first above set forth.

BORROWER:

SOLARIS PROPERTY OWNER I, LLC,
a Delaware limited liability company

By: _____
     Ryan A. Smith, its Authorized Signatory

LENDER:

COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP,
a Colorado limited liability limited partnership

By:_____
Name: _____
Its: _____

With respect to Section 2 only.

BROKER:

P.B.K. REAL ESTATE, LLC d/b/a SOLARIS REAL ESTATE LLC,
a Colorado limited liability limited partnership

By:_____
Name: _____
Its: _____

**EXHIBIT A**     Exhibit 1

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the date first above set forth.

BORROWER:

SOLARIS PROPERTY OWNER I, LLC,
a Delaware limited liability company


By: _____
    Ryan A. Smith, its Authorized Signatory


LENDER:

COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP,
a Colorado limited liability limited partnership

By: _____
Name: _____
Its: _____

With respect to Section 2 only.

BROKER:

P.B.K. REAL ESTATE, LLC d/b/a SOLARIS REAL ESTATE LLC,
a Colorado limited liability limited partnership

By: _____
Name: _____
Its: _____

**EXHIBIT A**                      Exhibit 1

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the date first above set forth.

BORROWER:

SOLARIS PROPERTY OWNER I, LLC,
a Delaware limited liability company

By: _____
Ryan A. Smith, its Authorized Signatory

LENDER:

COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP,
a Colorado limited liability limited partnership

By:_____
Name: _____
Its: _____

With respect to Section 2 only.

BROKER:

P.B.K. REAL ESTATE, LLC d/b/a SOLARIS REAL ESTATE LLC,
a Colorado limited liability limited partnership

By:_____
Name: _____
Its: _____

# EXHIBIT A

## FORM OF TRANSFER AGREEMENT

(Attached)

7

**EXHIBIT A**

Exhibit 1

# TRANSFER AGREEMENT

This TRANSFER AGREEMENT (this "**Agreement**") is executed this _____ day of _____, 20__, by and between SOLARIS PROPERTY OWNER I, LLC, a Delaware limited liability company ("**Borrower**") and COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP, a Colorado limited liability limited partnership ("**Lender**")

## Recitals

A.     Reference is hereby made to that certain Promissory Note dated April 18, 2012, executed by Borrower, as assignee of Solaris Property Owner, LLC, a Delaware limited liability company ("**Original Borrower**") pursuant to that certain Assignment of Loan Agreement dated October 12, 2011 by and between Original Borrower and Borrower, and payable to the order of Lender ("**Lender**") in the original maximum principal amount of One Hundred Million and No/100 Dollars ($100,000,000.00), as amended by that certain Allonge to Promissory Note dated of even date therewith by and between Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, collectively the "**Note**"), Borrower has become indebted to Lender with respect to a loan ("**Loan**") made pursuant to that certain Loan Agreement dated November 5, 2010 between Original Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), which Loan is secured by one of more Deeds of Trust recorded against the Collateral Units in the real property records of Eagle County, Colorado (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, each a "**Deed of Trust**" and collectively, the "**Deeds of Trust**"), and further evidenced, secured or governed by other instruments and documents executed in connection with the Loan, including, but not limited to (i) that certain Operating Payment Agreement dated November 5, 2010 by and between Borrower, as successor in interest to Original Borrower, and Lender (the "**Operating Payment Agreement**"), (ii) that certain Memorandum of Understanding dated April 1, 2011 by and between Borrower, as successor in interest to Original Borrower, and Lender (the "**MOU**"), and (iii) that certain Guaranty Agreement dated April 18, 2012 by Peter Knobel for the benefit of Lender (the "**Guaranty**"), and as such loan documents were amended pursuant to that certain Omnibus Amendment to EB-5 Investment Documents dated March 8, 2012 by and between Original Borrower and Lender (the "**Omnibus Amendment**") (such other instruments and documents, Operating Payment Agreement, MOU, Guaranty, and Omnibus Amendment, together with the Note, the Loan Agreement and Deeds of Trust, as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, collectively, the "**Loan Documents**"). All capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Loan Documents.

