# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02443

Jun Li, Qi Qin, Yi Liu, Jie Yang, Yuquan Ni, Li Fang,
Zhongzao Shi, Fang Sheng, Shunli Shao, Kaiyuan Wu,
Zhijian Wu, Zhongwei Li, and Yuwei Dong,
    Plaintiffs,

     v.             Hon. Magistrate Scott Varholak

Colorado Regional Center Project Solaris LLLP,
Colorado Regional Center I, LLC,
Solaris Property Owner LLC, and
Peter Knobel,
    Defendants.

## Plaintiffs' Response to Petition to Show Cause,

## and Demand for Fees Under C.R.S. §38-35-204(3)

### Introduction

A central issue in this lawsuit is which party should hold title to condominium units in Vail, Colorado.

In one corner, the current titleholder is Solaris Property Owner I ("SPO").

In the other corner, Colorado Regional Center Project Solaris LLLP (the "LP") has multiple contracts with SPO which require that title be transferred from SPO to the LP.

SPO - the current titleholder - acknowledges that LP has the ultimate right to title. And the LP also acknowledges that it has the right to take title from SPO. However, the parties refuse to make the transfer. Therefore the limited partners of LP have sought derivatively to compel the LP to enforce the contracts requiring SPO to transfer title.

In summary, this Court is faced with a classic dispute over title to real estate. In such cases, a lis pendens is justified so that the Court can sort out the proper titleholder, make sure the transfer of title is accomplished, clear the chain of title, and allow the property to be sold free and clear to future purchasers. As discussed later, Colorado Courts give an "expansive interpretation" to the permissibility of lis pendens filings, approving a notice of lis pendens in any action that might remotely affect title, use, enjoyment, or possession of real estate. *Kerns v. Kerns*, 53 P.3d 1157, 1163 (Colo. 2002). Colorado courts have allowed lis pendens in cases that aren't even strict title disputes - such as probate matters, restrictive covenants, and constructive trusts. Here, there is a direct dispute over title -- precisely within the narrow definition of a permissible lis pendens, not even having to rely on Colorado's "expansive interpretation" of permissible lis pendens documents.

In response to the Notice of Lis Pendens, the Defendants filed a Petition to Show Cause under §38-35-204 which allows a Court to block a "spurious document," defined in §38-35-201(3) as a document that is "forged, groundless, contains a material misstatement or false claim, or is otherwise patently invalid." Courts have generally limited the category of "spurious documents" to outright frauds, revenge filings, wild deeds, and other clearly groundless documents. In fact, the entire Colorado statutory scheme for spurious liens and documents was enacted to combat the "very serious problem" of "groups who are disgruntled with the present American system of government" filing "phony documents and liens against public officials' property. " *Tuscany, LLC v. Western States Excavating Pipe & Boring*, 128 P.3d 274, 278 (Colo. App. 2005). That is the exact opposite of the situation here, which is a purely private dispute based on negotiated business documents in which the Defendants admit that title belongs with the LP.

The hearing required under §38-35-204 is not a trial on the merits of the case nor the sufficiency of the Complaint. The Court must only decide whether the Lis Pendens was a "spurious document." If not, Plaintiffs' counsel will be awarded statutory fees under §38-35-204(3).

## Relevant Facts

The background facts are fairly well set out in the Petition to Show Cause. The case arises from an $82.5 million loan from the LP to SPO, whose principal is Defendant Peter Knobel ("SPO")[1] SPO and Knobel were building 79 condominiums and a complex called Solaris Village in Vail, Colorado when they sought funding from the LP.

Even though Knobel and SPO were building a huge complex of commercial, entertainment, parking, and 79 residential units, the $82.5 million loan was secured only by mortgages on 19 condominium units (the "Property"). So the lending party was the LP, the borrower was SPO, and the collateral was 19 condominium units which were not the cream of the crop (hereafter, the "Loan"). The money in the LP came from 165 limited partners who were foreign, mostly Chinese, who each invested $500,000 for a limited partnership unit.

