


EXHIBIT 1 1 of 2

Jinge Hu <huchinko@gmail.com>

## Units Transferred from SPO to CRCPS
1 message

**Meagan C. Hayes** <mhayes@coloradoregionalcenter.com>  Fri, Apr 26, 2013 at 10:08 AM
To: Jinge Hu <huchinko@gmail.com>
Cc: Quincy Zhao <quincyzhao@yahoo.com>, Yao Vivian Jiang <yjiang@visa-law-usa.com>, "jwillard@willardandkurek.com" <jwillard@willardandkurek.com>, Rick Hayes <rhayes@wavelandventures.com>, Paul Deslongchamps <pauld@wavelandventures.com>

Hi Jinge Hu,

Please see list below of condominium units that have been transferred from SPO to CRCPS, LLLP. To date, 16/18 of the units have been transferred.

**The units that were transferred from SPO to CRCPS, LLLP in 2012 were:**

1. Unit 6E West
2. Unit 2A South
3. Unit Pent E West
4. Unit 6E East
5. Unit Pent E East
6. Unit 5E West
7. Unit 4G West
8. Unit 7E West
9. Pent C East
10. Unit 6D East
11. Unit 5C West
12. Unit 6C West

**Units transferred from SPO to CRCPS, LLLP in 2013 thus far:**

13. Unit 5G West
14. Unit 3E East
15. Unit 7E East
16. Unit 4DEast

If you have any further questions please let me know.

**EXHIBIT 1**
2 of 2

Thanks & best regards,

Meagan

**From:** Jinge Hu [mailto:huchinko@gmail.com]
**Sent:** Wednesday, April 17, 2013 10:11 PM
**To:** Meagan C. Hayes
**Cc:** Quincy Zhao; Yao Vivian Jiang; jwillard@willardandkurek.com
**Subject:** Re: Fw: Net rental loss in K-1

Hi, Meagan,

Thank you for forwarding such detailed response in regards of our concerns on K-1. Upon consulting with my accountant, we still have concerns on the K-1 of 2012 and feel we need to further discuss it. Please see and forward following questions and requests:

1\ Our major concern is that the preferred interest payment appeared on the K-1 only shown as withdrawal but not as "income" in anywhere. The subscription agreement specified that there will be no distribution or withdrawal in order to secure the legal procedure of limited partners' green cards.

We would like to understand why the preferred interests payment to limited partner was treated as distributions in K-1. The interest payment was recorded in Part II and section L 'Partner's capital account analysis' as Withdrawals&distributions. **The USCIS may consider it as withdrawal of the capital contribution based on the K-1, which ultimately will seriously jeopardize the removal of the condition on the green card of all the limited partners. We strongly suggest the accountants who prepared the K-1 review the subscription agreement, and make proper amendments on the K-1;**

2\ As a limited partner, I request the copy of annual financial report of 2012;

3\ I request the information on condo units transfered from SPO to CRCPS during or before 2012(the list of condo units transfered and now owned by CRCPS, if any) ;

We are looking forward to review the requested information and to resolve the above mentioned concerns.

Thank you.

Best regards.

 

EXHIBIT 2 1 of 2

Jinge Hu <huchinko@gmail.com>

# Fw: Net rental loss in K-1

11 messages

**Quincy Zhao** <quincyzhao@yahoo.com>         Wed, Apr 3, 2013 at 8:13 PM
Reply-To: Quincy Zhao <quincyzhao@yahoo.com>
To: Yao Vivian Jiang <yjiang@visa-law-usa.com>, Jinge Hu <huchinko@gmail.com>

Hi, Jinge and Vivian,

Here is Meagan's reply to my question and concern on K-1. I don't have time to digest it yet. Please review and we can discuss later.

Quincy

----- Forwarded Message -----
**From:** Meagan C. Hayes <mhayes@coloradoregionalcenter.com>
**To:** Quincy Zhao <quincyzhao@yahoo.com>
**Cc:** Chet Schwartz <cschwartz@wavelandventures.com>; Rick Hayes <rhayes@wavelandventures.com>
**Sent:** Wednesday, April 3, 2013 11:15 AM
**Subject:** RE: Net rental loss in K-1

Hi Quincy,

We have received a detailed explanation from our accountants regarding (1) the loss reflected on the K-1 and (2) why the interest distribution was deducted from the principal capital amount.

The loss reflected on the K-1 was in part because the operating performance of the real estate is heavily affected by the ski season in Colorado which runs from December through April. Our rental income is heavily skewed towards the months of January, February, and March. Given this was our first year of operation, that income was not included in 2012 operating results. Also, because we bifurcated the amounts loans to SPO between notes receivable and condominium units, this resulted in substantially less interest income and a large depreciation deduction, which caused the rental real estate loss shown on the K-1's.

For income tax purposes we have bifurcated the payments from CRCPS to Solaris Property Owner, LLC into two parts; 1) a loan which is being repaid over time and 2) an acquisition of the Solaris units.

Tax law is clear that the holding of title, although a factor in determining ownership for tax purposes, is not the only or controlling factor. Rather, for tax purposes, we look at all the facts and circumstances to determine who is the owner of the property. With respect to CRCPS the facts are clear that CRCPS has all the benefits and burdens of ownership of the real estate and that the ultimate transfer of title is simply a matter of time. In all cases, CRCPS will end up with the real property and some repayment in cash. Therefore payments made from CRCPS have been split into the two parts. To the extent CRCPS will receive payments in cash back, we have recorded a note receivable. The principal balance of the note is determined by computing the net present value of the payments to be received discounted at 1.15%. The 1.15% is the mid-term applicable federal rate published by the IRS. The balance of the payment that will not be received back in cash has been treated as a purchase of the real property.

