# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02443

Jun Li, Qi Qin, Yi Liu, Jie Yang, Yuquan Ni, Zhongzao Shi,
Fang Sheng, Shunli Shao, Kaiyuan Wu,
Zhijian Wu, Zhongwei Li, and Yuwei Dong,
        Plaintiffs,

        v.                                  Hon. Magistrate Scott Varholak

Colorado Regional Center Project Solaris LLLP,
Colorado Regional Center I, LLC,
Solaris Property Owner LLC, and
Peter Knobel,
        Defendants.

## Plaintiffs' Motion for Preliminary Injunction to Block Bulk Sale of Collateral Units

Plaintiffs are limited partners who bring this motion in a derivative capacity for Colorado Regional Center Project Solaris LLLP (the "LP") to prevent the LP from engaging in a bargain basement bulk sale of the condominium units held as collateral for the LP's loan to Solaris Property Owner LLC ("SPO"). Plaintiffs' counsel has conferred with opposing counsel pursuant to Local Rule 7.1 and they have stated their intention to oppose this motion. The Plaintiffs state as follows:

### Background

1. As this Court is aware, this case arises from $82.5 million invested from mostly Chinese persons into the LP. The LP turned around and made a loan of $82.5

million to SPO, secured by mortgages on 19 condominium units in Solaris Vail, a project developed by SPO and its principal Peter Knobel ("Knobel").

2. The loan was not paid back. It was supposed to be 'repaid' by transferring title of the 19 condominium units, but this didn't happen either, a violation of the transaction documents. That matter is already before this Court on a separate motion concerning a Lis Pendens filed by Plaintiffs on the units.

3. As required by the Limited Partnership Agreement ("LPA"), every six months the LP and its general partner Colorado Regional Center I ("GP") send a Notice to all limited partners showing the "Appraised Fair Market Value" of the units and the outstanding balance of the loan. The units are described as "Partnership Property."

4. The last notice dated May 30, 2019 is attached as Exhibit 1 (the "May 30 Notice").

5. The May 30 Notice says that the Appraised Fair Value of 18 units is $73,130,000 against a loan balance of $78,500,000.

6. In other words, the GP and LP are telling investors that the loan is ninety-three percent (93%) collateralized.

7. However, the same Notice says that a bulk sale would only fetch approximately $43,320,000 -- 55% of the collateral's value, not the 93% set forth earlier.

8. The 55% figure is generous. The true figure would have to allow deductions for realtor costs, transfer taxes, and accrued management fees of the GP which are bearing interest at a default rate.

9. Out of one side of their mouth, they say that the units collateralize 93% of the loan balance. Out of the other side of their mouth they say that a bulk sale won't generate even 55% of the value of the loan.

10. The May 30 Notice says that the GP and the LP are currently selling units in an "orderly, market driven manner" -- which has led to a breathtaking sale of only 2 units over several years' time.

11. The limited partners want their money back, but not at a ridiculously low price that contradicts the appraisals given by the GP. In fact, the limited partners are justifiably confused as to why the loan had insufficient collateral of 19 mediocre units, when SPO was developing 79 units, a commercial area, a retail area, and a parking lot -- all of which could have - and should have - collateralized the loan.

12. The only way for limited partners to participate in getting the proceeds of any sale of a particular unit is to exercise "put rights" by selling their LP interest back to the LP (to date, some 80% of partners have exercised these put rights), but a bulk sale would also extinguish their limited partnership units since they would be effectively redeemed, perhaps depriving the investors of limited partners status to pursue the claims in the Complaint.

**Fraudulent Transfer**

13. Limited partners have the right to bring a derivative action against a limited partnership and its general partner to challenge an inappropriate sale or transfer of real estate by the partnership. *Day v. Stascavage*, 251 P.3d 1225

3

(Colo. App. 2010); C.R.S. 7-62-1001 (Limited Partnership Act provision for derivative action).

14. Plaintiffs filed a notice of Lis Pendens on the units on September 13, 2019 and allege that the loan was fraudulently undercollateralized to benefit the GP and SPO/Knobel at the expense of the Chinese passive investors who bear dollar-for-dollar loss if the value of the units is lower than the loan balance.

15. The purpose of the Lis Pendens was to freeze the units temporarily until this matter could be heard by the Court and sorted out.

16. However, Plaintiffs have now learned that the LP intends to conduct a bulk sale despite the Lis Pendens by 'bonding over it,' so that the buyer will take the units with the Lis Pendens still attached.

17. The purpose of this motion is to preserve the status quo by preventing a bulk sale until this Court can approve it.

18. Limited Partners are not typically "creditors" of a limited partnership since they own an equity stake, not a debt stake.

19. But a limited partner becomes a creditor when he is entitled to a distribution: "At the time a partner becomes entitled to receive a distribution, the partner has the status of and is entitled to all remedies of a creditor of the limited partnership with respect to the distribution."  C.R.S. 7-62-606.

