# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02443                           Hon. Scott T. Varholak

Jun Li, Qi Qin, Yi Liu, Jie Yang, Yuquan Ni, Zhongzao Shi,
Fang Sheng, Shunli Shao, Kaiyuan Wu, Zhijian Wu,
Zhongwei Li, Sa Wu, Fan Zhang, Lin Qiao, Jinge Hu,
Rujun Liu, Ying Xu, Lu Li, and Yuwei Dong, individually,
as well as Derivatively for Colorado Regional Center Project
Solaris LLLP,

> Plaintiffs,

v.                                   _____

Waveland Ventures LLC,
Colorado Regional Center Project Solaris LLLP,
Colorado Regional Center,
Colorado Regional Center I, LLC,
Solaris Property Owner LLC,
Solaris Property Owner I LLC, and
Peter Knobel,

> Defendants.

## FIRST AMENDED COMPLAINT

### Introduction

The Plaintiffs seek to recoup their investment in a condominium project called The Vail Solaris Residences (or more colloquially, "Solaris"). Plaintiffs were among 165 foreigners who each invested $500,000 into Defendant Colorado Regional Center Project Solaris LLLP ("LLLP"), whose general partner was Defendant Colorado Regional Center I LLC (the "GP"). The LLLP loaned all the foreign money ($82.5 million) to Defendants Solaris Property Owner ("SPO") and its principal Defendant Peter Knobel to help them develop and

market Solaris (the "Loan").[1]  The LLLP never registered the limited partnership units as securities, never registered as an investment fund, and used unlicensed brokers and sales representatives to recruit the foreign investors.

The Loan looked like a standard $82.5 million loan with a 5-year maturity at 5% annual interest, secured by condominium units as collateral.  It offered investors a preferred return of 2% annually with the remainder to be paid to the GP and Waveland Ventures LLC ("Waveland") as the manager of the project.  The 165 foreign investors believed that after 5 years the borrower (SPO/Knobel) would repay the $82.5 million, and in turn the lender LLLP would distribute this $82.5 million back to all 165 investors. On this belief, the Plaintiffs purchased LP units. This was the *first* of two securities offering in this case.

But this Loan was not normal: it was rigged to never get repaid. First, the Loan was *nonrecourse*, which exempted the developer SPO/Knobel from the obligation to repay the $82.5 million principal. Second, nonrecourse loans are *always* over-collateralized, but this one wasn't.  For example, a typical lender will require $120 million in collateral to secure an $82.5 million nonrecourse loan, but here the lender let the borrower secure an $82.5 million loan with only $82.5 million of collateral, and further allowed the borrower to choose the condominium units supposedly securing this amount, which was only 19 condominiums of the 79 total owned by the borrower and none of the commercial or parking space owned by the borrower, a freakish under-collateralization for a nonrecourse loan.  This under-

_____

[1]    This was a so-called EB-5 transaction under the auspices of the United States Citizenship and Immigration Service (USCIS), with the hope that a transaction generates sufficient jobs that investors receive a green card and a return of their $500,000 investment with profit.  Here, they got the green card, but never got their money returned.

2

collateralization was not known to the investors whose money was solicited and then loaned out.

Third, the Loan allowed the borrower SPO/Knobel to 'put' the 19 units of collateral it had selected back to the lender after *three* years instead of paying back the loan principal in *five* years, so it never needed to pay back the cash it borrowed.

**Deleted:** .

Fourth, the Loan (like all loans) was a *debt* of the borrower but allowed the borrower SPO and Knobel to designate the $82.5 million loan as "developer's equity," meaning that it could be used as an 'asset' (instead of a liability) to leverage other financing for the project. This suggests that the transaction was a disguised sale, where SPO and Knobel got $82.5 million cash for the delivery of 19 units worth $40 million.

**Deleted:** 80

**Deleted:** 80

True to form, after three years the borrower SPO/Knobel 'put' all 19 units that it had designated as collateral back to the lender LLLP and got credit for 'repaying' the entire $82.5 million loan. But in actuality it never transferred title to the LLLP of the units, which are Solaris Property I LLC, a successor to SPO. Now it is time to repay the foreign investors, but the LLLP cannot find willing buyers to purchase the units for anything remotely close to the $82.5 million valuation it had previously approved. By 2016, the LLLP (lender) found itself sitting on 19 units of collateral which it could not sell, except in the range of fifty cents on the dollar. It had made a horrific deal by intention or recklessness, and now it was going to have to stiff the investors who relied on them.

**Deleted:** 80

**Deleted:** was

**Deleted:** could not sell

**Deleted:** 80

Since the resale process was going to take years and years, the LLLP decided to make a *second* securities offering, in which they offered each investor a 'put option' to sell their LP unit back to the LLLP so that when a condominium was sold, the money could be used to pay back the first-in-line investors who had agreed to exercise the put option, leaving the other

**Deleted:** Rather than selling the collateral in one shot and paying back the investors pro-rata in 2016 and 2017

3

investors at the back of the line with no money from the sale of that unit.  This *second* security

offering started in 2016 and is ongoing: some 82% of the investors have so far exercised the

put option and now hold a put right to sell their LP unit back to the LLLP.  The put right was

not registered as a security.

Since 2016, the LLLP sends the investors a notice every six months estimating saying

that the units are worth nearly the same as the principal of the loan (i.e. that the Loan is fully

secured, which is obviously not true), but a bulk sale would take 7 years and return only $40

million, so the units have to be put on the market one-by-one and assigned to whichever

investors are in line under the put right.  In three years, the LLLP has sold precisely two (2)

unit of collateral (one of which was sold to friends of the Chinese agent who marketed the

units), allowing only 13 of the 160 investors to get out of this transaction at fifty cents on the

dollar (at best) after inflation.  All of the others, including the Plaintiffs are stuck in this black

hole of an investment.

For the last few years, and into the indefinite future, the LLLP will hold the

condominium units and sustain the 'put option' into perpetuity, continually accruing fees

from the investors, trying to sell the condominium units that were 'put' to it by the borrower

and then give the money to the investors first in line who have bought a put right from the

LLLP.  Like an elephant trying to squeeze into a funnel, every six months 150-plus foreign

investors are trying to squeeze into line to get assigned to a unit that someday – hopefully –

will be sold at a price that will allow them to walk away with a fraction of their investment

because the deal was so radically under-collateralized.

To make it more ridiculous, the collateral units for sale by the LLLP are competing

with units that Mr. Knobel himself is selling in the same complex, so the lender is competing

**Deleted:** .

**Deleted:** 19

**Deleted:** one (1

**Deleted:** ,

**Deleted:** 8

**Deleted:** drawing

with its own borrower.  Further, Mr. Knobel has a right of first refusal on any unit sold by the LLLP, so if a unit is priced to sell, he can buy it and flip it.  To put it in simple terms, the lender cannot or will not get rid of the collateral because it would show their negligence in setting up this deal.

