**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 1:19-cv-02443-STV**

Jun Li, Qi Qin, Yi Liu, Jie Yang, Yuquan Ni, Li Fang,
Zhongzao Shi, Fang Sheng, Shunli Shao, Kaiyuan Wu,
Zhijian Wu, Zhongwei Li, Sa Wu, Fan Zhang, Lin Qiao,
Jinge Hu, Rujun Liu, Ying Xu, Lu Li,  and Yuwei
Dong, individually, as well as Derivatively for Colorado
Regional Center Project Solaris LLLP,

      Plaintiffs,

v.

Waveland Ventures LLC,
Colorado Regional Center Project Solaris LLLP,
Colorado Regional Center,
Colorado Regional Center I, LLC,
Solaris Property Owner LLC,
Solaris Property Owner  I LLC, and
Peter Knobel,

      Defendants.

---

**DEFENDANTS COLORADO REGIONAL CENTER PROJECT SOLARIS LLLP,
COLORADO REGIONAL CENTER, LLC, AND COLORADO REGIONAL CENTER I,
LLC'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION TO BLOCK BULK SALE OF COLLATERAL UNITS
[ECF 32]**

---

Colorado Regional Center Project Solaris LLLP ("CRCPS"), Colorado Regional Center,

LLC ("CRC"), and Colorado Regional Center I, LLC ("CRC I") (collectively, the "CRC Entities"),

through undersigned counsel, hereby files this Response in Opposition to Plaintiffs' Motion for

Preliminary Injunction to Block Bulk Sale of Collateral Units [ECF 32], stating as follows:

1

## I.     <u>INTRODUCTION</u>

Plaintiffs represent approximately ten percent (10%) of the 152 limited partners of CRCPS. Defendant CRC I is the general partner of CRCPS. In its capacity as general partner, CRC I has exercised its reasonable business judgment in deciding to proceed with a bulk sale of 17 luxury condominium units that were pledged as security for CRCPS' loan with Defendant Solaris Property Owner LLC ("SPO").  The bulk sale transaction is designed to bring $49.5 million to CRCPS, which in turn will be distributed directly to the limited partners, after payment of transaction costs and accrued partnership expenses.

In their Original Complaint, Plaintiffs claimed that Plaintiffs' investments into CRCPS were "rigged to never get repaid" - insisting that CRCPS and CRC I intended to hold these condominium units "in perpetuity" in order to continually draw management fees. [ECF 1, p. 4]. In fact, CRC I has diligently been attempting to sell the condominium units for some time, and it has kept the limited partners of CRCPS regularly informed about the appraisals of this property, and efforts to market and sell.  CRCPS now has an existing opportunity to satisfy the demands of the limited partners (including Plaintiffs) for immediate liquidity and to monetize the assets of the limited partnership. After learning of this opportunity, Plaintiffs filed their Motion for Preliminary Injunction ("Motion") [ECF 32], demanding that the Court enjoin the bulk sale that CRCPS has identified. Plaintiffs' Motion contains no evidence whatsoever, and the *only* legal citation identified to support the request for injunctive relief was the Colorado Fraudulent Transfer Act, C.R.S. § 38-3-205. [ECF 32, p. 5, "(t)he applicable state law here is the Colorado Fraudulent Transfer Act."]. But Plaintiffs never even asserted a fraudulent transfer cause of action in their Original Complaint. [ECF 1].

After filing their Motion, Plaintiffs filed a motion to amend [ECF 43], with an attached Amended Complaint which the Court has accepted. [ECF 50]. Notably, Plaintiffs did *not* pursue the claim for fraudulent transfer that they had previously cited as the only support for their request for injunctive relief. The Amended Complaint includes six causes of action for money damages or return of investment through rescission [ECF 43-1, Counts I-VI], a cause of action purportedly (though improperly) filed in a derivative capacity called "Force Borrower to Repay $82.5 Million Loan" [ECF 43-1, Count VII] and a cause of action called "lis pendens." [ECF 43-1, Count VIII]. Notably – and as Plaintiffs clarify in their prayers for relief after each claim for relief pled in the Amended Complaint – the claim called "Force Borrower to Repay $82.5 Million" is the *only* cause of action in the Amended Complaint that even purports to seek injunctive relief.

