# LOAN AGREEMENT

THIS LOAN AGREEMENT (this "**Agreement**" or "**Loan Agreement**") is made into and entered into this 5th day of November 2010 between Borrower and Lender (as such terms are defined below).

**1.** **AGREEMENT TO LEND.** Subject to all of the terms, conditions and provisions set forth below and in the Loan Documents (as hereinafter defined) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, (i) Lender has agreed to lend to Borrower and (ii) Borrower has agreed to borrow from Lender, certain funds not to exceed the Loan Amount (as hereinafter defined).

**2.** **TERM.** This Agreement shall become effective as of the date first written above and remain in effect until the parties respective obligations hereunder have been performed in full or this Agreement is terminated as provided below.

**3.** **UNITED STATES DOLLARS.** All references to dollar amounts shall mean amounts in lawful money of the United States of America.

**4.** **DEFINITIONS.** Terms not otherwise defined in this Agreement or the other Loan Documents (as hereinafter defined) shall have the meanings attributed to such terms in the Uniform Commercial Code. The following terms shall have the meanings set forth below:

"**Agreement**" or "**Loan Agreement**" means this Agreement, as the same may be amended or modified from time to time, together with any and all exhibits and schedules attached to this Agreement from time to time.

"**Borrower**" means Solaris Property Owner, LLC, a Delaware limited liability company, its successors and assigns.

"**Closing**" means the date on which each Loan Advance is made to Borrower.

"**Collateral**" means the Property, as hereinafter defined.

"**Collateral Unit(s)**" shall have the meaning set forth below in Section 8 of this Loan Agreement.

"**Collateral Unit Value**" means the estimated market value of each Collateral Unit as set forth in the Condominium Pool.

"**Condominium Pool**" means certain Condominium Units listed on Exhibit A hereto.

"**Condominium Unit(s)**" or "**Unit(s)**" means the individual condominiums in the Condominium Pool.

"**Deed of Trust**" means the deed of trust (in a form and substance materially similar to the form attached hereto as Exhibit B) to be recorded against each Collateral Unit in connection with Closing on the Loan Advance secured by such Collateral Unit.

"**Event of Default**" means any one of the Events of Default (as hereinafter defined).

"**Grantor**" means each and all of the persons or entities (including, without limitation, a Borrower) granting a Security Interest in the Collateral.

1

CRC 000230

"**Indebtedness**" means and includes without limitation the Loan, together with all other obligations, debts and liabilities of Borrower to Lender, or any one or more of them.

"**Lender**" means Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership, its successors and assigns.

"**Loan**" means the loan or loans made to Borrower under this Agreement and the Loan Documents as described below.

"**Loan Advance**" means the amount of each advance of principal from Lender to Borrower under this Agreement.

"**Loan Amount**" means the sum of all Loan Advances made, from time to time, pursuant to the terms hereof.

"**Loan Documents**" shall have the meaning set forth in the Deed of Trust..

"**Material Adverse Effect**" or "**Material Adverse Change**" means a condition or event that materially and adversely affects (i) the business, assets, results of operations, financial condition or prospects of the parties, or (ii) the ability of the parties to perform their respective obligations under the Loan Documents.

"**Maturity Date**" means a date that is exactly sixty (60) calendar months from the date of each Closing hereunder.

"**Note**" or "**Promissory Note**" means the promissory note (in form and substance substantially the same as the form attached hereto as Exhibit C) to be executed by Borrower in connection with the first Closing, as the same may be amended from time to time.

"**Prepayment Date**" shall have the meaning set forth in the Note.

"**Property**" means the Collateral Unit(s) together with all fixtures and other articles of personal property now or subsequently located in or affixed to the Collateral Unit(s), and all proceeds (including, without limitation, all insurance proceeds and refunds of premiums) from any sale or other disposition of such property.

"**Security Agreement**" means any agreements executed by the parties for the purpose of evidencing and/or creating Lender's Security Interest in the Collateral.

"**Security Interest**" means on any type of collateral security, whether in the form of a lien, charge, mortgage, deed of trust, assignment, pledge, chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

"**Solaris Lenders**" means any and all lenders previously or hereafter advancing funds in connection with the construction and/or refinancing of all or any portion of Solaris.

"**Solaris Project**" means certain real estate in Eagle County Colorado, generally located at 141 East Meadow Drive, Vail, Colorado 81657 and commonly known as "The Residences at Solaris" and "The Shops at Solaris."

2

CRC 000231

5.   **LOAN.**  Lender intends to raise the maximum amount of funds permitted pursuant to the EB-5 Immigrant Investor Program (**"EB-5"**), the proceeds of which will be loaned to Borrower pursuant to the terms and conditions set forth in the Loan Documents.  Borrower understands and agrees that Lender is unable to guarantee that it will be successful in raising funds from investors pursuant to the EB-5 program.  Consequently, if by December 31, 2012, Lender is unable to raise funds to enable it to make a Loan Advance, the Loan Documents shall automatically and without further action by the parties terminate and neither party shall have any further rights or obligations hereunder.  If Lender is successful in raising funds pursuant to the terms and conditions of this Agreement, (i) Borrower shall be obligated to accept all such funds raised by Lender and made available to Borrower on the terms set forth herein, and (ii) Lender shall be obligated to lend to Borrower all such sums raised by Lender on the terms set forth herein.  Borrower recognizes and agrees that Lender will expend significant funds to raise capital from EB-5 investors pursuant to the EB-5 program, and Lender is relying on Borrower's obligation to accept each Loan Advance made by Lender in accordance with the terms and conditions set forth in this Agreement. Lender recognizes and agrees that Borrower will also expend significant funds to raise capital from EB-5 investors pursuant to the EB-5 program, and Borrower is relying on Lender's obligation to lend to Borrower all such amounts raised by Lender in accordance with the terms and conditions set forth in this Agreement.

6.   **INTEREST.**  Each Loan Advance shall bear interest at the rate of five percent (5%) per annum from and after the date Borrower receives such Loan Advance until such Loan Advance is repaid pursuant to and in accordance with the Note.

7.   **LOAN ADVANCES GENERALLY.**  Lender shall advance all invested sums to Borrower as soon as reasonably practicable in accordance with the terms, conditions, provisions and restrictions of EB-5.  The parties agree to use good faith best efforts and take all reasonable steps necessary to ensure that the EB-5 proceeds are advanced to Borrower as soon as reasonably practicable within the parameters of EB-5.  Without limiting the generality of the foregoing, the parties agree to establish procedures and modify the Loan Documents as necessary to accomplish the foregoing.

8.   **COLLATERAL UNITS.**  Without limiting the generality of Section 7 above, at the time of each Loan Advance, Borrower shall select one or more Condominium Units from the Condominium Pool that will serve as security for the Loan Advance (each, a **"Collateral Unit"** and collectively, the **"Collateral Units"**).  Borrower shall execute a separate Deed of Trust for each Collateral Unit in connection with Closing on the Loan Advance secured by such Collateral Unit.

9.   **CONDOMINIUM POOL; SALES OF UNITS.**  Borrower may sell any Unit in the Condominium Pool to a third party at any time prior to such Unit's designation as a Collateral Unit; *provided, however*, that Borrower and Lender shall jointly select a replacement Unit reasonably comparable in size, price, and location to the Unit sold. The parties agree to use good faith best efforts to select the replacement Unit for the Condominium Pool.

10.   **FEES AND EXPENSES.**  Except as may be specifically set forth in this Agreement, each party shall pay its own legal and related expenses incurred in connection with the preparation and review of Loan Documents and the making of the Loan.  Any fees incurred in connection with the transfer of any Condominium Units pursuant to a Security Agreement shall be paid as set forth herein.

11.   **PREPAYMENT OF NOTE.**  Notwithstanding anything to the contrary set forth herein, in the Note, Deed of Trust or any other Loan Documents, at any time after the expiration of thirty six (36) months following a Loan Advance, Borrower shall have the absolute right to prepay the portion of the Note attributable to such Loan Advance by repaying Lender the amount of such Loan Advance or

3

CRC 000232

tendering to Lender the Collateral Unit(s) securing such Loan Advance. If Borrower conveys any Collateral Unit(s) in repayment of a Loan Advance, the principal balance of the Note shall be reduced by the amount of the Loan Advance secured by such Collateral Unit(s).

12.   **REPRESENTATIONS AND WARRANTIES OF BORROWER.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each Loan Advance, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

(i)   **Organization.** Borrower is a limited liability company duly organized, validly existing, and in good standing under the laws of Delaware and is validly existing and in good standing in Colorado. Borrower has the full power and authority to own its properties and to transact the businesses in which it is presently engaged or presently proposes to engage.

(ii)   **Authorization.** Except as expressly set forth below, the execution, delivery, and performance of this Agreement by Borrower, to the extent to be executed, delivered or performed by Borrower, have been duly authorized by all necessary action by Borrower; and do not conflict with, result in a violation of, or constitute a default under (a) any provision of its Articles of Organization or Operating Agreement, or, any agreement or other instrument binding upon Borrower (unless such violation or default of such agreement or instrument has been waived in writing), or (b) any law, governmental regulation, court decree, or order applicable to Borrower.

(iii)   **Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may Materially Adversely Affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing. Lender acknowledges and agrees that Borrower has disclosed the existence of the litigation involving Borrower, The Weitz Company and Richard Joseph & Company for purposes of the foregoing sentence.

(iv)   **Title to Property.** Borrower has good and marketable title to the Condominium Units free and clear of all defects, liens, and encumbrances, excepting only those set forth on the title commitment furnished to Lender in connection any Loan Advance, liens for taxes, assessments or governmental charges or levies not yet delinquent or payable without penalty or interest and such liens and encumbrances as may be approved in writing by the Lender.

(v)   **Hazardous Substances.** The terms "hazardous waste," "hazardous substance," "disposal," "release," and "threatened release," as used in this Agreement, shall have the same meanings as set forth in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act at 1988, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing. Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (a) During the period of Borrower's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any hazardous waste or substance by any person on, under, about or from any of the properties; (b) Borrower has no knowledge of, or reason to believe that there has been (i) any use, generation, manufacture, storage, treatment, disposal, release, or threatened release of any hazardous waste or substance on, under, about or from the properties by any prior owners or occupants of any of the properties, or (ii) any actual or threatened litigation or claims of any kind by any person relating to such matters; (c) neither Borrower nor any

-4-

CRC 000233

tenant, contractor, agent or other authorized user of any of the properties shall use, generate, manufacture, store, treat, dispose of, or release any hazardous waste or substance on, under, about or from the Property (except for commercial products that are stored in standard commercial containers); and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation those laws, regulations and ordinances described above. Borrower authorizes Lender and its agents to enter upon the properties to make such inspections and tests as Lender may deem appropriate to determine compliance of the properties with this section of the Agreement. The representations and warranties contained herein are based on Borrower's due diligence in investigating the properties for hazardous waste and hazardous substances. Borrower hereby (a) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence or any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the properties. The provisions of this section of the Agreement, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the properties, whether by foreclosure or otherwise.

