**From:** General Partner ("GP") of Colorado Regional Center Project Solaris, LLLP ("CRCPS" or the "Partnership")

**To:** Limited Partners ("LPs") of the Partnership

**Date:** March 15, 2016

**Re:** Notice of Fair Market Value of the Partnership Property (this "Notice") and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions

**Definitions:**

"Administrative Expenses" means those expenses incurred by the GP in connection with the sale of LP Interests including specifically and without limitation, certain marketing, travel, legal and accounting fees, referral and related fees, and the legal fees of a LP incurred in preparation of such LP's I-526 petition.

"Appraisal(s)" means the good faith estimate of the Fair Market Value of each Unit performed by the independent third party firm Pack Appraisal Company.

"Capital Contribution" means the total amount of money or property contributed to the Partnership by each Partner (excluding any amounts contributed for Administrative Expenses).

"Fair Market Value" means the total liquidation value (as determined pursuant to a good faith market analysis conducted by qualified third-parties engaged by the GP) of all of the Partnership Property or an individual Unit after deduction of all usual and customary selling expenses, pro rations, and other similar matters.

"Loan" means the loan made from CRCPS to the Solaris developer in the aggregate amount of $82,500,000.

"Loan Advance" means the amount of each advance of principal from CRCPS to the developer per terms of the Loan.

"LP Interest" means a limited partnership interest in CRCPS.

"Partnership Property or Units" means the 19 individual properties presently held by the developer which collateralize the Loan.

"Put Exercise Notice" means written notice provided by a LP to the Partnership of his or her intent to exercise the Put Right. A Put Exercise Notice must be provided to the Partnership within 45 days following the receipt of this Notice.

"Put Right" means for each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, such LP may elect to sell his or her LP Interest to the Partnership and receive a return of capital.

"Partnership Agreement" means the Limited Liability Limited Partnership Agreement of Colorado Regional Center Project Solaris, LLLP.

"Put Purchase Price" means the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance amount multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses.

1

"Section 13.06" means Section 13.06 of the CRCPS Partnership Agreement entitled "Rights of Limited Partners to Return of Capital Contributions.

"U.S. Immigration Legal Requirements" means the GP's understanding that only LPs who have either received adjudication of their I-829 petition or who are foregoing permanent residency in the United States would be eligible to receive a return of capital and sell their LP Interest to the Partnership.

### Notice of Fair Market Value of the Partnership and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions:

As previously discussed, per the terms of the Loan, the developer has the right to transfer each Unit to the Partnership in lieu of cash payment at maturity of the Loan. The developer has indicated its desire to do so for each Unit as each Loan Advance reaches its 3-year anniversary mark. Accordingly, we are working with the developer to transfer title to the Partnership on the Units which Loan Advances have reached or surpassed the 3-year anniversary mark. The Partnership has been in the process of developing a comprehensive plan to permit the transfer and orderly sale of Units presently held by the developer. We have obtained valuations (see summary below) on each of the Units and are continually performing an overall assessment of the real estate market in an effort to maximize value on the sale of each of the Units which in turn maximizes value to the Partnership and to all LPs.

In accordance with Section 13.06, we engaged an independent third party, Pack Appraisal Company, to prepare a good faith estimate of the Fair Market Value of the Partnership Property. The Appraisals do not account for customary selling expenses, which the Partnership will incur as it pursues the strategy set forth in this Notice. We are hereby providing notice to the LPs of the estimated Fair Market Value, which has been determined to be $66,360,000 in the aggregate. Upon request, we will provide copies of the Appraisals for your review. The Appraisal amount compares to the aggregate amount of the Loan made to the Solaris developer in the amount of $82,500,000, representing approximately eighty percent (80%) of the Loan amount, although we believe the value of the Partnership Property to be higher based on reasons set forth below.

2

CRC 000637

The following is a summary of the appraised Fair Market Value of the Partnership Property:

| Unit | Appraised Fair Market Value | Loan Advance Date | Prepayment Date | Loan Advance Amount | Ratio of Fair Market Value to Loan Advance Amount |
|------|------|------|------|------|------|
| 6E West | $2,650,000 | 4/18/2012 | 4/18/2015 | $4,000,000 | -33.8% |
| 5E West | $2,650,000 | 8/2/2012 | 8/2/2015 | $4,000,000 | -33.8% |
| Pent E West | $2,125,000 | 5/3/2012 | 5/3/2015 | $3,000,000 | -29.2% |
| Pent E East | $2,150,000 | 6/15/2012 | 6/15/2015 | $3,000,000 | -28.3% |
| 2A South | $4,700,000 | 4/25/2012 | 4/25/2015 | $6,500,000 | -27.7% |
| 7E East | $2,960,000 | 1/30/2013 | 1/30/2016 | $4,000,000 | -26.0% |
| 7E West | $3,350,000 | 9/7/2012 | 9/7/2015 | $4,500,000 | -25.6% |
| 5C West | $2,620,000 | 11/6/2012 | 11/6/2015 | $3,500,000 | -25.1% |
| 6C West | $2,630,000 | 11/27/2012 | 11/27/2015 | $3,500,000 | -24.9% |
| 6E East | $2,640,000 | 5/30/2012 | 5/30/2015 | $3,500,000 | -24.6% |
| Pent C West | $2,020,000 | 5/30/2013 | 5/29/2016 | $2,500,000 | -19.2% |
| Pent G West | $3,700,000 | 5/20/2013 | 5/19/2016 | $4,500,000 | -17.8% |
| 3E East | $2,525,000 | 1/29/2013 | 1/29/2016 | $3,000,000 | -15.8% |
| 4G West | $5,500,000 | 8/24/2012 | 8/24/2015 | $6,500,000 | -15.4% |
| 5G West | $5,545,000 | 1/24/2013 | 1/24/2016 | $6,500,000 | -14.7% |
| 6D East | $7,150,000 | 10/2/2012 | 10/2/2015 | $8,000,000 | -10.6% |
| 3C East | $2,280,000 | 1/30/2015 | 1/29/2018 | $2,500,000 | -8.8% |
| 4D East | $7,150,000 | 3/6/2013 | 3/5/2016 | $7,500,000 | -4.7% |
| Pent C East | $2,015,000 | 9/13/2012 | 9/13/2015 | $2,000,000 | 0.8% |
| **Total** | **$66,360,000** | | | **$82,500,000** | **-19.6%** |

Pursuant to Section 13.06, each LP who has held his or her limited partnership interest in CRCPS ("LP Interest") for at least three years is entitled to receive notice of the Fair Market Value of Partnership Property and to give notice to the GP of his or her election to sell their LP Interest to the Partnership. The purchase price for the LP Interest would be equal to the LPs pro rata share of the amount the Partnership actually receives from a sale, which may be greater or less than the Fair Market Value as estimated by the third party appraiser. The Put Purchase Price is further described below.

Even if the Partnership was able to liquidate Partnership Property at this time, the GP does not believe it would be prudent to attempt to liquidate now, but rather to do so on a unit-by-unit basis in an orderly, market driven manner which seeks to create the most value for each LP. While the Appraisals indicate the Partnership Property is valued below the face value of the Loan, we believe this is attributable to the lack of adequate comparable sales within the Solaris building and the lack of adequate comparable properties in the greater Vail, Colorado area. Additionally, since the date of the Appraisal, there has been a higher sale within the Solaris building. Furthermore, as title to the Units is transferred to the Partnership, we expect higher sales prices will be established for the Solaris building. Another factor that will contribute to what we believe to be increased value in the future is supply and demand for the building. For example, the Partnership has control over the only two remaining mountain facing four-bedroom units that will be available for sale. As fewer properties in Solaris are available for sale, we anticipate demand will continue to increase the sales price of each Unit.

**Put Rights:**

We have set forth our good faith interpretation of Section 13.06 which we believe conforms with the original intent and provides qualifying LPs with an equitable exit strategy, while protecting the overall

3

CRC 000638

economic viability of the Partnership. We advise each LP to seek advice from his or her immigration attorney with respect to the U.S. Immigration Legal Requirements and any early exit procedure.

Each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, may elect to sell his or her LP Interest to the Partnership. By exercising his or her Put Right, the LP is seeking a return of capital earlier than other LPs in the Partnership may be permitted to. For those LPs first electing to exercise his or her Put Right, the Put Purchase Price for an LP Interest will be based on the Appraisals. To restate, the Put Purchase Price is equal to the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance as compared to the other Units multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses. However, the Partnership will not attempt to sell a Unit(s) until the number of LPs exercising their Put Right is equal to the number of LPs investments that were necessary to make the Loan Advance for such Unit.

For example, Unit 6E West was appraised at a Fair Market Value of $2,650,000, while the Loan Advance collateralized by this unit was in the amount of $4,000,000. The ratio of Fair Market Value to the Loan Advance amount on 6E West is -33.8% and represents the lowest ratio (along with 5E West) amongst the Units. Eight (8) LPs equity contributions to the Partnership were required in order to make the Loan Advance for which Unit 6E West serves as collateral. Therefore, once eight (8) LPs have exercised his or her Put Right, the Partnership will use reasonable business efforts to market and liquidate Unit 6E West once the Partnership has obtained title to the unit. The Partnership shall not be entitled to sell a Unit(s) for less than the then appraised Fair Market Value without the consent of all LPs who will receive a return of capital from such sale. Thus, the Put Purchase Price for the first eight (8) LPs electing to exercise his or her Put Right would be equal to his or her pro rata share from realizable value of the sale of Unit 6E West less customary transaction expenses, i.e., 1 / 8 multiplied by at least $2,650,000 less customary transaction expenses, unless a sale at a lower price is approved by all participating LPs. Should the Partnership be able to sell the Unit for greater than the Fair Market Value, the benefit shall go to those eight investors who have exercised their Put Right, but in no event would the Put Purchase Price be greater than the actual LP Capital Contribution. Subsequently, the next Unit that would be sold would be 5E West, which has the second lowest ratio of Fair Market Value to Loan Advance amount amongst the remaining Units in the portfolio.

In order to exercise his or her Put Right, such LP must provide written notice (the "Put Exercise Notice") to the Partnership within 45 days following the date of this Notice expressly stating his or her exercise of the Put Right. By delivering the Put Exercise Notice, the LP represents and warrants to the Partnership that (A) the LP has full right, title and interest in and to the LP Interest, (B) the LP has all the necessary power and authority and has taken all necessary action to sell such LP Interest as contemplated herein, and (C) the LP Interest is free and clear of any and all mortgages, pledges, security interests, options, rights of first offer, encumbrances or other restrictions or limitations of any nature whatsoever other than those arising as a result of or under the terms of this Partnership Agreement. The delivery of a Put Exercise Notice by a LP to the Partnership shall create a binding and irrevocable obligation to sell his or her LP Interest at the Put Purchase Price as set forth in this Notice. Failure of an LP to deliver the Put Exercise Notice within such 45-day period shall constitute a waiver of such LPs Put Right with respect to the specific Put Purchase Price formula as set forth in this Notice, but shall not affect their respective rights with respect to any future Put Rights.

4

CRC 000639

Upon the Partnership's receipt of such Put Exercise Notice, the Partnership will use commercially reasonable efforts to sell a Unit or Units in its possession at the Fair Market Value as identified in the Appraisals or at a higher amount. As described above, the Partnership shall not undertake such efforts until enough LPs have submitted their Put Exercise Notice that matches the number of investor's whose capital supported the Loan Advance on such Unit. The Partnership may, with the consent of all participating LPs, sell such Unit or Units below the Fair Market Value. The Partnership shall pay the Put Purchase Price no later than thirty (30) days following the closing of the sale of the applicable Unit or Units. The Partnership will pay the Put Purchase Price for the LP Interest by check or wire transfer of funds. At the closing of the sale of the LP Interest to the Partnership, the LP shall deliver to the Partnership (a) an assignment and all other transfer documents to consummate the sale and assignment of the LP Interest to the Partnership, and (b) waiver and release of the Partnership from any and all future claims, each in a form acceptable to the Partnership. Upon the LPs receipt of the Put Purchase Price at the closing, the LP shall have no further right, interest or claim to distributions in or from the Partnership and shall no longer be an LP in the Partnership.

On each one-year (1) anniversary of this Notice, the General Partner shall provide to the remaining LPs a new notice setting forth the then applicable Fair Market Value of the remaining Partnership Property and each LP shall then have 45 days from the date of such new notice to deliver a Put Exercise Notice to the Partnership. The Put Purchase Price would continue to be based on the formula described above, only using the new Fair Market Value of the remaining Units, and would otherwise be payable upon and subject to the same terms set forth above.

**General Provisions for LPs Who Do Not Provide a Put Exercise Notice:**

As each Unit is transferred to the Partnership and to the extent the Unit(s) are not required to be put on the market to satisfy prior Put Exercise Notices, we will explore opportunities to put them on the market when market conditions are deemed to be favorable for sale. The sale of Units will be conducted in an orderly, market driven manner that seeks to maximize value to the Partnership and the LPs. As such, there can be no definitive timeline for which all of the Units will be sold. To sell prematurely would likely mean selling units at a significant discount to the original amount of each Loan Advance, which would mean LPs would receive less than the full amount of their capital contributions returned. The Partnership seeks to avoid this.

As each Unit is sold, a pro rata return of capital will be made to those LPs who have received their adjudication of their I-829 Petitions and have not otherwise exercised their Put Rights (as set forth above). The remainder of the proceeds shall remain with the Partnership and shall be returned on a pro rata basis to the rest of the LPs as their I-829 petitions are approved, subject to the distribution provisions in the Partnership Agreement. We intend such returns of capital to be made until all LPs (other than the LPs who have exercised their Put Rights (as set forth above)) have received a return of their capital contribution. All capital returns shall be made on a pro rata basis, treating each LP equal to one another. Once all of the Partnership Property has been sold, the Partnership shall wind down. To the extent there is Available Cash Flow (as defined in the Partnership Agreement) after the sale of all Partnership Property and return of LP capital, it shall be paid out in accordance with Article VI of the Partnership Agreement.

The strategy outlined above was developed in good faith with the LPs best interests in mind and seeks to provide a path toward maximizing value to each and every LP, while still providing the LPs with an early

5

CRC 000640

exit alternative as contemplated under Section 13.06. The Partnership will strive to execute this strategy as quickly as is economically feasible.

