# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02443

JUN LI, QI QIN, JIE YANG, et al.,
individually and derivatively for defendant
COLORADO REGIONAL CENTER
PROJECT SOLARIS LLLP,

                Plaintiffs,

                v.

WAVELAND VENTURES LLC,
COLORADO REGIONAL CENTER
PROJECT SOLARIS LLLP, COLORADO
REGIONAL CENTER I LLC, SOLARIS
PROPERTY OWNER LLC, SOLARIS
PROPERTY OWNER I LLC, AND PETER
KNOBEL,

                Defendants.

Hon. Judge Raymond Moore
Hon. Magistrate Scott Varholak

---

## Motion to Disqualify the Law Firm of Snell & Wilmer LLP from Simultaneous Representation of the Defendant Limited Partnership and its General Partner

---

The Snell & Wilmer law firm <u>jointly</u> represents two directly adverse defendants: Colorado Regional Center Project Solaris LLLP (the "LP") and Colorado Regional Center I LLC (the "GP"). That is not permissible under the Colorado Rules of Professional Conduct as adopted by this Court.

To recap the relevant facts as set forth in the Second Amended Complaint, 165 Chinese investors - including the roughly 40 investors in this consolidated action - collectively gave $82,500,000 to the LP to become limited partners. The LP vested the GP with discretion to loan this money to defendant Solaris Property Owner LLC ("SPO") in a 5-year 5% loan supposedly secured in full by property at Solaris Vail complex. The loan was non-recourse to SPO and its owners, so it was paramount for the limited partners that the loan be fully secured or over-secured,

1

as is customary for non-recourse loans.  Having been told that the loan was fully secured, the Chinese limited partners understood that the borrower would either repay $82,500,000 at the end of 5 years or turn over collateral (property) worth $82,500,000 at the end of 3 years.

Undisclosed to the Chinese limited partners, the GP and SPO had secret documents structuring the loan transaction so that at the end of 3 years the borrower SPO did not have to turn over collateral worth $82,500,000 -- but could instead turn over merely 19 pre-selected city-facing condos (or their equivalent) and then walk away scot-free.

Naturally they did this, leaving the LP with $0 loan principal repaid and instead holding 19 illiquid, nearly impossible to sell condos worth about $42,000,000 if sold at once -- a loss of half the LP's money in 3 years.  Of these 19 condos, the LP has sold 2 units in 3 years and one of those sales was to a related party with ties to this transaction. As a result, the LP is stuck with 17 units and cannot and will not return capital to the Chinese investors (even by refinancing the existing units), while the GP continues to rack up fees.  Let's be clear: the LP's loss was caused by the GP and the borrower SPO structuring this transaction in a bizarre way.  The Chinese investors have demanded in writing that the LP take action against the GP and SPO to recover the money lost by their negligent and fraudulent structuring of the loan transaction, but the LP refuses. Two derivative actions followed and were consolidated into this case.

Snell & Wilmer purports to represent both the LP who lost $40,000,000 and the GP who structured the bizarre loan transaction by which the LP lost this $40,000,000.  This is a directly adverse relationship. In any normal universe, an LP who lost this much money would have already sued both the GP and SPO for negligently and fraudulently structuring a transaction where the LP and its 165 Chinese investors lost half their assets.

The LP not only refuses to pursue any remedy against the GP or SPO who caused it to lose some $40,000,000 in a mere three years, it is actually aligned with the GP and SPO who cooked up this freakish abomination of an alleged 'loan' transaction. This is mind-boggling and deeply troubling: a lender is friendly with the borrower who refused to pay back a loan in cash and stuck the lender with insufficient, illiquid and impossible to sell collateral, and friendly with the manager who structured the nightmare scenario that cost the lender $40,000,000. These people should be at each other's throats over this massive loss. Instead they are buddies.

This is an indication of collusion among all the Colorado parties to circle the wagons and protect each other at the expense of the Chinese limited partners whose money they took and continue to bleed out. This is not permissible. Under the ethical rules, the lawyer for each Colorado entity must assert all viable claims against every other Colorado party who harmed it, even if the lawyers happen to be friends outside of work. The first step is to get the LP its own lawyer instead of sharing one with a party that harmed it.

The starting point of the analysis is Local Attorney Rule 2, "Standards of Professional Conduct," which incorporates the Colorado Rules of Professional Conduct into this District. This takes the analysis to Colo. RPC 1.13 "Organization as a Client," at comment 14, which deals with derivative actions. It says that a conflict of interest can arise when both an entity and its managers are accused of wrongdoing:

> [14] . . . Most derivative actions are a normal incident of an organization's affairs, to be defended by the organization's lawyer like any other suit. However, if the claim involves serious charges of wrongdoing by those in control of the organization, a conflict may arise between the lawyer's duty to the organization and the lawyer's relationship with the board. In those circumstances, Rule 1.7 governs who should represent the directors and the organization.

