# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02443                    Hon. Judge Moore
                                                Hon. Magistrate Judge Varholak

**Derivatively:**
Hsin-Yi Wu, and Qi Qin,
in their capacity as limited partners of
Colorado Regional Center Project Solaris LLLP,
                    Plaintiffs,
        v.

Colorado Regional Center Project Solaris LLLP,
                    Nominal Defendant,

and

**Directly:**
Hsin-Yi Wu, Jun Li, Qi Qin, Yi Liu, Jie Yang, Yuquan Ni,
Zhongzao Shi, Fang Sheng, Shunli Shao, Kaiyuan Wu,
Zhijian Wu, Zhongwei Li, Sa Wu, Fan Zhang, Lin Qiao,
Jinge Hu, Rujun Liu,Ying Xu, Lu Li, Cao Xiaolong,
and Yuwei Dong,
                    Plaintiffs,
            v.

Colorado Regional Center LLC, Colorado Regional Center I, LLC,
Solaris Property Owner LLC, Solaris Property Owner I LLC,
Peter Knobel, and Colorado Regional Center Project Solaris LLLP,
and all principals and ultimate owners of business entities pursuant to
piercing of the limited liability veil,
                    Defendants.

---

## THIRD AMENDED COMPLAINT FOR DERIVATIVE AND DIRECT RELIEF

---

This is a complaint for derivative and direct relief by Asian limited partners who

invested $82,500,000 in a special purpose entity called Colorado Regional Center Project

Solaris LLLP ("CRCPS"), who lent all of this money to Peter Knobel's companies for the

project known as Solaris Vail (the "Loan"). The Loan was made on a risky non-recourse basis

where CRCPS' recovery of the Loan money was limited to the collateral - which consisted of condominium units in Solaris Vail -- thereby letting Knobel and his companies off the hook for repaying cash and allowing them to 'repay' with transfer of the collateral.  Unknown to the limited partners, Knobel and his companies colluded with the general partner of CRCPS to set the collateral at an extreme under-collateralization ratio, so when the loan was eventually 'repaid' in units they proved far less valuable than $82,500,000 loaned against them as collateral.

The limited partners made this investment in the first because the marketing materials and loan documents misled them that the Loan would be fully collateralized dollar-for-dollar and therefore safe.  They weren't informed (it was concealed from them) that the Loan's collateral was limited to 19 units facing away from Vail Mountain or had no value higher than units facing away, and these 19 units were assigned collateral value at the inflated prices that Knobel wished he could sell his own units at, but at which no one wanted to pay in the real world.

The Loan was set up to allow Knobel and his companies to 'repay' by transferring condominium units in 3 years even though the Loan matured in 5 years.  Naturally, they chose not to pay the Loan back in cash. Instead of repaying $82,500,000 borrowed at 5% interest, Knobel turned over the collateral units.  This exposed the fraud at the heart of this Loan, since the units were never worth anything near the $82,500,000 Loan value, but if sold today would fetch perhaps $40,000,000 or less, depending on whether they could be sold in bulk.   In three years, they have sold only 2 units of the 19, one under suspicious circumstances, and both at prices wildly below the estimates assigned by Knobel.   To summarize, this deal was set up to cost foreign investors some $40,000,000 in three years,

2

and this same $40,000,000 was misappropriated as pure profit into the pockets of Knobel and his entities and/or the Colorado Regional Center LLC and its affiliates and owners. This was theft with a fountain pen.

At the time of this Complaint CRCPS has 17 illiquid, unsellable, overpriced and undesired condominium units in Solaris Vail, only 1 of which has sold at arms-length since 2016. Bizarrely, CRC1 tells the limited partners that the collateral is worth 93 cents on the dollar of the Loan, but if sold today would only get less than 50 cents on the dollar for the limited partners. To make things crazier, Knobel never turned over the titles of the units since the geniuses in Colorado who put this together wanted to save transfer taxes of $800,000 after losing $40,000,000; so title remains with the borrower (where it is vulnerable to creditors) even after the borrower defaulted on paying the loan in cash.

Normally a lender with $82,500,000 in total capital who loses $40,000,000 in three years is viciously angry with the borrower. Not in this crazy deal. Here, after CRCPS was underpaid in collateral by Knobel's companies, it hired Knobel's real estate firm as exclusive sales agent to sell the units turned over as insufficient collateral, like hiring a fox to guard the henhouse. This is a massive fraud and a colossal breach of fiduciary duty, a Roach Motel set up in Colorado that tricked investors out of $40,000,000 in three years. This was a zero-sum deal. Every dollar taken from the foreign investors went into the pockets of Knobel and CRC's owners.

Derivatively, the limited partners demand that CRCPS take action to sue its general partner Colorado Regional Center 1 LLC and its owners/affiliates, as well as Knobel and his affiliates, who set up this horrendous transaction with the intentional and predictable consequence that the limited partners would lose money into the hands of the Defendants.

In conformity with Colo. Rev. Stat. 7-62-1001 et seq., the limited partners made written demand for CRCPS to sue the parties who set up this freakish abomination of a deal. In response, CRCPS failed to form an independent special litigation committee to consider the merits of the derivative request. They have gone into defensive mode and don't show an ounce of regret or shame for losing so much foreign money so fast. They show no interest whatsoever in recovering the money. Since the limited partnership failed to take action for its own benefit, the limited partners will do so derivatively.

On the direct side, the Plaintiffs assert that they were individually harmed by the fraud, deceit, fraudulent transfer, and civil theft by the named Defendants including CRCPS itself.

## **Jurisdiction and Venue**

1.      Jurisdiction is proper in federal court pursuant to diversity jurisdiction, 28 U.S.C. 1332(a)(2), because this is a civil matter, in excess of the statutory minimum, and the Plaintiffs are citizens of different states than the Defendants.[1]

---

[1]      The Defendants have created a Rubik's Cube of interlocking shell companies to hide the citizenship of the real parties at interest. But upon information and belief, grounded in due diligence, the following appears to be the case: There is a Colorado entity called **Waveland EB-5 Management LLC** whose members are Colorado resident **Rick Hayes**, Colorado resident **Chester Schwartz**, and Wisconsin resident **Paul Deslongchamp**. This entity is the sole member of Texas company **Waveland Ventures LLC**, which is the sole member of Colorado-based **Colorado Regional Center LLC**, which is the sole member of Colorado-based **Colorado Regional Center 1 LLC**, which is the the general partner of Colorado-based **CRCPS,** the lender in this deal. The ultimate parties in interest for the defendants who approved the Loan structure on the lender side are **Rick Hayes**, **Chester Schwartz**, and **Paul Deslongchamp.**

As for the borrower defendants, **Peter Knobel** is a Colorado resident, and is the sole equity member of **Solaris Property Owner LLC**, a Delaware company doing business in Colorado, who assigned its interests in this transaction to **Solaris Property Owner 1 LLC**, a Delaware company doing business in Colorado.   The ultimate party in interest on the borrower side is Peter Knobel.

Thus, all the Defendants' ultimate members are residents of Colorado, Wisconsin, and perhaps Texas - - and none of the Plaintiffs are residents of any of these states. This makes for complete diversity.

2.	Jurisdiction is also proper in federal court pursuant to federal subject matter jurisdiction, 28 U.S.C. 1331, because the Plaintiffs assert violation of the Securities Exchange Act of 1934.

3.	Supplemental jurisdiction over related State law claims may be heard by this Court under 28 U.S.C. 1367.

4.	Personal jurisdiction over the Defendants complies with basic principles of due process because they conduct business in this district, the lawsuit arises out of conduct in this district, and the lawsuit concerns real estate in this district.

5.	Venue is proper in this district pursuant to 28 U.S.C. 1391(b)(2) because Defendants have their principal place of business in Denver and Vail.

## Parties

**Plaintiffs**

6.	Hsin-Yi Wu is a Republic of China national who lived in Shanghai when this suit was filed and is moving to New York.

7.	Qi Qin is a Chinese national who resides in Florida.

8.	The remaining Plaintiffs reside in States other than Colorado, Wisconsin, or Texas.

**The "Lender Group" Defendants**

9.      Defendant CRCPS, the lender of the Loan, is a Colorado limited liability limited partnership.

10.     Colorado Regional Center 1 LLC ("CRC1"), a Colorado limited liability company, is the General Partner of CRCPS.

11.     Colorado Regional Center LLC is a Colorado limited liability company.

12.     Waveland Ventures LLC is a Texas limited liability company doing business in the State of Colorado ("Waveland Ventures").

13.     Waveland EB-5 Management LLC is a Colorado limited liability company ("Waveland").

14.     The ultimate owners and members of these entities - the "Lender Group" -- are Rick Hayes, Chester Schwartz, and Paul Deslongchamps.


**The "Borrower Group" Defendants**

15.     Defendant Solaris Property Owner LLC (SPO") - the original borrower - is a Delaware company qualified to do business in the State of Colorado.

16.     Defendant Solaris Property Owner 1 LLC ("SPO1") - the successor borrower - is a Delaware entity qualified to do business in the State of Colorado.

17.     Defendant Peter Knobel is the sole equity owner of SPO and SPO1, and a resident of Colorado.

18.     The ultimate owner and member of these entities - the "Borrower Group" -- is Knobel.

### Factual Allegations Common to All Counts

**Background to the Solaris Project**

19.     Solaris Vail had its origins in a development known as 'the Crossroads' which was purchased in 2003 by Knobel.[2]

20.      Knobel sought to transform this parcel into Vail's largest condominium and entertainment complex, but could not get approval from government committees and councils.

21.     Knobel spent 2003 - 2006 immersing himself in Vail politics with the goal of obtaining the necessary approvals.[3]

22.     The matter was ultimately decided by a special election in July 2006 where Vail residents approved the development.

