# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

**Civil Action No. 19-cv-02443**
**Consolidated with Civil Action No. 19-cv-02637**

Jun Li, Qi Qin, Yi Liu, et al.,
        Plaintiffs,

v.                                            Hon. Magistrate Scott Varholak

Waveland Ventures LLC,
Colorado Regional Center Project Solaris LLLP,
Colorado Regional Center I, LLC,
Solaris Property Owner LLC,
Solaris Property Owner LLC I, and
Peter Knobel,
        Defendants.

## Declaration of Brian P. Stewart

I, Brian P. Stewart, am over the age of eighteen and have personal knowledge of the facts stated herein and hereby to state as follows:

1. I am an attorney at The Ardent Law Group, attorneys of record for the Plaintiff's in Civil Action No. 19-cv-02637.

2. 165 Chinese investors collectively invested $82.5 million into a Colorado limited partnership, Defendant Colorado Regional Center Project Solaris LLLP ("LLLP") that was created by Waveland Ventures, LLC ("Waveland") and CRC created. CRC's subsidiary, Colorado Regional Center I, LLC ("GP") was established as the general partner of the LLLP and received a 1% partnership interest.

3. The GP had the exclusive right to negotiate on behalf of the LLLP, however such rights included a fiduciary duty to negotiate in the best interests of the LLLP.

4.  In negotiating the loan with Solaris Property Owner ("SPO"), the GP failed to negotiate in the best interests of the LLLP and instead entered into the Loan agreement and a series of amendments thereto which benefited SPO and its successor in interest Solaris Property Owner LLC I ("SPOI") and the GP itself, all to the detriment of the LLLP.

5.  Any lender in a commercial transaction would require: the debt to be secured by the entire property, not specific units; would not only require that the loan be a recourse loan but would additionally require personal guarantees from any individual members of the ownership group of a corporate borrower. Each of these traditional steps would be taken at the outset of the by the lender to ensure repayment of the loan.

6.  Here, GP expressly agreed to make the loan non-recourse as to the principal loan amount, did not secure a meaningful personal guarantee, and secured the loan with individual units rather than the entire project. Furthermore, the loan contains a provision that SPOI can, after three years opt to repay the loan in full as well as another provision that allows SPOI the option to transfer title to the Collateral Units the LLLP rather than repay the loan.

7.  On November 5, 2010 the GP and SPO executed the Loan Agreement, the Operating Agreement and the Yield Enhancement Agreement. The Yield Enhancement Agreement (a copy of which is attached as Exhibit "A") states that

> "In addition to the Interest Payments set forth in the Note and as a material inducement for CRCPS to make the Loan, Solaris hereby agrees to allow each Limited Partner (as hereinafter defined) to use a two (2) bedroom Collateral Unit for up to twenty one (21) nights each calendar year during the term of the Loan (the "**USE RIGHTS**"). Solaris understands and acknowledges that CRSPS is entering into the Loan Agreement in reliance on the Use Rights and would not have agreed to make the loan but for the Use Rights." [Yield Enhancement Agreement ¶ 1]

8.  Mr. Hayes testified during the October 28, 2019 injunction hearing on page 14 line 18 – thru page 15 line 3 that the Use Rights for the Collateral Units be removed from the transaction at the request of the USCIS. With the removal of this material inducement to enter into the Yield

Enhancement Agreement serious questions exist as to whether the Yield Enhancement Agreement is enforceable for lack of consideration.  The Yield Enhancement Agreement is also the part of the transaction which provides that the LLLP is entitled to receive Rental Proceeds – **net of Rental Management Expenses.**  It is expected that Defendants will attempt to argue that this is somehow a benefit to the LLLP.   No legitimate lender would consider such a thing.  Rental proceeds are speculative let alone rental proceeds net expenses.

9. A review of the financial Statements produced by the GP's accountants indicates that over a five year period from 2013 - 2017, expenses totaled $19,951,869 against rental income of only $10,822,077.  (Copies of the annual financial statements are attached hereto as Exhibits "B", "C", "D", "E" & "F").  Most or all of these expenses have been paid to the GP or one of its affiliates.

