1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLORADO

3
   Civil Action No. 19-cv-02443-STV
4

5    JUN LI, QI QIN, YI LIU, JIE YANG,
     YUQUAN NI, ZHONGZAO SHI, FANG SHENG,
6    SHUNLI SHAO, KAIYUAN WU, ZHIJIAN WU,
     ZHONGWEI LI, SA WU, FAN ZHANG, LIN QIAO,
7    JINGE HU, RUJUN LIU, YING XU, LU LI, and
     YUWEI DONG, individually, as well as
8    derivatively for COLORADO REGIONAL CENTER
     PROJECT SOLARIS LLLP,
9
            Plaintiffs,
10
            vs.
11
   WAVELAND VENTURES LLC,
12 COLORADO REGIONAL CENTER PROJECT SOLARIS
   LLLP, COLORADO REGIONAL CENTER,
13 COLORADO REGIONAL CENTER I LLC,
   SOLARIS PROPERTY OWNER LLC,
14 SOLARIS PROPERTY OWNER I LLC, and
   PETER KNOBEL,
15
            Defendants.
16
   ----------------------------------------------------------------
17
        TRANSCRIPT OF ELECTRONICALLY RECORDED PROCEEDINGS
18                      MOTION HEARING

19 ----------------------------------------------------------------

20        Proceedings before the HONORABLE SCOTT T. VARHOLAK,
   Magistrate Judge, United States District Court for the
21 District of Colorado, commencing at 9:22 a.m. on the 28th day
   of October, 2019, in Courtroom A402, Alfred A. Arraj United
22 States Courthouse, Denver, Colorado.

23
   Transcriber:  JULIE H. THOMAS
24                901 19th Street, Room A256
                  Denver, CO 80294
25                (303)335-2111

        Proceedings recorded by electronic recording device;
              transcription produced via computer.

19-cv-02443-STV                                           10/22/19    2

1                              APPEARANCES

2   For the Plaintiffs:
    DOUGLAS ELIOT LITOWITZ, LAW OFFICE OF DOUGLAS LITOWITZ,
3   413 Locust Place, Deerfield, IL 60015

4   For the Defendant CRC Entities:
    JAMES D. KILROY and STEPHANIE A. KANAN, SNELL & WILMER L.L.P.,
5   1200 Seventeenth Street, Suite 1900, Denver, CO 80202-5854

6   For the Defendants SPO LLC and Knobel:
    TY GEE, HADDON MORGAN AND FOREMAN, P.C., 150 East 10th Avenue,
7   Denver, CO 80203

8                   *       *       *       *       *

9                          I N D E X

10   DEFENDANTS' WITNESS                                    PAGE

11   DONALD RICK HAYES
         Direct - Mr. Kilroy                                  9
12       Cross - Mr. Litowitz                                57
         Redirect - Mr. Kilroy                               79
13       Cross - Mr. Gee                                     80
         Further Redirect - Mr. Kilroy                       80
14

15                   DEFENDANTS'
                     EXHIBITS                    RECEIVED
16
                     1                              15
17
                     3                              30
18
                     5                              31
19
                     2                              36
20
                     4                              37
21
                     6                              38
22
                     11                             52
23
                     12                             53
24
                     13                             54
25
                     14                             55

    Julie H. Thomas, RMR, CRR                        (303)296-3056

 1          (Proceedings commenced 9:22 a.m.,

 2      October 28, 2019.)

 3              THE COURT:  Please be seated.  This is 19-cv-2443.

 4              Can I have entries of appearance, please.

 5              Can I have entries of appearance?

 6              MR. LITOWITZ:  Oh.  Good morning, Your Honor.  Doug

 7      Litowitz for the plaintiffs.

 8              MR. KILROY:  Good morning, Your Honor.  James Kilroy

 9      for defendants Waveland Ventures LLC, Colorado Regional Center

10      Project Solaris LLLP, Colorado Regional Center, and Colorado

11      Regional Center I LLC.  With me is my colleague Stephanie

12      Kanan.  And this is Rick Hayes, who is a principal of the CRC

13      entities.

14              THE COURT:  Good morning.

15              MR. GEE:  Good morning, Your Honor.  Ty Gee appearing

16      on behalf of Solaris Property Owner, Solaris Property Owner I

17      LLC, and also Peter Knobel.  With me is Ryan Smith, who is a

18      representative of the Solaris Property Owner entities.

19              THE COURT:  Good morning.

20              So before we begin today, I know there's a number of

21      motions.  I want to take all of them up here today, and I'll

22      tell you the order that we are going to go in in a moment.

23      But before we begin, I want to raise an issue that I have with

24      the parties, which is this.

25              I think it is clear from the filings in this case

1   that a couple things are going on.  One, I think the property

2   is worth less than what the total value is, and the investors

3   are almost certainly going to take some loss in this case.  I

4   encourage the parties at the conclusion of this hearing to sit

5   down and discuss whether there is some way that you-all can

6   perhaps reach some nonlitigation agreement.  This case is a

7   whopping two months old, not even two months old, and we are

8   already at ECF number 58.  We already have four pending

9   motions that I'm deciding now, most of which involve briefing

10  of -- combined briefing of about 50 pages each.  There's,

11  what, four attorneys and two principals in the courtroom now.

12  I don't know who all is in the back, but we might have more

13  attorneys and more principals, more individuals in the back.

14          UNIDENTIFIED SPEAKER:  [Inaudible.]

15          THE COURT:  Okay.  You might already blow through in

16  attorney's fees what this case is worth at the end of the day,

17  and I don't think at the end of the day that does anybody any

18  good.

19          I also want to caution the parties about the rhetoric

20  that is going on in the briefings here.  I don't think that's

21  helpful either.

22          So I'm going to take these up, but I really think the

23  parties need to consider whether or not you are pursuing what

24  is the best result to try to get some money back to these

25  investors and the greatest amount of money back to these

1    investors and to get the project, to the extent the parties

2    can move forward, built and completed and these units sold.

3         So I say that, and, again, I'm happy to spend as much

4    time as you-all need to litigate this case, but there's only

5    so much money involved here, and you're going to blow through

6    it all, and the investors are going to get back pennies on the

7    dollar, and I don't think that does anybody any good.

8         Okay.  So currently before me are the following

9    motions:

10         The first is document number 14.  This is the

11   emergency motion to show cause to hold James Kilroy and his

12   clients in contempt.  This has been responded to at document

13   number 45, and a reply brief was filed at document number 47.

14         The second is the petition for order to show cause

15   pursuant to Colorado Revised Statute Section 38-35-204.  This

16   was filed at document number 20, responded to at document

17   number 22, and a reply filed at document number 46.

18         The third is the plaintiffs' motion for preliminary

19   injunction.  That was filed at document number 32 and has been

20   responded to by the defendants.

21         And then the final is document number 54.  This is

22   the defendant's motion for a protective order.  That was

23   responded to at document number 58.

24         What I want to do is, I want to take up the motion

25   for preliminary injunction because I think that this is likely

1     the only one that requires an evidentiary hearing on anything.

2     To the extent that the parties wish to submit evidence on the

3     other motions, you are free to do so as part of the

4     evidentiary hearing on the motion for preliminary injunction.

5     And then I'll take argument on all four of these together at

6     the end, and then I'll -- I anticipate being prepared to issue

7     oral rulings here today since many of these are time

8     sensitive.  It is quicker for me to issue an oral ruling,

9     involves the same amount of research, but I don't need to

10    worry about using Colorado Bluebook format citation and

11    worrying that the grammatical issues may appear on Westlaw

12    somewhere and make it look like I can't write.  So it makes it

13    much quicker if I can do it orally and get you out.  Or, as I

14    said, I hope to do it today, but if I can't, what I'll likely

15    do is carry this over for a ruling, but again for an oral

16    ruling because I know that a lot of this is time sensitive,

17    and I want to get you answers to these questions.

18            So because I think that the motion that most clearly

19    requires evidence in support of it is the motion for

20    preliminary injunction, and because that is the plaintiffs'

21    burden, I will allow plaintiff to present any evidence the

22    plaintiff wishes to first, and then I'll allow defendant to

23    present any evidence it wishes to.

24            So for plaintiff, do you have any witnesses or

25    evidence you wish to present with respect to that motion or

 1   any of the four motions?

 2          MR. LITOWITZ:  No, Your Honor.

 3          THE COURT:  Okay.  Let me ask defendants.  Any

 4   evidence you wish to present?

 5          MR. KILROY:  Your Honor, based on that, we would ask

 6   the Court to summarily deny the motion under the legal

 7   citations that we gave in the response brief.  That means

 8   there's literally no facts whatsoever in support of this.

 9          THE COURT:  I'm happy to go straight into argument,

10   but I want to give you the opportunity, if you wish to call

11   any witnesses, to call those witnesses.

12          MR. KILROY:  We will.

13          THE COURT:  Okay.

14          MR. KILROY:  Your Honor, before could I ask the Court

15   to reconsider the order of this?  Because we'd like to

16   introduce an exhibit that currently is confidential.  That's

17   why we filed that motion for protective order.

18          THE COURT:  What I'm inclined to do with that is to

19   initially place that -- in fact, I think there's -- I think

20   there's two different issues.  The first is whether or not you

21   can share the documents with anybody, and the second is

22   whether or not they should be placed under a level of

23   restriction.

24          I don't think there's anything -- well, I'll let you

25   address it.  Is there anything with the confidentiality order

1  that will prohibit you from sharing it with opposing counsel

2  and with the Court here today absent me entering the

3  protective order first?

4          MR. KILROY:  The language in the -- this is the

5  LOI -- the letter of intent would permit us to share this the

6  way the Court has indicated upon Court order.  So if the Court

7  just orders that as you've said, I think we're fine.

8          THE COURT:  Okay.  Then I will issue that order now,

9  that the letter of intent may be used as part of this hearing,

10 it may be shared with plaintiffs' counsel and with the Court

11 and court staff.  I would file it under a level 1 restriction,

12 however, so that once it becomes an exhibit it can only be

13 viewed by the parties in this case and myself.

14         MR. KILROY:  Understood.  That should solve it.

15         THE COURT:  All right.  You may call your first

16 witness.

17         MR. KILROY:  Our first and only witness, Your Honor,

18 is Rick Hayes.

19     (The witness was sworn.)

20         COURTROOM DEPUTY:  Please be seated.  And state your

21 full name, and spell your last name for the record.

22         THE WITNESS:  It's Donald Rick Hayes, and it's

23 spelled H-a-y-e-s.

24 ///

25 ///

1    **DONALD RICK HAYES, DEFENDANTS' WITNESS, DIRECT EXAMINATION**

2    BY MR. KILROY:

3    Q.  Mr. Hayes, what is your residence address?

4    A.  Um, I live at 1620 14th Street, Denver, Colorado.

5    Q.  And what do you do for a living?

6    A.  I am a member of Colorado Regional Center I LLLP, which is

7    the general partner to Colorado Regional Center Project

8    Solaris LLP.

9    Q.  Before we go into those entities, give the Court sort of a

10   high level of background on your education.

11   A.  Well, I went to Michigan State University, so, um, the

12   Harvard of Washtenaw County.

13   Q.  What year did you graduate?

14   A.  1977.

15   Q.  And again just on a high level, run through some of your

16   work history prior to the position you have now with CRC.

17   A.  Prior to founding Waveland Ventures in 2002, I worked for

18   a handful of investment banks, starting with E.F. Hutton.  I

19   think the last firm I worked for was Morgan Stanley.  And I

20   primarily focused on mortgage and derivative trading and

21   structured products in the latter part of my career.

22   Q.  How old are you?

23   A.  I am 64.

24   Q.  Let's go right into the entities that you have already

25   mentioned.  Starting with Colorado Regional Center Project

1    Solaris LLLP, what is that?

2    A.   That's an investment vehicle, um, that was approved by the

3    United States Citizen Immigration Services to, um, obtain

4    foreign investment in a qualified project in Vail, Colorado.

5    Q.   And it is a limited liability partnership; is that

6    correct?

7    A.   Correct.

8    Q.   Who are the limited partners?

9    A.   We have 162 foreign investors.

10   Q.   Including the plaintiffs?

11   A.   Correct.

12   Q.   Who is the general partner of that entity?

13   A.   The general partner is Colorado Regional Center I LLLP.

14   Q.   Okay.   For reference purposes during this testimony, I'm

15   going to refer to CRCSP as the limited partnership and CRC I

16   as the general partner.   Okay?

17   A.   Okay.

18   Q.   And what is the other entity, Colorado Regional Center?

19   A.   That's a management company that's responsible kind of for

20   the oversight of the day-to-day operations of the building.

21   Q.   Property management?

22   A.   Mm-hmm.

23   Q.   Okay.   Make sure you answer audibly, because we're having

24   this recorded.

25   A.   Okay.

 1   Q.  I want to clear something up before I forget.  It's just a

 2   reaction to a comment that the Court made.  What is the

 3   status -- I think the Court said something along the lines of

 4   we want to permit the project to be complete.  What's the

 5   status of the project, just so we --

 6   A.  You know, the project is fully complete.  Um, it received

 7   a certificate of occupancy I believe in 2009.  Our project was

 8   approved by, um, USCIS, USCIS, in 2011, and, um, you know, of

 9   our -- I think the majority, if not all, of the 162 investors

10   in the partnership have received their green cards.

11   Q.  And specifically on construction, has construction been

12   completed on those units?

13   A.  Correct, and a certificate of occupancy by the Town of

14   Vail was issued.

15   Q.  And the units that we're talking about at this point are

16   17 luxury condominium units?

17   A.  Correct.  There were originally 19, and then two have been

18   transferred or sold.

19   Q.  Fully developed and ready to sell right now?

20   A.  Correct.

21   Q.  You've mentioned a couple of times now EB-5.  What is --

22   what is the EB-5 investment and give us a [inaudible] again of

23   that.

24   A.  Okay.  So EB-5, if I remember correctly, is the fifth

25   immigration category created to allow a pathway to citizenship

19-cv-02443-STV                                    10/22/19    12

1    to foreign nationals that invested $500,000 into a qualifying

2    project via a qualified regional center in a specifically

3    targeted and approved area of the United States.

4    Q.  What's your understanding of the general features of an

5    EB-5 investment for it to be approved as such?

6    A.  The investments have to be deemed at risk by the USCIS,

7    and the project needs to create at least 10 jobs per investor

8    in the project.

9    Q.  To jump ahead a little bit, did this particular project

10   get approved by the USCIS as an EB-5?

11   A.  Yes, it did.

12   Q.  Did this project, in fact, create jobs sufficient to

13   satisfy the feature you just identified?

14   A.  Yes, it did.

15   Q.  How many jobs were created as a result of this particular

16   investment?

17   A.  It was in excess of 2,000, which was, you know,

18   approximately 20 percent more than the requisite jobs needed

19   to obtain the green cards.

20   Q.  So take us through the process that led to the approval by

21   the USCIS.

22   A.  You know, I wasn't really involved in terms of the

23   machinations, the mechanics of the approvals, but, um, Chet

24   Schwartz managed the regional center at the time and had been

25   a practicing attorney prior to that.  There were various --

1   various submittals, starting with the regional center, that we

2   had to have approved, that we had to make submittals to get

3   the project approved.  Every investor that wanted to place

4   money into the partnership had to be approved.  So there was,

5   you know, a series of various, you know, kind of, and sundry

6   approvals that were incumbent upon us to obtain to, you know,

7   allow the investors, um, access to the limited partnership.

