# In the United States District Court
# for the District of Colorado

Civil Action No. 1:19-cv-02443-RM-STV
—*Consolidated with* No. 19-cv-2637-RM-STV

JUN LI, *et al.*, individually and derivatively for Colorado Regional Center Project
Solaris LLLP,

     Plaintiffs,

v.

WAVELAND VENTURES LLC, *et al.*,

     Defendants.

---

## Solaris Property Owner, Solaris Property Owner I and Peter Knobel's Response to *Li* and *Cui* Plaintiffs' Motion to Amend Their Complaints

---

# Table of Contents

Introduction .................................................................................................. 1

Facts ........................................................................................................... 3

Plaintiffs' investment ................................................................................... 3

    The *Li* plaintiffs ..................................................................................... 7

    The *Cui plaintiffs* .................................................................................10

Argument ...................................................................................................10

I.   Plaintiffs' amendments are futile..........................................................11

    A.   The *Li* plaintiffs' proposed civil theft claim against
         the SPO Defendants is futile. ................................................. 12

    B.   The *Li* plaintiffs' proposed claim for breach of the Loan Agreement is futile. ... 14

    C.   The *Li* plaintiffs' new, vague Claim 4 is futile. ....................................15

    D.   The *Cui* plaintiffs' amendments impleading Mr. Knobel are futile. ...................16

    E.   Plaintiffs' proposed veil-piercing claim is futile. ...................................17

    F.   The *Cui* plaintiffs' declaratory judgment claim is futile. .................... 22

    G.   The amendments should be rejected because they make worse
         the problems in the predecessor complaints. ...................................... 26

    H.   The *Li* plaintiffs' amendments fail to establish this Court's
         diversity jurisdiction over their lawsuit against the SPO Defendants. ................ 27

II.   The SPO Defendants will suffer prejudice from
    the granting of Plaintiffs' motions. .......................................................... 30

Table of Exhibits ........................................................................................31

Defendants Solaris Property Owner, LLC ("SPO"), Solaris Property Owner I, LLC ("SPO I"), and Peter Knobel (collectively, "SPO Defendants") submit this combined Response[1] to the *Li* plaintiffs' and the *Cui* plaintiffs' motions to amend their respective complaints.

## Introduction

The *Li* and *Cui* plaintiffs (collectively, "Plaintiffs") are disappointed investors who experienced the investment risks they explicitly were warned of and now are trying to improve their returns. In pursuit of a better return, since August and September 2019 Plaintiffs have (a) rummaged through documents, most of which they've had for the better part of a decade because they were given these documents pre-investment; (b) sued any business and person who participated in the investment and those, such as the SPO Defendants, who participated only in a loan transaction with their partnership; and (c) serially tried to build legal theories of liability out of speculation, guesswork and conspiracy theories. Their previous over- efforts never pleaded meritorious claims. The new, wholesale amendments proposed to try to stitch together a viable lawsuit against the SPO Defendants—the *Li* plaintiffs' fourth attempt, the *Cui* plaintiffs' third attempt—are more of the same.

---

[1] Although the two sets of plaintiffs assert a few different theories of alleged liability, the basic facts relating to their claims are the same in that each plaintiff engaged in the same investment transaction. They are trying to amend their complaints in much the same ways. To avoid repetition and promote efficiency, we suggest it makes sense for the SPO Defendants to submit a single response.

In this Response we focus on the proposed amendments relevant to the SPO Defendants. Nothing in the proposed amendments improves the previous iterations of Plaintiffs' complaints. Indeed, as the complaints have become more bloated, it has become easier to see the claims against the SPO Defendants are bereft of facts to support them. The gravamen of Plaintiffs' lawsuit against the SPO Defendants is that the SPO entities, with Mr. Knobel serving as their LLC manager, participated in a fraudulent scheme to "trick" each Plaintiff into investing $500,000 which, Plaintiffs claim, they had no chance of recovering.

Plaintiffs face two devastating problems. One is that everything that happened to their investment was within the risks actually disclosed to them years ago—namely, that the Vail real estate market was going to have a significant say in whether they would have a positive or negative investment return.

Their second problem is that whatever complaints they have about their investment and whatever are their hindsight disappointments with their investment, they have no factual basis to bring a lawsuit in the first instance against the SPO Defendants. Plaintiffs' complaints are heavy on baseless, vague allegations "conspiracy" and "collusion" and light on any facts showing the SPO Defendants did anything than engage in a loan transaction with the co-defendants. Even as amended the complaints fail to allege a single misrepresentation, let alone with particularity, by any of the SPO Defendants. Nor have they alleged any facts that would impose upon the SPO Defendants any duty, as a borrower, to disclose any information to Plaintiffs as limited partners of the

2

lender, defendant Colorado Regional Center Project Solaris LLLP ("CRCPS"). Their proposed amendments are lipstick on a Potemkin village.

## Facts

The facts are drawn generally from Plaintiffs' proposed complaints, their attachments, and the documents referenced in the complaints.[2]

**Plaintiffs' investment.** Plaintiffs are 37—just over a fifth—of the 165 limited partners investing, i.e., buying an interest, in CRCPS during the period 2011-2013. *See* Exhibit A, at 31:11-32:5.[3] Before investing $500,000 CRCPS and its general partner Colorado Regional Center I, LLC ("CRC") provided to each investor a private placement memorandum, or PPM, along with numerous documents supplying information about the investment. Doc.121 ¶ 68. Plaintiffs bought an interest in CRCPS as part of the so-called EB-5 immigrant investor program, under which foreign nationals receive conditional legal permanent resident status, i.e., a green card, upon a showing, *inter alia*, they have placed a certain amount of capital "at risk," 8 C.F.R. § 204.6(j)(2), *see generally Doe v. McAleenan*, 929 F.3d 478, 480-81 (7th Cir. 2019).

---

[2]In this proceeding the Court may consider any written instrument attached to or referenced in a pleading. *See, e.g.*, Fed. R. Civ. P. 10(c); *Decker v. 'Murica, LLC*, No. 19-cv-00104-MSK-SKC, 2020 WL 491188, at *1 (D. Colo. Jan. 30, 2020); *see also Openwater Safety IV, LLC v. Great Lakes Ins. SE*, No. 18-cv-01400-NYW, 2020 WL 417596, at *6 (D. Colo. Jan. 24, 2020) (for purposes of assessing futility of amendment, courts apply Rule 12(b)(6) standards).

