```
                    IN THE UNITED STATES DISTRICT COURT

                        FOR THE DISTRICT OF COLORADO


Civil Action No. 19-cv-02443-STV


 JUN LI, QI QIN, YI LIU, JIE YANG,
 YUQUAN NI, ZHONGZAO SHI, FANG SHENG,
 SHUNLI SHAO, KAIYUAN WU, ZHIJIAN WU,
 ZHONGWEI LI, SA WU, FAN ZHANG, LIN QIAO,
 JINGE HU, RUJUN LIU, YING XU, LU LI, and
 YUWEI DONG, individually, as well as
 derivatively for COLORADO REGIONAL CENTER
 PROJECT SOLARIS LLLP,

         Plaintiffs,

         vs.

 WAVELAND VENTURES LLC,
 COLORADO REGIONAL CENTER PROJECT SOLARIS
 LLLP, COLORADO REGIONAL CENTER,
 COLORADO REGIONAL CENTER I LLC,
 SOLARIS PROPERTY OWNER LLC,
 SOLARIS PROPERTY OWNER I LLC, and
 PETER KNOBEL,

         Defendants.

------------------------------------------------------------------

         TRANSCRIPT OF ELECTRONICALLY RECORDED PROCEEDINGS
                          MOTION HEARING

------------------------------------------------------------------

         Proceedings before the HONORABLE SCOTT T. VARHOLAK,
Magistrate Judge, United States District Court for the
District of Colorado, commencing at 9:22 a.m. on the 28th day
of October, 2019, in Courtroom A402, Alfred A. Arraj United
States Courthouse, Denver, Colorado.


Transcriber:   JULIE H. THOMAS
               901 19th Street, Room A256
               Denver, CO 80294
               (303)335-2111

         Proceedings recorded by electronic recording device;
               transcription produced via computer.
```

**EXHIBIT A**

```
19-cv-02443-STV                                              10/22/19    2
```

1                              APPEARANCES

2  For the Plaintiffs:
   DOUGLAS ELIOT LITOWITZ, LAW OFFICE OF DOUGLAS LITOWITZ,
3  413 Locust Place, Deerfield, IL 60015

4  For the Defendant CRC Entities:
   JAMES D. KILROY and STEPHANIE A. KANAN, SNELL & WILMER L.L.P.,
5  1200 Seventeenth Street, Suite 1900, Denver, CO 80202-5854

6  For the Defendants SPO LLC and Knobel:
   TY GEE, HADDON MORGAN AND FOREMAN, P.C., 150 East 10th Avenue,
7  Denver, CO 80203

8                    *      *      *      *      *

9                            I N D E X

10   DEFENDANTS' WITNESS                                        PAGE

11   DONALD RICK HAYES
        Direct - Mr. Kilroy                                        9
12      Cross - Mr. Litowitz                                      57
        Redirect - Mr. Kilroy                                     79
13      Cross - Mr. Gee                                           80
        Further Redirect - Mr. Kilroy                             80
14

15              DEFENDANTS'
                EXHIBITS                         RECEIVED
16
                   1                                15
17
                   3                                30
18
                   5                                31
19
                   2                                36
20
                   4                                37
21
                   6                                38
22
                   11                               52
23
                   12                               53
24
                   13                               54
25
                   14                               55

Julie H. Thomas, RMR, CRR                              (303)296-3056

1  Q. What was the purpose of the loan, the contemplated loan
2  from CRCPS to SPO?
3  A. Well, it was to finance the development. You know, it was
4  part of the source of funds in the overall development of this
5  $375 million project.
6  Q. How was CRCPS planning on securing that loan obligation to
7  SPO?
8  A. All the units were secured, um, with a first priority lien
9  in the form of a deed of trust.
10 Q. Does Mr. Knobel or his company SPO have any ownership
11 interest, direct or indirect, with any of the CRC companies
12 that we've identified that you've mentioned?
13 A. No.
14 Q. Was the -- was there negotiation between CRCPS, on the one
15 hand, and Mr. Knobel or his company SPO regarding the terms of
16 this loan?
17 A. Yes.
18 Q. Who was involved in those negotiations?
19 A. Um, myself, Mr. Schwartz, Peter Knobel, and counsel
20 before, Brian Reed Weiling [phonetic].
21 Q. Was this an arm's length loan transaction?
22 A. Yes.
23 Q. You were aware that this private placement memorandum was
24 going to foreign potential investors; correct?
25 A. Correct.

