# FAQ: Solaris Project Update

**Question:** It seems the bulk transaction stopped. So, how can I do now ? To set up a group to sell, or still wait for your company's sales progress like before ? Will your company continue to sell through agents instead of bulk transaction efforts ?

**Response:** The potential buyer in the bulk sale transaction abandoned the potential acquisition of the units and formally terminated the Letter of Intent, primarily on account of the pending litigation and lis pendens filings. LPs were provided with a copy of the termination letter.  The Partnership continues to have several of the units listed on an individual basis with Slifer Smith & Frampton Real Estate. The units that are currently listed on the market include 6C West, 7E East, 7E West, 4D East, and 5G West.  The Partnership plans to continue engaging real estate brokerages to sell the units on an individual basis. Further, the Partnership is also willing to negotiate with investor groups formed by Limited Partners who want to redeem their Partnership interests in exchange for ownership of a unit as detailed in the "Solaris Project Update" memo. The Partnership is discussing steps to remove the *lis pendens,* as the Partnership will be severely inhibited in selling or transferring any unit(s) until the *lis pendens* is removed.

**Question:** How is the first lis pendens different from the 2nd one from legal perspective? The reason why I asked this is that the Partnership did manage to win favorable ruling to extinguish the first lis pendens, and I'm wondering how the Partnership feel about chance to extinguish the 2nd one.

**Response:**  Although there are some distinctions in the legal basis, the two *lis pendens* are substantially legally similar and the Partnership feels confident that they will receive a favorable ruling in removing the second *lis pendens* if the Partnership cannot have it withdrawn voluntarily by the plaintiffs in the second case

**Question:** For the LPs who have potential intent to redeem interests for the ownership of a unit, will the Partnership facilitate formation of such investment groups through sharing contact information and referring LPs who have similar intents to each other? I ask this because I think most of LPs do not have such a network through which they can reach out to the peers who have the same intent  and good faith to form such a group. If the Partnership can facilitate that, I personally would be willing to get in contact with other peer LPs who also have redemption of interests in consideration.

**Response:** The Partnership will consider introducing LPs to each who want to set up separate legal companies to pursue a transfer.  However, once introductions are made it will be up to the LPs to organize and properly document the entity and negotiate operational structure and agreements amongst themselves, etc.  The Partnership will not be part of the actual setup or operations of those entities.

**Question:** One question comes to my mind: have you ever proven that the valuation of these 17 (or 19 at the beginning) units equals to 21% of the property? If not, how can you use it as the collateral of our investment which accounts for 21% of the total investment?

This is a core and simple question. If you cannot answer this, I think the court should put lis pendens on the whole property, including 79 units and the facilities in common area, instead of only the 17 units.

**Response:** The loan was never collateralized by the entire 79-unit project or the retail space and the Partnership has never represented that the EB-5 loan was collateralized by the entire project. The Partnership continues to have a first deed of trust on the remaining 17 units which is equivalent to a first-priority position. There is no dispute as to ownership of the units. The percentage of the total financing for the project that was funded by the Partnership does not necessarily dictate the percentage of total project value that is represented by the units pledged as collateral, as funds were advanced at different times during project completion, and a different level of risk was taken by each investor and lender.

**Question:** Thank you for sending the update and I'm so sorry to hear that the bulk sale is no longer available. Just to clarify， does this lis pendens means foreclosure for the condominium ？If I don't do anything，I could still wait for the liquidation of the property and get my share ，is that right？
Thank you.

**Response:** The lis pendens does not mean foreclosure of the condominium units. The lis pendens is notice to anyone who is searching title that the units are subject to a lawsuit. Yes, if you wait for the liquidation of the property you will receive your pro rata share per the Partnership Agreement.

**Question:** I am interested in the transfers. My question is if I transfer the units with other limited parters, how long will I get the money back? By the way, can you put me on the list of transferring the units? And does the price of the unit depends on the market price?

**Response:** If a unit is transferred to a company owned by a group of limited partners of which you are a partner, the decision to sell the unit, what price to list the unit for and accept, and timing of ownership will be up to your company. Your group of limited partners may decide to own and rent the unit for some time or you may decide to list the unit for sale immediately. That decision would be up to your company. The price it is ultimately sold for will depend on market dynamics.

