# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02443

Jun Li, Qi Qin, Yi Liu, Jie Yang, et al.

          Plaintiffs,

                                                      Hon. Judge Moore
      v.                                        Hon. Magistrate Varholak

Colorado Regional Center Project Solaris LLLP,
Colorado Regional Center I, LLC, et al.

          Defendants.

---

## *LI* PLAINTIFFS' REPLY ON MOTION FOR PERMANENT INJUNCTION

---

The Plaintiffs are Asians - mostly Chinese - who invested $82.5 million in Colorado Regional Center Project Solaris LLLP ("CRCPS"). The general partner is Colorado Regional Center I LLC ("CRC"). All of this Asian money was lent out in an $82.5 million, 5-year installment loan to Solaris Property Owner I LLC ("SPO") to improve the condo units at Solaris Vail (the "Loan"). The Loan advances started in 2012, secured by deeds of trust on condo units at Solaris Vail.

The Loan had to be repaid in cash at 5-year maturity or **pre**paid by transfer of condo units by special warranty deed in years 3-5. Neither was done. We are now in year 8.

Under the loan documents, SPO had a prepayment option. That is, they could wait until the 5-year maturity date and repay the Loan in cash, or they had an option to prepay the Loan advances by transferring title of condo units by special warranty deed during the

period from 3 years to the 5-year maturity.  This option runs through all the loan documents and is laid out front and center on pages 1 and 3 of the PPM which Defendants drafted:

> After three years following a Loan Advance, upon 60 days prior written notice to the Company (the "Prepayment Notice Period"), SPO shall have the right to prepay all or certain minimum amounts of the outstanding principal balance on the Solaris Note by tendering to the Company either (i) a special warranty deed to a Condominium Unit . . . or (ii) cash in the amount of the principal amount of the prepayment plus all accrued interest.  (emphasis added).
>
> On the five-year anniversary date of each respective Loan Advance (the "Maturity Date"), provided that the specific Loan Advance has not previously been paid, SPO will be obligated to pay the entire remaining unpaid principal balance together with any accrued and unpaid interest in full.

See Exhibit 3 to the Li Plaintiffs' Third Amended Complaint.  The second paragraph above describes the current situation, which is 8 years after the first loan advances: the Loan has not been prepaid by tender of special warranty deeds prior to maturity, so the full balance of principal and interest must be paid.

SPO's right of prepayment was an "option."  Every option has an expiration date.  For example, NASDAQ defines an option as having a "set time period." See https://www.nasdaq.com/articles/options-defined-2019-06-10 (last checked April 27, 2020).  In fact, it is impossible to assign a value to an option unless it has a known expiration date.  The Options Clearing Corporation - the world's largest options clearinghouse - states that "Time to Execution" is a necessary element to valuing any option. See https://www.optionseducation.org/optionsoverview/options-pricing (last checked April 27, 2020).

Like every option that ever existed, the prepayment option in this case had an expiration date, which is clearly stated in the quote above: the option began 3 years after each Loan advance, and expired at the 5-year maturity.  It could be exercised only by transfer of a special warranty deed. SPO never did this.  As a result, the option expired unexercised.

"Prepayment" is not an ambiguous word.  The meaning is so obvious that even Black's Law Dictionary doesn't bother to define it, but rather goes straight to variations such as "prepayment penalty."  *Kirk v. Kitchens*, 49 P.3d 1189, 1193 (Colo. App. 2002)(citing Black's Law Dictionary definition of "prepayment penalty" as a "charge assessed against a borrower who elects to pay off a loan before it is due.").  The latest version of Black's Law Dictionary makes clear that a "prepayment clause" is a contract term that "permits a borrower to satisfy a debt before its due date**."**  Black's Law Dictionary 11th ed. 2019.  "Pre" means "before" or "prior to."  This is so basic that a child can understand it: "<u>pre</u>payment" must occur before the maturity date. Here the loan documents make clear that <u>prepayment</u> was permissible only by SPO tendering the titles by special warranty deed.   This never happened.  Nor can it happen now. There is no way to "prepay" a 5-year loan in year 8.

CRC and SPO have only one card to play against the direct language of all the loan documents requiring transfer of collateral by special warranty deed during the prepayment option period.  Their defense is a document styled Agreement Regarding Collateral Units ("ARCU") which they surreptitiously signed in 2015 and never showed or explained to the limited partners.  [ECF 152-6 and reattached as Exhibit 1 hereto].

The ARCU says that for purposes of computing the amount of interest payable to the lender, the parties shall hypothetically deem (for the purpose of calculating interest) that the

3

properties will be "deemed" transferred: "**For purposes of calculating interest** under the Loan Documents . . . Borrower shall be **deemed** to have caused a Collateral Unit Distribution." See Exhibit 1 at ¶1 (emphasis added).

The ARCU (in 2015) speaks in the future tense that SPO "intends" in the future to tender the collateral deeds as prepayment, but is "temporarily refrain[ing] from conveying title . . on condition of calculating interest under the loan documents." According to SPO and CRC, we are still in the "temporary" period five years after the ARCU itself and long after the Loan itself has matured. They would have this Court believe that the "temporary" period of refraining from a transfer of title can last forever. That makes nonsense out of the word "temporary" and contradicts the clear language requiring an actual transfer of title in years 3-5 to effectuate the prepayment.

Further, SPO's statement that it "intends" to transfer title in the future is not the same as actually transferring title during the option exercise period. The loan documents don't allow prepayment of the Loan by "intending"; they require actual transfer by special warranty deed, which didn't happen.

