**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No.  1:19-cv-02443-RM-STV**
**Consolidated with Civil Action No. 1:19-cv-02637**

Jun Li, *et al.*,

      Plaintiffs,

v.

Waveland Ventures, LLC, *et al.*,

      Defendants.

---

**CRC DEFENDANTS' FED. R. CIV. P. 12(B)(6) MOTION TO DISMISS CUI
PLAINTIFFS' THIRD AMENDED VERIFIED COMPLAINT [ECF 190] AND LI
PLAINTIFFS' THIRD AMENDED COMPLAINT [ECF 121]**

---

# TABLE OF CONTENTS

Page

I.     INTRODUCTION .................................................................................................. 1

II.    RELEVANT FACTUAL BACKGROUND.......................................................... 2

III.   STANDARD OF REVIEW ................................................................................. 6

IV.    ARGUMENT ....................................................................................................... 7

    A.   Plaintiffs Fail to State Claims for Fraudulent Misrepresentation and Fraud ......... 7

        1.   The Fraud Claims are Barred by the Statute of Limitations ..................... 7

        2.   The Fraud Claims Fail to Satisfy the Heightened Pleading
            Requirements ............................................................................................. 9

            (a)   Plaintiffs have not adequately alleged any false or
                misleading statements .................................................................. 9

            (b)   Plaintiffs' representations, warranties, and disclaimers
                preclude reliance ........................................................................ 12

            (c)   Plaintiffs have failed to adequately plead scienter....................... 14

    B.   Plaintiffs Fail to State Claims for Federal and State Securities Fraud................. 15

        1.   The Federal and State Securities Claims are Time-Barred...................... 15

        2.   The Federal and State Securities Fraud Claims Fail to Satisfy the
            Heightened Pleading Requirements .......................................................... 16

            (a)   Plaintiffs have not adequately alleged any false or
                misleading statements .................................................................. 17

            (b)   Plaintiffs have failed to adequately allege scienter...................... 18

        3.   The Li Plaintiffs' Derivative Securities Fraud Claims State No
            Claim........................................................................................................ 19

    C.   Plaintiffs Fail to State Claims for Breach of Fiduciary Duty............................... 19

        1.   The Fiduciary Duty Claims are Barred by the Statute of
            Limitations ............................................................................................... 20

        2.   Plaintiffs Lack Standing to Assert Breaches of Fiduciary Duty for
            Acts that Allegedly Occurred Before They Became Limited
            Partners ..................................................................................................... 21

        3.   The Li Plaintiffs' Allegations of Post-Investment Breaches of
            Fiduciary Duty Fail as a Matter of Law................................................... 21

        4.   The Breach of Fiduciary Duty Claims Are Barred by the Economic
            Loss Rule .................................................................................................. 22

    D.   The Cui Plaintiffs Fail to State a Claim Under the Colorado Consumer
        Protection Act ...................................................................................................... 22

i

TABLE OF CONTENTS

Page

    1.    The CCPA Claim is Preempted by the Colorado Securities Act ............. 22

    2.    The CCPA Claim is Time-Barred ........................................................... 23

E.    The Cui Plaintiffs Fail to State a Claim Under the Investment Company Act .............................................................................................................. 23

F.    The Cui Plaintiffs Fail to State a Claim for Aiding and Abetting ...................... 26

G.    Plaintiffs Fail to State Claims of Veil Piercing ................................................... 27

H.    The Cui Plaintiffs Fail to State a Claim for Declaratory Judgment .................... 28

I.    The Li Plaintiffs Fail to State a Claim of Civil Theft ......................................... 28

J.    Li Plaintiffs' Derivative Claims Fail .................................................................. 29

K.    Plaintiffs Fail to State Any Claims against CRC and Waveland ........................ 29

V.    CONCLUSION ................................................................................................... 30

CERTIFICATE OF SERVICE ................................................................................. 31

4819-0980-0635.5

Defendants Waveland Ventures, LLC, Colorado Regional Center, LLC, and Colorado Regional Center I, LLC (collectively, the "CRC Defendants"), hereby submit their Motion to Dismiss the Cui Plaintiffs' Third Amended Verified Complaint [ECF 190] ("CTAC") and the Li Plaintiffs' Third Amended Complaint [ECF 121] ("LTAC")[1], under Fed. R. Civ. P. 12(b)(6), stating as follows:

Pursuant to D.C.COLO.LCivR 7.1(a) and this Court's Practice Standard IV.N.2(a), undersigned counsel conferred with counsel for Plaintiffs regarding this motion, including potential correctable deficiencies in the CTAC and LTAC. This is the fourth operative complaint for each set of Plaintiffs, and in responding to the various motions to amend counsel have identified the deficiencies described herein. In addition, in a hearing dated February 27, 2020, the Court has notified Plaintiffs of pleading deficiencies for the derivative claims. Finally, on May 6, 2020 undersigned counsel again identified, in an email sent to Plaintiffs' counsels, the issues raised herein.

## I.   INTRODUCTION

This consolidated lawsuit is an effort by certain limited partners of CRCPS to obtain preferential treatment over their fellow limited partners. Despite the many inflammatory allegations of fraud and theft, CRCPS has been, since before this lawsuit was filed, been trying to sell its valuable luxury condominium units in Vail, Colorado *so that it can liquidate its holdings and make distributions to all limited partners.* Plaintiffs, while claiming to vindicate the interests of the overall limited partnership, have repeatedly and successfully interfered with those efforts in

---

[1] CRC Defendants move to dismiss all claims in the CTAC and all claims in the LTAC other than the (first) Count VII, for removal of the general partner of Colorado Regional Center Project Solaris LLLP ("CRCPS").

order to paralyze CRCPS and secure a financial benefit for themselves by forcing a settlement of their individual claims. But Plaintiffs have no claims for relief against the CRC Defendants, and they have pled no claims upon which relief can be granted.

## II.     RELEVANT FACTUAL BACKGROUND

Colorado Regional Center ("CRC") is an approved EB-5 Regional Center, authorized by the U.S. Citizenship and Immigration Services ("USCIS") to operate anywhere within the State of Colorado.  *See* **Exhibit A**, p. 47.[2] CRC I is the general partner of CRCPS.  [ECF 190, ¶ 4; ECF 121, ¶ 10].  Plaintiffs are Chinese investors who each purchased a limited partnership interest in CRCPS for $500,000, as part of an approved EB-5 Program for foreign nationals to obtain a permanent residence visa. [ECF 190, ¶¶ 3-4; ECF 121, pp. 1-2, ¶ 222].

CRCPS prepared a Confidential Information Memorandum dated March 31, 2011 (the "Memorandum") to raise funds related to the development of a luxury residential and commercial project known as Solaris Residences (the "Project"). ECF 190, ⁋ 69; ECF 121, ⁋ 68; Ex. A**.** As the Memorandum explained, investors would pay $500,000 for a limited partnership interest in CRCPS, and the proceeds of the financing described in the Memorandum were to be used to lend approximately $80 million to Solaris Property Owner, LLC ("SPO"), the developer of the Project. Ex. A, pp. 5, 14. The Memorandum included, among other things, copies of the transactional documents related to CRCPS' contemplated loan to SPO, a fulsome description of the anticipated

---

[2] The Court may consider documents that are both central to Plaintiffs' claims and to which Plaintiffs refer in their complaints. *See GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1384-85 (10th Cir. 1997) (holding also that courts need not accept as true legal conclusions and factual allegations that are contradicted by properly considered documents). All exhibits hereto are either referred to in the CTAC and LTAC or central to Plaintiffs' claims.

use of the Memorandum offering, a description of the investor qualifications and suitability requirements, and an actual copy of the CRCPS partnership agreement. *Id.*

According to the Memorandum, the proceeds of the loan were to be used by SPO to pay certain costs pertaining to the development of the Project "as part of its developer's equity." *Id.*, p. 11. The loan would be evidenced by a loan agreement and promissory note, and would be funded in multiple advances over a period of time, accruing interest at a rate of 5.0% per annum. *Id.* at p.14. The principal balance together with all accrued and unpaid interest of each loan advance would be due and payable five years after the date of each loan advance. *Id.*, pp. 16-17.

