IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02443

Jun Li, Qi Qin, Yi Liu, Jie Yang, et al.

        Plaintiffs,

        v.

Hon. Judge Moore
Hon. Magistrate Varholak

Colorado Regional Center Project Solaris LLLP,
Colorado Regional Center I, LLC, et al.

        Defendants.

---

**LI PLAINTIFFS' RESPONSE TO CRC DEFENDANTS' MOTION [ECF 203] TO DISMISS LI PLAINTIFFS' THIRD AMENDED COMPLAINT [ECF 121]**

---

**I.    General Matters Covering the Entire Dispute**

<u>**The Li Plaintiffs will Voluntarily Dismiss all Direct Counts and Two Derivative Counts**</u>

The Li Plaintiffs pled the Third Amended Complaint ("TAC") as both a derivative and direct lawsuit. *Srebnik v. Dean*, 2006 WL 2457386 *2 (D. Colo. August 22, 2006)("It is well-settled that shareholders have the right to bring direct and derivative actions simultaneously"). However, the Li Plaintiffs are convinced they have satisfied all prerequisites to a derivative claim and are willing to proceed solely on a derivative basis, with the proviso that they retain the right to seek equitable veil-piercing remedies as set forth in ¶¶246-251 of the TAC. Further, because the claims and remedies sought in Counts IV and VII of the TAC are already before the Court on motions, the Li Plaintiffs will voluntarily dismiss those Counts. That leaves a 5 Count derivative action: Counts I (Breach of Fiduciary Duties); Count II (Civil Theft); Count III (Breach of the

Loan Agreement by Borrower SPO); Count V (Federal Securities Fraud); and Count VI (Colorado Securities Fraud).

Before explaining why these counts survive the Motion to Dismiss, there are two global issues that must be addressed. First, the Li Plaintiffs will explain why this action is a justified derivative suit. Second, the Li Plaintiffs will explain why it is necessary to seek veil-piercing remedies due to the Defendant entities being deliberately structured as shells and alter egos.

**The Standard of Review under Fed. R. Civ. Pro. 12(b)(6)**

Fed. R. Civ. Pro. 8(a)(2) requires a short and plain statement of a claim, alleging sufficient factual matter that, when taken as true, makes the claim plausible on its face and raises the right to relief above the speculative level. *Dias v. City and County of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007). A Complaint only has to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197 (2007). The Court must "accept the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Zartner v. City and County of Denver*, 242 F. Supp. 3d 1168, 1172 (D. Colo. 2017), quoting *Alvarado v. KOB-TC, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007). Dismissal under Fed. R. Civ. Pro. 12(b)(6) is a "harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Duran v. Carris*, 238 F.3d 1268, 1270 (10th Cir. 2001), quoting *Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1251 (10th Cir. 1999). Here, the TAC gives 25 pages of detailed facts before it even reaches the individual counts for relief, giving copious quotes from the seminal transaction documents and direct testimony from court hearings [ECF 121 pp. 7-32]. Each count

is separately labeled and identified by the applicable code section and source of law invoked, with each element listed separately.

The facts of this case can be summarized briefly. Asian investors put $82.5 million into Colorado Regional Center Project Solaris (the "LP"). Its general partner, Colorado Regional Center I LLC (the "GP"), loaned all this cash to Solaris Property Owner LLC I ("SPO") for improvement of the Vail Solaris condos and entertainment complex. SPO was required to put up collateral in the form of pledged condominium units, and the GP had a fiduciary duty to ensure that this collateral was sufficient. Unfortunately, the GP allowed SPO itself to set the value of its own collateral using inflated prices, not actual market value, and there was no 'margin call' or 'truing up' requiring the borrower to maintain collateral having a market value that was equal or exceeding the loan balance. The loan term was 5 years for each advance, with the right to prepay the loan during years 3-5 by transfer of condo titles by special warranty deed. Most of the loan matured in 2017, a bit in 2018, and the last bit in 2020. The loan has never been repaid in cash and no condo units have been transferred as prepayment.

