# EXHIBIT  B

## LOAN AGREEMENT

THIS LOAN AGREEMENT (this "**Agreement**" or "**Loan Agreement**") is made into and entered into this 5th day of November 2010 between Borrower and Lender (as such terms are defined below).

1.  **AGREEMENT TO LEND.**  Subject to all of the terms, conditions and provisions set forth below and in the Loan Documents (as hereinafter defined) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, (i) Lender has agreed to lend to Borrower and (ii) Borrower has agreed to borrow from Lender, certain funds not to exceed the Loan Amount (as hereinafter defined).

2.  **TERM.**  This Agreement shall become effective as of the date first written above and remain in effect until the parties respective obligations hereunder have been performed in full or this Agreement is terminated as provided below.

3.  **UNITED STATES DOLLARS.**  All references to dollar amounts shall mean amounts in lawful money of the United States of America.

4.  **DEFINITIONS.**  Terms not otherwise defined in this Agreement or the other Loan Documents (as hereinafter defined) shall have the meanings attributed to such terms in the Uniform Commercial Code.  The following terms shall have the meanings set forth below:

"**Agreement**" or "**Loan Agreement**" means this Agreement, as the same may be amended or modified from time to time, together with any and all exhibits and schedules attached to this Agreement from time to time.

"**Borrower**" means Solaris Property Owner, LLC, a Delaware limited liability company, its successors and assigns.

"**Closing**" means the date on which each Loan Advance is made to Borrower.

"**Collateral**" means the Property, as hereinafter defined.

"**Collateral Unit(s)**" shall have the meaning set forth below in Section 8 of this Loan Agreement.

"**Collateral Unit Value**" means the estimated market value of each Collateral Unit as set forth in the Condominium Pool.

"**Condominium Pool**" means certain Condominium Units listed on Exhibit A hereto.

"**Condominium Unit(s)**" or "**Unit(s)**" means the individual condominiums in the Condominium Pool.

"**Deed of Trust**" means the deed of trust (in a form and substance materially similar to the form attached hereto as Exhibit B) to be recorded against each Collateral Unit in connection with Closing on the Loan Advance secured by such Collateral Unit.

"**Event of Default**" means any one of the Events of Default (as hereinafter defined).

"**Grantor**" means each and all of the persons or entities (including, without limitation, a Borrower) granting a Security Interest in the Collateral.

1

**"Indebtedness"** means and includes without limitation the Loan, together with all other obligations, debts and liabilities of Borrower to Lender, or any one or more of them.

**"Lender"** means Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership, its successors and assigns.

**"Loan"** means the loan or loans made to Borrower under this Agreement and the Loan Documents as described below.

**"Loan Advance"** means the amount of each advance of principal from Lender to Borrower under this Agreement.

**"Loan Amount"** means the sum of all Loan Advances made, from time to time, pursuant to the terms hereof.

**"Loan Documents"** shall have the meaning set forth in the Deed of Trust..

**"Material Adverse Effect"** or **"Material Adverse Change"** means a condition or event that materially and adversely affects (i) the business, assets, results of operations, financial condition or prospects of the parties, or (ii) the ability of the parties to perform their respective obligations under the Loan Documents.

**"Maturity Date"** means a date that is exactly sixty (60) calendar months from the date of each Closing hereunder.

**"Note"** or **"Promissory Note"** means the promissory note (in form and substance substantially the same as the form attached hereto as <u>Exhibit C</u>) to be executed by Borrower in connection with the first Closing, as the same may be amended from time to time.

**"Prepayment Date"** shall have the meaning set forth in the Note.

**"Property"** means the Collateral Unit(s) together with all fixtures and other articles of personal property now or subsequently located in or affixed to the Collateral Unit(s), and all proceeds (including, without limitation, all insurance proceeds and refunds of premiums) from any sale or other disposition of such property.

**"Security Agreement"** means any agreements executed by the parties for the purpose of evidencing and/or creating Lender's Security Interest in the Collateral.

**"Security Interest"** means on any type of collateral security, whether in the form of a lien, charge, mortgage, deed of trust, assignment, pledge, chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**"Solaris Lenders"** means any and all lenders previously or hereafter advancing funds in connection with the construction and/or refinancing of all or any portion of Solaris.

**"Solaris Project"** means certain real estate in Eagle County Colorado, generally located at 141 East Meadow Drive, Vail, Colorado 81657 and commonly known as "The Residences at Solaris" and "The Shops at Solaris."

**5.    LOAN**. Lender intends to raise the maximum amount of funds permitted pursuant to the EB-5 Immigrant Investor Program ("**EB-5**"), the proceeds of which will be loaned to Borrower pursuant to the terms and conditions set forth in the Loan Documents. Borrower understands and agrees that Lender is unable to guarantee that it will be successful in raising funds from investors pursuant to the EB-5 program. Consequently, if by December 31, 2012, Lender is unable to raise funds to enable it to make a Loan Advance, the Loan Documents shall automatically and without further action by the parties terminate and neither party shall have any further rights or obligations hereunder. If Lender is successful in raising funds pursuant to the terms and conditions of this Agreement, (i) Borrower shall be obligated to accept all such funds raised by Lender and made available to Borrower on the terms set forth herein, and (ii) Lender shall be obligated to lend to Borrower all such sums raised by Lender on the terms set forth herein. Borrower recognizes and agrees that Lender will expend significant funds to raise capital from EB-5 investors pursuant to the EB-5 program, and Lender is relying on Borrower's obligation to accept each Loan Advance made by Lender in accordance with the terms and conditions set forth in this Agreement. Lender recognizes and agrees that Borrower will also expend significant funds to raise capital from EB-5 investors pursuant to the EB-5 program, and Borrower is relying on Lender's obligation to lend to Borrower all such amounts raised by Lender in accordance with the terms and conditions set forth in this Agreement.

**6.    INTEREST.** Each Loan Advance shall bear interest at the rate of five percent (5%) per annum from and after the date Borrower receives such Loan Advance until such Loan Advance is repaid pursuant to and in accordance with the Note.

**7.    LOAN ADVANCES GENERALLY.** Lender shall advance all invested sums to Borrower as soon as reasonably practicable in accordance with the terms, conditions, provisions and restrictions of EB-5. The parties agree to use good faith best efforts and take all reasonable steps necessary to ensure that the EB-5 proceeds are advanced to Borrower as soon as reasonably practicable within the parameters of EB-5. Without limiting the generality of the foregoing, the parties agree to establish procedures and modify the Loan Documents as necessary to accomplish the foregoing.

**8.    COLLATERAL UNITS.** Without limiting the generality of Section 7 above, at the time of each Loan Advance, Borrower shall select one or more Condominium Units from the Condominium Pool that will serve as security for the Loan Advance (each, a **"Collateral Unit"** and collectively, the **"Collateral Units"**). Borrower shall execute a separate Deed of Trust for each Collateral Unit in connection with Closing on the Loan Advance secured by such Collateral Unit.

**9.    CONDOMINIUM POOL; SALES OF UNITS.** Borrower may sell any Unit in the Condominium Pool to a third party at any time prior to such Unit's designation as a Collateral Unit; *provided, however*, that Borrower and Lender shall jointly select a replacement Unit reasonably comparable in size, price, and location to the Unit sold. The parties agree to use good faith best efforts to select the replacement Unit for the Condominium Pool.

**10.    FEES AND EXPENSES.** Except as may be specifically set forth in this Agreement, each party shall pay its own legal and related expenses incurred in connection with the preparation and review of Loan Documents and the making of the Loan. Any fees incurred in connection with the transfer of any Condominium Units pursuant to a Security Agreement shall be paid as set forth herein.

**11.    PREPAYMENT OF NOTE.** Notwithstanding anything to the contrary set forth herein, in the Note, Deed of Trust or any other Loan Documents, at any time after the expiration of thirty six (36) months following a Loan Advance, Borrower shall have the absolute right to prepay the portion of the Note attributable to such Loan Advance by repaying Lender the amount of such Loan Advance or

tendering to Lender the Collateral Unit(s) securing such Loan Advance. If Borrower conveys any Collateral Unit(s) in repayment of a Loan Advance, the principal balance of the Note shall be reduced by the amount of the Loan Advance secured by such Collateral Unit(s).

**12. REPRESENTATIONS AND WARRANTIES OF BORROWER.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each Loan Advance, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**(i) Organization.** Borrower is a limited liability company duly organized, validly existing, and in good standing under the laws of Delaware and is validly existing and in good standing in Colorado. Borrower has the full power and authority to own its properties and to transact the businesses in which it is presently engaged or presently proposes to engage.

**(ii) Authorization.** Except as expressly set forth below, the execution, delivery, and performance of this Agreement by Borrower, to the extent to be executed, delivered or performed by Borrower, have been duly authorized by all necessary action by Borrower; and do not conflict with, result in a violation of, or constitute a default under (a) any provision of its Articles of Organization or Operating Agreement, or, any agreement or other instrument binding upon Borrower (unless such violation or default of such agreement or instrument has been waived in writing), or (b) any law, governmental regulation, court decree, or order applicable to Borrower.

**(iii) Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may Materially Adversely Affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing. Lender acknowledges and agrees that Borrower has disclosed the existence of the litigation involving Borrower, The Weitz Company and Richard Joseph & Company for purposes of the foregoing sentence.

**(iv) Title to Property.** Borrower has good and marketable title to the Condominium Units free and clear of all defects, liens, and encumbrances, excepting only those set forth on the title commitment furnished to Lender in connection any Loan Advance, liens for taxes, assessments or governmental charges or levies not yet delinquent or payable without penalty or interest and such liens and encumbrances as may be approved in writing by the Lender.

**(v) Hazardous Substances.** The terms "hazardous waste," "hazardous substance," "disposal," "release," and "threatened release," as used in this Agreement, shall have the same meanings as set forth in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act at 1988, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing. Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (a) During the period of Borrower's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any hazardous waste or substance by any person on, under, about or from any of the properties; (b) Borrower has no knowledge of, or reason to believe that there has been (i) any use, generation, manufacture, storage, treatment, disposal, release, or threatened release of any hazardous waste or substance on, under, about or from the properties by any prior owners or occupants of any of the properties, or (ii) any actual or threatened litigation or claims of any kind by any person relating to such matters; (c) neither Borrower nor any

4

tenant, contractor, agent or other authorized user of any of the properties shall use, generate, manufacture, store, treat, dispose of, or release any hazardous waste or substance on, under, about or from the Property (except for commercial products that are stored in standard commercial containers); and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation those laws, regulations and ordinances described above. Borrower authorizes Lender and its agents to enter upon the properties to make such inspections and tests as Lender may deem appropriate to determine compliance of the properties with this section of the Agreement. The representations and warranties contained herein are based on Borrower's due diligence in investigating the properties for hazardous waste and hazardous substances. Borrower hereby (a) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence or any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the properties. The provisions of this section of the Agreement, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the properties, whether by foreclosure or otherwise.

