# LOAN AGREEMENT

THIS LOAN AGREEMENT (this "**Agreement**" or "**Loan Agreement**") is made into and entered into this 5th day of November 2010 between Borrower and Lender (as such terms are defined below).

**1. AGREEMENT TO LEND.** Subject to all of the terms, conditions and provisions set forth below and in the Loan Documents (as hereinafter defined) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, (i) Lender has agreed to lend to Borrower and (ii) Borrower has agreed to borrow from Lender, certain funds not to exceed the Loan Amount (as hereinafter defined).

**2. TERM.** This Agreement shall become effective as of the date first written above and remain in effect until the parties respective obligations hereunder have been performed in full or this Agreement is terminated as provided below.

**3. UNITED STATES DOLLARS.** All references to dollar amounts shall mean amounts in lawful money of the United States of America.

**4. DEFINITIONS.** Terms not otherwise defined in this Agreement or the other Loan Documents (as hereinafter defined) shall have the meanings attributed to such terms in the Uniform Commercial Code. The following terms shall have the meanings set forth below:

"**Agreement**" or "**Loan Agreement**" means this Agreement, as the same may be amended or modified from time to time, together with any and all exhibits and schedules attached to this Agreement from time to time.

"**Borrower**" means Solaris Property Owner, LLC, a Delaware limited liability company, its successors and assigns.

"**Closing**" means the date on which each Loan Advance is made to Borrower.

"**Collateral**" means the Property, as hereinafter defined.

"**Collateral Unit(s)**" shall have the meaning set forth below in Section 8 of this Loan Agreement.

"**Collateral Unit Value**" means the estimated market value of each Collateral Unit as set forth in the Condominium Pool.

"**Condominium Pool**" means certain Condominium Units listed on Exhibit A hereto.

"**Condominium Unit(s)**" or "**Unit(s)**" means the individual condominiums in the Condominium Pool.

"**Deed of Trust**" means the deed of trust (in a form and substance materially similar to the form attached hereto as Exhibit B) to be recorded against each Collateral Unit in connection with Closing on the Loan Advance secured by such Collateral Unit.

"**Event of Default**" means any one of the Events of Default (as hereinafter defined).

"**Grantor**" means each and all of the persons or entities (including, without limitation, a Borrower) granting a Security Interest in the Collateral.

1

"**Indebtedness**" means and includes without limitation the Loan, together with all other obligations, debts and liabilities of Borrower to Lender, or any one or more of them.

"**Lender**" means Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership, its successors and assigns.

"**Loan**" means the loan or loans made to Borrower under this Agreement and the Loan Documents as described below.

"**Loan Advance**" means the amount of each advance of principal from Lender to Borrower under this Agreement.

"**Loan Amount**" means the sum of all Loan Advances made, from time to time, pursuant to the terms hereof.

"**Loan Documents**" shall have the meaning set forth in the Deed of Trust..

"**Material Adverse Effect**" or "**Material Adverse Change**" means a condition or event that materially and adversely affects (i) the business, assets, results of operations, financial condition or prospects of the parties, or (ii) the ability of the parties to perform their respective obligations under the Loan Documents.

"**Maturity Date**" means a date that is exactly sixty (60) calendar months from the date of each Closing hereunder.

"**Note**" or "**Promissory Note**" means the promissory note (in form and substance substantially the same as the form attached hereto as <u>Exhibit C</u>) to be executed by Borrower in connection with the first Closing, as the same may be amended from time to time.

"**Prepayment Date**" shall have the meaning set forth in the Note.

"**Property**" means the Collateral Unit(s) together with all fixtures and other articles of personal property now or subsequently located in or affixed to the Collateral Unit(s), and all proceeds (including, without limitation, all insurance proceeds and refunds of premiums) from any sale or other disposition of such property.

"**Security Agreement**" means any agreements executed by the parties for the purpose of evidencing and/or creating Lender's Security Interest in the Collateral.

