# In the United States District Court
# for the District of Colorado

Civil Action No. 1:19-cv-02443-RM-STV
—*Consolidated with* No. 19-cv-2637-RM-STV

JUN LI, *et al.*, individually and derivatively for Colorado Regional Center Project Solaris LLLP,

     Plaintiffs,

v.

WAVELAND VENTURES LLC, *et al.*,

     Defendants.

---

## Solaris Property Owner, Solaris Property Owner I and Peter Knobel's Amended* Motion to Dismiss the *Li* and *Cui* Complaints

---

*The original motion was filed two hours earlier at 4:40 PM. This version clarifies an ambiguous sentence and typographical errors, both in the Introduction on page 2.

# Table of Contents

Introduction ................................................................................................................1

Facts ...................................................................................................................... 3

The *Li* and *Cui* Claims ......................................................................................... 9

Argument .............................................................................................................. 10

I.   Plaintiffs' complaints fail because they are no more than conclusions and
     therefore are not entitled to the assumption of truth. .................................. 11

     The Li plaintiffs' complaint. .................................................................. 12

     The *Cui* plaintiffs' complaint. .............................................................. 13

II.  Plaintiffs' tort claims fail to state a claim for relief. .................................. 14

    A.   The tort claims are premised on two acts of "fraud";
     Plaintiffs do not come close to pleading facts in support of either. ..................... 15

     Value of Collateral Units. ....................................................................... 15

     Alleged fraudulent investment materials. ............................................. 16

    B.   The *Li* plaintiffs' derivative civil theft claim (LTAC Claim 2) is deficient. ......... 17

    C.   The *Li* plaintiffs' derivative Colorado securities fraud claim (LTAC
     Claim 6) and the *Cui* plaintiffs' direct fraud claim (CTAC Claim 1)
     and federal securities fraud claim (CTAC claim 5) are deficient. ......................... 17

     The *Li* plaintiffs have no viable derivative state securities fraud claim. ............... 17

     Plaintiffs failed to plead their fraud claims with particularity ............................. 18

     The LTAC fails to plead a claim for state securities fraud. .................................. 18

     Plaintiffs' securities fraud and fraud claims are time-barred. .............................. 20

    D.   The *Cui* plaintiffs' direct CCPA claim (CTAC Claim 3) is deficient. ................ 20

III. Plaintiffs' contract claims fail to state a claim for relief. ........................... 22

A.  The *Li* plaintiffs' derivative and *Cui* plaintiffs' direct and derivative breach of contract claims (LTAC Claim 3; CTAC Claim 6) are deficient. ......... 22

The *Cui* plaintiffs lack standing to assert a direct claim for breach of the Loan Agreement ................................................................. 22

Plaintiffs' claim is barred as a matter of law. ...................................... 23

The ARCU remains in effect. .............................................................. 24

The ARCU was supported by consideration. .................................... 25

B.  The *Cui* plaintiffs' direct and derivative claim for declaratory judgment (CTAC Claim 7) is deficient. ............................................... 27

IV. The *Cui* plaintiffs' direct veil-piercing "claim" (CTAC Claim 8) is deficient. ........ 29

Conclusion ...................................................................................................... 30

Table of Exhibits ............................................................................................. 1

Solaris Property Owner ("SPO"), Solaris Property Owner I ("SPO I"), and Peter Knobel (collectively, "SPO Defendants") move under Federal Rule of Civil Procedure 12(b)(6) and the PSLRA[1] to dismiss the *Li* plaintiffs' and the *Cui* plaintiffs' respective third amended complaints.[2]

## Introduction

Through its EB-5 Immigrant Investor Program, the United States government invites wealthy foreign investors to invest money in U.S commercial enterprises. In return for their investment, the foreign investors gain entry into the United States as lawful permanent residents and a chance to receive a return on the money they are required under the program to put "at risk," that is, subject to potential partial or total loss.

The *Li* and *Cui* plaintiffs (collectively, "Plaintiffs") are disappointed investors who, as the *Cui* plaintiffs say, wanted a "return that is certain," Doc.190 ¶ 12. After having watched their investment for nearly a decade, Plaintiffs now are concerned they will realize the very investment risks that they explicitly were warned of and that they knowingly, voluntarily and willingly accepted when they made their investment. In pursuit of improving their return they have brought this lawsuit naming every entity and

---

[1] Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 (codified as amended in scattered sections of Title 15 of the United States Code).

[2] The two sets of plaintiffs assert the same factual grounds for their partially overlapping claims. To avoid repetition and promote efficiency, we suggest it makes sense for the SPO Defendants to submit a single motion to dismiss all the claims. It reduces attorney fees and the Court's work. Instead of filing two motions of up to 60 pages (Doc.196), we are filing one motion of 30 pages.

entity manager that might have touched their investment and advancing claims supported only by conclusory allegations and wishful thinking.

The gravamen of Plaintiffs' lawsuit against the SPO Defendants is that the SPO entities, with Mr. Knobel serving as their LLC manager, participated in a fraudulent scheme to trick each plaintiff into investing $500,000 into an unaffiliated entity, defendant Colorado Regional Center Project Solaris, LLLP ("CRCPS").

Plaintiffs face three devastating problems. One, nothing has happened to their investment. In lieu of a cash payment on the loan their partnership extended, CRCPS was tendered, and it controls the disposition of, the collateral—condominium units—securing the loan. They complain that in the current real estate market they can't sell the units and recover 100 percent of the loan amount, and they don't want to wait—they want *now* a positive investment return. But when they made their investment a decade ago, they were told the Vail real estate market and their patience were going to have a significant say in whether they eventually would have a positive or negative return. Any returns they ultimately realize, positive or negative, will not be a product of fraud but of investment risk and their decision making.

Two, whatever complaints they have about their investment and whatever are their hindsight disappointments with it, they have no factual basis to bring a lawsuit in the against the SPO Defendants, whom Plaintiffs do not allege had any contact with any of them. Plaintiffs make baseless, vague allegations of "conspiracy" and "collusion," but assert no well-pleaded facts showing the SPO Defendants did anything other than engage

in a loan transaction with CRCPS. With no ability to plead facts against the SPO

Defendants, Plaintiffs retreat to the twin refuges of pleading argumentative facts and

group pleading, but in this District neither tactic can save a legally insufficient complaint.

Three, Plaintiffs made their investments the better part of a decade ago. Every

claim they assert is time-barred by the applicable statute of limitations.

