```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF COLORADO

 3
    Civil Action No. 19-cv-02443-STV
 4

 5    JUN LI, QI QIN, YI LIU, JIE YANG,
      YUQUAN NI, ZHONGZAO SHI, FANG SHENG,
 6    SHUNLI SHAO, KAIYUAN WU, ZHIJIAN WU,
      ZHONGWEI LI, SA WU, FAN ZHANG, LIN QIAO,
 7    JINGE HU, RUJUN LIU, YING XU, LU LI, and
      YUWEI DONG, individually, as well as
 8    derivatively for COLORADO REGIONAL CENTER
      PROJECT SOLARIS LLLP,                                  REDACTED
 9
            Plaintiffs,
10
            vs.
11
      WAVELAND VENTURES LLC,
12    COLORADO REGIONAL CENTER PROJECT SOLARIS
      LLLP, COLORADO REGIONAL CENTER,
13    COLORADO REGIONAL CENTER I LLC,
      SOLARIS PROPERTY OWNER LLC,
14    SOLARIS PROPERTY OWNER I LLC, and
      PETER KNOBEL,
15
            Defendants.
16
    -------------------------------------------------------------------
17
           TRANSCRIPT OF ELECTRONICALLY RECORDED PROCEEDINGS
18                             MOTION HEARING

19  -------------------------------------------------------------------

20          Proceedings before the HONORABLE SCOTT T. VARHOLAK,
    Magistrate Judge, United States District Court for the
21  District of Colorado, commencing at 9:22 a.m. on the 22nd day
    of October, 2019, in Courtroom A402, Alfred A. Arraj United
22  States Courthouse, Denver, Colorado.

23
    Transcriber:   JULIE H. THOMAS
24                 901 19th Street, Room A256
                   Denver, CO 80294
25                 (303)335-2111

         Proceedings recorded by electronic recording device;
                  transcription produced via computer.
```

Case No. 1:19-cv-02443-RM-STV Document 224-1 filed 06/10/20 USDC Colorado pg 2 of 11
Case 1:19-cv-02443-RM-STV Document 102 Filed 12/03/19 USDC Colorado Page 17 of 106

19-cv-02443-STV 10/22/19 17

1  Q. What was the purpose of the loan, the contemplated loan
2  from CRCPS to SPO?
3  A. Well, it was to finance the development. You know, it was
4  part of the source of funds in the overall development of this
5  $375 million project.
6  Q. How was CRCPS planning on securing that loan obligation to
7  SPO?
8  A. All the units were secured, um, with a first priority lien
9  in the form of a deed of trust.
10 Q. Does Mr. Knobel or his company SPO have any ownership
11 interest, direct or indirect, with any of the CRC companies
12 that we've identified that you've mentioned?
13 A. No.
14 Q. Was the -- was there negotiation between CRCPS, on the one
15 hand, and Mr. Knobel or his company SPO regarding the terms of
16 this loan?
17 A. Yes.
18 Q. Who was involved in those negotiations?
19 A. Um, myself, Mr. Schwartz, Peter Knobel, and counsel
20 before, Brian Reed Weiling [phonetic].
21 Q. Was this an arm's length loan transaction?
22 A. Yes.
23 Q. You were aware that this private placement memorandum was
24 going to foreign potential investors; correct?
25 A. Correct.

Case No. 1:19-cv-02443-RM-STV   Document 224-1   filed 06/10/20   USDC Colorado   pg 3 of 11
Case 1:19-cv-02443-RM-STV   Document 102   Filed 12/03/19   USDC Colorado   Page 19 of 106

19-cv-02443-STV                                                    10/22/19    19

1   you've said, the investors would make an equity investment, in
2   other words, they would be purchasing a limited partnership
3   interest in the entity CRCPS.  That entity in turn would enter
4   into a debt instrument with SPO.  Is that correct?
5   A.  Correct.
6   Q.  So let's talk -- when I say "debt instrument," I just mean
7   a loan.
8           We'll go through documents here in a second, but on a
9   high level can you describe the features of the loan that
10  CRCPS intended to enter into with SPO?
11  A.  Okay.  The loan from CRCPS to SPO I, you know, the basic
12  terms were a five-year original security deed.  The interest
13  rate was 5 percent.  The loan could be prepaid, um, after
14  three years either in cash or the tendering of the underlying
15  collateral to the loan.  And we, as the lender, also had the
16  ability to reject cash payment or prepayment and have the
17  units or, excuse me, have the collateral put to us in lieu of
18  a cash payment.
19  Q.  In your affidavit I think you referred to this as the
20  put/call mechanism --
21  A.  Right.
22  Q.  -- is that right?
23  A.  So, in essence, the borrower had the right to put the
24  collateral to us, and we had the ability to call the
25  collateral away.  Um, the basic economics of that would be if

