# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.  1:19-cv-02443-RM-STV;
Consolidated with Civil Action No. 1:19-cv-02637

Li, *et al*.,

      Plaintiffs,

v.

Waveland Ventures, LLC, *et al*.,

      Defendants.

---

## DEFENDANT COLORADO REGIONAL CENTER I, LLC'S RESPONSE IN OPPOSITION TO THE CUI PLAINTIFFS' MOTION FOR APPOINTMENT OF RECEIVER [ECF 211]

---

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................... 1

II. STATEMENT OF MATERIAL FACTS......................................................................... 1

    A.  Background of CRCPS ........................................................................................... 1

    B.  The Loan Agreement Between CRCPS (Lender) and SPO I (Borrower) ............. 2

    C.  The ARCU ............................................................................................................. 3

    D.  CRC I's Thwarted Efforts to Sell the Property and Liquidate the Limited
        Partners' Investments................................................................................................ 4

    E.  CRC Manages CRCPS' Property ........................................................................... 5

    F.  The Alleged Removal of CRC I as General Partner of CRCPS ............................. 6

III. STANDARD OF REVIEW ............................................................................................. 8

IV. ARGUMENT .................................................................................................................... 9

    A.  The Cui Plaintiffs Fail to Demonstrate That the Appointment of a
        Receiver is Warranted Under Fed........................................................................... 9

        1.  The Cui Plaintiffs Have No Valid Claim................................................. 10

            (a)  There Has Been No Breach of Contract ...................................... 10

            (b)  There Has Been No Breach of Fiduciary Duty and No
                 Cause Exists to Justify Removal.................................................. 13

            (c)  No Other Claims Support the Requested Remedy of a
                 Receiver ....................................................................................... 14

        2.  The Cui Plaintiffs Have Not Established Any Probability That
            Fraudulent Conduct Has Occurred or Will Occur ................................... 14

        3.  The Cui Plaintiffs Have Not Demonstrated That the Receivership
            Property is in Imminent Danger of Being Concealed or Lost ................. 16

        4.  If They Have Valid Claims, the Cui Plaintiffs Have Adequate
            Legal Remedies........................................................................................ 18

        5.  The Availability of Less Drastic Equitable Remedies is
            Inapplicable............................................................................................. 19

        6.  Appointment of a Receiver Will Do More Harm Than Good ................. 19

    V. CONCLUSION ...................................................................................................... 20

Defendant Colorado Regional Center I, LLC's ("CRC I"), submits its Response in Opposition to the Cui Plaintiffs' Motion for Appointment of Receiver [ECF 211], stating as follows:

## I.   INTRODUCTION

Despite their inflammatory rhetoric, the Cui Plaintiffs present nothing but counsel's argument and conclusory allegations in support of their motion to appoint a receiver to manage and sell luxury condominium units in Vail, Colorado. The Cui Plaintiffs seem to be arguing that CRC I has not sold those units quickly enough, or for not enough money and that a receiver is needed to preserve and sell the units. The Cui Plaintiffs ignore that for about nine months all Plaintiffs have repeatedly interfered with and thwarted every single effort that CRC I has made to sell this property.

Nothing has happened to the CRCPS limited partners' investment. CRC I has done nothing wrong and CRCPS' property is not and never has been in jeopardy. There is no basis to appoint a receiver.

## II.   STATEMENT OF MATERIAL FACTS

### A.   Background of CRCPS

Colorado Regional Center, LLC ("CRC") is an approved EB-5 Regional Center, authorized by USCIS to operate anywhere within the State of Colorado. **Exhibit A**, Affidavit of Rick Hayes, 10/18/19, ¶ 2. CRC I is the general partner of CRCPS. *Id.*, ¶ 3. Plaintiffs are Chinese investors who each purchased a limited partnership interest in CRCPS for $500,000, as part of an approved EB-5 Program through the USCIS to obtain a permanent residence visa. *Id.*, ¶ 4.

1

CRCPS prepared a Private Placement Memorandum ("PPM") to raise funds related to the development of a project known as Solaris Residences ("Solaris"). *Id.*, ¶ 5. As the PPM explained, investors who invested in this opportunity paid $500,000 for limited partnership interests in CRCPS, and the proceeds of the PPM offering were to be used to lend up to $100 million to Solaris Property Owner, LLC ("SPO"), the developer of Solaris. *Id.*, ¶ 6. The PPM included, among other things, copies of the transactional documents related to CRCPS' contemplated loan to SPO, a fulsome description of the anticipated use of the PPM offering, a description of the investor qualifications and suitability requirements, and an actual copy of the CRCPS partnership agreement. *Id.*, ¶ 7. In order to purchase an interest in CRPCS, the investors had to, and did, certify their proficiency in the English language. *Id.*, ¶ 8. CRC, CRC I, and CRCPS did not promise any of the investors a guaranteed return of their investment. *Id.*, ¶ 11.