B.     Pursuant to that certain Agreement Regarding Collateral Units dated April 17, 2015, by and between Borrower and Lender, Borrower and Lender desire to provide for the conveyance of Collateral Unit _____ (the "**Tendered Unit**") from Borrower to Lender or its designee in full or partial satisfaction of that certain Loan Advance made _____, 20__ in the initial principal amount of $_____ against the Tendered Unit (the "**Tendered Unit**

**EXHIBIT A**

Exhibit 1

**Loan Advance**"), as more particularly set forth on Exhibit A of the Note. The initial principal amount of the Tendered Unit Loan Advance together with all accrued interest and other amounts due from Borrower to Lender under the Loan Documents in connection with the Tendered Unit or Tendered Unit Loan Advance is hereafter referred to as the "**Tendered Unit Indebtedness**." The legal description of the Tendered Unit is set forth in the Deed (as defined below).

## Agreement

Now, therefore, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Lender and Borrower agree as follows:

1.      Acknowledgments.   The parties hereto each affirm the foregoing Recitals and reincorporate them herein as covenants.

      a.      Borrower further acknowledges that:

        i.      This Agreement is entered into without force or duress and as an act of the free will of Lender and Borrower, and the transfers of the Tendered Unit and Personal Property (defined below) to Lender or its designee are voluntary and absolute conveyances given with all knowledge of the circumstances;

        ii.      The satisfaction of the Tendered Unit Indebtedness under the Loan Documents, as more particularly described below, constitutes good, adequate and valuable consideration for the conveyance of the Tendered Unit and Personal Property to Lender or its designee;

        iii.      Upon conveyance of the Tendered Unit and Personal Property to Lender or its designee, Borrower will have no rights with respect to the Tendered Unit or Personal Property, including, without limitation, rights of redemption, rights to cure or reinstatement under the Colorado Revised Statutes, as they may be amended from time to time, or under any other applicable law;

        iv.      Borrower will hereafter be estopped from asserting any claim or right of redemption as to the Tendered Unit or Personal Property; and

        v.      Upon conveyance of the Tendered Unit and Personal Property to Lender or its designee, Borrower has no equity in the Tendered Unit or Personal Property.

      b.      Lender further acknowledges that:

        i.      This Agreement is entered into without force or duress and as an act of the free will of Lender and Borrower, and the releases and satisfactions given to Borrower are voluntary and absolute releases and satisfactions given with all knowledge of the circumstances;

{00316124.DOCX / 1}

2

**EXHIBIT A**

Exhibit 1

ii.      The transfer of the Tendered Unit and Personal Property, as more particularly described below, constitutes good, adequate and valuable consideration for the releases and satisfactions granted to Borrower hereunder;

iii.      Upon conveyance of the Tendered Unit and Personal Property to Lender or its designee, Lender will have no rights with respect to the Tendered Unit Indebtedness except for any Remaining Loan Advance (as defined below); and

iv.      If the Tendered Unit and Personal Property are conveyed to Lender, Lender accepts the Tendered Unit and Personal Property "as is" and "where is" in its condition on the date of Closing subject only to the express provisions of this Agreement.

2.      Conveyance of Tendered Unit

a.      Conveyance to Lender.  If a Tendered Unit is conveyed to Lender, then on or before the Closing Date (as defined in Section 4 below), Borrower will execute and deliver to Lender a special warranty deed for the Tendered Unit in the form attached hereto as **Exhibit "A"** (the "**Deed**").  Upon delivery of the Deed for the Tendered Unit from Borrower to Lender, the Tendered Unit will be subject only to (A) those encumbrances and exceptions to title, if any, (i) listed in Schedule B attached to the Deed, (ii) listed in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with the Tendered Unit, or (iii) arising by, through or under Lender, and (B) the Deed of Trust (collectively, the "**Permitted Exceptions**").

b.      Conveyance to Lender's Designee.  If a Tendered Unit is conveyed to a designee (i.e., unrelated third-party) of Lender, the form of the deed shall be in form reasonably acceptable to Borrower, Lender, and Lender's designee but in no event shall Borrower be obligated to convey greater rights in a Tendered Unit to a designee of Lender than it would otherwise be required to convey to Lender pursuant to Section 2.a. above.