This was not structured as a normal loan where the borrower has to pay back the principal and interest, or else the lender will take the collateral and sue the borrower for the deficiency. As described in the Complaint, the loan was "non-recourse," thereby limiting the lender to recovery only against the collateral itself. In a "non-recourse" loan, the debt is

---

[1] The current titleholder is SPO I LLC but the loan documents allow the properties to be moved among successor and affiliated SPO companies, so Plaintiffs will use the generic term "SPO" to encompass the original borrower SPO, its successor SPO I, and any other SPO entities, until such time as Plaintiffs can unravel why there are so many iterations of this entity.

3

usually overcollateralized to protect the lender, yet in this case the loan was woefully undercollateralized, and in a shocking arrangement, the borrower got to decide on the location of the units to be used as collateral, forcing some of the worst-positioned units into the collateral pool. Worse, the loan documents contained non-standard and frankly bizarre provisions that would never appear in an arms-length standard commercial loan. Of particular note, the loan documents gave the borrower (SPO) a choice between paying back each installment of the $82.5 million *after five years*, or alternatively, it could 'repay' the Loan by transferring title to each unit *after three years* even if the unit's value was a fraction of the Loan advance that it secured. For example, a unit tied to a cash advance of $4 million could be fully repaid three years later by transferring title to a unit that could only be sold for $2 million. This was the most sweetheart deal in the history of commercial real estate lending, which is why Plaintiffs think it was fraudulent.

Naturally, SPO refused to pay back the loan in cash, instead choosing to turn over title to all the units at the three-year mark of each loan advance. As the Defendants explain in their Petition to Show Cause: "Consistent with the terms of the loan agreement, SPO I delivered notice of its intention to exercise the right to collateral transfer with respect to each condominium unit to [the LP] in lieu of cash payment after three years following each loan advance."  See Petition at para. 7.

The final loan advance was January 2015, which means that SPO should have transferred title to all the units by three years later, January of 2018.  Indeed, failure to do so would be a breach of the loan agreements, giving the LP the contractual right to enforce transfer of title.

Here is where things start to get weird, and we have to turn to facts that the Petition to Show Cause somehow omits to mention.

The Defendants have been engaged in an ongoing fraudulent smokescreen to perpetuate the misrepresentation that transfer of title has already occurred. For example, in an email from Colorado Regional Center I, the GP of the LP, the daughter of Rick Hayes (affiant in the Petition to Show Cause) tells a Plaintiff that 16 units had been transferred to the LP in 2012 and 2013:

> Friday, April 26, 2013
> From: Meagan C. Hayes
> To: Jinge Hu
> Hi, Jinge Hu,
> Please see the list below of condominium units that have been transferred from SPO to CRCPS, LLLP [the LP]. To date, 16/18 of the units have been transferred.
> The units that were transferred from SPO to CRCPS, LLLP in 2012 were: Unit 6E West, Unit 2A South, Unit Pent E West, Unit 6E East, Unit Pent E East, Unit 5E West, Unit 4G West, Unit 7E West, Pent C East, Unit 6D East, Unit 5C West, Unit 6C West.
> Units transferred from SPO to CRCPS, LLLP in 2013 thus far: Unit 5G West, Unit 3E East, Unit 7E East, Unit 4D East.
> If you have any further questions, please let me know. Thanks & best regards, Meagan

See Exhibit 1 attached hereto. In an earlier email from 2013, the same agent said that transfer of title is simply a matter of time and that the LP will assuredly hold title to the Property:

> With respect to CRCPS the facts are clear that CRCPS has all the benefits and burdens of ownership of the real estate and that the **ultimate transfer of title is simply a matter of time. In all cases, CRCPS will end up with the real property** and some repayment in cash.

See Exhibit 2 attached hereto (emphasis added).