EXHIBIT 2

2 of 2

The net result of this treatment should be favorable to the investors of CRCPS. First it will r[educe the] amount of interest income that they will have to report with the respect to the cash payment[s. In] addition, CRCPS will record a rental property that, when sold, could result in the gain being taxed at long term capital gain rates. This assumes that CRCPS does not become a dealer in real property at the time of sale.

During the time that CRCPS holds the property and rents the property out, they will shelter rental income with expenses including depreciation. Any net loss will likely be treated as a passive loss for the investors and thus will carry over to shelter future gains from sales of the properties.

Interest income which is earned by CRCPS is allocated to each LP pursuant to the terms of its operating agreement, as are all other items of income and loss incurred by the entity. These items are reflected in Part III of the K-1's, titled "Partner's Share of Current Year Income, Deductions, Credits, and Other Items" and represent the partnership items allocated to the LP's which should be considered when the LP's prepare their US tax returns. The cash payments made by CRCPS to the LP's represent a preferred return on their capital contributions and is treated as a distribution for US tax purposes. These payments are reflected in Part L of the K-1's titled "Partner's capital account analysis". Distributions from the partnership to the LP's are generally not taxable to the LP's.

In theory, when the condominium units are sold for a gain, the gain will be allocated to the LP's in a manner similar to historic allocations of partnership income and loss and payments of cash distributions, thus restoring their capital balances. The cash received upon sale of the units will be distributed to the LP's in accordance with the terms of the operating agreement. In essence, the LP's are receiving a current return on their capital contribution with no corresponding taxable income allocation. The taxable income allocation will come when CRCPS sells the units (or incurs a profit from rental activities). As soon as the LP's have received distributions equal to their preferred returns, future distributions will constitute a return of capital and then a share of excess cash available for distribution.

I hope that this clarifies your investors questions. Please let me know if you have any further questions.

Thanks and best regards,

Meagan

---

**From:** Quincy Zhao [mailto:quincyzhao@yahoo.com]
**Sent:** Tuesday, April 02, 2013 2:09 PM
**To:** Meagan C. Hayes
**Cc:** Chet Schwartz; Rick Hayes; Quincy Zhao
**Subject:** Net rental loss in K-1

Hi, Meagan,

When are you going to send us the annual financial reports for the fund? I noticed the net rental loss on the the K-1 form. I am sure people will start to ask about it once they have chance to digest it. Also, what is "distribution" field on the K-1? Why is there a pretty big number there too?

We hope to get some idea on how much the properties are worth at this point too.

regards,

**From:** General Partner ("GP") of Colorado Regional Center Project Solaris, LLLP ("CRCPS" or the "Partnership")

**To:** Limited Partners ("LPs") of the Partnership

**Date:** June 19, 2017

**Re:** 3rd Notice of Fair Market Value of the Partnership Property (this "Notice") and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions

## Definitions:

"Administrative Expenses" means those expenses incurred by the GP in connection with the sale of LP Interests including specifically and without limitation, certain marketing, travel, legal and accounting fees, referral and related fees, and the legal fees of a LP incurred in preparation of such LP's I-526 petition.

"Appraisal(s)" means the good faith estimate of the Fair Market Value of each Unit performed by the independent third party firm Pack Appraisal Company.

"Capital Contribution" means the total amount of money or property contributed to the Partnership by each Partner (excluding any amounts contributed for Administrative Expenses).

"Fair Market Value" means the total liquidation value (as determined pursuant to a good faith market analysis conducted by qualified third-parties engaged by the GP) of all of the Partnership Property or an individual Unit after deduction of all usual and customary selling expenses, pro rations, and other similar matters.

"Loan" means the loan made from CRCPS to the Solaris developer in the aggregate amount of $82,500,000.

"Loan Advance" means the amount of each advance of principal from CRCPS to the developer per terms of the Loan.

"LP Interest" means a limited partnership interest in CRCPS.

"Partnership Property or Units" means the 19 individual properties presently held by the developer which collateralize the Loan.

"Put Exercise Notice" means written notice provided by a LP to the Partnership of his or her intent to exercise the Put Right. A Put Exercise Notice must be provided to the Partnership within 45 days following the receipt of this Notice.

"Put Right" means for each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, such LP may elect to sell his or her LP Interest to the Partnership and receive a return of capital.

"Partnership Agreement" means the Limited Liability Limited Partnership Agreement of Colorado Regional Center Project Solaris, LLLP.

"Put Purchase Price" means the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance amount multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses.

"Section 13.06" means Section 13.06 of the CRCPS Partnership Agreement entitled "Rights of Limited Partners to Return of Capital Contributions.

"U.S. Immigration Legal Requirements" means the GP's understanding that only LPs who have either received adjudication of their I-829 petition or who are foregoing permanent residency in the United States would be eligible to receive a return of capital and sell their LP Interest to the Partnership.

### Notice of Fair Market Value of the Partnership and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions:

As previously discussed, per the terms of the Loan, the developer has the right to transfer each Unit to the Partnership in lieu of cash payment at maturity of the Loan. The developer has indicated its desire to do so for each Unit as each Loan Advance reaches its 3-year anniversary mark. Accordingly, we are working with the developer to transfer title to the Partnership on the Units which Loan Advances have reached or surpassed the 3-year anniversary mark. The Partnership has been in the process of developing a comprehensive plan to permit the transfer and orderly sale of Units presently held by the developer. Further, the Partnership has approved a listing agreement with the brokerage firm, Solaris Real Estate, LLC, and is coordinating the marketing plan for unit(s) to be introduced to the market for sale.

In September 2015, the Partnership obtained valuations of each of the Units from the independent third party firm, Pack Appraisal Company. Subsequently, the Partnership has obtained valuations (see summary below) on each of the Units from the independent appraisal firm Angelo's Appraisal Inc. and we are continually performing an overall assessment of the real estate market in an effort to maximize value on the sale of each of the Units which in turn maximizes value to the Partnership and to all LPs.