20. By giving up their LP unit in exchange for a distribution, the limited partners who have signed put rights (or who are otherwise forced to participate and take the proceeds of a bulk sale) are "creditors."  Those who are forced to go along with a bulk sale will also become *de facto* creditors.

21. F.R.C.P. 64 allows attachment and freezing of assets from the pendency of the case pursuant to state law:

> (a) Remedies Under State Law - In General. At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment. But a federal statute governs to the extent it applies. (b) Specific Kinds of Remedies. The remedies available under this rule include the following—arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies.

22. The applicable state law here is the Colorado Fraudulent Transfer Act (C.R.S. 38-8-105), which prohibits harm to current or future creditors by a transfer that is not for equivalent value and leaves an entity without assets for creditors:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; *or*
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> (I) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; *or*
> (II) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

23. The contemplated bulk sale is a fraudulent transfer in three ways.

24. First, it is an exchange not for equivalent value since the GP and LP say that the loan is 93% collateralized ($73 million), so a bulk sale at 55% is a transfer not for equivalent value - by their own figures.

5

25. Second, the Complaint asserts that plaintiffs have a right to receive their full money back ($500,000) -- but a bulk sale would drain all the LP's assets and leave it unable to pay the plaintiffs if this court upholds their claims.

26. Third, a bulk sale would remove the assets at the heart of this lawsuit, thereby allowing the defendants to unfairly gain a tactical advantage by telling this Court that, "Oh well, the assets are gone so there is nothing left to fight about." It is a tactic to get rid of this case by preventing the Court from examining the issues. This is a game of 'hot potato' by which the LP can get rid of its property and dissolve, the GP can take its payments and dissolve, and leave nothing to satisfy the Chinese investors who lost half their money.

27. This Court needs time to maintain the status quo and assess the situation, not allow the subject matter of the dispute to be sold before the case even gets started.

28. The Tenth Circuit has approved this District's ability to freeze real estate via a preliminary injunction - for property near Vail, no less. *Nat'l Union Fire Ins. Co. v. Kozeny*, 115 F. Supp. 2d 2010 (D. Colo. 2010), injunction aff'd 19 Fed. Appx. 815 (10th Cir. 2001)(freezing real estate assets in Colorado in light of a future judgement in Colorado for RICO, securities laws, and common law claims); *FDIC v. Antonio*, 843 F.2d 1311, 1312 (10th Cir. 1988)(preliminary injunction before trial granted "to prevent dissipation of defendant's assets which may be needed to satisfy a judgment if the suit is successful.")

29. Injunctive relief such as requested here requires a showing of four factors: (i) irreparable injury if relief is not granted, (ii) that the injury outweighs any

damage that might be caused by the injunction, (iii) that there is no adverse public interest, and (iv) substantial likelihood of success on the merits. *Session v. Carlson*, 2019 U.S. Dist. LEXIS 168929 (D. Colo. May 9, 2019)(Mix, J.).

30. These elements are easily met. If the GP and LP really believe that the loan is 93% collateralized and that the units are worth $73 million, there is irreparable harm if they sell at $40 million since it will dissipate the company's assets and remove any property from which the Plaintiffs can recover a judgment, leaving them without any remedy at law or equity.

31. A bulk sale not only removes all assets from the LP and prevents full recovery in this lawsuit, but also eliminates the Plaintiffs' status as LP holders, thereby affecting their standing to sue.

32. In other words, it is not at all clear whether a limited partner who "puts" his unit to the LP can later sue for breach of fiduciary duty and other claims. So a bulk sale might extinguish all rights of all limited partners.

33. The Plaintiffs have every likelihood of winning on the merits. This entire loan was designed so that the Colorado people gained money while all the Chinese people lost money. It was set up to take money from the Chinese. And there are further problems such as the LP not even owning the title to the units it proposes to sell.

34. The purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held." *Schrier v. Univ. of Colorado*, 427 F.3d 1253, 1258 (10th Cir. 2005)(explaining that an injunction

7

to preserve the status quo is preferable and has a lower threshold than an injunction requiring a change in the status quo).

35. This entire deal is already bizarre and suspicious. A sudden transfer is a bad idea. Any radical actions should be stayed until this Court can get its hands around the operative facts, and before any sudden action might extinguish the rights of the Plaintiffs.

WHEREFORE, the Plaintiffs pray for a preliminary injunction barring the bulk sale of the collateral units in Solaris Vail until such sale can be examined and approved by the Court.

Dated: October 8, 2019

Respectfully Submitted,

/s/ Douglas Litowitz
413 Locust Place
Deerfield, IL 60015
312-622-2848
Litowitz@gmail.com

### Certificate of Service

I have this day filed the foregoing document and exhibits by filing the same with the ECF system and by sending them by email to opposing and interested counsel:
James Kilroy: jkilroy@swlaw.com
Ty Gee: tgee@hmflaw.com
Hubert Kuo: hkuo@ardentlawgroup.com