Who wins and who loses?  The borrower SPO/Knobel wins because they got $82.5 million cash to use as 'equity' by turning over merely $40 million in collateral and walking away.  GP and Waveland win because they are still collecting fees on the $82.5 million for 'managing' it.  So all the loss from under-collateralization falls on the foreign investors such as the Plaintiffs who invested $82.5 million in what they thought was a 5-year conventional loan only to be stuck in perpetuity.

This lawsuit contends that the LLLP made two securities offerings – the original offering in 2011 and the 'put option' which has been continuous since 2016.  These offerings violated federal and state securities laws (Counts I-IV), and the transaction and sale of collateral were negligently set up to impose all the risk of loss on the foreign investors in breach of fiduciary duties owned to them, and as part of a fraud involving the LLLP, the GP, SPO and Knobel (Counts V and VI).  Count VII is a derivative action to force the LLLP to collect $82.5 million on the Loan; Count VIII is for a lis pendens to assert the derivative right of the Plaintiffs to have title of the units transferred to the name of the LP.  The Plaintiffs are victims who have a right to the return of their entire investment and/or the damages they have suffered.

**Deleted:** 80

**Deleted:** The
**Deleted:** the LLLP
**Deleted:** a fee
**Deleted:** 80
**Deleted:** as long as they are
**Deleted:** 80

**Jurisdiction and Venue**

1.      Jurisdiction is proper in federal court pursuant to diversity jurisdiction, 28 U.S.C. 1332(a)(2), because this is a civil matter, in excess of the statutory minimum, between Plaintiffs of a foreign country (The People's Republic of China) and foreign States, against Defendants who have a principal place of business and who are resident in the State of Colorado.

2.      Jurisdiction is also proper in federal court pursuant to subject matter jurisdiction, 28 U.S.C. 1331, because this action asserts violations of federal laws including the Securities Exchange Act of 1934 and the Investment Company Act of 1940.

3.      Venue is proper in this district pursuant to 28 U.S.C. 1391(b)(2) because all Defendants have their principal place of business in Denver and Vail, Colorado.

**The Parties**

4.      Plaintiffs are each Chinese nationals who are green-card holders. Some reside in China and others reside in States other than Colorado.

5.      Defendant LLLP is a Colorado limited liability partnership.

6.      Defendant Colorado Regional Center LLC is a Colorado limited liability company ("CRC").

7.      Defendant GP is a Colorado limited liability company.

8.      Defendant Waveland Ventures LLC is a Texas limited liability company doing business in the State of Colorado and is an affiliate of the GP ("Waveland").

9.      Defendant SPO is a Delaware entity qualified to do business in the State of Colorado.

6

10.     Defendant Solaris Property Owner I ("SPO I") is a Delaware entity qualified to do business in the State of Colorado.

11.     Defendant Knobel is the principal of SPO, the believed principal of SPO I,  and a resident of this State.

12.     Collectively, the Defendants Waveland, CRC, GP, SPO, SPO I, LP, and Knobel are referred to herein as the "Defendants."

> **Formatted:** Font: Not Bold

### **Factual Allegations**

13.     Plaintiffs were recruited to be investors in the LLLP while living in China.

14.     Plaintiffs were recruited to invest by brokers and sales representatives acting as selling agents of the LLLP/GP ("Brokers").

15.     The Defendants paid fees to the Brokers for attracting clients to invest in the LP.

16.     The Brokers provided information about the project to potential investors touting it as a 5-year investment at 5% interest with full collateralization.

17.     The GP, LLLP, and Brokers gave Plaintiffs a Confidential Information Memorandum dated March 31, 2011 containing a description of the Solaris project and a number of ancillary agreements, including drafts of various deal documents, subscription agreements, a form of Promissory Note, and the Limited Liability Limited Partnership Agreement (the "PPM").  The PPM containing these documents is attached as Exhibit 1.

18.     The Brokers received sales commissions and compensation.

19.     The Brokers were not licensed with FINRA or the State of Colorado.

20.     The PPM states in caps: "THE COMPANY IS EXEMPT FROM THE PROVISIONS OF THE INVESTMENT COMPANY ACT OF 1940 PURSUANT TO SECTION 3(c)(1) THEREOF."

21.     In reliance on the PPM and related documents, each investor made two investment payments: (i) an administrative fee of $50,000 which was non-refundable, a portion of which went to the selling agent, and (ii) a $500,000 purchase of an LP unit in the LLLP (a "Unit").

22.     Further, each investor was changed an annual Management Fee of 2% of their investment, to be paid to Waveland.

23.     Each investor was charged a 1% fee to GP.

24.     The PPM indicated that the LLLP would make a loan to SPO which could be designated as "developer's equity" by SPO/Knobel.

25.     The PPM contained a draft Promissory Note ("Note"), which was supposed to have an exhibit listing the collateral securing the loan and the value of such collateral, but this exhibit was empty when delivered to Plaintiffs at the time of their investment. The Promissory Note had an exhibit for listing the collateral -- showing spaces for listing at least 40 units as collateral for the Loan, far more than the 19 units actually assigned as collateral.

26.     The Plaintiffs did not realize that the collateral for the Loan of $82.5 million would be only 19 units out of the 79 owned by SPO/Knobel, and to this day they have no idea why the Loan was not secured by all 79 units of the borrower and the commercial and parking areas. Upon information and belief, an agreement between the GP and SPO/Knobel specified that the 19 units were to be chosen from a group of units pre-selected by Knobel, most of which had the least desirable views.

27.     The first securities offering was conducted in 2011 and 2012.

8

**Deleted:** an entity affiliated with the GP

**Deleted:** Accordingly, the

**Deleted:** 80

**Deleted:** This

28.   The offering documents were in English and the Plaintiffs could not read or speak English proficiently, so they had to rely on representations of the Brokers acting for the LLLP.

29.   160 investors (including the Plaintiffs) subscribed to the securities offering and transferred $82.5 million into the LLLP.

**Deleted:** 80

30.   The LLLP lent all $82.5 million to SPO/Knobel under the Note, which had a five-year maturity for each advance, at an interest rate of 5% per year.

**Deleted:** 80

31.   The structure of the Loan had some very unusual features that were not obvious to non-professional investors such as the Plaintiffs.

32.   First, the Note was non-recourse to SPO/Knobel, meaning that there was no entity or person promising to repay the $82.5 million principal if the collateral proved insufficient.

**Deleted:** 80

33.   Second, a nonrecourse loan is the riskiest kind of construction loan, so it is always over-collateralized to offset the risk. For example, if a prudent lender made a nonrecourse loan of $100 million, it might require that the borrower put up collateral of $150 million or more to secure the loan, so there is a deep cushion for recovery of the principal in case the collateral diminishes in value. In the hypothetical above, even if collateral went down in value from $150 million to $100 million, the collateral would still be sufficient to cover the loan.