But there is no such cause of action recognized at law. Moreover, it is entirely unclear what Plaintiffs are even claiming, or how they can show a likelihood of success on the merits of this non-claim. Nor can Plaintiffs meet any of the other elements necessary to secure an injunction. Ultimately this is a money-damages lawsuit: Plaintiffs are demanding a return of $500,000 each, and apparently contend that the anticipated bulk sale will cause them irreparable injury even though it clearly will greatly benefit all limited partners and, at a minimum, mitigate the damages they are seeking in their potentially cognizable causes of action.[1]

Plaintiffs' Motion is simply an effort by ten percent of the limited partners to set aside the general partner's reasonable business judgment and tie up limited partnership property in favor of their (yet undisclosed) business judgment of when and how to sell the real estate at issue. This

---

[1] To be clear, the CRC Entities contend that none of Plaintiffs' other claims – which are all claims for money – in the Amended Complaint are in fact viable, but they are at least recognized as causes of action.

effort should be rejected, and this Court should summarily deny the Motion. If the Court is inclined to enter the preliminary injunction, the Court will be enjoining a $49.5 million transaction and thus, under Fed. R. Civ. P. 65(c), the CRC Entities will request that as a condition of the preliminary injunction Plaintiffs must post a bond of no less than $49.5 million.

## II.     EB-5 VISA PROGRAM OVERVIEW

By way of background, the United States Customs and Immigration Services ("USCIS") administers the EB-5 Visa Program. *See* EB-5 Immigrant Investor Program, USCIS, https://www.uscis.gov/eb-5 (last visited Oct. 18, 2019).  To meet EB-5 visa requirements, foreign investors must make an "at risk" capital investment in a United States commercial enterprise. *See* 6 USCIS Policy Manual, pt. g, ch. 4, § C, https://www.uscis.gov/policy-manual ("USCIS Policy Manual"). To be "at risk," an EB-5 investment must constitute an actual commitment of capital and not a mere intent to invest, *see* 8 C.F.R. § 204.6 (j), and any capital contribution cannot be made "in exchange for a note, bond, convertible debt, obligation, or any other debt arrangement." 8 C.F.R. § 204.6(e)(ii).  For a commercial investment to qualify for an EB-5 investment, it must be a "for-profit activity formed for the ongoing conduct of lawful business including, but not limited to, a sole proprietorship, partnership (whether limited or general), holding company, joint venture, corporation, business trust, or other entity which may be publicly or privately owned." 8 C.F.R. § 204.6(e).

The required investment is either $500,000, for investments in a "targeted employment area" ("TEA"), which means a rural area or area with high unemployment, or $1 million for other investments. 8 U.S.C. § 1153(b)(5); 8 C.F.R. § 204.6(j) and (e).  EB-5 investors may invest directly or through qualified EB-5 regional centers. A regional center is an organization designated by

4

USCIS that sponsors EB-5 capital investment projects. *See* 6 USCIS Policy Manual, pt. g, ch. 4, §

A. While direct investors must create ten actual, identifiable full-time jobs for qualified U.S.

workers, regional centers may create the jobs indirectly.  *See SEC v. Chen*, No. C17-045JLR, 2019

WL 652360, at *1 (W.D. Wash. Feb. 15, 2019).  Once an EB-5 investor makes the required capital

investment, he or she may submit a Form I-526 petition to USCIS to obtain status as a legal U.S.

resident, along with his or her spouse and children under age twenty-one, on a conditional basis

for two years. 8 C.F.R. § 204.6(a).

### III.    STATEMENT OF MATERIAL FACTS

CRC is an approved EB-5 Regional Center, authorized by USCIS to operate anywhere

within the State of Colorado. *See* **Exhibit A**, Affidavit of Rick Hayes, at ¶ 2. CRC I is the general

partner of CRCPS. *Id.* at ¶ 3. Plaintiffs are Chinese investors who each purchased a limited

partnership interest in CRCPS for $500,000, as part of an approved EB-5 Program through the

USCIS to obtain a permanent residence visa, commonly referred to as a "green card." *Id.* at ¶ 4.