(vi)     **Assessment of Condominium Units.**  Each Condominium Unit is and will continue to be assessed and taxed as an independent parcel by all governmental authorities.

(vii)     **Compliance with Governing Authorities.**  Borrower has examined and is familiar with all the easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements affecting the Property.   The Property was constructed in compliance with the requirements of such easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements.

(viii)     **Legal Effect.**  This Agreement constitutes, and any instrument or agreement required hereunder to be given by Borrower when delivered will constitute, legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

(ix)     **Binding Effect.**  This Agreement, the Note and all Security Agreements directly or indirectly securing repayment of Borrower's Loan and Note are binding upon Borrower as well as upon Borrower's successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

(x)     **Survival of Representation and Warranties.**  Borrower understands and agrees that Lender is relying upon the above representations and warranties in extending Loan Advances to Borrower. Notwithstanding anything to the contrary set forth herein, Borrower and Lender agree that the representations, warranties and covenants of Borrower hereunder shall automatically terminate and cease to apply to any Condominium Unit(s) tendered in repayment or prepayment of all or any portion of the Indebtedness.

13.     **CONDITIONS PRECEDENT TO INITIAL ADVANCE.**  Lender's obligation to make the initial Loan Advance shall be subject to the reasonable fulfillment of the following:

(i)     **Borrower's Authorization.**  Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of the Loan Documents.

5

CRC 000234

(ii)    **Environmental Report.**  Borrower has furnished to Lender an environmental report in form and substance reasonably satisfactory to Lender.

(iii)    **Lender's Title Insurance.**  Borrower shall have provided to Lender (at Lender's sole cost and expense) an ALTA Lender's extended coverage policy of title insurance with such endorsements as Lender may require, issued by the Land Title Guarantee Company in a form, amount, and content satisfactory to Lender, insuring or agreeing to insure that Lender's Mortgage or Deed of Trust on the Property is or will be upon recordation a valid first lien on the Property free and clear of all defects, liens, encumbrances, and exceptions except those listed on Exhibit F hereto or specifically accepted by Lender in writing (the "**Permitted Exceptions**").

14.    **AFFIRMATIVE COVENANTS.**  Borrower covenants and agrees with Lender that, while this Agreement is in effect, Borrower will:

(i)    **Litigation.**  Promptly inform Lender in writing of (a) all Material Adverse Changes in Borrower's financial condition, and (b) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions which could result in a Materially Adverse Change to the financial condition of Borrower.  Lender acknowledges and agrees that Borrower has disclosed the existence of the litigation involving Borrower, The Weitz Company and Richard Joseph & Company for purposes of the foregoing sentence.

(ii)    **Additional Information.**  Furnish such additional information with respect to Borrower's business operations as they relate to the Solaris Project as Lender may request from time to time.  Such information shall include but not be limited to, information concerning the number of jobs created at the Project, a description of the types of jobs created, including salary ranges, sales figures for the commercial tenants, and all other information reasonably requested by Lender that Lender deems reasonably necessary to fulfill its reporting requirements under EB-5.  Borrower shall use all commercially reasonable efforts to cause all commercial tenants to cooperate with Lender and to timely furnish the information outlined above.

(iii)    **Compliance with Governmental Requirements.**  Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans with Disabilities Act.  Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as Lender's interests in the Property are not jeopardized.

(iv)    **Payment of Claims and Removal of Liens.**  (a) Cause all valid claims for labor done and materials and services properly furnished in connection with the Property to be fully paid and discharged in a timely manner, (b) diligently file or procure the filing of a valid notice of completion of the Property, or such comparable document as may be permitted under applicable lien laws, (c) diligently file or procure the filing of a notice of cessation, or such comparable document as may be permitted under applicable lien laws, upon the happening of cessation of labor on the Property for a continuous period of 30 days or more, and (d) take all commercially reasonable steps necessary to remove all valid claims of liens properly recorded against the Property, or any rights or interests appurtenant to the Property or improvements.

(v)    **Taxes and Claims.**  Pay and discharge when due all of Borrower's indebtedness, obligations, and claims that, if unpaid, might become a lien or charge upon the Property or Improvements which would be senior to the Security Interest of Lender; provided, however, that Borrower shall not be required to pay and discharge any such indebtedness, obligation, or claim so long as (a) its legality shall

6

CRC 000235

be contested in good faith by appropriate proceedings. and (b) the indebtedness, obligation, or claim does not become a lien or charge upon the Property or Improvements(unless Borrower provides appropriate security, procures a bond or causes the title company to insure over the such a lien or charge). If the indebtedness, obligation, or claim does become a lien or charge upon the Property or Improvements, Borrower shall remove the lien or charge as provided in the preceding paragraph.

(vi)   **Performance.** Perform and comply with all terms, conditions, and provisions set forth in this Agreement and in all other instruments and agreements between Borrower and Lender, and in all other loan agreements now or hereafter existing between Borrower and any other party.

(vii)   **Additional Assurances.**   Make, execute, and deliver to Lender such Security Agreements, instruments, documents, and other agreements reasonably necessary to document and secure the Loan and to protect Lender's Security Interests in the Property and Improvements.

**15.   REPRESENTATIONS, WARRANTIES AND COVENANTS OF LENDER.** Lender represents and warrants to Borrower, as of the date of this Agreement, as of the date of each Loan Advance, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

(i)   **Organization.** Lender is a limited liability limited partnership duly organized, validly existing, and in good standing under the laws of Colorado and is validly existing and in good standing in Colorado. Borrower has the full power and authority to transact the businesses in which it is presently engaged or presently proposes to engage.

(ii)   **Authorization.** The execution, delivery, and performance of this Agreement by Lender, to the extent to be executed, delivered or performed by Lender, have been duly authorized by all necessary action by Lender; and do not conflict with, result in a violation of, or constitute a default under (a) any provision of its organizational documents, or, any agreement or other instrument binding upon Lender (unless such violation or default of such agreement or instrument has been waived in writing), or (b) any law, governmental regulation, court decree, or order applicable to Lender.

(iii)   **Legal Effect.** This Agreement constitutes, and any instrument or agreement required hereunder to be given by Lender when delivered will constitute, legal, valid and binding obligations of Lender enforceable against Lender in accordance with their respective terms.

(iv),   **Binding Effect.** This Agreement is binding upon Lender as well as upon Lender's successors, representatives and assigns, and is legally enforceable in accordance with its terms.

(v)   **Invested Funds.** Lender shall advance all invested sums to Borrower as soon as reasonably practicable in accordance with the terms, conditions, provisions and restrictions of EB-5. The parties agree to use good faith best efforts and take all reasonable steps necessary to ensure that the EB-5 proceeds are advanced to Borrower as soon as reasonably practicable within the parameters of EB-5. Without limiting the generality of the foregoing, the parties agree to establish procedures and modify the Loan Documents (including, without limitation, Section 8 above) as necessary to accomplish the foregoing. Further, without limiting the generality of the foregoing, Lender shall in no event unreasonably withhold or delay the advance of any funds secured from investors in connection with the transactions contemplated hereunder.

(vi)   **Survival of Representation, Warranties and Covenants.** Lender understands and agrees that Borrower is relying upon the above representations, warranties and covenants in agreeing to enter into the transaction contemplated in the Loan Documents.

7

CRC 000236

(vii)   **Performance.**   Lender shall perform and comply with all terms, conditions, and provisions set forth in this Agreement and in all other instruments and agreements between Borrower and Lender.

(viii)   **Additional Assurances.**   Lender shall make, execute, and deliver to Borrower such instruments, documents, and other agreements reasonably necessary to document and effectuate the purposes of this Agreement.

16.   **EVENTS OF DEFAULT BY BORROWER.**   Subject to any applicable cure periods set forth in any Loan Document, each of the following shall constitute an Event of Default by Borrower under this Agreement:

(i)   **Default on Indebtedness.**   Failure of Borrower to make any payment when due on the Loan.

(ii)   **Other Defaults.**   Failure of Borrower to comply with or to perform when due any other material term, obligation, covenant or condition contained in this Agreement or in any of the Loan Documents, or failure of Borrower to comply with or to perform any other material term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or between Borrower and any other party that is not cured within applicable cure periods and which, if not cured, would have a Material Adverse Effect on the Collateral.

(iii)   **False Statements.**   Any warranty, representation or statement made or furnished to Lender by or on behalf of Borrower under this Agreement or the Loan Documents is false or misleading in any material respect at the time made or furnished, or becomes false or misleading in any material respect at any time thereafter.

(iv)   **Insolvency.**   The insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

17.   **EFFECT OF AN EVENT OF DEFAULT BY BORROWER; LENDER'S REMEDIES.**   Upon the occurrence of any Event of Default and at any time thereafter, Lender shall give written notice to Borrower which notice shall describe the nature of the Event of Default. Borrower shall have ten (10) days after receipt of written notice in which to cure any default that can be cured by the payment of money and thirty (30) days in which to cure any default that cannot be cured solely by the payment of money (which thirty (30) day period may be extended for such time as may be reasonably necessary if the default cannot reasonably be cured in the initial thirty (30) day period, provided that Borrower is making reasonable efforts to cure such default during such period). Upon the expiration of the applicable cure period, Lender may, at its option, but without any obligation to do so, and in addition to any other right Lender may have, do any one or more of the following without further notice to Borrower:  (a) cancel this Agreement; (b) institute appropriate proceedings to enforce the performance of this Agreement; (c) withhold further disbursement of Loan Advances; (d) expend funds necessary to remedy the default; (e) take possession of the Property; (f) foreclose Lender's Mortgage or Deed of Trust, if any, on the Property in any manner available under law; and (h) exercise any other right or remedy which it has under the Note or Loan Documents, or which is otherwise available at law or in equity or by statute.

8

CRC 000237

18. **EVENTS OF DEFAULT BY LENDER.** Subject to any applicable cure periods set forth in any Loan Document, each of the following shall constitute an Event of Default by Lender under this Agreement:

(i) **Failure of Performance.** Failure of Lender to comply with or to perform when due any other material term, obligation, covenant or condition contained in this Agreement or in any of the Loan Documents.

(ii) **False Statements.** Any warranty, representation or statement made or furnished to Borrower by or on behalf of Lender under this Agreement or the Loan Documents is false or misleading in any material respect at the time made or furnished, or becomes false or misleading in any material respect at any time thereafter.

19. **EFFECT OF AN EVENT OF DEFAULT BY LENDER; BORROWER'S REMEDIES.** Upon the occurrence of any Event of Default by Lender and at any time thereafter, Borrower shall give written notice to Lender which notice shall describe the nature of the Event of Default. Lender shall have ten (10) days after receipt of written notice in which to cure any default that can be cured by the payment of money and thirty (30) days in which to cure any default that cannot be cured solely by the payment of money (which thirty (30) day period may be extended for such time as may be reasonably necessary if the default cannot reasonably be cured in the initial thirty (30) day period, provided that Lender is making reasonable efforts to cure such default during such period). Upon the expiration of the applicable cure period, Borrower may, at its option, but without any obligation to do so, and in addition to any other right Borrower may have, do any one or more of the following without further notice to Borrower: (a) cancel this Agreement; (b) institute appropriate proceedings to enforce the performance of this Agreement; (b) expend funds necessary to remedy the default; and (c) exercise any other right or remedy which it has under the Note or Loan Documents, or which is otherwise available at law or in equity or by statute.