6

CRC 000641

**From:** General Partner ("GP") of Colorado Regional Center Project Solaris, LLLP ("CRCPS" or the "Partnership")

**To:** Limited Partners ("LPs") of the Partnership

**Date:** October 27, 2016

**Re:** 2nd Notice of Fair Market Value of the Partnership Property (this "Notice") and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions

## Definitions:

"Administrative Expenses" means those expenses incurred by the GP in connection with the sale of LP Interests including specifically and without limitation, certain marketing, travel, legal and accounting fees, referral and related fees, and the legal fees of a LP incurred in preparation of such LP's I-526 petition.

"Appraisal(s)" means the good faith estimate of the Fair Market Value of each Unit performed by the independent third party firm Pack Appraisal Company.

"Capital Contribution" means the total amount of money or property contributed to the Partnership by each Partner (excluding any amounts contributed for Administrative Expenses).

"Fair Market Value" means the total liquidation value (as determined pursuant to a good faith market analysis conducted by qualified third-parties engaged by the GP) of all of the Partnership Property or an individual Unit after deduction of all usual and customary selling expenses, pro rations, and other similar matters.

"Loan" means the loan made from CRCPS to the Solaris developer in the aggregate amount of $82,500,000.

"Loan Advance" means the amount of each advance of principal from CRCPS to the developer per terms of the Loan.

"LP Interest" means a limited partnership interest in CRCPS.

"Partnership Property or Units" means the 19 individual properties presently held by the developer which collateralize the Loan.

"Put Exercise Notice" means written notice provided by a LP to the Partnership of his or her intent to exercise the Put Right. A Put Exercise Notice must be provided to the Partnership within 45 days following the receipt of this Notice.

"Put Right" means for each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, such LP may elect to sell his or her LP Interest to the Partnership and receive a return of capital.

"Partnership Agreement" means the Limited Liability Limited Partnership Agreement of Colorado Regional Center Project Solaris, LLLP.

"Put Purchase Price" means the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance amount multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses.

1

CRC 000642

"Section 13.06" means Section 13.06 of the CRCPS Partnership Agreement entitled "Rights of Limited Partners to Return of Capital Contributions.

"U.S. Immigration Legal Requirements" means the GP's understanding that only LPs who have either received adjudication of their I-829 petition or who are foregoing permanent residency in the United States would be eligible to receive a return of capital and sell their LP Interest to the Partnership.

**Notice of Fair Market Value of the Partnership and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions:**

As previously discussed, per the terms of the Loan, the developer has the right to transfer each Unit to the Partnership in lieu of cash payment at maturity of the Loan. The developer has indicated its desire to do so for each Unit as each Loan Advance reaches its 3-year anniversary mark. Accordingly, we are working with the developer to transfer title to the Partnership on the Units which Loan Advances have reached or surpassed the 3-year anniversary mark. The Partnership has been in the process of developing a comprehensive plan to permit the transfer and orderly sale of Units presently held by the developer. The Partnership has a final draft of the transfer agreements and is awaiting issuance of an owner's title policy from Land Title Guaranty Company.

In September 2015, the Partnership obtained valuations of each of the Units from the independent third party firm, Pack Appraisal Company. Subsequently, the Partnership has obtained valuations (see summary below) on each of the Units from the independent appraisal firm Angelo's Appraisal Inc. and we are continually performing an overall assessment of the real estate market in an effort to maximize value on the sale of each of the Units which in turn maximizes value to the Partnership and to all LPs.

In accordance with Section 13.06, we engaged an independent third party appraisal firm to prepare a good faith estimate of the Fair Market Value of the Partnership Property. The Appraisals do not account for customary selling expenses, which the Partnership will incur as it pursues the strategy set forth in this Notice and estimates to be approximately six percent (6.0%) of the sales price. We are hereby providing notice to the LPs of the estimated Fair Market Value as of July/August 2016, which has been determined to be $67,510,000 in the aggregate. Upon request, we will provide copies of the Appraisals for your review. The Appraisal amount compares to the aggregate amount of the Loan made to the Solaris developer in the amount of $82,500,000, representing approximately eighty two percent (82%) of the Loan amount, although we believe the value of the Partnership Property to be higher based on reasons set forth below and in accompanying materials (if applicable).

2

CRC 000643

The following is a summary of the appraised Fair Market Value of the Partnership Property:

| Unit | Appraised Fair Market Value | Loan Advance Date | Prepayment Date | Loan Advance Amount | Ratio of Fair Market Value to Loan Advance Amount |
|---|---|---|---|---|---|
| 4G West | $4,300,000 | 8/24/2012 | 8/24/2015 | $6,500,000 | -33.8% |
| 5G West | $4,400,000 | 1/24/2013 | 1/24/2016 | $6,500,000 | -32.3% |
| 6E West | $2,990,000 | 4/18/2012 | 4/18/2015 | $4,000,000 | -25.3% |
| 5E West | $2,990,000 | 8/2/2012 | 8/2/2015 | $4,000,000 | -25.3% |
| 2A South | $4,950,000 | 4/25/2012 | 4/25/2015 | $6,500,000 | -23.8% |
| 3E East | $2,335,000 | 1/29/2013 | 1/29/2016 | $3,000,000 | -22.2% |
| 7E East | $3,300,000 | 1/30/2013 | 1/30/2016 | $4,000,000 | -17.5% |
| Pent E West | $2,500,000 | 5/3/2012 | 5/3/2015 | $3,000,000 | -16.7% |
| Pent E East | $2,500,000 | 6/15/2012 | 6/15/2015 | $3,000,000 | -16.7% |
| 6C West | $2,940,000 | 11/27/2012 | 11/27/2015 | $3,500,000 | -16.0% |
| 6E East | $2,980,000 | 5/30/2012 | 5/30/2015 | $3,500,000 | -14.9% |
| 7E West | $3,835,000 | 9/7/2012 | 9/7/2015 | $4,500,000 | -14.8% |
| 5C West | $2,990,000 | 11/6/2012 | 11/6/2015 | $3,500,000 | -14.6% |
| 6D East | $6,840,000 | 10/2/2012 | 10/2/2015 | $8,000,000 | -14.5% |
| 4D East | $6,500,000 | 3/6/2013 | 3/5/2016 | $7,500,000 | -13.3% |
| Pent G West | $3,960,000 | 5/20/2013 | 5/19/2016 | $4,500,000 | -12.0% |
| 3C East | $2,220,000 | 1/30/2015 | 1/29/2018 | $2,500,000 | -11.2% |
| Pent C West | $2,490,000 | 5/30/2013 | 5/29/2016 | $2,500,000 | -0.4% |
| Pent C East | $2,490,000 | 9/13/2012 | 9/13/2015 | $2,000,000 | 24.5% |
| Total | $67,510,000 | | | $82,500,000 | -18.2% |

Pursuant to Section 13.06, each LP who has held his or her limited partnership interest in CRCPS ("LP Interest") for at least three years is entitled to receive notice of the Fair Market Value of Partnership Property and may also, depending on U.S. Immigration Legal Requirements, be entitled to give notice to the GP of his or her election to sell their LP Interest to the Partnership. The purchase price for the LP Interest would be equal to the LPs pro rata share of the amount the Partnership actually receives from a sale, which may be greater or less than the Fair Market value as estimated by the third party appraiser. The Put Purchase Price is further described below.

Even if the Partnership was able to liquidate Partnership Property at this time, the GP does not believe it would be prudent to attempt to liquidate now, but rather to do so on a unit-by-unit basis in an orderly, market driven manner which seeks to create the most value for each LP. While the Appraisals indicate the Partnership Property is valued below the face value of the Loan, we believe this is attributable to the lack of adequate comparison to sales within the Solaris building and the lack of adequate comparable properties in the greater Vail, Colorado area. Furthermore, as title to the Units is transferred to the Partnership, we expect higher sales prices will be established for the Solaris building. Another factor that will contribute to what we believe to be increased value in the future is supply and demand for the building.

3

CRC 000644

For example, the Partnership has control over the only two remaining mountain facing four-bedroom units that will be available for sale. As fewer properties in Solaris are available for sale, we anticipate demand will continue to increase the sales price of each Unit.

**Put Rights:**

We have set forth our good faith interpretation of Section 13.06 which we believe conforms to the original intent and provides qualifying LPs with an equitable exit strategy, while protecting the overall economic viability of the Partnership. The GPs understanding is that only LPs who have either received adjudication of their I-829 and received an unconditional green card or who are foregoing permanent residency in the U.S. would be eligible to receive a return of capital without jeopardizing the EB-5 process. We advise each LP to seek advice from his or her immigration attorney with respect to the U.S. Immigration Legal Requirements and any early exit procedure.

Each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, may elect to sell his or her LP Interest to the Partnership. By exercising his or her Put Right, the LP is seeking a return of capital earlier than other LPs in the Partnership may be permitted to. For those LPs first electing to exercise his or her Put Right, the Put Purchase Price for an LP Interest will be satisfied by the sale of a unit(s), while the order of unit sales is to be based on the Appraisals. To restate, the Put Purchase Price is equal to the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance as compared to the other Units multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses. However, the Partnership will not attempt to sell a Unit(s) until the number of LPs exercising their Put Right is equal to the number of LPs investments that were necessary to make the Loan Advance for such Unit.

For example, Unit 4G West was appraised at a Fair Market Value of $4,300,000, while the Loan Advance collateralized by this unit was in the amount of $6,500,000. The ratio of Fair Market Value to the Loan Advance amount on 4G West is -33.8% and represents the lowest ratio amongst the Units. Thirteen (13) LPs equity contributions to the Partnership were required in order to make the Loan Advance for which Unit 4G West serves as collateral. Therefore, once thirteen (13) LPs have exercised his or her Put Right, the Partnership will use reasonable business efforts to market and liquidate Unit 4G West once the Partnership has obtained title to the unit. The Partnership shall not be entitled to sell a Unit(s) for less than the then appraised Fair Market Value without the consent of all LPs who will receive a return of capital from such sale. Thus, the Put Purchase Price for the first thirteen (13) LPs electing to exercise his or her Put Right would be equal to his or her pro rata share from realizable value of the sale of Unit 4G West less customary transaction expenses, i.e., 1 / 13 multiplied by at least $4,300,000 less customary transaction expenses, unless a sale at a lower price is approved by all participating LPs. Should the Partnership be able to sell the Unit for greater than the Fair Market Value, the benefit shall go to those thirteen investors who have exercised their Put Right, but in no event would the Put Purchase Price be greater than the actual LP Capital Contribution. Subsequently, the next Unit that would be sold would be 5G West, which has the second lowest ratio of Fair Market Value to Loan Advance amount amongst the remaining Units in the portfolio.

In order to exercise his or her Put Right, such LP must provide written notice (the "Put Exercise Notice") to the Partnership within 45 days following the date of this Notice expressly stating his or her exercise of the Put Right. By delivering the Put Exercise Notice, the LP represents and warrants to the Partnership

4

CRC 000645

that (A) the LP has full right, title and interest in and to the LP Interest, (B) the LP has all the necessary power and authority and has taken all necessary action to sell such LP Interest as contemplated herein, and (C) the LP Interest is free and clear of any and all mortgages, pledges, security interests, options, rights of first offer, encumbrances or other restrictions or limitations of any nature whatsoever other than those arising as a result of or under the terms of this Partnership Agreement. The delivery of a Put Exercise Notice by a LP to the Partnership shall create a binding and irrevocable obligation to sell his or her LP Interest at the Put Purchase Price as set forth in this Notice. Failure of an LP to deliver the Put Exercise Notice within such 45-day period shall constitute a waiver of such LPs Put Right with respect to the specific Put Purchase Price formula as set forth in this Notice, but shall not affect their respective rights with respect to any future Put Rights. An LP who previously provided a Put Exercise Notice but has not yet received a capital distribution shall continue to be treated as having provided a Put Exercise Notice, unless the LP informs the Partnership of his or her desire to remain in the Partnership and withdraw their prior Put Exercise Notice.

Upon the Partnership's receipt of such Put Exercise Notice, the Partnership will use commercially reasonable efforts to sell a Unit or Units in its possession at the Fair Market Value as identified in the Appraisals or at a higher amount. As described above, the Partnership shall not undertake such efforts until enough LPs have submitted their Put Exercise Notice that matches the number of investor's whose capital supported the Loan Advance on such Unit. The Partnership may, with the consent of all participating LPs, sell such Unit or Units below the Fair Market Value. The Partnership shall pay the Put Purchase Price no later than thirty (30) days following the closing of the sale of the applicable Unit or Units. The Partnership will pay the Put Purchase Price for the LP Interest by check or wire transfer of funds. At the closing of the sale of the LP Interest to the Partnership, the LP shall deliver to the Partnership (a) an assignment and all other transfer documents to consummate the sale and assignment of the LP Interest to the Partnership, and (b) waiver and release of the Partnership from any and all future claims, each in a form acceptable to the Partnership. Upon the LPs receipt of the Put Purchase Price at the closing, the LP shall have no further right, interest or claim to distributions in or from the Partnership and shall no longer be an LP in the Partnership.

On each six (6) month anniversary of this Notice or within a reasonable time thereafter, the General Partner shall provide to the remaining LPs a new notice setting forth the then applicable Fair Market Value of the remaining Partnership Property and each LP shall then have 45 days from the date of such new notice to deliver a Put Exercise Notice to the Partnership. The Put Purchase Price would continue to be based on the formula described above, only using the new Fair Market Value of the remaining Units, and would otherwise be payable upon and subject to the same terms set forth above.

**General Provisions for LPs Who Do Not Provide a Put Exercise Notice:**

As each Unit is transferred to the Partnership and to the extent the Unit(s) are not required to be put on the market to satisfy prior Put Exercise Notices, we will explore opportunities to put them on the market when market conditions are deemed to be favorable for sale. The sale of Units will be conducted in an orderly, market driven manner that seeks to maximize value to the Partnership and the LPs. As such, there can be no definitive timeline for which all of the Units will be sold. To sell prematurely would likely mean selling units at a significant discount to the original amount of each Loan Advance, which would mean LPs would receive less than the full amount of their capital contributions returned. The Partnership seeks to avoid this.