This takes us to Colo. RPC 1.7, which prevents concurrent representation if the parties are directly adverse, as in this case:

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> (1) the representation of one client will be directly adverse to another client; or
>
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
>
> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
>
> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
>
> (2) the representation is not prohibited by law;
>
> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
>
> (4) each affected client gives informed consent, confirmed in writing. (emphasis added).

In this case, the allegations are that the GP mismanaged the LP's money, engaged in fraud, self-dealing, and breach of fiduciary duties. The best interests of the LP are to sue the GP and the borrower SPO to recover the $40,000,000 lost. This LP-GP conflict cannot be waived since one of Snell & Wilmer's clients (the LP) will have to sue another client (the GP).

This conclusion is echoed in the Restatement 3rd of the Law Governing Lawyers, §131 (American Law Institute 2000) "Conflicts of Interest in Representing an Organization," which says that joint representation in a derivative context is ordinarily not permissible:

> *Cmt. g. Derivative action.* . . . Even with informed consent of all affected clients, the lawyer for the organization ordinarily may not

> represent an individual defendant as well. If, however, the disinterested directors conclude that no basis exists for the claim that the defending officers and directors have acted against the interests of the organization, the lawyer may, with the effective consent of all clients, represent both the organization and the officers and directors in defending the suit (cross references omitted).

Here, there was no independent committee exonerating the GP from wrongdoing, and there is no reason to have one law firm represent adverse parties.

The leading case on joint representation in the derivative context is *Bell Atlantic Corp. v Bolger*, 2 F.3d 1304, 1316 (3d Cir. 1993), which explains "the modern rule" as requiring separate counsel if both the organization and its managers are charged with wrongdoing:

> "There is some conflict as to the propriety of an attorney or law firm simultaneously representing a corporation and its officers and directors in a stockholders' derivative action. But the modern view is that it is generally improper due to conflict of interests for counsel to attempt to represent the corporation, on whose behalf the action has been instituted, while also representing the individuals charged with harming the corporation for their wrongful conduct."

*Id.* at 1316, quoting 13 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations,* sec. 6025, at 442 (perm. ed. rev. vol. 1991).  In *Bell Atlantic*, the Third Circuit ruled that joint representation was permissible in that case only because an independent committee found no wrongdoing by corporate insiders, and there weren't any allegations of fraud, self-dealing, or breach of duty of loyalty.  The Court concluded: "We have no hesitation in holding that—except in patently frivolous cases—allegations of directors' fraud, intentional misconduct, or self-dealing require separate counsel." *Id.* at 1317.  We have not found any authorities saying that this rule should differ for a limited partnership as opposed to a corporation.

Separate counsel should be obtained <u>before</u> the motion to dismiss is heard. *Musheno v. Gensemer,* 897 F. Supp. 833 (M.D. Pa. 1995)(disqualifying a firm from representing both the corporation and the defendant directors because the complaint alleged fraud and self-dealing by

the managers, and holding that separate counsel should be obtained before a motion to dismiss is heard).

The reason for assigning separate counsel as early as possible is that joint representation destroys the attorney-client privilege and confidentiality, so an early separation protects each party's information against later discovery.  See Colo. RPC 1.7:

> [Cmt. 30] . . .With regard to the attorney-client privilege, the prevailing rule is that, as between commonly represented clients, the privilege does not attach. Hence, it must be assumed that if litigation eventuates between the clients, the privilege will not protect any such communications, and the clients should be so advised.
>
> [Cmt. 31] As to the duty of confidentiality, continued common representation will almost certainly be inadequate if one client asks the lawyer not to disclose to the other client information relevant to the common representation. This is so because the lawyer has an equal duty of loyalty to each client, and each client has the right to be informed of anything bearing on the representation that might affect that client's interests and the right to expect that the lawyer will use that information to that client's benefit.

Accordingly, it is best for both the LP and the GP to have separate counsel as early as possible. Further, whatever law firm is appointed or chosen should be totally independent of the dispute, having no connection to any of the parties or the lawyers, thereby avoiding all future conflicts of interest.

**Statement of Conferral pursuant to Local Rule 7.1**: Counsel for Plaintiffs and the Defendants conferred on this topic by telephone.  Counsel for both sets of Plaintiffs (Litowitz for the Li Plaintiffs, Stewart for the Cui Plaintiffs) favor separate representation for the LP and the GP.  Counsel for the LP and GP (Kilroy) disagrees on separate counsel at this time but remain open to discussion about later stages.  Counsel for the borrower SPO and Knobel (Gee) did not express an opinion.

WHEREFORE, Plaintiffs request this Court to order that the LP and GP obtain separate and independent counsel, with no relation to the dispute or the lawyers involved.

Dated:  January 1, 2020

Respectfully Submitted,
/s/ Douglas Litowitz
Attorney for the Li Plaintiffs