23.     In February of 2007, the *New York Times* reported that the design of Solaris Vail features 75 condominiums, retail shops, a skating rink, a bowling alley, and a public plaza --- and that "Within six weeks of going on the market, 60 percent of the condos had sold."[4]

24.     In July of 2008, Solaris issued a press release saying that the project team led by developer Peter Knobel, had closed on $325,000,000 of financing, consisting of a $140,000,000 first mortgage construction loan from PB Capital and Vectra Bank, mezzanine

---

[2]     Edward Stoner, "The Man Behind Solaris," *Vail Daily*, July 7, 2006, at www.vaildaily.com/news/the-man-behind-solaris/ (last checked Jan 11, 2020).

[3]     Wendy Knight, "A Ski Town's Battle Over Growth," New York Times, February 18, 2007, at www.nytimes.com/2007/02/18/realestate/18nati.html (last checked January 11, 2020).

[4]     *Id.*

debt led by Och-Ziff Real Estate; public bonds from the "Solaris Metropolitan Districts;" and owner equity from Knobel.[5]

25.     Solaris' July 2008 press release boasted that $300 million of residential condominiums were under contract (representing 70% of the units) and that "most of the purchasers are high net worth individuals who have posted large, non-refundable deposits."

26.     By 2009 all condominiums were completed and ready for occupancy, and a certificate of occupancy was issued by the City of Vail.[6]

27.     In December of 2010, SPO announced it was paying back the $140,000,000 first mortgage construction loan.   According to a statement from SPO, ""Remaining construction costs will be funded from developer equity, commercial cash flow, and other sources."[7]

28.     The loan payoff of $140,000,000 in senior financing came on the heels of Mr. Knobel's meetings with members of CRC, a local EB-5 'regional center' that specialized in raising foreign capital.

29.     The meetings between Knobel and Mr. Hayes of CRC (and their respective affiliates) culminated in a series of loan contracts dated November 5, 2010 between SPO as future borrower and CRC as sponsor for a future lending entity.

---

[5]      https://eaglecountytimes.files.wordpress.com/2010/07/solaris-press-release-9jul2008.pdf

[6]      See Transcript of Proceeding Before Magistrate Varholak, October 28, 2019, Testimony of Rick Hayes, at page 11.  Subsequent references to the examination of Mr. Hayes will be to "Tr. pp." Note that Mr. Hayes represents CRC and that under Colo. Rev. Stat. 7-60-111, an admission or representation by a general partner within the scope of his authority is evidence against the partners.

[7]      Daily Staff Report, "Vail's Solaris Developer Pays Off $140 Million Loan," *Vail Daily*, December 26, 2010, at  www.vaildaily.com/news/vails-solaris-developer-pays-off-140-million-loan/  (last  checked  January 11, 2020).

30.     These contracts set the trap for foreign investors by ensuring that any foreign money would be (i) "non-recourse" so that Knobel and his companies would have no obligation to pay back the money in cash but merely turn over the collateral; and (ii) the loans would be under-collateralized by limiting the pool of collateral units to undesirable and overvalued units that would never be sold for the value that was arbitrarily assigned to them using the rubric of Knobel's overpriced units that had been sitting unsold.

**The Trap is Set By Secret EB-5 Collateral Arrangements**

31.     On November 5, 2010, CRCPS  (formed by CRC as the lender) and SPO (formed by Knobel as the borrower) entered into a Loan Agreement for up to $100,000,000 (the "Loan Agreement."). The Loan Agreement was executed simultaneously with certain agreements as exhibits under the statement that "All exhibits attached to this Loan Agreement are incorporated herein by this reference":

| | |
|---|---|
| Exhibit A: | Condominium Pool of Units Eligible for Collateral |
| Exhibit B: | Form of Deed of Trust against Collateral Units |
| Exhibit C: | Form of Promissory Note for up to $100,000,000 |
| Exhibit D: | Yield Enhancement Agreement |
| Exhibit E: | Operating Agreement |
| Exhibit F: | List of Permitted Encumbrances on Deeds of Trust |

The Loan Agreement and these exhibits shall be referred as the "Loan Documents."  The Loan Agreement is attached as Exhibit 1.

32.     Section 8 of the Loan Agreement stipulates that the <u>Borrower</u> can select the collateral to secure each loan advance from the <u>Lender</u>:

> "[A]t the time of each loan advance, Borrower shall select one or more Condominium Units from the Condominium Pool that will serve as security for the Loan Advance.  Borrower shall execute a separate Deed of Trust for each Collateral Unit in connection

with Closing on the Loan Advance secured by such Collateral Unit."

33.     The Loan Agreement and Promissory Note specified a maturity date of 5 years and an interest rate of 5%, with a CRC-affiliates taking a 2% management fee.

34.     The Loan Agreement and Promissory Note also contain a proviso that each loan advance could be 'prepaid" after 3 years by SPO through transfer to CRCPS of the title of the collateral unit securing such advance, which would be credited as a payment of the total dollar value assigned to such collateral *regardless of the collateral's historical or current market value*.  The collateral would have whatever value CRC accepted from Knobel without informing the investors that these values were based on unrealistic list prices at which no one was buying.

35.     Furthermore, the Operating Agreement, though unclear, seemed to say that the 5% interest payments were no longer required after a collateral unit was turned over, such that SPO only had to pay amounts that CRCPS was required to make to investors, if any, capped at 3%, not 5%.

36.     This structure created an irresistible incentive for Knobel and his SPO entities to pack the Collateral pool with overvalued units and pay the Loan back with these units versus actually paying it back in cash.

37.     By way of example, Knobel could take a cash advance of $6,000,000 and designate a particular condominium unit (say, Unit 6A) as collateral based on the price that he wanted to sell 6A for but couldn't find anyone willing to pay his asking price.  If the market said that 6A would sell only at $4,000,000, there would be no adjustment of collateral downward to say that 6A was worth $4,000,000 in collateral instead of $6,000,000.  Instead, 6A would be deemed worth $6,000,000 in collateral and when it was transferred it would

count as "repayment" of $6,000,000.  There was no way to adjust the collateral required to secure the loan -- no "margin call" to make the borrower put up additional capital to secure the Loan.

38.     This sets up a game.  SPO could borrow from CRCPS like taking money from a piggy bank and then assigning value to collateral units based on fantasy projections of what the units were worth, not on the reality of their market value in the real world.  There was no mechanism to check or adjust the value of the collateral against real world sales over time.

39.     In other words, the borrower was granted the power to set the value of its own collateral.  When that happens, a borrower will always under-collateralize their loan.

40.     It is standard for non-recourse loans (where the lender can only recover from the collateral) to require over-collateralization to protect the lender in case the collateral drops below the value of the loan, since the collateral is the lender's only recourse if the borrower doesn't pay back cash.  This is expressed as Loan-To-Value or "LTV" -- with a non-recourse loan having an LTV far below 100%, so the loan amount is typically no more than 60% the value of the collateral.  A 30-second Google search confirms this basic principle:

> **Wikipedia:**
> Thus, nonrecourse debt is typically limited to 50% or 60% loan-to-value ratios, so that the property itself provides "overcollateralization" of the loan.

> **Investopia:**
> Loan-to-value ratios are usually limited to 60% in non-recourse loans. [8]

---

[8]     https://en.wikipedia.org/wiki/Nonrecourse_debt (last checked January 11, 2020); https://www.investopedia.com/terms/n/nonrecoursedebt.asp (last checked January 11, 2020).

41.     The normal LTV ratios above (50-60%) would have required SPO to put up Loan collateral in the range of $120,000,000 to secure the non-recourse Loan of $82,500,000. Instead, they made a non-recourse loan that looked on the surface as 100% LTV which is still way outside industry standard, and to make matters even worse, the 100% LTV was calculated by unrealistic prices that Knobel had set for his own properties which were simply not selling.  In other words, CRC did not conduct due diligence on the true value of the collateral, and/or they conspired with Knobel to mislead foreign investors with exaggerated and inflated collateral values.  This loan was actually 150% LTV when a normal non-recourse loan is 50-60% LTV.

42.     In a hearing before this Court, CRC1 rationalized their bizarre LTV ratio on the grounds that CRCPS was compensated for this non-standard LTV because the Loan had an "embedded option structure" (the so-called 'put/call' structure that allowed Knobel and his entities to transfer the units after 3 years and allowed CRCPS to insist on title to the units after 5 years).

43.     This is pure nonsense, because the "embedded option structure" actually harmed - not helped - the limited partners, which is precisely why it was put into the Loan Documents in the first place.

44.     The "embedded option structure" was all part of the ruse to defraud and mislead the limited partners, not benefit them, for many reasons.

45.     First, the "embedded option strategy" was structured so that the limited partners and CRCPS would be forced to take weak collateral instead of cash repayment, a horrendous bargain that has no place in an investment touted as safe and fully collateralized.

CRC had a fiduciary duty under Section 8.06 to *safeguard* the assets of the partnership as well as a duty to use reasonable care in making investments.  Investors thought they were funding a loan, not making a wild bet that was set up to lose.

46.    Second, CRC never built downside protection or a stop loss to stench the bleeding of the undervalued collateral -- such as by short selling REITs which would pay off if the value of the collateral went down, or purchasing a credit default swap that would pay off if collateral value decreased.

47.    Third, the "embedded option" was asymmetrically detrimental to the limited partners.  For every $1 the collateral went down the limited partners stood to lose $1, but for every $1 that the collateral went up, they stood to gain only  30 cents (and CRC took the remaining 70 cents).  So for the limited partners, CRCPS's call option was worth only 3/10th of SPO's put option.

48.    Fourth, there is no proof that the collateral *ever had* a market value of $82,500,000 since this was merely a number assigned based on the wishes of the developer to sell his own units at a price exceeding market value -- so the Loan started off from day one with inadequate collateral.  So if, for example, the collateral started with a true market value of $50,000,000 instead of $82,500,000, that means that at day one the option was worth $32,500,000 to SPO and worth nearly $0 to CRCPS.  To say the same thing differently, if the real value of collateral was overstated by Knobel by 40%, then it would have to rise 40% just to make the options reach the equal point of $82,500,000.  **This is like agreeing with someone that the temperature is now 80 degrees and placing a bet that it will go higher than 80 this afternoon, when in fact you could look out the window and check**

**that the temperature is 40 not 80, so the entire premise of the bet is wrong and the temperature has to go up 40 degrees just to reach the basic premise of the bet**.