10. On April 17, 2012 SPOI executed the Promissory Note.   On April 17, 2015, exactly one day before SPOI became eligible to prepay the loan, GP and SPOI entered into the Agreement Regarding Collateral Units (a copy of which is attached as Exhibit " G").  This is the agreement wherein it states that:

> "In lieu of accepting the conveyance of title to the Eligible Units pursuant to a Collateral Unit Distribution, the Lender and Borrower have determined that it is desirable for Borrower to continue to hold record title to the Eligible Units." [Agreement Regarding Collateral Units ¶ E]

And,

> "Borrower has agreed to temporarily refrain from conveying title to the Eligible Units to Lender pursuant to a Collateral Unit Distribution on the condition that, for purposes of calculating interest under the Loan Documents, Borrower shall be deemed to have caused a Collateral Unit Distribution as of the Prepayment Date corresponding to each Eligible Unit and associated Loan Advance". [Agreement Regarding Collateral Units ¶ F]

11. This agreement absolves the Borrower of paying interest while allowing them to retain control of the inventory of units, and is of no benefit to the LLLP.  Furthermore, nothing in the loan documents states that the LLLP is responsible for the transfer taxes, property taxes, insurance

3

and commissions as if this were a sale transaction, prior to the Agreement Regarding Collateral Units.

12. After executing the Agreement Regarding Collateral Units SPOI gets to maintain possession and equity in the Collateral Units, is absolved of paying interest on the loan, essentially writes of 50% of the principal obligation and forces LLLP to pay all the transfer costs as if this was a purchase, which it clearly is not. And of course the GP and/or its affiliates continue to collect a variety of fees identified as Net Rental Management Expenses. This is a completely unenforceable agreement concocted by GP and SPOI to allow SPOI to avoid paying any transfer fees or costs after exercising the option to convey title to the Collateral Units rather than repay the loan. There is absolutely no benefit conferred upon the LLLP.

13. Plaintiff's 1st Amended Complaint makes a derivative claim on behalf of LLLP including all of the elements for breach of contract for failure on the part of SPOI to transfer title to the Collateral Units, and seeks specific performance of the SPOI's duty to transfer title to the Collateral Units. GP's contention that LLLP is protected by the Deed of Trust might be correct if SPOI was still paying on the loan, but it is not. A security instrument secures payment of an obligation. GP and SPOI maintain that SPOI no longer is obligated to make payments on the loan, therefore the Deed of Trust is unenforceable. Plaintiffs filed and recorded the Lis Pendens to put the public on notice that the LLLP has a claim to title to the real property.

14. On or about January 14, 2020, I was contacted by Roger Hauptman stating that there was an offer to purchase one of the units and inquiring to know if we would be willing to remove the Lis Pendens as to that unit. I indicated that I would consider it depending upon receiving information about the price, the identity of the buyer and how the proceeds would be applied. On January 1, 2020 Mr. Hauptman informed me that the proceeds would be applied as follows:

4

> "First, given the volume of concerns my client has heard from LP's regarding the status of title (even though we believe that they are without merit), to fund the necessary expenses to effectuate the transfer of all remaining collateral units from SPO to CRCPS, including closing costs, HOA payments etc.
> Second, to accrued and unpaid liabilities of the partnership;
> Third, to establish adequate reserves for working capital expenses; and
> To the extent there are available proceeds, to the LP's on a pro rata basis."

(A true and correct copy of the e-mails exchange is attached hereto as Exhibit "H")

15. So essentially, as usual none of the sale proceeds will find their way to the LP's but will continue to pay obligations of SPOI and enrich the GP and/or its affiliates.

16. Because of this I responded to CRCPS's counsel that I would be willing to release the Unit from the lis pendens if the proceeds were placed I an escrow account pending the resolution of the dispute as to the proper application of the purchase funds.

17. Not only is this is not an emergency, contrary to the representations being made by GP the Deed of Trust currently has no effect as a lien against the property and LLLP's only protection is the lis pendens. These issues should wait until the matter can be completely briefed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 30th day of January 2020.

/s/ Brian P. Stewart_____
Brian P. Stewart

**CERTIFICATION OF SERVICE**

The undersigned attorney certifies that copies of the foregoing:
PLAINTIFFS' OPPOSITION TO DEFENDANT COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP'S MOTION FOR FORTHWITH HEARING RE: PETITION FOR ORDER TO SHOW CAUSE PURSUANT TO C.R.S. § 38-35-204 [ECF 115] was served through ECF on January 30, 2020 upon all parties who have appeared.

/s/ Brian P. Stewart
Brian P. Stewart