8   Q.  Chet Schwartz, the attorney, was in charge of

9   communicating with USCIS at that --

10  A.  Correct.

11  Q.  In that process did the USCIS analyze the offering

12  documents that we're going to get to here in a second?

13  A.  Yes, they did.

14  Q.  Did they -- how do you know they were analyzed by the

15  USCIS?

16  A.  Well, they would correspond with us, you know, in terms

17  of, you know, the content of the various documents that we

18  submitted.

19  Q.  Did the USCIS ever engage in site visits or inspections

20  to -- just to ensure that the project was proceeding --

21  A.  Yeah, I met with a representative of USCIS approximately a

22  year and a half ago.  They did, you know, a tour and

23  inspection of the building, um.

24  Q.  And, again, ultimately the USCIS did approve this

25  investment as [inaudible] a qualifying investment?

1    A.   Correct.

2    Q.   Has the USCIS ever revoked that approval?

3    A.   No.

4    Q.   Does the USCIS have jurisdiction to do just that, to

5    revoke the EB-5 approval?

6    A.   They do.

7    Q.   We're going to jump right into the investment itself, and

8    I'm going to direct you to the exhibit notebooks, I think,

9    right to your left.  Sorry.  Get the exhibit notebook number 1

10   in front of you.

11           MR. KILROY:  And, Your Honor, I will apologize.

12   Normally we'd have these ready to go on our computer, but we

13   were kind of scrambling, and we're doing it by paper.

14           THE COURT:  No, that's all right.  [Inaudible].

15           COURTROOM DEPUTY:  If you wouldn't mind, sir, bending

16   the microphone up a little?  There you go.  Thank you.

17           MR. KILROY:  I'm taller than I used to be.

18           THE WITNESS:  Yeah, and I don't know if now is the

19   appropriate time, but, you know, there was a communication

20   with USCIS in the approval process regarding the original PPM,

21   and we did have a usage right for the investors that allowed

22   them I believe 21 days, gave them the right to use one of the

23   condominium units if it wasn't being rented.  And USCIS came

24   back and had us remove that right.  Um, it was based on their

25   judgment that the value of those 21 days over a period of time

19-cv-02443-STV                                          10/22/19    15

1    would reduce the initial $500,000 at risk, and then so we were

2    requested to take that out of the partnership agreement so

3    that the investment would be qualified.

4    BY MR. KILROY:

5    Q.  And you did -- and you did that?

6    A.  Correct.

7    Q.  So the USCIS was not just rubber-stamping this?  They were

8    actually communicating and reviewing these documents; correct?

9    A.  Correct.

10   Q.  What is Exhibit 1?

11   A.  The private placement memorandum for Colorado Regional

12   Center Project Solaris LLLP.

13          MR. KILROY:  I'd move to admit Exhibit 1.

14          THE COURT:  Any objection?

15          MR. LITOWITZ:  None.

16          THE COURT:  It's admitted.

17      (Defendant's Exhibit 1 received.)

18   BY MR. KILROY:

19   Q.  What I'm not going to do is go through -- this is a very

20   big document, but I want to just hit some highlights and get

21   your understanding of what was being -- starting with what

22   was -- what was being offered to these investors --

23   A.  Okay.

24   Q.  -- through this private placement memorandum?

25   A.  Okay.

 1   Q.   That's a question.

 2   A.   Oh.

 3   Q.   What was being offered?

 4   A.   Basically what we were offering were membership units in

 5   this limited liability partnership in the amount of $500,000

 6   so that it would be a qualified investment.  It was an equity

 7   investment into the partnership.

 8        This entity then became the lender to Solaris

 9   Property Owner 1 for 19 residential condominium units in

10   Solaris at Vail with a value of 82 and a half million dollars.

11   Q.   So let me break that down, starting with Solaris.  This is

12   the first time you've mentioned Solaris.  What is Solaris?

13   What was it at the time?  Let me ask a better question.  What

14   was Solaris?

15   A.   Solaris Property Owner was an entity, to my knowledge, was

16   owned by Peter Knobel that was developed -- as the developer

17   of the project.  Um, the project, um, consisted of 79

18   residential condominium units and I believe approximately

19   70,000 square feet of retail commercial space.

20   Q.   And Mr. Gee represents both Mr. Knobel and Solaris

21   Property Owner.  What's that company Solaris Property Owner,

22   that company?  Is that Mr. Knobel's company?

23   A.   Correct.

24   Q.   And is that ultimately the borrower in this transaction?

25   A.   Correct.

1   Q.  What was the purpose of the loan, the contemplated loan

2   from CRCPS to SPO?

3   A.  Well, it was to finance the development.  You know, it was

4   part of the source of funds in the overall development of this

5   $375 million project.

6   Q.  How was CRCPS planning on securing that loan obligation to

7   SPO?

8   A.  All the units were secured, um, with a first priority lien

9   in the form of a deed of trust.

10  Q.  Does Mr. Knobel or his company SPO have any ownership

11  interest, direct or indirect, with any of the CRC companies

12  that we've identified that you've mentioned?

13  A.  No.

14  Q.  Was the -- was there negotiation between CRCPS, on the one

15  hand, and Mr. Knobel or his company SPO regarding the terms of

16  this loan?

17  A.  Yes.

18  Q.  Who was involved in those negotiations?

19  A.  Um, myself, Mr. Schwartz, Peter Knobel, and counsel

20  before, Brian Reed Weiling [phonetic].

21  Q.  Was this an arm's length loan transaction?

22  A.  Yes.

23  Q.  You were aware that this private placement memorandum was

24  going to foreign potential investors; correct?

25  A.  Correct.

19-cv-02443-STV                                      10/22/19    18

1   Q.  Were you concerned that they may not understand the terms

2   of this English language document?

3   A.  Yes, and, um, you know, we made sure that the investors

4   were required not only to sign a English language proficiency

5   form, um, but represent via their signature, through their

6   PPM, that they understood both English and the contents of the

7   PPM.

8   Q.  Did CRCPS take measures to translate the entirety of this

9   PPM to Chinese?

10  A.  We did provide a Chinese version of the PPM, but it was

11  explicit in both agreements that if there were -- if there was

12  any confusion or, um, semantics in language that led to

13  confusion, that the English language version of the PPM would

14  be the governing document.

15  Q.  Did invest -- how did investors commit to this investment?

16  In other words, did they sign subscription agreements or

17  something along those lines?

18  A.  Right.

19  Q.  Did they, through that process, provide these

20  proficiency-in-the-English-language certificates as part of

21  the subscription agreement process?

22  A.  They did.

23  Q.  And did the plaintiffs in this case do just that?

24  A.  They did.

25  Q.  You've told us that ultimately, as I understand what

1    you've said, the investors would make an equity investment, in

2    other words, they would be purchasing a limited partnership

3    interest in the entity CRCPS.  That entity in turn would enter

4    into a debt instrument with SPO.  Is that correct?

5    A.  Correct.

6    Q.  So let's talk -- when I say "debt instrument," I just mean

7    a loan.

8         We'll go through documents here in a second, but on a

9    high level can you describe the features of the loan that

10   CRCPS intended to enter into with SPO?

11   A.  Okay.  The loan from CRCPS to SPO I, you know, the basic

12   terms were a five-year original security deed.  The interest

13   rate was 5 percent.  The loan could be prepaid, um, after

14   three years either in cash or the tendering of the underlying

15   collateral to the loan.  And we, as the lender, also had the

16   ability to reject cash payment or prepayment and have the

17   units or, excuse me, have the collateral put to us in lieu of

18   a cash payment.

19   Q.  In your affidavit I think you referred to this as the

20   put/call mechanism --

21   A.  Right.

22   Q.  -- is that right?

23   A.  So, in essence, the borrower had the right to put the

24   collateral to us, and we had the ability to call the

25   collateral away.  Um, the basic economics of that would be if

1   the value of the collateral went down, more than likely it

2   would be put to us.  If the value of the collateral went up,

3   you know, we would call it away in lieu of cash.

4   Q.  So let's talk about the time frame we're in.  The private

5   placement memorandum date is in March of 2011.  Is that your

6   recollection?

7   A.  Correct.

8   Q.  What was CRC and CRCPS's view of the state of the real

9   estate market in Vail on this topic of whether it was going to

10  go up or down?  Give us the context of this PPM.

11  A.  Well, another feature that I should -- that I didn't

12  mention -- that I didn't mention was one of the reasons for us

13  taking the project on is that, as the general partner, we had

14  a 70 percent carry in the upside of the real estate.  So if

15  the value of the real estate went up, in addition to the

16  coupon that the investors were receiving that was being passed

17  through from the loan, you know, the investors would receive

18  30 percent of any upside appreciation of the real estate, you

19  know, and we would receive 70 percent in the form of carry in

20  the upside of the real estate.

21          Um, you know, this was, you know, probably -- you

22  know, I think Vail, you know, started to get developed in the

23  mid-'60s.  This was kind of, you know, a small place, but if

24  there were outskirts, this was it.  Peter, who was a long-term

25  resident of New York and developed properties there both for

1    himself and related companies, after 9/11 moved to Vail, saw

2    an opportunity with this specific parcel, and, um, you know,

3    ended up, you know, developing, you know, a $375 million

4    project there.  It completely recentered the town of Vail.  If

5    you go there now --

6              MR. LITOWITZ:  Your Honor, I object.  He's just free

7    associating now.  He's not answering the question.  And I

8    don't want to be here forever.

9              THE COURT:  Sustained.

10             Why don't you focus the response.

11   A.  Okay.  My view of the real estate was that it would go up

12   in value or I wouldn't have structured a transaction that gave

13   us 70 percent appreciation in the value of the real estate.

14   BY MR. KILROY:

15   Q.  Let's keep it simple.  When the PPM is offered to

16   investors, did CRCPS hope that the market for luxury

17   condominiums in Vail would go up or down?

18   A.  Go up.

19   Q.  Why?

20   A.  Well --

21   Q.  Why was that your hope?

22   A.  A, it would have been --

23             MR. LITOWITZ:  Object.  He's not being asked to --

24   he's not an expert on hope, and he doesn't know -- he's not an

25   expert on the real estate situation in Vail.  He is here in

19-cv-02443-STV                                          10/22/19      22

1    the capacity of a partner in CRC.

2              THE COURT:  Overruled.  I think it goes to why the

3    transaction was set up with the put option, which is one of

4    the key issues in this case.  So overruled.

5    BY MR. KILROY:

6    Q.  Why did CRCPS hope the real estate market would go up?

7    A.  It would benefit both the investors and us, as the general

8    partner.

9    Q.  And if the real estate market went down, what would happen

10   to CRCPS and the investors?

11   A.  It would be to the detriment of the investors and us, as

12   the general partner.

13   Q.  What happened to the market between 2011 and today?

14   A.  It went down.

15   Q.  Again, I'm not going to take you through this

16   multi-multi-multi-page document, but do turn with me to the

17   table of contents.  We can at least turn to what's in -- CRC

18   Bates number 4, with Bates numbers on the bottom right hand,

19   and just tell me when you get there.

20   A.  Okay.

21   Q.  And, first of all, who drafted the private placement

22   memorandum?

23   A.  This was drafted by us.  We also had immigration counsel

24   that, um -- a group by the name of Miller Mayer that helped

25   us.

1   Q.  And when you say "us," was it drafted by attorneys for

2   CRCPS or -- yes?

3   A.  Mm-hmm.

4   Q.  At the bottom -- I'm going to jump around a little, but

5   there's a reference to attachments A through K.  Were all of

6   those attachments provided as part of this private placement

7   memorandum to all of the investors?

8   A.  They were.

9   Q.  Then we go through, again, I'm not going to take you

10  through everything, but an executive summary, a summary of

11  principal terms, a description of a limited liability

12  partnership.  Then it says statement of risks.  Why did CRCPS

13  include a statement of risks in this PPM?

14  A.  Well, you know, it's I think incumbent upon us, as a

15  fiduciary, which we are as the general partner, to make sure

16  that the investors -- there are at-risk rules relative to EB-5

17  regulations, but we wanted to be more specific in terms of the

18  economic risk that each individual investor was assuming when

19  they made this investment.

20  Q.  Those risks, it looks like, are included in the PPM as

21  indicated in the table of contents.  Turn with me to CRC 23.

22  Tell me when you're there.

23  A.  I'm sorry.  Page --

24  Q.  23.

25  A.  Okay.  Mm-hmm.

1    Q.  I'm interested in the last risk, risk of ownership of

2    condominium units.  Why did CRCPS include that?

3    A.  Mm, my page 23 says risks relating to U.S. EB-5

4    immigration program.

5    Q.  Bates number 23.  Look at the Bates number.  That's the

6    bottom right-hand number.

7    A.  Oh, okay.

8    Q.  This is always going to be -- from here on out I'm going

9    to be referring to the Bates number.

10   A.  Okay.  Risk of ownership of condominium units.

11   Q.  Why did CRCPS feel the need to advise that particular

12   risk?

13   A.  Because they were taking the risk.

14   Q.  And then turn to page 24.  The last sentence of this

15   statement of risks says:  "Additionally, there is a risk that

16   the prices of the units will decline over the next several

17   years resulting in an inability of the investors to sell the

18   units for an amount sufficient to repay the amount of their

19   initial capital contributions."

20         Why did CRCP include that specific risk in this seven

21   or eight pages of risks identified?

22   A.  Because it was a very germane risk factor that was true

23   then, and it's true now.

24   Q.  Turn with me to Bates number 34.  And just identify what

25   that document within the PPM is.

1   A.  Um, this is just an acknowledgment by the investors in the

2   partnership of their proficiency of the English language.

3   Q.  And, again, those were actually filled out by the

4   plaintiffs and submitted with their subscription agreements?

5   A.  Correct.

6   Q.  Did -- did the, um -- ultimately, was this investment

7   fully subscribed?

8   A.  Well, I think in the PPM we allowed -- I think we

9   estimated 80, we allowed for a hundred, and we -- it settled

10  at 82 and a half million, but in essence it was fully

11  subscribed.

12  Q.  Okay.  And by "fully subscribed" I mean did you stop

13  taking new investors at some point in time?

14  A.  Yes.

15  Q.  And when?  What date and time?

16  A.  I believe -- we made our -- the last, um -- you know, to

17  be honest, I don't know the date that we took the last one.

18  Q.  Okay.  But, in any case, it started, am I correct, in

19  March of 2011, and it went through for a period of time before

20  it was --

21  A.  Yeah, I would estimate 2013, in there.

22  Q.  Sometime in 2013.  So for that two-year period there's a

23  process of signing on new investors; is that correct?

24  A.  Correct.

25  Q.  And let's talk about this concept of loan advances.  I

1   think that has not come up in your testimony, but it may have

2   in prior --

3   A.   Mm-hmm.

4   Q.   -- affidavits and so forth.

5           How did the loan work in terms of getting money to

6   the borrower SPO?  Was it a lump sum, or how did it happen?