[3]The *Li* plaintiffs' Third Amended Complaint repeatedly relies on and references the October 22 hearing, *e.g.*, Doc.121 ¶¶ 42, 51 & 102; Doc.121, at 8 n.6, at which CRC's manager testified unrebutted about the loan transaction.

None of the SPO Defendants has owned any interest in CRCPS or CRC. *See* Exhibit A, at 17:10-13. None of the SPO Defendants has directed or controlled any of CRCPS's or CRC's activities in connection with the sale or purchase of CRCPS interests. None of the SPO Defendants has any relationship with any of the Plaintiffs. Neither of the proposed amended complaints submitted by Plaintiffs contains any well-pleaded fact alleging otherwise. Nor is there any allegation the SPO Defendants ever communicated with any of the Plaintiffs.

The *Li* and *Cui* lawsuits concern Plaintiffs' investment in CRCPS, and CRCPS's loan to SPO I. The principal documents relating to the transaction are:

- The PPM (Exhibit B)[4];

- The Loan Agreement (Exhibit C);

- The Yield Enhancement Agreement (Exhibit D);

- The Promissory Note (Exhibit E);

- The Agreement Regarding Collateral Units (Exhibit F).

The PPM attached (unsigned) copies the Loan Agreement, Yield Enhancement Agreement, and Promissory Note. *See* Exhibit B, at CRC_000004. The PPM advised prospective investors of *inter alia* the following:

- "These securities are *highly speculative and involve a high degree of risk*; investors should not invest any funds in this offering unless they can afford to

---

[4]The *Li* plaintiffs attached the PPM and loan-related documents to their proposed complaint. *See* Doc.121-1, -3 & -4. We are attaching the copies of these documents that were admitted into evidence at the hearing on October 22, 2019, because they have sequential Bates numbering on all pages.

lose their entire investment." EXHIBIT A, at CRC_000001 (all-uppercase omitted; emphasis supplied).

- "If you are given any information or representations not included in this memorandum, you must not rely upon them as having been authorized by [CRCPS] (the "Company") or its officers. *No person is authorized to give any information or to make any representations other than those contained in this memorandum, and if given or made, such information or representations must not be relied upon as having been authorized by the Company*." *Id.* at CRC_000002 (all-uppercase omitted; emphasis supplied).

- "No representations or warranties of any kind are intended or should be inferred with respect to the economic return, which may accrue as a result of an investment in the company." *Id.* at CRC_000003 (all-uppercase omitted).

- Under the intended investment scheme (*Id.* CRC_000005-08):

  ➢ CRCPS, managed by its general partner CRC, would loan "the proceeds of this offering," about $80 million, to SPO or its assignee; SPO would use the money to fund the development of a real estate project known as Solaris ("the Project"), consisting of 79 condominium units and 70,000 sf of commercial space;

  ➢ SPO would issue a promissory note to CRCPS to pay the principal plus interest;

  ➢ SPO would have a right to prepay the note after three years from its issuance date;

  ➢ On prepayment of any given loan advance, SPO could tender (a) cash, or (b) the condominium units securing the note for that advance; for its part, if SPO prepaid with cash, CRCPS had the option to require prepayment via SPO's tender of the condominium units; under the Yield Enhancement Agreement (PPM, Ex.K) CRCPS also had the right after the prepayment date of a loan advance to require SPO to convey the units to CRCPS in lieu of cash in satisfaction of the loan advance, EXHIBIT B, at CRC_000181-82.

  ➢ If CRCPS acquired one or more of the units, it would rent them out to third parties but retained the right to sell them at any time.

Before the first loan advance from CRCPS, SPO assigned all its right, interest and obligations in connection with the Project and loan transaction to SPO I. *See, e.g.*, Doc.144-11, at 6 ¶ 15; Doc.115-1 ¶ 6, at 2, ¶ 15 at 3; Doc.115-2 ¶ 9 at 2. SPO I assumed all SPO's obligations under the Loan Agreement and Yield Enhancement Agreement. *See* Doc.115-2 ¶ 9 at 2. Mr. Knobel is the manager of SPO and SPO I. He signed a personal guaranty for the CRCPS loan to SPO I. (Contrary to Plaintiffs' allegations, he is not and never has been a member of either SPO or SPO I.)

As contemplated under the PPM, CRCPS entered into a loan agreement with SPO and related loan documents, including a Promissory Note (EXHIBIT E) and the Yield Enhancement Agreement (EXHIBIT D). CRCPS's loan as described in the PPM and accompanying documents had common features of loans, e.g., the lender made loan advances, the borrower was required to pay interest, and the borrower was required to pay the principal balance plus all accrued interest at the end of the loan term. EXHIBIT B, at CRC_000005. However, it was not a traditional loan. EXHIBIT A, at 28:8. It involved more risk than a typical commercial loan.[5] For example, as the PPM notified potential investors, during the prepayment period:

---

[5]Plaintiffs' proposed complaints suggest the dissimilarities between CRCPS's loan to SPO I, on the one hand, and commercial loans, on the other, are indicative of fraud. *See, e.g.*, Doc.144-11 ¶¶ 12, 21. They fail to understand that a traditional commercial loan would not qualify as an EB-5 investment, and had CRCPS made such a loan, the United States Citizenship and Immigration Services would not have approved it and Plaintiffs would not have secured a green card. *See Wang v. United States Citizenship & Immigration Servs.*, 375 F. Supp. 3d 22, 38 (D.D.C. 2019).

- The borrower had the right to prepay any of the loan advances either by paying cash *or* tendering the collateral, i.e., the condominium unit(s) securing the loan ("Collateral Units"). Exhibit B, at CRC_000005.

- If the borrower prepaid with cash, CRCPS had the right to reject the cash prepayment and instead buy the Collateral Units by crediting the Collateral Units' purchase price against the outstanding loan balance. *Id.*; *see* Exhibit D ¶ 3.

*See generally* Exhibit B, at 19:11-20:20.