1   you've said, the investors would make an equity investment, in
2   other words, they would be purchasing a limited partnership
3   interest in the entity CRCPS.  That entity in turn would enter
4   into a debt instrument with SPO.  Is that correct?
5   A.  Correct.
6   Q.  So let's talk -- when I say "debt instrument," I just mean
7   a loan.
8        We'll go through documents here in a second, but on a
9   high level can you describe the features of the loan that
10  CRCPS intended to enter into with SPO?
11  A.  Okay.  The loan from CRCPS to SPO I, you know, the basic
12  terms were a five-year original security deed.  The interest
13  rate was 5 percent.  The loan could be prepaid, um, after
14  three years either in cash or the tendering of the underlying
15  collateral to the loan.  And we, as the lender, also had the
16  ability to reject cash payment or prepayment and have the
17  units or, excuse me, have the collateral put to us in lieu of
18  a cash payment.
19  Q.  In your affidavit I think you referred to this as the
20  put/call mechanism --
21  A.  Right.
22  Q.  -- is that right?
23  A.  So, in essence, the borrower had the right to put the
24  collateral to us, and we had the ability to call the
25  collateral away.  Um, the basic economics of that would be if

1  the value of the collateral went down, more than likely it
2  would be put to us.  If the value of the collateral went up,
3  you know, we would call it away in lieu of cash.
4  Q.  So let's talk about the time frame we're in.  The private
5  placement memorandum date is in March of 2011.  Is that your
6  recollection?
7  A.  Correct.
8  Q.  What was CRC and CRCPS's view of the state of the real
9  estate market in Vail on this topic of whether it was going to
10 go up or down?  Give us the context of this PPM.
11 A.  Well, another feature that I should -- that I didn't
12 mention -- that I didn't mention was one of the reasons for us
13 taking the project on is that, as the general partner, we had
14 a 70 percent carry in the upside of the real estate.  So if
15 the value of the real estate went up, in addition to the
16 coupon that the investors were receiving that was being passed
17 through from the loan, you know, the investors would receive
18 30 percent of any upside appreciation of the real estate, you
19 know, and we would receive 70 percent in the form of carry in
20 the upside of the real estate.
21         Um, you know, this was, you know, probably -- you
22 know, I think Vail, you know, started to get developed in the
23 mid-'60s.  This was kind of, you know, a small place, but if
24 there were outskirts, this was it.  Peter, who was a long-term
25 resident of New York and developed properties there both for

1  think that has not come up in your testimony, but it may have
2  in prior --
3  A.  Mm-hmm.
4  Q.  -- affidavits and so forth.
5       How did the loan work in terms of getting money to
6  the borrower SPO?  Was it a lump sum, or how did it happen?
7  A.  No, it was -- they were pretty much serial fundings.  We
8  made our first loan advance in April of, um, 2012.  Our last
9  loan advance was in January of 2015.  And, in essence, as we
10 raised money, um, in increments that would allow us to
11 collateralize the borrowing with either a specific or number
12 of residential condominium units, we would make that loan
13 advance to SPO, um, and then take a deed of trust and secure
14 the note at the time of the loan advance.
15 Q.  So as loan advances were made, there was a determination
16 of the value of certain units so that that would set up
17 security; is that correct?
18 A.  Correct.  I mean, we had a memorandum of understanding
19 that went back to April of 2011, um, that was the document
20 that we operated within in terms of how units were going to be
21 selected and just kind of procedurally, um, how we would fund
22 the investments over time.
23 Q.  I read in the plaintiffs' papers that they are alleging
24 that they believed that all 79 units that were owned by
25 Mr. Gee's client were pledged as collateral in this