The Partnership will consider introducing LPs to each who want to set up separate legal companies to pursue a transfer. However, once introductions are made, it will be up to the LPs to organize and properly document the entity and negotiate operational structure and agreements amongst themselves, etc. The Partnership will not be part of the actual setup or operations of those entities.

**Question:** Thanks for the update. To be honest, I am shocked to know there are two litigations against the partnership and relative parties. And I do have a few questions about the new developments as below.

First, could you let me know what those two lawsuits pursue? What the problems really are to drive so many LPs to file lawsuits?

Second, If there is no any wrong doing from your side, why not just summon a meeting for all the LPs to make everything clear in person? As I know, the accrued management fee should cover such a meeting according to our LP agreement. And the GP never hold a meeting for LPs, which maybe cause some misunderstanding I think.

In the end, as you mentioned investor group to redeem the partnership interest in the PDF, how do I get in touch with other investors to form a group of 6-9 people who also want to do so? I don't have any contact info of other LPs. Could you share the contact info of other LPs who have the same will?

Looking forward to your kindly reply. Thank you very much.

**Response:** The lawsuits are of public record and copies of the complaints are attached.  There are a number of allegations contained therein all of which the Partnership and GP find without merit.  The plaintiffs are essentially asking to be treated differently than the other limited partners and are seeking a full return of their investment in preference to the other limited partners. We will take your suggestion for an in-person meeting under advisement and will follow up on this point.  Again, the Partnership will consider introducing LPs to each who want to set up separate legal companies to pursue a transfer.  However, once introductions are made it will be up to the LPs to organize and properly document the entity and negotiate operational structure and agreements amongst themselves, etc.  The Partnership will not be part of the actual setup or operations of those entities.

**Question:** I have some questions on the bulk sales although it's gone due to the lis.

Who is the potential buyer? Individual or company? What kind of background and who are key share holders? Does anyone of them have any direct or indirect relationship with the Regional Center/ Solaris?

What price range you had reached before it was canceled?

Any real estate appraiser has been involved during the process? Who is the appraiser or company? What's their valuation of these 17 units?

The above will help me to understand the team's capabilities, process and the value of our asset.

Thx!

**Response:** The Partnership is bound by confidentiality under the Letter of Intent even though it has been formally terminated. Based on actions of the plaintiffs and their attorneys in the litigation, the GP is going to continue to hold the name of the company and its ownership team confidential to comply with the non-disclosure obligations. The potential buyer does not have a prior relationship with the Partnership, Regional Center, or Solaris that we are aware of. However, it is a real estate investment company with over $600 million invested and developed in real estate with investment experience in Vail, Colorado. The Partnership had received interest ranging from $12.25 million for three mountain facing units to $49.5 million for the remaining 17 units from the potential buyer that just walked away from a transaction. The Partnership had received interest from a different party in late 2018 for $50.75 million for 19 units, however their proposed terms included a 6% commission paid to themselves which reduced the net purchase price to $47.7 million. That party walked away from a transaction process.

The Partnership has engaged Angelo's Appraisal Inc. to perform appraisal on an individual, unit-by-unit basis approximately every six months. The Partnership also engaged BBG, Inc. to perform appraisals on a bulk sale basis. On a bulk sale basis, as of June 10, 2019 BBG, Inc. appraised the 17-unit portfolio to be $41.29 million. Both Angelo's Appraisal Inc. and BBG, Inc. are independent third-party companies and have no other relationship to the Partnership, GP, or Regional Center.

**Question:** What was the offering price for the bulk sale? We understand it is already off the table, but would like to know the market price for the bulk sale at this time.

Thanks!

**Response:** The offer price was $49.5 million which did not include any commission back to the potential buyer. It was for the remaining 17 units in the portfolio and was the highest bulk offer received by the Partnership.

**Question:** Thank you for your email. The information only provided in English, which is difficult for foreign LPs to fully understand. Is there any Chinese edition?