Nor can the ARCU be rationalized as a money-saver (and even if it did save money - which it didn't - that would not relieve SPO of its contractual obligation that prepayment requires transfer by special warranty deed). In any event, the ARCU does not save money but actually costs money to the lender. It reduces the interest that CRCPS received from 5% ($4.1 million/year) to a maximum of 3% ($2.4 million/year), for saving "$1 million in taxes, HOA dues, and insurance costs." See SPO Response at p.3. This is a net harm to the lender, not a benefit, and hence the agreement lacks consideration. This is a shady, secret

agreement, hidden from the investors because it inexplicably cut in half the money payable to investors.  CRC signed the ARCU behind the backs of the Asians because it causes the Asians to *lose* money, while CRC itself continues to draw its 2% management fee for a never-ending "temporary" period beyond the maturity date of the Loan.[1]

No matter how loopy the secret ARCU happens to be, it cannot change that SPO did not properly prepay the Loan by transferring special warranty deeds to the collateral.  That means that the loan is unpaid and has a principal around $78.5 million, which is what CRC admits in its own IRS filings and its financial statements.

Let's be honest and talk straight: it is obvious that CRC and SPO have a vested interest in keeping this Loan alive forever even if it harelips the Asians whose money they are playing with.  CRC rides the gravy train of a continuous 2% management fee from Asian money, and SPO doesn't have to pay back the Asian money it borrowed.  They are playing games to benefit themselves at the expense of the Asians.

A lender is a natural enemy of a borrower who shortchanges them. But here, SPO and CRC are playing with Chinese money as if it is Monopoly money, scratching each other's backs so long as neither of them has any skin in the game and the only ones hurt are

---

[1] Another curious feature of this loan transaction is that is lacks a standard prepayment penalty.  Colorado courts recognize prepayment penalties as reasonable because a prepayment deprives the lender of the continued interest payments for which it bargained, and thus the borrower is penalized for cutting off this income stream to the lender.  *Planned Pethood Plus, Inc. v. KeyCorp, Inc.*, 228 P.3d 262, 265 (Colo. App. 2010).  The ARCU not only fails to impose a prepayment penalty, but it gives the borrower a prepayment bonus by reducing its interest payments.  This is wildly outside industry standard.  Neither SPO nor CRC have ever provided any economic breakdown showing the costs and benefits of the ARCU, neither to this Court nor to the limited partners.

foreigners; this is obvious from the fact that they sit together in Court and join each other's motions even though they claim that SPO has lost $40 million of CRCPS' collateral.[2]  Imagine a lender being buddy-buddy with a borrower who just lost $40 million of collateral, and imagine a lender who refuses to call a loan.  It is unthinkable, yet that is the situation here because they are dealing with other peoples' money, and those other people are nameless and faceless Asians.  But now they have been caught and the Asians are holding their feet to the fire, demanding that CRC act as a true lender and that SPO act as a true borrower, and that they follow the loan documents and return the money to the Asians.

The Tenth Circuit allows injunctive relief compelling a party to perform a contract, whether styled as an 'injunction' or as 'specific performance'.  *Westar Energy v. Lake*, 552 F.3d 1215 (10th Cir. 2015)(court enforced a corporation to perform a contractual obligation to indemnify the costs of litigation incurred by a corporate officer, saying that it was specific performance or injunction, but the label didn't matter).   See, also, *Zurn Constructors, Inc. v. B.F. Goodrich Co.*, 685 F. Supp. 1172, 1187 (D. Kan. 1988)("the court will fashion this preliminary injunction in specific performance terms.").   All this Court needs to do is to tell CRC and SPO to follow the loan documents.

The Plaintiffs need to be repaid so that they can cover basic expenses of life: medical bills, tuition payments, rent, food, travel, and essentials.  It is inequitable to hold them

---

[2] In a shocking failure of due diligence, CRC allowed SPO - the borrower - to set the value of its own collateral by using SPO's 2009 asking prices that it sought - in its dreams - buyers might pay for the units, and not on the actual market value of the units at the time of the loan advancements in 2012-2015. In a huge drafting error, there was no mechanism requiring SPO to keep the collateral at a market value equal or exceeding the Loan balance. As a result, the Loan was radically undercollateralized and if the collateral was sold today, it would fetch only about 50% of the unpaid loan balance.

hostage and unpaid for 8 years of a 5 year contract, with no end in sight.  At the rate of current sales the GP would take decades to sell the properties at half of their stated collateral value, all while drawing a 2% management fee plus default interest.  This is an unreasonable state of affairs.  And the public interest is served by Colorado not being known as a place where foreign investors get ripped off.

This Court has two options for dealing with this crazy situation.

The long way is to go through the process of pleading, motions to dismiss, repleading, discovery, depositions, motions for summary judgment, pretrial memoranda, witness and expert lists, and a long trial.  That will take 2-3 years and will cost millions of dollars.

The faster way is to simply order the lender and borrower to follow the loan documents, collect the Loan, and distribute the proceeds to the limited partners.  That can put a merciful end to this case, in absolute conformity to the loan documents and in fulfillment of the reasonable expectations of the Asian investors.


Dated: April 28, 2020

Respectfully Submitted,
/s/ Douglas Litowitz
413 Locust Place
Deerfield, IL 60015
312-622-2848
Litowitz@gmail.com


Certificate of Service:  This document was filed on the ECF system for the District of Colorado and thereby sent to all counsels of record.