The promissory note, which was included in the Memorandum, indicated that the loan was non-recourse with the exception of interest payments. *Id.*, p. 33. To secure the loan, SPO would grant a lien, evidenced by a deed of trust, to CRCPS for each of the condominium units designated as collateral. *Id.*, pp. 5-6, 14. The Memorandum does not state that all 79 units would be designated as collateral, nor would that have been feasible at that time. Exhibit I, which was attached to the Memorandum, detailed the various sources of funding for the Project, including $135 million that SPO received from the presales of numerous units that would, in turn, be unavailable as collateral. *Id.*, p. 145. The Memorandum also stated that the total amount of the loan would be $80 million to be paid in multiple advances of approximately $5 million, depending on the price of the pledged unit. *Id.*, p. 11.

The Memorandum did not promise any of the investors a guaranteed return, nor would that have been permitted under the EB-5 Program, which requires the investment to be placed "at-risk." *Id.*, p. 28. To the contrary, the Memorandum explicitly warned that the securities were "highly speculative and involve[d] a high degree of risk" and further cautioned prospective investors that

4819-0980-0635.5

they "should not invest any funds in this offering unless they can afford to lose their entire investment." *Id*. In total, the Memorandum cautioned prospective investors 11 different times that there was no guarantee or assurance of a return or repayment of the capital contributions, and 13 different times that a return or repayment of the capital contributions could be contingent upon the ability to sell the collateral units. *Id.*, *passim*. The Memorandum further stated that the investment involved "significant risks," and provided an 8-page summary of each of the principal risks. *Id.*, pp. 21-29. Those risks included: (i) the failure to complete the Project; (ii) the failure to sell the condominium units; (iii) no guarantee of any returns to investors; (iv) the risk of foreclosure; (v) risk of ownership of the condominium units; (vi) lack of liquidity; (vii) the inability to refinance or sell; and (viii) the inability to repay debt and return capital contributions. *Id*. The Memorandum also explicitly informed investors that they should not rely on any information or representation not contained within the document. *Id.*, p. 1.

The limited partners subscribed to the partnership in 2011 and 2012 [**Exhibit B**], and entered into the Limited Liability Partnership Agreement of CRCPS (the "Partnership Agreement"). [ECF 190, ¶ 94; ECF 121, p. 2]. *See* **Exhibit C**. To purchase an interest in CRPCS, each of the investors had to certify their proficiency in the English language and that they received and understood the Memorandum (the "Memorandum Agreement"). *See* Ex. A, pp. 34, 102, 134; *see also* Ex. B. They were also required to execute a Subscription Agreement, which provided the same 8-page summary of the principal risks as those outlined in the Memorandum. *See* Ex. B. In executing the Subscription Agreements, Plaintiffs represented and warranted:

> That the offer to sell the Partnership Interests was directly communicated to the undersigned by the Partnership through the Memorandum and meetings with the General Partner of the Partnership in such a manner that the undersigned was able to ask

> questions of and receive answers from the Partnership or a person acting on its behalf concerning the terms and conditions of this investment. At no time was the undersigned presented with or solicited by or through any leaflet, public promotional meeting, television advertisement or any other form of general solicitation or advertising.

Ex. B.   Plaintiffs further represented and warranted that they relied on their independent investigations in making the decision to purchase their interest in CRCPS and agreed that the Subscription Agreement constituted the entire agreement between the parties.  *See id*.

According to the Partnership Agreement, CRC I, as the general partner, had the exclusive right and power to manage, operate and control CRCPS, and make all decisions necessary or appropriate to carry on the partnership's business and affairs.  *See* **Exhibit C**, at § 8.01. CRC I also had a "fiduciary responsibility for the safekeeping and use of all funds and assets of the Limited Partnership." *Id.* at § 8.06. Consistent with the Memorandum, § 13.06 of the Partnership Agreement provided an exit strategy for limited partners who wanted to liquidate their investment that would also be equitable to the remaining limited partners. *See* Ex. C, § 13.06; Ex. A, p. 167. Section 13.06 provided an opportunity for a limited partner to exercise a "put option" to cause CRCPS to redeem their limited interest partnership. *See id*.

Prior to the first advance under the loan, SPO assigned all rights, obligations, title and interest related to the loan, note and collateral to Solaris Property Owner I, LLC ("SPO I"). [ECF 190, ¶ 15; ECF 121, ¶¶ 16, 77]. Thereafter, CRCPS loaned the proceeds of the investment in tranches, which totaled approximately $82.5 million, to SPO I. [ECF 190, ¶¶ 3-4; ECF 121, ¶ 75]. As set forth the Memorandum, the loan was evidenced by a loan agreement and a promissory note and was secured by a deed of trust for each of 19 condominium units valued in the aggregate at approximately $82.5 million at the time of execution of the loan agreement (the "Property"). [ECF

5

190 ¶¶ 4-5; p. 1]. The 19 units were designated pursuant to the selection process outlined in the Memorandum of Understanding ("MOU"). *See* **Exhibit D**. Also consistent with the Memorandum, CRCPS was required to pay a subsidiary of Waveland Ventures, LLC for management and servicing duties prior to distributing available cash to the limited partners. Ex. A, p. 14.

Three years following each loan advance, CRCPS (the lender) and SPO I (the borrower) had certain "put" and "call" rights. *See* **Exhibit E,** ¶ 5; **Exhibit F**, ¶ 11; Ex. A, pp. 5,7. Specifically, after three years SPO I was entitled to "put" the Property instead of repaying CRCPS with cash, and CRCPS was entitled to refuse SPO I's repayment of cash and require SPO I to convey the Property. *Id.* As structured, if the value of the Property went down three years after the loan closing, SPO I had the option to repay its obligations by conveying the Property, and if the value of the Property went up three years after the loan closing, CRCPS could reject SPO I's cash repayment and demand a conveyance of the Property. *Id.*

After three years of each loan advance, SPO I provided notice of its intent to exercise its "put" right to transfer each condominium unit in lieu of cash payment. [ECF 190, ¶ 86; ECF 121, ¶ 85]. Pursuant to the terms of an Agreement Regarding Collateral Units ("ARCU") between CRCPS and SPO I, CRCPS has not yet been assigned title to the remaining units comprising the Property, because SPO I agreed to continue to hold title and, upon the instruction of CRCPS, to directly sell the units to a buyer designated by CRCPS, with proceeds going exclusively to CRCPS. *See* **Exhibit G**. Accordingly, SPO I continues to hold title to the Property, and CRCPS continues to hold a first priority lien on the Property by means of the respective deeds of trust. *Id.*

## III.    STANDARD OF REVIEW

Under Fed. R. Civ. P. 12(b)(6), a complaint must state "sufficient factual matter, accepted

4819-0980-0635.5

as true" to state a plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The standard of review "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. A pleading that "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Nor does it suffice to tender "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (quoting *Twombly*, 550 U.S. at 557). Rather, "the plaintiff must do more than articulate a set of facts that could 'conceivabl[y]' or 'possibly' give rise to a claim; he must 'nudge[] his claims across the line from conceivable to plausible.'" *Martinez v. Nash Finch Co.*, 886 F.Supp.2d 1212, 1215 (D. Colo. 2012) (citations omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal,* 556 U.S. at 678 (citation omitted).