The Private Placement Memorandum ("PPM"), which CRC insists is the officially sanctioned governing document, said expressly that the loan had a **pre**payment period from years 3-5 during which the borrower could be **pre**paid by special warranty deeds, but once the **pre**payment period was over, the full principal and interest was due at the 5-year maturity:

> After three years following a Loan Advance, upon 60 days prior written notice to the Company (the "**Pre**payment Notice Period"), SPO shall have the right to **pre**pay all or certain minimum amounts of the outstanding principal balance on the Solaris Note by tendering to the Company either (i) a special warranty deed to a Condominium Unit . . . or (ii) cash in the amount of the principal amount of the **pre**payment plus all accrued interest.  (emphasis added).

> On the five-year anniversary date of each respective Loan Advance (the "Maturity Date"), provided that the specific Loan Advance has not previously been paid, SPO will be obligated to pay the entire remaining unpaid principal balance together with any accrued and unpaid interest in full.

SPO never repaid the loan nor made **pre**payment by special warranty deed, and therefore the entire loan is overdue and should be earning default interest. As the TAC states (¶151-153):

> The Loan Agreement between CRCPS and SPO (later assigned to SPO1) at Section 11 said that SPO1 had two choices: repay $82.5 million in cash to CRCPS at maturity, or tender each collateral unit to CRCPS after the 3 year mark. SPO1 defaulted on repaying $82.5 million plus interest at the 5-year mark. SPO1 also defaulted on transferring the collateral units to CRCPS after the 3 year mark.

The LP's tax return for 2018 is proof that no collateral units were transferred in prepayment, and no payment was made at maturity. In that tax return, they told the Internal Revenue Service that the LP had one significant asset -- an unpaid *note receivable* for $82.5 million. TAC ¶160.

In its latest pleading, CRC claims that the *note receivable* which it told the IRS was worth $82.5 million is actually worth $0 since it can never be called for payment: "CRC1 has no legal right to demand repayment of the loan from SPO1" [ECF 204 counterclaim at ¶52(a)]. But if this is true, then the LP's assets consist of an uncollectable note receivable and no (zero) titles to condo units, giving the LP no assets. This raises the question of what assets CRC is 'managing.'

CRC and SPO's argument for refusing to pay the overdue loan rests entirely on a bizarre secret agreement that CRC and SPO (as lender and borrower) signed in 2015 and kept hidden in the crypts unbeknownst to the limited partners. This "Agreement Regarding Collateral Units" ("ARCU") says in the very first section that "**for purposes of calculating interest** . . . Borrower shall be **deemed** to have caused a Collateral Unit Distribution [a tender by prepayment]," and that the Borrower "**intends** to cause the occurrence of a Collateral Unit Distribution . . . on the

applicable Prepayment Date" in the future, and that "Borrower will **temporarily** refrain from conveying title." TAC ¶155 (emphasis added).

In other words, the ARCU was an imaginary-hypothetical-temporary-deemed transfer *for purposes of calculating interest due on the loan*. In had no effect on the real world of the loan transaction. Even worse, the ARCU cuts off interest payments to the LP (lender) on the pretext that it saves money on title transfer fees, but there is no evidence that the LP benefits from this arrangement because the reduction of interest is likely greater than the savings of transfer fees. See TAC ¶156 (transfer fees are typically borne by the borrower). Legally, the ARCU leaves the world exactly as it is. It is ridiculous for CRC to say that the 'temporary' period of the ARCU has lasted from 2015 to 2020, a period of time greater than the loan itself. At the end of the day, the borrower SPO did not *repay* the loan, nor did it *prepay* the loan.

When this Court looks at the ARCU and this entire transaction, it must ask "*Cui bono*?" - "Who benefits?" The answer is obvious. CRC gained a 2% management fee on $82.5 million for 8 years and counting, plus expenses, giving them an estimated $13 million for just sticking the Asian money into this bad deal. SPO got $82.5 million in liquid cash for dumping overpriced condos worth half that amount that it couldn't sell anyway. And who loses? The Asian investors. Money was not created nor destroyed; the market did not cause this loss. CRC and SPO simply arranged for the money to be moved from the pockets of the Asian investors into their own pockets. Comically - if it wasn't tragic -- CRC says that taking money from the Asians to benefit themselves and SPO was  . . . wait for it . . . . wait for it . . .  wait for it  . . .  "sound business judgment." [ECF 204, Counterclaim ¶52].