(vi) **Assessment of Condominium Units.** Each Condominium Unit is and will continue to be assessed and taxed as an independent parcel by all governmental authorities.

(vii) **Compliance with Governing Authorities.** Borrower has examined and is familiar with all the easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements affecting the Property. The Property was constructed in compliance with the requirements of such easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements.

(viii) **Legal Effect.** This Agreement constitutes, and any instrument or agreement required hereunder to be given by Borrower when delivered will constitute, legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

(ix) **Binding Effect.** This Agreement, the Note and all Security Agreements directly or indirectly securing repayment of Borrower's Loan and Note are binding upon Borrower as well as upon Borrower's successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

(x) **Survival of Representation and Warranties.** Borrower understands and agrees that Lender is relying upon the above representations and warranties in extending Loan Advances to Borrower. Notwithstanding anything to the contrary set forth herein, Borrower and Lender agree that the representations, warranties and covenants of Borrower hereunder shall automatically terminate and cease to apply to any Condominium Unit(s) tendered in repayment or prepayment of all or any portion of the Indebtedness.

**13. CONDITIONS PRECEDENT TO INITIAL ADVANCE.** Lender's obligation to make the initial Loan Advance shall be subject to the reasonable fulfillment of the following:

(i) **Borrower's Authorization**. Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of the Loan Documents.

   **(ii)**  **Environmental Report.**  Borrower has furnished to Lender an environmental report in form and substance reasonably satisfactory to Lender.

   **(iii)**  **Lender's Title Insurance.**  Borrower shall have provided to Lender (at Lender's sole cost and expense) an ALTA Lender's extended coverage policy of title insurance with such endorsements as Lender may require, issued by the Land Title Guarantee Company in a form, amount, and content satisfactory to Lender, insuring or agreeing to insure that Lender's Mortgage or Deed of Trust on the Property is or will be upon recordation a valid first lien on the Property free and clear of all defects, liens, encumbrances, and exceptions except those listed on Exhibit F hereto or specifically accepted by Lender in writing (the **"Permitted Exceptions"**).

   **14.**  **AFFIRMATIVE COVENANTS**. Borrower covenants and agrees with Lender that, while this Agreement is in effect, Borrower will:

   **(i)**  **Litigation.**  Promptly inform Lender in writing of (a) all Material Adverse Changes in Borrower's financial condition, and (b) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions which could result in a Materially Adverse Change  to the financial condition of Borrower.  Lender acknowledges and agrees that Borrower has disclosed the existence of the litigation involving Borrower, The Weitz Company and Richard Joseph & Company for purposes of the foregoing sentence.

   **(ii)**  **Additional Information.**  Furnish such additional information with respect to Borrower's business operations as they relate to the Solaris Project as Lender may request from time to time.  Such information shall include but not be limited to, information concerning the number of jobs created at the Project, a description of the types of jobs created, including salary ranges, sales figures for the commercial tenants, and all other information reasonably requested by Lender that Lender deems reasonably necessary to fulfill its reporting requirements under EB-5.  Borrower shall use all commercially reasonable efforts to cause all commercial tenants to cooperate with Lender and to timely furnish the information outlined above.

   **(iii)**  **Compliance with Governmental Requirements.**  Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans with Disabilities Act.  Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as Lender's interests in the Property are not jeopardized.

   **(iv)**  **Payment of Claims and Removal of Liens.**  (a) Cause all valid claims for labor done and materials and services properly furnished in connection with the Property to be fully paid and discharged in a timely manner, (b) diligently file or procure the filing of a valid notice of completion of the Property, or such comparable document as may be permitted under applicable lien laws, (c) diligently file or procure the filing of a notice of cessation, or such comparable document as may be permitted under applicable lien laws, upon the happening of cessation of labor on the Property for a continuous period of 30 days or more, and (d) take all commercially reasonable steps necessary to remove all valid claims of liens properly recorded against the Property, or any rights or interests appurtenant to the Property or improvements.

   **(v)**  **Taxes and Claims.**  Pay and discharge when due all of Borrower's indebtedness, obligations, and claims that, if unpaid, might become a lien or charge upon the Property or Improvements which would be senior to the Security Interest of Lender; provided, however, that Borrower shall not be required to pay and discharge any such indebtedness, obligation, or claim so long as (a) its legality shall

be contested in good faith by appropriate proceedings, and (b) the indebtedness, obligation, or claim does not become a lien or charge upon the Property or Improvements(unless Borrower provides appropriate security, procures a bond or causes the title company to insure over the such a lien or charge).  If the indebtedness, obligation, or claim does become a lien or charge upon the Property or Improvements, Borrower shall remove the lien or charge as provided in the preceding paragraph.

   **(vi)** **Performance.**  Perform and comply with all terms, conditions, and provisions set forth in this Agreement and in all other instruments and agreements between Borrower and Lender, and in all other loan agreements now or hereafter existing between Borrower and any other party.

   **(vii)** **Additional Assurances.**   Make, execute, and deliver to Lender such Security Agreements, instruments, documents, and other agreements reasonably necessary to document and secure the Loan and to protect Lender's Security Interests in the Property and Improvements.

   **15.** **REPRESENTATIONS, WARRANTIES AND COVENANTS OF LENDER.**  Lender represents and warrants to Borrower, as of the date of this Agreement, as of the date of each Loan Advance, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

   **(i)** **Organization.**  Lender is a limited liability limited partnership duly organized, validly existing, and in good standing under the laws of Colorado and is validly existing and in good standing in Colorado. Borrower has the full power and authority to transact the businesses in which it is presently engaged or presently proposes to engage.

   **(ii)** **Authorization.**  The execution, delivery, and performance of this Agreement by Lender, to the extent to be executed, delivered or performed by Lender, have been duly authorized by all necessary action by Lender; and do not conflict with, result in a violation of, or constitute a default under (a) any provision of its organizational documents, or, any agreement or other instrument binding upon Lender (unless such violation or default of such agreement or instrument has been waived in writing), or (b) any law, governmental regulation, court decree, or order applicable to Lender.

   **(iii)** **Legal Effect.**  This Agreement constitutes, and any instrument or agreement required hereunder to be given by Lender when delivered will constitute, legal, valid and binding obligations of Lender enforceable against Lender in accordance with their respective terms.

   **(iv)** **Binding Effect.**  This Agreement is binding upon Lender as well as upon Lender's successors, representatives and assigns, and is legally enforceable in accordance with its terms.

   **(v)** **Invested Funds.**  Lender shall advance all invested sums to Borrower as soon as reasonably practicable in accordance with the terms, conditions, provisions and restrictions of EB-5.  The parties agree to use good faith best efforts and take all reasonable steps necessary to ensure that the EB-5 proceeds are advanced to Borrower as soon as reasonably practicable within the parameters of EB-5. Without limiting the generality of the foregoing, the parties agree to establish procedures and modify the Loan Documents (including, without limitation, Section 8 above) as necessary to accomplish the foregoing.   Further, without limiting the generality of the foregoing, Lender shall in no event unreasonably withhold or delay the advance of any funds secured from investors in connection with the transactions contemplated hereunder.

   **(vi)** **Survival of Representation, Warranties and Covenants.**  Lender understands and agrees that Borrower is relying upon the above representations, warranties and covenants in agreeing to enter into the transaction contemplated in the Loan Documents.

**(vii)   Performance.**   Lender shall perform and comply with all terms, conditions, and provisions set forth in this Agreement and in all other instruments and agreements between Borrower and Lender.

**(viii)   Additional Assurances.**   Lender shall make, execute, and deliver to Borrower such instruments, documents, and other agreements reasonably necessary to document and effectuate the purposes of this Agreement.

**16.      EVENTS OF DEFAULT BY BORROWER.**  Subject to any applicable cure periods set forth in any Loan Document, each of the following shall constitute an Event of Default by Borrower under this Agreement:

**(i)      Default on Indebtedness**.  Failure of Borrower to make any payment when due on the Loan.

**(ii)     Other Defaults.**  Failure of Borrower to comply with or to perform when due any other material term, obligation, covenant or condition contained in this Agreement or in any of the Loan Documents, or failure of Borrower to comply with or to perform any other material term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or between Borrower and any other party that is not cured within applicable cure periods and which, if not cured, would have a Material Adverse Effect on the Collateral.

**(iii)    False Statements.**  Any warranty, representation or statement made or furnished to Lender by or on behalf of Borrower under this Agreement or the Loan Documents is false or misleading in any material respect at the time made or furnished, or becomes false or misleading in any material respect at any time thereafter.

**(iv)     Insolvency.**  The insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**17.      EFFECT OF AN EVENT OF DEFAULT BY BORROWER; LENDER'S REMEDIES.**  Upon the occurrence of any Event of Default and at any time thereafter, Lender shall give written notice to Borrower which notice shall describe the nature of the Event of Default.  Borrower shall have ten (10) days after receipt of written notice in which to cure any default that can be cured by the payment of money and thirty (30) days in which to cure any default that cannot be cured solely by the payment of money (which thirty (30) day period may be extended for such time as may be reasonably necessary if the default cannot reasonably be cured in the initial thirty (30) day period, provided that Borrower is making reasonable efforts to cure such default during such period).  Upon the expiration of the applicable cure period, Lender may, at its option, but without any obligation to do so, and in addition to any other right Lender may have, do any one or more of the following without further notice to Borrower:  (a) cancel this Agreement; (b) institute appropriate proceedings to enforce the performance of this Agreement; (c) withhold further disbursement of Loan Advances; (d) expend funds necessary to remedy the default; (e) take possession of the Property; (f) foreclose Lender's Mortgage or Deed of Trust, if any, on the Property in any manner available under law; and (h) exercise any other right or remedy which it has under the Note or Loan Documents, or which is otherwise available at law or in equity or by statute.

**18.      EVENTS OF DEFAULT BY LENDER.**  Subject to any applicable cure periods set forth in any Loan Document, each of the following shall constitute an Event of Default by Lender under this Agreement:

**(i)      Failure of Performance.**  Failure of Lender to comply with or to perform when due any other material term, obligation, covenant or condition contained in this Agreement or in any of the Loan Documents.

**(ii)      False Statements.**  Any warranty, representation or statement made or furnished to Borrower by or on behalf of Lender under this Agreement or the Loan Documents is false or misleading in any material respect at the time made or furnished, or becomes false or misleading in any material respect at any time thereafter.