"**Security Interest**" means on any type of collateral security, whether in the form of a lien, charge, mortgage, deed of trust, assignment, pledge, chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

"**Solaris Lenders**" means any and all lenders previously or hereafter advancing funds in connection with the construction and/or refinancing of all or any portion of Solaris.

"**Solaris Project**" means certain real estate in Eagle County Colorado, generally located at 141 East Meadow Drive, Vail, Colorado 81657 and commonly known as "The Residences at Solaris" and "The Shops at Solaris."

5.     **LOAN.** Lender intends to raise the maximum amount of funds permitted pursuant to the EB-5 Immigrant Investor Program ("**EB-5**"), the proceeds of which will be loaned to Borrower pursuant to the terms and conditions set forth in the Loan Documents.  Borrower understands and agrees that Lender is unable to guarantee that it will be successful in raising funds from investors pursuant to the EB-5 program.  Consequently, if by December 31, 2012, Lender is unable to raise funds to enable it to make a Loan Advance, the Loan Documents shall automatically and without further action by the parties terminate and neither party shall have any further rights or obligations hereunder.  If Lender is successful in raising funds pursuant to the terms and conditions of this Agreement, (i) Borrower shall be obligated to accept all such funds raised by Lender and made available to Borrower on the terms set forth herein, and (ii) Lender shall be obligated to lend to Borrower all such sums raised by Lender on the terms set forth herein.  Borrower recognizes and agrees that Lender will expend significant funds to raise capital from EB-5 investors pursuant to the EB-5 program, and Lender is relying on Borrower's obligation to accept each Loan Advance made by Lender in accordance with the terms and conditions set forth in this Agreement. Lender recognizes and agrees that Borrower will also expend significant funds to raise capital from EB-5 investors pursuant to the EB-5 program, and Borrower is relying on Lender's obligation to lend to Borrower all such amounts raised by Lender in accordance with the terms and conditions set forth in this Agreement.

6.     **INTEREST.**  Each Loan Advance shall bear interest at the rate of five percent (5%) per annum from and after the date Borrower receives such Loan Advance until such Loan Advance is repaid pursuant to and in accordance with the Note.

7.     **LOAN ADVANCES GENERALLY.**  Lender shall advance all invested sums to Borrower as soon as reasonably practicable in accordance with the terms, conditions, provisions and restrictions of EB-5.  The parties agree to use good faith best efforts and take all reasonable steps necessary to ensure that the EB-5 proceeds are advanced to Borrower as soon as reasonably practicable within the parameters of EB-5.  Without limiting the generality of the foregoing, the parties agree to establish procedures and modify the Loan Documents as necessary to accomplish the foregoing.

8.     **COLLATERAL UNITS.**  Without limiting the generality of Section 7 above, at the time of each Loan Advance, Borrower shall select one or more Condominium Units from the Condominium Pool that will serve as security for the Loan Advance (each, a "**Collateral Unit**" and collectively, the "**Collateral Units**").  Borrower shall execute a separate Deed of Trust for each Collateral Unit in connection with Closing on the Loan Advance secured by such Collateral Unit.

9.     **CONDOMINIUM POOL; SALES OF UNITS.**  Borrower may sell any Unit in the Condominium Pool to a third party at any time prior to such Unit's designation as a Collateral Unit; *provided, however*, that Borrower and Lender shall jointly select a replacement Unit reasonably comparable in size, price, and location to the Unit sold. The parties agree to use good faith best efforts to select the replacement Unit for the Condominium Pool.

10.    **FEES AND EXPENSES.**  Except as may be specifically set forth in this Agreement, each party shall pay its own legal and related expenses incurred in connection with the preparation and review of Loan Documents and the making of the Loan.  Any fees incurred in connection with the transfer of any Condominium Units pursuant to a Security Agreement shall be paid as set forth herein.