## Facts

The facts are drawn from Plaintiffs' complaints, their attachments, and the

documents referenced in and central to the complaints.[3]

Plaintiffs are 37—just over a fifth—of the 165 limited partners who invested, i.e.,

bought an interest, in CRCPS in 2011-2013. *See* Exhibit A, at 31:11-32:5[4]; Doc.203-2.

Before they invested, Plaintiffs received from CRCPS and its general partner Colorado

Regional Center I, LLC ("CRC I")[5] a private placement memorandum ("PPM") and

numerous documents supplying facts about the investment. Doc.222 ¶ 68.

---

[3]The Court may consider any document attached to the complaints or referenced in and central to the complaints. *See, e.g.*, Fed. R. Civ. P. 10(c); *Pace v. Swerdlow*, 519 F.3d 1067, 1072 (10th Cir. 2008).

[4]The *Li* plaintiffs' Third Amended Complaint ("LTAC") repeatedly relies on and references the October 22 hearing, *e.g.*, Doc.222 ¶¶ 42, 51 & 102; *id.* at 8 n.6, at which CRC I's manager testified unrebutted about the loan transaction.

[5]The LTAC's body says the "defendants" include CRC I; Colorado Regional Center LLC ("CRC"); Waveland Ventures LLC ("Waveland"); Waveland EB-5 Management LLC; and these entities' members. Doc.222 ¶¶ 10-14. However, the *Li* plaintiffs did not actually implead any of these "defendants" other than CRC I. *Id.* at [1].

(footnote cont'd on next page)

Each plaintiff bought an interest in CRCPS as part of the EB-5 program. *id.* ¶ 69, Doc.190 ¶¶ 57-57. Under the program foreign nationals receive conditional legal permanent resident status, i.e., a green card, upon a showing, *inter alia*, they have placed a certain amount of capital "at risk for the purpose of generating a return." 8 C.F.R. § 204.6(j)(2); *see Doe v. McAleenan*, 929 F.3d 478, 480-81 (7ᵗʰ Cir. 2019). To be "at risk" an investor must show "actual commitment of the required amount of capital." § 204.6(j)(2). A capital contribution is not "at risk" if made "in exchange for a note, bond, convertible debt, obligation, or *any other debt arrangement*." § 204.6(e)(ii) (emphasis supplied); *Wang v. USCIS*, 375 F. Supp. 3d 22, 27 (D.D.C. 2019). An investment is not at risk if part or all of it is guaranteed to be returned regardless of the success or failure of the business into which the investment is made. *Matter of Izummi*, 22 I. & N. Dec. 169, 184 (BIA 1998), *cited with approval in Wang*, 375 F. Supp. 3d at 27.[6]

CRCPS loaned the investment proceeds to SPO I, which owned and (via SPO) had developed a mixed-use, high-end luxury condominium and commercial-property project in Vail.[7] SPO I sought a loan to help pay off a construction loan. Doc.222 ¶ 27.

---

The body of the *Cui* plaintiffs' Third Amended Complaint ("CTAC") says the "defendants" include Waveland, CRC, CRC I, Mr. Hayes, and Does 1-10. Doc.190 ¶¶ 40-48. However, the *Cui* plaintiffs impleaded only Waveland and CRC I. *Id.* at 1.

[6]The USCIS designated *Izummi* as a "precedent decision" binding in proceedings adjudicating the sufficiency of EB-5 petitions. *Wang*, 375 F. Supp. 3d at 27.

[7]Before the first loan advance, SPO assigned its right, interest and obligations re the loan transaction to SPO I. SPO I assumed SPO's obligations under the Loan Agreement and Yield Enhancement Agreement. *See* Doc.222 ¶¶ 7, 16, 77; Doc.190 ¶ 15.

This action concerns Plaintiffs' investment in CRCPS and its loan to SPO I. The principal documents relating to the transaction, all referenced by and central to Plaintiffs' complaints, are:

- **PPM**, dated Mar. 31, 2011 (*e.g.*, Doc.222 ¶¶ 68-73, 87, 167; Doc.190 ¶¶ 19-20, 67-75), *filed as* Doc.222-3;

- **Loan Agreement**, dated Nov. 5, 2010 (*e.g.*, Doc.222-1 ¶¶ 31-34, 151-164; *see* Doc.190 ¶¶ 11 & 133), *filed as* Doc.222-1;

- **Yield Enhancement Agreement**, dated Nov. 5, 2010 (Doc.222 ¶ 31; Doc.190 ¶¶ 11, 13, 139-142), *filed as* Doc.203-5;

- **Promissory Note**, dated Apr. 18, 2012 (Doc.222 ¶¶ 31-34, 163-164; Doc.190 ¶¶ 15), *attached as* EXHIBIT B; and

- **Agreement Regarding Collateral Units**, dated Apr. 17, 2015 (*e.g.*, Doc.222 ¶¶ 80-81, 85-95, 154, 169; Doc.190 ¶¶ 81, 139-142), *filed as* Doc.203-7.

The PPM told prospective investors:

- "These securities are highly speculative and involve a high degree of risk . . . ." Doc.222-3, at 1[8] (all-uppercase omitted).

- Investors must rely only on information in the PPM. *Id.* at 2.

- "No representations or warranties of any kind are intended or should be inferred with respect to the economic return . . . ." *Id.* at 3 (all-uppercase omitted).

- CRCPS would loan "the proceeds of this offering," about $80 million, to SPO or its assignee; SPO would use the money to fund the development of a real estate project known as Solaris ("the Project"), consisting of 79 high-end condominium units and 70,000 sf of commercial space. *Id.* at 5.

---

[8]Page numbers are to the ECF page numbers at the top of the pages.

- SPO would issue a promissory note to CRCPS to pay the principal plus interest. Mr. Knobel personally guaranteed the interest payments due under the note. *Id.* at 6. The note would have these terms:

  - The principal amount would be $80 million; advances of principal would be made to SPO; interest, payable monthly, would at 5 percent per annum. *Id.* at 5.