Case No. 1:19-cv-02443-RM-STV Document 224-1 filed 06/10/20 USDC Colorado pg 4 of 11
Case 1:19-cv-02443-RM-STV Document 162 Filed 12/03/19 USDC Colorado Page 20 of 106

19-cv-02443-STV					10/22/19   20

1  the value of the collateral went down, more than likely it
2  would be put to us.  If the value of the collateral went up,
3  you know, we would call it away in lieu of cash.
4  Q.  So let's talk about the time frame we're in.  The private
5  placement memorandum date is in March of 2011.  Is that your
6  recollection?
7  A.  Correct.
8  Q.  What was CRC and CRCPS's view of the state of the real
9  estate market in Vail on this topic of whether it was going to
10 go up or down?  Give us the context of this PPM.
11 A.  Well, another feature that I should -- that I didn't
12 mention -- that I didn't mention was one of the reasons for us
13 taking the project on is that, as the general partner, we had
14 a 70 percent carry in the upside of the real estate.  So if
15 the value of the real estate went up, in addition to the
16 coupon that the investors were receiving that was being passed
17 through from the loan, you know, the investors would receive
18 30 percent of any upside appreciation of the real estate, you
19 know, and we would receive 70 percent in the form of carry in
20 the upside of the real estate.
21         Um, you know, this was, you know, probably -- you
22 know, I think Vail, you know, started to get developed in the
23 mid-'60s.  This was kind of, you know, a small place, but if
24 there were outskirts, this was it.  Peter, who was a long-term
25 resident of New York and developed properties there both for

1  within the confines of the EB-5 regulation, then it was our
2  job to create a pool of collateral that represented the
3  building in a whole to the best we could.
4  Q.  There's been an accusation by the plaintiffs that the
5  collateral -- that this loan agreement was
6  undercollateralized, that the loan-to-value ratio was
7  something unacceptable.  What's your response to that?
8  A.  Well, it wasn't a traditional loan.  You know, had it been
9  a conventional loan without these put and call features, um, I
10 think that would be a more germane argument, um, but given our
11 ability to call the loan away -- just by means of example, at
12 its most extreme, um, had SPO not sold units prior to our
13 involvement, you know, those 77 condominium units would
14 probably have a retail value of about $400 million.  Um, if
15 our note was collateralized, our 82 million dollar -- half
16 million dollar loan was collateralized with $400 million of
17 residential condominium units, and then we had a call right,
18 the developer in essence would be giving up $320 million in
19 equity for an 82 and a half million dollar loan.  Just really
20 nonsensical.
21 Q.  Maybe more importantly, in any of the private placement
22 memorandum itself or attachments, did CRCPS ever represent
23 that these loan advances were going to be secured by all of
24 SPO's 79 units?
25 A.  No.

```
19-cv-02443-STV                                          10/22/19    31
```

1  A. Correct.
2         MR. KILROY: Move to admit Exhibit 5.
3         THE COURT: Any objection?
4         Any objection to number --
5         MR. LITOWITZ: No objection.
6         THE COURT: Okay. It's admitted.
7      (Defendant's Exhibit 5 received.)
8  BY MR. KILROY:
9  Q. Now let's move -- I apologize for jumping around, but move
10 to Exhibit 2, please.
11        What is Exhibit 2?
12 A. It's the limited liability partnership agreement for
13 Colorado Regional Center Project Solaris.
14 Q. Is this the same agreement that was provided to all the
15 investors as an attachment to the PPM?
16 A. Yes.
17 Q. And then turn with me again to Bates number -- the last
18 four pages on [inaudible] which starts with Bates number
19 210 --
20 A. Okay.
21 Q. -- to 214 -- 213.
22        And when you get there, tell the Court what is that
23 last attachment, the last three -- three pages or four pages?
24 A. This is a list of 162 limited partners' as well as the
25 general partner's ownership interest in the entity.

```
                                    19-cv-02443-STV                              10/22/19    32
```

1  Q. And if you look at the very last page, it has 166
2  references, as I'm reading this, 165 at the top --
3  A. Oh, I'm sorry. Did I say 162?
4  Q. You did. I wanted to clear that up.
5  A. 166.
6  Q. And that last reference is -- so 1 through 165 are
7  limiteds. 166 is --
8  A. 166 is --
9  Q. -- general. Is that correct?
10     [Speaking over one another].
11 Q. This is an entity, a limited liability partnership. Who
12 under this operating agreement of this entity was charged with
13 making decisions for the company?
14 A. The general partner.
15 Q. And, again, CRCPS?
16 A. Excuse me? I'm sorry?
17 Q. That's CRCPS?
18 A. Um, the --
19 Q. I'm sorry.
20 A. The Colorado Regional Center I was the --
21 Q. I'm confusing you because I was confused for a moment, so
22 let me clear it up.
23     The general partner is CRC I; is that correct?
24 A. Correct.
25 Q. What are the types of decisions that CRC I made for the