**B.      The Loan Agreement Between CRCPS (Lender) and SPO I (Borrower)**

The PPM was issued on or about March 11, 2011, and the last limited partner subscribed by April 2013. *Id.* at ¶ 12. Thereafter, CRCPS loaned the proceeds of the investment, which totaled approximately $82.5 million, to SPO's assignee, Solaris Property Owner I, LLC ("SPO I"). *Id.*, ¶ 13. The proceeds of the loan were to be used by SPO I to pay certain costs pertaining to the development of the Solaris project. *Id.,* ¶ 14. The loan was evidenced by a loan agreement, and a promissory note and was funded in multiple advances over a period of time. *Id.,* ¶ 15. To secure the loan, SPO I granted a lien, evidenced by a deed of trust, to CRCPS for each of 19 condominium units valued in the aggregate at approximately $82.5 million at the time of execution of the loan agreement (the "Property"). *Id.*, ¶ 16. Prior to the commencement of this action, two of the 19 units were assigned to entities owned by certain limited partners of CRCPS

2

in consideration of a redemption of their partnership interests. *Id.*, ¶ 17. The loan accrued interest at a rate of 5.55% per annum. *Id.*, ¶ 18. The principal balance together with all accrued and unpaid interest of each loan advance was due and payable five years after the date of each loan advance. *Id.*, ¶ 19.

Pursuant to the terms of the overall loan agreement and as expressed by the PPM, three years following each loan advance, CRCPS and SPO I had certain "put" and "call" rights.  Ex. A, ¶ 5, Ex. 1, pp. 5,7, 174, 181; Ex. A, ¶ 20. Specifically, three years after each loan advance SPO I was entitled to "put" the collateral securing the loan advance instead of repaying CRCPS with cash, and CRCPS was entitled to refuse SPO I's repayment of cash and require SPO I to convey the Property. *Id.* As structured, if the value of the Property went down three years after the loan closing, SPO I had the option to repay its obligations by conveying the Property, and if the value of the Property went up three years after the loan closing, CRCPS could reject SPO I's cash repayment and demand a conveyance of the Property. *Id.*

### C.    The ARCU

The real estate market for luxury condominium units in Vail, Colorado did not do as well as CRCPS and its limited partners hoped it would – a risk that was specifically identified in the PPM. *Id.,* ¶ 5, Ex. 1, pp. 23-24. Consistent with the terms of the loan agreement, SPO I exercised its right to transfer the Property in lieu of cash payment with respect to each condominium unit after three years following each loan advance. *Id.*, ¶ 22. Pursuant to the terms of an Agreement Regarding Collateral Units ("ARCU") between CRCPS and SPO I, CRCPS has not yet been assigned title to the remaining units comprising the Property, because SPO I agreed to continue to hold title and, upon the instruction of CRCPS, to directly sell the units to a buyer designated

3

by CRCPS. *Id.*, ¶ 23, Ex. 4.  The ARCU was entered into between CRCPS and SPO I to save CRCPS and its limited partners approximately $1 million in HOA dues, taxes and other payments.  *Id.*, ¶ 24; *see also* **Exhibit B**, Hearing Transcript, 10/22/19, 40:2-43:4. Accordingly, SPO I continues to hold title to the Property, which does not constitute a default, and CRCPS continues to hold a first priority lien on the Property by means of the respective deeds of trust. Ex. A., ¶ 25.

### D.    CRC I's Thwarted Efforts to Sell the Property and Liquidate the Limited Partners' Investments

CRC I, as general partner of CRCPS, has been cognizant of the limited partners' desire to liquidate their investment, and has consistently and regularly provided the investors notices regarding appraisals of the Property, opportunities to sell the Property through bulk sales of the condominium units or sales of individual units, and plans for the return of the limited liability partners' capital contributions. *Id.*, ¶ 26. Consistent with the exit strategy described in the PPM and set forth in § 13.06 of the Limited Liability Limited Partnership Agreement of CRCPS (the "Partnership Agreement"), CRC I sent notices beginning on March 15, 2016, to the limited partners giving them an opportunity to have their limited partnership interest redeemed to the partnership, CRCPS. *Id.*, ¶ 27. All Plaintiffs ultimately rejected this opportunity. *Id.*, ¶ 28.

CRC I has diligently attempted to find a suitable exit strategy for all investors, which would necessarily involve a sale of the Property. *Id.*, ¶ 29. Exercising its reasonable business judgment, and given the limited partners stated interest in liquidity, CRC I determined that an offer for a bulk sale of the Property was in the best interest of CRCPS.  *Id.*, ¶ 30. On June 5, 2019, CRCPS entered into a Letter of Intent to sell all of the Property (then 17 units) to a buyer in a transaction referred to as a bulk sale for total consideration of $49.5 million. *Id.*, ¶ 31. On

October 8, 2019, the Li Plaintiffs sought to enjoin CRCPS from proceeding with that bulk sale. [ECF 32]. After an evidentiary hearing, during which the Li Plaintiffs presented no witnesses or other documentary evidence, Magistrate Judge Varholak denied the Li Plaintiffs' motion to enjoin the bulk sale. [ECF 59]. On that same day, Magistrate Judge Varholak also granted CRCPS' Petition for Order to Show Cause Pursuant to C.R.S. § 38-35-204, extinguishing the spurious lis pendens filed by the Li Plaintiffs. [ECF 59 and 68].