3.      Conveyance of Personal Property.  On or before the Closing Date, Borrower will execute and deliver to Lender or its designee a bill of sale in the form attached hereto as **Exhibit "B"** (the "**Bill of Sale**") or such other form as the parties may hereafter mutually agree, conveying all personal property owned by Borrower and used in connection with the ownership, development, maintenance and operation of the Tendered Unit ("**Personal Property**"), which is described with more detail in the Bill of Sale, free and clear of all liens and claims arising by, through or under Borrower.

4.      Closing Date. The "**Closing Date**" shall mean _____, 20__.  "**Closing**" shall be deemed to have occurred upon delivery of the Deed and Bill of Sale from Borrower to Lender or upon delivery of a deed and Bill of Sale to Lender's designee in form provided in Section 2.b. above.

5.      Real Property Taxes. Lender or its designee shall be solely responsible for payment of all real property taxes and assessments on the Tendered Unit for the year of closing and

subsequent years, provided any amounts for property taxes and assessments pre-paid by Lender to Borrower for the Tendered Unit for the year of Closing shall be credited to Lender at Closing.

6.      Closing Costs; Net Proceeds. Lender and/or its designee shall pay (i) any escrow agent's fee, (ii) any applicable transfer or recording taxes, (iii) any costs incurred in recording the Deed or any other instruments, (iv) any title insurance premiums, (v) any brokerage commissions, and (vii) any other costs customarily paid by a transferee of real property in Eagle County, Colorado. Any net proceeds resulting from a sale of a Tendered Unit to a third-party shall be paid to Lender at Closing. Each party shall pay their own attorneys' fees.

7.      Satisfaction of Loan Advance. Effective upon Closing and subject to Section 12 below: (i) the Tendered Unit Indebtedness shall be paid, satisfied, discharged and released in an amount equal to $_____ (the "Satisfaction Amount") (ii) the principal balance of the Note shall be reduced by the Satisfaction Amount, (iii) the Loan Documents shall be deemed to be amended by deleting all references to the Tendered Unit and/or Tendered Unit Loan Advance, and (v) all security interests, mortgages (including the Deed of Trust), guaranties (including the Guaranty), pledges and other liens granted to or held by Lender and any other secured parties under the security documents with respect only to the Tendered Unit and Tendered Unit Indebtedness shall be forever satisfied, released and discharged without further action by the parties. Any difference between the Satisfaction Amount and the Tendered Unit Indebtedness is hereinafter referred to as the "**Remaining Loan Advance**." Notwithstanding anything herein to the contrary, the Remaining Loan Advance shall continue to constitute Indebtedness under the Loan; provided, however, in no event shall interest (including default interest) accrue on the Remaining Loan Advance. The Remaining Loan Advance shall be deemed to have been paid, satisfied, discharged and released upon the earlier to occur of Borrower's conveyance of the final Collateral Unit to Lender or its designee or the date on which all other Loan Advances, excluding any Remaining Loan Advances, are satisfied in full or deemed satisfied in full. The provisions of this Section 7 shall survive Closing.

8.    Mutual Releases.

a.      Release of Lender. Effective upon Closing, subject to Section 12 below, Borrower, and its affiliates, general partners, limited partners, employees, managers, members, and other representatives and agents, hereby, unconditionally and forever discharge and release Lender, its affiliates, designees, general partners, limited partners, employees, attorneys, lenders, and other representatives from any and all claims and/or liabilities of every nature and kind, whether known or unknown, arising out of or related to the Tendered Unit and/or Tendered Unit Loan Advance, except for claims against Lender which may arise from a breach of this Agreement or the documents executed in connection herewith. Nothing in this release shall be meant to release the Lender from the obligations and rights stated in this Agreement. The provisions of this Section 8.a. shall survive Closing.

b.      Release of Borrower. Effective upon Closing, subject to Section 12 below, Lender, and its affiliates, general partners, limited partners, employees, managers, members, and other representatives and agents, hereby, unconditionally and forever

discharge and release Borrower, its affiliates, designees, general partners, limited partners, employees, attorneys, lenders, and other representatives from any and all claims and/or liabilities of every nature and kind, whether known or unknown, arising out of or related to the Tendered Unit and/or Tendered Unit Loan Advance, except for (i) the Remaining Loan Advance, if any, and (ii) claims against Borrower which may arise from a breach of this Agreement or the documents executed in connection herewith. Nothing in this release shall be meant to release the Borrower from the obligations and rights stated in this Agreement. The provisions of this Section 8.b. shall survive Closing.