5

The lie continued and continued.  In a June 2017 notice to investors, the Defendants said "Accordingly, we are working with the developer to transfer title to the Partnership on the Units which Loan Advances have reached or surpassed the 3-year anniversary mark." See Exhibit 3 attached hereto.

For the last three years, the Defendants have sent six-month notices to all investors listing the condominium units individually and saying they are "**Partnership Property**." The most recent notice dated May 30, 2019 again listed each of the units as "Partnership Property," and in the definition section in the back of the notice said that the units was merely being 'held' by the developer.  See Exhibit 4 attached hereto.  Nothing would put any investor on notice that title had remained with SPO and had never been transferred as required under the loan documents.   In other words, there was a concerted effort to fool investors that title had already been transferred to the LP as the rightful owner.

The truth emerged only after this lawsuit was filed.  Plaintiffs' lawyer dug through Eagle County records and discovered that the units had never been transferred.  In reality, the LP had zero titles in its name.

This was a horrendous breach of fiduciary duty by the GP.  It was sheer folly to let title sit with a former borrower who couldn't pay back the $82.5 million it borrowed and who offered collateral worth half its estimated value.  Even worse, if title remained with SPO, the property was vulnerable to SPO's creditors, vulnerable to a bankruptcy, vulnerable to a super-priority lender, vulnerable to an action by the State, vulnerable to a transfer to a good faith purchaser, and vulnerable to affiliates, partners, ex-wives, and anyone that wanted to

take a shot at SPO or Mr. Knobel. The Plaintiffs retained counsel to derivatively get the LP to collect the assets that rightfully belong to it.

C.R.S. §7-62-1001 says that a limited partner may sue derivatively on behalf of a limited partnership if it makes a request for the partnership to bring a suit or collect on a judgment. By letter dated July 1, 2019, Plaintiffs made a demand that the LP declare a formal default, take the collateral, foreclose on the units, transfer the title, sell the units, and explore every avenue to sue for the deficiency. They refused. And so the Plaintiffs brought this action, part of which asserts their derivative right to have the property titles transferred to the LP where they belong. After the Defendants failed to respond to the lawsuit by transferring title to the rightful owner, the Plaintiffs filed the Lis Pendens derivatively.[2] See Exhibit 5 for the Notice of Lis Pendens as recorded in Eagle County, saying that it is a derivative action on behalf of the LP.

If the facts ended there, the story would be weird enough. But it gets weirder.

The Lis Pendens caused the Defendants to cough up a secret document called "Agreement Regarding Collateral Units," dated April 17, 2015, between the LP and SPO (hereafter, the "Secret Agreement"). The Secret Agreement is attached to the Petition to Show Cause, after the Affidavit of Rick Hayes. Plaintiffs call this a "Secret Agreement" because it was not shown to the limited partners even though it tramples on their rights, nor were they asked to approve it, nor was it shown to counsel until after the Lis Pendens was filed. Initially, the Secret Agreement merely repeats that SPO will cause a "Collateral Unit

---

[2] Colorado Law recognizes the right of limited partners to derivatively assert that a general partner has harmed the partnership by making irresponsible decisions regarding real estate. See, e.g., *Day v. Stascavage*, 251 P.3d 1225 (Colo. App. 2010)(Derivative actions protect the entity itself from "malfeasance of 'faithless directors and managers'")(citations omitted).

7

Distribution" of all the 19 units, meaning that SPO will "tender any Collateral Unit to Lender in repayment." This merely affirmed what we already knew.

But then the Secret Agreement contradicts its claim that SPO will tender the units to the LP in repayment, instead saying that "Borrower (SPO) has agreed to **temporarily refrain from conveying title."** (emphasis added). That was 4.5 years ago. For that language to still be active in October of 2019, the "temporary" period would have to stretch from 2015 to 2019 and then into perpetuity, making a mockery of the term "temporarily."