In accordance with Section 13.06, we engaged an independent third party appraisal firm to prepare a good faith estimate of the Fair Market Value of the Partnership Property. The Appraisals do not account for customary selling expenses, which the Partnership will incur as it pursues the strategy set forth in this Notice and estimates to be approximately six percent (6.0%) of the sales price. We are hereby providing notice to the LPs of the estimated Fair Market Value as of February - April 2017, which has been determined to be $76,425,000 in the aggregate, a 13.2% increase in the aggregate appraisal from the prior appraisal. Upon request, we will provide copies of the Appraisals for your review. The Appraisal amount compares to the aggregate amount of the Loan made to the Solaris developer in the amount of $82,500,000, representing approximately ninety three percent (93%) of the Loan amount, although we continue to believe the value of the Partnership Property to be higher based on reasons set forth below and in accompanying materials (if applicable).

EXHIBIT 3
3 of 6

The following is a summary of the appraised Fair Market Value of the Partnership Property:

| Unit | Appraised Fair Market Value | Loan Advance Date | Prepayment Date | Loan Advance Amount | Ratio of Fair Market Value to Loan Advance Amount |
|---|---|---|---|---|---|
| 6E West | $3,215,000 | 4/18/2012 | 4/18/2015 | $4,000,000 | -19.6% |
| 5E West | $3,215,000 | 8/2/2012 | 8/2/2015 | $4,000,000 | -19.6% |
| 2A South | $5,650,000 | 4/25/2012 | 4/25/2015 | $6,500,000 | -13.1% |
| 7E East | $3,525,000 | 1/30/2013 | 1/30/2016 | $4,000,000 | -11.9% |
| 6D East | $7,125,000 | 10/2/2012 | 10/2/2015 | $8,000,000 | -10.9% |
| 3E East | $2,690,000 | 1/29/2013 | 1/29/2016 | $3,000,000 | -10.3% |
| 7E West | $4,075,000 | 9/7/2012 | 9/7/2015 | $4,500,000 | -9.4% |
| 6C West | $3,185,000 | 11/27/2012 | 11/27/2015 | $3,500,000 | -9.0% |
| 3C East | $2,290,000 | 1/30/2015 | 1/29/2018 | $2,500,000 | -8.4% |
| 6E East | $3,210,000 | 5/30/2012 | 5/30/2015 | $3,500,000 | -8.3% |
| 5C West | $3,225,000 | 11/6/2012 | 11/6/2015 | $3,500,000 | -7.9% |
| Pent G West | $4,150,000 | 5/20/2013 | 5/19/2016 | $4,500,000 | -7.8% |
| 5G West | $6,050,000 | 1/24/2013 | 1/24/2016 | $6,500,000 | -6.9% |
| Pent E West | $2,800,000 | 5/3/2012 | 5/3/2015 | $3,000,000 | -6.7% |
| Pent E East | $2,800,000 | 6/15/2012 | 6/15/2015 | $3,000,000 | -6.7% |
| 4D East | $7,450,000 | 3/6/2013 | 3/5/2016 | $7,500,000 | -0.7% |
| 4G West | $6,530,000 | 8/24/2012 | 8/24/2015 | $6,500,000 | 0.5% |
| Pent C West | $2,620,000 | 5/30/2013 | 5/29/2016 | $2,500,000 | 4.8% |
| Pent C East | $2,620,000 | 9/13/2012 | 9/13/2015 | $2,000,000 | 31.0% |
| Total | $76,425,000 | | | $82,500,000 | -7.4% |

Pursuant to Section 13.06, each LP who has held his or her limited partnership interest in CRCPS ("LP Interest") for at least three years is entitled to receive notice of the Fair Market Value of Partnership Property and may also, depending on U.S. Immigration Legal Requirements, be entitled to give notice to the GP of his or her election to sell their LP Interest to the Partnership. The purchase price for the LP Interest would be equal to the LPs pro rata share of the amount the Partnership actually receives from a sale, which may be greater or less than the Fair Market value as estimated by the third party appraiser. The Put Purchase Price is further described below.

Even if the Partnership was able to liquidate Partnership Property at this time, the GP does not believe it would be prudent to attempt to liquidate now, but rather to do so on a unit-by-unit basis in an orderly, market driven manner which seeks to create the most value for each LP. While the Appraisals indicate the Partnership Property is valued below the face value of the Loan, we believe this is attributable to the lack of adequate comparison to sales within the Solaris building and the lack of adequate comparable properties in the greater Vail, Colorado area. Another factor that will contribute to what we believe to be increased value in the future is supply and demand for the building. For example, the Partnership has control over the only two remaining mountain facing four-bedroom units that will be available for sale. As fewer properties in Solaris are available for sale, we anticipate demand will continue to increase the sales price of each Unit.

**Put Rights:**

We have set forth our good faith interpretation of Section 13.06 which we believe conforms to the original intent and provides qualifying LPs with an equitable exit strategy, while protecting the overall economic viability of the Partnership. The GPs understanding is that only LPs who have either received adjudication of their I-829 and received an unconditional green card or who are foregoing permanent residency in the

EXHIBIT 3
4 of 6
tabbies

U.S. would be eligible to receive a return of capital without jeopardizing the EB-5 process. We advise each LP to seek advice from his or her immigration attorney with respect to the U.S. Immigration Legal Requirements and any early exit procedure.

Each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, may elect to sell his or her LP Interest to the Partnership. By exercising his or her Put Right, the LP is seeking a return of capital earlier than other LPs in the Partnership may be permitted to. For those LPs first electing to exercise his or her Put Right, the Put Purchase Price for an LP Interest will be satisfied by the sale of a unit(s), while the order of unit sales is to be based on the Appraisals. To restate, the Put Purchase Price is equal to the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance as compared to the other Units multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses. However, the Partnership will not attempt to sell a Unit(s) until the number of LPs exercising their Put Right is equal to the number of LPs investments that were necessary to make the Loan Advance for such Unit.