**Deleted:**

**Deleted:** 140

**Deleted:** 140

34.   It is unheard-of for any lender to make a nonrecourse loan based on collateral equal to the value of the money being lent; in fact, this is illegal for an FDIC registered bank to make such a loan since it is such a bad deal for the banks' customers.  See, e.g., 12 U.S.C.

9

1828(o) codified at 12 C.F.R. 365.1 (setting an 80% limit for *recourse* construction loans, meaning that even recourse loans must be over-collateralized).

35.     Unknown to the Plaintiffs, the lender LLLP allowed the borrower SPO/Knobel to select the condominium units that would supposedly serve as collateral as being worth $82.5 million, abdicating its business discretion.

36.     In other words, the lender let the borrower choose its own collateral and its own valuation, to which the lender agreed.

37.     Plaintiffs and other investors had no idea of the meager under-collateralization of the Loan (and hence the diminished amount they would get back) until they started to receive Notices to Investors beginning in 2016, showing that the collateral appeared to be only 19 units; they were thus totally mystified as to why only 19 units were used as collateral for the Loan instead of many more units and the commercial and parking space. At some point the Plaintiffs received a list of the collateral value of 19 units, but they still believed that there was more collateral and that the loan was going to be paid at maturity. See Exhibit 2 for a list of collateral and its 'value' as designated by the borrower SPO/Knobel.

*38.*     It was only after Plaintiffs hired a lawyer in 2019, who in turn hired a valuation expert, that the Plaintiffs came to understand that the Loan had been grossly under-collateralized and that the borrower had been allowed to pick the collateral, which meant that from the beginning this was designed so that the borrower would not pay the principal. This was unfathomable to the Plaintiffs, both because of the language barrier and because it seemed so absurd that no rational lender would allow such a thing with *other people's money.*

39.     The most bizarre feature of the Loan is that SPO was allowed after three years to "put" each of the 19 units back to the lender (that is, to the LLLP) and get credit for

10

'repaying' the stated value agreed to by the parties.  In other words, they could "send the keys in the mail" and walk away after three years.

40.     The PPM is purposely confusing and contradictory.  In some parts it says that the transfer of title to the units will occur only if the borrower defaults after 5 years:

> If SPO is unable to make a cash payment on the Maturity Date, SPO will be required to transfer to the Company certain of the Condominium Units located at the Project that are being pledged to secure the obligation to pay the Solaris Note.

> The Solaris Note provides that each Loan Advance has a term of five years. Interest will accrue at the rate of 5% per annum and will be payable interest only in monthly installments. There will be no right to prepay principal for the first three years of any Loan Advance. . . . At the Maturity Date, the unpaid principal balance together with any accrued but unpaid interest shall be due and payable either in cash or by transfer of certain Condominium Units in lieu of cash. (pages 11-13).

Yet it also says that the borrower can put the units back to the lender earlier, after 3 years:

> After three years following a Loan Advance, upon 60 days prior written notice to the Company (the "Prepayment Notice Period"), SPO shall have the right to prepay all or certain minimum amounts of the outstanding principal balance on the Solaris Note by tendering to the Company either (i) a special warranty deed to a Condominium Unit (as defined below) and a bill of sale for the Furnishings (as defined below), which deed and bill of sale will transfer title to the Condominium Units and the Furnishings free and clear of all liens and encumbrances except for matters of record approved by the Company, or (ii) cash in the amount of the principal amount of the prepayment plus all accrued interest. (Page 1)

41.     In practical terms, a condominium unit might have a stipulated collateral value of $3.7 million set by the borrower that could be 'put' to the lender for 'repayment' of $4 million principal even though the actual sale price of the unit in Vail was, say, $2.7 million. On paper - in the fantasyland of the deal - $4 million principal would have been repaid, but

in the real world of Vail, Colorado, only $2.7 million would be available to repay 8 investors who each put in $500,000 of the $4 million and were now lining up to get the lowball figure from which the GP and Waveland would deduct accrued management fees and realtor fees; in fact, the investors had to sign a promissory note in favor of the LLLP promising to pay the management fees. In this example, all of the shortfall and loss ($1.3 million) would fall on the foreign investors. This was by design.

42.     Although called a "loan," this structure is no different from a 3-year sales transaction since the LLLP was paying $82.5 million to SPO/Knobel for units after three years. when they turned out to be far less valuable than the Loan the collateralized, since the Loan was so horrendously under-collateralized.

43.     Upon information and belief, it was contemplated and intended by SPO/Knobel and the LLLP *ab initio* that the 'put' feature would of necessity be exercised, leaving the Plaintiffs shortchanged.

44.     In other words, this transaction was promoted and sold as an investment in a Loan against the condominium units but was in fact an intentionally disguised *purchase* of 19 units.

45.     Furthermore, the PPM variously states that the purpose of the loan is working capital as well as "developer's equity" – a truly bizarre way to refer to a loan (which is debt, not equity).

46.     From a business perspective, no rational lender would allow a loan (which is debt) to be used by the borrower as "equity" since the borrower could then take the loan proceeds as "equity" to another lender and obtain senior-ranking debt to the loan proceeds,

thus harming the lender.  By characterizing the Loan as "equity" the lender imperiled the investors by allowing other lenders to get a stake, perhaps a priority stake,  in the collateral.

> **Deleted:** including the Plaintiffs

47.    The bizarre structure of this transaction came home to roost, naturally.

48.    SPO/Knobel took advantage of the 'put' option and in one fell swoop informed the LP that it would tur over all 19 units at the 3-year mark, in supposed full payment of the principal of the Note, then walked away scot-free, leaving the LLLP stuck holding the 19 illiquid units.

> **Deleted:** turned

> **Deleted:**  with the $80 million that had been given to them...

49.    Despite the requirement in the Note, the PPM, and the offering documents that SPO I would transfer title to the LP, the LP and the SPO entered into a secret  "Agreement Regarding Collateral Units" where (SPO) agreed to temporarily refrain from conveying title to the LP.  That was 4.5 years ago.  For that language to still be active in October of 2019, the "temporary" period would have to stretch from 2015 to 2019 and then into perpetuity, making a mockery of the term "temporarily."

50.    Further, the Secret Agreement had all sorts of ill-advised provisions that the parties obviously wanted to hide, for example that an affiliate of SPO (who had just defaulted on paying back the money) would have the exclusive right to be the real estate agent to collect half of the commissions for sales of the units, that the units were not allowed to be listed on the MLS, and that the LP would apparently forgive interest payments due from SPO.  This is a bizarre, non-standard agreement that the parties had good reason to hide.

51.    Despite this Secret Agreement, the LP represented to Plaintiffs that the units were "Partnership Property" and that title had been transferred.