CRCPS prepared a Private Placement Memorandum ("PPM") to raise funds related to the

development of a luxury residential and commercial project known as Solaris Residences

("Solaris"). *Id.* at ¶ 5. As the PPM explained, investors who invested in this opportunity paid

$500,000 for limited partnership interests in CRCPS, and the proceeds of the PPM offering were

to be used to lend up to $100 million to SPO, the developer of Solaris. *Id.* at ¶ 6. The PPM included,

among other things, copies of the transactional documents related to CRCPS' contemplated loan

to SPO, a fulsome description of the anticipated use of the PPM offering, a description of the

investor qualifications and suitability requirements, and an actual copy of the CRCPS limited

liability partnership agreement. *Id.* at ¶ 7. In order to purchase an interest in CRPCS, the investors had to, and did, certify their proficiency in the English language. *Id.* at ¶ 8.

The loan agreement between CRCPS and SPO was and always has been an arm's length transaction. *Id.* at ¶ 9. Before sending the PPM to potential investors, CRCPS submitted the investment opportunity described in the PPM to the USCIS. *Id.* at ¶ 10. The USCIS evaluated this investment structure and approved it as an EB-5 Program investment. *Id.* USCIS has never revoked the EB-5 Program approval for this investment. *Id.* While Plaintiffs are apparently claiming in this lawsuit that they believed they were promised a guaranteed return of their investment, CRC, CRC I, and CRCPS did not promise any of the investors a guaranteed return, nor would USCIS have permitted such an investment under the EB-5 Program. *Id.* at ¶ 11.

The PPM was issued on or about March 11, 2011, and the last limited partner subscribed by April 2013. *Id.* at ¶ 12. Thereafter, CRCPS loaned the proceeds of the investment, which totaled approximately $82.5 million, to SPO's assignee, Solaris Property Owner I, LLC ("SPO I"). *Id.* at ¶ 13. The proceeds of the loan were to be used by SPO to pay certain costs pertaining to the development of the Solaris project. *Id.* at ¶ 14. The loan was evidenced by a loan agreement, and a promissory note and was funded in multiple advances over a period of time. *Id.* at ¶ 15. To secure the loan, SPO granted a lien, evidenced by a deed of trust, to CRCPS for each of 19 condominium units valued in the aggregate at approximately $82.5 million at the time of execution of the loan agreement (the "Property"). *Id.* at ¶ 16. Prior to the commencement this action, two of the 19 units were assigned to entities owned by certain limited partners of CRCPS in consideration of a redemption of their partnership interests. *Id.* at ¶ 17. The loan accrued interest at a rate of 5.55%

per annum. *Id.* at ¶ 18. The principal balance together with all accrued and unpaid interest of each loan advance was due and payable five years after the date of each loan advance. *Id.* at ¶ 19.

Pursuant to the terms of the overall loan agreement and as expressed by the PPM, three years following each loan advance, CRCPS (the lender) and SPO (the borrower) had certain "put" and "call" rights. *Id.* at ¶ 5, Ex. 1. Specifically, after three years SPO was entitled to "put" the Property instead of repaying CRCPS with cash, and CRCPS was entitled to refuse SPO's repayment of cash and require SPO to convey the Property. *Id.* As structured, if the value of the Property went down three years after the loan closing, SPO had the option to repay its obligations by conveying the Property, and if the value of the Property went up three years after the loan closing, CRCPS could reject SPO's cash repayment and demand a conveyance of the Property. *Id.* at ¶ 20. Prior to the first advance under the loan, SPO assigned all rights, obligations, title and interest related to the loan, note and Property to SPO I, and SPO I assumed all obligations thereunder, thus becoming the borrower pursuant to the loan agreement. *Id.* at ¶ 21.

The real estate market for luxury condominium units in Vail, Colorado did not do as well as CRCPS and its limited partners hoped it would – a risk that was specifically identified in the PPM. *Id.* at ¶ 5, Ex. 1. Consistent with the terms of the loan agreement, SPO I exercised its right to transfer the Property in lieu of cash payment with respect to each condominium unit after three years following each loan advance. *Id.* at ¶ 22. Pursuant to the terms of an Agreement Regarding Collateral Units between CRCPS and SPO I, CRCPS has not yet been assigned title to the remaining units comprising the Property (other than the two condominium units conveyed to CRCPS' designees), because SPO I agreed to continue to hold title and, upon the instruction of CRCPS, to directly sell the units to a buyer designated by CRCPS. *Id.* at ¶ 23. Such deferral of

title transfer benefits CRCPS because it avoids a significant municipal transfer tax, prepayment of HOA dues, and over $100,000 of working capital payments that would be due the HOA, which costs would be borne by the limited partners, including Plaintiffs (investors). *Id.* at ¶ 24. Accordingly, SPO I continues to hold title to the Property (now consisting of 17 units), and CRCPS continues to hold a first priority lien on the Property by means of the respective deeds of trust. *Id.* at ¶ 25.