20. **MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

(i) **Agency.** Nothing in this Agreement shall be construed to constitute the creation of a partnership or joint venture between Lender and Borrower or any contractor. Lender is not an agent or representative of Borrower. This Agreement does not create a contractual relationship with and shall not be construed to benefit or bind Lender in any way with or create any contractual duties by Lender to any contractor, subcontractor, materialman, laborer, or any other person.

(ii) **Amendments.** This Agreement, together with any Loan Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

(iii) **Applicable Law.** This Agreement has been delivered to Lender and accepted by Lender in Colorado. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of the City and County of Denver, Colorado. This Agreement shall be governed by and construed In accordance with the laws of Colorado.

(iv) **Assignment by Borrower.** Notwithstanding to the contrary set forth in any of the Loan Documents, Borrower shall have the absolute right to assign this Loan Agreement, the Promissory Note and the other Loan Documents to Borrower's wholly-owned, single-purpose subsidiary (the "SPE"). Upon such assignment, all of Borrower's rights and obligations under the Loan Documents shall automatically

9

CRC 000238

and forever terminate and, thereafter, Borrower shall have no further obligation of any kind whatsoever with respect to the Loan or Loan Documents. A condition precedent to any such assignment shall be that any assignee of Borrower shall continue to operate the Solaris Project, as defined in the Loan Agreement, to assure full construction expenditure to project completion and subsequent operation of the retail businesses, all in satisfaction of the factual assumptions set forth in the EB-5 Econometric Report prepared in connection with the Solaris Project. The purpose of this condition precedent is to assure the Lender that the related EB-5 investors' ability to obtain removal of conditions on their U.S. permanent residency will not be impaired by any such assignment of the Borrower's rights and obligations under the Loan Documents. The Lender shall have sole discretion to determine satisfaction of this condition precedent prior to any assignment by Borrower.

(v)　**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

(vi)　**Costs and Expenses.** Borrower and Lender shall each be responsible for its own expenses, including without limitation attorneys' fees, incurred in connection with the preparation, execution, enforcement, modification and collection of this Agreement or in connection with the Loans made pursuant to this Agreement. In the event of any litigation arising out of this Loan, the prevailing party, in addition to any other rights or remedies to which it may be entitled, shall be awarded its reasonable expenses incurred in enforcing or defending such action. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses, whether or not there is a lawsuit, including attorneys' fees for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the prevailing party also will be entitled to recover any court costs, in addition to all other sums provided by law.

(vii)　**Entire Agreement.** This Agreement and the Loan Documents constitute all of the agreements between the parties relating to the Property and supersede all other prior or concurrent oral or written agreements or understandings relating to the Property.

(viii)　**Notices.** All notices required to be given under this Agreement shall be given in writing, may be sent by facsimile (unless otherwise required by law) or by electronic mail, and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address shown below. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.

*If to Borrower*:　　　**Solaris Property Owner, LLC**
　　　　　　　　　Attention: Legal Department
　　　　　　　　　141 East Meadow Drive, Suite 211
　　　　　　　　　Vail, Colorado 81657
　　　　　　　　　P: 970.479.7566
　　　　　　　　　F: 970.479.6666

*If to Lender*:　　　　**Colorado Regional Center Project Solaris, LLLP**
　　　　　　　　　4643 S. Ulster Street, Suite 950
　　　　　　　　　Denver, Colorado 80237
　　　　　　　　　P: 720.554.9704
　　　　　　　　　F: 720.554.9905

10

CRC 000239

(ix)     **Successors and Assigns.**  All covenants and agreements contained by or on behalf of either party shall bind such party's successors and assigns and shall inure to the benefit of the other party, its successors and assigns. Neither party shall have the right to assign its rights under this Agreement or any interest therein, without the prior written consent of Lender.

(x)     **Severability.**  If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

(xi)     **Survival.**  All warranties, representations, and covenants made by a party in this Agreement or in any certificate or other instrument delivered by a party under this Agreement shall be considered to have been relied upon by the other party and will survive the making of the Loan and delivery to the other of the Loan Documents, regardless of any investigation made by such party or on such party's behalf.

(xii)     **Time is of the Essence.** Time is of the essence in the performance of this Agreement.

(xiii)     **Waiver.**  Neither party shall be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by such party. No delay or omission on the part of either party in exercising any right shall operate as a waiver of such right or any other right. A waiver by one party of a provision of this Agreement shall not prejudice or constitute a waiver of such party's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by either party, nor any course of dealing between Lender and Borrower, shall constitute a waiver of either party's rights or of any obligations as to any future transactions. Whenever the consent of either party is required under this Agreement, the granting of such consent by such party in any instance shall not constitute continuing consent in subsequent instances where such consent is required, and in all cases such consent may be granted or withheld in the sole discretion of the party from whom consent is required.

(xiv)     **Confidentiality; Publicity.**  Lender understands, acknowledges and agrees that Borrower has certain legitimate and material business reasons for keeping the Loan confidential.  Borrower understands, acknowledges and agrees that it is essential to Lender's marketing efforts that Lender be allowed to market the Loan in a manner designed to facilitate the successful completion of the offering. The parties therefore agree that Lender may refer on its Public Website (as hereinafter defined) to a generic description of the project (e.g., by reference to a "high-end, luxury mixed-use condominium/retail project" located in Vail" and similar general wording).  "**Public Website**" means the basic website maintained by Lender to provide general information concerning Lender's projects to the public at large. Notwithstanding the foregoing or anything to the contrary set forth herein, Lender's Public Website shall in no event disclose the following: (i) the name of the Project; (ii) the address and/or precise location of the Project; (iii) the exact number of units in the Project; (iv) the names of specific individuals, business, types of businesses, tenants, or others affiliated with or connected to the Project; or (v) or any other such information that identifies the Project as Borrower or leads to the unavoidable conclusion that the Project is Borrower. The parties further agree that the Public Website will include a secure area created to provide certain parties to get specific details concerning the Project (including the name) and the Investment (the "**Secure Website**").  In order to gain access to the Secure Website, all users must first register with Lender by providing Lender with their name and contact information. Lender will make a reasonable inquiry into the validity of the party seeking such information (each, an "**Inquiring Party**"

CRC 000240

and collectively, the **"Inquiring Parties"**) prior to providing any such Inquiring Party with a password to the Secure Website (the **"Secure Password"**).

Borrower agrees that any such system will be susceptible to deception by a potential user, but that the parties intend to provide commercially reasonable means to deter anyone not having a legitimate interest in making an EB-5 investment from gaining access to this information. Lender agrees to utilize a further more detailed filtering system on its website prior to allowing access to offering materials (including the Private Placement Memorandum) about the Project. Lender shall be free to distribute marketing materials about the Project using the Borrower's name to targeted investment prospects including without limitation, immigration attorneys, brokers and agents specializing in EB-5 investor referrals, wealth managers, individual foreign investors seeking to make an EB-5 investment, and other professionals who are likely to make a targeted referral to Lender. Except as expressly set forth above, Lender shall be prohibited from disclosing to anyone any specific information concerning the Project. The foregoing sentence shall in no event preclude Lender from disclosing the general information available on the Public Website in response to specific inquiries from the media and others. The parties agree to work together to reasonably respect each other's reasonable business interests regarding these issues. Lender and Borrower will cooperate in preparing information about the Project for inclusion in the PPM and other related materials and Borrower agrees that Lender shall have the right to include such materials in the PPM (subject to appropriate non-disclosure agreements and other such standard protections).

20. **EXHIBITS.** All exhibits attached to this Loan Agreement are incorporated herein by this reference.

21. **LENDER APPROVAL; DISCLAIMER.** NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH HEREIN, THE EFFECTIVENESS OF THIS AGREEMENT AND THE LOAN DOCUMENTS IS EXPRESSLY CONDITIONED UPON THE APPROVAL OF THE SOLARIS LENDERS. WITHOUT LIMITING THE FOREGOING, THE PARTIES AGREE TO MODIFY THIS AGREEMENT AND THE LOAN DOCUMENTS, AS NECESSARY TO ACCOMMODATE THE REQUESTS OF THE SOLARIS LENDERS SO LONG AS SUCH MODIFICATIONS NEITHER (1) MATERIALLY ALTER THE SUBSTANCE OF THE BUSINESS DEAL AGREED UPON BY THE PARTIES NOR (2) DISQUALIFY THE TRANSACTION FROM EB-5 ELIGIBILITY.

[Signature Page Follows]

CRC 000241

THIS LOAN AGREEMENT is made effective as of the date first above written by and between:

### BORROWER:

**Solaris Property Owner, LLC,** a Delaware limited liability company

By: Solaris Mezz, LLC, a Delaware limited liability company

By: _____
Peter Knobel, Manager

### LENDER:

**Colorado Regional Center Project Solaris, LLLP,** a Colorado limited liability limited partnership

By: Colorado Regional Center I, LLC, a Colorado limited liability company, general partner

By: _____
Chester Schwartz, Manager

13

CRC 000242

## OMNIBUS AMENDMENT TO MEZZANINE LOAN AGREEMENT, LIMITED INDEMNITY AND GUARANTY AND AMENDED AND RESTATED GUARANTOR SECURITY AGREEMENT

THIS OMNIBUS AMENDMENT TO MEZZANINE LOAN AGREEMENT, LIMITED INDEMNITY AND GUARANTY AND AMENDED AND RESTATED GUARANTOR SECURITY AGREEMENT (this "Amendment") is made as of October 21, 2010 (the "Amendment Date"), by and among SOLARIS MEZZ, LLC, a Delaware limited liability company ("Borrower"), which has an address at 2211 North Frontage Road, Suite A, Vail, Colorado 81657, VAIL MEZZ FUNDING LLC, a Delaware limited liability company, in its capacity as a Lender and as the administrative agent, with an address at c/o Och-Ziff Real Estate, 9 West 57th Street, 39th Floor, New York, New York 10019, VAIL MEZZ FUNDING II LLC, a Delaware limited liability company, as a Lender, with an address at c/o Och-Ziff Real Estate, 9 West 57th Street, 39th Floor, New York, New York 10019, PETER B. KNOBEL, with an address at 2211 North Frontage Road, Suite A, Vail, Colorado 81657, and PATRICE KNOBEL, with an address at 2211 North Frontage Road, Suite A, Vail, Colorado 81657.

### RECITALS:

A.      Borrower is the owner of one hundred percent (100%) of the limited liability company interests in Solaris Property Owner, LLC, a Delaware limited liability company ("Project Owner"), and Project Owner is the fee owner of the residential condominium units listed on Schedule A annexed hereto and the Commercial Unit (collectively, the "Units").