CRC 000646

As each Unit is sold, a pro rata return of capital will be made to those LPs who have received their adjudication of their I-829 Petitions and have not otherwise exercised their Put Rights (as set forth above). The remainder of the proceeds shall remain with the Partnership and shall be returned on a pro rata basis to the rest of the LPs as their I-829 petitions are approved, subject to the distribution provisions in the Partnership Agreement. We intend such returns of capital to be made until all LPs (other than the LPs who have exercised their Put Rights (as set forth above)) have received a return of their capital contribution. All capital returns shall be made on a pro rata basis, treating each LP equal to one another. Once all of the Partnership Property has been sold, the Partnership shall wind down. To the extent there is Available Cash Flow (as defined in the Partnership Agreement) after the sale of all Partnership Property and return of LP capital, it shall be paid out in accordance with Article VI of the Partnership Agreement.

The strategy outlined above was developed in good faith with the LPs best interests in mind and seeks to provide a path toward maximizing value to each and every LP, while still providing the LPs with an early exit alternative as contemplated under Section 13.06. The Partnership will strive to execute this strategy as quickly as is economically feasible.

Civil Action No. 1:19-cv-02443-STV
Exhibit 11

CRC 000647

**From:** General Partner ("GP") of Colorado Regional Center Project Solaris, LLLP ("CRCPS" or the "Partnership")

**To:** Limited Partners ("LPs") of the Partnership

**Date:** June 19, 2017

**Re:** 3rd Notice of Fair Market Value of the Partnership Property (this "Notice") and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions

**Definitions:**

"Administrative Expenses" means those expenses incurred by the GP in connection with the sale of LP Interests including specifically and without limitation, certain marketing, travel, legal and accounting fees, referral and related fees, and the legal fees of a LP incurred in preparation of such LP's I-526 petition:

"Appraisal(s)" means the good faith estimate of the Fair Market Value of each Unit performed by the independent third party firm Pack Appraisal Company.

"Capital Contribution" means the total amount of money or property contributed to the Partnership by each Partner (excluding any amounts contributed for Administrative Expenses).

"Fair Market Value" means the total liquidation value (as determined pursuant to a good faith market analysis conducted by qualified third-parties engaged by the GP) of all of the Partnership Property or an individual Unit after deduction of all usual and customary selling expenses, pro rations, and other similar matters.

"Loan" means the loan made from CRCPS to the Solaris developer in the aggregate amount of $82,500,000.

"Loan Advance" means the amount of each advance of principal from CRCPS to the developer per terms of the Loan.

"LP Interest" means a limited partnership interest in CRCPS.

"Partnership Property or Units" means the 19 individual properties presently held by the developer which collateralize the Loan.

"Put Exercise Notice" means written notice provided by a LP to the Partnership of his or her intent to exercise the Put Right. A Put Exercise Notice must be provided to the Partnership within 45 days following the receipt of this Notice.

"Put Right" means for each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, such LP may elect to sell his or her LP Interest to the Partnership and receive a return of capital.

"Partnership Agreement" means the Limited Liability Limited Partnership Agreement of Colorado Regional Center Project Solaris, LLLP.

"Put Purchase Price" means the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance amount multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses.

1

CRC 000648

"Section 13.06" means Section 13.06 of the CRCPS Partnership Agreement entitled "Rights of Limited Partners to Return of Capital Contributions.

"U.S. Immigration Legal Requirements" means the GP's understanding that only LPs who have either received adjudication of their I-829 petition or who are foregoing permanent residency in the United States would be eligible to receive a return of capital and sell their LP Interest to the Partnership.

**Notice of Fair Market Value of the Partnership and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions:**

As previously discussed, per the terms of the Loan, the developer has the right to transfer each Unit to the Partnership in lieu of cash payment at maturity of the Loan. The developer has indicated its desire to do so for each Unit as each Loan Advance reaches its 3-year anniversary mark. Accordingly, we are working with the developer to transfer title to the Partnership on the Units which Loan Advances have reached or surpassed the 3-year anniversary mark. The Partnership has been in the process of developing a comprehensive plan to permit the transfer and orderly sale of Units presently held by the developer. Further, the Partnership has approved a listing agreement with the brokerage firm, Solaris Real Estate, LLC, and is coordinating the marketing plan for unit(s) to be introduced to the market for sale.

In September 2015, the Partnership obtained valuations of each of the Units from the independent third party firm, Pack Appraisal Company. Subsequently, the Partnership has obtained valuations (see summary below) on each of the Units from the independent appraisal firm Angelo's Appraisal Inc. and we are continually performing an overall assessment of the real estate market in an effort to maximize value on the sale of each of the Units which in turn maximizes value to the Partnership and to all LPs.

In accordance with Section 13.06, we engaged an independent third party appraisal firm to prepare a good faith estimate of the Fair Market Value of the Partnership Property. The Appraisals do not account for customary selling expenses, which the Partnership will incur as it pursues the strategy set forth in this Notice and estimates to be approximately six percent (6.0%) of the sales price. We are hereby providing notice to the LPs of the estimated Fair Market Value as of February - April 2017, which has been determined to be $76,425,000 in the aggregate, a 13.2% increase in the aggregate appraisal from the prior appraisal. Upon request, we will provide copies of the Appraisals for your review. The Appraisal amount compares to the aggregate amount of the Loan made to the Solaris developer in the amount of $82,500,000, representing approximately ninety three percent (93%) of the Loan amount, although we continue to believe the value of the Partnership Property to be higher based on reasons set forth below and in accompanying materials (if applicable).

2

CRC 000649

The following is a summary of the appraised Fair Market Value of the Partnership Property:

| Unit | Appraised Fair Market Value | Loan Advance Date | Prepayment Date | Loan Advance Amount | Ratio of Fair Market Value to Loan Advance Amount |
|---|---|---|---|---|---|
| 6E West | $3,215,000 | 4/18/2012 | 4/18/2015 | $4,000,000 | -19.6% |
| 5E West | $3,215,000 | 8/2/2012 | 8/2/2015 | $4,000,000 | -19.6% |
| 2A South | $5,650,000 | 4/25/2012 | 4/25/2015 | $6,500,000 | -13.1% |
| 7E East | $3,525,000 | 1/30/2013 | 1/30/2016 | $4,000,000 | -11.9% |
| 6D East | $7,125,000 | 10/2/2012 | 10/2/2015 | $8,000,000 | -10.9% |
| 3E East | $2,690,000 | 1/29/2013 | 1/29/2016 | $3,000,000 | -10.3% |
| 7E West | $4,075,000 | 9/7/2012 | 9/7/2015 | $4,500,000 | -9.4% |
| 6C West | $3,185,000 | 11/27/2012 | 11/27/2015 | $3,500,000 | -9.0% |
| 3C East | $2,290,000 | 1/30/2015 | 1/29/2018 | $2,500,000 | -8.4% |
| 6E East | $3,210,000 | 5/30/2012 | 5/30/2015 | $3,500,000 | -8.3% |
| 5C West | $3,225,000 | 11/6/2012 | 11/6/2015 | $3,500,000 | -7.9% |
| Pent G West | $4,150,000 | 5/20/2013 | 5/19/2016 | $4,500,000 | -7.8% |
| 5G West | $6,050,000 | 1/24/2013 | 1/24/2016 | $6,500,000 | -6.9% |
| Pent E West | $2,800,000 | 5/3/2012 | 5/3/2015 | $3,000,000 | -6.7% |
| Pent E East | $2,800,000 | 6/15/2012 | 6/15/2015 | $3,000,000 | -6.7% |
| 4D East | $7,450,000 | 3/6/2012 | 3/5/2015 | $7,500,000 | -0.7% |
| 4G West | $6,530,000 | 8/24/2012 | 8/24/2015 | $6,500,000 | 0.5% |
| Pent C West | $2,620,000 | 5/30/2013 | 5/29/2016 | $2,500,000 | 4.8% |
| Pent C East | $2,620,000 | 9/13/2012 | 9/13/2015 | $2,000,000 | 31.0% |
| **Total** | **$76,425,000** | | | **$82,500,000** | **-7.4%** |

Pursuant to Section 13.06, each LP who has held his or her limited partnership interest in CRCPS ("LP Interest") for at least three years is entitled to receive notice of the Fair Market Value of Partnership Property and may also, depending on U.S. Immigration Legal Requirements, be entitled to give notice to the GP of his or her election to sell their LP Interest to the Partnership. The purchase price for the LP Interest would be equal to the LPs pro rata share of the amount the Partnership actually receives from a sale, which may be greater or less than the Fair Market value as estimated by the third party appraiser. The Put Purchase Price is further described below.

Even if the Partnership was able to liquidate Partnership Property at this time, the GP does not believe it would be prudent to attempt to liquidate now, but rather to do so on a unit-by-unit basis in an orderly, market driven manner which seeks to create the most value for each LP. While the Appraisals indicate the Partnership Property is valued below the face value of the Loan, we believe this is attributable to the lack of adequate comparison to sales within the Solaris building and the lack of adequate comparable properties in the greater Vail, Colorado area. Another factor that will contribute to what we believe to be increased value in the future is supply and demand for the building. For example, the Partnership has control over the only two remaining mountain facing four-bedroom units that will be available for sale. As fewer properties in Solaris are available for sale, we anticipate demand will continue to increase the sales price of each Unit.

**Put Rights:**

We have set forth our good faith interpretation of Section 13.06 which we believe conforms to the original intent and provides qualifying LPs with an equitable exit strategy, while protecting the overall economic viability of the Partnership. The GPs understanding is that only LPs who have either received adjudication of their I-829 and received an unconditional green card or who are foregoing permanent residency in the

3

U.S. would be eligible to receive a return of capital without jeopardizing the EB-5 process. We advise each LP to seek advice from his or her immigration attorney with respect to the U.S. Immigration Legal Requirements and any early exit procedure.

Each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, may elect to sell his or her LP Interest to the Partnership. By exercising his or her Put Right, the LP is seeking a return of capital earlier than other LPs in the Partnership may be permitted to. For those LPs first electing to exercise his or her Put Right, the Put Purchase Price for an LP Interest will be satisfied by the sale of a unit(s), while the order of unit sales is to be based on the Appraisals. To restate, the Put Purchase Price is equal to the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance as compared to the other Units multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses. However, the Partnership will not attempt to sell a Unit(s) until the number of LPs exercising their Put Right is equal to the number of LPs investments that were necessary to make the Loan Advance for such Unit.

For example, Unit 6E West was appraised at a Fair Market Value of $3,215,000, while the Loan Advance collateralized by this unit was in the amount of $4,000,000. The ratio of Fair Market Value to the Loan Advance amount on 6E West is -19.6% and represents the lowest ratio amongst the Units. Eight (8) LPs equity contributions to the Partnership were required in order to make the Loan Advance for which Unit 6E West serves as collateral. Therefore, once eight (8) LPs have exercised his or her Put Right, the Partnership will use reasonable business efforts to market and liquidate Unit 6E West once the Partnership. The Partnership shall not be entitled to sell a Unit(s) for less than the then appraised Fair Market Value without the consent of all LPs who will receive a return of capital from such sale. Thus, the Put Purchase Price for the first eight (8) LPs electing to exercise his or her Put Right would be equal to his or her pro rata share from realizable value of the sale of Unit 6E West less customary transaction expenses, i.e., 1 / 8 multiplied by at least $3,215,000 less customary transaction expenses, unless a sale at a lower price is approved by all participating LPs. Should the Partnership be able to sell the Unit for greater than the Fair Market Value, the benefit shall go to those eight investors who have exercised their Put Right, but in no event would the Put Purchase Price be greater than the actual LP Capital Contribution. Subsequently, the next Unit that would be sold would be 5E West, which has the second lowest ratio of Fair Market Value to Loan Advance amount amongst the remaining Units in the portfolio.

In order to exercise his or her Put Right, such LP must provide written notice (the "Put Exercise Notice") to the Partnership within 45 days following the date of this Notice expressly stating his or her exercise of the Put Right. By delivering the Put Exercise Notice, the LP represents and warrants to the Partnership that (A) the LP has full right, title and interest in and to the LP Interest, (B) the LP has all the necessary power and authority and has taken all necessary action to sell such LP Interest as contemplated herein, and (C) the LP Interest is free and clear of any and all mortgages, pledges, security interests, options, rights of first offer, encumbrances or other restrictions or limitations of any nature whatsoever other than those arising as a result of or under the terms of this Partnership Agreement. The delivery of a Put Exercise Notice by a LP to the Partnership shall create a binding and irrevocable obligation to sell his or her LP Interest at the Put Purchase Price as set forth in this Notice. Failure of an LP to deliver the Put Exercise Notice within such 45-day period shall constitute a waiver of such LPs Put Right with respect to the specific Put Purchase Price formula as set forth in this Notice, but shall not affect their respective rights with respect to any future Put Rights. **An LP who has previously provided a Put Exercise Notice but has not**

4

**yet received a capital distribution shall continue to be treated as having provided a Put Exercise Notice, unless the LP informs the Partnership of his or her desire to remain in the Partnership and withdraw their prior Put Exercise Notice.**

Upon the Partnership's receipt of such Put Exercise Notice, the Partnership will use commercially reasonable efforts to sell a Unit or Units in its possession at the Fair Market Value as identified in the Appraisals or at a higher amount. As described above, the Partnership shall not undertake such efforts until enough LPs have submitted their Put Exercise Notice that matches the number of investor's whose capital supported the Loan Advance on such Unit. The Partnership may, with the consent of all participating LPs, sell such Unit or Units below the Fair Market Value. The Partnership shall pay the Put Purchase Price no later than thirty (30) days following the closing of the sale of the applicable Unit or Units and receipt of the sales proceeds. The Partnership will pay the Put Purchase Price for the LP Interest by check or wire transfer of funds. At the closing of the sale of the LP Interest to the Partnership, the LP shall deliver to the Partnership (a) an assignment and all other transfer documents to consummate the sale and assignment of the LP Interest to the Partnership, and (b) waiver and release of the Partnership from any and all future claims, each in a form acceptable to the Partnership. Upon the LPs receipt of the Put Purchase Price at the closing, the LP shall have no further right, interest or claim to distributions in or from the Partnership and shall no longer be an LP in the Partnership.

On each six (6) month anniversary of this Notice or within a reasonable time thereafter, the General Partner shall provide to the remaining LPs a new notice setting forth the then applicable Fair Market Value of the remaining Partnership Property and each LP shall then have 45 days from the date of such new notice to deliver a Put Exercise Notice to the Partnership. The Put Purchase Price would continue to be based on the formula described above, only using the new Fair Market Value of the remaining Units, and would otherwise be payable upon and subject to the same terms set forth above.