49.     Fifth, the value of an option is related to *time,* but the options here were asymmetrical in timing to the advantage of SPO (3 years to exercise) and the detriment of the limited partners (5 years to exercise).  SPO got the first look, the first decision, the first feel of the market and the first mover advantage on the option, including the right to exercise the put option and thereby knock out CRCPS' call option, which they did on the very first possible day.

50.     Sixth, CRC never used the industry-standard way to measure the value of the put and call options, e.g., the method called the "Black-Scholes-Merton Model" for which two of the authors won a Nobel Prize in Economics.  It is the touchstone of option valuation. This model says that the current value of an option on a stock is a function of 5 variables: the strike price of the option, the current stock price, the time to expiration, the risk-free rate of return, and the volatility of the stock.  The analysis is similar, if a bit more complex, when valuing real estate options, but this model is such a basic tool that it can be accessed via Internet plug-ins by any investor.  CRC failed to perform this basic valuation so they have no grounds for saying the "embedded option" benefitted the limited partners.

51.     At the first hearing in this matter, CRC1 admitted it made no calculations of what the "put" and "call" features were worth.  Then after saying they had no idea what the put and call options were worth, they magically came to the conclusion that the put and call features had the same value, which is impossible when they had different timing and exercise prices.  Here is CRC1 talking in circles:

14

| | |
|---|---|
| Mr. Litowitz: | You have a background in finance. Is typically a nonrecourse loan structured exactly to the penny with collateral, or is it overcollateralized? |
| Mr. Hayes: | In an instance where the loan has an embedded call option in it, it would always be structured at the money. |
| Mr. Litowitz: | Okay. Let's talk about the call option.  Did you do a Black-Scholes analysis of the value of the call option? |
| Mr. Hayes: | No. |
| Mr. Litowitz: | Okay.  So what value was the call option?  Did you do an analysis of it? |
| Mr. Hayes: | I didn't have to do an analysis of it. |
| Mr. Litowitz: | Okay.  You gave them [SPO] a put option.  What the value of their put option?  If they put you properties that were bulked at $41 to $49 [million] and they borrowed 82.5 [million], which has more value, your call or their put? |
| Mr. Hayes: | They would have equal value. . . . |
| Mr. Litowitz: | I spent 10 years as a senior counsel of a hedge fund. That's not true.[9] |

52.     As it turned out in the real world, SPO's 'put option' resulted in a loss to the limited partners of some $40,000,000.   This is the result of the "benefit" that CRC1 gave the limited partners.   And this money went right into the hands of CRC1 and Knobel's SPO entities.

53.     For the 'call option' to have resulted in equal value -- a corresponding gain of $40,000,000 to the limited partners -- the collateral units would have had to almost triple in market value instantly and be immediately sellable a net value (after sales costs and commissions) of $203,500,000, thereby generating a profit of $120,000,000, 30% of which would go to limited partners to give them the amount of $40,000,000 to them.

54.     To measure option values one must compare their likelihood: What is the likelihood that Knobel had overpriced his condo units and that their list prices did not reflect

---

[9]        Tr. at 61-62.

actual value and would never do so, versus the likelihood that these prices would triple in 5 years?  Anyone who says these events are equally probable should not be in the finance industry.  But that is the assumption on which this deal was made.

55.     Seventh, this transaction is not an "embedded option" but actually a disguised sale. A **_loan_** is when one person (a lender) lends money to another person (the borrower) and the money must be paid back: I lend you $82,500,000 and you must pay it back after 5 years.  If a **_loan_** is structured so that the money does not have to be paid back, but instead the **_title to a thing_** can be voluntarily transferred at the option of the borrower, then the transaction is a **_sale_** of the thing transferred, regardless of whether you call it a "loan."  Here, the initial collateralization was so weak that it was virtually assured that the borrower would pay back the Loan with units, which it chose to do for all units immediately on the first day that the first loan advance could be paid back with collateral. And as noted later, correspondence from CRC told an investor that the tax treatment of the returned collateral considered it as a "sale" and not a repayment of loan principal.  Indeed, a publication from CRC to investors dated October 27, 2016 repeatedly refers to CRCPS as "purchasing" the units.

56.     In other words, CRC is dead wrong as a matter of basic finance that this was a 50-50 bet on the value of Vail real estate.  It was a reckless loan on insufficient and unverified collateral with a bogus option-looking feature that guaranteed that the loan would not be paid back in cash, and that the transaction would end up a cash sale at a massive loss to the limited partners and corresponding gain to the Lender Group and Borrower Group.

57.     But even if the people who built this transaction wanted to include a little wager on the future value of Vail real estate, there is no justification for the Lender Group

Defendants to gamble the farm, so to speak, with no downside on the loss of the money of foreign investors. If CRC wanted to add an option feature to the Loan, it could have capped the maximum gain or loss at, say, $5 million, by designing any number of financial mechanisms that could be created by any MBA.

58. This was structured as a sure thing, a *fait accompli*: since the loan was undercollateralized the borrower would take the principal of $82,500,000 and transfer the overvalued collateral which would obviously be worth less, which SPO did at the earliest possible moment, exercising this 'option' for all 19 properties - the entire collateral - even before the put options came due for all these properties. Knobel knew in advance precisely what would happen, since this was set up to give free money to SPO and generate management fees to CRC who stood to gain a 2% fee for many years regardless of how the options turned out.

59. Frankly, it is not even clear how many other deals CRC looked at before investing in this one with Knobel. It is not at all clear that they explored any other range of investments for safeguarding the limited partners' money.

60. On January 15, 2011, CRCPS entered into a Management Agreement with Waveland EB-5 Management Ventures LLC ("Waveland"), a newly formed LLC whose principals were Rick Hayes, Chester Schwartz, and Paul Deslongchamps. Waveland, and later its affiliate Waveland Venture LLC, were retained to interface with limited partners that would be recruited into CRCPS. For this reason, Waveland and its principals are implicated in the fraudulent structure of this transaction and its marketing and administration to

foreign investors, resulting in the loss of tens of millions of dollars due to Waveland's incompetence. [10]

61.     After the execution of the Loan Documents but before the marketing materials were given to investors, CRC entered into a Memorandum of Understanding with SPO (the "MOU") which clarified that the condominium units to be used as collateral must be selected pursuant to a Unit Selection Process whereby CRC selects units "equal in value to the Value of all North Facing Units" and further sets forh a Collateral Unit Ratio such that the "Aggregate General Value shall not exceed the Aggregate North Value at any time" -- a fancy way of saying that the collateral must either be north-facing units (less desirable) or having a value equal to these less desirable north-facing units.  The MOU defines "North Units" as not having a direct, partial, or limited view of Vail Mountain.  The purpose of this tortuous language was to stick the EB-5 investors with collateral consisting of (or equal in value to) condominiums with the worst views.

62.     The transaction was pre-built to implode at the expense of CRCPS' limited partners, and that is precisely what happened.

63.     The undeniable fact is that CRC and Knobel/SPO/SPO1 structured this transaction so that the limited partners would inevitably lose over $40,000,000 in 3 years, a stunning display of incompetence or fraudulent collusion.

64.     CRC admitted in Court that it bore responsibility for structuring the transaction:

> Mr. Kilroy:     What are the types of decisions that CRC1 made
> for the partnership CRCPS?

---

[10]     Initially the manager was Waveland, but this function was assigned to CRC by an Assignment of Management Agreement dated March 1, 2013.

| | |
|---|---|
| Mr. Hayes: | **I think the primary economic decisions that we made in terms of affecting investor return, um, was**, uh, at its highest level, the loan, **the structure of the loan** itself where we had these put and call features that ultimately did not work out to our benefit. . . [emphasis added] |
| / | |
| / | |
| Mr. Litowitz: | Didn't Knobel get all 82.5 million? |
| Mr. Hayes: | I don't know what you mean did he get all 82 - - - |
| Mr. Litowitz: | Didn't he get a loan from you [CRCPS] for 82.5 million? |
| Mr. Hayes: | Well, the terms of the loan agreement would specify if we were making a loan to somebody in a specified amount that he would receive the proceeds of the loan or we'd be in breach of that agreement. Yes. |
| Mr. Litowitz: | And you -- he got his money. You're going to get your money? |
| Mr. Hayes: | We haven't. |
| Mr. Litowitz: | You will at the bulk sale, right? |
| Mr. Hayes: | That's speculative. I can't -- |
| Mr. Litowitz: | The losers are this side [the limited partners]. |
| Mr. Hayes: | Pardon me? |
| Mr. Litowitz: | We're the losers. |
| Mr. Hayes: | Again, you use terms -- I don't know how -- |
| Mr. Litowitz: | Whose losing money at the bulk sale? Not Knobel. Not you. Who's losing money at the bulk sale? |
| Mr. Hayes: | The investors will receive less money than they invested, so they will incur a loss, correct. |
| Mr. Litowitz: | I have nothing more.[11] |

 It takes incompetence or fraudulent collusion for a general partner to lose $40,000,000 of

limited partnership money in 3 years in a real estate market that is basically flat because

they have so horrendously structured a loan transaction that their own limited partners are

---

[11]     Tr. at 32, 78-79.  Mr. Hayes of CRC also admitted that the deal was negotiated by Knobel.

stuck with the total loss while the borrower and the general partner itself both gain by taking money from the pockets of the limited partners.

**The EB-5 Capital Raise**

65.     Once the Loan Documents set the framework, CRC entered into contracts with foreign marketing agents to conduct sales of limited partnership units into a newly formed entity that would have their subsidiary CRC1 as its general partner.

66.     A typical set of marketing materials is attached as Exhibit 2, this one given to potential investors in Shanghai, China.  In Chinese, the brochure says that the investment is safe and fully collateralized; the investor will either get his money back in 5 years or in 3 years by collateral worth the same value as the loan principal, and at that point the investor can exit the partnership.