7   A.   No, it was -- they were pretty much serial fundings.  We

8   made our first loan advance in April of, um, 2012.  Our last

9   loan advance was in January of 2015.  And, in essence, as we

10  raised money, um, in increments that would allow us to

11  collateralize the borrowing with either a specific or number

12  of residential condominium units, we would make that loan

13  advance to SPO, um, and then take a deed of trust and secure

14  the note at the time of the loan advance.

15  Q.   So as loan advances were made, there was a determination

16  of the value of certain units so that that would set up

17  security; is that correct?

18  A.   Correct.  I mean, we had a memorandum of understanding

19  that went back to April of 2011, um, that was the document

20  that we operated within in terms of how units were going to be

21  selected and just kind of procedurally, um, how we would fund

22  the investments over time.

23  Q.   I read in the plaintiffs' papers that they are alleging

24  that they believed that all 79 units that were owned by

25  Mr. Gee's client were pledged as collateral in this

1   $82.5 million transaction.  Is that accurate?

2   A.  No.

3   Q.  And did --

4   A.  No, in fact, by April of 2011 there had been approximately

5   19 units in the building that had been sold with a value

6   slightly in excess of a hundred million dollars.

7   Q.  That had already been sold?

8   A.  Correct.

9   Q.  How did you, on behalf of CRCPS, ensure that the

10  collateral would adequately meet the loan advance?  In other

11  words, if you are loaning $4 million, how did you make sure

12  sufficient units were being pledged to adequately secure that

13  repayment by Mr. -- by SPO?

14  A.  Well, we would just basically manage the subscriptions as

15  they came in relative to -- you know, it was our goal to have

16  a pool of collateral, um, that best reflects all the units in

17  the building.  So we wanted half the units to face the

18  mountain and half the units to face the highway, we wanted it

19  dispersed by floors, so it was a representative sampling of

20  all the units in the building.  You know, we couldn't raise --

21  you know, we didn't have the ability -- the -- I think the

22  primary limiter on capital you can raise is job creation.  So

23  you really kind of size your loan based on the number of jobs

24  that are created.  And so given how much money we could raise

25  based on what jobs were being created for the project to stay

1  within the confines of the EB-5 regulation, then it was our

2  job to create a pool of collateral that represented the

3  building in a whole to the best we could.

4  Q.  There's been an accusation by the plaintiffs that the

5  collateral -- that this loan agreement was

6  undercollateralized, that the loan-to-value ratio was

7  something unacceptable.  What's your response to that?

8  A.  Well, it wasn't a traditional loan.  You know, had it been

9  a conventional loan without these put and call features, um, I

10 think that would be a more germane argument, um, but given our

11 ability to call the loan away -- just by means of example, at

12 its most extreme, um, had SPO not sold units prior to our

13 involvement, you know, those 77 condominium units would

14 probably have a retail value of about $400 million.  Um, if

15 our note was collateralized, our 82 million dollar -- half

16 million dollar loan was collateralized with $400 million of

17 residential condominium units, and then we had a call right,

18 the developer in essence would be giving up $320 million in

19 equity for an 82 and a half million dollar loan.  Just really

20 nonsensical.

21 Q.  Maybe more importantly, in any of the private placement

22 memorandum itself or attachments, did CRCPS ever represent

23 that these loan advances were going to be secured by all of

24 SPO's 79 units?

25 A.  No.

 1    Q.   Turn with me to Exhibit 3 in your notebook there.

 2    A.   Okay.

 3    Q.   What is Exhibit 3?

 4    A.   The English Language Proficiency --

 5    Q.   For whom?

 6         Are these the plaintiffs?

 7    A.   One of -- one of our LPs.

 8    Q.   Okay.  But are these the -- the English Language

 9    Proficiency certificates you talked about earlier that the

10    plaintiffs signed?

11    A.   Correct.

12         MR. KILROY:  Move to admit Exhibit 3.

13         THE COURT:  Any objection?

14         MR. LITOWITZ:  No objection, but I would like to

15    see -- I'm at a loss as to what this has to do with the

16    preliminary injunction hearing today.  We have four motions

17    today, and we're going into the details of what's already been

18    said in their pleadings.  So I'm a little confused as to why.

19         MR. KILROY:  As am I.  I don't even know what I'm

20    defending.  The motion says that the plaintiffs are attempting

21    to seek a preliminary injunction, and the likelihood of

22    success element goes to a claim that has never been asserted.

23    It's not in the pleading, the fraudulent transfer claim.  I

24    have to assume that we have to tell the story why my clients

25    didn't defraud Mr. -- um, opposing counsel's, I'm sorry,

 1   clients, and that's what we're doing.  We're telling the

 2   story.  And I'm moving as quickly as possible, and we will get

 3   through.

 4          THE COURT:  The objection is overruled.  One of the

 5   factors I have to consider is likelihood of success on the

 6   merits.  I note that in the briefing on this there is the

 7   argument that was just raised which is that the preliminary

 8   injunction is not an issue that -- the relief requested in the

 9   preliminary injunction is not relief that was requested in the

10   Complaint, the Amended Complaint, and as a result this whole

11   line of inquiry may be irrelevant, but, um, I'm still going to

12   consider it because I think to the extent the argument is made

13   that there was some sort of fraudulent transfer, I think that

14   this testimony is relevant.

15          So I will overrule the objection, and I will admit

16   Exhibit 3.

17       (Defendant's Exhibit 3 received.)

18   BY MR. KILROY:

19   Q.  Then let's move on to Exhibit 5.  Why don't you tell us

20   what Exhibit 5 is.

21   A.  Um, this is the original memorandum of understanding, uh,

22   between lender and borrower for the transaction.

23   Q.  The one you testified about earlier that set forth the

24   methodology for picking the units that would serve as

25   collateral?

1    A.   Correct.

2              MR. KILROY:  Move to admit Exhibit 5.

3              THE COURT:  Any objection?

4              Any objection to number --

5              MR. LITOWITZ:  No objection.

6              THE COURT:  Okay.  It's admitted.

7         (Defendant's Exhibit 5 received.)

8    BY MR. KILROY:

9    Q.   Now let's move -- I apologize for jumping around, but move

10   to Exhibit 2, please.

11             What is Exhibit 2?

12   A.   It's the limited liability partnership agreement for

13   Colorado Regional Center Project Solaris.

14   Q.   Is this the same agreement that was provided to all the

15   investors as an attachment to the PPM?

16   A.   Yes.

17   Q.   And then turn with me again to Bates number -- the last

18   four pages on [inaudible] which starts with Bates number

19   210 --

20   A.   Okay.

21   Q.   -- to 214 -- 213.

22             And when you get there, tell the Court what is that

23   last attachment, the last three -- three pages or four pages?

24   A.   This is a list of 162 limited partners' as well as the

25   general partner's ownership interest in the entity.

 1   Q.  And if you look at the very last page, it has 166

 2   references, as I'm reading this, 165 at the top --

 3   A.  Oh, I'm sorry.  Did I say 162?

 4   Q.  You did.  I wanted to clear that up.

 5   A.  166.

 6   Q.  And that last reference is -- so 1 through 165 are

 7   limiteds.  166 is --

 8   A.  166 is --

 9   Q.  -- general.  Is that correct?

10        [Speaking over one another].

11   Q.  This is an entity, a limited liability partnership.  Who

12   under this operating agreement of this entity was charged with

13   making decisions for the company?

14   A.  The general partner.

15   Q.  And, again, CRCPS?

16   A.  Excuse me?  I'm sorry?

17   Q.  That's CRCPS?

18   A.  Um, the --

19   Q.  I'm sorry.

20   A.  The Colorado Regional Center I was the --

21   Q.  I'm confusing you because I was confused for a moment, so

22   let me clear it up.

23           The general partner is CRC I; is that correct?

24   A.  Correct.

25   Q.  What are the types of decisions that CRC I made for the

1   partnership CRCPS?

2   A.   I think the primary economic decisions that we made in

3   terms of affecting investor return, um, was, uh, at its

4   highest level, the loan, the structure of the loan itself

5   where we had these put and call features that ultimately did

6   not work to our benefit.

7        Um, we were also responsible for, um, monetizing the

8   investment via the leasing of the units, um, during the

9   period, um, when we were trying to sell them, which we still

10  continue to do.

11       Um, the overall making sure that the units are

12  maintained, you know, in a manner, um, where there is no

13  liability in the form of deferred maintenance.

14       And then ultimately, um, maximizing the value of the

15  units in a point in time, um, to return, you know, as much or

16  all of the original investment that we can.

17  Q.   Did the general partner, CRC I, receive compensation for

18  services as the general partner of CRCPS?

19  A.   We did.

20  Q.   And -- did and do; correct?

21  A.   Correct.

22  Q.   Because the entity is still -- --

23  A.   Still --

24  Q.   -- in existence?

25  A.   Yeah.

1    Q.   It's still servicing?

2    A.   Correct.

3    Q.   Turn to page 190, again, Bates number CRC 190.

4    A.   Mm-hmm.

5    Q.   Article V is the article that refers to compensation for

6    services.   In lieu of reading it, what was the annual

7    management fee that CRC I was entitled to per this operating

8    agreement?

9    A.   Uh, 2 percent of the outstanding value of the membership

10   units.

11   Q.   And what specifically -- I have kind of alluded to this.

12   Let me now get specific.

13        What did CRC I do to justify that compensation for

14   services?   What was the specific type of activity that was

15   going on?

16   A.   Well, in terms of the general -- you mean -- there's the

17   overall management of the property, as well as the regulatory

18   compliance functions, you know, that we have both to USCIS and

19   our investors.

20   Q.   Did CRC I have employees that needed to get paid to --

21   A.   Correct.

22   Q.   -- fulfill these functions?

23   A.   Correct.

24   Q.   About how many?

25   A.   We have four full-time employees and, you know, we

1    outsourced, you know, various legal functions, various

2    accounting functions.

3    Q.  Does the general partner continue to communicate with the

4    USCIS on any level?

5    A.  We do, as well as the investors in the partnership.

6    Q.  To ensure compliance with the USCIS --

7    A.  Correct.

8    Q.  -- parameters?

9    A.  Mm-hmm.

10   Q.  Now turn with me to Exhibit -- page 193 of this same

11   document.  And I'm interested in the entirety of Article VIII,

12   which is the powers, rights and obligations of general

13   partners.  Right?

14   A.  Right.

15   Q.  Would you just read the second listed power of the general

16   partner, number (2).

17   A.  Sure.

18          "To manage, sell, develop, purchase, mortgage,

19   improve, operate and dispose of Limited Partnership Property,

20   including to act on behalf of Limited Partnership with respect

21   to any Limited Partnership or joint venture in which the

22   limited partnership participates."

23   Q.  And is it your understanding that the 17 units that we're

24   talking about -- used to be 19; we'll explain that in a

25   second -- are limited partnership property?

1   A.   Correct.

2   Q.   Let's -- let's find the specific references to the put and

3   call provisions that you have identified.  So look at me with

4   Exhibit -- look to Exhibit 4 with me.  Sorry.

5           MR. KILROY:  Before we do that, I would belatedly

6   move to admit Exhibit No. 2, which is that limited liability

7   partnership agreement.

8           THE COURT:  Any objection?

9           MR. LITOWITZ:  None.

10          THE COURT:  It's admitted.

11      (Defendant's Exhibit 2 received.)

12  BY MR. KILROY:

13  Q.   So Exhibit 4 is entitled Loan Agreement.  Is that correct?

14  A.   Yes.

15  Q.   Now, this loan was subject to a number of different

16  instruments, correct, different documents and so forth?

17  A.   Correct.

18  Q.   So on this one, page 232, paragraph 11, which is at the

19  bottom of 232, it says prepayment of note.  What was the point

20  of that provision, the prepayment of note provision?

21  A.   Basically it allowed the borrower to prepay the note after

22  36 months from the original advance, and they could prepay in

23  the form of cash or tendering the collateral securing the loan

24  advance.

25          MR. KILROY:  Move to admit Exhibit 4.

1          THE COURT:  Any objection?

2          MR. LITOWITZ:  None.

3          THE COURT:  It's admitted.

4      (Defendant's Exhibit 4 received.)

5  BY MR. KILROY:

6  Q.  And then look with me at Exhibit 6.

7  A.  Mm-hmm.

8  Q.  The yield enhancement agreement.  And in particular

9  paragraph 3, option to demand conveyance.

10 A.  Correct.

11 Q.  And what was the point of that provision?

12 A.  Well, that was basically our call right on the units.  Um,

13 were SPO to come to us and want to repay a note in cash, we

14 could refuse payment and demand transfer of the unit to us.

15 Q.  If the market for luxury real estate in -- luxury condo

16 multifamily real estate in Vail had increased, would CRCPS

17 have exercised that call right that's identified in the yield

18 enhancement agreement?

19 A.  Yes.

20 Q.  Let me be clear on something I glossed over.  When I asked

21 you what happened with the market, just so we're clear, we're

22 talking about the market of luxury multifamily condominium

23 units in Vail?

24 A.  Correct.

25 Q.  And, again, is it your testimony that since 2011 that

1    market has gone down rather than up?

2    A.   Correct.

3             Well, it has for Solaris, yeah --

4    Q.   For Solaris.

5    A.   -- for luxury condominiums in Vail.

6    Q.   Then turn with me to Exhibit 10.

7    A.   I'm sorry?

8             MR. KILROY:  I didn't move to admit Exhibit No. 6,

9    and Miss Kanan was going to stand up, but move to admit

10   Exhibit No. 6.

11            THE COURT:  Any objection?

12            MR. LITOWITZ:  None.

13            THE COURT:  It's admitted.

14       (Defendant's Exhibit 6 received.)

15   BY MR. KILROY:

16   Q.   So just to summarize, Exhibit 4, it shows the borrower's

17   put right.  Exhibit 6 shows the lender's call right.  Is that

18   correct?

19   A.   Yes.

20   Q.   Did the investors get copies of those two exhibits as

21   attachments to their private placement memorandum?

22   A.   They did.

23   Q.   Now look with me to Exhibit 10.

24            Tell me when you're there.

25   A.   I'm there.

1   Q.  This is a series of documents.  The first page is deed of

2   trust, and then as you go through there are separators for

3   each one.  What -- what -- what is Exhibit 10 in total?

4   A.  Um, Exhibit 10 consists of deeds of trust that granted us

5   a first priority security lien in each of the properties

6   securing the loan to SPO.

7   Q.  And the first one is dated April 26, 2012.  That's the

8   recordation date; correct?

9   A.  Correct.

10  Q.  And the others, I'll represent, have different dates.  The

11  last one, page 618, is dated May 20 and 23rd.  Why were there

12  different dates for the filings of these deeds of trusts?

13  A.  Basically they would sync up with the loan advances that

14  we made for the various, um, condominiums that were securing

15  the loan advances.

16  Q.  Now, to be clear, were each and every one of these deeds

17  of trust the first position on the collateral, the units in

18  this Solaris?

19  A.  Yes.

20  Q.  Have they always been first deeds of trust?

21  A.  Yes.

22  Q.  Has there ever been a moment where they had lost priority,

23  to your knowledge?

24  A.  No.  In fact, we transferred two units, um, to investors

25  since the beginning of the partnership, and those units have

 1   been totally unencumbered.

 2   Q.   Let's -- before we get there -- I'll get to that, but

 3   we've now referenced the put right and call right.  What

 4   happened at the three-year mark when the parties,

 5   borrower/lender, each had that put and call right?  What

 6   actually happened?