In 2015 SPO I notified CRCPS it intended to exercise its right to prepay the loan advances by conveying to CRCPS title to the condominium units securing those loan advances ("Collateral Units"). *See* Doc.115-1, at 7. The conveyances would have required CRCPS's limited partners to pay about $1 million in HOA dues, taxes and other payments. *See* Exhibit A, at 40:22-41:11. To avoid these payments, CRCPS entered into an Agreement Regarding Collateral Units ("ARCU") with SPO I, Doc.115-1, at 6-28. *See* Doc.115-1 ¶ 18, at 3; Exhibit C, at 41:7-18. The ARCU is attached as Exhibit F. Under the ARCU, SPO I agreed to refrain from conveying title to the Collateral Units until certain conditions occurred, e.g., the sale of a Collateral Unit to a third party or CRCPS notified SPO I that a particular unit is to be conveyed to CRCPS. Exhibit F, at [1], 2 & 4; *see* Doc.115-1, at 7-9; *see generally* Exhibit A, at 40:22-42:10.

**The *Li* plaintiffs.** The *Li* action commenced in August 2019 with thirteen plaintiffs. As relevant to the SPO Defendants,[6] the Complaint asserted against SPO

---

[6]Our analysis of plaintiffs' complaints relates only to amendments affecting the SPO Defendants. We do not address amendments pertaining to the other co-defendants.

claims for common law fraud and "lis pendens"; it asserted against Mr. Knobel claims for federal securities fraud, common law fraud, and "lis pendens." Doc.1 (No. 19-cv-02443).

In October 2019 the *Li* plaintiffs moved to amend their complaint to add seven plaintiffs, withdraw one plaintiff, add three additional defendants, re-work significant parts of their factual allegations, add a derivative claim against SPO, and change the "lis pendens" claim so it was asserted only against SPO I.

In November, over our objection on grounds of futility and undue prejudice, *see* Doc.79, the Court granted the *Li* plaintiffs' motion to file a Second Amended Complaint to add one plaintiff. Our objection noted that at the October 22 hearing plaintiffs' counsel said he would have "20," "30" and "50" more plaintiffs to add, and plaintiffs appeared to believe it was appropriate to serially add them one at a time so that their complaint and this action would remain in flux. *See id.* at 10-11.

On November 30, the *Li* plaintiffs' counsel Mr. Litowitz said, "I plan on moving to add one person in the next few days." As of December 16, when the *Cui* plaintiffs and defendants jointly submitted a proposed scheduling order, Mr. Litowitz (who submitted his own proposed scheduling order) had not moved to add a plaintiff. We expressed concern that the *Li* plaintiffs' counsel's serial amendments have been causing significant delays in this case. *See* Doc.109 at 12.

At the December 19 scheduling conference the Court discussed with Mr. Litowitz amendments to his complaint. When the Court asked him whether he planned on filing a third amended complaint, Mr. Litowitz said, "I have more plaintiffs lined up and I want

to ask the Court if they thought it made sense for me to keep amending just to add plaintiffs . . . ." EXHIBIT G, at 4:19-22. When the Court asked when he would be done adding plaintiffs, counsel said "I have at least two more" and suggested he would do nothing but "amend[] the caption" to add the parties. *See id.* at 5:1-10.

From the time the original Complaint was filed and December 19, counsel for the SPO Defendants had expended a considerable amount of time reviewing the three complaints as they were filed and drafting (a) a motion to dismiss the Amended Complaint, and (b) a motion for sanctions against the *Li* plaintiffs and their counsel, which on November 19 was served on Mr. Litowitz under Rule 11(c)(2).

On January 28, 2020, five months after filing their original Complaint, the *Li* plaintiffs moved to file a Third Amended Complaint. In addition to adding yet another plaintiff, plaintiffs made wholesale changes to the Second Amended Complaint. *See* Doc.123. At no time did Mr. Litowitz indicate to the Court or defendants that he would be making wholesale changes to the Second Amended Complaint. As plaintiffs' own redline establishes, *see* Doc.123, the proposed Third Amended Complaint leaves intact virtually no paragraph from the Second Amended Complaint; based on the redline, the Third Amended Complaint deletes virtually every paragraph of the Second Amended Complaint. It effectively commences this action *de novo*.

No disclosures or discovery has occurred. As to the SPO Defendants, the same information available to the *Li* (and *Cui*) plaintiffs at the inception of this action is the

information available to them now. The wholesale re-write of the complaint is inexplicable and has caused significant delay in this litigation.

     **The *Cui* plaintiffs.** These plaintiffs commenced their action September 16, 2019, and on November 8 amended their complaint in due course.

     At the scheduling conference the *Cui* plaintiffs' counsel said that although "nothing is ever 100 percent, . . . I have no intention of amending the complaint unless I find out additional information during discovery, which clearly I'm not going to find out before the 31st." Exhibit G, at 16:14-17. As noted above, the parties have engaged in no discovery.

     On January 31 the *Cui* plaintiffs proposed a Second Amended Complaint with wholesale changes to their Amended Complaint. The *Cui* plaintiffs have received no information not already in the public domain to justify their substantial changes to the Amended Complaint and the delay resulting from the proposed amendments.

## Argument

     While leave to amend a pleading is "freely given when justice so requires," Fed. R. Civ. P. 15(a), as the rule suggests it is freedom with limits. *See Bertolo v. Raemisch*, No. 17-cv-00773-RM-KLM, 2020 WL 132764, at *4 (D. Colo. Jan. 13, 2020) (noting that *pro se* "[p]laintiff has already amended the complaint four times and fails to show why he should be allowed to amend once again," and denying motion to amend: "While the Federal Rules of Civil Procedure permit and require a liberal amendment of pleadings, the rules do not grant parties an unlimited right to amend.").The Court may refuse leave to amend

upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment. *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Granting or refusing an amendment is within the Court's discretion. *Foman*, 371 U.S. at 182. Depending on its findings on undue delay, prejudice, etc., the Court may grant proposed amendments *in toto* or only in part. *See, e.g.*, *Hertz v. Luzenac Am., Inc.*, No. 04-cv-01961-LTB-CBS, 2005 WL 8171858, at *2 (D. Colo. Aug. 29, 2005).