1  $82.5 million transaction.  Is that accurate?
2  A.  No.
3  Q.  And did --
4  A.  No, in fact, by April of 2011 there had been approximately
5  19 units in the building that had been sold with a value
6  slightly in excess of a hundred million dollars.
7  Q.  That had already been sold?
8  A.  Correct.
9  Q.  How did you, on behalf of CRCPS, ensure that the
10 collateral would adequately meet the loan advance?  In other
11 words, if you are loaning $4 million, how did you make sure
12 sufficient units were being pledged to adequately secure that
13 repayment by Mr. -- by SPO?
14 A.  Well, we would just basically manage the subscriptions as
15 they came in relative to -- you know, it was our goal to have
16 a pool of collateral, um, that best reflects all the units in
17 the building.  So we wanted half the units to face the
18 mountain and half the units to face the highway, we wanted it
19 dispersed by floors, so it was a representative sampling of
20 all the units in the building.  You know, we couldn't raise --
21 you know, we didn't have the ability -- the -- I think the
22 primary limiter on capital you can raise is job creation.  So
23 you really kind of size your loan based on the number of jobs
24 that are created.  And so given how much money we could raise
25 based on what jobs were being created for the project to stay

1   within the confines of the EB-5 regulation, then it was our
2   job to create a pool of collateral that represented the
3   building in a whole to the best we could.
4   Q.   There's been an accusation by the plaintiffs that the
5   collateral -- that this loan agreement was
6   undercollateralized, that the loan-to-value ratio was
7   something unacceptable.  What's your response to that?
8   A.   Well, it wasn't a traditional loan.  You know, had it been
9   a conventional loan without these put and call features, um, I
10  think that would be a more germane argument, um, but given our
11  ability to call the loan away -- just by means of example, at
12  its most extreme, um, had SPO not sold units prior to our
13  involvement, you know, those 77 condominium units would
14  probably have a retail value of about $400 million.  Um, if
15  our note was collateralized, our 82 million dollar -- half
16  million dollar loan was collateralized with $400 million of
17  residential condominium units, and then we had a call right,
18  the developer in essence would be giving up $320 million in
19  equity for an 82 and a half million dollar loan.  Just really
20  nonsensical.
21  Q.   Maybe more importantly, in any of the private placement
22  memorandum itself or attachments, did CRCPS ever represent
23  that these loan advances were going to be secured by all of
24  SPO's 79 units?
25  A.   No.

```
19-cv-02443-STV                                          10/22/19    31
```

1   A. Correct.
2        MR. KILROY: Move to admit Exhibit 5.
3        THE COURT: Any objection?
4        Any objection to number --
5        MR. LITOWITZ: No objection.
6        THE COURT: Okay. It's admitted.
7     (Defendant's Exhibit 5 received.)
8   BY MR. KILROY:
9   Q. Now let's move -- I apologize for jumping around, but move
10  to Exhibit 2, please.
11       What is Exhibit 2?
12  A. It's the limited liability partnership agreement for
13  Colorado Regional Center Project Solaris.
14  Q. Is this the same agreement that was provided to all the
15  investors as an attachment to the PPM?
16  A. Yes.
17  Q. And then turn with me again to Bates number -- the last
18  four pages on [inaudible] which starts with Bates number
19  210 --
20  A. Okay.
21  Q. -- to 214 -- 213.
22       And when you get there, tell the Court what is that
23  last attachment, the last three -- three pages or four pages?
24  A. This is a list of 162 limited partners' as well as the
25  general partner's ownership interest in the entity.

1  Q.  And if you look at the very last page, it has 166
2  references, as I'm reading this, 165 at the top --
3  A.  Oh, I'm sorry.  Did I say 162?
4  Q.  You did.  I wanted to clear that up.
5  A.  166.
6  Q.  And that last reference is -- so 1 through 165 are
7  limiteds.  166 is --
8  A.  166 is --
9  Q.  -- general.  Is that correct?
10     [Speaking over one another].
11 Q.  This is an entity, a limited liability partnership.  Who
12 under this operating agreement of this entity was charged with
13 making decisions for the company?
14 A.  The general partner.
15 Q.  And, again, CRCPS?
16 A.  Excuse me?  I'm sorry?
17 Q.  That's CRCPS?
18 A.  Um, the --
19 Q.  I'm sorry.
20 A.  The Colorado Regional Center I was the --
21 Q.  I'm confusing you because I was confused for a moment, so
22 let me clear it up.
23     The general partner is CRC I; is that correct?
24 A.  Correct.
25 Q.  What are the types of decisions that CRC I made for the