For how to exit the investment or put exercise notice, is there any updates information? After the lawsuit, what's the difference for LPs to exit? Or what should the LPs do if wanted to exit? Thank you for reading.

Looking forward.

**Response:** For convenience we have included a translation into Chinese. As with the offering documents, the English version of documents provided by the Partnership in both English and

Chinese is the governing document.  As the litigation remains ongoing, the paths for exit remain unchanged.  The Partnership will (i) pursue individual unit sales to the market, (ii) list unit(s) as described in the exit strategy memorandum, (iii) negotiate with companies formed by LPs for individual unit transfers.  However, at this time given the litigation and multiple efforts to block a bulk sale which resulted in the highest bulk transaction buyer walking away and a waste of significant resources expended toward closing that sale, the Partnership will not pursue further bulk sale opportunities at this time.

 As mentioned in the update, the Partnership will be severely inhibited in selling or transferring any unit(s) until the *lis pendens* is removed. The Partnership will continue engaging real estate brokerages to sell units on an individual basis. If a unit is sold on an individual basis, then a pro rata distribution will be made to the remaining Limited Partners per the Partnership Agreement after satisfaction of other liabilities of the Partnership. Limited Partners may also form companies to negotiate with the Partnership to redeem their Partnership interests in exchange for ownership of a unit, which is further detailed below. Thirdly, the Partnership plans to continue obtaining individual appraisals and distributing updated exit strategy memorandum.

**Question:** As we discussed last time through phone call, now I think it is time for us to continue the process of redeeming LP shares in exchange of ownership for a unit. We have several investors who are interested in this way. Please let me know how this process is going?

**Response:** As mentioned in the "Solaris Project Update" that was shared with all Limited Partners, the Partnership is willing to negotiate with investor groups formed by Limited Partners who want to redeem their Partnership interests in exchange for ownership of a unit. As in the past, such investor groups would be responsible for paying accrued management fees associated with each unit which is approximately $35,000 per limited partnership interest, as well as other closing expenses and terms to be discussed. Investor groups would have the option of paying these fees at closing or deferring payment by way of having the Partnership finance a two-year note to be paid at the earlier of resale of the unit or maturity. Importantly, the Partnership's ability to transfer a unit to Limited Partners will also be subject to the removal of the lis pendens with respect to that particular unit.

**Question:** I want to know how to withdraw from holding a property.  But I don't know other investors, please help me team up with other investors.  Please let me know the specific operation process.  Thank you!

**Response:** The Partnership will consider introducing LPs to each who want to set up separate legal companies to pursue a transfer.  However, once introductions are made it will be up to the LPs to organize and properly document the entity and negotiate operational structure and agreements amongst themselves, etc.  The Partnership will not be part of the actual setup or operations of those entities.

**Question:** Thanks for the update. Can you please explain more about below paragraph about "Unit Transfer":

"...... However, the Partnership is also willing to negotiate with investor groups formed by Limited Partners who want to redeem their Partnership interests in exchange for ownership of a unit. As in the past, such investor groups would be responsible for paying accrued management fees associated with each unit which is approximately $35,000 per limited partnership interest, as well as other closing expenses and terms to be discussed. Investor groups would have the option of paying these fees at closing or deferring payment by way of having the Partnership finance a two-year note to be paid at the earlier of resale of the unit or maturity. Investor groups of six (6) to nine (9) Limited Partners may reach out to the Partnership if interested in discussing a unit transfer. Importantly, the Partnership's ability to transfer a unit to Limited Partners will also be subject to the removal of the *lis pendens* with respect to that particular unit."

**Response:** As detailed in this paragraph, Limited Partners may form investor groups if they desire to redeem their Partnership interests for ownership of a unit. Limited Partners may contact the Partnership if they are interested in discussing the process to redeem their Partnership interests in exchange for ownership of a unit (i.e., a "unit transfer").