## IV.    ARGUMENT

### A.    Plaintiffs Fail to State Claims for Fraudulent Misrepresentation and Fraud

Plaintiffs contend in Count I of CTAC [ECF 190, ¶¶ 93-105] and (second) Count VII of LTAC[3] [ECF 121, ¶¶ 220-235], that they were fraudulently induced into purchasing an interest in CRCPS, and they seek to rescind or recover their $500,000 investment. [ECF 190, ¶ 95; ECF 121, ¶¶ 221-235]. The fraud claims are asserted as direct, or individual claims in both complaints.

### 1.    *The Fraud Claims are Barred by the Statute of Limitations*

Under Colorado law, fraudulent misrepresentation claims are subject to a three-year statute of limitations, which commences when the defrauded person has knowledge of facts which, in exercise of proper prudence and diligence, would enable person to discover fraud perpetrated

---

[3] The Li Plaintiffs fraud claim is the second of four separate "Count VII's" in the LTAC.

against that person. *See* C.R.S. §§ 13-80-101(c) and (f); *see First Interstate Bank of Denver, N.A.*

*v. Berenbaum*, 872 P.2d 1297 (Colo. App. 1993). For statute of limitations purposes, "investors

are presumed to have read prospectuses, quarterly reports, and other information related to their

investments." *See DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209, 216 (3d Cir. 2007); *Grubka*

*v. WebAccess Int'l, Inc.*, 445 F. Supp. 2d 1259, 1266 (D. Colo. 2006) (offering documents can put

a plaintiff on inquiry notice of claims); *see also Conrady v. Ribardeneira*, No. 86-1745, 1990 WL

112875, at *2 (D. Kan. July 2, 1990) (knowledge contained in prospectus is imputed to investors).

The Memorandum, Subscription Agreements and Partnership Agreement, all of which

were provided to, and signed by, Plaintiffs in 2012, clearly describe the nature and terms of the

investment that Plaintiffs now contend was fraudulent. *See* Section IV.A.2, *infra*. The various

disclosures would have put any reasonable person on notice of the facts underlying this claim no

later than 2012. Plaintiffs apparently suggest, however, that their claims should be tolled either

due to a language barrier that prevented them from understanding the nature of the investment or

because they were unaware of their claim until they consulted with an attorney in 2019. [CTAC,

ECF 190, ¶¶ 19, 59, 69, 82-84, 86-87; LTAC, ECF 121, ¶¶ 234-35]. Even if equitable tolling were

applicable here (which it is not), this argument fails. First, it contradicts Plaintiffs' express

representations and warranties that they understood English at the time of the transaction. And

second, tolling does not apply under these circumstances. To the contrary, "lack of knowledge

regarding the law, including ignorance resulting from language barriers, does not toll the statute

of limitations." *Gibson v. Klinger*, 232 F.3d 799, 808 (10th Cir. 2000). Nor does the failure to

consult an attorney toll or expand the period of limitations. *See, e.g., Wright v. Heyne*, 349 F.3d

321, 330–31 (6th Cir. 2003); *Bolduc v. Nat'l Semiconductor Corp.*, 35 F.Supp.2d 106, 120 (D. Me.

1998); *Reichelt v. Johns–Manville Corp.*, 733 P.2d 530, 536 (Wash. 1987).

### 2.     The Fraud Claims Fail to Satisfy the Heightened Pleading Requirements

Dismissal of the fraud claims is further warranted because the allegations in the CTAC and LTAC fail to satisfy the heightened pleading requirements under Rule 9(b). A party alleging fraud "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this standard, a plaintiff must substantiate its allegations of harm and cite to "the specific who, what, when, where and how of the alleged fraud." *Two Moms & a Toy, LLC v. Int'l Playthings, LLC*, 898 F. Supp. 2d 1213, 1216 (D. Colo. 2012) (citation omitted). To prevail on a claim for fraudulent misrepresentation, a plaintiff must allege that the defendant made a false representation or concealment of a material fact with the requisite scienter, which led to plaintiff's reliance. *See Rosenthal v. Dean Witter Reynolds, Inc.*, 908 P.2d 1095 (Colo. 1995); *Black v. First Federal Sav. And Loan Ass'n of Fargo, ND, F.A.*, 830 P.2d 1103, 1113 (Colo. App. 1992). For claims premised on omissions, a plaintiff must sufficiently identify "the particular information that should have been disclosed, the reason the information should have been disclosed, the person who should have disclosed it, and the approximate time or circumstances in which the information should have been disclosed." *Martinez v. Nash Finch Co.*, 886 F. Supp. 2d 1212, 1216 (D. Colo. 2012).

### (a)     Plaintiffs have not adequately alleged any false or misleading statements

The Cui Plaintiffs cite to paragraphs 56, 66, 68, 70, 73 and 74 of the CTAC for the specific material misrepresentations and omissions that support their fraud claim. [ECF 190, ¶ 94]. The only allegations of misrepresentations or omissions in these paragraphs, however, are in paragraph 73, where the Cui Plaintiffs allege that an unidentified "agent," failed to discuss risk with

9

unidentified investors and in paragraph 73, where the Cui Plaintiffs allege that the Offering Documents were confusing. [ECF 190, ¶¶ 73-74]. The Cui Plaintiffs also allege, generally, that a certain unidentified "agent" provided "false information through a PowerPoint presentation to induce investors to purchase limited liability partnership interests. [ECF 190, ¶ 65]. Nowhere in the CTAC do the Cui Plaintiffs' allege who specifically made these representations, when the representations were made, or even whether the Cui Plaintiffs were present for this single PowerPoint presentation.

The Li Plaintiffs, on the other hand, do not even attempt to identify specific misrepresentations or omissions – despite the LTAC being their fourth pleading in this case. [ECF 121]. Like the Cui Plaintiffs, the Li Plaintiffs generally allege that marketing material given to some investors was either misleading in that it characterized the investment as risk-free, or that it contained omissions of fact. [ECF 121, ¶¶ 66-67]. In addition, the Li Plaintiffs vaguely allege marketing material given to the investors was false and contained material omissions and misstatements about the loan being safe and fully collateralized. [ECF 121, ¶ 223]. Like the Cui Plaintiffs, the Li Plaintiffs utterly fail to allege specifically who made the representations, when this occurred, and whether the Li Plaintiffs received or relied on the marketing material.