**<u>Reasons Why This is a Justified Derivative Action</u>**

The hallmark of a derivative claim is that all investors suffered an identical harm which is derived from an injury to the business entity itself, so the recovery goes to the entity first, and then derivatively to the investors. *Tisch v. Tisch*, 439 P.3d 89, 105 (Colo. App. 3d Div. 2019), quoting *In Re Ionosphere Clubs, Inc.,* 17 F.3d 600, 605 (2d Cir. 1994)("The distinction between derivative and direct claims turns primarily on whether the breach of duty is to the corporation or to the [specific plaintiffs] and whether it is the corporation or the [specific plaintiffs] that should appropriately seek relief.")  Here, the Li Plaintiffs seek recovery to the LP.  Once the money is rightfully returned to the LP, it can be apportioned to limited partners equally.

In addition to the requirement that recovery is sought for the business entity itself, there are two formalities required.  First, there must be a pre-lawsuit demand.  Second, there must be a verification under oath accompanying the complaint stating that it is correct and that a pre-lawsuit demand was made, and various other jurisdictional matters.  Both were satisfied here.

The Li Plaintiffs satisfied the demand requirement of the Colorado Uniform Limited Partnership Act, Colo. Rev. Stat. 7-62-1001 ("Derivative Actions") by making a pre-lawsuit demand against the GP to call the loan and to pay back the LP and the limited partners. The demand letter was dated July 1, 2019 and delivered in hard copy.  Strangely, the GP did not form an independent special litigation committee, but proceeded to act as judge in their own case, exonerating themselves and refusing to call the loan.

In addition to satisfying the pre-suit demand, the Li Plaintiffs filed a "Verification Pursuant to Fed. Civ. Pro. R. 23.1" (the "Verification") in which a plaintiff verified under oath that "I have read the foregoing Complaint and attest to its accuracy."  She also verified that she has been a limited partner for the duration of this dispute; that she did not join the case to collusively confer

jurisdiction; and that a demand letter was sent but no relief was given. The wording of the Verification is line-for-line with Fed. R. Civ. Pro. 23.1, which states:

> The complaint must be verified and must: (1) allege that the plaintiff was a shareholder or member at the time of the transaction complained of . . . ; (2) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and (3) state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort.

That would seem to be the end of the matter, but CRC asserts that the Complaint was not properly verified [ECF 203 p. 29]. They make the unsupported and picayune claim that a Rule 23.1 verification must have the exact words "true and correct" to describe the complaint, so the Verification in this case is deficient for using the word "accurate" instead. This is a strange argument because Rule 23.1 does not require the words "true and correct." Merriam-Webster Thesaurus defines "accurate" as a synonym for "true" and "correct," so one word is the same as the others. See https://www.merriam-webster.com/thesaurus/accurate (last checked May 21, 2020). And if CRC was so hung up on those precise words, they could have simply asked opposing counsel for a substitute verification using those precise words, without involving this Court.

CRC has previously made a similar meritless argument by importing a totally different federal statute into Rule 23.1. There is a federal statute that governs statements not made under notary ("unsworn"), saying that such unsworn statements can be considered 'verified' if the author signs under penalty of perjury and says that the statement is "true and correct" or uses words "substantially in the same form." 28 U.S.C. §1746. CRC appears to be jumping from this statute on **un**sworn statements to the assertion that Rule 23.1 requires the exact words "true and correct" in **sworn** statements. But even if we somehow jimmied 28 U.S.C. §1746 inside of Rule 23.1 it wouldn't make these words mandatory because courts have said that 28 U.S.C. §1746 doesn't

require the exact statutory language. *U.S. v. 8 Gilcrease Lane, Quincy Fla. 32351*, 587 F. Supp. 2d 133, 139 (D.D.C. 2008)("the statement of verification need not be identical to the statutory language to suffice.")