**19.      EFFECT OF AN EVENT OF DEFAULT BY LENDER; BORROWER'S REMEDIES.**  Upon the occurrence of any Event of Default by Lender and at any time thereafter, Borrower shall give written notice to Lender which notice shall describe the nature of the Event of Default.  Lender shall have ten (10) days after receipt of written notice in which to cure any default that can be cured by the payment of money and thirty (30) days in which to cure any default that cannot be cured solely by the payment of money (which thirty (30) day period may be extended for such time as may be reasonably necessary if the default cannot reasonably be cured in the initial thirty (30) day period, provided that Lender is making reasonable efforts to cure such default during such period).  Upon the expiration of the applicable cure period, Borrower may, at its option, but without any obligation to do so, and in addition to any other right Borrower may have, do any one or more of the following without further notice to Borrower:  (a) cancel this Agreement; (b) institute appropriate proceedings to enforce the performance of this Agreement; (b) expend funds necessary to remedy the default; and (c) exercise any other right or remedy which it has under the Note or Loan Documents, or which is otherwise available at law or in equity or by statute.

**20.      MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**(i)      Agency.**  Nothing in this Agreement shall be construed to constitute the creation of a partnership or joint venture between Lender and Borrower or any contractor.  Lender is not an agent or representative of Borrower.  This Agreement does not create a contractual relationship with and shall not be construed to benefit or bind Lender in any way with or create any contractual duties by Lender to any contractor, subcontractor, materialman, laborer, or any other person.

**(ii)      Amendments.** This Agreement, together with any Loan Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement.  No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**(iii)      Applicable Law.**  This Agreement has been delivered to Lender and accepted by Lender in Colorado. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of the City and County of Denver, Colorado. This Agreement shall be governed by and construed In accordance with the laws of Colorado.

**(iv)      Assignment by Borrower**. Notwithstanding to the contrary set forth in any of the Loan Documents, Borrower shall have the absolute right to assign this Loan Agreement, the Promissory Note and the other Loan Documents to Borrower's wholly-owned, single-purpose subsidiary (the "**SPE**"). Upon such assignment, all of Borrower's rights and obligations under the Loan Documents shall automatically

and forever terminate and, thereafter, Borrower shall have no further obligation of any kind whatsoever with respect to the Loan or Loan Documents.  A condition precedent to any such assignment shall be that any assignee of Borrower shall continue to operate the Solaris Project, as defined in the Loan Agreement, to assure full construction expenditure to project completion and subsequent operation of the retail businesses, all in satisfaction of the factual assumptions set forth in the EB-5 Econometric Report prepared in connection with the Solaris Project. The purpose of this condition precedent is to assure the Lender that the related EB-5 investors' ability to obtain removal of conditions on their U.S. permanent residency will not be impaired by any such assignment of the Borrower's rights and obligations under the Loan Documents.  The Lender shall have sole discretion to determine satisfaction of this condition precedent prior to any assignment by Borrower.

       **(v)**    **Caption Headings.**  Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

       **(vi)**    **Costs and Expenses.** Borrower and Lender shall each be responsible for its own expenses, including without limitation attorneys' fees, incurred in connection with the preparation, execution, enforcement, modification and collection of this Agreement or in connection with the Loans made pursuant to this Agreement.  In the event of any litigation arising out of this Loan, the prevailing party, in addition to any other rights or remedies to which it may be entitled, shall be awarded its reasonable expenses incurred in enforcing or defending such action.  This includes, subject to any limits under applicable law, attorneys' fees and legal expenses, whether or not there is a lawsuit, including attorneys' fees for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the prevailing party also will be entitled to recover any court costs, in addition to all other sums provided by law.

       **(vii)**    **Entire Agreement.**  This Agreement and the Loan Documents constitute all of the agreements between the parties relating to the Property and supersede all other prior or concurrent oral or written agreements or understandings relating to the Property.

       **(viii)**    **Notices.** All notices required to be given under this Agreement shall be given in writing, may be sent by facsimile (unless otherwise required by law) or by electronic mail, and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address shown below. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.

*If to Borrower*:        **Solaris Property Owner, LLC**
                       Attention: Legal Department
                       141 East Meadow Drive, Suite 211
                       Vail, Colorado 81657
                       P: 970.479.7566
                       F: 970.479.6666

*If to Lender*:          **Colorado Regional Center Project Solaris, LLLP**
                       4643 S. Ulster Street, Suite 950
                       Denver, Colorado 80237
                       P: 720.554.9704
                       F: 720.554.9905

**(ix)     Successors and Assigns.**  All covenants and agreements contained by or on behalf of either party shall bind such party's successors and assigns and shall inure to the benefit of the other party, its successors and assigns. Neither party shall have the right to assign its rights under this Agreement or any interest therein, without the prior written consent of Lender.

**(x)     Severability.**  If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any ether persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

**(xi)     Survival.**  All warranties, representations, and covenants made by a party in this Agreement or in any certificate or other instrument delivered by a party under this Agreement shall be considered to have been relied upon by the other party and will survive the making of the Loan and delivery to the other of the Loan Documents, regardless of any investigation made by such party or on such party's behalf.

**(xii)     Time is of the Essence.**  Time is of the essence in the performance of this Agreement.

**(xiii)     Waiver.**  Neither party shall be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by such party. No delay or omission on the part of either party in exercising any right shall operate as a waiver of such right or any other right. A waiver by one party of a provision of this Agreement shall not prejudice or constitute a waiver of such party's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by either party, nor any course of dealing between Lender and Borrower, shall constitute a waiver of either party's rights or of any obligations as to any future transactions. Whenever the consent of either party is required under this Agreement, the granting of such consent by such party in any instance shall not constitute continuing consent in subsequent instances where such consent is required, and in all cases such consent may be granted or withheld in the sole discretion of the party from whom consent is required.

**(xiv)     Confidentiality; Publicity**.  Lender understands, acknowledges and agrees that Borrower has certain legitimate and material business reasons for keeping the Loan confidential.  Borrower understands, acknowledges and agrees that it is essential to Lender's marketing efforts that Lender be allowed to market the Loan in a manner designed to facilitate the successful completion of the offering. The parties therefore agree that Lender may refer on its Public Website (as hereinafter defined) to a generic description of the project (e.g., by reference to a "high-end, luxury mixed-use condominium/retail project located in Vail" and similar general wording).  **"Public Website"** means the basic website maintained by Lender to provide general information concerning Lender's projects to the public at large. Notwithstanding the foregoing or anything to the contrary set forth herein, Lender's Public Website shall in no event disclose the following:  (i) the name of the Project; (ii) the address and/or precise location of the Project; (iii) the exact number of units in the Project; (iv) the names of specific individuals, business, types of businesses, tenants, or others affiliated with or connected to the Project; or (v) any other such information that identifies the Project as Borrower or leads to the unavoidable conclusion that the Project is Borrower.  The parties further agree that the Public Website will include a secure area created to provide certain parties to get specific details concerning the Project (including the name) and the Investment (the **"Secure Website"**).  In order to gain access to the Secure Website, all users must first register with Lender by providing Lender with their name and contact information.  Lender will make a reasonable inquiry into the validity of the party seeking such information (each, an **"Inquiring *Party*"**

and collectively, the "**Inquiring Parties**") prior to providing any such Inquiring Party with a password to the Secure Website (the "**Secure Password**").

Borrower agrees that any such system will be susceptible to deception by a potential user, but that the parties intend to provide commercially reasonable means to deter anyone not having a legitimate interest in making an EB-5 investment from gaining access to this information. Lender agrees to utilize a further more detailed filtering system on its website prior to allowing access to offering materials (including the Private Placement Memorandum) about the Project. Lender shall be free to distribute marketing materials about the Project using the Borrower's name to targeted investment prospects including without limitation, immigration attorneys, brokers and agents specializing in EB-5 investor referrals, wealth managers, individual foreign investors seeking to make an EB-5 investment, and other professionals who are likely to make a targeted referral to Lender. Except as expressly set forth above, Lender shall be prohibited from disclosing to anyone any specific information concerning the Project. The foregoing sentence shall in no event preclude Lender from disclosing the general information available on the Public Website in response to specific inquiries from the media and others. The parties agree to work together to reasonably respect each other's reasonable business interests regarding these issues. Lender and Borrower will cooperate in preparing information about the Project for inclusion in the PPM and other related materials and Borrower agrees that Lender shall have the right to include such materials in the PPM (subject to appropriate non-disclosure agreements and other such standard protections).

      **20.**    **EXHIBITS.** All exhibits attached to this Loan Agreement are incorporated herein by this reference.

      **21.**    **LENDER APPROVAL; DISCLAIMER**. NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH HEREIN, THE EFFECTIVENESS OF THIS AGREEMENT AND THE LOAN DOCUMENTS IS EXPRESSLY CONDITIONED UPON THE APPROVAL OF THE SOLARIS LENDERS. WITHOUT LIMITING THE FOREGOING, THE PARTIES AGREE TO MODIFY THIS AGREEMENT AND THE LOAN DOCUMENTS AS NECESSARY TO ACCOMMODATE THE REQUESTS OF THE SOLARIS LENDERS SO LONG AS SUCH MODIFICATIONS NEITHER (1) MATERIALLY ALTER THE SUBSTANCE OF THE BUSINESS DEAL AGREED UPON BY THE PARTIES NOR (2) DISQUALIFY THE TRANSACTION FROM EB-5 ELIGIBILITY.

[Signature Page Follows]

THIS LOAN AGREEMENT is made effective as of the date first above written by and between:

### BORROWER:

**Solaris Property Owner, LLC,** a Delaware limited liability company

By: Solaris Mezz, LLC, a Delaware limited liability company

By: _____
Peter Knobel, Manager

### LENDER:

**Colorado Regional Center Project Solaris, LLLP,**
a Colorado limited liability limited partnership

By:  Colorado Regional Center I, LLC, a Colorado limited liability company, general partner

By: _____
Chester Schwartz, Manager

*Exhibit A to Loan Agreement*
*Condominium Pool*

## EXHIBIT A

CONDOMINIUM POOL

(Attached)

A-1

*Exhibit B to Loan Agreement*
*Form of Deed of Trust*

## EXHIBIT B

FORM OF DEED OF TRUST

(Attached)

*Exhibit B to Loan Agreement*
*Form of Deed of Trust*

### DEED OF TRUST

THIS DEED OF TRUST IS DATED _____, 2011, among Solaris Property Owner, LLC, a Delaware limited liability company ("Grantor"), whose address is c/o Solaris Property Owner, LLC, 141 East Meadow Drive, Suite 211, Vail, CO 81657 ("Grantor"); Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership, whose address is c/o Colorado Regional Center, 4643 S. Ulster Street, Suite 950, Denver, CO 80237 (referred to below sometimes as "Lender" and sometimes as "Beneficiary"); and the Public Trustee of the Eagle County, Colorado (referred to below as "Trustee").