11.    **PREPAYMENT OF NOTE.**  Notwithstanding anything to the contrary set forth herein, in the Note, Deed of Trust or any other Loan Documents, at any time after the expiration of thirty six (36) months following a Loan Advance, Borrower shall have the absolute right to prepay the portion of the Note attributable to such Loan Advance by repaying Lender the amount of such Loan Advance or

tendering to Lender the Collateral Unit(s) securing such Loan Advance. If Borrower conveys any Collateral Unit(s) in repayment of a Loan Advance, the principal balance of the Note shall be reduced by the amount of the Loan Advance secured by such Collateral Unit(s).

12. **REPRESENTATIONS AND WARRANTIES OF BORROWER.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each Loan Advance, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

(i) **Organization.** Borrower is a limited liability company duly organized, validly existing, and in good standing under the laws of Delaware and is validly existing and in good standing in Colorado. Borrower has the full power and authority to own its properties and to transact the businesses in which it is presently engaged or presently proposes to engage.

(ii) **Authorization.** Except as expressly set forth below, the execution, delivery, and performance of this Agreement by Borrower, to the extent to be executed, delivered or performed by Borrower, have been duly authorized by all necessary action by Borrower; and do not conflict with, result in a violation of, or constitute a default under (a) any provision of its Articles of Organization or Operating Agreement, or, any agreement or other instrument binding upon Borrower (unless such violation or default of such agreement or instrument has been waived in writing), or (b) any law, governmental regulation, court decree, or order applicable to Borrower.

(iii) **Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may Materially Adversely Affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing. Lender acknowledges and agrees that Borrower has disclosed the existence of the litigation involving Borrower, The Weitz Company and Richard Joseph & Company for purposes of the foregoing sentence.

(iv) **Title to Property.** Borrower has good and marketable title to the Condominium Units free and clear of all defects, liens, and encumbrances, excepting only those set forth on the title commitment furnished to Lender in connection any Loan Advance, liens for taxes, assessments or governmental charges or levies not yet delinquent or payable without penalty or interest and such liens and encumbrances as may be approved in writing by the Lender.

(v) **Hazardous Substances.** The terms "hazardous waste," "hazardous substance," "disposal," "release," and "threatened release," as used in this Agreement, shall have the same meanings as set forth in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act at 1988, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing. Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (a) During the period of Borrower's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any hazardous waste or substance by any person on, under, about or from any of the properties; (b) Borrower has no knowledge of, or reason to believe that there has been (i) any use, generation, manufacture, storage, treatment, disposal, release, or threatened release of any hazardous waste or substance on, under, about or from the properties by any prior owners or occupants of any of the properties, or (ii) any actual or threatened litigation or claims of any kind by any person relating to such matters; (c) neither Borrower nor any

tenant, contractor, agent or other authorized user of any of the properties shall use, generate, manufacture, store, treat, dispose of, or release any hazardous waste or substance on, under, about or from the Property (except for commercial products that are stored in standard commercial containers); and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation those laws, regulations and ordinances described above. Borrower authorizes Lender and its agents to enter upon the properties to make such inspections and tests as Lender may deem appropriate to determine compliance of the properties with this section of the Agreement. The representations and warranties contained herein are based on Borrower's due diligence in investigating the properties for hazardous waste and hazardous substances. Borrower hereby (a) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence or any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the properties. The provisions of this section of the Agreement, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the properties, whether by foreclosure or otherwise.

      (vi)    **Assessment of Condominium Units.** Each Condominium Unit is and will continue to be assessed and taxed as an independent parcel by all governmental authorities.

      (vii)    **Compliance with Governing Authorities.** Borrower has examined and is familiar with all the easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements affecting the Property. The Property was constructed in compliance with the requirements of such easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements.