  - SPO would have a right to prepay the note after three years from its issuance date. *Id.* The principal balance and all unpaid interest were due five years from the date of each loan advance. *Id.*

  - After three years following a loan advance, SPO had the right to tender (a) cash, or (b) the condominium unit securing the note for that advance; if SPO prepaid with cash, CRCPS had the right under the Yield Enhancement Agreement (which was attached as Ex.K to the PPM) to reject SPO's cash payment and buy the unit at its list price. *Id.*

SPO and SPO I are Delaware (or Colorado, Doc.190 ¶ 45) limited liability companies qualified to do business in Colorado. Doc. 222 ¶¶ 15-16; Doc.190 ¶¶ 44-45. Their manager is Mr. Knobel. *See* Doc.222-3, at 6, 21, 38. None of the SPO Defendants has owned any interest in the other defendants. *See* Exhibit A, at 17:10-13; *see generally* Docs. 222 & 190. None of the SPO Defendants has directed or controlled any of the other defendants' activities in connection with the sale or purchase of CRCPS interests. None of the SPO Defendants has any relationship with any of the Plaintiffs. Neither of Plaintiffs' complaints contains any well-pleaded fact alleging otherwise. Except in improper group-pleading allegations, none of the Plaintiffs alleges the SPO Defendants ever communicated with them.

As contemplated under the PPM, CRCPS and SPO/SPO I entered into a loan agreement and related loan documents, including a Promissory Note and the Yield

6

Enhancement Agreement. *E.g.*, Doc.222 ¶¶ 31, 76; Doc.190 ¶¶ 11, 13, 15-16, 87. The agreement emerged from meetings before November 2010 between Mr. Knobel as SPO's representative and CRC I manager Hayes. Doc.222 ¶ 29.

CRCPS's loan as described in the PPM and loan documents had common loan features, e.g., the lender made loan advances, the borrower was required to pay interest, and the borrower was required to pay the principal balance plus all accrued interest at the end of the loan term. *See* Doc.222-1; Exhibit B; Doc.190 ¶ 11. However, it was not a traditional loan. Exhibit A, at 28:8. It involved more risk than a typical commercial loan. For example, as the PPM notified potential investors, during the prepayment period at the three-year anniversary of each loan advance:

- The borrower had the right to prepay the loan advance either by paying cash *or* tendering the collateral, i.e., the condominium unit(s) securing the loan advance ("Collateral Units"). Doc.222-3, at 5; Doc.222-1, at 3-4.

- If the borrower prepaid with cash, CRCPS had the right to reject the cash prepayment and instead buy the Collateral Unit securing the loan advance by crediting the unit's purchase price against the loan advance. Doc.222-3, at 5; Doc.203-5, at 2 ¶ 3.

From these terms it followed that the real estate market for high-end luxury condominium units in Vail would be highly influential in CRCPS's and SPO I's prepayment decisions. Depending on whether the real estate market went up, SPO I would be economically incentivized to pay off a loan advance with cash, and CRCPS would be economically incentivized to reject the cash and require conveyance of the Collateral Unit. *See generally* Exhibit A, at 19:11-20:20.

7

CRCPS ultimately raised $82.5 million from the investors. Doc.222 ¶¶ 74-75; Doc.190 ¶ 4. CRCPS loaned that amount to SPO I in a series of nineteen advances. Doc.222 ¶ 79; Doc.190 ¶ 79. Each of the loan advances—the first was made April 18, 2012; the last, January 30, 2015—was secured by a Collateral Unit with an approximate value equal to the advance. Some units were worth less and some more than a given loan advance. Doc.222-4. However, the aggregate estimated value of the units was equal to the aggregate loan advances, i.e., $82.5 million. *See id.*

In the Loan Agreement dated November 5, *2010*, CRCPS and SPO/SPO I agreed on each unit's estimated market value. *See* Doc.222-1, at 1. Plaintiffs allege the agreed estimated market value was based on SPO I's "unrealistic list prices" or "inflated [sales] prices." Doc.222 ¶ 34; Doc.190 ¶¶ 75-76. Before August 5, 2016, the limited partners engaged a real estate valuation firm, HVS, to conduct an independent investigation into "why loan [sic] was so undercollateralized with only 19 units." Doc.222 ¶¶ 100-101; Doc.190 ¶ 82. HVS issued a report undermining Plaintiffs' allegation. The report found, "As of *March 2011*, [SPO I] had already sold at least 18 units, *all of them at or near the list prices*. The project sales pace dramatically slowed in 2011, and have been basically unchanged since *2012* . . . ." Doc.222-6, at 3 (emphasis supplied); *see* Doc.190 ¶ 82.

In April 2015 SPO I notified CRCPS it intended to prepay each advance by conveying title to the Collateral Unit correlating to that advance. *See* Doc.222 ¶¶ 80-81; Doc.190 ¶ 16. The conveyances would have required CRCPS's limited partners to pay about $1 million in HOA dues, taxes and other payments. *See* EXHIBIT A, at 40:22-41:11;

8

Doc.222, at 3 & ¶¶ 85-86, 92; Doc.190 ¶¶ 139, 148. CRCPS avoided the payments by entering into the Agreement Regarding Collateral Units ("ARCU"). Exhibit A, at 41:7-18; Doc.203-7, at 3 ¶ D. Under the ARCU, SPO I agreed to hold the Collateral Units unless and until (i) CRCPS and SPO I sold a unit to a third party, (ii) SPO I notified CRCPS of its intent to convey a unit to CRCPS; (iii) CRCPS directed SPO I to convey a unit to CRCPS; or (iv) CRCPS directed SPO I to convey a unit to one or more limited partners. Doc.203-7, at 4 ¶ 4; *see generally* Exhibit A, at 40:22-42:10. Two (actually, three as of a few months ago) of the nineteen Collateral Units were sold, and SPO I conveyed title under the ARCU. *See* Doc.222, at 2-3, ¶¶ 101-102 & n.14; Doc.190 ¶¶ 79 n.4, 81.

## The *Li* and *Cui* Claims

After three attempts, each set of Plaintiffs has settled on their respective third amended complaints. The *Li* plaintiffs are still amending. On May 29 the *Li* plaintiffs abruptly announced they are voluntarily dismissing all direct claims, leaving three derivative claims lodged against the SPO Defendants: Claims 2, 3 and 6. Doc.210, at [1]-2. On June 10 the *Li* plaintiffs filed an "amended" Third Amended Complaint ("LTAC"). Doc.222. The *Li* and *Cui* complaints have one common claim—breach of the Loan Agreement—asserted against SPO I. Plaintiffs' claims directed at the SPO Defendants are set forth in the table below:

### Plaintiffs' Claims Against One or More of the SPO Defendants

| Li Plaintiffs | | | Cui Plaintiffs | | |
|---|---|---|---|---|---|
| Claim No. | Claim | Asserted Against | Claim No. | Claim | Asserted Against |
| 2 | Civil Theft (derivative) | SPO Defendants | 1 | Fraud (direct) | SPO Defendants |
| 3 | Breach of Loan Agreement (derivative) | SPO I | 6 | Breach of Loan Agreement (direct and derivative) | SPO I |
| 6 | Colorado Securities Fraud (derivative) | [Unclear]* | 3 | Colorado Consumer Protection Act (direct) | SPO Defendants |
| | | | 5 | Federal Securities Fraud (direct) | [Unclear]* |
| | | | 7 | Declaratory Judgment re YEA and ARCU (direct and derivative) | SPO; SPO I |
| | | | 8 | Veil Piercing (direct) | SPO I |

*The claim heading says it is asserted against one or more of the SPO Defendants, but the prayer for relief in the claim seeks relief against different defendants.