Case No. 1:19-cv-02443-RM-STV Document 224-1 filed 06/10/20 USDC Colorado Page 8 of 11
Case 1:19-cv-02443-RM-STV Document 102 Filed 12/03/19 USDC Colorado Page 40 of 106

19-cv-02443-STV                                                   10/22/19    40

1   been totally unencumbered.
2   Q.  Let's -- before we get there -- I'll get to that, but
3   we've now referenced the put right and call right.  What
4   happened at the three-year mark when the parties,
5   borrower/lender, each had that put and call right?  What
6   actually happened?
7   A.  The lender notified us of their intent to tender the units
8   to us.
9   Q.  In what time period is that?
10  A.  That would have been three years after -- well, it was
11  probably a few months before the third anniversary of the
12  first loan advance.
13  Q.  Okay.  March, April 2015?  Does that time frame sound
14  right?
15  A.  Correct.
16  Q.  So the borrower puts the properties to the lender.  The
17  Court has seen, through the filings, that the title to the
18  properties didn't go to CRCPS.  Is that accurate?
19  A.  That is accurate.
20  Q.  Why?  First tell us why, and then tell us how we got
21  there.
22  A.  Um, it's really just a question of cost and what we felt
23  was in the best interest of the investors.  Um, were we to
24  transfer title, um, to the limited partnership versus holding
25  a deed of trust, the cost of that exercise would have

1 approximated a million dollars. Um, there's a 1 percent
2 transfer tax in the Town of Vail. We would have had to pay --
3 you know, prepay three months of HOA dues. In fact, it would
4 have caused us then to go out and insure the various units
5 which, you know, which was being insured at the time -- you
6 know, was being insured by SPO.
7     So we made a business judgment that, um, basically
8 entailed not incurring a million dollars of partnership
9 expenses to take title versus holding a first deed of trust,
10 that our security position was such that it just simply didn't
11 merit taking title of the properties.
12 Q. In other words, the security position remains the first
13 position.
14 A. Correct.
15 Q. Let me restate it to make sure we've got it.
16     SPO entered into an agreement with CRCPS that,
17 notwithstanding the put, SPO would retain title; correct?
18 A. Correct.
19 Q. And ultimately the objective was to liquidate or sell
20 these units; correct?
21 A. The objective never changed. It was just basically, in
22 our opinion, form over substance in taking title to the units
23 and burdening the partnership with a million dollars of
24 expenses that given that we held a first security interest in
25 the real estate underlying the loan, it simply didn't make any

```
19-cv-02443-STV                                          10/22/19    42
```

1  sense to incur that expense.
2  Q. Let me make it really simple. If SPO had transferred
3  title to CRCPS, CRCPS then transfers title to a third-party
4  purchaser, there would be a $1 million consequence?
5  A. Correct.
6  Q. If SPO holds title and conveys to the ultimate purchaser,
7  there would not be a million-dollar hit?
8  A. Correct.
9  Q. And that's why you did it?
10 A. Correct.
11 Q. For the first time you've used the term "business
12 judgment." Tell us why that decision was in the best
13 interests of the limited partnership.
14 A. Well, ultimately when a unit is sold, it doesn't --
15 there's no creation of more risk for the partnership relative
16 to the spending of a million dollars of monies that, in our
17 judgment, was not necessary.
18 Q. Who would have taken that million-dollar hit had you just
19 gone ahead and taken title?
20 A. All the investors.
21 Q. To the tune of a million dollars?
22 A. Correct.
23 Q. As we sit here today, is SPO willing to transfer the
24 properties directly to a final purchaser so that that million
25 dollars is not incurred?

```
19-cv-02443-STV                                           10/22/19    106
```

1     MR. LITOWITZ:  No.  Thank you.

2     (Proceedings concluded 12:08 p.m.,

3     October 22, 2019.)

4

5

                        TRANSCRIBER'S CERTIFICATE
6

           I, JULIE H. THOMAS, Official Court Reporter for the
7     United States District Court for the District of Colorado, do
      hereby certify that the foregoing pages are a correct
8     transcription to the best of my ability to hear and understand
      the audio recording and based on the quality of the audio
9     recording from the above-entitled matter.
           Dated this 4th day of November, 2019.
10

11            _____/s/ Julie H. Thomas_____

12

13
                        *     *     *     *     *
14

           I certify that the foregoing is a true and correct
15    copy of the transcript originally filed with the Clerk of
      Court on 11/04/2019 and incorporating redactions of
16    confidential information, in accordance with Judicial
      Conference policy and the Order of this Court, requested by
17    the following attorneys of record:  James D. Kilroy and
      Stephanie A. Kanan.  Redacted characters appear as a black box
18    in the transcript.

19            _____/s/ Julie H. Thomas_____

20                    JULIE H. THOMAS

21

22

23

24

25