Immediately thereafter, and before this case was consolidated with Case No. 19-cv-2637, the Cui Plaintiffs filed a new lis pendens despite having no legal basis for doing so. [ECF 28; Case No. 19-cv-2637]. The prospective bulk sale buyer on the $49.5 million sale then backed out of the bulk sale, specifically citing the Cui Plaintiffs' lis pendens. CRCPS was forced to again petition the Court to extinguish the spurious lis pendens, which was ultimately granted on February 27, 2020. [ECF 164].

### E.    CRC Manages CRCPS' Property

Pursuant to the Partnership Agreement, CRCPS entered into a management contract with Waveland EB-5 Management, LLC, which was later assigned to CRC. *See* **Exhibit C**, Declaration of Rick Hayes, 6/3/20, ¶ 17, Ex. 1, § 5.01. In consideration of the performance by CRC of certain management and servicing duties, CRC is entitled to receive an annual management fee payable quarterly from Available Cash Flow (defined by the Partnership Agreement), which includes proceeds from the sale of any portion of the Property. *Id.*, ¶ 18, Ex. 1, §§ 5.01, 2.07, 2.10. Notwithstanding CRC's express contractual right to collect its management fees, it has deferred almost $4 million in management fees over a period of many years at this point. Ex. C, ¶ 19. The management fees owed to CRC, would ordinarily be paid

out of available cash flow prior to, and have priority over, distributions to the limited partners. CRC has voluntarily deferred almost $4 million that it is contractually owed in an effort to preserve CRCPS' overall cash flow. *Id.*, ¶¶ 19-21.

**F.      The Alleged Removal of CRC I as General Partner of CRCPS**

In their operative complaint, the Li Plaintiffs, but not the Cui Plaintiffs' (the movants here), asserted a claim for removal of CRC I as the general partner of CRCPS. [Li Plaintiffs' Third Amended Complaint ("LTAC), ECF 121 (first Count VII, ¶¶ 212-19]. On April 20, 2020, the Li Plaintiffs filed and served a Status Report on Removal of General Partner by Proxies and Written Consent (the "Status Report"), which purports to be an announcement by the limited partners of CRCPS that they have appointed Yi Wen Chen, the legal assistant of the Li Plaintiffs' attorney, Douglas Litowitz, to serve as their proxy to remove CRC I as the general partner of CRCPS. [ECF 183]. The Status Report included one-hundred and six (106) proxies allegedly executed by certain limited partners of CRCPS, most of whom are unidentified in the proxies themselves. According to the proxies, the limited partners claim to have removed CRC I for fraud "due to failure of the [CRC I] to return the capital investments by failing to collect the loan to [SPO I]" and because "the entire structure of this transaction and the material given to [the limited partners] in China was fraudulent." The proxies further contend that CRC I's alleged conduct was a breach of fiduciary duty.

CRC I disputes that "cause" existed to justify its removal as general partner of CRCPS and, in particular, disputes the allegations that it committed fraud based on the following:

(a)      CRC I has no legal right to demand repayment of the loan from SPO I.  SPO I validly exercised its "put" right to transfer each condominium unit in lieu of cash payment. And under the terms of the ARCU, which incorporates all of the underlying loan documents,

SPO I is expressly authorized and required to hold record title to the Property. Thus, CRC I's failure to collect repayment of the loan from SPO I is not fraudulent;

(b) the investments at issue were EB-5 offerings that were sold to limited partners through documents that comprehensively disclosed risks and waived claims. The documents not only cautioned prospective investors that there was no guarantee or assurance of a return or repayment of the capital contributions, they also explicitly warned that "[t]here can be no assurance that [CRCPS] will achieve its investment objectives, including the return of capital invested by the Limited Partners";

(c) CRC I's actions and inactions comport with the PPM, Partnership Agreement and the ARCU, and are undoubtedly the result of sound business judgment;

(d) to the extent removal was based on the investment structure itself, removal was improper because conduct prior to the formation of the partnership and CRC I's role as general partner cannot form the basis for "cause"; and

(e) aside from general criticism of the loan structure and characterizing the investment as unduly risky, there are no facts to substantiate the claim that it was fraudulent.

[CRC Entities' Partial Answer and CRC I's Counterclaim, ECF 204; ECF 219].