9.      Representations and Warranties of Borrower.  Borrower hereby represents and warrants to Lender, as of the date hereof and Closing, as follows:

a.      Borrower owns good, marketable and fee simple title in the Tendered Unit and the Personal Property, free and clear of any and all liens, security interests, charges and encumbrances, except for the Permitted Exceptions;

b.      Borrower does not have any knowledge of any material physical, structural, mechanical or electrical defect affecting any of the Personal Property and/or the improvements attached to or made a part of the Tendered Unit;

c.      Borrower is not currently insolvent, and none of Borrower's property is subject to any bankruptcy proceedings, assignment for benefit of creditors or similar proceedings, nor has Borrower committed any act of bankruptcy;

d.      To the knowledge of Borrower and except as otherwise set forth in any reports delivered from Borrower to Lender, (i) there are no and have never been any Hazardous Materials (as that term is defined below) located, generated or stored in, on or under the Tendered Unit in violation of any Hazardous Materials laws, (ii) Borrower has received no notice of any violation or claim of violation of any law, rule, ordinance or regulation relating to any Hazardous Materials.  Borrower hereby warrants and represents that it has not taken any measures to remove, clean-up or abate any Hazardous Materials at the Tendered Unit.  As used in this subparagraph, the term **"Hazardous Materials"** shall include any substance, liquid or gas in any quantity or manner which violates any Hazardous Materials laws:

(1)      the presence of which requires investigation or remediation under any federal, state or local statute, regulation, ordinance, order, action, policy or common law; or

(2)      which is defined as a hazardous waste, hazardous substance, pollutant or contaminant under any federal, state or local statute, regulation, rule or ordinance, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act; or

(3)      which is toxic, explosive, corrosive, flammable, infectious, radioactive, mutenogenic, or otherwise hazardous or toxic and is regulated by any

**EXHIBIT A**                                               Exhibit 1

government or authority, agency, department, commission, board, agent or instrumentality of the United States, the state where the Tendered Unit is located, or any political subdivision thereof; or,

(4)     the presence of which in the Tendered Unit causes or threatens to a cause a nuisance upon the Tendered Unit or to adjacent properties, or which poses a hazard to the health or safety of personas on or about the Tendered Unit.  Without limiting the generality of the foregoing, the term "Hazardous Materials" shall include asbestos, gasoline, diesel fuel, petroleum hydrocarbons, polychlorinated biphenyls (PCBs), urea formaldehyde foam insulation and radon gas.

e.     Borrower has not incurred any obligations to any real estate broker or sales person or similar party for the payment of a commission, fee or similar charge in connection with the conveyance of the Tendered Unit and/or the Personal Property;

f.     There are no leases, subleases, tenancies, occupancy agreements or other agreements granted by Borrower to any party other than Lender for the possession or use of all or any portion of the Tendered Unit or the Personal Property ("**Leases**"), except those Leases attached hereto as **Exhibit "C"**.  At Closing, Borrower shall deliver to Lender or its designee any and all original Leases, and, if applicable, Borrower shall execute the Assignment and Assumption of Lease and Rents, in the form attached hereto as **Exhibit "D,"** conveying all of Borrower's right, title and interest in, to and under any Leases, including, without limitation any and all rents prepaid as of the Closing and security deposits held by Borrower in connection with the Leases (the "**Rent**").  At Closing, Borrower shall deliver the Rent to Lender or its designee (to the extent not previously delivered to Lender or its designee);

g.     Borrower warrants that there are no other deposits or prepaid rental arrangements with any tenants or occupants of the Tendered Unit to which Borrower is a party other than the Rent;