Further, the Secret Agreement had all sorts of ill-advised provisions that the parties obviously wanted to hide, for example that SPO (who had just defaulted on paying back the money) would have the exclusive right to be the real estate agent to collect half of the commissions for sales of the units, that the units were not allowed to be listed on the MLS, and that the LP would apparently forgive interest payments due from SPO. This is a bizarre, non-standard agreement that the parties had good reason to hide. But the main point is that it only vested SPO with "temporarily refraining" from transferring title to the LP, recognizing that the LP is the rightful titleholder. As of today - 4.5 years after the Secret Agreement -- the Loan is over. There is no logic in saying that a "temporary" arrangement outlasts the Loan itself and continues forever. The LP has the right to declare the temporary period over and have the title put in its name.

## Argument

### I. This is a Classic Case for Lis Pendens and There are No Spurious Documents

C.R.S. §38-35-110 allows the recording of a notice of lis pendens. The purpose is to give notice to potential purchasers of real estate that there is litigation where "relief is claimed affecting title to real property." The statutory term "affecting title to real property"

8

must be "expansively interpreted" to cover any dispute over the use, enjoyment, title, or possession of real estate. *Pierce v. Francis*, 194 P.3d 505, 509 (Colo. App. 2008)(Court allowed notice of lis pendens incidental to a probate dispute); *Kerns v. Kerns*, 53 P.3d 1157, 1163 (Colo. 2002)(Colorado Supreme Court allowed notice of lis pendens in an action for constructive trust on grounds that the ruling on constructive trust might ultimately affect legal title to real property); *Hammersley v. Dist. Ct. Routt Cty.*, 610 P.2d 94, 96 (Colo. 1980)(Colorado Supreme Court allowed notice of lis pendens in a dispute over restrictive covenants in a subdivision on grounds that the statute must be expansively interpreted to cover any dispute affecting land). The case at bar fits within the narrowest possible literal reading of the statute as a dispute "affecting title," and that means that it *unquestionably* fits within the expansive interpretation of the lis pendens statute in Colorado.

The Notice of Lis Pendens is not a "spurious document" under §38-35-201(3). The term "spurious document" means forgeries, groundless claims, material misstatements of law, and false claims. A good example would be a situation where a tax protestor claims a lien against government property, or a person gives a deed to land that he doesn't own, or someone fails to make a down payment for land and then prevents future sales by filing a lis pendens. See *GMAC Mort. Corp. v. PWI Group*, 155 P.3d 556 (Colo. App 2006)(striking a 'wild deed' given by a non-owner as a spurious document); *Westar Holdings P'ship v. Reece*, 991 P.2d 328 (Colo. App. 1999)(striking lis pendens filed by putative purchaser who failed to make the required down payment). Here, the Plaintiffs' claim is based on written documents signed by the Defendants themselves saying that the rightful owner of the title is not themselves but the LP, and misrepresenting to investors that they have already transferred

9

the title to the LP as rightful owner. The Plaintiff's argument is highly rational and well-grounded, the precise opposite of a "spurious document."

### II. The Plaintiffs do NOT Claim a Right to Title of Partnership Property, and do not Claim Purely Monetary Damages

The Defendants' Petition wrongly mischaracterizes the Lis Pendens as an assertion of a right to partnership property. Nonsense. The Plaintiffs do not - repeat, do not - assert a right to partnership property. They understand that their only right as limited partners is to an inchoate partnership interest and not to specific partnership property. Plaintiffs know that "a partnership interest is personal property," C.R.S. §7-62-701, and they are only asserting a derivative right of the limited partnership itself, not asserting their own rights to the title of the units. As holders of limited partnership interests, they have a keen interest in ensuring that the limited partnership takes control of all assets to which it has a right, including real property which should be in its name. The Plaintiffs seek to have title put in the name of the limited partnership, not into their own names. The Lis Pendens clearly states all of this.