For example, Unit 6E West was appraised at a Fair Market Value of $3,215,000, while the Loan Advance collateralized by this unit was in the amount of $4,000,000. The ratio of Fair Market Value to the Loan Advance amount on 6E West is -19.6% and represents the lowest ratio amongst the Units. Eight (8) LPs equity contributions to the Partnership were required in order to make the Loan Advance for which Unit 6E West serves as collateral. Therefore, once eight (8) LPs have exercised his or her Put Right, the Partnership will use reasonable business efforts to market and liquidate Unit 6E West once the Partnership. The Partnership shall not be entitled to sell a Unit(s) for less than the then appraised Fair Market Value without the consent of all LPs who will receive a return of capital from such sale. Thus, the Put Purchase Price for the first eight (8) LPs electing to exercise his or her Put Right would be equal to his or her pro rata share from realizable value of the sale of Unit 6E West less customary transaction expenses, i.e., 1 / 8 multiplied by at least $3,215,000 less customary transaction expenses, unless a sale at a lower price is approved by all participating LPs. Should the Partnership be able to sell the Unit for greater than the Fair Market Value, the benefit shall go to those eight investors who have exercised their Put Right, but in no event would the Put Purchase Price be greater than the actual LP Capital Contribution. Subsequently, the next Unit that would be sold would be 5E West, which has the second lowest ratio of Fair Market Value to Loan Advance amount amongst the remaining Units in the portfolio.

In order to exercise his or her Put Right, such LP must provide written notice (the "Put Exercise Notice") to the Partnership within 45 days following the date of this Notice expressly stating his or her exercise of the Put Right. By delivering the Put Exercise Notice, the LP represents and warrants to the Partnership that (A) the LP has full right, title and interest in and to the LP Interest, (B) the LP has all the necessary power and authority and has taken all necessary action to sell such LP Interest as contemplated herein, and (C) the LP Interest is free and clear of any and all mortgages, pledges, security interests, options, rights of first offer, encumbrances or other restrictions or limitations of any nature whatsoever other than those arising as a result of or under the terms of this Partnership Agreement. The delivery of a Put Exercise Notice by a LP to the Partnership shall create a binding and irrevocable obligation to sell his or her LP Interest at the Put Purchase Price as set forth in this Notice. Failure of an LP to deliver the Put Exercise Notice within such 45-day period shall constitute a waiver of such LPs Put Right with respect to the specific Put Purchase Price formula as set forth in this Notice, but shall not affect their respective rights with respect to any future Put Rights. **An LP who has previously provided a Put Exercise Notice but has not**

**yet received a capital distribution shall continue to be treated as having provided a Put Exercise Notice, unless the LP informs the Partnership of his or her desire to remain in the Partnership and withdraw their prior Put Exercise Notice.**

Upon the Partnership's receipt of such Put Exercise Notice, the Partnership will use commercially reasonable efforts to sell a Unit or Units in its possession at the Fair Market Value as identified in the Appraisals or at a higher amount. As described above, the Partnership shall not undertake such efforts until enough LPs have submitted their Put Exercise Notice that matches the number of investor's whose capital supported the Loan Advance on such Unit. The Partnership may, with the consent of all participating LPs, sell such Unit or Units below the Fair Market Value. The Partnership shall pay the Put Purchase Price no later than thirty (30) days following the closing of the sale of the applicable Unit or Units and receipt of the sales proceeds. The Partnership will pay the Put Purchase Price for the LP Interest by check or wire transfer of funds. At the closing of the sale of the LP Interest to the Partnership, the LP shall deliver to the Partnership (a) an assignment and all other transfer documents to consummate the sale and assignment of the LP Interest to the Partnership, and (b) waiver and release of the Partnership from any and all future claims, each in a form acceptable to the Partnership. Upon the LPs receipt of the Put Purchase Price at the closing, the LP shall have no further right, interest or claim to distributions in or from the Partnership and shall no longer be an LP in the Partnership.

On each six (6) month anniversary of this Notice or within a reasonable time thereafter, the General Partner shall provide to the remaining LPs a new notice setting forth the then applicable Fair Market Value of the remaining Partnership Property and each LP shall then have 45 days from the date of such new notice to deliver a Put Exercise Notice to the Partnership. The Put Purchase Price would continue to be based on the formula described above, only using the new Fair Market Value of the remaining Units, and would otherwise be payable upon and subject to the same terms set forth above.

**General Provisions for LPs Who Do Not Provide a Put Exercise Notice:**

To the extent the Unit(s) are not required to be put on the market to satisfy prior Put Exercise Notices, we will explore opportunities to put them on the market when market conditions are deemed to be favorable for sale. The sale of Units will be conducted in an orderly, market driven manner that seeks to maximize value to the Partnership and the LPs. As such, there can be no definitive timeline for which all of the Units will be sold. To sell prematurely would likely mean selling units at a significant discount to the original amount of each Loan Advance, which would mean LPs would receive less than the full amount of their capital contributions returned. The Partnership seeks to avoid this.

As each Unit is sold, a pro rata return of capital will be made to those LPs who have received their adjudication of their I-829 Petitions and have not otherwise exercised their Put Rights (as set forth above). The remainder of the proceeds shall remain with the Partnership and shall be returned on a pro rata basis to the rest of the LPs as their I-829 petitions are approved, subject to the distribution provisions in the Partnership Agreement. We intend such returns of capital to be made until all LPs (other than the LPs who have exercised their Put Rights (as set forth above)) have received a return of their capital contribution. All capital returns shall be made on a pro rata basis, treating each LP equal to one another. Once all of the Partnership Property has been sold, the Partnership shall wind down. To the extent there is Available Cash Flow (as defined in the Partnership Agreement) after the sale of all Partnership Property and return of LP capital, it shall be paid out in accordance with Article VI of the Partnership Agreement.