52.    Now the LLLP/lender  had told investors were worth $82.5 million, but when they tried to sell them individually, they couldn't get anywhere near the prices which they

> **Deleted:** , was holding 19 units that they
>
> **Deleted:** 80

had told the Plaintiffs that the units were worth, and when they tried to sell them as a bulk sale, they were offered low figures that would leave the investors with some fifty cents on the dollar.

53.     The LLLP had told Plaintiffs that the loan was fully collateralized but obviously it wasn't, and as a nonrecourse loan it should not have been fully collateralized but over-collateralized.

54.     Under the terms of the LLLP Agreement and the PPM, the LLLP is supposed to make every effort to "monetize" (a fancy word for "sell") the condominiums by the 5th year anniversary of each advance under the Loan. They couldn't do this.

55.     Instead of selling the units, which they could not do, the LLLP started engaging in a byzantine process for getting rid of the units outlined in Section 13.06 of the LLLP Agreement (Section 13.06) whereby every six months the GP sends an estimate of the collateral value of the units and offers investors a "put option" for putting their LP to the LLLP, which they refer to as a "Notice to Investors."

56.     An example of the latest Notice to Investors is attached as Exhibit 3.

57.     As explained in Exhibit 3, the LLLP offers a continuing "put option" to the Plaintiffs and investors whereby they are offered an option to put their LP interest to the LLLP (the issuer), then the issuer will sell a unit and assign the proceeds to the first investors who submitted their put notice.

58.     Apparently, some 82% of the investors have signed the "put option."

59.     A "put" is a security, so the offering of a put option is an offering of securities, making this a *second* offering of securities, starting in 2016 but ongoing through the present in a continuous offering.

14

**Deleted:** block,

**Deleted:** simply

**Deleted:** far

60.   To date, only two (2) unit out of 19 have been, one to an affiliate of the Chinese agent, to an entity called "Lucky 5 LLC" representing 5 lucky investors who were able to escape this quicksand of a terribly managed investment.   On one property, the lender had allowed the borrower SPO/Knobel to assign it a collateral value of $3,707,982 to secure a loan advance of $4 million by 8 investors at $500,000 each.  It was sold at $2,780,000 and then subject to expenses plus accrued management fees of $210,000 in a promissory note due to the LLLP, with the result that each the 8 investors who were 'lucky' enough to get out of this deal only got slightly over $300,000 for their $500,000 investment after 7 years – about a 50% loss accounting for inflation.

> **Deleted:** To date, only one (1) unit out of 19 has been sold in 3 years.  The

61.   This extreme loss could have been avoided by insisting on better collateral, or by cross-collateralizing the loan, or by hedging the loan with a trade that would pay off if the housing market went down – or any number of rational business decisions that a prudent lender can find.

62.   The 6th Notice to Investors (dated May 30, 2019) attached as Exhibit 3 tells investors that the remaining 18 units have collateral value of $73,130,000 on $78,500,000 remaining of loan principal (93% collateralized), yet also says that a bulk sale will only generate $43 million gross value before deductions and will take 7 years.

> **Deleted:** 31

> **Deleted:** ,

63.   This is bizarre on its face: if the units are right now worth nearly 100 cents on the dollar, why can they only be sold for 50 cents on the dollar in 7 years?  This makes no sense and is designed solely to confuse the investors.

64.   Right now the entire transaction is stuck in 6-month cycles where the LLLP informs investors that they cannot sell the property but asks them to get on the list of persons who exercise a put option to sell their LP unit back to the LLLP.

15

65.     If we "follow the money" we find that the borrower SPO/Knobel got $82.5 in return for turning over $40 million in condominium units; the GP and Waveland get their full management fee as a precondition for any sale of collateral; and the big losers are the investor, which is left holding the bag.

66.     This cannot have happened purely by chance. It reeks of a design, an artifice to place all the burden and risk on the foreign investors, to make them bag-holders, and to use their loans as 'developer's equity.'

67.     Further, title stays with SPO until each unit is sold, which creates a danger that a creditor of SPO or Knobel might try to reach this collateral, or that SPO might declare bankruptcy, leaving the investors without title.

68.     To make matters worse, the LLLP has informed Plaintiffs' counsel that Knobel has a contractual right of first refusal to buy any of the units that the LLLP puts up for sale, and allows him to compete in the sale of Solaris units, so every time that the LLLP lists a unit for a certain price, Mr. Knobel has the ability to list a comparable unit for a lesser amount, or to buy the LLLP's unit and flip it for a greater price, thereby short-circuiting the ability of the LLLP to realize the collateral.  The lender has allowed the borrower to get in the way of 'monetizing' the collateral – all at the expense of the Plaintiffs.

69.     The limited partnership units sold to the Plaintiffs are clearly "securities." *SEC v. Liu*, 262 F. Supp. 3d 957, 969-970 (S.D. Cal. 2017)("Accordingly, securities laws apply to the EB-5 fund offering and [the owner's] conduct."); *SEC v. Kameli*, 276 F. Supp. 3d. 852, fn9 (N.D. Ill. 2017)("Courts have specifically held that investments in EB–5 enterprises like those at issue here constitute 'securities' within the meaning of the securities laws.").

16

**Deleted:** 80

**Deleted:** LLLP

**Deleted:** loser is

**Deleted:** Further, Plaintiffs' counsel has been informed that the transaction is structured so that

70.     Likewise, the 'puts' offered by the LLLP to the limited partners starting in 2016 and continuing through the present are expressly within the definition of a "security" under the 1933 Securities Act.  15 U.S.C. 77b(a)(1)(specifically including the word "put" in the definition).

71.     The Plaintiffs are not native English speakers and cannot fully comprehend the legalese written in English.  They assumed well into 2018 that the collateral was sufficient to repay the Loan and that the LLLP and GP had merely hit a snag in monetizing the deal.

72.     In 2019, the Plaintiffs hired US counsel, who in turn hired a valuation expert for the Plaintiffs.  He immediately discovered that this transaction was set up to fail, that it was a disguised sale to artificially prop up the developer's supposed 'developers' equity' and that the units would not be able to be monetized except at perhaps 50 cents on a dollar, will the entire loss falling on the Plaintiffs.  This transaction is a Roach Motel designed to extract value from foreigners.

73.     Declarations of the Plaintiffs are set forth as Exhibit 4 stating their understanding of this transaction.

<u>**COUNT I**</u>
**(against the LLLP and the GP)**
**15 U.S.C. 80a**
<u>**RESCISSION FOR**</u> **FAILURE TO REGISTER AS INVESTMENT COMPANY**

74.     Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

75.     Section 7(a) of the Investment Company Act ("ICA") precludes an "investment company" transacting business in interstate commerce unless it is registered or qualifies for an exemption from registration.

76.     The ICA defines an "investment company" as "any issuer which . . . is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities." 15 U.S.C. 80a-3(a)(1)(A).