CRC I, as general partner of CRCPS, has been cognizant of the limited partners' desire to liquidate their investment, and has consistently and regularly provided the investors notices regarding appraisals of the Property, opportunities to sell the Property through bulk sales of the condominium units or sales of individual units, and plans for the return of the limited liability partners' capital contributions. *Id.* at ¶ 26. In an effort to provide an equitable exit strategy for limited partners who wanted to liquidate their investment, CRC I sent notices beginning on March 15, 2016, to the limited partners, including Plaintiffs, giving them an opportunity to sell their limited partnership interest to the partnership, CRCPS. *Id.* at ¶ 27. Plaintiffs expressly rejected this opportunity, advising CRC I that they would not exercise the "Put Right" that CRC I described in the various notices. *Id.* at ¶ 28.

CRC I has diligently attempted to find a suitable exit strategy for all investors, which of course would necessarily involve a sale of the Property. *Id.* at ¶ 29. Exercising its reasonable business judgment, CRC I determined that a recent offer for a bulk sale of the Property was in the best interest of CRCPS. *Id.* at ¶ 30. On June 5, 2019, CRCPS entered into a Letter of Intent ("LOI") to sell all of the Property (now comprised of 17 units) to a buyer in a transaction referred to as a bulk sale for total consideration of $49.5 million. *Id.* at ¶ 31. CRC I would prefer to sell the units

8

for a higher price than $49.5 million, but the reality is that in CRC I's business judgment, the price being offered in the LOI is reasonable under current market conditions. *Id.* at ¶ 32. It may be possible to secure a higher total price for the sale of all 17 units on an individualized basis, as opposed to a bulk sale, but many of the limited partners have insisted on immediate liquidity of their investment and a cessation of management fees that naturally accrue unless and until the units are sold. *Id.* The rationale of the bulk sale contemplated in the LOI is to satisfy the demands of the limited partners to immediately monetize the assets of the limited partnership. *Id.* at ¶ 33.

If the LOI proceeds to a purchase and sale agreement closing, the net proceeds of the bulk sale (after payment of transaction costs and accrued partnership expenses) will be distributed to limited partners, including Plaintiffs, as a return of capital. *Id.* at ¶ 34. Counsel for CRC, CRC I, and CRCPS sent counsel for Plaintiffs notice of the LOI and proposed bulk sale on or about September 4, 2019 and warned that this lawsuit or any lis pendens filed would jeopardize this potential bulk sale. *Id.* at ¶ 35. Plaintiffs reacted by filing a notice of lis pendens and requesting an injunction. *Id.* It appears that Plaintiffs are asking the Court to require SPO I to place title to the 17 units in the name of CRCPS based on some kind of claim that SPO I has somehow breached the loan agreement with CRCPS. *Id.* at ¶ 36. But CRC and CRCPS are not aware of any breach by SPO I of the loan agreement, and, again, the reason that CRC I asked SPO I to hold title until the 17 units are sold was to avoid a possible transfer penalty that could cost CRCPS (and its limited partners) about $1 million. *Id.*

If the Court orders transfer of title to the Property to CRCPS, and CRCPS enters into a sale with the purchaser under the LOI (or another purchaser), CRCPS will be saddled with liability of about $1 million upon the transfer of title. *Id.* at ¶ 37. It also appears that Plaintiffs are asking the

4837-9163-7673.5

Court to enjoin CRCPS from proceeding with the transaction contemplated in the LOI. *Id.* at ¶ 38. This lawsuit and the lis pendens have already jeopardized the transaction, but it may be salvaged, depending on the outcome of this Motion. *Id.* at ¶ 39. If the Court enjoins the bulk sale contemplated by the LOI, it is unlikely that CRCPS will get another similar opportunity to sell the Property – at least not in the near term. *Id.* at ¶ 40. And CRCPS will be damaged in a sum certain: $49.5 million. *Id.* at ¶ 41. In addition, if the Property is not sold, it will have to be maintained and managed, and management fees will necessarily continue to accrue. *Id.* Based on past history, those fees will accrue in the amount of approximately $134,000 per month. *Id.*

## IV.   STANDARD OF REVIEW

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *see also O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004). The purpose of a preliminary injunction is limited and is designed "to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Although the grant or denial of a preliminary injunction lies within the sound discretion of the trial court, "[a] preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019). And "the right to relief must be clear and unequivocal." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003).