B.      Borrower entered into that certain Loan ·Agreement, made as of July 8, 2008, by and among the Borrower and the Lenders, as amended by the First Amendment to the Loan Agreement made as of October 28, 2008 (the "Loan Agreement") pursuant to which the Lenders loaned the Borrower Eighty Seven Million Dollars ($87,000,000.00) (together with all interest accrued thereon, the "Loan") for the purposes of making a capital contribution to the Project Owner, in order for the Project Owner to pay certain costs pertaining to the development of the Project.

NOW, THEREFORE, in consideration of the covenants and mutual promises contained herein and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties hereto, intending to be legally bound hereby, agree as follows:

### ARTICLE I.  AMENDMENT PROVISIONS

1.1      **Definitions**.  All capitalized terms not otherwise defined herein shall have the meanings given to such terms in the Loan Agreement.

1.2      **Representations and Warranties**.  Borrower hereby represents and warrants as follows:

(A)      This Amendment and all of the documents executed in connection with this Amendment to which the Borrower is a party have been duly authorized and constitute legal, valid and binding obligations of Borrower and are enforceable against Borrower in accordance with their respective terms.

(B)      Borrower hereby reaffirms all covenants, representations and warranties made in the Loan Documents and agrees that all such covenants, representations and warranties shall be deemed to have been remade as of the Amendment Date with such qualifications as are set forth in the Loan Documents, as the case may be, except to the extent such covenants, representations or warranties

C047579/0219357/1597367.15

expressly relate to an earlier date or facts or circumstances the Administrative Agent or Lenders actually know to be untrue upon the effectiveness hereof.

(C)   Borrower is in compliance with all the terms and provisions of the Loan Documents and no default or Event of Default has occurred or currently exists thereunder.

(D)   Borrower has no defense, counterclaim or offset with respect to Administrative Agent or the Lenders or with respect to the Loan Documents or any of the transactions contemplated thereunder.

1.3   **Ratification by Guarantor**.

(A)   Each Guarantor, in his or her capacity as Guarantor under the Guarantees, hereby acknowledges and agrees that (i) such Guarantor has reviewed and consented to this Amendment and (ii) the applicable Loan Documents have been modified pursuant to the terms of this Amendment. Each Guarantor, in his or her capacity as Guarantor under the Guarantees, hereby reaffirms and ratifies his or her Obligations (as defined in the Guarantor Security Agreement).

(B)   Each Guarantor, in his or her capacity as a Guarantor under the Guarantees, represents and warrants to the Administrative Agent and the Lenders that:

(i)    This Amendment constitutes the legal, valid and binding obligations of each Guarantor and is enforceable against such Guarantor in accordance with its respective terms.

(ii)   The representations and warranties of the Guarantors contained in the Guarantees are true and correct in all material respects on and as of the Amendment Date as if such representations and warranties had been made on and as of the Amendment Date, with such qualifications as are set forth in the Guarantees, except to the extent that any such representations and warranties expressly relate to an earlier date or facts or circumstances the Administrative Agent or Lenders actually know to be untrue upon the effectiveness hereof.

(iii)   Each Guarantor is in compliance with all the terms and provisions of the Guarantees and no default or Event of Default has occurred or currently exists thereunder.

(iv)   Each Guarantor has no defense, counterclaim or offset with respect to the Administrative Agent or the Lenders or with respect to the Loan Agreement or any other Loan Document or any of the transactions contemplated thereunder.

1.4   **Effect on the Loan Agreement, the Limited Indemnity and Guaranty and the Guarantor Security Agreement**.

(A).   Upon the effectiveness of this Amendment, each reference in the Loan Agreement to "this Agreement," "hereunder," "hereof," "herein" or words of like import shall mean and be a reference to the Loan Agreement as amended hereby, as the same may from time to time hereafter be modified, supplemented or amended.

(B)   Upon the effectiveness of this Amendment, each reference in the Limited Indemnity and Guaranty to "this Guarantee," "hereunder," "hereof," "herein" or words of like import shall mean and be a reference to the Limited Indemnity and Guaranty as amended hereby, as the same may from time to time hereafter be modified, supplemented or amended.

C047579/0219357/1597367.15

CRC 000244

(C)     Upon the effectiveness of this Amendment, each reference in the Guarantor Security Agreement to "this Security Agreement," "hereunder," "hereof," "herein" or words of like import shall mean and be a reference to the Guarantor Security Agreement as amended hereby, as the same may from time to time hereafter be modified, supplemented or amended.

(D)     From and after the Amendment Date references in any of the Loan Documents to any of the other Loan Documents shall be deemed to be references to such other Loan Documents, as modified by this Amendment and all documents executed in connection with this Amendment.

(E)     Except as specifically amended herein, the Loan Agreement, the Loan Documents, and all other documents, instruments and agreements executed and/or delivered in connection therewith, shall remain in full force and effect, and are hereby ratified and confirmed.

(F)     The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of Lender, nor constitute a waiver of any provision of the Loan Agreement, the Loan Documents, or any other documents, instruments or agreements executed and/or delivered under or in connection therewith.

1.5     **Guarantee Agreements**.   Lender hereby represents and warrants that the Guarantors are not party to any guaranty agreement in connection with the Loan other than the Guarantee of Completion, the Limited Indemnity and Guarantee and the Environmental Indemnity Agreement.   For avoidance of doubt and notwithstanding anything to the contrary set forth in any Loan Document and all other documents, instruments and agreements executed and/or delivered in connection therewith, the obligations of Guarantors in their entirety under the Loan are limited to the Obligations (as defined in the Guarantor Security Agreement).

## ARTICLE II.  LOAN AGREEMENT AMENDMENTS

The Loan Agreement shall be amended as follows:

2.1     **Modification of Certain Definitions**.

(A)     The defined term "Guarantor Accounts" set forth in Section 1.1. is hereby amended and restated in its entirety to read as follows:

"Guarantor Account: means, the Vectra Account, as such term is defined in the Guarantor Security Agreement."

(B)     The defined term "Junior Mezzanine Component Rate" set forth in Section 1.1 is hereby amended and restated in its entirety to read as follows:

"Junior Mezzanine Component Rate: means (a) prior to the occurrence of a Junior Mezzanine Component Trigger Event, a rate per annum equal to twenty percent (20.00%), compounded quarterly as provided herein and (b) after a Junior Mezzanine Component Trigger Event occurs, a rate per annum equal to fifteen percent (15.00%), compounded quarterly as provided herein."

(C)     The defined term "Lockout Date" set forth in Section 1.1 is hereby amended and restated in its entirety to read as follows:

"Lockout Date: means the Stated Maturity Date."

3

Civil Action No. 1:19-cv-02443-STV
Exhibit 4

CRC 000245

(D)     The defined term "Net Release Proceeds" set forth in Section 1.1 is hereby amended and restated in its entirety to read as follows:

"Net Release Proceeds:  means (a) with respect to any Residential Unit, the greatest of (i) the Minimum Release Price in respect of such Unit, (ii) 94% of the actual gross sales price of such Unit (including any mortgage recording tax reimbursement or such similar reimbursement received from the Unit purchaser) and (iii) 100% of the Net Sales Proceeds receivable by Borrower or its affiliates; and (b) with respect to the Commercial Unit, to the extent the Commercial Unit Release Price has not been paid in full by the Borrower, the Commercial Unit Release Price.

(E)     The defined term "Project Costs" set forth in Section 1.1 is hereby amended and restated in its entirety to read as follows:

"Project Costs:  means, collectively, Hard Costs, Soft Costs and such other actual costs incurred by Project Owner in connection with the construction and completion of the Project (exclusive of Operating Costs and any debt service payments on any indebtedness of Project Owner), that are approved by Administrative Agent.  For avoidance of doubt, Borrower and Administrative Agent acknowledge that although a Hard Cost or Soft Cost may be set forth in the Budget, such cost shall not be deemed to be approved by Administrative Agent for purposes of this definition.

(F)     The defined term "Senior Mezzanine Component Rate" set forth in Section 1.1 is hereby amended and restated in its entirety to read as follows:

"Senior Mezzanine Component Rate:  means (a) prior to the occurrence of a Junior Mezzanine Component Trigger Event, a rate per annum equal to sixteen and one-half percent (16.50%), compounded quarterly as provided herein and (b) after the Junior Mezzanine Component Trigger Event occurs, a rate per annum equal to fifteen percent (15.00%), compounded quarterly as provided herein."

(G)     The defined term "Stated Maturity Date" set forth in Section 1.1 is hereby amended and restated in its entirety to read as follows:

"Stated Maturity Date:  means June 30, 2013."

2.2     **Deletion of Definitions**.  The definition of "Extension Period" set forth in Section 1.1 shall be deleted in its entirety.

2.3     **New Definitions**.  The following definitions are hereby added to Section 1.1 of the Loan Agreement in appropriate alphabetical order:

(A)     "Amendment Date" means October 21, 2010.

(A)     "Commercial Unit Release Price" has the meaning assigned to such term in Section 15.2(e) of this Agreement."

(B)     "Junior Mezzanine Component Trigger Event:  means such time upon which (i) the outstanding principal amount of the Junior Mezzanine Component plus (ii) all interest accrued thereon (whether such interest is outstanding or has been prepaid in part), equals or exceeds $74,550,000."

4

C047579/0219357/1597367.15

CRC 000246

(C)    "Operating Costs" means all real estate taxes and General Assessments (as such term is defined in the Condominium Declaration) from time to time due and payable with respect to Units that are then encumbered by the lien and security interest of the Deed of Trust and all other reasonable and customary operating costs and expenses of Project Owner, as approved by Administrative Agent, with respect to (i) owning and operating the Units encumbered by the lien and security interest of the Deed of Trust and (ii) overhead costs for operating and maintaining the Project Owner's sales office at the Project for the sale of Units, including without limitation, insurance premiums, utility costs, wages, salaries, bonuses and other compensation of Project Owner's employees, costs of supplies, legal fees and expenses for outside counsel and other similar costs and expenses, as approved by Administrative Agent (other than real estate taxes and General Assessments which shall not be subject to approval by Administrative Agent), provided, however, that (x) in no event shall Operating Costs permitted to be retained from Excess Sales Proceeds exceed $100,000 per month calculated on a cumulative basis from and after the Amendment Date (the "General Operating Cost Limit") and (y) Operating Costs shall not include debt service on any loans, rent for the sales office at the Project, capital expenditures, depreciation and amortization, brokerage and sales commissions, any amounts incurred to an entity affiliated with Project Owner, Borrower and/or the Guarantors to the extent the same exceeds the amount which would have been incurred in an "arm's length" transaction and on a fair market basis in the absence of such affiliation, any expenses to the extent covered by insurance, and income taxes of Project Owner or any Affiliate of Project Owner. Notwithstanding the foregoing, (i) real estate taxes and General Assessments shall not be included within the Operating Costs that are subject to the General Operating Cost Limit, and (ii) legal fees and expenses for outside counsel also shall not be included within the Operating Costs that are subject to the General Operating Cost Limit but shall be subject to a separate limit of $30,000 per month, calculated on a cumulative basis from and after the Amendment Date (the "Legal Fee Operating Cost Limit"). For avoidance of doubt, Borrower and Administrative Agent acknowledge that although a cost or expense may be set forth in the Budget, such cost shall not be deemed to be approved by Administrative Agent for purposes of this definition."