**General Provisions for LPs Who Do Not Provide a Put Exercise Notice:**

To the extent the Unit(s) are not required to be put on the market to satisfy prior Put Exercise Notices, we will explore opportunities to put them on the market when market conditions are deemed to be favorable for sale. The sale of Units will be conducted in an orderly, market driven manner that seeks to maximize value to the Partnership and the LPs. As such, there can be no definitive timeline for which all of the Units will be sold. To sell prematurely would likely mean selling units at a significant discount to the original amount of each Loan Advance, which would mean LPs would receive less than the full amount of their capital contributions returned. The Partnership seeks to avoid this.

As each Unit is sold, a pro rata return of capital will be made to those LPs who have received their adjudication of their I-829 Petitions and have not otherwise exercised their Put Rights (as set forth above). The remainder of the proceeds shall remain with the Partnership and shall be returned on a pro rata basis to the rest of the LPs as their I-829 petitions are approved, subject to the distribution provisions in the Partnership Agreement. We intend such returns of capital to be made until all LPs (other than the LPs who have exercised their Put Rights (as set forth above)) have received a return of their capital contribution. All capital returns shall be made on a pro rata basis, treating each LP equal to one another. Once all of the Partnership Property has been sold, the Partnership shall wind down. To the extent there is Available Cash Flow (as defined in the Partnership Agreement) after the sale of all Partnership Property and return of LP capital, it shall be paid out in accordance with Article VI of the Partnership Agreement.

CRC 000652

The strategy outlined above was developed in good faith with the LPs best interests in mind and seeks to provide a path toward maximizing value to each and every LP, while still providing the LPs with an early exit alternative as contemplated under Section 13.06.  The Partnership will strive to execute this strategy as quickly as is economically feasible.

Authorized Representative

Colorado Regional Center Project Solaris, LLLP

6

CRC 000653

**From:** General Partner ("GP") of Colorado Regional Center Project Solaris, LLLP ("CRCPS" or the "Partnership")

**To:** Limited Partners ("LPs") of the Partnership

**Date:** December 26, 2017

**Re:** 4th Notice of Fair Market Value of the Partnership Property (this "Notice") and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions

---

## Definitions:

"Administrative Expenses" means those expenses incurred by the GP in connection with the sale of LP Interests including specifically and without limitation, certain marketing, travel, legal and accounting fees, referral and related fees, and the legal fees of a LP incurred in preparation of such LP's I-526 petition.

"Appraisal(s)" means the good faith estimate of the Fair Market Value of each Unit performed by the independent third party firm Pack Appraisal Company.

"Capital Contribution" means the total amount of money or property contributed to the Partnership by each Partner (excluding any amounts contributed for Administrative Expenses).

"Fair Market Value" means the total liquidation value (as determined pursuant to a good faith market analysis conducted by qualified third-parties engaged by the GP) of all of the Partnership Property or an individual Unit after deduction of all usual and customary selling expenses, pro rations, and other similar matters.

"Loan" means the loan made from CRCPS to the Solaris developer in the aggregate amount of $82,500,000.

"Loan Advance" means the amount of each advance of principal from CRCPS to the developer per terms of the Loan.

"LP Interest" means a limited partnership interest in CRCPS.

"Partnership Property or Units" means the 19 individual properties presently held by the developer which collateralize the Loan.

"Put Exercise Notice" means written notice provided by a LP to the Partnership of his or her intent to exercise the Put Right. A Put Exercise Notice must be provided to the Partnership within 45 days following the receipt of this Notice.

"Put Right" means for each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, such LP may elect to sell his or her LP Interest to the Partnership and receive a return of capital.

"Partnership Agreement" means the Limited Liability Limited Partnership Agreement of Colorado Regional Center Project Solaris, LLLP.

"Put Purchase Price" means the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance amount multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses.

1

"Section 13.06" means Section 13.06 of the CRCPS Partnership Agreement entitled "Rights of Limited Partners to Return of Capital Contributions.

"U.S. Immigration Legal Requirements" means the GP's understanding that only LPs who have either received adjudication of their I-829 petition or who are foregoing permanent residency in the United States would be eligible to receive a return of capital and sell their LP Interest to the Partnership.

**Notice of Fair Market Value of the Partnership and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions:**

As previously discussed, per the terms of the Loan, the developer has the right to transfer each Unit to the Partnership in lieu of cash payment at maturity of the Loan. The developer has indicated its desire to do so for each Unit as each Loan Advance reaches its 3-year anniversary mark. Accordingly, we are working with the developer to transfer title to the Partnership on the Units which Loan Advances have reached or surpassed the 3-year anniversary mark as is practicable for all parties. The Partnership has been in the process of developing a comprehensive plan to permit the transfer and orderly sale of Units presently held by the developer. Further, the Partnership has approved a listing agreement with the brokerage firm, Solaris Real Estate, LLC, and is coordinating the marketing plan for unit(s) to be introduced to the market for sale.

In September 2015, the Partnership obtained valuations of each of the Units from the independent third party firm, Pack Appraisal Company. Subsequently, the Partnership has obtained valuations (see summary below) on each of the Units from the independent appraisal firm Angelo's Appraisal Inc. and we are continually performing an overall assessment of the real estate market in an effort to maximize value on the sale of each of the Units which in turn maximizes value to the Partnership and to all LPs.

In accordance with Section 13.06, we engaged an independent third party appraisal firm to prepare a good faith estimate of the Fair Market Value of the Partnership Property. The Appraisals do not account for customary selling expenses, which the Partnership will incur as it pursues the strategy set forth in this Notice and estimates to be approximately six percent (6.0%) of the sales price. We are hereby providing notice to the LPs of the estimated Fair Market Value as of October 2017, which has been determined to be $78,450,000 in the aggregate, a 2.6% increase in the aggregate appraisal from the prior appraisal. Upon request, we will provide copies of the Appraisals for your review. The Appraisal amount compares to the aggregate amount of the Loan made to the Solaris developer in the amount of $82,500,000, representing approximately ninety five percent (95%) of the Loan amount, although we continue to believe the value of the Partnership Property to be higher based on reasons set forth below and in accompanying materials (if applicable).

2

CRC 000655

The following is a summary of the appraised Fair Market Value of the Partnership Property:

| Unit | Appraised Fair Market Value | Loan Advance Date | Prepayment Date | Loan Advance Amount | Ratio of Fair Market Value to Loan Advance Amount |
|------|------|------|------|------|------|
| 6E West | $3,345,000 | 4/18/2012 | 4/18/2015 | $4,000,000 | -16.4% |
| 5E West | $3,345,000 | 8/2/2012 | 8/2/2015 | $4,000,000 | -16.4% |
| 6D East | $7,150,000 | 10/2/2012 | 10/2/2015 | $8,000,000 | -10.6% |
| 2A South | $5,850,000 | 4/25/2012 | 4/25/2015 | $6,500,000 | -10.0% |
| 7E East | $3,660,000 | 1/30/2013 | 1/30/2016 | $4,000,000 | -8.5% |
| 3E East | $2,770,000 | 1/29/2013 | 1/29/2016 | $3,000,000 | -7.7% |
| 4G West | $6,075,000 | 8/24/2012 | 8/24/2015 | $6,500,000 | -6.5% |
| 6C West | $3,310,000 | 11/27/2012 | 11/27/2015 | $3,500,000 | -5.4% |
| Pent G West | $4,275,000 | 5/20/2013 | 5/19/2016 | $4,500,000 | -5.0% |
| 6E East | $3,335,000 | 5/30/2012 | 5/30/2015 | $3,500,000 | -4.7% |
| 4D East | $7,175,000 | 3/6/2013 | 3/5/2016 | $7,500,000 | -4.3% |
| 5C West | $3,350,000 | 11/6/2012 | 11/6/2015 | $3,500,000 | -4.3% |
| 5G West | $6,275,000 | 1/24/2013 | 1/24/2016 | $6,500,000 | -3.5% |
| Pent E West | $2,940,000 | 5/3/2012 | 5/3/2015 | $3,000,000 | -2.0% |
| Pent E East | $2,945,000 | 6/15/2012 | 6/15/2015 | $3,000,000 | -1.8% |
| 7E West | $4,570,000 | 9/7/2012 | 9/7/2015 | $4,500,000 | 1.6% |
| 3C East | $2,590,000 | 1/30/2015 | 1/29/2018 | $2,500,000 | 3.6% |
| Pent C West | $2,745,000 | 5/30/2012 | 5/29/2015 | $2,500,000 | 9.8% |
| Pent C East | $2,745,000 | 9/13/2012 | 9/13/2015 | $2,000,000 | 37.3% |
| **Total** | **$78,450,000** | | | **$82,500,000** | **-4.9%** |

Pursuant to Section 13.06, each LP who has held his or her limited partnership interest in CRCPS ("LP Interest") for at least three years is entitled to receive notice of the Fair Market Value of Partnership Property and may also, depending on U.S. Immigration Legal Requirements, be entitled to give notice to the GP of his or her election to sell their LP Interest to the Partnership. The purchase price for the LP Interest would be equal to the LPs pro rata share of the amount the Partnership actually receives from a sale, which may be greater or less than the Fair Market value as estimated by the third party appraiser. The Put Purchase Price is further described below.

Even if the Partnership was able to liquidate Partnership Property at this time, the GP does not believe it would be prudent to attempt to liquidate all of the Partnership Property at once, but rather to do so on a unit-by-unit basis in an orderly, market driven manner which seeks to create the most value for each LP. While the Appraisals indicate the Partnership Property is valued below the face value of the Loan, we believe this is attributable to the lack of adequate comparison to sales within the Solaris building and the lack of adequate comparable properties in the greater Vail, Colorado area. Another factor that will contribute to what we believe to be increased value in the future is supply and demand for the building. For example, the Partnership has control over the only two remaining mountain facing four-bedroom units that will be available for sale. As fewer properties in Solaris are available for sale, we anticipate demand will continue to increase the sales price of each Unit.

**Put Rights:**

We have set forth our good faith interpretation of Section 13.06 which we believe conforms to the original intent and provides qualifying LPs with an equitable exit strategy, while protecting the overall economic viability of the Partnership. The GPs understanding is that only LPs who have either received adjudication of their I-829 and received an unconditional green card or who are foregoing permanent residency in the

3

U.S. would be eligible to receive a return of capital without jeopardizing the EB-5 process. We advise each LP to seek advice from his or her immigration attorney with respect to the U.S. Immigration Legal Requirements and any early exit procedure.

Each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, may elect to sell his or her LP Interest to the Partnership. By exercising his or her Put Right, the LP is seeking a return of capital earlier than other LPs in the Partnership may be permitted to. For those LPs first electing to exercise his or her Put Right, the Put Purchase Price for an LP Interest will be satisfied by the sale of a unit(s), while the order of unit sales is to be based on the Appraisals. To restate, the Put Purchase Price is equal to the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance as compared to the other Units multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses. However, the Partnership will not attempt to sell a Unit(s) until the number of LPs exercising their Put Right is equal to the number of LPs investments that were necessary to make the Loan Advance for such Unit.

For example, Unit 6E West was appraised at a Fair Market Value of $3,345,000, while the Loan Advance collateralized by this unit was in the amount of $4,000,000. The ratio of Fair Market Value to the Loan Advance amount on 6E West is -16.4% and represents the lowest ratio amongst the Units. Eight (8) LPs equity contributions to the Partnership were required in order to make the Loan Advance for which Unit 6E West serves as collateral. Therefore, once eight (8) LPs have exercised his or her Put Right, the Partnership will use reasonable business efforts to market and liquidate Unit 6E West once the Partnership. The Partnership shall not be entitled to sell a Unit(s) for less than the then appraised Fair Market Value without the consent of all LPs who will receive a return of capital from such sale. Thus, the Put Purchase Price for the first eight (8) LPs electing to exercise his or her Put Right would be equal to his or her pro rata share from realizable value of the sale of Unit 6E West less customary transaction expenses, i.e., 1 / 8 multiplied by at least $3,345,000 less customary transaction expenses, unless a sale at a lower price is approved by all participating LPs. Subsequent to the 3rd Notice, Unit 6E West was listed for sale and the first eight (8) LPs who provided an executed Put Exercise Notice were assigned to that Unit. Should the Partnership be able to sell the Unit for greater than the Fair Market Value, the benefit shall go to those eight investors who have exercised their Put Right, but in no event would the Put Purchase Price be greater than the actual LP Capital Contribution. Subsequently, the next Unit that would be sold would be 5E West, which has the second lowest ratio of Fair Market Value to Loan Advance amount amongst the remaining Units in the portfolio.

In order to exercise his or her Put Right, such LP must provide written notice (the "Put Exercise Notice") to the Partnership within 45 days following the date of this Notice expressly stating his or her exercise of the Put Right. By delivering the Put Exercise Notice, the LP represents and warrants to the Partnership that (A) the LP has full right, title and interest in and to the LP Interest, (B) the LP has all the necessary power and authority and has taken all necessary action to sell such LP Interest as contemplated herein, and (C) the LP Interest is free and clear of any and all mortgages, pledges, security interests, options, rights of first offer, encumbrances or other restrictions or limitations of any nature whatsoever other than those arising as a result of or under the terms of this Partnership Agreement. The delivery of a Put Exercise Notice by a LP to the Partnership shall create a binding and irrevocable obligation to sell his or her LP Interest at the Put Purchase Price as set forth in this Notice. Failure of an LP to deliver the Put Exercise Notice within such 45-day period shall constitute a waiver of such LPs Put Right with respect to the specific

4

Put Purchase Price formula as set forth in this Notice, but shall not affect their respective rights with respect to any future Put Rights. **An LP who has previously provided an executed Put Exercise Notice form but has not yet received a capital distribution shall continue to be treated as having provided an executed Put Exercise Notice, unless the LP informs the Partnership of his or her desire to remain in the Partnership and withdraw their prior Put Exercise Notice.**

Upon the Partnership's receipt of such Put Exercise Notice, the Partnership will use commercially reasonable efforts to sell a Unit or Units in its possession at the Fair Market Value as identified in the Appraisals or at a higher amount, but will take consideration of listing too many Units at the same time. As described above, the Partnership shall not undertake such efforts until enough LPs have submitted their Put Exercise Notice that matches the number of investor's whose capital supported the Loan Advance on such Unit. The Partnership may, with the consent of all participating LPs, sell such Unit or Units below the Fair Market Value. The Partnership shall pay the Put Purchase Price no later than thirty (30) days following the closing of the sale of the applicable Unit or Units and receipt of the sales proceeds. The Partnership will pay the Put Purchase Price for the LP Interest by check or wire transfer of funds. At the closing of the sale of the LP Interest to the Partnership, the LP shall deliver to the Partnership (a) an assignment and all other transfer documents to consummate the sale and assignment of the LP Interest to the Partnership, and (b) waiver and release of the Partnership from any and all future claims, each in a form acceptable to the Partnership. Upon the LPs receipt of the Put Purchase Price at the closing, the LP shall have no further right, interest or claim to distributions in or from the Partnership and shall no longer be an LP in the Partnership.