67.     The marketing materials contains omissions of material facts. The collateral is not explained.  The Loan was - obviously - not "safe."  Investors could not exit at 3 years or even 5 years.  The marketing materials also said that the investors would receive usage rights to stay at Solaris for 21 days a year, but this was withdrawn from them later.

68.     The Defendants, through the foreign agents, caused the Plaintiffs to receive a Confidential Information Memorandum dated March 31, 2011 (the "PPM") -- or in some cases, only the signature pages.  The PPM contained a description of the Solaris project and a number of ancillary agreements, including a subscription agreement, form of Promissory Note, and a Limited Liability Limited Partnership Agreement ("LPA").  The PPM containing these documents is attached as Exhibit 3.

69.     In reliance on the marketing materials and the PPM and related documents, each investor made a $500,000 purchase of an LP unit in CRCPS and agreed to pay CRC1 an annual Management Fee of 2%.

70.     Each investor was also charged a 1% 'give up' of their limited partnership interest to CRC1, with the result that CRC1 had a greater limited partnership interest than any single investor.

71.     The PPM indicated that the loan from CRCPS to SPO could be designated by SPO as "developer's equity" -- recharacterizing debt as equity -- meaning that it could be used to generate future debt financing on Solaris Vail that would leverage the project and reduce the value of the collateral units.

72.     The PPM contained a draft Promissory Note which was supposed to have an Exhibit A listing the collateral units securing the loan and the market value of each unit, but this exhibit was empty when delivered to Plaintiffs and at the time of their investment.  The Promissory Note had spaces for listing at least 40 units as collateral for the Loan, leading investors to believe that the collateral would be in the range of 40 units.

73.     The PPM did not state - as the investors would later find out to their shock - that the collateral consisted of only 19 condominium units:

> Mr. Litowitz:  Does the PPM say that there are 19 units?
> Mr. Hayes:      No.
> Mr. Litowitz:  Does the PPM say how many units there are --
> Mr. Hayes:      No.
> Mr. Litowitz:   . . . as collateral?
> /
> /
> Mr. Litowitz:  Why are there 42 lines on the promissory note for security?
> Mr. Hayes:      Because I think it fits the page.
> Mr. Litowitz:  Do you believe that that creates an impression in the eyes of someone from China, where you don't

| | see a list of collateral and they see 44 lines for collateral? Do you think that creates an impression for them [that collateral is 42 units?] |
|---|---|
| Mr. Hayes: | I can't speak to what someone from China would [think] -- |
| Mr. Litowitz: | Obviously. [12] |

Indeed, the PPM refers continually to an investment in the 'project' and never mentions that the collateral will consist only of 19 units, nor how such units will be selected, nor how such units will be valued and assigned a dollar figure as collateral. This creates the mistaken impression that the Loan is secured by sufficient units **and** property to cover the Loan principal.

74.     165 foreign limited partners invested in the project, from as early as 2012 to as late as 2015.

75.     This resulted in an aggregate investment to CRCPS of $82,500,000.

76.     The very first loan advance from CRCPS was made on April 18, 2012, and on that same date the Defendants entered into a series of documents in furtherance of the Loan Documents from 2010, to wit: a Promissory Note for up to $100,000,000 by SPO1; a Promissory Note Allonge setting interest rate at 5.55%; a Guarantee Agreement by Peter Knobel for interest payable under the Note; and an Omnibus Agreement stating that limited partners have no usage rights as previously promised.

77.     As the money came in, advances were made to SPO (and then to its successor entity SPO1), and for each advance a collateral unit was assigned within the parameters set by CRC and SPO.

---

[12]     Tr. at 62.

78.     When the last advance was made, Exhibit A to the Promissory Note was finally completed so that it listed each loan advance and the collateral assigned to it, and it was initialed and dated by CRC on January 9, 2015.  See Exhibit 4.

79.     This document page shows that the loan of $82,500,000 made over the course of three years was magically secured by condominium units having a value TO THE PENNY of $82,500,000.  The likelihood of any Loan balance coming exactly equal to the penny with the collateral  is about as likely as shooting a bottle rocket into space and then having it land back softly in the Coke bottle from which it was shot.

80.     Then on April 17, 2015 -- one day before the first loan advance hit the three-year mark where it would require transfer of title back to CRCPS -- the lender and borrower decided to create a never-disclosed, secret "Agreement Regarding Collateral Units" between CRCPS, SPO1, and PBK Real Estate LLC d/b/a Solaris Real Estate as broker (the "Secret Agreement").

81.     The Secret Agreement says that SPO1 has decided in advance of each loan advance hitting the 3-year mark that when such advance does in fact hit the 3-year mark, it will be paid back in collateral units instead of cash.

82.     SPO1 knew that every fish in the collateral barrel was rotten.  They knew in advance that all the loan advances were undercollateralized and so they decided at the earliest possible moment that it would 'prepay' by transferring all the collateral units to CRCPS as they hit their respective 3-year marks, even though some of the advances wouldn't hit the 3-year mark until 2018.

83.     This lays bare the fraudulent and incompetent structure of the transaction from the onset, since it must have been a *fait accompli* that the SPO1 had arranged for the

units to be so undercollateralized that they knew in advance that there could never be any reason to pay the loan in cash, that the units would never sell for more than $82,500,00.  Per the Agreement Regarding Collateral:

> Borrower has duly notified Lender that it intends to cause the occurrence of a Collateral Unit Distribution with respect to each of the Collateral Units on the Applicable Prepayment Date.

The only way they could know this early that all the collateral was worth less than the Loan was because they set up the Loan to be this way.

84.     Given that the transaction was so undercollateralized, it was virtually guaranteed that SPO1 would 'repay' with units, making this transaction a **sale** of units over three years and not a five-year loan.   The result is no different than CRCPS paying $82,500,000 for the purchase of $42,000,000 worth of illiquid, impossible to sell, overpriced condominium units, and with SPO1 and CRC1 keeping the difference.   But never once were the limited partners informed that this was a sale transaction or even that it resembled one.

85.     The Secret Agreement also said (in 2015) that SPO1 would "temporarily" keep title to the collateral units instead of transferring them to CRCPS as required by all the Loan Documents and the PPM, ostensibly to save money on transfer taxes, yet it sticks CRCPS with the homeowner association dues and real estate taxes which exceed these savings.   This "temporary" period has now stretched almost 5 years, making nonsense of the word "temporary."

86.     The Secret Agreement lacks consideration because it imposes a loss on CRCPS of taking title while not giving them any consideration in exchange -- it saves them transfer fees of perhaps $800,000 but sticks them with a greater amount of homeowner association

fees and real estate taxes, so it deprives them of title at their own expense.  See Exhibit 5 for profit and loss figures from 2018.

87.    The Secret Agreement violates the marketing materials, the loan documents, and even the PPM itself, which requires that title be transferred:

> If SPO is unable to make a cash payment on the Maturity Date, **SPO will be required to transfer to the Company certain of the Condominium Units** located at the Project that are being pledged to secure the obligation to pay the Solaris Note. . . . At the Maturity Date, the unpaid principal balance together with any accrued but unpaid interest shall be due and payable either in cash or by transfer of certain Condominium Units in lieu of cash. See PPM, Ex. 3, at pp. 11-13.
>
> **Borrower shall** have the absolute right to prepay . . . by repaying Lender the amount of such Loan Advance or **tendering to Lender the Collateral Unit(s) securing such Loan** advance.  See Loan Agreement, Ex. 1, at section 11 [and note that this language is verbatim in the Promissory Note].

88.    The very existence of this Secret Agreement was never revealed to anyone -- not even to the limited partners, who from 2016 to the present have received six-month notices listing the units as CRCPS's "Partnership Property" when in fact they are held in the name of SPO1 and therefore cannot be "Partnership Property."

89.    Indeed, less than a year after the Secret Agreement, CRC and CRCPS sent investors a report dated February 26, 1016 that said, "we are working with the developer to transfer title to the Partnership on the Units which Loan Advances have reached or surpassed the 3-year anniversary mark."  This has still never happened.

90.    This shows that they cannot even keep straight their own lie: they told investors that the titles were transferred in 2012/2013, they signed documents that the titles would be transferred at the 3-year mark, they reached a secret agreement not to

transfer the titles in 2015, and then in 2016 they told investors that they were working to transfer the titles. They simply tell different stories to different people. That's called fraud.

91. Finally, the Secret Agreement says that Peter Knobel's real estate firm - owned by the same guy whose companies had just stiffed CRCPS for tens of millions of dollars - must be hired as exclusive agent to sell the collateral units and earn a commission from it, and that the units would not be listed on the MLS where they would dilute Knobel's other listed units. Upon information and belief, Knobel had his own units for sale in the same complex, so he could steer potential buyers to his mountain-facing units and away from the no-view units that were required to make up the collateral pool.

92. Keeping title in the name of SPO1 instead of CRCPS might save a bit of money on transfer taxes, but the fact that CRCPS must absorb these transfer costs instead of SPO1 is itself proof of the negligent terms of this loan: typically a *debtor* (not a *lender*) is punished with fees when it doesn't repay a loan in cash.

93. Even if CRCPS holds a first deed of trust, there is danger so long as the title itself is in the name of SPO1, because of super-creditors who can gain priority over CRCPS: for example, state and municipal tax liens have priority over a first deed of trust, and so can mechanics liens, as well as debtor in possession financiers. And when your title is held by another person, there is an agency cost of monitoring that person to make sure that they don't encumber title or go into bankruptcy.

94. There is something laughably absurd about CRC's obsessive-compulsive need to point out that it saved CRCPS about $800,000 by holding title, despite the risks. After having structured a transaction that just lost $40,000,000, CRC1 boldly proclaims its virtue in saving the lender $800,000 in transfer fees that in any normal loan should have been paid

by the debtor anyway.  Even if this savings is correct, it only reduces the amount that they took from foreign investors from $40,000,000 to $39,200,000.  This is like stabbing someone 40 times and then showing concern by putting a single band-aid on one of the cuts.