 7   A.   The lender notified us of their intent to tender the units

 8   to us.

 9   Q.   In what time period is that?

10   A.   That would have been three years after -- well, it was

11   probably a few months before the third anniversary of the

12   first loan advance.

13   Q.   Okay.  March, April 2015?  Does that time frame sound

14   right?

15   A.   Correct.

16   Q.   So the borrower puts the properties to the lender.  The

17   Court has seen, through the filings, that the title to the

18   properties didn't go to CRCPS.  Is that accurate?

19   A.   That is accurate.

20   Q.   Why?  First tell us why, and then tell us how we got

21   there.

22   A.   Um, it's really just a question of cost and what we felt

23   was in the best interest of the investors.  Um, were we to

24   transfer title, um, to the limited partnership versus holding

25   a deed of trust, the cost of that exercise would have

1   approximated a million dollars.  Um, there's a 1 percent

2   transfer tax in the Town of Vail.  We would have had to pay --

3   you know, prepay three months of HOA dues.  In fact, it would

4   have caused us then to go out and insure the various units

5   which, you know, which was being insured at the time -- you

6   know, was being insured by SPO.

7            So we made a business judgment that, um, basically

8   entailed not incurring a million dollars of partnership

9   expenses to take title versus holding a first deed of trust,

10  that our security position was such that it just simply didn't

11  merit taking title of the properties.

12  Q.  In other words, the security position remains the first

13  position.

14  A.  Correct.

15  Q.  Let me restate it to make sure we've got it.

16           SPO entered into an agreement with CRCPS that,

17  notwithstanding the put, SPO would retain title; correct?

18  A.  Correct.

19  Q.  And ultimately the objective was to liquidate or sell

20  these units; correct?

21  A.  The objective never changed.  It was just basically, in

22  our opinion, form over substance in taking title to the units

23  and burdening the partnership with a million dollars of

24  expenses that given that we held a first security interest in

25  the real estate underlying the loan, it simply didn't make any

1    sense to incur that expense.

2    Q.  Let me make it really simple.  If SPO had transferred

3    title to CRCPS, CRCPS then transfers title to a third-party

4    purchaser, there would be a $1 million consequence?

5    A.  Correct.

6    Q.  If SPO holds title and conveys to the ultimate purchaser,

7    there would not be a million-dollar hit?

8    A.  Correct.

9    Q.  And that's why you did it?

10   A.  Correct.

11   Q.  For the first time you've used the term "business

12   judgment."  Tell us why that decision was in the best

13   interests of the limited partnership.

14   A.  Well, ultimately when a unit is sold, it doesn't --

15   there's no creation of more risk for the partnership relative

16   to the spending of a million dollars of monies that, in our

17   judgment, was not necessary.

18   Q.  Who would have taken that million-dollar hit had you just

19   gone ahead and taken title?

20   A.  All the investors.

21   Q.  To the tune of a million dollars?

22   A.  Correct.

23   Q.  As we sit here today, is SPO willing to transfer the

24   properties directly to a final purchaser so that that million

25   dollars is not incurred?

1   A.  Yes, and we have done it twice.

2   Q.  And if they don't, CRCPS has the first deed of trust on

3   all those properties; correct?

4   A.  Correct.

5   Q.  So taking us through -- this hasn't been cleared up yet.

6   We started with -- as I understand it, 19 units were pledged

7   as collateral by SPO.  Correct?

8   A.  Yes.

9   Q.  We are now talking about 17.  What happened to those other

10  two?  You started to mention this.

11  A.  We were approached by, um, initially a group of eight

12  investors that wanted to tender their partnership interests

13  for a specified condo unit and then have the right to either

14  keep, sell, dispose, whatever they wanted to do with that

15  condominium unit.  And then we got approached by a second

16  group.  You know, in both instances, um, we accepted the

17  tendering of their units and transferred the real estate to an

18  entity owned by those specific members of the partnership.

19  Q.  Those limited partners were similarly situated to the

20  plaintiffs in that they each invested $500,000; correct?

21  A.  Correct.

22  Q.  How did they do on a return of their investment based on

23  the transactions that you mentioned?

24  A.  One sold a unit, and one still owns a unit.

25  Q.  How about the one that was sold?

1    A.   The one that was sold, um, you know, they received about

2    30 percent -- they received about, you know, right around --

3    approximately 70 percent of the value of their membership

4    unit.

5    Q.   So they took a 30 percent loss based on the real estate

6    market in Vail, Colorado, for luxury condominium units?

7    A.   Yes.

8    Q.   Now, chronologically, I want to focus on the point --

9            THE COURT:  I'm sorry.  I'm sorry.  To clarify, is

10   that 8H?

11           THE WITNESS:  No.  That would have been 6E West.

12           THE COURT:  Thank you.

13   BY MR. KILROY:

14   Q.   While we are at it, you said there were two.  6E West

15   was --

16   A.   6E West was one, and 3C East was the other.

17   Q.   C3 East [sic] is the other.  And that one is still being

18   held by the limited partners; is that correct?

19   A.   Yes.

20   Q.   So we are down to 17 left securing the remainder of the

21   loan; correct?

22   A.   Correct.

23   Q.   I want to take us to -- we have established that in the

24   spring of 2015 SPO puts properties back to the [inaudible] to

25   hold title for our benefit.  What did CRCPS do to address the

1   clear concern the plaintiffs and all investors had in

2   liquidating their investment?  What did CRCPS do starting at

3   that point?

4   A.  We began on a six-month basis notifying and communicating

5   with the investors, um, by providing them put exercise

6   notices.

7   Q.  Well, did, for instance, CRCPS or CRC I make any effort --

8   I should say CRC I, the general partner, make any -- any

9   effort to liquidate the investment, meaning sell properties?

10  A.  Oh, okay.  Yes, we did.  Um, we received an unsolicited

11  bulk offer from Ed Flynn [phonetic] in New York.  We didn't

12  think that the offer was real, um, given the financing

13  contingencies.  Any offer we asked him to remove the financing

14  contingencies, because they basically wanted to take -- have

15  us take the property off the market.  We didn't think that was

16  an investment good for the partnership, and, um, so that offer

17  went away.

18        Shortly thereafter, um, Peter Knobel made an offer

19  for three of the units.  [Audio interference] because we

20  didn't think it was a sufficient value.

21        We then went out to a handful of groups that we

22  thought might be interested in the property on a bulk sale

23  basis.  Again, we didn't deem those offers to be within the

24  range of what we would say is fair value.

25        Um, and then we made the decision to retain Cushman &

1   Wakefield, which if they're not the largest, they're one of

2   the top five commercial real estate brokers in the world.

3   And, um, they basically went out worldwide to solicit offers,

4   um, on a bulk sale basis.  And, um, you know, again we weren't

5   really comfortable with the discount factors that were being

6   put on ultimately [audio interference] determine what the

7   price was.

8          And so shortly thereafter I think we moved our

9   listing from, um -- they were originally listed with Solaris

10  Real Estate.  We moved the listing to Slifer, and -- which is

11  I believe the biggest real estate brokerage firm in Vail, and

12  they listed four of our units.  And through that we were able

13  to obtain an offer from a large commercial real estate

14  developer in Colorado and that we've ultimately signed a

15  letter of intent with.

16  Q.  Okay.  We're going to get to that, we'll call it the

17  LOI --

18  A.  Correct.

19  Q.  -- in a moment.

20         Let me break that down again.  You are describing a

21  number of different efforts to unload the property, in

22  colloquial terms.  Correct?

23  A.  Correct.

24  Q.  Has it been CRC I's objective to sell all the units in the

25  best way to maximize the investment for the investors?

1   A.  Correct.

2   Q.  Since that put happened in the spring of 2015?

3   A.  Correct.

4   Q.  You identified, as I understood it, listings of individual

5   units, listings of bulk sale opportunities, hiring brokers

6   where there [inaudible] selling the property?

7   A.  Yes.

8   Q.  So let me break that down even further.  If I have 17

9   units, condominium units in Vail, Colorado, there's many ways

10  I could liquidate those.

11  A.  Mm-hmm.

12  Q.  And let me take you through them.  Um, one would involve

13  putting all of them as individual units on the market.  Has

14  CRC I done that?

15  A.  No.

16  Q.  Why not?

17  A.  I don't believe --

18  Q.  Why not?

19  A.  It's basically supply and demand.  Um, you know,

20  there's -- there was originally 77 units in the building.  I

21  believe SPO has sold 19 units.  You know, we acquired 19

22  units.  So there's, you know, in essence, 58 units still for

23  sale in the building.  You know, were you to list every one of

24  them and create that kind of supply, it would completely

25  destroy any price integrity in the building.

1  Q.  It would be a buyer's free-for-all market; correct?

2  A.  Correct.

3  Q.  And --

4  A.  It would be like every house in the neighborhood for sale

5  versus one.

6  Q.  And I asked you about the 17 that you now have control of.

7  Separately, is SPO marketing units in that same building?

8  A.  Yes.

9  Q.  How many right now?

10  A.  I would believe, you know, that they probably have about

11  the same number of units listed as we do, I would think, you

12  know, in that four to seven.

13  Q.  To be clear, did CRC I use its business judgment and

14  determine that it would not be a good solution to dump 17

15  units onto the market all at the same time?

16  A.  Not in a retail environment.

17  Q.  Another way you could do it is to bulk sale; correct?

18  A.  Correct.

19  Q.  And am I correct that that is the preferred approach that

20  the general partner has to liquidating this, this investment?

21  A.  Yes, based on our belief of both near and longer-term

22  liquidity in the building.

23  Q.  Would a bulk sale necessarily involve some kind of a

24  discount?  In other words, if you were to sell 17 units over a

25  period of time, would there necessarily be some discount if

1  you sell them all at once?

2  A.  Yeah, I mean, the bulk sale purchaser will not be the end

3  user of unit.  So, you know, a retail buyer will live in the

4  unit for a period of time.  Whoever buys these units in bulk

5  will buy them, you know, with the sole goal of over time

6  reselling them for a gain based on some kind of implied return

7  that's predicated both as a function of [inaudible] and price.

8  Q.  As long as the properties are held by CRCPS, they have

9  been managed; correct?

10  A.  Correct.

11  Q.  And we have covered the mechanism for management, which is

12  the general partner manages; correct?

13  A.  Yes.

14  Q.  In exchange for a fee that's in the operating agreement;

15  correct?

16  A.  Correct.

17  Q.  If there's a bulk sale, what happens to the approval of

18  that management fee?

19  A.  They no longer exist.

20  Q.  It stops on the day of sale?

21  A.  Correct.

22  Q.  If there's not a bulk sale, if you choose to market these

23  properties in ones, twos, threes, fours over a period of

24  years, what happens to the management fee that is --

25  A.  It stops accruing.

1   Q.   It --

2   A.   Oh, if we continue to manage it?  Then it continues to

3   accrue.

4   Q.   Until the last unit is sold?

5   A.   Correct.

6   Q.   You have been accused in the first Complaint, CRC I and

7   CRCPS, of not marketing these properties quickly enough, as I

8   understand, because of a motivation to benefit from the

9   accrual of management fees.  Has that ever been a motivation

10  of CRC I in this process?

11  A.   No.   I mean, our primary motivation from the beginning of

12  the partnership was in concert with what we wanted to achieve

13  for our investors, and that was, you know, investing in a real

14  estate project that went up in value [inaudible] accordingly.

15  Q.   You share an interest with the investors to invest dollars

16  realistically for these properties; is that correct?

17  A.   That's correct.

18  Q.   Has CRC I used its best reasonable business judgment in

19  making all these decisions you have identified?

20  A.   Absolutely.

21  Q.   Turn with me to Exhibit 11, and tell me when you're there.

22        MR. KILROY:  And, again, I forgot to move to admit

23  Exhibit 10, which was the deeds of trust.

24        THE COURT:  Any objection?

25        Any objection to the admission of 10?

1           MR. LITOWITZ:  No.

2           Um, are we going to go through this on all these?

3           THE COURT:  I do need to tell counsel, I have a

4    conference at 1:30.  So to the extent we can expedite the

5    remaining testimony from the witness, I encourage you to do

6    so, because we still have cross-examination and redirect and

7    then argument also.

8           MR. KILROY:  I'll stop and do that, and that would

9    involve admitting exhibits that haven't already been offered.

10          THE COURT:  Okay.

11   BY MR. KILROY:

12   Q.  So let's identify Exhibit No. 11.

13   A.  These are just communications from us to the limited

14   partners.

15   Q.  Referencing appraisals that were done and so forth and

16   exit strategies; is that correct?

17   A.  Correct.

18   Q.  How many of those notices went out to the investors?

19   A.  I'd have to count them, but they've been --

20   Q.  I'll represent there's six in Exhibit 11.

21   A.  Okay.

22   Q.  Does that sound right?

23   A.  Yeah.

24          MR. KILROY:  Move to admit Exhibit 11.

25          THE COURT:  Any objection?

1              MR. LITOWITZ:  No objection.

2              THE COURT:  It's admitted.

3         (Defendant's Exhibit 11 received.)

4    BY MR. KILROY:

5    Q.  What was the point of sending the investors these notices?

6    A.  Um, just to basically keep the limited partners appraised

7    of the value of their investment.

8    Q.  And I do want to just quickly reference one thing in

9    Exhibit 11, which is page 638.  Can you tell me when you're

10   there?

11   A.  I'm there.

12   Q.  Beginning in the middle of the page and then into the

13   bottom, there's something called "put right."  Just at a high

14   level, what was CRC I conveying to the investors about their

15   right to [inaudible]?

16   A.  Well, we gave the investors the ability to provide us with

17   notice of their intent to exit the partnership.

18   Q.  And that's what's referenced as that put option in the

19   notices?

20   A.  Correct.

21   Q.  Did the plaintiffs in this case pursue that opportunity

22   that's identified as the put option?

23   A.  Not to my knowledge.

24   Q.  Okay.  And to the second -- turn with me now -- we are

25   going to go to the second volume, and then we're almost done.

1          Exhibit 12 I think is the first document in the

2    second volume.  And what is that?

3    A.  This was an appraisal that was done in June of this year

4    that represents, um, an appraiser's opinion of the value of

5    the collateral on a bulk sale basis.

6    Q.  And CRC I commissioned this appraisal; is that correct?

7    A.  Correct.

8    Q.  Turn to me -- turn with me -- I've got that wrong every

9    time -- to CRC 684, which is three -- four pages in.

10          MR. KILROY:  Before asking any questions, I'd move to

11   admit Exhibit 12.

12          THE COURT:  Any objection?

13          MR. LITOWITZ:  No objection.

14          THE COURT:  It's admitted.

15      (Defendant's Exhibit 12 received.)

16   BY MR. KILROY:

17   Q.  What does the whole page 684 represent?

18   A.  Um, it's a unit-by-unit listing of the current outstanding

19   collateral securing on the notes of the partnership.  There

20   are 17 units with an appraised value of 41,290,000.

21   Q.  And the reference at the bottom of that chart, bulk value

22   as is, is this -- is it your understanding this appraisal is

23   of the bulk sale market value?

24   A.  Correct.

25   Q.  At $41,290,000?

 1  A.   Yes.

 2  Q.   Which is about $8 million short of the opportunity we had

 3  in this letter of intent?