## I.  Plaintiffs' amendments are futile.

Amendment futility warrants amendment denial. *E.g.*, *Jefferson Cnty. School Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 859 (10th Cir. 1999). A proposed amendment is futile if the complaint, as amended, would be subject to dismissal. *Bradley v. Val-Mejias*, 379 F.3d 892, 901 (10th Cir. 2004); *see, e.g.*, *id.* (futile because claim was subject to statute of limitations); *Anderson v. Suiters*, 499 F.3d 1228, 1238 (10th Cir. 2007) (futile for failure to allege all elements of cause of action); *Lind v. Aetna Health, Inc.*, 466 F.3d 1195, 1200 (10th Cir. 2006) (futile because amended claim would seek relief barred by statute). In considering whether an amendment is futile, courts apply the same standard used to evaluate a claim under Rule 12(b)(6), accepting well-pleaded facts as true and reviewing to determine if the complaint states a plausible claim for relief as amended. *Openwater Safety IV*, 2020 WL 417596, at *6.

A.   **The *Li* plaintiffs' proposed civil theft claim against the SPO Defendants is futile.**

To plead a claim for civil theft the plaintiff must allege facts showing that (1) defendant knowingly obtained control over plaintiff's property without authorization, or by threat or deception; and (2) with the specific intent to permanently deprive plaintiff of the benefit of the property. *See, e.g.*, *Electrology Lab., Inc. v. Kunze*, 169 F. Supp. 3d 1119, 1161 (D. Colo. 2016). The *Li* plaintiffs' Count II fails to plead civil theft.

The *Li* plaintiffs derivatively allege the SPO Defendants stole $82.5 million from CRCPS. Doc.123 ¶ 136. But the *Li* plaintiffs' own complaint and attached documents foreclose a theft claim. The $82.5 million was a loan extended by CRCPS to SPO under a Loan Agreement signed by Mr. Knobel as manager of Solaris Mezz, LLC, which was SPO agent. Doc.121-1, at 13; Doc.121, at 1. Accordingly SPO obtained control over the $82.5 million *with* authorization.

Plaintiffs allege the SPO Defendants deceived CRCPS into making the loan. But the Loan Agreement, Yield Enhancement Agreement and ARCU, all signed by CRCPS's authorized representative, destroy that allegation. CRCPS was not deceived about the value of the Collateral Units. Indeed, CRCPS selected the nineteen units that comprised the Condominium Pool, i.e., the group of Collateral Units eligible to serve as collateral for loan advances. *See* Exhibit A, at 26:18-22, 27:9-28:3-25; Exhibit H ¶ 8, at CRC_000272 (addendum to Loan Agreement signed by CRC and SPO setting rules for CRC's selection of Collateral Units from entire set of condominium units owned by SPO

and available for sale). If SPO sold any unit in the Condominium Pool before it was used to secure a loan advance, CRCPS had a right to participate in selecting the replacement unit, which was required to be "reasonably comparable in size, price, and location" to the unit sold. Exhibit C ¶ 9. At the time CRC selected the units in about spring 2011, SPO separately had just sold some nineteen other units from the Solaris development for an aggregate amount of more than $100 million. *See* Exhibit A, at 27:4-8. Additionally, both CRC and CRCPS had a powerful financial interest in ensuring the collateral units were worth at least as much as the $82.5 million loan it was extending to SPO. If the Collateral Units' value went up, CRCPS had the right to demand repayment of the loan through SPO's relinquishment of the Collateral Units in lieu of cash; to the extent the units' value exceeded the loan amount, CRC would receive 70 percent of that value and CRCPS would receive 30 percent. *See* Exhibit A, at 19:8-20:3, 20:8-20.

Plaintiffs' own referenced documents show none of the SPO Defendants had the intent to permanently deprive CRCPS of the $82.5 million. The Loan Agreement provided that CRCPS was obligated to loan SPO all monies it raised from investors. It also provided that SPO would borrow all money CRCPS raised from investors, pay interest, Exhibit C ¶¶ 5-6, and repay the loan, Exhibit E, at CRC_000265 (Promissory Note), by tendering cash or the Collateral Units securing the loan advances. Exhibit E ¶ 11. SPO I chose to repay by tendering the Collateral Units. Exhibit F ¶ C. Instead of accepting the units, CRCPS agreed it was "desirable for [SPO I] to continue to hold record title to the" the tendered units. *Id.* ¶ D. A person's *agreement*

with another person to hold that other person's property forecloses specific intent to permanently deprive that person of her property.

**B.   The *Li* plaintiffs' proposed claim for breach of the Loan Agreement is futile.**

Claim 3 purportedly is a derivative CRCPS claim against SPO I for breach of the Loan Agreement. As discussed below, both the *Li* and *Cui* proposed complaints are careless, sloppy pleadings making it difficult to understand what is being alleged. Claim 3 is an example. The *Li* plaintiffs describe Claim 3 as "Derivative CRCPS [sic] against [SPO I] for Breach of *Loan Agreement*." Doc.121, at 38 (emphasis supplied). Its text says SPO I "defaulted" on the loan. *E.g.*, Doc.121 ¶¶ 152-54. Inexplicably its prayer for relief requests that the Court (1) "*declare* that the *Promissory Note* was breached," and (2) "*declare* . . . that the [ARCU]" is "no longer . . . applicable" and "*giv[e] CRCPS the right to bring suit* to enforce . . . the *Promissory Note*." *Id.* at 40 (emphasis supplied). This violates Rule 8.

Regardless whether Claim 3 asserts a breach of contract or declaratory judgment claim, it is futile since as a matter of law there is no breach of the Loan Agreement or Promissory Note. Both the Loan Agreement and the Note expressly provide that the borrower, SPO I, "shall have the absolute right to prepay . . . by repaying Lender the amount of [any loan advance] or *tendering to Lender the Collateral Unit(s) securing such Loan Advance*." Exhibit C ¶ 11 (Loan Agreement; emphasis supplied); *see* Exhibit E, at CRC_000265 (Promissory Note: stating that Borrower "shall have the absolute right

to prepay . . . by repaying Lender . . . in cash *or conveying . . . the Collateral Unit(s) securing such Loan Advance*") (emphasis supplied). In the ARCU, CRCPS acknowledged SPO I complied with the Promissory Note and Loan Agreement by tendering the Collateral Units. *See* EXHIBIT F ¶ C. CRCPS and SPO I then agreed SPO I would continue to hold title to the units until CRCPS requested delivery of the title. *Id.* ¶ D. This is fatal to the proposed Claim 3.