1   been totally unencumbered.
2   Q.  Let's -- before we get there -- I'll get to that, but
3   we've now referenced the put right and call right.  What
4   happened at the three-year mark when the parties,
5   borrower/lender, each had that put and call right?  What
6   actually happened?
7   A.  The lender notified us of their intent to tender the units
8   to us.
9   Q.  In what time period is that?
10  A.  That would have been three years after -- well, it was
11  probably a few months before the third anniversary of the
12  first loan advance.
13  Q.  Okay.  March, April 2015?  Does that time frame sound
14  right?
15  A.  Correct.
16  Q.  So the borrower puts the properties to the lender.  The
17  Court has seen, through the filings, that the title to the
18  properties didn't go to CRCPS.  Is that accurate?
19  A.  That is accurate.
20  Q.  Why?  First tell us why, and then tell us how we got
21  there.
22  A.  Um, it's really just a question of cost and what we felt
23  was in the best interest of the investors.  Um, were we to
24  transfer title, um, to the limited partnership versus holding
25  a deed of trust, the cost of that exercise would have

```
19-cv-02443-STV                                           10/22/19    41
```

1  approximated a million dollars.  Um, there's a 1 percent
2  transfer tax in the Town of Vail.  We would have had to pay --
3  you know, prepay three months of HOA dues.  In fact, it would
4  have caused us then to go out and insure the various units
5  which, you know, which was being insured at the time -- you
6  know, was being insured by SPO.
7           So we made a business judgment that, um, basically
8  entailed not incurring a million dollars of partnership
9  expenses to take title versus holding a first deed of trust,
10 that our security position was such that it just simply didn't
11 merit taking title of the properties.
12 Q.   In other words, the security position remains the first
13 position.
14 A.   Correct.
15 Q.   Let me restate it to make sure we've got it.
16          SPO entered into an agreement with CRCPS that,
17 notwithstanding the put, SPO would retain title; correct?
18 A.   Correct.
19 Q.   And ultimately the objective was to liquidate or sell
20 these units; correct?
21 A.   The objective never changed.  It was just basically, in
22 our opinion, form over substance in taking title to the units
23 and burdening the partnership with a million dollars of
24 expenses that given that we held a first security interest in
25 the real estate underlying the loan, it simply didn't make any

```
19-cv-02443-STV                                    10/22/19    42
```

1  sense to incur that expense.
2  Q.  Let me make it really simple.  If SPO had transferred
3  title to CRCPS, CRCPS then transfers title to a third-party
4  purchaser, there would be a $1 million consequence?
5  A.  Correct.
6  Q.  If SPO holds title and conveys to the ultimate purchaser,
7  there would not be a million-dollar hit?
8  A.  Correct.
9  Q.  And that's why you did it?
10 A.  Correct.
11 Q.  For the first time you've used the term "business
12 judgment."  Tell us why that decision was in the best
13 interests of the limited partnership.
14 A.  Well, ultimately when a unit is sold, it doesn't --
15 there's no creation of more risk for the partnership relative
16 to the spending of a million dollars of monies that, in our
17 judgment, was not necessary.
18 Q.  Who would have taken that million-dollar hit had you just
19 gone ahead and taken title?
20 A.  All the investors.
21 Q.  To the tune of a million dollars?
22 A.  Correct.
23 Q.  As we sit here today, is SPO willing to transfer the
24 properties directly to a final purchaser so that that million
25 dollars is not incurred?

```
 1            MR. LITOWITZ:  No.  Thank you.

 2       (Proceedings concluded 12:08 p.m.,

 3       October 28, 2019.)

 4

 5
                        TRANSCRIBER'S CERTIFICATE
 6
              I, JULIE H. THOMAS, Official Court Reporter for the
 7       United States District Court for the District of Colorado, do
         hereby certify that the foregoing pages are a correct
 8       transcription to the best of my ability to hear and understand
         the audio recording and based on the quality of the audio
 9       recording from the above-entitled matter.
              Dated this 4th day of November, 2019.
10

11                      ____/s/ Julie H. Thomas____

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```