**Question:** I am especially eager to know when and how you decided those 19 unites (or 17 units) to be the collateral of our money? How did you decide that their value equals to 21% of the total property?
In the past 10 years, how many times of real estate appraisals have you ever done for these 17 (or 19) units? Have you ever done the appraisal of the total real estate, including 79 units and the facilities on common area? Please share with me all the related real estate appraisal reports. I need these to convince myself that we (EB5 investors) get the fair share of the property, which is supposed to be 21%.
These documents should be available easily as they are the core foundation of our lenders/ borrowers relationship in terms of money. I've been asking similar questions again and again for many times.  Please help me to solve this puzzle.
The other questions are about the other lender whose money accounts for 59% of the investment, i.e. $222,251,091.
1)      Who are they? An individual or a company?
2)      What did they get as the collateral for their money? How many units and which units?
3)      How did you decide they get the right share of the property? Have you ever done the real estate appraisals of their units? How much is it? Pls share the related reports.
4)      Have they got their money back? If yes, how much? (I remember we EB5 investors have the priority, right?)
5)      Are they aware of the fact they you have tried bulk sales of our 17 units and the price was very low, more than 50% discount vs. original investment?
6)   If they are aware of it, what's their reaction? Are they nervous as we are? What actions have they taken? Have they checked the value or potential value of their units? (If I were them, I should have been very nervous and tried hard to get money back!)

I need an overall picture to know what's going on. It seems we have been in dark along the way. Pls help me to trust that you are honest and transparent as the day I met your people back to 2012 in Shanghai.
Thanks in advance!

**Response:** The Partnership has never claimed or held out that the collateral for the $82.5 million was the entire project nor is there another lender related to the original 19 units that are the collateral for the EB-5 Loan.  In fact, it would be illogical to make that assumption as there were a significant number of sales of condominium to unrelated third parties prior to making the EB-5 Loan.  Additionally, the percentage of the total financing for the project that was funded by the Partnership does not necessarily dictate the percentage of total project value that is represented by the units pledged as collateral, as funds were advanced at different times during project completion, and a different level of risk was taken by each investor and lender. Regarding how the Partnership chose the original 19 units that served as the collateral for the original $82.5 million loan, through negotiations it became clear that the both the Partnership and developer desired diversity of the Units in terms of size, type, number of bedrooms, etc.  Ultimately, it was negotiated that approximately half of the value of Property collateralizing the Loan advances would be mountain-facing Units, and half the value of the collateral would be Units on the highway-facing side of the development. This was memorialized in a Memorandum of Understanding.  The amount of each Loan corresponded to the value of each Unit as established and negotiated by the Partnership through prior sale data, market conditions and negotiations with the developer. The Loan advances totaled $82.5 million and were collateralized by 19 units.

Please see the following link to a copy of the appraisals received by the Partnership: https://app.box.com/s/tdcka5i4squ996gyum27ys3fb7oxx1ma

Regarding your remaining questions, again, there is not another lender related to the original 19 units or the remaining 17 units in the portfolio that serve as the collateral for the EB-5 loan.

**Question:** The last six-month notice to limited partners date May 30, 2019, states that "Upon request, we will provide copies of the Appraisals for your review". The term "Appraisals" means the good faith estimate of fair market value of each unit performed by an independent third-party firm." We request to see these Appraisals, and we want to konw if GP stands by the values stated in these Appraisals, or has a different valuation(and if so, what it is). So plesase send to us by email.

**Response:**  Please see the following link to a copy of the appraisals received by the Partnership: https://app.box.com/s/tdcka5i4squ996gyum27ys3fb7oxx1ma

**Question:** Have you ever considered to go to banks to do refinance of these 17 （or 18?) units and return us the money? Why? No hurt to just try and see how much the bank's real estate appraiser believe our asset deserve.

That kind of appraisal by an objective appraiser hired by banks is important for a LP like me. The cost of initiating refinance is not high.

Pls include this in your January FAQ document.

**Response:** We have considered borrowing money and using the proceeds to repay a portion of the investment of the partners. However, a bank lender would lend at significantly less than 100% of the value of the units and the proceeds would not be sufficient to fully repay the limited partners' investment. Additionally, after accounting for interest and rental income and satisfying Partnership expenses, the cash flow generated by the units would not be sufficient to pay for interest expense if the Partnership were to incur a significant amount of debt. Ultimately, the general partner determined that financing the units with new indebtedness would most likely impair the ultimate return on investment realized by the limited partners.