Under the "bespeaks caution" doctrine, a court may dismiss fraud claims where the alleged misrepresentations are belied by cautionary language in an offering statement. *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1120 (10th Cir. 1997) (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994), *cert. denied*, 516 U.S. 868 (1995)); *see also Robinson v. Oppenheimer Funds, Inc.*, No. 12-CV-1528-JLK, 2013 WL 754417, at *6 (D. Colo. Feb. 27, 2013); *In re Sun Healthcare Grp., Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1290 (D.N.M. 2002). In

other words, representations are considered immaterial when the defendant has provided potential investors with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potentially misleading effect. *See id.* The doctrine is designed to "minimize the chance that a plaintiff with a largely groundless claim will bring a suit and conduct extensive discovery in the hopes of obtaining an increased settlement." *Id.*

The Memorandum did not simply provide general warnings and disclaimers. Instead, it carefully documented the specific risk factors that potential investors should consider. It noted that the investment involved "significant risk" and informed Plaintiffs that a return or repayment of their capital contributions could be contingent upon the ability to sell the collateral units. *See* Ex. A, p. 17. Indeed, on the very first page, it explicitly warns in all capital letters: "These securities are highly speculative and involve a high degree of risk; investors should not invest any funds in this offering unless they can afford to lose their entire investment." *Id.*, p. 1. The next sentence refers potential investors to the 8-page "Statement of Risks" section within the Memorandum, which clearly and concisely highlighted the principal risks involved with the investment and warned that "[t]here can be no assurance that [CRCPS] will achieve its investment objectives, including the return of capital invested by the Limited Partners." *Id.*, pp. 21-29. The Memorandum also required each investor, including Plaintiffs, to sign an English Language Proficiency, acknowledging that he or she read and understood the contents of the Memorandum.

Moreover, the Subscription Agreements, which Plaintiffs were also required to execute, similarly warned that the investment involved certain elements of risk "different from and/or greater than those associated with other investments" and informed Plaintiffs that the return or

4819-0980-0635.5

repayment of the capital contributions could be contingent upon the ability to sell the collateral units. *See* Ex. A, p. 98; Ex. B.  The Subscription Agreement also included the 8-page summary of the principal risks, which was identical to those outlined in the Memorandum. Like the Memorandum, the Subscriptions Agreements, clearly and precisely relayed to potential investors the substantial uncertainties in the investment. Plaintiffs cannot now evade these repeated disclosures by simply stating their claims in terms of their current beliefs.  *See, e.g., In re In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 364 (3d Cir. 1993)

As one court observed, "[d]ocuments such as this, which clearly bespeak caution, are not the stuff of which securities fraud claims are made." *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 879 (1st Cir. 1991). Because the Memorandum, the Subscription Agreements and Partnership Agreement plainly cautioned the Plaintiffs about the risks involved in investing in CRCPS, "[n]o investor, in the face of these substantive disclosures," could have been misled by the alleged misrepresentations. *In re Convergent Technologies Sec. Litigation*, 948 F.2d 507, 516 (9th Cir. 1991).

    (b)    **Plaintiffs' representations, warranties, and disclaimers preclude reliance**

Although the Plaintiffs vaguely allege that some of them did not receive the Memorandum or the Subscription Agreement [ECF 190, ¶ 71; ECF 121, ¶ 60] and therefore reasonably relied on the PowerPoint presentation and other statements made by unidentified agents in China, both documents were signed by all Plaintiffs and explicitly state that they did in fact receive and review

them.[4] *See* Exhibit B. Both documents also contain express representations, warranties, and disclaimers that preclude Plaintiffs, as a matter of law, from demonstrating reliance.

Common to both fraudulent concealment and fraudulent misrepresentation is the element of reliance. *See, e.g., Black v. First Federal Savings & Loan Ass'n*, 830 P.2d 1103 (Colo. App. 1992). Courts routinely dismiss fraud claims, however, where investors were provided with disclosures about the risks attendant to their investments. *See, e.g., San Diego Cnty. Emps. Ret. Ass'n v. Maounis*, No. 07-Civ-2618, 2010 WL 1010012, *14 (S.D.N.Y. Mar. 15, 2010) (clause in subscription agreement that investor relied on PPM precluded any claim of justifiable reliance on oral representations); *Rissman v. Rissman*, 213 F.3d 381, 383 (7th Cir. 2000) (same); *Paracor Fin., Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1159–60 (9th Cir. 1996) (same); *Grumman Allied Indus. Inc. v. Rohr Indus. Inc.*, 748 F.2d 729, 730 (2d Cir. 1984) (same); *Graham v. Barriger*, No. 08-Civ-9357, 2009 WL 3852461, at *13 (S.D.N.Y. Nov. 17, 2009) (same).

By executing the Memorandum and the Subscription Agreements, Plaintiffs expressly disclaimed their ability to rely on: (1) statements made outside the Memorandum; (2) statements that conflict with the Memorandum; and (3) any representations that conflict with the Memorandum and Subscription Agreements' disclaimers regarding the risky and speculative nature of the investment. Plaintiffs not only represented that they read and understood the Memorandum and Subscription Agreements, but also that they had the opportunity to ask questions and that they relied on their independent investigations in making the decision to

---

[4] Plaintiffs do not identify any particular individual who did not receive the documents, which alone fails to satisfy the heightened pleading requirements under Rule 9(b). [ECF 190, ¶¶ 20,71-72; ECF 121, ¶¶ 65-79]. Nor do they attribute any misstatements in any Chinese translation of anything to the CRC Defendants. [ECF 121, ¶ 66].

purchase their interest in CRCPS. As a matter of contract law, Plaintiffs are bound by these unambiguous representations and disclaimers – even if they are fatal to their fraud claims. *See, e.g., Rasmussen v. Freehling,* 412 P.2d 217, 219 (Colo. 1966) (party who signs a contract without reading it is barred from claiming he is not bound by what he has signed); *Cordillera Corp. v. Heard*, 592 P.2d 12 (Colo. App. 1978) (party signing an agreement is presumed to know its contents).

### (c)   Plaintiffs have failed to adequately plead scienter

Plaintiffs have also failed to allege any facts to show that the CRC Defendants acted with scienter. To satisfy this element, a plaintiff is required to allege facts showing the "scienter element required for deceit." *See Ebrahimi v. E.F. Hutton & Co*., 794 P.2d 1015, 1017 (Colo. App. 1989). "In a fraud case . . . the gravamen of the tort is the defendant's conscious knowledge of the falsity of the representation or such recklessness as amounts to a conscious indifference to the truth." *Id*. Indeed, "one cannot avoid the [particularity] requirement simply through a general averment that defendants 'knew' earlier what later turned out badly." *In re BP Lubricants USA., Inc.,* 637 F.3d 1307, 1310 (Fed. Cir. 2011) (citation omitted).

The only allegations in the CTAC and LTAC even referring to scienter are conclusory, non-specific and therefore woefully deficient. For instance, the Cui Plaintiffs allege simply "at the time Defendants made representations, they knew they were false." [ECF 190, ₱ 97]. The Li Plaintiffs allege the same. [ECF 121, ₱ 223]. Nowhere in the complaints do Plaintiffs allege any facts that provide any specificity regarding specific Defendants' specific state of knowledge that would plausibly support the element of scienter. To the contrary, where, as here, a defendant requires a plaintiff to sign an agreement representing that he or she received and read a document,

14

there is a strong inference that the defendant did not intend to conceal the information in the document. *See Kronk v. Landwin Group, LLC,* Case No. SACV 10-00344, 2011 WL 1313096, at * 5 (C.D. Cal. June 7, 2011).