CRC tries to find support for their argument about Rule 23.1 from a 1992 decision of the DC Circuit that did not deal with Rule 23.1 at all. *Neal v. Kelly*, 963 F.2d 453, 457 (D.C. Cir. 1972). In *Neal*, there was a dispute as to whether a verified complaint counted as an "affidavit" to support a Rule 56 motion. This led the court to look up the word "verify" in *Black's Law Dictionary* which says that verification is "confirmation of truth, correctness, **or** authenticity" (emphasis added). This case does not say anything about Rule 23.1 and does not say that verification requires the magic words "true and correct." CRC's argument is from a nearly 20 year old case, from a different Circuit, dealing with a different Federal Rule, wrongfully analogizing from a different federal statute. CRC then cites the unreported decision in *Eschino v. Lopez*, 2015 WL 5047650 (D. Colo. 2015), where a derivative complaint was dismissed because the plaintiff didn't verify it nor make a demand on the company. And so? That decision says nothing about the case at bar, where a verification and written demand were made. In any event, this Court disfavors Rule 12(b) motions that raise technical defects which can be pleaded over. See Civ. Practice Standard IV.N.2.a:

> Motions brought pursuant to Fed. R. Civ. P. 12(b) are discouraged if the defect is correctable by filing an amended pleading. Movants should confer before filing the motion to determine whether the deficiency can be corrected by amendment (e.g., failure to plead fraud with specificity) and should exercise their best efforts to stipulate to appropriate amendments. If such a motion is nonetheless filed, movants shall include in the motion a conspicuous statement describing the specific efforts undertaken to comply with this Practice Standard.

8

This Civil Practice Standard specifically discourages a motion to dismiss for failure to plead fraud with specificity, yet this is precisely what the CRC Defendants do in their Motion to Dismiss [ECF 203 p. 12-13], asserting wildly that **"The Li Plaintiffs do not even attempt to identify specific misrepresentations or omissions."** (emphasis added). Oh, really? Let's see if the Li Plaintiffs do not even attempt to identify specific misrepresentations or omissions.

TAC ¶95 reproduces emails from CRC lying to investors that the condo units had been transferred, when no units have ever been transferred. TAC ¶83 says that the entire transaction was "fraudulent and incompetent." TAC ¶103 reveals how the GP misinformed investors that the collateral was worth 93% of the loan balance by omitted the material information that this number was based on the impossible assumption that only one unit was for sale at a time, a situation requiring a sales period of 57 years. TAC ¶135 says that the limited partners were "deceived." TAC ¶188 says that the 6-month status reports to limited partners contained "fraudulent misleading information about the value of the collateral units, misleading investors . . . and inducing reliance . . . on the basis of this misrepresentation of material fact." TAC ¶189 says that "CRC failed to explain the history and method by which it was over-valuing the capital." TAC ¶191 says CRC acted with scienter. TAC ¶192 and ¶202 say that CRC committed an "an ongoing continuing fraud" that induced justifiable reliance. TAC ¶205 says that CRC wrongly omitted to warn investors that the loan was likely to never get paid back in cash and that they would be left with undervalued collateral. TAC ¶209 says that "fraudulent misrepresentations in connection with a security were made intentionally, with scienter, with intent to deceive, and to the detriment of the limited partners." TAC ¶90 says that "[CRC] cannot even keep straight their own lie: they told investors that the titles were transferred in 2012/2013, then that the titles would be transferred at the three year mark, and later that they reached a secret agreement not to transfer the titles, but from 2017

9

onwards they told investors they were working to transfer the titles [but told the IRS in 2018 they didn't own any units]. They simply tell different stories to different people. That's called fraud." TAC ¶214 says:

> CRC1 has committed fraud in multiple ways:
>
> The creation of an unjust Roach Motel of an EB-5 investment structure that ensured the loss and conversion of 50% of the assets of the partnership within 3 years and left the limited partners with under-collateralized illiquid real estate that cannot be sold;
>
> Fraudulently overstating the value of the collateral to limited partners every six months;
>
> Putting the partnerships' assets at risk by having SPO1 hold title while telling the investors that these units are "partnership property";
>
> Hiring Knobel's company as a broker after his other companies fraudulently 'repaid' the partnership's $82,500,000 loan with collateral units worth $40,000,000.
>
> Fraudulently concealing from limited partners the Secret Agreement and the methodology of assigning collateral value that overstated such value from the outset.

The TAC says that there was "fraud at the heart of this loan since the units were never worth anything near the $82.5 million loan value" and that "the marketing materials and loan documents misled [limited partners] that the loan would be fully collateralized dollar-for-dollar and therefore safe" TAC at p. 2. The TAC says that the entire transaction was "theft with a fountain pen . . . with the intentional and predictable consequence that the limited partners would lose money into the hands of the Defendants." TAC at p. 2-3. TAC ¶102 shows that a $4 million loan advance was collateralized with a unit valued by SPO and CRC at $3.7 million but actually sold in the real world for $2.7 million before reductions for accrued management fees and commissions, with the remainder split among 8 investors, giving each of them sub-50% return, not the 93% promised. It

is mystifying that CRC could see all these specific allegations of fraud in the TAC and still robotically invoke the specificity requirement of Rule 9 despite a warning in the Civil Practice Standards not to do so.