**CONVEYANCE AND GRANT.** For valuable consideration, Grantor hereby irrevocably grants, transfers and assigns to Trustee for the benefit of Lender as Beneficiary all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, located in the County of Eagle, State of Colorado (the "Real Property"):

> **The real property located in the County of Eagle, State of Colorado, and legally described as set forth in <u>Exhibit A</u> attached hereto and incorporated herein by reference.**

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants Lender a Uniform Commercial Code security interest in the Rents and the Personal Property defined below.

**DEFINITIONS.** The following words shall have the following meanings when used in this Deed of Trust. Terms not otherwise defined in this Deed of Trust shall have the meanings attributed to such terms in the Uniform Commercial Code. All references to dollar amounts shall mean amounts in lawful money of the United States of America.

> **Beneficiary.** The word "Beneficiary" means Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership, its successors and assigns. Colorado Regional Center Project Solaris, LLLP also is referred to as "Lender" in this Deed of Trust.

> **Borrower.** The word "Borrower" refers to Solaris Property Owner, LLC, or its wholly-owned, single purpose subsidiary.

> **Deed of Trust.** The words "Deed of Trust" mean this Deed of Trust among Grantor, Lender, and Trustee, and includes without limitation all assignment and security interest provisions relating to the Personal Property and Rents.

> **Grantor.** The word "Grantor" means any and all persons and entities executing this Deed of Trust.

> **Indebtedness.** The word "Indebtedness" means all principal and interest payable under the Note and any amounts expended or advanced by Lender to discharge obligations of Grantor or expenses incurred by Trustee or Lender to enforce obligations of Grantor under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust.

> **Leases.** The word "Leases" refers to those leases on the Property currently existing, together with any other leases that may be executed during the term of the Loan on the Property.

*Exhibit B to Loan Agreement*
*Form of Deed of Trust*

**Lender.** The word "Lender" means Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership, its successors and assigns. Colorado Regional Center Project Solaris, LLLP also is referred to as "Beneficiary" in this Deed of Trust.

**Note.** The word "Note" means the Promissory Note dated _____, 2011, in the principal amount of $_____ from Borrower to Lender, together with all renewals, extensions, modifications, refinancings, and substitutions for the Note.

**Personal Property**. The words "Personal Property" mean all furniture, fixtures, and other articles of personal property now or hereafter owned by Grantor, or now or hereafter attached or affixed to the Real Property, or located within a condominium unit designated in Exhibit A attached hereto, together with all accessions, parts and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property as defined in this Deed of Trust.

**Real Property.** The words "Real Property" mean the property, interests and rights described above in the "Conveyance and Grant" section.

**Loan Documents.** The words "Loan Documents" mean and include without imitation the Promissory Note, Loan Agreement and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Leases.

**Trustee**. The word 'Trustee" means the Public Trustee of the County of Eagle, Colorado,

THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (1) PAYMENT OF THE INDEBTEDNESS AND (2) PERFORMANCE OF ANY AND ALL OBLIGATIONS OF GRANTOR UNDER THE NOTE, THE LOAN DOCUMENTS, AND THIS DEED OF TRUST. THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS ALSO GIVEN TO SECURE ANY AND ALL OBLIGATIONS OF BORROWER UNDER THAT CERTAIN LOAN AGREEMENT BETWEEN BORROWER AND LENDER. ANY EVENT OF DEFAULT UNDER THE LOAN AGREEMENT, OR ANY OF THE LOAN DOCUMENTS REFERRED TO THEREIN, SHALL ALSO BE AN EVENT OF DEFAULT UNDER THIS DEED OF TRUST. THE NOTES AND THIS DEED OF TRUST ARE GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

**BORROWER'S REPRESENTATIONS AND WARRANTIES.** Borrower warrants that: (a) this Deed of Trust is executed at Borrower's request and not at the request of Lender; (b) Borrower has the full power, right, and authority to enter into this Deed of Trust and to hypothecate the Property; and (c) the provisions of this Deed of Trust do not conflict with, or result in a default under any agreement or other instrument binding upon Borrower and do not result in a violation of any law, regulation, court decree or order applicable to Borrower.

*Exhibit B to Loan Agreement*
*Form of Deed of Trust*

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Deed of Trust, Borrower shall pay to Lender all Indebtedness secured by this Deed of Trust as it becomes due, and Borrower and Grantor shall strictly perform all their respective obligations under the Note, this Deed of Trust, and the Loan Documents.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Grantor and Borrower agree that Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until the occurrence of an Event of Default, or until Lender exercises its right to collect Rents as provided for in the Assignment of Rents form executed by Grantor in connection with the Property, Grantor may (a) remain in possession and control of the Property, (b) use, operate or manage the Property, and (c) collect any Rents from the Property.

**Duty to Maintain.** Grantor shall maintain the Property or cause the Property to be maintained in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Hazardous Substances.** The terms "hazardous waste," "hazardous substance," "disposal," "release," and "threatened release," as used in this Deed of Trust, shall have the same meanings as set forth in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1988, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 8901, et seq., or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing. The terms "hazardous waste" and "hazardous substance" shall also include, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos. Grantor represents and warrants to Lender that: (a) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any hazardous waste or substance by any person on, under, about or from the Property; (b) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (i) any use, generation, manufacture, storage, treatment, disposal, release, or threatened release of any hazardous waste or substance on, under, about or from the Property by any prior owners or occupants of the Property or (ii) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (c) Except as previously disclosed to and acknowledged by Lender in writing, (i) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of, or release any hazardous waste or substance on, under, about or from the Property and (ii) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation those laws, regulations, and ordinances described above. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Deed of Trust. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for hazardous waste and hazardous substances. Grantor hereby (a) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Deed of Trust or as a consequence of

*Exhibit B to Loan Agreement*
*Form of Deed of Trust*

any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the properties. The provisions of this section of the Deed of Trust, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Deed of Trust and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.**  Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property.

> **Lender's Right to Enter.**  Lender and its agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Property for purposes of Grantor's compliance with the terms and conditions of this Deed of Trust.

**Compliance with Governmental Requirements.**  Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans with Disabilities Act.  Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon the Property nor leave it unattended.  Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.**  Lender may, at its option, declare immediately due and payable all sums secured by this Deed of Trust upon the sale or transfer, without the Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property.  A "sale or transfer" means the conveyance of Real Property or any right, title or interest therein; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract to deed, leasehold interest with a term greater than five years, lease option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of Real Property interest.   However, Lender, if such exercise is prohibited by federal law or by Colorado law, shall not exercise this option.

**TAXES AND LIENS.**  The following provisions relating to the taxes and liens on the Property are a part of this Deed of Trust.

**Payment.**  Grantor shall pay when due (and in all events prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Deed of Trust, except for the lien of taxes and assessments not due and except as otherwise provided in this Deed of Trust.

**Right to Contest.**  Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within 15 days after the lien arises or, if a lien is filed, within 15 days after Grantor has notice of the filing, secure

the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees or other charges that could accrue as a result of a foreclosure or sale under the lien, In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bend furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Deed of Trust.

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with trustee and Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption, builders risk and boiler insurance, as Lender may reasonably require. Policies shall be written in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten days' prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in anyway by any act, omission or default of Grantor or any other person. Should the Real Property at anytime become located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance for the full unpaid principal balance of the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within 15 days of the casualty. Grantor is specifically authorized to utilize the proceeds from any insurance policies available to accomplish the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Deed of Trust. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Deed of Trust, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Grantor's Report on Insurance.** Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing: (a) the name

of the insurer; (b) the risks insured; (c) the amount of the policy; (d) the property insured, the then current replacement value of such property, and the manner of determining that value; and (e) the expiration date of the policy. Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**EXPENDITURES BY LENDER.** If Grantor fails to comply with any provision of this Deed of Trust, or if any action or proceeding is commenced that would materially affect Lender's interests in the Property, Lender on Grantor's behalf may, but shall not be required to, take any action that Lender deems appropriate. Any amount that Lender expends in so doing will bear interest at the rate provided for in the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses, at Lender's option, will (a) be payable on demand, (b) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (i) the term of any applicable insurance policy or (ii) the remaining term of the Note, or (c) be treated as a balloon payment which will be due and payable at the Note's maturity.  This Deed of Trust also will secure payment of these amounts. The rights provided for in this paragraph shall be in addition to any other rights or any remedies to which Lender may be entitled on account of the default.  Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Deed of Trust.

**Title.**  Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Deed of Trust, and (b) Grantor has the full right, power, and authority to execute and deliver this Deed of Trust to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Trustee or Lender under this Deed of Trust, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance with Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Deed of Trust.

**Application of Net Proceeds.**  If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Trustee or Lender in connection with the condemnation.

*Exhibit B to Loan Agreement*
*Form of Deed of Trust*

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments as may be requested by it from time to time to permit such participation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Deed of Trust;

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Deed of Trust and take whatever other action is requested by Lender to protect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Deed of Trust, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Deed of Trust.

**Taxes.** The following shall constitute taxes to which this section applies: (a) a specific tax upon this type of Deed of Trust or upon all or any part of the Indebtedness secured by this Deed of Trust; (b) a specific tax on Borrower which Borrower is authorized or required to deduct from payments on the Indebtedness secured by this type of Deed of Trust; (c) a tax on this type of Deed of Trust chargeable against the Lender or the holder of the Note; and (d) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Borrower.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Deed of Trust, this event shall have the same effect as an Event of Default (as defined below), and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (a) pays the tax before it becomes delinquent, or (b) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Deed of Trust as a security agreement are a part of this Deed of Trust.

**Security Agreement.** This instrument shall constitute a security agreement to the extent any of the Property constitutes fixtures or other personal property, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall execute financing statements and take whatever other action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Deed of Trust in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Deed of Trust as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall assemble the Personal Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three days after receipt of written demand from Lender.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party), from which information concerning the security interest granted by this Deed of Trust may be obtained (each as required by the Uniform Commercial Code), are as stated on the first page of this Deed of Trust.

*Exhibit B to Loan Agreement*
*Form of Deed of Trust*

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Deed of Trust.

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (a) the obligations of Grantor and Borrower under the Note, this Deed of Trust, and the Loan Documents, and (b) the liens and security interests created by this Deed of Trust as first and prior liens on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or agreed to the contrary by Lender in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** Trustee may, upon production of the Note duly cancelled, release this Deed of Trust, and such release shall constitute a release of the lien for all such additional sums and expenditures made pursuant to this Deed of Trust. Lender agrees to cooperate with Grantor in obtaining such release and releasing the other collateral securing the Indebtedness. Grantor, if permitted by applicable law shall pay any release fees required by law.