      (viii)    **Legal Effect.** This Agreement constitutes, and any instrument or agreement required hereunder to be given by Borrower when delivered will constitute, legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

      (ix)    **Binding Effect.** This Agreement, the Note and all Security Agreements directly or indirectly securing repayment of Borrower's Loan and Note are binding upon Borrower as well as upon Borrower's successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

      (x)    **Survival of Representation and Warranties.** Borrower understands and agrees that Lender is relying upon the above representations and warranties in extending Loan Advances to Borrower. Notwithstanding anything to the contrary set forth herein, Borrower and Lender agree that the representations, warranties and covenants of Borrower hereunder shall automatically terminate and cease to apply to any Condominium Unit(s) tendered in repayment or prepayment of all or any portion of the Indebtedness.

      13.    **CONDITIONS PRECEDENT TO INITIAL ADVANCE.** Lender's obligation to make the initial Loan Advance shall be subject to the reasonable fulfillment of the following:

      (i)    **Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of the Loan Documents.

(ii)     **Environmental Report.**  Borrower has furnished to Lender an environmental report in form and substance reasonably satisfactory to Lender.

(iii)    **Lender's Title Insurance.**  Borrower shall have provided to Lender (at Lender's sole cost and expense) an ALTA Lender's extended coverage policy of title insurance with such endorsements as Lender may require, issued by the Land Title Guarantee Company in a form, amount, and content satisfactory to Lender, insuring or agreeing to insure that Lender's Mortgage or Deed of Trust on the Property is or will be upon recordation a valid first lien on the Property free and clear of all defects, liens, encumbrances, and exceptions except those listed on Exhibit F hereto or specifically accepted by Lender in writing (the "**Permitted Exceptions**").

14.   **AFFIRMATIVE COVENANTS.**  Borrower covenants and agrees with Lender that, while this Agreement is in effect, Borrower will:

(i)   **Litigation.**  Promptly inform Lender in writing of (a) all Material Adverse Changes in Borrower's financial condition, and (b) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions which could result in a Materially Adverse Change to the financial condition of Borrower.  Lender acknowledges and agrees that Borrower has disclosed the existence of the litigation involving Borrower, The Weitz Company and Richard Joseph & Company for purposes of the foregoing sentence.

(ii)   **Additional Information.**  Furnish such additional information with respect to Borrower's business operations as they relate to the Solaris Project as Lender may request from time to time.  Such information shall include but not be limited to, information concerning the number of jobs created at the Project, a description of the types of jobs created, including salary ranges, sales figures for the commercial tenants, and all other information reasonably requested by Lender that Lender deems reasonably necessary to fulfill its reporting requirements under EB-5.  Borrower shall use all commercially reasonable efforts to cause all commercial tenants to cooperate with Lender and to timely furnish the information outlined above.

(iii)   **Compliance with Governmental Requirements.**  Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans with Disabilities Act.  Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as Lender's interests in the Property are not jeopardized.

(iv)   **Payment of Claims and Removal of Liens.**  (a) Cause all valid claims for labor done and materials and services properly furnished in connection with the Property to be fully paid and discharged in a timely manner, (b) diligently file or procure the filing of a valid notice of completion of the Property, or such comparable document as may be permitted under applicable lien laws, (c) diligently file or procure the filing of a notice of cessation, or such comparable document as may be permitted under applicable lien laws, upon the happening of cessation of labor on the Property for a continuous period of 30 days or more, and (d) take all commercially reasonable steps necessary to remove all valid claims of liens properly recorded against the Property, or any rights or interests appurtenant to the Property or improvements.

(v)   **Taxes and Claims.**  Pay and discharge when due all of Borrower's indebtedness, obligations, and claims that, if unpaid, might become a lien or charge upon the Property or Improvements which would be senior to the Security Interest of Lender; provided, however, that Borrower shall not be required to pay and discharge any such indebtedness, obligation, or claim so long as (a) its legality shall

be contested in good faith by appropriate proceedings, and (b) the indebtedness, obligation, or claim does not become a lien or charge upon the Property or Improvements(unless Borrower provides appropriate security, procures a bond or causes the title company to insure over the such a lien or charge). If the indebtedness, obligation, or claim does become a lien or charge upon the Property or Improvements, Borrower shall remove the lien or charge as provided in the preceding paragraph.