## Argument

In assessing a complaint's legal sufficiency, Rules 8 and 9(b) inform Rule 12(b)(6).

*See Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). Rule 8's pleading

standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me

accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It requires more than "labels and

conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* (internal

quotations omitted). "Nor does a complaint suffice if it tenders naked assertions devoid

of further factual enhancement." *Id.* (internal quotations and brackets omitted).

"[C]onclusory statements[] do not suffice." *Id.* For its part, Rule 9(b) imposes a

"heightened pleading standard" for fraud claims. *Tellabs*, 551 U.S. at 319.

10

In addition to requiring compliance with Rules 8 and 9(b), Rule 12(b)(6) imposes a second requirement. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face." *Iqbal*, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While the "plausibility standard" is not akin to a probability requirement, "it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Accordingly, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotations omitted).

The Supreme Court in *Iqbal* suggested a Rule 12(b)(6) approach for trial courts:

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.* at 679.

## I. Plaintiffs' complaints fail because they are no more than conclusions and therefore are not entitled to the assumption of truth.

Taking *Iqbal*'s suggestion, we begin by identifying the pleadings that are no more than conclusions and argument, entitled to no assumption of truth.

**The Li plaintiffs' complaint.** These plaintiffs named SPO, SPO I and their manager Mr. Knobel, who plaintiffs claim is SPO's and SPO I's sole equity owner. Their complaint reveals no factual basis for naming either entity, let alone their manager.

Of these plaintiffs' ninety-four factual allegations, all but a handful are conclusions and argument that should be disregarded under *Iqbal*. In the handful of well-pleaded factual allegations, the *Li* plaintiffs allege SPO and SPO I were parties to various loan documents. Doc.222 ¶¶ 29, 31-35, 61, 74-78, 81. Nothing in these factual allegations or in the loan documents, which speak for themselves, gives rise to a claim for relief that is "plausible on its face," *Iqbal*, 556 U.S. at 678.

*Iqbal* teaches that when a complaint only pleads facts that at best suggest a defendant's actions might be or are consistent with liability, it fails to meet the plausibility standard. The *Li* plaintiffs all but confess this failure: they repeatedly offer two alternative explanations for conduct—a culpable one and a non-culpable one. For example: In Paragraphs 55-57 they argue that in entering into the Loan Agreement CRCPS made a *mistake* "as a matter of basic finance"; and they offer contract terms they believe would have improved the agreement for them, such as "capp[ing] the maximum gain or loss" on the loan. In Paragraph 92 they complain about the ARCU yet concede it "might save a bit of money" (it saved about $1 million, EXHIBIT A, at 40:22-41:11).

The LTAC also engages in improper group pleading, in violation of Rule 8(a). In *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008), the Tenth Circuit affirmed a 12(b)(6) dismissal in part because of group pleading:

We need not speculate [about which defendant engaged in which act], because the burden rests on the plaintiffs to provide fair notice of the grounds for the claims made against each of the defendants. Given the complaint's use of either the collective term "Defendants" or a list of the defendants named individually but with no distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed.

*Accord Lewis v. Strong*, No. 09-cv-2861, 2010 WL 2232359, at *2 n.2 (D. Colo. June 2, 2010). As discussed above in footnote 5, at p.3, the LTAC's references to defendants are a mess. The "defendants" in the caption do not match the "defendants" in the body (*see* Doc.222 ¶¶ 9-18). So it is impossible to say who are the "defendants" group-pleaded in Paragraphs 57, 68 and 76.

**The *Cui* plaintiffs' complaint.** The CTAC fares even worse under Rule 8(a). Like the LTAC, the CTAC's caption conflicts with its list of "defendants" in the body (*see* Doc.190 ¶¶ 40-48). But these plaintiffs make the 8(a) problem worse. The CTAC defines "Defendants" to create a *third* category of defendants. This category encompasses all the defendants listed in the body *except* CRC I, which is the general partner of impleaded defendant CRCPS.[9] *See* Doc.190 ¶ 49. To make matters worse, group pleading is prevalent in the CTAC. It makes more than seventy allegations concerning the defined "Defendants." Without distinguishing among and between the "Defendants," whoever they may be in the CTAC, the *Cui* plaintiffs for each claim assert

---

[9] The third category includes "CRC," referring to Colorado Regional Center, LLC. *Id.* ¶ 41. But CRC is not the general partner; CRC I is. *See* Doc.222-1, at 13.

that "Defendants" committed every act. *See generally* Doc.190, Claims 1-8. As a result the complaint is an unrecognizable brew of indiscriminate claims. For example, Paragraph 96 alleges "Defendants" caused their agents to mislead Chinese nationals, but there is no allegation any of the SPO Defendants ever used Chinese agents. Paragraph 131 alleges "Defendants" have failed to transfer title to Collateral Units, yet only one of the "Defendants" holds title to the remaining units. The CTAC is not a viable complaint.

The *Iqbal* exercise reveals the CTAC shares the same problems as the LTAC— heavy on conclusions and arguments, light on well-pleaded facts. For example, Paragraph 65 alleges Waveland and CRC (but not CRC I) gave misleading information to Chinese agents marketing the investment to potential investors. In the next paragraph the CTAC alleges conclusorily that these "representations [were made by] Waveland, CRC and *SPO*." Doc.190 ¶ 66 (emphasis supplied). As another example, after discussing the agents' marketing efforts, the CTAC alleges without any factual development: "Waveland, CRC and SPO reviewed and approved the marketing materials." *Id.* ¶ 68.

The LTAC's and CTAC's Rule 8(a) failings are many and serious. These complaints fail to satisfy the threshold *Iqbal* viability test.