CRC I disagrees that it has been properly removed as the general partner of CRCPS and has asserted a counterclaim for declaratory judgment that it has not been properly removed as general partner and that there is no cause to support the alleged removal. [ECF 204, ¶¶ 48-63]. In the counterclaim, CRC I alleges that under § 9.06 of the Partnership Agreement two-thirds of all limited partners could vote to remove CRC I as general partner of CRCPS "for cause," and under § 12.02 of the Partnership Agreement, "cause" is defined as "acts of the General Partner which constitute larceny, fraud or a crime involving moral turpitude." [ECF 204, ¶¶ 30-31 and 48-63; ECF 211-22, p. 196, § 9.06 and p. 202, §12.02]. In a motion to dismiss CRC I's counterclaim, the Li Plaintiffs insist that CRC I has already been removed as general partner of CRCPS [ECF 208], but the Court recently noted "there has been no showing (or finding) to date that CRC I has been properly removed." [ECF 218, p. 4].

In their motion for appointment of receiver, the Cui Plaintiffs state, among other things:

7

(a) that undersigned counsel for the CRC Entities "has stated on several occasions that he intends to withdraw as counsel for [the general partner of CRCPS] … now that he understands that he has a conflict of interest"; and (b) that undersigned counsel has been "evasive on the issue of the removal and replacement of the General Partner." [ECF 211, p. 15, citing ¶ 16 of the Stewart Declaration (ECF 211-9, p. 2) and ¶ 1 of the Litowitz Declaration (ECF 2111-19, p. 3)]. These statements are false and are not supported by the declarations cited by the Cui Plaintiffs. *See* **Exhibit D**, Declaration of James D. Kilroy, 6/19/20.

## III.   STANDARD OF REVIEW

The Tenth Circuit has emphasized that the appointment of a receiver is an extraordinary equitable *remedy* that is only justified in extreme situations. *Skirvin v. Mesta*, 141 F.2d 668, 673 (10th Cir. 1944); *Kelleam v. Maryland Cas. Co. of Baltimore, Md.*, 312 U.S. 377, 381 (1941).

The Cui Plaintiffs bring their motion under Fed. R. Civ. P. 66, pursuant to which a federal court has the power in equity to appoint a receiver in order to protect a party's interest in property. That power, however, "is a delicate one which is jealously safeguarded, and it should be exerted sparingly. A court should be cautious and circumspect in the exertion of the remedy because perversion or abuse may work great hardship." *Skirvin v. Mesta*, 141 F.2d 668, 673 (10th Cir. 1994) (internal citations omitted). Indeed, courts have long recognized that the appointment of a receiver is "an extreme and drastic measure, justifiable only in extreme situations." *Waag v. Hamm*, 10 F.Supp.2d 1191, 1193 (D. Colo. 1998); *see also Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993). "Like injunctive relief, the appointment of a receiver is not a positive right." *Id*. "[O]nly on the most cogent and compelling grounds should a receiver be appointed." *Zinke-Smith. Inc. v. Marlow,* 323 F. Supp. 1151, 1152

(D. Virgin Islands 1971). "Dissatisfaction with existing management and the fact that the business is a losing venture are not sufficient to warrant a receivership." *Macon Lumber Co. v. Bishop & Coffin,* 229 F. 2d 305, 307 (6th Cir. 1956).

The appointment of a receiver is a decision that rests in the sound discretion of the court. *Waag*, 10 F.Supp.2d at 1193. While there is no precise formula, courts consider the following factors in determining whether a receiver is appropriate:

> (1) the existence of a valid claim by the moving party; (2) the probability that fraudulent conduct has occurred or will occur to frustrate the claim; (3) imminent danger that property will be lost, concealed, or diminished in value; (4) inadequacy of available legal remedies; (5) lack of a less drastic equitable remedy; and (6) the likelihood that appointment of a receiver will do more harm than good.

*Id.* Because the appointment of a receiver is such an extraordinary remedy, "the party requesting the receivership must show by clear and convincing evidence that the appointment is necessary for the preservation of the complainant's rights." *Meyer Jewelry Co. v. Meyer Holdings,* 906 F. Supp. 428, 432-33 (E. D. Mich. 1995); *see also Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012).

## IV.   ARGUMENT

### A.   The Cui Plaintiffs Fail to Demonstrate That the Appointment of a Receiver is Warranted Under Fed. R. Civ. P. 66

As a preliminary matter, the Cui Plaintiffs are only requesting a receivership over the condominium units that CRCPS currently controls. The Cui Plaintiffs define what they call "Receivership Property" as the Collateral and Additional Collateral [ECF 211, ¶ 9 and ECF 211-42]. The Cui Plaintiffs have not, however, requested the appointment of a receiver over the entity that controls the Receivership Property – CRCPS.

While the Cui Plaintiffs do not address any of the factors identified in *Waag*, none of the factors support the extraordinary remedy the Cui Plaintiffs seek.