h.     To Borrower's knowledge and except as set forth in the Permitted Exceptions, there are neither special improvement assessments nor municipal assessments outstanding and owing against the Tendered Unit;

i.     Except for the Loan Documents, the Permitted Exceptions, and any agreements, commitments, guarantees, undertakings and arrangements, or privileges arising out of Borrower's membership in any homeowner's association governing the Tendered Unit, Borrower warrants that there are no warranties, service and maintenance contracts, agreements with respect to utilities, accounts receivable and other contracts, agreements, commitments, guarantees, undertakings and arrangements, and privileges to which Borrower is a party that are currently in effect with respect to the Tendered Unit, oral or written;

**EXHIBIT A**                                                          Exhibit 1

j.     There is no pending lawsuit or arbitration, or, to Borrower's knowledge, there is no threatened lawsuit or arbitration, which would relate to or affect the Tendered Unit, other than claims identified as Permitted Exceptions;

k.     Borrower has not taken, or permitted any person or entity under its control to take, any action which could result in any of the following:

(1)     Any lien for labor, equipment or materials against the Tendered Unit or the Personal Property which has not been paid; or

(2)     Any lien against, exception to, or claim against the title to the Tendered Unit or the Personal Property, except the Permitted Exceptions;

(3)     Any modification to zoning or other restrictions affecting the use of the Tendered Unit; or,

(4)     Any leases or other rights to occupy the Tendered Unit, except the Leases.

l.     The representations and warranties of Borrower in this <u>Section 9</u> shall survive the Closing for a period of one (1) year.

10.     <u>Representations and Warranties of Lender</u>. Lender hereby represents and warrants to Borrower, as of the date hereof and Closing, as follows:

a.     Lender has full power and authority, and has been duly authorized, to consummate the transaction contemplated herein; and the transaction contemplated herein does not conflict with, result in a violation of, or constitute a default under any agreement or instrument binding upon Lender or any law, governmental regulation, court decree, or order applicable to Lender.

b.     Lender is not currently insolvent, and none of Lender's property is subject to any bankruptcy proceedings, assignment for benefit of creditors or similar proceedings, nor has Lender committed any act of bankruptcy;

c.     Lender has not incurred any obligations to any real estate broker or sales person or similar party for the payment of a commission, fee or similar charge in connection with the conveyance of the Tendered Unit and/or the Personal Property;

d.     Lender is the sole owner of all of the claims, rights, counts, causes of action, obligations, debts, and demands which are intended to be released or deemed satisfied by Lender pursuant to this Agreement, and no other persons or entities have any interest, by assignment or otherwise, in any of the claims, rights, counts, causes of action, obligations, debts, and demands referred to herein;

**EXHIBIT A**                                    Exhibit 1

e.     The conveyance of the Tendered Unit from Borrower to Lender is exempt from the Town of Vail Real Estate Transfer Tax, and the Lender has received from the Town of Vail a duly executed exemption therefrom; and

f.     The representations and warranties of Lender in this Section 10 shall survive the Closing for a period of one (1) year.

11.     Indemnification.

a.     Indemnification of Lender. Borrower shall indemnify, defend, and hold harmless Lender, its officers, managers, directors, governors, employees, shareholders, members, affiliates, partners, agents, successors, assigns, professionals, and each of them, from and against and in respect of any and all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries, and deficiencies, including reasonable attorneys' fees, interest and penalties, which Lender actually incurs or suffers arising out of the breach of any representation or warranty or breach of any covenant of Borrower in this Agreement. Subject to Section 9.l., the provisions of this Section 11.a. shall survive Closing.

b.     Indemnification of Borrower. Lender shall indemnify, defend and hold harmless Borrower, its officers, managers, directors, governors, employees, shareholders, members, affiliates, partners, agents, successors, assigns, professionals, and each of them, from and against and in respect of any and all claims, damages, losses, costs, expenses, obligations, liabilities, damages, recoveries, and deficiencies including reasonable attorneys' fees, interest and penalties, which Borrower actually incurs or suffers arising out of (i) the breach of any representation or warranty or breach of covenant of Lender in this Agreement, or (ii) the conveyance of the Tendered Unit and/or Personal Property to any person or entity other than Lender. Subject to Section 10.f., the provisions of this Section 11.b. shall survive Closing.