Defendants wrongfully analogize this case to *Central Allied Profit-Sharing Trust v. Bailey*, 759 P.2d 849 (Colo. App. 1988) where the very first sentence says that the lis pendens was filed "against the partnership's property." Here, the lis pendens was NOT filed against partnership property: it was filed against property where title is held by a third party. So the facts and the claims are totally different. In *Central Allied*, the limited partners filed a *lien* against the property of the limited partnership itself, but in this case Plaintiffs do not assert a lien against anybody or anything: a notice of lis pendens is not a "lien," *Pierce v. Francis*,

10

194 P.3d 505 (Colo. App. 2008)(holding that a notice of lis pendens is not a "lien" so it cannot be a "spurious lien"). Further, *Central Allied* was not a derivative claim to *help* the partnership by having it *gain* assets, it was a suit *against* the partnership hoping that the partnership would *lose* assets.  That was a case where limited partners were fighting **against** the limited partnership; this is a case where the limited partners are fighting **for** the limited partnership. The facts in *Central Allied* are not "strikingly similar" as Defendants claim, but strikingly different. Even worse, *Central Allied* has been rejected by a court in another state as inapplicable when dealing with a derivative claim that sought transfer title from one party to another, as in this case.  *Bock v. Slater*, 241 P.3d 668, 672 (Okla. App. 2010)(*Central Allied* "affirmed the striking of a lis pendens notice because the plaintiff's underlying lawsuit, if successful, would not affect the title to certain partnership property").   Here, Plaintiffs are seeking a transfer of title in favor of the LP.

Defendants also wrongfully analogize this case to a pure claim for money damages, in which case a lis pendens would be inappropriate. Again, this is wrong.   The Plaintiffs assert a *mixed* claim -- they ask for money damages from all Defendants **as well as** a transfer of title of the condominium units from SPO to the LP.  This is expressly countenanced by F.R.C.P. 18 "Joinder of Claims" which allows a party to assert as many claims as it has against an opposing party, even if some claims sound in law and others in equity.

Here, the Plaintiffs have counts for monetary damages, but obviously they discovered that the LP has no property to monetize in large part due to its failure to take title to real estate.   Therefore, the first task of the Plaintiffs is to have the LP claim title to property it rightfully owns. That is separate from the claims for securities violation and breach of

11

fiduciary duty.  The fact that Plaintiffs seek multiple remedies is not fatal, but is expressly allowed by the federal rules, and is quite common.

### III. The Secret Agreement is No Obstacle to Title Transfer

Obviously, the Defendants are ashamed of their Secret Agreement.  They ought to be.  No lender should ever let a borrower default on paying back his loan and let the borrower put up deficient collateral, then let that borrower keep title to the collateral, where it can be exposed to the borrower's creditors, and then - to make it crazier - pay the borrower to act as the real estate agent to sell the collateral while it is kept off the market.  But those claims of negligence and fiduciary breaches can wait until later.  The question right now is whether the Secret Agreement is a barrier to transfer of the title to the LP.  And the answer is No -- it is not a barrier.

The there is nothing in the Secret Agreement or anywhere else that prevents the LP from declaring that the "temporary" period for SPO to hold title is over and that title should be transferred immediately.  SPO was authorized to "**temporarily** refrain" from transferring the units, and that was 4.5 years ago.  The LP has the contractual right to declare the "temporary" period over and to take rightful title to the units.  If SPO still wants to cover the LP's expenses of being a title holder, they can do that by writing a check.  Whatever games these parties are playing with each other behind the backs of the investors (and we will find out soon enough), the title belongs with the LP and that is where it should be transferred.