5



The strategy outlined above was developed in good faith with the LPs best interests in mind and seeks to provide a path toward maximizing value to each and every LP, while still providing the LPs with an early exit alternative as contemplated under Section 13.06. The Partnership will strive to execute this strategy as quickly as is economically feasible.

*Robert Glicksman*

Authorized Representative

Colorado Regional Center Project Solaris, LLLP

**From:** General Partner ("GP") of Colorado Regional Center Project Solaris, LLLP ("CRCPS" or the "Partnership")

**To:** Limited Partners ("LPs") of the Partnership

**Date:** May 30, 2019

**Re:** 6th Notice of Fair Market Value of the Partnership Property (this "Notice") and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions

**Notice of Fair Market Value of the Partnership and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions:**[1]

As previously discussed, per the terms of the Loan and as described in the Partnership's offering memorandum (as amended to date, the "Offering Memorandum"), the developer held the right to transfer each Unit to the Partnership in lieu of cash payment at maturity of the Loan. The developer previously indicated its desire to do so for each Unit as each Loan Advance reached its 3-year anniversary mark. Accordingly, the Partnership entered into an Agreement Regarding Collateral Units to address the relationship between the developer and the Partnership.

The Partnership had listed units with Solaris Real Estate as broker as it believed that Solaris Real Estate previously had the most experience marketing, listing and selling units in the building. However, as there has not been a transaction for a Partnership unit through Solaris Real Estate, the Partnership has recently engaged Slifer Smith & Frampton Real Estate to market units. Slifer Smith & Frampton Real Estate is the largest real estate company in Eagle County and has indicated to us that it has sold more property than any other real estate firm in the valley. They currently have listed Units 7E West, 5G West, 4D East, and 7E East.

The Partnership has additionally entered into a listing agreement with Cushman & Wakefield U.S., Inc. for the sale of the six mountain facing units; 6D East, 4D East, 4G West, 5G West, 2A South, and Penthouse G West. Collectively, these six units are the premium, mountain-facing units in the portfolio and represent $39.5 million of the Loan. The term of the engagement commenced February 18, 2019 and will expire on May 31, 2019. The expected cost is 1% commission on the total sales price payable to Cushman & Wakefield, which is expected to be the only brokerage expense and will only be payable if a sale is finalized. The Partnership received an update from Cushman & Wakefield that they have set a formal "Call for Offers" date of Thursday, May 9th and anticipate receiving a couple indications of interest for the entire portfolio. An update will be provided once they receive the offers.

In September 2015, the Partnership obtained valuations of each of the Units from the independent third-party firm, Pack Appraisal Company. Subsequently, the Partnership has obtained valuations (see summary below) on each of the Units from the independent appraisal firm Angelo's Appraisal Inc. and we are continually performing an overall assessment of the real estate market in an effort to maximize value on the sale of each of the Units which in turn maximizes value to the Partnership and to all LPs.

In accordance with Section 13.06, we engaged an independent third party appraisal firm to prepare a good faith estimate of the Fair Market Value of the Partnership Property. The Appraisals do not account

---

[1] See Exhibit A for definitions.

1



for customary selling expenses or accrued and unpaid Partnership liabilities, which the Partnership will incur as it pursues the strategy set forth in this Notice and estimates customary selling expenses to be approximately six percent (6.0%) of the sales price while the balance of the accrued and unpaid management fee is approximately $4.5 million as of April 30, 2019 (after deducting the amount to be paid from the 6E West transaction described below).

On February 8, 2019, the transaction for unit 6E West closed. In exchange for ownership of 6E West, eight LPs transferred their ownership interests back to the Partnership, ceased to be LPs, and have no further rights or claims upon the Partnership. Unit 6E West had the lowest ratio of individual appraised value to the amount of the loan advance amongst all of the units. The 8 LPs were also responsible for their respective share of the accrued management fee through the date of the transaction, and accordingly executed a promissory note for their share in the amount of $210,074. Thus, there are now 157 Limited Partners remaining and 18 Units left in the portfolio which collateralized $78.5 million of Loan advances. The 8 LPs sold Unit 6E West on April 30, 2019 for a purchase price of approximately $2.78mm and made a payment of $210,074 to satisfy the promissory note to the Partnership.

The Partnership is hereby providing notice to the LPs of the estimated Fair Market Value as of November 2018, which has been determined to be $73,130,000 in the aggregate for the remaining 18 Units in the portfolio. Upon request, we will provide copies of the Appraisals for your review. The Appraisal amount compares to the aggregate amount of the loan advances made to the Solaris developer and collateralized by the remaining 18 units in the amount of $78,500,000, representing approximately ninety three percent (93%) of the Loan amount.

The following is a summary of the appraised Fair Market Value of the Partnership Property:

| Unit | Appraised Fair Market Value | Loan Advance Date | Prepayment Date | Loan Advance Amount | Ratio of Fair Market Value to Loan Advance Amount |
|---|---|---|---|---|---|
| 5E West | $3,300,000 | 8/2/2012 | 8/2/2015 | $4,000,000 | -17.5% |
| 6D East | $6,850,000 | 10/2/2012 | 10/2/2015 | $8,000,000 | -14.4% |
| 3E East | $2,650,000 | 1/29/2013 | 1/29/2016 | $3,000,000 | -11.7% |
| 4G West | $5,780,000 | 8/24/2012 | 8/24/2015 | $6,500,000 | -11.1% |
| 5G West | $5,780,000 | 1/24/2013 | 1/24/2016 | $6,500,000 | -11.1% |
| 7E East | $3,575,000 | 1/30/2013 | 1/30/2016 | $4,000,000 | -10.6% |
| 2A South | $5,875,000 | 4/25/2012 | 4/25/2015 | $6,500,000 | -9.6% |
| 4D East | $6,865,000 | 3/6/2013 | 3/5/2016 | $7,500,000 | -8.5% |
| 6E East | $3,300,000 | 5/30/2012 | 5/30/2015 | $3,500,000 | -5.7% |
| 6C West | $3,300,000 | 11/27/2012 | 11/27/2015 | $3,500,000 | -5.7% |
| 5C West | $3,300,000 | 11/6/2012 | 11/6/2015 | $3,500,000 | -5.7% |
| Pent G West | $4,350,000 | 5/20/2013 | 5/19/2016 | $4,500,000 | -3.3% |
| Pent E West | $2,900,000 | 5/3/2012 | 5/3/2015 | $3,000,000 | -3.3% |
| 7E West | $4,400,000 | 9/7/2012 | 9/7/2015 | $4,500,000 | -2.2% |
| Pent E East | $2,950,000 | 6/15/2012 | 6/15/2015 | $3,000,000 | -1.7% |
| 3C East | $2,475,000 | 1/30/2015 | 1/29/2018 | $2,500,000 | -1.0% |
| Pent C West | $2,740,000 | 5/30/2013 | 5/29/2016 | $2,500,000 | 9.6% |
| Pent C East | $2,740,000 | 9/13/2012 | 9/13/2015 | $2,000,000 | 37.0% |
| **Total** | **$73,130,000** | | | **$78,500,000** | **-6.8%** |

Pursuant to Section 13.06, each LP who has held his or her limited partnership interest in CRCPS ("LP Interest") for at least three years is entitled to receive notice of the Fair Market Value of Partnership



Property and may also, depending on U.S. Immigration Legal Requirements, be entitled to give notice to the GP of his or her election to sell their LP Interest to the Partnership. The purchase price for the LP Interest would be equal to the LPs pro rata share of the amount the Partnership actually receives from a sale, which may be greater or less than the Fair Market value as estimated by the third-party appraiser. The Put Purchase Price is further described below.

The GP also engaged independent, unrelated appraiser, BBG, Inc. to appraise the remaining 18-unit portfolio for a bulk purchase. BBG, Inc. has no relationship to either the Partnership or Angelo's Appraisals. This provides the Partnership with a better sense of the value of the portfolio if sold to a financial buyer as a bulk purchase. The BBG appraised value indicates the appraised fair market value assuming a sale of all 18-units and incorporates the amount of time to re-sell each unit individually, risk factors associated with doing so, and the time value of money (i.e., a dollar today is worth more than a dollar in the future). The 'Bulk Value' for the 18-unit portfolio was determined by BBG, Inc. to be $43,320,000.

| MARKET VALUE CONCLUSION(S) - AS IS | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| Bulk Value "As is" (18 Units) - All | Fee Simple | February 20, 2019 | $43,320,000 |
| Bulk Value "As is" (6 Units) - Mtn Views | Fee Simple | February 20, 2019 | $28,180,000 |

BBG's appraisal incorporates a number of assumptions, including a sales period of approximately 7 years. Per BBG, the indicated rate of return for this type of investment is between 16% and 17%. The 'Bulk Value' appraisal is not materially different from some of the indications of interest received by the Partnership. The Partnership also asked BBG to appraise the six-unit mountain facing portfolio which was determined to be $28,180,000, which represents approximately 71% of the Loan amount for those units.

**Put Rights:**

We have set forth our good faith interpretation of Section 13.06 which we believe conforms to the original intent and provides qualifying LPs with an equitable exit strategy, while protecting the overall economic viability of the Partnership. The GPs understanding is that only LPs who have either received adjudication of their I-829 and received an unconditional green card or who are foregoing permanent residency in the U.S. would be eligible to receive a return of capital without jeopardizing the EB-5 process. We advise each LP to seek advice from his or her immigration attorney with respect to the U.S. Immigration Legal Requirements and any early exit procedure.

Each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, may elect to sell his or her LP Interest to the Partnership. By exercising his or her Put Right, the LP is seeking a return of capital earlier than other LPs in the Partnership may be permitted to. For those LPs first electing to exercise his or her Put Right, the Put Purchase Price for an LP Interest will be satisfied by the sale of a unit(s), while the order of unit sales is to be based on the Appraisals. To restate, the Put Purchase Price is equal to the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance as compared to the other Units multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses and accrued and unpaid Partnership expenses. Per Section 13.06 of the Partnership Agreement, notwithstanding, if the actual unit sales price is less than 70% of the Fair Market

EXHIBIT 4
4 of 7

Value set forth herein, the participating LPs shall have the right, exercisable within 10 days following written notice of the amount of the sales, to rescind their Put Right exercise. The Partnership will not attempt to sell a Unit(s) until the number of LPs exercising their Put Right is equal to the number of LPs investments that were necessary to make the Loan Advance for such Unit.

For example, Unit 5E West was appraised at a Fair Market Value of $3,300,000, while the Loan Advance collateralized by this unit was in the amount of $4,000,000. The ratio of Fair Market Value to the Loan Advance amount on 5E West is -17.5% and represents the lowest ratio amongst the Units. Eight (8) LPs equity contributions to the Partnership were required in order to make the Loan Advance for which Unit 5E West serves as collateral. Therefore, once eight (8) LPs have exercised his or her Put Right, the Partnership will use reasonable business efforts to market and liquidate Unit 5E West, as market dynamics may permit. Thus, the Put Purchase Price for the first eight (8) LPs electing to exercise his or her Put Right would be equal to his or her pro rata share from realizable value of the sale of Unit 5E West less customary transaction expenses, i.e., 1 / 8 multiplied by at least $2,310,000 (i.e., at least 70% of the Fair Market Value Appraisal of $3,300,000) less customary transaction expenses and accrued but unpaid Partnership expenses, unless a sale at a lower price is approved by all participating LPs. Should the Partnership be able to sell the Unit for greater than the Fair Market Value, the benefit shall go to those eight investors who have exercised their Put Right, but in no event would the Put Purchase Price be greater than the actual LP Capital Contribution. Subsequently, the next Unit that would be sold would be 6D East, if practicable, which has the second lowest ratio of Fair Market Value to Loan Advance amount amongst the remaining Units in the portfolio. The Partnership may continue to engage in customary business practices in terms of listing and selling Units in any order and pro rata distributions may occur as well.