77.     Here, the LLLP is an investment company because it holds itself out as being engaged in the investing in securities, namely by issuing limited partnership units and put options.  When an EB-5 fund makes a loan, the loan is itself an "investment contract" because it is an investment of money in a common enterprise (the development of Solaris) with the expectation of profit (the interest on the loan) derived from the work of others.  See *Realex Capital Corporation*, SEC No-Action Letter (March 19, 1984).

78.     The LLLP was required to register as an investment company or find an exemption from registration.

79.     As noted above, the LLLP stated in the PPM that it was exempt from the ICA because of section 3(c)(1).

80.     However, section 3(c)(1) only provides an exemption for funds that have fewer than 100 investors, which is not the case here.

81.     Therefore, the PPM contains a material misstatement of law and is not exempt as a 3(c)(1) fund.

82.     The PPM admits that if there is no exemption from the registration requirement of the ICA, the investors have a right of rescission.

83.     The remedy for failure to register as an investment company is rescission of contracts entered into by the company, and a ban on the company engaging in interstate commerce.  15 U.S.C. 80a-46(b), 80a-7 and 80-8.

84.     There is a private right of action for violation of the ICA that allows rescission of each investment contract with an unregistered investment company. *University Bank v. Lansuppe Feeder Inc.,* No. 16-4061 (2d Cir., August 5, 2019).

85.     As for the statute of limitations, the Second Circuit in *University Bank* held that the ICA created a private right of action for security holders to rescind their investment with respect to sales by an investment company that occurred *a decade* before the suit was brought.

86.     The LLLP knew that they should have registered under the ICA since they put in capital letters on the PPM their belief that they were exempt and then admitted that if they were not exempt the investors would have a claim for rescission.

87.     The Plaintiffs are entitled to rescind their investment contract with the LLLP.

WHEREFORE, Plaintiffs ask this Court for an Order rescinding their investment of $500,000 each and returning such money with statutory interest and costs.


**COUNT II**
**(against the LLLP and the GP)**
**15 U.S.C. 78o**
**RESCISSION FOR USE OF UNREGISTERED BROKER-DEALERS**


88.     Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

89.     Section 15(a)(1) of the Exchange Act of 1934 makes it unlawful for a person to "effect a transaction in securities" or "attempt to induce the purchase or sale of any security" unless they are registered with FINRA as a broker-dealer.

90.     Section 15(a)(1) applies to the offer and sale of EB-5 units.  *SEC v. Hui Feng*, 17-cv-56522 at page 18 (August 23, 2019)(Lipez, J.)(holding that 15(a)(1) applies to a private placement of EB-5 securities).

91.     Section 29(b) of the Exchange Act provides that every contract made in violation of any provision of the broker-dealer registration requirements "shall be void." The voidable transaction gives the investor a right of rescission.

92.     Section 20(e) of the Exchange Act imposes aiding-and-abetting liability on any person that knowingly or recklessly provides substantial assistance in a violation of the Exchange Act, such as by using a unlicensed broker and paying them transaction-based compensation.

93.     The LLLP admits to selling units and using foreign agents as brokers.  There is no way to describe the $50,000 administrative fee charged to investors as anything other than a transaction-based brokerage fee for finding an investor.

94.     In this District, a transaction brokered by an unlicensed broker is subject to rescission. *Landegger v Cohen*, 5 F. Supp. 3rd 1278, 1292 (D. Colo. 2013) holds that when an unlicensed broker puts a purchaser of securities into contractual privity with an issuer of the securities, the transaction is void, and under Section 29 of the Exchange Act, no investment contract is valid if it involves a violation of the Act.  15 U.S.C. 78cc(b).  The purchaser has a private right of action to declare the transaction void. *Landegger* is good law without negative reviews and has been cited by other federal courts.

Deleted: .

95. Given that the limited partnership units were sold through brokers that were unlicensed, at the insistence of the LLLP, they have aided-and-abetted a violation of section 15(a)(1) of the 1934 Exchange Act.

96. The remedy for using unlicensed broker-dealers is rescission under Section 29(b) of the 1934 Securities Exchange Act, 15 U.S.C 78cc.

**Deleted:** .

97. The statute of limitations for Section 29(b) violations is 1-and-3 years for *fraudulent* conduct by a broker-dealer, but there is no specific limit for the complete failure to register, as in this case.

98. Accordingly, the investment contracts (the initial investment and the put options) are void, and thus the LLLP should return each investor their investment of $500,000.

WHEREFORE, Plaintiffs ask this Court for an Order rescinding their investment of $500,000 each and returning such money with statutory interest and costs.

**Formatted:** Indent: Left:  0"

<u>**COUNT III**</u>
**(against the LLLP, GP, and Knobel)**
**15 U.S.C. 78j (17 CFR. 240.10b-5) and 78t**
**Federal Securities Exchange Act Violation**

99. Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

100. Section 10b of the Exchange Act (15 U.S.C. 78j) provides that it shall be unlawful for any person, directly or indirectly, to use any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe for the protection of investors.

101. In furtherance of Rule 10(b), the Commission enacted Rule 10b-5 (17 CFR

240.10b-5) which makes it unlawful to (a) employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of material fact, or (c) to engage in any act, practice or course of business which operates as a fraud or deceit on any person, in connection with the purchase and sale of a security.

102.    A "material fact" under Rule 10b-5 is any fact that a reasonable investor would find important in making a decision whether to invest.

103.    The GP and the LLLP engaged in deceit in the PPM by creating the misleading impression to Plaintiffs that they were investing in a loan, when in fact it was a disguised sale. This has been a continuing fraud and is a lie that is still being propagated to the Plaintiffs in the Notice to Investors in connection with the second securities offering of the put options.

104.    Furthermore, the GP and LLLP omitted to disclose the material fact that the collateral would be chosen by the borrower and that the Loan would be under-collateralized for a nonrecourse loan, a fact that was not discovered until last year.

105.    The PPM describes the investment in terms of the entire Project (condominiums, parking, commercial) and thereby gave the misleading impression that investors would be investing in something more than 19 units.

106.    The PPM given to investors has a form Promissory Note that has an Exhibit A list of collateral that has room for many dozens of units to be listed as collateral. This created the misrepresentation that there would be ample units to fully over-secure the Loan.

107.    Nowhere in the PPM is there any warning that the Chinese investors would NOT be investing in Solaris as a Project, but only in certain limited units chosen by the borrower to under-collateralize a nonrecourse loan.

**Deleted:** Furthermore, the

108.   The GP and LLLP omitted to disclose the material fact that characterizing the loan as "equity" would allow the borrower to put other creditors ahead of them, and create a benefit to the borrower in which they would not share, a fact that was not discovered until last year.