To obtain a preliminary injunction, the movant must demonstrate: (1) substantial likelihood that movant will eventually prevail on the merits; (2) a showing that the movant will

suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction will cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest. *See id.* at 1255.

## V.    <u>ARGUMENT</u>

### A.    **Plaintiffs' Failure to Present Any Evidence Bars Injunctive Relief**

In their Motion, Plaintiffs' do not proffer any affidavits, declarations or other documentary evidence, and instead rely entirely on argument from counsel. For this reason alone, Plaintiffs' Motion should be denied.

While the movant need not prove all aspects of his or her case in full for a preliminary injunction, *see Atty. Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009), the movant must at least put forward some evidence to support a preliminary injunction. *See, e.g.*, *Voile Mfg. Corp. v. Dandurand*, 551 F. Supp. 2d 1301, 1307 (D. Utah 2008) ("Courts require more than unsupported factual conclusions to support . . .a finding [of irreparable harm].*"); see also Underwood v. Bank of Am. Corp.*, No. 18-cv-02329-PAB-MEH, 2018 WL 6655913, at *6 (D. Colo. Dec. 19, 2018) (concluding that plaintiffs failed to offer sufficient evidence of irreparable harm where declarations submitted by plaintiffs were from close friends and business associates). To that end, conclusory statements, that merely reiterate the four requirements for preliminary relief, do not establish entitlement to preliminary injunction. *See Muhammad v. U.S.*, 295 F. App'x 289, 291 (10th Cir. 2008).

Plaintiffs' Motion is simply a series of unverified and wholly unsupported conclusory statements. Such statements standing alone, however, do not justify the issuance of a preliminary

injunction. *See Advanced Commc'n Design, Inc. v. Premier Retail Networks*, 46 F. App'x 964, 979 (Fed. Cir. 2002) (noting that "[p]reliminary injunctions frequently are denied if the affidavits are too vague or conclusory to demonstrate a clear right to relief"); *see also Blango v. Thornburgh*, 942 F.2d 1487, 1493 (10th Cir. 1991) (noting that arguments that are "merely conclusory reiterations of the requirements for an injunction couched in the form of declarative statements" are insufficient). Because the Motion contains no evidence whatsoever, Plaintiffs' request must be denied.

**B.      Plaintiffs' Request for Injunctive Relief Should be Denied Because the Relief Sought Does Not Relate to the Claims in the Amended Complaint**

Plaintiffs' Motion is based on an alleged fraudulent transfer under C.R.S. § 38-3-105. But Plaintiffs have not, and cannot, allege, let alone establish a fraudulent transfer and they have not pled such a claim in their Original or Amended Complaints. [ECF 1 and 43].

Preliminary injunctions are only appropriately used to grant intermediate relief of the same character as that which may be finally granted at the conclusion of the litigation. *See DeBeers Consol. Mines v. U.S.*, 325 U.S. 212, 220 (1945). In other words, "injunctive relief must relate in some fashion to the relief requested in the complaint." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1134 (11th Cir. 2005). When the movant seeks intermediate relief beyond the claims in the complaint, the court is powerless to enter a preliminary injunction. *See Stewart v. U.S. Immigration & Naturalization Serv.*, 762 F.2d 193, 198-99 (2d Cir. 1985) (holding that the district court lacked jurisdiction to issue a preliminary injunction because the movant had "present[ed] issues which [were] entirely different from those which [had been] alleged in his original complaint").

Aside from a single conclusory statement they have "every likelihood of winning on the merits," Plaintiffs do not even attempt to demonstrate that they are likely prevail on the merits of any particular cause of action that they actually pled. [ECF 32, at ¶ 32]. Nor could they because the Amended Complaint does not include any claim that would permit the remedy Plaintiffs now seek. At most, Plaintiffs' Amended Complaint includes so-called derivative claim to "Force Borrower to Repay $82.5 Million Loan" but that is not a cause of action at all. Simply put, a court cannot order a remedy without an underlying claim.