2.4    **Extension of the Term of the Loan**. Section 2.6 of the Loan Agreement is hereby deleted, and the following is hereby substituted in lieu thereof:

"2.6    **Intentionally Omitted**."

2.5    **Principal Prepayments**. Section 2.7(a) and Section 2.7(b) of the Loan Agreement are hereby amended and restated in their entirety to read as follows:

"(a)    After the repayment of the Mortgage Loan in full, Borrower shall be required to repay a portion of the outstanding monetary Obligations due under the Loan in connection with any permitted sale of Units in accordance with Section 15.2 hereof, and all of such payments shall be applied in accordance with the terms of Section 15.2; provided that the aggregate reduction payment of the monetary Obligations due under the Loan arising from the proceeds of the sale or refinancing of the Commercial Unit shall not exceed the Commercial Unit Release Price.

(b)    Except in connection with a partial prepayment of the Loan in connection with the closing of a sale and transfer of title to a Unit as contemplated by and pursuant to the terms of an Approved Contract and the terms of Section 15.2 of this Agreement, the Loan (inclusive of principal, interest and Additional Interest) may not be prepaid in whole or in part at any time prior to the Stated Maturity Date."

5

CRC 000247

2.6   **Guarantor Accounts**.  Section 6.1(v) of the Loan Agreement is hereby amended and restated in its entirety to read as follows:

"(v) Guarantor Account.  Borrower shall have (w) caused the Guarantors to open the Vectra Account (as such term is defined in the Guarantor Security Agreement), (x) caused the Guarantor to deposit $11,858,029.93 into the Vectra Account, (y) delivered to Administrative Agent an account control agreement executed by Vectra Bank with respect to the Vectra Account (in a form approved by Administrative Agent), and also executed by the Guarantors and the Administrative Agent, and (z) caused the Guarantors to execute and deliver the Guarantor Security Agreement (with all blanks and account information completed)."

2.7   **Sale of Units and Release of Commercial Unit**.  Section 15.2 of the Loan Agreement is hereby amended by inserting the following new subsections (d), (e) and (f) after subsection (c):

"(d)     Notwithstanding anything contained in this Loan Agreement or any other Loan Document to the contrary, the aggregate principal reduction payment of the Loan resulting from the proceeds of the sale or refinancing of the Commercial Unit shall not exceed the Commercial Unit Release Price.

(e)     At any time after the Amendment Date, upon the payment by the Borrower to the Administrative Agent (for the benefit of the Lenders) of $25,000,000 in the aggregate (the "Commercial Unit Release Price") from a capital contribution by the owner of the Borrower, proceeds from the sale of the Commercial Unit, proceeds from the refinancing of the Commercial Unit or any combination thereof, the Commercial Unit shall be released from the lien of that certain Deed of Trust made by Project Owner to Administrative Agent and dated as of the Amendment Date (the "Deed of Trust") and thereafter all references to the "Project" and the "Units" in this Agreement and the Loan Documents shall be deemed to exclude the Commercial Unit and all covenants, representations and warranties contained in this Agreement and the other Loan Documents with respect to the Commercial Unit shall cease to apply. Such release shall be effective only when accompanied by a written notice from the Borrower indicating that the funds should be applied to the Commercial Unit Release Price. The Commercial Unit Release Price received by the Administrative Agent pursuant to this Section 15.2(e) shall be applied in accordance with the terms of Section 2.7(c) of this Agreement.

(f)  If any storage space which is now a part of the Residential Lot is at any time sold, then 100% of the Net Sales Proceeds paid by the buyer for such storage space (determined as if such storage space were a Unit) shall be paid to Administrative Agent, and shall be applied in accordance with the terms of Section 2.7(c) of this Agreement."

2.8   **Use of Certain Sale Proceeds**.  The Loan Agreement is hereby amended by inserting a new Section 15.3 to read as follows:

C047579/0219357/1597367.15

CRC 000248

"15.3   **Use of Certain Sale Proceeds.** Notwithstanding anything to the contrary set forth in this Loan Agreement or any of the other Loan Documents, and as a material inducement for Borrower to enter into this Amendment, the Administrative Agent and Lenders hereby confirm and agree that if the Net Sales Proceeds from the sale of a Residential Unit by Project Owner exceeds the Minimum Release Price (such excess amount being herein called the "Excess Sales Proceeds"), then the Project Owner shall have the right (but not the obligation) to withhold and retain from the Excess Sales Proceeds an amount equal to Operating Costs first incurred by Project Owner after the Amendment Date, determined on an accrual basis, unless otherwise approved by Administrative Agent (provided however, that notwithstanding the foregoing and anything to the contrary provided herein, real estate taxes and General Assessments (as such term is defined in the Condominium Declaration) first payable after the Amendment Date may be paid out of Excess Sales Proceeds regardless of when such items were first incurred and/or accrued), provided that the following conditions have been satisfied at the time of the sale of the Residential Unit by Project Owner that is generating such Excess Sales Proceeds:

(i) Guarantor has not theretofore requisitioned funds from the Vectra Account for such Operating Costs and Project Owner has not theretofore withheld any Excess Sales Proceeds from prior Unit sales for payment of such Operating Costs, such that there is no duplication of payment sources for the same Operating Costs;

(ii) there are no funds remaining in the Vectra Account to pay such Operating Costs;

(iii) Project Owner shall have provided evidence reasonably satisfactory to Administrative Agent that all rental and operating income received by Project Owner from the operation of the Commercial Unit and any other income producing facilities at the Project (e.g. the ice skating rink, the bowling alley, the parking garage, etc.) at any time during the period commencing on the Amendment Date and ending on the date on which the Commercial Unit is released from the lien of the Deed of Trust (the "Commercial Unit Release Date"), shall have first been applied to and used for the payment of Operating Costs, tenant improvement costs and/or leasing commissions with respect to the Project;

(iv) no Default or Event of Default has occurred and is then continuing under the Loan Documents, and all of the representations and warranties in the Loan Documents are true and correct in all material respects, and all real estate taxes and General Assessments (as defined in the Condominium Declaration) that are due and payable with respect to the Units then owned by Project Owner (other than those to be paid with the Excess Sales Proceeds) have been paid in full;

(v) Borrower has delivered to Administrative Agent a certification setting forth the actual gross sales price of the applicable Unit, the Net Sales Proceeds for such Unit, the Minimum Release Price for such Unit, the resulting Excess Sales Proceeds from the sale of such Unit, and the portion of such Excess Sales Proceeds to be retained by Project Owner to pay for Operating Costs that have been incurred by Project Owner; and

(vi)   Borrower shall have delivered to Administrative Agent a reasonably detailed itemization of each individual cost comprising the Operating Costs (each, an "Itemized Operating Cost", and collectively, the "Itemized Operating Costs") to be paid from the Excess Sales Proceeds, and shall have provided the Administrative Agent with all reasonable back-up documentation and invoices requested by and reasonably satisfactory to the Administrative Agent to evidence that such Itemized Operating Costs have been incurred by Project Owner.

7

From and after the Commercial Unit Release Date, (x) the General Operating Cost Limit shall be reduced to $75,000 per month and (y) the Legal Fee Operating Cost Limit shall remain unchanged (i.e. $30,000 per month).

2.9 **Minimum Release Prices for the Residential Units**. Schedule 1.1(6) to the Loan Agreement is amended and restated in its entirety by Schedule A attached to this Amendment.

2.10 **Covenants**. Section 8.1(ll) of the Loan Agreement is hereby amended and restated in its entirety to read as follows:

"(ll) Deed of Trust Modification. The Borrower will cause the Project Owner to modify the Deed of Trust, on or before April 1, 2011, to expressly state the amount of the obligations secured by the Deed of Trust."

### ARTICLE III. AMENDMENT TO LIMITED INDEMNITY AND GUARANTY AND GUARANTOR SECURITY AGREEMENT

3.1 **Amendment to Limited Indemnity and Guaranty**. Section 2.01(d) of the Limited Indemnity and Guaranty shall be amended and restated in its entirety to read as follows:

"(d) Intentionally Omitted"

3.2 **Amendment to Guarantor Security Agreement**.

(A) From and after the effectiveness of this Amendment, all references in the Guarantor Security Agreement and all other Loan Documents to "JPMorgan", "JPMorgan Account" and JPMorgan Control Agreement" and all covenants, representations and warranties contained in the Guarantor Security Agreement and the other Loan Documents with respect to such terms shall cease to apply.

(B) The defined term "Vectra Account" set forth in Section 1(b) is hereby amended and restated in its entirety to read as follows:

"Vectra Account" means the deposit account, number 4252902046, in the name of the Grantors, held at Vectra, including, without limitation, all sub-accounts thereof, and any successor account and related sub-accounts established from time to time."

(C) The defined term "Vectra Control Agreement" set forth in Section 1(b) is hereby amended and restated in its entirety to read as follows:

"Vectra Control Agreement" means the Account Control Agreement, dated as of October 21, 2010, among Grantor, the Administrative Agent and Vectra."

(D) Section 4(e) of the Guarantor Security Agreement shall be amended and restated in its entirety to read as follows:

"(e) The value of the Collateral contained in the Vectra Account shall equal or exceed $11,858,029.93 at all times, except as permitted under Section 6 and Section 7 of this Security Agreement."

(E) Section 5 of the Guarantor Security Agreement shall be amended and restated in its entirety to read as follows:

8

C047579/0219357/1597367.15

CRC 000250

"Section 5. Restriction on Withdrawals

Notwithstanding anything contained in this Security Agreement or any other Loan Document to the contrary, except as expressly permitted in Section 7 of this Security Agreement, the Grantors shall not be permitted to withdraw funds from the Account until the payment in full of the Loan Agreement Obligations and the Commitments have been terminated; provided that the Grantors shall be permitted to withdraw the accrued interest contained in the Account one time each month so long as no Event of Default has occurred or is continuing immediately before and after giving effect to such withdrawal."

(F)     Section 6 of the Guarantor Security Agreement shall be amended and restated in its entirety to read as follows:

"Section 6. Withdrawals for Mechanics' Liens and Materialmens' Liens

(a)     Notwithstanding anything contained in this Security Agreement or any other Loan Document to the contrary, at any time after the first anniversary of the Amendment Date, to the extent that a mechanics' Lien or materialmens' Lien has been filed against or has been otherwise asserted against the Project or any of the other collateral for the Loan and the Borrower or the Project Owner has failed to cause such Lien to be discharged or bonded in accordance with Section 8.1(b) of the Loan Agreement, the Grantors agree that the Administrative Agent shall have the right (but is not required) to withdraw funds, at any one time or in a series of withdrawals, from the Vectra Account to be used solely to discharge or bond such mechanics' Liens or materialmens' Liens filed or asserted against the Project or any of the other collateral for the Loan.