On each six (6) month anniversary of this Notice or within a reasonable time thereafter, the General Partner shall provide to the remaining LPs a new notice setting forth the then applicable Fair Market Value of the remaining Partnership Property and each LP shall then have **45 days** from the date of such new notice to deliver a Put Exercise Notice to the Partnership. The Put Purchase Price would continue to be based on the formula described above, only using the new Fair Market Value of the remaining Units, and would otherwise be payable upon and subject to the same terms set forth above.

**General Provisions for LPs Who Do Not Provide a Put Exercise Notice:**

To the extent the Unit(s) are not required to be put on the market to satisfy prior Put Exercise Notices, we will explore opportunities to put them on the market when market conditions are deemed to be favorable for sale. The sale of Units will be conducted in an orderly, market driven manner that seeks to maximize value to the Partnership and the LPs. As such, there can be no definitive timeline for which all of the Units will be sold. To sell prematurely would likely mean selling units at a significant discount to the original amount of each Loan Advance, which would mean LPs would receive less than the full amount of their capital contributions returned. The Partnership seeks to avoid this.

As each Unit is sold, a pro rata return of capital will be made to those LPs who have received their adjudication of their I-829 Petitions and have not otherwise exercised their Put Rights (as set forth above). The remainder of the proceeds shall remain with the Partnership and shall be returned on a pro rata basis to the rest of the LPs as their I-829 petitions are approved, subject to the distribution provisions in the Partnership Agreement. We intend such returns of capital to be made until all LPs (other than the LPs who have exercised their Put Rights (as set forth above)) have received a return of their capital contribution. All capital returns shall be made on a pro rata basis, treating each LP equal to one another based on ownership percentage. Once all of the Partnership Property has been sold, the Partnership shall

5

CRC 000658

wind down.  To the extent there is Available Cash Flow (as defined in the Partnership Agreement) after the sale of all Partnership Property and return of LP capital, it shall be paid out in accordance with Article VI of the Partnership Agreement.

The strategy outlined above was developed in good faith with the LPs best interests in mind and seeks to provide a path toward maximizing value to each and every LP, while still providing the LPs with an early exit alternative as contemplated under Section 13.06.  The Partnership will strive to execute this strategy as quickly as is economically feasible.

Robert Glucksman

Authorized Representative

Colorado Regional Center Project Solaris, LLLP

6

CRC 000659

**From:** General Partner ("GP") of Colorado Regional Center Project Solaris, LLLP ("CRCPS" or the "Partnership")

**To:** Limited Partners ("LPs") of the Partnership

**Date:** July 18, 2018

**Re:** 5th Notice of Fair Market Value of the Partnership Property (this "Notice") and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions

---

**Definitions:**

"Administrative Expenses" means those expenses incurred by the GP in connection with the sale of LP Interests including specifically and without limitation, certain marketing, travel, legal and accounting fees, referral and related fees, and the legal fees of a LP incurred in preparation of such LP's I-526 petition.

"Appraisal(s)" means the good faith estimate of the Fair Market Value of each Unit performed by the independent third party firm Pack Appraisal Company.

"Capital Contribution" means the total amount of money or property contributed to the Partnership by each Partner (excluding any amounts contributed for Administrative Expenses).

"Fair Market Value" means the total liquidation value (as determined pursuant to a good faith market analysis conducted by qualified third-parties engaged by the GP) of all of the Partnership Property or an individual Unit after deduction of all usual and customary selling expenses, pro rations, and other similar matters.

"Loan" means the loan made from CRCPS to the Solaris developer in the aggregate amount of $82,500,000.

"Loan Advance" means the amount of each advance of principal from CRCPS to the developer per terms of the Loan.

"LP Interest" means a limited partnership interest in CRCPS.

"Partnership Property or Units" means the 19 individual properties presently held by the developer which collateralize the Loan.

"Put Exercise Notice" means written notice provided by a LP to the Partnership of his or her intent to exercise the Put Right. A Put Exercise Notice must be provided to the Partnership within 45 days following the receipt of this Notice.

"Put Right" means for each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, such LP may elect to sell his or her LP Interest to the Partnership and receive a return of capital.

"Partnership Agreement" means the Limited Liability Limited Partnership Agreement of Colorado Regional Center Project Solaris, LLLP.

"Put Purchase Price" means the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance amount multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses.

1

"Section 13.06" means Section 13.06 of the CRCPS Partnership Agreement entitled "Rights of Limited Partners to Return of Capital Contributions.

"U.S. Immigration Legal Requirements" means the GP's understanding that only LPs who have either received adjudication of their I-829 petition or who are foregoing permanent residency in the United States would be eligible to receive a return of capital and sell their LP Interest to the Partnership.

**Notice of Fair Market Value of the Partnership and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions:**

As previously discussed, per the terms of the Loan, the developer has the right to transfer each Unit to the Partnership in lieu of cash payment at maturity of the Loan. The developer has indicated its desire to do so for each Unit as each Loan Advance reaches its 3-year anniversary mark. Accordingly, we are working with the developer to transfer title to the Partnership on the Units which Loan Advances have reached or surpassed the 3-year anniversary mark as is practicable for all parties. The Partnership has been in the process of developing a comprehensive plan to permit the transfer and orderly sale of Units presently held by the developer. Further, the Partnership has approved a listing agreement with the brokerage firm, Solaris Real Estate, LLC, and continues to coordinate a marketing plan for unit(s).

In September 2015, the Partnership obtained valuations of each of the Units from the independent third party firm, Pack Appraisal Company. Subsequently, the Partnership has obtained valuations (see summary below) on each of the Units from the independent appraisal firm Angelo's Appraisal Inc. and we are continually performing an overall assessment of the real estate market in an effort to maximize value on the sale of each of the Units which in turn maximizes value to the Partnership and to all LPs.

In accordance with Section 13.06, we engaged an independent third party appraisal firm to prepare a good faith estimate of the Fair Market Value of the Partnership Property. The Appraisals do not account for customary selling expenses, which the Partnership will incur as it pursues the strategy set forth in this Notice and estimates to be approximately six percent (6.0%) of the sales price. We are hereby providing notice to the LPs of the estimated Fair Market Value as of April 2018, which has been determined to be $75,460,000 in the aggregate, a 3.8% decrease in the aggregate appraisal from the prior appraisal. Upon request, we will provide copies of the Appraisals for your review. The Appraisal amount compares to the aggregate amount of the Loan made to the Solaris developer in the amount of $82,500,000, representing approximately ninety one percent (91%) of the Loan amount, although we continue to believe the value of the Partnership Property to be higher based on reasons set forth below and in accompanying materials (if applicable).

2

The following is a summary of the appraised Fair Market Value of the Partnership Property:

| Unit | Appraised Fair Market Value | Loan Advance Date | Prepayment Date | Loan Advance Amount | Ratio of Fair Market Value to Loan Advance Amount |
|---|---|---|---|---|---|
| 6E West | $3,295,000 | 4/18/2012 | 4/18/2015 | $4,000,000 | -17.6% |
| 5E West | $3,295,000 | 8/2/2012 | 8/2/2015 | $4,000,000 | -17.6% |
| 2A South | $5,400,000 | 4/25/2012 | 4/25/2015 | $6,500,000 | -16.9% |
| 4G West | $5,490,000 | 8/24/2012 | 8/24/2015 | $6,500,000 | -15.5% |
| 6D East | $6,825,000 | 10/2/2012 | 10/2/2015 | $8,000,000 | -14.7% |
| 4D East | $6,500,000 | 3/6/2013 | 3/5/2016 | $7,500,000 | -13.3% |
| 5G West | $5,780,000 | 1/24/2013 | 1/24/2016 | $6,500,000 | -11.1% |
| 7E East | $3,570,000 | 1/30/2013 | 1/30/2016 | $4,000,000 | -10.8% |
| 3E East | $2,725,000 | 1/29/2013 | 1/29/2016 | $3,000,000 | -9.2% |
| 6E East | $3,285,000 | 5/30/2012 | 5/30/2015 | $3,500,000 | -6.1% |
| 6C West | $3,300,000 | 11/27/2012 | 11/27/2015 | $3,500,000 | -5.7% |
| 5C West | $3,300,000 | 11/6/2012 | 11/6/2015 | $3,500,000 | -5.7% |
| Pent G West | $4,310,000 | 5/20/2013 | 5/19/2016 | $4,500,000 | -4.2% |
| 7E West | $4,400,000 | 9/7/2012 | 9/7/2015 | $4,500,000 | -2.2% |
| Pent E West | $2,945,000 | 5/3/2012 | 5/3/2015 | $3,000,000 | -1.8% |
| Pent E East | $2,950,000 | 6/15/2012 | 6/15/2015 | $3,000,000 | -1.7% |
| 3C East | $2,550,000 | 1/30/2015 | 1/29/2018 | $2,500,000 | 2.0% |
| Pent C West | $2,770,000 | 5/30/2013 | 5/29/2016 | $2,500,000 | 10.8% |
| Pent C East | $2,770,000 | 9/13/2012 | 9/13/2015 | $2,000,000 | 38.5% |
| | | | | | |
| Total | $75,460,000 | | | $82,500,000 | -8.5% |

Pursuant to Section 13.06, each LP who has held his or her limited partnership interest in CRCPS ("LP Interest") for at least three years is entitled to receive notice of the Fair Market Value of Partnership Property, and may also, depending on U.S. Immigration Legal Requirements, be entitled to give notice to the GP of his or her election to sell their LP Interest to the Partnership. The purchase price for the LP Interest would be equal to the LPs pro rata share of the amount the Partnership actually receives from a sale, which may be greater or less than the Fair Market value as estimated by the third party appraiser. The Put Purchase Price is further described below.

Even if the Partnership was able to liquidate Partnership Property at this time, the GP does not believe it would be prudent to attempt to liquidate all of the Partnership Property at once, but rather to do so on a unit-by-unit basis in an orderly, market driven manner which seeks to create the most value for each LP. While the Appraisals indicate the Partnership Property is valued below the face value of the Loan, we believe this is attributable to the lack of adequate comparison to sales within the Solaris building and the lack of adequate comparable properties in the greater Vail, Colorado area. Another factor that will contribute to what we believe to be increased value in the future is supply and demand for the building. For example, the Partnership has control over the only two remaining mountain facing four-bedroom units that will be available for sale. As fewer properties in Solaris are available for sale, we anticipate demand will increase the sales price of each Unit.

**Put Rights:**

We have set forth our good faith interpretation of Section 13.06 which we believe conforms to the original intent and provides qualifying LPs with an equitable exit strategy, while protecting the overall economic viability of the Partnership. The GPs understanding is that only LPs who have either received adjudication of their I-829 and received an unconditional green card or who are foregoing permanent residency in the U.S. would be eligible to receive a return of capital without jeopardizing the EB-5 process. We advise each

3

CRC 000662

LP to seek advice from his or her immigration attorney with respect to the U.S. Immigration Legal Requirements and any early exit procedure.

Each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, may elect to sell his or her LP Interest to the Partnership. By exercising his or her Put Right, the LP is seeking a return of capital earlier than other LPs in the Partnership may be permitted to. For those LPs first electing to exercise his or her Put Right, the Put Purchase Price for an LP Interest will be satisfied by the sale of a unit(s), while the order of unit sales is to be based on the Appraisals. To restate, the Put Purchase Price is equal to the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance as compared to the other Units multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses. However, the Partnership will not attempt to sell a Unit(s) until the number of LPs exercising their Put Right is equal to the number of LPs investments that were necessary to make the Loan Advance for such Unit.

For example, Unit 6E West was appraised at a Fair Market Value of $3,295,000, while the Loan Advance collateralized by this unit was in the amount of $4,000,000. The ratio of Fair Market Value to the Loan Advance amount on 6E West is -17.6% and represents the lowest ratio amongst the Units. Eight (8) LPs equity contributions to the Partnership were required in order to make the Loan Advance for which Unit 6E West serves as collateral. Therefore, once eight (8) LPs have exercised his or her Put Right, the Partnership will use reasonable business efforts to market and liquidate Unit 6E West once the Partnership. The Partnership shall not be entitled to sell a Unit(s) for less than the then appraised Fair Market Value without the consent of all LPs who will receive a return of capital from such sale. Thus, the Put Purchase Price for the first eight (8) LPs electing to exercise his or her Put Right would be equal to his or her pro rata share from realizable value of the sale of Unit 6E West less customary transaction expenses, i.e., 1 / 8 multiplied by at least $3,295,000 less customary transaction expenses, unless a sale at a lower price is approved by all participating LPs. Should the Partnership be able to sell the Unit for greater than the Fair Market Value, the benefit shall go to those eight investors who have exercised their Put Right, but in no event would the Put Purchase Price be greater than the actual LP Capital Contribution. Subsequently, the next Unit that would be sold would be 5E West, which has the second lowest ratio of Fair Market Value to Loan Advance amount amongst the remaining Units in the portfolio.