95.     CRC has perpetually lied to limited partners that the collateral units were transferred back to CRCPS, as evidenced by the following email:

> Friday, April 26, 2013
> From: Meagan C. Hayes
> To: Jinge Hu
> Hi,
> Please see the list below of condominium units that have been transferred from SPO to CRCPS.  To date, 16/18 of the units have been transferred.  The units that were transferred from SPO to CRCPS in 2012 were: Unit 6E West, Unit 2A South, Unit Pent E West, Unit 6E East, Unit Pent E East, Unit 5E West, Unit 4G West, Unit 7E West, Pent C East, Unit 6D East, Unit 5C West, Unit 6C West. Units transferred from SPO to CRCPS in 2013 thus far: Unit 5G West, Unit 3E East, Unit 7E East, Unit 4D East.

By another email dated April 3, 2013, CRC told investor Zhao that "**CRCPS has all the benefits and burdens of ownership of the real estate and that the ultimate transfer of title is simply a matter of time.  In all cases, CRCPS will end up with the real property and some repayment in cash**."  See Dkt #22 at 5, Exs. 1-2 (emphasis added).

96.     The April 3, 2013 email further states that 'repayments' by collateral would be treated as a sale for tax purposes. This suggests again that the entire transaction was a disguised sale from the beginning.

**EB-5 Investors Slowly Learn of Under-Collateralization and Massive Loss**

97.     After making their investments into CRCPS to loan the money to SPO, the limited partners continued to believe that the Loan was fully secured dollar for dollar by real estate  with a market value of $82,500,000.

98.     However, in 2016 CRC and CRCPS started sending Notices to Investors who had invested longer than three years, showing a supposed appraisal value of the collateral as well below the Loan, even in the best-case scenario, and explaining a hyper-complex method by which CRCPS would try to liquidate the collateral units in which it was being repaid.

99.     In essence, CRC and CRCPS put the investors into a Rube Goldberg system whereby limited partners could line up every six months to 'put' their securities back to CRCPS to be assigned to a unit in the unlikely event that gets sold: in other words, when a unit of collateral is sold, the payout would not go to all the limited partners pro-rata, but would instead go to a few partners who would get X cents on the dollar from the sale of the collateral and then be knocked out of the deal forever; for example, 8 investors might be allocated a unit that sold at $2,000,000 (getting $250,000 each) even though the unit had a stipulated collateral value of $4,000,000 and counted as repayment of $4,000,000 from SPO to CRCPS.

100.    The Notices to Investors showed that the Loan appeared to be under-collateralized by only 19 condominium units.  In shock, the limited partners contacted their foreign agents to see why loan was so undercollateralized with only 19 units, in contradiction to what was said in the marketing material, and since the PPM never said anything about the collateral being merely 19 specific units.

101.    The agents arranged for the appraisal firm of HVS Golf Services of Boulder, Colorado to examine the situation.  That firm concluded that SPO and CRC had set wildly inflated prices on the collateral **from the outset**, and that these wildly inflated collateral numbers were **not determined by the market prices** but instead by what SPO1 determined

in a solipsistic wish for the units were worth (i.e., at prices of their own units that had not sold in the last 3-4 years), and were assigned a collateral value that was outdated:

> The project sales pace slowed in 2011, and has been basically unchanged since 2012, at about 2 a year.  The Solaris Developer has never adjusted the prices downward on any of their units, notwithstanding the general downward pressure on average sale prices and slow sales velocity of only 2 per year.  Some of the Solaris Developer's units have been on the market for over 1,300 days. **Accordingly, the listing price of all the units has been out of step with the market since 2011.**  With only 2 sales per year, and listing times of over three and one-half years, the market is "saying" the prices are too high to sell within a normal marketing period, much less to sell multiple similar and undesirable units.  The list prices remain elevated in 2016, and as of the date of this report [mid 2016], only one unit has sold in 2016.  When the Loan Advances were made (between 2012 and 2015) and mortgages were granted on the Partnership Property, the value allocated to the Partnership property (as shown in the Put Notice) was above the market value at that time, but consistent with the listing prices within Solaris. This explains, in part, why the Partnership Property does not fully secure the Loan Advances.  **The value of the property at the time the Loan Advances were made were based on Solaris list prices, as opposed to the general market, and were not adequate from the outset.**  (emphasis added).

<u>See</u> Report of HVS attached as Exhibit 6 (the "HVS Report").

102.   Since the six-month notices have come out in 2016, only 2 of the 19 collateral units have been sold.  At the hearing in October, CRC said that 8 investors got out on a 'first come, first served' basis, but 5 investors got out in a special deal.[13]   Either way, it leaves 150-

---

[13]   Upon information and belief, 5 investors jumped the line of other investors  (in other words, they were moved to the head of the line) under the name Lucky 5 LLC, represented by the law firm KingWood, who strangely called Plaintiffs' counsel, and when asked if they had a connection to the foreign agents which allowed them to get to the front of the line, they refused to answer.

plus limited partners stuck and waiting for these units to sell so they can get some liquidity, all while CRC makes money at 6% default interest on its 2% management fee.[14]

103.     The 6th Notice to Investors (dated May 30, 2019 and attached as Exhibit 7) tells investors that the remaining 18 units have collateral value of $73,130,000 on $78,500,000 remaining of loan principal (93% collateralized), yet also says that a bulk sale will only generate $43 million gross value before deductions and will take 7 years.  This is bizarre on its face: if the units are right now worth 93 cents on the dollar, why can they only be sold for 50 cents on the dollar in 7 years?  Hence the exchange between attorney Litowitz and CRC's Rick Hayes in Court:

> Mr. Litowitz:  So how do you get 93 percent collateralization . . . [You say] the collateral is worth $73 million, and now you are proposing to sell it for 41? And maybe now you're saying 49?
>
> Mr. Hayes:     Perhaps I didn't explain that well enough.  **The appraisal is based on any one unit being sold at a particular time, not all 17 units being sold at the same time.** (emphasis added).
>
> Mr. Litowitz:  I get that, but the question is -- you sold exactly one unit in three years, right?
>
> Mr. Hayes:     Correct.
>
> Mr. Litowitz:  Okay. So you are not exactly whipping through these. So if you went at that rate, 19 times 3, you're talking 57 years to get rid of these units.
>
> Mr. Hayes:     Well, I think that's your answer to why we would sell them in bulk.[15]

---

[14]     For the first unit that sold, the lender assigned a collateral value of $3,707,982 to secure $4 million.  It was sold at $2,780,000 and subject to deductions for commissions plus accrued management fees.  The investors got out of this deal after 7 years (not 5) at a loss of around 40-50% accounting for inflation, and they are the *lucky* ones from the front of the line.  Note the $4 million loan was under-collateralized at the onset, then was finally found to have a market value even 35% lower than this under-collateralized number.

[15]     Tr. 72-73.

This is financial illiteracy.  There is a difference between Present Value and Future Value. It is nonsensical to say that 17 units of collateral are appraised at $73,130,000 in Present Value but cannot be sold for $73,130,000 presently, since it is an imaginary number based on the impossible assumption that each unit is sold separately.  If the units can only be sold for $43,000,000 gross value in 7 years in a bulk sale, then $43,000,000 is their Future Value, and their Present Value is actually below $40,000,000 and maybe as low as $30,000,000 depending on the discount factor.

104.    If we "follow the money," we find that the all the Defendants robbed the limited partners by deception: the borrower group SPO/SPO1/Knobel got $82,500,000 in cash in return for probably less than $40,000,000 million in condominium units; the lending group CRC/CRC1/Waveland got a 2% management fee annually ($1.6 million a year) which is now overdue at a 6% default rate which will be taken out of any future sales; and the big loser who pays for it all is CRCPS, the suckers of a zero-sum scam, which  loaned $82,500,000 in liquid cash and three years later stood around with illiquid, unsellable, useless condominiums that no one wants to buy.

105.    To make matters worse, CRCPS has informed Plaintiffs' counsel that Knobel has a contractual right of first refusal to buy any of the units that CRCPS puts up for sale, and allows him to compete with CRCPS by selling his own units in Solaris side by side with CRCPS so that he can undercut his former lender on price.   These limitations on sale have never been fully disclosed to the limited partners even though they are material to the ability of CRCPS to pay back the limited partners.

106.    In 2019, the Plaintiffs hired US counsel, who in turn hired a valuation expert for the Plaintiffs.  He immediately discovered that this transaction was set up to fail, that it

was a disguised sale to artificially prop up the developer's supposed 'developers' equity' and that the units could not be monetized except at perhaps 50 cents on a dollar, with the entire loss falling on the Plaintiffs.  This transaction is a Roach Motel designed solely to extract value from foreigners and transfer it to the people who set it up.

107.    By letter dated July 1, 2019, attorney Litowitz made a formal demand on CRCPS to notify CRC1 to take action against third parties  to collect the full $82,500,000 plus interest owed to CRCPS and distribute it to the limited partners, and warning that the limited partners would bring a derivative claim to enforce CRCPS' rights against CRC1.

108.    By letter dated August 13, 2019 from attorney James Kilroy, CRCPS declined to take action.

109.    CRCPS did not refer the matter to a Special Litigation Committee.

110.    The derivative action was brought for genuine derivative relief and not to vest jurisdiction in this Court or for any strategic litigation advantage.

111.    Plaintiffs are now and have been at all times limited partners of CRCPS.

112.    The Plaintiffs have satisfied the formalities of Colo. Rev. Stat. 7-62-1001 et seq, which governs derivative actions against Colorado limited partnerships.

## DERIVATIVE COUNTS

### COUNT I
**(Derivative for CRCPS against its general partner CRC1)**
**Breach of Fiduciary Duty arising by Contract and Statute**

113.    Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

114.   The CRCPS Limited Liability Limited Partnership Agreement (the "LPA") at Section 8.04 states that "In carrying out their duties and exercising the powers hereunder, the General Partner [CRC1] shall exercise reasonable skill, care, and business judgement."