 4  A.   Correct.  The letter of intent is for 49 and a

 5  half million.

 6  Q.   And then turn with me to Exhibit 13.  I'll just represent

 7  that 13 are individual unit appraisals for the 17 units.

 8  A.   Mm-hmm.

 9  Q.   Is that your understanding as well?

10  A.   Yes.

11  Q.   And the time period I have for these is the same general

12  time period of June and July of 2019.  Is that your

13  understanding?

14  A.   Correct.

15          MR. KILROY:  Move to admit Exhibit 13.

16          THE COURT:  Any objection?

17          MR. LITOWITZ:  No objection.

18          THE COURT:  It's admitted.

19      (Defendant's Exhibit 13 received.)

20  BY MR. KILROY:

21  Q.   Then turn with me to Exhibit 14 in this notebook.

22  A.   Okay.

23  Q.   Exhibit 14 is a series of e-mails, I'll represent, from

24  the plaintiffs.  They speak for themselves, but they refer to

25  withdrawing the put exercise notice previously given to your

1   office.

2           Am I correct that the plaintiffs clearly rejected

3   that opportunity to provide put notices the liquidation

4   strategy that's identified in Exhibit 11 these notices?

5   A.  Correct.

6   Q.  And they did it in writing?

7   A.  Correct.

8   Q.  Prior to this lawsuit being filed?

9   A.  Correct.

10          MR. KILROY:  Move to admit Exhibit 14.

11          THE COURT:  Any objection?

12          MR. LITOWITZ:  No objection.

13          THE COURT:  It's admitted.

14      (Defendant's Exhibit 14 received.)

15          MR. KILROY:  And, Your Honor, if I may, we didn't

16  include the LOI in the notebooks because we didn't have a

17  ruling yet, but I'm prepared to give the witness a copy of

18  that.

19          THE COURT:  Okay.

20  BY MR. KILROY:

21  Q.  Mr. Hayes, this is what we called Exhibit 8.  And after

22  the hearing we can insert it in the exhibit notebooks.  This

23  is subject to the Court's order we heard about at the

24  beginning of this, um, [inaudible].

25          First of all, identify --

1      THE COURT:  Before we question on this, is it

2  possible to put this portion of the proceedings under

3  restriction, level 1, or no?

4      COURTROOM DEPUTY:  Yes.

5      THE COURT:  Okay.  And then we have individuals in

6  the courtroom that I -- whom I don't know who they are.  So

7  I'm assuming counsel will tell us if there are any problem

8  with them being subject to this portion of the proceeding.

9      MR. KILROY:  There's not.  Counsel [inaudible]

10 attorneys on the SPO side, representatives of the principals

11 of the CRC, and folks from my office.

12     THE COURT:  All right.  Okay.  Until further order,

13 the next portion of the testimony will be under restriction,

14 level 1.

15     MR. KILROY:  Thank you, Your Honor.

16   (Restricted portion of proceedings filed in

17    separate transcript.)

18              *     *     *     *     *

19     THE WITNESS:  So just tell me when it's okay.

20 BY MR. KILROY:

21 Q.  You can go ahead.

22 A.  Okay.  It probably negates the other limited partners'

23 ability to participate in a liquidity event.

24     MR. KILROY:  I have nothing further.  Thank you.

25     THE COURT:  Thank you.

1           We'll take a five-minute recess, and then we'll go to

2    cross-examination.

3           (Proceedings recessed 10:49 a.m. to 10:57 a.m.)

4               THE COURT:   Please be seated.

5               All right.   Cross-examination.

6                        **CROSS-EXAMINATION**

7    BY MR. LITOWITZ:

8    Q.   Good morning, Mr. Hayes.   Can you hear me?

9    A.   Yeah, a little [inaudible] there.

10   Q.   I want to draw your attention to the Bates number -- to

11   the very last document in the first volume.   It's the May 30th

12   letter to investors.

13          This is May 20.   So it would be CRC 674, triple zero

14   674.

15   A.   Okay.

16   Q.   It's also Exhibit 5 to your affidavit if that makes it

17   easier for you.

18          Have you got it?

19   A.   I'm there.

20   Q.   Okay.   In the first full paragraph that begins "Upon," I

21   want you to read me the sentence that begins "At the closing."

22   It's one, two, three, four, five, six, seven, eight, nine

23   lines down.

24   A.   This is the notice dated May 20th, 2019?

25   Q.   Correct.

1    A.   And then which paragraph?

2    Q.   First full paragraph on page 5 of that document.

3    A.   Page 5?

4    Q.   Beginning with the word "Upon."

5    A.   Okay.

6    Q.   Go ahead and read it, and skip (a).  Just go to (b).

7    A.   Okay.  So the paragraph that's -- I'm just having a hard

8    time following you.  "Upon the Partnership's receipt" --

9    Q.   Correct.  Go down 9 lines.  To the right it says, "The

10   Partnership will pay" --

11   A.   Okay.

12   Q.   Can you read that to --

13   A.   "The Partnership will pay the Put Purchase Price for the

14   LP interest by check or wire transfer of funds."

15   Q.   Okay.  Keep going.

16   A.   "At the closing of the sale of the LP interest to the

17   Partnership, the LP shall deliver to the Partnership" --

18   Q.   (b), just go to (b).

19   A.   I'm sorry?

20   Q.   Sub (b).

21   A.   "...waiver and release of the Partnership from any and all

22   future claims, each in a form acceptable to the Partnership."

23   Q.   Okay.  What does that mean?

24   A.   Well, we were asking for a release of any future liability

25   that the, uh, LPs may place upon us.

1  Q.  So if they have a finding for breach of fiduciary duty in

2  your bulk sale and they get paid, they sign a waiver waiving

3  their rights.  Is that correct?

4  A.  No.

5  Q.  It's not correct?  Then what does this mean?

6  A.  Well, I don't think the put exercise notice is part of a

7  bulk sale.

8  Q.  What does it mean that they will waive and release the

9  partnership from all future claims?

10 A.  The whole paragraph is prefaced by "Upon the partnership's

11 receipt of such put exercise notice..."

12 Q.  Correct.  And bulk sale would be -- you don't -- you're

13 saying [inaudible].  So in a bulk sale they would still retain

14 the right to sue you for breach of fiduciary duties.

15 A.  Yes.

16 Q.  That's [inaudible].  I'm just double-checking.

17         Would you say this was a good investment from the

18 perspective of the limited partner, a wash, or a bad

19 investment?

20 A.  You'd have to define good, moderate, and bad for me.

21 Q.  Okay.  You put in $550,000, and you get back 250,000.  Do

22 you think that's a good investment?

23 A.  You know, I'm not an investor, and I would --

24 Q.  You're -- you have a background in finance; is that

25 correct?

1    A.  You asked me if it was a good investment.  You know, these

2    investors received permanent green cards --

3    Q.  I didn't ask about the green cards.  Okay.  I'll move on.

4            You said in response to Mr. Kilroy that the USCIS

5    looked at the documents.  Did they pass on the fairness of the

6    documents to the limited partners?

7    A.  No, I think the --

8    Q.  I just -- yes or no?  Did they pass on the fairness of the

9    documents?

10   A.  No.

11   Q.  Did they pass on the quality of the investment?

12   A.  You'd have to define "quality" to me.

13   Q.  In terms of whether it was a good or bad investment?

14   A.  No.

15   Q.  Did they pass on securities law registration issues under

16   the '40 Act, '33 Act, '34 Act, Investment Company Act?

17   A.  No.

18   Q.  Is the USCIS a judicial branch of government?

19   A.  No.

20   Q.  Did the USCIS pass on the sufficiency of collateral in

21   this case?

22   A.  No.

23   Q.  Did the USCIS pass on the fiduciary duties and whether you

24   satisfied your fiduciary duties as CRC?

25   A.  That would have been perspective, but no.

1  Q.  So when you say they passed on it, did they pass on any of

2  the financial side of it?

3  A.  No.

4  Q.  Okay.  This loan was structured as nonrecourse; correct?

5  A.  Correct.

6  Q.  You have a background in finance.  Is typically a

7  nonrecourse loan structured exactly to the penny with

8  collateral, or is it overcollateralized?

9  A.  In an instance where the loan has an embedded call option

10  in it, it would always be structured at the money.

11  Q.  Okay.  Let's talk about the call option.  Did you do a

12  Black-Scholes analysis of the value of the call option?

13  A.  No.

14  Q.  Okay.  So what value was the call option?  Did you do an

15  analysis of it?

16  A.  I didn't have to do an analysis of it.

17  Q.  Okay.  You gave them a put option.  What's the value of

18  their put option?  If they put to you properties that were

19  bulked at 41 to 49 and they borrowed 82.5, which has more

20  value, your call or their put?

21  A.  They would have equal value.

22  Q.  That's absolutely -- can you explain what you mean by

23  equal value?

24  A.  If it's structured at the money, given their put, given

25  standard deviation returns over a given point of time, given

```
 1   fair market value of the collateral, the options would be
 2   valued at the same price.
 3   Q.  I spent 10 years as a senior counsel of a hedge fund.
 4   That's not true.
 5           MR. KILROY:  Your Honor, move to strike.
 6           THE COURT:  That's --
 7           MR. KILROY:  Ask that questions be asked and not
 8   testify.
 9           THE COURT:  Sustained.
10           MR. LITOWITZ:  Understood.
11   BY MR. LITOWITZ:
12   Q.  Does the PPM say that there are 19 units?
13   A.  No.
14   Q.  Does the PPM say how many units there are --
15   A.  No.
16   Q.  -- as collateral?
17           Does the PPM talk about the project, people investing
18   in the project?
19   A.  The -- does it talk to the project?
20   Q.  Does it mention the project?
21   A.  Yes.
22   Q.  Okay.  So attached to the PPM is a promissory note, which
23   has been entered as an exhibit here.  Okay?  In the back of
24   the promissory note at CRC 000177 --
25   A.  You'd have to direct me so I can look at it.
```

1   Q.  Well, it's at CRC 177.

2           THE COURT:  I think --

3           UNIDENTIFIED SPEAKER:  It's Exhibit 1.

4           THE COURT:  -- it's Exhibit 1.

5           MR. LITOWITZ:  Those are Bates numbers.

6   A.  Okay.  What page in Exhibit 1?

7   BY MR. LITOWITZ:

8   Q.  177.

9           And Exhibit 1 was given to investors; correct?

10  A.  Correct.

11  Q.  How many lines are there that list the dates of properties

12  and potential properties?  Can you count those lines, please?

13  A.  You're serious?

14  Q.  Yeah.

15          UNIDENTIFIED SPEAKER:  Of course he's serious.

16  A.  42.

17  BY MR. LITOWITZ:

18  Q.  If it's secured by a limited partner, why are there 42

19  lines on the promissory note for security?

20  A.  Because I think it fits the page.

21  Q.  Do you believe that that creates an impression in the eyes

22  of someone from China, where you don't list a collateral and

23  they see 44 lines for collateral?  Do you think that would

24  create an impression for them?

25  A.  I can't speak to what somebody from China would --

 1   Q.   Obviously.

 2            Okay.   I want to turn your attention now to page, um,

 3   CRC 00206.   It's at document number 2.

 4   A.   Again, you're going to have to be a little more -- pardon?

 5   Q.   I'm sorry.   Document number 2.

 6   A.   Okay.   And then what Bates number?

 7   Q.   206.

 8   A.   206.

 9            Okay.

10   Q.   This discusses, um, generally a 70 percent rule with

11   respect to sales.   Can you explain that rule?

12   A.   Well, I think, again, this goes back to the put notice and

13   that if in exercising the put, um, we aren't able to generate

14   a price equal or greater to 70 percent of the fair market

15   value set forth in that option notice, you know, they'll

16   basically have the right to rescind the acceptance of the

17   option.

18   Q.   Okay.   So a bulk sale -- I'm just trying to understand

19   this.   Can you explain to me -- you see a bulk sale as outside

20   of the put?

21   A.   Yes.

22   Q.   Okay.   So would you seek approval of the limited partners

23   before a bulk sale?

24   A.   No.

25   Q.   Why wouldn't you do that?

1    A.   We're not compelled to.

2    Q.   What's that?

3    A.   We have very broad investment powers as the general

4    partner within the four corners of the partnership agreement.

5    Q.   So you took in $82 million, and how much is it worth now?

6    A.   Well, in the eyes of the Brue-Baukol people, they have put

7    a bulk sale value of 49 and a half million.  Um, we also have

8    another current appraisal --

9    Q.   Well, hold on a second here.  If the loan is 82.5 with

10   5.5 percent interest, each year that's 4 and a half million

11   dollars.

12   A.   Okay.

13   Q.   So at the maturity it would generate an extra $20 million.

14   It would make over a hundred million dollars.  Correct?

15   A.   Yeah, but they have --

16   Q.   That's just a yes or no.

17   A.   Yes.

18   Q.   Okay.  So it would have been a hundred million dollars if

19   it had been paid at maturity.

20   A.   Okay.  Well, they also had the right to prepay it after

21   three years at the interest rate --

22   Q.   Why would you give them that right?

23   A.   I'm not agreeing to your math.

24   Q.   Why would you give them -- why would a lender give

25   somebody that right, to put the units back to them after three

1   years?

2   A.   Because we had the right to call them away as well.

3   Q.   But you could call away in year five.  At year five the

4   choice -- the amount they owed you would be well over a

5   hundred million dollars because that would be 5 percent --

6   A.   But --

7   Q.   -- on --

8   A.   -- the note would have been --

9        [Speaking over one another.  Inaudible.]

10  A.   -- it wouldn't have been a hundred million because the

11  full value of the interest payments did not go direct -- all

12  completely to the investors.  They paid other expenses.  So --

13  Q.   They paid --

14  A.   -- that it would accrue up to that amount is simply not

15  correct.

16  Q.   Okay.  What would it accrue to?

17  A.   I don't have the ability -- I could do the math, but I

18  don't know if I can do it right now.  I will tell you, though,

19  that the LPs since the inception of the partnership had

20  received, as of June 19, $8.1 million.

21  Q.   As of June 19?

22  A.   June 19, 2009.  $8.1 million has been distributed to the

23  LP in the --

24  Q.   Okay.  Let's get to the Lucky 5.  Do you know Lucky 5?

25  A.   No, I don't know Lucky 5.

19-cv-02443-STV                                      10/22/19    67

1    Q.   Lucky 5 is the buyer of the three Cs.

2    A.   Okay.

3    Q.   You don't know them?

4    A.   I know we had five --

5    Q.   They called me recently.

6    A.   Pardon me?

7    Q.   They called me in Chinese.

8              So the interesting thing is you now take people and

9    you put them in the list; right?  People exercise put rights.

10   You claim in your pleadings that you have 82 percent of the

11   people that are giving you put rights.  Is that -- is that

12   correct?

13   A.   No -- I don't know the exact percentage, but it seems

14   reasonable.

15   Q.   Okay.  How do you decide who goes out first?

16   A.   How do we determine --

17   Q.   Who gets assigned out to a property that is being sold?

18   A.   It's typically based on the date of the put notice.  You

19   know, first in, first out.

20   Q.   So these five were the first at the top of the list.  Is

21   that what you are testifying today under oath?