### C.   The *Li* plaintiffs' new, vague Claim 4 is futile.

The *Li* plaintiffs' Claim 4 is an attempt to plead . . . something but it isn't clear what. It purports to bring a claim under section 38-35-110, C.R.S. Doc.121, at 40 & ¶ 176. That statute authorizes the filing of a notice of *lis pendens* if certain preconditions are met. It does now, however, create a claim for relief; so if the plaintiffs are attempting to assert a claim under the statute, it is not cognizable as a matter of law.

Plaintiffs' prayer for relief is that the Court "authorize the transfer of these units to the name of CRCPS, and in the meantime . . . authorize the placing of a *lis pendens* on such units." This is confusing at best. If the *Li* plaintiffs seek an order "authoriz[ing]" transfer of Collateral Units to CRCPS, they must describe the legal theory for such an order. If it is via a breach of contract claim, they did not plead such a claim and, as discussed in Argument I.B., such a claim is not legally cognizable since both SPO I and CRCPS expressly agreed in the ARCU that SPO I would hold title to the units pending their sale or a request from CRCPS.

If they seek an order "authoriz[ing] the placing of a *lis pendens* on such units," they are misguided. "Lis pendens" literally means a pending legal action; one cannot "place" a pending legal action on real property. Requesting an order "authorizing" the placing of a <u>notice</u> of *lis pendens* is an improper request for an advisory opinion, i.e., whether the plaintiffs have met the statutory criteria for filing a notice of *lis pendens*. Plaintiffs are trying to secure from this Court immunity from a section 38-35-204 order to show cause—already granted once against them, Doc.68—for filing a spurious lien or document. But advisory opinions are forbidden. *E.g.*, *Hill v. Warsewa*, No. 19-1025, 2020 WL 370796, at *4 n.4 (10th Cir. Jan. 23, 2020); *see Harper v. Houston*, No. 17-2132-STA-cgc, 2018 WL 354609, at *6 (W.D. Tenn. Jan. 10, 2018) ("A party has no right to an advisory opinion from the Court informing [him] of the deficiencies of the complaint . . . .").

### D. The *Cui* plaintiffs' amendments impleading Mr. Knobel are futile.

Without amending their caption, the *Cui* plaintiffs impleaded Mr. Knobel by asserting factual allegations and claims against him in the text of their proposed Second Amended Complaint. They asserted against him claims based on misrepresentation and concealment of material facts—namely, fraud, violation of the Colorado Consumer Protection Act, and federal securities fraud. Doc.144-11, at 25, 27, 28. These claims are futile.

It is axiomatic that any fraud-based claim requires a false representation or concealment of a material fact, and fraud must be pleaded with particularity. *See, e.g.*,

*Bishop v. JP Morgan Chase Bank, Nat'l Ass'n*, No. 17-cv-01188-RM-KLM, 2018 WL 4368614, at *3 (D. Colo. Mar. 6, 2018); *Bath v. Am. Express Nat'l Bank*, No. 1:19-cv-00606-RM-NYW, 2019 WL 2602505, at *1 (D. Colo. June 25, 2019). Nowhere do the *Cui* plaintiffs allege Mr. Knobel had any contact with them, let alone made representations to them described with particularity. Nor do plaintiffs make any allegations that Mr. Knobel owed a duty to disclose material facts to them and failed to do so. We note that we disregard the *Cui* plaintiffs' improper group pleading in their amendments, in which they allege that "Defendants"—defined to mean *all* the defendants, Doc.144-10 ¶ 49—made misrepresentations to plaintiffs. *See, e.g.*, Doc.144-10 ¶ 96.

The *Cui* plaintiffs make various allegations that Mr. Knobel failed to make disclosures to them.

### E.   Plaintiffs' proposed veil-piercing claim is futile.

Because of their carelessly pleaded claim, it is not possible to determine whose veil the *Li* plaintiffs want to pierce. In the claim's title and Paragraph 247, they say they want to pierce SPO's veil. In Paragraph 251, they appear to want to pierce SPO I's veil. And in the prayer for relief they ask the Court to pierce "the veil of . . . SPO I/SPO." Doc.121, at 54. The *Cui* plaintiffs seek to pierce SPO I's LLC veil. Doc.144-10, at 32 and ¶ 144. Neither set of plaintiffs has asserted a viable veil-piercing claim.

Section 7-80-107, C.R.S., provides that a plaintiff may seek to hold "the members of a limited liability company personally responsible" for the LLC's alleged improper actions. To determine whether piercing the LLC veil is appropriate, the Court must first

17

inquire into whether the LLC entity is the alter ego of the member. *Estate of Bogue v. Adams*, 405 F. Supp. 3d 929, 943 (D. Colo. 2019). An alter ego relationship exists when an LLC is a "mere instrumentality for the transaction of the [member's] own affairs, and there is such unity of interest in ownership that the separate personalities of the [LLC] and the owners no longer exist." *Id.* (internal quotations omitted). In establishing whether such unity of interest exists as to disregard the LLC fiction and treat the LLC and member as alter egos, courts consider a variety of factors, e.g., whether the LLC is operated as a distinct business entity, whether its funds and assets are commingled, and whether it is used as a "mere shell." *Id.* In addition to establishing the LLC is the member's alter ego, the plaintiff must also show justice requires the entity's form be disregarded because it was merely a fiction used to perpetrate a fraud or defeat a rightful claim. *Griffith v. SSC Pueblo Belmont Operating Co. LLC*, 2016 CO 60M ¶ 14, *as modified on denial of reh'g* (2016). Finally, the plaintiff must show piercing achieves an equitable result. *Id.*

"Insulation from individual liability is an inherent purpose of incorporation; only extraordinary circumstances justify disregarding the corporate entity to impose personal liability." *Griffith*, 2016 CO 60M ¶ 11; *see Crew Tile Distrib'n, Inc. v. Porcelanosa Los Angeles, Inc.*, No. 13-cv-3206-WJM-KMT, 2017 WL 4988667, at *13 (D. Colo. Nov. 2, 2017) (piercing is permitted only in "extraordinary circumstances") (internal quotations omitted).

If a plaintiff fails to allege facts to support a piercing claim, the claim must be dismissed. "[C]onclusory and 'information and belief' [allegations] parroting . . . the elements," *Bogue,* 405 F. Supp. 3d at 943, of piercing are insufficient. Like the plaintiffs in *Bogue*, Plaintiffs at bar have merely parroted the piercing elements with conclusory allegations.