**Question:** One question related to my previous question on that 59% loan, $ 222,251,091. Who is the lender? Do they also get units back or dollars? If dollars, how much did they get? If units, what units?

Have they got money back already? How much? And we EB5 investors are here waiting you to sell units?

Pls specify the same and different treatments between that lender and EB5 investors. Both are lenders for your project, should get fair/ same treatment. If different, why?

**Response:** There is not another lender involved or related to the units collateralizing the Partnership's loan. The Partnership has no relationship with the other project lenders, and does not have visibility into the terms of repayment, as the EB5 transaction was an independent transaction. Again, the percentage of the total financing for the project that was funded by the Partnership does not necessarily dictate the percentage of total project value that is represented by the units pledged as collateral, as funds were advanced at different times during project completion, and a different level of risk was taken by each investor and lender.

**Question:** I'm always confused why selling those 17 units to return money? Based my understanding from the seminar you conducted in Shanghai in 2012 and the document I got from that seminar, you borrowed our money for the common area facility and the whole 79 units. Our money accounts for something like 21% of the total investment. How come it is limited to the 17 units?
Pls clarify.

**Response:** The structure of the investment is detailed in the Confidential Information Memorandum that was provided to all Limited Partners and which all Limited Partners represented they understood as part of the subscription process. The Partnership has never claimed or represented that the $82.5 million loan was collateralized by the entire project nor is there another lender related to the original 19 units that are the collateral for the EB-5 Loan. In

fact, it would be illogical to make that assumption that the loan was collateralized by the entire project as there were a significant number of sales of condominium to unrelated third parties prior to making the EB-5 Loan.  Units already sold by the developer could not somehow be added to a collateral pool.  Additionally, the percentage of the total financing for the project that was funded by the Partnership does not necessarily dictate the percentage of total project value that is represented by the units pledged as collateral, as funds were advanced at different times during project completion, and a different level of risk was taken by each investor and lender.

The Executive Summary of the Confidential Information Memorandum reads,

> "After three years following a Loan Advance, upon 60 days prior written notice to the Company (the "Prepayment Notice Period"), SPO shall have the right to prepay all or certain minimum amounts of the outstanding principal balance on the Solaris Note by tendering to the Company either (i) a special warranty deed to a Condominium Unit (as defined below) and a bill of sale for the Furnishings (as defined below), which deed and bill of sale will transfer title to the Condominium Units and the Furnishings free and clear of all liens and encumbrances except for matters of record approved by the Company, or (ii) cash in the amount of the principal amount of the prepayment plus all accrued interest. Any such prepayment shall be in a minimum amount of the purchase price of a Condominium Unit (which purchase prices will be attached to the Solaris Note at the time of execution). If SPO tenders a prepayment in the form of a transfer of ownership of a Condominium Unit, the amount of the principal balance of the Solaris Note that will be deemed prepaid shall be equal to the purchase price of the Condominium Unit tendered as set forth in the attachment to the Solaris Note. During the Prepayment Notice Period, the Company will have the right to exercise its right to purchase a Condominium Unit and to reject the cash prepayment offered by SPO. In such event, the purchase price of the Condominium Unit shall be credited against the outstanding balance of the Solaris Note."

> In summary, Solaris Property Owner ("SPO") had the right to prepay the Solaris Note after three years following a Loan Advance by (i) transferring ownership of the Unit to the Company or (ii) paying off the loan in cash at maturity. At the three-year anniversary of each Loan Advance, SPO chose to transfer the Units to the Company and effectively did so although actual transfer has not yet occurred.  This was memorialized in the Agreement Regarding Collateral Units. Since the Company now effectively controls the Units, repayment of capital will be based on monetizing, or selling, the Units. The process for Limited Partners receiving their return of capital is detailed in the Notices that have been distributed to all Limited Partners. As the developer had the right to transfer units to the Partnership instead of repayment in cash and the Company had the right to demand transfer of the units to the Company instead of receiving cash payment, it is also illogical to assume an $82.5 million loan is collateralized by over $375 million of property and the Partnership would have been able to force the developer to transfer more than $375 million of value to satisfy an $82.5 million loan.