**B.     Plaintiffs Fail to State Claims for Federal and State Securities Fraud**

Count V of the CTAC refers, in paragraph 123 to 15 U.S.C. § 78j, perhaps indicating that the Cui Plaintiffs intended to assert a claim of federal securities fraud. [ECF 190, ¶¶ 120-24]. The Li Plaintiffs clearly allege federal securities fraud in Count V of the LTAC. [ECF 121, Count V, ¶¶ 181-196]. And the Li Plaintiffs also allege, in Count VI of the LTAC, a claim for state securities fraud under C.R.S. § 11-5-101, *et seq.*

The Cui Plaintiffs assert their federal securities claim as a direct, individual claim. The Li Plaintiffs assert their federal and state securities claims as derivative claims.

### 1.     The Federal and State Securities Claims are Time-Barred

The Cui and Li Plaintiffs' claims for federal securities fraud under § 10(b) of the 1934 Act, 15 U.S.C. § 78j, is subject to a two-year statute of limitations and five-year statute of repose. *See* 28 U.S.C. § 1658. The Li Plaintiffs' separate claim for state securities fraud under C.R.S. § 11-51-501 and 604(5) is subject to a three year statute of limitation and a five year statute of repose. *See* C.R.S. § 11-51-604(8). Because Plaintiffs are seeking damages related to their original investments, which again occurred in 2011 or 2012, their federal and state securities fraud claims are barred as a matter of law.

The Li Plaintiffs attempt to avoid this result, however, by alleging that "put" options provided to limited partners in order to give them a liquidation opportunity somehow constitute a "continuing violation." [ECF 121, ¶¶ 186-87]. But the "put" options were not new security

offerings – they were expressly incorporated into the parties' original investment contract. Exercising that right in accordance with contract terms cannot form the basis for a separate violation of federal or state securities law.  More fundamentally, Plaintiffs do not allege – because they cannot do so - that they actually exercised the "put" opportunity granted to each limited partner. [ECF 121, ℙ 187].  A violation of federal securities law does not occur until there is an actual purchase or sale of the relevant security.  *See In re Biozoom, Inc. Securities* Litigation, 93 F.Supp.3d 801, 810 (N.D. Ohio 2015); *City of Pontiac General Employees' Retirement System v. MBIA, Inc.*, 637 F.3d 169 (2d. Cir. 2011).  While offers or solicitations may ultimately support a claim, until a sale takes place, no violation has occurred.  *See id*.  Because Plaintiffs fail to allege that they purchased or sold a security in connection with the "put" options, there can be no civil liability.

But even so, the five-year period of repose serves "as a cutoff" and "tolling principles do not apply." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 363 (1991) (addressing predecessor statute of repose). Nor does the continuing fraud exception apply.  *See Carlucci v. Han*, E.D.Va.2012, 886 F.Supp.2d 497; *In re Brocade Communications Systems, Inc. Derivative Litigation*, 615 F.Supp.2d 1018 (N.D. Cal. 2009).

### 2.	The Federal and State Securities Fraud Claims Fail to Satisfy the Heightened Pleading Requirements

Plaintiffs' federal securities fraud claims are based on Section 10(b) of the Federal Securities Exchange Act, 15 U.S.C. § 78j [ECF 190, Count V, ℙℙ 120-21; ECF 121, Count V, ℙℙ 181-96]. To prevail on a claim under § 10(b), a plaintiff must establish that the defendant made statements (1) containing "false or misleading statements of material fact," (2) "related to the purchase or sale of a security," (3) "with the intent to defraud investors or with a conscious

16

disregard of a risk that shareholders would be misled (scienter)," (4) that "led to reliance by [Plaintiffs]," and (5) that "caused the [Plaintiffs'] loss (loss causation)." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1146 (10th Cir. 2015) (citation omitted).

The Private Securities Litigation Reform Act of 1995 (the "PSLRA") imposes an even higher pleading requirement than Rule 9(b), requiring a plaintiff "to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter." *In re Zagg, Inc. Securities Litigation*, 797 F.3d 1194, 1201 (10th Cir. 2015); *In re Qwest Communications Int'l, Inc.*, 396 F. Supp. 2d 1178, 1188 (D. Colo. 2004); *see* 15 U.S.C. § 78u.

And under the Colorado Securities Act, a plaintiff alleging securities fraud must allege that the defendant made a false representation or concealment of a material fact with the requisite scienter, which led to plaintiff's reliance. *See Rosenthal v. Dean Witter Reynolds, Inc*., 908 P.2d 1095 (Colo. 1995); *Black v. First Federal Sav. And Loan Ass'n of Fargo, ND, F.A*., 830 P.2d 1103, 1113 (Colo. App. 1992).

> (a)    **Plaintiffs have not adequately alleged any false or misleading statements.**

The Tenth Circuit evaluates "the facts alleged in a complaint to determine whether, taken as a whole, they support a reasonable belief that the defendant's statements identified by a plaintiff were false and misleading." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1099 (10th Cir. 2003). This approach involves an evaluation of the following factors: (1) the level of detail provided by the facts stated in the complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts when considered together; (4) whether the source of the plaintiff's knowledge about stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a

reasonable person would believe that the defendant's statements were misleading. *Adams*, 340 F.3d at 1099.

**(b)**     <u>**Plaintiffs have failed to adequately allege scienter.**</u>

The term 'scienter' has been defined by the Supreme Court as "a mental state embracing intent to deceive, manipulate or defraud." *City of Phila. v. Fleming Cas. Co.*, 264 F.3d 1245, 1258 (10th Cir. 2001) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, n. 12, 96 S. Ct. 1375, 47 L. Ed.2d 668 (1976)). To satisfy the scienter element under the PSLRA, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Supreme Court has held that "courts must consider the complaint in its entirety … [in order to determine] whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23, 127 S. Ct. 2499, 168 L. Ed 2d 179 (2007) (emphasis in original). For an inference of scienter to qualify as strong "[it] must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

In order to establish scienter in a securities fraud case alleging non-disclosure of potentially material facts, the plaintiff must demonstrate: (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors. *Fleming*, 264 F.3d at 1261. "[I]t is the danger of misleading buyers that must be actually known or so obvious that any reasonable man would be legally bound as knowing." *Fleming*, 264 F.3d at 1260-61.

As set forth in Section IV.A.2(a), *supra*, Plaintiffs have not even met the Fed. R. Civ. P. 9

18

standard for alleging false and misleading statements or scienter. They certainly have not met the standard under state law, not to mention the more stringent standard under federal law.

### 3.    The Li Plaintiffs' Derivative Securities Fraud Claims State No Claim

The Li Plaintiffs assert their federal and state securities fraud claims in a derivative capacity. [LTAC, ECF 121, Count V, ¶¶ 181-96, Count VI, ¶¶ Count VI, ¶¶ 197-211]. These claims are nonsensical as pled by the Li Plaintiffs. A derivative action is a mechanism whereby a shareholder can sue on behalf of a corporation when those in control of the corporation have opted not to pursue a claim belonging to it. *Hirsch v. Jones Intercable, Inc.*, 984 P.2d 629, 634 (Colo. 1999). The Li Plaintiffs' federal and state securities fraud claims are therefore claims asserted by CRCPS. But, of course, CRCPS cannot possibly have a securities fraud claim against itself. The Li Plaintiffs do not, because they cannot, somehow allege that CRCPS was somehow a buyer or seller of limited partnership interests in itself.  For this independent reason, the Li Plaintiffs' federal and state securities fraud claims fail as a matter of law.