**<u>Why the Parent Companies Should be Named Defendants</u>**

In most cases of white collar fraud, the people who ultimately benefit (i.e., those who actually get the money) hide behind layers of shell companies. The most effective shell is an LLC because it allows profits to flow-through to owners who cannot be traced through the Secretary of State records. The victims deal only with the lowest level of LLCs (as it were, 'street level') which profess limited liability while sending the misappropriated money upwards as flow-through income. Typically, the street level LLCs are insufficiently capitalized or underinsured to cover the losses that they create, thereby insulating the beneficiaries who get the money while hiding behind corporate (or LLC) veils. In these schemes, the LLCs often share the same officers, they act together, they have a unity of interest, and they exist primarily to create layers of confusion, not for a genuine purpose. This is precisely why the Li Plaintiffs need to assert liability up the chain of LLCs to actual human beings in order to avoid injustice.

The two visible ('street level') LLCs that harmed the limited partners were Colorado Regional Center I LLC and Solaris Property Owner I LLC. But these LLCs are owned by other LLCs, and so on up the chain, so profits flowed upward to persons while purporting to cut off personal responsibility. The Li Plaintiffs tried diligently to trace the chain, see TAC ¶9-18, but cannot know for sure they have named all the owners whose identities have been hidden.

The TAC alleges that "SPO and SPO1 are shell for Defendant Knobel and alter-egos for him. . . so any gain to such entities obtained through artifice, deception, or theft inures to the

11

benefit of Knobel personally." TAC ¶143-144.  But still, there may be other principals who own or control the SPO entities, and in fact there are many SPO entities in Colorado (SPO1, SPO2, SPO3, SPO4, etc.), so there is no way to untangle ownership without discovery.

The TAC says Colorado Regional Center I LLC is a shell for its parent company, Colorado Regional Center LLC, which is a shell for *its* parent company, Waveland Ventures LLC, and its presumed ultimate owners listed in ¶14.  This is why liability is asserted up the chain to Waveland and its principals:

> Waveland and its principals are implicated in the fraudulent structure of this transaction and its marketing and administration to foreign investors, resulting in the loss of tens of millions of dollars due to Waveland's incompetence.  TAC ¶60.

In fact, the TAC asserts the liability of all owners, whether entities or persons:

> the borrower group SPO/SPOI/Knobel got $82.5 million in cash in return for probably less than $40 million in condominium units; the lending group CRC/CRCI/Waveland got a 2% management fee annually ($1.6 million) . . . and the big loser who pays for it all is CRCPS, the suckers of a zero-sum scam . . . TAC ¶104.
>
> $40 million was misappropriated as pure profit into the hands of Knobel and his entities and/or the Colorado Regional Center LLC and its affiliates and owners. . . Every dollar taken from the foreign investors went into the pockets of Knobel and CRC's owners. Derivatively, the limited partners demand that that CRCPS take action to sue its general partner Colorado Regional Center I LLC and its owners/affiliates, as well as Knobel and his affiliates, who set up this horrendous transaction with the intentional and predictable consequence that the limited partners would lose money into the hands of the Defendants.  TAC p. 2.

Colorado law allows piercing of an LLC if there is a unity of interest, the entities are alter egos of the owners, the entities' owners are interchangeable, or the entity is a mere instrumentality. *Griffith v. SSC Pueblo Belmont Operating Co.,* 381 P.3d 308, 313 (Colo. 2016)("the case law

12

governing corporate veil piercing applies to disregarding the LLC form as well"); *Stockdale v. Ellsworth*, 407 P.3d 571, 576 (Colo. 2017)(holding that an entity is an alter ego if it is a "mere instrumentality" for the ultimate owners). The determination of whether a court should pierce the veil is a "mixed question of law and fact," *id.* at 576, so it should not be decided on a motion to dismiss which addresses solely the pleadings. *Lester v. Career Bldg. Acad.*, 338 P.3d 1054, 1062 (Colo. App. 1st Div. 2014)(because it is a mixed question of law and fact, "we generally defer to the trial court's factual findings"). Obviously, a Rule 12(b)(6) motion is addressed to the pleadings and not the facts, so the determination of veil-piercing is not yet ripe.