**DEFAULT.** Each of the following, at the option of Lender, shall constitute an event of default ("Event of Default") under this Deed of Trust:

**Default on Indebtedness**. Failure of Borrower to make any payment when due on the Loan.

**Other Defaults.** Failure of Borrower or any Grantor to comply with or to perform when due any other term, obligation, covenant or condition contained in this Deed of Trust or in any of the Loan Documents, or failure of Borrower to comply with or to perform any other term, obligation, covenant or condition contained in any other agreement between Lender and Borrower relating to the Loan secured by this Deed of Trust.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by or on behalf of Borrower or any Grantor under this Deed of Trust or the Loan Documents is false or misleading in any material respect at the time made or furnished, or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Deed of Trust or any of the Loan Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower, any creditor of any Grantor against any collateral securing the Indebtedness, or by any governmental agency. This includes a garnishment, attachment, or levy on or of any of Borrower's deposit accounts with Lender.

**Adverse Change.** A Material Adverse Change occurs in Borrower's financial condition, or Lender reasonably believes the prospect of payment or performance of the Indebtedness is impaired.

**Transfer of Property.** The sale, transfer, hypothecation, assignment, or conveyance of the Property or the improvements or any portion thereof or interest therein by Borrower without Lender's prior written consent.

**Condemnation.** All or any material portion of the Property is condemned, seized, or appropriated without compensation, and Borrower does not within 30 days after such condemnation, seizure, or appropriation, initiate and diligently prosecute appropriate action to contest in good faith the validity of such condemnation, seizure, or appropriation.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of any Event of Default and at any time thereafter, Lender shall give written notice to Borrower which notice shall describe the nature of the Event of Default. Borrower shall have three days in which to cure any default that can be cured by the payment of money and 30 days in which to cure any default that cannot be cured solely by the payment of money (which 30-day period may be extended for such time as may be reasonably necessary, not to exceed an additional 60 days, if the default cannot reasonably be cured in the initial 30-day period, provided that Borrower is making reasonable efforts to cure such default during such period). Upon the expiration of the applicable cure period, and at any time thereafter, Trustee or Lender, at its option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without further notice to Grantor or Borrower to declare the entire Indebtedness immediately due and payable, in which event Borrower shall immediately convey the Collateral Unit(s) to Lender in full satisfaction of the Indebtedness. The foregoing shall in no event preclude Lender from proceeding against any guarantees provided pursuant to the Loan Documents.

**Foreclosure.** Lender shall have the right to cause all or any part of the Real Property, and Personal Property, if Lender decides to proceed against it as if it were real property, to be sold by the Trustee according to the laws of Colorado as respects foreclosures against real property. The Trustee shall give notice in accordance with the laws of Colorado. The Trustee shall apply the proceeds of the sale in the following order: (a) to all costs and expenses of the sale, including but not limited to Trustee's fees, attorneys' fees, and the cost of title evidence: (b) to all sums secured by this Deed of Trust; and (c) the excess, if any, to the person or persons legally entitled to the excess.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

*Exhibit B to Loan Agreement*
*Form of Deed of Trust*

**Collect Rents.** Lender shall have the right, without notice to Grantor or Borrower, to take possession of and manage the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If Lender collects the Rents, then Grantor irrevocably designates Lender, as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver. Receiver may be appointed by a court of competent jurisdiction upon ex parte application and without notice, notice being expressly waived.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (a) pay a reasonable rental for the use of the Property, or (b) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Trustee or Lender shall have any other right or remedy provided in this Deed of Trust or the Note or by law.

**Sale of the Property.** In exercising its rights and remedies, Lender shall be free to designate on or before it files a notice of election and demand with the Trustee, that the Trustee sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property. Upon any sale of the Property, whether made under a power of sale granted in this Deed of Trust or pursuant to judicial proceedings, if the holder of the Note is a purchaser at such sale, it shall be entitled to use and apply all, or any portion of, the Indebtedness for or in settlement or payment of all, or any portion of, the purchase price of the Property purchased, and, in such case, this Deed of Trust, the Note, and any documents evidencing expenditures secured by this Deed of Trust shall be presented to the person conducting the sale in order that the amount of Indebtedness so used or applied may be credited thereon as having been paid.

**Waiver; Election of Remedies.** A waiver by any party of a breach of a provision of this Deed of Trust shall not constitute a waiver of or prejudice the party's rights otherwise to demand strict compliance with that provision or any other provision. Election by Lender to pursue any remedy provided in this Deed of Trust, the Note, in any Related Document, or provided by law shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor or Borrower under this Deed of Trust after failure of Grantor or

*Exhibit B to Loan Agreement*
*Form of Deed of Trust*

Borrower to perform shall not affect Lender's right to declare a default and to exercise any of its remedies.

**Attorneys' Fees; Expenses.** If Lender forecloses or institutes any suit or action to enforce any of the terms of this Deed of Trust, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and on any appeal. Whether or not any court action is involved, all reasonable expenses incurred by Lender which in Lender's opinion are necessary at anytime for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note's rate from the date of expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees whether or not there is a lawsuit, including attorneys' fees for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**Rights of Trustee.** Trustee shall have all of the rights and duties of Lender as set forth in this section.

**POWERS AND OBLIGATIONS OF TRUSTEE.** The following provisions relating to the powers and obligations of Trustee are part of this Deed of Trust.

**Powers of Trustee.** In addition to all powers of Trustee arising as a matter of law, Trustee shall have the power to take the following actions with respect to the Property upon the written request of Lender and Grantor: (a) join in preparing and filing a map or plat of the Real Property, including the dedication of streets or other rights to the public; (b) join in granting any easement or creating any restriction on the Real Property; and (c) join in any subordination or other agreement affecting this Deed of Trust or the interest of Lender under this Deed of Trust.

**Obligations to Notify.** Trustee shall not be obligated to notify any other party of a pending sale under any other trust deed or lien, or of any action or proceeding in which Grantor, Lender, or Trustee shall be a party, unless the action or proceeding is brought by Trustee.

**Trustee.** Trustee shall meet all qualifications required for Trustee under applicable law. In addition to the rights and remedies set forth above, with respect to all or any part of the Property, the Trustee shall have the right to foreclose by notice and sale, and Lender shall have the right to foreclose by judicial foreclosure, in either case in accordance with and to the full extent provided by applicable law.

**NOTICES TO GRANTOR AND OTHER PARTIES.** Any notice under this Deed of Trust shall be in writing, may be sent by facsimile (unless otherwise required by law), and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier, or, if mailed, shall be deemed effective when deposited in the United States mail first class, certified or registered mail, postage prepaid, directed to the addresses shown near the beginning of this Deed of Trust. Any party may change its address for notices under this Deed of Trust by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. All copies of notices of foreclosure from the holder of any lien which has priority over this Deed of Trust shall be sent to Lender's address, as shown near the beginning of this Deed of Trust. For notice purposes, Grantor agrees to keep Lender and Trustee informed at all times of Grantor's current address.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Deed of Trust:

**Amendments.** This Deed of Trust, together with any Loan Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Deed of Trust. No alteration of or amendment to this Deed of Trust shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Financial Reports.** Grantor shall provide annual financial statements (consisting of a balance sheet and a profit and loss statement) to Lender during the term of the Loan, each of which shall be due by April 15 of each year for the preceding year.

**Applicable Law.** This Deed of Trust has been delivered to Lender and accepted by Lender in Colorado. This Deed of Trust shall be governed by and construed in accordance with the laws of Colorado.

**Caption Headings.** Caption headings in this Deed of Trust are for convenience purposes only and are not to be used to interpret or define the provisions of this Deed of Trust.

**Merger.** There shall be no merger of the interest or estate created by this Deed of Trust with any other interest or estate in the Property at anytime held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Multiple Parties; Corporate Authority.** All obligations of Grantor and Borrower under this Deed of Trust shall be joint and several, and all references to Borrower shall mean each and every Borrower, and all references to Grantor shall mean each and every Grantor. This means that each of the persons signing below is responsible for all obligations in this Deed of Trust.

**Severability.** If a court of competent jurisdiction finds any provision of this Deed of Trust to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Deed of Trust in all other respects shall remain valid and enforceable.

**Assignment by Borrower.** Notwithstanding to the contrary set forth in any of the Loan Documents, Borrower shall have the absolute right (in Borrower's discretion) to assign this Deed of Trust, the Loan Agreement and the other Loan Documents to Borrower's wholly-owned, single-purpose subsidiary (the "**SPE**"). Upon such assignment, all of Borrower's rights and obligations under the Loan Documents shall automatically and forever terminate and, thereafter, Borrower shall have no further obligation of any kind whatsoever with respect to the Loan or Loan Documents. If Borrower so assigns Borrower's interest in the Loan Documents to Borrower's SPE prior to the execution of this Deed of Trust, Borrower's SPE shall be substituted for Borrower as the signatory hereof and construed to mean "Borrower" for all purposes hereunder and under the other Loan Documents. A condition precedent to any such assignment shall be that any assignee of Borrower shall continue to operate the Solaris Project, as defined in the Loan Agreement, to assure full construction expenditure to project completion and subsequent operation of the retail businesses, all in satisfaction of the factual assumptions set forth in the EB-5 Econometric Report prepared in connection with the Solaris Project. The purpose of this condition precedent is to assure the Lender that the related EB-5 investors' ability to obtain removal of conditions on their U.S. permanent residency will not be impaired by any such assignment of the Borrower's rights and obligations

under the Loan Documents. The Lender shall have sole discretion to determine satisfaction of this condition precedent prior to any assignment by Borrower.

**Successors and Assigns.** Subject to the limitations stated in this Deed of Trust on transfer of Grantor's interest, this Deed of Trust shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Deed of Trust and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Deed of Trust or liability under the Indebtedness.

**Time Is of the Essence.** Time is of the essence in the performance of this Deed of Trust.

**Waivers and Consents**. Lender shall not be deemed to have waived any rights under this Deed of Trust (or under the Loan Documents) unless such waiver is in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by any party of a provision of this Deed of Trust shall not constitute a waiver of or prejudice the party's right otherwise to demand strict compliance with that provision or any other provision. No prior waiver by Lender, nor any course of dealing between Lender and Grantor or Borrower, shall constitute a waiver of any of Lender's rights or any of Grantor or Borrower's obligations as to any future transactions. Whenever consent by Lender is required in this Deed of Trust, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required.

**Waiver of Homestead Exemption.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Colorado as to all Indebtedness secured by this Deed of Trust.