(vi)   **Performance.** Perform and comply with all terms, conditions, and provisions set forth in this Agreement and in all other instruments and agreements between Borrower and Lender, and in all other loan agreements now or hereafter existing between Borrower and any other party.

(vii)   **Additional Assurances.** Make, execute, and deliver to Lender such Security Agreements, instruments, documents, and other agreements reasonably necessary to document and secure the Loan and to protect Lender's Security Interests in the Property and Improvements.

15.   **REPRESENTATIONS, WARRANTIES AND COVENANTS OF LENDER.** Lender represents and warrants to Borrower, as of the date of this Agreement, as of the date of each Loan Advance, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

(i)   **Organization.** Lender is a limited liability limited partnership duly organized, validly existing, and in good standing under the laws of Colorado and is validly existing and in good standing in Colorado. Borrower has the full power and authority to transact the businesses in which it is presently engaged or presently proposes to engage.

(ii)   **Authorization.** The execution, delivery, and performance of this Agreement by Lender, to the extent to be executed, delivered or performed by Lender, have been duly authorized by all necessary action by Lender; and do not conflict with, result in a violation of, or constitute a default under (a) any provision of its organizational documents, or, any agreement or other instrument binding upon Lender (unless such violation or default of such agreement or instrument has been waived in writing), or (b) any law, governmental regulation, court decree, or order applicable to Lender.

(iii)   **Legal Effect.** This Agreement constitutes, and any instrument or agreement required hereunder to be given by Lender when delivered will constitute, legal, valid and binding obligations of Lender enforceable against Lender in accordance with their respective terms.

(iv)   **Binding Effect.** This Agreement is binding upon Lender as well as upon Lender's successors, representatives and assigns, and is legally enforceable in accordance with its terms.

(v)   **Invested Funds.** Lender shall advance all invested sums to Borrower as soon as reasonably practicable in accordance with the terms, conditions, provisions and restrictions of EB-5. The parties agree to use good faith best efforts and take all reasonable steps necessary to ensure that the EB-5 proceeds are advanced to Borrower as soon as reasonably practicable within the parameters of EB-5. Without limiting the generality of the foregoing, the parties agree to establish procedures and modify the Loan Documents (including, without limitation, Section 8 above) as necessary to accomplish the foregoing. Further, without limiting the generality of the foregoing, Lender shall in no event unreasonably withhold or delay the advance of any funds secured from investors in connection with the transactions contemplated hereunder.

(vi)   **Survival of Representation, Warranties and Covenants.** Lender understands and agrees that Borrower is relying upon the above representations, warranties and covenants in agreeing to enter into the transaction contemplated in the Loan Documents.

(vii) **Performance.** Lender shall perform and comply with all terms, conditions, and provisions set forth in this Agreement and in all other instruments and agreements between Borrower and Lender.

(viii) **Additional Assurances.** Lender shall make, execute, and deliver to Borrower such instruments, documents, and other agreements reasonably necessary to document and effectuate the purposes of this Agreement.

16. **EVENTS OF DEFAULT BY BORROWER.** Subject to any applicable cure periods set forth in any Loan Document, each of the following shall constitute an Event of Default by Borrower under this Agreement:

(i) **Default on Indebtedness**. Failure of Borrower to make any payment when due on the Loan.

(ii) **Other Defaults.** Failure of Borrower to comply with or to perform when due any other material term, obligation, covenant or condition contained in this Agreement or in any of the Loan Documents, or failure of Borrower to comply with or to perform any other material term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or between Borrower and any other party that is not cured within applicable cure periods and which, if not cured, would have a Material Adverse Effect on the Collateral.

(iii) **False Statements.** Any warranty, representation or statement made or furnished to Lender by or on behalf of Borrower under this Agreement or the Loan Documents is false or misleading in any material respect at the time made or furnished, or becomes false or misleading in any material respect at any time thereafter.