## II.  **Plaintiffs' tort claims fail to state a claim for relief.**

Plaintiffs have asserted five tort claims against one or more of the SPO Defendants: civil theft (*Li*); Colorado securities fraud (*Li*); Colorado Consumer Protection Act ("CCPA") (*Cui*); fraud (*Cui*); and federal securities fraud (*Cui*). None is viable.

A.   **The tort claims are premised on two acts of "fraud"; Plaintiffs do not come close to pleading facts in support of either.**

In their two derivative tort claims (theft and Colorado securities fraud), the *Li* plaintiffs allege one fraudulent act—one or more of the SPO Defendants gave CRCPS "wildly inflated" and "misleading and fraudulent valuations" of the Collateral Units. Doc.222 ¶¶ 134-136, 148, 201, 203-04, 209. In their direct and derivative tort claims (fraud and federal securities fraud), the *Cui* plaintiffs allege two fraudulent acts against one or more of the SPO Defendants: (1) misrepresenting and concealing material facts in investment materials given to plaintiffs; and (2) using "inflated prices" for the Collateral Units' value. Doc.190 ¶¶ 19, 76, 82, 88.

**Value of Collateral Units.** Plaintiffs' premise is that the SPO Defendants owed CRCPS some duty to provide it with a kind of talismanic "fair market value" of the units. That is not what CRCPS and SPO I agreed to.

The Loan Agreement, which CRCPS signed November 5, *2010*, provided that SPO I would secure each loan advance with a condominium unit. Doc.222-1 ¶ 8, at 3. Each unit within the pool of condominium units eligible for use in securing advances would have an agreed "*estimated* market value." *Id.* at 1 (defining "Collateral Unit Value"; emphasis supplied). In a separate agreement dated April 1, *2011*, addressing selection of the Collateral Units, CRCPS and SPO I agreed the pool of units from which the subset of Collateral Units would be selected consisted of all units available for sale. Doc.203-4 ¶ 8, at 3; *see* Doc.222 ¶ 61. CRCPS via its general partner was entitled to select

15

the Collateral Units, including the more desired units with a direct view of Vail Mountain. Doc.203-4 ¶ 8(a); Doc.222 ¶ 61.

As Plaintiffs' own real estate valuation firm HVS concluded, "As of *March 2011*, [SPO I] had already sold at least 18 units, *all of them at or near the list prices*." Doc.222-6, at 3 (emphasis supplied); *see* Doc.190 ¶ 82. Accordingly, assuming Plaintiffs are correct that the Collateral Units were being valued under the Loan Agreement at their list prices, the list prices are powerful evidence of the units' estimated market value as of 2011. *See, e.g.*, *Fountain v. Mojo*, 687 P.2d 496, 500 (Colo. App. 1984) (fair market value is "the price the property could have been sold for under those circumstances where the owner was willing to sell and the purchaser was willing to buy"; contract executed in January 1979 "constituted sufficient evidence of the market value of the residence had [it] been conveyed to plaintiffs on January 15, 1979").

**Alleged fraudulent investment materials.** The *Cui* plaintiffs' claim that the SPO Defendants misrepresented/concealed facts in the investment materials requires well-pleaded facts that (1) the SPO Defendants prepared the materials or conspired with others in preparing them; and (2) the materials were fraudulent. The *Cui* plaintiffs suggest SPO I was involved with the investment information CRC I gave to its Chinese agents. Doc.190 ¶¶ 65-66. But their own allegations contradict each other—one paragraph alleges Waveland provided the information; the next paragraph alleges it was Waveland, CRC I and SPO I. *See id.* Regardless plaintiffs fail to plead any non-conclusory facts that any of the SPO Defendants prepared or conspired with anyone to provide any

16

information to plaintiffs. *See* Doc.190 ¶¶ 65-66, 68, 77, 81-82, 87, 88. As to the SPO Defendants, the only claim the investment materials were fraudulent relates to the Collateral Units' alleged overvaluation. As set forth in the previous two paragraphs, Plaintiffs' own pleadings show the units' valuation complied with the Loan Agreement.

### B. The *Li* plaintiffs' derivative civil theft claim (LTAC Claim 2) is deficient.

To plead theft a plaintiff must allege facts showing (1) defendant knowingly obtained control over plaintiff's property without authorization or by deception; and (2) with the specific intent to permanently deprive plaintiff of the property. *Electrology Lab., Inc. v. Kunze*, 169 F. Supp. 3d 1119, 1161 (D. Colo. 2016).

This claim rests on the factual premise that the Collateral Units' value was "wildly inflated and only had half [the loan] value," Doc.222 ¶ 134. By plaintiffs' own admission *via* their expert consultant HVS, the $82.5 million loan in 2011 was fully collateralized 1:1 by the Collateral Units with an estimated market value of $82.5 million. *See* Doc.222-4. As discussed above at pp.15-16, the units' valuation was an accurate estimate of their market value. This removes the factual premise undergirding the theft claim.

### C. The *Li* plaintiffs' derivative Colorado securities fraud claim (LTAC Claim 6) and the *Cui* plaintiffs' direct fraud claim (CTAC Claim 1) and federal securities fraud claim (CTAC claim 5) are deficient.

**The *Li* plaintiffs have no viable derivative state securities fraud claim.** The *Li* plaintiffs' derivative claim is brought on behalf of CRCPS. CRCPS was the *seller* and *marketer* of the securities these plaintiffs are alleging were fraudulent. It did not *buy* any

17

securities. It has no standing to assert a securities fraud claim. We adopt and incorporate by reference the CRC Defendants' Argument B.3. Doc.203, at 22.

**Plaintiffs failed to plead their fraud claims with particularity.** Plaintiffs failed to plead the fraud and federal and state securities fraud claims under the heightened pleading standards of Rule 9(b) and the PSLRA. As to the SPO Defendants, Plaintiffs' complaints do not provide the most basic information Rule 9(b) requires. *See, e.g.*, *Tatten v. Bank of Am. Corp.*, 912 F. Supp. 2d 1032, 1041 (D. Colo. 2012) (dismissing fraudulent misrepresentation claim because it "failed to set forth the who, what, when, where and how of the alleged fraud"), *cited with approval in Reich v. Genzyme Corp.*, No. 14-cv-01684-RM-MJW, 2015 WL 5842418, at *6 (D. Colo. Oct. 7, 2015). Nor do they comply with the stringent and heightened PSLRA pleading standards. *See Tellabs,* 551 U.S. at 321. We adopt and incorporate by reference the CRC Defendants' Argument A.2. and B.2. Doc.203, at 12-18, 19-22.