### 1.        The Cui Plaintiffs Have No Valid Claim

The Cui Plaintiffs claim that cause exists to appoint a receiver for two reasons. First, they claim that an event of default in the loan agreement between CRCPS and SPO I has occurred, entitling the lender (CRCPS) to appointment of a receiver as a contractual remedy. [ECF 211, p. 17, ¶ 48]. While unclear, the Cui Plaintiffs appear to be asserting their motion in a derivative capacity – that is, on behalf of CRCPS – and as a remedy under the Cui Plaintiffs' derivative breach of contract claim in their Third Amended Complaint ("CTAC") [ECF 190, Count VI, ¶¶ 125-343]. Second, the Cui Plaintiffs claim that the limited partners have already voted to remove CRC I as general partner of CRCPS and that CRC I has actively engaged in breaches of fiduciary duties to the limited partners, justifying the appointment of a receiver over what they call the Receivership Property. [ECF 211, ¶ 48]. This second argument appears to be in support of the Cui Plaintiffs' claim against CRC I for breach of fiduciary duty, asserted as both a derivative and a direct claim. [ECF 190, ¶¶ 106-110]. The claims upon which the Cui Plaintiffs rely, however, are not valid and do not support the appointment of a receiver.

### (a)        There Has Been No Breach of Contract

The Cui Plaintiffs fault CRC I for not enforcing the loan documents between CRCPS and SPO I and for failing to enforce the rights of CRCPS following defaults by the borrower, SPO I. [ECF 211, ¶ 21]. The Cui Plaintiffs ignore the fact that CRC I cannot just pretend that a default has occurred when it has not.  That would involve pursuing frivolous and groundless claims –

something CRC I is unwilling to do.[1]

As the CRC Entities have advised Plaintiffs repeatedly, the borrower, SPO I, exercised its contractual right to put the collateral condominium units back to CRCPS in compliance with the loan agreement. CRC I cannot claim breach of the loan agreement by SPO because there was no breach. A breach of contract claim predicated on a faulty legal proposition must be dismissed. *See MidCities Metro. Dist. No. 1 v. U.S. Bank Nat'l Ass'n*, No. 12-CV-03322-LTB, 2013 WL 3200088, at * 7 (D. Colo. June 24, 2013). And here, the Cui Plaintiffs' insistence that there was a breach of contract that CRC I has failed to enforce on behalf of CRCPS is a faulty legal proposition, unsupported by the clear factual record. Moreover, the Cui Plaintiffs' derivative breach of contract claim was directed at SPO I, not the CRC Entities, and SPO I filed a motion to dismiss explaining what occurred between CRCPS and SPO I in connection with the loan agreement and ACRU. [ECF 224]. While the Cui Plaintiffs insist that CRC I should reject SPO I's contention that no breach has occurred, the CRC Entities in good faith cannot do so.

It is indeed undisputed that in April 2015, SPO I elected to exercise its right under the loan documents to prepay all the loan advances totaling $82.5 million by conveying to CRCPS title to the collateral units. Ex. A, Ex. 4, p. 2. CRCPS entered into the ARCU with SPO I, pursuant to which SPO I would "temporarily refrain" from conveying title to the units to CRCPS until CRCPS requested conveyance. *Id.*, pp. 2-3. The ARCU effectively supplemented, modified or otherwise amended the Loan Agreement's terms governing SPO I's discharge of its payment obligations explicitly permitting it to hold title to the units. *See Reynolds v. Farber*, 577 P.2d

---

[1] If SPO I was in default under the loan agreement it would be in the CRC Entities' clear *self-interest* to pursue a claim against SPO I for breach of contract. CRC has deferred payment of almost $4 million in management fees that it is owed by CRCPS.

318, 321 (Colo. App. 1978) (permitting contract modification where parties mutually consent). SPO I has complied with the ARCU. To date, CRCPS has requested conveyance of three of the nineteen units, and SPO I has conveyed all three. [ECF 211, ¶ 30].

Thus, SPO I's failure to transfer title or repay the loan is not an event of default under the deeds of trust, as the Cui Plaintiffs' contend, to constitute a breach and trigger CRCPS' right to appoint a receiver. [ECF 211, ¶¶ 42-44].  Indeed, the ARCU provides that:

> no default or Event of Default shall be deemed to have occurred as a result of a failure of [SPO I] to repay such Loan Advance on or before such Maturity Date, and [CRCPS] may not exercise any rights or remedies with respect to a default or Event of Default, unless and until it shall have provided [SPO I] with a notice and cure period in accordance with Section 17 of the Loan Agreement.

Ex. A, Ex. 4, § 1. The Cui Plaintiffs simply refuse to acknowledge the existence of the ARCU. They do not even mention it in their motion, let alone provide any compelling reason why the Court should disregard its terms.

In sum, while the CRC Entities would certainly enforce CRCPS' rights under the loan agreement with SPO I if there was a basis to do so, there is simply not a factual or legal basis to declare the ARCU unenforceable or the loan agreement in default. And the Cui Plaintiffs' requested remedy – appointment of a receiver – is not available in the absence of a breach of contract. *See, e.g. Gordon v. Washington*, 295 U.S. 30, 37 (1935) ("A receivership is only a means to reach some legitimate end sought through the exercise of the power of a court of equity. It is not an end in itself").