12.     Operating Payment Agreement. Notwithstanding anything to the contrary set forth herein, this Agreement shall not be construed to release Borrower or Lender from their rights and obligations under the Operating Payment Agreement, including, but not limited to, any obligation of Borrower to make the Operating Payments to Lender.

13.     Additional Information. Borrower affirms its continued obligation to provide to Lender the information required by Section 14(ii) of the Loan Agreement.

14.     Construction of Agreement. Time is of the essence in the performance of this Agreement. This Agreement represents the entire and complete agreement between the parties. The Agreement shall not be amended or modified, except by an instrument in writing, signed by all parties. All terms and provisions hereof shall inure to the benefit of, and being binding upon Lender, Borrower, and their respective successors and assigns. Wherever used in this Agreement, the singular shall include the plural, and the masculine shall include the feminine and neuter grammatical forms. Captions are included for convenient reference only, and shall not be construed to alter or affect any terms or provisions of this Agreement. This Agreement has been

executed by the parties after discussions and negotiation, and shall be construed as having been drafted by both parties. If any term of this Agreement is held to be invalid or unenforceable, such term shall be construed as being valid and enforceable to the fullest extent permitted by law, and all remaining terms shall remain full force and effect. This Agreement shall be construed and enforced in accordance with the laws of the State of Colorado. Each party hereto waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or any related document.

15. **Legal Expenses.** If Borrower or Lender initiates any action to enforce or interpret this Agreement, the party determined by the court or arbiter, as the case may be, to be the prevailing party in such action will be entitled to receive from the non-prevailing party all reasonable costs and expenses, including all reasonable attorneys' fees incurred by the prevailing party in such action.

16. **Legal Counsel.** All parties hereto have been represented by competent legal counsel who has explained the legal significance of this Agreement to their respective clients, or they have had ample opportunity to consult with legal counsel.

17. **Survival of Agreement.** Unless otherwise expressly herein stated to survive, the terms, covenants and conditions of this Agreement shall not survive the delivery of the Deed and the Bill of Sale from Borrower to Lender or its designee, and shall be merged into the Deed for the conveyance of the Tendered Unit and the Bill of Sale for the conveyance of the Personal Property.

18. **Rights to Equitable and Legal Relief.** Notwithstanding any other provision contained herein or in any document executed in connection with this Agreement, and in addition to the other remedies set for the in the Loan Documents, this Agreement and the documents executed in connection with this Agreement, each party shall have the right to seek all remedies available at law or in equity in the event of the other party's default or breach hereunder. Without limiting the generality of the foregoing, the non-defaulting or non-breaching party shall be entitled to seek all or any of the following remedies in the event of a default or breach by the other party hereunder: (a) specific performance; and/or (b) injunctive relief; and/or (c) seek the recovery from the other party, on a joint and several basis, all damages, costs, fees (including, without limitation, reasonable attorney fees), losses, and expenses associated with or caused by the breach or default. Notwithstanding the foregoing, in no event shall any party hereto be liable for special, incidental, indirect, exemplary, consequential or punitive damages arising under or in connection with this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Borrower and Lender have executed this Transfer Agreement as of the date first above set forth.

BORROWER:

SOLARIS PROPERTY OWNER I, LLC,
a Delaware limited liability company

By: _____
Name: _____
Its: _____

LENDER:

COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP,
a Colorado limited liability limited partnership

By: _____
Name: _____
Its: _____

**EXHIBIT A**                                            Exhibit 1

# EXHIBIT A

## FORM OF DEED

(Attached)

**EXHIBIT B**

**FORM OF BILL OF SALE**

(Attached)

12

**EXHIBIT A**                                                    Exhibit 1

# EXHIBIT C

## LEASES

(Attached)

**EXHIBIT A**

Exhibit 1

# EXHIBIT B

## FORM OF LISTING AGREEMENT

(Attached)