The Defendants rationalize the continuance of the Secret Agreement with the flimsy excuse that secretly allowing SPO to continue holding title is some kind of beneficial

arrangement for the LP by avoiding transfer taxes, homeowners association dues, and working capital payments that fall on the titleholder, and which the LP would have to pay if it took title.  See Affidavit of Rick Hayes, at para. 18.  This is nonsense.  The exact same economic effect could be achieved by SPO transferring title to the LP as required under the loan documents and simply having SPO write a check to cover these costs, if they are covering them anyway.   Further, letting SPO hold title exposes the property to all of SPO's creditors. And this begs the question of why the LP has any further business dealings whatsoever with SPO.   They defaulted on paying the principal and interest on the loan; they gave collateral that is worth half of what they estimated it to be worth; they left the LP with properties that it cannot sell.  They took $82.5 million from the LP and left it face down in the dirt: why would the LP have anything more to do with a party like that?  SPO was supposed to transfer title after three years, period, end of story.  The LP is under a duty to safeguard partnership property, and toward this end it must enforce its right to hold title to real estate of which it is the rightful titleholder.

## IV.     The Lis Pendens Count in the Complaint is Not the Issue Before this Court

The Petition to Show Cause is **not** a motion to dismiss under F.R.C.P. Rule 12(b)(6). The issue before this Court is **not** the sufficiency of the Count for Lis Pendens in the Complaint.  The only issue before this Court is whether the Lis Pendens is a "spurious document," which it certainly isn't.

But for the record, Plaintiffs' counsel knows that a Notice of Lis Pendens has serious implications, so he did everything possible to avoid filing it and to cushion the blow.

13

First, he gave a verbal warning to the limited partnership. He told the registered agent and corporate attorney (Mr. Roger Hauptman) that he did not see any reason for SPO to still hold title to the units after they defaulted on paying the principal of the Loan and were required to turn over title to the Property. Attorney Litowitz said that would give the LP a window to take rightful title from SPO. They didn't take action. He submitted a derivative claim. They didn't take action.

To further comfort opposing counsel, attorney Litowitz put a very lightly drafted Count in the Complaint for Lis Pendens in the hopes that Defendants' counsel would instinctively do the right thing and transfer title without Litowitz having to make a big deal about it in the Complaint. Just as no good deed goes unpunished, Defendants' counsel responded by attacking the Complaint instead of realizing that every loan document and every statement by their clients admitted that title belongs with the LP, and that transfer was the right thing to do. Obviously, they are not going to do the right thing until this Court forces them to do it. If the Defendants want to play hardball, then Litowitz will forego all courtesy next time and bring down the hammer with a long and brutal Count for Lis Pendens and sanctions, but that is not the issue here. We are here to decide only if the Lis Pendens is a spurious document. It isn't.

### V.   Demand for Fees under C.R.S. §38-35-204(3)

The controlling statute says that after a hearing is held on this matter, a Court can award fees and costs if it finds that the document filed was not spurious:

> If, following the hearing on the order to show cause, the court determines that the lien or document is not a spurious lien or spurious document, the court shall issue an order so finding and enter a monetary judgment in the amount of any respondent's

> costs, including reasonable attorney fees, against any petitioner and in favor of the respondent.

Plaintiff's counsel hereby demands attorney fees and costs if this Court finds the Notice of Lis Pendens to be non-spurious.  This is not a case of forgery, fraud, wild deeds, angry purchasers, or tax protestors.  This is a bona-fide dispute over title to real estate.  The Defendants have no business to characterize the Lis Pendens as "spurious" after they signed documents admitting that the LP was the rightful titleholder and even characterized the units as property of the LP.

This is a classic case for lis pendens and therefore it cannot be a spurious filing.  The Court should hear this matter and award fees and costs to Plaintiffs' counsel.

Dated: September 29, 2019

Respectfully Submitted,

/s/ Douglas Litowitz
413 Locust Place
Deerfield, IL 60015
312-622-2848
Litowitz@gmail.com

### Certificate of Service

I have this day filed the foregoing document and exhibits by filing the same with the ECF system and by sending them by email to opposing and interested counsel:
James Kilroy: jkilroy@swlaw.com
Ty Gee: tgee@hmflaw.com
Hubert Kuo: hkuo@ardentlawgroup.com