If an LP is redeemed out through the early exit process, such LP would receive a return of capital, including any proceeds received through pro rata distributions made from the sale of Units in the ordinary course of business and preferred return amounts received to date, of an amount no greater than the ratio of the net proceeds available for distribution (after transaction and accrued but unpaid Partnership expenses are satisfied) after the sale of the particular early exit Unit to the Loan Advance amount for such Unit. As an example, if the net proceeds after transaction and accrued expenses are paid from the sale of Unit 5E West is $2,500,000, then each investor would receive no more than $2,500,000 divided by 8, or $312,500. If those 8 LPs had each received $100,000 from prior preferred return distributions and the sale of other Units, then each LP would received $212,500 from the sale of 5E West which would net the LP $312,500. Such LP would then be fully redeemed out of the Partnership. Any surplus capital would be available for Partnership expenses and distribution to the remaining LPs.

Each LP initially invested $500,000 as their initial capital basis for an equal share in the 99% of the Partnership owned by LPs. Since the first Loan Advance was made to the Borrower in April 2012, and as cash flow has permitted, LPs have earned a blended annual rate of return of approximately 2.10%, or approximately $10,500 per year, on their initial investment. Over a five-year period, this would have generated an aggregate return of approximately $52,500.[2] This implicitly offsets a portion of each LP's initial capital investment, leaving approximately $450,000 of that initial investment remaining. This is in addition to permanent residency already received by most LPs.

---

[2] The actual amount received may differ for each LP depending upon time of investment and Loan advances.

4



In order to exercise his or her Put Right, such LP must provide written notice (the "Put Exercise Notice") to the Partnership within 45 days following the date of this Notice expressly stating his or her exercise of the Put Right. By delivering the Put Exercise Notice, the LP represents and warrants to the Partnership that (A) the LP has full right, title and interest in and to the LP Interest, (B) the LP has all the necessary power and authority and has taken all necessary action to sell such LP Interest as contemplated herein, and (C) the LP Interest is free and clear of any and all mortgages, pledges, security interests, options, rights of first offer, encumbrances or other restrictions or limitations of any nature whatsoever other than those arising as a result of or under the terms of this Partnership Agreement. The delivery of a Put Exercise Notice by a LP to the Partnership shall create a binding and irrevocable obligation to sell his or her LP Interest at the Put Purchase Price as set forth in this Notice. Failure of an LP to deliver the Put Exercise Notice within such 45-day period shall constitute a waiver of such LPs Put Right with respect to the specific Put Purchase Price formula as set forth in this Notice, but shall not affect their respective rights with respect to any future Put Rights. **An LP who has previously provided an executed Put Exercise Notice form but has not yet been fully redeemed shall continue to be treated as having provided an executed Put Exercise Notice, unless the LP informs the Partnership of his or her desire to remain in the Partnership and withdraw their prior Put Exercise Notice.**

Upon the Partnership's receipt of such Put Exercise Notice, the Partnership will use commercially reasonable efforts to sell a Unit or Units in its possession at the Fair Market Value as identified in the Appraisals or at a higher amount, but will take consideration of listing too many Units at the same time as well as guidance from brokerage in terms of a listing and marketing strategy. As described above, the Partnership shall not undertake such efforts until enough LPs have submitted their Put Exercise Notice that matches the number of investor's whose capital supported the Loan Advance on such Unit. The Partnership may, with the consent of all participating LPs, sell such Unit or Units below the Fair Market Value. The Partnership shall pay the Put Purchase Price no later than thirty (30) days following the closing of the sale of the applicable Unit or Units and receipt of the sales proceeds. The Partnership will pay the Put Purchase Price for the LP Interest by check or wire transfer of funds. At the closing of the sale of the LP Interest to the Partnership, the LP shall deliver to the Partnership (a) an assignment and all other transfer documents to consummate the sale and assignment of the LP Interest to the Partnership, and (b) waiver and release of the Partnership from any and all future claims, each in a form acceptable to the Partnership. Upon the LPs receipt of the Put Purchase Price at the closing, the LP shall have no further right, interest or claim to distributions in or from the Partnership and shall no longer be an LP in the Partnership. As of April 30, 2019, the Partnership has received executed Put Exercise Notices from approximately 82% of LPs remaining in the Partnership.

On or about each six (6) month anniversary of this Notice or within a reasonable time thereafter, the General Partner shall provide to the remaining LPs a new notice setting forth the then applicable Fair Market Value of the remaining Partnership Property and each LP shall then have **45 days** from the date of such new notice to deliver a Put Exercise Notice to the Partnership. The Put Purchase Price would continue to be based on the formula described above, only using the new Fair Market Value of the remaining Units, and would otherwise be payable upon and subject to the same terms set forth above.

**General Provisions for LPs Who Do Not Provide a Put Exercise Notice:**

The Partnership will continue to explore opportunities to put Units on the market when market conditions are deemed to be favorable for sale. The sale of Units will be conducted in an orderly,



market driven manner that seeks to maximize value to the Partnership and the LPs. As such, there can be no definitive timeline for which all of the Units will be sold. To sell prematurely would likely mean selling units at a significant discount to the original amount of each Loan Advance, which would mean LPs would receive less than the full amount of their capital contributions returned. The Partnership seeks to avoid this.