109.   Furthermore, each Notice to Investors (sent every six months from 2016 – 2019) fraudulently mislead investors to believe that the collateral "Partnership Property" and is roughly equal to the value of the loan when there is no proof to this effect, and indeed, there is no evidence of sales to give it any credence, but precisely the opposite -- the actual sales show how bizarrely the property was overvalued by the borrower and the lender who was supposed to be protecting the interests of the Plaintiffs.

110.   It was not until the Notices to Investors began to pile up (in 2018 and 2019) that the Plaintiffs realized that the Loan was under-collateralized and wasn't secured for $82.5 million, but that it was radically under-collateralized to benefit the issuer and the borrower and the expense of the Plaintiffs; prior to that time, they thought it was impossible for the Loan to be secured only by 19 units, as they figured no lender would ever agree to something so lacking in business sense.

111.   Furthermore, the ridiculous process of lining up the Plaintiffs by 'put options' to state their availability for payout in case there is sale is a fraudulent and deceptive practice by the LLLP.  It had – and has – an obligation to pay back the Plaintiffs' money as quickly as possible, but it has now stuck them in perpetuity.

112.   The Defendants acted with scienter, in full knowledge of the fact that the Loan would not be paid back like a normal loan but was in fact a disguised sale.

23

**Deleted:** 2017

**Deleted:** 2018

**Deleted:** 80

**Deleted:** opitons'

113.    The Defendants had a duty to prominently disclose that the Loan was not likely to have been paid back, and that the LLLP was stuck with undervalued collateral that it could not unload.

114.    This is an ongoing, current fraud since the issuance of the "put option," a security, is still being offered by the LLLP.

115.    The loss causation here is easily quantifiable: each investor has lost $550,000 plus interest, which is what they would have received if this was a normal loan – which is how it was packaged.

116.    Each Plaintiff should receive an amount of money sufficient to make it whole.

117.    Upon information and belief, Defendant Knobel colluded with the GP, Waveland, and the LLLP to set the collateral artificially low for a nonrecourse loan, under the tacit agreement that any loss would fall on the Plaintiffs.  He took $82.5 million of investor money for $40 million in collateral, and that the whole transaction was set up to benefit Knobel.

WHEREFORE, the Plaintiffs demand damages in an amount equal to what would make them whole if the transaction had been a true loan instead of a disguised sale, e.g. the difference between $500,000 plus interest versus the value of their collateral, with an award of interest, costs and attorney fees.

**COUNT IV**
**(against the LLLP and GP)**
**C.R.S. 11-51-501**
**Colorado Securities Act Fraud and Prohibited Conduct**

118.    Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

Deleted: 80

Deleted: , and worked with the GP and LLLP to mislead the investors that this was inevitable

119.    Section 11-51-501 of the Colorado Securities Act provides that it is unlawful for any person in connection with the offer, sale, or purchase of a security, to directly or indirectly employ any device, scheme, or artifice to defraud, to make any untrue statement of material fact, or to engage in any act, practice, course of business which would operate as a fraud or deceit on any person.

120.    Section 11-51-604(5) of the Colorado Securities Act extends liability to all control persons, and those who provide substantial assistance to persons who violate section 11-41-501.

121.    The GP and the LLLP caused – and continued to cause – the Notice to Investors to be sent every six months setting forth the ongoing put option.

122.    The Notices to Investors work a continuing fraud and deceit on the Plaintiffs by overstating the value of the collateral (the condominium units) and thereby covering up the fraud at the heart of this transaction, namely that the Loan was never meant to be paid back but was in fact a disguised sale with the intention of leaving the Plaintiffs with a financial loss.

123.    It was not until the Notices to Investors began to pile up (in 2017 and 2018) that the Plaintiffs could have realized that the Loan was under-collateralized and wasn't secured for $82.5 million, but that it was radically under-collateralized to benefit the issuer and the borrower and the expense of the Plaintiffs.

**Deleted:** 80

124.    It wasn't until 2019 that the Plaintiffs hired a valuation expert who told them that the Loan was in fact horrendously structured so that it would not be paid but was a vehicle to create fictitious "developer's equity" and a disguised sale, in a deception on the Plaintiffs.

125.    The Defendants acted with scienter, in full knowledge of the fact that the Loan would not be paid back like a normal loan but was in fact a disguised sale.

126.    The Defendants never informed the Plaintiffs of the material fact concerning the designation of the Loan (debt) as "developer's equity" and what this implied in terms of putting their interests in a worse position.

127.    The Defendants had a duty to prominently disclose that the Loan was not likely to have been paid back, and that the LLLP was stuck with undervalued collateral that it could not unload.

128.    This is an ongoing, current fraud since the issuance of the "put option," a security, is still being offered by the LLLP.

129.    The parties who made this fraud are the LLLP, its GP, persons who control such entities, and SPO/Knobel, who by agreement set the value of the collateral so low as to make it a disguised sale.

130.    The loss causation here is easily quantifiable: each investor has lost $550,000 plus interest, which is what they would have received if this was a normal loan – which is how it was packaged.

131.    Each Plaintiff should receive an amount of money sufficient to make it whole.

132.    Upon information and belief, Defendant Knobel colluded with the LLLP to set the collateral artificially low for a nonrecourse loan, under the tacit agreement that any loss would fall on the Plaintiffs.   He is jointly and severally liable as providing substantial assistance to this fraud.

        WHEREFORE, the Plaintiffs demand damages in an amount equal to what would make them whole if the transaction had been a true loan instead of a disguised

sale, e.g. the difference between $500,000 plus interest versus the value of their collateral, with an award of interest, costs and attorney fees.

**COUNT V**
**(against the GP)**
**BREACH OF FIDUCIARY DUTY**

133.    Plaintiffs re-allege and reincorporate, as if fully set forth herein, each and every allegation above.

134.    The GP had a fiduciary duty of care to the Plaintiffs.  The LLLP Agreement at Section 8.04 states that "In carrying out their duties and exercising the powers hereunder, the General Partner shall exercise reasonable skill, care, and business judgement."

135.    The LLLP Agreement immunizes the GP from lawsuit over its good faith conduct, but not from willful misconduct or gross negligence which was the situation here.

136.    The GP breached its duty of care to the Plaintiffs and engage in willful misconduct by putting the investors' money into a nonrecourse loan with insufficient collateral.

137.    The GP should have demanded increased collateral and placed a hedge to reduce downside exposure, for example by buying a put option on a real estate index so that it would profit if the value of the collateral went down.

138.    It was a breach of the duty of care to issue a nonrecourse loan of the Plaintiff's money while getting only 1.0 loan-to-value collateral, which is willful misconduct and gross negligence.

139.    It was a breach of duty to make a loan against only 19 units and not against all 79 units of the developer, and the commercial and parking space.

27

**Deleted:** protects

**Deleted:** .

140.   It was a breach of the duty of care to allow the Loan to be 'repaid' after 3 years by the borrower simply 'putting' the units back to the LLLP.