Stripping away the improperly pled derivative claim, the Amended Complaint remains confined to claims for monetary damages. As a result, a preliminary injunction under these circumstances would be used solely to restrain a defendant's use of assets to preserve a potential money judgment – a pre-judgment attachment. But the Tenth Circuit has expressly rejected the use of an injunction for this purpose, and instead has held that a preliminary injunction is available only when a plaintiff, in an action for equitable relief, seeks an injunction with respect to the same *res* or thing that is the subject of its underlying claim. *See Home-Stake Prod. Co. v. Talon Petroleum, C.A.*, 907 F.2d 1012, 1021 (10th Cir. 1990) ("[A] court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a potential money judgment.") (citation omitted). Neither Fed. R. Civ. P. 65 nor common law principles countenance the preliminary injunction requested by Plaintiffs.

**C.      Plaintiffs Cannot Satisfy the Requirements for Injunctive Relief**

>      ***1.      Plaintiffs Cannot Demonstrate a Substantial Likelihood of Success on the Merits of Their Claims***

The only claim Plaintiffs have pled in support of their request for injunctive relief is a cause of action that does not exist.  For this reason alone, Plaintiffs cannot demonstrate a substantial likelihood of success on any claim *that entitles Plaintiffs to injunctive relief.* If the Court reviews the remainder of Plaintiffs' claims – which it should not because they are all claims for money damages, not injunctive relief – Plaintiffs fare no better.

Count I of Plaintiffs' Amended Complaint is for rescission in light of an alleged violation of 15 U.S.C. § 80a. Colorado courts have held that there is no private right of action under 15 U.S.C. § 80a-46(a).  *See, e.g.*, *In re Oppenheimer Rochester Funds Group Sec. Litig.*, 838 F. Supp. 2d 1148, 1159 (D. Colo. 2012); *Davis v. Bailey*, No. CIVA05cv00042WYD-OES, 2005 WL 3527286, at *5 (D. Colo. Dec. 22, 2005).  While the Tenth Circuit has not directly addressed this issue, several circuits have adopted this approach.   *See, e.g., Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co.*, 677 F.3d 178, 185 (3d Cir. 2012); *UFCW Local 1500 Pension Fund v. Mayer*, 895 F.3d 695, 669 (9th Cir. 2018).   But even if Plaintiffs were permitted to assert this claim, Count I is also time-barred under the one-year statute of limitations and the three-year statute of repose because Plaintiffs seek rescission of the initial $500,000 investment that was made in 2011 or 2012.  *See UFCW Local 1500 Pension Fund v. Mayer*, No. 16-cv-00478-RS, 2016 WL 6122458, at *9 (N.D. Cal. Oct. 19, 2016), *aff'd,* 895 F.3d 695 (9th Cir. 2018).

Count II of Plaintiffs' Amended Complaint is for rescission in light of an alleged violation of 15 U.S.C. § 78o.  Plaintiffs similarly have no private right of action under 15 U.S.C. § 78o. Plaintiffs cite, in their Amended Complaint itself, to *Landegger v. Cohen*, 5 F. Supp. 3d 1278, 1292 (D. Colo. 2013), which is distinguishable. Unlike this case, the defendants in *Landegger* were in fact brokers, and, unlike this case, the *Landegger* plaintiffs did not bring claims for aiding and

14

abetting. 5 F. Supp. 3d at 1280.  Moreover, *Landegger* conflicts with other Colorado cases and several circuit courts, and its holding has not been widely cited by other federal courts as Plaintiffs contend. *Contra Snyder v. Neward, Cook & Co., Inc.*, 764 F. Supp. 612, 616 (D. Colo. 1991) (holding there is no private right of action for aiding and abetting liability); *see also Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990); *Asch v. Philips, Appel & Walden, Inc.*, 867 F.2d 776, 777 (2d Cir. 1989); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1314 (9th Cir. 1982).