(b)     Notwithstanding anything contained in this Security Agreement or any other Loan Document to the contrary, after such time as the Administrative Agent or any of the other Lenders exercise any remedies in connection with the Collateral and in accordance with the Pledge Agreement, the Grantors agree that the Administrative Agent shall have the right to withdraw funds, at any one time or in a series of withdrawals, from the Vectra Account to be used solely to discharge or bond any mechanics' Liens or materialmens' Liens filed or asserted against the Project relating to any work on the Project commenced prior to the Administrative Agent or the Lenders becoming the beneficial owner of the Project Owner."

(G)     Section 7 of the Guarantor Security Agreement shall be amended and restated in its entirety to read as follows:

"Section 7. Withdrawals for Project Costs and Operating Costs

Notwithstanding anything contained in this Security Agreement or any other Loan Document to the contrary, the Guarantors shall be permitted to requisition the funds contained in the Vectra Account, provided that (i) such funds are used by the Project Owner solely for (x) the payment of Project Costs, (y) the payment of Operating Costs or (z) as otherwise set forth in the Loan Agreement, (ii) at the time of such request and at the time of any withdrawal in accordance with this Section, no Default or Event of Default has occurred and is then continuing under the Loan Documents, (iii) all of the representations and warranties in the Loan Documents are true and correct in all material

9

CRC 000251

respects, (iv) if such funds are to be used for payment of Project Costs, Guarantors shall have satisfied (or caused Borrower to so satisfy) the terms of subsections 6.2(c)(i) and 6.2(c)(iii) of the Loan Agreement with respect to the requisition of such funds from the Vectra Account for the payment of Project Costs, (v) if such funds are to be used for the payment of Operating Costs, Guarantors shall have satisfied (or caused the Project Owner to so satisfy) the terms of Section 15.3 of the Loan Agreement with respect to the requisition of such funds from the Vectra Account for the payment of Operating Costs (i.e. as if such funds were Excess Sales Proceeds), except that such Operating Costs may have been incurred at any time by Project Owner (i.e. may have been incurred before and/or after the Amendment Date), and (vi) the Guarantors shall request all withdrawals from the Administrative Agent in writing and shall provide the Administrative Agent with all reasonable back-up and invoices reasonably requested by and reasonably satisfactory to the Administrative Agent in connection with such withdrawal request."

(H)    Sections 10(b) and 10(c) of the Guarantor Security Agreement shall be amended and restated in their entirety to read as follows:

"(b) Intentionally omitted"

"(c) Intentionally omitted"

(I)    Section 10 of the Guarantor Security Agreement is hereby amended by (i) deleting the "or" at the end of clause (g), (ii) replacing the "." at the end of clause (h) with "; or", and (iii) adding a new clause (i) to the end thereof that reads as follows:

"(i) The funds held in the Vectra Account shall be used in any manner not otherwise expressly permitted by this Security Agreement or the Loan Agreement."

## ARTICLE IV. MISCELLANEOUS

4.1    **Full Force and Effect**. Except as expressly modified or amended hereby, the Loan Documents shall remain in full force and effect and all of the terms and conditions of the Loan Documents are hereby ratified and confirmed and are incorporated herein by references as if more fully set forth herein.

4.2    **No Third Parties Benefited**. This Amendment is between and for the sole benefit of the parties hereto, and the Lenders' successors and assigns, and creates no rights whatsoever in favor of any other Person and no other Person will have any rights to rely hereon.

4.3    **Binding Effect; No Borrower Assignment**. This Amendment will be binding upon and inure to the benefit of Borrower, Guarantors, the Administrative Agent and the Lenders and their respective heirs, executors, administrators, successors and assigns; provided however Borrower and Guarantors may not assign their rights or interests in this Amendment without the prior consent of the Administrative Agent and the Lenders, as provided in the Loan Documents.

4.4    **Costs and Expenses**. As a material inducement for Lenders to agree to this Amendment and the documents executed in connection herewith, Borrower agrees to pay all of the Administrative Agent's and the Lenders' costs and expenses (including, without limitation, the reasonable fees and expenses of counsel to the Administrative Agent and the Lenders) associated with this Amendment and the documents executed in connection herewith, in excess of $170,000 in the aggregate, upon written demand therefor from the Administrative Agent or the Lenders. Lenders agree to pay the reasonable fees and expenses of counsel to the Borrower associated with the preparation and negotiation of this Amendment and the

10

documents executed in connection herewith.  The amount of such fees and expenses paid by Lenders shall not be included in the $170,000 cap set forth hereinabove.

4.5     **Execution in Counterparts**.  This Amendment may be executed in counterparts, each of which shall be deemed an original and such counterparts when taken together shall constitute but one agreement.

4.6     **Governing Law**.  This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York.

4.7     **Further Assurances** Borrower and each Guarantor shall, upon demand by the Administrative Agent or any Lender, execute, acknowledge (if appropriate) and deliver any and all documents and instruments and do or cause to be done all further acts reasonably necessary or appropriate to effectuate the purposes of the Loan Documents and to perfect any assignments contained therein.

[SIGNATURES BEGIN ON THE NEXT PAGE]

C047579/0219357/1597367.15

11

CRC 000253

IN WITNESS WHEREOF, Borrower and Lender have hereunto caused this Amendment to be executed on the date first above written.

**BORROWER:**

**SOLARIS MEZZ, LLC,**
a Delaware limited liability company

By: _____
Name:  Peter B. Knobel
Title:   Manager

By its signature below, each Guarantor acknowledges and confirms the provisions set forth in Section 1.3, Article III and Article IV above.

**GUARANTORS:**

_____
Peter B. Knobel

_____
Patrice Knobel

[SIGNATURE PAGES CONTINUE]

C047579/0219357/1597367.15

**LENDERS:**

**VAIL MEZZ FUNDING LLC,**
a Delaware limited liability company

By: _____
      Name:  Steven Orbuch
      Title:  Authorized Person


**VAIL MEZZ FUNDING II LLC,**
a Delaware limited liability company

By: _____
      Name:
      Title:


**ADMINISTRATIVE AGENT:**


**VAIL MEZZ FUNDING LLC,**
a Delaware limited liability company, as Administrative
Agent for Lenders

By: _____
      Name:  Steven Orbuch
      Title:  Authorized Person


SOLARIS OMNIBUS AMENDMENT SIGNATURE PAGE

CRC 000255

## SCHEDULE A

### SCHEDULE 1.1(6)
### MINIMUM RELEASE PRICES FOR THE RESIDENTIAL UNITS

| Old Unit ID | New Unit ID | SF | Release Price ($ Per Square Foot) | Release Price ($ Per Unit) |
|---|---|---|---|---|
| A-4 | 4A WEST | 2,828 | $1,542 | $4,361,588 |
| A-5 | 5A WEST | 2,880 | $1,634 | $4,706,117 |
| A-6 | 6A WEST | 2,880 | $1,705 | $4,911,368 |
| A-7 | 7A WEST | 2,880 | $1,852 | $5,332,866 |
| B-3 | 3A WEST | 2,395 | $2,046 | $4,899,400 |
| C-4 | 4C WEST | 1,770 | $1,554 | $2,750,000 |
| C-5 | 5C WEST | 1,720 | $1,385 | $2,382,380 |
| C-6 | 6C WEST | 1,721 | $1,432 | $2,464,660 |
| D-3 | 3B WEST | 1,808 | $1,820 | $3,291,200 |
| E-4 | 4E WEST | 1,759 | $1,297 | $2,281,400 |
| E-5 | 5E WEST | 1,729 | $1,363 | $2,356,200 |
| E-6 | 6E WEST | 1,738 | $1,365 | $2,372,656 |
| E-7 | 7E WEST | 2,272 | $1,399 | $3,179,000 |
| F-5 | 5F WEST | 2,386 | $1,536 | $3,665,200 |
| F-6 | 6F WEST | 2,385 | $1,250 | $2,980,313 |
| G-4 | 4G WEST | 2,577 | $1,500 | $3,866,786 |
| G-5 | 5G WEST | 2,600 | $1,537 | $3,995,068 |
| G-6 | 6G WEST | 2,599 | $1,885 | $4,899,400 |
| H-1 | 1A SOUTH | 2,570 | $1,505 | $3,867,160 |
| H-3 | 3C WEST | 2,914 | $2,004 | $5,840,000 |
| H-4 | 4H WEST | 2,911 | $1,612 | $4,691,456 |
| H-5 | 5H WEST | 3,125 | $1,783 | $5,572,600 |
| I-3 | 3B EAST | 909 | $1,100 | $1,000,000 |
| I-4 | 4A EAST | 2,817 | $1,548 | $4,361,588 |
| I-5 | 5A EAST | 2,882 | $1,633 | $4,706,117 |
| I-6 | 6A EAST | 2,882 | $1,704 | $4,911,368 |
| I-7 | 7A EAST | 2,882 | $1,850 | $5,332,866 |
| J-3 | 3A EAST | 2,405 | $2,037 | $4,899,400 |
| J-5 | 5B EAST | 2,550 | $1,995 | $5,086,400 |
| J-6 | 6B EAST | 2,554 | $2,072 | $5,292,100 |
| K-3 | 3C EAST | 1,458 | $1,029 | $1,500,000 |
| K-4 | 4C EAST | 1,737 | $1,742 | $3,025,000 |
| K-5 | 5C EAST | 1,736 | $1,261 | $2,188,237 |
| K-6 | 6C EAST | 1,737 | $1,361 | $2,363,680 |
| L-3 | 3D EAST | 2,816 | $1,919 | $5,404,300 |
| L-4 | 4D EAST | 2,814 | $1,834 | $5,161,200 |
| L-6 | 6D EAST | 2,816 | $1,986 | $5,591,300 |
| M-3 | 3E EAST | 1,664 | $1,022 | $1,700,000 |
| M-4 | 4E EAST | 1,732 | $1,316 | $2,279,156 |
| M-5 | 5E EAST | 1,730 | $1,405 | $2,431,000 |
| M-6 | 6E EAST | 1,730 | $1,459 | $2,524,500 |

C047579/0219357/1597367.15

| Old Unit ID | New Unit ID | SF | Release Price ($ Per Square Foot) | Release Price ($ Per Unit) |
|---|---|---|---|---|
| M-7 | 7E EAST | 1,987 | $1,425 | $2,831,180 |
| N-3 | 3F EAST | 2,720 | $1,199 | $3,262,028 |
| N-4 | 4F EAST | 2,923 | $1,235 | $3,610,222 |
| N-5 | 5F EAST | 2,926 | $1,296 | $3,793,482 |
| O-3 | 3G EAST | 2,259 | $1,509 | $3,408,636 |
| O-4 | 4G EAST | 2,283 | $1,572 | $3,588,231 |
| O-5 | 5G EAST | 2,288 | $1,952 | $4,465,560 |
| O-6 | 6G EAST | 2,602 | $1,564 | $4,068,372 |
| P-3 | 3H EAST | 2,793 | $1,848 | $5,161,200 |
| V-2 | 2A SOUTH | 2,023 | $2,101 | $4,250,000 |
| V-3A | 3A SOUTH | 1,870 | $1,529 | $3,700,000 |
| Penthouse A | PENTHOUSE A EAST | 6,584 | $2,164 | $14,250,000 |
| Penthouse B | PENTHOUSE B WEST | 4,538 | $2,369 | $10,750,000 |
| Penthouse C | PENTHOUSE C WEST | 1,184 | $1,248 | $1,477,300 |
| Penthouse E | PENTHOUSE E WEST | 1,354 | $1,511 | $2,045,780 |
| Penthouse F | PENTHOUSE F WEST | 2,357 | $1,046 | $2,464,660 |
| Penthouse G | PENTHOUSE G WEST | 1,874 | $1,708 | $3,200,000 |
| Penthouse J | PENTHOUSE B EAST | 4,526 | $2,375 | $10,750,000 |
| Penthouse K | PENTHOUSE C EAST | 1,178 | $1,254 | $1,477,300 |
| Penthouse L | PENTHOUSE D EAST | 4,985 | $2,257 | $11,250,000 |
| Penthouse M | PENTHOUSE E EAST | 1,363 | $1,501 | $2,045,780 |
| Penthouse N | PENTHOUSE F EAST | 3,776 | $1,973 | $7,450,000 |
| Penthouse O | PENTHOUSE G EAST | 2,693 | $1,708 | $4,600,000 |
| n/a | RS | | $400 | |