In order to exercise his or her Put Right, such LP must provide written notice (the "Put Exercise Notice") to the Partnership within 45 days following the date of this Notice expressly stating his or her exercise of the Put Right. By delivering the Put Exercise Notice, the LP represents and warrants to the Partnership that (A) the LP has full right, title and interest in and to the LP Interest, (B) the LP has all the necessary power and authority and has taken all necessary action to sell such LP Interest as contemplated herein, and (C) the LP Interest is free and clear of any and all mortgages, pledges, security interests, options, rights of first offer, encumbrances or other restrictions or limitations of any nature whatsoever other than those arising as a result of or under the terms of this Partnership Agreement. The delivery of a Put Exercise Notice by a LP to the Partnership shall create a binding and irrevocable obligation to sell his or her LP Interest at the Put Purchase Price as set forth in this Notice. Failure of an LP to deliver the Put Exercise Notice within such 45-day period shall constitute a waiver of such LPs Put Right with respect to the specific Put Purchase Price formula as set forth in this Notice, but shall not affect their respective rights with respect to any future Put Rights. **An LP who has previously provided an executed Put Exercise Notice form but has not yet received a capital distribution shall continue to be treated as having provided an**

4

CRC 000663

**executed Put Exercise Notice, unless the LP informs the Partnership of his or her desire to remain in the Partnership and withdraw their prior Put Exercise Notice.**

Upon the Partnership's receipt of such Put Exercise Notice, the Partnership will use commercially reasonable efforts to sell a Unit or Units in its possession at the Fair Market Value as identified in the Appraisals or at a higher amount, but will take consideration of listing too many Units at the same time as well as guidance in terms of a listing and marketing strategy. As described above, the Partnership shall not undertake such efforts until enough LPs have submitted their Put Exercise Notice that matches the number of investor's whose capital supported the Loan Advance on such Unit. The Partnership may, with the consent of all participating LPs, sell such Unit or Units below the Fair Market Value. The Partnership shall pay the Put Purchase Price no later than thirty (30) days following the closing of the sale of the applicable Unit or Units and receipt of the sales proceeds. The Partnership will pay the Put Purchase Price for the LP Interest by check or wire transfer of funds. At the closing of the sale of the LP Interest to the Partnership, the LP shall deliver to the Partnership (a) an assignment and all other transfer documents to consummate the sale and assignment of the LP Interest to the Partnership, and (b) waiver and release of the Partnership from any and all future claims, each in a form acceptable to the Partnership. Upon the LPs receipt of the Put Purchase Price at the closing, the LP shall have no further right, interest or claim to distributions in or from the Partnership and shall no longer be an LP in the Partnership.

On each six (6) month anniversary of this Notice or within a reasonable time thereafter, the General Partner shall provide to the remaining LPs a new notice setting forth the then applicable Fair Market Value of the remaining Partnership Property and each LP shall then have **45 days** from the date of such new notice to deliver a Put Exercise Notice to the Partnership. The Put Purchase Price would continue to be based on the formula described above, only using the new Fair Market Value of the remaining Units, and would otherwise be payable upon and subject to the same terms set forth above.

**General Provisions for LPs Who Do Not Provide a Put Exercise Notice:**

To the extent the Unit(s) are not required to be put on the market to satisfy prior Put Exercise Notices, we will explore opportunities to put them on the market when market conditions are deemed to be favorable for sale. The sale of Units will be conducted in an orderly, market driven manner that seeks to maximize value to the Partnership and the LPs. As such, there can be no definitive timeline for which all of the Units will be sold. To sell prematurely would likely mean selling units at a significant discount to the original amount of each Loan Advance, which would mean LPs would receive less than the full amount of their capital contributions returned. The Partnership seeks to avoid this.

As each Unit is sold, a pro rata return of capital will be made to those LPs who have received their adjudication of their I-829 Petitions and have not otherwise exercised their Put Rights (as set forth above). The remainder of the proceeds shall remain with the Partnership and shall be returned on a pro rata basis to the rest of the LPs as their I-829 petitions are approved, subject to the distribution provisions in the Partnership Agreement. We intend such returns of capital to be made until all LPs (other than the LPs who have exercised their Put Rights (as set forth above)) have received a return of their capital contribution. All capital returns shall be made on a pro rata basis, treating each LP equal to one another based on ownership percentage. Once all of the Partnership Property has been sold, the Partnership shall wind down. To the extent there is Available Cash Flow (as defined in the Partnership Agreement) after

5

the sale of all Partnership Property and return of LP capital, it shall be paid out in accordance with Article VI of the Partnership Agreement.

The strategy outlined above was developed in good faith with the LPs best interests in mind and seeks to provide a path toward maximizing value to each and every LP, while still providing the LPs with an early exit alternative as contemplated under Section 13.06.  The Partnership will strive to execute this strategy as quickly as is economically feasible.

_____

_____

Authorized Representative

Colorado Regional Center Project Solaris, LLLP

6

CRC 000665


COLORADO
REGIONAL CENTER

From: Colorado Regional Center I, LLC, (the "General Partner" or "GP") of Colorado Regional Center Project Solaris ("CRCPS" or the "Partnership")

To: Limited Partners of the Partnership

Date: January 29, 2019

Re: Update on Portfolio Offer Process and Additional Partnership Information

CRCPS Limited Partners ("LP(s)"):

We are writing to inform you of several updates including (i) the status of pending I-829 petitions, (ii) the status of preliminary indications of interest received for Partnership property and a related bidding process, (iii) a capital basis analysis, (iv) an update on accrued and unpaid liabilities, (v) the status of preferred return distributions, (vi) the pending 6E West transaction, and (vii) an update on the Vail real estate market generally.

<u>**Status of I-829 Petitions**</u>

We are pleased to inform you that approximately ninety eight percent (98%) of LPs have had their I-829 petitions positively adjudicated as of December 31, 2018.

<u>**Indications of Interest and Bidding Process**</u>

The Partnership has received preliminary indications of interest from third parties to either purchase (i) select Partnership units, (ii) title to the entire portfolio of units, or (iii) the loan (i.e., the $82,500,000 loaned (the "Loan") to the Solaris developer). These preliminary indications of interest have ranged from $12.25 million for three of the mountain facing units in the portfolio to a net price of approximately $47 million for the entire portfolio from a party that ultimately walked away from the bidding process. Many of the preliminary indications received for the entire portfolio have fallen between $35 million and $40 million. All preliminary indications received to date represent significant discounts from the Loan amount. The two most recent preliminary indications for the entire portfolio came from financial investors and were for gross purchase prices of $38 million and $40.4 million, respectively. These prices would be subject to commission expenses and the unpaid management fee described below which would reduce the amount available for distribution. As we continue to evaluate these preliminary indications of interest, we would appreciate any feedback you may have on this range of indications.

The interested parties indicate they believe that they would be able to close and fund a transaction within 30 to 60 days.

The General Partner continues to believe the highest sales price achievable for each unit is to sell the units on a market driven, one-by-one basis. However, there is a time value of money consideration to doing so given the amount of time it could take to sell 19 units individually and the LPs have expressed a desire for liquidity. In other words, the longer a bulk purchaser views it will take to sell all 19 units and achieve their desired return, the deeper discount we would expect to see in an offer

DOC ID - 30291971.1

Page 1 of 4



price. That being said, the economics of a bulk portfolio transaction could be attractive to achieve a liquidity event sooner.

While the Partnership has received preliminary indications of interest for such a transaction, a worldwide bidding process run by a brokerage firm with international exposure may result in more competitive bids and a higher indication of value than what has been received to date, but there can be no guarantee of such an outcome. Cushman & Wakefield, an international brokerage firm, has informed the General Partner that such a bidding process would take approximately 5 to 6 months. The process would involve preparation of materials and process, execution of a marketing plan, negotiations, escrow, and potential closing.

The Partnership continues to be in discussion with two parties who have indicated interest in acquiring the entire portfolio and we are in dialogue with an international brokerage firm to market the portfolio for a bulk transaction. The Partnership also continues to have active listings with Solaris Real Estate, an entity that is owned by the developer. There are currently two units listed under exclusive listing agreements with the term of those listing agreement ending in March. The Partnership selected Solaris Real Estate as the broker as it has the most experience listing and selling units in the building. Solaris Real Estate has also represented other third-party sellers in the building, not just the developer's units. However, as there has not been a transaction for a Partnership unit, we are re-evaluating the brokerage relationship.

### Capital Basis Analysis

Each LP initially invested $500,000 as their initial capital basis for an equal share in the 99% of the Partnership owned by LPs. Since the first Loan Advance was made to the Borrower in April 2012, and as cash flow has permitted, LPs have earned a blended annual rate of return of approximately 2.10%, or approximately $10,500 per year, on their initial investment. Over a five-year period, this would have generated an aggregate return of approximately $52,500.[1] This implicitly offsets a portion of each LP's initial capital investment, leaving approximately $450,000 of that initial investment remaining. This is in addition to permanent residency already received by most LPs.

### Accrued and Unpaid Partnership Liabilities

In the past, in order to continue paying LPs an annual preferred return, the general partner placed a preference on LP benefit and deferred the management fee owed under Section 5.01 of the Partnership Agreement. The management fees would ordinarily be paid out of available cash flow prior to, and have priority over, distributions to LPs. However, the General Partner opted to put the LPs' priority ahead of the management fee for the benefit of each LP by deferring the payment of that management fee until units are sold and LP interests redeemed. Doing so created an unpaid accrued liability to the General Partner. Specifically, the management fee has been accruing since August 2016 and the balance is $4,130,858 as of December 31, 2018. This is a Partnership expense and will be satisfied and effectively shared as units are sold and LP interests redeemed.

---

[1] The actual amount received may differ for each LP depending upon time of investment and Loan advances.

DOC ID - 30291971.1

Page **2** of **4**

 COLORADO
REGIONAL CENTER

### Preferred Return Distributions

Historically, an annual preferred return has been made to LPs which was funded out of the interest payments the Partnership was receiving from the Developer.  Notably, such payments were made possible in part by the General Partner's decision to defer the management fee owed to it until units sell and LP interests are redeemed.  Per the terms of the transaction, the Developer has now largely completed its obligation to continue making interest payments.  This means the source of any future revenue to the Partnership will be rental revenue.  Such rental income, however, is likely to be insufficient to to satisfy all Partnership expenses and still create a residual for the preferred return payment to LPs.  As a result, the Partnership will likely be unable to continue making a preferred return to LPs until there is sufficient available cash flow.  At such time when there is sufficient available cash flow, such as upon the sale of one or more units, the preferred return may be reinstated.

### Pending Transaction for Unit 6E West

The Partnership has an executed Memorandum of Understanding with a group of 8 LPs who intend to acquire unit 6E West.  This unit had the lowest ratio of appraised value to the loan advance per the latest round of appraisals.  In exchange for accepting ownership of 6E West, the 8 LPs will transfer their ownership interests back to the Partnership, shall cease to be LPs, and will have no further rights or claims upon the Partnership.  The group shall be responsible for their share of the accrued and unpaid liabilities attributable to their respective LP interests at the time of the transfer.  It is anticipated that this transaction will close by the end of February 2019.

### Vail Real Estate Market Dynamics

Within the Vail and Lionshead condominium market over the $2 million price point, there have been 38 condo sales in 2018 through early November 2018.[2]  Of these, 21 were in Vail Village and the prices ranged from $2,300,000 for a 3-bedroom unit in Manor Vail to $14,000,000 for the 6-bedroom Penthouse B East in the Solaris building.[3]  On a price per square foot basis, pricing ranged from $1,172 per square foot to $3,093 per square foot.[4]  For comparison, the Units initially transacted between $1,696 and $3,216 per square foot.  These sales figures are obviously dependent upon location, amenities, quality of finishings, age, etc.  Within the Solaris building itself, two units have sold in 2018; the 6-bedroom penthouse unit referenced above and the 4-bedroom unit 4B East for $5,950,000 or $2,352 per square foot.

Historically, the Solaris building has seen two to four transactions per year.  In 2015, three units sold while two sold in 2016, three sold in 2017, and the two referenced above sold in 2018.  Of these 10 transactions in the past four years, eight were south, mountain facing units indicating mountain facing units have a higher propensity to sell than the north facing units.  A snapshot of these transactions is as follows:

---

[2] Source: Multiple Listing Service (MLS) printed November 8, 2018. Copies are available upon request.
[3] Id.
[4] Id.

DOC ID - 3029197I.1

Page **3** of **4**


COLORADO
REGIONAL CENTER

| Unit # | Bedrooms | SQFT | View | Closing Date | Closing Price | Price/ SQFT |
|--------|----------|------|------|--------------|---------------|-------------|
| 5B East | 4 | 2,549 | South | 5/21/2015 | $7,140,000 | $2,801 |
| 3D East | 4 | 2,819 | South | 6/3/2015 | $7,262,500 | $2,576 |
| Pent B West | 6 | 4,573 | South | 12/15/2015 | $13,800,000 | $3,018 |
| 5E East | 2 | 1,734 | North | 1/5/2016 | $3,025,000 | $1,745 |
| 3A South | 3 | 1,875 | South | 5/13/2016 | $4,800,000 | $2,560 |
| Pent H West | 3 | 2,498 | South/West | 4/10/2017 | $7,750,000 | $3,102 |
| Pent H East | 2 | 4,170 | South/West | 11/15/2017 | $11,700,000 | $2,806 |
| 3B East | 0 | 925 | North | 12/12/2017 | $1,425,000 | $1,541 |
| 4B East | 4 | 2,530 | South | 3/23/2018 | $5,950,000 | $2,352 |
| Pent B East | 6 | 4,522 | South | 5/15/2018 | $14,000,000 | $3,096 |
| | | | | | | |
| Total | | 28,195 | | | $76,852,500 | $2,726 |
| Average | | 2,820 | | | $7,685,250 | $2,560 |

Source: Closing Price, Sq. Ft., and Closing Date obtained from Eagle County Assessor Website.

Not all the Partnership units have been listed on the open market, although real estate brokers are aware that they have been for sale and all have been available for viewings.

At a sales velocity of two to three units per year and with a sales process of selling units through a market driven strategy, we would expect that it could take more than five years to fully monetize the portfolio.

Please direct any feedback or questions to mhayes@coloradoregionalcenter.com or rglucksman@coloradoregionalcenter.com. We welcome your thoughts and input. Please provide any feedback by February 15th.

DOC ID - 30291971.1

Page 4 of 4

From: Colorado Regional Center I, LLC, (the "General Partner" or "GP") of Colorado Regional Center Project Solaris ("CRCPS" or the "Partnership")

To: Limited Partners of the Partnership

Date: March 14, 2019

Re: Update on Portfolio Offer Process and Additional Partnership Information

CRCPS Limited Partners ("LP(s)"):

We are writing to inform you of several updates including (i) the status of preliminary indications of interest received for Partnership property, (ii) sales strategy, (iii) the 6E West transaction, (iv) updated individual appraisals of Partnership property, and (iv) an appraisal of Partnership property assuming a bulk sale.