115.   A General Partner partners owe fiduciary duties to the partnership and to all partners.

116.   CRC/CRC1 agent Rick Hayes admitted in open court that it is a fiduciary to the limited partners.[16]

117.   CRC1 owed fiduciary duties to CRCPS and to the limited partners to act in their best interests, with care, skill, loyalty, and sound business judgment.

118.   CRC1 breached its fiduciary duties to CRCPS by engaging in willful misconduct and negligent exercise of business judgment -- specifically by structuring the underlying transaction so that CRCPS would make a loan backed by insufficient collateral that would be paid back in the insufficient collateral.

119.   CRC1 negligently or with fraudulent intent failed to demand increased collateral and failed to hedge downside exposure.

120.   CRC1 structured the underlying transaction as a wild bet that lost half of CRCPS' assets in 3 years, instead of safeguarding the money.

121.   CRC1 violated its fiduciary duties by allowing the borrower SPO1 to keep title to the collateral units after the Loan Documents and PPM demanded that title was to be transferred back to CRCPS.

---

[16]      Tr. at 23.

122.    CRC1 placed CRCPS' assets into a non-recourse loan grossly below industry standard, violating any commercially reasonable standard of care.

123.    CRC1 breached its duty of loyalty by arranging the transaction so that it would be paid a management fee of 2% annually (incurring a 6% default rate if the project stopped generating income to it) while negligently mismanaging the assets of CRCPS into the dirt -- thereby profiting from the harm it imposed on CRCPS.

124.    CRC has failed to collect - or even attempt to collect - the full amount of the $82,500,000 loan by bringing suit against SPO/SPO1/Knobel for failure to disclose the true value of collateral given to CRCPS in this transaction.

125.    CRC has violated the honestly demanded by the fiduciary duty of good faith and fair dealing by sending investors a notice every six months containing wildly erroneous valuations.

126.    CRC's contractual and fiduciary breaches resulted in a significant loss to CRCPS of approximately $40,000,000 of the $82,500,000 entrusted to CRC to invest.

127.    CRC took these harmful actions knowingly, willfully, and with scienter, knowingly placing all the risk on the foreign investors of CRCPS and putting itself in a position where it benefitted by converting the assets of CRCPS through taking a preposterously undeserved management fee for losing money.

128.    CRC's breach of fiduciary duty was - and continues to be - fraudulently concealed by the surface rationality of the loan transaction and thereby could not have been discovered until 2018 when the Plaintiffs learned that the Loan had been radically under-collateralized at their expense, and that it was a disguised sale, and that it was structured for the benefit of SPO/SPO1/Knobel to proclaim the debt as equity.

129.    As a result of CRC's action, CRCPS has suffered and continues to suffer to the extent of the shortfall between what it would have received in the Loan had been paid in cash versus the value of what it actually received (hereafter, the "Damages").

130.    The Damages suffered by CRCPS affect each limited partner equally, making this claim derivative.

**WHEREFORE,** Plaintiffs ask this Court to find that CRC1 acted in breach of its fiduciary duties as a general partner when it wrongfully structured a loan transaction to be secretly under-collateralized whereby CRCPS lost half of its assets.  CRCPS has the right to recover Damages from CRC plus statutory interest, plus fees and costs.

## COUNT II
**(Derivative CRCPS against CRC, SPO, SPO1, Knobel and LLC Principals)**
**Civil Theft and Treble Damages**
**Colo. Rev. Stat. 18-4-405**

131.    Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

132.    Colo. Rev. Stat. 18-4-101(a) defines "theft" to include receipt of another's property by deception.

133.    Colo. Rev. Stat. 18-4-205 authorizes a civil lawsuit with treble damages to obtain the return of property obtained by deception.

134.    As described above, an $82,500,000 loan transaction was set up by the "Lender Defendants" (CRC, CRC1, Waveland) and the "Debtor Defendants" (SPO, SPO1, Knobel) which deceptively gave the impression of the Loan being fully collateralized, when in fact the collateral was wildly inflated and only had half this value, thereby converting through fraud

roughly $40,000,000 from CRCPS to the benefit of  the Lender Defendants and the Debtor Defendants.

135.    CRCPS was deceived into making this loan by these parties under the impression that the loan was fully collateralized, and without being informed that the collateral was insufficient, and without CRC1 conducting due diligence to ensure that the market value of the collateral was equal to the loan balance.

136.    This act of deception caused CRCPS to part with its property -- $82,500,000 in cash -- to SPO1 for the benefit of SPO and Knobel, without telling CRCPS that the loan was set up not be repaid in cash.

137.    The loan transaction was set up so there was no intention of paying it back with cash, but instead with overvalued units whose real value was well below the loan principal, and Knobel stood to gain dollar for dollar for the difference between the loan principal and the value of the collateral.

138.    According to testimony before this Court, Defendant Knobel actively participated in meetings setting the structure of this transaction.

139.    According to testimony before this Court, Defendant Knobel controls SPO and SPO1.

140.    According to the PPM, the loan proceeds ($82,500,000) was a *debt* that Defendant Knobel was permitted to mischaracterize as "Owners' Equity" to obtain more financing, but it was never explained to the investors what consequences this could have, such as allowing increased leverage to be raised on the project, lowering the value of the collateral units.

141.    According to the Guaranty Agreement signed by Knobel in the Loan Documents, this Loan transaction was a benefit to him.

142.    According to CRC, Knobel is the developer of Solaris.

143.    SPO and SPO1 are pass-through entities that have only Knobel as equity owner, so any gain to such entities obtained through artifice, deception, or theft inures to the benefit of Knobel personally.

144.    SPO and SPO1 are shells for Defendant Knobel and alter-egos for him.

145.    Upon information and belief Defendant Knobel has created many SPO entities relating to this transaction, all of which are masks for the same person.

146.    Knobel was the original owner of Solaris and has units that he could not sell, and thus structured this deal so that he would be overpaid via the Loan and could thereby unload undesirable units that he himself could not sell, at inflated valuations.

147.    For these acts of fraud and in the interests of justice to make the limited partners whole, the veil on the SPO entities should be pierced and Knobel as an individual should be held civilly liable.

148.    In addition to the $40,000,000 converted by Knobel through deception and artifice and overinflating the value of collateral, he was accompliced by CRC and its affiliates and principals, and they acted with forethought, scienter, and malice for their own personal benefit.

149.    The Lender Defendants and the Borrower Defendants, and their respective principals acted willfully, recklessly, with scienter, and in violation of their duties to the investors.

**WHEREFORE,** Plaintiffs ask this Court to find that CRC, SPO, SPO1 (and their respective owners and principals personally), along with Knobel personally, committed civil theft of CRCPS' assets by deception, allowing CRCPS to recover treble damages plus statutory interest, fees, and costs.

<u>**COUNT III**</u>
**(Derivative CRCPS against SPO1 for Breach of Loan Agreement)**

150.    Plaintiffs re-allege and reincorporate, as if fully set forth herein, each and every allegation above.

151.    The Loan Agreement between CRCPS and SPO (later assigned to SPO1) at Section 11 said that SPO1 had two choices: repay $82.5 million in cash to CRCPS at maturity, or tender each collateral unit to CRCPS after the 3-year mark.

152.    SPO1 defaulted on repaying $82.5 million plus interest at the 5-year mark.

153.    SPO1 also defaulted on transferring the collateral units to CRCPS after the 3-year mark.

154.    SPO1's ostensible excuse for default on transferring the units after 3 years is that the parties signed the Secret Agreement in 2015 ("Agreement Regarding Collateral Units" dated April 17, 2015) specifying that SPO1 would hold title to the collateral units "temporarily."

155.    That was 5 years ago, and any "temporary" period has expired, so the Agreement has expired, unless the word "temporarily" can mean 5 years, 10 years, or 20 years, in other words, it has no meaning.

156.    Further, as noted above, there is a danger in allowing another party to hold title to units that are contractually required to be in the name of CRCPS, and since the Secret

Agreement imposes costs on CRCPS in excess of benefits, it lacks consideration and is unenforceable *ab initio.*

157.    CRC has a fiduciary duty under Section 8.06 of the LPA entitled "Fiduciary Responsibility" to safeguard the assets of CRCPS.

158.    CRCPS's assets are not safeguarded and are in danger of dissipation while in the possession and title of SPO1 because they are vulnerable to super-priority creditors of SPO1 in the form of tax liens, mechanics liens, bankruptcy creditors -- and in addition, CRCPS has no knowledge of whether the title to the units have been pledged by SPO1.

159.    Therefore, CRCPS should compel transfer of the units from SPO1 to itself so that the property can be safeguarded, in accordance with Section 8.06 of the LPA which requires CRC1 to safeguard the assets of CRCPS.

160.    Furthermore, the latest available Tax Returns of CRCPS (for 2018) state that it has an asset consisting of a Note Payable in the amount of $82,500,000 from SPO1.

161.    CRCPS has therefore not figured into its tax returns that the collateral was returned, and they are still pretending to the IRS that it owns a Note from SPO1.

162.    This is either a lie to the IRS, or if true, it gives CRCPS the right to call this Note at the state value of $82,500,000.

163.    It is in the best interests of CRCPS to bring suit against SPO1 for the full value of the Promissory Note, or to force conveyance of units and bring suit for the deficiency from the amount of principal that ought to be returned.

164.    The failure of CRCPS to enforce the Promissory Note, PPM, and related Loan Documents harms each of the limited partners equally, making this a derivative claim.

**WHEREFORE**, Plaintiffs ask this Court to declare that the Promissory Note was breached by SPO1 due to returning neither the cash nor the collateral units, and that the Secret Agreement is no longer 'temporarily' applicable for 5 years and counting, giving CRCPS the right to bring suit to enforce the terms of the Promissory Note, plus interest, fees, and costs.

**COUNT IV**
**(Derivative against SPO1 for Transfer of Title to CRCPS)**
**Colo. Rev. Stat. 38-35-110**
**Claim for Relief Affecting Title to Real Property**

165.     Plaintiffs re-allege and reincorporate, as if fully set forth herein, each and every allegation above.

166.     The Loan Agreement at Section 11 said that the borrower SPO (later assigned to SPO1) had two choices: repay $82.5 million in cash to CRCPS at maturity, or tender  each collateral unit to CRCPS after the 3-year mark but before the 5-year mark.