22   A.   The transfer of these units, again, weren't as a result of

23   a put notice.  This was a transfer of collateral based upon

24   their desire to obtain the collateral and do with it what they

25   felt was in the best interest of the individual partners that

1    were taking trans -- they were basically transferring their

2    membership interest for a piece of collateral in the

3    partnership, but not under a specific put right.

4    Q.  So they weren't -- they were outside of the put right, and

5    they were outside of a broker.  They were just a transfer of

6    [inaudible] in determining kind.

7    A.  Correct.

8    Q.  Do you know the five people?

9    A.  Do I know them personally?  No.

10   Q.  What broker did you use -- Chinese broker did you use to

11   sell all these in China?

12   A.  We used, you know, more than one.

13   Q.  Can you give me their names?

14   A.  I believe we used a group called Whale Yan [phonetic].

15   Q.  Whaul Yan [phonetic].  Okay.

16   A.  We used a group called Shiny Way [phonetic].  Is that not

17   the pronunciation?

18            I'm sorry?

19   Q.  Now --

20   A.  We used Whale Yan [phonetic].  We used Shiny Way

21   [phonetic].  Um, I think there might have been one other, you

22   know, group that we used, but, you know, we used different

23   immigration agents.  World Way [phonetic], I believe.

24   Q.  If you got $49 million, which is an "if," what would be

25   the waterfall in terms of how much your entity would get?

1   Would you get your accrued management fees?

2   A.   We would.

3   Q.   What are they accruing now at?   What percent?

4   A.   6 percent.

5   Q.   So they're at the default rate?

6   A.   Well, the reason they are at the default rate is, if you

7   want to go to the waterfall, our management fees have always

8   had priority to the preferred return of our investors.   We

9   decided a couple years ago to defer our management fees and

10  place the interests of investors ahead of us and pay them the

11  preferred return, and then we deferred our management fees.

12  Q.   So at a bulk sale you would get your fees back with -- at

13  the return?

14  A.   Most of it.

15  Q.   Would the investors get -- get the default rate on -- when

16  they get paid back?

17  A.   Depending on default.

18  Q.   Yeah.   Okay.   In the bulk sale you are going to be getting

19  paid -- CRC will be getting paid, so it's a conflicted

20  transaction.   Have you used an independent board of directors

21  or an independent group to assess this?

22         MR. KILROY:   Objection to the embedded legal

23  conclusion in the question.

24         THE COURT:   Sustained, but he can answer the

25  question.

1   BY MR. LITOWITZ:

2   Q.   Do you -- does your entity stand to make money from the

3   bulk sale?

4   A.   We stand --

5   Q.   And how much?

6   A.   -- our carry.  So if a 70 percent, any type of --

7   Q.   Well, so will the limited partners.

8   A.   But will we receive our management fees?  Yes, we will

9   receive our management fees.

10  Q.   Okay.  Have you formed an independent board to look at

11  this --

12  A.   No.

13  Q.   -- transaction?

14          You send out a, um -- this -- this item which comes

15  out every six months, and it says that the entities are 93 --

16  they're 93 percent collateralized.  What do you mean by that?

17  A.   You'd have to show me exactly what you are referring to.

18  Q.   I've just got to move this beast.

19          On page CRC 675, Exhibit 11.

20  A.   Okay.

21  Q.   On this chart of fair market value it says that, um,

22  you're 93 percent collateralized.

23  A.   That is based on an appraisal that was done at the time,

24  correct.

25  Q.   Okay.  So if you're 93 percent collateralized, why would

1  you sell the units for so little?

2  A.  Well, it's basically a function of liquidity and time and

3  discount.  And I'm sure, as the general partner of a hedge

4  fund that you head, you're very conversant in that, but --

5  Q.  You don't have discount values in your appraisals?

6  A.  The appraisals assume that individual units are sold on a

7  one-off basis.  The bulk -- to a go-away buyer, to a retail

8  buyer, a buyer that will use the unit.

9       A bulk sale will go to an intermediary who will not

10 reside in the units but will actually provide a warehouse

11 function and then look to resell the units to end users of the

12 real estate.

13 Q.  Understood.

14 A.  That intermediary will price the units at a discount to

15 whatever a current appraisal or market value would be to

16 generate a return for the period of time that they would have

17 to hold the assets based upon historical velocity of sales in

18 the building given a designated --

19 Q.  Okay.

20     [Speaking over one another.  Inaudible.]

21 Q.  One of the keys of market value is obviously what price

22 you can get for something on the market.  Would you agree?

23 A.  Say that again?

24 Q.  One of the -- one of the ways to figure out market -- fair

25 market value is the price you get for something.

19-cv-02443-STV                                        10/22/19    72

1   A.   I --

2   Q.   You can say a house is worth a million dollars, but if you

3   can only --

4   A.   I --

5   Q.   -- sell it for 500 --

6   A.   -- agree with you that is the definition of market value.

7   Q.   Okay.  So how do you get 93 percent collateralization and

8   you're selling for 4 -- at -- and the collateral is worth

9   $73 million, and now you are proposing in this same notice to

10  sell it for 41?  And maybe now you're saying 49.

11  A.   Perhaps I didn't explain that well enough.  The appraisal

12  is based on any one unit being sold at a particular time, not

13  all 17 units being sold at the same time.

14  Q.   I get that, but the question is -- you sold exactly one

15  unit in three years; right?

16  A.   Correct.

17  Q.   Okay.  So you're not exactly whipping through these.  So

18  if you went at that rate, 19 times 3, you're talking 57 years

19  to get rid of these units.

20  A.   Well, I think that's your answer to why we would sell them

21  in bulk.

22  Q.   Well, then this number is wrong, because you can't sell --

23  you can't --

24  A.   They're two different numbers, sir.

25  Q.   I know they're two different numbers.  They're -- you've

1  got both of them in your document that you are giving to the

2  limited partners.  So they're obviously --

3  A.  [Inaudible] responsibility to provide both values.

4  Q.  Can you see why the limited partners would be extremely

5  confused?  They don't really understand English.  I mean, you

6  think -- you think -- you may think they understand English --

7  A.  It's not --

8  Q.  -- but they don't.

9  A.  I take issue with that.  It's not that we think --

10      [Speaking over one another.  Inaudible.]

11  A.  It's that the investors represented to us that they speak

12  English.

13  Q.  I understand --

14  A.  They made representations.  We relied on the

15  representations that they speak and understand English.

16  Q.  Do you --

17  A.  We have no other set of facts other than what they

18  represent to us.

19  Q.  Okay.  Have you been to China?  Do you go there a lot?

20  Spend time?

21  A.  I have been there.  I don't go there a lot.

22  Q.  Do you think it's a dangerous place?

23          MR. KILROY:  Your Honor, relevance.

24          MR. LITOWITZ:  It's very relevant.  We're asking

25  about ability to sign a document that you admit which is about

 1   whether they understand --

 2   A.  No, I don't think it's a dangerous place.  I think it's a

 3   nice place.

 4          THE COURT:  I will briefly allow some questioning

 5   into this.  I want to emphasize what we are here for today.

 6   It is the various motions that are pending.  The most [audio

 7   interference] is the preliminary injunction, and right now the

 8   only testimony that's been before me is, one, that there's an

 9   appraisal that comes in under the value of what the current

10   sale is.  And there's been some questioning about another

11   appraisal, but it seems like you don't even believe the

12   numbers in this other appraisal.  If that's the case --

13          MR. LITOWITZ:  They don't believe it.

14          THE COURT:  Fine.  Let's assume for purposes of today

15   that everybody thinks this is a phony appraisal number.  That

16   supports -- that doesn't support your preliminary injunction.

17   That supports denying the preliminary injunction.  Now, that

18   may go ultimately to a breach of fiduciary duty or some other

19   claim down the road, but whether I actually enjoin this -- if

20   everybody agrees these things aren't worth anywhere near their

21   current value, I don't see how that helps the motion for

22   preliminary injunction.

23          MR. LITOWITZ:  Well, because -- okay.  It removes the

24   subject matter.  So -- you can only sell something once.

25   Okay?  So if it's sold at an artificially low price, the

1   minute it's sold, my people become predators.  Okay?  Under

2   the Limited Partnership Act.

3           THE COURT:  I understand that, but so far today there

4   is absolutely zero testimony that this is an artificially low

5   price.

6           MR. LITOWITZ:  I --

7           THE COURT:  Go ahead.  Your questioning wasn't to

8   that.  It was to your client's knowledge of the language.

9   Because this was brought up on direct, I will allow some brief

10  questioning into this, but I do want to note we are at 11:30

11  or so, close to 11:30 at this point.

12          MR. LITOWITZ:  Okay.  I'll make it real short then.

13  BY MR. LITOWITZ:

14  Q.  So you're saying that if there's a bulk sale, the clients

15  can still, regardless, not have to sign a waiver.  They don't

16  do anything.  They don't sign anything.  It's structured such

17  that you make a bulk sale.

18  A.  We would not require releases from any limited partners

19  relative to the bulk sale.

20  Q.  Okay.  So if there is a bulk sale at 49.5, how much of

21  that ends up -- how much of that ends up with the limited

22  partners?  Do you have any rough idea?

23  A.  Um, I would say roughly 42 million, 43 million.

24  Q.  Split among 158, I think?

25  A.  Well, we had 8 and 12 --

1          MR. KILROY:   152.

2          THE WITNESS:   100 and --

3          MR. KILROY:   152.

4          THE WITNESS:   There was 162; correct?

5          MR. KILROY:   Yeah, but that was before the takeout of

6     the limited partnership.

7          THE WITNESS:   There was 8 before, wasn't there?

8     BY MR. LITOWITZ:

9     Q.   I guess my puzzle is also just -- I'll note that in the

10    letter of intent it says that there's a drop dead date in

11    June.  If you look at the letter of intent, page 2.

12    A.   What are you referring to?

13    Q.   Actually, page 3.  This exhibit has been admitted.  "The

14    terms set forth in this Letter of Intent shall expire" --

15    A.   Can you direct me, though, to what you are reading?

16    Q.   I'm on page CRC 306 on Exhibit 8, which is the letter of

17    intent that, uh, Attorney Kilroy handed out.

18    A.   Okay.

19    Q.   Page 3 of that letter of intent.

20    A.   Correct.

21    Q.   It says, "The terms in this Letter ... shall expire

22    June 10th, 2019."

23    A.   Correct.

24    Q.   Has there been a continuation of this agreement?

25    A.   I think you're missing the point.

1    Q.  No, I'm not.  I'm asking you a question.

2    A.  You're missing the point.  This letter was sent to us on

3    June 3rd with a 10-day period for us to agree to the LOI.

4    This LOI was signed on June 5th, which was two days after

5    June 3rd and within the expiration period that he's deemed in

6    here being June 10th.

7    Q.  So what's the expiration date of this LOI?

8    A.  There is no expiration date of the LOI.  What he was

9    referring to is saying, I'm sending you a letter of intent on

10   June 3rd.  By June 13th either you execute it and you return

11   it to me or this LOI is no longer available for your

12   execution, the deal is off the table.

13   Q.  So --

14   A.  We then signed it two days later --

15   Q.  Correct.

16   A.  -- and said, we are now bound by your LOI.

17   Q.  So the 40 -- page 2 of Exhibit 8, it says there's a 45-day

18   due diligence period?

19   A.  Correct.

20   Q.  That would take you to, um, July 25th?

21   A.  It would have.

22   Q.  Um, my lawsuit wasn't filed until August 28th, so, um --

23   A.  Again, this was a letter of intent.

24   Q.  Correct.

25   A.  Okay?  It's the intent by each party to operate within the

1   confines of what's on here.  It's not a binding agreement.

2   There are no damages for this happening 90 days later or 120

3   days later.  It's just simply a document that outlines the

4   intent of both parties, again, intent.  And there will be a

5   series of documents, including a purchase and sale agreement,

6   that will actually effectuate the transaction.

7          Unfortunately, due to this litigation, due to

8   comments you and your plaintiffs have made, all this is now at

9   risk, and so it's been pushed back until the potential

10  purchaser sees a clear path to being able to execute on the

11  transaction.

12  Q.  Didn't Jim Knobel get all 82.5 million?

13  A.  I don't know what you mean did he get all 82 --

14  Q.  Didn't he get a loan from you -- from the LLLP for

15  82.5 million?

16  A.  Well, the terms of the loan agreement would specify if we

17  were making a loan to somebody in a specified amount that he

18  would receive the proceeds of the loan or we'd be in breach of

19  that agreement.  Yes.

20  Q.  Okay.  And you -- he got his money.  You're going to get

21  your money.

22  A.  We haven't.

23  Q.  You will at the bulk sale; right?

24  A.  That's speculative.  I can't --

25  Q.  The losers are this side.

1   A.   Pardon me?

2   Q.   We're the losers.

3   A.   Again, you use terms -- I don't know how --

4   Q.   Who's losing money at the bulk sale?  Not Knobel.  Not

5   you.  Who's losing money at the bulk sale?

6   A.   The investors will receive less money than they invested,

7   so they will incur a loss, correct.

8            MR. LITOWITZ:  I have nothing more.

9            THE COURT:  Redirect.

10                    **REDIRECT EXAMINATION**

11   BY MR. KILROY:

12   Q.   Mr. Litowitz showed you a blank page where the collateral

13   was to be described in the private placement memo.  Do you

14   remember that?

15   A.   Correct.

16   Q.   Why was it blank?

17   A.   Uh, because we had not raised any money at that point from

18   anyone, um, nor did we have the opportunity, so there couldn't

19   have been any loan advances given there weren't any funds to

20   lend.

21   Q.   In other words, collateral hadn't been identified until

22   loan advances came out; correct?

23   A.   There -- the partnership -- if the borrower doesn't have

24   the funds to lend, we can't specify what we're lending on.

25            MR. KILROY:  I have nothing further.

1           THE COURT:  Thank you.  All right.

2           MR. GEE:  I have just one quick question.

3                      **CROSS-EXAMINATION**

4    BY MR. GEE:

5    Q.   Mr. Hayes, who is the borrower in this transaction?

6    A.   Solaris Property Owner I.

7    Q.   Was Mr. Knobel ever a borrower?

8    A.   No.

9           MR. GEE:  Nothing further.

10          MR. KILROY:  Can I redirect on that?

11          THE COURT:  Yes.

12                **FURTHER REDIRECT EXAMINATION**

13   BY MR. KILROY:

14   Q.   Who is SPO?  Who controls it?  Who controls SPO?

15   A.   To my knowledge, Peter Knobel.

16          THE COURT:  Okay.  You're excused.

17          Okay.  Any further witnesses for the defendants?

18          MR. KILROY:  No, Your Honor.  We'd rest.

19          THE COURT:  Okay.  I will now take up argument.  I'm

20   going to begin with document number 54.  This is a motion for

21   protective order.  I am going to grant this.  I don't need

22   further argument on this.  The motion for protective order

23   seeks a standard protective order, which is set forth in

24   Exhibit 1.  I think, given the nature of this case and the

25   discovery that will be made -- that the parties will need to

1   get into, including value of transactions and financial

2   information with respect to the companies involved,

3   potentially certain financial information with respect to the

4   individuals involved, that may contain sensitive information,

5   and I think that it is standard in such cases to issue

6   protective orders.