The *Li* plaintiffs conclusorily allege SPO—but not SPO I—along with the co-defendant LLCs "fraudulently set up [the loan] transaction to rob the limited partners . . . by radically under-collateralizing the Loan." Doc.121 ¶ 247. In a factual allegation purporting to support their theft claim, the *Li* plaintiffs conclusorily alleged the SPO entities "are pass-through entities that have only Knobel as equity owner, so any gain to such entities obtained through artifice, deception, or theft inures to the benefit of Knobel personally." *Id.* ¶ 143. They conclusorily allege, "SPO and [SPO I] are shells for Defendant Knobel and alter-egos for him." *Id.* ¶ 144.

The *Cui* plaintiffs' allegations are equally conclusory. They vaguely allege the "LLC's [sic] acting through their owners and members—fraudulently [sic] set up these transactions to rob the limited partners by under collateralizing [sic] the Loan so that the owners and members of [CRC] and [SPO I] would personally benefit." Doc.144-10 ¶ 142. And in Paragraph 144 they allege that "[i]n the interests of justice and in order to provide an adequate remedy for the fraudulent conduct which directly benefited the members of [CRC and SPO I], the Court should enter an order piercing the corporate veils."

19

The *Li* and *Cui* plaintiffs' allegations betray their misunderstanding of veil piercing. Even assuming *arguendo* SPO I participated in a fraudulent transaction by "under-collateralizing" the loan and this benefited SPO I's sole member,[7] veil piercing would not be warranted as a matter of law. As *Bogue* teaches, the question is whether in the loan transaction the SPO entities were a "mere instrumentality for the transaction of the [member's] own affairs," and whether "there is such unity of interest in ownership that the separate personalities of the [LLC] and the owners no longer exist," 405 F. Supp. 3d at 943.  Even assuming *arguendo* Mr. Knobel were a member of SPO or SPO I, Plaintiffs have not alleged facts showing the SPO entities were his mere instrumentality in the loan transaction.

Plaintiffs are a long way from stating facts supporting the other two elements for piercing the SPO entities, namely, that (a) justice requires the entity's form be disregarded because it was used to perpetrate a fraud, and (b) piercing would achieve an equitable result. *See Griffith*, 2016 CO 60M ¶ 14. Beyond improper group pleading and conclusory allegations Plaintiffs' amendments purporting to allege fraud facts amount to nothing more than group pleading and allegations based on wishful thinking. For example, the essential premise of Plaintiffs' fraud theory is that at the time of the loan transaction the Collateral Units were not worth the $82.5 million, the loan amount they secured.

---

[7] Mr. Knobel has been the manager of both SPO or SPO I; he has been a member of neither. Accordingly he cannot be held personally liable under § 7-80-705, which provides for veil piercing of LLCs as to "members" only.

Yet Plaintiffs' amendments do not allege facts "plausibly (not just speculatively)," *Colo. Dep't of Pub. Health and Environ.,* 381 F. Supp. 3d at 1305, showing that the units were worth less than $82.5 million. They merely make allegations that assume the units were worth less than $82.5 million. See, e.g., Doc.123 ¶ 48 (Li plaintiffs: "[T]here is no proof that the collateral ever had a market value of $82,500,000 since this was merely a number assigned based on the wishes of the developer . . . so the Loan started off from day one with inadequate collateral."); Doc.144-10 ¶ 82 (Cui plaintiffs: "SPO and CRC had previously agreed to use pre-determined overinflated prices for purposes of determining the collateral value of the units"). This bare allegation is contradicted by the hearing transcript Plaintiffs rely on. *See* EXHIBIT A, at 27:4-6 (testimony by CRC's principal: by April 2011, when CRC and SPO entered into a contract on how Collateral Units would be selected and before Collateral Units had been selected, "there had been approximately 19 units in the building that had been sold with a value slightly in excess of a hundred million dollars").

None of these allegations rises above "'labels and conclusions [and] . . . a formulaic recitation of the elements of a cause of action,'" *Colo. Dep't of Pub. Health and Environ. v. United States*, 381 F. Supp. 3d 1300, 1305 (D. Colo. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Plaintiffs only "'tender[] naked assertions devoid of further factual enhancement.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). The piercing claims are futile.

### F.   The *Cui* plaintiffs' declaratory judgment claim is futile.

It is tempting for a plaintiff to think she can guarantee survival of a motion to amend or dismiss by contriving a "dispute" over the enforceability of a contract for the purpose of requesting a declaratory judgment. That is what is happening here. But the *Cui* plaintiffs' declaratory judgment claim is not viable.

In Claim 7 the *Cui* plaintiffs directly and derivatively for CRCPS seek a declaration against SPO (and CRC) that the Yield Enhancement Agreement and ARCU are unenforceable for lack of consideration. Doc.144-11 ¶¶ 137-138. For factual support for this "dispute" they only allege in conclusory fashion—without elaboration—that both agreements conferred "tremendous benefits" to CRC and SPO I but provided "no benefits" to CRCPS. *Id.* ¶ 137.

As to the Yield Enhancement Agreement, it was signed by CRCPS via its general partner CRC and by SPO. Exhibit D, at CRC_000280. As the *Cui* plaintiffs admit, however, SPO assigned all its rights under the loan transaction agreements to SPO I. Doc.144-11 ¶ 15. But the *Cui* plaintiffs do not assert the declaratory judgment claim against SPO I, only SPO. Accordingly, the claim is non-justiciable since it does not settle a dispute that "affects the behavior of [SPO] toward the [*Cui* plaintiffs]," *Schell v. OXY USA, Inc.*, 814 F.3d 1107, 1114 (10th Cir. 2016) (quoting *Hewitt v. Helms*, 482 U.S. 755, 761 (1987)). The plaintiffs have the converse problem with the ARCU. The ARCU was signed by CRCPS and SPO I, *not* SPO. *See* Exhibit F, at 6-[8]. But they seek declaratory judgment as to the ARCU only against SPO. Accordingly Claim 7 is futile.