## C.    Plaintiffs Fail to State Claims for Breach of Fiduciary Duty

Count II of the CTAC [ECF 190 and Count I of the LTAC [ECF 121] are breach of fiduciary duty claims against CRC 1, the general partner of CRCPS. The CTAC asserts the breach of fiduciary duty claim as both an individual and derivative claim[5], while the LTAC asserts the breach of fiduciary duty claim as a derivative claim.

In order to recover for breach of fiduciary duty, a plaintiff must prove: (a) that the defendant

---

[5] The Cui Plaintiffs' breach of fiduciary duty claim is against the general partner of CRCPS, and as pled must be a derivative, not individual, claim. "(C)laims for redress belonging to the partnership and cannot be asserted by a partner in his or her individual capacity." *Adams v. Land Services, Inc.*, 194 P. 3d 429, 434 (Colo. App. 2008)

was acting as a fiduciary of the plaintiff; (b) that he breached a fiduciary duty to the plaintiff; and, (c) that the plaintiff incurred damages; and, (4) that the defendant's breach of fiduciary duty was a cause of plaintiff's damages. *Graphic Directions, Inc. v. Bush*, 862 P.2d 1020 (Colo. App. 1993).

### 1.      *The Fiduciary Duty Claims are Barred by the Statute of Limitations*

Like fraudulent misrepresentation, a breach of fiduciary duty claim is subject to a three-year statute of limitations, which begins to run "when the injury, loss, damage, or conduct giving rise to the cause of action is discovered or should have been discovered by the exercise of reasonable diligence." *See* C.R.S. §§ 13-80-101(f) and -108(8); *see First Interstate Bank of Denver, N.A. v. Berenbaum*, 872 P.2d 1297 (Colo. App. 1993).

The Cui Plaintiffs contend that CRC I breached its fiduciary duties of candor, good faith, reasonable inquiry, oversight and supervision as set forth in paragraphs 56, 66, 68, 70, 73 and 74 of the CTAC. [ECF 190, ¶ 109]. Each of these allegations, however, relates to various representations and conduct that allegedly occurred *prior to Plaintiffs' investment*. The same is true for virtually all of the allegations made by the Li Plaintiffs in the LTAC in support of the alleged breach of fiduciary duty by CRC I.  [LTAC, Count I, ¶¶ 118, 119, 120, 122 and 123].

And as set forth in Section IV.A.2, *supra*, the Memorandum, Subscription Agreements and Partnership Agreement, all of which were signed by Plaintiffs no later than 2012, clearly describe the nature and terms of the investment that Plaintiffs now contend were concealed or misleading. For the same reasons that the fraud claims are time-barred, so too are the breach of fiduciary duty claims.[6]

---

[6] The Li Plaintiffs allege two possible breaches of fiduciary duty that occurred after their investment in CRCPS. [ECF 121, ¶¶ 121 and 125].  These alleged breaches, however, fail to state a claim for other reasons.  *See* Section IV.C.3.

20

**2. Plaintiffs Lack Standing to Assert Breaches of Fiduciary Duty for Acts that Allegedly Occurred Before They Became Limited Partners.**

Moreover, because the fiduciary duty claim is purportedly derivative, Fed. R. Civ. P. 23.1(b)(1) requires a plaintiff to allege continuous ownership of the entity "at the time of the transaction complained of, or that the plaintiffs' share or membership later devolved on it by operation of law." Again however, Plaintiffs' alleged breaches relate almost exclusively to pre-investment conduct. The transaction complained of in the CTAC and LTAC is the underlying transaction with the borrower, which was put in place *before* Plaintiffs became limited partners of CRCPS. Indeed, the transactional documents describing the underlying transaction were attached to the Memorandum – all of which describe in detail every aspect of the transaction challenged now by Plaintiffs. *See In re Accuray Inc, Shareholder Derivative Litigation*, 757 F. Supp. 2d 919 (N.D. Cal. 2010) (a derivative plaintiff has no standing to challenge transactions that occurred prior to the time he owned stock or membership). Thus, Plaintiffs' derivative claim fails as a matter of law.

**3. The Li Plaintiffs' Allegations of Post-Investment Breaches of Fiduciary Duty Fail as a Matter of Law**

The only allegations of breaches of fiduciary duty that occurred after the Plaintiffs' investment are the allegations in paragraphs 121, 124 and 125 of the LTAC. [ECF 121]. These allegations do not support a claim for breach of fiduciary duty. Paragraph 121 of the LTAC alleges that CRC I breached a fiduciary duty be allowing the borrower to keep title to units. But the ARCU, attached hereto as Ex. G, clearly shows that CRCPS controls these units and, thus the Li Plaintiffs cannot allege damages flowing from the alleged breach. Paragraph 124 alleges that CRC 1 has failed to attempt to collect the loan by bringing a lawsuit against the borrower. Again, however,

the ARCU clearly shows there is no breach of the loan agreement. Finally, paragraph 125 alleges that CRC I has breached the duty of honesty by sending out notices containing erroneous valuations of the units. Again, the Li Plaintiffs cannot allege damages flowing from this alleged breach, as the ARCU establishes that CRCPS currently controls these units.

### 4. The Breach of Fiduciary Duty Claims Are Barred by the Economic Loss Rule

Section 8.06 of the CRCPS Partnership agreement provides that the general partner – here CRC I  - shall have a fiduciary responsibility for the safekeeping and use of all funds and assets of CRCPS.  *See* Ex. C.

The economic loss rule "maintain[s] the boundary between contract law and tort law." *Town of Alma v. AZCO Construction, Inc.*, 10 P.3d 1256, 1259 (Colo. 2000). It provides that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Id.* at 1264.  Where, as here, fiduciary duties imposed by contract are the same as or subsume the duties imposed by law, then the duties are no longer "independent" of those agreed to in contract. *See Tuchman v. Pell Rudman Trust Co.*, 245 F. Supp.2d 1156, 1159-60 (D. Colo. 2003)(the economic loss doctrine bars a breach of fiduciary duty claim where fiduciary duties are contracted for);  *see also Micale v. Bank One N.A.*, 382 F.Supp. 1207, 1220 (D. Colo. 2005).

## D. The Cui Plaintiffs Fail to State a Claim Under the Colorado Consumer Protection Act

Count III of the CTAC is for alleged violation of the Colorado Consumer Protection Act, C.R.S. § 6-1-101 *et seq*. ("CCPA").

### 1. The CCPA Claim is Preempted by the Colorado Securities Act

The CCPA addresses unfair or deceptive trade practices that significantly impact the public

as actual or potential consumers of a defendant's goods or services.  *See Rhino Linings USA, Inc. v. Rocky Mountain Rhino*, 62 P.3d 142, 147 & 150–51 (Colo. 2003) (quoting *Hall v. Walter*, 969 P.2d 224, 235 (Colo.1998)). Where the "goods" at issue are securities investments, however, courts have held that misrepresentations as to the nature or risk of the investment are governed solely by the Colorado Securities Act, C.R.S. § 11-51-101 *et seq*. ("CSA").  *See, e.g. Robinson v. Oppenheimer,* 2013 Westlaw 754417, at * 4 (D. Colo. Feb. 27, 2013).