However, the pleading standard for veil piercing is liberal. *Wichita Destination Developers, Inc. v. Focus Hospitality Services, LLC*, 365 F. Supp. 3d 1172, 1181 (D. Kan. 2019). The federal court in *Wichita* said that allegations adding persons or entities on a veil-piercing theory fall within Fed. Civ. Pro. R. 8's liberal pleading standard and not the more stringent Rule 9 standard for allegations of fraud. Therefore the *Wichita* court denied a motion to dismiss since the plaintiff had properly alleged that "upholding the fiction of separate corporate entities would promote social injustice." *Id.* at 1181. The Li Plaintiffs have obviously met this standard. They alleged that money went up the LLC chains of shell companies and came to rest with the ultimate owners who controlled the shells, so liability should follow the money, otherwise the fiction of separate entities would cause injustice. As this Court may know, The Li Plaintiffs conferred with opposing counsels under Local Rule 7.1 to ask for a simple one-page chart showing the ownership structure of the LLCs and their members. Opposing counsel refused. The Li Plaintiffs should not be punished at this early stage because the other side has set up an Enron-type structure.

13

## II. In Support of the Derivative Counts as Pled

When it comes to the specific counts, CRC tries to hide behind the boilerplate risk warnings, waivers, and "bespeaks caution" language in their offering documents. It is true that risk warnings are effective against ordinary market risks, fluctuations in price, unanticipated changes in the law, and they allow "puffing" and "optimism" about future performance. But there was never any warning to limited partners that CRC and SPO would commit intentional fraud, or breach fiduciary duties, or convert funds, or make knowing violations of securities laws. CRC cites the "bespeaks caution" doctrine to say that investors were warned that future results might not be as rosy as projected. This is beside the point, since that doctrine only applies to forward-looking 'puffing' about the future value of securities, not to intentional fraud, lies, breaches of duty, or securities fraud. *Grossman v. Novell*, 120 F.3d 1120, 1123 (10th Cir. 1997)(holding that the "bespeaks caution" doctrine does not apply to misrepresentations of facts such as percentage of market share, since it only protects against forward-looking projections and not against current factual misrepresentations or omissions). There is no way for CRC - or anybody - to legally excuse themselves from wrongdoing.

**Count I for Breach of Fiduciary Duty is Properly Pled and within the Statute of Limitations**

The Limited Liability Partnership Agreement ("LPA") expressly says that the GP owes fiduciary duties of "skill, care, and business judgment" and expressly requires them to safeguard and protect the partnership property. TAC ¶114. In addition, a representative of the GP, Mr. Rick Hayes, told the Court that the GP has fiduciary duties to the limited partners. TAC ¶116. Colorado law says that general partners owe duties of "good faith, sound business judgment, candor, forthrightness and fairness," *Silverberg v. Colantuno*, 991 P.2d 280, 285 (Colo. App. 4th Div.

1998), and the Colorado Uniform Limited Partnership Act says that these duties owed between general partners (care, good faith, loyalty, and accounting) are also owed by general partners to limited partners. Colo. Rev. Stat. 7-62-403(1).  So there are two distinct sources of fiduciary duties here: contractual and statutory.

The TAC states precisely how, why, and when these fiduciary duties were violated, to wit: by accepting insufficient collateral chosen by the borrower instead of being independently valued, by not 'truing up' the collateral to remain equal to the loan balance, by making an unhedged asymmetrical gamble on price movements, by failing to hedge downside risk with a stop loss, by failing to collect the loan at maturity, by misrepresenting to investors every six months the value of the collateral, and by enriching itself with management fees of 2% while *mis*managing the assets. TAC ¶114-128.