[Signature Page Follows]

*Exhibit B to Loan Agreement*
*Form of Deed of Trust*

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS DEED OF TRUST, AND GRANTOR AGREES TO ITS TERMS.

**GRANTOR:**

**Solaris Property Owner, LLC,** a Delaware limited liability company

By: _____

Name: _____

Title: _____

**Acknowledgement:**

COUNTY OF EAGLE )
             ) ss:
STATE OF COLORADO     )

On this ___ day of _____, 2011, before me, the undersigned Notary Public, personally appeared _____, _____, the _____ of Solaris Property Owner, LLC, a Delaware limited liability company, and acknowledged the Deed of Trust to be the free and voluntary act and deed of the above-named limited liability company, by authority of statute or its Articles of Organization and Operating Agreement, for the uses and purposes therein mentioned, and on oath stated that he is authorized to execute this Deed of Trust and in fact executed the Deed of Trust on behalf of the limited liability company

By: _____
       Notary Public In and for the State of Colorado

My Commission Expires:

*Exhibit B to Loan Agreement*
*Form of Deed of Trust*

## **EXHIBIT A**
**(Deed of Trust)**

LEGAL DESCRIPTION

*Exhibit C to Loan Agreement*
*Form of Promissory Note*

## **EXHIBIT C**

FORM OF PROMISSORY NOTE

(Attached)

*Exhibit C to Loan Agreement*
*Form of Promissory Note*

### PROMISSORY NOTE

Original Principal Amount: $_____            Date: _____, 2011

**PROMISE TO PAY**:   Solaris Property Owner, LLC, a Delaware limited liability company ("**Borrower**") promises to pay to Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership ("**Lender**"), or order, in lawful money of the United States of America, the principal amount of $_____ together with interest at the rate of five percent (5%) per annum (the "**Interest Rate**") on the terms and conditions set forth below (the "**Loan**").

**DEFINED TERMS**: Initially capitalized terms used but not otherwise defined below shall have the meanings ascribed to such terms under the provisions of that certain Loan Agreement dated effective November __, 2010, by and between Borrower and Lender (the "**Loan Agreement**").

**INTEREST PAYMENTS**:  Commencing on the date Lender makes the first Loan Advance to Borrower in accordance with the Loan Agreement (the "**Commencement Date**"), the outstanding principal of the loan shall bear interest at the Interest Rate.   Borrower shall make interest-only payments on the outstanding principal balance of the Loan (each, an "**Interest Payment**") on the first business day of each month following the Commencement Date until the Loan is repaid in full.  Each Interest Payment shall include interest on all sums outstanding at the time such Interest Payment is due (including a pro-rated amount of interest for any Loan Advances that took place during the previous month).  Borrower will pay Lender at Lender's address as Lender shall designate in writing.  Any and all payments made hereunder shall be applied first to any unpaid collection costs and late charges pursuant to this Note, second to accrued unpaid interest, and third in reduction of the outstanding principal balance of the Loan.

**TERM**:  With respect to each Loan Advance, this note shall be deemed to mature, and (if not sooner repaid in accordance with the provisions hereof) the unpaid principal balance attributable to such Loan Advance, together with all accrued interest attributable to the same (if any), shall be due and payable on the date that is exactly sixty (60) months from Closing on such Loan Advance (each, a "**Maturity Date**"); *provided, however*, that (notwithstanding anything to the contrary set forth in this Note or any other Loan Documents) at any time after the Prepayment Date (as hereinafter defined), Borrower shall have the absolute right to prepay the portion the Note attributable to any Loan Advance  by repaying Lender the amount of such Loan Advance in cash or conveying Lender the Collateral Unit(s) securing such Loan Advance.  If Borrower tenders to Lender any Collateral Unit(s) in repayment of a Loan Advance, the principal balance of the Note shall be reduced by the amount of the Loan Advance secured by such Collateral Unit(s). With respect to each Loan Advance, the term "**Prepayment Date**" means a date that is exactly thirty six (36) months from and after the Closing on such Loan Advance.

**PREPAYMENT**: Except as otherwise set forth in this Note, Borrower shall not be allowed to pay all or a portion of the Loan prior to the Prepayment Date.

**NOTICE OF PREPAYMENT**: Borrower shall give Lender (i) at least sixty (60) calendar days prior written notice of any Cash Prepayment and (ii) at least twenty (20) calendar days prior written notice of any Collateral Unit Distribution.

**DEFAULT**:  Subject to any applicable cure rights set forth in any Loan Document, each of the following shall constitute an "**Event of Default**" hereunder:

　　　(i)　　if Borrower fails to make any payment when such payment is due;

*Exhibit C to Loan Agreement*
*Form of Promissory Note*

(ii)     if Borrower fails to comply with or to perform when due any other material, obligation, covenant, representation, warranty or condition contained in this Note or any other Loan Document;

(iii)     if Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement in favor of any other creditor or person that results in a Material Adverse Affect; or

(iv)     if any material representation or statement made or furnished to Lender by Borrower is false or misleading at the time made or furnished.

**NON-RECOURSE LOAN; EXCEPTION FOR INTEREST PAYMENTS**:

(i)     **Non-Recourse Loan**. Except as expressly provided below, subject to any applicable cure rights set forth in any Loan Document, if an Event of Default has occurred and is then continuing, Lender agrees to proceed solely against the Collateral, it being the parties' mutual understanding and intent that principal amount of the Loan secured by this Note is entirely non-recourse to Borrower. Notwithstanding the foregoing, Lender may name Borrower or any of its successors or assigns or any person or entity holding under or through them as parties to any actions, suits or other proceedings initiated by Lender to enforce any remedies set forth herein against the Collateral, including without, limitation, any action, suit or proceeding to foreclose the lien of the Deed of Trust against the Collateral.

(ii)     **Exception for Interest Payments**.  Notwithstanding the foregoing, subject to any applicable cure rights set forth in any Loan Document, if Borrower fails to make any Interest Payment(s) due hereunder, the amount of such Interest Payment(s) plus the Collection Costs directly related collecting to the same shall be fully recourse to Borrower.  Except as expressly set forth in the immediately preceding sentence, the Loan evidenced by this Note is and shall remain entirely non-recourse to Borrower.

**LENDER'S RIGHTS**:  Subject to any applicable cure rights set forth in any Loan Documents, if an Event of Default under this Note has occurred and is then continuing: (i) Lender may declare the entire unpaid principal balance of this Note and all accrued interest, if any, immediately due and, upon receipt of written notice of such acceleration, Borrower shall convey the Collateral Unit(s) to Lender in full satisfaction of Borrower's obligations under this Note and the other Loan Documents; (ii) Lender, at its option, may also, if permitted under applicable law, increase the Interest Rate on this Note to the lesser of fourteen percent (14.00%) or the maximum amount permitted by law (the "**Default Rate**"); and (iii) Borrower shall be responsible for any and all Collection Costs directly related to the  Event of Default. "**Collection Costs**" means, to the extent permitted by law, Lender's reasonable legal expenses (whether or not there is a lawsuit), including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, any post-judgment collection services, and any court costs and fees associated with the foregoing.

**CHOICE OF LAW**: This Note has been delivered to Lender and accepted by Lender in Colorado. Borrower and Lender agree to submit to the jurisdiction of the courts of the City and County of Denver, Colorado.  Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.  This Note shall be governed by and construed in accordance with the laws of Colorado.

**COLLATERAL**:  In order to secure payment of this Note, Borrower has granted to Lender security interests in certain real and personal property owned by Borrower (the "**Collateral**").  These security interests are evidenced by a Deed of Trust and Security Agreement and certain other documents

*Exhibit C to Loan Agreement*
*Form of Promissory Note*

(collectively, the **"Collateral Documents"**).  Reference is made to the Collateral Documents for various rights and remedies of the parties to those documents.

**ASSIGNMENT BY BORROWER**.  Notwithstanding to the contrary set forth in any of the Loan Documents, Borrower shall have the absolute right (in Borrower's discretion) to assign this Promissory Note, the Loan Agreement and the other Loan Documents to Borrower's wholly-owned, single-purpose subsidiary (the **"SPE"**).  Upon such assignment, all of Borrower's rights and obligations under the Loan Documents shall automatically and forever terminate and, thereafter, Borrower shall have no further obligation of any kind whatsoever with respect to the Loan or Loan Documents.  If Borrower so assigns Borrower's interest in the Loan Documents to Borrower's SPE prior to the execution of this Promissory Note, Borrower's SPE shall be substituted for Borrower as the signatory hereof and construed to mean "Borrower" for all purposes hereunder and under the other Loan Documents.  A condition precedent to any such assignment shall be that any assignee of Borrower shall continue to operate the Solaris Project, as defined in the Loan Agreement, to assure full construction expenditure to project completion and subsequent operation of the retail businesses, all in satisfaction of the factual assumptions set forth in the EB-5 Econometric Report prepared in connection with the Solaris Project. The purpose of this condition precedent is to assure the Lender that the related EB-5 investors' ability to obtain removal of conditions on their U.S. permanent residency will not be impaired by any such assignment of the Borrower's rights and obligations under the Loan Documents. The Lender shall have sole discretion to determine satisfaction of this condition precedent prior to any assignment by Borrower.

**GENERAL**:  Lender may delay or forego enforcing any of its rights or remedies under this Note or under the Collateral Documents without losing them.  Borrower understands and agrees that, with or without any notice to anyone other than Borrower, Lender may (i) make one or more additional secured or unsecured loans or otherwise extend additional credit and (ii) apply any security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreements, as Lender in its discretion may determine.  Borrower, to the extent allowed by law, waives presentment, demand for payment, protest and notice of dishonor.

**BORROWER:**

**Solaris Property Owner, LLC,** a Delaware limited liability company

By: Solaris Mezz, LLC, a Delaware limited liability company

By: _____
     Peter B. Knobel, Manager

C-4

*Exhibit C to Loan Agreement*
*Form of Promissory Note*

## EXHIBIT A
(Promissory Note)

| Date of Loan Advance | Amount of Loan Advance | Maturity Date |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

*Exhibit C to Loan Agreement*
*Form of Promissory Note*

## EXHIBIT B
### (Promissory Note)

| Date of Loan Advance | Collateral Unit | Collateral Unit Value |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

*Exhibit D to Loan Agreement*
*Yield Enhancement Agreement*

## **EXHIBIT D**

YIELD ENHANCEMENT AGREEMENT

(Attached)

*Exhibit D to Loan Agreement*
*Yield Enhancement Agreement*

## YIELD ENHANCEMENT AGREEMENT

THIS YIELD ENHANCEMENT AGREEMENT (the **"Yield Enhancement Agreement"**) is made effective into this 5th day of November, 2010, by and between COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP, a Colorado limited liability limited partnership (**"CRCPS"**) and SOLARIS PROPERTY OWNER, LLC, a Delaware limited liability company (**"Solaris"**). Initially capitalized terms used but not otherwise defined below shall have the meanings ascribed to such terms under the provisions of the Loan Documents, as hereinafter defined.