(iv) **Insolvency.** The insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

17. **EFFECT OF AN EVENT OF DEFAULT BY BORROWER; LENDER'S REMEDIES.** Upon the occurrence of any Event of Default and at any time thereafter, Lender shall give written notice to Borrower which notice shall describe the nature of the Event of Default. Borrower shall have ten (10) days after receipt of written notice in which to cure any default that can be cured by the payment of money and thirty (30) days in which to cure any default that cannot be cured solely by the payment of money (which thirty (30) day period may be extended for such time as may be reasonably necessary if the default cannot reasonably be cured in the initial thirty (30) day period, provided that Borrower is making reasonable efforts to cure such default during such period). Upon the expiration of the applicable cure period, Lender may, at its option, but without any obligation to do so, and in addition to any other right Lender may have, do any one or more of the following without further notice to Borrower: (a) cancel this Agreement; (b) institute appropriate proceedings to enforce the performance of this Agreement; (c) withhold further disbursement of Loan Advances; (d) expend funds necessary to remedy the default; (e) take possession of the Property; (f) foreclose Lender's Mortgage or Deed of Trust, if any, on the Property in any manner available under law; and (h) exercise any other right or remedy which it has under the Note or Loan Documents, or which is otherwise available at law or in equity or by statute.

**18.     EVENTS OF DEFAULT BY LENDER.**  Subject to any applicable cure periods set forth in any Loan Document, each of the following shall constitute an Event of Default by Lender under this Agreement:

(i)     **Failure of Performance.**  Failure of Lender to comply with or to perform when due any other material term, obligation, covenant or condition contained in this Agreement or in any of the Loan Documents.

(ii)    **False Statements.**  Any warranty, representation or statement made or furnished to Borrower by or on behalf of Lender under this Agreement or the Loan Documents is false or misleading in any material respect at the time made or furnished, or becomes false or misleading in any material respect at any time thereafter.

**19.     EFFECT OF AN EVENT OF DEFAULT BY LENDER; BORROWER'S REMEDIES.**  Upon the occurrence of any Event of Default by Lender and at any time thereafter, Borrower shall give written notice to Lender which notice shall describe the nature of the Event of Default.  Lender shall have ten (10) days after receipt of written notice in which to cure any default that can be cured by the payment of money and thirty (30) days in which to cure any default that cannot be cured solely by the payment of money (which thirty (30) day period may be extended for such time as may be reasonably necessary if the default cannot reasonably be cured in the initial thirty (30) day period, provided that Lender is making reasonable efforts to cure such default during such period).  Upon the expiration of the applicable cure period, Borrower may, at its option, but without any obligation to do so, and in addition to any other right Borrower may have, do any one or more of the following without further notice to Borrower:  (a) cancel this Agreement; (b) institute appropriate proceedings to enforce the performance of this Agreement; (b) expend funds necessary to remedy the default; and (c) exercise any other right or remedy which it has under the Note or Loan Documents, or which is otherwise available at law or in equity or by statute.

**20.     MISCELLANEOUS PROVISIONS.**  The following miscellaneous provisions are a part of this Agreement:

(i)     **Agency.**  Nothing in this Agreement shall be construed to constitute the creation of a partnership or joint venture between Lender and Borrower or any contractor.  Lender is not an agent or representative of Borrower.  This Agreement does not create a contractual relationship with and shall not be construed to benefit or bind Lender in any way with or create any contractual duties by Lender to any contractor, subcontractor, materialman, laborer, or any other person.

(ii)    **Amendments.**  This Agreement, together with any Loan Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement.  No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

(iii)   **Applicable Law.**  This Agreement has been delivered to Lender and accepted by Lender in Colorado. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of the City and County of Denver, Colorado. This Agreement shall be governed by and construed In accordance with the laws of Colorado.