**The LTAC fails to plead a claim for state securities fraud.** The *Li* plaintiffs assert a derivative securities fraud claim against "Knobel personally"[10] under section 11-51-501, C.R.S. (2019). To state a claim under the statute the *Li* plaintiffs were required to allege facts plausibly showing at least that (1) one or more of the SPO Defendants made an untrue statement or omission of a material fact in connection with the sale of a

---

[10]While the heading of Count 6 says the claim is lodged against "Knobel personally," the prayer for relief says it is lodged against "[SPO I] and [its] affiliates and principals." This is a Rule 8(a) violation.

security; and (2) the SPO Defendants knew, or in the exercise of reasonable care could have known, of the untruth or omission. *FDIC v. RBS Accept. Inc.*, No. 14-cv-00418-PAB-NRN, 2020 WL 491202, at *4 (D. Colo. Jan. 30, 2020). None of these facts is well-pleaded in the LTAC.

The factual basis of the claim is the *Li* plaintiffs' allegation that Mr. Knobel "personally" used the "wildly inflated" sales price of Collateral Units as their estimated market value. Doc.222 ¶ 203. Setting aside the conclusory nature of the allegation, the allegation is insufficient to state a securities fraud claim. One, as discussed above, *see* pp.15-16, the units' sales prices were a fair estimate in 2011-2012 of fair market value as required under the Loan Agreement. Two, the report from HVS, Plaintiffs' own expert valuation consultant, confirmed that there was no reason for the SPO Defendants to believe its sales prices were not a fair estimate of the units' market value.

Since "the major thrust" of securities fraud and common law fraud "is identical," *Sandefer v. Dist. Court,* 635 P.2d 547, 551 (Colo. 1981), *overruled on other grounds*, *Ingold v. AIMCO/Bluffs, L.L.C. Apts.*, 159 P.3d 116 (Colo. 2007), the same analysis applies to the *Li* plaintiffs' derivative common law fraud claim. As to the *Cui* plaintiffs' direct common law fraud claim, they were required to plead facts showing at least that the SPO Defendants made a false representation or concealed a material fact, and knew of the representation's falsity or knew they were concealing a material fact. *See Morrison v. Goodspeed*, 68 P.2d 458, 462 (Colo. 1937). The *Cui* plaintiffs did not do that.

Nowhere do they allege that any of the SPO Defendants had any contact with any of them, let alone that the SPO Defendants made any misrepresentations to them at any time. They claim the misrepresentations and omissions are "set forth in detail above in paragraphs, *inter alia*, 56, 66, 68, 70, 73 and 74." Doc.190 ¶ 94. Yet none of those paragraphs "details" any of the SPO Defendants' alleged misrepresentations/omissions. Paragraph 66 refers to promotional information provided to CRCPS's "agents" in China, but it contains no non-conclusory allegations of communications by the SPO Defendants.

When a plaintiff alleges fraudulent nondisclosure, she "must show that the defendant had a duty to disclose material information." *Leprino Foods Co. v. DCI, Inc.*, No. 13-CV-2430-RM-KMT, 2017 WL 57256, at *5 (D. Colo. Jan. 3, 2017), *aff'd*, 727 Fed. App'x 464 (10th Cir. 2018). Plaintiffs have pleaded no facts from which this Court could conclude the SPO Defendants had a duty to disclose any information to them.

**Plaintiffs' securities fraud and fraud claims are time-barred.** In opposition to the *Li* plaintiffs' securities fraud claim and the *Cui* plaintiffs' fraud and securities fraud claims, in the alternative to the other grounds for dismissal of the fraud claims, we adopt and incorporate by reference the CRC Defendants' Argument A.1 and B.1. Doc.203, at 10-12, 18-19.

### D.   The *Cui* plaintiffs' direct CCPA claim (CTAC Claim 3) is deficient.

To state a CCPA claim the plaintiff must allege facts that the defendant engaged in an unfair or deceptive trade practice, and the challenged practice significantly impacts the public as actual or potential consumers of the defendant's goods, services or property.

20

*Platt v. Winnebago Indus., Inc.*, No. 18-1408, 2020 WL 2893227, at *8 (10th Cir. June 3, 2020). "To prove a deceptive trade practice, the plaintiff must show that a defendant knowingly made a false representation." *O'Connor v. BMW of N. Am., LLC*, No. 18-cv-03190-CMA-STV, 2020 WL 2309617, at *12 (D. Colo. Jan. 7, 2020) (internal quotations and brackets omitted), *report and recommendation adopted*, No. 18-cv-03190-CMA-STV, 2020 WL 1303285 (D. Colo. Mar. 19, 2020). The CCPA also prohibits "failing to disclose material information concerning goods, services, or property" if the information was known at the time of an advertisement or sale if the failure to disclose was intended to induce the consumer to enter into a transaction. *Id.* (internal quotations and brackets omitted). The *Cui* plaintiffs failed to plead facts in support of these elements.

The CTAC alleges "Defendants" engaged in an unfair or deceptive trade practice "as described in paragraphs, *inter alia*, 56, 66, 68, 70, 73 and 74." Doc.190 ¶ 113. Paragraphs 66 and 68 allege SPO reviewed, approved or otherwise was responsible for marketing materials given to Waveland's Chinese agents. The allegations are conclusory; they are entitled to no assumption of truth. The other paragraphs say nothing about the SPO Defendants. The CTAC does not further identify what unfair/deceptive trade practices the SPO Defendants allegedly engaged in.

Except for a conclusory one (Doc.190 ¶ 115) the CTAC contains no allegation that any practice of SPO Defendants impacts the public as actual or potential consumers of their services or property. The SPO Defendants are developers of the Solaris project. Doc.190 ¶¶ 3 & 4. None of the allegations of misconduct conclusorily alleged against the

SPO Defendants—i.e., providing inflated sales prices to a lender—impacts actual or potential public consumers of the SPO Defendants' services or property.

CCPA claims must be pleaded with the particularity required of fraud claims under Rule 9(b). *O'Connor*, 2020 WL 2309617, at *12. The CTAC contains no CCPA-related facts pleaded with particularity.

We adopt and incorporate by reference the CRC Defendants' Argument D. Doc.203, at 25-26.

### III. Plaintiffs' contract claims fail to state a claim for relief.

#### A. The *Li* plaintiffs' derivative and *Cui* plaintiffs' direct and derivative breach of contract claims (LTAC Claim 3; CTAC Claim 6) are deficient.