Even if the Cui Plaintiffs were able to show an actual breach of the loan agreement with SPO I (and they cannot), their apparent assumption that they are *automatically* entitled to a receiver under the terms of the loan agreement and Colorado state law is wrong. [ECF 211, ¶ 47

(citing C.R.S. § 38-38-602(3))]. The appointment of a receiver in this case is governed by federal law. *LPP Mortgage Ltd. v. Worldwide Christian Aid, Inc.*, No. CIV 14-0367, 2014 WL 12495345, at *2 (D. N.M. Oct. 20, 2014) (citing *Sterling v. Stewart*, 158 F.3d 1199, 1201 (11th Cir. 1998) ("Federal law governs the appointment of a receiver by a federal court exercising diversity jurisdiction."); *Aviation Supply*, 999 F.2d at 316 ("The appointment of a receiver in a diversity case is a procedural matter governed by federal law and federal equitable principles."). Accordingly, the Cui Plaintiffs' request for appointment of a receiver pursuant to Colorado statute and the loan documents – without regard to the factors considered in this District under Fed. R. Civ. P. 66 – is without legal basis. *LPP Mortgage*, 2014 WL 12495345, at *2 (rejecting plaintiff's request for receiver which demanded an automatic appointment under loan documents and New Mexico law, instead analyzing the Rule 66 factors); *see also Gage v. First Fed. Sav. & Loan Ass'n*, 717 F. Supp. 745, 750 (D. Kan. 1989).

### (b)  *There Has Been No Breach of Fiduciary Duty and No Cause Exists to Justify Removal*

While the Cui Plaintiffs have asserted a derivative and direct breach of fiduciary duty claim against CRC I in Count VI of the CTAC [ECF 190, ¶¶ 125-343], the CRC Entities have moved to dismiss the claim under Fed. R. Civ. P. 12(b)(6) [ECF 203]. Moreover, even if the Cui Plaintiffs have *asserted* a valid claim for breach of fiduciary duty, they have not presented sufficient evidence in their motion to support the validity of the claim and, in any event, the Partnership Agreement does not permit removal of the general partner for any reason other than "cause," defined as "acts of the General Partner which constitute larceny, fraud or a crime involving moral turpitude." [ECF 211-22, p. 196, § 9.06 and p. 202, § 12.02].

13

*(c)*     ***No Other Claims Support the Requested Remedy of a Receiver***

Even if the Cui Plaintiffs rely on other claims that they or the Li Plaintiffs have asserted to support their request for a receiver, there is still no valid claim to support the motion – which, again, is a motion for a *remedy*. The CRC Entities have moved to dismiss all claims for relief asserted by the Cui Plaintiffs and the Li Plaintiffs, other than the Li Plaintiffs' claim for removal of CRC I as the general partner of CRCPS. [ECF 203, 228]; [LTAC, (first) Count VII, ¶¶ 212-219]. And the Li Plaintiffs have now dismissed their claim for removal of CRC I as the general partner of CRCPS. [ECF 210, pp. 1-2].

In sum, whether the Cui Plaintiffs are seeking appointment of a receiver as a remedy to their derivative breach of contract claim, their breach of fiduciary duty claim or some other claim, they have asserted no claims upon which relief can be granted. [ECF 203]. And they have supported their motion with nothing more than conclusory declarations,[2] the effect of which can hardly be said to amount to clear and convincing evidence. *See Meyer Jewelry*, 906 F. Supp. at 428.

## 2.  The Cui Plaintiffs Have Not Established Any Probability That Fraudulent Conduct Has Occurred or Will Occur

Similarly, the Cui Plaintiffs fail to demonstrate that fraud or other corporate waste has occurred or will probably occur such that it will frustrate their claims or pose a threat to the Property.  This factor also weighs heavily against the appointment of a receiver.

Consistent with their prior filings in this case, the Cui Plaintiffs offer only conclusory

---

[2] The Cui Plaintiffs attach declarations of the two attorneys representing the Cui Plaintiffs and the Li Plaintiffs [ECF 211-9 and 211-19], and also a declaration of Leng Sufen [ECF 211-21]. None of the declarations even address, let alone support, the elements of the Cui Plaintiffs' claims for relief in this case.

14

allegations and unsupported opinions from counsel that "fraud" has occurred.  The vast majority of these allegations and opinions are not only contradicted by documentary evidence, but they are virtually the same conclusory allegations that were offered by the Li Plaintiffs in support of their requests for a preliminary and mandatory injunction, both of which were denied.  [ECF 32, 59, 165 and 218].

Nor is CRC I's purported removal as general partner conclusive evidence that any fraudulent conduct has occurred or will occur, as the Cui Plaintiffs apparently suggest. [ECF 211, ¶ 48]. The Cui Plaintiffs are simply wrong that CRC I has in fact been removed as the general partner for committing acts of fraud. [ECF 211, ¶¶ 38-40]. To the contrary, the Court has expressly recognized that "there has been no showing (or finding) to date that CRC I was properly removed." [ECF 218]. The Cui Plaintiffs offer no facts to demonstrate that their allegations of fraud are supported, much less that they are demonstrated to a clear and convincing standard.