As each Unit is sold, a pro rata return of capital will be made to those LPs who remain in the Partnership. The remainder of the proceeds shall remain with the Partnership and shall be returned on a pro rata basis to the rest of the LPs as their I-829 petitions are approved, subject to the distribution provisions in the Partnership Agreement. We intend such returns of capital to be made until all LPs (other than the LPs who have exercised their Put Rights (as set forth above)) have received a return of their capital contribution as Available Cash Flow permits. All capital returns shall be made on a pro rata basis, treating each LP equal to one another based on ownership percentage. Once all of the Partnership Property has been sold, the Partnership shall wind down. To the extent there is Available Cash Flow (as defined in the Partnership Agreement) after the sale of all Partnership Property and return of LP capital, it shall be paid out in accordance with Article VI of the Partnership Agreement.

The strategy outlined above was developed in good faith with the LPs best interests in mind and seeks to provide a path toward maximizing value to each and every LP, while still providing the LPs with an early exit alternative as contemplated under Section 13.06. The Partnership will strive to execute this strategy as quickly as is economically feasible.

*Meagan Dillard*
Meagan Dillard

Authorized Representative

Colorado Regional Center Project Solaris, LLLP



EXHIBIT 4
7 of 7

## Exhibit A - Definitions

"Administrative Expenses" means those expenses incurred by the GP in connection with the sale of LP Interests including specifically and without limitation, certain marketing, travel, legal and accounting fees, referral and related fees, and the legal fees of a LP incurred in preparation of such LP's I-526 petition.

"Appraisal(s)" means the good faith estimate of the Fair Market Value of each Unit performed by an independent third-party firm.

"Capital Contribution" means the total amount of money or property contributed to the Partnership by each Partner (excluding any amounts contributed for Administrative Expenses).

"Fair Market Value" means the total liquidation value (as determined pursuant to a good faith market analysis conducted by qualified third-parties engaged by the GP) of all of the Partnership Property or an individual Unit after deduction of all usual and customary selling expenses, pro rations, and other similar matters.

"Loan" means the loan made from CRCPS to the Solaris developer in the aggregate amount of $82,500,000 or the remaining outstanding balance if a portion of the Loan has been repaid.

"Loan Advance" means the amount of each advance of principal from CRCPS to the developer per terms of the Loan.

"LP Interest" means a limited partnership interest in CRCPS.

"Partnership Property or Units" means the remaining individual properties presently held by the developer which collateralize the Loan.

"Put Exercise Notice" means written notice provided by a LP to the Partnership of his or her intent to exercise the Put Right. A Put Exercise Notice must be provided to the Partnership within 45 days following the receipt of this Notice.

"Put Right" means for each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, such LP may elect to sell his or her LP Interest to the Partnership and receive a return of capital.

"Partnership Agreement" means the Limited Liability Limited Partnership Agreement of Colorado Regional Center Project Solaris, LLLP.

"Put Purchase Price" means the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance amount multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses and accrued and unpaid Partnership expenses.

"Section 13.06" means Section 13.06 of the CRCPS Partnership Agreement entitled "Rights of Limited Partners to Return of Capital Contributions.

"U.S. Immigration Legal Requirements" means the GP's understanding that only LPs who have either received adjudication of their I-829 petition or who are foregoing permanent residency in the United States would be eligible to receive a return of capital and sell their LP Interest to the Partnership.



EXHIBIT 5
1 of 2

Eagle County, CO
Regina O'Brien
Pgs: 2
REC: $18.00
DOC: $0.00

**201915152**
09/13/2019
02:12:24 PM

**LIS PENDENS NOTICE**

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLOARDO

Civil Action No. 19-CV-02443

Plaintiffs: Jun Li, Qi Qin, Yi Liu, Jie Yang, Yuquan Ni,
Li Fang, Zhongzao Shi, Fang Sheng, Shunli Shao,
Kaiyuan Wu, Zhijian Wu, Zhongwei Li, and Yuwei Dong,

v.

Defendants: Colorado Regional Center Project Solaris LLLP,
Colorado Regional Center I, LLC,
Solaris Property Owner LLC, and
Peter Knobel,

Attorney for Plaintiffs:
Douglas Litowitz, 413 Locust Place, Deerfield, IL 60015
312-622-2848; litowitz@gmail.com

---

Notice of Lis Pendens Pursuant to C.R.S. 38-35-110

---

Notice is hereby given that the above-entitled action (the "Action") has been commenced 8/28/19 affecting title to real property located in Eagle County, more particularly described as the condominium units listed on Exhibit A (the "Property"). The Action asserts that Solaris Property Owner LLC (whose successors are current title holders of the units) borrowed $80 million from Colorado Regional Center Project Solaris LLLP (the "LP") using the Property as collateral. The borrower failed to repay the $80 million loan and was required to transfer the Property to the LP as the new rightful owner. It never did so, leaving the LP with a rightful claim to take title to the Property. The limited partners assert a derivative claim under C.R.S. 7-62-1001 to compel the LP to take title to the Property as enforcement of its right to judgment and collection of collateral under the transaction documents described in the Action. Upon transfer of title to the LP, the Plaintiffs assert pro rata rights to partnership interests, including any sale proceeds accruing to the LP from sale of the Property.

This document was prepared by and should be returned to Douglas Litowitz, 413 Locust Place, Deerfield, IL, 60015.

Douglas Litowitz   September 11, 2019

1



EXHIBIT 5
2 of 2

09/11/2019

## Exhibit A

| | |
|---|---|
| Common Address: | 141 East Meadow Drive, Vail, Colorado 81657 |
| Common Name: | Residences at Solaris Vail |
| Property Type: | Condominium Subdivision |
| Tax Area: | SC226 |
| Parcel No.: | 2.10E+11 |
| Title Holder: | Solaris Property Owner I LLC (except as noted below) |

Units:
1) 2A South
2) Pent E West
3) 6E East
4) Pent E East
5) 5E West
6) 4G West
7) 7E West
8) Pent C East
9) 6D East
10) 5C West
11) 6C West
12) 5G West
13) 3E East
14) 7E East
15) 4D East
16) Pent G West
17) Pent C West
18) 3C East (Title Holder: Lucky 5 LLC)