141.   It was a breach of duty to allow the Loan to be repaid by having the borrower continue to hold title if such arrangement exposes the collateral to the creditors of the borrower, while telling the investors that the units were "Partnership Property."

**Deleted:** .

142.   The terms of the Loan are so far below industry standard that they are negligent, reckless, and don't satisfy the standard of reasonable care.

143.   It was a breach of fiduciary duty to not sell the collateral and distribute the proceeds pro-rata.

144.   It is a breach of fiduciary duty to engage in the preposterous charade of having the collateral over-valued every 6 months and having each investor line up for the distinction of losing money pursuant to the Notices to Investors in the form of Exhibit 3.

145.   By not pursuing its options for obtaining full payment on the $82.5 million loan to SPO/Knobel, the GP and LLLP are engaging in a continuing breach of fiduciary duty whereby they get paid in full their management fee on the sale of each unit, but the Plaintiffs suffer the entire loss.

**Deleted:** 80

146.   The GP has purposely delayed in collecting and realizing the value of the collateral because it would nakedly expose how bad a deal it made when it took such meager collateral (worth $40 million) to secure a nonrecourse $82.5 million loan.

**Deleted:** 80

147.   This breach of duty caused harm to the Plaintiffs by reducing the amount of money they would get back from repayment of the loan and reducing the collateral they could use to recoup their losses.

28

148.    The Defendants set up this transaction structure knowingly, willfully, and with scienter, knowing that it placed all the risk on the foreign investors.

149.    By virtue of this structure – a disguised sale portrayed as a loan– the Plaintiffs have suffered monetary loss.

150.    By virtue of the GP's failure to realize the collateral and pursue collection on the Loan from the borrower, it has committed a breach of fiduciary duty.

151.    This breach of fiduciary duty could not have been discovered until the Plaintiffs learned that the Loan had been radically under-collateralized at their expense, and that it was a disguised sale, and that it was structured for the benefit of the borrower to proclaim the debt as equity – which they did not realize until 2018 and 2019 when they hired a valuation expert to examine the transaction.

WHEREFORE, Plaintiffs ask this Court for an award of damages in such amount that they will obtain the equivalent of a return of their investment as if the Loan had been paid at maturity, plus statutory interest, plus fees and costs.

**COUNT VI**
**(against all Defendants)**
**FRAUD**

152.    Plaintiffs re-allege and reincorporate, as if fully set forth herein, each and every allegation above.

153.    The Defendants set up this transaction knowingly, intentionally, and with scienter to defraud the Plaintiffs.

154.    The structure of the Loan was such that there was no intention of the borrower SPO/Knobel paying the principal back.

155.    This was in effect a disguised sale of the 19 units, for a price set by the GP and SPO/Knobel behind the backs of the Plaintiffs and other investors.

156.    The characterization of the loan (which is debt) as "developer's equity" is fraudulent and has only one purpose which is to allow the borrower to overload the project with additional senior debt, thereby disadvantaging the Plaintiffs by recharacterizing their debt as equity.

157.    In addition, this works a fraud on banks and third-party vendors dealing with SPO/Knobel by giving the false impression that they had $82.5 million in equity from the EB-5 investors, when in fact it had an $82.5 million debt.

158.    The LLLP, SPO, and Knobel conspired to create this fraudulent scenario so that each of them would benefit at the expense of the Plaintiffs and other investors who would be left holding insufficient collateral to pay back their investment.

159.    The GP, SPO, and Knobel acted willfully, recklessly, with scienter, and in violation of their duties to the investors.

160.    The PPM mischaracterizes this transaction by creating the false impression to Plaintiffs that it was a regular loan, when in fact it was a disguised sale in which they would invest $82.5 million and end up with collateral worth far less.

161.    This fraud was created by collusion of the GP, SPO, and Knobel when the PPM's terms were created, and then when the collateral was selected for the Loan.

162.    This fraud has benefitted SPO/Knobel by giving them $82.5 million in cash for condominium units worth half of that and picked by the borrower; it benefitted the GP by having its affiliate earn an annual 2% management fee; but the entire onus of loss was put on the Plaintiffs and other dissenters.

30

**Deleted:** 80

**Deleted:** 80

**Deleted:** 80

**Deleted:** 80

163.   The Plaintiffs were unaware that there was a high likelihood (indeed a *certainty*) that the collateral could be 'put' to the LLLP at such a massive loss.  They have no idea why the collateral was restricted to only 19 units, and there is no good explanation for this other than for the other parties to profit on the back of the Plaintiffs.

164.   The Plaintiffs have suffered a massive monetary loss since the collateral is worth only about 50 cents on the dollar because the Loan was purposely undercapitalized and nonrecourse at a loan-to-value of 1:1, which is a freakish anomaly in the business world.

165.   This breach of fiduciary duty could not have been discovered until the Plaintiffs learned that the Loan had been radically under-collateralized at their expense, and that it was a disguised sale, and that it was structured for the benefit of the borrower to proclaim the debt as equity – which they did not realize until 2018 and 2019 when they hired a valuation expert to examine the transaction.

166.   The Plaintiffs have the right to be compensated so that they receive the amount they would have been paid if the Loan had not been set up as a fraud for the Defendants to profit at the Plaintiffs' expense.

167.   The damages for fraud include all monies paid to the GP, Waveland and any third parties after the collateral should have been turned over to the LP.

WHEREFORE, the Plaintiff asks this Court for damages resulting from the loss due to the breach of fiduciary duties by the general partners, in an amount to be determined by the Court, plus fees and costs.

Formatted: Font: Not Bold

Formatted: Indent: Left:  0.5"

**COUNT VII**
**(Derivative Action In the name of the LP)**
**Force Borrower to Repay $82.5 Million Loan**

168.    Plaintiffs re-allege and reincorporate, as if fully set forth herein, each and every allegation above.

169.    The Loan was structured to give the borrower SPO two choices: repay $82.5 million in cash, or transfer title to 19 units.

170.    SPO defaulted on repaying $82.5 million plus interest as set forth in the Loan.

171.    SPO also did not transfer title to the units.

172.    Plaintiffs have in writing derivatively demanded that the LP declare that SPO is in default and exercise all remedies against SPO, but the LP has refused to do so.

173.    Plaintiffs demand that the LP declare a default of payment of $82.5 million by SPO.

174.    Plaintiffs demand that the LP bring suit against SPO for $82.5 million plus interest, costs, and fees.

175.    Plaintiffs demand that the LP distribute the proceeds of collection to Plaintiffs and other limited partners.

176.    Plaintiffs demand that the LP act as a real lender instead of an accomplice to a massive fraud against them.

177.    Plaintiffs demand that the LP join this lawsuit, declare a default, and proceed to judgment against SPO, and/or arrange for SPO to pay LP the difference between the fair value of the units and $82.5 million owed to the LP.