Moreover, Section 20(e) of the Exchange Act, upon which Plaintiffs further rely in support of their Count II, explicitly provides that liability for aiding and abetting can only be pursued by the SEC:

> Prosecution of persons who aid and abet violations. For purposes of any action brought by the Commission under paragraph (1) or (3) of section 21(d) [15 USCS § 78u(d)], any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this title [15 USCS §§ 78a et seq.], or of any rule or regulation issued under this title [15 USC §§ 78a et seq.], shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

15 U.S.C. § 78t; *see also Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S.148, 162 (2008) ("Aiding and abetting liability is authorized in actions brought by the SEC but not by private parties.").  And finally, like Count I, Count II is also time-barred under the one-year statute of limitations and the three-year statute of repose because Plaintiffs seek rescission of the initial $500,000 investment that was made in 2011 or 2012.  *See* 15 U.S.C. § 78cc(b).

Counts III and IV of the Amended Complaint are for federal and state securities fraud, respectively.  Both are barred.  Count III is subject to a two-year statute of limitations and five-year statute of repose.  *See* 28 U.S.C. § 1658.  Because Plaintiffs are seeking rescission of the

initial $500,000 investment, which again occurred in 2011 or 2012, their claim is barred as a matter of law.  Even if Count III could survive the applicable statute of limitations, it is certainly barred by the five-year statute of repose under 28 U.S.C. § 1658.  The five-year period of repose serves "as a cutoff" and "tolling principles do not apply." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 363 (1991) (addressing predecessor three-year statute of repose), *abrogated on other grounds by,* 28 U.S.C. § 1658. Plaintiffs' Count IV under the Colorado Securities Act is likewise barred by the five-year statute of repose pursuant to C.R.S. § 11-51-604(8).

As for Counts V and VI – for breach of fiduciary duty and fraud – Plaintiffs' Amended Complaint does not come near stating plausible claims for relief. For example, while Plaintiffs allege that the PPM was fraudulent or misleading, they do not even attempt to identify any specific misrepresentations or duties that the CRC Entities breached.  More importantly, in their Motion, Plaintiffs do not even mention these claims and of course Plaintiffs have presented no evidence at all in support of these claims.

Count VIII is called "lis pendens."  As with Count VII (*see* Section I, *supra*), there is simply no such cause of action recognized at law.

### 2. Plaintiffs Cannot Demonstrate That They Will Suffer Irreparable Harm Without Injunctive Relief

Plaintiffs argue, without citation to any evidence, that they will suffer real, immediate and irreparable injury unless the Court enjoins the bulk sale of the units.  Plaintiffs contend that, absent injunctive relief, the partnership's assets will be dissipated, preventing any recovery on a potential money judgment and leaving them without any legal or equitable remedy.   These conclusory

allegations fail to satisfy their burden on this Motion and do not constitute a sufficient showing in any event.

Courts have consistently held that "a showing of probable irreparable harm is the single most important prerequisite." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (citation omitted). Irreparable harm "does not readily lend itself to definition" and proving irreparable harm is not "an easy burden to fulfill." *Id*. at 1262 (citation omitted). "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (citation omitted). The essence of showing irreparable harm is demonstrating an injury that money damages cannot sufficiently remedy. *See, e.g., High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995); *Voile*, 551 F. Supp. 2d at 1307. "Economic loss usually does not, in and of itself, constitute irreparable harm." *See Cobra N. Am., LLC v. Cold Cut Systems Svenska AB*, 639 F. Supp. 2d 1217, 1231 (D. Colo. 2008) (citation omitted); *see also Dominion Video*, 356 F.3d at 1265. Similarly, a claim of "[p]urely speculative harm will not suffice"; instead, a plaintiff must show that "significant risk of irreparable harm" is present to meet the burden. *RoDa Drilling*, 552 F. 3d at 1210. "Wholly conclusory and speculative statements, no matter how vividly argued, do not amount to irreparable harm." *Digital Ally, Inc. v. Corum*, Case No. 17-cv-02026-DC-GLR, 2017 WL 1545671, at *4 (D. Kan. Apr. 28, 2017).

The only legally cognizable claims for relief in Plaintiffs' Amended Complaint are claims for money damages, and, if successful, Plaintiffs will obtain a money judgment. Despite their repeated (and unsubstantiated) allegations, Plaintiffs have not demonstrated that the sale of the units will prevent them from any meaningful remedy. [ECF 32, at ¶ 29-31]. To the contrary, a sale

17

of the units, which will, in turn, result in a pro rata distribution to each of the remaining limited partners, will not only mitigate Plaintiffs damages, but it will also allow such damages to be reduced to a sum certain (i.e. the difference between the initial investment and the amount distributed).