C047579/0219357/1597367.15

Civil Action No. 1:19-cv-02443-STV
Exhibit 4

CRC 000257

## OPERATING PAYMENT AGREEMENT

THIS OPERATING PAYMENT AGREEMENT (the "**Agreement**") is made effective this 5th day of November, 2010, by and among Solaris Property Owner, LLC, a Delaware limited liability company ("**Solaris**"), Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership ("**CRCPS**"), and, for the limited purposes set forth below, Peter Knobel, an individual ("**Guarantor**"). Initially capitalized terms used but not otherwise defined below shall have the meanings ascribed to such terms under the provisions of the Loan Documents.

### RECITALS:

F.      CRCPS has agreed to loan Solaris certain sums of money (the "**Loan**") in accordance with the terms, conditions and provisions of the Loan Agreement, Promissory Note and certain other documents (all of which documents may be collectively referred to below as the "**Loan Documents**").

G.      The Loan proceeds are expected to be generated by investments into CRCPS from certain investors (the "**Investors**") pursuant to the EB-5 Immigrant Investor Regional Center Program ("**EB-5**").

H.      The parties recognize and agree that under the terms of the Loan Documents, Solaris is permitted to repay Loan Advance(s) prior to the Maturity Date, but in no event sooner than thirty-six (36) months from and after the date of such Loan Advance(s).

I.      Upon Solaris' prepayment of any such Loan Advance(s), Solaris' obligation to pay interest in connection with such Loan Advance(s) shall automatically terminate pursuant to the Note.

J.      In the event of any such prepayment, CRCPS may experience cash flow deficiencies resulting from the costs and expenses associated with ownership of any Collateral Unit(s) conveyed by Solaris in repayment of any Loan Advance(s).

K.      Subject to all of the terms, conditions and provisions set forth below and as a material inducement for CRCPS to make the Loan, Solaris has agreed to make certain Operating Payments (as hereinafter defined) to CRCPS if in the event of any Prepayment(s) by Solaris.

L.      Guarantor will derive substantial benefit from the Loan by virtue of Guarantor's residual interest in the Project.

M.      But for the personal guarantee of Guarantor, CRCPS would not have agreed to enter into the transaction contemplated in and evidenced by the Loan Documents.

NOW THEREFORE, in consideration of the foregoing, the mutual promises set forth below and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

### AGREEMENT

1.      **OBLIGATION TO MAKE OPERATING PAYMENTS.** Solaris shall be obligated to make certain Operating Payments (as hereinafter defined) to CRCPS in the event of Solaris prepays any Loan Advance(s) under the Note.

E-2

CRC 000258

2.     **CERTAIN DEFINED TERMS.**

"**Aggregate Investor Interest**" means total periodic Investor Interest (as hereinafter defined) due in connection with each Loan Advance.

"**Investor Interest**" means the periodic interest actually owed from CRCPS to each Investor from time to time (whether the same is accruing or paid current), but in no event more than an effective annual rate three percent (3%) per Investor.

"**Operating Payments**" means, with respect to each Loan Advance, an amount equal to the Aggregate Investor Interest due in connection with such Loan Advance during the Term (as hereinafter defined).

"**Operating Payment Commencement Date**" means, with respect to each Loan Advance, the day after Solaris prepays such Loan Advance (in applicable).

"**Operating Payment Termination Date**" means, with respect to each Loan Advance, the Maturity Date set forth in the Note.

3.     **TERM.** Solaris' obligation to make Operating Payments in connection with any Loan Advance(s) shall begin on the applicable Operating Payment Commencement Date and end on the applicable Operating Payment Termination Date (the "**Term**"). Without limiting the generality of the foregoing, , if CRCPS' obligation to pay interest to any Investor terminates, Solaris' obligation to pay CRCPS the portion of any Operating Payments due in connection with such Investor shall likewise terminate.

4.     **PAYMENT SCHEDULE.**  During the Term, Operating Payments shall be due and payable in arrears on the first business day of each calendar month. Any partial months shall be prorated.

5.     **GUARANTEE AGREEMENT.**  As a condition precedent the first Loan Advance, Guarantor shall execute a guarantee agreement in form and substance reasonably satisfactory to Lender personally guaranteeing payment of (i) the Interest Payments due under the Note and (ii) the Operating Payments due hereunder (the "**Guarantee Agreement**").  Lender shall in no event be required to advance or loan any funds in connection with the Loan Agreement until Guarantor executes and delivers the Guarantee Agreement described above.

6.     **MISCELLANEOUS.**

**Waivers and Amendments.** Neither this Agreement nor any provision hereof may be changed, waived, discharged or terminated orally, but only by a statement in writing signed by each of the parties hereto.

**Governing Law.** The parties agree to submit to the jurisdiction of the courts of the City and County of Denver, Colorado. This Agreement shall be governed by and construed in accordance with the laws of Colorado.

**No Right to Jury Trial.** Each party hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement any right to a trial by jury.

CRC 000259

**Successors and Assigns.** Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns, heirs, executors and administrators. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Notwithstanding to the contrary set forth in any of the Loan Documents, Solaris shall have the absolute right (in Solaris' discretion) to assign this Operating Payment Agreement to Solaris' wholly-owned, bankruptcy-remote, single-purpose subsidiary (the "SPE"). Upon such assignment, all of Solaris' rights and obligations under the Loan Documents shall automatically and forever terminate and, thereafter, Solaris shall have no further obligation of any kind whatsoever with respect to this Operating Payment Agreement. If Solaris assigns Solaris' interest in the Loan Documents to Solaris' SPE prior to the execution of this Operating Payment Agreement, Solaris' SPE shall be substituted for Solaris as the signatory hereof and construed to mean "Solaris" for all purposes hereunder. A condition precedent to any such assignment shall be that any assignee of Borrower shall continue to operate the Solaris Project, as defined in the Loan Agreement, to assure full construction expenditure to project completion and subsequent operation of the retail businesses, all in satisfaction of the factual assumptions set forth in the EB-5 Econometric Report prepared in connection with the Solaris Project. The purpose of this condition precedent is to assure the Lender that the related EB-5 investors' ability to obtain removal of conditions on their U.S. permanent residency will not be impaired by any such assignment of the Borrower's rights and obligations under the Loan Documents. The Lender shall have sole discretion to determine satisfaction of this condition precedent prior to any assignment by Borrower.

**Notices.** All notices required to be given under this Agreement shall be given in writing, may be sent by facsimile (unless otherwise required by law) or by electronic mail, and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address shown below. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address:

| | |
|---|---|
| **SPO:** | Solaris Property Owner, LLC<br>Attention: Legal Department<br>141 East Meadow Drive, Suite 211<br>Vail, Colorado 81657<br>P: (970) 479-7566<br>F: (970) 479-6666 |
| **CRC:** | Colorado Regional Center Project Solaris, LLLP<br>4643 S. Ulster Street, Suite 950<br>Denver, Colorado 80237<br>P: 720.554.9704<br>F: 720.554.9905 |
| **Guarantor:** | Peter Knobel c/o Solaris Property Owner, LLC<br>Attention: Legal Department<br>141 East Meadow Drive<br>Suite 211<br>Vail, Colorado 81657<br>P: (970) 479-7566<br>F: (970) 479.6666 |

E-1

CRC 000260

**Severability.** In case any provision of this Agreement shall be declared invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

**Titles and Subtitles.** The titles of the paragraphs and subparagraphs of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

**Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

**No Strict Construction.** The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**Amendments.** This Agreement may only be amended and any waivers hereunder shall only be made with the approval of the Company and the Purchaser.

[Signature Page Follows]

E-5

CRC 000261

THIS OPERATING PAYMENT AGREEMENT is made effective as of the date first above written by and among:

**SOLARIS:**

**Solaris Property Owner, LLC,** a Delaware limited liability

By: Solaris Mezz, LLC, a Delaware limited liability company

By: _____
Peter Knobel, Manager

**CRCPS:**

**Colorado Regional Center Project Solaris, LLLP,**
a Colorado limited liability limited partnership

By: Colorado Regional Center I, LLC, a Colorado limited liability company, general partner

By: _____
Chester Schwartz, Manager

**GUARANTOR:**

By: _____
Peter B. Knobel, individually

E-6

**ALLONGE TO PROMISSORY NOTE**

**ENDORSEMENT SEPARATE FROM INSTRUMENT**

| | |
|---|---|
| Borrower: | Solaris Property Owner I, LLC |
| Lender: | Colorado Regional Center Project Solaris, LLLP |
| Date of Note: | April 18, 2012 |
| Original Principal Amount: | $100,000,000 |

This Allonge shall be and remain attached to and shall constitute an integral part of the above-described Promissory Note (the "Note") from and after the effective date of this Allonge.

Effective as of the original date of the Note, the Interest Rate (as defined in the Note) shall be 5.55% and all references to the Interest Rate shall mean 5.55%.

Except as expressly amended by this Allonge, the provisions of the Note shall remain in full force and effect and are hereby ratified and confirmed by the undersigned.

DATED to be effective as of April 18, 2012.

BORROWER:

Solaris Property Owner I, LLC, a Delaware limited liability company

By: _____

Name: _Ryan Smith_

Title: _Designated Agent_

Lender hereby consents to the amendment of the Note as set forth in this Allonge effective as of the date first set forth above.

Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership

By: _____

Name: _Chester P Schwartz_

Title: _Manager_

**EXHIBIT A**
(Promissory Note)

| A | B | C | D | E |
|---|---|---|---|---|
| Property | Collateral Unit Value | Loan Advance | Date Loan Advance Complete | Maturity Date |
| Unit 6E West | $3,707,982 | $4,000,000 | April 18, 2012 | April 17, 2017 |
| Unit 2A South | $6,439,950 | $6,500,000 | April 25, 2012 | April 24, 2017 |
| Pent E West | $3,084,124 | $3,000,000 | May 3, 2012 | May 2, 2017 |
| Unit 6E East | $3,707,485 | $3,500,000 | May 30, 2012 | May 29, 2017 |
| Pent E East | $3,084,683 | $3,000,000 | June 15, 2012 | June 14, 2017 |
| Unit 5E West | $3,581,090 | $4,000,000 | August 2, 2012 | August 1, 2017 |
| Unit 4G West | $6,420,861 | $6,500,000 | August 24, 2012 | August 23, 2017 |
| Unit 7E West | $4,556,554 | $4,500,000 | September 7, 2012 | September 6, 2017 |
| Pent C East | $2,355,248 | $2,000,000 | September 13, 2012 | September 12, 2017 |
| Unit 6D East | $7,832,070 | $8,000,000 | October 2, 2012 | October 1, 2017 |
| Unit 5C West | $3,555,668 | $3,500,000 | November 6, 2012 | November 5, 2017 |
| Unit 6C West | $3,605,715 | $3,500,000 | November 27, 2012 | November 26, 2017 |
| Unit 5G West | $6,521,940 | $6,500,000 | January 24, 2013 | January 23, 2018 |
| Unit 3E East | $2,578,042 | $3,000,000 | January 29, 2013 | January 28, 2018 |
| Unit 7E East | $4,043,190 | $4,000,000 | January 30, 2013 | January 29, 2018 |
| Unit 4D East | $7,831,977 | $7,500,000 | March 6, 2013 | March 5, 2018 |
| Pent G West | $4,737,891 | $4,500,000 | May 20, 2013 | May 19, 2018 |
| Pent C West | $2,355,530 | $2,500,000 | May 30, 2013 | May 29, 2018 |
| Unit 3C East | $2,500,000 | $2,500,000 | January 30, 2015 | January 29, 2020 |

Borrower Initials _RS_
Date _4/29/15_

# PROMISSORY NOTE

Original Principal Amount: **$100,000,000.00**                    Date: April 18, 2012

**PROMISE TO PAY:** Solaris Property Owner I, LLC, a Delaware limited liability company ("**Borrower**") promises to pay to Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership ("**Lender**"), or order, in lawful money of the United States of America, the principal amount of One Hundred Million and No/100 United States Dollars ($100,000,000.00) together with interest at the rate of five and seven-tenths percent (5.7%) per annum (the "**Interest Rate**") on the terms and conditions set forth below (the "**Loan**"). Notwithstanding anything contained herein to the contrary (including, without limitation, the Original Principal Amount set forth above), the maximum principal balance due hereunder at any point in time shall equal the total principal balance of all Loan Advances made to Borrower as set forth in <u>Exhibit A</u> attached hereto and incorporated herein by this reference. It is the express intent of the parties hereto that the Original Principal Amount of this Note is intended to reflect the maximum amount of principal to be loaned by Lender to Borrower from the various Loan Advances made from time to time.

**DEFINED TERMS:** Initially capitalized terms used but not otherwise defined below shall have the meanings ascribed to such terms under the provisions of that certain Loan Agreement dated effective November 5, 2010, by and between Borrower and Lender (the "**Loan Agreement**").

**INTEREST PAYMENTS:** Commencing on the date Lender makes the first Loan Advance to Borrower in accordance with the Loan Agreement (the "**Commencement Date**"), the outstanding principal of the loan shall bear interest at the Interest Rate. Borrower shall make interest-only payments on the outstanding principal balance of the Loan (each, an "**Interest Payment**") on the first business day of each month following the Commencement Date until the Loan is repaid in full. Each Interest Payment shall include interest on all amounts outstanding at the time such Interest Payment is due (including a pro-rated amount of interest for any Loan Advances that took place during the previous month). Borrower will pay Lender at Lender's address as Lender shall designate in writing. Any and all payments made hereunder shall be applied first to any unpaid collection costs and late charges pursuant to this Note, second to accrued unpaid interest, and third in reduction of the outstanding principal balance of the Loan.

**TERM:** With respect to each Loan Advance, this note shall be deemed to mature, and (if not sooner repaid in accordance with the provisions hereof) the unpaid principal balance attributable to such Loan Advance, together with all accrued interest attributable to the same (if any), shall be due and payable on the date that is exactly sixty (60) months from Closing on such Loan Advance (each, a "**Maturity Date**"); *provided, however,* that (notwithstanding anything to the contrary set forth in this Note or any other Loan Documents), at any time after the Prepayment Date (as hereinafter defined), Borrower shall have the absolute right to prepay the portion the Note attributable to any Loan Advance by repaying Lender the amount of such Loan Advance in cash or conveying Lender the Collateral Unit(s) securing such Loan Advance. If Borrower tenders to Lender any Collateral Unit(s) in repayment of a Loan Advance, the principal balance of the Note shall be reduced by the amount of the Loan Advance secured by such Collateral Unit(s). With respect to each Loan Advance, the term "**Prepayment Date**" means a date that is exactly thirty six (36) months from and after the Closing on such Loan Advance.

**PREPAYMENT:** Except as otherwise set forth in this Note, Borrower shall not be allowed to pay all or a portion of the Loan prior to the Prepayment Date.

**NOTICE OF PREPAYMENT:** Borrower shall give Lender (i) at least sixty (60) calendar days prior written notice of any Cash Prepayment and (ii) at least twenty (20) calendar days prior written notice of any Collateral Unit Distribution.

CRC 000265

**DEFAULT**: Subject to any applicable cure rights set forth in any Loan Document, each of the following shall constitute an "**Event of Default**" hereunder:

      (i)     if Borrower fails to make any payment when such payment is due;

      (ii)    if Borrower fails to comply with or to perform when due any other material, obligation, covenant, representation, warranty or condition contained in this Note or any other Loan Document;

      (iii)   if Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement in favor of any other creditor or person that results in a Material Adverse Affect; or

      (iv)   if any material representation or statement made or furnished to Lender by Borrower is false or misleading at the time made or furnished.

**NON-RECOURSE LOAN; EXCEPTION FOR INTEREST PAYMENTS**:

      (i)     **Non-Recourse Loan**. Except as expressly provided below, subject to any applicable cure rights set forth in any Loan Document, if an Event of Default has occurred and is then continuing, Lender agrees to proceed solely against the Collateral, it being the parties' mutual understanding and intent that principal amount of the Loan secured by this Note is entirely non-recourse to Borrower. Notwithstanding the foregoing, Lender may name Borrower or any of its successors or assigns or any person or entity holding under or through them as parties to any actions, suits or other proceedings initiated by Lender to enforce any remedies set forth herein against the Collateral, including without limitation, any action, suit or proceeding to foreclose the lien of the Deed of Trust against the Collateral.

      (ii)    **Exception for Interest Payments**. Notwithstanding the foregoing, subject to any applicable cure rights set forth in any Loan Document, if Borrower fails to make any Interest Payment(s) due hereunder, the amount of such Interest Payment(s) plus the Collection Costs directly related collecting to the same shall be fully recourse to Borrower. Except as expressly set forth in the immediately preceding sentence, the Loan evidenced by this Note is and shall remain entirely non-recourse to Borrower.

**LENDER'S RIGHTS**: Subject to any applicable cure rights set forth in any Loan Documents, if an Event of Default under this Note has occurred and is then continuing: (i) Lender may declare the entire unpaid principal balance of this Note and all accrued interest, if any, immediately due and, upon receipt of written notice of such acceleration, Borrower shall convey the Collateral Unit(s) to Lender in full satisfaction of Borrower's obligations under this Note and the other Loan Documents; (ii) Lender, at its option, may also, if permitted under applicable law, increase the Interest Rate on this Note to the lesser of fourteen percent (14.00%) or the maximum amount permitted by law (the "**Default Rate**"); and (iii) Borrower shall be responsible for any and all Collection Costs directly related to the Event of Default. "**Collection Costs**" means, to the extent permitted by law, Lender's reasonable legal expenses (whether or not there is a lawsuit), including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, any post-judgment collection services, and any court costs and fees associated with the foregoing.

**CHOICE OF LAW**: This Note has been delivered to Lender, and accepted by Lender in Colorado. Borrower and Lender agree to submit to the jurisdiction of the courts of the City and County of Denver, Colorado. Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or

2

CRC 000266

counterclaim brought by either Lender or Borrower against the other. This Note shall be governed by and construed in accordance with the laws of Colorado.

**COLLATERAL:** In order to secure payment of this Note, Borrower has granted to Lender security interests in certain real and personal property owned by Borrower (the "**Collateral**"). These security interests are evidenced by a Deed of Trust and Security Agreement and certain other documents (collectively, the "**Collateral Documents**"). Reference is made to the Collateral Documents for various rights and remedies of the parties to those documents.

**ASSIGNMENT BY BORROWER.** Notwithstanding to the contrary set forth in any of the Loan Documents, Borrower shall have the absolute right (in Borrower's discretion) to assign this Promissory Note, the Loan Agreement and the other Loan Documents to Borrower's wholly-owned, single-purpose subsidiary (the "**SPE**"). Upon such assignment, all of Borrower's rights and obligations under the Loan Documents shall automatically and forever terminate and, thereafter, Borrower shall have no further obligation of any kind whatsoever with respect to the Loan or Loan Documents. If Borrower so assigns Borrower's interest in the Loan Documents to Borrower's SPE prior to the execution of this Promissory Note, Borrower's SPE shall be substituted for Borrower as the signatory hereof and construed to mean "Borrower" for all purposes hereunder and under the other Loan Documents. A condition precedent to any such assignment shall be that any assignee of Borrower shall continue to operate the Solaris Project, as defined in the Loan Agreement, to assure full construction expenditure to project completion and subsequent operation of the retail businesses, all in satisfaction of the factual assumptions set forth in the EB-5 Econometric Report prepared in connection with the Solaris Project. The purpose of this condition precedent is to assure the Lender that the related EB-5 investors' ability to obtain removal of conditions on their U.S. permanent residency will not be impaired by any such assignment of the Borrower's rights and obligations under the Loan Documents. The Lender shall have sole discretion to determine satisfaction of this condition precedent prior to any assignment by Borrower.

**GENERAL:** Lender may delay or forego enforcing any of its rights or remedies under this Note or under the Collateral Documents without losing them. Borrower understands and agrees that, with or without any notice to anyone other than Borrower, Lender may (i) make one or more additional secured or unsecured loans or otherwise extend additional credit and (ii) apply any security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreements, as Lender in its discretion may determine. Borrower, to the extent allowed by law, waives presentment, demand for payment, protest and notice of dishonor.

**BORROWER:**

**Solaris Property Owner I, LLC,** a Delaware limited liability company

By: _____

Name: _____

Title: _____

3

CRC 000267

## EXHIBIT A
### (Promissory Note)

| Date of Loan Advance | Amount of Loan Advance | Maturity Date |
|---|---|---|
| April 18, 2012 | $4,000,000 | April 18, 2017 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

4

CRC 000268

## EXHIBIT B
(Promissory Note)

| Date of Loan Advance | Collateral Unit | Collateral Unit Value |
|---|---|---|
| April 18, 2012 | Unit 6E West | $3,707,982 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

5

CRC 000269