### Indications of Interest

As mentioned in the update distributed on January 29, 2019 (the "Update"), the Partnership received preliminary indications of interest from third parties to either purchase (i) select Partnership units, (ii) title to the entire portfolio of units, or (iii) the loan (i.e., the $82,500,000 loaned (the "Loan") to the Solaris developer). These preliminary indications of interest ranged from $12.25 million for three of the mountain facing units in the portfolio to a net price of approximately $47 million for the entire portfolio from a party that ultimately walked away from the bidding process. Many of the preliminary indications received for the entire portfolio have fallen between $35 million and $40 million. All preliminary indications received to date represent significant discounts from the Loan amount.

The GP requested the Limited Partner's feedback to the preliminary indications of interest by February 15, 2019. The feedback the GP received, while only representing a fraction of the Limited Partners, was largely not in favor of selling the Partnership property for the indicated values. Accordingly, the Partnership is not moving forward with those indications of interest.

### Sales Strategy – Next Steps

The GP has devised an alternative strategy. The portfolio now consists of 18 units (see 6E West discussion below); six south and/or west mountain facing units and thirteen north facing units. The GP has entered into a listing agreement with Cushman & Wakefield U.S., Inc. for the sale of the six mountain facing units; 6D East, 4D East, 4G West, 5G West, 2A South, and Penthouse G West. Collectively, these six units are the premium, mountain-facing units in the portfolio and represent $39.5 million of the Loan. This six-unit subset of the portfolio may be better positioned for a bulk transaction. A six-unit portfolio of mountain facing units presumably requires a shorter sell off period and less of a discount. The term of the engagement commenced February 18, 2019 and will expire on May 31, 2019. The expected cost is a 1% commission on the total sales price payable to Cushman & Wakefield, which is expected to be the only brokerage expense and will only be payable if a sale is finalized. This strategy is implemented with the intent of maximizing value to the Limited Partners, while also providing liquidity. Cushman & Wakefield are compiling marketing materials and plan to begin the sales process within the next two weeks, which will

Page 1 of 3

CRC 000670

include reaching out to all of their contacts and referral sources for potential bidders. While the bidding process will take a few months, the GP believes we will have an idea if there is interest in the six units within a month or two. The GP will continue to keep the Limited Partners informed with updates regarding the bidding process.

The remainder of the portfolio consists of 13 north facing units. As previously mentioned, the GP is interviewing different brokerage firms to begin a listing and marketing process for these units. We have been in discussion with Slifer Smith & Frampton Real Estate, a Vail based real estate firm with over 50 years of experience (www.vailrealestate.com) and Sotheby's (www.livsotheby.com). In addition to the sales process through Cushman & Wakefield, the GP plans to list north facing units with a new real estate broker. Thus, there will be a two-pronged approach of having Cushman & Wakefield run a bidding process for the six-unit mountain facing portfolio and a new real estate broker listing north facing units.

## Transaction for Unit 6E West

The transaction for 6E West closed on February 8, 2019. In exchange for ownership of 6E West, the 8 LPs transferred their ownership interests back to the Partnership, ceased to be LPs, and will have no further rights or claims upon the Partnership. Unit 6E West had the lowest ratio of individual appraised value to the amount of the loan advance amongst all of the units. The 8 LPs are responsible for their share of the accrued management fee and have carried a promissory note for their share in the amount of $210,074. The 8 LPs now control all aspects of unit 6E West. Thus, there are now 157 Limited Partners remaining and 18 Units left in the portfolio.

As mentioned in previous updates, if there is another group of Limited Partners who are interested in exchanging their interests for a Unit or an investor who would like to outright purchase a unit, we would be happy to have that conversation. Upon request, the Partnership can connect investors interested in this type of transaction. The GP would need an investor's permission to share personal information with other investors.

## Updated Individual Appraisals of Partnership Property

The remaining 18 Units were most recently appraised in November-December 2018 by Angelo's Appraisal Inc. and are summarized in the following:

CRC 000671

| Unit | Appraised Fair Market Value | Loan Advance Date | Prepayment Date | Loan Advance Amount | Ratio of Fair Market Value to Loan Advance Amount | Sq. Ft. | Appraisal Value/ Sq. Ft. |
|---|---|---|---|---|---|---|---|
| 5E West | $3,000,000 | 8/2/2012 | 8/2/2015 | $4,000,000 | -17.5% | 1,741 | $1,895 |
| 6D East | $6,850,000 | 10/2/2012 | 10/2/2015 | $8,000,000 | -14.4% | 2,815 | $2,433 |
| 3E East | $2,650,000 | 1/29/2013 | 1/29/2016 | $3,000,000 | -11.7% | 1,655 | $1,601 |
| 4G West | $5,780,000 | 8/24/2012 | 8/24/2015 | $6,500,000 | -11.1% | 2,567 | $2,252 |
| 5G West | $5,780,000 | 1/24/2013 | 1/24/2016 | $6,500,000 | -11.1% | 2,590 | $2,232 |
| 7E East | $3,575,000 | 1/30/2013 | 1/30/2016 | $4,000,000 | -10.6% | 1,970 | $1,815 |
| 2A South | $5,875,000 | 4/25/2012 | 4/25/2015 | $6,500,000 | -9.6% | 2,021 | $2,907 |
| 4D East | $6,865,000 | 3/6/2013 | 3/5/2016 | $7,500,000 | -8.5% | 2,813 | $2,440 |
| 6E East | $3,300,000 | 5/30/2012 | 5/30/2015 | $3,500,000 | -5.7% | 1,734 | $1,903 |
| 6C West | $3,300,000 | 11/27/2012 | 11/27/2015 | $3,500,000 | -5.7% | 1,723 | $1,915 |
| 5C West | $3,300,000 | 11/6/2012 | 11/6/2015 | $3,500,000 | -5.7% | 1,715 | $1,924 |
| Pent G West | $4,350,000 | 5/20/2013 | 5/19/2016 | $4,500,000 | -3.3% | 1,846 | $2,356 |
| Pent E West | $2,900,000 | 5/3/2012 | 5/3/2015 | $3,000,000 | -3.3% | 1,354 | $2,142 |
| 7E West | $4,400,000 | 9/7/2012 | 9/7/2015 | $4,500,000 | -2.2% | 2,268 | $1,940 |
| Pent E East | $2,950,000 | 6/15/2012 | 6/15/2015 | $3,000,000 | -1.7% | 1,373 | $2,149 |
| 3C East | $2,475,000 | 1/30/2015 | 1/29/2018 | $2,500,000 | -1.0% | 1,459 | $1,696 |
| Pent C West | $2,740,000 | 5/30/2013 | 5/29/2016 | $2,500,000 | 9.6% | 1,183 | $2,316 |
| Pent C East | $2,740,000 | 9/13/2012 | 9/13/2015 | $2,000,000 | 37.0% | 1,179 | $2,334 |
| **Total** | $73,130,000 | | | $78,500,000 | -6.8% | 34,006 | $2,151 |
| **Average** | $4,062,778 | | | $4,361,111 | -4.3% | 1,889 | $2,125 |

The unit with the lowest ratio of individual appraised value to loan advance is unit 5E West, which was appraised at $3.3 million. The 18-unit portfolio was appraised in the aggregate at $73.1 million. This represents a discount of 6.8% from the loan advance total of $78.5 million.

### Bulk Appraisal of Partnership Property

The GP also engaged an independent, unrelated appraiser, BBG, Inc. to appraise the portfolio for a bulk purchase. BBG, Inc. has no relationship to either the Partnership or Angelo's Appraisals. This will give the Partnership a better sense of the value of the portfolio if sold to a financial buyer as a bulk purchase. The BBG appraised value indicates the appraised value assuming a sale of all 18-units and incorporates the amount of time to re-sell each unit individually, risk factors associated with doing so, and the time value of money (i.e., a dollar today is worth more than a dollar in the future). The 'Bulk Value' for the 18-unit portfolio was determined by BBG, Inc. to be $43,320,000.

| MARKET VALUE CONCLUSION(S) - AS IS | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| Bulk Value "As Is" (18 Units) - All | Fee Simple | February 20, 2019 | $43,320,000 |
| Bulk Value "As Is" (6 Units) - Mtn Views | Fee Simple | February 20, 2019 | $28,180,000 |

BBG's appraisal incorporates a number of assumptions, including a sales period of approximately 7 years. Per BBG, the indicated rate of return for this type of investment is between 16% and 17%. The 'Bulk Value' appraisal is not materially different from some of the indications of interest received by the Partnership. The Partnership also asked BBG to appraise the six-unit mountain facing portfolio which was determined to be $28,180,000, which represents approximately 71% of the Loan amount for those units.

A copy of the individual appraisals and the BBG, Inc. appraisal is available upon request.

Please let us know as you have questions about any of the information contained in this update.

Page 3 of 3

Please direct any feedback or questions to mhayes@coloradoregionalcenter.com or rglucksman@coloradoregionalcenter.com.

Page **4** of **3**

CRC 000673

**From:** General Partner ("GP") of Colorado Regional Center Project Solaris, LLLP ("CRCPS" or the "Partnership")

**To:** Limited Partners ("LPs") of the Partnership

**Date:** May 20, 2019

**Re:** 6th Notice of Fair Market Value of the Partnership Property (this "Notice") and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions

### Notice of Fair Market Value of the Partnership and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions:[1]

As previously discussed, per the terms of the Loan and as described in the Partnership's offering memorandum (as amended to date, the "Offering Memorandum"), the developer held the right to transfer each Unit to the Partnership in lieu of cash payment at maturity of the Loan. The developer previously indicated its desire to do so for each Unit as each Loan Advance reached its 3-year anniversary mark. Accordingly, the Partnership entered into an Agreement Regarding Collateral Units to address the relationship between the developer and the Partnership.

The Partnership had listed units with Solaris Real Estate as broker as it believed that Solaris Real Estate previously had the most experience marketing, listing and selling units in the building. However, as there has not been a transaction for a Partnership unit through Solaris Real Estate, the Partnership has recently engaged Slifer Smith & Frampton Real Estate to market units. Slifer Smith & Frampton Real Estate is the largest real estate company in Eagle County and has indicated to us that it has sold more property than any other real estate firm in the valley. They currently have listed Units 7E West, 5G West, 4D East, and 7E East.

The Partnership has additionally entered into a listing agreement with Cushman & Wakefield U.S., Inc. for the sale of the six mountain facing units; 6D East, 4D East, 4G West, 5G West, 2A South, and Penthouse G West. Collectively, these six units are the premium, mountain-facing units in the portfolio and represent $39.5 million of the Loan. The term of the engagement commenced February 18, 2019 and will expire on May 31, 2019. The expected cost is 1% commission on the total sales price payable to Cushman & Wakefield, which is expected to be the only brokerage expense and will only be payable if a sale is finalized. The Partnership received an update from Cushman & Wakefield that they have set a formal "Call for Offers" date of Thursday, May 9th and anticipate receiving a couple indications of interest for the entire portfolio. An update will be provided once they receive the offers.

In September 2015, the Partnership obtained valuations of each of the Units from the independent third-party firm, Pack Appraisal Company. Subsequently, the Partnership has obtained valuations (see summary below) on each of the Units from the independent appraisal firm Angelo's Appraisal Inc. and we are continually performing an overall assessment of the real estate market in an effort to maximize value on the sale of each of the Units which in turn maximizes value to the Partnership and to all LPs.

In accordance with Section 13.06, we engaged an independent third party appraisal firm to prepare a good faith estimate of the Fair Market Value of the Partnership Property. The Appraisals do not account

---

[1] See Exhibit A for definitions.

1

for customary selling expenses or accrued and unpaid Partnership liabilities, which the Partnership will incur as it pursues the strategy set forth in this Notice and estimates customary selling expenses to be approximately six percent (6.0%) of the sales price while the balance of the accrued and unpaid management fee is approximately $4.5 million as of April 30, 2019 (after deducting the amount to be paid from the 6E West transaction described below).

On February 8, 2019, the transaction for unit 6E West closed. In exchange for ownership of 6E West, eight LPs transferred their ownership interests back to the Partnership, ceased to be LPs, and have no further rights or claims upon the Partnership. Unit 6E West had the lowest ratio of individual appraised value to the amount of the loan advance amongst all of the units. The 8 LPs were also responsible for their respective share of the accrued management fee through the date of the transaction, and accordingly executed a promissory note for their share in the amount of $210,074. Thus, there are now 157 Limited Partners remaining and 18 Units left in the portfolio which collateralized $78.5 million of Loan advances. The 8 LPs sold Unit 6E West on April 30, 2019 for a purchase price of approximately $2.78mm and made a payment of $210,074 to satisfy the promissory note to the Partnership.

The Partnership is hereby providing notice to the LPs of the estimated Fair Market Value as of November 2018, which has been determined to be $73,130,000 in the aggregate for the remaining 18 Units in the portfolio. Upon request, we will provide copies of the Appraisals for your review. The Appraisal amount compares to the aggregate amount of the loan advances made to the Solaris developer and collateralized by the remaining 18 units in the amount of $78,500,000, representing approximately ninety three percent (93%) of the Loan amount.