167.     The PPM at page 1 says that the borrower SPO (now SPO1) will convey title to CRCPS of the collateral units under a special warranty deed if it returns the property to CRCPS after the 3-year mark.

168.     These documents establish a contractual right for CRCPS to assert a claim against the title of the units, which are currently held by SPO1 but which should be held in the name of CRCPS.

169.     The ostensible excuse for SPO1's default on transferring the units after 3 years is that the parties signed the Secret Agreement in 2015 ("Agreement Regarding Collateral Units" dated April 17, 2015) specify that SPO1 would hold title to units "temporarily."

170.    That was 5 years ago, and any "temporary" period has expired, so the Agreement has expired, unless the word "temporarily" can mean 5 years, 10 years, or 20 years, in other words, it has no meaning.

171.    Further, as noted above, there is a danger in allowing another party to hold title to units that are contractually required to be in the name of CRCPS, and since the Secret Agreement imposes costs on CRCPS in excess of benefits, it lacks consideration and is unenforceable *ab initio.*

172.    CRC has an express written fiduciary duty under 8.06 "Fiduciary Responsibility" to safeguard the assets of CRCPS.

173.    CRC is failing to safeguard CRCPS's assets while the units are in the title of SPO1 where they are vulnerable to super-priority creditors of SPO1 in the form of tax liens, mechanics liens, bankruptcy creditors -- and in addition, CRCPS has no knowledge of whether the title to the units have been pledged.

174.    SPO1 has a legal duty to transfer title to CRCPS.

175.    Therefore, CRCPS has a legal right to be listed as the titleholder of each collateral unit and has an obligation to request that this Court order the transfer of the units from SPO1 to CRCPS.

176.    C.R.S. 38-35-110 authorizes the filing of a *lis pendens* to indicate that litigation has be filed with respect to any good faith claim for the title of real estate. Under this statute, and under the Colorado Revised Limited Partnership Act, C.R.S. 7-62-1001, a limited partner may file a *lis pendens* in the name of the limited partnership asserting its right to title of the subject real estate.

177.    Here, the Plaintiffs may act in a derivative capacity to have CRCPS take title to at least the remaining units.

178.    Plaintiffs have asked that title be transferred to CRCPS but both CRCPS and SPO1 have refused to do so, making for a genuine dispute over title to the real estate.

179.    Based on the reasonable belief that the CRCPS has a claim to title of the collateral units currently held by SPO I, and a beneficial interest in the proceeds of the sale of any such unit of collateral, the Plaintiffs may place a *lis pendens* on such units under C.R.S. 38-25-110 to reflect that there is litigation concerning the proper title holder of the units.

180.    Any *lis pendens* will be filed in good faith, under the Plaintiffs' informed belief that they have a derivative claim against for CRCPS to have title to such real estate.

**WHEREFORE,** CRCPS asks this Court to authorize the transfer of these units to the name of CRCPS, and in the meantime to authorize the placing of a *lis pendens* on such units.

### COUNT V
**(Derivative against CRC1)**
**15 U.S.C. 78j (17 CFR. 240.10b-5) and 78t**
**Federal Securities Exchange Act**

181.    Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

182.    Section 10b of the Exchange Act (15 U.S.C. 78j) provides that it shall be unlawful for any person, directly or indirectly, to use any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe for the protection of investors.

183.    In furtherance of Rule 10(b), the Commission enacted Rule 10b-5 (17 CFR 240.10b-5) which makes it unlawful to (a) employ any device, scheme, or artifice to defraud,

(b) to make any untrue statement of material fact, or (c) to engage in any act, practice or course of business which operates as a fraud or deceit on any person, in connection with the purchase and sale of a security.

184.    A "material fact" under Rule 10b-5 is any fact that a reasonable investor would find important in deciding whether to invest.

185.    The limited partnership units are clearly "securities." *SEC v. Liu*, 262 F. Supp. 3d 957, 969-970 (S.D. Cal. 2017)("Accordingly, securities laws apply to the EB-5 fund offering and [the owner's] conduct."); *SEC v. Kameli*, 276 F. Supp. 3d. 852, fn9 (N.D. Ill. 2017)("Courts have specifically held that investments in EB–5 enterprises like those at issue here constitute 'securities' within the meaning of the securities laws.").

186.    Likewise, the 'puts' offered by CRCPS to the limited partners are expressly within the definition of a "security" under the 1933 Securities Act.   15 U.S.C. 77b(a)(1)(specifically including the word "put" in the definition).

187.    CRCPS - acting through CRC1 -- issued an offering of securities when it granted a put right to each limited partner to 'put' his unit back to CRCPS.

188.    Each Notice to Investors (sent every six months from 2016 – 2019 in connection with the put option) was a separate offering of a put option, accompanied by fraudulently misleading information about the value of the collateral units, misleading investors into thinking that their investment was almost fully collateralized when in fact it was radically under-collateralized, and inducing reliance by investors to sign up for 'puts' on the basis of this misrepresentation of material fact.

189.    In connection with the offering of the put option to investors, CRC failed to explain the history and method by which it was over-valuing the collateral (i.e. that it was

using Knobel's outrageous asking prices that no one was paying as a substitute for market value), thereby keeping material information from investors and creating the false impression that the collateral was worth 93 cents on the dollar, as a fraudulent inducement to accept the put offer.  The latest such report to investors is attached as Exhibit 7, showing the date and time of the false statements made in connection with the offer of the put security.

190.    Further, CRC never explained clearly to investors the implications of allowing SPO to recharacterize the loan (a debt) as "investors equity" -- namely that it allows the creation of extra leverage on the subject property and the consequential decline in collateral value of each unit.  This is a material omission of fact to induce the limited partners to invest and stay in the transaction which has caused them continuing detriment.

191.    The Defendants acted with scienter, in full knowledge of the fact that the Loan would not be paid back like a normal loan but was in fact a disguised sale from the beginning.

192.    This is an ongoing, current fraud since the issuance of the "put option," a security, is still being offered by the LLLP.

193.    The limited partners have justifiably relied on these false statements and material omissions.

194.    The loss causation is easily quantifiable: each investor has lost $500,000 plus interest, which is what they would have received if this was a normal and fully collateralized loan as packaged to them.

195.    The offer of the put option in fraudulent and misleading terms, with material omissions of fact, had the effect of convincing limited partners to accept a reduced repayment of their unit due to the negligent and wrongful set up of the transaction.

196.    Each Plaintiff should receive an amount of money sufficient to make it whole, and each Plaintiff is equally injured in this respect, making this a derivative claim.

**WHEREFORE,** the Plaintiffs demand that the CRC be held accountable for making material misstatements in connection with the offer of a security in violation of Section 10(b) of the Securities Exchange Act, and entitling the limited partners to each recover $500,000 plus interest, costs and attorney fees.

**COUNT VI**
**(Derivative against CRC and its principals, and Knobel personally)**
**Colo. Rev. Stat. 11-51-501**
**Colorado Securities Act Fraud and Prohibited Conduct**

197.    Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

198.    Section 11-51-501 of the Colorado Securities Act provides that it is unlawful for any person in connection with the offer, sale, or purchase of a security, to directly or indirectly employ any device, scheme, or artifice to defraud, to make any untrue statement of material fact, or to engage in any act, practice, course of business which would operate as a fraud or deceit on any person.

199.    Section 11-51-604(5) of the Colorado Securities Act extends liability to all control persons, and those who provide substantial assistance to persons who violate section 11-41-501.

200.    As stated in the previous count for violation of the federal securities laws, CRC sent misleading and fraudulent valuations to investors in connection with an attempt to get them to exercise a put option offered to them, which would cause a loss to each investor.

201.    Knobel was aware of the misleading valuations since they were based off his untenable and unrealistic list prices that had fallen flat since 2011, so he knew that the entire

deal and all representations made by CRC about the collateral were lies designed to induce limited partners to lose money and have it transferred to Knobel and his companies.

202. The Notices to Investors work a continuing fraud and deceit on the Plaintiffs by overstating the value of the collateral (the condominium units) and thereby covering up the fraud at the heart of this transaction, namely that the Loan was never meant to be paid back but was in fact a disguised sale with the intention of leaving the Plaintiffs with a financial loss.

203. The overvaluation of collateral was provided by Knobel personally as he based the collateral numbers on the sale prices of his units that he was unable to sell in Solaris Vail, thereby masterminding the under-collateralization of the loan.

204. Knobel met with CRC and provided the figures on value of the units, which their principals knew or should have known were wildly inflated, thereby causing the Loan from foreign investors to be under-collateralized, making the exercise of the put option translate into a loss of investment capital for each investor exercising it.

205. CRC and Knobel had a duty to prominently disclose to investors that the Loan was not likely to get paid back in cash - ever, and that CRCPS was likely to be stuck with undervalued collateral that it could not unload.

206. The parties who made this fraud are CRC and its affiliates and principals plus SPO1 and its affiliates including Knobel, since they set the value of the collateral so low as to make it a disguised sale and never revealed this material fact to the investors.

207. By designing this so-called 'put option,' both CRC and SPO (and their affiliates and principles) created a wrongful impression that the Loan could be wound down by selling collateral in an amount equal to the Loan money invested by the limited partners, when in

fact they had already structured the transaction to deceive, defraud, and deprive the limited partners of their investment.

208.    Roughly 80% or more of the limited partners have accepted the put option in reliance on the fraudulent misrepresentations.

209.    These fraudulent misrepresentations in connection with a security were made intentionally, with scienter, with intent to deceive, and to the detriment of the limited partners of CRCPS.

210.    Each remaining limited partner has been equally deceived by these securities law violations, making this a derivative claim.

211.    Each Plaintiff should receive an amount of money sufficient to make it whole.

**WHEREFORE,** the Plaintiffs demand that the CRCPS hold CRC and SPO1 and their affiliates and principals accountable for making material misstatements in connection with the offer of a security, entitling the limited partners to recover $500,000 each plus interest, costs and attorney fees.