7           The proposed protective order has at paragraph 12 the

8   ability for a party to object to the designation if somebody

9   is trying to overuse the confidential information, and I think

10  that that provides sufficient protection to the parties that

11  information that should be made public will be made public and

12  information that should not be made public will be maintained

13  as confidential.  And, therefore, I will grant number 54

14  without any further argument on it.

15          That then brings us to the preliminary injunction,

16  and that's the one I want to address next.  And here it's

17  plaintiffs' motion.  I'll hear further argument, but in

18  particular what I'd like you to address is it appears that,

19  largely, what you are seeking here and through this litigation

20  is money damages, and it appears that that money damages may

21  be obtained in one of a couple of ways.  The first would be if

22  the properties happen to have sufficient value that were they

23  to be liquidated at some point, it could result in a return of

24  capital.  All of the testimony here today was that the chances

25  of that happening are slim to none.  I don't even think you

1    believe that that's going to happen.

2           So then the remaining money comes out one of two

3    ways, either from the general -- this suit against the general

4    for money damages.  The general is going to have, it sounds

5    like, some money from this sale.  I don't know whether the

6    general has any other additional assets or not, but whether it

7    does or does not, it's still available whether this

8    preliminary injunction is granted or not.  You can still

9    continue to go after the general.

10          The third is some -- is under the theory of a

11   fraudulent transfer against the other defendants in this case,

12   but, again, that theory exists whether or not a preliminary

13   injunction is granted or whether a preliminary injunction is

14   not.

15          So it seems that the only real harm here in allowing

16   this bulk sale is if the bulk sale is significantly under the

17   value of what could be obtained on the market, but it doesn't

18   tell -- I have no evidence of that.  So I don't know how I

19   find harm for allowing this bulk sale to go through.  On the

20   flip side, all of the testimony is this bulk sale valuation is

21   higher than anything that anybody's offered in the past and

22   higher than the current appraisal.  And so if that's the case,

23   there would be harm in blocking this.

24          So it appears that the balancing of the harms of

25   granting versus not granting would seem to way with the

1    defense in this case, but I'll allow you to address that.

2            MR. LITOWITZ:  Thank you.  I understand your logic,

3    Your Honor, and I see where you're coming from.

4            I think that our greatest fear here that we haven't

5    quite addressed yet is that once the property is sold, then

6    the general partner can dissolve, the LLLP can dissolve,

7    there's nowhere left for my clients to [inaudible].  They're

8    selling the meat of the -- of the transaction.

9            THE COURT:  Well, but isn't that then a -- if the

10   transaction goes through, certainly the LLLP can dissolve.

11   It's going to be liquidated.  It's not going to have any other

12   assets.  The general, on the other hand, will have some

13   assets.  That's what the testimony was here today.  Isn't then

14   the remedy seeking some sort of injunctive relief against the

15   dissolution of the general so that the general continues to

16   have assets in this case that you can continue to go after

17   down the road?  That seems like a different issue.  I'm not

18   addressing that here today because there's been no briefing on

19   that, but it seems if that's what your concern is, then that's

20   the remedy in this case, is liquidating these assets; allowing

21   the LLLP to dissolve; get some money back to the limited

22   partners -- it's not going to be 500,000; it's going to be 270

23   or something along those lines -- and then [inaudible] wish to

24   continue the lawsuit against the general, ensure that those

25   assets aren't dissipated in some way.

1        MR. LITOWITZ:  As long as we can -- I think today

2    clarified that they're saying -- and I -- as long as this is

3    something we all agree on -- that the bulk sale does not waive

4    the rights to any future claims.

5        THE COURT:  That --

6        MR. LITOWITZ:  It's got to be crystal-clear.

7        THE COURT:  They are on record testifying to that.

8        MR. LITOWITZ:  Okay.

9        THE COURT:  I will allow the defendants to make any

10   dispute argument to that, but I think your client twice was

11   very clear that this sale goes through and they don't waive

12   their rights under the lawsuit.

13        UNIDENTIFIED SPEAKER:  [Inaudible].

14        THE COURT:  I will allow the defendants to respond to

15   that.  That was my understanding of the testimony.

16        MR. KILROY:  That was mine as well.

17        THE COURT:  So you have them on record in federal

18   court.

19     [Voices speaking over one another.  Inaudible.]

20        MR. LITOWITZ:  That goes some distance to our

21   allowing them to go through with the bulk sale, because that

22   was a key concern of mine in reviewing the language.

23        So I do get your -- I do understand your point.  Um,

24   my -- what I'm trying to say in the Complaint is that this

25   whole entire thing is structured so that everyone will walk

 1   away with money except my people, and I think you need to

 2   realize that.

 3          THE COURT:  I understand -- I understand that

 4   argument, and down the road I'm sure that's going to be part

 5   of your argument on the breach of fiduciary duty claim, but

 6   I'm not weighing in on that one way or another now because I

 7   don't think I need to.  That's not what's at issue here today.

 8          Here today the two most critical motions are the

 9   notice of lis pendens and the injunction.  And if -- as I

10   think everybody agrees here today, or at least the only

11   testimony was, this sale is not an unfair sale.  You can argue

12   that the original transaction was set up in some way that was

13   unfair, that the agreement was somehow -- initially this

14   agreement was unfair, the fact that the general continued to

15   receive management fees is unfair, but that's not what is at

16   issue today, is should we sell these units.  And all of the

17   testimony here today was this is the best they're going to get

18   out of it.  And if it's the best they're going to get out of

19   it, I'm very hesitant to block it because that may hurt your

20   clients, too, because now with a lis pendens sitting on there

21   and with a permanent injunction prohibiting it, these things

22   are logically only going to continue to drop in value.  And

23   instead of getting whatever it is, 4 -- instead of getting

24   even 60 cents on the dollar or 55 cents on the dollar, you may

25   only get 25 cents on the dollar down the road.  And I'm not

1   inclined to do that.

2           Again, that's a different issue than whether there

3   was some breach of fiduciary duty in how this was set up or

4   some breach of fiduciary duty in the fact that they can walk

5   away from this with still getting their, you know, management

6   fees at the end.  That's a different issue than what we have

7   here today.

8           MR. LITOWITZ:  I understand Your Honor, and I

9   appreciate that, and I [inaudible].

10          THE COURT:  Okay.  Since we're on this, because I

11  think the notice of lis pendens is a major potential hindrance

12  to this, I think that as we -- as the motion is currently

13  sitting, I should grant the motion to strike the notice of lis

14  pendens because as it was filed -- when it was filed, there

15  wasn't a derivative claim.  Now, now there is, and in theory

16  you can now go back in after I strike this and file a new

17  notice of lis pendens, and then we can argue whether that's

18  valid or not going into whether or not this is a validly pled

19  derivative claim.  That's not before me.  And, again, I just

20  urge the parties to be cautious in what your ultimate goal

21  here is in this case.

22          MR. LITOWITZ:  You know, the question of whether the

23  lis pendens is valid or not is a question under the spurious

24  document law, which was enacted to prevent antigovernment

25  groups from putting lis pendens on the homes and post offices

1    in rural Colorado.  Okay?

2          We have a genuine dispute over title because every

3    document in that book says title will be transferred back to

4    the, um, company, and I have no idea why it structured this

5    transaction so that the transaction fees when they pay -- if

6    they're being paid back with property, they should pay the

7    transaction fees too.

8          THE COURT:  Well, but the answer to that, from the

9    testimony here today, was if they transferred this back, then

10   under the tax laws --

11         MR. LITOWITZ:  I get it.

12         THE COURT:  But you've got the --

13      [Speaking over one another.  Inaudible.]

14         MR. LITOWITZ:  That's not a good argument.

15         THE COURT:  Why?

16         MR. LITOWITZ:  Because why set up a loan where it's

17   kicked when you get -- when the other person exercises their

18   rights?  No sane person would do that.

19         THE COURT:  Again, that goes back to what was done

20   five, six years ago, whenever this was set up, and that -- you

21   may be --

22      [Speaking over one another.  Inaudible.]

23         THE COURT:  You may be absolutely right that this was

24   a terrible transaction when it was first set up, and you may

25   be absolutely right to that.  Whether or not that is a breach

1    of fiduciary duty or just bad business judgment, that's a

2    question for down the road.  But as we sit here today, if this

3    gets transferred back, they get dinged with 800,000 or so in

4    taxes.  So why would they transfer it when -- what is a danger

5    here if they have the first priority deed of trust?  What are

6    you worried about happening with a first priority deed of

7    trust?

8            MR. LITOWITZ:  I'm very worried because the property

9    is in the name of SPO, one of their creditors, a super

10   priority creditor.  It could have bankruptcy.  It could have

11   other people make claims against it.  I tell you what --

12           THE COURT:  But how would they deal with first

13   priority?

14           MR. LITOWITZ:  I tell you what.  It's possible.

15           THE COURT:  Let's use your example before.  You had

16   your home on the market.  You say you bought your home with a

17   mortgage through Chase Bank.  It puts a first priority lien on

18   you.  You go bankrupt.  Chase has the first priority.  Chase

19   is going to get their property back.

20           MR. LITOWITZ:  There are other people that can get in

21   front of you, like debt repossession lenders.  They get in

22   front of lienholders.  You know that.

23           THE COURT:  Okay.

24           MR. LITOWITZ:  In spite of -- I'll hold the title to

25   your house.  How about that?  I mean, you know, you wouldn't

1    want that.  No, it's okay.  Let me hold the title to your

2    house.  I'm like, no, you won't get to hold the title to my

3    house.

4         THE COURT:  If they told me, let me hold the title to

5    your house while you try to sell it or else it's going to cost

6    you a hundred thousand dollars -- now, it may have been set up

7    badly in the beginning.  That's a different question.  Whether

8    or not this was a terrible deal from, you know, 2011 or

9    whenever it was structured is not the question before me

10   today.  It's accepting the deal that we have, where -- where

11   do we go with this?  It's not really the lis pendens question.

12   But I think -- and I will allow you to argue this, but the lis

13   pendens, I have to read it from was there a claim on the land

14   on the date that the lis pendens was filed.  And that's based

15   on the original Complaint, and there was not a claim on the

16   land.  The Amended Complaint has a derivative claim.  The

17   original Complaint does not.  And if I need to look at when

18   the original Complaint was filed, there was no claim on this

19   land.

20        MR. LITOWITZ:  Well, I did have a count for lis

21   pendens saying there was a 1/60th claim -- in the lis pendens

22   itself I claimed it.

23        This is not -- this is a suit over title.  Every

24   [inaudible] this title should go back.  And the Chinese

25   themselves think that -- the Chinese themselves, first of all,

1    can't figure out why there are not 79 units.  There are some

2    things we need to discuss here.  Like there's a right of first

3    refusal for Mr. Knobel to sell his units before these 19 get

4    sold.  And there's all kinds of things in here that you

5    wouldn't even dream of how badly this was set up, but it was

6    just set up bad.  And so there's a genuine title dispute as to

7    who owns the title to this, who should have title.  It's not a

8    question of it costs more, it costs less.  Title should go to

9    the creditor, period.  That's what the documents say.

10             So you are telling me I should forget the documents

11   and should be practical and I shouldn't enforce the documents.

12   It's hard for me to understand a federal judge telling me

13   that.

14             THE COURT:  What I'm telling you is that on the lis

15   pendens motion I have to look at what the -- when the lis

16   pendens was filed, what was -- was there a claim on the land,

17   and there wasn't.  There's no claim anywhere on the original

18   Complaint.

19             MR. LITOWITZ:  Okay.  I can -- I mean --

20             THE COURT:  You have -- you have --

21        [Speaking over one another.  Inaudible.]

22             MR. LITOWITZ:  I can refile.

23             THE COURT:  You can refile, and that's not before me.

24             MR. LITOWITZ:  That's not the dispute here?

25             THE COURT:  There wasn't in the original Complaint,

1   no.  Tell me where in the Complaint there's an original

2   title --

3           MR. LITOWITZ:  The original Complaint says we believe

4   title was held with SPO instead of with the creditor, and it

5   should be with the creditor.

6           THE COURT:  Where?

7           MR. LITOWITZ:  Um, I think it's -- it's in one of the

8   earlier pic- -- um, numbers.  I can find it.

9           THE COURT:  It's document number 1 is the original

10  Complaint.  Point me to where it says anywhere that there's a

11  title claim there.

12          MR. LITOWITZ:  Um, I have it in paragraph 56:

13  "Counsel has been informed the transaction is structured so

14  that title stays with SPO if the lease unit is sold, which

15  creates a danger that a creditor of SPO or Knobel may try to

16  reach this collateral or SPO might declare bankruptcy, leaving

17  the investors without title."

18          THE COURT:  Okay, but that then doesn't work its way

19  into any of the claims for relief.  I'm sure --

20      [Speaking over one another.  Inaudible.]

21          MR. LITOWITZ:  I understand what you're getting at.

22  There's a little back story here.  The back story here is I

23  wanted to work out a small deal for eight people.  Okay?  And

24  I approached them and said, I want to get my eight people out.

25  And I said, Let's get them out, otherwise I'm going to -- you

 1   know, there will be a title dispute and I am going to file a

 2   lis pendens.  They said no.  I said, I've got 12 people now.

 3   They said no.  I said, Get my 12 out; we'll work out some

 4   solution.  No.  Now I've got 20 and more coming.  There's

 5   another lawsuit in front of Judge Wang, 15 people, exact same

 6   case against the exact same plaintiff -- exact same

 7   defendants.  I filed a notice to you about that.  I'm only

 8   going to get more and more clients, and it may be [inaudible].

 9        So, I mean, if this could have been solved a long

10   time ago, I put in a Mickey Mouse count for lis pendens as a

11   kind of favor.  Let's settle this before it gets out of hand.

12   And no good deed goes unpunished.  Now in this case I have

13   20-some clients, and it's going to blow up.  And when they

14   hear that their -- this is -- a bulk sale is going to happen

15   around them, it's going to blow up.  I'll get another 50

16   clients.

17        THE COURT:  I don't think the argument is it's going

18   to happen -- do you mean without their input, or do you

19   mean --

20        MR. LITOWITZ:  Yes.  If they find out there's no

21   input, it will blow up.  I'll get another 30 clients then.

22   They don't want this deal.  They want their money back.  They

23   want all of it back.  And they're not -- the only way they are

24   going to get it back, they think, is by -- is by not having

25   the land sold.  So I'm here to represent them.

1          THE COURT:  Let me ask this.  How -- again, I'm not

2    sure that this goes to the motions now other than to the

3    potential harm of the sale.  How so -- at least the evidence

4    before me is --

5          MR. LITOWITZ:  Very easy.  Very easy.  The person

6    that borrowed the money pays it back.  That doesn't sound too

7    complicated.  They borrowed the money.  They pay it back.  And

8    then I take all of my lis pendens, I take all of my motions,

9    and I take my case, and I go back to Chicago.  Give the money

10   back.  You're rich.  You borrowed the money.  You had the

11   money for many years.  You've been paid much interest on it.

12   You were able to put it off [inaudible] all the units.  And

13   you know what else?  The loan was disguised as equity.  They

14   got to call it equity so they can go to the bank and borrow on

15   it.  They've got plenty of benefits.  Just pay it back, and

16   we're out of here.  I'm out of your hair.  I don't want to be

17   in your hair.  I don't want to cause you any trouble.  Just

18   pay the money back.