22

Even if the *Cui* plaintiffs had requested declaratory relief against the proper SPO entity, it still would be futile. Consideration for a contract is "any benefit to a promisor or any detriment to a promise at the time of the contract—no matter how slight." *Townsend v. Adams 12 Five Star Sch.*, No. 16-cv-02354-PAB-MEH, 2018 WL 741026, at *4 (D. Colo. Feb. 7, 2018) (internal quotations omitted). An agreement is supported by consideration if "the promisee, in return for a promise, does anything legal which he is not bound to do, or refrains from doing anything which he has a right to do, even though there is no actual loss or detriment to him or actual benefit to the promisor." *Id.* It long has been the law in Colorado[8] that "any benefit to a promisor or any detriment to a promisee at the time of the contract—no matter how slight—constitutes adequate consideration." *Lucht's Concrete Pumping, Inc. v. Horner*, 255 P.3d 1058, 1061 (Colo. 2011). "Except in extreme circumstances, such as those involving allegations of unconscionability, a court should not judge or attempt to assess the adequacy of the consideration." *Id.*; *see Townsend*, 2018 WL 741026, at *4.

This case does not present an extreme circumstance. The *Cui* plaintiffs do not plead otherwise. It would not help them if they had. The Yield Enhancement Agreement expressly provides CRCPS and SPO received "good," "valuable" and "sufficien[t]" consideration. Exhibit D, at CRC_000277. Plaintiffs in fact received a substantial benefit. During the prepayment period SPO would have a contractual right under the

---

[8] Colorado law applies. *See, e.g.*, Exhibit C ¶ 20(iii), at CRC_000238.

Loan Agreement and a financial incentive to pay off one or more loan advances if the Collateral Units' market value went up. In that event the Yield Enhancement Agreement conferred on CRCPS a valuable right, namely, the "absolute right to refuse cash repayment . . . and . . . require [SPO] to convey the Collateral Units." *Id.* ¶ 3. In this way CRCPS would benefit financially from the increased market value of the Collateral Units.

Similarly Plaintiffs received a substantial benefit from the ARCU, which also provides that CRCPS and SPO I received "good," "valuable" and "sufficien[t]" consideration, Exhibit F, at 3. Before entering into the ARCU, SPO I had notified CRCPS it intended to exercise its right under the Loan Agreement to convey to CRCPS the various Collateral Units securing all the loan advances. *See id.* ¶ C, at 2. CRCPS, however, wanted SPO I to "continue to hold record title" to the units. *See id.* ¶ D. SPO I's forbearance in conveying the units to CRCPS was worth about $1 million to CRCPS. CRCPS's general partner explained at the October 22 hearing the reason for delaying conveyance of the units: If CRCPS had not entered into the ARCU and the units were transferred to CRCPS, it would have resulted in a $1 million expense to CRCPS from transfer-related taxes, fees and other costs, which ultimately Plaintiffs would have been responsible for. *See* Exhibit A, at 40:20-41:6. CRC exercised its business judgment "in the best interest of the investors" to avoid "incurring a million dollars of partnership expenses to take title versus holding a first deed of trust." *Id.* at 40:22-23, 41:7-11.

This is not a justiciable declaratory judgment claim. This Court has jurisdiction over the claim under the Declaratory Judgment Act of 1934, 28 U.S.C. § 2201 (2012). The Act "confers a discretion on the courts rather than an absolute right upon the litigant." *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241 (1952); *see Kunkel v. Continental Cas. Co.*, 866 F.2d 1269, 1273 (10th Cir. 1989). Among the factors a trial judge should consider in determining whether to hear a declaratory action are whether the action "would settle the controversy," whether it would serve a useful purpose in clarifying the legal relations at issue, and whether the declaratory remedy is being used merely for "procedural fencing." *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994).

Here, the declaratory claim would settle nothing. Plaintiffs' grievance is the loss of a substantial part of their $500,000 investment because SPO I exercised its right under the Loan Agreement to prepay the loan advances with Collateral Units, which have lost value since the loan advances were made, instead of with cash; Plaintiffs wish SPO I had prepaid with cash. They have thus tried to invalidate the very investment agreements with CRCPS and CRC under which they made the investment (while of course keeping the valuable green cards they received as part of their EB-5 investment). *See, e.g.*, Doc.144-11 ¶ 94 (*Cui* plaintiffs: alleging all defendants fraudulently induced plaintiffs to invest in CRCPS). If the Yield Enhancement Agreement and ARCU were declared unenforceable, it would leave intact the *Cui* plaintiffs' investment in CRCPS and SPO I's prepayment of the loan advances by conveyance of Collateral Units. After all it is the

Loan Agreement that provides, "Borrower shall have the absolute right to prepay [loan advances] by repaying Lender the amount of such [loan advances] *or tendering to Lender the Collateral Unit(s) securing [the loan advances]*." EXHIBIT C ¶ 11, at CRC_000232 (emphasis supplied).

### G. The amendments should be rejected because they make worse the problems in the predecessor complaints.

It is well within a district court's discretion to refuse to accept a proposed complaint when the amendments are a "vague, confusing, and conclusory articulation of the factual and legal basis for the claims and a general 'kitchen sink' approach to pleading the case." *Stanard v. Nygren*, 658 F.3d 792, 798 (7th Cir. 2011); *Smith v. Markell*, No. 07-cv-01912-BNB, 2007 WL 4365665, at *1 (D. Colo. Dec. 10, 2007). Plaintiffs' proposed amendments meet these criteria for rejection.

The *Li* plaintiffs' proposed prolix, 251-paragraph Third Amended Complaint is rife with problems. There is no shortage of examples. Claim 3 asserts a derivative claim against SPO I for "Breach of Loan Agreement," Doc.123, at 38, yet requests a judicial "declar[ation]" that the Promissory Note was "breached" and that the ARCU "is no longer . . . applicable . . ., giving CRCPS the right to bring suit to enforce the terms of the Promissory Note," *id.* at 40. There are four "Count VIIs." *See id.* at 47, 49, 52, 53. The second Count VII's title asserts a fraud claim against Mr. Knobel, *id.* at 49, but its prayer for relief seeks fraud liability against Mr. Knobel "and his SPO/SPO1 entities," *id.* at 51.

The last Count VII's title seeks to pierce SPO's veil, *id.* at 53, but its prayer for relief seeks to pierce the veil of "SPO1/SPO," *id.* at 54.