Under Colorado law, when two statutes attempt to regulate the same conduct, the more specific statute preempts the general statute. *See Crowe v. Tull*, 126 P.3d 196, 206 (Colo. 2006); *Showpiece Homes Corp. v. Assurance*, 38 P.2d 47 (Colo. 2001). The making of materially misleading statements and omissions in connections with the sale of securities "is conduct clearly falling most specifically under the purview of the Colorado Securities Act."   *Robinson.* Accordingly, the CCPA does not apply to Plaintiffs' allegations.

### 2.       The CCPA Claim is Time-Barred

Claims under the CCPA must be brought "within three years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice." Colo. Rev. Stat. § 6-1-115 (1987).  For the reasons set forth in Section IV.A.1, *supra*, this claim is time-barred.

### E.       The Cui Plaintiffs Fail to State a Claim Under the Investment Company Act

Count IV of the CTAC is a claim for rescission under the Investment Company Act, 15 U.S.C. 80a, *et seq.* – specifically, for alleged failure to register as an investment company. [ECF 190, Count V].  But there is no private right action to enforce the registration requirements under the Investment Company Act, 15 U.S.C. § 80a, *et seq*. (the "ICA"), nor is there a private remedy

23

for rescission.

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress" – either expressly or implicitly. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). To create a private right, a statute must use rights-creating language that places an "unmistakable focus" on the individuals protected rather than the person regulated. *See id*. at 288-89; *Ball v. Rodgers*, 492 F.3d 1094, 1106 (9th Cir. 2007). To create a private remedy, a statute must avoid remedy-foreclosing language. *See In re Digimarc*, 549 F.3d at 1231. Language establishing an express "remedial scheme[ ]" may "foreclose a[n implied] private [right] of action to enforce even those statutes that admittedly create substantive private rights." *Sandoval*, 532 U.S. at 290.

The ICA provisions related to registration requirements do not have rights-creating language. *See UFCW Local 1500 Pension Fund v. Mayer*, 895 F.3d 695, 699 (9th Cir. 2018). Section 7(a) of the ICA provides that "[n]o investment company" shall, among other things, "engage in any business in interstate commerce" unless it registers with the SEC. 15 U.S.C. § 80a-7(a)(4). And section 8(e) "focuses neither on the individuals protected nor even on the [parties] being regulated, but on the agenc[y] that will do the regulating" – the SEC. *Sandoval*, 532 U.S. at 289. It provides that if a company has failed to comply with the registration requirements, the SEC may "suspend the registration of such company until such statement or report is filed or corrected, or may by order revoke such registration." 15 U.S.C. § 80a-8(e). This language not only defeats any notion that Congress intended to create a private right, but it also forecloses any remedy beyond SEC enforcement. To be sure, Congress did provide for a private right of action under § 36(b) of the ICA to allow investors to bring suit for breach of fiduciary duty. *See* 15

24

U.S.C. § 80a-35.  But it chose not to use that language in §§ 7 and 8, leaving little doubt regarding its intent.  *See In re Oppenheimer Rochester Funds Group Sec. Litigation*, 838 F. Supp.2d 1148, 1158 (D. Colo. 2012).

Nor is there any private remedy for rescission under 15 U.S.C. § 80a-46(b). Rather, it provides that a "contract that is made, or whose performance involves, a violation of [the ICA], or of any rule, regulation, or order thereunder, is unenforceable by either party" to the contract unless equity dictates otherwise. 15 U.S.C. § 80a-46(b)(1).  This language does not expressly establish a private remedy, as "nothing in the text of the section makes any mention of [one]."  *See, e.g., Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.)*, 677 F.3d 178 (3rd Cir. 2012), *cert. denied* 133 S.Ct. 529.  The CRC Defendants acknowledge that the Second Circuit has found a private right of action under the ICA for rescission in *Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99 (2d Cir. 2019). But other circuits disagree.  *See Santomenno*, 677 F.3d at 187; *UFCW*, 895 F.3d at 700.  And at least one Colorado court has adopted the Third and Ninth Circuits reasoning in holding that no private right of action exists under the ICA unless expressly provided.  *See, e.g., In re Oppenheimer*, 838 F.Supp.2d at 1158.

Finally, Count IV of the CTAC is also time-barred under a one-year statute of limitations and three-year statute of repose.   Where courts have considered the appropriate limitations period in the event that a private claim arising under the ICA exists, they have held that a one-year statute of limitations and three-year statute of repose are applicable.  *See*, *e.g., UFCW Local 1500 Pension Fund v. Mayer*, No. 16-cv-00478-RS, 2016 WL 6122458, at *9 (N.D. Cal. Oct. 19, 2016), *aff'd*, 895 F.3d 695 (9th Cir. 2018).

**F.      The Cui Plaintiffs Fail to State a Claim for Aiding and Abetting**

Count V of the CTAC is a claim for aiding and abetting unregistered brokers. [ECF 190,

Count V]. Pursuant to § 15(a)(1) of the 1934 Act, it is unlawful for any broker or dealer to effect

a transaction in any security unless such broker or dealer is properly registered.  *See* 15 U.S.C. §

78o(a)(1).  But courts have long held that a private right of action does not exist for violations of

this provision.  *See, e.g., Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990);

*Asch v. Philips, Appel & Walden, Inc.,* 867 F.2d 776, 777 (2d Cir. 1989); *Goodman v. Shearson*

*Lehman Bros., Inc*., 698 F.Supp. 1078, 1086 (S.D.N.Y. 1988); *Bull v. American Bank and Trust*

*Co. of Pa.*, 641 F.Supp. 62 (E.D. Pa. 1986).

To the extent the Court finds that a private right of action under § 15(a)(1) does in fact

exist, it certainly does not extend to aiders and abettors.  Section 20(e) of the 1934 Act explicitly

provides that liability for aiding and abetting can only be pursued by the SEC.  *See* 15 U.S.C. §

78t (limiting its application to actions brought by the SEC); *see also Stoneridge Inv. Partners, LLC*

*v. Scientific-Atlanta, Inc.*, 552 U.S.148, 162 (2008) ("Aiding and abetting liability is authorized in

actions brought by the SEC but not by private parties."). Consistent with the plain language of §

20(e), courts have repeatedly refused to find a private right of action for aiding and abetting a

violation of § 15(a)(1). *See Contra Snyder v. Neward, Cook & Co., Inc.*, 764 F. Supp. 612, 616 (D.

Colo. 1991); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990); *Asch v.*

*Philips, Appel & Walden, Inc.,* 867 F.2d 776, 777 (2d Cir. 1989). Count IV should be dismissed.

Plaintiffs' claim under § 78o is also time-barred.  For claims arising under the broker-dealer

requirements under § 15(a) of the 1934 Act, courts apply a one-year statute of limitations and

three-year statute of repose.  *See, e.g*., *Celsion Corp. v. Stearns Management Corp.*, 157 F.Supp.2d

942, 947 (ND. Ill. 2001).

**G.      Plaintiffs Fail to State Claims of Veil Piercing**

Count VII of the CTAC and (fourth) Count VII of the LTAC allege generally that the Court should pierce the corporate veil of CRC 1 and enter judgment against the individual owners and members of CRC 1. [CTAC, ECF 190, Count VII, ¶¶ 145-49; LTAC, ECF 121, (fourth) Count VII, ¶¶ 246-51].  Setting aside the fact that Plaintiffs cannot prevail on any of their underlying claims to even warrant this procedural mechanism, the allegations in the TAC fail to satisfy the requirements for such a drastic remedy.