The TAC points out that this deal had certain hidden features when it was put together by CRC and SPO (the lender and borrower) that made it likely to go rotten in the future (i.e., that it was set up to fail), but the actual discovery of rottenness was not visible until much later - in 2018 - when investors first realized that the loan was radically undercollateralized with merely 19 condo units which if sold at bulk would only fetch 50% of the original loan balance (not even accounting for interest or inflation).  The limited partners had always presumed (relying on the Memorandum) that the loan would be fully collateralized and that the principal would be due at maturity.  Only the Defendants knew from the beginning that the borrower had no intention of paying the loan at maturity and that the collateral was overpriced and unsellable - they kept this hidden until 2018.  This was a "long con" -- stretching from the offering memorandum to the present day.

The statute of limitations for breach of fiduciary duty begins ticking when an investor learns of the breach, *not when he could have learned of it* by independent investigation, because there is no duty to make an independent investigation until put on notice of wrongdoing. *Tisch v. Tisch*, 439 P.3d 89, 101 (Colo. App. 3rd Div. 2019). In *Tisch*, the court refused to strike a claim as stale under the three year statute of limitations for breach of fiduciary duty, even though the breach happened many years earlier, since the breach had only recently been discovered and the plaintiff was a minority shareholder who did not have a duty to investigate the breach and had no notice of it until a year before he filed suit. Applying *Tisch* to this case, the limited partners were entitled to rely on the GP's statements, until in 2018 the GP admitted that the collateral was not really worth 93% if sold off, but only 50% or less. And the failure to call the loan is a continuing breach.

The TAC alleges that the breach of fiduciary duty was fraudulently concealed: "CRC's breach of fiduciary duty was - and continues to be - fraudulently concealed by the surface rationality of the loan transaction . . . and could not have been discovered until 2018 when the Plaintiffs learned that the loan had been radically undercapitalized." TAC ¶128 (emphasis added). Obviously, the failure of CRC to call the loan - despite the demand of 109 of the 152 limited partners telling it to do so, is a current and ongoing breach of fiduciary duty. TAC ¶124. This is not a lawsuit over a discrete event that happened years ago, such as an old merger that turned out badly, or a product line that fizzled out years ago. This is happening right now, not in some distant past.

Nor does the judge-made "economic loss doctrine" save CRC, since that doctrine is intended to prevent a plaintiff from recovering twice under different theories - once under contract and once under tort. Nor is it clear that the Li Plaintiffs are even asserting a free-floating independent tort separate from the contract, since Count I says that the fiduciary duties of the GP

16

are derived both from the LPA (a contract) and from the Colorado Uniform Limited Partnership Act (which governs limited partnerships, creatures of contract). Strangely, the case CRC cites on the economic loss doctrine, *Tuchman v. Pell Rudman Trust Co.*, 245 F. Supp. 2d 1156 (D. Colo. 2003) *denied* a motion to dismiss under the economic loss doctrine where a plaintiff claimed breach of contract as well as torts arising from an investment advisor contract, saying that the determination of whether the complaint sounds in tort or contract was better decided on summary judgment. The same is true here.

**Count II states a Claim for Civil Theft**

Civil theft is defined as the permanent taking of another person's property by deception. Here the limited partners invested their money in reliance on the Memorandum's statement that the loan would be fully secured. The Memorandum did not say that the collateral was only going to be 19 units, but rather that the loan would be collateralized, and any normal nonrecourse loan is always over-collateralized and requires the borrower to put up additional collateral if the existing collateral drops in value. TAC ¶40, 41, 73. The Promissory Note given to limited partners had 40 spaces for listing of collateral units securing the note, creating the impression that up to 40 units would secure the loan. TAC ¶72. Again, the limited partners were told repeatedly that the collateral was worth almost the same as the loan balance.

By 2019, CRC had to admit their previous valuations as misrepresentations for leaving out the essential fact that the collateral could never be sold for 93% of the loan value, but was estimated to take 7 years to sell at bulk, and would return only $43 million, for a present value around $35 million. TAC ¶103. As CRC's representative said to the Magistrate Judge: "The appraisal [at 93%] is based on any one unit being sold at a particular time, not all being sold at the same time."

TAC ¶103. Mr. Litowitz thereupon calculated that at the current rate, it would take 57 years to sell the collateral, at which time Mr. Hayes admitted that this is why they would pursue a bulk sale, yet that sale would make recovery 50% not 93%.