### RECITALS:

A.    CRCPS has agreed to loan Solaris certain sums of money (the **"Loan"**) in accordance with the terms, conditions and provisions of the Loan Agreement, Note and Loan Documents (all of which documents may be collectively referred to below as the **"Loan Documents"**).

B.    The Loan proceeds are expected to be generated by investments into CRCPS from certain investors (the **"Investors"**) pursuant to the EB-5 Immigrant Investor Regional Center Program (**"EB-5"**).

C.    Subject to all of the terms, conditions and provisions set forth below and as a material inducement for CRCPS to make the Loan, Solaris has agreed to make certain Interest Payments to CRCPS in connection with the Loan as more specifically set forth in the Note and other Loan Documents.

D.    In addition to the Interest Payments and as a material inducement for CRCPS to enter into the Loan, Solaris has agreed to give CRCPS certain rights with respect to the Collateral Unit(s) as additional interest for the Loan (the "Additional Interest").

E.    The parties now desire to memorialize their mutual understanding concerning the Additional Interest by pursuant to this Yield Enhancement Agreement.

NOW THEREFORE, in consideration of the foregoing, the mutual promises set forth below and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

### AGREEMENT:

1.    **USE RIGHTS.**  In addition to the Interest Payments set forth in the Note and as a material inducement for CRCPS to make the Loan, Solaris hereby agrees to allow each Limited Partner (as hereinafter defined) to use a two (2) bedroom Collateral Unit for up to twenty one (21) nights each calendar year during the term of the Loan (the **"Use Rights"**). Solaris understands and acknowledges that CRCPS is entering into the Loan Agreement in reliance on the Use Rights and would not have agreed to make the Loan but for the Use Rights.

2.    **RULES OF USE.**  Solaris and CRCPS hereby agree cooperate in good faith to establish such reasonable rules, regulations and procedures as are necessary to administer the Use Rights (the **"Rules of Use"**) as soon as reasonably practicable and in no event later than the Closing of the first Loan Advance. Solaris Borrower and Lender further agree to execute and deliver a recordable memorandum or other recordable document(s) evidencing the existence of the Use Rights established pursuant to this paragraph and, when applicable, the release thereof

3.    **OPTION TO DEMAND CONVEYANCE OF COLLATERAL UNITS.** Notwithstanding anything to the contrary set forth in any Loan Documents, CRCPS shall have the

*Exhibit D to Loan Agreement*
*Yield Enhancement Agreement*

absolute right to refuse cash repayment of the Note and may, at any time after the applicable Prepayment Date, require Solaris to convey the Collateral Unit(s) securing any Loan Advance(s) to CRCPS in full satisfaction of such Loan Advance(s) (the **"Unit Demand Right"**).    In the event of any conflict or inconsistency between this Yield Enhancement Agreement and the provisions of the Loan Documents, this Yield Enhancement Agreement shall supersede and control in point of conflict or inconsistency.

4.    **RENTAL PROCEEDS.** During the Term of the Loan, CRCPS shall be entitled to receive any and all Rental Proceeds (as hereinafter defined) collected in connection with the rental and occupancy of the Collateral Unit(s),  **"Rental Proceeds"** means all rents received in connection with the rental of any Collateral Unit(s) net of Rental Management Expenses (as hereinafter defined).  **"Rental Management Expenses,"** means all taxes (including, without limitation, real estate taxes), dues and fees (including, without limitation, condominium association dues and fees), all management fees, housekeeping fees, administration fees and other reasonabe and customary costs, fees and expenses incurred in connection with the Collateral Unit(s) or the rental thereof.

5.    **LOAN ADVANCE ADJUSTMENT.** Notwithstanding anything to the contrary set forth in any Loan Documents, the parties acknowledge and agree that each Loan Advance shall be automatically increased by the amount necessary to provide Required Furnishings for the Collateral Unit(s) securing such Loan Advance.  **"Required Furnishings"** means all furniture, accessories, linens, towels, silverware, wall hangings, and other similar items used to decorate or accessorize the Collateral Unit(s).  Any and all interest costs related to the Required Furnishings (including, without limitation, interest under the Promissory Note) shall be considered Rental Management Expenses.

6.    **MISCELLANEOUS.**

**Waivers and Amendments**.  Neither this Agreement nor any provision hereof may be changed, waived, discharged or terminated orally, but only by a statement in writing signed by each of the parties hereto.

**Governing Law**.  The parties agree to submit to the jurisdiction of the courts of the City and County of Denver, Colorado. This Agreement shall be governed by and construed in accordance with the laws of Colorado.

**No Right to Jury Trial**.  Each party hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement any right to a trial by jury.

**Successors and Assigns**.  Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns, heirs, executors and administrators.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.  Notwithstanding to the contrary set forth in any of the Loan Documents, Solaris shall have the absolute right (in Solaris' discretion) to assign this Yield Enhancement Agreement to Solaris' wholly-owned, bankruptcy-remote, single-purpose subsidiary (the **"SPE"**). Upon such assignment, all of Solaris' rights and obligations under the Loan Documents shall automatically and forever terminate and, thereafter, Solaris shall have no further obligation of any kind whatsoever with respect to this Yield Enhancement Agreement.  If Solaris assigns Solaris' interest in the Loan Documents to Solaris' SPE prior to the execution of this Yield Enhancement Agreement, Solaris' SPE shall be substituted for Solaris as the signatory hereof and construed to mean "Solaris" for all purposes hereunder. A condition precedent to any such assignment shall be that any assignee of Borrower shall continue to

*Exhibit D to Loan Agreement*
*Yield Enhancement Agreement*

operate the Solaris Project, as defined in the Loan Agreement, to assure full construction expenditure to project completion and subsequent operation of the retail businesses, all in satisfaction of the factual assumptions set forth in the EB-5 Econometric Report prepared in connection with the Solaris Project. The purpose of this condition precedent is to assure the Lender that the related EB-5 investors' ability to obtain removal of conditions on their U.S. permanent residency will not be impaired by any such assignment of the Borrower's rights and obligations under the Loan Documents. The Lender shall have sole discretion to determine satisfaction of this condition precedent prior to any assignment by Borrower.

**Notices**. All notices required to be given under this Agreement shall be given in writing, may be sent by facsimile (unless otherwise required by law) or by electronic mail, and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address shown below. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.

**SOLARIS**: Solaris Property Owner, LLC
Attention: Legal Department
141 East Meadow Drive, Suite 211
Vail, Colorado 81657
P: (970) 479-7566
F: (970) 479-6666

**CRCPS**: Colorado Regional Center Project Solaris, LLLP
4643 S. Ulster Street, Suite 950
Denver, Colorado 80237
P: 720.554.9704
F: 720.554.9905

**Severability**. In case any provision of this Agreement shall be declared invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

**Titles and Subtitles**. The titles of the paragraphs and subparagraphs of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

**Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

**No Strict Construction**. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**Amendments**. This Agreement may only be amended and any waivers hereunder shall only be made with the approval of the Company and the Purchaser.

[Signature Page Follows]

THIS YIELD ENHANCEMENT AGREEMENT is made effective as of the date first above written by and between:

**SOLARIS:**

**Solaris Property Owner, LLC,** , a Delaware limited liability company

By:  Solaris Mezz, LLC, a Delaware limited liability company

By: _____
        Peter Knobel, Manager

**CRCPS:**

**Colorado Regional Center Project Solaris, LLLP,** a Colorado limited liability limited partnership

By:  Colorado Regional Center I, LLC, a Colorado limited liability company, general partner

By: _____
        Chester Schwartz, Manager

*Exhibit E to Loan Agreement*
*Operating Payment Agreement*

## **EXHIBIT E**

OPERATING PAYMENT AGREEMENT

(Attached)

## OPERATING PAYMENT AGREEMENT

THIS OPERATING PAYMENT AGREEMENT (the "**Agreement**") is made effective this 5th day of November, 2010, by and among Solaris Property Owner, LLC, a Delaware limited liability company ("**Solaris**"), Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership ("**CRCPS**"), and, for the limited purposes set forth below, Peter Knobel, an individual ("**Guarantor**"). Initially capitalized terms used but not otherwise defined below shall have the meanings ascribed to such terms under the provisions of the Loan Documents.

### RECITALS:

F. CRCPS has agreed to loan Solaris certain sums of money (the "**Loan**") in accordance with the terms, conditions and provisions of the Loan Agreement, Promissory Note and certain other documents (all of which documents may be collectively referred to below as the "**Loan Documents**").

G. The Loan proceeds are expected to be generated by investments into CRCPS from certain investors (the "**Investors**") pursuant to the EB-5 Immigrant Investor Regional Center Program ("**EB-5**").

H. The parties recognize and agree that under the terms of the Loan Documents, Solaris is permitted to repay Loan Advance(s) prior to the Maturity Date, but in no event sooner than thirty-six (36) months from and after the date of such Loan Advance(s).

I. Upon Solaris' prepayment of any such Loan Advance(s), Solaris' obligation to pay interest in connection with such Loan Advance(s) shall automatically terminate pursuant to the Note.

J. In the event of any such prepayment, , CRCPS may experience cash flow deficiencies resulting from the costs and expenses associated with ownership of any Collateral Unit(s) conveyed by Solaris in repayment of any Loan Advance(s).

K. Subject to all of the terms, conditions and provisions set forth below and as a material inducement for CRCPS to make the Loan, Solaris has agreed to make certain Operating Payments (as hereinafter defined) to CRCPS if in the event of any Prepayment(s) by Solaris.

L. Guarantor will derive substantial benefit from the Loan by virtue of Guarantor's residual interest in the Project.

M. But for the personal guarantee of Guarantor, CRCPS would not have agreed to enter into the transaction contemplated in and evidenced by the Loan Documents.

NOW THEREFORE, in consideration of the foregoing, the mutual promises set forth below and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

### AGREEMENT

1. **OBLIGATION TO MAKE OPERATING PAYMENTS.** Solaris shall be obligated to make certain Operating Payments (as hereinafter defined) to CRCPS in the event of Solaris prepays any Loan Advance(s) under the Note.

2.      **CERTAIN DEFINED TERMS.**

"**Aggregate Investor Interest**" means total periodic Investor Interest (as hereinafter defined) due in connection with each Loan Advance.

"**Investor Interest**" means the periodic interest actually owed from CRCPS to each Investor from time to time (whether the same is accruing or paid current), but in no event more than an effective annual rate three percent (3%) per Investor.