(iv)    **Assignment by Borrower**. Notwithstanding to the contrary set forth in any of the Loan Documents, Borrower shall have the absolute right to assign this Loan Agreement, the Promissory Note and the other Loan Documents to Borrower's wholly-owned, single-purpose subsidiary (the "**SPE**"). Upon such assignment, all of Borrower's rights and obligations under the Loan Documents shall automatically

and forever terminate and, thereafter, Borrower shall have no further obligation of any kind whatsoever with respect to the Loan or Loan Documents. A condition precedent to any such assignment shall be that any assignee of Borrower shall continue to operate the Solaris Project, as defined in the Loan Agreement, to assure full construction expenditure to project completion and subsequent operation of the retail businesses, all in satisfaction of the factual assumptions set forth in the EB-5 Econometric Report prepared in connection with the Solaris Project. The purpose of this condition precedent is to assure the Lender that the related EB-5 investors' ability to obtain removal of conditions on their U.S. permanent residency will not be impaired by any such assignment of the Borrower's rights and obligations under the Loan Documents. The Lender shall have sole discretion to determine satisfaction of this condition precedent prior to any assignment by Borrower.

(v) **Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

(vi) **Costs and Expenses.** Borrower and Lender shall each be responsible for its own expenses, including without limitation attorneys' fees, incurred in connection with the preparation, execution, enforcement, modification and collection of this Agreement or in connection with the Loans made pursuant to this Agreement. In the event of any litigation arising out of this Loan, the prevailing party, in addition to any other rights or remedies to which it may be entitled, shall be awarded its reasonable expenses incurred in enforcing or defending such action. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses, whether or not there is a lawsuit, including attorneys' fees for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the prevailing party also will be entitled to recover any court costs, in addition to all other sums provided by law.

(vii) **Entire Agreement.** This Agreement and the Loan Documents constitute all of the agreements between the parties relating to the Property and supersede all other prior or concurrent oral or written agreements or understandings relating to the Property.

(viii) **Notices.** All notices required to be given under this Agreement shall be given in writing, may be sent by facsimile (unless otherwise required by law) or by electronic mail, and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address shown below. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.

*If to Borrower*:     **Solaris Property Owner, LLC**
Attention: Legal Department
141 East Meadow Drive, Suite 211
Vail, Colorado 81657
P: 970.479.7566
F: 970.479.6666

*If to Lender*:     **Colorado Regional Center Project Solaris, LLLP**
4643 S. Ulster Street, Suite 950
Denver, Colorado 80237
P: 720.554.9704
F: 720.554.9905

(ix)     **Successors and Assigns.**  All covenants and agreements contained by or on behalf of either party shall bind such party's successors and assigns and shall inure to the benefit of the other party, its successors and assigns. Neither party shall have the right to assign its rights under this Agreement or any interest therein, without the prior written consent of Lender.

(x)     **Severability.**  If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any ether persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

(xi)     **Survival.**  All warranties, representations, and covenants made by a party in this Agreement or in any certificate or other instrument delivered by a party under this Agreement shall be considered to have been relied upon by the other party and will survive the making of the Loan and delivery to the other of the Loan Documents, regardless of any investigation made by such party or on such party's behalf.

(xii)     **Time is of the Essence.** Time is of the essence in the performance of this Agreement.

(xiii)     **Waiver.**  Neither party shall be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by such party. No delay or omission on the part of either party in exercising any right shall operate as a waiver of such right or any other right. A waiver by one party of a provision of this Agreement shall not prejudice or constitute a waiver of such party's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by either party, nor any course of dealing between Lender and Borrower, shall constitute a waiver of either party's rights or of any obligations as to any future transactions. Whenever the consent of either party is required under this Agreement, the granting of such consent by such party in any instance shall not constitute continuing consent in subsequent instances where such consent is required, and in all cases such consent may be granted or withheld in the sole discretion of the party from whom consent is required.