The *Li* plaintiffs assert against SPO I a derivative claim for breach of the Loan Agreement. Doc.222 ¶¶ 150-164. The *Cui* plaintiffs assert against SPO I a direct and derivative claim for breach of the Loan Agreement. Doc.190 ¶¶ 125-134.

**The *Cui* plaintiffs lack standing to assert a direct claim for breach of the Loan Agreement.** Limited partners cannot bring a direct action against a third party whose action causes harm only to the partnership. *See Tisch v. Tisch*, 439 P.3d 89, 103 (Colo. App. 2019). They lack standing to maintain a direct action in their own capacity unless they have sustained an injury separate and distinct from that suffered by their partnership. *See River Mgmt. Corp. v. Lodge Props. Inc.*, 829 P.2d 398, 403 (Colo. App. 1991).

The *Cui* plaintiffs have no standing to assert a direct claim against SPO I. They could not have suffered personal harm from a breach of an agreement to which they were

22

not a party separate and distinct from the partnership's harm. They have alleged no such harm. Any harm from the alleged breach could only be to CRCPS.

**Plaintiffs' claim is barred as a matter of law.** A breach of contract claim predicated on a faulty legal proposition must be dismissed. *MidCities Metro. Dist. No. 1 v. U.S. Bank Nat'l Ass'n*, No. 12-CV-03322-LTB, 2013 WL 3200088, at *7 (D. Colo. June 24, 2013). To state a claim for breach of contract, a plaintiff must allege facts showing, among other things, plaintiff's performance or some justification for nonperformance and defendant's failure to perform the contract. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992). Plaintiffs allege SPO I breached the Loan Agreement because it has not paid back the $82.5 million principal and has not conveyed title to the Collateral Units to CRCPS. Doc.222 ¶¶ 151-153; Doc.190 ¶¶ 128-129. As a matter of law SPO I has not breached the Loan Agreement.

In April 2015 SPO I elected to exercise its right under the Loan Agreement to prepay all the loan advances totaling $82.5 million by conveying to CRCPS title to the Collateral Units. *See* Doc.203-7, at 2-3. CRCPS entered into a contract with SPO I, the ARCU, under which SPO I would "temporarily refrain" from conveying title to the units to CRCPS until CRCPS requested conveyance. *Id.* at 3, 4. The ARCU effectively supplemented, "modif[ied]",[11] Doc.190 ¶ 140, or otherwise amended the Loan

---

[11] *See Reynolds v. Farber*, 577 P.2d 318, 321 (Colo. App. 1978) (permitting modification of contract where parties mutually consent).

Agreement's terms governing SPO I's discharge of its payment obligations explicitly permitting it to hold title to the units. SPO I has complied with the ARCU. To date CRCPS has requested conveyance of two of the nineteen Collateral Units, and SPO I has conveyed both. *See* Doc.222, at 2-3 & ¶¶ 102.

**The ARCU remains in effect.** The *Li* plaintiffs argue the ARCU has "expired" because it was entered into "5 years ago, and any 'temporary' period has expired." Doc.222 ¶ 155. Even if this were a proper factual allegation, which it isn't, the argument is wrong. One, in a claim for breach of one contract, the Loan Agreement, the *Li* plaintiffs cannot challenge the validity and enforceability of *another* contract that modifies, supplements or otherwise amends the first contract. They certainly may not do so without requesting judicial relief from the legal effect of the second contract, i.e., the ARCU, which they did not do.

Two, the word "temporarily" in the context of the ARCU cannot be interpreted to contemplate its expiration within any specified time period. Words in contracts should be given their plain meaning according to common usage. *Aurzadniczek v. Humana Health Plan, Inc.*, No. 15-cv-00146-RM-KMT, 2016 WL 1266972, at *8 (D. Colo. Apr. 1, 2016). "Temporarily," in common usage, does not have a maximum number of years. The dictionary definition of "temporarily" is "during a limited time." *Temporarily*, *Merriam Webster Dictionary*, https://www.merriam-webster.com/dictionary/temporarily (last visited June 9, 2020). In common usage, there is no limit in days, months, or years, on what "temporarily" means. Regardless, where no durational limit is expressed in the

24

contract, courts will "not give it a duration beyond the manifest purpose and object for which it was intended." *Miller v. Miller*, 134 F.2d 583, 589 (10th Cir. 1943). Here, the real party in interest in the *Li* plaintiffs' derivative claim, CRCPS, entered into an agreement that required SPO I to refrain from conveying title to the unit until CRCPS directed otherwise. Doc.203-7, at 4. CRCPS, in short, holds and always has held the keys to the duration of SPO I's temporary refrainment. So it hardly can be heard to complain about the duration of SPO I's forbearance.

**The ARCU was supported by consideration.** The *Li* plaintiffs argue the ARCU "lacks consideration and is unenforceable *ab initio*" because "there is danger in allowing another party to hold title" to the Collateral Units and the ARCU "imposes costs on CRCPS in excess of benefits." Doc.222 ¶ 156. The argument is meritless.

Consideration is a requirement for an enforceable contract, but it has been "greatly limited through decades of case law developed by the Colorado Supreme Court." *Hatlee v. Hardey*, No. 13-cv-02469-RM-MJW, 2015 WL 5719644, at *11 (D. Colo. Sept. 29, 2015), *aff'd in part sub nom. Hatlee v. Olds*, 665 Fed. App'x 695 (10th Cir. 2016). The supreme court "'has long held that any benefit to a promisor or any detriment to a promisee at the time of the contract—no matter how slight—constitutes adequate consideration.'" *Id.* (quoting *Lucht's Concrete Pumping, Inc. v. Horner*, 255 P.3d 1058, 1061 (Colo. 2011).

A court evaluating a disputed contract need only find some consideration, "'regardless of its relative value[,] to support the enforceability of that contract." *Id.*

(quoting *Lucht's Concrete Pumping*, 255 P.3d at 1061). The contracting parties' actual loss or detriment or actual benefit is irrelevant. *Lucht's Concrete Pumping*, 255 P.3d at 1061. "'Except in extreme circumstances, such as those involving allegations of unconscionability, a court should not judge or attempt to assess the adequacy of the consideration.'" *Hatlee*, 2015 WL 5719644, at *11 (quoting *Lucht's Concrete Pumping*, 255 P.3d at 1061). Consideration may take the form of some right, interest, profit, or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by the other. *Id.* (internal quotations omitted).