Moreover, the repeated arguments by all Plaintiffs that CRC I is somehow churning management fees is completely fictional. Plaintiffs have never supported such accusations with facts because the accusations are completely untrue. Instead, they simply substitute speculation for fact while admitting they have no actual knowledge of any wrongdoing. [ECF 211, ¶ 31]. And for nine months now, both sets of Plaintiffs have done everything possible to prevent the sale of condominium units, all the while demanding preferential treatment for themselves to the detriment of the full set of limited partners. In addition, CRC, which is the manager of CRCPS, has *deferred* almost $4 million in management fees over a period of many years at this point. *See* Ex. C, ¶¶ 19-21. The management fees owed to CRC, would ordinarily be paid out of available

cash flow prior to, and have priority over, distributions to the limited partners. *Id*., ¶ 20. But CRC has voluntarily deferred almost $4 million that it is contractually owed in an effort to preserve CRCPS' overall cash flow. *Id*., ¶¶ 19-21. Finally, the Cui Plaintiffs' accusations that undersigned counsel has stated an intent to withdraw as counsel for CRC I and been evasive about CRC I's position is simply false. *See* Ex. D, Kilroy Declaration.

### 3. The Cui Plaintiffs Have Not Demonstrated That the Receivership Property is in Imminent Danger of Being Concealed or Lost

The Cui Plaintiffs make no attempt to establish that the Receivership Property is subject to any immediate danger aside from identifying three condominium units that were previously conveyed in a manner that they claim violated the Partnership Agreement. But the Cui Plaintiffs' lengthy and inexplicable delay in requesting a receiver significantly undermines any claimed urgency.

Although not entirely clear from their motion, the Cui Plaintiffs apparently contend that the Receivership Property is in imminent danger because CRC I conveyed certain of the condominium units "without the consent of the limited partners" and in violation of the Partnership Agreement.  [ECF 211, ¶ 31 and 212, p. 4]. According to the terms of the Partnership Agreement, however, the general partner has the exclusive right to manage, operate and control the limited partnership, which includes the right "to manage, sell, develop, purchase, mortgage, improve, operate and dispose of Limited Partnership Property." Ex. A, Ex. 2, § 8.01(2). In other words, consent from the limited partners is not necessary or required for the general partner to sell or otherwise convey partnership property. Thus, the Cui Plaintiffs' assertion that the prior conveyances somehow violated the Partnership Agreement and reflects an urgent need for a receiver is entirely baseless.

4849-8390-8799

To the extent the Cui Plaintiffs contend that in-kind distributions of collateral to the limited partners are somehow improper, [ECF 211, ¶ 32], there is nothing in the Partnership Agreement or the Colorado Uniform Limited Partnership Act, C.R.S. § 7-62-101, *et seq.* (the "Act") that precludes a limited partner from agreeing to receive an in-kind distribution. The Partnership Agreement states that "[n]o Limited Partner shall have any right to demand or receive any distribution from the Limited Partnership in any form other than cash, upon dissolution or otherwise." Ex. A, Ex. 2, § 9.05. While this provision certainly prohibits the limited partners from asserting a right to an in-kind distribution, it does not prohibit CRC I from exercising its discretion to issue an in-kind distribution, particularly where a limited partner wishes to accept a distribution of that nature.

The Act is consistent with the terms of the Partnership Agreement. C.R.S. § 7-62-605 provides that a limited partner has no right to receive any distribution except in cash unless the partnership agreement in writing provides otherwise. It further provides that a limited partner may not be compelled to accept a distribution in kind to the extent that the percentage of the asset distributed to the partner exceeds a percentage of that asset that is equal to the partner's interest in the partnership. C.R.S. § 7-62-605. To the extent the Cui Plaintiffs contend that this statute also prevents a limited partner from agreeing to receive an in-kind distribution, the statute includes no such language. And while Colorado courts have not directly addressed this issue, several commentators have opined that "if a limited partner is willing to accept a particular item, the language of the [Act] would seem to permit a general partner to distribute that item to the limited partner even though the other limited partners object." 1 Colo. Prac., Methods of Practice § 4:40 (7th ed.). Neither the Partnership Agreement, nor the Act, requires the Court to interfere

17

with CRC I's business judgment.

More critically, the significant delay in requesting a receiver is ample proof that there is no imminent danger of the loss of the Receivership Property. It is undisputed that two of the units were conveyed before the Cui Plaintiffs even commenced this action – a fact the Cui Plaintiffs have known for at least nine months. Indeed, they specifically referenced these conveyances in their very first pleading filed on September 16, 2019. [ECF 1, Case No. 19-cv-02637, ¶ 10] ("[d]espite SPO's election, title to the 19 (now 17) units remained with SPO") (emphasis added). Similarly, the third unit – Unit 6C West – was sold over three months ago and the Cui Plaintiffs were on notice of this potential transaction nearly six months ago, which again, they readily admit. [ECF 148, p. 2] ("[o]n January 14, 2020, counsel for [CRC I] contacted Plaintiffs' counsel and informed him that there was an offer to purchase Unit 6CWest") (emphasis added). Despite having this information, the Cui Plaintiffs did not seek a receiver at that time, nor did they seek a receiver immediately thereafter.