32

---

Deleted: against

Deleted: LLLP, SPO, and Knobel

Formatted: Font: Bold

Deleted: Intention to File

Moved down [1]: Lis Pendens¶

Deleted: Upon information and belief,

Deleted: the condominium

Deleted: held

Deleted: collateral are being held

178.  C.R.S. 7-62-1001 allows limited partners to demand that the limited partnership take action to collect a judgment, bring an action, or take an action beneficial to the partnership.

WHEREFORE, Plaintiffs as limited partners acting under Colorado law hereby demand that the LP take action to benefit the limited partners by suing to collect the full amount of the Loan in cash plus interest, fees, and costs.

**COUNT VIII**
**(Derivative Action in the name of the LP against SPO I)**
**Lis Pendens**

179.  Plaintiffs re-allege and reincorporate, as if fully set forth herein, each and every allegation above.

180.  A search of public records from the Eagle County Assessor's Office shows that of the 18 remaining units of collateral, 17 are owned by SPO I.

181.  One unit is owned by Lucky 5 LLC, which represents persons put in the front of the line to get out of this miserable situation through their connection with an Chinese agency which marketed this deal; hence they are the "lucky" 5 people.

182.  The only parcel of the 19 collateral units that was sold to date was a sale to "Solaris Bella LLC" in Avon, Colorado, through a law firm called Garfield & Hecht.

183.  The Note specifies that the units are to be transferred to the LP if the principal is not paid.

184.  The PPM specifies that the units are to be transferred to the LP if the principal is not paid.

33

185.    The Secret Agreement specified 4.5 years ago that SPO I would only hold the units "temporarily" before transferring them to the LP as rightful owner.

186.    The LP has a contractual claim to title of the units.

187.    SPO, by the Secret Agreement, acknowledged that title of the units belongs to the LP.

188.    The Note specifies that the borrower must pay back the loan of $82.5 million or it must transfer the units to the LP.

189.    Plaintiffs have in writing derivatively demanded that the LP declare that SPO is in default and exercise all remedies against SPO.

**Deleted:** assert a

190.    Plaintiffs are limited partners with the right to make a derivative claim on behalf of the LP pursuant to C.R.S. 7-62-1001.

191.    SPO, SPO I, Knobel, Waveland, and the GP have knowingly, intentionally, and with scienter breached the terms of the Note, the Loan, the PPM, and loan documents whivh require them to transfer title of all units to the LP.

192.    The Secret Agreement - if still valid - can be disclaimed by the LP and it has the right to demand transfer of title of the units to the LP.

193.    Derivatively, the Partners demand on behalf of the LP that title be transferred to the LP and out of the name of SPO I, where such title can be subject to SPO's creditors, bankruptcy, good faith purchasers, super-priority lenders, and other lien holders.

194.    Further to the letter demanding derivative action dated July 1, 2019 to the GP, the Parnters hereby demand for the GP to pursue collection on the full amount of the Loan, and/or to take action asserting their right to title of the units, and to further seek any and all actions for recovery against SPO, Knobel, and the Defendants.

**Deleted:** proportionate value in the title of each of the 19 units...

34

195.   C.R.S. 38-35-110 authorizes the filing of a Lis Pendens to indicate that litigation has be filed with respect to the title of real estate.  Under this statute, and under the Colorado Revised Limited Partnership Act, C.R.S. 7-62-1001, a limited partner may file a Lis Pendens in the name of the limited partnership asserting its right to title of the subject real estate, in this case the units at Solaris Vail that were set as collateral for the Loan.

196.   Here, the Plaintiffs may act in a derivative capacity in the name of the LLLP to enforce its rights against the Defendants to pay back as much as possible of the $82.5 million that it loaned to them, and to take title to at least the 18 remaining units, if not more.

197.   Furthermore, the Plaintiffs as limited partners may petition this Court for creation of a system for paying back the limited partners that allows pro rata reimbursement instead of generating a mad rush of investors exercising put rights every six months to squeeze into line.

198.   The Plaintiffs have withdrawn their 'put notice' so they are in the residual group of investors who have a pro-rata right to the LP's proceeds of units that are sold.

199.   The Plaintiffs have no confidence in the GP to conduct a fair and reasonable sale of the units since they cannot even communicate the value of the units with a straight face -- telling investors that the units are worth almost 100 cents on the dollar and then saying that a bulk sale will realize only 50 cents on the dollar.

200.   Right now there cannot be a legitimate bulk sale of the units because the LP does not own the units.  It cannot sell something it doesn't own.

201.   In addition, the GP an Waveland cannot take management fees and costs which were generated after its failure to transfer title to the LP.

**Deleted:** persons

**Deleted:** sold, and given that only one (1) unit has been

**Deleted:** in 3 years for 8 out of 160 investors, the

**Deleted:** see

**Deleted:** business judgement and no reason to

**Deleted:** the units one at a time allowing

**Deleted:** to draw

**Deleted:** during the process: they should simply liquify the collateral and pay each investor pro rata.

202.   Accordingly, the limited partners hereby demand that the GP forfeit all rights to compensation from and after the date when it was required to transfer the units to the LP.

203.   Based on the reasonable belief that the LP has a claim to title of the collateral units currently held by SPO I, and a beneficial interest in the proceeds of the sale of any such unit of collateral, the Plaintiffs have placed a *lis pendens* on such units under C.R.S. 38-25-110 to reflect that there is litigation concerning the proper title holder of the units.

204.   The *lis pendens* is filed in good faith, under the Plaintiffs' informed belief that they have a derivative claim against such real estate to be transferred to the LP and then sold under terms and conditions that are fair and approved by the Court.

205.   The Plaintiffs fully recognize that a limited partner does not have a property interest in, and cannot file a *lis pendens* on, real property held by an LP.  But in this situation, the real property is not held by the LP -- rather, it is held by a third party who should be compelled to turn the title over to the LP.  If the LLLP will not take action to collect on this remedy, the Plaintiffs may do so derivatively.

WHEREFORE, the Plaintiffs have derivatively placed a Lis Pendens on the units which were required to be transferred to the LP and in which the LP holds a contractual right to hold title, and Plaintiffs further assert that the LP has the right to collect the full value of the loan $82.5 million by collecting from Defendants any deficiency between the sale price of the units and the amounts due under the Loan.

Dated: October 15, 2019

Respectfully Submitted,

/s/ Douglas Litowitz
413 Locust Place

36

---

**Deleted:** they have

**Deleted:** and

**Deleted:** will place

**Deleted:** will be

**Deleted:** Plaintiff's

**Deleted:** <#>The Plaintiffs have no intention to wrongfully cloud title, and will remove the *lis pendens* if the facts are shown to be otherwise. ¶
<#>¶
<#>¶

**Deleted:** August 27

Deerfield, IL 60015
312-622-2848
Litowitz@gmail.com