3.     *The Balance of Equities Strongly Disfavors Injunctive Relief*

Plaintiffs make no attempt to demonstrate that the balance of equities favor an injunction. Focusing solely on the purported harm that they insist will result from the bulk sale, Plaintiffs fail to consider the impact that an injunction will have not only on CRCPS itself, but also on the 90% of the limited partners who are not a party to this lawsuit.

To satisfy this factor, Plaintiffs are required to make a showing that the threatened irreparable harm to them outweighs the threatened harm the injunctive relief may inflict on CRCPS, CRC I, and the other limited partners. *See Free the Nipple*, 916 F.3d at 806. In entering into the LOI, CRC I exercised its business judgment, including weighing relevant market conditions and certain limited partners' desire for immediate liquidity. Preventing the LOI from proceeding to a purchase and sale agreement would nullify the purpose of the limited partnership agreement, including CRC I's role as general partner, and harm all limited partners – including Plaintiffs – by preventing an immediate distribution of capital and causing CRCPS to continue to accrue maintenance and management fees. CRC I has determined that this sale is a good business judgment and an opportunity that could be forever lost if the injunction enters. Under such circumstances, equity does not support Plaintiffs' request for this Court to halt the pending bulk sale, particularly when such outcome is inconsistent with the views of other limited partners, the limited partnership structure, and the relief Plaintiffs themselves request – immediate liquidity of

4837-9163-7673.5

their investment. The balance of equities does not weigh in favor of granting Plaintiffs' requested injunction.

### 4.    An Injunction Would Disserve the Public Interest

Plaintiffs do not advance any argument relating to this factor. As described above, the structure of the investment, the exigencies of the bulk sale, and governing state and federal law do not support Plaintiffs' request for an injunction.  As such, the issuance of a preliminary injunction would undermine the public's interest in the proper enforcement of state and federal securities law and the independence of corporate governance. This factor weighs against an injunction.

### 5.    Security Requirement Under Fed. R. Civ. P. 65(c)

To the extent an injunction is issued, Plaintiffs should be required to post a bond for $49.5 million – the total consideration for the bulk sale.  If Plaintiffs are unable or unwilling to provide such security, the preliminary injunction should be denied.

Fed. R. Civ. P. 65(c) provides that the court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."   The bond requirement "assures the enjoined party that it may readily collect damages . . . in the event that it was wrongfully enjoined, without further litigation and without regard to the possible insolvency'" of the movant.  *Phillips v. Charles Schreiner Bank*, 894 F.2d 127, 131 (5th Cir. 1990) (citation omitted) (alteration in original).   "Because the damages caused by an erroneous preliminary injunction cannot exceed the amount of the bond posted as security, and because an error in setting the bond too high is not serious, district courts should err on the high side when setting bond."

*Builder's World, Inc. v. Marvin Lumber & Cedar, Inc.*, 482 F. Supp. 2d 1065, 1078 (E.D. Wis. 2007).

If an injunction enters and it is later determined that CRCPS was wrongfully enjoined from proceeding with the sale contemplated in the LOI, CRCPS will suffer damages in the amount of $49.5 million. CRCPS therefore requests that the Court require Plaintiffs to post a bond in that amount pursuant to Rule 65(c) in the event that an injunction is entered.

## VI.     CONCLUSION

Plaintiffs have failed to establish the right to any injunctive relief.  Their Motion should be denied.

DATED: October 18, 2019.

/s/ Stephanie A. Kanan
James D. Kilroy
Stephanie A. Kanan
SNELL & WILMER L.L.P.
1200 Seventeenth Street, Suite 1900
Denver, CO 80202-5854
Phone: (303) 634-2000
Fax: (303) 634-2020
Email:  jkilroy@swlaw.com
Email:  skanan@swlaw.com

***Counsel for Defendants Colorado Regional Center Project Solaris, LLLP, Colorado Regional Center, LLC and Colorado Regional Center I, LLC***

20

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on October 18, 2019, a true and correct copy of the above and foregoing document has been electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record:

Douglas Litowitz
413 Locust Place
Deerfield, IL  60015

Harold A. Haddon
Ty Gee
Haddon Morgan and Foreman, P.C.
150 East 10th Avenue
Denver, CO  80203

*/s/ Erika Conner*
for Snell & Wilmer L.L.P.