The following is a summary of the appraised Fair Market Value of the Partnership Property:

| Unit | Appraised Fair Market Value | Loan Advance Date | Prepayment Date | Loan Advance Amount | Ratio of Fair Market Value to Loan Advance Amount |
|------|------|------|------|------|------|
| 5E West | $3,300,000 | 8/2/2012 | 8/2/2015 | $4,000,000 | -17.5% |
| 6D East | $6,850,000 | 10/2/2012 | 10/2/2015 | $8,000,000 | -14.4% |
| 3E East | $2,650,000 | 1/29/2013 | 1/29/2016 | $3,000,000 | -11.7% |
| 4G West | $5,780,000 | 8/24/2012 | 8/24/2015 | $6,500,000 | -11.1% |
| 5G West | $5,780,000 | 1/24/2013 | 1/24/2016 | $6,500,000 | -11.1% |
| 7E West | $3,575,000 | 1/30/2013 | 1/30/2016 | $4,000,000 | -10.6% |
| 2A South | $5,875,000 | 4/25/2012 | 4/25/2015 | $6,500,000 | -9.6% |
| 4D East | $6,865,000 | 3/6/2013 | 3/5/2016 | $7,500,000 | -8.5% |
| 6E East | $3,300,000 | 5/30/2012 | 5/30/2015 | $3,500,000 | -5.7% |
| 6C West | $3,300,000 | 11/27/2012 | 11/27/2015 | $3,500,000 | -5.7% |
| 5C West | $3,300,000 | 11/6/2012 | 11/6/2015 | $3,500,000 | -5.7% |
| Pent G West | $4,350,000 | 5/20/2013 | 5/19/2016 | $4,500,000 | -3.3% |
| Pent E West | $2,900,000 | 5/3/2012 | 5/3/2015 | $3,000,000 | -3.3% |
| 7E West | $4,400,000 | 9/7/2012 | 9/7/2015 | $4,500,000 | -2.2% |
| Pent E East | $2,950,000 | 6/15/2012 | 6/15/2015 | $3,000,000 | -1.7% |
| 3C East | $2,475,000 | 1/30/2015 | 1/29/2018 | $2,500,000 | -1.0% |
| Pent C West | $2,740,000 | 5/30/2013 | 5/29/2016 | $2,500,000 | 9.6% |
| Pent C East | $2,740,000 | 9/13/2012 | 9/13/2015 | $2,000,000 | 37.0% |
| **Total** | **$73,130,000** | | | **$78,500,000** | **-6.8%** |

Pursuant to Section 13.06, each LP who has held his or her limited partnership interest in CRCPS ("LP Interest") for at least three years is entitled to receive notice of the Fair Market Value of Partnership

2

CRC 000675

Property and may also, depending on U.S. Immigration Legal Requirements, be entitled to give notice to the GP of his or her election to sell their LP Interest to the Partnership. The purchase price for the LP Interest would be equal to the LPs pro rata share of the amount the Partnership actually receives from a sale, which may be greater or less than the Fair Market value as estimated by the third-party appraiser. The Put Purchase Price is further described below.

The GP also engaged independent, unrelated appraiser, BBG, Inc. to appraise the remaining 18-unit portfolio for a bulk purchase. BBG, Inc. has no relationship to either the Partnership or Angelo's Appraisals. This provides the Partnership with a better sense of the value of the portfolio if sold to a financial buyer as a bulk purchase. The BBG appraised value indicates the appraised fair market value assuming a sale of all 18-units and incorporates the amount of time to re-sell each unit individually, risk factors associated with doing so, and the time value of money (i.e., a dollar today is worth more than a dollar in the future). The 'Bulk Value' for the 18-unit portfolio was determined by BBG, Inc. to be $43,320,000.

| MARKET VALUE CONCLUSION(S) - AS IS | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| Bulk Value "As Is" (18 Units) - All | Fee Simple | February 20, 2019 | $43,320,000 |
| Bulk Value "As Is" (6 Units) - Mtn Views | Fee Simple | February 20, 2019 | $28,180,000 |

BBG's appraisal incorporates a number of assumptions, including a sales period of approximately 7 years. Per BBG, the indicated rate of return for this type of investment is between 16% and 17%. The 'Bulk Value' appraisal is not materially different from some of the indications of interest received by the Partnership. The Partnership also asked BBG to appraise the six-unit mountain facing portfolio which was determined to be $28,180,000, which represents approximately 71% of the Loan amount for those units.

**Put Rights:**

We have set forth our good faith interpretation of Section 13.06 which we believe conforms to the original intent and provides qualifying LPs with an equitable exit strategy, while protecting the overall economic viability of the Partnership. The GPs understanding is that only LPs who have either received adjudication of their I-829 and received an unconditional green card or who are foregoing permanent residency in the U.S. would be eligible to receive a return of capital without jeopardizing the EB-5 process. We advise each LP to seek advice from his or her immigration attorney with respect to the U.S. Immigration Legal Requirements and any early exit procedure.

Each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, may elect to sell his or her LP Interest to the Partnership. By exercising his or her Put Right, the LP is seeking a return of capital earlier than other LPs in the Partnership may be permitted to. For those LPs first electing to exercise his or her Put Right, the Put Purchase Price for an LP Interest will be satisfied by the sale of a unit(s), while the order of unit sales is to be based on the Appraisals. To restate, the Put Purchase Price is equal to the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance as compared to the other Units multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses and accrued and unpaid Partnership expenses. Per Section 13.06 of the Partnership Agreement, notwithstanding, if the actual unit sales price is less than 70% of the Fair Market

3

CRC 000676

Value set forth herein, the participating LPs shall have the right, exercisable within 10 days following written notice of the amount of the sales, to rescind their Put Right exercise. The Partnership will not attempt to sell a Unit(s) until the number of LPs exercising their Put Right is equal to the number of LPs investments that were necessary to make the Loan Advance for such Unit.

For example, Unit 5E West was appraised at a Fair Market Value of $3,300,000, while the Loan Advance collateralized by this unit was in the amount of $4,000,000. The ratio of Fair Market Value to the Loan Advance amount on 5E West is -17.5% and represents the lowest ratio amongst the Units. Eight (8) LPs equity contributions to the Partnership were required in order to make the Loan Advance for which Unit 5E West serves as collateral. Therefore, once eight (8) LPs have exercised his or her Put Right, the Partnership will use reasonable business efforts to market and liquidate Unit 5E West, as market dynamics may permit. Thus, the Put Purchase Price for the first eight (8) LPs electing to exercise his or her Put Right would be equal to his or her pro rata share from realizable value of the sale of Unit 5E West less customary transaction expenses, i.e., 1 / 8 multiplied by at least $2,310,000 (i.e., at least 70% of the Fair Market Value Appraisal of $3,300,000) less customary transaction expenses and accrued but unpaid Partnership expenses, unless a sale at a lower price is approved by all participating LPs. Should the Partnership be able to sell the Unit for greater than the Fair Market Value, the benefit shall go to those eight investors who have exercised their Put Right, but in no event would the Put Purchase Price be greater than the actual LP Capital Contribution. Subsequently, the next Unit that would be sold would be 6D East, if practicable, which has the second lowest ratio of Fair Market Value to Loan Advance amount amongst the remaining Units in the portfolio. The Partnership may continue to engage in customary business practices in terms of listing and selling Units in any order and pro rata distributions may occur as well.

If an LP is redeemed out through the early exit process, such LP would receive a return of capital, including any proceeds received through pro rata distributions made from the sale of Units in the ordinary course of business and preferred return amounts received to date, of an amount no greater than the ratio of the net proceeds available for distribution (after transaction and accrued but unpaid Partnership expenses are satisfied) after the sale of the particular early exit Unit to the Loan Advance amount for such Unit. As an example, if the net proceeds after transaction and accrued expenses are paid from the sale of Unit 5E West is $2,500,000, then each investor would receive no more than $2,500,000 divided by 8, or $312,500. If those 8 LPs had each received $100,000 from prior preferred return distributions and the sale of other Units, then each LP would received $212,500 from the sale of 5E West which would net the LP $312,500. Such LP would then be fully redeemed out of the Partnership. Any surplus capital would be available for Partnership expenses and distribution to the remaining LPs.

Each LP initially invested $500,000 as their initial capital basis for an equal share in the 99% of the Partnership owned by LPs. Since the first Loan Advance was made to the Borrower in April 2012, and as cash flow has permitted, LPs have earned a blended annual rate of return of approximately 2.10%, or approximately $10,500 per year, on their initial investment. Over a five-year period, this would have generated an aggregate return of approximately $52,500.[2] This implicitly offsets a portion of each LP's initial capital investment, leaving approximately $450,000 of that initial investment remaining. This is in addition to permanent residency already received by most LPs.

---

[2] The actual amount received may differ for each LP depending upon time of investment and Loan advances.

4

CRC 000677

In order to exercise his or her Put Right, such LP must provide written notice (the "Put Exercise Notice") to the Partnership within 45 days following the date of this Notice expressly stating his or her exercise of the Put Right.  By delivering the Put Exercise Notice, the LP represents and warrants to the Partnership that (A) the LP has full right, title and interest in and to the LP Interest, (B) the LP has all the necessary power and authority and has taken all necessary action to sell such LP Interest as contemplated herein, and (C) the LP Interest is free and clear of any and all mortgages, pledges, security interests, options, rights of first offer, encumbrances or other restrictions or limitations of any nature whatsoever other than those arising as a result of or under the terms of this Partnership Agreement. The delivery of a Put Exercise Notice by a LP to the Partnership shall create a binding and irrevocable obligation to sell his or her LP Interest at the Put Purchase Price as set forth in this Notice.  Failure of an LP to deliver the Put Exercise Notice within such 45-day period shall constitute a waiver of such LPs Put Right with respect to the specific Put Purchase Price formula as set forth in this Notice, but shall not affect their respective rights with respect to any future Put Rights.  **An LP who has previously provided an executed Put Exercise Notice form but has not yet been fully redeemed shall continue to be treated as having provided an executed Put Exercise Notice, unless the LP informs the Partnership of his or her desire to remain in the Partnership and withdraw their prior Put Exercise Notice.**

Upon the Partnership's receipt of such Put Exercise Notice, the Partnership will use commercially reasonable efforts to sell a Unit or Units in its possession at the Fair Market Value as identified in the Appraisals or at a higher amount, but will take consideration of listing too many Units at the same time as well as guidance from brokerage in terms of a listing and marketing strategy.  As described above, the Partnership shall not undertake such efforts until enough LPs have submitted their Put Exercise Notice that matches the number of investor's whose capital supported the Loan Advance on such Unit.  The Partnership may, with the consent of all participating LPs, sell such Unit or Units below the Fair Market Value.  The Partnership shall pay the Put Purchase Price no later than thirty (30) days following the closing of the sale of the applicable Unit or Units and receipt of the sales proceeds. The Partnership will pay the Put Purchase Price for the LP Interest by check or wire transfer of funds.  At the closing of the sale of the LP Interest to the Partnership, the LP shall deliver to the Partnership (a) an assignment and all other transfer documents to consummate the sale and assignment of the LP Interest to the Partnership, and (b) waiver and release of the Partnership from any and all future claims, each in a form acceptable to the Partnership.  Upon the LPs receipt of the Put Purchase Price at the closing, the LP shall have no further right, interest or claim to distributions in or from the Partnership and shall no longer be an LP in the Partnership.  As of April 30, 2019, the Partnership has received executed Put Exercise Notices from approximately 82% of LPs remaining in the Partnership.

On or about each six (6) month anniversary of this Notice or within a reasonable time thereafter, the General Partner shall provide to the remaining LPs a new notice setting forth the then applicable Fair Market Value of the remaining Partnership Property and each LP shall then have **45 days** from the date of such new notice to deliver a Put Exercise Notice to the Partnership.  The Put Purchase Price would continue to be based on the formula described above, only using the new Fair Market Value of the remaining Units, and would otherwise be payable upon and subject to the same terms set forth above.

**General Provisions for LPs Who Do Not Provide a Put Exercise Notice:**

The Partnership will continue to explore opportunities to put Units on the market when market conditions are deemed to be favorable for sale.  The sale of Units will be conducted in an orderly,

5

CRC 000678

market driven manner that seeks to maximize value to the Partnership and the LPs. As such, there can be no definitive timeline for which all of the Units will be sold. To sell prematurely would likely mean selling units at a significant discount to the original amount of each Loan Advance, which would mean LPs would receive less than the full amount of their capital contributions returned. The Partnership seeks to avoid this.

As each Unit is sold, a pro rata return of capital will be made to those LPs who remain in the Partnership. The remainder of the proceeds shall remain with the Partnership and shall be returned on a pro rata basis to the rest of the LPs as their I-829 petitions are approved, subject to the distribution provisions in the Partnership Agreement. We intend such returns of capital to be made until all LPs (other than the LPs who have exercised their Put Rights (as set forth above)) have received a return of their capital contribution as Available Cash Flow permits. All capital returns shall be made on a pro rata basis, treating each LP equal to one another based on ownership percentage. Once all of the Partnership Property has been sold, the Partnership shall wind down. To the extent there is Available Cash Flow (as defined in the Partnership Agreement) after the sale of all Partnership Property and return of LP capital, it shall be paid out in accordance with Article VI of the Partnership Agreement.

The strategy outlined above was developed in good faith with the LPs best interests in mind and seeks to provide a path toward maximizing value to each and every LP, while still providing the LPs with an early exit alternative as contemplated under Section 13.06. The Partnership will strive to execute this strategy as quickly as is economically feasible.

_____

_____

Authorized Representative

Colorado Regional Center Project Solaris, LLLP

6

CRC 000679

### Exhibit A - Definitions

"Administrative Expenses" means those expenses incurred by the GP in connection with the sale of LP Interests including specifically and without limitation, certain marketing, travel, legal and accounting fees, referral and related fees, and the legal fees of a LP incurred in preparation of such LP's I-526 petition.

"Appraisal(s)" means the good faith estimate of the Fair Market Value of each Unit performed by an independent third-party firm.

"Capital Contribution" means the total amount of money or property contributed to the Partnership by each Partner (excluding any amounts contributed for Administrative Expenses).

"Fair Market Value" means the total liquidation value (as determined pursuant to a good faith market analysis conducted by qualified third-parties engaged by the GP) of all of the Partnership Property or an individual Unit after deduction of all usual and customary selling expenses, pro rations, and other similar matters.

"Loan" means the loan made from CRCPS to the Solaris developer in the aggregate amount of $82,500,000 or the remaining outstanding balance if a portion of the Loan has been repaid.

"Loan Advance" means the amount of each advance of principal from CRCPS to the developer per terms of the Loan.

"LP Interest" means a limited partnership interest in CRCPS.

"Partnership Property or Units" means the remaining individual properties presently held by the developer which collateralize the Loan.

"Put Exercise Notice" means written notice provided by a LP to the Partnership of his or her intent to exercise the Put Right. A Put Exercise Notice must be provided to the Partnership within 45 days following the receipt of this Notice.

"Put Right" means for each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, such LP may elect to sell his or her LP Interest to the Partnership and receive a return of capital.

"Partnership Agreement" means the Limited Liability Limited Partnership Agreement of Colorado Regional Center Project Solaris, LLLP.

"Put Purchase Price" means the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance amount multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses and accrued and unpaid Partnership expenses.

"Section 13.06" means Section 13.06 of the CRCPS Partnership Agreement entitled "Rights of Limited Partners to Return of Capital Contributions.

"U.S. Immigration Legal Requirements" means the GP's understanding that only LPs who have either received adjudication of their I-829 petition or who are foregoing permanent residency in the United States would be eligible to receive a return of capital and sell their LP Interest to the Partnership.

7

CRC 000680