<u>**COUNT VII**</u>
**(Derivative for Removal of CRC as General Partner)**

212.    Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

213.    Section 12.03 of the LPA states that the general partner, CRC1, an be removed for "cause" which include an act of "fraud."

214.    CRC1 has committed fraud in multiple ways:

The creation of an unjust Roach Motel of an EB-5 investment structure that ensured the loss and conversion of 50% of the assets of the partnership within 3 years and left the limited partners with under-collateralized illiquid real estate that cannot be sold;

Fraudulently overstating the value of the collateral to limited partners every six months;

Putting the partnerships' assets at risk by having SPO1 hold title while telling the investors that these units are "partnership property";

Hiring Knobel's company as a broker after his other companies fraudulently 'repaid' the partnership's $82,500,000 loan with collateral units worth $40,000,000.

Fraudulently concealing from limited partners the Secret Agreement and the methodology of assigning collateral value that overstated such value from the outset.

215.    CRC1 has done a horrendous job of managing the limited partnership's assets right into the dirt in a 3-year period, violating its fiduciary duty of safeguarding such assets as required by Section 8.06 of the Limited Partnership Agreement.

216.    While losing tens of millions of dollars for the limited partners due to its horrible structuring of this investment, CRC1 has paid itself 2% of the assets of the limited partners as a "management fee" and has deferred some of this money so that it gets 6% penalty interest, taking a reward from the investors whom it just destroyed.

217.    The limited partners should not have to pay a management fee to CRC1 just to have it lose half their money by creating an elaborate scheme to misappropriate it to Knobel. CRC1 has already been overpaid for the bad job that they did, and in any just universe they would make the investors whole out of shame and guilt.

218.    If they cannot hit the nail on the head, they should get out of the way and stop bending the nail and making it harder for everyone that comes later.  And their pay should be clawed back.  No person should profit from their own wrongdoing.

219.    By letter dated July 1, 2019 attorney Litowitz for the limited partners made a written demand on CRCPS to restore the money lost by the limited partners.  No action was

taken in response.  There is no statute of limitations governing removal of an existing general partner in a Colorado limited partnership, so this action is timely brought, and it affects all limited partners equally, so it is derivative in nature.

**WHEREFORE,** the Plaintiffs demand the judicial removal of CRC1 as general partner for cause -- and its replacement by a reputable financial firm with no relation or interest in this transaction, who will work for the best interests of the limited partners.


# DIRECT COUNTS

**The following counts are pleaded directly because the named Plaintiffs are different from the other limited partners in that they have declined to 'put' their security back to CRCPS.  Their damages and their recovery -- indeed, their entire factual and legal situation -- is different than that of the other limited partners.  This District allows a party to bring BOTH a derivative and a direct action simultaneously.  *Srebnik v. Dean*, 2006 U.S. Dist. LEXIS 59232 \*7; 2006 WL 2457386 (D. Colo. 2006).  Accordingly, the named Plaintiffs bring these counts in the alternative with the preceding counts.**

## COUNT VII
**(Direct against Knobel and CRC, CRC1, and Waveland Ventures)**
**Fraud**

220.    Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

221.    The structure of the Loan was predetermined in discussions between Knobel and the principals behind CRC/Waveland in November of 2010.  These agreements were memorialized in a series of Loan Documents described above.

222.   The purpose of these Loan Documents was to create the framework for an undercollateralized loan to be funded by foreign investors trying to qualify for the EB-5 generated green card.

223.   Knobel and the members of CRC knew that the marketing material given to the Plaintiffs was false and contained material omissions and misstatements about the loan being safe and fully collateralized.

224.   Knobel - as developer of Solaris Vail and having his own units for sale - knew that the price of units assigned by him were exceedingly unrealistic and thereby resulted in a paucity of sales.

225.   Knobel therefore knew that the numbers he gave to CRC and assigned as the value of collateral were wrong and wildly inflated.

226.   At all times pertinent hereto, Knobel controlled the entities SPO and SPO1 and ran them as alter egos, controlling them, and using them to create fraudulent activity.

227.   CRC's knowledge is imputed to its affiliates CRC1 and Waveland Ventures LLC, and to their affiliates and owners.

228.   Despite the knowledge that the collateral was radically overvalued and could not repay the Loan, Knobel and CRC informed the investors that the Loan would be secured by collateral of equal value to the Loan principal.

229.   Since this Loan was non-recourse to Knobel and his entities, CRC should have insisted on a better LTV ratio and stronger collateral.

230.   CRC failed to investigate the market value of the stipulated collateral because they stood to gain 2% management fee to their affiliate regardless of the performance of the Loan.

231.    CRC misinformed investors, and continues to do so, in its reports about the appraisal value of the collateral, refusing to explain to investors that this value (to wit, 93 cents on the dollar of the Loan principal) is not attainable.

232.    By setting up this Loan to be deliberately undercollateralized, Knobel and SPO/SPO1 have wrongfully and fraudulently made themselves a profit of $40,000,000 in three years drawn from foreign money in the Loan.

233.    At all times hereto, Knobel operated SPO and SPO1 as alter egos of himself, and they are pass through entities so that he personally gained from the wrongful and fraudulent fleecing of the foreign investors.

234.    A cause of action for fraud must be brought under Colorado law within 3 years of discovery of the fraud (or such time as it could be reasonably discovered).  See Colo. Rev. Stat. 13-80-108 and 13-8-101(c).

235.    Here, the class of limited partners could not have known that the Loan was radically undercollateralized because CRC1 kept sending them documents every six months saying that it was not undercollateralized; hence they concealed their fraud and equitably tolled the statute until they hired an attorney and forensic accountant to review the documents in 2019; in addition, the Secret Agreement was withheld from them, as were the original loan documents showing the restrictions on the choice of collateral.  As such this state law claim is timely.

**WHEREFORE,** the Plaintiffs ask this Court to find that Knobel personally and his SPO/SPO1 entities, along with CRC and its affiliates, directly responsible for the losses incurred by the Plaintiffs and (in a joint and several capacity) should make full restitution of the Plaintiffs' investment of $500,000 each plus each plus interest, costs and attorney fees.

## COUNT VII
### (Direct against CRCPS)
### Fraud

236.    Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

237.    CRCPS not only failed to take **derivative** action to collect the lost and fraudulently taken assets of the limited partnership contributed by the limited partners, but it also **directly** harmed the limited partners.  They have a direct claim against CRCPS for such directly caused harm.

238.    CRCPS is a limited partnership, which under Colorado law can sue and be sued in its own name by any person that it harmed, including its own limited partners.

239.    Under Colo. Rev. Stat. 7-62-403(2)(b)(II), a general partner of a limited liability limited partnership shall have the liabilities of a partner in a limited liability partnership to the partnership and the other partners.

240.    Under Colo. Rev. Stat. 7-60-109, the actions of a general partner are as agent for the partnership as principal, and bind it accordingly.

241.    Therefore, all of the wrongdoing, frauds, breaches of fiduciary duty, negligence, and incompetence of CRC1 is equally the responsibility of CRCPS.

242.    Wherefore, if CRC1 is determined to have committed any act of fraud, breach of duty, negligence, or wrongdoing in the course of its role as general partner, such wrongdoing shall be answerable by CRCPS as principal in a direct action.

243.    CRCPS was a party to the Loan Documents whereby the Loan was under-collateralized, a material fact concealed from the investors.

244.    CRCPS was an issuing party to the Notices to Investors sent every six month which overstated the value of the collateral and gave false information to the limited partners so they would not see how badly CRCPS and CRC1 structured this transaction to lose so much of the limited partners' assets.

245.    CRCPS has directly harmed the Plaintiffs.

**WHEREFORE,** the Plaintiffs ask this Court to find CRCPS directly liable and as a principal for wrongdoing and harm committed by CRC1 as its agent, requiring it to give full restitution of the Plaintiffs' investment of $500,000 each plus each plus interest, costs and attorney fees.

### COUNT VII
**(Direct to Pierce the Veils of CRC1 and SPO to hold their owners/members liable)**
**Fraud, Breach of Contract, Securities Violations**

246.    Under Colo. Rev. Stat. 7-60-153 and 7-80-107, the Court may pierce the veil of a limited liability limited partnership or a limited liability company, to hold the owners personally liable, under the same principles of piercing of the veil of a corporation (e.g., under-capitalization, fraud, alter ego, absence of formalities, or the interests of justice).

247.    LLCs - acting through their owners and members -- fraudulently set up this transaction to rob the limited partners with a pen by radically under-collateralizing the Loan, so that the owners and members of CRC1 and SPO would personally benefit, without informing the limited partners that the Loan they were funding was radically under-collateralized by fake numbers that did not reflect the reality of what condominium units were really worth.

248.    The magnitude of the destruction they caused is around $40,000,000.

249.    That money did not evaporate into thin air, and it did not go to unknown counterparties -- it went straight into the pockets of the *individuals* who own and manage the flow-through LLC entities.

250.    The limited partners lost their life savings in cash -- a *personal* loss, so that individuals hiding behind entities in Colorado could *personally* gain the identical money that was *personally* lost.   Justice demands that the *persons* who took these *persons'* money be held *personally* responsible, and that this Court not play shell games to insulate fraud, illegality, and wrongdoing.

251.    In the interests of justice and to remedy fraudulent activity from which the owners and members of CRC1 and SPO1 personally benefitted, they should be held personally liable for all the loss that they caused.

**WHEREFORE,** the Plaintiffs ask this Court to pierce the veil of CRC1 and SPO1/SPO and find their owners personally liable for the personal harm that they created  through fraud wrongdoing, since they knowingly set up an undercollateralized Loan that was bound to fail, which it did with the predictability of clockwork. The personal owners of these entities should make restitution of the Plaintiffs' investment of $500,000 each plus each plus interest, costs and attorney fees.

Dated: January 22, 2019

Respectfully Submitted,

/s/ Douglas Litowitz
413 Locust Place
Deerfield, IL 60015
312-622-2848
Litowitz@gmail.com