19         THE COURT:  Any further argument?  You have argued

20   that the, um --

21         MR. LITOWITZ:  I see where you're going, Your Honor,

22   and I understand you are going to deny the preliminary

23   injunction and you are going to deny -- and you want

24   withdrawal of lis pendens.  I will do that if you want me to

25   do that.  I understand your --

 1            THE COURT:  I want to know because you have one more

 2    motion pending, which is the motion to hold Mr. Kilroy and his

 3    clients in contempt, is there any further argument?  I've

 4    reviewed it.  I've reviewed the response.  I've reviewed the

 5    reply.  I have reviewed the letter itself.  I will tell the

 6    parties I have concerns about the language that's in the

 7    letter.  I don't think it rises -- given the status of where

 8    the case was when this letter was sent, I don't know that it

 9    rises to the level of contempt, although I will allow

10    plaintiff to make further argument on that.  But I do have

11    concerns about the language in this -- in this letter.  But

12    I'll allow you to make any further argument you wish to make

13    on that.

14            MR. LITOWITZ:  My concern is that I just want an

15    apology to my clients, and I will walk away happy.

16            THE COURT:  Okay.  Let me hear from defendants.  I

17    think you probably have a sense of where I'm leaning on the

18    first two.  I'm not inclined to hold contempt, but I don't

19    like this language.  What it says is:  "The Complaint fails to

20    address the significant benefit received by the plaintiffs in

21    the form of a permanent green card."  I don't have any problem

22    with that language.  That's an accurate statement.  The next

23    one I do.  It says:  "As the lawsuit proceeds, we may ask the

24    plaintiffs to voluntary abandon their green card or ask the

25    Court to revoke their green card should the plaintiffs

1   continue to seek rescission as a remedy."

2          I have some problems with this.  One, there is

3   absolutely no basis on which I could revoke the parties' green

4   cards.  That is an executive decision within ICE, and I have

5   absolutely no ability to revoke a green card.

6          Second, I think if you -- I don't see any benefit

7   that this gives to informing the individuals.  If they were in

8   danger and what you were doing was informing them of, hey,

9   this -- this may create problems for you that you may not be

10  aware of, that's one thing.  This reads to me as an implicit

11  threat, and I don't like it.  Okay?  This was sent shortly

12  after the lawsuit was filed.  Nobody had entered in on it.  I

13  am not inclined to hold anybody in contempt for it, but I

14  don't like it, and I don't want to see future statements like

15  this in letters.

16         MR. KILROY:  Your Honor, I understand.  I respect

17  that perspective.  I'll work with the client to make sure that

18  doesn't happen again.  You might just at least explain the

19  thought process, because I think since you generalize the idea

20  of sending the letter -- again, there's two; there's one from

21  me to Mr. Litowitz, and there's one from my client to the

22  limited partners.  I will take responsibility for both

23  messages because they went out with my understanding and

24  approval.

25         The idea here was to edu- -- or to let the entirety

```
 1    of the limited partners know, kind of on a high level, watch

 2    out what you ask for.  The real motivation is to educate them

 3    about this letter of intent and --

 4         THE COURT:  And that's fine.  I don't have an issue

 5    with anything else in this letter.  I don't have an issue with

 6    you informing them, telling them.  That last sentence I think

 7    goes beyond informing to containing an implicit threat.

 8         MR. KILROY:  I hear you.  All I can tell you, as an

 9    officer of the court, is that was not the intention, but the

10    analysis -- and it doesn't matter; it's not on the table right

11    now -- is a little different than I think it's being received.

12    From our standpoint, we have never asked for a revocation of

13    green cards.  What we've said is you have two potential

14    remedies under your claims for relief, damages or rescission.

15    If you seek rescission, you have to have a rescindable

16    transaction, and this is one that can't be rescinded absent a

17    return of all of the benefits you received.

18         So we've never said we are seeking revocation.  We

19    are saying you have an alternative damage remedy.  We don't

20    think rescission is a proper remedy in this context.  That was

21    the idea.  It may be dead wrong.  We hear you loud and clear

22    that you were offended by the language.  It's not going to

23    happen again.

24         THE COURT:  Okay.  Thank you.

25         MR. KILROY:  And I don't have anything on the other
```

 1   two motions.  I do want to say on the lis pendens, we've

 2   prepared, and I haven't sent counsel, and I can either give

 3   counsel and you a proposed order or e-mail it.  From our

 4   standpoint, we do think that the Court should grant that

 5   petition, extinguish the lis pendens, but it's important for

 6   our purposes to identify the reference number of the Eagle

 7   County recordation.  There are some technical issues --

 8          THE COURT:  I am happy to review a proposed order.

 9   Review it with plaintiffs' counsel.  If plaintiffs' counsel

10   has any objections to the order itself beyond -- I want you

11   two to try to work it out.  I am going to grant the motion to

12   strike it.  That does not waive your rights to filing a

13   renewed one.  It does not waive your rights to objecting to my

14   order on the strike.  But rather I'm -- I'm not a real estate

15   attorney, so I want the lis pendens to look correct and match

16   what I'm hoping -- the order striking it to look correct.

17          MR. KILROY:  I will give it to counsel, give him time

18   to look at it, and then present it to the Court.

19          THE COURT:  And that's fine.  And you can just submit

20   it through C -- or you can just submit it through CM/ECF, if

21   you want, if plaintiffs' counsel needs time to review it.

22          UNIDENTIFIED SPEAKER:  Can we get an idea of time for

23   response --

24          MR. KILROY:  I guess this is a question for counsel,

25   but we share this concern that what plaintiffs are hearing is

1   they have the right to proceed with a lis pendens.  I want

2   there to be a clear record that's going to cause imminent

3   damage that we have avoided by virtue of this.

4         THE COURT:  Well, what is not before me is whether

5   the Amended Complaint would create a right to a lis pendens.

6   I'm not going to rule on that issue.  I think I have expressed

7   my views on the practical effect of what a lis pendens does

8   here, but that's not my job to make business judgment

9   decisions on behalf of everybody.  It's simply the role of

10  what the law is.  I think the law is clear on what the

11  original lis pendens does because it goes back to the original

12  Complaint.  If plaintiff believes it has a valid lis pendens

13  based on the Amended Complaint, he has to do what he thinks

14  his clients --

15        MR. KILROY:  Sure --

16     [Speaking over one another.  Inaudible.]

17        THE COURT:  -- his clients' best interests.

18        MR. KILROY:  -- on an expedited basis.

19        THE COURT:  I strongly encourage the parties to

20  discuss that, that issue.

21        MR. KILROY:  Okay.  Thank you.

22        THE COURT:  All right.  So pending before me are

23  several motions.  I have already ruled on number 54.

24        With respect to document number 14, this is the

25  emergency motion to show cause to hold James Kilroy and his

1   clients in contempt, I am going to deny that motion but with

2   the admonishment that I gave previously that were there to be

3   subsequent statements similar to what was in that letter in

4   the future, I would be inclined to entertain some sort of

5   sanctions as a result.  I take counsel's word that there was

6   not -- that was not their intent, and I'm not going to hold

7   them in contempt, but I do want the parties to be very careful

8   in their language in the future.

9          Before I go on, on the record, Mr. Gee, I didn't give

10  you an opportunity to speak.  Do you have any further

11  arguments that you wish to make on behalf of your client?

12          MR. GEE:  Your Honor, we simply want to lay low.

13          THE COURT:  Okay.

14          MR. GEE:  We --

15          THE COURT:  I think you have successfully done that.

16          MR. GEE:  -- are basically listening to find out why

17  we are involved in the lawsuit.

18          THE COURT:  I think you now know the answer to that,

19  and I think you have also successfully laid low through this

20  hearing.

21          With respect to the motion for preliminary

22  injunction --

23          MR. LITOWITZ:  Excuse me, Your Honor.  Are you

24  ordering an apology from --

25          THE COURT:  I am not going to order an apology.

1    That's up to the parties as to how they wish to conduct

2    themselves on that.

3           With respect to the preliminary injunction motion,

4    this is docket number 32, I am going to deny it.  There are

5    four factors that I have to consider:  one, whether

6    irreparable injury will occur if relief is not granted; two,

7    the injury from any damages that might be caused by the

8    injunction; three, that there is no adverse public interest;

9    and, four, the substantial likelihood of success on the

10   merits.

11          As the parties have recognized, a preliminary

12   injunction, plaintiff bears a heavy burden of demonstrating a

13   preliminary injunction, and here I find that that has not been

14   met.

15          First, with respect to the irreparable injury if the

16   relief is not granted, here I don't find any irreparable

17   injury.  Admittedly, if this sale comes through, the

18   collateral will not be present anymore to back the -- the

19   sale -- or to back any damages in this case, but the clear

20   testimony here today was that the collateral is worth at most

21   equal to what the sale terms are and perhaps significantly

22   less than that.  And so regardless of whether it is sold today

23   or sold at some point in the future, there simply is not

24   enough collateral present in order to pay back what the loans

25   are.  So the damage is not from the sale here today.  Rather,

 1    any damage is the result of the original deal that was set up.

 2    That issue can be satisfied through money damages, either

 3    through assets that remain after the sale in the general or,

 4    if there is a legitimate claim for fraudulent transfer,

 5    through the developer in this case, and those remain even

 6    after the sale.

 7            One of plaintiffs' concerns was whether or not they

 8    were somehow jeopardizing their rights to continue pursuing

 9    this case if that sale were to come through.  The clear

10    testimony here today is that they are not.  That was testified

11    to by the general today.  And as a result, I find that that

12    concern, um, is not valid.

13            The second factor that the Court has to consider is

14    the injury, the potential injury that might be caused by the

15    injunction, and here I find that injury to be significant.  I

16    think were the Court to enjoin the sale in this case, then the

17    ultimate value of this property may be even further

18    significantly reduced, and that may damage not just the

19    individuals involved in this litigation but also all of the --

20    the limited partners.

21            The third is whether there is any adverse public

22    interest.  And here, to the extent we consider the limited

23    partners who are not members of this litigation, in other

24    words, those who have not brought a derivative claim, I think

25    that there is significant potential danger to them of granting

1   the preliminary injunction because of the chance that this

2   value would significantly decrease.  I don't see any other

3   significant public interest in this case, and so that factor

4   weighs against preliminary injunction.

5          And, finally, the substantial likelihood of success

6   on the merits.  And here I don't think I need to get into

7   whether or not this litigation will ultimately be successful,

8   but rather whether or not this litigation entails a challenge

9   to any sale, and here it does not.  Rather, the vast bulk of

10  this litigation involves how this deal was originally

11  structured.  And I don't think I need to pass on the

12  likelihood of success of that because that is not at issue in

13  the injunction.

14         The only claim that goes to the land here itself is

15  the issue of whether the developer should continue to hold

16  title to the land or whether that's to be transferred back

17  over to the -- the LLLP, but that's not in play either here by

18  the litigation because -- or by the preliminary injunction

19  because if the preliminary injunction is denied, and the sale

20  goes through, then that concern is essentially moot because

21  the land will be transferred to the purchaser.

22         And so, as a result, I find that all four factors

23  weigh in favor of denying the motion for preliminary

24  injunction, and I will, therefore, deny the motion for

25  preliminary injunction.

1          The last motion is document number 20, which is the

2     petition for order to show cause as to why the notice of lis

3     pendens should not be stricken as a spurious document.  And

4     here I'm going to grant that and order that the lis pendens be

5     stricken.  The law is that I have to look at what the status

6     of the litigation was at the time the notice of lis pendens

7     was filed.  At the time the notice of lis pendens was filed in

8     this case, the litigation had been filed, but that litigation

9     did not seek any relief with respect to title to land.

10    Rather, it sought relief with respect to monetary damages.

11    And because at the time the litigation was filed there was no

12    claim to the challenge to the ownership of the land, I find

13    that the notice of lis pendens was improperly filed.

14         Now, I know that the Amended Complaint does now

15    contain such a challenge, and whether or not a lis pendens

16    would be appropriate with respect to the Amended Complaint is

17    an issue that the parties should discuss following today's

18    hearing.  I made no ruling on that because any ruling would be

19    advisory and without full briefing on the issue.  But in

20    looking, as I must, at what the status of the litigation was

21    at the time the notice of lis pendens was filed, I need to

22    look at the original Complaint.  And because that did not

23    contain any claim that challenged ownership of the land, I

24    find that the notice of lis pendens was improperly filed, and

25    I will order that it be stricken.

1          I will order the parties to confer over an

2   appropriate written order to go with that.

3          That, I believe, resolves all pending motions that

4   are currently before me.

5          Do we have a scheduling conference set up in this

6   matter?  I don't recall.

7          MR. KILROY:  Your Honor, it was set for the first

8   week of November, and the Court vacated in favor of this one.

9          THE COURT:  Okay.

10          MR. KILROY:  And we don't have a proposed scheduling

11   order from the plaintiffs.

12          THE COURT:  Why don't we -- answers are due

13   December 2nd.  I think it makes sense to set a scheduling

14   conference shortly after that.

15          UNIDENTIFIED SPEAKER:  I'm going to be overseas, and

16   I told them they could take until the 12th.

17          THE COURT:  Until what date?  I'm sorry.

18          UNIDENTIFIED SPEAKER:  I come back on the 9th, so I

19   told them they could take to the 12th to answer.

20          THE COURT:  Okay.  So -- and we're talking about

21   December?

22          UNIDENTIFIED SPEAKER:  Yes.

23          THE COURT:  Why don't we look -- we start getting

24   into the holidays.  Again, my calendar doesn't seem to --

25   that's still very busy.

1          How about the 19th at 2:00 p.m.?

2          MR. KILROY:  I know that's fine at least with the CRC

3    folks.

4          THE COURT:  Okay.

5          MR. LITOWITZ:  We are talking about December 19th?

6          THE COURT:  December 19th, yes.

7          MR. LITOWITZ:  That's fine with me.  Do you want me

8    to call or --

9          THE COURT:  You can call.  That's fine.  My

10   scheduling conferences, especially if there's not major

11   disputes, tend to take about three minutes, so there's no need

12   for you to travel from Chicago for it.

13         MR. LITOWITZ:  That's fine then.

14         MR. GEE:  [Inaudible] traveling to Chicago.

15         THE COURT:  Okay.

16         MR. GEE:  So maybe I can [inaudible].  I do have

17   cocounsel who will be appearing also.

18         THE COURT:  You can appear by phone too.  Like I

19   said, if there aren't any major disputes, my scheduling

20   conferences usually take about three minutes.  So you can call

21   in for it as long as you are not in midair at the time.

22         All right.  So we will set this for a scheduling

23   conference on the 19th at 2 o'clock.

24         Anything further we can do here today?

25         MR. KILROY:  No.  Thank you, Your Honor.

1          MR. LITOWITZ:  No.  Thank you.

2       (Proceedings concluded 12:08 p.m.,

3       October 28, 2019.)

4

5                    TRANSCRIBER'S CERTIFICATE

6

7          I, JULIE H. THOMAS, Official Court Reporter for the
United States District Court for the District of Colorado, do
hereby certify that the foregoing pages are a correct

8    transcription to the best of my ability to hear and understand
the audio recording and based on the quality of the audio

9    recording from the above-entitled matter.
           Dated this 4th day of November, 2019.

10

11              _____/s/ Julie H. Thomas_____

12

13

14

15

16

17

18

19

20

21

22

23

24

25