The *Cui* plaintiffs' proposed Second Amended Complaint fares little better. For example, they use "Defendants" to refer collectively to Waveland Ventures, LLC, two CRC entities, CRC's manager Rick Hayes, SPO, SPO I, and the SPO entities' manager Mr. Knobel. Doc.144-11 ¶ 49. Setting aside the inappropriateness of group pleading,[9] the *Cui* plaintiffs' usage of "Defendants" in their amendments amounts to a "vague, confusing, and conclusory articulation of the factual and legal basis for the claims and a general 'kitchen sink' approach to pleading the case," *Stanard*, 658 F.3d at 798. In requesting specific performance against SPO, as an example, plaintiffs allege, "The defendants have not repaid the loan, nor have they transferred title to the units to [CRCPS]." Doc.144-11 ¶ 128. Yet Waveland Ventures, the CRC entities, Mr. Hayes, and Mr. Knobel never have had any obligation to repay the loan or transfer title to the Collateral Units.

### H. The *Li* plaintiffs' amendments fail to establish this Court's diversity jurisdiction over their lawsuit against the SPO Defendants.

The SPO Defendants previously suggested one or more of them might contest the Court's diversity jurisdiction, *see* Doc.109, at 3, because of our belief that federal question jurisdiction is in doubt based on Plaintiffs' then-pending complaints. *See, e.g.*, *Isenbart v.*

---

[9] *Carrado v. Daimler AG*, No. 17-cv-3080-WJM-SKC, 2018 WL 4565562, at *3 (D. Colo. Sept. 24, 2018) ("Group pleading violates Rule 8 when a plaintiff fails to distinguish among multiple defendants, including on claims that could not apply to certain defendants.").

*Bd. of Cnty. Comm'rs of Kit Carson Cnty.*, No. 11-cv-03240-LTB-BNB, 2013 WL 1768684, at *2 (D. Colo. Apr. 24, 2013). The Court correctly pointed out that as of January 8, 2020, there had been no challenge to federal question jurisdiction. Doc.114, at 2. When we file our Rule 12(b) motions, we intend to move to dismiss all federal claims lodged against the SPO Defendants.

In the meantime the *Li* plaintiffs have moved to amend their complaint so that as to their lawsuit the Court no longer has federal question jurisdiction over it as to the SPO Defendants. They have a single federal claim, Claim 5 (federal securities fraud), but in their proposed complaint it no longer is asserted against any of the SPO Defendants; it is asserted only against CRC. *See* Doc.123, at 42-45. Their only remaining claims against the SPO Defendants are state-law claims. Accordingly federal jurisdiction depends upon diversity of citizenship under 28 U.S.C. § 1332.

As to each of the twenty-one *Li* plaintiffs, they allege variously and mostly generically that they are Chinese nationals and/or they reside in various states other than Colorado. *See* Doc.123 ¶¶ 6-8. As to the "CRC Defendants," i.e., all defendants other than the SPO Defendants, the plaintiffs allege they are Colorado or Texas LLCs and their members are Colorado and Texas "residents." *Id.* ¶¶ 1 n.2 & 9-14. As to the SPO Defendants, the plaintiffs allege that the SPO entities are Delaware companies qualified to do business in Colorado and that Mr. Knobel is a "resident of Colorado." *Id.* ¶¶ 15-17. The *Li* plaintiffs also have sued "all principals and ultimate owners of business entities,"

Doc.123, at [1], yet they have not identified all these "principals" and "owners," *see id.* 5-6. These allegations do not invoke diversity jurisdiction.

The party seeking the exercise of jurisdiction in his favor "'must allege in his pleading the facts essential to show jurisdiction.'" *Penteco Corp. Ltd. P'ship--1985A v. Union Gas Sys., Inc.*, 929 F.2d 1519, 1521 (10th Cir. 1991) (quoting *McNutt v. General Motors Accept. Corp.*, 298 U.S. 178, 189 (1936)). "An individual's residence is not equivalent to his domicile and it is domicile that is relevant for determining citizenship for purposes of diversity jurisdiction." *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 n.3 (10th Cir. 2019) (internal quotations omitted). While "the place of residence is *prima facie* the domicile," "allegations of mere 'residence' may not be equated with 'citizenship.'" *Reece v. AES Corp.*, 638 Fed. App'x 755, 769 (10th Cir. 2016) (internal quotations and citations omitted); *see Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989) ("'Domicile' is not necessarily synonymous with 'residence,' and one can reside in one place but be domiciled in another.") (citation omitted).

The Third Amended Complaint fails to invoke this Court's jurisdiction. The *Li* plaintiffs have failed to plead the domicile of each plaintiff and of those individuals or entities who are members of the defendant LLCs. They also have failed to identify, let alone plead the domicile of, the "principals" and "ultimate owners" of business entities, Doc.123, at [1], whom they purport to implead. This deprives the Court of diversity jurisdiction over the *Li* plaintiffs' lawsuit. *See United Fin. Cas. Co. v. Lapp*, No. 12-cv-00432–MSK–MEH, 2012 WL 7800838, at *2 (D. Colo. Oct. 12, 2012), *report and*

*recommendation adopted*, No. 12-cv–00432–MSK–MEH, 2013 WL 1191392, at **5-6

(D. Colo. Mar. 21, 2013).

## II. The SPO Defendants will suffer prejudice from the granting of Plaintiffs' motions.

Like their co-defendants, the SPO Defendants will suffer delays and prejudice

from the cost of preparing motions in anticipation there would not be wholesale

amendments to Plaintiffs' respective complaints. To avoid repetitiousness, we

incorporate by reference our co-defendants' responses to Plaintiffs' respective motions to

amend, Docs.150 & 151.

February 11, 2020

Respectfully submitted,

*s/ Ty Gee*
Harold A. Haddon
Ty Gee
HADDON, MORGAN AND FOREMAN, P.C.
150 East Tenth Avenue
Denver, CO 80203
Tel 303.831.7364
hhaddon@hmflaw.com; tgee@hmflaw.com

*Attorneys for Defendants Solaris Property Owner, LLC, Solaris Property Owner I, LLC, and Peter Knobel*

# Table of Exhibits

A.  Transcript of Hearing on Motions (Oct. 22, 2019)

B.  Private Placement Memorandum

C.  Loan Agreement (Nov. 5, 2010)

D.  Yield Enhancement Agreement (Nov 5, 2010)

E.  Promissory Note (Apr. 18, 2012)

F.  Agreement Regarding Collateral Units (Apr. 17, 2015)

G.  Transcript of Scheduling Conference (Dec. 19, 2019)

H.  Memorandum of Understanding (Apr. 1, 2011)