It is well-settled that piercing the corporate veil is not a separate and independent cause of action, but rather a procedure to enforce an underlying judgment.  *See Swinerton Builders v. Nassi*, 272 P.3d 1174, 1177 (Colo. App. 2012).  Thus, to impose individual liability on an alter ego, Plaintiffs must first prevail on their underlying substantive claims.  Because Plaintiffs have not pled any viable claims against the CRC Defendants, there is simply no reason to disregard the corporate form to impose individual liability. But even assuming Plaintiffs could in fact prevail on their substantive claims, the allegations in the CTAC and LTAC fall decidedly short of establishing that veil piercing is warranted under these circumstances.

A duly formed corporation is treated as a separate legal entity, unique from its officers, directors, and shareholders. *In re Phillips*, 139 P.3d 639, 643 (Colo. 2006). Only extraordinary circumstances justify disregarding the corporate entity to impose personal liability. *See id.* at 644. Before piercing the corporate veil, courts conduct a three-part inquiry to determine whether: (i) the corporate entity is the alter ego of the person or entity in issue; (ii) justice requires recognizing the substance of the relationship between the person or entity sought to be held liable and the

corporation over the form, because the corporate fiction was "used to perpetrate a fraud or defeat a rightful claim;" and (iii) an equitable result will be achieved by disregarding the corporate form and holding a shareholder or other insider personally liable for the acts of the business entity. *Id*.

A corporation is the alter ego of its shareholders when it is a "mere instrumentality for the transaction of the shareholders' own affairs, and there is such unity of interest in ownership that the separate personalities of the corporation and the owners no longer exist." *Id*. (quoting *Krystkowiak v. W.O. Brisben Co.*, 90 P.3d 859, 867 n.7 (Colo. 2004)). The Cui Plaintiffs failed to plead any allegation demonstrating that CRC I is a mere instrumentality; instead, they resorted to conclusory statements that the "LLC's [sic] acting through their owners and members—fraudulently set up these transactions to rob the limited partners by under collateralizing the Loan so that the owners and members of [CRC I] and SPOI would personally benefit" and that "in the interests of justice and in order to provide an adequate remedy for the fraudulent conduct which directly benefited the members of [CRC I] and SPOI, the Court should enter an order piercing the corporate veils." [CTAC, ECF 190, ¶ 147]. The Li Plaintiffs did not even allege that much, instead just vaguely suggesting that CRC I and SPO acted through their owners." [LTAC, ECF 121, ¶ 247]. Neither the CTAC nor LTAC even identify the individuals or businesses who they claim are the so-called alter egos of CRC 1.

## H.    The Cui Plaintiffs Fail to State a Claim for Declaratory Judgment

Count VII of the CTAC is for a declaratory judgment regarding the enforceability of the Yield Enhancement Agreement and Agreement Regarding Collateral Units between SPO I and CRCPS. This claim is not directed at the CRC Defendants.

## I.    The Li Plaintiffs Fail to State a Claim of Civil Theft

Count II of the LTAC is for civil theft under C.R.S. § 18-4-405 (or 205), asserted as a derivative claim. [LTAC, ECF 121, ¶¶ 131-49].  To plead a claim for civil theft, a plaintiff must allege facts showing that (a) the defendant knowing obtained control over plaintiff's property without authorization or by threat or deception; and, (b) with the specific intent to permanently deprive plaintiff of the benefit of the property. *Electrology Lab., Inc. v. Kunze*, 1119, 1161 (D. Colo. 2016).  There are no allegations in the  Li Plaintiffs' civil theft claim that address these elements as to the CRC Defendants.

**J.     Li Plaintiffs' Derivative Claims Fail**

Despite the repeated opportunity to amend their pleading and the Court's express notice to the Li Plaintiffs during a hearing of March 2, 2020, the LTAC is unverified and thus fails to comply with Fed. R. Civ. P. 23.1. Verification requires that a signed and notarized statement be attached to the pleading in which a witness swears that the statements in the pleading are true and correct. *See Neal v. Kelly*, 963 F.2d 453, 457 (D.C. Cir. 1992) (verification is confirmation of truth by affidavit or oath).  Counts I through VII of the LTAC fail to state a claim upon which relief can be granted by virtue of this clear deficiency and should be dismissed.  *See Eschino*, 2015 WL 5047650, at * 2 (dismissing unverified complaint pursuant to Rule 23.1).

**K.     Plaintiffs Fail to State Any Claims against CRC and Waveland**

While the CTAC and LTAC refer to certain individuals, the only named Defendants in both complaints are CRC I, CRC, Waveland and CRCPS.[7]  Neither complaint alleges anything at all with specificity as to CRC and Waveland, and both complaints completely fail to state claims against these Defendants.

---

[7]  The Court has granted CRCPS an extension of time to respond to the complaints. [ECF 200].

## V.     CONCLUSION

For the foregoing reasons:

a. The CRC Defendants request the Court to dismiss Counts I, II, III, IV, V and VII and VIII of the CTAC.[8]

b.      In the alternative to full dismissal of all claims against the CRC Defendants in the CTAC, the CRC Defendants request the Court to dismiss all claims asserted against Waveland and CRC in the CTAC.

c.      The CRC Defendants request the Court to dismiss Counts I, II, IV, V, VI, (second) VII, and (fourth) VII of the LTAC.[9]

d.      In the alternative to full dismissal of the CRC Defendants on Counts I, II, IV, V, VI, (second) VII, and (fourth) VII of the LTAC, the CRC Defendants request the Court to dismiss all claims asserted against Waveland and CRC in the LTAC.

DATED: May 11, 2020

/s/James D. Kilroy
James D. Kilroy
Stephanie A. Kanan
SNELL & WILMER L.L.P.
1200 Seventeenth Street, Suite 1900
Denver, Colorado 80202
Telephone: 303.634.2000
Facsimile: .303.634.2020
Email: jkilroy@swlaw.com
Email: skanan@swlaw.com

*Counsel for Defendants Waveland Ventures, LLC, Colorado Regional Center, LLC and Colorado Regional Center I, LLC*

---

[8] The CRC Defendants are not named as Defendants in Count VI of the CTAC.

[9] The CRC Defendants are not named in Count III and (third) Count VII.  The CRC Defendants do not move for dismissal of (first) Count VII, and will file an answer as to that claim this same day.

4819-0980-0635.5

## CERTIFICATE OF SERVICE

     This is to certify that on May 11, 2020, a true and correct copy of the above and foregoing **CRC DEFENDANTS' FED. R. CIV. P. 12(B)(6) MOTION TO DISMISS CUI PLAINTIFFS' THIRD AMENDED VERIFIED COMPLAINT [ECF 190] AND LI PLAINTIFFS' THIRD AMENDED COMPLAINT [ECF 121]** has been electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record:

Douglas Litowitz
413 Locust Place
Deerfield, IL  60015

Hubert Kuo
Brian P. Stewart
Ardent Law Group
4340 Von Karman Avenue, Suite 290
Newport Beach, CA  92660

Harold A. Haddon
Ty Gee
David Maxted
Haddon Morgan and Foreman, P.C.
150 East 10th Avenue
Denver, CO  80203


*Amy Kovarsky*
for Snell & Wilmer L.L.P.