CRC created a false impression of full collateralization to get investors to part with their money, then later failed to fully collateralize and failed to collect the loan. That is civil theft -- deceitfully inducing a person to part with their money knowing that it will never be fully repaid. The civil theft claim is not barred by the economic loss doctrine. *Bermel v. BuleRadios, Inc.*, 440 P.3d 1150 (Colo. 2019). As far as when the civil fraud was first ascertainable and the cause of action accrued, this question cannot be decided at the pleading stage since the date of injury is not discrete but requires factual analysis. *Wagner v. Grange Ins. Assn.,* 166 P.3d 304, 307 (Colo. App.4th Div. 2007)(denying a motion to dismiss for failure to state a claim under statute of limitations since the dates were fact-specific and not readily identifiable, as in a personal injury case based on a date certain).

**The Motion to Dismiss Does not Address Count III, so
neither will this Response**

**Counts V and VI state claims under the Federal and
State Securities Laws**

CRC seeks to dismiss the federal and state securities law claims as time-barred by a 5 year statute of repose. The problem with this is that there are two securities offerings here which trigger separate limitations periods: the limited partnership units were a first (unregistered) offering in 2012, and a second offering was later made of puts to 'put' these units back to CRCPS (a 'put" is expressly noted as a type of security under the securities laws). TAC ¶186. The puts were *described* in 2012 but not issued then. They were actually offered and exercisable only after 2017,

when they were offered on a continuing basis every six months to limited partners. The put was exercised by roughly 80-some percent of limited partners (TAC ¶208), against the backdrop of CRC's misrepresentation that the value of the collateral was 93% of the loan. TAC ¶189

CRC objects that there was no purchase or sale here, so there can be no Rule 10b-5 violation for fraud in connection with a purchase or sale of securities. But 15 U.S.C. 77b defines "sale" broadly as any contract or disposition of a security for value, i.e. some benefit in return. So offering a put that would put money in the hands of an investor, and then having 80% of investors exercise it constitutes a sale of a security. The same federal law that defines "sale" says that when a security is issued with notice that a companion or derivative security will be issued later, the date of issuance of the derivative security is the *later* date. In other words, there is no back-dating of the put to the original securities offering. And the document accompanying the put misled investors to believe that they would get 93% return of $500,000, which means there was a false statement of material fact related to the purchase and sale of a security, with intent to defraud investors, upon which a reasonable person would rely. These are the elements of a Rule 10b-5 action, and the TAC also alleges the necessary elements of scienter, intent to deceive, and detrimental reliance. TAC ¶209. But even if the Court finds there was no purchase and sale to invoke the 10b-5 anti-fraud provisions, the pleadings can be easily amended to invoke identical anti-fraud provisions applicable to securities *offerings*, so in either case the Defendants will have to face anti-fraud scrutiny under the securities laws.

**Conclusion**

Normally, a five-year secured loan of $82.5 million at 5% interest should be repaid after five years with the aggregate amount of $103 million, assuming simple interest. And if the

19

borrower can't pay cash, the lender can foreclose on collateral and cover this amount. This is the deal that the limited partners were led to believe they were getting. The limited partners never authorized any hidden secret agreement to change this. But through artifice and self-dealing, CRC and SPO have shifted the Asian money into their own pockets instead of safeguarding it.

Neither CRC nor SPO have shown a shred, not an ounce, not a pinch of sympathy for the Asians whose money is now lining their pockets. Even when 109 of the 152 limited partners voted to remove CRC as the GP and told them to call the loan and then go away, they nevertheless refuse to leave. They refuse to listen to the very people to whom they owe fiduciary duties, so they can selfishly rack up additional fees. 109 of 152 limited partners - *the actual owners of the LP* - demand that SPO repay the loan, but CRC refuses to demand payment and SPO refuses to pay. This is greed on steroids, aimed at immigrant minorities.

CRC's Motion to Dismiss is a color-by-numbers roadblock designed to keep this Court tied up. But the Li Plaintiffs have already accomplished what a Rule 12(b)(6) motion is intended to do, by voluntarily cleaning up the TAC and dismissing multiple counts to streamline this case. The Motion to Dismiss should be denied and the stay on discovery lifted.

Dated: May 29, 2020

Respectfully Submitted,

/s/ Douglas Litowitz
413 Locust Place
Deerfield, IL 60015
312-622-2848; Litowitz@gmail.com

Certificate of Service: This document was filed on the ECF system for the District of Colorado on May 29, 2020 and thereby sent to all counsels of record.