"**Operating Payments**" means, with respect to each Loan Advance, an amount equal to the Aggregate Investor Interest due in connection with such Loan Advance during the Term (as hereinafter defined).

"**Operating Payment Commencement Date**" means, with respect to each Loan Advance, the day after Solaris prepays such Loan Advance (in applicable).

"**Operating Payment Termination Date**" means, with respect to each Loan Advance, the Maturity Date set forth in the Note.

3.      **TERM.** Solaris' obligation to make Operating Payments in connection with any Loan Advance(s) shall begin on the applicable Operating Payment Commencement Date and end on the applicable Operating Payment Termination Date (the "**Term**"). Without limiting the generality of the foregoing, , if CRCPS' obligation to pay interest to any Investor terminates, Solaris' obligation to pay CRCPS the portion of any Operating Payments due in connection with such Investor shall likewise terminate.

4.      **PAYMENT SCHEDULE.** During the Term, Operating Payments shall be due and payable in arrears on the first business day of each calendar month. Any partial months shall be prorated.

5.      **GUARANTEE AGREEMENT**. As a condition precedent the first Loan Advance, Guarantor shall execute a guarantee agreement in form and substance reasonably satisfactory to Lender personally guaranteeing payment of (i) the Interest Payments due under the Note and (ii) the Operating Payments due hereunder (the "**Guarantee Agreement**"). Lender shall in no event be required to advance or loan any funds in connection with the Loan Agreement until Guarantor executes and delivers the Guarantee Agreement described above.

6.      **MISCELLANEOUS.**

**Waivers and Amendments**. Neither this Agreement nor any provision hereof may be changed, waived, discharged or terminated orally, but only by a statement in writing signed by each of the parties hereto.

**Governing Law**. The parties agree to submit to the jurisdiction of the courts of the City and County of Denver, Colorado. This Agreement shall be governed by and construed in accordance with the laws of Colorado.

**No Right to Jury Trial**. Each party hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement any right to a trial by jury.

**Successors and Assigns**.  Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns, heirs, executors and administrators.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.  Notwithstanding to the contrary set forth in any of the Loan Documents, Solaris shall have the absolute right (in Solaris' discretion) to assign this Operating Payment Agreement to Solaris' wholly-owned, bankruptcy-remote, single-purpose subsidiary (the **"SPE"**).  Upon such assignment, all of Solaris' rights and obligations under the Loan Documents shall automatically and forever terminate and, thereafter, Solaris shall have no further obligation of any kind whatsoever with respect to this Operating Payment Agreement.  If Solaris assigns Solaris' interest in the Loan Documents to Solaris' SPE prior to the execution of this Operating Payment Agreement, Solaris' SPE shall be substituted for Solaris as the signatory hereof and construed to mean "Solaris" for all purposes hereunder. A condition precedent to any such assignment shall be that any assignee of Borrower shall continue to operate the Solaris Project, as defined in the Loan Agreement, to assure full construction expenditure to project completion and subsequent operation of the retail businesses, all in satisfaction of the factual assumptions set forth in the EB-5 Econometric Report prepared in connection with the Solaris Project. The purpose of this condition precedent is to assure the Lender that the related EB-5 investors' ability to obtain removal of conditions on their U.S. permanent residency will not be impaired by any such assignment of the Borrower's rights and obligations under the Loan Documents.  The Lender shall have sole discretion to determine satisfaction of this condition precedent prior to any assignment by Borrower.

**Notices**.  All notices required to be given under this Agreement shall be given in writing, may be sent by facsimile (unless otherwise required by law) or by electronic mail, and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address shown below. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.

| | |
|---|---|
| **SPO**: | Solaris Property Owner, LLC<br>Attention: Legal Department<br>141 East Meadow Drive, Suite 211<br>Vail, Colorado 81657<br>P: (970) 479-7566<br>F: (970) 479-6666 |
| **CRC**: | Colorado Regional Center Project Solaris, LLLP<br>4643 S. Ulster Street, Suite 950<br>Denver, Colorado 80237<br>P: 720.554.9704<br>F: 720.554.9905 |
| **Guarantor**: | Peter Knobel c/o Solaris Property Owner, LLC<br>Attention: Legal Department<br>141 East Meadow Drive<br>Suite 211<br>Vail, Colorado 81657<br>P: (970) 479-7566<br>F: (970) 479.6666 |

**Severability**.  In case any provision of this Agreement shall be declared invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

**Titles and Subtitles**.  The titles of the paragraphs and subparagraphs of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

**Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

**No Strict Construction**.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**Amendments**.  This Agreement may only be amended and any waivers hereunder shall only be made with the approval of the Company and the Purchaser.

[Signature Page Follows]

THIS OPERATING PAYMENT AGREEMENT is made effective as of the date first above written by and among:

**SOLARIS:**

**Solaris Property Owner, LLC,** a Delaware limited liability

By: Solaris Mezz, LLC, a Delaware limited liability company

By: _____
   Peter Knobel, Manager

**CRCPS:**

**Colorado Regional Center Project Solaris, LLLP,**
a Colorado limited liability limited partnership

By: Colorado Regional Center I, LLC, a Colorado limited liability company, general partner

By: _____
   Chester Schwartz, Manager

**GUARANTOR:**

By: _____
   Peter B. Knobel, individually

*Exhibit F to Loan Agreement*
*Permitted Exceptions*

## EXHIBIT E

### PERMITTED EXCEPTIONS

1.     RIGHT OF PROPRIETOR OF A VEIN OR LODE TO EXTRACT AND REMOVE HIS ORE THEREFROM SHOULD THE SAME BE FOUND TO PENETRATE OR INTERSECT THE PREMISES AS RESERVED IN UNITED STATES PATENT RECORDED JULY 12, 1899, IN BOOK 48 AT PAGE 475.

2.     RIGHT OF WAY FOR DITCHES OR CANALS CONSTRUCTED BY THE AUTHORITY OF THE UNITED STATES AS RESERVED IN UNITED STATES PATENT RECORDED JULY 12, 1899 IN BOOK 48 AT PAGE 475.

3.     TERMS, CONDITIONS AND PROVISIONS OF PARKING RIGHTS AGREEMENT RECORDED NOVEMBER 30, 2006 AT RECEPTION NO. 200632758.

4.     BURDENS AND OBLIGATIONS UNDER DEVELOPMENT AGREEMENT RECORDED DECEMBER 18, 2006, AT RECEPTION NO. 200634299, AS AMENDED.

5.     TERMS, CONDITIONS AND PROVISIONS OF CONSOLIDATED SERVICE PLAN RECORDED JANUARY 05, 2007, AT RECEPTION NO. 200700327.

6.     TERMS, CONDITIONS AND PROVISIONS OF ORDER OF INCLUSION RECORDED APRIL 27, 2007 AT RECEPTION NO. 200710831.

7.     TERMS, CONDITIONS AND PROVISIONS OF ORDER OF INCLUSION RECORDED APRIL 27, 2007 AT RECEPTION NO. 200710832 AND RECORDED MARCH 19, 2008 AT RECEPTION NO. 200805845.

8.     TERMS, CONDITIONS AND PROVISIONS OF ORDER OF INCLUSION RECORDED APRIL 27, 2007 AT RECEPTION NO. 200710833 AND RECORDED MARCH 19, 2008 AT RECEPTION NO. 200805846.

9.     TERMS, CONDITIONS AND PROVISIONS OF CROSSROADS PROTECTIVE COVENANTS BUT OMITTING ANY COVENANTS OR RESTRICTIONS, IF ANY, BASED UPON RACE, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, FAMILIAL STATUS, MARITAL STATUS, DISABILITY, HANDICAP, NATIONAL ORIGIN, ANCESTRY, OR SOURCE OF INCOME, AS SET FORTH IN THE APPLICABLE STATE OR FEDERAL LAWS, EXCEPT TO THE EXTENT THAT SAID COVENANT OR RESTRICTION IS PERMITTED BY APPLICABLE LAW RECORDED AUGUST 16, 2007 UNDER RECEPTION NO. 200721910, RE-RECORDED AUGUST 28, 2007 UNDER RECEPTION NO. 200722884.

10.     TERMS, CONDITIONS AND PROVISIONS OF TRENCH, CONDUIT AND VAULT AGREEMENT RECORDED OCTOBER 10, 2007 AT RECEPTION NO. 200727140.

11.     TERMS, CONDITIONS AND PROVISIONS OF UNDERGROUND RIGHT-OF-WAY EASEMENT RECORDED OCTOBER 10, 2007 AT RECEPTION NO. 200727141 AND UNDERGROUND RIGHT-OF-WAY EASEMENT RECORDED OCTOBER 10, 2007 AT RECEPTION NO. 200727142.

12.     BURDENS AND OBLIGATIONS UNDER CONSTRUCTION LICENSE AGREEMENT RECORDED DECEMBER 05, 2007 AT RECEPTION NO. 200731952.

13.     TERMS, CONDITIONS AND PROVISIONS OF EASEMENT AGREEMENT BETWEEN SOLARIS PROPERTY OWNER, LLC, A DELAWARE LIMITED LIABILITY COMPANY AND SOLARIS METROPOLITAN DISTRICT NO. 1 RECORDED MAY 28, 2008 AT RECEPTION NO. 200811070.

14.     THE EFFECT OF SOLARIS METROPOLITAN DISTRICT NOS. 1-3 MAP RECORDED DECEMBER 22, 2009 UNDER RECEPTION NO. 200927310.

15.     EASEMENTS, RESERVATIONS AND RESTRICTIONS AS SHOWN OR RESERVED ON THE CONDOMINIUM PLAT FOR SOLARIS-VAIL RECORDED APRIL 26, 2010 UNDER RECEPTION NO. 201007816.

16.     TERMS, CONDITIONS AND PROVISIONS OF SHARED FACILITIES AGREEMENT RECORDED APRIL 26, 2010 AT RECEPTION NO. 201007817.

17.     EASEMENTS, RESERVATIONS AND RESTRICTIONS AS SHOWN OR RESERVED ON THE CONDOMINIUM PLAT FOR THE RESIDENCES AT SOLARIS-VAIL RECORDED APRIL 26, 2010 AT RECEPTION NO. 201007818.

18.     THOSE PROVISIONS, COVENANTS AND CONDITIONS, EASEMENTS, AND RESTRICTIONS, WHICH ARE A BURDEN TO THE CONDOMINIUM UNIT DESCRIBED IN SCHEDULE A, AS CONTAINED IN CONDOMINIUM DECLARATION FOR THE RESIDENCES AT SOLARIS-VAIL, RECORDED APRIL 26, 2010 AT RECEPTION NO. 201007819.