(xiv)     **Confidentiality; Publicity**.  Lender understands, acknowledges and agrees that Borrower has certain legitimate and material business reasons for keeping the Loan confidential.  Borrower understands, acknowledges and agrees that it is essential to Lender's marketing efforts that Lender be allowed to market the Loan in a manner designed to facilitate the successful completion of the offering. The parties therefore agree that Lender may refer on its Public Website (as hereinafter defined) to a generic description of the project (e.g., by reference to a "high-end, luxury mixed-use condominium/retail project located in Vail" and similar general wording).  **Public Website**" means the basic website maintained by Lender to provide general information concerning Lender's projects to the public at large. Notwithstanding the foregoing or anything to the contrary set forth herein, Lender's Public Website shall in no event disclose the following: (i) the name of the Project; (ii) the address and/or precise location of the Project; (iii) the exact number of units in the Project; (iv) the names of specific individuals, business, types of businesses, tenants, or others affiliated with or connected to the Project; or (v) or any other such information that identifies the Project as Borrower or leads to the unavoidable conclusion that the Project is Borrower.  The parties further agree that the Public Website will include a secure area created to provide certain parties to get specific details concerning the Project (including the name) and the Investment (the "**Secure Website**").  In order to gain access to the Secure Website, all users must first register with Lender by providing Lender with their name and contact information.  Lender will make a reasonable inquiry into the validity of the party seeking such information (each, an "**Inquiring Party**"

and collectively, the "**Inquiring Parties**") prior to providing any such Inquiring Party with a password to the Secure Website (the "**Secure Password**").

Borrower agrees that any such system will be susceptible to deception by a potential user, but that the parties intend to provide commercially reasonable means to deter anyone not having a legitimate interest in making an EB-5 investment from gaining access to this information. Lender agrees to utilize a further more detailed filtering system on its website prior to allowing access to offering materials (including the Private Placement Memorandum) about the Project. Lender shall be free to distribute marketing materials about the Project using the Borrower's name to targeted investment prospects including without limitation, immigration attorneys, brokers and agents specializing in EB-5 investor referrals, wealth managers, individual foreign investors seeking to make an EB-5 investment, and other professionals who are likely to make a targeted referral to Lender. Except as expressly set forth above, Lender shall be prohibited from disclosing to anyone any specific information concerning the Project. The foregoing sentence shall in no event preclude Lender from disclosing the general information available on the Public Website in response to specific inquiries from the media and others. The parties agree to work together to reasonably respect each other's reasonable business interests regarding these issues. Lender and Borrower will cooperate in preparing information about the Project for inclusion in the PPM and other related materials and Borrower agrees that Lender shall have the right to include such materials in the PPM (subject to appropriate non-disclosure agreements and other such standard protections).

20. **EXHIBITS.** All exhibits attached to this Loan Agreement are incorporated herein by this reference.

21. **LENDER APPROVAL; DISCLAIMER.** NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH HEREIN, THE EFFECTIVENESS OF THIS AGREEMENT AND THE LOAN DOCUMENTS IS EXPRESSLY CONDITIONED UPON THE APPROVAL OF THE SOLARIS LENDERS. WITHOUT LIMITING THE FOREGOING, THE PARTIES AGREE TO MODIFY THIS AGREEMENT AND THE LOAN DOCUMENTS AS NECESSARY TO ACCOMMODATE THE REQUESTS OF THE SOLARIS LENDERS SO LONG AS SUCH MODIFICATIONS NEITHER (1) MATERIALLY ALTER THE SUBSTANCE OF THE BUSINESS DEAL AGREED UPON BY THE PARTIES NOR (2) DISQUALIFY THE TRANSACTION FROM EB-5 ELIGIBILITY.

[Signature Page Follows]

THIS LOAN AGREEMENT is made effective as of the date first above written by and between:

**BORROWER:**

**Solaris Property Owner, LLC,** a Delaware limited liability company

By: Solaris Mezz, LLC, a Delaware limited liability company

By: _____
Peter Knobel, Manager

**LENDER:**

**Colorado Regional Center Project Solaris, LLLP,** a Colorado limited liability limited partnership

By: Colorado Regional Center I, LLC, a Colorado limited liability company, general partner

By: _____
Chester Schwartz, Manager