CRCPS through the ARCU secured SPO I's forbearance from conveying the Collateral Units. This was a $1 million benefit to CRCPS. *See* EXHIBIT A, at 40:22-41:11; Doc.222, at 3 & ¶¶ 85-86, 92; Doc.190 ¶ 139. Based on "the exceedingly broad and inclusive standard established under Colorado Supreme Court jurisprudence regarding the doctrine of consideration," *Hatlee*, 2015 WL 5719644, at *12, this was adequate consideration.

The *Li* plaintiffs admit CRCPS received benefits from the ARCU but argues it "imposes costs on CRCPS in excess of benefits." Doc.222 ¶ 171. The *Cui* plaintiffs argue the ARCU confers "tremendous benefits" to CRC I and SPO I but provides "no benefits" to CRCPS. Doc.190 ¶ 140. Both sets of plaintiffs are misguided. Courts don't "attempt to assess the adequacy of consideration,"[12] let alone weigh the "relative

---

[12] *Hatlee*, 2015 WL 5719644, at *11 (internal quotations omitted).

value"[13] of the benefits and costs the parties received or suffered. *Cui*'s conclusory allegation CRCPS received no benefits from either contract is entitled to no assumption of truth. Regardless, in both contracts CRCPS explicitly acknowledged it received "sufficien[t]," "good and valuable consideration." Doc.203-7, at 4; Doc.203-5, at 2.

## B. The *Cui* plaintiffs' direct and derivative claim for declaratory judgment (CTAC Claim 7) is deficient.

The *Cui* plaintiffs seek a declaratory judgment invalidating the Yield Enhancement Agreement and the ARCU. The claim should be dismissed.

These plaintiffs have no standing to assert a direct claim for declaratory judgment as to the contracts, to which none of the plaintiffs is a party. *See* This Mot., at 26.

The Court should decline to consider the claim. The Declaratory Judgment Act of 1934, 28 U.S.C. § 2201 (2012), "confers a discretion on the courts rather than an absolute right upon the litigant." *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241 (1952); *see Kunkel v. Cont'l Cas. Co.*, 866 F.2d 1269, 1273 (10th Cir. 1989). Among the factors a court should consider when deciding whether to entertain a declaratory judgment claim are whether the action "would settle the controversy," whether it would serve a useful purpose in clarifying the legal relations at issue, and whether the declaratory remedy is being used merely for "procedural fencing." *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994). None of these factors weighs in favor of

---

[13] *Id.*

entertaining the claim. The claim serves no useful purpose. Even if both contracts were invalidated, SPO I was authorized under the Loan Agreement and Promissory Note to prepay any and all loan advances by conveying Collateral Units to CRCPS. Additionally, as noted above, pp.25-26, CRCPS has the right under the ARCU to request conveyance of the Collateral Units to it at any time.

The *Cui* plaintiffs argue there is "[a] genuine dispute . . . as to the[ir] enforceability" because of lack of consideration. Doc.190 ¶¶ 141-42. That is wrong. There is no non-frivolous dispute over the contracts' consideration and enforceability.

As discussed above, p.25, consideration has a low threshold. The ARCU is supported by consideration. *See* This Mot., at 26.

So is the Yield Enhancement Agreement ("YEA"). In the Loan Agreement SPO I gave CRCPS certain rights as to the Collateral Units. Doc.203-5 ¶ D, at 2. The YEA memorialized those rights. *Id.* ¶ E, at 2. Among the rights the YEA memorialized was CRCPS's right to refuse SPO I's cash repayment of a loan advance and instead require SPO I to convey the Collateral Units to CRCPS. *Id.* ¶ 3, at 2-3. This was a substantial benefit: if the market value of the units rose, they potentially would be worth significantly more than the loan advance. Accordingly the YEA was supported by more than adequate consideration.

Alternatively, CTAC Claim 7 as to the YEA should be dismissed because of laches. *See United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001). A declaratory judgment claim that seeks construction of a contract and no relief akin to damages is an

equitable claim. *Manning v. United States*, 146 F.3d 808, 813 (10th Cir. 1998). Accordingly it is subject to laches. *Barnett v. Surefire Med., Inc.*, 342 F. Supp. 3d 1167, 1171 (D. Colo. 2018). A case may be dismissed on the equitable defense of laches when three elements are present: full knowledge of the facts by the party against whom the defense is asserted; unreasonable delay by the party against whom the defense is asserted in pursuing an available remedy; and intervening reliance by and prejudice to the party asserting the defense. *In re Marriage of Johnson*, 2016 CO 67 ¶ 16.

Plaintiffs have known of the YEA since before they invested. The YEA was attached as Exhibit K to and referenced repeatedly in the PPM. *See* Doc.222-3, at 4, 6-7, 15, 53, 166-69. Their partnership CRCPS and SPO signed the agreement in 2010, nearly a decade ago. Doc.203-5, at 2. CRCPS and SPO's assignee SPO I have discharged all their promises under it. Until SPO I elected to prepay the loan advances by conveying Collateral Units, CRCPS held the valuable option to reject SPO I's cash prepayment. The Court should apply laches to the declaratory judgment claim as to the YEA.

## IV. The *Cui* plaintiffs' direct veil-piercing "claim" (CTAC Claim 8) is deficient.

The veil-piercing "claim" is dependent upon the *Cui* plaintiffs' prevailing on a direct claim. However, they can prevail on none of them.

Veil piercing is not a viable claim for relief—it is a procedure to enforce an underlying judgment. *See Swinerton Builders v. Nassi*, 272 P.3d 1174, 1177 (Colo. App. 2012).

29

Even if it were a claim, the plaintiffs pleaded no non-conclusory facts in support of it. *See* Doc.190 ¶¶ 146-149. We adopt and incorporate by reference the CRC Defendants' Argument G. Doc.203, at 27-28.

## Conclusion

The Court should dismiss the LTAC and CTAC.

June 10, 2020

Respectfully submitted,

*s/ Ty Gee*
Harold A. Haddon
Ty Gee
HADDON, MORGAN AND FOREMAN, P.C.
150 East Tenth Avenue
Denver, CO 80203
Tel 303.831.7364
hhaddon@hmflaw.com; tgee@hmflaw.com

*Attorneys for Defendants Solaris Property Owner, LLC, Solaris Property Owner I, LLC, and Peter Knobel*

# Table of Exhibits

A.  Transcript of Hearing on Motions (Oct. 22, 2019)

B.  Promissory Note (Apr. 18, 2012)