Simply put, the Cui Plaintiffs own actions demonstrate that no circumstances exist to conclude that the Receivership Property is in imminent danger. And to the extent any alleged harm does in fact result from any subsequent conveyance, it can be addressed through monetary damages after a judgment is rendered on the merits. *See, e.g., Cox v. Sullivan*, No. 14-cv-206, 2015 WL 5040039, at * 2 (N.D. Okla. Aug. 26, 2015) (finding no immediate danger to property because any resulting harm can be addressed after judgment on the merits).

### 4.     If They Have Valid Claims, the Cui Plaintiffs Have Adequate Legal Remedies

The Cui Plaintiffs offer no explanation as to why the monetary damages that they seek are inadequate. Absent such explanation, the Cui Plaintiffs are not entitled to receive any

4849-8390-8799

equitable remedy, much less the drastic equitable remedy of receivership.  It is well-settled that monetary loss alone is insufficient to justify the appointment of a receiver. *See Simms v. Exeter Architectural Products, Inc.*, 868 F. Supp. 668, 673 (M.D. Penn. 1994). The Cui Plaintiffs make no attempt to demonstrate that they cannot be compensated with money damages, let alone establish that they will somehow be denied a meaningful remedy in the absence of a receiver. Nor could they because any subsequent sale of the units, which will, in turn, result in a pro rata distribution to each of the remaining limited partners, will not only mitigate the Cui Plaintiffs' damages, but it will also allow such damages to be reduced to a sum certain (i.e. the difference between initial investment and amount distributed). The existence of an adequate legal remedy precludes the appointment of a receiver. *See Meyer Jewelry Co.*, 906 F. Supp. at 433.

**5.      The Availability of Less Drastic Equitable Remedies is Inapplicable**

This factor has no real application here because the Cui Plaintiffs do not even have a valid claim to support the remedy they seek.

**6.      Appointment of a Receiver Will Do More Harm Than Good**

Finally, a receivership will do more harm than good – to CRCPS itself as well as the 90% of the limited partners who are not parties to this lawsuit. Receivers do not work for free, yet the Cui Plaintiffs demand appointment of a receiver "and that no bond be required." [ECF 211, ¶ 49]. The cash flow from managing the Property that CRCPS controls does not support, and has not supported, CRCPS' obligation to pay management fees, and as a result CRC has accrued almost $4 million in management fees as it is. The only way to fund a receiver would be to require the limited partners to finance the effort, and there is of course no indication that the limited partners wish to do that for the benefit of the named Plaintiffs in this case. *See Federal*

*Home Loan Mortg. Corp. v. Spark Tarrytown, Inc.*, 813 F. Supp. 234, 235 (S.D.N.Y. 1993) (receivership is drastic remedy dispossessing owners of assets, imposing substantial additional costs). A receiver's fees would undoubtedly deplete the assets of CRCPS during the pendency of the litigation and divert funds that would have otherwise been distributed to the limited partners. *See Waag*, 10 F. Supp. 2d at 1195 (cost and expense of receiver may do more harm than good). Finally, the appointment of a receiver "would unnecessarily complicate this already lengthy and contentious action." *MTGLQ Inv., LP v. Wellington*, No. 17-487, 2019 WL 7596227, at * 2 (D. N.M. Oct. 3, 2019) (quotations omitted).

## V.   CONCLUSION

In sum, there is no basis for the appointment of a receiver. For the foregoing reasons, respectfully, the Cui Plaintiffs' motion for appointment of a receiver [ECF 211] should be denied.

Dated:  June 19, 2020

/s/ James D. Kilroy

James D. Kilroy
Stephanie A. Kanan
SNELL & WILMER L.L.P.
1200 Seventeenth Street, Suite 1900
Denver, CO 80202-5854
Phone: (303) 634-2000
Fax: (303) 634-2020
Email:  jkilroy@swlaw.com
Email:  skanan@swlaw.com

***Counsel for Defendant Colorado Regional Center I, LLC***

## <u>CERTIFICATE OF SERVICE</u>

  This is to certify that on June 19, 2020, a true and correct copy of the above and foregoing document has been electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record:

Douglas Litowitz
413 Locust Place
Deerfield, IL  60015

Hubert Kuo
Brian P. Stewart
Ardent Law Group
4340 Von Karman Avenue, Suite 290
Newport Beach, CA  92660

Harold A. Haddon
Ty Gee
Haddon Morgan and Foreman, P.C.
150 East 10th Avenue
Denver, CO  80203

         */s/Amy Kovarsky*
         for Snell & Wilmer L.L.P.