# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 1:19-cv-02443-STV**

Jun Li, Qi Qin, Yi Liu, Jie Yang, Yuquan Ni, Li Fang,
Zhongzao Shi, Fang Sheng, Shunli Shao, Kaiyuan Wu,
Zhijian Wu, Zhongwei Li, Sa Wu, Fan Zhang, Lin Qiao, Jinge
Hu, Rujun Liu, Ying Xu, Lu Li, and Yuwei Dong,
individually, as well as Derivatively for Colorado Regional
Center Project Solaris LLLP,

      Plaintiffs,

v.

Waveland Ventures LLC,
Colorado Regional Center Project Solaris LLLP,
Colorado Regional Center,
Colorado Regional Center I, LLC,
Solaris Property Owner LLC,
Solaris Property Owner I LLC, and
Peter Knobel,

      Defendants.

---

## AFFIDAVIT OF RICK HAYES

---

    I, Rick Hayes, being of the age of majority, and with personal knowledge, hereby state as follows:

    1.    I am a managing member of Colorado Regional Center, LLC ("CRC"), a Colorado limited liability company.

    2.    CRC is an approved EB-5 Regional Center, authorized by U.S. Citizenship and Immigration Services ("USCIS") to operate anywhere within the State of Colorado.

Exhibit A

Case No. 1:19-cv-02445-RM-STV  Document 51-1  filed 10/18/19  USDC Colorado  pg 3 of
293
Case 1:19-cv-02445-STV  Document 31  Filed 10/06/19  USDC Colorado  Page 2 of 3

3.      I am also a managing member of Colorado Regional Center I, LLC ("CRC I"), a Colorado limited liability company, which is the general partner of Colorado Regional Center Project Solaris LLLP ("CRCPS"), a Colorado limited liability limited partnership.

4.      Jun Li, Qi Qin, Yi Liu, Jie Yang, Yuquan Ni, Zhongzao Shi, Fang Sheng, Shunli Shao, Kaiyuan Wu, Zhijian Wu, Zhongwei Li, and Yuwei Dong (collectively, the "Plaintiffs") are Chinese investors who each purchased a limited partnership interest in CRCPS for $500,000, as part of an approved EB-5 Program through the USCIS to obtain a permanent residence visa, commonly referred to as a "green card."

5.      CRCPS prepared a Private Placement Memorandum ("PPM") to raise funds related to the development of a luxury residential and commercial project known as Solaris Residences ("Solaris"). *See* **Exhibit 1.**

6.      As the PPM explained, investors who invested in this opportunity paid $500,000 for limited partnership interests in CRCPS and the proceeds of the PPM offering were to be used to lend up to $100 million to Solaris Property Owner LLC ("SPO"), the developer of Solaris.

7.      The PPM included, among other things, copies of the transactional documents related to CRCPS' contemplated loan to SPO, a fulsome description of the anticipated use of the proceeds of the private offering, a description of the investor qualifications and suitability requirements, and an actual copy of the CRCPS limited liability partnership agreement (the "Partnership Agreement"). *See* **Exhibit 2.**

8.      In order to purchase a limited liability partnership interest, the investors had to, and did, certify their proficiency in the English language.

2

Exhibit A

Case 1:19-cv-02443-RM-STV   Document 31-1   Filed 10/05/19   USDC Colorado   Page 3 of 9

9.      The loan agreement between CRCPS and SPO was and always has been an arms' length and fully negotiated transaction.

10.     Before sending the PPM to potential investors, counsel for CRCPS submitted the investment opportunity and transaction structure described in the PPM to the United States Citizenship and Immigration Services ("USCIS").  The USCIS evaluated this investment structure and transaction structure and approved it as an EB-5 Program investment.  USCIS has never revoked the EB-5 Program approval for this investment.

11.     In this lawsuit, Plaintiffs are apparently claiming that they believed they were promised a guaranteed return.  CRC, CRC I and CRCPS did not promise any of the investors a guaranteed return, nor would USCIS have permitted such an investment under the EB-5 Program.  Attached hereto as **Exhibit 3** is a copy of 8 C.F.R. § 204.6(j)(2), which provides: "To show that the petitioner has invested … the right amount of capital, the petition must be accompanied by evidence that the petitioner has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk."

12.     The PPM was issued on or about March 11, 2011.  The last limited partner subscribed by April 2013.

13.      Thereafter, CRCPS loaned 100% of the proceeds of the investments made by the limited partners which totaled approximately $82.5 million, to SPO's assignee, Solaris Property Owner I, LLC ("SPO I").

14.     The proceeds of the loan were to be used by SPO to pay certain costs pertaining to the development of the Solaris project.

15. The loan was evidenced by a loan agreement and a promissory note and was funded in multiple advances over a period of time.

16. To secure the loan, SPO granted a lien, evidenced and perfected by individual deeds of trust, to CRCPS for each of 19 condominium units valued in the aggregate at approximately $82.5 million at the time of execution of the loan agreement (the "Property").

17. Prior to the commencement this action, two of the nineteen units have been assigned to entities owned by certain limited partners of CRCPS in consideration of a redemption of their partnership interests.

18. The loan accrued interest at a rate of 5.55% per annum.

19. The principal balance together with all accrued and unpaid interest of each loan advance was due and payable five years after the date of each loan advance.

20. Pursuant to the terms of the loan agreement and as expressed by the PPM, three years following each loan advance, SPO had the right to prepay the amount of the loan advance by either paying cash or tendering a special warranty deed to one or more condominium units, which would reduce the principal balance of the loan, as set forth in the loan agreement and promissory note.

21. Prior to the first advance under the loan, SPO assigned all rights, obligations, title and interest related to the loan, note and Property to Solaris Property Owner I, LLC ("SPO I"), and SPO I assumed all obligations thereunder, thus becoming the borrower pursuant to the loan agreement.

4838-1702-8777.3

Exhibit A

22.    Consistent with the terms of the loan agreement, SPO I delivered notice of its intention to exercise the right to collateral transfer with respect to each condominium unit to CRCPS in lieu of cash payment after three years following each loan advance.

23.    Pursuant to the terms of an Agreement Regarding Collateral Units between CRCPS and SPO I, attached hereto as **Exhibit 4**, CRCPS has not yet been assigned title to the remaining units comprising the Property (other than the two condominium units conveyed to CRCP's designees) because SPO I agreed to continue to hold title and, upon the instruction of CRCPS, to directly sell the units to a buyer designated by CRCPS.

24.    Such deferral of title transfer benefits CRCPS because it avoids a significant municipal transfer tax, prepayment of HOA dues, and over $100,000 of working capital payments that would be due the HOA, which costs would be borne by the limited partners, including Plaintiffs (investors).

25.    Accordingly, SPO I continues to hold title to the Property (now consisting of 17 units), as the successor in interest to SPO, and CRCPS continues to hold a first priority lien on the Property by means of the respective deeds of trust.

26.    CRC I, as general partner of CRCPS, has been cognizant of the limited partners' desire to liquidate their investment, and CRC I has consistently and regularly provided the investors notices regarding appraisals of the Property, opportunities to sell the Property through bulk sales of the condominium units or sales of individual units and plans for the return of the limited liability partners' capital contributions.  Copies of certain notices that CRC I has sent to all limited partners are attached hereto as **Exhibit 5.**

5

Exhibit A

27.     In an effort to provide an equitable exit strategy for limited partners who wanted to liquidate their investment, CRC I sent notices beginning on March 15, 2016 (*see* Ex. 5), to the limited partners, including Plaintiffs, giving them an opportunity have their limited partnership interest redeemed by the partnership, CRCPS, in accordance with the terms of the Partnership Agreement.

28.     After initially exercising their respective redemption rights, Plaintiffs subsequently expressly rejected this opportunity, advising CRC I that they would not exercise the "Put Right" that CRC I described in the notices.

29.     CRC I has diligently attempted to find a suitable exit strategy for all investors, which of course would necessarily involve a sale of the Property.

30.     Exercising its reasonable business judgment, CRC I determined that a recent offer for a bulk sale of the remaining 17 units was in the best interest of CRCPS and its limited partners.

31.     On June 5, 2019, CRCPS entered into a Letter of Intent ("LOI") to sell all of the Property (again, now comprised of 17 units) to a buyer in a transaction referred to as a bulk sale for total consideration of $49.5 million.

32.     CRC I would obviously prefer to sell the units for a higher price than $49.5 million, but the reality is that in CRC I's business judgment, the price being offered in the LOI is reasonable under current market conditions after giving consideration to the application of a liquidity discount (i.e., factoring in time value of money, etc).  It may be possible to secure a higher total price for the sale of all 17 units on an individualized basis, as opposed to a bulk sale, but many of the limited partners have been insistent that they desire immediate liquidity on their investment and a cessation of management fees that naturally accrue unless and until the units are sold.

4838-1702-8777.3

Exhibit A

33. The rationale of the bulk sale contemplated in the LOI is to satisfy the demands of the limited partners for immediate liquidity and to monetize the assets of the limited partnership.

34. If the LOI proceeds to a purchase and sale agreement closing, the net proceeds of the bulk sale (after payment of transaction costs and accrued partnership expenses) will be distributed to limited partners, including Plaintiffs, as a return of capital.

35. Counsel for CRC, CRC I and CRCPS sent counsel for Plaintiffs notice of the LOI and proposed bulk sale on or about September 4, 2019 and warned that this lawsuit or any lis pendens filed to support Plaintiffs' complaint would jeopardize this potential bulk sale. Plaintiffs reacted by filing a lis pendens and a motion for preliminary injunction.

36. It appears that Plaintiffs are asking the Court to require SPO to place title to the 17 units in the name of CRCPS based on some kind of claim that SPO or SPO I has somehow breached the loan agreement with CRCPS. But CRC and CRCPS are not aware of any breach by SPO or SPO I of the loan agreement, and, again, the whole reason that CRC asked SPO I to hold title until the 17 units are sold was to avoid a possible transfer penalty that could cost CRCPS (and, derivatively, its limited partners about $1 million.

37. If the Court orders title to the 17 units to be placed in CRCPS, and CRCPS enters into a direct sale with the purchaser under the current letter of intent (or another purchaser), CRCPS will be saddled with a liability of about $1 million upon the transfer of the units.

38. It also appears that Plaintiffs are asking the Court to enjoin CRCPS from proceeding with the transaction contemplated in the LOI.

Exhibit A

Case 1:19-cv-02443-STV   Document 51   Filed 10/18/19   USDC Colorado   Page 8 of 9

39.     This lawsuit and the lis pendens filed by Plaintiffs have already jeopardized the transaction contemplated in the LOI, but I believe that this transaction can be salvaged, depending on the outcome of the hearing on Plaintiffs' motion for preliminary injunction.

40.     If the Court enjoins the bulk sale contemplated by the LOI, it is unlikely that CRCPS will get another similar opportunity to sell the remaining 17 units – at least not in the near term. I base this belief on my personal knowledge of the relevant market for real estate of this nature in Vail, Colorado and specifically on my personal efforts over a long period of time to have the Property appraised and marketed.

41.     If the Court enjoins the bulk sale contemplated by the LOI, CRCPS will be damaged in a sum certain: $49.5 million.  In addition, if the Property is not sold it will of course have to be maintained and managed, and management fees will necessarily continue to accrue.  Based on past history, those maintenance and management fees will necessarily accrue in the amount of approximately $134,000 per month.

///

8

Exhibit A

Dated this 18th day of October, 2019.

_____
Rick Hayes

STATE OF COLORADO    )
                     )ss.
COUNTY OF Eagle      )

Subscribed and sworn to before me this _18_ day of _October_, 2019 by Rick Hayes.

Witness my hand and official seal.

_____
Notary Public

My Commission Expires:
        march 9, 2022

[SEAL]

SAMANTHA GUARDIAN CASTILLO
Notary Public - State of Colorado
Notary ID 20184011065
My Commission Expires Mar 9, 2022

9

Exhibit A



### CONFIDENTIAL INFORMATION MEMORANDUM

### COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP
**a Colorado Limited Liability Limited Partnership**

_____

**Minimum of $500,000**
**Maximum of $80,000,000**
**Limited Liability Limited Partnership Interests**

_____

This Confidential Information Memorandum (the "Memorandum") of Colorado Regional Center Project Solaris, LLLP (the "Company") relates to the issuance of limited liability limited partnership interests in a minimum amount of $500,000. The minimum total offering amount will be $500,000 and the maximum total offering amount will be $80,000,000 (See: *SUMMARY OF PRINCIPAL TERMS - Maximum Gross Total Offering* below as to a possible increase in the maximum total offering amount).

THESE SECURITIES ARE HIGHLY SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK; INVESTORS SHOULD NOT INVEST ANY FUNDS IN THIS OFFERING UNLESS THEY CAN AFFORD TO LOSE THEIR ENTIRE INVESTMENT. SEE "STATEMENT OF RISKS" ON PAGE 20. THESE SECURITIES HAVE NOT BEEN REGISTERED WITH THE U.S. SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION AND ARE BEING OFFERED PRIVATELY TO A LIMITED NUMBER OF ACCREDITED INVESTORS THROUGH THIS CONFIDENTIAL INFORMATION MEMORANDUM. NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE DISCLOSURES IN THIS MEMORANDUM. ANY REPRESENTATION OF THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE NOT LISTED ON ANY NATIONAL SECURITIES EXCHANGE OR THE NASDAQ STOCK MARKET.

### <u>Colorado Regional Center Project Solaris, LLLP</u>
4643 S. Ulster Street
Suite 950
Denver, CO 80237
(720) 554-9704

March 31, 2011

EXHIBIT 1

### CONFIDENTIALITY AND SECURITIES REQUIREMENTS

THE SECURITIES OFFERED HEREIN ARE TO BE ACQUIRED FOR INVESTMENT ONLY AND NOT WITH A VIEW TO SUBSEQUENT TRANSFER OR RESALE. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF CERTAIN STATES AND ARE OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT, THE REGULATIONS PROMULGATED THEREUNDER AND PURSUANT TO EXEMPTIONS FROM REGISTRATION OR QUALIFICATION UNDER CERTAIN STATE SECURITIES LAWS. THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "COMMISSION"), THE SECURITIES COMMISSIONER OF ANY STATE OR OTHER REGULATORY AUTHORITY. FURTHER, NO FEDERAL OR STATE SECURITIES COMMISSIONER HAS PASSED ON THE MERITS OF THIS OFFERING, THE ACCURACY OR ADEQUACY OF THIS OFFERING OR ANY LITERATURE PROVIDED HEREWITH AND ANY REPRESENTATION OF THE CONTRARY IS A CRIMINAL OFFENSE.

IF YOU ARE GIVEN ANY INFORMATION OR REPRESENTATIONS NOT INCLUDED IN THIS MEMORANDUM, YOU MUST NOT RELY UPON THEM AS HAVING BEEN AUTHORIZED BY COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP (THE "COMPANY") OR ITS OFFICERS. NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL IN ANY CIRCUMSTANCE CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY SINCE THE DATE HEREOF OR THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE OF THIS MEMORANDUM OR ANY SUPPLEMENT OR AMENDMENT HERETO.

THIS MEMORANDUM HAS BEEN PREPARED FOR DISTRIBUTION TO A LIMITED NUMBER OF INVESTORS MEETING CERTAIN SUITABILITY STANDARDS TO ASSIST THEM IN EVALUATING A PROPOSED INVESTMENT IN THE COMPANY. INVESTORS GENERALLY MUST QUALIFY AS BEING "ACCREDITED INVESTORS" AS DEFINED BY REGULATION D UNDER THE SECURITIES ACT OF 1933 ("REGULATION D"), AS AMENDED.

THIS MEMORANDUM CONSTITUTES AN INVITATION ONLY TO THE PERSON WHO WAS DELIVERED THIS MEMORANDUM BY THE COMPANY. NO OFFERS WILL BE ACCEPTED FROM ANY OTHER PERSON.

THERE IS NO PUBLIC OR OTHER MARKET FOR THE LIMITED LIABILITY LIMITED PARTNERSHIP INTERESTS (THE "LP INTERESTS"), NOR IS SUCH MARKET EXPECTED TO DEVELOP. THEREFORE, AN INVESTMENT IN THE LP INTERESTS SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN AFFORD THE ILLIQUIDITY AND TOTAL LOSS OF THEIR INVESTMENT.

THE LP INTERESTS OFFERED HEREBY ARE "RESTRICTED SECURITIES" AS THAT TERM IS DEFINED BY RULE OF THE COMMISSION AND THEY MAY NOT BE TRANSFERRED, HYPOTHECATED OR SOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, UNLESS EXEMPTIONS FROM SUCH REGISTRATIONS ARE AVAILABLE AND ESTABLISHED TO THE SATISFACTION OF THE COMPANY. SEE "STATEMENT OF RISKS."

EXHIBIT 1

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITY OTHER THAN THE LP INTERESTS OFFERED OR AN OFFER TO SELL OR SOLICITATION OF AN OFFER TO BUY THE LP INTERESTS IN ANY JURISDICTION OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE ANY SUCH OFFER OR SOLICITATION IN SUCH JURISDICTION.

PROSPECTIVE INVESTORS ARE URGED TO READ THIS MEMORANDUM CAREFULLY.  THEY WILL HAVE AN OPPORTUNITY TO TALK WITH REPRESENTATIVES OF THE COMPANY TO VERIFY ANY OF THE INFORMATION INCLUDED HEREIN AND TO OBTAIN ADDITIONAL INFORMATION REGARDING THE COMPANY.  THIS MEMORANDUM CONTAINS SUMMARIES OF CERTAIN DOCUMENTS. COPIES OF ALL MATERIAL DOCUMENTS RELATING TO THE COMPANY WILL BE MADE AVAILABLE TO THE PROSPECTIVE INVESTORS FOR INSPECTION DURING NORMAL BUSINESS HOURS UPON REQUEST TO THE COMPANY.

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.

ANY ESTIMATES OR PROJECTIONS AS TO EVENTS THAT MAY OCCUR IN THE FUTURE (INCLUDING THE COMPANY'S PROPOSED BUSINESS OPERATIONS AND PROJECTIONS OF ALL TYPES) ARE BASED UPON THE BEST JUDGMENT OF THE COMPANY AS OF THE DATE OF THIS MEMORANDUM.  WHETHER SUCH PROPOSED BUSINESS OPERATIONS, ESTIMATES OR PROJECTIONS MAY BE ACHIEVED WILL DEPEND UPON THE COMPANY ACHIEVING ITS OVERALL BUSINESS OBJECTIVES AND THE AVAILABILITY OF FUNDS.  THERE IS NO GUARANTEE THAT ANY OF THESE PROJECTIONS ARE CORRECT OR WILL BE ATTAINED. ACTUAL RESULTS WILL VARY FROM THE PROJECTIONS AND SUCH VARIATIONS MAY BE MATERIAL.

NO REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE INTENDED OR SHOULD BE INFERRED WITH RESPECT TO THE ECONOMIC RETURN, WHICH MAY ACCRUE AS A RESULT OF AN INVESTMENT IN THE COMPANY.  NEITHER THE INFORMATION CONTAINED HEREIN, NOR ANY PRIOR, CONTEMPORANEOUS OR SUBSEQUENT COMMUNICATION SHOULD BE CONSTRUED BY THE PROSPECTIVE INVESTOR AS LEGAL OR TAX ADVICE.   EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OR HER OWN INVESTMENT, LEGAL AND TAX ADVISOR TO ASCERTAIN THE MERITS AND RISKS OF THE TRANSACTIONS DESCRIBED HEREIN.

THESE SECURITIES HAVE NOT BEEN REGISTERED WITH ANY FEDERAL OR STATE AUTHORITIES.

THE COMPANY IS EXEMPT FROM THE PROVISIONS OF THE INVESTMENT COMPANY ACT OF 1940 PURSUANT TO SECTION 3(C)(1) THEREOF.

EXHIBIT 1

# TABLE OF CONTENTS

**EXECUTIVE SUMMARY**                                                    **1**
      **The Project**                                              **3**
      **Business Objectives**                                     **4**
      **Marketing**                                               **5**
      **Job Creation**                                            **6**
      **Financing**                                               **7**
      **The EB-5 Program**                                        **7**
      **EB-5 Eligibility**                                        **9**

**SUMMARY OF PRINCIPAL TERMS**                                          **9**
      **Summary of the Offering**                                 **9**

**COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP**                      **15**
      **Structure of the Investment**                             **15**
      **Monetization/Exit Strategy**                              **16**
      **Due Diligence**                                           **16**
      **Monitoring**                                              **17**

**STATEMENT OF RISKS**                                                  **17**

**TERMS OF THE OFFERING**                                               **26**
      **General**                                                 **26**
      **Suitability Standards**                                   **26**
      **Sales; Review of Subscriptions**                          **27**
      **Escrow Arrangements**                                     **27**
      **Use of Proceeds**                                         **28**
      **Legal Proceedings**                                       **28**
      **Investor Qualifications**                                 **29**

**SUBSCRIPTION PROCEDURES**                                             **29**

**ENGLISH LANGUAGE PROFICIENCY**                                        **30**

**EXHIBIT A**    **Solaris Promissory Note**                         **31**
**EXHIBIT B**    **Operating Payment Agreement**                     **37**
**EXHIBIT C**    **Regional Center Approval Letter**                 **42**
**EXHIBIT D**    **Cash Flow Schematic**                             **49**
**EXHIBIT E**    **Citibank Escrow Agreement**                       **50**
**EXHIBIT F**    **Chartered Escrow Agreement**                      **66**
**EXHIBIT G**    **Investor Questionnaire**                          **85**
**EXHIBIT H1** **Citibank Subscription Agreement A**                 **93**
**EXHIBIT H2** **Citibank Subscription Agreement B**                 **109**
**EXHIBIT H3** **Chartered Subscription Agreement**                  **125**
**EXHIBIT I**    **Sources and Uses**                                **141**
**EXHIBIT J**    **Limited Liability Limited Partnership Agreement**  **142**
**EXHIBIT K**    **Yield Enhancement Agreement**                     **176**

EXHIBIT 1

# EXECUTIVE SUMMARY

This offering relates to development of a luxury residential and commercial project known as Solaris Residences ("Solaris") located in Vail, Colorado, USA.

Investors will purchase limited partnership interests in Colorado Regional Center Project Solaris, LLLP (the "Company"), a Colorado limited liability limited partnership. The Company's general partner is Colorado Regional Center I, LLC, a Colorado limited liability company, a wholly-owned subsidiary of Colorado Regional Center, LLC, a Colorado limited liability company. The limited partners of the Company will be the investors who invest pursuant to this offering. The Company intends to lend the proceeds of this offering to Solaris Property Owner, LLC, a Delaware limited liability company or its permitted assignee ("SPO"). SPO is the developer of a residential and commercial development in Vail, Colorado, consisting of 79 high-end residential Condominium Units and 70,000 square feet of commercial space (the "Project"). SPO will issue a promissory note (the "Solaris Note") to the Company. A copy of the form of the Solaris Note is attached hereto as Exhibit A. Additionally, SPO and the Company will enter into an Operating Payment Agreement (the "Operating Payment Agreement") in the form as attached hereto as Exhibit B. The Solaris Note has the following basic terms and conditions:

- The principal amount will be for $80,000,000 and will provide that advances of principal will be made in minimum amounts of $ 500,000. The amount of each advance of principal (each a "Loan Advance") will be noted on the Solaris Note and interest will accrue only on the amount of principal outstanding.

- The interest rate is 5.0% per annum.

- Interest will be payable monthly and the principal balance will be due and payable on the fifth anniversary of each Loan Advance.

- SPO will have no right to prepay the Solaris Note for the first three years from the date of issuance.

- The principal balance together with all accrued and unpaid interest of each Loan Advance shall be due and payable five years after the date of each such Loan Advance.

- After three years following a Loan Advance, upon 60 days prior written notice to the Company (the "Prepayment Notice Period"), SPO shall have the right to prepay all or certain minimum amounts of the outstanding principal balance on the Solaris Note by tendering to the Company either (i) a special warranty deed to a Condominium Unit (as defined below) and a bill of sale for the Furnishings (as defined below), which deed and bill of sale will transfer title to the Condominium Units and the Furnishings free and clear of all liens and encumbrances except for matters of record approved by the Company, or (ii) cash in the amount of the principal amount of the prepayment plus all accrued interest. Any such prepayment shall be in a minimum amount of the purchase price of a Condominium Unit (which purchase prices will be attached to the Solaris Note at the time of execution). If SPO tenders a prepayment in the form of a transfer of ownership of a Condominium Unit, the amount of the principal balance of the Solaris Note that will be deemed prepaid shall be equal to the purchase price of the Condominium Unit tendered as set forth in the attachment to the Solaris Note. During the Prepayment Notice Period, the Company will have the right to exercise its right to purchase a Condominium Unit and to reject the cash prepayment offered by SPO. In such event, the purchase price of the Condominium Unit shall be credited against the outstanding balance of the Solaris Note.

EXHIBIT 1

- The Solaris Note is executed by SPO and the interest on the Solaris Note is personally guaranteed by the principal of SPO, Peter Knobel, until the principal balance is paid or prepaid.

The Operating Payment Agreement contains the following basic terms and conditions:

- SPO will have no right to prepay all or any portion of a Loan Advance under the Solaris Note for the three-year period following such Loan Advance and the Company will have no right to exercise its option to purchase a Condominium Unit for three years following the execution of the Condominium Lease (as defined below). If, after such applicable time periods, either SPO prepays all or some portion of the Solaris Note by the transfer of one or more Condominium Units, or if the Company exercises its option to purchase a Condominium Unit and such Condominium Unit is conveyed to the Company, then commencing on the first day of the month following such prepayment or conveyance, and continuing on the first day of each month thereafter until terminated as provided below, SPO will pay to the Company an amount equal to the periodic interest actually owed from the Company to each Investor from time to time (whether the same is accruing or paid current), but in no event more than an effective annual rate of three percent (3%) per Investor (the "Operating Payments"). The Operating Payments will continue until the earlier to occur of (i) the Maturity Date of the specific Loan Advance that is being prepaid by the conveyance of the Condominium Unit(s), or (ii) with respect to each individual Limited Partner, the date on which the Company is no longer required to pay the Preferred Return to such Limited Partner.

    SPO's obligations to make interest payments during the term of the Solaris Note and to make Operating Payments will be personally guaranteed by Peter Knobel, the principal of SPO. The Company has reviewed certain financial information about Mr. Knobel and believes that his personal guaranty is a significant credit enhancement to the transaction.

    If the Company acquires one or more Condominium Units prior to a Maturity Date, it is the Company's current intent to hold the Condominium Units and rent them out to third parties and to own the Condominium Units until the fifth anniversary of each Loan Advance. However, the Company has the right to sell a Condominium Unit at any time after it acquires title to the Condominium Unit.

Ownership of the LP Interests will entitle Limited Partners to free use of a two-bedroom Condominium Unit at Solaris for up to seven consecutive days during the months of November through March, and 14 days during the rest of the year. Additionally, the Investors will be entitled to use the Condominium Units for longer periods of time at a discount of 30% off of the stated rental rates for the dates utilized. Such usage rights are subject to the Company's continued ownership of or leasehold interests in the Condominium Units and such usage and notice restrictions as may be applicable from time to time.

SPO will retain ownership of the Condominium Units that are pledged to the Company as Collateral for the SPO Note. Therefore, SPO will be responsible for ongoing payments of Homeowners Association Dues, property taxes, insurance, and other obligations relating to the pledged Condominium Units. Subject to the Company's rights to designate a rental management company, SPO will further be responsible for leasing the Condominium Units to third parties for the purpose of generating revenues. As set forth in the Yield Enhancement Agreement entered into between the Company and SPO, a copy of which is attached hereto as Exhibit K (the "Yield Enhancement Agreement"), the Company will be granted the right to use the Condominium Units for its Limited Partners for their use as granted under the

EXHIBIT 1

Case No. 1:19-cv-02443-RM-STV Document 211-10 filed 06/19/20 USDC Colorado pg 7 of 17
Case 1:19-cv-02443-PAB-NRN Document 50-1 filed 10/18/19 USDC Colorado Page 7 of 184
of 293

Limited Partnership Agreement.  The Company will receive any net income derived from the rentals of such units and shall be responsible for any shortfalls if expenses exceed revenue.  The Company and SPO shall adjust such expenses on a quarterly basis.  The specific terms and conditions of the rental and usage arrangements between the Company and SPO are set forth in the Yield Enhancement Agreement.  The Yield Enhancement Agreement gives the Company the right to purchase the Condominium Units for the purchase prices that will be set forth in an exhibit to the Loan Agreement executed at the time of each Loan Advance.  Such right may be exercised at any time after the expiration of three years following each Loan Advance and prior to acceptance of payment of the principal balance from SPO to the Company.

The Company will be a special purpose entity and at the time of this Offering will own no other assets other than the Solaris Note.  Under the terms of the Limited Partnership Agreement, a copy of which is attached as Exhibit J, each Limited Partner will be entitled to receive cash flow distributions from the Company in an amount as set forth in the Limited Partnership Agreement (the "Preferred Return") and further be entitled to personal use of the Condominium Units as described above.  The Company reserves the absolute right (in its sole discretion) to pay additional amounts to particular investors and/or classes of investors, whether such amounts are characterized as additional interest, commissions, fees, rebates or otherwise (the "Additional Compensation"), as necessary to adjust for variations between different EB-5 markets, whether such differences result from geographical separation, local custom, governmental and or regulatory matters, business concerns or otherwise.  The source of the cash flow for such payments to the Limited Partners is expected to be derived from a portion of the interest payable to the Company as well as from a portion of the net revenues, if any, derived from the rental of the individual Condominium Units tendered in exchange for the payment or prepayment of the Solaris Note. Additionally, in the event that some or all of the principal of the Solaris Note is paid or prepaid, then the sources of funds for the payment of the returns to the Limited Partners will come from one or more of either (i) a portion of the Operating Payments from SPO, (ii) proceeds from the sale of the Condominium Units conveyed to the Company as a payment of the Solaris Note, and (iii) a portion of the net revenues, if any, derived from the rental of the individual Condominium Units tendered in exchange for the payment or prepayment of the Solaris Note.  In no event will payments of the Preferred Returns to the Limited Partners come from any portion of any principal prepayment of the Solaris Note.  On the five-year anniversary date of each respective Loan Advance (the "Maturity Date"), provided that the specific Loan Advance has not previously been paid, SPO will be obligated to pay the entire remaining unpaid principal balance together with any accrued and unpaid interest in full.  Under the terms of the Yield Enhancement Agreement, the Company will have the option to purchase individual Condominium Units securing the obligations under the Solaris Note rather than being required to accept a cash payment for the Solaris Note.  The Company expects that it would only exercise that option if the value of the Condominium Unit exceeded the amount of the Loan secured by that Condominium Unit.  The Company would advise the Limited Partners of these considerations prior to making that decision.  If the Company exercises its option to purchase, the purchase price shall be paid by a credit of the purchase price against the Solaris Note.  If SPO does not have the funds available to pay the Solaris Note when such payment is due, SPO will be required to transfer to the Company certain of the Condominium Units located at the Project that are being pledged to secure the obligation to pay the Solaris Note.  At the time of the Maturity Date, the Company will make reasonable efforts to sell the Condominium Units and will use the proceeds of such sales to redeem from the Limited Partners the LP Interests.  The Company intends to pay the Limited Partners for their respective interests in the Company either by utilizing the proceeds derived from the receipt from SPO of the payment of the Solaris Note, or, alternatively, if there has already been a prepayment of all or any portion of the Solaris Note, then by selling the Condominium Units that were previously transferred to the Company as consideration for the payment of the Solaris Note.  The sources of funds for repayment of the Limited Partners' Capital Contributions will come solely from the sources described above.

**The Project**

EXHIBIT 1

The Project is located in the heart of Vail, Colorado in one of the premier locations in the Vail Village, only a short walk from the Vista Bahn ski gondola. The principal of SPO, the developer of the project, is Vail resident Peter Knobel. Mr. Knobel has developed high-rise buildings in New York City, built high-end residential homes in New York and other locations, and has also served as an executive at several successful telecommunications companies.

Vail, Colorado, has a resident population of approximately 4,500 people and is a world-renowned ski and resort community that has been recognized by numerous industry publications as one of the top five ski destinations in the world. Ski Magazine has awarded Vail as the "No. 1 Ski Resort in North America." Vail is the largest single ski mountain in North America and has hosted numerous worldwide skiing competitions (including two World Alpine Ski Championships) and its resort facilities have been in high demand for many years. The ski area hosts almost two million skiers/snowboarders per year. The town is not just dependent on skiing to attract tourists. During the summer, Vail is host to music festivals and served as a venue for the New York Philharmonic summer residency, the only residency for the orchestra outside of New York. Visitors come to Vail for a variety of reasons including world-class skiing, snowboarding, and other winter sports, golf, tennis, hiking, camping, music, and other summer activities, as well as very high-end shopping, and dining experiences.

The Project, known as "Solaris," consists of 79 residential condominium units (the "Condominium Units" and individually, a "Condominium Unit") and approximately 70,000 square feet of commercial space. There are 304 heated underground parking spaces under the building. The Condominium Units are constructed and finished at the very highest end of the luxury scale. The unit owners will have access to a facility located at the gondola where they can store ski equipment and other personal belongings, thereby making the short walk from the Project to the ski slopes even less burdensome. Also, there are numerous shopping facilities, restaurants, and other recreational activities at or near the new complex. All of these activities can also be accessed by the free shuttle buses that carry visitors throughout the Vail Village on streets where automobile traffic is not allowed.

In an economic environment that is not currently conducive to sales of expensive mountain condominiums, the developers of Solaris have fashioned a business plan that addresses the desires of the luxury condominium owner in the form of a large-scale mixed-use facility that will have features and amenities designed to differentiate Solaris from the more typical ski resort development.

## Business Objectives/Advantages

Among other features, Solaris will emphasize:

*Location*. The Project is centrally located in Vail Village, a short walk to the ski gondolas and to the numerous shopping and commercial activities in the area. There is no automobile traffic permitted in the Vail Village. Rather, visitors move around the town by walking or by riding the free shuttle buses that circulate on a regular basis throughout the Village. The Project's premier location will be a significant selling point for the Condominium Units.

*Retail and other Facilities on Site*. The main floor of the Project has approximately 70,000 square feet of commercial space. Current tenants planned for the Project include a three-screen movie theater, a bowling alley, numerous restaurants, including one exclusive high-end restaurant and a wide range of retail outlets. Additionally, during the winter months, there will be a large ice-skating rink in the front of the complex with skate rentals and instruction available.

EXHIBIT 1

*Parking*. Parking in the Vail Village is always at a premium. Solaris will have 304 heated underground parking spaces available to condominium owners and visitors to the retail center. The developers of Solaris understand that buyers of high-end condominium units may well conclude that convenient and adequate parking will be a significant inducement in making their investment decision.

*Property Management*. The developers will have an on-site property management company that will assist owners in all aspects of the maintenance of their units, including a full-scale rental agency. If an owner desires to rent out his or her unit to visitors, all rental operations will be facilitated through the property management company. Fees for this service will be comparable to other property management companies in the Vail area and will approximate 25-50% of the gross rental fees. Likewise, the property management company will be responsible for all day-to-day maintenance matters including arrangements for owner occupancy of the unit.

*Quality Finishes*. All of the units in the Project will be finished to the same high-end standard of quality. Individual purchasers are given very little latitude in choosing the level of finish and all of the units are completed to an extremely high level, including luxury brand name appliances, marble and granite slab countertops, fixtures, carpeting, flooring, and other similar matters. Insulation, sound-proofing, heating and air-conditioning systems are all built to the highest standards and are designed to appeal to discriminating buyers.

## Marketing of the Project

*Residential*. The developers have allocated substantial sums of money for marketing the units to high-end buyers. The units are being marketed through certain specific real estate brokers in the Vail area who are experienced and successful in marketing to potential buyers of these types of units. Real estate records in the Vail area show that a very high percentage of buyers of residential units already own property in the area and are either likely buyers of a second residence or, alternatively, are likely to upgrade to another unit after selling their first property. The real estate brokers are focusing a portion of their efforts on these existing owners of Vail real estate. Additionally, marketing efforts will be directed at another large group of buyers of Vail property, foreign nationals. Many purchasers of Vail real estate have been residents of Mexico, China, Japan, and a variety of European countries. The developers intend to work with the Company to utilize the EB-5 program to help combine an EB-5 investment with a possible sale of a condominium unit. This presents a unique opportunity for the developer and the regional center to work together for the mutual benefits of the investor, the developer, and the operator of the Regional Center.

The Condominium Units at Solaris are priced at the higher end of the market. Prices will range from $1,500 - $2,500 per square foot, depending on location in the building. The market for purchasers of high-end residential Condominium Units in the Colorado mountains is very competitive due to general economic conditions. However, the developer believes that the unique characteristics of the Solaris project will be sufficient to differentiate the residential units from other high-end residential units for sale in the area.

*Commercial*. The commercial portion of the Project is closely tied to the residential development. As described above, the first two levels of the development consists of a commercial complex of approximately 70,000 square feet plus a large outdoor skating rink. The commercial area will include several high-end retail shops including a sporting goods store, a ski, snowboard, and ice skating rental shop (including a large maintenance and repair shop for each of these types of equipment), clothing

EXHIBIT 1

stores, restaurants (including a gourmet facility, a sports bar, and a more casual restaurant), a bowling alley, a three-screen movie theater, and several other shops of similar characteristics.

The developers believe that the guests who will be occupying the residential units (both owners and rental guests) will seek new and very high-quality facilities on site. They believe that they can attract new retailers to this location because of the types of guests who will be residing in the units. The Project is expected to be the new center of the Town of Vail because of its centralized location and the many goods and services that will be located at the Project. The new, state-of-the-art, three-screen movie theater facility will be the only movie theater in the Vail Village area and promises to be a major draw for both residents of Solaris and other residents and visitors to Vail. Likewise, the bowling alley will be the only facility of its kind in the area. The skating rink (again, the only one of its kind in the Vail Village) will be open during the winter months and will provide an excellent recreational facility for residents and guests alike. The skate rental shop will likely increase usage of this amenity by making the rental process easy and convenient.

While the ultimate tenants of the retail space are different from the ultimate buyers of the residential units, the developers are utilizing an integrated marketing plan. The convenience and variety of the retail amenities are significant selling points for the residential units. Likewise, the developer believes that the tenants of the retail space will be more likely to rent space in this location, not only because it is centrally located in the heart of Vail, but also because there will be a large number of relatively affluent guests staying directly above the retail outlets. Agents of the developer are seeking both new tenants for the retail and existing retailers in Vail who are being encouraged to open a second location at Solaris. In addition to the attraction of a large number of potential customers in the floors above the shops, the developer believes that the availability of underground, on-site parking will be a very attractive selling point for potential tenants. Contiguous parking simply does not exist in the main shopping district in Vail as the streets are closed to vehicular traffic except for the City-operated bus shuttle bus system.

For all of the above reasons, projected rental rates for the tenants at the retail center will be at the high end of rates for retail commercial space in the Town of Vail. Rates are expected to range from $50 to $75 per square foot (annual). With projected sales of $350 - $500 per square foot, the Developer believes that there will be excellent demand for the space. Lease terms will be competitive with other area leases with most leases having three- to five-year terms. As with the Condominium Units, the developer believes that the retail space will attract tenants even at the high end of the rate schedule due to the superior location and amenities discussed above.

## Job Creation

***Residential***. The Company has commissioned the firm of Evans, Carroll & Associates to perform an econometric study to determine the number of jobs that will be created by the Project. The econometric study was updated in February, 2011 to reflect current data and to utilize the RIMS II economic analysis methodology. The study concludes that the 79 residential Condominium Units will generate a total of 76 new full-time jobs. For purposes of job creation, the econometric study breaks down the condominiums into 39 units that will be owner-occupied and 40 units that will be rented out in a rental pool. The study assumes that some of the "owner-occupied" units will be rented some of the time and some of the rental units will be occupied by the owners some of the time. The jobs will be generated over a wide range of disciplines. A number of the direct jobs will come from the service sector and will include jobs in insurance, real estate sales and management, security and maid service, services to building grounds, and local governmental jobs. Indirect and induced jobs will be created in various sectors including retail trade, transportation, professional and business services (including architectural

EXHIBIT 1

and engineering), social services, repair services, and other related areas. Specific jobs relating to rental units include employees to advertise and handle reservations, check-in and check-out personnel, security personnel, and maintenance and groundskeeping services. Specific jobs relating to the owner-occupied units include insurance agents, real estate sales associates, security personnel, housekeepers, professional designers, and other professional service personnel.

*Commercial and Parking*. The parking structure and the commercial portion of the Solaris project will create a total of 534 direct jobs from all of the retail and parking structure activities carried out at the facility. These jobs will include retail store clerks, store managers, security personnel, and other similar employees necessary to operate a large-scale retail and parking complex.

*Construction*. USCIS does not accept or credit creation of direct temporary "construction jobs" within a business plan or economic job creation forecasts activities which involve a limited direction construction phase of less than two years unless the scope, complexity, and the ongoing construction phase must be fully sustained for all the construction phase jobs for two years or more with respect to the size, scope, nature, engineering/technology challenges and breadth of the project. Since this project does represent a massive project that will actually take more than three years to complete, all the construction jobs are included to the extent that they represent hard construction costs. The total construction jobs created by the project are 1,500 jobs. The annual increase in output will be about $184 million, with the annual increase in household earnings about $57.1 million. The average output per new construction worker will be about $123,700, with average earnings of about $41,200. For all new workers, average output will be about $122,600, with average earnings of about $38,100.

*Total Jobs*. The Residential portion of the Project will generate 76 direct jobs, the construction will create 1,500 jobs, and the Commercial and parking portions of the Project will generate 534 direct and indirect full-time jobs for a total job creation of 2,110 new, full-time jobs created at the Project.

## Financing

The Solaris project is currently being financed by a combination of institutional construction loans and developer equity. The current debt will be reduced as Condominium Units are sold and closed. Developer equity will remain in the project as a long-term investment. The development cost of the Project is approximately $375 million. Proceeds from the loan represented by the Solaris Note will be used by SPO for development of the Project as part of its developer's equity and may include funding for such items as marketing, construction costs, and other development expenses typically incurred in connection with a development of this magnitude. All of the expense funded by the proceeds from the Solaris Note are essential to the completion of the Project and will contribute directly to the creation of the projected jobs at both the Residences and the Commercial facilities. The parties expect to close the loans in traunches of approximately $5.0 million each, but may close loans in individual amounts of $500,000 each. The amount of each traunche may vary by the prices of the individual Condominium Units that are pledged as collateral for each loan. For example, if an individual Condominium Unit has a purchase price of $4.5 million, the parties may choose to close an individual loan in that amount. A copy of the sources and uses of the various forms of financing for the Project is attached hereto as Exhibit I.

## The EB-5 Program

Congress created the employment-based fifth preference ("EB-5") immigrant visa category in 1990 for immigrants seeking to enter the United States to engage in a commercial enterprise that will benefit the

EXHIBIT 1

US economy and create at least 10 full-time American jobs. To date, over $2 billion of foreign capital has been invested under the EB-5 program resulting in the creation of over 50,000 full-time American jobs. There are currently approximately 100 Regional Centers located throughout the United States with approximately 90 more applications pending. Investments have been made in a wide range of projects ranging from dairy farms in South Dakota to movie production in Southern California, to hotels and condominiums in Vermont.

The basic amount required to be invested is $1.0 million, although there are circumstances under which the minimum investment may be reduced to $500,000 (as discussed below). In exchange for this investment, an investor receives a green card for himself or herself, his or her spouse, and his or her dependent children. The immigrant family (the investor, spouse, and dependent children under age 21) are subject to conditional permanent residence for a two-year period. If the investment has met the minimum EB-5 requirements within that two-year period, the conditions are removed and the investor and his or her spouse and dependents will be granted full permanent residence in the United States. Each applicant is subject to a rigorous background check, including verification of the legitimacy of the sources of the funds used to make the initial investment.

The statutory minimum investment is $1.0 million. The minimum investment may be reduced to $500,000 if the business is established in a "targeted employment area." Targeted employment areas" include:
- Rural areas, defined as any area other than one within a metropolitan statistical area or within the boundary of a city or town with a population of 20,000 or more; and
- Areas having an unemployment rate that is at least 150% of the national average.

The Project qualifies for the minimum $500,000 investment level in that it is located in Vail, Colorado, a city outside of a recognized Metropolitan Statistical Area and having a total population of 4,500 permanent residents based on the 2000 Census.

Investments may be pooled with the funds of other investors seeking permanent investor visas. However, each investor is required to invest the applicable statutory amount and all of the jobs created directly and/or indirectly by the new commercial enterprise will be allocated among those within the pool seeking investor visas. The investors may be limited partners in a limited partnership and the limited partnership may make the investments to the job-creating entity or entities. The foreign investor may live anywhere in the US and does not have to live in the area in which the funds are invested. The applicant may expect to receive his temporary green card within approximately 10-12 months after completing the subscription process, depending in part on the country in which he is currently located and depending on USCIS and National Visa Center processing times.

Under section 203(b)(5) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1153(b)(5), 10,000 immigrant visas per year are available to qualified individuals seeking permanent resident status on the basis of their engagement in a new commercial enterprise. Of the 10,000 investor visas (i.e., EB-5 visas) available annually, 3,000 are set aside for those who apply under the Regional Center program (as described below).

**Regional Center**

A Regional Center is an entity, organization or agency that has been approved as such by the USCIS and is established to focus on a specific geographic area within the United States. The geographic area can be

EXHIBIT 1

as small as a few blocks in a city or as large as an entire state. The Regional Center seeks to promote economic growth through improved regional productivity, creation of new jobs, and increased domestic capital investment.

The Colorado Regional Center was approved as a Regional Center by USCIS on May 17, 2010, and is authorized to engage in projects anywhere within the State of Colorado. A copy of the approval letter is attached as Exhibit C.

An alien investor must demonstrate that a "qualified investment" (see below) is being made in a new commercial enterprise located within an approved Regional Center and show, using reasonable methodologies, that 10 or more jobs will be created either directly or indirectly by the new commercial enterprise through revenues generated from improved regional productivity, job creation, or increased domestic capital investment. The Company has retained the services of Evans, Carroll & Associates to perform the econometric study that is being used to make the job creation estimates set forth in this Memorandum.

Colorado Regional Center, LLC, the parent of the general partner of the Company, has established an approved Regional Center for the State of Colorado. The Project will be the first project developed under the EB-5 program within the Colorado Regional Center.

### EB-5 Eligibility

Permanent resident status based on EB-5 eligibility is available to investors, either alone or coming with their spouse and unmarried dependent children under the age of 21. Eligible aliens are those who have invested -- or are actively in the process of investing -- the required amount of capital (either $500,000 or $1,000,000, as described above) into a new commercial enterprise. As described above, they must further demonstrate that this investment will create the requisite number of full-time jobs for qualified persons within the United States.

### SUMMARY OF PRINCIPAL TERMS

The following summarizes the principal terms of the proposed offering of the limited partnership interests (the "LP Interests") of Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership (the "Company"). The following is only a summary and is subject to the terms of the Limited Liability Limited Partnership Agreement (the "Partnership Agreement") and the Subscription Agreement. Investors should carefully read the Partnership Agreement and the Subscription Agreement before subscribing to purchase the LP Interests.

### Summary of the Offering

*Issuer:*      Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership (the "Company").

*Securities Offered:*      Limited Liability Limited Partnership Interests (the "LP Interests").

EXHIBIT 1

| **Business:** | The Company will lend the proceeds of this Offering to Solaris Property Owner, LLC, a Delaware limited liability company ("SPO"). The Company will receive a promissory note (the "Solaris Note") executed by SPO. SPO is the owner/developer of the Solaris residential and retail complex located in Vail, Colorado. |
|---|---|
| **Principals; Management:** | The Company will enter into a management contract (the "Management Contract") with Waveland EB-5 Management, LLC, a Colorado limited liability company ("Waveland Management"). Waveland Management is a wholly-owned subsidiary of Waveland Ventures, LLC, the sole member of the limited liability company which is the parent of the General Partner. Under the terms of the Management Contract, in consideration of the performance by Waveland Management of certain management and servicing duties, Waveland Management will be entitled to receive an annual management fee equal to 2% of the total Capital Contributions to the Company (the "Management Fee"), payable quarterly. If there is insufficient cash flow available to pay the Management Fee, then the amount payable shall accrue and bear interest at the rate of 6% per annum and shall be payable from the cash flow of the Company as set forth in the Limited Liability Limited Partnership Agreement of the Company. In no event will the Management Fee be payable from any Capital Contributions or from any prepaid amounts under the Solaris Note. |
| | The principals of Waveland Management who will be primarily involved in the management of the Company are D. Rick Hayes, Chester P. Schwartz, and Paul Deslongchamps (the "Principals"). The Company will leverage the resources of its affiliates, for certain operational activities. Chester Schwartz will be the primary principal of the Company who will be responsible for management of the Company. Rick Hayes and Paul Deslongchamps will also devote significant amounts of their time to the activities of the Company. |
| **Maximum Gross Total Offering:** | $80,000,000 (US). The Company will have the right to lend proceeds of this Offering to SPO in multiples of $500,000 or such other amounts as may be agreed upon between the Company and SPO. |
| **Minimum Individual Subscription:** | Each limited partnership interest (the "LP Interest) will require a capital contribution of $500,000 plus $50,000 as an Administrative Expense, as defined below). The Administrative Expense fees will be used to pay expenses such as legal, accounting, commissions, background checks, and other similar types of fees and expenses (which expenses will be collectively referred to as "Administrative Expenses"). The General Partner, in its sole and absolute discretion, may allow an individual purchaser of an LP Interest to pay his or her own legal fees in which case the Administrative Expense shall be $35,000. Each purchaser of an LP Interest shall be referred to as a "Limited Partner" or an "Investor" and shall be collectively referred to as "Limited Partners" or "Investors." |

EXHIBIT 1

**Closing Dates:**         The initial closing (the "Initial Closing") of the offering contemplated hereby will occur at such time as the Company receives subscriptions for LP Interests with an aggregate Capital Contribution of $500,000. For a period of up to 12 months after the Initial Closing (or such longer period s the parties may agree), the Managers may accept additional Limited Partners and subscriptions until the Company's aggregate subscriptions for Capital Contributions hereunder equal $80,000,000 or such higher number if permitted under the applicable EB-5 rules and regulations.

**Terms of the LP Interests:**    The Company intends to pay to each Investor the Preferred Return. The actual annual return will be determined at the discretion of the General Partner and will be set forth in each potential investor's Subscription Agreement and in the Limited Partnership Agreement. The funds necessary to pay the Preferred Returns are expected to come from (i) a portion of the interest payments made to the Company by SPO under the terms of the Solaris Note, and (ii) a portion of the net revenues, if any, derived from the rental of the individual Condominium Units pursuant to the Yield Enhancement Agreement. In no event will payment of the Preferred Returns come from any portion of any prepayment of the Solaris Note. Additionally, in the event that SPO pays or prepays some or all of the Solaris Note, then the sources of funds for the payment of the Preferred Returns to the Investors are expected to come from one or more of either (i) a portion of the Operating Payments from SPO, (ii) proceeds from the sale of the Condominium Units conveyed to the Company as a payment of the Solaris Note, and (iii) a portion of the net revenues, if any, derived from the rental of the individual Condominium Units tendered in exchange for the payment of the Solaris Note. On the five-year anniversary date of each respective Loan Advance (the "Maturity Date"), provided that the Solaris Note has not previously been paid, SPO will be obligated to pay the entire remaining unpaid principal balance together with any accrued and unpaid interest in full. The Company will have the right to require SPO to pay such balance by tendering the deeds to Condominium Units securing the obligations under the Yield Enhancement Agreement rather than by the payment of cash for the Solaris Note. If SPO is unable to make a cash payment on the Maturity Date, SPO will be required to transfer to the Company certain of the Condominium Units located at the Project that are being pledged to secure the obligation to pay the Solaris Note. At the time of the Maturity Date, the Company will begin the process of redeeming from the Investors the Investors' Limited Liability Limited Partnership Interests in the Company. The Company intends to pay the Investors for their respective interests in the Company either by utilizing the proceeds derived from the receipt from SPO of the payment of the Solaris Note, or, alternatively, if there has already been a payment of all or any portion of the Solaris Note, then by selling the Condominium Units that were previously transferred to the Company as consideration for the payment of the Solaris Note. The Company

EXHIBIT 1

intends to begin marketing efforts directed at selling the Condominium Units sometime prior to each Maturity Date. The sources of funds for repayment of the Investors' Capital Contributions are expected to come from the sources described above. Thus, the date for actual payment to the Investors for their LP Interests may be delayed until such time as the individual Condominium Units can be sold and closed. Beginning on a date three years following the date of the first Capital Contribution, the General Partner will engage one or more third parties to determine a fair market value for the Partnership Property. The General Partner will notify all investors who have held their Partnership Interests for more than three years of the results of the fair market value analysis. If an investor desires to sell at that price, he/she will give notice to the General Partner of this decision. The General Partner shall then make reasonable business efforts to liquidate Partnership Property sufficient to redeem the electing investors' interests within 180 days following the election to sell. Each electing investor shall be required to sell his/her Partnership Interest unless the actual sales price of the Partnership Property results in proceeds equal to less than 70% of the fair market value previously determined. Prior to the consummation of any sale pursuant to this provision, the independent party or parties who made the initial determination of Fair Market Value, shall make a second determination that the actual sales price represents a fair valuation under all facts and circumstances. Such fair market analyses shall be made available for review by any Limited Partner. (*Reference is made to the Limited Partnership Agreement for a more complete description of this provision*) Available cash will be distributed to the Investors from the Company in the following order: First to Waveland Management to pay for all Management Fees, then to the Investors to pay for all Preferred Returns, then to the Investors until they have been paid back the full amount of their Capital Contributions, and, finally, the excess, if any, shall be divided 70% to the General Partner and 30% to the Investors. Additionally, for such time as the Company either owns or has use rights to Condominium Units, each Investor will be entitled to have the use of a Condominium Unit at the Solaris project for a period of not less than seven consecutive days during the months of November through March and 14 days for the rest of the year. The terms and conditions of such usage are as set forth in the Partnership Agreement and reference is made to such Agreement for a more complete description of such usage rights.

*Use of Proceeds:*

The proceeds of this Offering will be used by the Company to make a loan to SPO. The loan will be evidenced by the Solaris Note. SPO intends to use the proceeds for general working capital in developing the Project.

*Terms and Conditions of the Solaris Note:*

The Solaris Note provides that each Loan Advance has a term of five years. Interest will accrue at the rate of 5% per annum and will be payable interest only in monthly installments. There will be no right to prepay principal for the first three years of any Loan Advance. At

EXHIBIT 1

the Maturity Date, the unpaid principal balance together with any accrued but unpaid interest shall be due and payable either in cash or by transfer of certain Condominium Units in lieu of cash. The Company has the right to require payment in the form of Condominium Units rather than accepting payment in cash but has no right to require payment in cash.

**Restrictions on Transfer of Securities Acquired:** The securities offered are restricted and may not be sold, transferred, or otherwise disposed of in the absence of an effective registration statement or an exemption from registration. Additionally, the transferability of the LP Interests is further restricted by the terms and conditions of the Partnership Agreement.

**No Market for LP Interests:** There is no market for the LP Interests being offered and none is expected to develop. Investors may not be able to sell the LP Interests at any price.

**Certain Risk Factors:** Investment in the LP Interests involves significant risks. See "CERTAIN RISK FACTORS."

**Investor Qualifications:** Each investor must be an accredited investor as such term is defined in Regulation D issued pursuant to the Securities Act of 1933.

**Sale and Private Placement:** Sales of the LP Interests will be made in reliance upon one or more exemptions from the registration requirements of federal and state securities laws or upon qualification under those laws.

**Management Fees:** As stated above, the Company will enter into the Management Contract with Waveland Management. Under the terms of the Management Contract, Waveland Management will be entitled to receive an annual management fee equal to 2% of the total Capital Contributions to the Company (the "Management Fee"), payable quarterly. If there is not Available Cash Flow sufficient to pay the Management Fee, then the amount payable shall accrue and bear interest at the rate of 6% per annum and shall be payable from the cash flow of the Company (but in no event from any prepayment of the Solaris Note). Additionally, the General Partner will participate in the distribution of the cash available for distribution, if any, after the Limited Partners have received the Preferred Return and 100% of their original Capital Contributions (excluding Administrative Expenses). The Company may take certain fees out of Administrative Expenses collected from Limited Partners if there are funds available after payment of all required out-of-pocket expenses relating to the offering of the LP Interests and the related EB-5 expenses. Additionally, the General Partner will have a 1% general partnership interest in the Limited Partnership in consideration of its capital and services rendered in the formation of the Limited Partnership.

EXHIBIT 1

| | |
|---|---|
| ***Management Expenses:*** | The Company will be responsible for its operating expenses as well as auditing, examination fees, accounting and legal fees, and annual meeting costs and other charges. All operating expenses will be paid from Administrative Expenses or from the cash flow of the Company, but will not be paid from Capital Contributions. |
| ***Indemnification by the Company:*** | The General Partner and its affiliates will be indemnified by the Company against all liability, including legal expense, arising out of its involvement with the Company. No one, however, shall be so indemnified for acts or omissions in material breach of the Partnership Agreement which would constitute fraud, willful misconduct or breach of fiduciary duty to the Company or to the Members. |
| ***Voting Rights; Protective Provisions:*** | The Limited Partners will not be entitled to vote except for matters specifically identified in the Partnership Agreement, as summarized below. Consent by a majority of the Limited Partners will be required for: (i) any action which alters or changes the rights, preferences or privileges of, or otherwise materially adversely affects, the Limited Partners, (ii) any amendment of the Company's Partnership Agreement in a manner materially adverse to the Limited Partners, (iii) the declaration or payment of any distribution on or the purchase, redemption or other acquisition of any security junior or *pari passu* to the LP Interests except for certain distributions defined in the Partnership Agreement, or (iv) the authorization or issuance of any equity senior to or on parity with the LP Interests. |
| ***Withdrawals and Transfers of Limited Partners' Interests:*** | No Limited Partner may withdraw from the Company, except as provided in the Partnership Agreement. Partnership Interests will not be transferable without the approval of the General Partner, whose approval may be withheld for any reason or no reason at all, and may only be transferred if in compliance with applicable securities laws. |
| ***Reporting:*** | The Company will operate on a calendar year (December 31) basis for record keeping and for tax purposes. The general partner will furnish to each Investor, within 90 days of the end of each fiscal year, annual tax information necessary for each Investor's returns and unaudited financial statements of the Company. Additionally, the Company will provide to the Limited Partners quarterly reports summarizing the status of the Company's business for the previous quarter. The books and records of the Company will be kept on the accrual basis in accordance with generally accepted accounting principles. There will be at least one meeting of the Limited Partners per year. |

*[Remainder of page intentionally left blank.]*

EXHIBIT 1

*The foregoing summary of certain portions of this Memorandum is intended for quick reference only and is not intended to be complete. This Memorandum and other accompanying documents describe in greater detail aspects of the investment that are material to prospective investors in the Company. They should be read in their entirety by prospective investors.*

*Statements contained in this Memorandum as to the contents of any other agreements or documents are not necessarily complete and each such statement is deemed to be qualified in all respects by the provisions of those agreements and documents, copies of which are available for examination by prospective investors upon request.*

## COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP

**Structure of the Investment**

An investment in the Company will entitle each Limited Partner to an LP Interest in the Company. The minimum investment from each Limited Partner will be a $500,000 Capital Contribution and a separate payment of a fee for Administrative Expenses. The Administrative Expense payments may be used by Colorado Regional Center, LLC ("CRC") or its affiliated companies to pay certain expenses relating to this Offering including but not limited to legal and accounting fees, agency fees, referral fees, marketing and travel expenses, and costs and expenses incurred relating to background checks and other similar expenses related to the EB-5 program. The Company may, with the agreement of the Limited Partner, further pay out of the Administrative Expenses up to $15,000 of the legal expenses of the Investors for the I-526 application process (provided that the Company retains the right to reasonably approve each Investor's choice of legal counsel). Alternatively, if the Limited Partner elects to pay his or her own legal expenses, then the amount of the Administrative Expense shall be reduced by $15,000. If CRC incurs expenses that exceed the amount received for Administrative Expenses, then the excess amounts will be paid by CRC. If CRC incurs expenses that are less than the amount received for Administrative Expenses, then it shall be entitled to retain such excess amounts.

Each Investor will own a pro rata share of the Company depending on the total number of Investors in the Company. For example, if there are 20 Investors, each Investor will own a 4.95% membership interest in the Company (and the general partner will have a 1% interest in the Limited Partnership in consideration of its contribution of capital and services rendered to the Limited Partnership as discussed above). No member will be admitted to the Company for a Capital Contribution that is less than $500,000 plus the then applicable charge for Administrative Expenses. Initially, the Company's sole asset will be the Solaris Note. If the Solaris Note is paid or prepaid, then the Company will likely own various Condominium Units in the Project, including the personal property located within each such unit.

The Company will lend to SPO 100% of the Capital Contributions. The loan to Solaris will be represented by the Solaris Note will not represent any ownership interest in SPO. SPO will develop, own, and operate the Project. To the extent that there is cash available for distribution from SPO, such cash will be distributed to the Company in the manner as described in this Memorandum and as more particularly set forth in the Solaris Note. A schematic of the flow of funds is attached hereto as Exhibit D.

Under the terms of the Partnership Agreement, to the extent that the Company has available cash flow after payment of the Management Fee, the Limited Partners shall be entitled to the Preferred Return payable at the discretion of the General Partner no less than annually. After payment to the Investors of the Preferred Return, 100% of all additional cash available for distribution shall be paid to the Investors until such time as they have received cash distributions equal to 100% of their initial Capital Contributions (excluding contributions for Administrative Expenses). After the Investors have received

EXHIBIT 1

payments equal to their entire Capital Contributions in the Company (excluding contributions for Administrative Expenses), available cash flow shall be distributed 70% to the General Partner and 30% to the holders of the LP Interests. Until such time as the Company distributes to the Limited Partners an amount equal to 100% of their Capital Contributions (excluding contributions for Administrative Expenses), the Company will be prohibited from making any distributions to Partners on behalf of their Partnership Interests except for payment of the Management Fees and reimbursements of permitted expenses, and Permitted Distributions. "Permitted Distributions" shall mean distributions to Partners in an amount equal to their tax liability derived from such Partner's allocable share of the Company's taxable income as more fully described in the Partnership Agreement.

## Monetization/Exit Strategy

A significant metric in any investment will be the ability to monetize the investment within a targeted time horizon. The Company intends to monetize the investment in the Project within approximately five years. While there can be no assurance that this will be accomplished in that time frame, SPO is required to pay the Solaris Note on the fifth anniversary date of each Loan Advance under the Solaris Note. If, however, SPO exercises its rights to prepay all or some portion of the principal balance due under the Solaris Note by transfer to the Company of one or more Condominium Units located in the Project, or if SPO pays the Solaris Note at the Maturity Date by the transfer of one or more Condominium Units, then the ability to monetize the investment will be dependent in part on the ability of the Company to sell or otherwise dispose of such Condominium Units. Likewise, the amount realized from the sale or other disposition of the Condominium Units will be dependent on the market conditions existing at the time of the sales or attempted sales of such units. It is the Company's intent to make every effort to monetize the investments on or about the fifth anniversary date of the original Capital Contributions, so that if the Company is the owner of one or more Condominium Units prior to such date, the Company will begin marketing efforts directed at closing such sales prior to the fifth anniversary date of the contributions. Because one or more investors may desire to liquidate his investment within five years without concern for maximizing the timing of the exit, the Company has established a procedure to account for this eventuality. Beginning on a date three years following the date of the first Capital Contribution, the General Partner will engage one or more third parties to determine a fair market value for the Partnership Property. The General Partner will notify all investors who have held their Partnership Interests for more than three years of the results of the fair market value analysis. If an investor desires to sell at that price, he/she will give notice to the General Partner of this decision. The General Partner shall then make reasonable business efforts to liquidate Partnership Property sufficient to redeem the electing investors' interests within 180 days following the election to sell. Each electing investor shall be required to sell his/her Partnership Interest unless the actual sales price of the Partnership Property results in proceeds equal to less than 70% of the fair market value previously determined. Prior to the consummation of any sale pursuant to this provision, the independent party or parties who made the initial determination of Fair Market Value, shall make a second determination that the actual sales price represents a fair valuation under all facts and circumstances. Such fair market analyses shall be made available to any Limited Partner. (*Reference is made to the Limited Partnership Agreement for a more complete description of this provision*) Of course, market conditions (including such factors as credit conditions, interest rates, income tax laws then in effect, and the state of the economy in the Vail Colorado, area, the United States as a whole, and the global economy) will all have a material effect on the ability of the Company to successfully sell the Condominium Units and the price at which such units might be sold.

## Due Diligence

EXHIBIT 1

The Company has conducted extensive due diligence on the Project and its developers, architects, contractors, and management company. In connection with the Company's due diligence, it has reviewed copies of the business plan of the Project, credit and background information on the principals of SPO, financial statements, bank references, budgets, organizational documents, marketing materials competitive assessment and industry review, and has obtained third-party information on the industry, and analyzed market conditions, the competitive environment, and economic, technological and other trends within the industry. Additionally, the Company has utilized various third parties to assist in its due diligence. The Company believes that the information provided by such third parties is reasonable and may be relied upon for accuracy, but the Company is not able to fully verify each of these third-party sources of information.

**Monitoring**

After the Company has funded the loan to SPO, it will stay in regular contact (monthly at a minimum) with SPO and, pursuant to the Loan Agreement executed by the Company and SPO, will have informational rights with respect to all material financial and operational aspects of the Project. Additionally, under the terms of the Loan Agreement and related documents the Company has required SPO to provide a series of reports including job creation and employment metrics, monthly "flash reports," annual budgets, monthly financial statements, and year-end financial statements. The Company will review at least quarterly compliance with financial and structural covenants and compliance. Files will be maintained that will include all correspondence, resolutions and entity documents, investment due diligence, and credit information.

**STATEMENT OF RISKS**

Investment in the Company involves significant risks. There can be no assurance that the Company will achieve its investment objectives, including the return of capital invested by the Limited Partners. An investor in the Company should be able to hold the investment for an indefinite period of time and be financially able to bear the total loss of the investment. The following contains a summary of principal risks of an investment in the Company:

| | |
|---|---|
| ***Dependence on Management of SPO:*** | The Company will have very little active management responsibility or authority with respect to the management of the Project. The Company will have a note receivable from SPO, but the management of SPO will be controlled solely by Peter Knobel. Additionally, the day-to-day management of the business operations of the Project will rest exclusively in the control of SPO. While the Company is confident in the abilities of SPO to manage the Project in a profitable manner based on the success of its principal, Peter Knobel, in previous commercial real estate projects, there can be no assurance that it will be successful in the management of the Project. |
| ***The Project may not be Completed as Scheduled:*** | This is a development project and, therefore, there can be no assurance that the Project will be constructed on the projected schedule. If there is a substantial delay, the costs of completion may be increased and there will be a delay in the generation of revenues from the operation of the Project. Additionally, any material delay may postpone the starting date for the jobs related to the Project, thereby delaying the job creation requirements of the EB-5 program. The development team has a great deal of experience in this type of development and the Project is in an |

EXHIBIT 1

advanced stage of construction at this time. Therefore, the Company believes that absent significant unforeseen events, the Project will be constructed on time, within budget, and the related businesses operational within approximately 12 months.

*The Project may be Subject to Cost Overruns; Failure to Sell Condominium Units in a Timely Fashion:*

There are a number of variables in any new construction project and there is a risk that the costs of building the Project will be greater than the projected costs. The reasons for overruns include such matters as governmental issues, unforeseen construction problems, increases in the costs of construction materials and labor, weather, and other similar types of construction problems. If there are significant cost increases, the developers will have to provide additional funds to complete the project. The Company believes that these risks are mitigated by the inclusion of a contingency fund in the construction budget and also by the fact that the developers, architects, and general contractor have all built many similar types of projects from the ground up and have a great deal of experience in planning for the construction of similar projects, and, importantly, the Project is already in an advanced stage of construction at this time. Likewise, if SPO is unable to sell Condominium Units in a timely fashion, the holding costs related to such unsold units (such as HOA dues, property taxes, insurance, and maintenance) may be substantial and may create a financial hardship for SPO. The risks are mitigated by SPO's financial strength and its ability to fund any likely cash shortfalls.

*Job Creation; Potential Risk of Loss of Visa:*

Under the terms of the EB-5 program, the project must create a minimum of 10 full-time jobs within 2.5 years following the approval of the Limited Partners' Form I-526 Petition. These jobs may be indirect jobs, but must be filled with U.S. workers. The Company projects that there will be 2,110 new jobs created from the operation of the Project and this number was derived from the econometric study prepared by Evans, Carroll & Associates as a necessary requirement of the Colorado Regional Center application and designation. The Evans, Carroll & Associates econometric report was updated in February, 2011, to reflect current conditions and the use of the RIMS II methodology for determination of job creation. The projected job totals would be satisfactory to support 210 investors at $500,000 per investor. If there are fewer than 10 jobs created for each $500,000 investor during the 2.5-year period following the approval of the Limited Partners' Form I-526 Petition, each of the investors risks the loss of his or her visa and may be required to return to the investor's country of origin. The Company intends to mitigate this risk by seeking a maximum of $80,000,000 in Capital Contributions which would be supported by a total of 1,600 jobs. However, that amount may be increased given the cushion in the number of jobs expected to be created allowing the Company to increase the number of LP Interests that may be sold under applicable EB-5 rules and regulations. Further, if the econometric study is found to have significantly undercounted the number of associated jobs, the Company may increase the number of LP Interests that may be sold.

EXHIBIT 1

| | |
|---|---|
| ***SPO may not be Profitable and may not Generate Positive Cash Flow:*** | There is a risk that the Project may never become profitable and that, therefore, SPO will not be profitable and will not have positive cash flow. If SPO does not experience adequate cash flow, it may not be able to make the payments on the Solaris Note. The Project is a development project and initially may have limited revenues. Because development projects, even if successful, typically generate losses during the initial investment process, it will take some time to generate profits. The Company will enter into a Management Agreement with a company affiliated with the General Partner. The management fees payable under the Management Agreement will be payable prior to the distribution of available cash flow to the Limited Partners. Additionally, the Project may not show positive cash flow so that SPO would not have sufficient cash flow to repay the Capital Contributions of the Limited Partners or any profits on the Capital Contributions. |
| ***No Guarantee of any Returns to Investors; Risk of Foreclosure:*** | The investment by the Limited Partners is an equity investment. There is no obligation of any kind by either the Company nor any other person or entity to pay back the amount of the Limited Partners' Capital Contributions. The return of each Limited Partner's Capital Contribution as well as any additional cash flow is dependent on the ability of the Project to generate positive cash flow to SPO and SPO's ability to make payments to the Company, the ability of SPO to make Operating Payments, and the ability to monetize the investment by selling the Condominium Units that are the collateral for the Solaris Note. If these various sources of cash prove to be insufficient to pay the expenses of the Project, then SPO may not have cash flow and may not be able to make payments to the Company of interest under the Solaris Note or Operating Payments. In such event, the Limited Partners will receive neither a return of their investment nor any return on their investment. SPO will be required to pay HOA dues and real estate property taxes on one or more Condominium Units during the term of the Solaris Note. If SPO is unable to make such payments, there is a risk that the amount of any such deficiency would be set off against interest payments due to the Company and that this would impair the Company's ability to make distributions of the Preferred Returns. Likewise, under the terms of the Yield Enhancement Agreement, the Company is required to reimburse SPO for any cash flow deficits from the leasing of the Condominium Units. If the Company is unable to pay any such cash flow deficits, there is a risk that the interest payments to the Company under the Solaris Note would be reduced to cover any such deficits. |
| ***Risk of Ownership of Condominium Units*** | The market for luxury Condominium Units in the Colorado resort communities has experienced severe pressure, especially over the past two years. The reasons for this pressure are varied, but include the world-wide recession, over-supply of units, and a lack of available credit for potential buyers. The Condominium Units at the Project are at the very high end of the luxury scale and are priced at levels that are at the highest levels of almost any other units in the Vail, Colorado, |

EXHIBIT 1

area. There is a risk that SPO may not be able to sell enough Condominium Units to generate sufficient revenues to pay the interest due to the Company under the Solaris Note and that as a result, the Company would not in turn be able to pay the Preferred Returns to the Investors. Additionally, there is a risk that the prices of the units will decline over the next several years resulting in an inability of the Investors to sell the units for an amount sufficient to repay the amount of their initial Capital Contributions.

*Pro Formas may not Prove Accurate:*

The Company has reviewed carefully the pro forma financial statements for the Project. These financial pro formas were prepared primarily by the principals of SPO. Pro formas are projections only and should not be relied upon as an accurate forecast of the financial performance of the Project. There are many factors that will impact the financial performance of the Project and many of these will have a material effect on the ability of the Project to generate profits and positive cash flow. The pro formas represent management's good faith attempt to project the financial performance of the Project and, therefore, the Company, but should not be relied upon as any form of guaranty of actual results.

*Lack of Liquidity:*

The Company will not be able to make cash distributions to its Limited Partners unless SPO makes its payments to the Company of interest under the Solaris Note or Operating Payments. The Company believes that SPO has sufficient cash reserves to enable it to make its required payments to the Company in a timely fashion for the foreseeable future. However, there can be no assurance that SPO will be able to sustain the required payments. Additionally, if SPO elects to redeem the Solaris Note by transferring ownership of one or more Condominium Units, then the Company will own the units and will be required to pay Homeowners Association dues, property taxes, insurance, and other expenses relating to ownership of the units. As a requirement of paying or prepaying principal under the Solaris Note, SPO will enter into an agreement whereby it will pay to the Company payments equal to the amounts of the Preferred Returns payable by the Company. Additionally, the Company intends to receive additional income from the renting of the Condominium Units by SPO to third parties. The Company will receive the benefit of any rental income under the terms set forth in the Loan Agreement. The Company believes that these payments will adequately cover the expenses associated with ownership of the Condominium Units. If SPO fails to make its payments, however, there is a risk that the Company would not be able to pay the expenses and the Company could lose ownership of the units. The Company believes that SPO will be able to make such payments and has further received the personal guaranty of Peter Knobel with respect to the Operating Payments and the interest payments that are payable during the period that any principal balance of the Solaris Note is outstanding. Therefore, the Company does not believe that there is a substantial risk of default in these payments. There is no market for the LP Interests and there are significant restrictions on the transferability of the LP Interests. Therefore, until there is a liquidity event (such as a

EXHIBIT 1

sale of the Condominium Units), the Limited Partners will not be able to monetize their investment in the Company.

**Inability to Refinance or Sell:** At the time that the Company desires to sell the Condominium Units, there is a risk that the market may not be conducive to such sale. If the credit markets are illiquid, or if general economic conditions are unfavorable, the market for the sales of Condominium Units may be limited or depressed. In such event, the investment will have to be held for a longer period of time or, if there is a liquidity event, it may yield a smaller return.

**Conflicts of Interest:** The General Partner of the Company and certain Principals and affiliates of the General Partner currently have interests and responsibilities in other companies requiring a portion of their time. The General Partner and its affiliates may have interests in other projects in Colorado and other locations that may seek investors for other EB-5 projects. Neither the Company nor the General Partner believes that except for the time required to attend to other business matters, these other EB-5 activities will create any conflicts of interest due to the fact that once that all of the Capital Contributions for the Company have been received, the General Partner does not intend to seek any new EB-5 investors for the Company.

**Limited Transferability:** There will not be a public market for the LP Interests. There will be substantial restrictions on transferring interests in the Company, including federal and state securities laws. Accordingly, purchasers of the LP Interests may need to bear the economic risk of their investment in the Company until such time as the Company is liquidated. All persons acquiring the interests will be required to represent, among other things, that they are purchasing such interests for their own account for investment only and not with a view to the resale or distribution thereof.

**Not Registered Under Investment Advisers Act:** The Company is not registered under, and does not intend to register under, the Investment Adviser's Act of 1940 in reliance upon exemptions from registration thereunder.

**Not Registered under Investment Company Act:** The Company is not registered under, and does not intend to register under, the Investment Company Act of 1940 in reliance upon an exemption from registration, available under Section 3(c)(1) thereof. There is a risk that the Securities and Exchange Commission or a court might conclude that we fall within the definition of investment company, and unless an exclusion were available, we would be required to register under the Investment Company Act of 1940. Compliance with the Investment Company Act, as a registered investment company, would cause us to alter significantly our business strategy, impair our ability to operate as planned and seriously harm our business. If we fail to comply with the requirements of this Act, we would be prohibited from engaging in business or selling securities, and could be subject to civil and criminal actions for doing so. In addition, our contracts would

EXHIBIT 1

be voidable and a court could appoint a receiver to take control of and liquidate our business.

*Repayment of Debt; Return of Capital Contributions:*  The Company's ability to make cash distributions is dependent in part upon the success of the Project and the availability of distributions from the Project to SPO and the ability of SPO to make payments to the Company of interest under the Solaris Note or Operating Payments.  No Limited Partner shall be entitled to withdraw or to the return of his or her Capital Contributions except as provided in the Partnership Agreement, or to demand and receive property other than in cash in return for his or her Capital Contributions except upon dissolution of the Company per the further terms of the Partnership Agreement.  Each Limited Partner must rely upon payments made by SPO to the Company or by sales of the Condominium Units by the Company and then upon distributions by the Company to the Limited Partners, at the discretion of the General Partner, to the extent there are liquid assets available, for return of his or her Capital Contributions.  There can be no assurance, irrespective of the success of the investments, that any Limited Partner will receive cash or property equal to his or her investment in the Company.

*Federal Income Tax Risks:*  **BECAUSE THE FEDERAL INCOME TAX LAWS ARE COMPLEX AND THE IMPACT ON EACH MEMBER MAY VARY CONSIDERABLY DEPENDING ON THE INVESTOR'S INDIVIDUAL TAX ATTRIBUTES, INVESTORS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS BEFORE ACQUIRING THE LP INTERESTS IN THE COMPANY HEREUNDER.**

*Indemnification:*  The Partnership Agreement provides limitations on the liability of the General Partner, its affiliates and its members, officers, directors and employees, and provides for indemnification of the General Partner and its affiliates, members, officers, directors and employees, under certain circumstances.  Limited Partners may have more limited rights than they would absent such limitations.

*Control:*  The Company is managed by the General Partner.  The General Partner will make all decisions with respect to the control and management of the Company except as specifically provided in the Partnership Agreement.

*Immigration Issues:*  Congress and or USCIS may change the law, regulations, or interpretations of the law without notice and in a manner that may be detrimental to an Investor or the Company.

It is impossible to predict visa-processing times. Investors should not physically move to the United States until their visa has been issued.

Investors who obtain conditional or permanent residence status must

EXHIBIT 1

intend to make the United States their primary residence. Conditional or permanent residents who continue to live abroad risk revocation of their conditional or permanent residence status.

USCIS requires proof of direct and indirect employment creation as part of the removal of conditions process. There is no assurance that the actual number of direct employees and indirect job creation will be the same as the number predicted in the economist's report. Depending upon the disparity there may be insufficient employment to remove conditional visa status.

The process of obtaining conditional and permanent resident status involves several factors and circumstances which are not within the control of the Company. These include the Investor's past history and quotas established by the United States government limiting the number of immigrant visas available to qualified individuals seeking permanent resident status under the EB-5 "Regional Center" program. Although the Company has been structured so that each Limited Partner may maximize eligibility for permanent residency under the EB-5 "Regional Center" provisions of the U.S. immigration laws, no assurance can be given that each Investor will obtain approval of his or her particular immigrant petition. Purchase of a Unit does not guarantee conditional or permanent residency in the United States. Furthermore, no advice can be given that conditions to permanent residency will be removed. Each prospective investor should consult competent immigration counsel to review the likelihood that the Investor's Immigrant Petition will be granted.

*Risks Relating to the U.S. EB-5 Immigration Investor Pilot Program*

Investors in this Offering who have subscribed for LP Interests with the intention of applying for approval of a Petition through the EB-5 program should be aware of certain risk factors involving the EB-5 program and its administration. A description of the risks below are based on information obtained by the Company from third parties who the Company believes are reliable. However, there can be no assurance that such information is accurate or current or that it includes all of the risks relating to the EB-5 program for such investors.

The Company was designated as a regional center to participate in the EB-5 program on May 17, 2010. Accordingly, the personnel within the Company do not have experience in administering the EB-5 program, which could lead to delays for investors in the process of obtaining a conditional or permanent green card. In addition, investors will be charged an Administrative Expense of $50,000 (or in some cases in which the investor pays for his or her own immigration attorney's fees, $35,000) by the Company in connection with review of the investors' applications. If an EB-5 I-526 Petition is denied by the USCIS the investor will receive a refund of only that portion of the Administrative Expense that has not been expended by the General Partner for legal fees incurred on behalf of the investor. In the event that an I-526 Petition is denied on behalf of an investor who has paid his or her own

EXHIBIT 1

immigration attorney's fees, the entire $35,000 Administrative Expense will be refunded.

There are a number of areas within the State of Colorado which the Company believes will be designated a "Targeted Employment Area" ("TEA") as defined in 8 CFR Section 204.6(e). Additionally, all towns and cities with a population of under 20,000 will be designated as TEAs. Whether or not a particular location qualifies as a TEA may change from time to time depending on unemployment and census data.

The investment must be at risk to qualify for the EB-5 program. As part of the EB-5 I-526 Petition, an immigrant investor must show evidence that he or she has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk.

Each investor who purchases LP Interests with the intention of obtaining permanent or conditional residence from the USCIS is encouraged, along with his or her advisors, to make his or her own independent review of the EB-5 program and the various risk factors relating to the process in obtaining an EB-5 permanent or conditional residence to determine if an investment in the Units is a suitable approach for such investor.

As part of the I-526 Petition, an investor must present to the USCIS clear documentary evidence of the source of funds invested and that the funds belong to the investor. Generally, the investor can satisfy the source of funds requirements by submitting documents showing that he or she has a level of income from legal sources that would yield sufficient funds for the investment. The USCIS generally requires copies of income tax returns to satisfy the source of funds requirement. For investors who do not have such records, there may be other records that can be provided to the USCIS by an investor to demonstrate that the investment funds came from legal sources. All such matters regarding the investor's petition should be discussed with his or her immigration counsel.

The Pilot Program requires an investor to hold a policymaking or management position within the Company. The Company believes that each Limited Partner is provided with the powers and duties under the Limited Partnership Agreement sufficient to meet the USCIS requirement that an investor is actively participating in policymaking or management of a new commercial enterprise. However, either USCIS or the consulate abroad issuing the immigrant visa based on an approved EB-5 Petition may challenge the sufficiency of the Limited Partner's engagement.

As a "pilot," the Regional Center Pilot Program is not yet permanent, and consequently requires periodic renewal by Congress. The Regional Center Pilot Program has been renewed several times by Congress and is currently due to expire on 30 September 2012. Because this program

EXHIBIT 1

creates U.S. jobs and utilizes a very small quota, there has been no controversy surrounding its renewal.  Congress is expected to renew this program prior to its expiration, or make the program permanent by removing its "pilot" designation. However, there is a risk that Congress may not renew, or not renew before the current expiration date.

*[Remainder of page intentionally left blank.]*

EXHIBIT 1

## TERMS OF THE OFFERING

### General

The LP Interests will be offered to a limited number of investors who qualify as "accredited investors" pursuant to the securities laws of the United States and who are eligible to invest under the EB-5 program.   An investment in the LP Interests involves certain risks, specifically those associated with the Company's ability to generate revenues and profits to allow for repayment of the Capital Contributions and any return on the investment.  There is no assurance that the Limited Partners will receive a return of their Capital Contributions.  This investment may not be appropriate for all investors.  The appropriateness of this investment depends on the investor's income and net worth and the need for investment liquidity as well as the investor's immigration status and desires.  If an investor desires to sell the LP Interests for any reason and at any time, the investor may be unable to do so at any price.  The transfer of LP Interests is subject to substantial restrictions, which may prohibit the investor from selling the LP Interests.  In addition, the investor may be unable to find any person who meets the requirements set forth in the Partnership Agreement and who is willing to purchase the LP Interests.

### Suitability Standards

Prospective purchasers of the LP Interests should give careful consideration to the entire contents of this Memorandum and its exhibits and the documents referred to herein, including, in particular, the risk factors described under "STATEMENT OF RISKS," the fact that an investor's entire investment may be lost, and the limitations described under "STATEMENT OF RISKS" with respect to the non-transferability of the LP Interests, the lack of a readily available market for the LP Interests, the possibility that sufficient jobs may not be created and that, therefore, the Investor may not be able to retain his or her resident visa in the United States, and the long-term nature of any investment in the Company.

The Company has established certain minimum suitability standards for investors.  To purchase any of the LP Interests, investors will be required to represent in writing that they are capable of bearing the economic risks of an investment in the LP Interests, that they have no present or contemplated future need to dispose of LP Interests, that they have no present or contemplated future need for the funds that the investors will be using to purchase the LP Interests, that they are purchasing the LP Interests for investment purposes only and not with a view toward resale, and that they are capable of evaluating the merits and risks of an investment in the LP Interests.

The Company reserves the right to impose other suitability standards in its own discretion and to refuse acceptance of any subscription for any or no reason.

### Procedure for Subscription

An investor who meets the suitability standards may subscribe for the LP Interests by properly completing the subscription materials, which may be obtained from the Company upon request.  Please carefully read the instructions in the subscription materials.  Investors should deliver the executed subscription materials to Colorado Regional Center Project Solaris, LLLP.

As soon as reasonably possible, and no later than promptly after the termination of the subscription period for the Offering (the "Subscription Period") as described below, all subscribers will be notified by the Company whether their subscriptions have been accepted.  The Company reserves the right in its sole discretion to reject all or part of any subscription.

EXHIBIT 1

The Subscription Period will terminate on December 31, 2011. The Company may elect, in its sole discretion, to either terminate this Offering earlier or extend this Offering beyond such date.

**Sales; Review of Subscriptions**

The LP Interests are being sold by the Company through its officers and certain designated selling agents. The Company may pay a sales commission or other sales compensation to certain approved selling agents with respect to the sale of the LP Interests.

The minimum subscription amount is $500,000 for the Capital Contribution plus the Administrative Expense.

The Company has the right to reject any subscription. In no event will a subscription be accepted unless the subscriber has submitted a completed Investor's Questionnaire (and where necessary, a Questionnaire for Purchaser Representative) and a Subscription Agreement, with an executed signature page as well as all necessary documentation relating to the requirements of the EB-5 program.

**Escrow Arrangements**

The Company has entered into an agreement with Citibank (the "Bank") with respect to certain escrow services (the "Citi Escrow Agreement") relating to the Subscriptions. The escrow established at the Bank will include deposits for the Capital Contributions of $500,000 each and for the Administrative Expenses of $50,000 each. A copy of the Citi Escrow Agreement is attached to this Confidential Information Memorandum as Exhibit E. Under the terms of the Citi Escrow Agreement, each Investor's investment will be deposited into a non-interest bearing escrow account at the Bank. The Escrow Agent shall be permitted to disburse to the general partner an amount not to exceed $15,000 from the Administrative Fee at the request of the General Partner to be used solely for the payment of Investor's legal fees. The General Partner shall be entitled to pay any such legal fees directly to counsel for the Investor out of such $15,000 disbursement upon receipt of an invoice from counsel which invoice shall be approved in writing by the Investor prior to such payment. The General Partner shall further be authorized to disburse a portion of the $15,000 fee to the selected immigration counsel as required as a retainer by such counsel. At such time as an Investor's I-526 petition is accepted by USCIS, the Bank will be notified and the amount of the Subscription will be released to the Company. If the I-526 petition is not accepted by USCIS for any reason, then the Bank will return to the Investor the entire amount of the Subscription without interest. The investor's contribution of $50,000 for Administrative Expenses, less any amounts disbursed to the Investor's immigration counsel by the Company, will be returned to the investor along with the Capital Contribution.

In addition to the Citi Escrow Agreement, the Company has entered into an escrow agreement with Standard Chartered Bank (Hong Kong) Limited ("Chartered") with respect to certain escrow services (the "Chartered Escrow Agreement") relating to the Subscriptions. The escrow established at Chartered will include deposits for the Capital Contributions of $500,000 each and for the Administrative Expenses of $35,000 each. A copy of the Chartered Escrow Agreement is attached to this Confidential Information Memorandum as Exhibit F. Under the terms of the Chartered Escrow Agreement, each Investor's investment will be deposited into a non-interest bearing escrow account at the Bank. At such time as an Investor's I-526 petition is accepted by USCIS, the Bank will be notified and the amount of the Subscription will be released to the Company. If the I-526 petition is not accepted by USCIS for any reason, then the Bank will return to the Investor the entire amount of the Subscription without interest. The investor's contribution of $35,000 for Administrative Expenses will be returned to the investor along with the Capital Contribution.

EXHIBIT 1

Case No. 1:19-cv-02443-RM-STV   Document 91-1   filed 06/19/20   USDC Colorado   pg 42
Case 1:19-cv-02443-STV   Document 51-2   Filed 10/18/19   USDC Colorado   Page 32 of 184
of 293

**Use of Proceeds**

      The Capital Contributions received pursuant to this Offering will be used for capitalizing the Company for the purpose of making a loan to SPO.  The Administrative Expenses received pursuant to this Offering will be used for the payment of the certain fees and expenses including without limitation, legal, accounting, commissions, background checks, in certain circumstances, the legal fees relating to an Investor's I-526 application (provided that the Partnership shall have the right to reasonably approve immigration counsel) and other similar types of fees and expenses.

**Legal Proceedings**

      Currently, the Company is not a party to any legal proceedings.

*[Remainder of page intentionally left blank.]*

EXHIBIT 1

**Investor Qualifications**

This private placement offering (the "Offering") is being made to a limited number of investors who acknowledge and agree that they are acquiring the LP Interests for their own account, for investment purposes and without a view toward resale or other distribution.

The LP Interests have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or under any state securities laws because they will be issued in reliance upon exemptions therefrom. These exemptions are available only if certain restrictive conditions, including those described in this section, are met.

EACH INVESTOR MUST ACQUIRE THE LP INTERESTS FOR INVESTMENT PURPOSES ONLY. ANY LP INTERESTS THAT THE INVESTOR IS ACQUIRING MUST BE HELD WITHOUT SALE, TRANSFER, OR OTHER DISTRIBUTION FOR AN INDEFINITE PERIOD OF TIME UNLESS THE LP INTERESTS ARE SUBSEQUENTLY REGISTERED UNDER THE APPLICABLE FEDERAL AND STATE SECURITIES LAWS, OR UNLESS EXEMPTIONS FROM SUCH REGISTRATION ARE AVAILABLE. IN ADDITION, INVESTORS WILL BE RESTRICTED FROM TRANSFERRING THE LP INTERESTS EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF THE AMENDED AND RESTATED PARTNERSHIP AGREEMENT ADOPTED BY THE COMPANY EFFECTIVE AS OF THE DATE OF THIS MEMORANDUM.

In the Subscription Agreement, each prospective investor will be required to confirm in writing that he or she understands these restrictions and the other requirements necessary to become a purchaser of the LP Interests.

In order to establish that exemptions from federal and state registration requirements will be available, each investor must complete and execute a Subscription Agreement, an Investor Questionnaire, and such further documents as may be required pursuant to the EB-5 program. In addition, the Company may require prospective investors to supply additional information to further assure the suitability of this investment for them.

## SUBSCRIPTION PROCEDURES

In order to subscribe to purchase the interests offered hereby, a prospective investor must complete, execute and deliver the following documents to the Company at 4643 S. Ulster Street, Suite 950, Denver, CO 80237, Attention: Chester P. Schwartz: (a) the Prospective Investor Questionnaire (a copy of which is attached hereto as Exhibit G); and (b) the Subscription Agreement (a copy of which is attached hereto as Exhibit H.

The Company reserves the right in its sole discretion to reject, in whole or in part, the subscription of any potential investor for any or no reason. The Company normally will inform potential investors whether their subscriptions have been accepted within 60 days after receipt of their subscription documents, properly executed. However, the parties understand that the Company is required to perform substantial due diligence on each potential investor in order to comply with the requirements of the EB-5 program. Accordingly, the Company may require longer than 60 days to inform potential investors whether their subscriptions have been accepted.

A prospective investor who has any questions regarding the terms and provisions of this offering or regarding the subscription procedure should call Chester P. Schwartz at 720 554-0704.

EXHIBIT 1

**ENGLISH LANGUAGE PROFICIENCY**

By execution below, the undersigned hereby acknowledges that he or she has read this Confidential Information Memorandum and is proficient in the English language and, therefore, understands the contents of the matters set forth above. Alternatively, the undersigned acknowledges that he is acting in a fiduciary capacity and is proficient in the English language and understands the contents of the matters set forth above and has explained such matters to the Investor.

Dated this __ day of _____, 2011.

_____

_____

_____

_____

As agent for: _____

EXHIBIT 1

**EXHIBIT A**
**SOLARIS PROMISSORY NOTE**

*[Promissory Note on following page.]*

EXHIBIT 1

## PROMISSORY NOTE

Original Principal Amount:  $_____                    Date:  _____, 2011

**PROMISE TO PAY**:   Solaris Property Owner, LLC, a Delaware limited liability company ("**Borrower**") promises to pay to Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership ("**Lender**"), or order, in lawful money of the United States of America, the principal amount of $_____ together with interest at the rate of five percent (5%) per annum (the "**Interest Rate"**) on the terms and conditions set forth below (the "**Loan**").

**DEFINED TERMS**: Initially capitalized terms used but not otherwise defined below shall have the meanings ascribed to such terms under the provisions of that certain Loan Agreement dated effective November __, 2010, by and between Borrower and Lender (the "**Loan Agreement**").

**INTEREST PAYMENTS**:  Commencing on the date Lender makes the first Loan Advance to Borrower in accordance with the Loan Agreement (the "**Commencement Date**"), the outstanding principal of the loan shall bear interest at the Interest Rate.   Borrower shall make interest-only payments on the outstanding principal balance of the Loan (each, an "**Interest Payment**") on the first business day of each month following the Commencement Date until the Loan is repaid in full.  Each Interest Payment shall include interest on all sums outstanding at the time such Interest Payment is due (including a pro-rated amount of interest for any Loan Advances that took place during the previous month).  Borrower will pay Lender at Lender's address as Lender shall designate in writing.  Any and all payments made hereunder shall be applied first to any unpaid collection costs and late charges pursuant to this Note, second to accrued unpaid interest, and third in reduction of the outstanding principal balance of the Loan.

**TERM**:  With respect to each Loan Advance, this note shall be deemed to mature, and (if not sooner repaid in accordance with the provisions hereof) the unpaid principal balance attributable to such Loan Advance, together with all accrued interest attributable to the same (if any), shall be due and payable on the date that is exactly sixty (60) months from Closing on such Loan Advance (each, a "**Maturity Date**"); *provided, however*, that (notwithstanding anything to the contrary set forth in this Note or any other Loan Documents) at any time after the Prepayment Date (as hereinafter defined), Borrower shall have the absolute right to prepay the portion the Note attributable to any Loan Advance  by repaying Lender the amount of such Loan Advance in cash or conveying Lender the Collateral Unit(s) securing such Loan Advance.  If Borrower tenders to Lender any Collateral Unit(s) in repayment of a Loan Advance, the principal balance of the Note shall be reduced by the amount of the Loan Advance secured by such Collateral Unit(s). With respect to each Loan Advance, the term "**Prepayment Date**" means a date that is exactly thirty six (36) months from and after the Closing on such Loan Advance.

**PREPAYMENT**: Except as otherwise set forth in this Note, Borrower shall not be allowed to pay all or a portion of the Loan prior to the Prepayment Date.

**NOTICE OF PREPAYMENT**: Borrower shall give Lender (i) at least sixty (60) calendar days prior written notice of any Cash Prepayment and (ii) at least twenty (20) calendar days prior written notice of any Collateral Unit Distribution.

**DEFAULT**:  Subject to any applicable cure rights set forth in any Loan Document, each of the following shall constitute an "**Event of Default**" hereunder:

       (i)        if Borrower fails to make any payment when such payment is due;

EXHIBIT 1

(ii)     if Borrower fails to comply with or to perform when due any other material, obligation, covenant, representation, warranty or condition contained in this Note or any other Loan Document;

(iii)    if Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement in favor of any other creditor or person that results in a Material Adverse Affect; or

(iv)    if any material representation or statement made or furnished to Lender by Borrower is false or misleading at the time made or furnished.

**NON-RECOURSE LOAN; EXCEPTION FOR INTEREST PAYMENTS**:

(i)      **Non-Recourse Loan**. Except as expressly provided below, subject to any applicable cure rights set forth in any Loan Document, if an Event of Default has occurred and is then continuing, Lender agrees to proceed solely against the Collateral, it being the parties' mutual understanding and intent that principal amount of the Loan secured by this Note is entirely non-recourse to Borrower. Notwithstanding the foregoing, Lender may name Borrower or any of its successors or assigns or any person or entity holding under or through them as parties to any actions, suits or other proceedings initiated by Lender to enforce any remedies set forth herein against the Collateral, including without, limitation, any action, suit or proceeding to foreclose the lien of the Deed of Trust against the Collateral.

(ii)     **Exception for Interest Payments**.  Notwithstanding the foregoing, subject to any applicable cure rights set forth in any Loan Document, if Borrower fails to make any Interest Payment(s) due hereunder, the amount of such Interest Payment(s) plus the Collection Costs directly related collecting to the same shall be fully recourse to Borrower.  Except as expressly set forth in the immediately preceding sentence, the Loan evidenced by this Note is and shall remain entirely non-recourse to Borrower.

**LENDER'S RIGHTS**:  Subject to any applicable cure rights set forth in any Loan Documents, if an Event of Default under this Note has occurred and is then continuing: (i) Lender may declare the entire unpaid principal balance of this Note and all accrued interest, if any, immediately due and, upon receipt of written notice of such acceleration, Borrower shall convey the Collateral Unit(s) to Lender in full satisfaction of Borrower's obligations under this Note and the other Loan Documents; (ii) Lender, at its option, may also, if permitted under applicable law, increase the Interest Rate on this Note to the lesser of fourteen percent (14.00%) or the maximum amount permitted by law (the "**Default Rate**"); and (iii) Borrower shall be responsible for any and all Collection Costs directly related to the  Event of Default. "**Collection Costs**" means, to the extent permitted by law, Lender's reasonable legal expenses (whether or not there is a lawsuit), including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, any post-judgment collection services, and any court costs and fees associated with the foregoing.

**CHOICE OF LAW**: This Note has been delivered to Lender and accepted by Lender in Colorado. Borrower and Lender agree to submit to the jurisdiction of the courts of the City and County of Denver, Colorado.  Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.  This Note shall be governed by and construed in accordance with the laws of Colorado.

**COLLATERAL**:  In order to secure payment of this Note, Borrower has granted to Lender security interests in certain real and personal property owned by Borrower (the "**Collateral**").  These security interests are evidenced by a Deed of Trust and Security Agreement and certain other documents

EXHIBIT 1

(collectively, the "**Collateral Documents**").  Reference is made to the Collateral Documents for various rights and remedies of the parties to those documents.

**ASSIGNMENT BY BORROWER**. Notwithstanding to the contrary set forth in any of the Loan Documents, Borrower shall have the absolute right (in Borrower's discretion) to assign this Promissory Note, the Loan Agreement and the other Loan Documents to Borrower's wholly-owned, single-purpose subsidiary (the "**SPE**"). Upon such assignment, all of Borrower's rights and obligations under the Loan Documents shall automatically and forever terminate and, thereafter, Borrower shall have no further obligation of any kind whatsoever with respect to the Loan or Loan Documents.  If Borrower so assigns Borrower's interest in the Loan Documents to Borrower's SPE prior to the execution of this Promissory Note, Borrower's SPE shall be substituted for Borrower as the signatory hereof and construed to mean "Borrower" for all purposes hereunder and under the other Loan Documents. A condition precedent to any such assignment shall be that any assignee of Borrower shall continue to operate the Solaris Project, as defined in the Loan Agreement, to assure full construction expenditure to project completion and subsequent operation of the retail businesses, all in satisfaction of the factual assumptions set forth in the EB-5 Econometric Report prepared in connection with the Solaris Project. The purpose of this condition precedent is to assure the Lender that the related EB-5 investors' ability to obtain removal of conditions on their U.S. permanent residency will not be impaired by any such assignment of the Borrower's rights and obligations under the Loan Documents. The Lender shall have sole discretion to determine satisfaction of this condition precedent prior to any assignment by Borrower.

**GENERAL**: Lender may delay or forego enforcing any of its rights or remedies under this Note or under the Collateral Documents without losing them.  Borrower understands and agrees that, with or without any notice to anyone other than Borrower, Lender may (i) make one or more additional secured or unsecured loans or otherwise extend additional credit and (ii) apply any security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreements, as Lender in its discretion may determine. Borrower, to the extent allowed by law, waives presentment, demand for payment, protest and notice of dishonor.


**BORROWER:**

**Solaris Property Owner, LLC,** a Delaware limited liability company

By: Solaris Mezz, LLC, a Delaware limited liability company


By: _____
    Peter B. Knobel, Manager


EXHIBIT 1

**EXHIBIT A**
**(Promissory Note)**

| Date of Loan Advance | Amount of Loan Advance | Maturity Date |
| --- | --- | --- |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

EXHIBIT 1

**EXHIBIT B**
**(Promissory Note)**

| Date of Loan Advance | Collateral Unit | Collateral Unit Value |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

EXHIBIT 1

**EXHIBIT B**

**OPERATING PAYMENT AGREEMENT**

*[Operating Payment Agreement on following page.]*

EXHIBIT 1

THIS OPERATING PAYMENT AGREEMENT (the "**Agreement**") is made effective this 5th day of November, 2010, by and among Solaris Property Owner, LLC, a Delaware limited liability company ("**Solaris**"), Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership ("**CRCPS**"), and, for the limited purposes set forth below, Peter Knobel, an individual ("**Guarantor**"). Initially capitalized terms used but not otherwise defined below shall have the meanings ascribed to such terms under the provisions of the Loan Documents.

## RECITALS:

A. CRCPS has agreed to loan Solaris certain sums of money (the "**Loan**") in accordance with the terms, conditions and provisions of the Loan Agreement, Promissory Note and certain other documents (all of which documents may be collectively referred to below as the "**Loan Documents**").

B. The Loan proceeds are expected to be generated by investments into CRCPS from certain investors (the "**Investors**") pursuant to the EB-5 Immigrant Investor Regional Center Program ("**EB-5**").

C. The parties recognize and agree that under the terms of the Loan Documents, Solaris is permitted to repay Loan Advance(s) prior to the Maturity Date, but in no event sooner than thirty-six (36) months from and after the date of such Loan Advance(s).

D. Upon Solaris' prepayment of any such Loan Advance(s), Solaris' obligation to pay interest in connection with such Loan Advance(s) shall automatically terminate pursuant to the Note.

E. In the event of any such prepayment, , CRCPS may experience cash flow deficiencies resulting from the costs and expenses associated with ownership of any Collateral Unit(s) conveyed by Solaris in repayment of any Loan Advance(s).

F. Subject to all of the terms, conditions and provisions set forth below and as a material inducement for CRCPS to make the Loan, Solaris has agreed to make certain Operating Payments (as hereinafter defined) to CRCPS if in the event of any Prepayment(s) by Solaris.

G. Guarantor will derive substantial benefit from the Loan by virtue of Guarantor's residual interest in the Project.

H. But for the personal guarantee of Guarantor, CRCPS would not have agreed to enter into the transaction contemplated in and evidenced by the Loan Documents.

NOW THEREFORE, in consideration of the foregoing, the mutual promises set forth below and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## AGREEMENT

1. **OBLIGATION TO MAKE OPERATING PAYMENTS.** Solaris shall be obligated to make certain Operating Payments (as hereinafter defined) to CRCPS in the event of Solaris prepays any Loan Advance(s) under the Note.

2. **CERTAIN DEFINED TERMS.**

"**Aggregate Investor Interest**" means total periodic Investor Interest (as hereinafter defined) due in connection with each Loan Advance.

EXHIBIT 1

"**Investor Interest**" means the periodic interest actually owed from CRCPS to each Investor from time to time (whether the same is accruing or paid current), but in no event more than an effective annual rate three percent (3%) per Investor.

"**Operating Payments**" means, with respect to each Loan Advance, an amount equal to the Aggregate Investor Interest due in connection with such Loan Advance during the Term (as hereinafter defined).

"**Operating Payment Commencement Date**" means, with respect to each Loan Advance, the day after Solaris prepays such Loan Advance (in applicable).

"**Operating Payment Termination Date**" means, with respect to each Loan Advance, the Maturity Date set forth in the Note.

3.    **TERM.** Solaris' obligation to make Operating Payments in connection with any Loan Advance(s) shall begin on the applicable Operating Payment Commencement Date and end on the applicable Operating Payment Termination Date (the "**Term**"). Without limiting the generality of the foregoing, , if CRCPS' obligation to pay interest to any Investor terminates, Solaris' obligation to pay CRCPS the portion of any Operating Payments due in connection with such Investor shall likewise terminate.

4.    **PAYMENT SCHEDULE.**  During the Term, Operating Payments shall be due and payable in arrears on the first business day of each calendar month.  Any partial months shall be prorated.

5.    **GUARANTEE AGREEMENT**.  As a condition precedent the first Loan Advance, Guarantor shall execute a guarantee agreement in form and substance reasonably satisfactory to Lender personally guaranteeing payment of (i) the Interest Payments due under the Note and (ii) the Operating Payments due hereunder (the "**Guarantee Agreement**").  Lender shall in no event be required to advance or loan any funds in connection with the Loan Agreement until Guarantor executes and delivers the Guarantee Agreement described above.

6.    **MISCELLANEOUS.**

**Waivers and Amendments**.  Neither this Agreement nor any provision hereof may be changed, waived, discharged or terminated orally, but only by a statement in writing signed by each of the parties hereto.

**Governing Law**.  The parties agree to submit to the jurisdiction of the courts of the City and County of Denver, Colorado. This Agreement shall be governed by and construed in accordance with the laws of Colorado.

**No Right to Jury Trial**.  Each party hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement any right to a trial by jury.

**Successors and Assigns**.  Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns, heirs, executors and administrators.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.  Notwithstanding to the contrary set forth in any of the Loan

EXHIBIT 1

Documents, Solaris shall have the absolute right (in Solaris' discretion) to assign this Operating Payment Agreement to Solaris' wholly-owned, bankruptcy-remote, single-purpose subsidiary (the "**SPE**"). Upon such assignment, all of Solaris' rights and obligations under the Loan Documents shall automatically and forever terminate and, thereafter, Solaris shall have no further obligation of any kind whatsoever with respect to this Operating Payment Agreement.  If Solaris assigns Solaris' interest in the Loan Documents to Solaris' SPE prior to the execution of this Operating Payment Agreement, Solaris' SPE shall be substituted for Solaris as the signatory hereof and construed to mean "Solaris" for all purposes hereunder. A condition precedent to any such assignment shall be that any assignee of Borrower shall continue to operate the Solaris Project, as defined in the Loan Agreement, to assure full construction expenditure to project completion and subsequent operation of the retail businesses, all in satisfaction of the factual assumptions set forth in the EB-5 Econometric Report prepared in connection with the Solaris Project. The purpose of this condition precedent is to assure the Lender that the related EB-5 investors' ability to obtain removal of conditions on their U.S. permanent residency will not be impaired by any such assignment of the Borrower's rights and obligations under the Loan Documents.  The Lender shall have sole discretion to determine satisfaction of this condition precedent prior to any assignment by Borrower.

**Notices**.  All notices required to be given under this Agreement shall be given in writing, may be sent by facsimile (unless otherwise required by law) or by electronic mail, and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address shown below. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.

|  |  |
|---|---|
| **Solaris**: | Solaris Property Owner, LLC<br>Attention: Legal Department<br>141 East Meadow Drive, Suite 211<br>Vail, Colorado 81657<br>P: (970) 479-7566<br>F: (970) 479-6666 |
| **CRC**: | Colorado Regional Center Project Solaris, LLLP<br>4643 S. Ulster Street, Suite 950<br>Denver, Colorado 80237<br>P: 720.554.9704<br>F: 720.554.9905 |
| **Guarantor**: | Peter Knobel c/o Solaris Property Owner, LLC<br>Attention: Legal Department<br>141 East Meadow Drive<br>Suite 211<br>Vail, Colorado 81657<br>P: (970) 479-7566<br>F: (970) 479.6666 |

**Severability**.  In case any provision of this Agreement shall be declared invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

EXHIBIT 1

**Titles and Subtitles**.  The titles of the paragraphs and subparagraphs of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

**Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

**No Strict Construction**.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**Amendments**.  This Agreement may only be amended and any waivers hereunder shall only be made with the approval of the Company and the Purchaser.

THIS OPERATING PAYMENT AGREEMENT is made effective as of the date first above written by and among:

**SOLARIS**:

**Solaris Property Owner, LLC,** a Delaware limited liability

By:  Solaris Mezz, LLC, a Delaware limited liability company

By: _____

Peter Knobel, Manager

**CRCPS**:

**Colorado Regional Center Project Solaris, LLLP,** a Colorado limited liability limited partnership

By:  Colorado Regional Center I, LLC, a Colorado limited liability company, general partner

By: _____

Chester Schwartz, Manager

**GUARANTOR**:

By: _____

Peter B. Knobel, individually

EXHIBIT 1

Case No. 1:19-cv-02443-RM-STV  Document 29-1 filed 06/19/20  USDC Colorado  pg 56
Case 1:19-cv-02443-STV  Document 51-2  Filed 10/18/19  USDC Colorado  Page 46 of 184
of 293

**EXHIBIT C**
**USCIS REGIONAL CENTER APPROVAL LETTER**

*[USCIS Approval Letter on following page.]*

EXHIBIT 1



**U.S. Department of Homeland Security**
24000 Avila Road, 2nd Floor
Laguna Niguel, CA 92677

**U.S. Citizenship
and Immigration
Services**

May 19, 2010

Chester P. Schwartz
Colorado Regional Center, LLC
5251 DTC Parkway, Suite 1100
Greenwood Village, CO 80111

| | |
|---|---|
| Application: | Request for Designation as a Regional Center |
| Applicant(s): | Chester P. Schwartz, CEO |

| | |
|---|---|
| Re: | Colorado Regional Center, LLC.
W09000840 |

Pursuant to Section 610 of the Appropriations Act of 1993, on July 20, 2009, Chester P. Schwartz submitted a proposal seeking approval and designation by U.S. Citizenship and Immigration Services (USCIS) of the Colorado Regional Center, LLC.

Based on its review and analysis of your proposal, and of your response to the USCIS Request for Evidence, USCIS hereby designates Colorado Regional Center, LLC as a Regional Center within the Immigrant Investor Pilot Program and approves the request as described below:

**GEOGRAPHIC AREA:**

The Colorado Regional Center, LLC (CRC) shall have a geographic scope which includes the entire State of Colorado.

**FOCUS OF INVESTMENT ACTIVITY:**

As depicted in the economic model, the general proposal and the economic analysis, businesses within the Regional Center will engage in the following economic activities: Residential construction, retail, hospitality, restaurants, bioscience research and light manufacturing.

The Regional Center for EB-5 Immigrant purposes shall focus investments into new commercial enterprises in the following target industry economic clusters:

1. Office Buildings:  NAICS codes 5411, 5412, 5413, 5414, 5415 and 5416
2. Hotels:  NAICS 7211
3. Light Manufacturing:  NAICS 321, 323, 332 and 337

**www.uscis.gov**

EXHIBIT 1

Colorado Regional Center, LLC – W09000840
Page 2

4. Residential Construction:       NAICS 2332
5. Retail Trade:       NAICS 44 and 45; Restaurants: NAICS 722
6. Bioscience Research Park:       NAICS 5417

Exemplar business plans have been submitted for projects in each economic cluster. If any investment opportunities arise that are beyond the scope of the approved industry clusters, then an amendment would be required to add that cluster.

Aliens seeking immigrant visas through the Immigrant Investor Pilot Program may file individual petitions with USCIS for these commercial enterprises located within the approved Regional Center area. The geographic focus of this area may contain some High Unemployment Targeted Employment Areas (TEAs) as designated by the State of Colorado and rural TEAs as defined in 8 CFR 204.6(e). Therefore, the minimum capital investment threshold for any individual immigrant investment into an approved commercial enterprise throughout the Regional Center shall be not less than $500,000, if the investment target is located within a TEA or $1,000,000 if it is located outside of a TEA. No debt arrangement will be acceptable unless it is secured by assets owned by the alien entrepreneur. A full capital investment must be made and placed at risk.

For any alien requesting the reduced threshold of $500,000 based upon an investment in a Targeted Employment area, the alien must establish at the time of filing of the I-526 petition that either the investment will be made in a TEA designated area or was in a TEA designated area at the time of the alien's initial investment into the enterprise.

**EMPLOYMENT CREATION**

Immigrant investors who file petitions for commercial enterprises located in the Regional Center area must fulfill all of the requirements set forth in 8 CFR 204.6, except that the petition need not show that the new commercial enterprises created ten new jobs indirectly as a result of the immigrant investor's investment. This determination has been established by way of USCIS' acceptance of the final economic analysis that is contained as part of the approved Regional Center proposal and its indirect job creation model and multipliers contained within the final approved Regional Center application package. Rather, the investor must show at the time of removal of conditions that they performed the activities described in the model and on which the approved methodology is based. In this case the IMPLAN model was used.

**Multiplier based on underlying new "direct jobs"**

In addition, where job creation or preservation of existing jobs is claimed based on a multiplier rooted in underlying new "direct jobs", the immigrant investor's individual I-526 petition affiliated with your Regional Center, should include as supporting evidence:

- A comprehensive detailed business plan with supporting financial, marketing and related data and analysis providing a reasonable basis for projecting creation of any new direct jobs for "qualifying employees" to be achieved/realized within two years pursuant to 8 CFR 204.6(j)(4)(B).

An alien investor's I-829 petition to remove the conditions which was based on an I-526 petition approval that involved the creation of new direct jobs or the creation of new indirect jobs based on a multiplier tied to underlying new direct jobs needs to be properly supported by evidence of job creation. To support the full number of direct and indirect new jobs being claimed in connection with removal of conditions, the petition will need to be supported by probative evidence of the number of new direct full time (35 hours per week) jobs for qualified employees whose positions have been created as a result of the alien's investment. Such evidence may include copies of quarterly state employment tax reports, Forms W-2, Forms I-9, and any other pertinent employment records sufficient to demonstrate the number of qualified employees whose jobs were created directly.

EXHIBIT 1

Colorado Regional Center, LLC – W09000840
Page 3

**Additional Guidelines for individual Immigrant Investors Visa Petition (I-526)**

Each individual petition, in order to demonstrate that it is associated with the Regional Center, in conjunction with addressing all the requirements for an individual immigrant investor petition, shall also contain as supporting evidence relating to this Regional Center designation, the following:

1. A copy of this letter, the Regional Center approval and designation.

2. A copy of the USCIS approved Regional Center narrative proposal and business plan.

3. A copy of the job creation methodology required in 8 CFR 204.6(j)(4)(iii), as contained in the final Regional Center economic analysis which has been approved by USCIS, which reflects that investment by an individual immigrant investor will create not fewer than ten (10) full-time employment positions, either directly or indirectly, per immigrant investor.

4. The Business Plan for the proposed project using guidelines from _Matter of Ho_, 22 I&N Dec. 206 (Assoc. Comm., 1998) and including:

   a. An employment and hiring schedule
   b. Evidence of building or operating permits
   c. Information relating to loans, encumbrances, financing and closing documents
   d. Evidence relating to ownership or control of the property

5. A legally executed (signed and dated) copy of the USCIS approved:

   a. Private Offering Memorandum:  Sample submitted July 20, 2009
   b. Subscription Agreement:  Sample submitted July 20, 2009
   c. Operating Agreement:  Sample submitted July 20, 2009
   d. Limited Partnership Agreement:  Sample submitted July 20, 2009
   e. Escrow agreement and instructions:  Sample submitted July 20, 2009

**DESIGNEE'S RESPONSIBILITIES INHERENT IN CONDUCT OF THE REGIONAL CENTER:**

The law, as reflected in the regulations at 8 CFR 204.6(m)(6), requires that an approved Regional Center in order to maintain the validity of its approval and designation must continue to meet the statutory requirements of the Immigrant Investor Pilot Program by serving the purpose of promoting economic growth, including increased export sales (where applicable), improved regional productivity, job creation, and increased domestic capital investment.   Therefore, in order for USCIS to determine whether your Regional Center is in compliance with the above cited regulation, and in order to continue to operate as a USCIS approved and designated Regional Center, your administration, oversight, and management of your Regional Center shall be such as to monitor all investment activities under the sponsorship of your Regional Center and to maintain records, data and information on a quarterly basis in order to report to USCIS upon request the following year to date information for each Federal Fiscal Year[1], commencing with the initial year as follows:

1. Provide the principal authorized official and point of contact of the Regional Center responsible for the normal operation, management and administration of the Regional Center.

2. Be prepared to explain how you are administering the Regional Center and how you will be actively engaged in supporting a due diligence screening of its alien investors' lawful source of capital and the alien investor's ability to fully invest the requisite amount of capital.

---

[1] A Federal Fiscal Year runs for twelve consecutive months from October 1st to September 30th.

EXHIBIT 1

Colorado Regional Center, LLC – W09000840
Page 4

3. Be prepared to explain the following:

    a. How the Regional Center is actively engaged in the evaluation, oversight and follow-up on any proposed commercial activities that will be utilized by alien investors.

    b. How the Regional Center is actively engaged in the ongoing monitoring, evaluation, oversight and follow up on any investor commercial activity affiliated through the Regional Center that will be utilized by alien investors in order to create direct and/or indirect jobs through qualifying EB-5 capital investments into commercial enterprises within the Regional Center.

4. Be prepared to provide:

    a. the name, date of birth, petition receipt number, and alien registration number (if one has been assigned by USCIS) of each principal alien investor who has made an investment and has filed an EB-5/I-526 Petition with USCIS, specifying whether:
        i. the petition was filed,
        ii. was approved,
        iii. denied, or
        iv. withdrawn by the petitioner, together with the date(s) of such event.

    b. The total number of visas represented in each case for the principal alien investor identified in 4.a. above, plus his/her dependents (spouse and children) for whom immigrant status is sought or has been granted.

    c. The country of nationality of each alien investor who has made an investment and filed an EB-5/I-526 petition with USCIS.

    d. The U.S. city and state of residence (or intended residence) of each alien investor who has made an investment and filed an EB-5/I-526 petition with USCIS.

    e. For each alien investor listed in item 4.a., above, identify the following:

        i. the date(s) of investment in the commercial enterprise;

        ii. the amount(s) of investment in the commercial enterprise; and

        iii. the date(s), nature, and amount(s) of any payment/remuneration/profit/return on investment made to the alien investor by the commercial enterprise and/or Regional Center from when the investment was initiated to the present.

5. Be prepared to identify/list each of the target industry categories of business activity within the geographic boundaries of your Regional Center that have:

    a. received alien investors' capital, and in what aggregate amounts;

    b. received non-EB-5 domestic capital that has been combined and invested together, specifying the separate aggregate amounts of the domestic investment capital;

    c. of the total investor capital (alien and domestic) identified above in 5.a and 5.b, identify and list the following:
        i. The name and address of each "direct" job creating commercial enterprise.
        ii. The industry category for each indirect job creating investment activity.

EXHIBIT 1

Colorado Regional Center, LLC – W09000840
Page 5

6.  Be prepared to provide:

    a.  The total aggregate number of approved EB-5 alien investor I-526 petitions per each Federal Fiscal Year to date made through your Regional Center.

    b.  The total aggregate number of approved EB-5 alien investor I-829 petitions per each Federal Fiscal Year to date through your Regional Center.

7.  The total aggregate sum of EB-5 alien capital invested through your Regional Center for each Federal Fiscal Year to date since your approval and designation.

8.  The combined total aggregate of "new" direct and/or indirect jobs created by EB-5 investors through your Regional Center for each Federal Fiscal Year to date since your approval and designation.

9.  If applicable, the total aggregate of "preserved" or saved jobs by EB-5 alien investors into troubled businesses through your Regional Center for each Federal Fiscal Year to date since your approval and designation.

10. If for any given Federal Fiscal Year your Regional Center did or does not have investors to report, then provide:

    a.  a detailed written explanation for the inactivity,

    b.  a specific plan which specifies the budget, timelines, milestones and critical steps to:

        i.   actively promote your Regional Center program,

        ii.  identify and recruit legitimate and viable alien investors, and

        iii. a strategy to invest into job creating enterprises and/or investment activities within the Regional Center.

11. Regarding your website, if any, please be prepared to provide a hard copy which represents fully what your Regional Center has posted on its website, as well as providing your web address. Additionally, please provide a packet containing all of your Regional Center's hard copy promotional materials such as brochures, flyers, press articles, advertisements, etc.

12. Finally, please be aware that it is incumbent on each USCIS approved and designated Regional Center, in order to remain in good standing, to notify the USCIS within 15 business days at USCIS.ImmigrantInvestorProgram@dhs.gov of any change of address or occurrence of any material change in:

    •  the name and contact information of the responsible official and/or Point of Contact (POC) for the RC
    •  the management and administration of the RC,
    •  the RC structure,
    •  the RC mailing address, web site address, email address, phone and fax number,
    •  the scope of the RC operations and focus,
    •  the RC business plan,
    •  any new, reduced or expanded delegation of authority , MOU, agreement, contract, etc. with another party to represent or act on behalf of the RC,
    •  the economic focus of the RC,  or
    •  any material change relating to your Regional Center's basis for its most recent designation

EXHIBIT 1

Colorado Regional Center, LLC — W09000840
Page 6

and/or reaffirmation by USCIS.

If you have any questions concerning the Regional Center approval and designation under the Immigrant Investor Pilot Program, please contact the USCIS by Email at USCIS.ImmigrantInvestorProgram@dhs.gov.

Sincerely,

Christina Poulos
Director
California Service Center

cc: Carolyn S. Lee, Esq.

EXHIBIT 1

**EXHIBIT D**
**FLOW OF FUNDS**



EXHIBIT 1

**EXHIBIT E**
**CITIBANK ESCROW AGREEMENT**

*[Citibank Escrow Agreement on following page.]*

EXHIBIT 1



**SECOND AMENDED AND RESTATED ESCROW AGREEMENT**

between

**COLORADO REGIONAL CENTER, LLC**

and

**CITIBANK, N.A., as Escrow Agent**

**Dated as of April 15, 2011**

EXHIBIT 1

**SECOND AMENDED AND RESTATED ESCROW AGREEMENT** (this "Agreement"), dated as of April 15, 2011, by and between Colorado Regional Center, LLC, a Colorado limited liability company ("Company"), and Citibank, N.A., a national banking association organized and existing under the laws of the United States of America ("Citibank") and acting through its Agency and Trust Division and solely in its capacity as escrow agent under the Agreement, and any successors appointed pursuant to the terms hereof (Citibank in such capacity, the "Escrow Agent").

**WHEREAS,** the Company and the Escrow Agent entered into that certain Amended and Restated Escrow Agreement, dated as of April 4, 2011 (the "Amended and Restated Escrow Agreement").

**WHEREAS,** the Company wishes to amend the Amended and Restated Escrow Agreement to permit for the deposit of different escrow amounts and for the partial release of the Administrative Expenses (as defined below), as described in Section 2(b) below.

**WHEREAS,** pursuant to the United States Citizenship and Immigration EB-5 Investor Visa Program (the "Program"), qualified foreign investors (each, an "Investor" or collectively, the "Investors") are entitled to obtain permanent residency status in the United States by investing US $500,000.00 in designated regional centers;

**WHEREAS,** regional centers are entities approved by the United States federal government to seek and accept foreign investment under the Program;

**WHEREAS,** the Company has received full approval and designation from the United States Citizenship and Immigration Services (the "USCIS") as a regional center;

**WHEREAS,** as an approved regional center, the Company wishes to offer foreign investors the opportunity to invest in a certain project located in Vail, Colorado, and known as "Solaris Residences" (the "Solaris Project");

**WHEREAS,** the Company has established a Colorado limited liability limited partnership known as Colorado Regional Center Project Solaris, LLLP (the "Partnership") as the special purpose entity to act as the investment vehicle for the investment into the Solaris Project;

**WHEREAS,** the Company wishes to establish an escrow account for the purposes of holding, investing and disbursing funds deposited by the Investors for (i) investment in the Solaris Project, and (ii) administrative expenses associated with the investment in the Solaris Project (the "Administrative Expenses");

**WHEREAS,** the Company wishes to appoint Citibank as Escrow Agent and Citibank is willing to accept such appointment and to act as Escrow Agent, in each case upon the terms and conditions of the Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the parties hereto agree as follows:

EXHIBIT 1

## 1.    **Deposit of Escrow Deposit or Property.**

The Company will provide the Escrow Agent with no less than three (3) Business Day's prior written notice of the identity of any Investor, including without limitation, any and all information that the Escrow Agent may require in order to complete its initial due diligence procedures. The Company will instruct each Investor to deposit with the Escrow Agent in U.S. Dollars a minimum of either US $550,000 or $535,000, consisting of $500,000 as the Investor's Capital Contribution and either $50,000 or $35,000 as the Administrative Expense, (the "Escrow Deposit", and together with any investment income or proceeds received by the Escrow Agent from the investment thereof from time to time pursuant to Section 3 below, collectively, the "Escrow Property"), and the Escrow Agent agrees to hold the Escrow Property in a non-interest bearing account established with the Escrow Agent (the "Escrow Account"), and to administer the Escrow Property in accordance with the terms of this Agreement.   For purposes of this Agreement "*Business Day*" shall mean any day that the Escrow Agent is open for business.

## 2.    **Claims and Payment; Release from Escrow.**

(a)   Upon receipt of each Escrow Deposit, the Escrow Agent shall credit such funds to the Escrow Account.  In the event that the funds received from an Investor exceed an amount that is $250.00 less than the required Escrow Deposit amount, then the Escrow Agent without further direction may proceed with the deposit to the Escrow Account.  Any funding amounts that are deficient by more than $250.00 shall be deposited upon direction from an Authorized Person (as defined below). During any period prior to an Investor's approval of its I-526 petition to participate in a Project, the Escrow Deposit shall remain the property of the Investor and, except as expressly provided in Sections 2(b) and 6(a) herein, shall not be subject to any liens or charges by the Company or the Escrow Agent until properly released by the Escrow Agent to the Company in accordance with this Agreement.

(b)   The Escrow Deposit shall be disbursed as follows:

(i)  upon receipt by the Escrow Agent of the Escrow Deposit, if in the amount of $550,000, then U.S. $15,000 of the Escrow Deposit shall be disbursed to the Company, or, if upon receipt of the Escrow Deposit in the amount of $535,000, then such amount shall be held in escrow and released as follows;

(ii)  upon receipt by the Escrow Agent of written instruction from an Authorized Person of the Company (as defined below) that the Investor's I-526 Petition has been approved by the USCIS (a copy of such notice shall accompany the written confirmation), (A) U.S. $35,000 of the Escrow Deposit, less any amounts due and payable to the Escrow Agent, shall be disbursed to the Company and (B) U.S. $500,000 of the Escrow Deposit shall be disbursed to or in accordance with the written instructions of the Company, or

EXHIBIT 1

(iii) upon receipt of written instructions from an Authorized Person of the Company stating that an Investor's I-526 petition has been denied by the USCIS or the Investor's subscription has terminated (in the case of a rejection by the USCIS, a copy of such rejection notice shall accompany the written instruction), the Escrow Agent will as soon as practicable return to the Investor $500,000 plus such portion of the Administrative Expenses remaining in the Escrow Deposit as directed in writing by the Company. All of such Investor's funds, including any income earned on such funds, shall be delivered to the Investor pursuant to the wire instructions as set forth on Exhibit A, which shall be provided by each Investor at the time such Investor deposits its Escrow Deposit.

(c) The Escrow Agent shall be entitled to rely on the Company's review of each Investor's I-526 petition and any other documentation or information provided by such Investor under the Company's anti-money laundering policies and procedures, and in the absence of written notice from the Company, the Escrow Agent shall be entitled to conclude that no risk of money laundering or fraud exists; *provided, however*, that the Escrow Agent (without undertaking any independent or additional responsibility for diligence or review) reserves the right at any time to reject or return an Investor's funds based on its own policies and procedures and determinations by providing notice to the Company. Under no circumstances shall the Escrow Agent be liable for any fraud or money laundering activities by any Investor.

## 3. Investment of Funds.

The Escrow Deposit will remain uninvested and no interest will accrue thereon.

## 4. Tax Matters.

(a) The Company agrees that, for tax reporting purposes, the Escrow Property shall be allocated to the party to whom the Escrow Property is disbursed and shall be reported in the year of disbursement on a Form 1099-B, if applicable, in relation to principal and on a Form 1099-INT (or Form 1042S (income code 1, if such recipient is a non-U.S. person) for interest earned or on a Form 1099-DIV for dividends earned in the case of Money Market investments. The Company agrees that this Agreement does not relieve the Company of its obligation for tax information reporting under Section 6041 of the Internal Revenue Code of 1986, as amended from time to time (the "Code"), and the Treasury regulations thereunder, as well as the obligation to report amounts of imputed interest income to the extent required pursuant to Code Section 483 or Section 1272. The Escrow Agent shall not be responsible for determining or reporting such imputed interest.

(b) The Company shall upon their execution of this Agreement provide the Escrow Agent with a duly completed and properly executed original IRS Form W-9 (or applicable Form W-8, in the case of a non-U.S. person) certifying its U.S. tax identification number if Form W-9 is provided, or status as a beneficial owner of the Escrow Property if a Form W-8 is provided. The Company shall also provide to the Escrow Agent any other forms and documents that the Escrow Agent may reasonably request to determine the amount, if any, to be withheld, and to complete such information and payee statements. In the event the payee is not the Company or a party to this Agreement, the Company shall provide the Escrow Agent with a duly completed and properly executed original IRS Form W-9 (or applicable W-8, in the case of a non-U.S. person) from such payee prior to payment being made (or in the case of an

EXHIBIT 1

Investor, at the time such Investor's funds are deposited with the Escrow Agent). The Company understands that, in the event valid U.S. tax forms, or other relevant forms, are not provided to the Escrow Agent, the tax law may require withholding of tax on disbursements and on a portion of any interest or other income earned on the investment of the Escrow Property.

(c)     Should the Escrow Agent become liable for the payment of taxes, including withholding taxes relating to any funds, including interest and penalties thereon, held by it pursuant to this Agreement or any payment made hereunder, the Company agrees to reimburse the Escrow Agent for such taxes, interest and penalties upon demand. Without limiting the foregoing, the Escrow Agent shall be entitled to deduct such taxes, interest and penalties from the earnings on the Escrow Property in accordance with Section 6(a) hereof.

(d)     The Company acknowledges and agrees that none of the payments under this Agreement are for compensation for services performed by an employee or independent contractor of the Company.

(e)     Citigroup, Inc., its affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Citigroup, Inc. and its affiliates. This Agreement and any amendments or attachments are not intended or written to be used, and cannot be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties. Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

(f)     This Section 4 may be amended by the Escrow Agent as necessary and upon notice to the Company to conform to tax and regulatory requirements and any other changes to the current applicable governmental tax laws. The Escrow Agent's rights under this Section shall survive the termination of this Agreement or the resignation or removal of the Escrow Agent.

## 5.    Concerning the Escrow Agent.

(a)     Escrow Agent Duties. The Company acknowledges and agrees that (i) the duties, responsibilities and obligations of the Escrow Agent shall be limited to those expressly set forth in the Agreement, each of which is administrative or ministerial (and shall not be construed to be fiduciary) in nature, and no duties, responsibilities or obligations shall be inferred or implied, (ii) the Escrow Agent shall not be responsible for any of the agreements referred to or described herein (including without limitation the Investors' I-526 petitions), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby, (iii) this Agreement shall constitute the entire agreement of the parties with respect to the subject matter and supersedes all prior oral or written agreements in regard thereto, (iv) the Escrow Agent shall not be required to expend or risk any of its own funds or otherwise incur any financial or other liability in the performance of any of its duties hereunder and (v) the Escrow Agent shall not be obligated to take any legal or other action hereunder which might in its judgment involve or cause it to incur any expense or liability unless it shall have been furnished with acceptable indemnification.

(b)     Standard of Care. The Escrow Agent shall be under no duty to afford the Escrow Property any greater degree of care than it gives its own similar property. The Escrow

EXHIBIT 1

Agent shall not be liable for any damage, loss or injury resulting from any action taken or omitted in the absence of gross negligence or willful misconduct.

(c)     Limitation on Liability.    Notwithstanding any other provision of the Agreement, the Escrow Agent shall not be liable (i) for any indirect, incidental, consequential, punitive or special losses or damages, regardless of the form of action and whether or not any such losses or damages were foreseeable or contemplated, (ii) for the acts or omissions of any nominees, correspondents, designees, agents, subagents or sub-custodians, or (iii) for the investment or reinvestment of any Escrow Property, or any liquidation of such investment or reinvestment, executed in accordance with the terms of the Agreement, including, without limitation, any liability for any delays (not resulting from its gross negligence or willful misconduct as adjudicated by a court of competent jurisdiction) in the investment or reinvestment of the Escrow Property, any loss of interest incident to any such delays, or any loss or penalty as a result of the liquidation of any investment before its stated maturity date.

(d)     Reliance.    The Escrow Agent shall be entitled to rely upon any order, judgment, certification, demand, instruction, notice, instrument, certification, consent, authorization, receipt, power of attorney, e-mail, .pdf or other writing delivered to it without being required to determine the authenticity or validity thereof, or the correctness of any fact stated therein or the propriety or validity or the service thereof or the jurisdiction of the court issuing any judgment or order.  The Escrow Agent may act in reliance upon any signature believed by it to be genuine and may assume that any person purporting to make any statement or execute any document in connection with the provisions hereof has been duly authorized to do so.

(e)     Consultation.    The Escrow Agent may consult with counsel satisfactory to it, and the opinion or advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it in good faith and in accordance with the opinion and advice of such counsel.

6.     **Compensation, Expense Reimbursement and Indemnification.**

(a)     Compensation:    The Company covenants and agrees to pay the Escrow Agent's fees and expenses specified in Schedule A.  In the event that such fees or expenses, or any other obligations owed to the Escrow Agent (or its counsel) are not paid to the Escrow Agent within 30 calendar days following the presentment of an invoice for the payment of such fees and expenses or the demand for such payment, then the Escrow Agent may, without further action or notice, pay such fees from the earnings on the Escrow Property and may sell, convey or otherwise dispose of any Escrow Property for such purpose.  The Escrow Agent may in its sole discretion withhold from any distribution of the Escrow Property an amount of such distribution it reasonably believes would, upon sale or liquidation, produce proceeds equal to any unpaid amounts to which the Escrow Agent is entitled to hereunder.

(b)     Indemnification:    The Company covenants and agrees to indemnify the Escrow Agent and its employees, officers and directors (each, an "Indemnified Party") for, hold each Indemnified Party harmless from, and defend each Indemnified Party against, any and all claims, losses, actions, liabilities, costs, damages and expenses of any nature incurred by any Indemnified Party arising out of or in connection with this Agreement or with the administration

EXHIBIT 1

of its duties hereunder, including but not limited to attorney's fees, tax liabilities (including any taxes, interest and penalties but excluding any income tax liabilities associated with the Escrow Agent's fees), any liabilities or damages that may   result from any inaccuracy or misrepresentation made in any tax certification provided to the Escrow Agent, and other costs and expenses of defending or preparing to defend against any claim of liability, except to the extent such loss, liability, damage, cost and expense shall be caused by the Indemnified Party's own gross negligence or willful misconduct. The foregoing indemnification and agreement to hold harmless shall survive the termination of the Agreement and the resignation or removal of the Escrow Agent.

### 7.     **Dispute Resolution.**

In the event of any disagreement among the Company and any other person, resulting in adverse claims or demands being made with respect to the subject matter of the Agreement, or in the event that the Escrow Agent, in good faith, is in doubt as to any action it should take hereunder, the Escrow Agent may, at its option, refuse to comply with any claims or demands and refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event, the Escrow Agent shall not be liable in any way or to any person for its failure or refusal to act, and the Escrow Agent shall be entitled to continue to so refuse to act and refrain from acting until (i) the rights of all parties having or claiming an interest in the Escrow Property or the Escrow Account shall have been fully and finally adjudicated by a court of competent jurisdiction, or all differences and doubts shall have been resolved by agreement among all of the parties, and (ii) the Escrow Agent shall, in the case of adjudication by a court of competent jurisdiction, have received a final order, judgment or decree by such court of competent jurisdiction, which order, judgment or decree is not subject to appeal, and in the case of resolution of differences and doubts by agreement, have received a notice in writing signed by an Authorized Person (as defined below) of the Company setting forth in detail the agreement.  The Escrow Agent shall have the option, after 30 calendar days' notice to the Company of its intention to do so, to file an action in interpleader requiring the Company to answer and litigate any claims and rights among themselves.  The costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Escrow Agent in connection with such proceeding shall be paid by the Company.  The rights of the Escrow Agent under this Section 7 are cumulative of all other rights which it may have by law or otherwise.

### 8.     **Exclusive Benefit.**

Except as specifically set forth in the Agreement, the Agreement is for the exclusive benefit of the parties to the Agreement and their respective permitted successors, and shall not be deemed to give, either expressly or implicitly, any legal or equitable right, remedy, or claim to any other entity or person whatsoever.  No party may assign any of its rights or obligations under the Agreement without the prior written consent of the other parties except that the Escrow Agent may resign upon the terms described in the Agreement.

### 9.     **Force Majeure.**

Notwithstanding anything contained in the Agreement to the contrary, the Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, without limitation, any provision of any

EXHIBIT 1

present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility).

### 10. Resignation and Removal.

(a)     The Company may remove the Escrow Agent at any time by giving to the Escrow Agent thirty (30) calendar days' prior written notice of removal signed by an Authorized Person of the Company. The Escrow Agent may resign at any time by giving to the Company thirty (30) calendar days' prior written notice of resignation.

(b)     Within thirty (30) calendar days after giving the foregoing notice of removal to the Escrow Agent or within thirty (30) calendar days after receiving the foregoing notice of resignation from the Escrow Agent, the Company shall appoint a successor escrow agent and give notice of such successor escrow agent to the Escrow Agent. If a successor escrow agent has not accepted such appointment by the end of such (i) 30-day period, in the case of the Escrow Agent's removal, or (ii) 30-day period, in the case of the Escrow Agent's resignation, the Escrow Agent may either (x) deliver the Escrow Property to the Company at the address set forth on the signature page to the Agreement, or (y) apply to a court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief.

(c)     Upon receipt of notice of the identity of the successor escrow agent, the Escrow Agent shall either deliver the Escrow Property then held hereunder to the successor escrow agent, less the Escrow Agent's fees, costs, expenses and the value of other obligations owed to the Escrow Agent hereunder, or hold such Escrow Property (or any portion thereof) pending distribution, until all such fees, costs and expenses or the value of other obligations are paid to it.

(d)     Upon delivery of the Escrow Property to the successor escrow agent or to the Company, the Escrow Agent shall have no further duties, responsibilities or obligations hereunder.

### 11. Governing Law; Jurisdiction; Waivers.

(a)     The parties agree (pursuant to section 5-1401 of the General Obligations Law of the State of New York) that, to the extent such laws would otherwise not apply, the Agreement (including this choice-of-law provision) and the rights and obligations of the parties to the Agreement shall be governed by, construed in accordance with, and all controversies and disputes arising under, in connection with or in relation to the Agreement shall be resolved pursuant to, the laws of the State of New York applicable to contracts made and to be wholly performed in the State of New York.

(b)     The parties irrevocably and unconditionally submit to the exclusive jurisdiction of the federal and state courts located in the Borough of Manhattan, City, County and State of New York, for any proceedings commenced regarding the Agreement, including, but not limited to, any interpleader proceeding or proceeding for the appointment of a successor escrow agent the Escrow Agent may commence pursuant to the Agreement. The parties irrevocably submit to the jurisdiction of such courts for the determination of all issues in such proceedings

EXHIBIT 1

and irrevocably waive any objection to venue or inconvenient forum for any proceeding brought in any such court.

        (c)     The parties irrevocably and unconditionally waive, to the fullest extent permitted by law, and agree not to plead or claim, any right of immunity from legal action, suit or proceeding, from setoff or counterclaim, from the jurisdiction of any court, from service of process, from attachment upon or prior to judgment, from attachment in aid of execution or judgment, from execution of judgment, or from any other legal process or proceeding for the giving of any relief or for the enforcement of any judgment, and consents to such relief and enforcement against it, its assets and its revenues in any jurisdiction, in each case with respect to any matter arising out of, or in connection with, the Agreement.

        (d)     The parties irrevocably and unconditionally waive any right to trial by jury with respect to any proceeding relating to the Agreement.

**12.**    **Instructions, Verification, Communications.**

        (a)     All instructions required under the Agreement shall be delivered to the Escrow Agent in writing, in English, in facsimile or electronic mail form and, if so requested by the Escrow Agent, an original, executed by an Authorized Person (as hereinafter defined) of the Company or an entity acting on its behalf. The identity of such Authorized Person, as well as its specimen signatures, title, telephone number and e-mail address, shall be delivered to the Escrow Agent in the list of authorized signers forms as set forth on Schedule B and shall remain in effect until the Company, or an entity acting on its behalf, notifies Escrow Agent of any change thereto (the person(s) so designated from time to time, the "Authorized Persons"). The Escrow Agent and the Company agree that the above constitutes a commercially reasonable security procedure and further agree not to comply with any direction or instruction (other than those contained herein or delivered in accordance with the Agreement) from any party so appointed by the Company on its behalf.

        (b)     In the event funds transfer instructions are given (other than in writing at the time of execution of this Agreement), whether in writing, by telecopier, .pdf, e-mail, or otherwise, such funds transfer instructions should contain a selected test word also evidenced in Schedule B. Test Words must contain at least 8 alphanumeric characters, established at document execution and changed each time Schedule B is updated in accordance with (a) above. In addition or in lieu of text words, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call back to the applicable person(s) specified to the Escrow Agent from time to time by an Authorized Person and the Escrow Agent may rely upon the confirmations of anyone purporting to be the person(s) so designated. To ensure the accuracy of the instructions it receives, the Escrow Agent may record such call backs. If the Escrow Agent is unable to verify the instruction, or is not satisfied in its sole discretion with the verification it receives, it will not execute the instruction until all issues have been resolved to its satisfaction. The persons and telephone numbers for call backs may be changed only in writing, signed by an Authorized Person, actually received and acknowledged by the Escrow Agent. The Company acknowledges that these security procedures for funds transfers are commercially reasonable.

        (c)     To help the U.S. government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record

EXHIBIT 1

information that identifies each person who opens an account. When an account is opened, and from time to time as may be required by the Escrow Agent's internal policies and procedures, the Escrow Agent will be entitled to ask for information that will allow the Escrow Agent to identify relevant parties. The Company hereby acknowledges such information disclosure requirements and agree to comply with all such information disclosure requests from time to time from the Escrow Agent.

(d)     In accordance with the Unlawful Internet Gambling Act (the "Act"), the Company may not use the Escrow Account or other Citibank facilities in the United States to process 'restricted transactions' as such term is defined in 31 CRF Section 132.2(y). Therefore, neither the Company nor any person who has an ownership interest in or control over the Escrow Account may use it to process or facilitate payments for prohibited internet gambling transactions. For more information about the Act, including the types of transactions that are prohibited,          please          refer          to          the          following          link: http://www.federalreserve.gov/NEWSEVENTS/PRESS/BCREG/20081112B.HTM.

(e)     Notwithstanding anything to the contrary herein, any and all email communications (both text and attachments) by or from the Escrow Agent that the Escrow Agent deems to contain confidential, proprietary, and/or sensitive information shall be encrypted. The recipient (the "Email Recipient") of the encrypted email communication will be required to complete a registration process. Instructions on how to register and/or retrieve an encrypted message will be included in the first secure email sent by the Escrow Agent to the Email Recipient. Additional information and assistance on using the encryption technology can be found          at          Citibank's          Secure          Email          website          at www.citigroup.com/citigroup/citizen/privacy/email.htm or by calling (866) 535-2504 (in the U.S.) or (904) 954-6181.

(e)     The provisions of this Section 12(a)-(e) may be amended by the Escrow Agent unilaterally upon notice to the Company.

### 13.     Notices; Wiring Instructions.

(a)     Any notice permitted or required hereunder shall be in writing in English, and shall be sent (i) by personal delivery, overnight delivery by a recognized courier or delivery service, or (ii) mailed by registered or certified mail, return receipt requested, postage prepaid, or (iii) confirmed telecopy or electronic mail accompanied by mailing of the original on the same day by first class mail, postage prepaid, in each case addressed to the address and person(s) designated below their respective signature hereto (or to such other address as any such party may hereafter designate by written notice to the other parties). Notices to the Escrow Agent shall only be deemed given upon actual receipt by the Escrow Agent. Whenever under the terms hereof the time for giving a notice or performing an act falls upon a Saturday, Sunday, or a banking holiday in New York, such time shall be extended to the next Business Day.

(b)     Any funds to be paid to or by the Escrow Agent hereunder shall be sent by wire transfer pursuant to the following instructions (or by such method of payment and pursuant to such instruction as may have been given in advance and in writing to or by the Escrow Agent, as the case may be, in accordance with Section 13(a) above):

EXHIBIT 1

If to the Company:

Bank: Park Bank
       330 E. Kilbourn Avenue
       Milwaukee, WI 53202
ABA#: 075000666
A/C#:0610090062
Ref: Colorado Regional Center, LLC

If to the Escrow Agent:

**CITIBANK, N.A**.
SWIFT ID: CITIUS33 (For use when remitting funds from outside the U.S.)

or

ABA: 0210-0008-9 (For use when remitting funds from within the U.S.)

Account Name: Colorado Regional Center Escrow Concentration Account
Credit Account Number: 36936986

Reference: #798523 – Colorado Regional Center Project Solaris

### 14.    Amendment.

Except as specifically set forth in the Agreement, any amendment of the Agreement shall be binding only if evidenced by a writing signed by each of the parties to the Agreement.

### 15.    Severability.

The invalidity, illegality or unenforceability of any provision of the Agreement shall in no way affect the validity, legality or enforceability of any other provision. If any provision of the Agreement is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

### 16.    Termination.

The Agreement shall terminate upon the distribution of all Escrow Property from the Escrow Account established hereunder in accordance with the terms of the the Agreement, subject, however, to the survival of obligations after specifically contemplated in the Agreement to so survive.

### 17.    Use of Name.

No printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "Citibank", or "Citigroup" or "Citi" by name or the rights, powers, or duties of the Escrow Agent under the Agreement shall be issued by the Company, or on such party's behalf, without the prior written consent of the Escrow Agent.

EXHIBIT 1

18. **Counterparts.**

The Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement. Facsimile signatures on counterparts of the Agreement shall be deemed original signatures with all rights accruing thereto except in respect to any Non-US entity, whereby originals are required.

19. **Mergers and Conversions.**

Any corporation or entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or entity resulting from any merger, conversion or consolidation to which the Escrow Agent will be a party, or any corporation or entity succeeding to the business of the Escrow Agent will be the successor of the Escrow Agent hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

EXHIBIT 1

IN WITNESS WHEREOF, each of the parties has caused this Second Amended and Restated Escrow Agreement to be executed by a duly authorized officer as of the day and year first written above.

CITIBANK, N.A.,
as Escrow Agent

By: _____
    Name: Michael Pitfick
    Title: Vice President
    Date: April 15, 2011

Notice to:
Citibank, N.A.
Agency & Trust
388 Greenwich Street, 14th Floor
New York, NY 10013
Attn.: Michael Pitfick
Phone: (212) 816-5799
Facsimile: (212) 657-2762
E-mail: michael.pitfick@citi.com

COLORADO REGIONAL CENTER, LLC

By _____
    Name: Chester P. Schwartz
    Title: Manager
    Date:

Notice to:
Colorado Regional Center, LLC
4643 S. Ulster Street, Suite 950
Denver, CO 80237
Attn.: Chester P. Schwartz
Phone: 720.554.9704
Facsimile: 720.554.9905
E-mail: chet@colorradoregionalcenter.com

Copy to:
D. Rick Hayes
515 Congress Avenue, Suite 1700
Austin, TX 78701
Phone: 512.450.5111
E-mail: rhayes@coloradoregionalcenter.com

EXHIBIT 1

The above terms and conditions are hereby ratified and approved this 15th day of April 2011.

> **COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP, a Colorado limited liability limited partnership**
> **By Colorado Regional Center I, LLC, its general partner**
>
> By _____
>
> Its Manager

List of Schedules and Exhibits

Schedule A    Escrow Agent Fee Schedule (included with Initial Agreement)
Schedule B    Authorized List of Signers (included with Initial Agreement)
Exhibit A     Wire Instructions

EXHIBIT 1

# EXHIBIT A

## Colorado Regional Center Project Solaris

**Wire Investment Amount to:**
    **(Exact Bank Address)**
_____

_____

_____

_____

**SWIFT Code:** _____ (Foreign Payments only)
**or**
**ABA No.:** _____ (For US Domestic Payments only)

**For Credit to:  Account Name:** _____

    **Account Number:** _____

**Investor Phone Number:** _____

**Investor Address:** _____

_____

Reference:

The foregoing wire instructions must be the same as where the Investor's funds originated.  If such instructions are different from where the Investor's funds originated, please provide an explanation.

**The undersigned Investor hereby confirms that the above information is true and accurate.**

_____
**Signature of Investor**

**Date:** _____

EXHIBIT 1

Case No. 1:19-cv-02443-RM-STV Document 229-1 filed 06/19/20 USDC Colorado pg 80
Case 1:19-cv-02443-STV Document 51-2 Filed 10/18/19 USDC Colorado Page 70 of 184
of 293

**EXHIBIT F**
**CHARTERED ESCROW AGREEMENT**

*[Chartered Escrow Agreement on following page]*

EXHIBIT 1

Case No. 1:19-cv-02443-RM-STV Document 91-2 Filed 10/18/19 USDC Colorado Page 1 of 81
Case No. 1:19-cv-02443-RM-STV Document 249-1 Filed 06/19/20 USDC Colorado Page 71 of 184
of 293

*Sample of Escrow Agreement*

DATED _____ <mark>28 APRIL</mark> _____ 2011

## STANDARD CHARTERED BANK (HONG KONG) LIMITED
### as Escrow Agent

### and

[ <mark>CUSTOMER'S NAME</mark> ]
### as Customer

_____

### ESCROW AGREEMENT

_____

EXHIBIT 1

**THIS ESCROW AGREEMENT** (this "**Agreement**") is made on this ____28____ day of APRIL____ 2011

**BETWEEN**

(1) **STANDARD CHARTERED BANK (HONG KONG) LIMITED**, a bank incorporated with limited liability under the laws of Hong Kong with its registered office at 4-4A Des Voeux Road, Central, Hong Kong, Hong Kong (the "**Escrow Agent**"); and

(2) [ CUSTOMER'S NAME ], holder of People's Republic of China Identity Card No. [ China Identity Card No. ] / People's Republic of China Passport No. [ China Passport No. ] and whose address is at [ CUSTOMER'S ADDRESS ], People's Republic of China (the "**Customer**").

The Escrow Agent and the Customer are referred to herein collectively as the "**Parties**", and each of them individually as a "**Party**".

**WHEREAS**

(A) The Customer as an investor is applying to immigrate to the United States. In order to satisfy certain requirements imposed by the relevant U.S. authorities, the Customer is required to set up an escrow account in which funds or other property will be deposited which will be invested as capital in a U.S. business entity and used as payment of a syndication fee to a U.S. business entity.

(B) Accordingly, the Customer has agreed to appoint the Escrow Agent to open and operate the Escrow Account and to hold and administer in the name of the Customer the Escrow Fund as instructed by it and on the terms and subject to the conditions herein contained.

**NOW IT IS HEREBY AGREED**, in consideration of the mutual promises and covenants herein contained, as follows:

1. **INTERPRETATION**

1.1 In this Agreement (and the Recitals hereto), unless the context requires otherwise:

(a) "**Application**" means the Customer's Form I-526, Immigrant Petition by Alien Entrepreneur;

(b) "**Authorized Representative**" means an authorized representative appointed by the Customer as specified in Schedule 1 (*Authorized Representative(s)*) or any other person notified by the Customer to the Escrow Agent, by written notice specifying the date on which the appointment shall take effect (which shall not be less than thirty (30) days prior to such date), as Authorized Representative; the specimen signature of any authorized signatory of an Authorized Representative shall be notified to the Escrow Agent in accordance with Schedule 1 (*Authorized Representative(s)*);

(c) "**Business Day**" means a day (excluding Saturdays and Sundays) on which banks, including the Escrow Agent, are open for business in Hong Kong;

EXHIBIT 1

(d) "**Earnings**" means any interest, earnings, income or other amounts accruing on the Escrow Cash Deposit during the period of retention by the Escrow Agent in the Escrow Account;

(e) "**Escrow Account**" means the account [to be] established with the Escrow Agent for purposes of this Agreement and into which the Escrow Cash Deposit is paid[, details of which are set out below:

   [ Escrow Account No. ] denominated in U.S. Dollars];

(f) "**Escrow Cash Deposit**" means the sum deposited or to be deposited in the Escrow Account in the amount specified in Schedule 2 (*Escrow Cash Deposit*);

(g) "**Escrow Fund**" means the Escrow Cash Deposit, together with Net Earnings (if any) accrued thereon;

(h) "**Force Majeure Event**" means any event (including but not limited to an act of God, fire, epidemics, explosion, floods, tsunamis, earthquakes, typhoons or other natural disasters, riot, civil commotion or unrest, insurrection, terrorism, war, strikes or lockouts; nationalization, expropriation or other governmental actions; any law, order or regulation of a governmental, supranational or regulatory body; regulation of the banking or securities industry including changes in market rules, currency restrictions, devaluations or fluctuations; market conditions affecting the execution or settlement of transactions or the value of assets; and breakdown, failure or malfunction of any telecommunications, computer services or systems, or other causes) beyond the control of any Party which restricts or prohibits the performance of the obligations of such Party contemplated by this Agreement;

(i) "**Hong Kong**" means the Hong Kong Special Administrative Region of the People's Republic of China;

(j) "**Net Earnings**" means Earnings net of any amounts due and payable to, or liable to be withheld by, the Escrow Agent pursuant to this Agreement;

(k) "**PRC Agent**" has the meaning ascribed to such term in Schedule 1 (*Authorized Representative(s)*):

(l) "**Release Instructions**" has the meaning ascribed to such term in Clause 4.2 (*Release of Escrow Fund*) and, if available on the date of this Agreement, in (or substantially in) the form set out in Schedule 3 (*Forms of Release Instructions*);

(m) "**U.S.**" or "**United States**" means the United States of America;

(n) "**USCIS**" means the U.S. Citizenship and Immigration Services (or any successor or other agency or authority performing or assuming its or substantially similar functions)]; and

(o) "**US$**" or "**U.S. Dollars**" means the lawful currency for the time being of the United States of America.

1.2 <u>Construction</u>. In this Agreement, unless the context otherwise requires, any reference to:

(a) a "**person**" includes any individual, company, body corporate or unincorporate or other juridical person, sole proprietorship, partnership, club, society, firm, joint

EXHIBIT 1

venture or trust or any federation, state or subdivision thereof or any government or agency of any thereof;

(b)    "**including**" or "**includes**" means including or includes without limitation;

(c)    a "**regulation**" includes any regulation, rule, official directive, request, code of practice or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organization; and

(d)    "**tax**" includes any tax, levy, duty, charge, impost, fee, deduction or withholding of any nature now or hereafter imposed, levied, collected, withheld or assessed by any taxing or other authority and includes any interest, penalty or other charge payable or claimed in respect thereof and "**taxation**" shall be construed accordingly.

1.3    <u>Successors and Assigns</u>. The expressions "**Customer**" and "**Escrow Agent**" shall where the context permits include their respective successors in title, personal representatives, permitted assigns and transferees and any persons deriving title under them and, in the case of the Escrow Agent, any replacement Escrow Agent appointed pursuant to Clause 8 (*Replacement of Escrow Agent*).

1.4    <u>Miscellaneous</u>. In this Agreement, unless the context requires otherwise, references to provisions of any law or regulation shall be construed as references to those provisions as replaced, amended, modified or re-enacted from time to time; words importing the singular include the plural and vice versa and words importing a gender include every gender; references to this Agreement or any other document shall be construed as references to such document as the same may be amended, supplemented or novated from time to time; unless otherwise stated, references to Clauses and Schedules are to clauses of and schedules to this Agreement and references to this Agreement include its Schedules. Clause headings are inserted for reference only and shall be ignored in construing this Agreement.

## 2.    **APPOINTMENT**

The Customer hereby designates and appoints the Escrow Agent as escrow agent, and the Escrow Agent hereby accepts such designation and appointment on the terms and subject to the conditions herein contained.

## 3.    **ESCROW ACCOUNT**

3.1    <u>Deposit of Escrow Cash Deposit into Escrow Account</u>. The Customer hereby undertakes to deposit the Escrow Cash Deposit into the Escrow Account within six (6) months (or such longer period as the Escrow Agent may, in its sole discretion, agree in writing) after the date of this Agreement. In the event that the Customer does not deposit the Escrow Cash Deposit into the Escrow Account in accordance with this Clause 3.1, the Escrow Agent may terminate the Agreement in accordance with paragraph (a) of Clause 11.1 (*Termination*).

3.2    <u>Escrow Agent's Discretion</u>. The Customer agrees that the Escrow Agent has no responsibility whatsoever to ensure that the Escrow Cash Deposit is deposited into the Escrow Account. For the avoidance of doubt, the Escrow Agent may at any time decline acceptance of the Escrow Cash Deposit into the Escrow Account if the Escrow Agent believes, in its sole discretion, that such acceptance may cause it to be in breach of any applicable laws or regulations.

EXHIBIT 1

3.3 <u>Interest on Escrow Cash Deposit</u>. The Parties shall agree whether the Escrow Cash Deposit shall be interest-bearing and shall determine, where applicable, the interest rate applicable thereto and all other related matters including the basis for calculation of interest and the basis for any future changes or adjustments thereto.

3.4 <u>No Overdraft</u>. The Escrow Account may not go into overdraft.

3.5 <u>Records and Accounts</u>. The Escrow Agent shall at all times during the continuance of this Agreement keep complete and accurate books of account and records relating to the Escrow Account. During the period in which the Escrow Cash Deposit is deposited in the Escrow Account, the Escrow Agent shall deliver to the Customer, on a monthly basis, a report setting out all payments in and out of the Escrow Account during the preceding month.

3.6 <u>No Proprietary Interest</u>. The Escrow Agent does not have any proprietary interest in the Escrow Fund deposited hereunder but merely holds the same as banker subject to the terms of this Agreement.

4. **PAYMENTS FROM ESCROW ACCOUNT**

4.1 <u>General Provisions</u>. Subject to this Clause 4.1 and Clause 4.3 (*Court Orders*), the Escrow Agent shall hold or release the Escrow Fund in accordance with the written instructions issued and signed by the Authorized Representative.

The Escrow Fund shall be paid or repaid by the Escrow Agent in the following manner and in the following order, namely:

(a) to settle any outstanding fee due to the Escrow Agent under this Agreement;

(b) to settle any other outstanding expenses payable in accordance with Clause 9.3 (*Expenses*);

(c) to settle any other entitlement of the Escrow Agent hereunder (the amounts referred to in paragraphs (a) to (c) referred to collectively as "**Escrow Agent Amounts**"); and

(d) to make any payments under Clause 4.2 (*Release of Escrow Fund*).

If at any time the Escrow Agent shall determine that the funds standing to the credit of the Escrow Account are insufficient (i) to discharge the Escrow Agent Amounts due to it and/or (ii) for the Escrow Agent to make the payments under paragraph (a) (*Approval of Application*) of Clause 4.2 (*Release of Escrow Fund*), the Customer shall at the Escrow Agent's request, forthwith pay the amount (or, if the Escrow Agent so reasonably requests, the estimated amount) of any such shortfall to the Escrow Agent.

4.2 <u>Release of Escrow Fund</u>. The Parties hereby acknowledge and agree that the Escrow Agent shall, subject to Clause 4.3 (*Court Orders*), release the Escrow Fund or any portion thereof to the designated payee(s) in accordance with the following release instructions ("**Release Instructions**"):

(a) <u>Approval of Application</u>: If the Application is approved, the Escrow Agent shall release the Escrow Fund in its entirety (***excluding***, for the avoidance of doubt, any Earnings accrued thereon) to the Authorized Representative upon receipt of Release Instructions from the Authorized Representative confirming that the Customer's Application has been approved, enclosing a copy of the USCIS's

EXHIBIT 1

Approval Notice, Form I-797 "Notice of Action", together with wiring instructions to the account of [Name: Colorado Regional Centre Project, Solaris, LLLP. Address: 4643 S Ulster Street, Suite 950, Denver, CO 80111. Country: USA. A/C no: 0610090062];

(b) <u>Denial of Application</u>: If the Application is denied (and such denial is not reversed upon appeal within one hundred twenty (120) days of the date of the Notice of Denial issued by the USCIS ("**Notice of Denial**")), the Escrow Agent shall release the Escrow Fund in its entirety (***including***, for the avoidance of doubt, any Net Earnings accrued thereon) to the Customer upon receipt of Release Instructions from the Authorized Representative, confirming that the Customer's Application has been denied (and that such denial has not been reversed upon appeal within one hundred twenty (120) days of the date of the Notice of Denial), enclosing a copy of the Notice of Denial;

(c) <u>Withdrawal of Application</u>: If the Application is withdrawn by the Customer, the Escrow Agent shall release the Escrow Fund in its entirety (***including***, for the avoidance of doubt, any Net Earnings accrued thereon) to the Customer upon receipt of Release Instructions from the Authorized Representative, confirming that the Customer's Application has been withdrawn, enclosing a duly signed and dated copy of the Customer's notice of withdrawal to the USCIS (together with proof of mailing to the USCIS).

All Release Instructions must be in form and substance satisfactory to the Escrow Agent and must be received by the Escrow Agent not less than three (3) Business Days before the day on which the release is to be effected.

4.3 <u>Court Orders</u>. The Escrow Agent shall release the Escrow Fund in accordance with the terms of an order, judgment or decree ordering the release of the Escrow Fund (or any portion thereof) issued by a court of competent jurisdiction ordering the release of the Escrow Fund, accompanied by a legal opinion satisfactory to the Escrow Agent provided by counsel of the party requesting such release to the effect that such order, judgment or decree represents a final adjudication of the rights of the parties by a court of competent jurisdiction, and that the time for appeal from such order, judgment or decree has expired without an appeal having been made.

The Escrow Agent shall release the Escrow Fund (or any portion thereof) promptly upon (and in no event later than ten (10) Business Days after) receipt of an order, judgment or decree and legal opinion of counsel referred to in this Clause 4.3, in accordance therewith.

4.4 <u>Deductions</u>. Any release or payment by the Escrow Agent under this Agreement will be made without any deduction or withholding for or on account of any tax unless such deduction or withholding is required by applicable law. If the Escrow Agent is required by law to make a deduction or withholding, it will not pay any additional amount in respect of that deduction or withholding to the Customer or any third party to whom the Escrow Agent is instructed to make such release. If at any time the Escrow Agent determines that the Escrow Fund is insufficient to make the necessary deductions or withholdings, the Customer shall forthwith at the Escrow Agent's request, pay the amount (or, if the Escrow Agent so reasonably requests, the estimated amount) of any such shortfall into the Escrow Account.

**5. LIABILITY OF ESCROW AGENT AND GENERAL MATTERS SUBJECT TO ESCROW AGENT'S DISCRETION**

EXHIBIT 1

5.1  <u>No Duties Other Than Express Duties</u>. The Escrow Agent shall have no duties or obligations with respect to the Escrow Fund and the Escrow Account except those duties and obligations expressly set out in this Agreement (collectively, the "**Escrow Obligations**"). The Escrow Agent shall have no duty to inquire or to comply with, and shall not be bound by (and shall not be deemed to have notice of), the provisions of any agreement entered into by or involving the Customer other than this Agreement and any Release Instruction and no other duties shall be implied into this Agreement or any Release Instruction. Without limiting the generality of the foregoing, the Parties hereby acknowledge and agree that:

(a)  the Escrow Agent shall not be under any duty to give the Escrow Fund held by it hereunder any greater degree of care than it gives to its own similar property;

(b)  the Escrow Agent is under no duty to ensure that funds withdrawn from the Escrow Account are actually applied for the purpose for which they were withdrawn or that any Release Instruction or other notice, instruction or direction by or on behalf of the Customer, the PRC Agent or any Authorized Representative is accurate, correct or in accordance with this Agreement (all such Release Instructions or other notices, instructions or directions duly executed by them being final, conclusive and binding on the Customer and the Escrow Agent as to the matters referred to therein);

(c)  the Escrow Agent has not selected the Authorized Representatives or the PRC Agent and has no responsibility for any acts or omissions of any Authorized Representative or the PRC Agent (or any of their respective officers, directors, employees or representatives);

(d)  the Escrow Agent may:

(i)  use (and its performance will be subject to the rules of) any communications, clearing or payment systems, correspondent or intermediary bank or other system;

(ii)  perform any of its duties and functions hereunder through its officers, employees or representatives;

(iii)  engage and pay for the advice or services of lawyers, accountants or other experts or professional advisers as the Escrow Agent may consider necessary or desirable and rely and act upon such advice;

(iv)  refrain from taking any action which in its opinion would or might contravene any law in any relevant jurisdiction or render it liable to any person and do all such things in its opinion necessary to comply with any such law; and

(v)  assume that the Customer is not in breach of its obligations hereunder or in respect of the Customers Application unless the Escrow Agent receives specific written notice to the contrary.

5.2  <u>Reliance</u>. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any order, judgment, decree, certification, demand, notice, instruction or other written instrument (collectively "**Instructions**") given or delivered to it hereunder without being required to determine the authenticity or the correctness of any fact stated therein or the validity of service thereof. The Escrow Agent may act in reliance on any such Instruction (including any Release Instruction signed by an Authorized Representative and any notice of the PRC Agent advising the specimen signature of any authorized signatory of an Authorized Representative) which it

EXHIBIT 1

believes to be genuine and may assume that any person purporting to give receipt or advice or make any statement or execute any document in connection with the provisions of this Agreement has been duly authorized to do so. Without limiting the generality of the foregoing, the Escrow Agent shall not be obliged to release the Escrow Fund or otherwise to act on any instructions received by it under this Agreement if the Escrow Agent is unable:

(a)  to verify any signature on any Instruction from an Authorized Representative against the specimen signature of the relevant Authorized Representative provided by the Customer or the PRC Agent; and

(b)  to validate (which the Escrow Agent is not required to do) the authenticity of any Instructions from an Authorized Representative after seeking to contact the relevant Authorized Representative.

5.3  <u>No Duty to Take Legal Action</u>. The Escrow Agent shall not be obliged to take any legal action hereunder which might, in its judgment, involve any expense or liability unless it shall have been furnished with a full indemnity therefor from the relevant party requesting such legal action.

5.4  <u>Adverse Claims to Escrow Fund</u>. In the event of any disagreement between the Customer and any other party resulting in adverse claims or demands being made in connection with the Escrow Fund or the Escrow Account, or in the event that the Escrow Agent should take action hereunder, it may, at its option, refuse to comply with any claims or demands on it, or refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event, it shall not be or become liable in any way or to any person for its failure or refusal to act, and it shall be entitled to continue to refrain from acting until:

(a)  the rights of all relevant parties shall have been fully and finally adjudicated by a competent court or arbitration institution of competent jurisdiction; or

(b)  all differences shall have been adjusted and all doubt resolved by agreement among all of the interested persons, and it shall have been notified thereof in writing signed by all such persons.

5.5  <u>Liability</u>. Notwithstanding the other provision of this Agreement, neither the Escrow Agent nor its officers, employees or representatives shall be liable for:

(a)  any loss, liability, claim, action, damages or expenses arising out of or in connection with the performance of or its failure to perform any of its obligations under this Agreement, except to the extent caused by its own gross negligence or wilful default;

(b)  any loss or damage, or failure to comply or delay in complying with any duty or obligation, under or pursuant to this Agreement arising as a direct or indirect result of any Force Majeure Event or any event where, in the Escrow Agent's reasonable opinion, performance of any duty or obligation under or pursuant to this Agreement would or may be illegal or would result in the Escrow Agent being in breach of any law, rule, regulation, or any decree, order or judgment of any court, or practice, request, direction, notice, announcement or similar action (whether or not having the force of law) of any relevant government, government agency, regulatory authority, stock exchange or self-regulatory organisation to which the Escrow Agent is subject; and

(c)  without limiting the generality of the foregoing:

EXHIBIT 1

(i)     the acts or defaults of any agent employed in good faith by them (notwithstanding that the employment of such agent was not strictly necessary or expedient);

(ii)    the acts or defaults of any person to whom shall have been delegated the execution or exercise of all or any of the duties conferred on them provided that such delegation shall have been made in good faith;

(iii)   the acts or defaults in good faith of any, officer, employee or representative of the Escrow Agent; or

(iv)    any mistake or omission made in good faith.

The Escrow Agent will not under any circumstances be liable to the Customer for any indirect, incidental or consequential loss or damages, even if advised of the possibility of such loss or damages, or to any third party, known or not known to the Escrow Agent and whose interest may or may not be affected by the escrow arrangements contemplated herein, for whatever loss or damages.

5.6   Recording. The Customer unconditionally agrees to the use of any form of telephone or electronic monitoring or recording by the Escrow Agent as it deems appropriate for security or service purposes.

## 6.    **REPRESENTATIONS AND WARRANTIES**

The Customer represents and warrants to the Escrow Agent that:

(a)    it has the capacity, power and authority to enter into and perform its obligations under this Agreement which constitutes its legally binding and enforceable obligations and that is not subject to any current, pending or threatened bankruptcy, insolvency, composition with its creditors, administration or similar procedures;

(b)    this Agreement and the use of the services provided by the Escrow Agent hereunder will not conflict with:

(i)     any applicable law or regulation; or

(ii)    any agreement to which it is a party or which is binding upon it or its assets; and

(c)    neither it nor any of its assets enjoys a right of immunity from set-off, suit or execution in respect of its obligations under this Agreement.

## 7.    **INDEMNITY**

Save to compel performance by the Escrow Agent of the Escrow Obligations, the Customer shall not bring or prosecute or procure or allow to be brought or prosecuted any action, claim, demand, suit or proceeding against the Escrow Agent. The Customer shall and hereby agrees to fully indemnify and hold harmless the Escrow Agent from and against any and all actions, claims, costs, damages, losses, liabilities and expenses which the Escrow Agent may incur or suffer in connection with or arising out of the performance by the Escrow Agent of the Escrow Obligations, except to the extent caused by the Escrow Agent's own gross negligence or willful default.

EXHIBIT 1

## 8. REPLACEMENT OF ESCROW AGENT

8.1 <u>Resignation</u>. The Escrow Agent may resign from its duties and responsibilities upon giving ninety (90) days' notice in writing to the Customer (with a copy to its Authorized Representatives). Upon receipt of notice of the Escrow Agent's intention to resign, the Customer shall, within ninety (90) days from the date of the Escrow Agent's notice, select a replacement escrow agent and instruct the Escrow Agent in writing, by written notification signed by the Appointed Authorized Representative, to withdraw from the Escrow Account and transfer to the replacement escrow agent the Escrow Fund which has not been released or returned to the relevant Party according to Clause 4 (*Payments from Escrow Account*) (after settling any fees and/or expenses incurred and payable to the Escrow Agent as set out in Clause 9 (*Escrow Agent's Fees*)).

8.2 <u>Replacement Escrow Agent</u>. If the Customer fails to select a replacement escrow agent within ninety (90) days of the Escrow Agent's notice under Clause 8.1 (R*esignation*), the Escrow Agent shall, in so far as it is able so to do, then select the replacement escrow agent. The Escrow Agent shall continue to hold the Escrow Fund or any part thereof as the case may be until the replacement escrow agent has been selected and the Escrow Agent receives and complies with the instruction of the Customer to withdraw from the Escrow Account and transfer to the replacement escrow agent the Escrow Fund which has not been released or returned to the relevant Party according to Clause 4 (*Payments from Escrow Account*). Save and except for the obligation to maintain the Escrow Fund or any part thereof as the case may be until a replacement escrow agent is selected, ninety (90) days after notice of the Escrow Agent's intention to resign under Clause 8.1 (*Resignation*) has been received by the Customer, the Escrow Agent shall have no further obligations under this Agreement, and the Escrow Agent shall have no obligation to initiate or participate in any selection of a replacement escrow agent. The Customer agrees to enter into an escrow agreement substantially in the same form as this Agreement with the replacement escrow agent.

8.3 <u>Surplus</u>. If, following the transfer of the remaining Escrow Fund from the Escrow Account under Clause 8.1 (*Resignation*) or Clause 8.2 (*Replacement Escrow Agent*) (as the case may be), there remains any balance standing to the credit of the Escrow Account, the Escrow Agent shall release the said balance to the Customer in accordance with Clause 11.2 (*Surplus Balance*).

## 9. ESCROW AGENT'S FEES

9.1 <u>Escrow Agent's Fees</u>. The Customer agrees to pay the Escrow Agent, upon execution of this Agreement and from time to time thereafter upon receipt of the relevant invoice, the fees for the services rendered by the Escrow Agent under this Agreement, which unless otherwise agreed in writing shall be as described in Schedule 4 (*Escrow Agent's Fees*).

9.2 <u>Adjustments</u>. The Customer acknowledges and agrees that the Escrow Agent may adjust the fees referred to in Clause 9.1 (*Escrow Agent's Fees*) from time to time. The Escrow Agent shall notify the Customer in writing of any increase of its fees not later than thirty (30) Business Days prior to such increase taking effect.

9.3 <u>Expenses</u>. In addition to the fees payable under Clause 9.1 (*Escrow Agent's Fees*) above, the Customer agrees to pay to the Escrow Agent all out-of-pocket expenses (including all legal fees, registration fees, stamp or other documentary duties, taxes or levies and disbursements) incurred by the Escrow Agent in the performance of its duties under this Agreement.

EXHIBIT 1

9.4 <u>No set-off or counterclaim</u>. All amounts of whatever nature payable to, and recoverable by, the Escrow Agent pursuant to this Agreement shall be payable, without set-off or counterclaim, within five (5) Business Days of receipt of the Escrow Agent's invoice.

9.5 <u>Authority to Debit</u>. If the Customer fails to make any payment to the Escrow Agent when it becomes due in accordance with the terms of this Agreement, the Escrow Agent may at any time and from time to time at its discretion and without prior notice to the Customer debit any of the Customer's accounts (including, in order to settle any Escrow Agent Amounts (as defined in Clause 4.1 (*General Provisions*), the Escrow Account) with the Escrow Agent or any of its branches or offices (wherever situated) in or towards settlement of such overdue amounts.

## 10. **NOTICES**

10.1 <u>Communications</u>. Each notice or other communication to be given or made under this Agreement shall be in writing and delivered or sent to the relevant party at its address or fax number set out below (or such other address or fax number as the addressee has by five (5) days' prior written notice specified to the other party):

**To the Customer**

<u>Name and Address</u>:        [ CUSTOMER'S NAME
                                      ADDRESS 1, ADDRESS 2, ADDRESS3, COUNTRY ]

<u>Fax</u>:        [ FAX NO.]
<u>Attention</u>:        [ CUSTOMER'S NAME ]

**To the Escrow Agent**

<u>Name and Address</u>:        Standard Chartered Bank (Hong Kong) Limited
                                [ HK RM's NAME
                                  OFFICE ADDRESS        ]
                                Hong Kong

<u>Fax</u>:        [FAX NO.]
<u>Attention</u>:        [ HK RM's NAME ]

10.2 <u>Deemed Delivery</u>. Any notice or other communication so addressed to the relevant party shall be deemed to have been delivered (a) if given or made by letter, when actually delivered to the relevant address and (b) if given or made by fax, when despatched with electronic confirmation of complete and error-free transmission **Provided** that, if such day is not a working day in the place to which it is sent, such notice, demand or other communication shall be deemed delivered on the next following working day at such place.

10.3 <u>Language</u>. Each notice or other communication hereunder and any other documents required to be delivered hereunder shall be either in English or accompanied by a certified translation thereof into the English language.

## 11. **TERMINATION**

EXHIBIT 1

11.1 <u>Termination</u>. Except for Clauses 5 (*Liability of Escrow Agent and General Matters Subject to Escrow Agent's Discretion*) and 6 (*Indemnity*) (which shall survive the termination of this Agreement), this Agreement shall terminate on the earlier of the following (the "**Termination Date**"):

    (a)   if the Customer fails to deposit the Escrow Cash Deposit into the Escrow Account within the period specified in Clause 3.1 (*Deposit of Escrow Cash Deposit into Escrow Account*) and the Escrow Agent elects (at its sole discretion) to terminate this Agreement, upon the date specified by the Escrow Agent in a written termination notice to the Customer, whereupon the Escrow Agent shall forthwith be irrevocably released from its obligations under this Agreement with immediate effect;

    (b)   in the event of the Customer's death, upon the date the Escrow Agent receives written notice of the Customer's death from the Customer's personal representative, enclosing a copy of the Customer's death certificate, whereupon the Escrow Account shall become (and continue to be maintained as) an ordinary US$ savings account ("**Savings Account**") of the Customer, subject to the Escrow Agent's terms and conditions for such Savings Account prevailing from time to time, pending instructions from the Customer's executor, administrator or personal representative, accompanied by a certified copy of the grant of probate, letter of administration (or equivalent evidence of the capacity of the executor, administrator or personal representative (as applicable)), in each case in form and substance satisfactory to the Escrow Agent;

    (c)   the date falling two (2) years (or such other period as the Parties may agree in writing) after the date of this Agreement; or

    (d)   such time as the Escrow Agent shall have released the Escrow Fund pursuant to this Agreement.

Upon such termination, the Escrow Agent shall promptly close the Escrow Account.

11.2 <u>Surplus Balance</u>. If, on the Termination Date, there remains any balance represented by cash standing to the credit of the Escrow Account, the Escrow Agent shall as soon as reasonably practicable release such balance to the Customer in accordance with the instructions of the Authorized Representative or (where paragraph (b) of Clause 11.1 (*Termination*) applies) the instructions of the Customer's executor, administrator or other personal representative (as applicable). Such instructions must be in form and substance satisfactory to the Escrow Agent and must be received by the Escrow Agent not less than three (3) Business Days before the day on which the release is to be effected.

11.3 <u>Discharge</u>. The release of the Escrow Fund by the Escrow Agent to the relevant party in accordance with Clause 4 (*Payments from Escrow Account*) and Clause 11.2 (*Surplus Monies*) and (where the Escrow Agent elects to terminate this Agreement in accordance with paragraph (a) of Clause 11.1 (*Termination*)) the termination of this Agreement by the Escrow Agent (as the case may be) shall constitute due and complete performance and discharge by the Escrow Agent of all its obligations under this Agreement.

## 12. **MISCELLANEOUS**

12.1 <u>Assignment</u>. The Customer shall not assign any of its rights and benefits or transfer any of its obligations hereunder without the prior written consent of the Escrow Agent. The Escrow Agent may at any time assign or transfer by novation (each an

EXHIBIT 1

"**assignment**") all or any part of, or all or part of any interest in, any of its rights, benefits and/or obligations under or arising out of this Agreement and the Customer shall execute and do all such transfers, assignments, assurances, acts and things as the Escrow Agent may require for perfecting and completing the assignment of such rights, benefits and obligations. Upon any such assignment taking effect (i) the Escrow Agent shall be released from such obligations and the Customer shall look only to the assignee Escrow Agent in respect of such obligations and (ii) references in this Agreement to the Escrow Agent shall be construed accordingly as references to the assignee Escrow Agent or the Escrow Agent, as relevant. All agreements, representations and warranties made herein shall survive any assignments made pursuant to this Clause and shall inure to the benefit of all assignees/transferees as well as the Escrow Agent.

12.2 <u>Disclosure</u>. The Escrow Agent will treat all information relating to the Customer as confidential, but (unless consent is prohibited by law or qualified by any data policy issued by the Escrow Agent) the Customer consents to the transfer and disclosure by the Escrow Agent of any information relating to the Customer to and between the branches, subsidiaries, holding company, representative offices, units, affiliates and agents of the Escrow Agent and third parties selected by any of them (each a "**Recipient**"), wherever situated, for confidential use (including, without limitation, in connection with the provision of any services hereunder and for data processing, statistical and risk analysis purposes). The Escrow Agent and any Recipient may transfer and disclose any such information as required by any applicable law or regulation, court of competent jurisdiction, relevant regulator or legal process of Hong Kong or elsewhere.

12.3 <u>Outsourcing</u>. The Customer acknowledges and agrees that certain services, operational and processing procedures relating to the services hereunder may from time to time be outsourced by the Escrow Agent to its regional processing centres, branches, subsidiaries, representative offices, affiliates or agents of the Escrow Agent and third parties selected by the Escrow Agent or any of such regional processing centres, branches, subsidiaries, holding company, representative offices, affiliates or agents, wherever situated, and such service providers may from time to time be given access to information and data relating to the Customer and the services hereunder for the purpose of or in relation to the services and procedures they perform.

12.4 <u>Amendment</u>. This Agreement may not be amended or the instructions contained herein revoked unless such amendment or revocation is in writing and signed by the Escrow Agent.

12.5 <u>Entire Agreement</u>. This Agreement constitutes the entire obligation of the Parties and supersedes any previous expressions of intent or understandings in respect of the subject-matter of this Agreement.

12.6 <u>Severability</u>. If at any time any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, the legality, validity and enforceability of such provision under the law of any other jurisdiction, and of the remaining provisions of this Agreement, shall not be affected or impaired thereby.

12.7 <u>Counterparts</u>. This Agreement may be signed in as many counterparts as may be necessary, each of which so signed shall be deemed to be an original, and such counterparts together shall constitute one and the same instrument and, notwithstanding the date of execution, shall be deemed to bear date as of the date and year first above written.

EXHIBIT 1

13. **LAW AND JURISDICTION**

13.1 <u>Law</u>. This Agreement and all matters arising hereunder shall be governed by and construed in accordance with the laws of Hong Kong.

13.2 <u>Jurisdiction</u>. Each Party irrevocably agrees that any legal action or proceeding arising out of or relating to this Agreement may be brought in the courts of Hong Kong and irrevocably submits to the non-exclusive jurisdiction of such courts.

**IN WITNESS** whereof this Agreement has been executed by the parties hereto on the date stated at the beginning of this Agreement.

**CUSTOMER**



SIGNED by )
[                    ] )
in the presence of: )

**ESCROW AGENT**

SIGNED for and on behalf of )
**STANDARD CHARTERED BANK** )
**(HONG KONG) LIMITED** )
by )
its authorized representative )
and in the presence of : )

EXHIBIT 1

**Schedule 1**
**Authorized Representative(s)**

**Name and Contact Details**

[Colorado Regional Centre Project, Solaris, LLLP]
Authorized signatory: Mr. CHESTER PHILLIP SCHWARTZ]

Address:      [ 4643 S Ulster Street, Suite 950, Denver, CO 80111, USA ]
Tel.:         [001.720.554.9704      ]
Fax:          [001.720.554.9905      ]

**Specimen Signature**

The specimen signature of Mr. CHESTER PHILLIP SCHWARTZ (or any other authorized signatory of Colorado Regional Centre Project, Solaris, LLLP) shall be provided to the Escrow Agent separately by the following person (the "**PRC Agent**"):

Name:         [CHESTER PHILLIP SCHWARTZ]
Address:      [12 Canon PL, Greenwood Village, CO 90111-32]
Tel:          [001.720.554.9704                ]
Fax:          [001.720.554.9905                ]

[Specimen Signature:      _____ ]

*  **Note**: To the extent specimen signatures are not provided above, the same shall be produced to the Escrow Agent separately upon the signing of this Agreement.

EXHIBIT 1

Case No. 1:19-cv-02443-RM-STV   Document 239-1   filed 06/19/20   USDC Colorado   pg 96
Case 1:19-cv-02443-STV   Document 91-2   Filed 10/18/19   USDC Colorado   Page 96 of 184
of 293

**Schedule 2**
**Escrow Cash Deposit**

Five hundred-thirty five thousand U.S. Dollars (US$535,000)

EXHIBIT 1

## Schedule 3

## Forms of Release Instructions

COLORADO
REGIONAL CENTER

### RELEASE OF FUNDS INSTRUCTIONS FORM

**To:**   STANDARD CHARTERED BANK (HONG KONG) LIMITED (the "Escrow Agent")
**From:**   Colorado Regional Center Project Solaris, LLLP

| Customer Name: | | Passport No.: | |
|---|---|---|---|
| Escrow Account No.: | | | |

☐ **Approval of Application:**
The Authorized Representative hereby confirms to the Escrow Agent that the Customer's I-526 petition has been approved by the USCIS. In this connection, the Authorized Representative encloses herewith the following documents:
 ☐   USCIS's Approval Notice
 ☐   Form I-797 "Notice of Action"
The Authorized Representative and the Customer hereby instruct the Escrow Agent to release the Escrow Cash Deposit (as specified) _____ held in the Escrow Account in its entirety (excluding any accrued interest) by telegraphic transfer according to the payment instruction specified below:

| Beneficiary | Name: | Colorado Regional Center Project Solaris, LLLP |
|---|---|---|
| | Address: | 4643 S Ulster Street, Suite 950, Denver, CO 80111 |
| | Country: | USA |
| | A/C No.: | 0610090062 |

| Beneficiary's Bank | Name: | Park Bank |
|---|---|---|
| | Address: | 300 E Kilbourn Ave, Milwaukee, WI |
| | Country: | 53202 USA |
| | Swift Code: | 075000666 |

All charges relating to the remittance request shall be fully borne by the Customer and debited to HKD Account No. : _____

The remaining balance shall be released to the Customer by a fund transfer from the Escrow Account to A/C No. _____ (a/c currency) _____ that the Customer maintains with Standard Chartered Bank (Hong Kong) Limited.
The Escrow Account shall be closed upon completion of the payment instruction.

☐ **Denial of Application:**
The Authorized Representative hereby confirms to the Escrow Agent that the Customer's I-526 petition has been rejected by the USCIS. In this connection, the Authorized Representative encloses herewith the following document:
 ☐   Notice of Denial Issued by the USCIS
The Authorized Representative and the Customer hereby instruct the Escrow Agent to release the fund held in the Escrow Account in its entirety (including any accrued interest). The entire fund shall be released to the Customer by a fund transfer from the Escrow Account to A/C No. _____ (a/c currency) _____ that the Customer maintains with Standard Chartered Bank (Hong Kong) Limited.
The Escrow Account shall be closed upon completion of the payment instruction.

☐ **Withdrawal of Application:**
The Authorized Representative hereby confirms to the Escrow Agent that the Customer's I-526 petition has been terminated / withdrawn. In this connection, the Authorized Representative encloses herewith the following document:
 ☐   Duly signed and dated copy of the Customer's notice of withdrawal to the USCIS (together with proof of mailing to the USCIS)
The Authorized Representative and the Customer hereby instruct the Escrow Agent to release the fund held in the Escrow Account in its entirety (including any accrued interest). The entire fund shall be released to the Customer by a fund transfer from the Escrow Account to A/C No. _____ (a/c currency) _____ that the Customer maintains with Standard Chartered Bank (Hong Kong) Limited.
The Escrow Account shall be closed upon completion of the payment instruction.

Signed by: by: Colorado Regional Center Project Solaris, LLLP
Colorado Regional Center I, LLC
General partner

| Authorized Representative: | | Investor/ Customer: | |
|---|---|---|---|
| Date: | | Date: | |

EXHIBIT 1

**Schedule [4]**
**Escrow Agent's Fees**

[*Escrow Agent to complete if not agreed separately*]

EXHIBIT 1

Case No. 1:19-cv-02443-RM-STV   Document 239-1   filed 06/19/20   USDC Colorado   pg 99
Case 1:19-cv-02443-STV   Document 51-2   Filed 10/18/19   USDC Colorado   Page 99 of 184
of 293

**EXHIBIT G**

**INVESTOR QUESTIONNAIRE**

*[Investor Questionnaire on following page]*

EXHIBIT 1



# EB-5 INVESTOR SUITABILITY EVALUATION

PERSONAL & CONFIDENTIAL

| PRIMARY APPLICANT INFORMATION: |
|---|

**APPLICANT / INVESTOR NAME**

**FULL NAME IN NATIVE ALPHABET**

**GENDER:** _____ MALE _____ FEMALE

**MARITAL STATUS:**
_____ SINGLE _____ MARRIED
_____ DIVORCED _____ WIDOWED

| DATE OF BIRTH (month/day/year) | PLACE OF BIRTH (city/country) | COUNTRY OF CITIZENSHIP |
|---|---|---|

**HOME PHONE NUMBER**

_____
(Country Code)     (Area Code)     (Number)

**MOBILE PHONE NUMBER**

_____
(Country Code)     (Area Code)     (Number)

**EMAIL ADDRESS**

| PASSPORT ISSUED BY (country) | PASSPORT NUMBER |
|---|---|
| PASSPORT ISSUED (date) | PASSPORT EXPIRY |

| PRESENT RESIDENCE AND ADDRESS: |
|---|

**STREET ADDRESS**

| CITY | STATE/PROVINCE |
|---|---|
| COUNTRY | POSTAL/ZIP CODE |

EXHIBIT 1

**EB-5 INVESTOR SUITABILITY EVALUATION**
PERSONAL & CONFIDENTIAL
Page **2**

| INFORMATION ABOUT YOUR SPOUSE: |
|---|

| FULL LEGAL NAME |
|---|

| FULL NAME IN NATIVE ALPHABET |
|---|

| GENDER:  _____ MALE _____ FEMALE | MAIDEN NAME  (if applicable) |
|---|---|

| DATE OF BIRTH (month/day/year) | PLACE OF BIRTH (city/country) | COUNTRY OF CITIZENSHIP |
|---|---|---|

| INFORMATION ABOUT YOUR CHILDREN (UNDER 21 YEARS OF AGE): Please use separate page if needed. |
|---|

| FULL LEGAL NAME |
|---|

| FULL NAME IN NATIVE ALPHABET |
|---|

| GENDER:  _____ MALE _____ FEMALE |
|---|

| DATE OF BIRTH (month/day/year) | PLACE OF BIRTH (city/country) | COUNTRY OF CITIZENSHIP |
|---|---|---|

| CURRENT EMPLOYMENT: |
|---|

| EMPLOYER (name of business) |
|---|

| BUSINESS ADDRESS |
|---|

| CITY | STATE/PROVINCE |
|---|---|

| COUNTRY | POSTAL/ZIP CODE |
|---|---|

| POSITION | START DATE |
|---|---|

| ANNUAL SALARY | OTHER COMPENSATION |
|---|---|

EXHIBIT 1

Case No. 1:19-cv-02443-RM-STV   Document 51-2   filed 06/18/20   USDC Colorado   pg 102
of 293
Case 1:19-cv-02443-Pv   Document 51-2   filed 10/18/19   USDC Colorado   Page 92 of 194

**EB-5 INVESTOR SUITABILITY EVALUATION**
PERSONAL & CONFIDENTIAL
Page **3**

| GENERAL INFORMATION: |
|---|

HOW WELL DO YOU SPEAK ENGLISH?

_____ NEED TRANSLATION    _____ CONVERSATIONAL    _____ FLUENT

| APPLICANTS LIVING IN THE UNITED STATES: |
|---|

| | |
|---|---|
| US ADDRESS (street # and name) | |
| CITY | STATE/PROVINCE |
| COUNTRY | POSTAL/ZIP CODE |
| DATE OF ARRIVAL (month/day/year) | I-94 # (arrival and departure record #) |
| I-94 ISSUANCE DATE (attach copy) | I-94 EXPIRY DATE |
| CURRENT NON-IMMIGRANT STATUS | EXPIRES ON (month/day/year) |
| DATE OF LAST ENTRY INTO US | PLACE OF LAST ENTRY INTO US |
| SOCIAL SECURITY NUMBER (if any) | ALIEN NUMBER (if any) |

EXHIBIT 1

**EB-5 INVESTOR SUITABILITY EVALUATION**
PERSONAL & CONFIDENTIAL
Page **4**

## GENERAL IMMIGRATION QUESTIONS:

ARE YOU CURRENTLY A GREEN CARD HOLDER?                    _____ Yes        _____ No

    If YES, when does it expire?                    _____

HAVE YOU PREVIOUSLY OBTAINED A U.S. VISA BEFORE?        _____ Yes        _____ No

    If YES, what type of Visa?                    _____

    If YES, when was your last Date of Entry?        _____

HAVE YOU EVER STAYED IN THE U.S. BEYOND AUTHORIZATION?        _____ Yes        _____ No

    If YES, please explain the circumstances.

_____

_____

HAVE YOU PREVIOUSLY APPLIED FOR A U.S. IMMIGRATION OR NON- IMMIGRATION VISA AND BEEN DENIED?

                                                        _____ Yes        _____ No

    If YES, please provide details why application was denied.

_____

_____

ARE THERE ANY CHILDREN LISTED ON THE PRELIMINARY QUESTIONNAIRE THAT WILL TURN 21 YEARS OF AGE WITHIN THE NEXT YEAR?

                                                         _____ Yes        _____ No

    If YES, please provide name and date of birth of child.

_____

_____

IS THERE OTHER RELEVANT INFORMATION REGARDING YOUR CURRENT IMMIGRATION THAT WE SHOULD BE AWARE OF FOR YOU OR ANY MEMBER OF YOUR FAMILY?

_____

_____

EXHIBIT 1

**EB-5 INVESTOR SUITABILITY EVALUATION**
PERSONAL & CONFIDENTIAL
Page **5**

| US ADMISSABILITY VERIFICATION: | | |
|---|---|---|

**UNITED STATES LAWS GOVERNING THE ISSUANCE OF VISAS REQUIRE EACH APPLICANT TO STATE WHETHER OR NOT BE OR SHE IS A MEMBER OF ANY CLASS OF INDIVIDUALS EXCLUDED FROM ADMISSION INTO THE UNITED STATES. THE EXCLUDABLE CLASSES ARE DESCRIBED BELOW IN GENERAL TERMS. YOU SHOULD READ CAREFULLY THE FOLLOWING LIST AND ANSWER YES OR NO TO EACH CATEGORY. THE ANSWERS YOU GIVE WILL ASSIST THE CONSULAR OFFICER TO REACH A DECISION ON YOUR ELIGIBILITY TO RECEIVE A VISA.**

**EXCEPT AS OTHERWISE PROVDIED BY LAW, ALIENS WITHIN THE FOLLOWING CLASSIFICATIONS ARE INELIGIBLE TO RECEIVE A VISA.**

| DO ANY OF THE FOLLOWING CLASSES APPLY TO YOU? (check the yes/no box that applies to you for each question) | YES | NO |
|---|---|---|
| An alien who has a communicable disease or a physical or mental disorder that poses a threat to the safety or welfare of the alien or others; or who is a drug abuser or addict. | | |
| An alien who seeks to enter the United States to engage in espionage, sabotage, export control violations, terrorist activities, the overthrow of the Government of the United States or other unlawful activity; who is a member of or affiliated with the Communist or other totalitarian party; who participated in Nazi persecutions or genocide; who has engaged in genocide; or who is a member or representative or a terrorist organization as currently designated by the U.S. Secretary of State. | | |
| An alien who failed to attend a hearing on deportation or inadmissibility; who seeks or has sought a visa, entry into the United States, or any immigration benefit by fraud or misrepresentation. | | |
| An alien who was previously ordered removed (deported) from the United States within the last 5 years. | | |
| An alien who is former exchange visitor who has not fulfilled the 2-year foreign residence requirement. | | |
| Have you ever been convicted of any offense or crime? (if yes, please explain in space provided below) | | |
| Have you ever been refused admission to the United States at a port-of-entry? (if yes, please explain in space provided below) | | |
| Have you ever applied for a Social Security Number (SSN)? (if yes, please provide the number in the space provided below) | | |
| Do you want the Social Security Administration to assign you an SSN (and issue a card) or issue you a new card (if you have an SSN)? | | |
| CONSENT TO DISCLOSURE: I authorize disclosure of information from this form to the Department of Homeland Security (DHS), the Social Security Administration (SSA), such other U.S. government agencies as may be required for the purpose of assigning me an SSN and issuing me a Social Security card, and I authorize the SSA to share my SSN with USCIS. The applicant's response does not limit or restrict the Government's ability to obtain his or her SSN, or other information on this form, for enforcement or other purposes as authorized by law. **You must answer YES to this question in order to receive an SSN and/or card.** | | |

EXHIBIT 1

**EB-5 INVESTOR SUITABILITY EVALUATION**
PERSONAL & CONFIDENTIAL
Page **6**

## ADDITIONAL INFORMATION REQUESTED:

HAVE YOU RETAINED AN IMMIGRATION ATTORNEY?

    If YES, please provide name and the contact information for our files.

_____

_____

    If NO, do you need a referral?                      _____ Yes     _____ No

HOW DID YOU HEAR ABOUT THE COLORADO REGIONAL CENTER AND OUR PROJECTS?

_____

WERE YOU REFERRED TO US BY SOMEONE?          _____ Yes     _____ No

    If YES, please provide name and contact information for our files.

_____

## ASSETS AND SOURCE OF FUNDS:
Please use separate page if needed.

| ASSETS | AMOUNT | SOURCE OF FUNDS |
|---|---|---|
| CHECKING ACCOUNT | $ | |
| SAVINGS ACCOUNT | $ | |
| INVESTMENTS (Stocks, Bonds & Mutual Funds) | $ | |
| BUSINESS INCOME | $ | |
| REAL ESTATE | $ | |
| INHERITANCE | $ | |
| GIFT* | $ | |
| LOAN | $ | |
| OTHER | $ | |

* Note: if an asset is a gift, source of funds for the gift needs to be explained. i.e. $250,000 gift from parents, source of funds: sale of parents' real estate.

**TOTAL:   $ _____**

EXHIBIT 1

**EB-5 INVESTOR SUITABILITY EVALUATION**
PERSONAL & CONFIDENTIAL
Page **7**

| SOURCE OF FUNDS FOR INVESTMENT: |
| --- |
| Please use separate page if needed. |

**OF THE ABOVE ASSESTS, WHICH WILL CONTRIBUTE TO THE INVESTMENT?**
Please be specific as possible when completing the information below.

| ASSETS | AMOUNT | SOURCE OF FUNDS |
| --- | --- | --- |
|  | $ |  |
|  | $ |  |
|  | $ |  |
|  | $ |  |
| **TOTAL INVESTMENT:** | **$      500,000** | - |

| VERIFICATION: |
| --- |

PLEASE SUPPLY COPIES, SEND VIA FAX OR EMAIL OF THE FOLLOWING FOR THE APPLICANT AND SPOUSE:

1. Valid passport (copy of picture page)
2. National Identity card if available
3. Copy of current US visa (if inside the United States)
4. Copy of I-94 (if inside the United States)
5. Birth certificates for investor and all non-U.S. dependents (long form, naming both parents)
6. Marriage certificates (if any)

THE INFORMATION ABOVE IS ACCURATE AND HAS BEEN COMPLETED TO THE BEST OF MY ABILITY.

_____
        SIGNATURE OF APPLICANT                          DATE (month/day/year)

EXHIBIT 1

**EXHIBIT H1**
**CITIBANK SUBSCRIPTION AGREEMENT A**

*[Citibank Subscription Agreement on following page.]*

EXHIBIT 1

Case No. 1:19-cv-02443-RM-STV   Document 211-10   filed 06/19/20   USDC Colorado   pg 98 of 194
Case 1:19-cv-02443-RM-STV   Document 54   filed 10/18/19   USDC Colorado   Page 98 of 293
of 293

Colorado Regional Center Project Solaris, LLLP
(a Colorado limited liability limited partnership)

## SUBSCRIPTION AGREEMENT
## (CITIBANK)

Colorado Regional Center Project Solaris, LLLP
5251 DTC Pkwy, Suite 1100
Greenwood Village, CO 80111

Prospective Investor:

This Subscription Agreement is made by and between the Colorado Regional Center I, LLC, a Colorado limited liability company (the "General Partner") of Colorado Regional Center Project Solaris, LLLP (the "Partnership"), and the undersigned purchaser who is subscribing for the Partnership Interests as set forth below pursuant to the terms set forth in this Subscription Agreement. The address of the Partnership is 4643 S. Ulster Street, Suite 950, Denver, CO 80237.

## I.
## AGREEMENT TO PURCHASE
## AND ADMISSION AS A LIMITED PARTNER

A.   **Purchase.**  Subject to the terms and conditions hereof, the undersigned hereby irrevocably agrees to purchase the partnership interest set forth in Subsection A (3) herein.  The minimum Capital Contribution shall be $550,000 (USD) of which $500,000 shall be deemed a Capital Contribution and $50,000 shall be deemed payment for Administrative Expenses.  Payment in full for the Partnership Interests purchased hereunder accompanies the delivery of this Subscription Agreement (a "Capital Contribution").

1.   <u>Partnership Acceptance of Subscription Agreement</u>.  The undersigned agrees that the Partnership may reject any subscription in its sole and absolute discretion, and in particular, from any proposed subscriber who is not an accredited investor or who either alone or with his purchaser representative fails to meet the sophistication requirements set forth in Section II(A).

The Partnership shall notify the undersigned that it has accepted the subscription herein by delivering to the undersigned a signed copy of this Subscription Agreement.

2.   <u>Capital Contributions</u>.  Capital Contributions shall be made payable to Colorado Regional Center Project Solaris, LLLP, wired to Citibank at the address set forth below in Section 3.  A copy of the fully-executed Subscription Agreement and a completed corresponding Offeree Questionnaire shall be delivered to the offices of the Partnership at the address listed above.  In the event the subscription is not accepted in whole or in part by the Partnership, the full $500,000 of the Capital Contribution received and the remaining balance, if any, of the Administrative Expenses will be promptly refunded to the subscriber without deduction from or interest on the Capital Contribution.

EXHIBIT 1

3.   Purchase Terms:

AMOUNT OF SUBSCRIPTION: [$550,000.00] (USD)

NAME UNDER WHICH
TITLE SHALL BE HELD:   _____

SOCIAL SECURITY NUMBER
    OR TAXPAYER ID NO.:   _____
                                                    (If applicable)

YOU MAY WIRE YOUR CAPITAL CONTRIBUTION TO:

CITIBANK, N.A**.**
**ABA: 0210-0008-9**
**Account Name: Colorado Regional Center Escrow Concentration Account**
CREDIT A/C No.: 36936986
For Benefit of Colorado Regional Center Project Solaris, LLLP

B.   **Admittance as Limited Partner.**   Upon the Partnership's acceptance of this Subscription Agreement and receipt of your Capital Contribution, the undersigned shall be admitted as a Limited Partner of the Partnership.  The undersigned acknowledges the receipt of a true and correct copy of the Partnership Agreement and agrees to be bound by its terms.  Your Capital Contribution shall be used to further the business purposes of the Partnership as set forth in the Partnership Agreement.

C.   **Investment Terms.**   FOR A COMPLETE DESCRIPTION OF THE INVESTMENT TERMS AND HOW CASH WILL BE DISTRIBUTED PLEASE REFER TO THE PARTNERSHIP AGREEMENT.

**EB-5 Investors.**

5.   Independent Counsel. Investor shall hire an Independent Counsel for immigration processing and other legal matters.  Colorado Regional Center Project Solaris, LLLP will on request recommend qualified counsel for immigration processing matters. Colorado Regional Center Project Solaris, LLLP shall approve the selection of immigration counsel in writing in advance of retaining such counsel and Colorado Regional Center Project Solaris, LLLP shall be responsible for payment of legal fees and costs in an amount not to exceed $15,000.  The Escrow Agent shall be permitted to disburse to the general partner an amount not to exceed $15,000 from the Administrative Fee at the request of the General Partner to be used solely for the payment of Investor's legal fees.  The General Partner shall be entitled to pay any such legal fees directly to counsel for the Investor out of  such $15,000 disbursement upon receipt of an invoice from counsel which invoice shall be approved in writing by the Investor prior to such payment.  The General Partner shall further be authorized to disburse a portion of the $15,000 fee to the selected immigration counsel as required as a retainer by such counsel.

EXHIBIT 1

6.  <u>Filing the Immigration Petition</u>**.**  Colorado Regional Center Project Solaris, LLLP shall use its best efforts to assist Investor's Counsel for the filing of the appropriate visa petition, and verifying required direct and indirect employment until the removal of Investor's conditional permanent residency.

7.  <u>Visa Denial</u>**.**  If (i) the Investor's I-526 is denied or (ii) the Investor's application for conditional permanent residency (either via an immigrant visa application or an adjustment of status application) is denied for reasons related to the Project as defined in the Memorandum, and a final decision is reached on the denial described in either clause (i) or (ii) above (meaning all administrative and judicial appeals have been exhausted, any such appeals undertaken solely at the election and cost of the General Partner), Colorado Regional Center Project Solaris, LLLP shall pay back Investor's original Capital Contribution in cash within 150 days of denial, if the General Partner elects not to appeal, or within 150 days of final denial after exhaustion of all appeals at the General Partner's election. Investor must maintain the investment until the outcome of the appeal is rendered if the denial is appealed.  Colorado Regional Center Project Solaris, LLLP's liability shall be limited to the return of Investor's Capital Contribution only. Additionally, Colorado Regional Center Project Solaris, LLLP will refund any funds remaining from the Investor's payment of Administrative Expenses at the time of the refund of the Capital Contribution.  If the denial is based on matters relating to Investor's personal background or financial history, including without limitation, Investor's inability to prove to the appropriate governmental authorities sources of funds used to invest in the Partnership, then Investor shall not be entitled to receive any refund of the Administrative Expenses.

8.  <u>Maintenance of EB-5 Interest</u>.  Colorado Regional Center Project Solaris, LLLP agrees that it will not sell the interest Investor relies upon for EB-5 visa approval until removal of Investor's conditional permanent residence status.

## II. REPRESENTATIONS AND WARRANTIES

The undersigned hereby represents and warrants to the Partnership and COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP as follows:

A.  That the offer to sell the Partnership Interests was directly communicated to the undersigned by the Partnership through the Memorandum and meetings with the General Partner of the Partnership in such a manner that the undersigned was able to ask questions of and receive answers from the Partnership or a person acting on its behalf concerning the terms and conditions of this investment.  At no time was the undersigned presented with or solicited by or through any leaflet, public promotional meeting, television advertisement or any other form of general solicitation or advertising.

B.  That the undersigned is the sole and true party in interest and is not subscribing for the benefit of any other person.  If the undersigned is a corporation, partnership or other entity, the undersigned was not organized for the purpose of acquiring the Partnership Interests.  If the undersigned is an individual, he or she is twenty-one (21) years of age or over.

C.  That the Partnership Interests are being purchased for the undersigned's own account solely for investment, and with no present intention to distribute any of the Partnership Interests to any other person.

EXHIBIT 1

D.  That the undersigned understands that the Partnership Interests are not being registered under the Securities Act of 1933, as amended (Securities Act) in reliance upon the so-called "private offering" exemption provided by Section 4(2) the Securities Act and/or Regulation D promulgated pursuant to the Securities Act, and that the Partnership is basing its exemption in part on the representations, warranties, statements and agreements contained herein and those of other subscribers contained in similar subscription agreements.

E.  That the undersigned is an Accredited Investor within the meaning of Rule 501 of Regulation D promulgated pursuant to the Securities Act.

The undersigned understands that if a Purchaser Representative is used, the Purchaser Representative must complete, and the undersigned must review and acknowledge, a separate Purchaser Representative Questionnaire and Purchaser Acknowledgment, which must be returned to the Partnership prior to acceptance of this Subscription Agreement.

F.  That the undersigned understands that the Partnership Interests have not been recommended by any federal or state securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed or reviewed the accuracy or determined the adequacy of the information set forth in the Memorandum.

G.  That the undersigned understands that the Partnership Interests are characterized as restricted securities under the Act and applicable state securities laws inasmuch as they are being acquired from the Partnership in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be transferred or resold without registration under the Securities Act and applicable state securities laws only in certain limited circumstances.

H.  That prior to executing this Subscription Agreement the undersigned confirms that all documents requested by the undersigned have been made available, and that the undersigned has been supplied with all of the additional information concerning this investment that has been requested.

I.  That the undersigned has carefully considered and has, to the extent the undersigned considers necessary, discussed with the undersigned's professional legal, tax and financial advisers the suitability of an investment in the Partnership for the undersigned's particular tax and financial situation.

J.  That the undersigned has adequate means of providing for current needs and personal contingencies, and is aware that an investment in the Partnership Interests is highly speculative and subject to substantial risks. The undersigned is capable of bearing the high degree of economic risk and burden of this investment, including but not limited to, the possibility of the complete loss of all contributed capital and the limited transferability of the Partnership Interests.

K.  That the undersigned understands that the Partnership prepared pro formas and estimates of possible revenues and expenses and the possible consequent financial returns the Partnership could experience if such revenues and expenses were achieved. The undersigned understands that the Partnership is still in an early stage of development and has no history of achieving such revenues. The Partnership estimates are based on a good faith belief of what the Partnership can accomplish if it is able to obtain adequate financing and is able to commence and maintain operations in accordance with its current business plan. The pro formas were not prepared by any independent accountant and were not prepared with a view toward compliance with the

EXHIBIT 1

Association of Independent Certified Accountants' guidelines for projections. The assumptions and estimates are uncertain and the actual results of the Partnership will vary from the projected results and could vary in a materially adverse manner.

L.    That the undersigned, in making the decision to purchase the Partnership Interests subscribed for, relied upon independent investigations made by the undersigned and his or her Purchaser Representatives (if any), and the undersigned and such representatives (if any) have, prior to any sale to the investor, been given access and the opportunity to examine all material books and records of the Partnership, all material contracts and documents relating to this offering, and an opportunity to ask questions and receive answers from the Partnership or any person acting on its behalf concerning the terms and conditions of this offering, and an opportunity obtain any additional information, to the extent the Partnership possesses such information or can acquire it without unreasonable effort or expense, necessary to verify the accuracy of any information provided.

M.    **THAT THE UNDERSIGNED EITHER READS AND UNDERSTANDS ENGLISH OR HAD THIS SUBSCRIPTION AGREEMENT TRANSLATED BY A TRUSTED ADVISOR INTO A LANGUAGE THAT THE UNDERSIGNED DOES UNDERSTAND**.

N.    That each representation and warranty of the undersigned contained herein and all information furnished by the undersigned to the Partnership, is true, correct and complete in all respects.

## III. RISK FACTORS

AN INVESTMENT IN THE PARTNERSHIP HAS CERTAIN ELEMENTS OF RISK DIFFERENT FROM AND/OR GREATER THAN THOSE ASSOCIATED WITH OTHER INVESTMENTS. THE HIGHER DEGREE OF RISK MAKES AN INVESTMENT IN THE PARTNERSHIP SUITABLE ONLY FOR INVESTORS (i) WHO HAVE A CONTINUING LEVEL OF ANNUAL INCOME AND A SUBSTANTIAL NET WORTH, (ii) WHO CAN AFFORD TO BEAR THOSE RISKS, (iii) WHO HAVE PREVIOUSLY MADE THE INVESTMENT OF AT LEAST WHAT THEY INTEND TO INVEST IN THIS PARTNERSHIP AND, (iv) WHO HAVE NO NEED FOR LIQUIDITY FROM THESE INVESTMENTS. EACH INVESTOR SHOULD CONSIDER CAREFULLY THE RISK FACTORS ASSOCIATED WITH THIS INVESTMENT, INCLUDING, WITHOUT LIMITATION, THE FOLLOWING, AND SHOULD CONSULT HIS OR HER OWN LEGAL, TAX AND FINANCIAL ADVISORS WITH RESPECT THERETO. INVESTORS UNABLE OR UNWILLING TO ASSUME THE FOLLOWING RISKS, AMONG OTHERS, MUST NOT CONSIDER AN INVESTMENT IN THE PARTNERSHIP.

*Dependence on Management of SPO:*    The Company will have very little active management responsibility or authority with respect to the management of the Project. The Company will have a note receivable from SPO, but the management of SPO will be controlled solely by Peter Knobel as the sole equity member of SPO. Additionally, the day-to-day management of the business operations of the Project will rest exclusively in the control of SPO. While the Company is confident in the abilities of SPO to manage the Project in a profitable manner based on the success of its principal, Peter Knobel, in previous commercial real estate projects, there can be no assurance that it will be successful in the management of the Project.

*The Project may not be*    This is a development project and, therefore, there can be no assurance

EXHIBIT 1

| | |
|---|---|
| ***Completed as Scheduled:*** | that the Project will be constructed on the projected schedule. If there is a substantial delay, the costs of completion may be increased and there will be a delay in the generation of revenues from the operation of the Project. Additionally, any material delay may postpone the starting date for the jobs related to the Project, thereby delaying the job creation requirements of the EB-5 program. The development team has a great deal of experience in this type of development and the Project is in an advanced stage of construction at this time. Therefore, the Company believes that absent significant unforeseen events, the Project will be constructed on time, within budget, and the related businesses operational within approximately 12 months. |
| ***The Project may be Subject to Cost Overruns; Failure to Sell Condominium Units in a Timely Fashion:*** | There are a number of variables in any new construction project and there is a risk that the costs of building the Project will be greater than the projected costs. The reasons for overruns include such matters as governmental issues, unforeseen construction problems, increases in the costs of construction materials and labor, weather, and other similar types of construction problems. If there are significant cost increases, the developers will have to provide additional funds to complete the project. The Company believes that these risks are mitigated by the inclusion of a contingency fund in the construction budget and also by the fact that the developers, architects, and general contractor have all built many similar types of projects from the ground up and have a great deal of experience in planning for the construction of similar projects, and, importantly, the Project is already in an advanced stage of construction at this time. Likewise, if SPO is unable to sell Condominium Units in a timely fashion, the holding costs related to such unsold units (such as HOA dues, property taxes, insurance, and maintenance) may be substantial and may create a financial hardship for SPO. The risks are mitigated by SPO's financial strength and its ability to fund any likely cash shortfalls. |
| ***Job Creation; Potential Risk of Loss of Visa:*** | Under the terms of the EB-5 program, the project must create a minimum of 10 full-time jobs within 2.5 years following the approval of the Limited Partners' Form I-526 Petition. These jobs may be indirect jobs, but must be filled with U.S. workers. The Company projects that there will be 2,110 direct, indirect, and induced jobs created from the operation of the Project and this number was derived from the econometric study prepared in February, 2011, by Evans, Carroll & Associates as a necessary requirement of the Colorado Regional Center application and designation. The projected job totals would be satisfactory to support 210 investors at $500,000 per investor. If there are fewer than 10 jobs created for each $500,000 investor during the 2.5-year period following the approval of the Limited Partners' Form I-526 Petition, each of the investors risks the loss of his or her visa and may be required to return to the investor's country of origin. The Company intends to mitigate this risk by seeking a maximum of $80,000,000 in Capital Contributions which would be supported by a total of 1,600 jobs. However, that amount may be increased given the cushion in the number of jobs expected to be |

EXHIBIT 1

created allowing the Company to increase the number of LP Interests that may be sold under applicable EB-5 rules and regulations. Further, if the econometric study is found to have significantly undercounted the number of associated jobs, the Company may increase the number of LP Interests that may be sold.

*SPO may not be Profitable and may not Generate Positive Cash Flow:*

There is a risk that the Project may never become profitable and that, therefore, SPO will not be profitable and will not have positive cash flow. If SPO does not experience adequate cash flow, it may not be able to make the payments on the Solaris Note. The Project is a development project and initially may have limited revenues. Because development projects, even if successful, typically generate losses during the initial investment process, it will take some time to generate profits. The Company will enter into a Management Agreement with a company affiliated with the General Partner. The management fees payable under the Management Agreement will be payable prior to the distribution of available cash flow to the Limited Partners. Additionally, the Project may not show positive cash flow so that SPO would not have sufficient cash flow to repay the Capital Contributions of the Limited Partners or any profits on the Capital Contributions.

*No Guarantee of any Returns to Investors; Risk of Foreclosure:*

The investment by the Limited Partners is an equity investment. There is no obligation of any kind by either the Company nor any other person or entity to pay back the amount of the Limited Partners' Capital Contributions. The return of each Limited Partner's Capital Contribution as well as any additional cash flow is dependent on the ability of the Project to generate positive cash flow to SPO and SPO's ability to make payments to the Company, and the ability to monetize the investment by selling the Condominium Units that are the collateral for the Solaris Note. If these various sources of cash prove to be insufficient to pay the expenses of the Project, then SPO may not have cash flow and may not be able to make payments to the Company of interest under the Solaris Note. In such event, the Limited Partners will receive neither a return of their investment nor any return on their investment. SPO will be required to pay HOA dues and real estate property taxes on one or more Condominium Units during the term of the Solaris Note. If SPO is unable to make such payments, there is a risk that the amount of such deficiency would be set off against interest payments due to the Company and that this would impair the Company's ability to make distributions of the Preferred Returns Likewise, under the terms of the Amended Loan Agreement, the Company is required to reimburse SPO for any cash flow deficits from the leasing of the Condominium Units. If the Company is unable to pay any such cash flow deficits, there is a risk that the interest payments to the Company could be reduced to cover any such deficits.

*Risk of Ownership of Condominium Units*

The market for luxury Condominium Units in the Colorado resort communities has experienced severe pressure, especially over the past

EXHIBIT 1

two years. The reasons for this pressure are varied, but include the world-wide recession, over-supply of units, and a lack of available credit for potential buyers. The Condominium Units at the Project are at the very high end of the luxury scale and are priced at levels that are at the highest levels of almost any other units in the Vail, Colorado, area. There is a risk that SPO may not be able to sell enough Condominium Units to generate sufficient revenues to pay the interest due to the Company under the Solaris Note and that as a result, the Company would not in turn be able to pay the Preferred Returns to the Investors. Additionally, there is a risk that the prices of the units will decline over the next several years resulting in an inability of the Investors to sell the units for an amount sufficient to repay the amount of their initial Capital Contributions.

***Pro Formas may not Prove Accurate:***

The Company has reviewed carefully the pro forma financial statements for the Project. These financial pro formas were prepared primarily by the principals of SPO. Pro formas are projections only and should not be relied upon as an accurate forecast of the financial performance of the Project. There are many factors that will impact the financial performance of the Project and many of these will have a material effect on the ability of the Project to generate profits and positive cash flow. The pro formas represent management's good faith attempt to project the financial performance of the Project and, therefore, the Company, but should not be relied upon as any form of guaranty of actual results.

***Lack of Liquidity:***

The Company will not be able to make cash distributions to its Limited Partners unless SPO makes its payments to the Company of interest under the Solaris Note. The Company believes that SPO has sufficient cash reserves to enable it to make its required payments to the Company in a timely fashion for the foreseeable future. However, there can be no assurance that SPO will be able to sustain the required payments. Additionally, if SPO elects to redeem the Solaris Note by transferring ownership of one or more Condominium Units, then the Company will own the units and will be required to pay Homeowners Association dues, property taxes, insurance, and other expenses relating to ownership of the units. Additionally, the Company intends to receive additional income from the renting of the Condominium Units by SPO to third parties. The Company will receive the benefit of any rental income under the terms set forth in the Amended Loan Agreement. The Company believes that these payments will adequately cover the expenses associated with ownership of the Condominium Units. If SPO fails to make its payments, however, there is a risk that the Company would not be able to pay the expenses and the Company could lose ownership of the units. The Company believes that SPO will be able to make such payments and has further received the personal guaranty of Peter Knobel with respect to such interest payments during the period that any principal balance of the Solaris Note is outstanding. Therefore, the Company does not believe that there is a substantial risk of default in these payments. There is no market for the LP Interests and there are significant restrictions on the transferability of the LP Interests.

EXHIBIT 1

Therefore, until there is a liquidity event (such as a sale of the Condominium Units), the Limited Partners will not be able to monetize their investment in the Company.

**Prohibition of Sale of Condominium Units for Period of Time:**

If the Company becomes the fee owner of a Condominium Unit, it may not sell or otherwise dispose of that Condominium Unit until  a date that is not less than three years following the date of the Loan Advance. Thus, the Company may be required to hold one or more Condominium Units for a period longer than it would otherwise choose to do.  This will result in more holding costs and there is a risk that prolonged negative cash flow could jeopardize the investment in the Condominium Units.

At the time that the Company desires to sell the Condominium Units, there is a risk that the market may not be conducive to such sale.  If the credit markets are illiquid, or if general economic conditions are unfavorable, the market for the sales of Condominium Units may be limited or depressed.  In such event, the investment will have to be held for a longer period of time or, if there is a liquidity event, it may yield a smaller return.

**Inability to Refinance or Sell:**

**Conflicts of Interest:**

The General Partner of the Company and certain Principals and affiliates of the General Partner currently have interests and responsibilities in other companies requiring a portion of their time. The General Partner and its affiliates may have interests in other projects in Colorado and other locations that may seek investors for other EB-5 projects.  Neither the Company nor the General Partner believes that except for the time required to attend to other business matters, these other EB-5 activities will create any conflicts of interest due to the fact that once that all of the Capital Contributions for the Company have been received, the General Partner does not intend to seek any new EB-5 investors for the Company.

**Limited Transferability:**

There will not be a public market for the LP Interests.  There will be substantial restrictions on transferring interests in the Company, including federal and state securities laws.  Accordingly, purchasers of the LP Interests may need to bear the economic risk of their investment in the Company until such time as the Company is liquidated.  All persons acquiring the interests will be required to represent, among other things, that they are purchasing such interests for their own account for investment only and not with a view to the resale or distribution thereof.

**Not Registered Under Investment Advisers Act:**

The Company is not registered under, and does not intend to register under, the Investment Adviser's Act of 1940 in reliance upon exemptions from registration thereunder.

**Not Registered under Investment Company Act:**

The Company is not registered under, and does not intend to register under, the Investment Company Act of 1940 in reliance upon an exemption from registration, available under Section 3(c)(1) thereof.

EXHIBIT 1

There is a risk that the Securities and Exchange Commission or a court might conclude that we fall within the definition of investment company, and unless an exclusion were available, we would be required to register under the Investment Company Act of 1940. Compliance with the Investment Company Act, as a registered investment company, would cause us to alter significantly our business strategy, impair our ability to operate as planned and seriously harm our business. If we fail to comply with the requirements of this Act, we would be prohibited from engaging in business or selling securities, and could be subject to civil and criminal actions for doing so. In addition, our contracts would be voidable and a court could appoint a receiver to take control of and liquidate our business.

**Repayment of Debt; Return of Capital Contributions:**  The Company's ability to make cash distributions is dependent in part upon the success of the Project and the availability of distributions from the Project to SPO and the ability of SPO to make payments to the Company of interest under the Solaris Note. No Limited Partner shall be entitled to withdraw or to the return of his or her Capital Contributions except as provided in the Partnership Agreement, or to demand and receive property other than in cash in return for his or her Capital Contributions except upon dissolution of the Company per the further terms of the Partnership Agreement. Each Limited Partner must rely upon payments made by SPO to the Company or by sales of the Condominium Units by the Company and then upon distributions by the Company to the Limited Partners, at the discretion of the General Partner, to the extent there are liquid assets available, for return of his or her Capital Contributions. There can be no assurance, irrespective of the success of the investments, that any Limited Partner will receive cash or property equal to his or her investment in the Company.

**Federal Income Tax Risks:**  **BECAUSE THE FEDERAL INCOME TAX LAWS ARE COMPLEX AND THE IMPACT ON EACH MEMBER MAY VARY CONSIDERABLY DEPENDING ON THE INVESTOR'S INDIVIDUAL TAX ATTRIBUTES, INVESTORS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS BEFORE ACQUIRING THE LP INTERESTS IN THE COMPANY HEREUNDER.**

**Indemnification:**  The Partnership Agreement provides limitations on the liability of the General Partner, its affiliates and its members, officers, directors and employees, and provides for indemnification of the General Partner and its affiliates, members, officers, directors and employees, under certain circumstances. Limited Partners may have more limited rights than they would absent such limitations.

**Control:**  The Company is managed by the General Partner. The General Partner will make all decisions with respect to the control and management of the Company except as specifically provided in the Partnership Agreement.

EXHIBIT 1

| | |
|---|---|
| ***Immigration Issues:*** | Congress and or USCIS may change the law, regulations, or interpretations of the law without notice and in a manner that may be detrimental to an Investor or the Company. |

It is impossible to predict visa-processing times. Investors should not physically move to the United States until their visa has been issued.

Investors who obtain conditional or permanent residence status must intend to make the United States their primary residence. Conditional or permanent residents who continue to live abroad risk revocation of their conditional or permanent residence status.

USCIS requires proof of direct and indirect employment creation as part of the removal of conditions process. There is no assurance that the actual number of direct employees and indirect job creation will be the same as the number predicted in the economist's report. Depending upon the disparity there may be insufficient employment to remove conditional visa status.

The process of obtaining conditional and permanent resident status involves several factors and circumstances which are not within the control of the Company.  These include the Investor's past history and quotas established by the United States government limiting the number of immigrant visas available to qualified individuals seeking permanent resident status under the EB-5 "Regional Center" program. Although the Company has been structured so that each Limited Partner may maximize eligibility for permanent residency under the EB-5 "Regional Center" provisions of the U.S. immigration laws, no assurance can be given that each Investor will obtain approval of his or her particular immigrant petition.  Purchase of a Unit does not guarantee conditional or permanent residency in the United States. Furthermore, no advice can be given that conditions to permanent residency will be removed. Each prospective investor should consult competent immigration counsel to review the likelihood that the Investor's Immigrant Petition will be granted.

| | |
|---|---|
| ***Risks Relating to the U.S.*** ***EB-5 Immigration Investor*** ***Pilot Program*** | Investors in this Offering who have subscribed for LP Interests with the intention of applying for approval of a Petition through the EB-5 program should be aware of certain risk factors involving the EB-5 program and its administration.  A description of the risks below are based on information obtained by the Company from third parties who the Company believes are reliable.  However, there can be no assurance that such information is accurate or current or that it includes all of the risks relating to the EB-5 program for such investors. |

The Company was designated as a regional center to participate in the EB-5 program on May 17, 2010. Accordingly, the personnel within the Company do not have experience in administering the EB-5 program, which could lead to delays for investors in the process of obtaining a

EXHIBIT 1

conditional or permanent green card. In addition, investors will be charged an administrative fee of $50,000 by the Company in connection with review of the investors' applications. If an EB-5 I-526 Petition is denied by the USCIS the investor will receive a refund of only that portion of the Administrative Fee that has not been expended by the General Partner.

There are a number of areas within the State of Colorado which the Company believes will be designated a "Targeted Employment Area" ("TEA") as defined in 8 CFR Section 204.6(e). Additionally, all towns and cities with a population of under 20,000 will be designated as TEAs. Whether or not a particular location qualifies as a TEA may change from time to time depending on unemployment and census data.

The investment must be at risk to qualify for the EB-5 program. As part of the EB-5 I-526 Petition, an immigrant investor must show evidence that he or she has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk.

Each investor who purchases LP Interests with the intention of obtaining permanent or conditional residence from the USCIS is encouraged, along with his or her advisors, to make his or her own independent review of the EB-5 program and the various risk factors relating to the process in obtaining an EB-5 permanent or conditional residence to determine if an investment in the Units is a suitable approach for such investor.

As part of the I-526 Petition, an investor must present to the USCIS clear documentary evidence of the source of funds invested and that the funds belong to the investor. Generally, the investor can satisfy the source of funds requirements by submitting documents showing that he or she has a level of income from legal sources that would yield sufficient funds for the investment. The USCIS generally requires copies of income tax returns to satisfy the source of funds requirement. For investors who do not have such records, there may be other records that can be provided to the USCIS by an investor to demonstrate that the investment funds came from legal sources. All such matters regarding the investor's petition should be discussed with his or her immigration counsel.

The Pilot Program requires an investor to hold a policymaking or management position within the Company. The Company believes that each Limited Partner is provided with the powers and duties under the Limited Partnership Agreement sufficient to meet the USCIS requirement that an investor is actively participating in policymaking or management of a new commercial enterprise. However, either USCIS or the consulate abroad issuing the immigrant visa based on an approved EB-5 Petition may challenge the sufficiency of the Limited Partner's engagement.

EXHIBIT 1

As a "pilot," the Regional Center Pilot Program is not yet permanent, and consequently requires periodic renewal by Congress. The Regional Center Pilot Program has been renewed several times by Congress and is currently due to expire on 30 September 2012. Because this program creates U.S. jobs and utilizes a very small quota, there has been no controversy surrounding its renewal. Congress is expected to renew this program prior to its expiration, or make the program permanent by removing its "pilot" designation. However, there is a risk that Congress may not renew, or not renew before the current expiration date.

## IV. POWER OF ATTORNEY

The undersigned hereby irrevocably makes, constitutes and appoints Colorado Regional Center Project Solaris, LLLP, and each general partner of the Partnership, with full power of substitution its true and lawful attorney-in-fact in its name to execute and acknowledge (i) the Partnership Agreement in substantially the form enclosed herewith and to attach the limited partner execution page delivered herewith to such Partnership Agreement and thereby cause the undersigned to become a limited partner in the Partnership; (ii) any document required to effect the formation or continuation of the Partnership or which counsel to the Partnership deems necessary or desirable to comply with any state or federal law, and (iii) the Escrow Agreement. The power of attorney hereby granted is irrevocable and coupled with an interest and may be exercised by the attorney-in-fact for the undersigned as well as other limited partners of the Partnership by executing any instrument by use of the single signature of such attorney-in-fact acting for all the limited partners.

## V. MISCELLANEOUS

A.   **Indemnification.**   The undersigned hereby agrees to indemnify the Partnership and hold the Partnership harmless from and against any and all liability, damages, costs or expenses incurred on account of or arising out of:

   1.   Any inaccuracy in the declarations, representations, and warranties hereinabove set forth;

   2.   The disposition of any of the Partnership Interests by the undersigned, contrary to the foregoing declarations, representations and warranties; and

   3.   Any action, suit or proceeding based upon (i) a claim that the herein declarations, representations or warranties were inaccurate or misleading or otherwise a cause for obtaining damages or redress from the Partnership; or (ii) the disposition of any of the Partnership Interests or any part thereof.

B.   **Confidentiality.**   The undersigned acknowledges that the information contained in this Subscription Agreement and in the Memorandum, and which the undersigned receives orally or in writing from the Partnership is confidential and non-public and agrees that all such information shall be kept in confidence by the undersigned.

C.   **Binding Agreement**.   The undersigned agrees that the undersigned may not cancel, terminate or revoke this Subscription Agreement or any agreement of the undersigned made hereunder, and that this Subscription Agreement shall survive the death or disability of the undersigned and shall

EXHIBIT 1

be binding upon the heirs, successors, assigns, executors, administrators, guardians, conservators or personal representatives of the undersigned.

D.   **Defined Terms.**   Capitalized terms not defined herein shall have the meaning as in the Partnership Agreement.

E.   **Counterparts.**   This Subscription Agreement may be executed in any number of counterparts, each of which shall be considered an original but all of which together shall constitute one and the same instrument.

F.   **Severability.**   Every provision of this Subscription Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of the Subscription Agreement.

G.   **Nonwaiver.**   No provision of this Subscription Agreement shall be deemed waived except if such waiver is contained in a written notice given to the party claiming such waiver has occurred, and no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given.

H.   **Applicable Law.**   This Subscription Agreement shall be interpreted and enforced in accordance with the federal laws of the United States of America and the state laws of the Colorado, without giving effect to principles and provisions relating to choice of law.

I.   **Entirety of Agreement.**   This Subscription Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof.

J.   **Additional Information.**   The undersigned shall supply the Partnership with such additional information and documentation as may be required in order to ensure compliance with applicable law, including, without limitation, the Securities Act and regulations promulgated thereunder.

     **IN WITNESS WHEREOF**, the undersigned has executed this Subscription Agreement on the date set forth on the signature page, and desires to take title in the Partnership Interests (check one):

_____    a.    Individual (one signature required on the Signature Page);

_____    b.    Husband and Wife, as community property (one [1] signature required on the Signature Page if interest held in one [1] name, *i.e.*, managing spouse; two [2] signatures required on the signature Page if interest held in both names);

_____    c.    Joint Tenants with right of survivorship (both parties must sign Signature Page);

_____    d.    Tenants in Common (both parties must sign Signature Page);

### *SIGNATURES ON FOLLOWING PAGE*

EXHIBIT 1

If subscriber is an individual or husband and wife:

Signature: _____

Signature of Spouse: _____

**SUBSCRIPTION ACCEPTED** this _____ day of _____, 2011.

Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership

By:   Colorado Regional Center I, LLC, a Colorado limited liability company, General Partner

By:_____
Name, Manager

EXHIBIT 1

**EXHIBIT H2**
**CITIBANK SUBSCRIPTION AGREEMENT B**

*[Citibank Subscription Agreement on following page.]*

EXHIBIT 1

Colorado Regional Center Project Solaris, LLLP
(a Colorado limited liability limited partnership)

## SUBSCRIPTION AGREEMENT

Colorado Regional Center Project Solaris, LLLP
5251 DTC Pkwy, Suite 1100
Greenwood Village, CO 80111

Prospective Investor:

      This Subscription Agreement is made by and between the Colorado Regional Center I, LLC, a Colorado limited liability company (the "General Partner) of Colorado Regional Center Project Solaris, LLLP (the "Partnership"), and the undersigned purchaser who is subscribing for the Partnership Interests as set forth below pursuant to the terms set forth in this Subscription Agreement. The address of the Partnership is 4643 S. Ulster Street, Suite 950, Denver, CO 80237.

## I.
## AGREEMENT TO PURCHASE
## AND ADMISSION AS A LIMITED PARTNER

A.   **Purchase.** Subject to the terms and conditions hereof, the undersigned hereby irrevocably agrees to purchase the partnership interest set forth in Subsection A (3) herein. The minimum Capital Contribution shall be $535,000 (USD) of which $500,000 shall be deemed a Capital Contribution and $35,000 shall be deemed payment for Administrative Expenses. Payment in full for the Partnership Interests purchased hereunder accompanies the delivery of this Subscription Agreement (a "Capital Contribution").

    1.   <u>Partnership Acceptance of Subscription Agreement</u>. The undersigned agrees that the Partnership may reject any subscription in its sole and absolute discretion, and in particular, from any proposed subscriber who is not an accredited investor or who either alone or with his purchaser representative fails to meet the sophistication requirements set forth in Section II(A).

        The Partnership shall notify the undersigned that it has accepted the subscription herein by delivering to the undersigned a signed copy of this Subscription Agreement.

    2.   <u>Capital Contributions</u>. Capital Contributions shall be made payable to Colorado Regional Center Project Solaris, LLLP, wired to Citibank at the address set forth below in Section 3. A copy of the fully-executed Subscription Agreement and a completed corresponding Offeree Questionnaire shall be delivered to the offices of the Partnership at the address listed above. In the event the subscription is not accepted in whole or in part by the Partnership, the full $500,000 of the Capital Contribution received and the remaining balance, if any, of the Administrative Expenses will be promptly refunded to the subscriber without deduction from or interest on the Capital Contribution.

    3.   <u>Purchase Terms:</u>

        AMOUNT OF SUBSCRIPTION: $535,000 (USD)

EXHIBIT 1

NAME UNDER WHICH
TITLE SHALL BE HELD:        _____

SOCIAL SECURITY NUMBER
       OR TAXPAYER ID NO.:   _____
                                    (If applicable)

YOU MAY WIRE YOUR CAPITAL CONTRIBUTION TO:

CITIBANK, N.A**.**
ABA: 0210-0008-9
Account Name: Colorado Regional Center Escrow Concentration Account
CREDIT A/C No.: 36936986
For Benefit of Colorado Regional Center Project Solaris, LLLP

**B.**    **Admittance as Limited Partner.**   Upon the Partnership's acceptance of this Subscription Agreement and receipt of your Capital Contribution, the undersigned shall be admitted as a Limited Partner of the Partnership.  The undersigned acknowledges the receipt of a true and correct copy of the Partnership Agreement and agrees to be bound by its terms.  Your Capital Contribution shall be used to further the business purposes of the Partnership as set forth in the Partnership Agreement.

**C.**    **Investment Terms.**    FOR A COMPLETE DESCRIPTION OF THE INVESTMENT TERMS AND HOW CASH WILL BE DISTRIBUTED PLEASE REFER TO THE PARTNERSHIP AGREEMENT.

**D.**    **EB-5 Investors.**

5.    Independent Counsel. Investor shall hire an Independent Counsel for immigration processing and other legal matters.  Colorado Regional Center Project Solaris, LLLP will on request recommend qualified counsel for immigration processing matters. Colorado Regional Center Project Solaris, LLLP shall approve the selection of immigration counsel in writing in advance of retaining such counsel. Investor shall be responsible for payment of all legal fees and costs incurred in connection with Investor's I-526 and I-829 petitions.

6.    Filing the Immigration Petition**.**   Colorado Regional Center Project Solaris, LLLP shall use its best efforts to assist Investor's Counsel for the filing of the appropriate visa petition, and verifying required direct and indirect employment until the removal of Investor's conditional permanent residency.

7.    Visa Denial**.**  If (i) the Investor's I-526 is denied or (ii) the Investor's application for conditional permanent residency (either via an immigrant visa application or an adjustment of status application) is denied for reasons related to the Project as defined in the Memorandum, and a final decision is reached on the denial described in either clause (i) or (ii) above (meaning all administrative and judicial appeals have been exhausted, any such appeals undertaken solely at the election and cost of the General Partner), Colorado Regional Center Project Solaris, LLLP shall pay back Investor's original Capital Contribution in cash within 150 days of denial, if the General Partner elects not to appeal, or within 150 days of final denial after exhaustion of all appeals at the General Partner's election. Investor must maintain the investment until the outcome of the appeal is rendered if the denial is appealed.  Colorado Regional Center Project Solaris, LLLP's

EXHIBIT 1

liability shall be limited to the return of Investor's Capital Contribution only. Additionally, Colorado Regional Center Project Solaris, LLLP will refund the Investor's Administrative Expenses at the time of the refund of the Capital Contribution. If the denial is based on matters relating to Investor's personal background or financial history, including without limitation, Investor's inability to prove to the appropriate governmental authorities the sources of funds used to invest in the Partnership, then Investor shall not be entitled to receive any refund of the Administrative Expenses.

8.   <u>Maintenance of EB-5 Interest</u>.  Colorado Regional Center Project Solaris, LLLP agrees that it will not sell the interest Investor relies upon for EB-5 visa approval until removal of Investor's conditional permanent residence status.

## II. REPRESENTATIONS AND WARRANTIES

The undersigned hereby represents and warrants to the Partnership and COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP as follows:

A.   That the offer to sell the Partnership Interests was directly communicated to the undersigned by the Partnership through the Memorandum and meetings with the General Partner of the Partnership in such a manner that the undersigned was able to ask questions of and receive answers from the Partnership or a person acting on its behalf concerning the terms and conditions of this investment. At no time was the undersigned presented with or solicited by or through any leaflet, public promotional meeting, television advertisement or any other form of general solicitation or advertising.

B.   That the undersigned is the sole and true party in interest and is not subscribing for the benefit of any other person. If the undersigned is a corporation, partnership or other entity, the undersigned was not organized for the purpose of acquiring the Partnership Interests. If the undersigned is an individual, he or she is twenty-one (21) years of age or over.

C.   That the Partnership Interests are being purchased for the undersigned's own account solely for investment, and with no present intention to distribute any of the Partnership Interests to any other person.

D.   That the undersigned understands that the Partnership Interests are not being registered under the Securities Act of 1933, as amended (Securities Act) in reliance upon the so-called "private offering" exemption provided by Section 4(2) the Securities Act and/or Regulation D promulgated pursuant to the Securities Act, and that the Partnership is basing its exemption in part on the representations, warranties, statements and agreements contained herein and those of other subscribers contained in similar subscription agreements.

E.   That the undersigned is an Accredited Investor within the meaning of Rule 501 of Regulation D promulgated pursuant to the Securities Act.

The undersigned understands that if a Purchaser Representative is used, the Purchaser Representative must complete, and the undersigned must review and acknowledge, a separate Purchaser Representative Questionnaire and Purchaser Acknowledgment, which must be returned to the Partnership prior to acceptance of this Subscription Agreement.

F.   That the undersigned understands that the Partnership Interests have not been recommended by any federal or state securities commission or regulatory authority. Furthermore, the foregoing

EXHIBIT 1

authorities have not confirmed or reviewed the accuracy or determined the adequacy of the information set forth in the Memorandum.

G.      That the undersigned understands that the Partnership Interests are characterized as restricted securities under the Act and applicable state securities laws inasmuch as they are being acquired from the Partnership in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be transferred or resold without registration under the Securities Act and applicable state securities laws only in certain limited circumstances.

H.      That prior to executing this Subscription Agreement the undersigned confirms that all documents requested by the undersigned have been made available, and that the undersigned has been supplied with all of the additional information concerning this investment that has been requested.

I.      That the undersigned has carefully considered and has, to the extent the undersigned considers necessary, discussed with the undersigned's professional legal, tax and financial advisers the suitability of an investment in the Partnership for the undersigned's particular tax and financial situation.

J.      That the undersigned has adequate means of providing for current needs and personal contingencies, and is aware that an investment in the Partnership Interests is highly speculative and subject to substantial risks. The undersigned is capable of bearing the high degree of economic risk and burden of this investment, including but not limited to, the possibility of the complete loss of all contributed capital and the limited transferability of the Partnership Interests.

K.      That the undersigned understands that the Partnership prepared pro formas and estimates of possible revenues and expenses and the possible consequent financial returns the Partnership could experience if such revenues and expenses were achieved. The undersigned understands that the Partnership is still in an early stage of development and has no history of achieving such revenues. The Partnership estimates are based on a good faith belief of what the Partnership can accomplish if it is able to obtain adequate financing and is able to commence and maintain operations in accordance with its current business plan. The pro formas were not prepared by any independent accountant and were not prepared with a view toward compliance with the Association of Independent Certified Accountants' guidelines for projections. The assumptions and estimates are uncertain and the actual results of the Partnership will vary from the projected results and could vary in a materially adverse manner.

L.      That the undersigned, in making the decision to purchase the Partnership Interests subscribed for, relied upon independent investigations made by the undersigned and his or her Purchaser Representatives (if any), and the undersigned and such representatives (if any) have, prior to any sale to the investor, been given access and the opportunity to examine all material books and records of the Partnership, all material contracts and documents relating to this offering, and an opportunity to ask questions and receive answers from the Partnership or any person acting on its behalf concerning the terms and conditions of this offering, and an opportunity obtain any additional information, to the extent the Partnership possesses such information or can acquire it without unreasonable effort or expense, necessary to verify the accuracy of any information provided.

M.      **THAT THE UNDERSIGNED EITHER READS AND UNDERSTANDS ENGLISH OR HAD THIS SUBSCRIPTION AGREEMENT TRANSLATED BY A TRUSTED ADVISOR INTO A LANGUAGE THAT THE UNDERSIGNED DOES UNDERSTAND**.

EXHIBIT 1

N.  That each representation and warranty of the undersigned contained herein and all information furnished by the undersigned to the Partnership, is true, correct and complete in all respects.

## III. RISK FACTORS

AN INVESTMENT IN THE PARTNERSHIP HAS CERTAIN ELEMENTS OF RISK DIFFERENT FROM AND/OR GREATER THAN THOSE ASSOCIATED WITH OTHER INVESTMENTS. THE HIGHER DEGREE OF RISK MAKES AN INVESTMENT IN THE PARTNERSHIP SUITABLE ONLY FOR INVESTORS (i) WHO HAVE A CONTINUING LEVEL OF ANNUAL INCOME AND A SUBSTANTIAL NET WORTH, (ii) WHO CAN AFFORD TO BEAR THOSE RISKS, (iii) WHO HAVE PREVIOUSLY MADE THE INVESTMENT OF AT LEAST WHAT THEY INTEND TO INVEST IN THIS PARTNERSHIP AND, (iv) WHO HAVE NO NEED FOR LIQUIDITY FROM THESE INVESTMENTS. EACH INVESTOR SHOULD CONSIDER CAREFULLY THE RISK FACTORS ASSOCIATED WITH THIS INVESTMENT, INCLUDING, WITHOUT LIMITATION, THE FOLLOWING, AND SHOULD CONSULT HIS OR HER OWN LEGAL, TAX AND FINANCIAL ADVISORS WITH RESPECT THERETO. INVESTORS UNABLE OR UNWILLING TO ASSUME THE FOLLOWING RISKS, AMONG OTHERS, MUST NOT CONSIDER AN INVESTMENT IN THE PARTNERSHIP.

***Dependence on Management of SPO:***  The Company will have very little active management responsibility or authority with respect to the management of the Project. The Company will have a note receivable from SPO, but the management of SPO will be controlled solely by Peter Knobel as the sole equity member of SPO. Additionally, the day-to-day management of the business operations of the Project will rest exclusively in the control of SPO. While the Company is confident in the abilities of SPO to manage the Project in a profitable manner based on the success of its principal, Peter Knobel, in previous commercial real estate projects, there can be no assurance that it will be successful in the management of the Project.

***The Project may not be Completed as Scheduled:***  This is a development project and, therefore, there can be no assurance that the Project will be constructed on the projected schedule. If there is a substantial delay, the costs of completion may be increased and there will be a delay in the generation of revenues from the operation of the Project. Additionally, any material delay may postpone the starting date for the jobs related to the Project, thereby delaying the job creation requirements of the EB-5 program. The development team has a great deal of experience in this type of development and the Project is in an advanced stage of construction at this time. Therefore, the Company believes that absent significant unforeseen events, the Project will be constructed on time, within budget, and the related businesses operational within approximately 12 months.

***The Project may be Subject to Cost Overruns; Failure to Sell Condominium Units in a Timely Fashion:***  There are a number of variables in any new construction project and there is a risk that the costs of building the Project will be greater than the projected costs. The reasons for overruns include such matters as governmental issues, unforeseen construction problems, increases in the costs of construction materials and labor, weather, and other similar types of construction problems. If there are significant cost increases, the developers will have to provide additional funds to complete the project. The Company believes that these risks are mitigated by the inclusion of a contingency fund in the construction budget and also by

EXHIBIT 1

the fact that the developers, architects, and general contractor have all built many similar types of projects from the ground up and have a great deal of experience in planning for the construction of similar projects, and, importantly, the Project is already in an advanced stage of construction at this time. Likewise, if SPO is unable to sell Condominium Units in a timely fashion, the holding costs related to such unsold units (such as HOA dues, property taxes, insurance, and maintenance) may be substantial and may create a financial hardship for SPO. The risks are mitigated by SPO's financial strength and its ability to fund any likely cash shortfalls.

**Job Creation; Potential Risk of Loss of Visa:**

Under the terms of the EB-5 program, the project must create a minimum of 10 full-time jobs within 2.5 years following the approval of the Limited Partners' Form I-526 Petition. These jobs may be indirect jobs, but must be filled with U.S. workers. The Company projects that there will be 2,110 direct, indirect, and induced jobs created from the operation of the Project and this number was derived from the econometric study prepared in February, 2011, by Evans, Carroll & Associates as a necessary requirement of the Colorado Regional Center application and designation. The projected job totals would be satisfactory to support 210 investors at $500,000 per investor. If there are fewer than 10 jobs created for each $500,000 investor during the 2.5-year period following the approval of the Limited Partners' Form I-526 Petition, each of the investors risks the loss of his or her visa and may be required to return to the investor's country of origin. The Company intends to mitigate this risk by seeking a maximum of $80,000,000 in Capital Contributions which would be supported by a total of 1,600 jobs. However, that amount may be increased given the cushion in the number of jobs expected to be created allowing the Company to increase the number of LP Interests that may be sold under applicable EB-5 rules and regulations. Further, if the econometric study is found to have significantly undercounted the number of associated jobs, the Company may increase the number of LP Interests that may be sold.

**SPO may not be Profitable and may not Generate Positive Cash Flow:**

There is a risk that the Project may never become profitable and that, therefore, SPO will not be profitable and will not have positive cash flow. If SPO does not experience adequate cash flow, it may not be able to make the payments on the Solaris Note. The Project is a development project and initially may have limited revenues. Because development projects, even if successful, typically generate losses during the initial investment process, it will take some time to generate profits. The Company will enter into a Management Agreement with a company affiliated with the General Partner. The management fees payable under the Management Agreement will be payable prior to the distribution of available cash flow to the Limited Partners. Additionally, the Project may not show positive cash flow so that SPO would not have sufficient cash flow to repay the Capital Contributions of the Limited Partners or any profits on the Capital Contributions.

**No Guarantee of any Returns to Investors; Risk of**

The investment by the Limited Partners is an equity investment. There is no obligation of any kind by either the Company nor any other person

EXHIBIT 1

| | |
|---|---|
| ***Foreclosure:*** | or entity to pay back the amount of the Limited Partners' Capital Contributions. The return of each Limited Partner's Capital Contribution as well as any additional cash flow is dependent on the ability of the Project to generate positive cash flow to SPO and SPO's ability to make payments to the Company, and the ability to monetize the investment by selling the Condominium Units that are the collateral for the Solaris Note. If these various sources of cash prove to be insufficient to pay the expenses of the Project, then SPO may not have cash flow and may not be able to make payments to the Company of interest under the Solaris Note. In such event, the Limited Partners will receive neither a return of their investment nor any return on their investment. SPO will be required to pay HOA dues and real estate property taxes on one or more Condominium Units during the term of the Solaris Note. If SPO is unable to make such payments, there is a risk that the amount of such deficiency would be set off against interest payments due to the Company and that this would impair the Company's ability to make distributions of the Preferred Returns Likewise, under the terms of the Amended Loan Agreement, the Company is required to reimburse SPO for any cash flow deficits from the leasing of the Condominium Units. If the Company is unable to pay any such cash flow deficits, there is a risk that the interest payments to the Company could be reduced to cover any such deficits. |
| ***Risk of Ownership of Condominium Units*** | The market for luxury Condominium Units in the Colorado resort communities has experienced severe pressure, especially over the past two years. The reasons for this pressure are varied, but include the world-wide recession, over-supply of units, and a lack of available credit for potential buyers. The Condominium Units at the Project are at the very high end of the luxury scale and are priced at levels that are at the highest levels of almost any other units in the Vail, Colorado, area. There is a risk that SPO may not be able to sell enough Condominium Units to generate sufficient revenues to pay the interest due to the Company under the Solaris Note and that as a result, the Company would not in turn be able to pay the Preferred Returns to the Investors. Additionally, there is a risk that the prices of the units will decline over the next several years resulting in an inability of the Investors to sell the units for an amount sufficient to repay the amount of their initial Capital Contributions. |
| ***Pro Formas may not Prove Accurate:*** | The Company has reviewed carefully the pro forma financial statements for the Project. These financial pro formas were prepared primarily by the principals of SPO. Pro formas are projections only and should not be relied upon as an accurate forecast of the financial performance of the Project. There are many factors that will impact the financial performance of the Project and many of these will have a material effect on the ability of the Project to generate profits and positive cash flow. The pro formas represent management's good faith attempt to project the financial performance of the Project and, therefore, the Company, but should not be relied upon as any form of guaranty of actual results. |
| ***Lack of Liquidity:*** | The Company will not be able to make cash distributions to its Limited |

EXHIBIT 1

Partners unless SPO makes its payments to the Company of interest under the Solaris Note. The Company believes that SPO has sufficient cash reserves to enable it to make its required payments to the Company in a timely fashion for the foreseeable future. However, there can be no assurance that SPO will be able to sustain the required payments. Additionally, if SPO elects to redeem the Solaris Note by transferring ownership of one or more Condominium Units, then the Company will own the units and will be required to pay Homeowners Association dues, property taxes, insurance, and other expenses relating to ownership of the units. Additionally, the Company intends to receive additional income from the renting of the Condominium Units by SPO to third parties. The Company will receive the benefit of any rental income under the terms set forth in the Amended Loan Agreement. The Company believes that these payments will adequately cover the expenses associated with ownership of the Condominium Units. If SPO fails to make its payments, however, there is a risk that the Company would not be able to pay the expenses and the Company could lose ownership of the units. The Company believes that SPO will be able to make such payments and has further received the personal guaranty of Peter Knobel with respect to such interest payments during the period that any principal balance of the Solaris Note is outstanding. Therefore, the Company does not believe that there is a substantial risk of default in these payments. There is no market for the LP Interests and there are significant restrictions on the transferability of the LP Interests. Therefore, until there is a liquidity event (such as a sale of the Condominium Units), the Limited Partners will not be able to monetize their investment in the Company.

**_Prohibition of Sale of Condominium Units for Period of Time:_**

If the Company becomes the fee owner of a Condominium Unit, it may not sell or otherwise dispose of that Condominium Unit until a date that is not less than three years following the date of the Loan Advance. Thus, the Company may be required to hold one or more Condominium Units for a period longer than it would otherwise choose to do. This will result in more holding costs and there is a risk that prolonged negative cash flow could jeopardize the investment in the Condominium Units.

**_Inability to Refinance or Sell:_**

At the time that the Company desires to sell the Condominium Units, there is a risk that the market may not be conducive to such sale. If the credit markets are illiquid, or if general economic conditions are unfavorable, the market for the sales of Condominium Units may be limited or depressed. In such event, the investment will have to be held for a longer period of time or, if there is a liquidity event, it may yield a smaller return.

**_Conflicts of Interest:_**

The General Partner of the Company and certain Principals and affiliates of the General Partner currently have interests and responsibilities in other companies requiring a portion of their time. The General Partner and its affiliates may have interests in other projects in Colorado and other locations that may seek investors for other EB-5 projects. Neither the Company nor the General Partner believes that except for the time required to attend to other business

EXHIBIT 1

matters, these other EB-5 activities will create any conflicts of interest due to the fact that once that all of the Capital Contributions for the Company have been received, the General Partner does not intend to seek any new EB-5 investors for the Company.

**Limited Transferability:** There will not be a public market for the LP Interests. There will be substantial restrictions on transferring interests in the Company, including federal and state securities laws. Accordingly, purchasers of the LP Interests may need to bear the economic risk of their investment in the Company until such time as the Company is liquidated. All persons acquiring the interests will be required to represent, among other things, that they are purchasing such interests for their own account for investment only and not with a view to the resale or distribution thereof.

**Not Registered Under Investment Advisers Act:** The Company is not registered under, and does not intend to register under, the Investment Adviser's Act of 1940 in reliance upon exemptions from registration thereunder.

**Not Registered under Investment Company Act:** The Company is not registered under, and does not intend to register under, the Investment Company Act of 1940 in reliance upon an exemption from registration, available under Section 3(c)(1) thereof. There is a risk that the Securities and Exchange Commission or a court might conclude that we fall within the definition of investment company, and unless an exclusion were available, we would be required to register under the Investment Company Act of 1940. Compliance with the Investment Company Act, as a registered investment company, would cause us to alter significantly our business strategy, impair our ability to operate as planned and seriously harm our business. If we fail to comply with the requirements of this Act, we would be prohibited from engaging in business or selling securities, and could be subject to civil and criminal actions for doing so. In addition, our contracts would be voidable and a court could appoint a receiver to take control of and liquidate our business.

**Repayment of Debt; Return of Capital Contributions:** The Company's ability to make cash distributions is dependent in part upon the success of the Project and the availability of distributions from the Project to SPO and the ability of SPO to make payments to the Company of interest under the Solaris Note. No Limited Partner shall be entitled to withdraw or to the return of his or her Capital Contributions except as provided in the Partnership Agreement, or to demand and receive property other than in cash in return for his or her Capital Contributions except upon dissolution of the Company per the further terms of the Partnership Agreement. Each Limited Partner must rely upon payments made by SPO to the Company or by sales of the Condominium Units by the Company and then upon distributions by the Company to the Limited Partners, at the discretion of the General Partner, to the extent there are liquid assets available, for return of his or her Capital Contributions. There can be no assurance, irrespective of

EXHIBIT 1

the success of the investments, that any Limited Partner will receive cash or property equal to his or her investment in the Company.

**Federal Income Tax Risks:** **BECAUSE THE FEDERAL INCOME TAX LAWS ARE COMPLEX AND THE IMPACT ON EACH MEMBER MAY VARY CONSIDERABLY DEPENDING ON THE INVESTOR'S INDIVIDUAL TAX ATTRIBUTES, INVESTORS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS BEFORE ACQUIRING THE LP INTERESTS IN THE COMPANY HEREUNDER.**

**Indemnification:** The Partnership Agreement provides limitations on the liability of the General Partner, its affiliates and its members, officers, directors and employees, and provides for indemnification of the General Partner and its affiliates, members, officers, directors and employees, under certain circumstances. Limited Partners may have more limited rights than they would absent such limitations.

**Control:** The Company is managed by the General Partner. The General Partner will make all decisions with respect to the control and management of the Company except as specifically provided in the Partnership Agreement.

**Immigration Issues:** Congress and or USCIS may change the law, regulations, or interpretations of the law without notice and in a manner that may be detrimental to an Investor or the Company.

It is impossible to predict visa-processing times. Investors should not physically move to the United States until their visa has been issued.

Investors who obtain conditional or permanent residence status must intend to make the United States their primary residence. Conditional or permanent residents who continue to live abroad risk revocation of their conditional or permanent residence status.

USCIS requires proof of direct and indirect employment creation as part of the removal of conditions process. There is no assurance that the actual number of direct employees and indirect job creation will be the same as the number predicted in the economist's report. Depending upon the disparity there may be insufficient employment to remove conditional visa status.

The process of obtaining conditional and permanent resident status involves several factors and circumstances which are not within the control of the Company. These include the Investor's past history and quotas established by the United States government limiting the number of immigrant visas available to qualified individuals seeking permanent resident status under the EB-5 "Regional Center" program. Although

EXHIBIT 1

the Company has been structured so that each Limited Partner may maximize eligibility for permanent residency under the EB-5 "Regional Center" provisions of the U.S. immigration laws, no assurance can be given that each Investor will obtain approval of his or her particular immigrant petition.  Purchase of a Unit does not guarantee conditional or permanent residency in the United States.  Furthermore, no advice can be given that conditions to permanent residency will be removed.  Each prospective investor should consult competent immigration counsel to review the likelihood that the Investor's Immigrant Petition will be granted.

***Risks Relating to the U.S. EB-5 Immigration Investor Pilot Program***

Investors in this Offering who have subscribed for LP Interests with the intention of applying for approval of a Petition through the EB-5 program should be aware of certain risk factors involving the EB-5 program and its administration.  A description of the risks below are based on information obtained by the Company from third parties who the Company believes are reliable.  However, there can be no assurance that such information is accurate or current or that it includes all of the risks relating to the EB-5 program for such investors.

The Company was designated as a regional center to participate in the EB-5 program on May 17, 2010.  Accordingly, the personnel within the Company do not have experience in administering the EB-5 program, which could lead to delays for investors in the process of obtaining a conditional or permanent green card.  In addition, investors will be charged an administrative fee of $35,000 by the Company in connection with review of the investors' applications.  If an EB-5 I-526 Petition is denied by the USCIS the investor will receive a refund of only that portion of the Administrative Fee that has not been expended by the General Partner.

There are a number of areas within the State of Colorado which the Company believes will be designated a "Targeted Employment Area" ("TEA") as defined in 8 CFR Section 204.6(e).  Additionally, all towns and cities with a population of under 20,000 will be designated as TEAs.  Whether or not a particular location qualifies as a TEA may change from time to time depending on unemployment and census data.

The investment must be at risk to qualify for the EB-5 program.  As part of the EB-5 I-526 Petition, an immigrant investor must show evidence that he or she has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk.

Each investor who purchases LP Interests with the intention of obtaining permanent or conditional residence from the USCIS is encouraged, along with his or her advisors, to make his or her own independent review of the EB-5 program and the various risk factors relating to the process in obtaining an EB-5 permanent or conditional residence to determine if an investment in the Units is a suitable approach for such investor.

As part of the I-526 Petition, an investor must present to the USCIS

EXHIBIT 1

clear documentary evidence of the source of funds invested and that the funds belong to the investor. Generally, the investor can satisfy the source of funds requirements by submitting documents showing that he or she has a level of income from legal sources that would yield sufficient funds for the investment. The USCIS generally requires copies of income tax returns to satisfy the source of funds requirement. For investors who do not have such records, there may be other records that can be provided to the USCIS by an investor to demonstrate that the investment funds came from legal sources. All such matters regarding the investor's petition should be discussed with his or her immigration counsel.

The Pilot Program requires an investor to hold a policymaking or management position within the Company. The Company believes that each Limited Partner is provided with the powers and duties under the Limited Partnership Agreement sufficient to meet the USCIS requirement that an investor is actively participating in policymaking or management of a new commercial enterprise. However, either USCIS or the consulate abroad issuing the immigrant visa based on an approved EB-5 Petition may challenge the sufficiency of the Limited Partner's engagement.

As a "pilot," the Regional Center Pilot Program is not yet permanent, and consequently requires periodic renewal by Congress. The Regional Center Pilot Program has been renewed several times by Congress and is currently due to expire on 30 September 2012. Because this program creates U.S. jobs and utilizes a very small quota, there has been no controversy surrounding its renewal. Congress is expected to renew this program prior to its expiration, or make the program permanent by removing its "pilot" designation. However, there is a risk that Congress may not renew, or not renew before the current expiration date.

## IV. POWER OF ATTORNEY

The undersigned hereby irrevocably makes, constitutes and appoints Colorado Regional Center Project Solaris, LLLP, and each general partner of the Partnership, with full power of substitution its true and lawful attorney-in-fact in its name to execute and acknowledge (i) the Partnership Agreement in substantially the form enclosed herewith and to attach the limited partner execution page delivered herewith to such Partnership Agreement and thereby cause the undersigned to become a limited partner in the Partnership; (ii) any document required to effect the formation or continuation of the Partnership or which counsel to the Partnership deems necessary or desirable to comply with any state or federal law, and (iii) the Escrow Agreement. The power of attorney hereby granted is irrevocable and coupled with an interest and may be exercised by the attorney-in-fact for the undersigned as well as other limited partners of the Partnership by executing any instrument by use of the single signature of such attorney-in-fact acting for all the limited partners.

## V. MISCELLANEOUS

EXHIBIT 1

A. **Indemnification.** The undersigned hereby agrees to indemnify the Partnership and hold the Partnership harmless from and against any and all liability, damages, costs or expenses incurred on account of or arising out of:

    1.    Any inaccuracy in the declarations, representations, and warranties hereinabove set forth;

    2.    The disposition of any of the Partnership Interests by the undersigned, contrary to the foregoing declarations, representations and warranties; and

    3.    Any action, suit or proceeding based upon (i) a claim that the herein declarations, representations or warranties were inaccurate or misleading or otherwise a cause for obtaining damages or redress from the Partnership; or (ii) the disposition of any of the Partnership Interests or any part thereof.

B. **Confidentiality.** The undersigned acknowledges that the information contained in this Subscription Agreement and in the Memorandum, and which the undersigned receives orally or in writing from the Partnership is confidential and non-public and agrees that all such information shall be kept in confidence by the undersigned.

C. **Binding Agreement**. The undersigned agrees that the undersigned may not cancel, terminate or revoke this Subscription Agreement or any agreement of the undersigned made hereunder, and that this Subscription Agreement shall survive the death or disability of the undersigned and shall be binding upon the heirs, successors, assigns, executors, administrators, guardians, conservators or personal representatives of the undersigned.

D. **Defined Terms.** Capitalized terms not defined herein shall have the meaning as in the Partnership Agreement.

E. **Counterparts.** This Subscription Agreement may be executed in any number of counterparts, each of which shall be considered an original but all of which together shall constitute one and the same instrument.

F. **Severability.** Every provision of this Subscription Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of the Subscription Agreement.

G. **Nonwaiver.** No provision of this Subscription Agreement shall be deemed waived except if such waiver is contained in a written notice given to the party claiming such waiver has occurred, and no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given.

H. **Applicable Law.** This Subscription Agreement shall be interpreted and enforced in accordance with the federal laws of the United States of America and the state laws of the Colorado, without giving effect to principles and provisions relating to choice of law.

I. **Entirety of Agreement.** This Subscription Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof.

J. **Additional Information.** The undersigned shall supply the Partnership with such additional information and documentation as may be required in order to ensure compliance with applicable law, including, without limitation, the Securities Act and regulations promulgated thereunder.

EXHIBIT 1

Case No. 1:19-cv-02443-RM-STV   Document 291-1   filed 06/19/20   USDC Colorado   pg 137
Case 1:19-cv-02443-STV   Document 51-2   Filed 10/18/19   USDC Colorado   Page 127 of 184
of 293

**IN WITNESS WHEREOF**, the undersigned has executed this Subscription Agreement on the date set forth on the signature page, and desires to take title in the Partnership Interests (check one):

_____        a.      Individual (one signature required on the Signature Page);

_____        b.      Husband and Wife, as community property (one [1] signature required on the Signature Page if interest held in one [1] name, *i.e.*, managing spouse; two [2] signatures required on the signature Page if interest held in both names);

_____        c.      Joint Tenants with right of survivorship (both parties must sign Signature Page);

_____        d.      Tenants in Common (both parties must sign Signature Page);

***SIGNATURES ON FOLLOWING PAGE***

EXHIBIT 1

If subscriber is an individual or husband and wife:

Signature: _____

Signature of Spouse: _____

**SUBSCRIPTION ACCEPTED** this _____ day of _____, 2011.

Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership

By:  Colorado Regional Center I, LLC, a Colorado limited liability company, General Partner

By:_____
Name, Manager

EXHIBIT 1

**EXHIBIT H3**
**CHARTERED SUBSCRIPTION AGREEMENT**

*[Chartered Subscription Agreement on following page.]*

EXHIBIT 1

Case No. 1:19-cv-02443-RM-STV Document 51-2 filed 06/19/20 USDC Colorado pg 130 of 140
Case 1:19-cv-02443-STV Document 91-1 filed 10/18/19 USDC Colorado Page 130 of 184
of 293

Colorado Regional Center Project Solaris, LLLP
(a Colorado limited liability limited partnership)

## SUBSCRIPTION AGREEMENT

Colorado Regional Center Project Solaris, LLLP
5251 DTC Pkwy, Suite 1100
Greenwood Village, CO 80111

Prospective Investor:

This Subscription Agreement is made by and between the Colorado Regional Center I, LLC, a Colorado limited liability company (the "General Partner) of Colorado Regional Center Project Solaris, LLLP (the "Partnership"), and the undersigned purchaser who is subscribing for the Partnership Interests as set forth below pursuant to the terms set forth in this Subscription Agreement. The address of the Partnership is 4643 S. Ulster Street, Suite 950, Denver, CO 80237.

## I.
## AGREEMENT TO PURCHASE
## AND ADMISSION AS A LIMITED PARTNER

A.  **Purchase.**  Subject to the terms and conditions hereof, the undersigned hereby irrevocably agrees to purchase the partnership interest set forth in Subsection A (3) herein. The minimum Capital Contribution shall be $535,000 (USD) of which $500,000 shall be deemed a Capital Contribution and $35,000 shall be deemed payment for Administrative Expenses. Payment in full for the Partnership Interests purchased hereunder accompanies the delivery of this Subscription Agreement (a "Capital Contribution").

1.  <u>Partnership Acceptance of Subscription Agreement</u>.  The undersigned agrees that the Partnership may reject any subscription in its sole and absolute discretion, and in particular, from any proposed subscriber who is not an accredited investor or who either alone or with his purchaser representative fails to meet the sophistication requirements set forth in Section II(A).

    The Partnership shall notify the undersigned that it has accepted the subscription herein by delivering to the undersigned a signed copy of this Subscription Agreement.

2.  <u>Capital Contributions</u>.  Capital Contributions shall be made payable to Colorado Regional Center Project Solaris, LLLP, wired to Standard Chartered Bank (Hong Kong) Limited at the address set forth below in Section 3. A copy of the fully-executed Subscription Agreement and a completed corresponding Offeree Questionnaire shall be delivered to the offices of the Partnership at the address listed above. In the event the subscription is not accepted in whole or in part by the Partnership, the full $500,000 of the Capital Contribution received and the remaining balance, if any, of the Administrative Expenses will be promptly refunded to the subscriber without deduction from or interest on the Capital Contribution.

EXHIBIT 1

3. Purchase Terms:

AMOUNT OF SUBSCRIPTION: [$535,000.00] (USD)

NAME UNDER WHICH
TITLE SHALL BE HELD:        _____

SOCIAL SECURITY NUMBER
    OR TAXPAYER ID NO.:    _____
                                        (If applicable)

YOU MAY WIRE YOUR CAPITAL CONTRIBUTION TO:

Standard Chartered Bank (Hong Kong) Limited
**ABA:** _____
**Account Name: Escrow Concentration Account**
CREDIT A/C No.: _____
For Benefit of Colorado Regional Center Project Solaris, LLLP

B.   **Admittance as Limited Partner.**   Upon the Partnership's acceptance of this Subscription Agreement and receipt of your Capital Contribution, the undersigned shall be admitted as a Limited Partner of the Partnership.   The undersigned acknowledges the receipt of a true and correct copy of the Partnership Agreement and agrees to be bound by its terms.   Your Capital Contribution shall be used to further the business purposes of the Partnership as set forth in the Partnership Agreement.

C.   **Investment Terms.**    FOR A COMPLETE DESCRIPTION OF THE INVESTMENT TERMS AND HOW CASH WILL BE DISTRIBUTED PLEASE REFER TO THE PARTNERSHIP AGREEMENT.

**EB-5 Investors.**

5. Independent Counsel. Investor shall hire an Independent Counsel for immigration processing and other legal matters.  Colorado Regional Center Project Solaris, LLLP will on request recommend qualified counsel for immigration processing matters. Colorado Regional Center Project Solaris, LLLP shall approve the selection of immigration counsel in writing in advance of retaining such counsel. Investor shall be responsible for payment of all legal fees and costs incurred in connection with Investor's I-526 and I-829 petitions.

6. Filing the Immigration Petition**.**    Colorado Regional Center Project Solaris, LLLP shall use its best efforts to assist Investor's Counsel for the filing of the appropriate visa petition, and verifying required direct and indirect employment until the removal of Investor's conditional permanent residency.

7. Visa Denial**.**   If (i) the Investor's I-526 is denied or (ii) the Investor's application for conditional permanent residency (either via an immigrant visa application or an adjustment of status application) is denied for reasons related to the Project as defined in

EXHIBIT 1

the Memorandum, and a final decision is reached on the denial described in either clause (i) or (ii) above (meaning all administrative and judicial appeals have been exhausted, any such appeals undertaken solely at the election and cost of the General Partner), Colorado Regional Center Project Solaris, LLLP shall pay back Investor's original Capital Contribution in cash within 150 days of denial, if the General Partner elects not to appeal, or within 150 days of final denial after exhaustion of all appeals at the General Partner's election. Investor must maintain the investment until the outcome of the appeal is rendered if the denial is appealed. Colorado Regional Center Project Solaris, LLLP's liability shall be limited to the return of Investor's Capital Contribution only. Additionally, Colorado Regional Center Project Solaris, LLLP will refund the Investor's Administrative Expenses at the time of the refund of the Capital Contribution. If the denial is based on matters relating to Investor's personal background or financial history, including without limitation, Investor's inability to prove to the appropriate governmental authorities the sources of funds used to invest in the Partnership, then Investor shall not be entitled to receive any refund of the Administrative Expenses.

8.   <u>Maintenance of EB-5 Interest</u>.  Colorado Regional Center Project Solaris, LLLP agrees that it will not sell the interest Investor relies upon for EB-5 visa approval until removal of Investor's conditional permanent residence status.

<h2 style="text-align:center">II. REPRESENTATIONS AND WARRANTIES</h2>

The undersigned hereby represents and warrants to the Partnership and COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP as follows:

A.   That the offer to sell the Partnership Interests was directly communicated to the undersigned by the Partnership through the Memorandum and meetings with the General Partner of the Partnership in such a manner that the undersigned was able to ask questions of and receive answers from the Partnership or a person acting on its behalf concerning the terms and conditions of this investment.  At no time was the undersigned presented with or solicited by or through any leaflet, public promotional meeting, television advertisement or any other form of general solicitation or advertising.

B.   That the undersigned is the sole and true party in interest and is not subscribing for the benefit of any other person.  If the undersigned is a corporation, partnership or other entity, the undersigned was not organized for the purpose of acquiring the Partnership Interests.  If the undersigned is an individual, he or she is twenty-one (21) years of age or over.

C.   That the Partnership Interests are being purchased for the undersigned's own account solely for investment, and with no present intention to distribute any of the Partnership Interests to any other person.

D.   That the undersigned understands that the Partnership Interests are not being registered under the Securities Act of 1933, as amended (Securities Act) in reliance upon the so-called "private offering" exemption provided by Section 4(2) the Securities Act and/or Regulation D promulgated pursuant to the Securities Act, and that the Partnership is basing its exemption in part on the representations, warranties, statements and agreements contained herein and those of other subscribers contained in similar subscription agreements.

EXHIBIT 1

Case No. 1:19-cv-02443-RM-STV   Document 51-2   filed 06/19/20   USDC Colorado   pg 133 of 161
Case 1:19-cv-02443-STV   Document 31-1   Filed 10/18/19   USDC Colorado   Page 133 of 293
of 293

E.   That the undersigned is an Accredited Investor within the meaning of Rule 501 of Regulation D promulgated pursuant to the Securities Act.

The undersigned understands that if a Purchaser Representative is used, the Purchaser Representative must complete, and the undersigned must review and acknowledge, a separate Purchaser Representative Questionnaire and Purchaser Acknowledgment, which must be returned to the Partnership prior to acceptance of this Subscription Agreement.

F.   That the undersigned understands that the Partnership Interests have not been recommended by any federal or state securities commission or regulatory authority.  Furthermore, the foregoing authorities have not confirmed or reviewed the accuracy or determined the adequacy of the information set forth in the Memorandum.

G.   That the undersigned understands that the Partnership Interests are characterized as restricted securities under the Act and applicable state securities laws inasmuch as they are being acquired from the Partnership in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be transferred or resold without registration under the Securities Act and applicable state securities laws only in certain limited circumstances.

H.   That prior to executing this Subscription Agreement the undersigned confirms that all documents requested by the undersigned have been made available, and that the undersigned has been supplied with all of the additional information concerning this investment that has been requested.

I.   That the undersigned has carefully considered and has, to the extent the undersigned considers necessary, discussed with the undersigned's professional legal, tax and financial advisers the suitability of an investment in the Partnership for the undersigned's particular tax and financial situation.

J.   That the undersigned has adequate means of providing for current needs and personal contingencies, and is aware that an investment in the Partnership Interests is highly speculative and subject to substantial risks.  The undersigned is capable of bearing the high degree of economic risk and burden of this investment, including but not limited to, the possibility of the complete loss of all contributed capital and the limited transferability of the Partnership Interests.

K.   That the undersigned understands that the Partnership prepared pro formas and estimates of possible revenues and expenses and the possible consequent financial returns the Partnership could experience if such revenues and expenses were achieved.  The undersigned understands that the Partnership is still in an early stage of development and has no history of achieving such revenues.  The Partnership estimates are based on a good faith belief of what the Partnership can accomplish if it is able to obtain adequate financing and is able to commence and maintain operations in accordance with its current business plan.  The pro formas were not prepared by any independent accountant and were not prepared with a view toward compliance with the Association of Independent Certified Accountants' guidelines for projections.  The assumptions and estimates are uncertain and the actual results of the Partnership will vary from the projected results and could vary in a materially adverse manner.

L.   That the undersigned, in making the decision to purchase the Partnership Interests subscribed for, relied upon independent investigations made by the undersigned and his or her Purchaser Representatives (if any), and the undersigned and such representatives (if any) have, prior to any sale to the investor, been given access and the opportunity to examine all material books and

EXHIBIT 1

Case No. 1:19-cv-02443-RM-STV Document 251-2 filed 06/19/20 USDC Colorado pg 134 of 184
Case 1:19-cv-02443-STV Document 51-2 Filed 9/18/19 USDC Colorado Page 134 of 293
of 293

records of the Partnership, all material contracts and documents relating to this offering, and an opportunity to ask questions and receive answers from the Partnership or any person acting on its behalf concerning the terms and conditions of this offering, and an opportunity obtain any additional information, to the extent the Partnership possesses such information or can acquire it without unreasonable effort or expense, necessary to verify the accuracy of any information provided.

M. **THAT THE UNDERSIGNED EITHER READS AND UNDERSTANDS ENGLISH OR HAD THIS SUBSCRIPTION AGREEMENT TRANSLATED BY A TRUSTED ADVISOR INTO A LANGUAGE THAT THE UNDERSIGNED DOES UNDERSTAND**.

N. That each representation and warranty of the undersigned contained herein and all information furnished by the undersigned to the Partnership, is true, correct and complete in all respects.

## III. RISK FACTORS

AN INVESTMENT IN THE PARTNERSHIP HAS CERTAIN ELEMENTS OF RISK DIFFERENT FROM AND/OR GREATER THAN THOSE ASSOCIATED WITH OTHER INVESTMENTS. THE HIGHER DEGREE OF RISK MAKES AN INVESTMENT IN THE PARTNERSHIP SUITABLE ONLY FOR INVESTORS (i) WHO HAVE A CONTINUING LEVEL OF ANNUAL INCOME AND A SUBSTANTIAL NET WORTH, (ii) WHO CAN AFFORD TO BEAR THOSE RISKS, (iii) WHO HAVE PREVIOUSLY MADE THE INVESTMENT OF AT LEAST WHAT THEY INTEND TO INVEST IN THIS PARTNERSHIP AND, (iv) WHO HAVE NO NEED FOR LIQUIDITY FROM THESE INVESTMENTS. EACH INVESTOR SHOULD CONSIDER CAREFULLY THE RISK FACTORS ASSOCIATED WITH THIS INVESTMENT, INCLUDING, WITHOUT LIMITATION, THE FOLLOWING, AND SHOULD CONSULT HIS OR HER OWN LEGAL, TAX AND FINANCIAL ADVISORS WITH RESPECT THERETO. INVESTORS UNABLE OR UNWILLING TO ASSUME THE FOLLOWING RISKS, AMONG OTHERS, MUST NOT CONSIDER AN INVESTMENT IN THE PARTNERSHIP.

| | |
|---|---|
| ***Dependence on Management of SPO:*** | The Company will have very little active management responsibility or authority with respect to the management of the Project. The Company will have a note receivable from SPO, but the management of SPO will be controlled solely by Peter Knobel as the sole equity member of SPO. Additionally, the day-to-day management of the business operations of the Project will rest exclusively in the control of SPO. While the Company is confident in the abilities of SPO to manage the Project in a profitable manner based on the success of its principal, Peter Knobel, in previous commercial real estate projects, there can be no assurance that it will be successful in the management of the Project. |
| ***The Project may not be Completed as Scheduled:*** | This is a development project and, therefore, there can be no assurance that the Project will be constructed on the projected schedule. If there is a substantial delay, the costs of completion may be increased and there will be a delay in the generation of revenues from the operation of the Project. Additionally, any material delay may postpone the starting date for the jobs related to the Project, thereby delaying the job creation requirements of the EB-5 program. The development team has a great deal of experience in this type of development and the Project is in an advanced stage of construction at this time. Therefore, the Company |

EXHIBIT 1

believes that absent significant unforeseen events, the Project will be constructed on time, within budget, and the related businesses operational within approximately 12 months.

*The Project may be Subject to Cost Overruns; Failure to Sell Condominium Units in a Timely Fashion:*

There are a number of variables in any new construction project and there is a risk that the costs of building the Project will be greater than the projected costs. The reasons for overruns include such matters as governmental issues, unforeseen construction problems, increases in the costs of construction materials and labor, weather, and other similar types of construction problems. If there are significant cost increases, the developers will have to provide additional funds to complete the project. The Company believes that these risks are mitigated by the inclusion of a contingency fund in the construction budget and also by the fact that the developers, architects, and general contractor have all built many similar types of projects from the ground up and have a great deal of experience in planning for the construction of similar projects, and, importantly, the Project is already in an advanced stage of construction at this time. Likewise, if SPO is unable to sell Condominium Units in a timely fashion, the holding costs related to such unsold units (such as HOA dues, property taxes, insurance, and maintenance) may be substantial and may create a financial hardship for SPO. The risks are mitigated by SPO's financial strength and its ability to fund any likely cash shortfalls.

*Job Creation; Potential Risk of Loss of Visa:*

Under the terms of the EB-5 program, the project must create a minimum of 10 full-time jobs within 2.5 years following the approval of the Limited Partners' Form I-526 Petition. These jobs may be indirect jobs, but must be filled with U.S. workers. The Company projects that there will be 2,110 direct, indirect, and induced jobs created from the operation of the Project and this number was derived from the econometric study prepared in February, 2011 by Evans, Carroll & Associates as a necessary requirement of the Colorado Regional Center application and designation. The projected job totals would be satisfactory to support 210 investors at $500,000 per investor. If there are fewer than 10 jobs created for each $500,000 investor during the 2.5-year period following the approval of the Limited Partners' Form I-526 Petition, each of the investors risks the loss of his or her visa and may be required to return to the investor's country of origin. The Company intends to mitigate this risk by seeking a maximum of $80,000,000 in Capital Contributions which would be supported by a total of 1,600 jobs. However, that amount may be increased given the cushion in the number of jobs expected to be created allowing the Company to increase the number of LP Interests that may be sold under applicable EB-5 rules and regulations. Further, if the econometric study is found to have significantly undercounted the number of associated jobs, the Company may increase the number of LP Interests that may be sold.

*SPO may not be Profitable and may not Generate*

There is a risk that the Project may never become profitable and that, therefore, SPO will not be profitable and will not have positive cash

EXHIBIT 1

| | |
|---|---|
| ***Positive Cash Flow:*** | flow.  If SPO does not experience adequate cash flow, it may not be able to make the payments on the Solaris Note.  The Project is a development project and initially may have limited revenues.  Because development projects, even if successful, typically generate losses during the initial investment process, it will take some time to generate profits.  The Company will enter into a Management Agreement with a company affiliated with the General Partner.  The management fees payable under the Management Agreement will be payable prior to the distribution of available cash flow to the Limited Partners.  Additionally, the Project may not show positive cash flow so that SPO would not have sufficient cash flow to repay the Capital Contributions of the Limited Partners or any profits on the Capital Contributions. |
| ***No Guarantee of any Returns to Investors; Risk of Foreclosure:*** | The investment by the Limited Partners is an equity investment.  There is no obligation of any kind by either the Company nor any other person or entity to pay back the amount of the Limited Partners' Capital Contributions.   The return of each Limited Partner's Capital Contribution as well as any additional cash flow is dependent on the ability of the Project to generate positive cash flow to SPO and SPO's ability to make payments to the Company, and the ability to monetize the investment by selling the Condominium Units that are the collateral for the Solaris Note.  If these various sources of cash prove to be insufficient to pay the expenses of the Project, then SPO may not have cash flow and may not be able to make payments to the Company of interest under the Solaris Note.  In such event, the Limited Partners will receive neither a return of their investment nor any return on their investment.  SPO will be required to pay HOA dues and real estate property taxes on one or more Condominium Units during the term of the Solaris Note.  If SPO is unable to make such payments, there is a risk that the amount of such deficiency would be set off against interest payments due to the Company and that this would impair the Company's ability to make distributions of the Preferred Returns  Likewise, under the terms of the Amended Loan Agreement, the Company is required to reimburse SPO for any cash flow deficits from the leasing of the Condominium Units.  If the Company is unable to pay any such cash flow deficits, there is a risk that the interest payments to the Company could be reduced to cover any such deficits. |
| ***Risk of Ownership of Condominium Units*** | The market for luxury Condominium Units in the Colorado resort communities has experienced severe pressure, especially over the past two years.  The reasons for this pressure are varied, but include the world-wide recession, over-supply of units, and a lack of available credit for potential buyers.  The Condominium Units at the Project are at the very high end of the luxury scale and are priced at levels that are at the highest levels of almost any other units in the Vail, Colorado, area.   There is a risk that SPO may not be able to sell enough Condominium Units to generate sufficient revenues to pay the interest due to the Company under the Solaris Note and that as a result, the |

EXHIBIT 1

Case No. 1:19-cv-02443-RM-STV   Document 31-2   filed 10/18/19   USDC Colorado   pg 137 of 154
Case 1:19-cv-02443-STV   Document 51-2   Filed 10/18/19   USDC Colorado   Page 137 of 293
of 293

Company would not in turn be able to pay the Preferred Returns to the Investors. Additionally, there is a risk that the prices of the units will decline over the next several years resulting in an inability of the Investors to sell the units for an amount sufficient to repay the amount of their initial Capital Contributions.

***Pro Formas may not Prove Accurate:***

The Company has reviewed carefully the pro forma financial statements for the Project. These financial pro formas were prepared primarily by the principals of SPO. Pro formas are projections only and should not be relied upon as an accurate forecast of the financial performance of the Project. There are many factors that will impact the financial performance of the Project and many of these will have a material effect on the ability of the Project to generate profits and positive cash flow. The pro formas represent management's good faith attempt to project the financial performance of the Project and, therefore, the Company, but should not be relied upon as any form of guaranty of actual results.

***Lack of Liquidity:***

The Company will not be able to make cash distributions to its Limited Partners unless SPO makes its payments to the Company of interest under the Solaris Note. The Company believes that SPO has sufficient cash reserves to enable it to make its required payments to the Company in a timely fashion for the foreseeable future. However, there can be no assurance that SPO will be able to sustain the required payments. Additionally, if SPO elects to redeem the Solaris Note by transferring ownership of one or more Condominium Units, then the Company will own the units and will be required to pay Homeowners Association dues, property taxes, insurance, and other expenses relating to ownership of the units. Additionally, the Company intends to receive additional income from the renting of the Condominium Units by SPO to third parties. The Company will receive the benefit of any rental income under the terms set forth in the Amended Loan Agreement. The Company believes that these payments will adequately cover the expenses associated with ownership of the Condominium Units. If SPO fails to make its payments, however, there is a risk that the Company would not be able to pay the expenses and the Company could lose ownership of the units. The Company believes that SPO will be able to make such payments and has further received the personal guaranty of Peter Knobel with respect to such interest payments during the period that any principal balance of the Solaris Note is outstanding. Therefore, the Company does not believe that there is a substantial risk of default in these payments. There is no market for the LP Interests and there are significant restrictions on the transferability of the LP Interests. Therefore, until there is a liquidity event (such as a sale of the Condominium Units), the Limited Partners will not be able to monetize their investment in the Company.

***Prohibition of Sale of Condominium Units for Period of Time:***

If the Company becomes the fee owner of a Condominium Unit, it may not sell or otherwise dispose of that Condominium Unit until a date not less than three years following the date of the Loan Advance. Thus, the Company may be required to hold one or more Condominium Units for

EXHIBIT 1

a period longer than it would otherwise choose to do. This will result in more holding costs and there is a risk that prolonged negative cash flow could jeopardize the investment in the Condominium Units.

At the time that the Company desires to sell the Condominium Units, there is a risk that the market may not be conducive to such sale. If the credit markets are illiquid, or if general economic conditions are unfavorable, the market for the sales of Condominium Units may be limited or depressed. In such event, the investment will have to be held for a longer period of time or, if there is a liquidity event, it may yield a smaller return.

**Inability to Refinance or Sell:**

**Conflicts of Interest:** The General Partner of the Company and certain Principals and affiliates of the General Partner currently have interests and responsibilities in other companies requiring a portion of their time. The General Partner and its affiliates may have interests in other projects in Colorado and other locations that may seek investors for other EB-5 projects. Neither the Company nor the General Partner believes that except for the time required to attend to other business matters, these other EB-5 activities will create any conflicts of interest due to the fact that once that all of the Capital Contributions for the Company have been received, the General Partner does not intend to seek any new EB-5 investors for the Company.

**Limited Transferability:** There will not be a public market for the LP Interests. There will be substantial restrictions on transferring interests in the Company, including federal and state securities laws. Accordingly, purchasers of the LP Interests may need to bear the economic risk of their investment in the Company until such time as the Company is liquidated. All persons acquiring the interests will be required to represent, among other things, that they are purchasing such interests for their own account for investment only and not with a view to the resale or distribution thereof.

**Not Registered Under Investment Advisers Act:** The Company is not registered under, and does not intend to register under, the Investment Adviser's Act of 1940 in reliance upon exemptions from registration thereunder.

**Not Registered under Investment Company Act:** The Company is not registered under, and does not intend to register under, the Investment Company Act of 1940 in reliance upon an exemption from registration, available under Section 3(c)(1) thereof. There is a risk that the Securities and Exchange Commission or a court might conclude that we fall within the definition of investment company, and unless an exclusion were available, we would be required to register under the Investment Company Act of 1940. Compliance with the Investment Company Act, as a registered investment company, would cause us to alter significantly our business strategy, impair our ability to operate as planned and seriously harm our business. If we fail to comply with the requirements of this Act, we would be prohibited from engaging in business or selling securities, and could be subject to

EXHIBIT 1

civil and criminal actions for doing so. In addition, our contracts would be voidable and a court could appoint a receiver to take control of and liquidate our business.

**Repayment of Debt; Return of Capital Contributions:**   The Company's ability to make cash distributions is dependent in part upon the success of the Project and the availability of distributions from the Project to SPO and the ability of SPO to make payments to the Company of interest under the Solaris Note. No Limited Partner shall be entitled to withdraw or to the return of his or her Capital Contributions except as provided in the Partnership Agreement, or to demand and receive property other than in cash in return for his or her Capital Contributions except upon dissolution of the Company per the further terms of the Partnership Agreement. Each Limited Partner must rely upon payments made by SPO to the Company or by sales of the Condominium Units by the Company and then upon distributions by the Company to the Limited Partners, at the discretion of the General Partner, to the extent there are liquid assets available, for return of his or her Capital Contributions. There can be no assurance, irrespective of the success of the investments, that any Limited Partner will receive cash or property equal to his or her investment in the Company.

**Federal Income Tax Risks:**   **BECAUSE THE FEDERAL INCOME TAX LAWS ARE COMPLEX AND THE IMPACT ON EACH MEMBER MAY VARY CONSIDERABLY DEPENDING ON THE INVESTOR'S INDIVIDUAL TAX ATTRIBUTES, INVESTORS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS BEFORE ACQUIRING THE LP INTERESTS IN THE COMPANY HEREUNDER.**

**Indemnification:**   The Partnership Agreement provides limitations on the liability of the General Partner, its affiliates and its members, officers, directors and employees, and provides for indemnification of the General Partner and its affiliates, members, officers, directors and employees, under certain circumstances. Limited Partners may have more limited rights than they would absent such limitations.

**Control:**   The Company is managed by the General Partner. The General Partner will make all decisions with respect to the control and management of the Company except as specifically provided in the Partnership Agreement.

**Immigration Issues:**   Congress and or USCIS may change the law, regulations, or interpretations of the law without notice and in a manner that may be detrimental to an Investor or the Company.

It is impossible to predict visa-processing times. Investors should not physically move to the United States until their visa has been issued.

Investors who obtain conditional or permanent residence status must

EXHIBIT 1

intend to make the United States their primary residence. Conditional or permanent residents who continue to live abroad risk revocation of their conditional or permanent residence status.

USCIS requires proof of direct and indirect employment creation as part of the removal of conditions process. There is no assurance that the actual number of direct employees and indirect job creation will be the same as the number predicted in the economist's report. Depending upon the disparity there may be insufficient employment to remove conditional visa status.

The process of obtaining conditional and permanent resident status involves several factors and circumstances which are not within the control of the Company. These include the Investor's past history and quotas established by the United States government limiting the number of immigrant visas available to qualified individuals seeking permanent resident status under the EB-5 "Regional Center" program. Although the Company has been structured so that each Limited Partner may maximize eligibility for permanent residency under the EB-5 "Regional Center" provisions of the U.S. immigration laws, no assurance can be given that each Investor will obtain approval of his or her particular immigrant petition. Purchase of a Unit does not guarantee conditional or permanent residency in the United States. Furthermore, no advice can be given that conditions to permanent residency will be removed. Each prospective investor should consult competent immigration counsel to review the likelihood that the Investor's Immigrant Petition will be granted.

***Risks Relating to the U.S. EB-5 Immigration Investor Pilot Program***

Investors in this Offering who have subscribed for LP Interests with the intention of applying for approval of a Petition through the EB-5 program should be aware of certain risk factors involving the EB-5 program and its administration. A description of the risks below are based on information obtained by the Company from third parties who the Company believes are reliable. However, there can be no assurance that such information is accurate or current or that it includes all of the risks relating to the EB-5 program for such investors.

The Company was designated as a regional center to participate in the EB-5 program on May 17, 2010. Accordingly, the personnel within the Company do not have experience in administering the EB-5 program, which could lead to delays for investors in the process of obtaining a conditional or permanent green card. In addition, investors will be charged an administrative fee of $50,000 by the Company in connection with review of the investors' applications. If an EB-5 I-526 Petition is denied by the USCIS the investor will receive a refund of only that portion of the Administrative Fee that has not been expended by the General Partner.

There are a number of areas within the State of Colorado which the Company believes will be designated a "Targeted Employment Area"

EXHIBIT 1

("TEA") as defined in 8 CFR Section 204.6(e). Additionally, all towns and cities with a population of under 20,000 will be designated as TEAs. Whether or not a particular location qualifies as a TEA may change from time to time depending on unemployment and census data.

The investment must be at risk to qualify for the EB-5 program. As part of the EB-5 I-526 Petition, an immigrant investor must show evidence that he or she has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk.

Each investor who purchases LP Interests with the intention of obtaining permanent or conditional residence from the USCIS is encouraged, along with his or her advisors, to make his or her own independent review of the EB-5 program and the various risk factors relating to the process in obtaining an EB-5 permanent or conditional residence to determine if an investment in the Units is a suitable approach for such investor.

As part of the I-526 Petition, an investor must present to the USCIS clear documentary evidence of the source of funds invested and that the funds belong to the investor. Generally, the investor can satisfy the source of funds requirements by submitting documents showing that he or she has a level of income from legal sources that would yield sufficient funds for the investment. The USCIS generally requires copies of income tax returns to satisfy the source of funds requirement. For investors who do not have such records, there may be other records that can be provided to the USCIS by an investor to demonstrate that the investment funds came from legal sources. All such matters regarding the investor's petition should be discussed with his or her immigration counsel.

The Pilot Program requires an investor to hold a policymaking or management position within the Company. The Company believes that each Limited Partner is provided with the powers and duties under the Limited Partnership Agreement sufficient to meet the USCIS requirement that an investor is actively participating in policymaking or management of a new commercial enterprise. However, either USCIS or the consulate abroad issuing the immigrant visa based on an approved EB-5 Petition may challenge the sufficiency of the Limited Partner's engagement.

As a "pilot," the Regional Center Pilot Program is not yet permanent, and consequently requires periodic renewal by Congress. The Regional Center Pilot Program has been renewed several times by Congress and is currently due to expire on 30 September 2012. Because this program creates U.S. jobs and utilizes a very small quota, there has been no controversy surrounding its renewal. Congress is expected to renew this program prior to its expiration, or make the program permanent by removing its "pilot" designation. However, there is a risk that Congress may not renew, or not renew before the current expiration date.

EXHIBIT 1

Case No. 1:19-cv-02443-RM-STV Document 31-2 filed 10/18/19 USDC Colorado pg 142 of 154
Case 1:19-cv-02443-STV Document 51-2 filed 06/19/20 USDC Colorado Page 142 of 152
of 293

## IV. POWER OF ATTORNEY

The undersigned hereby irrevocably makes, constitutes and appoints Colorado Regional Center Project Solaris, LLLP, and each general partner of the Partnership, with full power of substitution its true and lawful attorney-in-fact in its name to execute and acknowledge (i) the Partnership Agreement in substantially the form enclosed herewith and to attach the limited partner execution page delivered herewith to such Partnership Agreement and thereby cause the undersigned to become a limited partner in the Partnership; (ii) any document required to effect the formation or continuation of the Partnership or which counsel to the Partnership deems necessary or desirable to comply with any state or federal law, and (iii) the Escrow Agreement. The power of attorney hereby granted is irrevocable and coupled with an interest and may be exercised by the attorney-in-fact for the undersigned as well as other limited partners of the Partnership by executing any instrument by use of the single signature of such attorney-in-fact acting for all the limited partners.

## V. MISCELLANEOUS

A. **Indemnification.** The undersigned hereby agrees to indemnify the Partnership and hold the Partnership harmless from and against any and all liability, damages, costs or expenses incurred on account of or arising out of:

    1. Any inaccuracy in the declarations, representations, and warranties hereinabove set forth;

    2. The disposition of any of the Partnership Interests by the undersigned, contrary to the foregoing declarations, representations and warranties; and

    3. Any action, suit or proceeding based upon (i) a claim that the herein declarations, representations or warranties were inaccurate or misleading or otherwise a cause for obtaining damages or redress from the Partnership; or (ii) the disposition of any of the Partnership Interests or any part thereof.

B. **Confidentiality.** The undersigned acknowledges that the information contained in this Subscription Agreement and in the Memorandum, and which the undersigned receives orally or in writing from the Partnership is confidential and non-public and agrees that all such information shall be kept in confidence by the undersigned.

C. **Binding Agreement**. The undersigned agrees that the undersigned may not cancel, terminate or revoke this Subscription Agreement or any agreement of the undersigned made hereunder, and that this Subscription Agreement shall survive the death or disability of the undersigned and shall be binding upon the heirs, successors, assigns, executors, administrators, guardians, conservators or personal representatives of the undersigned.

D. **Defined Terms.** Capitalized terms not defined herein shall have the meaning as in the Partnership Agreement.

E. **Counterparts.** This Subscription Agreement may be executed in any number of counterparts, each of which shall be considered an original but all of which together shall constitute one and the same instrument.

EXHIBIT 1

F.    **Severability.**  Every provision of this Subscription Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of the Subscription Agreement.

G.    **Nonwaiver.**  No provision of this Subscription Agreement shall be deemed waived except if such waiver is contained in a written notice given to the party claiming such waiver has occurred, and no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given.

H.    **Applicable Law.**  This Subscription Agreement shall be interpreted and enforced in accordance with the federal laws of the United States of America and the state laws of the Colorado, without giving effect to principles and provisions relating to choice of law.

I.    **Entirety of Agreement.**  This Subscription Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof.

J.    **Additional Information.**  The undersigned shall supply the Partnership with such additional information and documentation as may be required in order to ensure compliance with applicable law, including, without limitation, the Securities Act and regulations promulgated thereunder.

     **IN WITNESS WHEREOF**, the undersigned has executed this Subscription Agreement on the date set forth on the signature page, and desires to take title in the Partnership Interests (check one):

   _____      a.      Individual (one signature required on the Signature Page);

   _____      b.      Husband and Wife, as community property (one [1] signature required on the Signature Page if interest held in one [1] name, *i.e.*, managing spouse; two [2] signatures required on the signature Page if interest held in both names);

   _____      c.      Joint Tenants with right of survivorship (both parties must sign Signature Page);

   _____      d.      Tenants in Common (both parties must sign Signature Page);

     ***SIGNATURES ON FOLLOWING PAGE***

EXHIBIT 1

If subscriber is an individual or husband and wife:

      Signature:             _____

      Signature of Spouse:     _____

**SUBSCRIPTION ACCEPTED** this _____ day of _____, 2011.

                                    Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership

                                    By:    Colorado Regional Center I, LLC, a Colorado limited liability company, General Partner

                                       By:_____
                                            Name, Manager

EXHIBIT 1

Case 1:19-cv-02443-STV   Document 31-2   Filed 10/18/19   USDC Colorado   Page 145 of 154

# EXHIBIT I
## SOURCES AND USES

**Uses of Funds**

| | | |
|---|---|---|
| Hard Costs | $ | 224,656,377 |
| Soft Costs | $ | 51,474,962 |
| Contingency | $ | 15,479,632 |
| Hard Cost Overruns | $ | 10,077,578 |
| Mezzanine Financing Interest | $ | 38,104,380 |
| CRC Condominium Furnishings | $ | 2,000,000 |
| Acquisition (Land) | $ | 33,902,295 |
| **Total Uses of Funds** | **$** | **375,695,224** |

**Sources of Funds**

| | | |
|---|---|---|
| Owner Equity* | $ | 73,444,133 |
| EB-5 Proceeds / Additional Owner Equity ** | $ | 80,000,000 |
| Presales Closed (Including Retained Deposits) | $ | 135,251,091 |
| Senior Mezzanine | $ | 52,500,000 |
| Junior Mezzanine | $ | 34,500,000 |
| **Total Sources of Funds** | **$** | **375,695,224** |

*Includes approximately $23.5 million in Metropolitan District Bonds, which will be serviced through incremental property tax revenue.*

** *Amounts that cannot be raised through EB-5 investments have been or will be funded with additional Owner Equity.*

EXHIBIT 1

**EXHIBIT J**
**LIMITED LIABILITY LIMITED PARTNERSHIP AGREEMENT**

*[Limited Liability Limited Partnership Agreement on following page]*

EXHIBIT 1

**LIMITED LIABILITY LIMITED PARTNERSHIP AGREEMENT**
**OF**
**COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP**
**A COLORADO LIMITED LIABILITY LIMITED PARTNERSHIP**

This Agreement is made by and among Colorado Regional Center I, LLC, a Colorado Limited Liability Company, (the "General Partner") and each of the persons set forth in Exhibit A attached hereto and designated as Limited Partners (the "Limited Partners"). The Limited Partners and the General Partners are collectively referred to as the "Partners."

**AGREEMENT**

**ARTICLE I**
**FORMATION OF LIMITED PARTNERSHIP**

Section 1.01. Formation. The undersigned hereby form COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP, a Colorado limited liability limited partnership, under the revised Uniform Limited Partnership Act of the State of Colorado, as amended from time to time (the "Act"), to lend funds to Solaris Property Owner, LLC, a Delaware limited liability company ("SPO"), the owner and operator of a residential and commercial real estate project commonly known as Solaris, located in Vail, Colorado.

Section 1.02. Name. The name of the Limited Partnership is "COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP," a Colorado limited liability limited partnership (the "Limited Partnership"). The General Partner may from time to time change the name of the Limited Partnership to adopt such trade or fictitious names as it may determine to be appropriate.

Section 1.03. Principal Office of the Limited Partnership. The principal office of the Limited Partnership shall be at 4643 S. Ulster Street, Suite 950, Denver, Colorado 80237. The Limited Partnership may maintain offices at such other location as may be determined appropriate by the General Partner.

Section 1.04. Name and Place of Residence of Each Partner. The name, address, Capital Contribution, and number of Units of each of the Partners are designated on the attached Exhibit A. The name and address of the General Partner is Colorado Regional Center I, LLC located at 4643 S. Ulster Street, Suite 950, Denver, Colorado 80237.

Section 1.05. Term. The term of the Limited Partnership shall commence upon filing of the Certificate of Limited Partnership in the office of the Colorado Secretary of State and shall continue until the Limited Partnership is dissolved, wound up and terminated in accordance with the provisions of this Agreement and the Act.

Section 1.06. Designated Agents for Service of Process. The Limited Partnership elects and appoints Chester P. Schwartz, 4643 S. Ulster Street, Suite 950, Denver, Colorado 80237, as the designated agent for service of process.

EXHIBIT 1

## ARTICLE II
## DEFINITIONS

The following terms used in the Agreement shall have the meaning specified below:

Section 2.01. "Act" means the Uniform Limited Partnership Act of the State of Colorado, as amended from time to time.

Section 2.02. "Additional General Partner" means a person or entity, if any, that serves as a General Partner in addition to Colorado Regional Center I, LLC.

Section 2.03. "Administrative Expenses" means those expenses incurred by the General Partner in connection with the sale of Interests including specifically and without limitation, certain marketing, travel, legal and accounting fees, referral and related fees, and the legal fees of a Limited Partner incurred in preparation of such Limited Partner's I-526 petition (up to a maximum of $15,000 and provided that the General Partner approves the selection of the legal counsel).

Section 2.04. "Affiliate" means any person who directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control of the General Partner or Limited Partners.

Section 2.05. "Agreement" means this Agreement, as it may be amended from time to time.

Section 2.06. "Assignee" means a person who has acquired all or any portion of a Limited Partner's Interest in the Limited Partnership and has not been admitted as a Limited Partner.

Section 2.07. "Available Cash Flow" means funds provided from operation of the Limited Partnership (including the funds provided from any Capital Event, but specifically excluding any payments received by the Limited Partnership as a result of any prepayment of the SPO Note), without deduction for depreciation, but after deducting funds used to pay all expenses and debts of the Limited Partnership, including administrative operational expenses, management fees, debt payments, capital improvements, and less the amount set aside by the General Partner, in the exercise of its sole discretion, for reserves.

Section 2.08. "Capital Account" means that as defined in **Section 4.04** herein.

Section 2.09. "Capital Contribution" means the total amount of money or property contributed to the Limited Partnership by each Partner (excluding any amounts contributed for Administrative Expenses).

Section 2.10. "Capital Event" The refinance, sale, exchange or other disposition of the Project or any portion thereof, including an involuntary conversion or condemnation of real property or any portion thereof.

Section 2.11. "Code" means the Internal Revenue Code of 1986, as amended from time to time.

EXHIBIT 1

Section 2.12.  "Condominium Unit" means each of the 79 residential condominium units located at the Project.

Section 2.13.  "Deficit Capital Account" means the situation whereby the Limited Partnership has distributed to a Partner distributions in excess of such Partners capital contributions plus allocable share of income less allocable share of loss and any other charges allowable under this Agreement, resulting in such Partner's capital account falling below zero.

Section 2.14.  "General Partner" means Colorado Regional Center I, LLC and/or any other Person admitted as a General Partner pursuant to the Agreement and their successors.

Section 2.15.  "Interest" or "Limited Partnership Interest" or "Partnership Interest" means the ownership interest of a Partner in the Limited Partnership at any particular time, including the right of such Partner to any and all benefits to which such Partner may be entitled as provided in the Agreement and in the Act, together with the obligations of such Partner to comply with all the terms and provisions of the Agreement and the Act.

Section 2.16.  "Limited Partner" means each Limited Partner listed on Exhibit A and any person admitted to the Limited Partnership as a Limited Partner.

Section 2.17.  "Limited Partnership" means COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP.

Section 2.18.  "Limited Partnership Property" means all the real and personal property owned by the Limited Partnership, including specifically and without limitation, the SPO Note and any real or personal property securing the SPO Note which may be or may become owned by the Limited Partnership.

Section 2.19.  "LP Interest" means the Partnership Interest of a Limited Partner.

Section 2.20.  "Net Proceeds from a Capital Event" The net proceeds derived by the Limited Partnership from a capital event after payment or allowance for the expenses incurred in connection with such Capital Event and after payment or allowance for existing indebtedness, the discharge of any other expenses or liabilities of the Limited Partnership and the establishment of appropriate reserves, all as determined by the General Partner, in its sole discretion.

Section 2.21.  "Partners" means collectively the General Partners and the Limited Partners, and a reference to a Partner shall be to any one of the Partners.

Section 2.22.  "Person" means any natural person, partnership, corporation, association or other legal entity.

Section 2.23.  "Positive Capital Account" means that the balance of a Partner's Capital Account is greater than zero.

Section 2.24.  "Profit or Loss" means the income or loss of the Limited Partnership as determined by the method of accounting chosen by the General Partner and permitted by the Code.

EXHIBIT 1

Section 2.25. "Project" means the real property and improvements consisting of 79 residential condominium units and approximately 70,000 square feet of commercial space, all known as "Solaris" located in Vail, Colorado.

Section 2.26. "SPO Note" means the Promissory Note executed by SPO in favor of the Limited Partnership in the form as attached hereto as Exhibit B.

Section 2.27. "Subscription Agreement" means the agreement signed by each Limited Partner in connection with his or her Capital Contribution to the Limited Partnership.

Section 2.28. "Units" or "Partnership Interests" means each Partner's percentage of ownership in the Partnership as set forth adjacent to his or her name in **Exhibit A**.

### ARTICLE III
### PURPOSE, BUSINESS AND POWERS OF THE LIMITED PARTNERSHIP

Section 3.01. Purpose and Business of the Limited Partnership. The business of the Limited Partnership shall be to lend funds to SPO. In addition, the business of the Limited Partnership shall be to undertake all necessary actions in the General Partner's sole discretion to preserve the immigration benefits of the Limited Partners, including without limitation, investing in additional or alternate projects consistent with the requirements of the EB-5 Program, as described in the related Confidential Information Memorandum. The Loan to SPO will be evidenced by the SPO Note and the SPO Note will be secured by one or more deeds of trust (the "Deeds of Trust"). Each Deed of Trust will grant to the Limited Partnership a security interest in one or more Condominium Units, free and clear of all liens and encumbrances except for matters of record approved by the Limited Partnership. The Limited Partnership will further manage all income received from the SPO Note. If at any time the Limited Partnership becomes the owner of a Condominium Unit, then the business of the Limited Partnership will further include the management of the real and personal property then owned by the Limited Partnership.

Section 3.02. Powers. The Limited Partnership is hereby authorized:

        (1)     To acquire, manage and operate Limited Partnership Property and to hold it for economic gain;

        (2)     To mortgage, sell, lease, transfer and exchange or otherwise convey or encumber all or part of the Limited Partnership Property in furtherance of any and all of the objectives of Limited Partnership business; and

        (3)     To enter into, perform and carry out contracts of any kind necessary to, or in connection with or incidental to, the operation of Limited Partnership Property.

### ARTICLE IV
### CAPITAL CONTRIBUTIONS

Section 4.01. Capital Contributions; Administrative Expenses.

EXHIBIT 1

(1)    Each of the Limited Partners' Capital Contributions is set forth on Exhibit A. The Limited Partners shall own collectively 99% of the Limited Partnership and the General Partner shall own 1% of the Limited Partnership.  Each Limited Partner shall own his or her pro rata share of the 99% total Limited Partnership Interests determined by dividing each Limited Partner's Capital Contribution by 99% of the total of all Capital Contributions contributed by all Limited Partners.  For example, by way of illustration, if there are 40 Limited Partners, each of whom has contributed $500,000 in Capital Contributions, each Limited Partner will own a 2.475% interest in the Limited Partnership (40 X $500,000 =$20,000,000;    $20,000,000    X99% =$19,800,000;    $19,800,000/40 =$495,000; $495,000/19,800,000 =2.475%).  The Limited Partners shall have no obligation to make additional Capital Contributions.  In exchange for its Interest in the Limited Partnership, the General Partner has made an initial Capital Contribution of cash and certain soft costs.  The General Partner shall have no obligation to the Limited Partnership or the Partners to make additional Capital Contributions, except for the General Partner's obligation set forth in **Section 6.02**.

Section 4.02.  Return and Withdrawal of Capital.  No Partner shall have the right to demand Limited Partnership Property.  Further, no Partner shall have any right to withdraw or make a demand for the withdrawal of any of such Partner's Capital Contribution (or the capital interest reflected in such Partner's Capital Account) until the full and complete winding up and liquidation of the Limited Partnership.

Section 4.03.  Administrative Expenses.  Each Limited Partner shall pay the sum of $50,000 as an Administrative Expense.  The Administrative Expense shall be in addition to the Capital Contribution and shall not be deemed to be a Capital Contribution.

Section 4.04.  Partner Capital Accounts.  An individual Capital Account shall be maintained for each Partner in accordance with the requirements of the Code.  Except as required by the Code, the Capital Account of each Partner shall consist of his Capital Contribution, as increased by any contribution of capital subsequent to his original contribution, and by such Partner's share of Limited Partnership income and gain allocated after the date hereof to such Partner, and as decreased by the amount of all cash and the fair market value of all property and assets distributed to such Partner, the amount of all losses allocated after the date hereof to such Partner, and any amounts charged under Section 4.05 and/or Section 10.08 to such Partner.

Section 4.05.  Interest on Capital Contributions.  No interest shall be paid to a Partner on Capital Contributions.  Non-cumulative simple interest will be charged by the Limited Partnership to a Partner on the sum of any amounts charged to such Partner's Capital Account from obligations to the Limited Partnership or a General Partner arising under Section 10.08.  The interest charged will be computed on a calendar year compounded basis at a rate equal to the prime rate of interest from time to time announced by Wells Fargo Bank to be its "prime rate", such interest to be collected by reduction of any distributions payable to the Partner immediately following the calculation of the year's interest by the General Partner. To the extent that there are no distributions against which the interest can be applied, then the interest will be charged to the Partner's Capital Account.  This Section 4.05 will survive the termination of a Partner's status as a Partner.

Section 4.06.  Minimum Capital Contribution.  The minimum Capital Contribution by any Limited Partner in the Limited Partnership be $500,000.

EXHIBIT 1

## ARTICLE V
## COMPENSATION FOR SERVICES

Section 5.01.  General Partner's Fees.  The General Partner will not directly charge management fees to the Limited Partnership.  The Limited Partnership will enter into a management contract (the "Management Contract") with Waveland EB-5 Management, LLC, a Colorado limited liability company ("Waveland Management").  Waveland Management is a wholly-owned subsidiary of Waveland Ventures, LLC, the parent company of the General Partner.  Under the terms of the Management Contract, in consideration of the performance by Waveland Management of certain management and servicing duties, Waveland Management will be entitled to receive an annual management fee equal to 2% of the total Capital Contributions to the Limited Partnership (the "Management Fee"), payable quarterly from Available Cash Flow only.  If there is not Available Cash Flow sufficient to pay the Management Fee, then the amount payable shall accrue and bear interest at the rate of 6% per annum and shall be payable from Available Cash Flow. Additionally, the General Partner may pass on actual costs of operations to the Limited Partnership.  However, under no circumstance will such costs be deducted from the Limited Partners' Capital Contributions and will derive entirely from Available Cash Flow.

Section 5.02.  General Partner's Interest.  In consideration of the contribution of cash and other services rendered to the Limited Partnership, the General Partner will receive a 1% Interest in the Limited Partnership.  The General Partner will be entitled to receive from Available Cash Flow certain additional payments as set forth in Section 6.02 below.

## ARTICLE VI
## ALLOCATIONS AND DISTRIBUTIONS

Section 6.01.  Allocation of income, gain, deductions and loss.

Except for any special allocations required or permitted by the United States Tax Code to ensure that all allocations hereunder have substantial economic effect, all items of income, gain, deductions and loss shall be allocated to the Partners in the same manner as their proportionate share of Available Cash Flow and Net Proceeds from a Capital Event as set forth below in **Section 6.02**. Any non cash items of income or expense (such as depreciation or amortization) will be allocated in accordance with each Partner's Interest in the Partnership.

Section 6.02.    Distributions of Available Cash Flow; Usage of Condominium Units.

(a)    General Partner Distribution and Limited Partner Distribution.  If the Limited Partnership incurs expenses that exceed the amount received for Administrative Expenses, and if such excess amounts are paid by the General Partner, then the excess amounts shall be paid by the General Partner.  No such excess amounts, if any, shall be paid from Capital Contributions.  If the Limited Partnership incurs expenses that are less than the amount received for Administrative Expenses, then the General Partner shall be entitled to a distribution of such excess amounts as an organizational fee.  The Limited Partners shall be entitled to receive an annual cash return on their initial Capital Contributions (the "Preferred Return") out of Available Cash Flow to the extent available for distribution at the discretion of the General Partner.  The amount of the Preferred Return is set forth in Exhibit A.  After such time as the Limited Partners receive the Preferred Return, the Limited Partners shall be entitled

EXHIBIT 1

to receive Cash Available for Distribution equal to their total aggregate Capital Contributions. At such time as the Limited Partners have received payments equal to their total Capital Contributions, then all remaining Cash Available for Distribution (including the proceeds, if any, from a Capital Event) shall be distributed 30% to the Limited Partners and 70% to the General Partner.

(b)     Partner Distributions. Any distribution to the Partners will be distributed to each Partner an amount equal to the total amount of any such distribution multiplied by the ratio of each Partner's Interest over the total Limited Partnership Interests in the Limited Partnership held by all Partners. Distributions shall be made semi-annually and may only be made out of the accumulated balance of the operating profits (specifically excluding any prepayments of the SPO Note) of the Limited Partnership.

Section 6.03.   Deficit Capital Accounts at Liquidation. The Limited Partners shall have no liability to the Limited Partnership, to the General Partners, or to the creditors of the Limited Partnership on account of any deficit balance in their Capital Accounts upon liquidation of the Limited Partnership, provided, however, that any Partner for whom any charges have been made to his Capital Account by reason of the obligations described in Section 4.05 and/or Section 10.08 is required to pay to the Limited Partnership the amount of any negative balance in his Capital Account, but such payment shall not exceed the sum of the obligations under Section 4.05 and Section 10.08. This Section 6.03 will survive the termination of a Partner's status as a Partner. A Partner must also pay any attorneys' or accountants' fees actually and reasonably incurred by the Limited Partnership or a General Partner in collecting amounts under this proviso from the Partner.

Section 6.04.   Income Tax Distributions. To the extent that the Limited Partnership is earning income which will result in the Partners being subject to income tax on their distributive share of the Limited Partnership's income, minimum distributions shall be made to the Partners in such amounts and at such times (but in no event later than March 31 each year) as shall be sufficient to enable the Partners to meet income tax liability arising or incurred as a result of their Partnership Interests in the Limited Partnership. For the purposes of such distribution, it shall be assumed that the Partners are taxable at the then highest applicable U.S. individual federal, state and local rates, in Denver, Colorado. Any such distribution shall be made on a nondiscriminatory basis to all Partners pro rata in accordance with their respective Limited Partnership Interests. Such distributions shall be made based on the annual taxable income of the Limited Partnership without regard for the individual income tax liabilities of the individual Partners.

Section 6.05.   Usage of Condominium Units. Beginning on the date of the execution of the SPO Note, each Limited Partner shall be entitled to the use of a Condominium Unit on the terms and conditions set forth in the attached Exhibit C. The parties acknowledge and agree that the specific terms and conditions set forth in Exhibit C may be changed from time to time by the General Partner without a vote of the Limited Partners. The General Partner shall notify the Limited Partners of any changes to the terms and conditions set forth in Exhibit C.

**ARTICLE VII**
**EXPENSES**

Section 7.01.   Limited Partnership Expenses. The Limited Partnership shall pay all costs and expenses of the Limited Partnership which may include, but are not limited to the list below. However,

EXHIBIT 1

Case No. 1:19-cv-02443-RM-STV   Document 221-1   filed 06/19/20   USDC Colorado   pg 1 of 164
Case 1:19-cv-02443-STV   Document 51-2   Filed 10/18/19   USDC Colorado   Page 154 of 164
of 293

under no circumstance will any such cost or expense be deducted from the Limited Partners' Capital Contributions.

        (1)      All costs of personnel employed by the Limited Partnership;

        (2)      All costs of borrowed money including repayment of advances to the Partnership made by a Partner which shall be paid monthly and amortized over five years at an interest rate equal to the prime rate of interest from time to time announced by Wells Fargo Bank to be its "prime rate" plus **5%**, taxes and assessments on Limited Partnership Property;

        (3)      Legal, audit, accounting, brokerage and other fees;

        (4)      Printing and other expenses and taxes incurred in connection with the issuance, distribution, transfer, registration and recording of documents evidencing ownership of an Interest in the Limited Partnership or in connection with the business of the Limited Partnership;

        (5)      Fees and expenses paid to contractors, mortgage bankers, brokers and services, leasing agents, consultants, on-site managers, real estate brokers, insurance brokers and other agents, including Affiliates of any General Partner;

        (6)      Expenses in connection with the acquisition, preparation, operation, improvement, development, disposition, replacement, alteration, repair, remodeling, refurbishment, leasing, and financing and refinancing of Limited Partnership Property.

        (7)      The cost of insurance obtained in connection with the business of the Limited Partnership;

        (8)      Expenses of organizing, revising, amending, converting, modifying or terminating the Limited Partnership;

        (9)      Expenses in connection with distributions made by the Limited Partnership to, and communications and bookkeeping and clerical work necessary in maintaining relations with, Limited Partners;

        (10)      Expenses in connection with preparing and mailing reports required to be furnished to Partners for required tax reporting, or other purposes which the General Partner deems appropriate;

        (11)      Costs incurred in connection with any litigation, including any examination or audits by regulatory agencies;

        (12)      Costs of preparation and dissemination of informational material and documentation relating to potential sale, refinancing or other disposition of Limited Partnership Property;

        (13)      The Management Fee; and

EXHIBIT 1

(14)    Costs of compliance with reporting requirements imposed by USCIS or related governmental entities with respect to compliance with the EB-5 program as it may be amended from time to time.

# ARTICLE VIII
## POWERS, RIGHTS AND OBLIGATIONS OF GENERAL PARTNERS

Section 8.01.    General Authority and Powers of the General Partner. The General Partner shall have the exclusive right and power to manage, operate and control the Limited Partnership and to do all things and make all decisions necessary or appropriate to carry on the business and affairs of the Limited Partnership. In addition to the specific rights and powers herein granted to the General Partners, the General Partner shall possess and enjoy and may exercise all the rights and powers of a general partner as provided in the Act, including the full and exclusive power and authority to act for and to bind the Limited Partnership.  The scope of the General Partner's power and authority shall encompass all matters connected with or incident to the business of the Limited Partnership, including but not limited to the power and authority:

(1)    To spend and or invest the capital and revenue of the Limited Partnership to maximize return to the Limited Partnership, including the acquisition of the Limited Partnership Property;

(2)    To manage, sell, develop, purchase, mortgage, improve, operate and dispose of Limited Partnership Property, including to act on behalf of the Limited Partnership with respect to any Limited Partnership or joint venture in which the Limited Partnership participates;

(3)    To employ persons, firms and/or corporations for the sale, operation, management, syndication and development of Limited Partnership Property, including but not limited to sales agents, broker-dealers, attorneys and accountants;

(4)    To employ agents, attorneys, accountants, engineers and other consultants or contractors who may be Affiliates of a General Partner; however, any employment of such persons must be on terms not less favorable to the Limited Partnership than those offered by unaffiliated persons for comparable services in the same area;

(5)    To acquire and or sell personal or real property owned by the Limited Partnership or in which the Limited Partnership has an interest, lease real property, borrow on a secured or unsecured basis in the name of the Limited Partnership, grant Partnership property as security for a loan to the Partnership, hire and fire employees, to sign any documents required on behalf of the Limited Partnership, without the signatures or consents of the Limited Partners, required to carry out the duties of the General Partner, and all other acts necessary, appropriate, or helpful for the operation of the Limited Partnership business;

(6)    To appoint representatives to manage the day-to-day operations of the Limited Partnership, including specifically, the appointment of Waveland EB-5 Management, LLC;

(7)    To execute, acknowledge and deliver any and all instruments to effectuate any of the foregoing powers and any other powers granted to the General Partner under the laws of the State of Colorado or other provisions of this Agreement;

EXHIBIT 1

(8)     To enter into and to execute agreements for employment or services, as well as any other agreements and all other instruments the General Partner deems necessary or appropriate to own, sell, improve, operate and dispose of Limited Partnership Property or to effectively and properly perform its duties or exercise its powers hereunder;

(9)     To enter into such agreements and contracts with parties and to give such receipts, releases and discharges, with respect to the business of the Limited Partnership, which the General Partner, in its sole discretion, deems advisable or appropriate;

(10)     To purchase, at the expense of the Limited Partnership, such liability and other insurance as the General Partner, in its sole discretion, deems advisable to protect the Limited Partnership's assets and business; however, the General Partner shall not be liable to the Limited Partnership or the other Partners for failure to purchase any insurance, including earthquake insurance, unless such act or omission constitutes gross negligence or willful misconduct by a General Partner within the meaning of Section 8.04;

(11)     To sue and be sued, complain, defend, settle, and/or compromise, with respect to any claim in favor of or against the Limited Partnership, in the name and on behalf of the Limited Partnership; and

(12)     To grant Limited Partnership real or personal property as security for a loan to the Limited Partnership, and sign all documents required to grant such security interests in Limited Partnership Property, without the signatures or consents of the Limited Partners.

Section 8.02.   Right of Public to Rely on Authority of General Partner.   No person, firm, corporation, or governmental authority dealing with the Limited Partnership or any Limited Partnership or joint venture for which the Limited Partnership is a general partner or otherwise authorized to act, shall be required to inquire into the authority of the General Partner to take any action, make any decision, or sign and deliver any document, instrument or deed. The General Partner does not require an authorizing resolution from the Partners in order to grant Limited Partnership Property as security for an obligation of the Limited Partnership.

Section 8.03.   Time Devoted to Limited Partnership; Other Ventures. The General Partner shall devote so much of their time to the business of the Limited Partnership as in its judgment the conduct of the Limited Partnership's business reasonably requires.   The General Partner may engage in business ventures and activities of any nature and description independently or with others, whether or not in competition with the business of the Limited Partnership, and neither the Limited Partnership nor any of the other Partners shall have any rights in and to such independent ventures and activities or the income or profits derived there from by reason of the acquisition of Interests in the Limited Partnership.

Section 8.04.   Liability of General Partners to Limited Partners and Limited Partnership.   In carrying out their duties and exercising the powers hereunder, the General Partners shall exercise reasonable skill, care and business judgment.   A General Partner shall not be liable to the Limited Partnership or the Limited Partners for any act or omission performed or omitted by them in good faith pursuant to the authority granted to them by this Agreement unless such act or omission constitutes gross negligence or willful misconduct by that General Partner.   In exercising their powers hereunder, the General Partner recognizes its fiduciary responsibility to the Limited Partnership as set forth in **Section**

EXHIBIT 1

**8.06** hereof. The General Partner shall be entitled to rely on the advice of counsel and public accountants experienced in any matter at issue, and shall not be liable, responsible or accountable in damages or otherwise to the Limited Partnership, or any Limited Partner for any action taken or failure to act on behalf of the Limited Partnership in good faith and in reliance on any such advice.

Section 8.05.  Indemnification.  The Limited Partnership shall indemnify and hold harmless the General Partner from any loss or damage, including attorneys' fees actually and reasonably incurred by them, by reason of any act performed by them on behalf of the Limited Partnership or in furtherance of the interests of the Limited Partnership; provided, however, that such indemnification or agreement to hold harmless shall be recoverable only out of the assets of the Limited Partnership and not from the Limited Partners.  The foregoing indemnity shall extend only to acts or omissions performed or omitted by a General Partner in good faith and in the belief that the acts or omissions were in the Limited Partnership's interests, or not opposed to the best interests of the Limited Partnership and which are not a result of negligence or willful or wanton misconduct on the part of that General Partner.

Section 8.06.  Fiduciary Responsibility.  The General Partners shall have a fiduciary responsibility for the safekeeping and use of all funds and assets of the Limited Partnership.

## ARTICLE IX
## STATUS OF LIMITED PARTNERS

Section 9.01.  Participation in Management.  Except as specifically provided herein, no single Limited Partner shall control the Limited Partnership's business or management or have any right or authority to act for or on the behalf of, or otherwise bind, the Limited Partnership (except a Limited Partner who may also be a General Partner and then only in its capacity as General Partner within the scope of its authority hereunder). Notwithstanding the above, the Limited Partners shall form an advisory committee to consult and advise the General Partner with respect to the partnership business as may be permitted under the laws of the state of Colorado.

Section 9.02.  Limitation of Liability.  No Limited Partner shall have any personal liability whatever, whether to the Limited Partnership, to any Partners or to the creditors of the Limited Partnership, for the debts or obligations of the Limited Partnership or any of its losses beyond his Capital Contribution set forth opposite his name in Exhibit A attached hereto; provided, however, that any Partner for whom any charges have been made to his Capital Account by reason of the obligation described in Section 6.04, Section 4.05, and/or Section 10.08 is required to reimburse the Limited Partnership for the amount of any negative balance in his Capital Account, but such reimbursement shall not exceed the sum of the Partner's obligations under Section 4.05 and Section 10.08.  This Section 9.02 will survive the termination of a Partner's status as a Partner.  A Partner must also pay any attorneys' or accountants' fees actually and reasonably incurred by the Limited Partnership or a General Partner in collecting amounts under this proviso from the Partner.

Section 9.03.  Death or Incapacity of Limited Partner.  The death, legal incapacity, dissolution, termination, merger, consolidation or bankruptcy of a Limited Partner shall not cause dissolution of the Limited Partnership, but the rights of such Limited Partner to share in the profits and losses of the Limited Partnership, to receive distributions from the Limited Partnership and to assign an Interest in the Limited Partnership shall, on the happening of such an event, devolve upon such Limited Partner's executor,

EXHIBIT 1

administrator, guardian, conservator, or other legal representative or successor, as the case may be, subject to the terms and conditions of this Agreement, and the Limited Partnership shall continue as a Limited Partnership.  However, in any such event such legal representative or successor, or any assignee of such legal representative or successor shall be admitted to the Limited Partnership as a Limited Partner only in accordance with and pursuant to all of the terms and conditions of **Article XI** hereof.

Section 9.04.  Recourse of Limited Partners.  Each Limited Partner shall look solely to the Limited Partnership for all distributions with respect to the Limited Partnership and his Capital Contribution thereto and share of profits and losses thereof and shall have no recourse therefore, upon dissolution or otherwise, against the General Partners or any other Limited Partner.

Section 9.05.  No Right to Property.  No Limited Partner shall have any right to demand or receive any distribution from the Limited Partnership in any form other than cash, upon dissolution or otherwise.

Section 9.06.  Voting Rights of Limited Partners.  Subject to the provisions of **Article VIII**, the Limited Partners owning Interests constituting in the aggregate at least two-thirds of the Interests of all Limited Partners unless stated otherwise may, without the concurrence of the General Partners and in accordance with **Section 12.02** hereof, remove the General Partner for cause and admit a substitute General Partner.

Section 9.07.  Meetings of Limited Partners.

(1)     Meetings of the Limited Partners to vote upon any matters on which the approval or consent of the Limited Partners is required or on which the Limited Partners are authorized to take action under this Agreement may be called at any time by the General Partner and shall be called by the General Partner within ten (10) days after receipt of a written request for such a meeting signed by one or more Limited Partners owning Interests constituting in the aggregate more than 51% of the Interests of all Limited Partners.  Any such request shall state the purpose of the proposed meeting and the matters proposed to be acted upon at such meeting, including a verbatim statement of the wording of any proposed amendment to this Agreement.  Meetings shall be held at the principal office of the Limited Partnership or at such place as may be designated by the General Partners or, if the meeting is called upon the written request of Limited Partners, as designated by such Limited Partners.

(2)     Notification of any meeting to be held pursuant to this **Section 9.07** shall be given not less than ten (10) days nor more than sixty (60) days before the date of the meeting, to each Limited Partner at his record address, or at such other address which he may have furnished in writing to the General Partner.  Such notice shall be in writing; shall state the place, date and hour of the meeting; and shall indicate that the notice is being issued at or by the direction of the Partner or Partners calling the meeting.  The notice shall state the purpose or purposes of the meeting and the matters proposed to be acted upon at such meeting, including a verbatim statement of the wording of any proposed amendment to this Agreement.  If a meeting is adjourned to another time and place, and if an announcement of the adjournment of time or place is made at the meeting, it shall not be necessary to give notice of the adjourned meeting.  No notice of the time, place or purpose of any meeting of Limited Partners need be given to any Limited Partner who attends in person or is represented by proxy, except for a Limited Partner attending a meeting for the express purpose of objecting at the beginning of the meeting to the transaction or any business on the ground that the meeting is not lawfully called or convened, or to any

EXHIBIT 1

Limited Partner entitled to such notice who, in a writing executed and filed with the records of the meeting, either before or after the time thereof, waives such notice.

(3)     For the purpose of determining the Limited Partners entitled to notice of, or to vote at, any meeting or any adjournment thereof, or to vote by written consent without a meeting, the General Partners or the Limited Partners requesting such meeting or vote may fix, in advance, a date as the record date for any such determination of Limited Partners.  Such date shall not be more than sixty (60) days nor less than ten (10) days before any such meeting or submission of a matter to the Limited Partners, the date on which notice of the meeting or submission of the matter to the Limited Partners for a vote by written consent is mailed shall be the record date for such determination of Limited Partners.

(4)     Each Limited Partner may authorize any person or persons to act for him by proxy with respect to any matter in which a Limited Partner is entitled to participate, whether by waiving notice of any meeting, or voting or participating at a meeting.  Each proxy must be signed by the Limited Partner.  No proxy shall be valid after the expiration of twelve (12) months from the date thereof unless otherwise provided in the proxy.  Every proxy shall be revocable by the Limited Partner executing it.

(5)     Any matter for which the approval or consent of the Limited Partners is required or for which the Limited Partners are authorized to take action under this Agreement or under applicable law may be approved or action may be taken by the Limited Partners without a meeting and shall be as valid and effective as action taken by the Limited Partners at a meeting assembled, if written consents to such action by the Limited Partners are signed by the Limited Partners owning Interests constituting in the aggregate the Interests required to approve or otherwise authorize such action, and such written consents are delivered to the General Partners.

(6)     Personal presence of the Limited Partners shall not be required at any meeting, provided an effective written consent to or rejection of the action proposed to be taken at such meeting is submitted to the General Partner.  Attendance by a Limited Partner and voting in person at any meeting shall revoke any written consents or rejections of such Limited Partner submitted with respect to action proposed to be taken at such meeting.

(7)     Failure to vote either in person, by proxy or by written consent at a duly called meeting upon receipt of notice as provided for in this **Article IX** on matters for which approval of the Limited Partners are required by this Agreement shall be counted as an affirmative vote.

## ARTICLE X
## BOOKS AND RECORDS, ACCOUNTING, REPORTS AND
## STATEMENTS AND TAX MATTERS

Section 10.01.  Books and Records.  The General Partner shall, at the expense of the Limited Partnership, keep and maintain, or cause to be kept and maintained, the books and records of the Limited Partnership using the method of accounting chosen by the General Partner.  All books and records of the Limited Partnership shall be kept at the principal office of the Limited Partnership.

Section 10.02.  Annual Accounting Period.  All books and records of the Limited Partnership shall be kept on the basis of an annual accounting period ending December 31 of each year, except for the final accounting period which shall end on the date of termination of the Limited Partnership.  All

EXHIBIT 1

references herein to the "fiscal year of the Limited Partnership" are to the annual accounting period described in the preceding sentence, whether the same shall consist of twelve months or less.

Section 10.03.  General Partner's Reports to Limited Partners.  The General Partner shall send at Limited Partnership expense to each Limited Partner the following:

(1)      After the end of each fiscal year of the Limited Partnership, such information as shall be necessary for the preparation by such Limited Partner of his federal income tax return which shall include a computation of the distributions of such Limited Partner and the allocation to such Limited Partner of profits or losses, as the case may be; and

(2)      A reasonable time after the end of each fiscal year of the Limited Partnership, an annual report, which shall include an income statement for and balance sheet of the Limited Partnership as of the fiscal year end.

Section 10.04.   Right to Examine Records.  Limited Partners shall be entitled, upon written request directed to the General Partner, to (a) review the records of the Limited Partnership at all reasonable times and at the location where such records are kept by the Limited Partnership and (b) obtain a list of the names and addresses of the Limited Partners.

Section 10.05.  Tax Matters Partner.  The tax matters partner of the Limited Partnership shall be the General Partner.

Section 10.06.  Tax Returns.  The General Partner shall, at Limited Partnership expense, from Available Cash Flow, cause the Limited Partnership to prepare and file a United States Limited Partnership Return of Income and all other tax returns required to be filed by the Limited Partnership for each fiscal year of the Limited Partnership.

Section 10.07.  Tax Elections and Adjustments.  The General Partner is authorized to cause the Limited Partnership to make, forego or revoke such elections or adjustments for federal income tax purposes as it deems necessary or advisable in its sole discretion, provided such elections or adjustments are consistent with federal income tax rules and principles, including but not limited to, in the event of a transfer of all or part of the Limited Partnership Interest of any Partner, an election pursuant to Section 754 of the Code to adjust the basis of the assets of the Limited Partnership or any similar provision enacted in lieu thereof. The Partners will, upon request, supply any information necessary to properly give effect to any such election or adjustment.

Section 10.08.  Federal Income Tax Withholding. In the event any of the Partners are subject to Federal Income Tax withholding, the General Partner is authorized to withhold any sums required by the Internal Revenue Code even if such withholding conflicts with any of the terms and conditions of this Agreement or otherwise affects distributions, allocations or payments to the Partners.  In the event that the General Partner learns of a withholding obligation subsequent to the distribution to which the withholding obligation relates, the General Partner will issue an invoice to the Partner.  If the invoice is not paid within sixty (60) days, the General Partner will charge the amount against the Partner's Capital Account. This Section 10.08 will survive the termination of a Partner's status as a Partner.

EXHIBIT 1

# ARTICLE XI
## TRANSFERS OF LIMITED PARTNERSHIP INTERESTS;
## WITHDRAWAL AND ADMISSION OF LIMITED PARTNERS

Section 11.01.  General Prohibition.  No Limited Partner may voluntarily, or involuntarily, directly or indirectly, sell, transfer, assign, pledge or otherwise dispose of, or mortgage, pledge, hypothecate or otherwise encumber, or permit or suffer any encumbrance of, all or any part of his Interest in the Limited Partnership, except as provided in this **Article XI**.  Any other purported sale, transfer, assignment, pledge or encumbrance shall be null and void and of no force or effect whatsoever.

Section 11.02.  No withdrawal of Limited Partner.  No Limited Partner shall have the right to withdraw from the Limited Partnership except as otherwise provided in this Agreement.

Section 11.03.  Transfers by Limited Partners.

(1)     Subject to any restrictions on transferability required by law or contained elsewhere in this Agreement, a Limited Partner may transfer his entire Interest in the Limited Partnership upon satisfaction of the following conditions:

(a)     The transfer shall (A) be by bequest or by operation of the laws of intestate succession, or (B) be approved in writing by the General Partner, which approval shall be withheld only if, in the reasonable judgment of the General Partner, the proposed transfer does not comply with the requirements of this **Article XI**, would jeopardize the status of the Limited Partnership as a Limited Partnership for federal income tax purposes, or would violate, or cause the Limited Partnership to violate, any applicable law or governmental rule or regulation, including without limitation, any applicable federal or state securities law and federal immigration laws pertaining to EB-5 classification;

(b)     The transferor and transferee shall have executed and acknowledged such instruments as the General Partner may deem necessary or desirable to effect such transfer;

(c)     The transferor and transferee shall have provided, if requested by any General Partner, an opinion of counsel indicating that, in the opinion of said counsel, such transfer would not jeopardize the status of the Limited Partnership as a Limited Partnership for federal income tax purposes, and would not violate, nor cause the Limited Partnership to violate, any applicable law or governmental rule or regulation, including without limitation, any applicable federal or state securities law and federal immigration laws pertaining to EB-5 classification; and

(d)     The transferor has made all Capital Contributions to the Limited Partnership in accordance with **Article IV** hereof and has no further obligation to the Limited Partnership beyond his Capital Contribution as described in Section 9.02.

(2)     At the time of a transfer of any Limited Partner's Interest, whether or not such transfer is made in accordance with this **Section 11.03**, all the rights possessed as a Limited Partner in connection with the transferred Interest, which rights otherwise would be held either by the transferor or transferee, shall terminate against the Limited Partnership unless the transferee is admitted to the Limited Partnership as a Limited Partner pursuant to the provisions of **Section 11.04** hereof; provided, however,

EXHIBIT 1

that if the transfer is made in accordance with this **Section 11.03**, such transferee shall be entitled to receive distributions to which the transferor would otherwise be entitled as of the effective date of such transfer, which date shall be specified by the General Partner and shall be no later than the last day of the calendar month following the first calendar month during which the General Partner has received notice of the transfer and all conditions precedent to such transfer provided for in this Agreement have been satisfied. The Limited Partnership and the General Partner shall be entitled to treat the transferor as the recognized owner of such Interests until such effective date and shall incur no liability for distributions made in good faith to the transferor prior to the effective date.

(3)     In the event a Limited Partner transfers all of his Interest in the Limited Partnership, the transferor will cease to be a Limited Partner.  The transferring Limited Partner acknowledges that such a transfer may make him or her ineligible for any benefit conferred under the Immigration and Nationality Act to EB-5 investors.  The transferring Limited Partner is hereby advised to seek independent immigration counsel prior to effecting a transfer.

(4)     If a General Partner purchases the Interest of a Limited Partner, such Interest shall be treated as a Limited Partnership Interest with respect to all allocations and distributions of the Limited Partnership.

(5)     A transfer by a Limited Partner, including transfers of all or less than all rights hereunder, shall not relieve the transferor of obligations under this Agreement.

(6)     Each of the Limited Partners, by executing this Agreement, hereby covenants and agrees that he will not, in any event, sell or distribute his Interest in the Limited Partnership or any portion thereof unless, in the opinion of counsel to the Limited Partner (which counsel and opinion shall be satisfactory to counsel for the General Partner) such Interest in the Limited Partnership may be legally sold or distributed in compliance with applicable federal and state securities laws.

(7)     Notwithstanding any other provision of this Agreement, a Limited Partner may not transfer his Interest in any case if such a transfer, when aggregated with all other transfers within a twelve (12) month period, would cause the termination of the Limited Partnership as a Limited Partnership for federal income tax purposes pursuant to Section 708 of the Code, unless such transfer shall be expressly approved by the General Partner.

Section 11.04.  Admission of Transferees as Limited Partners.

(1)     No transferee of a Limited Partner shall be admitted as a Limited Partner unless all of the following conditions have been satisfied:

(a)     The transfer complies with **Section 11.03** and the transferor Limited Partner gives the transferee the right to become a Limited Partner;

(b)     The prospective transferee has executed an instrument, in form and substance satisfactory to the General Partner, accepting and agreeing to be bound by all the terms and conditions of this Agreement, including the power of attorney set forth in **Article XIV** hereof, and has paid all expenses of the Limited Partnership in effecting the transfer;

EXHIBIT 1

(c)      All requirements of the Act regarding the admission of a transferee limited partner have been complied with by the transferee, the transferring Limited Partner, and the Limited Partnership;

(d)      Such transfer is effected in compliance with all applicable state and federal securities laws; and

(e)      The transferee executes all documents reasonably required by the General Partner.

(2)      In the event of a transfer complying with all the requirements of **Section 11.03** hereof and the transferee being admitted as a Limited Partner pursuant to this **Section 11.04**, the General Partner, for himself as a General Partner and for each Limited Partner pursuant to the Power of Attorney granted by each Limited Partner, shall execute and file an amendment to this Agreement.  Unless named in this Agreement, as amended from time to time, no person shall be considered a Partner; and the Limited Partnership, each Partner, and any other person having business with the Limited Partnership need deal only with Partners so named and shall not be required to deal with any other person by reason of a transfer by, or by reason of the death of, a Partner, except as otherwise expressly provided herein.

## ARTICLE XII
## TRANSFERS OF GENERAL PARTNERSHIP INTERESTS;
## WITHDRAWAL AND ADMISSION OF GENERAL PARTNERS

Section 12.01.  Withdrawal of General Partner.  The General Partner may withdraw from the Limited Partnership by giving the Limited Partners written notice of withdrawal at least sixty (60) days prior to the effective date of the withdrawal.  A General Partner who withdraws from the Limited Partnership may sell its Interest only in accordance with the procedures and limitations of **Section 12.03** hereof.  In the event there is no such sale, or until such time as there is such a sale, a General Partner who has withdrawn shall have the same rights and be subject to the same limitations as a General Partner that has been removed pursuant to the provisions of **Section 12.03** hereof, and the interest of the withdrawn General Partner may be acquired by the other General Partners or by the Limited Partners in accordance with the procedures set forth in **Section 12.03** hereof.

Section 12.02.  Removal, Bankruptcy, Dissolution, Death or Incompetency of General Partner.  A General Partner shall cease to be a General Partner of the Limited Partnership upon the removal, bankruptcy, dissolution, death or incompetency of the General Partner and any General Partner may be removed by the vote of the Limited Partners, under **Section 9.06** above, only for cause.  For purposes of this **Section 12.02**, the term "cause" shall mean acts of the General Partner which constitute larceny, fraud, or a crime involving moral turpitude.

Section 12.03.  Transfer by General Partner; Admission of Additional or Successor General Partners.  A General Partner may transfer his Interest, or any part thereof, and an additional or successor General Partner, as the case may be, shall be admitted to the Limited Partnership as follows:

(1)      If a General Partner desires to sell, transfer or assign its Interest in the Limited Partnership to another then existing General Partner, such General Partner must obtain the consent of all of the other General Partners, if any, before effecting such sale or transfer.  If the Partner desiring to sell,

EXHIBIT 1

Case No. 1:19-cv-02443-RM-STV   Document 51-2   filed 06/18/20   USDC Colorado   pg 164
of 293
Case 1:19-cv-02443-STV   Document 31-1   Filed 10/18/19   USDC Colorado   Page 164 of 164

transfer or assign its interest is the General Partner, then a majority of the other General Partners, if there are three or more General Partners, and, if not, then two-thirds of the Limited Partners, must agree as to who is to become the new General Partner before the proposed sale, transfer or assignment can be effected.

(2)     Except as provided in **Section 12.03(3)**, if a General Partner desires to sell, transfer or assign its Interest in the Limited Partnership to a person or entity who is not then a General Partner, such transfer shall be permitted if, and only if, the proposed transferee is approved as a successor General Partner as follows:

(a)     The admission of the transferee as a successor General Partner shall have been consented to by the other General Partners, and if none, by a two-thirds vote of the Limited Partners;

(b)     If the proposed transferee is a non-natural person, it shall have provided the Limited Partnership evidence satisfactory to counsel for the Limited Partnership of its authority to become a General Partner;

(c)     In the event that one or more General Partners shall be so designated and approved, this Agreement shall be appropriately amended to provide for the participation of such additional General Partners.

Notwithstanding the above, the General Partner shall have the absolute right to assign to any third party all or any portion of its right to receive cash flow distributions from the Limited Partnership provided that the General Partner remains as a General Partner.

(3)     Upon action taken by the Limited Partners to remove a General Partner in accordance with **Section 9.06** and subject to **Section 12.02**, Limited Partners owning Interests constituting in the aggregate two-thirds of the Interests of all Limited Partners may, without the concurrence of the General Partners, admit to the Limited Partnership one or more additional General Partners to replace the General Partner(s) to be removed.  In the event that one or more additional General Partners shall be so admitted, this Agreement shall be appropriately amended to provide for the participation of such additional General Partners.

(4)     Notwithstanding any other provision of this Agreement, the General Partners may not transfer any Interest in any case if such transfer, when aggregated with all other transfers within a twelve (12) month period, would cause the termination of the Limited Partnership as a Limited Partnership for federal income tax purposes pursuant to Section 708 of the Code unless such transfer shall be approved by Limited Partners owning Interest constituting in the aggregate a majority of the Interests of all Limited Partners in the Limited Partnership.

Section 12.04.  Continuing Liability.  In the event a General Partner withdraws from the Limited Partnership or sells, transfers or assigns its entire Interest pursuant to the provisions of this Agreement, such General Partner shall be, and shall remain, liable for all obligations and liabilities incurred by the General Partner prior to the effective date of such occurrence and shall be free of any obligation or liability incurred on account of the activities of the Limited Partnership from and after such effective date.

EXHIBIT 1

Section 12.05.  Additional Conditions to Admission of General Partners.  Notwithstanding any other provision of this Agreement, no additional or successor General Partner may be admitted to the Limited Partnership and no right of the Limited Partners to consent to or approve such admission shall have any effect whatsoever or be exercisable until and unless prior to such exercise the Limited Partnership shall have received an opinion of counsel satisfactory to the Limited Partners (as hereinafter provided) to the effect that the giving of consent of the Limited Partners to such admission will not adversely affect the classification of the Limited Partnership as a Limited Partnership for federal income tax purposes.  For purposes of this **Section 12.05**, an opinion of counsel will be deemed satisfactory to the Limited Partners if approved in writing by Limited Partners owning Interests constituting in the aggregate a majority of the Interests of all Limited Partners.

Section 12.06.  Purchase of Interest(s) of General Partners.  Upon the removal, bankruptcy, dissolution, death or incompetency of a General Partner, the Limited Partnership Interest(s) of the General Partner(s) (hereinafter, for purposes of **Sections 12.02 and 12.06**, referred to as the "Terminated General Partner(s)") shall be purchased by the Limited Partnership for a purchase price determined in accordance with **Section 12.07** hereof.  The purchase price of such Interest(s) shall be paid by the Limited Partnership to the Terminated General Partner(s) or his/their representative either, at the option of the Limited Partnership, in cash or by a promissory note of the Limited Partnership payable to such Terminated General Partner(s) or his representative in a face amount equal to said purchase price and containing provisions as would be usual and customary in a commercial promissory note, including provisions for interest at a rate equal to the prime rate of interest from time to time announced by Wells Fargo Bank to be its "prime rate", such interest to be payable at the time of each installment of principal, which shall be payable in five (5) annual installments or as the Terminated General Partner(s) or his representative and the Limited Partnership may otherwise agree.

Section 12.07.  Purchase Price of a Terminated General Partner(s) Interest.  The fair market value of the Terminated General Partner(s)' Interest(s), for any reason other than for removal for cause, to be purchased by the Limited Partnership in accordance with **Section 12.06** above shall be determined by agreement between the Terminated General Partner(s) or his representative and the Limited Partnership. If the Terminated General Partner(s) or his representative and the Limited Partnership cannot agree upon the fair market value of such Limited Partnership Interest(s) within 90 days after the date of the Terminated General Partner(s) removal, bankruptcy, dissolution, death or incompetency, then the purchase price shall be the General Partner's percentage interest of the appraised value of the Limited Partnership's assets and business, valued as a going concern without a minority discount determined as soon as possible after the end of the 90-day period above. In the event of removal for cause the purchase price of the terminated General Partner(s) interest shall be based on the formula set forth in this paragraph except that the value of any distributions to Limited Partners paid to the General Partner shall be reduced to zero.

### ARTICLE XIII
### DISSOLUTION, WINDING UP AND TERMINATION

Section 13.01.  Events Causing Dissolution.  The Limited Partnership shall be dissolved and its affairs shall be wound up upon the happening of the first to occur of any of the following events:

(1)  Expiration of the term of the Limited Partnership stated in **Section 1.05** hereof;

EXHIBIT 1

(2)        Entry of a decree of judicial dissolution pursuant to the Act;

(3)        The sale or other disposition of all or substantially all of the assets of the Limited Partnership;

(4)        The removal, bankruptcy, dissolution, death or incompetency of the General Partner(s), unless:

(a)        At the time of the occurrence of any of such events there is at least one other additional or successor General Partner, in which case the business of the Limited Partnership shall be carried on by the remaining General Partner(s); or

(b)        Within 90 days of the occurrence of any such event, all Partners agree in writing to continue the business of the Limited Partnership and to the appointment of one or more General Partner(s) who shall succeed to all of the management rights and responsibilities of the General Partner(s) hereunder.

Section 13.02.   Bankruptcy of General Partner(s).  For the purposes of this Agreement, the "bankruptcy" of a General Partner shall mean any of the following:

(1)        The General Partner makes an assignment for the benefit of creditors;

(2)        The General Partner files a voluntary petition in bankruptcy;

(3)        The General Partner is adjudicated as bankrupt or insolvent;

(4)        The General Partner files a petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation;

(5)        The General Partner files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Partner in any proceedings of the nature described in (4) above;

(6)        The General Partner seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of such Partner or of all or any substantial part of such Partner's properties;

(7)        The expiration of 90 days after the commencement of any proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, provided the proceeding has not been dismissed within such 90 day period; or

(8)        The expiration of 60 days after the appointment without such General Partner's consent or acquiescence of a trustee, receiver, or liquidator of the General Partner or all or any substantial part of such General Partner's properties, provided the appointment is not vacated or stayed within such

EXHIBIT 1

60 day period, or if stayed within such 60 day period, then the expiration of sixty (60) days after the expiration of any such stay, provided the appointment is not vacated within such 60 day period.

Section 13.03.  Winding Up.  Upon dissolution of the Limited Partnership for any reason, he General Partner, or any other party (the "Liquidator") designated by vote or written consent of Limited Partners owning Interests constituting in the aggregate a majority of the Interests of all Limited Partners, if required, shall commence to wind up the affairs of the Limited Partnership and to liquidate its assets. The Partners shall continue to share income, gains, expenses, losses and all other items during the period of liquidation in the same proportion as before the dissolution. The Liquidator shall have the full right and unlimited discretion to determine the time, manner and terms of any sale or sales of Limited Partnership Property pursuant to such liquidation.  Pending such sales, the Liquidator or such other party shall have the right to continue to operate and otherwise deal with the assets of the Limited Partnership.  A reasonable time shall be allowed for the orderly winding up of the business of the Limited Partnership and the liquidation of its assets and the discharge of its liabilities to creditors so as to enable the Liquidator to minimize the normal losses attendant upon a liquidation, having due regard to the activity and condition of the relevant markets for the Limited Partnership Property and general financial and economic conditions.  Any Partner may be a purchaser of the Property of the Limited Partnership upon liquidation, including, without limitation, any liquidation conducted pursuant to a judicial dissolution or otherwise under judicial supervision; provided, however, that the purchase price and terms of sale are fair and reasonable to the Limited Partnership.

Section 13.04.  Distributions.  The proceeds of liquidation and any other funds of the Limited Partnership shall be distributed in the order of priority set forth in **Article VI** above.

Section 13.05.  Certificate of Cancellation; Report; Termination.  Upon the dissolution and commencement of winding up of the Limited Partnership, the General Partner shall execute and file a certificate of cancellation of the Limited Partnership. Within a reasonable time following the completion of the liquidation of the Limited Partnership's assets, the General Partner or such other party shall prepare and furnish to each Partner, at the expense of the Limited Partnership, a statement that sets forth the assets and liabilities of the Limited Partnership as of the date of complete liquidation and the amount of each Partner's distribution pursuant to Article VI hereof.  Upon completion of the liquidation and distribution of all Limited Partnership funds, the Limited Partnership shall terminate and the General Partner shall have the authority to execute and file all documents required to effectuate the termination of the Limited Partnership.

Section 13.06.  Rights of Limited Partners to Return of Capital Contribution.  Beginning on a date three years following the date of the first Capital Contribution to the Limited Partnership by a Limited Partner, the General Partner shall engage one or more independent third parties who are familiar with the Vail, Colorado condominium market to prepare a good faith estimate of the Fair Market Value (as hereinafter defined) of the Limited Partnership Property.  The Limited Partnership shall provide notice (the "Option Notice") to the Limited Partners of the estimated Fair Market Value.  For purposes of this Section, "Fair Market Value" shall be deemed to mean the total liquidation value (as determined pursuant to a good faith market analysis conducted by qualified third-parties engaged by the General Partner) of all of the Limited Partnership Property after deduction of all usual and customary selling expenses, pro rations, and other similar matters. Each Limited Partner who, at the time of the receipt of the Option Notice has held his or her LP Interest for at least three years, shall be entitled to give notice to the General Partner within 45 days following delivery of the Option Notice of his or her election to sell to the Limited Partnership his or her LP Interest (the "Acceptance Notice").  Failure to deliver the Acceptance Notice within such 45-day period shall be deemed conclusive evidence of the Limited Partner's rejection of the offer to purchase. Except as specifically set forth below, receipt of the Acceptance Notice shall be deemed

EXHIBIT 1

to be conclusive evidence of the Limited Partner's election to sell his or her LP Interest at the Purchase Price (as defined below). The price for such purchase shall be equal to the Limited Partner's pro rata share (as determined from the Capital Accounts) of whatever price the Partnership is able to realize using its reasonable business efforts to liquidate the Limited Partnership Property pursuant to the Option Notice (the "Purchase Price"). The Purchase Price may be greater than or less than the Fair Market Value as set forth in the Option Notice and shall be solely dependent on the price that the Partnership is able to realize from the liquidation of the Limited Partnership Property. Notwithstanding the above, if the actual Purchase Price is less than 70% of the Fair Market Value set forth in the Option Notice, the Limited Partner shall have the right, exercisable within 10 days following written notice to the Limited Partner of the amount of the Purchase Price, to rescind the Acceptance Notice. Prior to the consummation of any sale pursuant to this provision, the independent party or parties who made the initial determination of Fair Market Value, shall make a second determination that the actual sales price represents a fair valuation under all facts and circumstances. Such fair market analyses shall be made available for review by any Limited Partner. The Purchase Price shall be payable in cash on a date 180 days following the expiration of the 90-day period following delivery of the Option Notice. On each six-month anniversary date of the original Option Notice, the General Partner shall provide to the remaining Limited Partners a new Option Notice setting forth the then applicable Fair Market Value of the Limited Partnership Property and each Limited Partner shall then have 90 days from such date to deliver an Acceptance Notice. If the offer is accepted, the Purchase Price shall be payable as set forth above. This Section is intended only to provide the Limited Partners with the right to receive their pro-rata share the Fair Market Value on certain future date, as more specifically set forth above, and shall in no event be construed to confer any additional rights or privileges with respect to the management or disposition of the Partnership assets.

## ARTICLE XIV
## SPECIAL AND LIMITED POWER OF ATTORNEY

Section 14.01. Special and Limited Power of Attorney.

(1)     The General Partner shall at all times during the existence of the Limited Partnership have a special and limited power of attorney as the attorney-in-fact for each Limited Partner with power and authority to act in the name and on the behalf of each Limited Partner to make, execute, swear to, verify, acknowledge, correct and file the following documents and any other documents deemed by the General Partner to be necessary for the business of the Limited Partnership:

(a)     This Agreement, and any amendments thereto;

(b)     Any certificate of Limited Partnership for the Limited Partnership and amendments thereto required or permitted or deemed advisable by the General Partner to be made or filed on behalf of the Limited Partnership, and any and all certificates or other instruments necessary to qualify the Limited Partnership as a Limited Partnership;

(c)     Any other instrument or document that may be required to be filed by the Limited Partnership under the laws of any state or by a governmental agency or which the General Partner deems advisable to file, including without limitation the United States Citizenship and Immigration Services;

(d)     Any instrument or document which may be required to effect the continuation of the Limited Partnership and admission of an additional or substitute General or Limited

EXHIBIT 1

Partner, or the dissolution and termination of the Limited Partnership (provided such continuation, admission or dissolution and termination are in accordance with the terms of this Agreement).

(e)     Any instrument or document which may be required to respond to USCIS's requests for additional evidence or denial where the grounds relate to the Project only, with respect to any Limited Partner's I-526 Petition or I-829 Petition. Each Limited Partner acknowledges and agrees that the Limited Partnership's special immigration counsel, as appointed by the General Partner, is the sole entity authorized to respond on behalf of the Limited Partnership in any matter before the USCIS, the Administrative Appeals Office, or other judicial body having jurisdiction over any Limited Partner's I-526 Petition or I-829 Petition. Each Limited Partner agrees to supply a Form G-28 appointing such special immigration counsel to facilitate such response by the Partnership or General Partner; and

(f)     Execute any and all documents necessary to enable the General Partner to carry out powers of the General Partner including but not limited to granting Limited Partnership Property as security for Limited Partnership obligations and sale or conveyance of Limited Partnership Property.

(2)     This power of attorney is a special power of attorney coupled with an interest, is irrevocable, shall survive the death of each Limited Partner and is limited to those matters herein set forth.

## ARTICLE XV
## MISCELLANEOUS

Section 15.01.  Amendments.  Except as otherwise provided by law, this Agreement may be amended in any respect by the General Partner without the written approval or consent of Limited Partners owning Interests in the Limited Partnership; provided however, that:

(1)     Without the consent of Limited Partners to be adversely affected by the amendment, this Agreement may not be amended so as to change the Capital Contributions required, or rights and interests in profits, losses and distributions of any Partner; and

(2)     In the case of any provision hereof which requires the action, approval or consent of a specified Interest of Limited Partners, such provision may not be amended without the consent of the Limited Partners owning such specified Interests.

Section 15.02.  Notices.  Any notice, offer, consent or other communication required or permitted to be given or made hereunder shall be in writing and shall be deemed to have been sufficiently given or made when delivered personally to the party (or an officer of the party) to whom the same is directed, or (except in the event of a mail strike) five (5) days after being mailed by first class mail, postage prepaid, if to the Limited Partnership or to the General Partner, to the office described in **Section 1.03** hereof, or if to a General Partner or to a Limited Partner, to the address set forth in Exhibit A attached hereto.  Any Partner may change his or its address for the purpose of this **Section 15.02** by giving notice of such change to the Limited Partnership, such change to become effective on the tenth (10th) day after such notice is given.

Section 15.03.  Governing Law; Survival of Rights; Severability of Provisions.  This Agreement shall be governed by the internal laws of the State of Colorado and shall, subject to the restrictions on transfer set forth herein, bind and inure to the benefit of the heirs, executors, personal representatives, successors and assigns of the parties hereto.  If any provision of this Agreement is held to be invalid, the remainder of this Agreement shall not be affected thereby.

EXHIBIT 1

Case No. 1:19-cv-02443-RM-STV Document 291-1 filed 06/19/20 USDC Colorado pg 180
of 293
Case 1:19-cv-02443-STV Document 51-2 Filed 10/18/19 USDC Colorado Page 170 of 184

Section 15.04.  Entire Agreement.  This Agreement constitutes the entire agreement among the parties and supersedes any prior agreement or understandings among them, oral or written, all of which are hereby cancelled.  This Agreement may not be modified or amended other than pursuant to **Section 15.01** hereof.

Section 15.05.  Captions; Pronouns.  The paragraph titles or captions contained in this Agreement are inserted only as a matter of convenience of reference.  Such titles and captions in no way define, limit, extend or describe the scope of this Agreement nor the intent of any provision hereof.  All pronouns and any variation thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person or persons may require.

Section 15.06.  No Waiver.  The failure of any Partner to seek redress for violation, or to insist on strict performance, of any covenant of this Agreement shall not prevent a subsequent act which would have constituted a violation from having the effect of an original violation.

Section 15.07.  Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which shall constitute one Agreement, binding on all of the parties hereto.

**Signature Page Follows**

EXHIBIT 1

**IN WITNESS WHEREOF** the parties have executed this Agreement as of the day and year first above written.

**GENERAL PARTNER:**

Colorado Regional Center I, LLC

_____

By: Chester P. Schwartz
Its: Manager

**LIMITED PARTNERS:**

Colorado Regional Center I, LLC

_____

By Chester P. Schwartz, Manager, as attorney-in-fact for the
      Limited Partners listed in Exhibit A attached hereto and
      Incorporated herein

EXHIBIT 1

**EXHIBIT A**
**(Names and addresses of General Partner**
**And**
**Limited Partners**
**And**
**Preferred Returns and Percentage Interests)**

**General Partner:**

| **Name** | **Mailing Address** | **Percentage Interest** |
|---|---|---|
| Colorado Regional Center I, LLC | 4643 S. Ulster St., Suite 950, Denver, CO 80237 | 1% |

**Limited Partners:**

| **Name** | **Mailing Address** | **Preferred Return** | **Percentage Interest** |
|---|---|---|---|

EXHIBIT 1

**EXHIBIT B**
**(Copy of Solaris Note)**

*Attached*

EXHIBIT 1

# PROMISSORY NOTE

Original Principal Amount: $_____          Date: _____, 2011

**PROMISE TO PAY**:  Solaris Property Owner, LLC, a Delaware limited liability company ("**Borrower**") promises to pay to Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership ("**Lender**"), or order, in lawful money of the United States of America, the principal amount of $_____ together with interest at the rate of five percent (5%) per annum (the "**Interest Rate"**) on the terms and conditions set forth below (the "**Loan**").

**DEFINED TERMS**: Initially capitalized terms used but not otherwise defined below shall have the meanings ascribed to such terms under the provisions of that certain Loan Agreement dated effective November __, 2010, by and between Borrower and Lender (the "**Loan Agreement**").

**INTEREST PAYMENTS**:  Commencing on the date Lender makes the first Loan Advance to Borrower in accordance with the Loan Agreement (the "**Commencement Date**"), the outstanding principal of the loan shall bear interest at the Interest Rate.  Borrower shall make interest-only payments on the outstanding principal balance of the Loan (each, an "**Interest Payment**") on the first business day of each month following the Commencement Date until the Loan is repaid in full.  Each Interest Payment shall include interest on all sums outstanding at the time such Interest Payment is due (including a pro-rated amount of interest for any Loan Advances that took place during the previous month).  Borrower will pay Lender at Lender's address as Lender shall designate in writing.  Any and all payments made hereunder shall be applied first to any unpaid collection costs and late charges pursuant to this Note, second to accrued unpaid interest, and third in reduction of the outstanding principal balance of the Loan.

**TERM**:  With respect to each Loan Advance, this note shall be deemed to mature, and (if not sooner repaid in accordance with the provisions hereof) the unpaid principal balance attributable to such Loan Advance, together with all accrued interest attributable to the same (if any), shall be due and payable on the date that is exactly sixty (60) months from Closing on such Loan Advance (each, a "**Maturity Date**"); *provided, however*, that (notwithstanding anything to the contrary set forth in this Note or any other Loan Documents) at any time after the Prepayment Date (as hereinafter defined), Borrower shall have the absolute right to prepay the portion the Note attributable to any Loan Advance  by repaying Lender the amount of such Loan Advance in cash or conveying Lender the Collateral Unit(s) securing such Loan Advance.  If Borrower tenders to Lender any Collateral Unit(s) in repayment of a Loan Advance, the principal balance of the Note shall be reduced by the amount of the Loan Advance secured by such Collateral Unit(s). With respect to each Loan Advance, the term "**Prepayment Date**" means a date that is exactly thirty six (36) months from and after the Closing on such Loan Advance.

**PREPAYMENT**: Except as otherwise set forth in this Note, Borrower shall not be allowed to pay all or a portion of the Loan prior to the Prepayment Date.

**NOTICE OF PREPAYMENT**: Borrower shall give Lender (i) at least sixty (60) calendar days prior written notice of any Cash Prepayment and (ii) at least twenty (20) calendar days prior written notice of any Collateral Unit Distribution.

**DEFAULT**:  Subject to any applicable cure rights set forth in any Loan Document, each of the following shall constitute an "**Event of Default**" hereunder:

       (v)      if Borrower fails to make any payment when such payment is due;

EXHIBIT 1

Case No. 1:19-cv-02443-RM-STV   Document 231-1   Filed 06/19/20   USDC Colorado   pg 185
of 293
Case 1:19-cv-02443-STV   Document 51-2   Filed 10/18/19   USDC Colorado   Page 75 of 184

(vi)      if Borrower fails to comply with or to perform when due any other material, obligation, covenant, representation, warranty or condition contained in this Note or any other Loan Document;

(vii)      if Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement in favor of any other creditor or person that results in a Material Adverse Affect; or

(viii)      if any material representation or statement made or furnished to Lender by Borrower is false or misleading at the time made or furnished.

**NON-RECOURSE LOAN; EXCEPTION FOR INTEREST PAYMENTS**:

(iii)      **Non-Recourse Loan**. Except as expressly provided below, subject to any applicable cure rights set forth in any Loan Document, if an Event of Default has occurred and is then continuing, Lender agrees to proceed solely against the Collateral, it being the parties' mutual understanding and intent that principal amount of the Loan secured by this Note is entirely non-recourse to Borrower. Notwithstanding the foregoing, Lender may name Borrower or any of its successors or assigns or any person or entity holding under or through them as parties to any actions, suits or other proceedings initiated by Lender to enforce any remedies set forth herein against the Collateral, including without, limitation, any action, suit or proceeding to foreclose the lien of the Deed of Trust against the Collateral.

(iv)      **Exception for Interest Payments**.  Notwithstanding the foregoing, subject to any applicable cure rights set forth in any Loan Document, if Borrower fails to make any Interest Payment(s) due hereunder, the amount of such Interest Payment(s) plus the Collection Costs directly related collecting to the same shall be fully recourse to Borrower.  Except as expressly set forth in the immediately preceding sentence, the Loan evidenced by this Note is and shall remain entirely non-recourse to Borrower.

**LENDER'S RIGHTS**:  Subject to any applicable cure rights set forth in any Loan Documents, if an Event of Default under this Note has occurred and is then continuing: (i) Lender may declare the entire unpaid principal balance of this Note and all accrued interest, if any, immediately due and, upon receipt of written notice of such acceleration, Borrower shall convey the Collateral Unit(s) to Lender in full satisfaction of Borrower's obligations under this Note and the other Loan Documents; (ii) Lender, at its option, may also, if permitted under applicable law, increase the Interest Rate on this Note to the lesser of fourteen percent (14.00%) or the maximum amount permitted by law (the "**Default Rate**"); and (iii) Borrower shall be responsible for any and all Collection Costs directly related to the  Event of Default. "**Collection Costs**" means, to the extent permitted by law, Lender's reasonable legal expenses (whether or not there is a lawsuit), including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, any post-judgment collection services, and any court costs and fees associated with the foregoing.

**CHOICE OF LAW**: This Note has been delivered to Lender and accepted by Lender in Colorado.  Borrower and Lender agree to submit to the jurisdiction of the courts of the City and County of Denver, Colorado.  Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.  This Note shall be governed by and construed in accordance with the laws of Colorado.

**COLLATERAL**:  In order to secure payment of this Note, Borrower has granted to Lender security interests in certain real and personal property owned by Borrower (the "**Collateral**").  These security interests are evidenced by a Deed of Trust and Security Agreement and certain other documents

EXHIBIT 1

(collectively, the "**Collateral Documents**").  Reference is made to the Collateral Documents for various rights and remedies of the parties to those documents.

**ASSIGNMENT BY BORROWER**.  Notwithstanding to the contrary set forth in any of the Loan Documents, Borrower shall have the absolute right (in Borrower's discretion) to assign this Promissory Note, the Loan Agreement and the other Loan Documents to Borrower's wholly-owned, single-purpose subsidiary (the "**SPE**").  Upon such assignment, all of Borrower's rights and obligations under the Loan Documents shall automatically and forever terminate and, thereafter, Borrower shall have no further obligation of any kind whatsoever with respect to the Loan or Loan Documents.  If Borrower so assigns Borrower's interest in the Loan Documents to Borrower's SPE prior to the execution of this Promissory Note, Borrower's SPE shall be substituted for Borrower as the signatory hereof and construed to mean "Borrower" for all purposes hereunder and under the other Loan Documents. A condition precedent to any such assignment shall be that any assignee of Borrower shall continue to operate the Solaris Project, as defined in the Loan Agreement, to assure full construction expenditure to project completion and subsequent operation of the retail businesses, all in satisfaction of the factual assumptions set forth in the EB-5 Econometric Report prepared in connection with the Solaris Project. The purpose of this condition precedent is to assure the Lender that the related EB-5 investors' ability to obtain removal of conditions on their U.S. permanent residency will not be impaired by any such assignment of the Borrower's rights and obligations under the Loan Documents.  The Lender shall have sole discretion to determine satisfaction of this condition precedent prior to any assignment by Borrower.

**GENERAL**:  Lender may delay or forego enforcing any of its rights or remedies under this Note or under the Collateral Documents without losing them.  Borrower understands and agrees that, with or without any notice to anyone other than Borrower, Lender may (i) make one or more additional secured or unsecured loans or otherwise extend additional credit and (ii) apply any security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreements, as Lender in its discretion may determine. Borrower, to the extent allowed by law, waives presentment, demand for payment, protest and notice of dishonor.

**BORROWER:**

> **Solaris Property Owner, LLC,** a Delaware limited liability company
>
> By: Solaris Mezz, LLC, a Delaware limited liability company
>
> By: _____
>       Peter B. Knobel, Manager

EXHIBIT 1

**EXHIBIT A**
**(Promissory Note)**

| Date of Loan Advance | Amount of Loan Advance | Maturity Date |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

EXHIBIT 1

**EXHIBIT B**
**(Promissory Note)**

| Date of Loan Advance | Collateral Unit | Collateral Unit Value |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

EXHIBIT 1

**EXHIBIT C**
**(Terms and Conditions for**
**Usage of Condominium Units)**

Each Limited Partner shall be entitled to usage of a two-bedroom condominium unit at the Solaris Residences during the time in which such Limited Partner owns a Limited Partnership Interest in the Limited Partnership subject to the restrictions set forth as may be modified from time to time by the General Partner:

- The Limited Partner shall give notice to the General Partner of a minimum of two alternative dates for his or her desired stay.
- Each notice shall be given not less than 90 days prior to the requested date.
- The notice shall set forth the names of all proposed guests, the dates and times of expected arrival and departure, and any special requests for the stay.
- Each Limited Partner shall be entitled to utilize a condominium unit for one seven consecutive day stay during the months of November through March of each year during the time in which such Limited Partner owns a Limited Partnership Interest in the Limited Partnership.
- Each Limited Partner shall be entitled to utilize a condominium unit for a total of 14 days (in periods of not less than three consecutive days) during the months of April through October of each year during the time in which such Limited Partner owns a Limited Partnership Interest in the Limited Partnership.
- There will be no charge for such stay for use of the unit or for normal clean-up services. However, the Limited Partner will be responsible for any personal expenses incurred, damage or destruction to the unit or to any personal property contained in the unit, extra clean-up required by the use of the unit, or any other expense of any kind that is necessitated by such usage other than normal clean-up charges. The Limited Partner will be responsible for any daily cleaning or laundry services requested during such usage.
- Each Limited Partner shall be bound by the rules and regulations imposed by the Solaris Homeowners Association for occupancy of the unit as modified from time to time.

EXHIBIT 1

Case 1:19-cv-02443-STV Document 51-2 Filed 10/18/19 USDC Colorado Page 180 of 184

**EXHIBIT K**
**YIELD ENHANCEMENT AGREEMENT**

*[Yield Enhancement Agreement on following page.]*

EXHIBIT 1

# YIELD ENHANCEMENT AGREEMENT

THIS YIELD ENHANCEMENT AGREEMENT (the "**Yield Enhancement Agreement**") is made effective into this 5th day of November, 2010, by and between COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP, a Colorado limited liability limited partnership ("**CRCPS**") and SOLARIS PROPERTY OWNER, LLC, a Delaware limited liability company ("**Solaris**"). Initially capitalized terms used but not otherwise defined below shall have the meanings ascribed to such terms under the provisions of the Loan Documents, as hereinafter defined.

## RECITALS:

I.      CRCPS has agreed to loan Solaris certain sums of money (the "**Loan**") in accordance with the terms, conditions and provisions of the Loan Agreement, Note and Loan Documents (all of which documents may be collectively referred to below as the "**Loan Documents**").

J.      The Loan proceeds are expected to be generated by investments into CRCPS from certain investors (the "**Investors**") pursuant to the EB-5 Immigrant Investor Regional Center Program ("**EB-5**").

K.      Subject to all of the terms, conditions and provisions set forth below and as a material inducement for CRCPS to make the Loan, Solaris has agreed to make certain Interest Payments to CRCPS in connection with the Loan as more specifically set forth in the Note and other Loan Documents.

L.      In addition to the Interest Payments and as a material inducement for CRCPS to enter into the Loan, Solaris has agreed to give CRCPS certain rights with respect to the Collateral Unit(s) as additional interest for the Loan (the "Additional Interest").

M.      The parties now desire to memorialize their mutual understanding concerning the Additional Interest by pursuant to this Yield Enhancement Agreement.

NOW THEREFORE, in consideration of the foregoing, the mutual promises set forth below and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## AGREEMENT:

1.      **USE RIGHTS.**  In addition to the Interest Payments set forth in the Note and as a material inducement for CRCPS to make the Loan, Solaris hereby agrees to allow each Limited Partner (as hereinafter defined) to use a two (2) bedroom Collateral Unit for up to twenty one (21) nights each calendar year during the term of the Loan (the "**Use Rights**"). Solaris understands and acknowledges that CRCPS is entering into the Loan Agreement in reliance on the Use Rights and would not have agreed to make the Loan but for the Use Rights.

2.      **RULES OF USE.**  Solaris and CRCPS hereby agree cooperate in good faith to establish such reasonable rules, regulations and procedures as are necessary to administer the Use Rights (the "**Rules of Use**") as soon as reasonably practicable and in no event later than the Closing of the first Loan Advance. Solaris Borrower and Lender further agree to execute and deliver a recordable memorandum or other recordable document(s) evidencing the existence of the Use Rights established pursuant to this paragraph and, when applicable, the release thereof

3.      **OPTION TO DEMAND CONVEYANCE OF COLLATERAL UNITS.** Notwithstanding anything to the contrary set forth in any Loan Documents, CRCPS shall have the absolute right to refuse cash repayment of the Note and may, at any time after the applicable Prepayment

EXHIBIT 1

Date, require Solaris to convey the Collateral Unit(s) securing any Loan Advance(s) to CRCPS in full satisfaction of such Loan Advance(s) (the "**Unit Demand Right**").   In the event of any conflict or inconsistency between this Yield Enhancement Agreement and the provisions of the Loan Documents, this Yield Enhancement Agreement shall supersede and control in point of conflict or inconsistency.

4.    **RENTAL PROCEEDS.** During the Term of the Loan, CRCPS shall be entitled to receive any and all Rental Proceeds (as hereinafter defined) collected in connection with the rental and occupancy of the Collateral Unit(s),  "**Rental Proceeds**" means all rents received in connection with the rental of any Collateral Unit(s) net of Rental Management Expenses (as hereinafter defined).  "**Rental Management Expenses,**" means all taxes (including, without limitation, real estate taxes), dues and fees (including, without limitation, condominium association dues and fees), all management fees, housekeeping fees, administration fees and other reasonabe and customary costs, fees and expenses incurred in connection with the Collateral Unit(s) or the rental thereof.

5.    **LOAN ADVANCE ADJUSTMENT.** Notwithstanding anything to the contrary set forth in any Loan Documents, the parties acknowledge and agree that each Loan Advance shall be automatically increased by the amount necessary to provide Required Furnishings for the Collateral Unit(s) securing such Loan Advance.  "**Required Furnishings**" means all furniture, accessories, linens, towels, silverware, wall hangings, and other similar items used to decorate or accessorize the Collateral Unit(s).  Any and all interest costs related to the Required Furnishings (including, without limitation, interest under the Promissory Note) shall be considered Rental Management Expenses.

6.    **MISCELLANEOUS.**

**Waivers and Amendments**.  Neither this Agreement nor any provision hereof may be changed, waived, discharged or terminated orally, but only by a statement in writing signed by each of the parties hereto.

**Governing Law**.  The parties agree to submit to the jurisdiction of the courts of the City and County of Denver, Colorado. This Agreement shall be governed by and construed in accordance with the laws of Colorado.

**No Right to Jury Trial**.  Each party hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement any right to a trial by jury.

**Successors and Assigns**.  Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns, heirs, executors and administrators.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.  Notwithstanding to the contrary set forth in any of the Loan Documents, Solaris shall have the absolute right (in Solaris' discretion) to assign this Yield Enhancement Agreement to Solaris' wholly-owned, bankruptcy-remote, single-purpose subsidiary (the "**SPE**"). Upon such assignment, all of Solaris' rights and obligations under the Loan Documents shall automatically and forever terminate and, thereafter, Solaris shall have no further obligation of any kind whatsoever with respect to this Yield Enhancement Agreement.  If Solaris assigns Solaris' interest in the Loan Documents to Solaris' SPE prior to the execution of this Yield Enhancement Agreement, Solaris' SPE shall be substituted for Solaris as the signatory hereof and construed to mean "Solaris" for all purposes hereunder. A condition precedent to any such assignment shall be that any assignee of Borrower shall continue to operate the Solaris Project, as defined in the Loan Agreement, to assure full construction expenditure to project completion and subsequent operation of the retail businesses, all in satisfaction of the factual

EXHIBIT 1

assumptions set forth in the EB-5 Econometric Report prepared in connection with the Solaris Project. The purpose of this condition precedent is to assure the Lender that the related EB-5 investors' ability to obtain removal of conditions on their U.S. permanent residency will not be impaired by any such assignment of the Borrower's rights and obligations under the Loan Documents. The Lender shall have sole discretion to determine satisfaction of this condition precedent prior to any assignment by Borrower.

**Notices**. All notices required to be given under this Agreement shall be given in writing, may be sent by facsimile (unless otherwise required by law) or by electronic mail, and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address shown below. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.

SOLARIS:    Solaris Property Owner, LLC
Attention: Legal Department
141 East Meadow Drive, Suite 211
Vail, Colorado 81657
P: (970) 479-7566
F: (970) 479-6666

CRCPS:    Colorado Regional Center Project Solaris, LLLP
4643 S. Ulster Street, Suite 950
Denver, Colorado 80237
P: 720.554.9704
F: 720.554.9905

**Severability**. In case any provision of this Agreement shall be declared invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

**Titles and Subtitles**. The titles of the paragraphs and subparagraphs of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

**Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

**No Strict Construction**. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**Amendments**. This Agreement may only be amended and any waivers hereunder shall only be made with the approval of the Company and the Purchaser.

*Signature Page Follows*

EXHIBIT 1

THIS YIELD ENHANCEMENT AGREEMENT is made effective as of the date first above written by and between:

**SOLARIS:**

**Solaris Property Owner, LLC,** , a Delaware limited liability

By: Solaris Mezz, LLC, a Delaware limited liability company

By: _____
              Peter Knobel, Manager

**CRCPS:**

**Colorado Regional Center Project Solaris, LLLP,** a Colorado limited liability limited partnership

By: Colorado Regional Center I, LLC, a Colorado limited liability company, general partner

By: _____
              Chester Schwartz, Manager

EXHIBIT 1

## LIMITED LIABILITY LIMITED PARTNERSHIP AGREEMENT
### OF
## COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP
## A COLORADO LIMITED LIABILITY LIMITED PARTNERSHIP

This Agreement is made by and among Colorado Regional Center I, LLC, a Colorado Limited Liability Company, (the "General Partner") and each of the persons set forth in Exhibit A attached hereto and designated as Limited Partners (the "Limited Partners"). The Limited Partners and the General Partners are collectively referred to as the "Partners."

### AGREEMENT

### ARTICLE I
### FORMATION OF LIMITED PARTNERSHIP

Section 1.01. Formation. The undersigned hereby form COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP, a Colorado limited liability limited partnership, under the revised Uniform Limited Partnership Act of the State of Colorado, as amended from time to time (the "Act"), to lend funds to Solaris Property Owner, LLC, a Delaware limited liability company ("SPO"), the owner and operator of a residential and commercial real estate project commonly known as Solaris, located in Vail, Colorado.

Section 1.02. Name. The name of the Limited Partnership is "COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP," a Colorado limited liability limited partnership (the "Limited Partnership"). The General Partner may from time to time change the name of the Limited Partnership to adopt such trade or fictitious names as it may determine to be appropriate.

Section 1.03. Principal Office of the Limited Partnership. The principal office of the Limited Partnership shall be at 4643 S. Ulster Street, Suite 950, Denver, Colorado 80237. The Limited Partnership may maintain offices at such other location as may be determined appropriate by the General Partner.

Section 1.04. Name and Place of Residence of Each Partner. The name, address, Capital Contribution, and number of Units of each of the Partners are designated on the attached Exhibit A. The name and address of the General Partner is Colorado Regional Center I, LLC located at 4643 S. Ulster Street, Suite 950, Denver, Colorado 80237.

Section 1.05. Term. The term of the Limited Partnership shall commence upon filing of the Certificate of Limited Partnership in the office of the Colorado Secretary of State and shall continue until the Limited Partnership is dissolved, wound up and terminated in accordance with the provisions of this Agreement and the Act.

Section 1.06. Designated Agents for Service of Process. The Limited Partnership elects and appoints Chester P. Schwartz, 4643 S. Ulster Street, Suite 950, Denver, Colorado 80237, as the designated agent for service of process.

EXHIBIT 2

## ARTICLE II
## DEFINITIONS

The following terms used in the Agreement shall have the meaning specified below:

Section 2.01. "Act" means the Uniform Limited Partnership Act of the State of Colorado, as amended from time to time.

Section 2.02. "Additional General Partner" means a person or entity, if any, that serves as a General Partner in addition to Colorado Regional Center I, LLC.

Section 2.03. "Administrative Expenses" means those expenses incurred by the General Partner in connection with the sale of Interests including specifically and without limitation, certain marketing, travel, legal and accounting fees, referral and related fees, and the legal fees of a Limited Partner incurred in preparation of such Limited Partner's I-526 petition (up to a maximum of $15,000 and provided that the General Partner approves the selection of the legal counsel).

Section 2.04. "Affiliate" means any person who directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control of the General Partner or Limited Partners.

Section 2.05. "Agreement" means this Agreement, as it may be amended from time to time.

Section 2.06. "Assignee" means a person who has acquired all or any portion of a Limited Partner's Interest in the Limited Partnership and has not been admitted as a Limited Partner.

Section 2.07. "Available Cash Flow" means funds provided from operation of the Limited Partnership (including the funds provided from any Capital Event, but specifically excluding any payments received by the Limited Partnership as a result of any prepayment of the SPO Note), without deduction for depreciation, but after deducting funds used to pay all expenses and debts of the Limited Partnership, including administrative operational expenses, management fees, debt payments, capital improvements, and less the amount set aside by the General Partner, in the exercise of its sole discretion, for reserves.

Section 2.08. "Capital Account" means that as defined in Section 4.04 herein.

Section 2.09. "Capital Contribution" means the total amount of money or property contributed to the Limited Partnership by each Partner (excluding any amounts contributed for Administrative Expenses).

Section 2.10. "Capital Event" The refinance, sale, exchange or other disposition of the Project or any portion thereof, including an involuntary conversion or condemnation of real property or any portion thereof.

Section 2.11. "Code" means the Internal Revenue Code of 1986, as amended from time to time.

EXHIBIT 2

Section 2.12. "Condominium Unit" means each of the 79 residential condominium units located at the Project.

Section 2.13. "Deficit Capital Account" means the situation whereby the Limited Partnership has distributed to a Partner distributions in excess of such Partners capital contributions plus allocable share of income less allocable share of loss and any other charges allowable under this Agreement, resulting in such Partner's capital account falling below zero.

Section 2.14. "General Partner" means Colorado Regional Center I, LLC and/or any other Person admitted as a General Partner pursuant to the Agreement and their successors.

Section 2.15. "Interest" or "Limited Partnership Interest" or "Partnership Interest" means the ownership interest of a Partner in the Limited Partnership at any particular time, including the right of such Partner to any and all benefits to which such Partner may be entitled as provided in the Agreement and in the Act, together with the obligations of such Partner to comply with all the terms and provisions of the Agreement and the Act.

Section 2.16. "Limited Partner" means each Limited Partner listed on Exhibit A and any person admitted to the Limited Partnership as a Limited Partner.

Section 2.17. "Limited Partnership" means COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP.

Section 2.18. "Limited Partnership Property" means all the real and personal property owned by the Limited Partnership, including specifically and without limitation, the SPO Note and any real or personal property securing the SPO Note which may be or may become owned by the Limited Partnership.

Section 2.19. "LP Interest" means the Partnership Interest of a Limited Partner.

Section 2.20. "Net Proceeds from a Capital Event" The net proceeds derived by the Limited Partnership from a capital event after payment or allowance for the expenses incurred in connection with such Capital Event and after payment or allowance for existing indebtedness, the discharge of any other expenses or liabilities of the Limited Partnership and the establishment of appropriate reserves, all as determined by the General Partner, in its sole discretion.

Section 2.21. "Partners" means collectively the General Partners and the Limited Partners, and a reference to a Partner shall be to any one of the Partners.

Section 2.22. "Person" means any natural person, partnership, corporation, association or other legal entity.

Section 2.23. "Positive Capital Account" means that the balance of a Partner's Capital Account is greater than zero.

Section 2.24. "Profit or Loss" means the income or loss of the Limited Partnership as determined by the method of accounting chosen by the General Partner and permitted by the Code.

EXHIBIT 2

Section 2.25. "Project" means the real property and improvements consisting of 79 residential condominium units and approximately 70,000 square feet of commercial space, all known as "Solaris" located in Vail, Colorado.

Section 2.26. "SPO Note" means the Promissory Note executed by SPO in favor of the Limited Partnership in the form as attached hereto as Exhibit B.

Section 2.27. "Subscription Agreement" means the agreement signed by each Limited Partner in connection with his or her Capital Contribution to the Limited Partnership.

Section 2.28. "Units" or "Partnership Interests" means each Partner's percentage of ownership in the Partnership as set forth adjacent to his or her name in Exhibit A.

## ARTICLE III
## PURPOSE, BUSINESS AND POWERS OF THE LIMITED PARTNERSHIP

Section 3.01. Purpose and Business of the Limited Partnership. The business of the Limited Partnership shall be to lend funds to SPO. In addition, the business of the Limited Partnership shall be to undertake all necessary actions in the General Partner's sole discretion to preserve the immigration benefits of the Limited Partners, including without limitation, investing in additional or alternate projects consistent with the requirements of the EB-5 Program, as described in the related Confidential Information Memorandum. The Loan to SPO will be evidenced by the SPO Note and the SPO Note will be secured by one or more deeds of trust (the "Deeds of Trust"). Each Deed of Trust will grant to the Limited Partnership a security interest in one or more Condominium Units, free and clear of all liens and encumbrances except for matters of record approved by the Limited Partnership. The Limited Partnership will further manage all income received from the SPO Note. If at any time the Limited Partnership becomes the owner of a Condominium Unit, then the business of the Limited Partnership will further include the management of the real and personal property then owned by the Limited Partnership.

Section 3.02. Powers. The Limited Partnership is hereby authorized:

      (1)     To acquire, manage and operate Limited Partnership Property and to hold it for economic gain;

      (2)     To mortgage, sell, lease, transfer and exchange or otherwise convey or encumber all or part of the Limited Partnership Property in furtherance of any and all of the objectives of Limited Partnership business; and

      (3)     To enter into, perform and carry out contracts of any kind necessary to, or in connection with or incidental to, the operation of Limited Partnership Property.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS

Section 4.01. Capital Contributions; Administrative Expenses.

EXHIBIT 2

(1)     Each of the Limited Partners' Capital Contributions is set forth on Exhibit A. The Limited Partners shall own collectively 99% of the Limited Partnership and the General Partner shall own 1% of the Limited Partnership. Each Limited Partner shall own his or her pro rata share of the 99% total Limited Partnership Interests determined by dividing each Limited Partner's Capital Contribution by 99% of the total of all Capital Contributions contributed by all Limited Partners. For example, by way of illustration, if there are 40 Limited Partners, each of whom has contributed $500,000 in Capital Contributions, each Limited Partner will own a 2.475% interest in the Limited Partnership (40 X $500,000 =$20,000,000;     $20,000,000     X99% =$19,800,000;     $19,800,000/40 =$495,000; $495,000/19,800,000 =2.475%). The Limited Partners shall have no obligation to make additional Capital Contributions. In exchange for its Interest in the Limited Partnership, the General Partner has made an initial Capital Contribution of cash and certain soft costs. The General Partner shall have no obligation to the Limited Partnership or the Partners to make additional Capital Contributions, except for the General Partner's obligation set forth in Section 6.02.

Section 4.02.  Return and Withdrawal of Capital.  No Partner shall have the right to demand Limited Partnership Property. Further, no Partner shall have any right to withdraw or make a demand for the withdrawal of any of such Partner's Capital Contribution (or the capital interest reflected in such Partner's Capital Account) until the full and complete winding up and liquidation of the Limited Partnership.

Section 4.03.  Administrative Expenses.  Each Limited Partner shall pay the sum of $50,000 as an Administrative Expense. The Administrative Expense shall be in addition to the Capital Contribution and shall not be deemed to be a Capital Contribution.

Section 4.04.  Partner Capital Accounts.  An individual Capital Account shall be maintained for each Partner in accordance with the requirements of the Code. Except as required by the Code, the Capital Account of each Partner shall consist of his Capital Contribution, as increased by any contribution of capital subsequent to his original contribution, and by such Partner's share of Limited Partnership income and gain allocated after the date hereof to such Partner, and as decreased by the amount of all cash and the fair market value of all property and assets distributed to such Partner, the amount of all losses allocated after the date hereof to such Partner, and any amounts charged under Section 4.05 and/or Section 10.08 to such Partner.

Section 4.05.  Interest on Capital Contributions.  No interest shall be paid to a Partner on Capital Contributions. Non-cumulative simple interest will be charged by the Limited Partnership to a Partner on the sum of any amounts charged to such Partner's Capital Account from obligations to the Limited Partnership or a General Partner arising under Section 10.08. The interest charged will be computed on a calendar year compounded basis at a rate equal to the prime rate of interest from time to time announced by Wells Fargo Bank to be its "prime rate", such interest to be collected by reduction of any distributions payable to the Partner immediately following the calculation of the year's interest by the General Partner. To the extent that there are no distributions against which the interest can be applied, then the interest will be charged to the Partner's Capital Account. This Section 4.05 will survive the termination of a Partner's status as a Partner.

Section 4.06.  Minimum Capital Contribution.  The minimum Capital Contribution by any Limited Partner in the Limited Partnership shall be $500,000.

EXHIBIT 2

Case 1:19-cv-02443-STV Document 81-1 Filed 06/18/20 USDC Colorado Page 6 of 20

## ARTICLE V
## COMPENSATION FOR SERVICES

Section 5.01. General Partner's Fees. The General Partner will not directly charge management fees to the Limited Partnership. The Limited Partnership will enter into a management contract (the "Management Contract") with Waveland EB-5 Management, LLC, a Colorado limited liability company ("Waveland Management"). Waveland Management is a wholly-owned subsidiary of Waveland Ventures, LLC, the parent company of the General Partner. Under the terms of the Management Contract, in consideration of the performance by Waveland Management of certain management and servicing duties, Waveland Management will be entitled to receive an annual management fee equal to 2% of the total Capital Contributions to the Limited Partnership (the "Management Fee"), payable quarterly from Available Cash Flow only. If there is not Available Cash Flow sufficient to pay the Management Fee, then the amount payable shall accrue and bear interest at the rate of 6% per annum and shall be payable from Available Cash Flow. Additionally, the General Partner may pass on actual costs of operations to the Limited Partnership. However, under no circumstance will such costs be deducted from the Limited Partners' Capital Contributions and will derive entirely from Available Cash Flow.

Section 5.02. General Partner's Interest. In consideration of the contribution of cash and other services rendered to the Limited Partnership, the General Partner will receive a 1% Interest in the Limited Partnership. The General Partner will be entitled to receive from Available Cash Flow certain additional payments as set forth in Section 6.02 below.

## ARTICLE VI
## ALLOCATIONS AND DISTRIBUTIONS

Section 6.01. Allocation of income, gain, deductions and loss.

Except for any special allocations required or permitted by the United States Tax Code to ensure that all allocations hereunder have substantial economic effect, all items of income, gain, deductions and loss shall be allocated to the Partners in the same manner as their proportionate share of Available Cash Flow and Net Proceeds from a Capital Event as set forth below in **Section 6.02**. Any non cash items of income or expense (such as depreciation or amortization) will be allocated in accordance with each Partner's Interest in the Partnership.

Section 6.02. Distributions of Available Cash Flow; Usage of Condominium Units.

(a) General Partner Distribution and Limited Partner Distribution. If the Limited Partnership incurs expenses that exceed the amount received for Administrative Expenses, and if such excess amounts are paid by the General Partner, then the excess amounts shall be paid by the General Partner. No such excess amounts, if any, shall be paid from Capital Contributions. If the Limited Partnership incurs expenses that are less than the amount received for Administrative Expenses, then the General Partner shall be entitled to a distribution of such excess amounts as an organizational fee. The Limited Partners shall be entitled to receive an annual cash return on their initial Capital Contributions (the "Preferred Return") out of Available Cash Flow to the extent available for distribution at the discretion of the General Partner. The amount of the Preferred Return is set forth in Exhibit A. After such time as the Limited Partners receive the Preferred Return, the Limited Partners shall be entitled

EXHIBIT 2

to receive Cash Available for Distribution equal to their total aggregate Capital Contributions. At such time as the Limited Partners have received payments equal to their total Capital Contributions, then all remaining Cash Available for Distribution (including the proceeds, if any, from a Capital Event) shall be distributed 30% to the Limited Partners and 70% to the General Partner.

        (b)     Partner Distributions. Any distribution to the Partners will be distributed to each Partner an amount equal to the total amount of any such distribution multiplied by the ratio of each Partner's Interest over the total Limited Partnership Interests in the Limited Partnership held by all Partners. Distributions shall be made semi-annually and may only be made out of the accumulated balance of the operating profits (specifically excluding any prepayments of the SPO Note) of the Limited Partnership.

        Section 6.03. Deficit Capital Accounts at Liquidation. The Limited Partners shall have no liability to the Limited Partnership, to the General Partners, or to the creditors of the Limited Partnership on account of any deficit balance in their Capital Accounts upon liquidation of the Limited Partnership, provided, however, that any Partner for whom any charges have been made to his Capital Account by reason of the obligations described in Section 4.05 and/or Section 10.08 is required to pay to the Limited Partnership the amount of any negative balance in his Capital Account, but such payment shall not exceed the sum of the obligations under Section 4.05 and Section 10.08. This Section 6.03 will survive the termination of a Partner's status as a Partner. A Partner must also pay any attorneys' or accountants' fees actually and reasonably incurred by the Limited Partnership or a General Partner in collecting amounts under this proviso from the Partner.

        Section 6.04. Income Tax Distributions. To the extent that the Limited Partnership is earning income which will result in the Partners being subject to income tax on their distributive share of the Limited Partnership's income, minimum distributions shall be made to the Partners in such amounts and at such times (but in no event later than March 31 each year) as shall be sufficient to enable the Partners to meet income tax liability arising or incurred as a result of their Partnership Interests in the Limited Partnership. For the purposes of such distribution, it shall be assumed that the Partners are taxable at the then highest applicable U.S. individual federal, state and local rates, in Denver, Colorado. Any such distribution shall be made on a nondiscriminatory basis to all Partners pro rata in accordance with their respective Limited Partnership Interests. Such distributions shall be made based on the annual taxable income of the Limited Partnership without regard for the individual income tax liabilities of the individual Partners.

        Section 6.05. Usage of Condominium Units. Beginning on the date of the execution of the SPO Note, each Limited Partner shall be entitled to the use of a Condominium Unit on the terms and conditions set forth in the attached Exhibit C. The parties acknowledge and agree that the specific terms and conditions set forth in Exhibit C may be changed from time to time by the General Partner without a vote of the Limited Partners. The General Partner shall notify the Limited Partners of any changes to the terms and conditions set forth in Exhibit C.

**ARTICLE VII**
**EXPENSES**

        Section 7.01. Limited Partnership Expenses. The Limited Partnership shall pay all costs and expenses of the Limited Partnership which may include, but are not limited to the list below. However,

EXHIBIT 2

under no circumstance will any such cost or expense be deducted from the Limited Partners' Capital Contributions.

(1)     All costs of personnel employed by the Limited Partnership;

(2)     All costs of borrowed money including repayment of advances to the Partnership made by a Partner which shall be paid monthly and amortized over five years at an interest rate equal to the prime rate of interest from time to time announced by Wells Fargo Bank to be its "prime rate" plus 5%, taxes and assessments on Limited Partnership Property;

(3)     Legal, audit, accounting, brokerage and other fees;

(4)     Printing and other expenses and taxes incurred in connection with the issuance, distribution, transfer, registration and recording of documents evidencing ownership of an Interest in the Limited Partnership or in connection with the business of the Limited Partnership;

(5)     Fees and expenses paid to contractors, mortgage bankers, brokers and services, leasing agents, consultants, on-site managers, real estate brokers, insurance brokers and other agents, including Affiliates of any General Partner;

(6)     Expenses in connection with the acquisition, preparation, operation, improvement, development, disposition, replacement, alteration, repair, remodeling, refurbishment, leasing, and financing and refinancing of Limited Partnership Property.

(7)     The cost of insurance obtained in connection with the business of the Limited Partnership;

(8)     Expenses of organizing, revising, amending, converting, modifying or terminating the Limited Partnership;

(9)     Expenses in connection with distributions made by the Limited Partnership to, and communications and bookkeeping and clerical work necessary in maintaining relations with, Limited Partners;

(10)     Expenses in connection with preparing and mailing reports required to be furnished to Partners for required tax reporting, or other purposes which the General Partner deems appropriate;

(11)     Costs incurred in connection with any litigation, including any examination or audits by regulatory agencies;

(12)     Costs of preparation and dissemination of informational material and documentation relating to potential sale, refinancing or other disposition of Limited Partnership Property;

(13)     The Management Fee; and

EXHIBIT 2

(14)  Costs of compliance with reporting requirements imposed by USCIS or related governmental entities with respect to compliance with the EB-5 program as it may be amended from time to time.

## ARTICLE VIII
## POWERS, RIGHTS AND OBLIGATIONS OF GENERAL PARTNERS

Section 8.01.  General Authority and Powers of the General Partner. The General Partner shall have the exclusive right and power to manage, operate and control the Limited Partnership and to do all things and make all decisions necessary or appropriate to carry on the business and affairs of the Limited Partnership. In addition to the specific rights and powers herein granted to the General Partners, the General Partner shall possess and enjoy and may exercise all the rights and powers of a general partner as provided in the Act, including the full and exclusive power and authority to act for and to bind the Limited Partnership. The scope of the General Partner's power and authority shall encompass all matters connected with or incident to the business of the Limited Partnership, including but not limited to the power and authority:

(1)  To spend and or invest the capital and revenue of the Limited Partnership to maximize return to the Limited Partnership, including the acquisition of the Limited Partnership Property;

(2)  To manage, sell, develop, purchase, mortgage, improve, operate and dispose of Limited Partnership Property, including to act on behalf of the Limited Partnership with respect to any Limited Partnership or joint venture in which the Limited Partnership participates;

(3)  To employ persons, firms and/or corporations for the sale, operation, management, syndication and development of Limited Partnership Property, including but not limited to sales agents, broker-dealers, attorneys and accountants;

(4)  To employ agents, attorneys, accountants, engineers and other consultants or contractors who may be Affiliates of a General Partner; however, any employment of such persons must be on terms not less favorable to the Limited Partnership than those offered by unaffiliated persons for comparable services in the same area;

(5)  To acquire and or sell personal or real property owned by the Limited Partnership or in which the Limited Partnership has an interest, lease real property, borrow on a secured or unsecured basis in the name of the Limited Partnership, grant Partnership property as security for a loan to the Partnership, hire and fire employees, to sign any documents required on behalf of the Limited Partnership, without the signatures or consents of the Limited Partners, required to carry out the duties of the General Partner, and all other acts necessary, appropriate, or helpful for the operation of the Limited Partnership business;

(6)  To appoint representatives to manage the day-to-day operations of the Limited Partnership, including specifically, the appointment of Waveland EB-5 Management, LLC;

(7)  To execute, acknowledge and deliver any and all instruments to effectuate any of the foregoing powers and any other powers granted to the General Partner under the laws of the State of Colorado or other provisions of this Agreement;

EXHIBIT 2

(8)     To enter into and to execute agreements for employment or services, as well as any other agreements and all other instruments the General Partner deems necessary or appropriate to own, sell, improve, operate and dispose of Limited Partnership Property or to effectively and properly perform its duties or exercise its powers hereunder;

(9)     To enter into such agreements and contracts with parties and to give such receipts, releases and discharges, with respect to the business of the Limited Partnership, which the General Partner, in its sole discretion, deems advisable or appropriate;

(10)    To purchase, at the expense of the Limited Partnership, such liability and other insurance as the General Partner, in its sole discretion, deems advisable to protect the Limited Partnership's assets and business; however, the General Partner shall not be liable to the Limited Partnership or the other Partners for failure to purchase any insurance, including earthquake insurance, unless such act or omission constitutes gross negligence or willful misconduct by a General Partner within the meaning of Section 8.04;

(11)    To sue and be sued, complain, defend, settle, and/or compromise, with respect to any claim in favor of or against the Limited Partnership, in the name and on behalf of the Limited Partnership; and

(12)    To grant Limited Partnership real or personal property as security for a loan to the Limited Partnership, and sign all documents required to grant such security interests in Limited Partnership Property, without the signatures or consents of the Limited Partners.

Section 8.02.   Right of Public to Rely on Authority of General Partner.   No person, firm, corporation, or governmental authority dealing with the Limited Partnership or any Limited Partnership or joint venture for which the Limited Partnership is a general partner or otherwise authorized to act, shall be required to inquire into the authority of the General Partner to take any action, make any decision, or sign and deliver any document, instrument or deed. The General Partner does not require an authorizing resolution from the Partners in order to grant Limited Partnership Property as security for an obligation of the Limited Partnership.

Section 8.03.   Time Devoted to Limited Partnership; Other Ventures. The General Partner shall devote so much of their time to the business of the Limited Partnership as in its judgment the conduct of the Limited Partnership's business reasonably requires.  The General Partner may engage in business ventures and activities of any nature and description independently or with others, whether or not in competition with the business of the Limited Partnership, and neither the Limited Partnership nor any of the other Partners shall have any rights in and to such independent ventures and activities or the income or profits derived there from by reason of the acquisition of Interests in the Limited Partnership.

Section 8.04.   Liability of General Partners to Limited Partners and Limited Partnership.   In carrying out their duties and exercising the powers hereunder, the General Partners shall exercise reasonable skill, care and business judgment.  A General Partner shall not be liable to the Limited Partnership or the Limited Partners for any act or omission performed or omitted by them in good faith pursuant to the authority granted to them by this Agreement unless such act or omission constitutes gross negligence or willful misconduct by that General Partner. In exercising their powers hereunder, the General Partner recognizes its fiduciary responsibility to the Limited Partnership as set forth in **Section**

EXHIBIT 2

8.06 hereof. The General Partner shall be entitled to rely on the advice of counsel and public accountants experienced in any matter at issue, and shall not be liable, responsible or accountable in damages or otherwise to the Limited Partnership, or any Limited Partner for any action taken or failure to act on behalf of the Limited Partnership in good faith and in reliance on any such advice.

Section 8.05. Indemnification. The Limited Partnership shall indemnify and hold harmless the General Partner from any loss or damage, including attorneys' fees actually and reasonably incurred by them, by reason of any act performed by them on behalf of the Limited Partnership or in furtherance of the interests of the Limited Partnership; provided, however, that such indemnification or agreement to hold harmless shall be recoverable only out of the assets of the Limited Partnership and not from the Limited Partners. The foregoing indemnity shall extend only to acts or omissions performed or omitted by a General Partner in good faith and in the belief that the acts or omissions were in the Limited Partnership's interests, or not opposed to the best interests of the Limited Partnership and which are not a result of negligence or willful or wanton misconduct on the part of that General Partner.

Section 8.06. Fiduciary Responsibility. The General Partners shall have a fiduciary responsibility for the safekeeping and use of all funds and assets of the Limited Partnership.

ARTICLE IX
STATUS OF LIMITED PARTNERS

Section 9.01. Participation in Management. Except as specifically provided herein, no single Limited Partner shall control the Limited Partnership's business or management or have any right or authority to act for or on the behalf of, or otherwise bind, the Limited Partnership (except a Limited Partner who may also be a General Partner and then only in its capacity as General Partner within the scope of its authority hereunder). Notwithstanding the above, the Limited Partners shall form an advisory committee to consult and advise the General Partner with respect to the partnership business as may be permitted under the laws of the state of Colorado.

Section 9.02. Limitation of Liability. No Limited Partner shall have any personal liability whatever, whether to the Limited Partnership, to any Partners or to the creditors of the Limited Partnership, for the debts or obligations of the Limited Partnership or any of its losses beyond his Capital Contribution set forth opposite his name in Exhibit A attached hereto; provided, however, that any Partner for whom any charges have been made to his Capital Account by reason of the obligation described in Section 6.04, Section 4.05, and/or Section 10.08 is required to reimburse the Limited Partnership for the amount of any negative balance in his Capital Account, but such reimbursement shall not exceed the sum of the Partner's obligations under Section 4.05 and Section 10.08. This Section 9.02 will survive the termination of a Partner's status as a Partner. A Partner must also pay any attorneys' or accountants' fees actually and reasonably incurred by the Limited Partnership or a General Partner in collecting amounts under this proviso from the Partner.

Section 9.03. Death or Incapacity of Limited Partner. The death, legal incapacity, dissolution, termination, merger, consolidation or bankruptcy of a Limited Partner shall not cause dissolution of the Limited Partnership, but the rights of such Limited Partner to share in the profits and losses of the Limited Partnership, to receive distributions from the Limited Partnership and to assign an Interest in the Limited Partnership shall, on the happening of such an event, devolve upon such Limited Partner's executor,

EXHIBIT 2

administrator, guardian, conservator, or other legal representative or successor, as the case may be, subject to the terms and conditions of this Agreement, and the Limited Partnership shall continue as a Limited Partnership. However, in any such event such legal representative or successor, or any assignee of such legal representative or successor shall be admitted to the Limited Partnership as a Limited Partner only in accordance with and pursuant to all of the terms and conditions of Article XI hereof.

Section 9.04.  Recourse of Limited Partners.  Each Limited Partner shall look solely to the Limited Partnership for all distributions with respect to the Limited Partnership and his Capital Contribution thereto and share of profits and losses thereof and shall have no recourse therefore, upon dissolution or otherwise, against the General Partners or any other Limited Partner.

Section 9.05.  No Right to Property.  No Limited Partner shall have any right to demand or receive any distribution from the Limited Partnership in any form other than cash, upon dissolution or otherwise.

Section 9.06.  Voting Rights of Limited Partners.  Subject to the provisions of **Article VIII**, the Limited Partners owning Interests constituting in the aggregate at least two-thirds of the Interests of all Limited Partners unless stated otherwise may, without the concurrence of the General Partners and in accordance with **Section 12.02** hereof, remove the General Partner for cause and admit a substitute General Partner.

Section 9.07.  Meetings of Limited Partners.

(1)     Meetings of the Limited Partners to vote upon any matters on which the approval or consent of the Limited Partners is required or on which the Limited Partners are authorized to take action under this Agreement may be called at any time by the General Partner and shall be called by the General Partner within ten (10) days after receipt of a written request for such a meeting signed by one or more Limited Partners owning Interests constituting in the aggregate more than 51% of the Interests of all Limited Partners.  Any such request shall state the purpose of the proposed meeting and the matters proposed to be acted upon at such meeting, including a verbatim statement of the wording of any proposed amendment to this Agreement.  Meetings shall be held at the principal office of the Limited Partnership or at such place as may be designated by the General Partners or, if the meeting is called upon the written request of Limited Partners, as designated by such Limited Partners.

(2)     Notification of any meeting to be held pursuant to this **Section 9.07** shall be given not less than ten (10) days nor more than sixty (60) days before the date of the meeting, to each Limited Partner at his record address, or at such other address which he may have furnished in writing to the General Partner.  Such notice shall be in writing; shall state the place, date and hour of the meeting; and shall indicate that the notice is being issued at or by the direction of the Partner or Partners calling the meeting.  The notice shall state the purpose or purposes of the meeting and the matters proposed to be acted upon at such meeting, including a verbatim statement of the wording of any proposed amendment to this Agreement.  If a meeting is adjourned to another time and place, and if an announcement of the adjournment of time or place is made at the meeting, it shall not be necessary to give notice of the adjourned meeting.  No notice of the time, place or purpose of any meeting of Limited Partners need be given to any Limited Partner who attends in person or is represented by proxy, except for a Limited Partner attending a meeting for the express purpose of objecting at the beginning of the meeting to the transaction or any business on the ground that the meeting is not lawfully called or convened, or to any

EXHIBIT 2

Limited Partner entitled to such notice who, in a writing executed and filed with the records of the meeting, either before or after the time thereof, waives such notice.

(3)      For the purpose of determining the Limited Partners entitled to notice of, or to vote at, any meeting or any adjournment thereof, or to vote by written consent without a meeting, the General Partners or the Limited Partners requesting such meeting or vote may fix, in advance, a date as the record date for any such determination of Limited Partners. Such date shall not be more than sixty (60) days nor less than ten (10) days before any such meeting or submission of a matter to the Limited Partners, the date on which notice of the meeting or submission of the matter to the Limited Partners for a vote by written consent is mailed shall be the record date for such determination of Limited Partners.

(4)      Each Limited Partner may authorize any person or persons to act for him by proxy with respect to any matter in which a Limited Partner is entitled to participate, whether by waiving notice of any meeting, or voting or participating at a meeting. Each proxy must be signed by the Limited Partner. No proxy shall be valid after the expiration of twelve (12) months from the date thereof unless otherwise provided in the proxy. Every proxy shall be revocable by the Limited Partner executing it.

(5)      Any matter for which the approval or consent of the Limited Partners is required or for which the Limited Partners are authorized to take action under this Agreement or under applicable law may be approved or action may be taken by the Limited Partners without a meeting and shall be as valid and effective as action taken by the Limited Partners at a meeting assembled, if written consents to such action by the Limited Partners are signed by the Limited Partners owning Interests constituting in the aggregate the Interests required to approve or otherwise authorize such action, and such written consents are delivered to the General Partners.

(6)      Personal presence of the Limited Partners shall not be required at any meeting, provided an effective written consent to or rejection of the action proposed to be taken at such meeting is submitted to the General Partner. Attendance by a Limited Partner and voting in person at any meeting shall revoke any written consents or rejections of such Limited Partner submitted with respect to action proposed to be taken at such meeting.

(7)      Failure to vote either in person, by proxy or by written consent at a duly called meeting upon receipt of notice as provided for in this Article IX on matters for which approval of the Limited Partners are required by this Agreement shall be counted as an affirmative vote.

## ARTICLE X
## BOOKS AND RECORDS, ACCOUNTING, REPORTS AND
## STATEMENTS AND TAX MATTERS

Section 10.01.  Books and Records.  The General Partner shall, at the expense of the Limited Partnership, keep and maintain, or cause to be kept and maintained, the books and records of the Limited Partnership using the method of accounting chosen by the General Partner. All books and records of the Limited Partnership shall be kept at the principal office of the Limited Partnership.

Section 10.02.  Annual Accounting Period.  All books and records of the Limited Partnership shall be kept on the basis of an annual accounting period ending December 31 of each year, except for the final accounting period which shall end on the date of termination of the Limited Partnership. All

EXHIBIT 2

references herein to the "fiscal year of the Limited Partnership" are to the annual accounting period described in the preceding sentence, whether the same shall consist of twelve months or less.

Section 10.03. General Partner's Reports to Limited Partners. The General Partner shall send at Limited Partnership expense to each Limited Partner the following:

(1)     After the end of each fiscal year of the Limited Partnership, such information as shall be necessary for the preparation by such Limited Partner of his federal income tax return which shall include a computation of the distributions of such Limited Partner and the allocation to such Limited Partner of profits or losses, as the case may be; and

(2)     A reasonable time after the end of each fiscal year of the Limited Partnership, an annual report, which shall include an income statement for and balance sheet of the Limited Partnership as of the fiscal year end.

Section 10.04.  Right to Examine Records.  Limited Partners shall be entitled, upon written request directed to the General Partner, to (a) review the records of the Limited Partnership at all reasonable times and at the location where such records are kept by the Limited Partnership and (b) obtain a list of the names and addresses of the Limited Partners.

Section 10.05.  Tax Matters Partner.  The tax matters partner of the Limited Partnership shall be the General Partner.

Section 10.06.  Tax Returns.  The General Partner shall, at Limited Partnership expense, from Available Cash Flow, cause the Limited Partnership to prepare and file a United States Limited Partnership Return of Income and all other tax returns required to be filed by the Limited Partnership for each fiscal year of the Limited Partnership.

Section 10.07.  Tax Elections and Adjustments.  The General Partner is authorized to cause the Limited Partnership to make, forego or revoke such elections or adjustments for federal income tax purposes as it deems necessary or advisable in its sole discretion, provided such elections or adjustments are consistent with federal income tax rules and principles, including but not limited to, in the event of a transfer of all or part of the Limited Partnership Interest of any Partner, an election pursuant to Section 754 of the Code to adjust the basis of the assets of the Limited Partnership or any similar provision enacted in lieu thereof. The Partners will, upon request, supply any information necessary to properly give effect to any such election or adjustment.

Section 10.08.  Federal Income Tax Withholding. In the event any of the Partners are subject to Federal Income Tax withholding, the General Partner is authorized to withhold any sums required by the Internal Revenue Code even if such withholding conflicts with any of the terms and conditions of this Agreement or otherwise affects distributions, allocations or payments to the Partners.  In the event that the General Partner learns of a withholding obligation subsequent to the distribution to which the withholding obligation relates, the General Partner will issue an invoice to the Partner.  If the invoice is not paid within sixty (60) days, the General Partner will charge the amount against the Partner's Capital Account. This Section 10.08 will survive the termination of a Partner's status as a Partner.

EXHIBIT 2

## ARTICLE XI
## TRANSFERS OF LIMITED PARTNERSHIP INTERESTS;
## WITHDRAWAL AND ADMISSION OF LIMITED PARTNERS

Section 11.01.  General Prohibition.  No Limited Partner may voluntarily, or involuntarily, directly or indirectly, sell, transfer, assign, pledge or otherwise dispose of, or mortgage, pledge, hypothecate or otherwise encumber, or permit or suffer any encumbrance of, all or any part of his Interest in the Limited Partnership, except as provided in this **Article XI**.  Any other purported sale, transfer, assignment, pledge or encumbrance shall be null and void and of no force or effect whatsoever.

Section 11.02.  No withdrawal of Limited Partner.  No Limited Partner shall have the right to withdraw from the Limited Partnership except as otherwise provided in this Agreement.

Section 11.03.  Transfers by Limited Partners.

(1)    Subject to any restrictions on transferability required by law or contained elsewhere in this Agreement, a Limited Partner may transfer his entire Interest in the Limited Partnership upon satisfaction of the following conditions:

(a)    The transfer shall (A) be by bequest or by operation of the laws of intestate succession, or (B) be approved in writing by the General Partner, which approval shall be withheld only if, in the reasonable judgment of the General Partner, the proposed transfer does not comply with the requirements of this **Article XI**, would jeopardize the status of the Limited Partnership as a Limited Partnership for federal income tax purposes, or would violate, or cause the Limited Partnership to violate, any applicable law or governmental rule or regulation, including without limitation, any applicable federal or state securities law and federal immigration laws pertaining to EB-5 classification;

(b)    The transferor and transferee shall have executed and acknowledged such instruments as the General Partner may deem necessary or desirable to effect such transfer;

(c)    The transferor and transferee shall have provided, if requested by any General Partner, an opinion of counsel indicating that, in the opinion of said counsel, such transfer would not jeopardize the status of the Limited Partnership as a Limited Partnership for federal income tax purposes, and would not violate, nor cause the Limited Partnership to violate, any applicable law or governmental rule or regulation, including without limitation, any applicable federal or state securities law and federal immigration laws pertaining to EB-5 classification; and

(d)  The transferor has made all Capital Contributions to the Limited Partnership in accordance with **Article IV** hereof and has no further obligation to the Limited Partnership beyond his Capital Contribution as described in Section 9.02.

(2)    At the time of a transfer of any Limited Partner's Interest, whether or not such transfer is made in accordance with this **Section 11.03**, all the rights possessed as a Limited Partner in connection with the transferred Interest, which rights otherwise would be held either by the transferor or transferee, shall terminate against the Limited Partnership unless the transferee is admitted to the Limited Partnership as a Limited Partner pursuant to the provisions of **Section 11.04** hereof; provided, however,

EXHIBIT 2

Case 1:19-cv-02443-STV   Document 31-8   Filed 06/18/20   USDC Colorado   Page 16 of 25

that if the transfer is made in accordance with this **Section 11.03**, such transferee shall be entitled to receive distributions to which the transferor would otherwise be entitled as of the effective date of such transfer, which date shall be specified by the General Partner and shall be no later than the last day of the calendar month following the first calendar month during which the General Partner has received notice of the transfer and all conditions precedent to such transfer provided for in this Agreement have been satisfied. The Limited Partnership and the General Partner shall be entitled to treat the transferor as the recognized owner of such Interests until such effective date and shall incur no liability for distributions made in good faith to the transferor prior to the effective date.

(3)      In the event a Limited Partner transfers all of his Interest in the Limited Partnership, the transferor will cease to be a Limited Partner.   The transferring Limited Partner acknowledges that such a transfer may make him or her ineligible for any benefit conferred under the Immigration and Nationality Act to EB-5 investors.  The transferring Limited Partner is hereby advised to seek independent immigration counsel prior to effecting a transfer.

(4)      If a General Partner purchases the Interest of a Limited Partner, such Interest shall be treated as a Limited Partnership Interest with respect to all allocations and distributions of the Limited Partnership.

(5)      A transfer by a Limited Partner, including transfers of all or less than all rights hereunder, shall not relieve the transferor of obligations under this Agreement.

(6)      Each of the Limited Partners, by executing this Agreement, hereby covenants and agrees that he will not, in any event, sell or distribute his Interest in the Limited Partnership or any portion thereof unless, in the opinion of counsel to the Limited Partner (which counsel and opinion shall be satisfactory to counsel for the General Partner) such Interest in the Limited Partnership may be legally sold or distributed in compliance with applicable federal and state securities laws.

(7)      Notwithstanding any other provision of this Agreement, a Limited Partner may not transfer his Interest in any case if such a transfer, when aggregated with all other transfers within a twelve (12) month period, would cause the termination of the Limited Partnership as a Limited Partnership for federal income tax purposes pursuant to Section 708 of the Code, unless such transfer shall be expressly approved by the General Partner.

Section 11.04.  Admission of Transferees as Limited Partners.

(1)      No transferee of a Limited Partner shall be admitted as a Limited Partner unless all of the following conditions have been satisfied:

(a)      The transfer complies with **Section 11.03** and the transferor Limited Partner gives the transferee the right to become a Limited Partner;

(b)      The prospective transferee has executed an instrument, in form and substance satisfactory to the General Partner, accepting and agreeing to be bound by all the terms and conditions of this Agreement, including the power of attorney set forth in **Article XIV** hereof, and has paid all expenses of the Limited Partnership in effecting the transfer;

EXHIBIT 2

(c)     All requirements of the Act regarding the admission of a transferee limited partner have been complied with by the transferee, the transferring Limited Partner, and the Limited Partnership;

(d)     Such transfer is effected in compliance with all applicable state and federal securities laws; and

(e)     The transferee executes all documents reasonably required by the General Partner.

(2)     In the event of a transfer complying with all the requirements of Section 11.03 hereof and the transferee being admitted as a Limited Partner pursuant to this Section 11.04, the General Partner, for himself as a General Partner and for each Limited Partner pursuant to the Power of Attorney granted by each Limited Partner, shall execute and file an amendment to this Agreement.  Unless named in this Agreement, as amended from time to time, no person shall be considered a Partner; and the Limited Partnership, each Partner, and any other person having business with the Limited Partnership need deal only with Partners so named and shall not be required to deal with any other person by reason of a transfer by, or by reason of the death of, a Partner, except as otherwise expressly provided herein.

## ARTICLE XII
### TRANSFERS OF GENERAL PARTNERSHIP INTERESTS;
### WITHDRAWAL AND ADMISSION OF GENERAL PARTNERS

Section 12.01.  Withdrawal of General Partner.  The General Partner may withdraw from the Limited Partnership by giving the Limited Partners written notice of withdrawal at least sixty (60) days prior to the effective date of the withdrawal.  A General Partner who withdraws from the Limited Partnership may sell its Interest only in accordance with the procedures and limitations of Section 12.03 hereof.  In the event there is no such sale, or until such time as there is such a sale, a General Partner who has withdrawn shall have the same rights and be subject to the same limitations as a General Partner that has been removed pursuant to the provisions of Section 12.03 hereof, and the interest of the withdrawn General Partner may be acquired by the other General Partners or by the Limited Partners in accordance with the procedures set forth in Section 12.03 hereof.

Section 12.02.  Removal, Bankruptcy, Dissolution, Death or Incompetency of General Partner.  A General Partner shall cease to be a General Partner of the Limited Partnership upon the removal, bankruptcy, dissolution, death or incompetency of the General Partner and any General Partner may be removed by the vote of the Limited Partners, under Section 9.06 above, only for cause.  For purposes of this Section 12.02, the term "cause" shall mean acts of the General Partner which constitute larceny, fraud, or a crime involving moral turpitude.

Section 12.03.  Transfer by General Partner; Admission of Additional or Successor General Partners.  A General Partner may transfer his Interest, or any part thereof, and an additional or successor General Partner, as the case may be, shall be admitted to the Limited Partnership as follows:

(1)     If a General Partner desires to sell, transfer or assign its Interest in the Limited Partnership to another then existing General Partner, such General Partner must obtain the consent of all of the other General Partners, if any, before effecting such sale or transfer.  If the Partner desiring to sell,

EXHIBIT 2

transfer or assign its interest is the General Partner, then a majority of the other General Partners, if there are three or more General Partners, and, if not, then two-thirds of the Limited Partners, must agree as to who is to become the new General Partner before the proposed sale, transfer or assignment can be effected.

(2)     Except as provided in Section 12.03(3), if a General Partner desires to sell, transfer or assign its Interest in the Limited Partnership to a person or entity who is not then a General Partner, such transfer shall be permitted if, and only if, the proposed transferee is approved as a successor General Partner as follows:

(a)     The admission of the transferee as a successor General Partner shall have been consented to by the other General Partners, and if none, by a two-thirds vote of the Limited Partners;

(b)     If the proposed transferee is a non-natural person, it shall have provided the Limited Partnership evidence satisfactory to counsel for the Limited Partnership of its authority to become a General Partner;

(c)     In the event that one or more General Partners shall be so designated and approved, this Agreement shall be appropriately amended to provide for the participation of such additional General Partners.

Notwithstanding the above, the General Partner shall have the absolute right to assign to any third party all or any portion of its right to receive cash flow distributions from the Limited Partnership provided that the General Partner remains as a General Partner.

(3)     Upon action taken by the Limited Partners to remove a General Partner in accordance with Section 9.06 and subject to Section 12.02, Limited Partners owning Interests constituting in the aggregate two-thirds of the Interests of all Limited Partners may, without the concurrence of the General Partners, admit to the Limited Partnership one or more additional General Partners to replace the General Partner(s) to be removed. In the event that one or more additional General Partners shall be so admitted, this Agreement shall be appropriately amended to provide for the participation of such additional General Partners.

(4)     Notwithstanding any other provision of this Agreement, the General Partners may not transfer any Interest in any case if such transfer, when aggregated with all other transfers within a twelve (12) month period, would cause the termination of the Limited Partnership as a Limited Partnership for federal income tax purposes pursuant to Section 708 of the Code unless such transfer shall be approved by Limited Partners owning Interest constituting in the aggregate a majority of the Interests of all Limited Partners in the Limited Partnership.

Section 12.04.  Continuing Liability.  In the event a General Partner withdraws from the Limited Partnership or sells, transfers or assigns its entire Interest pursuant to the provisions of this Agreement, such General Partner shall be, and shall remain, liable for all obligations and liabilities incurred by the General Partner prior to the effective date of such occurrence and shall be free of any obligation or liability incurred on account of the activities of the Limited Partnership from and after such effective date.

EXHIBIT 2

Section 12.05.   Additional Conditions to Admission of General Partners. Notwithstanding any other provision of this Agreement, no additional or successor General Partner may be admitted to the Limited Partnership and no right of the Limited Partners to consent to or approve such admission shall have any effect whatsoever or be exercisable until and unless prior to such exercise the Limited Partnership shall have received an opinion of counsel satisfactory to the Limited Partners (as hereinafter provided) to the effect that the giving of consent of the Limited Partners to such admission will not adversely affect the classification of the Limited Partnership as a Limited Partnership for federal income tax purposes.  For purposes of this Section 12.05, an opinion of counsel will be deemed satisfactory to the Limited Partners if approved in writing by Limited Partners owning Interests constituting in the aggregate a majority of the Interests of all Limited Partners.

Section 12.06.   Purchase of Interest(s) of General Partners. Upon the removal, bankruptcy, dissolution, death or incompetency of a General Partner, the Limited Partnership Interest(s) of the General Partner(s) (hereinafter, for purposes of Sections 12.02 and 12.06, referred to as the "Terminated General Partner(s)") shall be purchased by the Limited Partnership for a purchase price determined in accordance with Section 12.07 hereof.  The purchase price of such Interest(s) shall be paid by the Limited Partnership to the Terminated General Partner(s) or his/their representative either, at the option of the Limited Partnership, in cash or by a promissory note of the Limited Partnership payable to such Terminated General Partner(s) or his representative in a face amount equal to said purchase price and containing provisions as would be usual and customary in a commercial promissory note, including provisions for interest at a rate equal to the prime rate of interest from time to time announced by Wells Fargo Bank to be its "prime rate", such interest to be payable at the time of each installment of principal, which shall be payable in five (5) annual installments or as the Terminated General Partner(s) or his representative and the Limited Partnership may otherwise agree.

Section 12.07.   Purchase Price of a Terminated General Partner(s) Interest. The fair market value of the Terminated General Partner(s)' Interest(s), for any reason other than for removal for cause, to be purchased by the Limited Partnership in accordance with Section 12.06 above shall be determined by agreement between the Terminated General Partner(s) or his representative and the Limited Partnership. If the Terminated General Partner(s) or his representative and the Limited Partnership cannot agree upon the fair market value of such Limited Partnership Interest(s) within 90 days after the date of the Terminated General Partner(s) removal, bankruptcy, dissolution, death or incompetency, then the purchase price shall be the General Partner's percentage interest of the appraised value of the Limited Partnership's assets and business, valued as a going concern without a minority discount determined as soon as possible after the end of the 90-day period above. In the event of removal for cause the purchase price of the terminated General Partner(s) interest shall be based on the formula set forth in this paragraph except that the value of any distributions to Limited Partners paid to the General Partner shall be reduced to zero.

### ARTICLE XIII
### DISSOLUTION, WINDING UP AND TERMINATION

Section 13.01.   Events Causing Dissolution. The Limited Partnership shall be dissolved and its affairs shall be wound up upon the happening of the first to occur of any of the following events:

(1)      Expiration of the term of the Limited Partnership stated in Section 1.05 hereof;

EXHIBIT 2

(2)        Entry of a decree of judicial dissolution pursuant to the Act;

(3)        The sale or other disposition of all or substantially all of the assets of the Limited Partnership;

(4)        The removal, bankruptcy, dissolution, death or incompetency of the General Partner(s), unless:

    (a)        At the time of the occurrence of any of such events there is at least one other additional or successor General Partner, in which case the business of the Limited Partnership shall be carried on by the remaining General Partner(s); or

    (b)        Within 90 days of the occurrence of any such event, all Partners agree in writing to continue the business of the Limited Partnership and to the appointment of one or more General Partner(s) who shall succeed to all of the management rights and responsibilities of the General Partner(s) hereunder.

Section 13.02.    Bankruptcy of General Partner(s).  For the purposes of this Agreement, the "bankruptcy" of a General Partner shall mean any of the following:

(1)        The General Partner makes an assignment for the benefit of creditors;

(2)        The General Partner files a voluntary petition in bankruptcy;

(3)        The General Partner is adjudicated as bankrupt or insolvent;

(4)        The General Partner files a petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation;

(5)        The General Partner files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Partner in any proceedings of the nature described in (4) above;

(6)        The General Partner seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of such Partner or of all or any substantial part of such Partner's properties;

(7)        The expiration of 90 days after the commencement of any proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, provided the proceeding has not been dismissed within such 90 day period; or

(8)        The expiration of 60 days after the appointment without such General Partner's consent or acquiescence of a trustee, receiver, or liquidator of the General Partner or all or any substantial part of such General Partner's properties, provided the appointment is not vacated or stayed within such

EXHIBIT 2

60 day period, or if stayed within such 60 day period, then the expiration of sixty (60) days after the expiration of any such stay, provided the appointment is not vacated within such 60 day period.

Section 13.03.  Winding Up.  Upon dissolution of the Limited Partnership for any reason, he General Partner, or any other party (the "Liquidator") designated by vote or written consent of Limited Partners owning Interests constituting in the aggregate a majority of the Interests of all Limited Partners, if required, shall commence to wind up the affairs of the Limited Partnership and to liquidate its assets. The Partners shall continue to share income, gains, expenses, losses and all other items during the period of liquidation in the same proportion as before the dissolution. The Liquidator shall have the full right and unlimited discretion to determine the time, manner and terms of any sale or sales of Limited Partnership Property pursuant to such liquidation.  Pending such sales, the Liquidator or such other party shall have the right to continue to operate and otherwise deal with the assets of the Limited Partnership.   A reasonable time shall be allowed for the orderly winding up of the business of the Limited Partnership and the liquidation of its assets and the discharge of its liabilities to creditors so as to enable the Liquidator to minimize the normal losses attendant upon a liquidation, having due regard to the activity and condition of the relevant markets for the Limited Partnership Property and general financial and economic conditions. Any Partner may be a purchaser of the Property of the Limited Partnership upon liquidation, including, without limitation, any liquidation conducted pursuant to a judicial dissolution or otherwise under judicial supervision; provided, however, that the purchase price and terms of sale are fair and reasonable to the Limited Partnership.

Section 13.04.  Distributions.  The proceeds of liquidation and any other funds of the Limited Partnership shall be distributed in the order of priority set forth in **Article VI** above.

Section 13.05.  Certificate of Cancellation; Report; Termination.  Upon the dissolution and commencement of winding up of the Limited Partnership, the General Partner shall execute and file a certificate of cancellation of the Limited Partnership. Within a reasonable time following the completion of the liquidation of the Limited Partnership's assets, the General Partner or such other party shall prepare and furnish to each Partner, at the expense of the Limited Partnership, a statement that sets forth the assets and liabilities of the Limited Partnership as of the date of complete liquidation and the amount of each Partner's distribution pursuant to Article VI hereof.  Upon completion of the liquidation and distribution of all Limited Partnership funds, the Limited Partnership shall terminate and the General Partner shall have the authority to execute and file all documents required to effectuate the termination of the Limited Partnership.

Section 13.06.  Rights of Limited Partners to Return of Capital Contribution.  Beginning on a date three years following the date of the first Capital Contribution to the Limited Partnership by a Limited Partner, the General Partner shall engage one or more independent third parties who are familiar with the Vail, Colorado condominium market to prepare a good faith estimate of the Fair Market Value (as hereinafter defined) of the Limited Partnership Property.  The Limited Partnership shall provide notice (the "Option Notice") to the Limited Partners of the estimated Fair Market Value.  For purposes of this Section, "Fair Market Value" shall be deemed to mean the total liquidation value (as determined pursuant to a good faith market analysis conducted by qualified third-parties engaged by the General Partner) of all of the Limited Partnership Property after deduction of all usual and customary selling expenses, pro rations, and other similar matters.  Each Limited Partner who, at the time of the receipt of the Option Notice has held his or her LP Interest for at least three years, shall be entitled to give notice to the General Partner within 45 days following delivery of the Option Notice of his or her election to sell to the Limited Partnership his or her LP Interest (the "Acceptance Notice").  Failure to deliver the Acceptance Notice within such 45-day period shall be deemed conclusive evidence of the Limited Partner's rejection of the offer to purchase. Except as specifically set forth below, receipt of the Acceptance Notice shall be deemed

EXHIBIT 2

to be conclusive evidence of the Limited Partner's election to sell his or her LP Interest at the Purchase Price (as defined below). The price for such purchase shall be equal to the Limited Partner's pro rata share (as determined from the Capital Accounts) of whatever price the Partnership is able to realize using its reasonable business efforts to liquidate the Limited Partnership Property pursuant to the Option Notice (the "Purchase Price"). The Purchase Price may be greater than or less than the Fair Market Value as set forth in the Option Notice and shall be solely dependent on the price that the Partnership is able to realize from the liquidation of the Limited Partnership Property. Notwithstanding the above, if the actual Purchase Price is less than 70% of the Fair Market Value set forth in the Option Notice, the Limited Partner shall have the right, exercisable within 10 days following written notice to the Limited Partner of the amount of the Purchase Price, to rescind the Acceptance Notice. Prior to the consummation of any sale pursuant to this provision, the independent party or parties who made the initial determination of Fair Market Value, shall make a second determination that the actual sales price represents a fair valuation under all facts and circumstances. Such fair market analyses shall be made available for review by any Limited Partner. The Purchase Price shall be payable in cash on a date 180 days following the expiration of the 90-day period following delivery of the Option Notice. On each six-month anniversary date of the original Option Notice, the General Partner shall provide to the remaining Limited Partners a new Option Notice setting forth the then applicable Fair Market Value of the Limited Partnership Property and each Limited Partner shall then have 90 days from such date to deliver an Acceptance Notice. If the offer is accepted, the Purchase Price shall be payable as set forth above. This Section is intended only to provide the Limited Partners with the right to receive their pro-rata share the Fair Market Value on certain future date, as more specifically set forth above, and shall in no event be construed to confer any additional rights or privileges with respect to the management or disposition of the Partnership assets.

## ARTICLE XIV
## SPECIAL AND LIMITED POWER OF ATTORNEY

Section 14.01. Special and Limited Power of Attorney.

(1) The General Partner shall at all times during the existence of the Limited Partnership have a special and limited power of attorney as the attorney-in-fact for each Limited Partner with power and authority to act in the name and on the behalf of each Limited Partner to make, execute, swear to, verify, acknowledge, correct and file the following documents and any other documents deemed by the General Partner to be necessary for the business of the Limited Partnership:

(a) This Agreement, and any amendments thereto;

(b) Any certificate of Limited Partnership for the Limited Partnership and amendments thereto required or permitted or deemed advisable by the General Partner to be made or filed on behalf of the Limited Partnership, and any and all certificates or other instruments necessary to qualify the Limited Partnership as a Limited Partnership;

(c) Any other instrument or document that may be required to be filed by the Limited Partnership under the laws of any state or by a governmental agency or which the General Partner deems advisable to file, including without limitation the United States Citizenship and Immigration Services;

(d) Any instrument or document which may be required to effect the continuation of the Limited Partnership and admission of an additional or substitute General or Limited

EXHIBIT 2

Partner, or the dissolution and termination of the Limited Partnership (provided such continuation, admission or dissolution and termination are in accordance with the terms of this Agreement).

(e)     Any instrument or document which may be required to respond to USCIS's requests for additional evidence or denial where the grounds relate to the Project only, with respect to any Limited Partner's I-526 Petition or I-829 Petition. Each Limited Partner acknowledges and agrees that the Limited Partnership's special immigration counsel, as appointed by the General Partner, is the sole entity authorized to respond on behalf of the Limited Partnership in any matter before the USCIS, the Administrative Appeals Office, or other judicial body having jurisdiction over any Limited Partner's I-526 Petition or I-829 Petition. Each Limited Partner agrees to supply a Form G-28 appointing such special immigration counsel to facilitate such response by the Partnership or General Partner; and

(f)     Execute any and all documents necessary to enable the General Partner to carry out powers of the General Partner including but not limited to granting Limited Partnership Property as security for Limited Partnership obligations and sale or conveyance of Limited Partnership Property.

(2)     This power of attorney is a special power of attorney coupled with an interest, is irrevocable, shall survive the death of each Limited Partner and is limited to those matters herein set forth.

### ARTICLE XV
### MISCELLANEOUS

Section 15.01.  Amendments.  Except as otherwise provided by law, this Agreement may be amended in any respect by the General Partner without the written approval or consent of Limited Partners owning Interests in the Limited Partnership; provided however, that:

(1)     Without the consent of Limited Partners to be adversely affected by the amendment, this Agreement may not be amended so as to change the Capital Contributions required, or rights and interests in profits, losses and distributions of any Partner; and

(2)     In the case of any provision hereof which requires the action, approval or consent of a specified Interest of Limited Partners, such provision may not be amended without the consent of the Limited Partners owning such specified Interests.

Section 15.02.  Notices.  Any notice, offer, consent or other communication required or permitted to be given or made hereunder shall be in writing and shall be deemed to have been sufficiently given or made when delivered personally to the party (or an officer of the party) to whom the same is directed, or (except in the event of a mail strike) five (5) days after being mailed by first class mail, postage prepaid, if to the Limited Partnership or to the General Partner, to the office described in Section 1.03 hereof, or if to a General Partner or to a Limited Partner, to the address set forth in Exhibit A attached hereto.  Any Partner may change his or its address for the purpose of this Section 15.02 by giving notice of such change to the Limited Partnership, such change to become effective on the tenth (10th) day after such notice is given.

Section 15.03.  Governing Law; Survival of Rights; Severability of Provisions.  This Agreement shall be governed by the internal laws of the State of Colorado and shall, subject to the restrictions on transfer set forth herein, bind and inure to the benefit of the heirs, executors, personal representatives, successors and assigns of the parties hereto.  If any provision of this Agreement is held to be invalid, the remainder of this Agreement shall not be affected thereby.

EXHIBIT 2

Section 15.04. Entire Agreement. This Agreement constitutes the entire agreement among the parties and supersedes any prior agreement or understandings among them, oral or written, all of which are hereby cancelled. This Agreement may not be modified or amended other than pursuant to **Section 15.01** hereof.

Section 15.05. Captions; Pronouns. The paragraph titles or captions contained in this Agreement are inserted only as a matter of convenience of reference. Such titles and captions in no way define, limit, extend or describe the scope of this Agreement nor the intent of any provision hereof. All pronouns and any variation thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person or persons may require.

Section 15.06. No Waiver. The failure of any Partner to seek redress for violation, or to insist on strict performance, of any covenant of this Agreement shall not prevent a subsequent act which would have constituted a violation from having the effect of an original violation.

Section 15.07. Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which shall constitute one Agreement, binding on all of the parties hereto.

**Signature Page Follows**

EXHIBIT 2

**IN WITNESS WHEREOF** the parties have executed this Agreement as of the day and year first above written.

**GENERAL PARTNER:**

Colorado Regional Center I, LLC

By: Chester P. Schwartz
Its: Manager

**LIMITED PARTNERS:**

Colorado Regional Center I, LLC

By Chester P. Schwartz, Manager, as attorney-in-fact for the
    Limited Partners listed in Exhibit A attached hereto and
    Incorporated herein

EXHIBIT 2

I-526 Attachment
Part 3: Information About Your Investors
Colorado Regional Center Project Solaris, LLLP Ownership

|  | Petitioner | Ownership Percentage |
|---|---|---|
| 1. | Mr. Seung Mo Kim | 0.6% |
| 2. | Mr. Fuqiang Sun | 0.6% |
| 3. | Mr. Siyuan Huang | 0.6% |
| 4. | Mr. Guohai Wang | 0.6% |
| 5. | Ms. Jie Yang | 0.6% |
| 6. | Ms. Ming Zhao | 0.6% |
| 7. | Mr. Min Zheng | 0.6% |
| 8. | Mr. Guohai He | 0.6% |
| 9. | Mr. Xiaolong Cao | 0.6% |
| 10. | Mr. Rujun Liu | 0.6% |
| 11. | Mr. CheonSoo Yoon | 0.6% |
| 12. | Ms. Juanjiao Zhu | 0.6% |
| 13. | Ms. Lin QIAO | 0.6% |
| 14. | Mr. Zhiwen ZHANG | 0.6% |
| 15. | Ms. Sha WU | 0.6% |
| 16. | Mr. Qi QIN | 0.6% |
| 17. | Mr. Xianhu WU | 0.6% |
| 18. | Mr. Luchuan YE | 0.6% |
| 19. | Ms. Yichen DAI | 0.6% |
| 20. | Mr. Hui CHEN | 0.6% |
| 21. | Mr. Hongbin SHEN | 0.6% |
| 22. | Mr. Feng LING | 0.6% |
| 23. | Ms. Yan LU | 0.6% |
| 24. | Ms. Xiaohe XU | 0.6% |
| 25. | Ms. Yuan BI | 0.6% |
| 26. | Mr. Hao Ying | 0.6% |
| 27. | Mr. Liyang Wang | 0.6% |
| 28. | Ms. Ying XU | 0.6% |
| 29. | Mr. Yong Jun LEE | 0.6% |
| 30. | Ms. Na LI | 0.6% |
| 31. | Ms. Lu LI | 0.6% |
| 32. | Ms. Hong HU | 0.6% |
| 33. | Ms. Yanxia SHEN | 0.6% |
| 34. | Mr. Zhong LIU | 0.6% |
| 35. | Ms. Ji Sun LEE | 0.6% |
| 36. | Ms. Lin SONG | 0.6% |
| 37. | Mr. Sheng YUAN | 0.6% |
| 38. | Mr. Shaowu KONG | 0.6% |
| 39. | Mr. Yuwei DONG | 0.6% |
| 40. | Ms. Xinping GENG | 0.6% |
| 41. | Mr. Youwei ZHANG | 0.6% |
| 42. | Mr. Dapeng WANG | 0.6% |
| 43. | Mr. Kewen ZHOU | 0.6% |

I-526 Attachment
Part 3: Information About Your Investors
Colorado Regional Center Project Solaris, LLLP Ownership

| 44. | Mr. Yi DING | 0.6% | |
|-----|-------------|------|--|
| 45. | Mr. Jie RONG | 0.6% | |
| 46. | Ms. Jiaqi YUAN | 0.6% | |
| 47. | Mr. Ruolin DONG | 0.6% | |
| 48. | Mr. Jae Seok HUR | 0.6% | |
| 49. | Mr. Xuqun LIU | 0.6% | |
| 50. | Ms. Xiaohong ZHANG | 0.6% | |
| 51. | Ms. Na-na MA | 0.6% | |
| 52. | Mr. Li XU | 0.6% | |
| 53. | Mr. Lian SHEN | 0.6% | |
| 54. | Ms. Xiaomei WANG | 0.6% | |
| 55. | Mr. Yue WU | 0.6% | |
| 56. | Ms. Mingxiu HAO | 0.6% | |
| 57. | Mr. Tao JIANG | 0.6% | |
| 58. | Mr. Linjie LUO | 0.6% | |
| 59. | Mr. Ilyong KIM | 0.6% | |
| 60. | Mr. Zhen HUANG | 0.6% | |
| 61. | Ms. Rong Zhu | 0.6% | |
| 62. | Ms. Weihua SHI | 0.6% | |
| 63. | Mr. Wen CHEN | 0.6% | |
| 64. | Ms. Xuyan SHAO | 0.6% | |
| 65. | Ms. Yang LI | 0.6% | |
| 66. | Mr. Yue Li | 0.6% | |
| 67. | Ms. Beilei HUANG | 0.6% | |
| 68. | Ms. Yuping YIN | 0.6% | |
| 69. | Ms. Xue HAN | 0.6% | |
| 70. | Mr. Wei WANG | 0.6% | |
| 71. | Mr. Jun ZHANG | 0.6% | |
| 72. | Ms. Haibo YU | 0.6% | |
| 73. | Mr. Chengyu XU | 0.6% | |
| 74. | Ms. Ling ZHANG | 0.6% | |
| 75. | Mr. Zhou MEI | 0.6% | |
| 76. | Ms. Yufang WU | 0.6% | |
| 77. | Mr. Xiao LIANG | 0.6% | |
| 78. | Ms. Yan AI | 0.6% | |
| 79. | Mr. Kaiyuan WU | 0.6% | |
| 80. | Ms. Lei GU | 0.6% | |
| 81. | Ms. Yu ZHAO | 0.6% | |
| 82. | Mr. Xiaofeng LIANG | 0.6% | |
| 83. | Ms. Yulan ZHOU | 0.6% | |
| 84. | Ms. Eunjeong KIM | 0.6% | |
| 85. | Mr. Weiqiang SU | 0.6% | |
| 86. | Mr. Naidong LIU | 0.6% | |
| 87. | Mr. Ji MA | 0.6% | |

EXHIBIT 2

I-526 Attachment
Part 3: Information About Your Investors
Colorado Regional Center Project Solaris, LLLP Ownership

| 88. | Mr. Jungwoo LEE | 0.6% |
|---|---|---|
| 89. | Ms. Yan SONG | 0.6% |
| 90. | Ms. Sufen LENG | 0.6% |
| 91. | Mr. Chunyi ZOU | 0.6% |
| 92. | Mr. Lei ZHANG | 0.6% |
| 93. | Ms. Zheng TAO | 0.6% |
| 94. | Ms. Xue MEI | 0.6% |
| 95. | Mr. Shijun CHEN | 0.6% |
| 96. | Ms. Bei YU | 0.6% |
| 97. | Mr. Yudong CAO | 0.6% |
| 98. | Ms. Qin ZHOU | 0.6% |
| 99. | Ms. Quanzhi DING | 0.6% |
| 100. | Ms. Lijun SUN | 0.6% |
| 101. | Ms. Hongyan HUANG | 0.6% |
| 102. | Ms. Xiaolin LIU | 0.6% |
| 103. | Mr. Guanou LI | 0.6% |
| 104. | Mr. Xun ZHU | 0.6% |
| 105. | Ms. Yu ZHANG | 0.6% |
| 106. | Mr. Yibo BAO | 0.6% |
| 107. | Mr. Yuquan NI | 0.6% |
| 108. | Ms. Jingwen ZHANG | 0.6% |
| 109. | Mr. Wentao LIU | 0.6% |
| 110. | Ms. Dong YE | 0.6% |
| 111. | Mr. Haifeng CHEN | 0.6% |
| 112. | Mr. Zhuo YANG | 0.6% |
| 113. | Mr. Hesong SUN | 0.6% |
| 114. | Mr. Fan ZHANG | 0.6% |
| 115. | Mr. Zhongzao SHI | 0.6% |
| 116. | Mr. Kang JIN | 0.6% |
| 117. | Ms. Qinfang YU | 0.6% |
| 118. | Ms. Fang SHENG | 0.6% |
| 119. | Ms. Qiushi LI | 0.6% |
| 120. | Ms. Hanying FU | 0.6% |
| 121. | Mr. Yuanzhen LI | 0.6% |
| 122. | Ms. Man YU | 0.6% |
| 123. | Ms. Haowen GUAN | 0.6% |
| 124. | Mr. Tao YUAN | 0.6% |
| 125. | Mr. Zhijian WU | 0.6% |
| 126. | Mr. Li FANG | 0.6% |
| 127. | Mr. Zhenghui LIU | 0.6% |
| 128. | Mr. Jinge HU | 0.6% |
| 129. | Ms. Lu WANG | 0.6% |
| 130. | Ms. Hsinyi WU | 0.6% |
| 131. | Mr. Zhidong WANG | 0.6% |

EXHIBIT 2

I-526 Attachment
Part 3: Information About Your Investors
Colorado Regional Center Project Solaris, LLLP Ownership

| 132. | Mr. Jiujing YU | 0.6% | |
|------|----------------|------|--|
| 133. | Mr. Tian XIA | 0.6% | |
| 134. | Mr. Li WEI | 0.6% | |
| 135. | Ms. Hui ZHANG | 0.6% | |
| 136. | Ms. Mengyao QIU | 0.6% | |
| 137. | Ms. Wei WANG | 0.6% | |
| 138. | Mr. Jun FAN | 0.6% | |
| 139. | Ms. Shengyun HUANG | 0.6% | |
| 140. | Mr. Xusheng ZHANG | 0.6% | |
| 141. | Mr. Yi LIU | 0.6% | |
| 142. | Ms. Ying LI | 0.6% | |
| 143. | Mr. Gang LI | 0.6% | |
| 144. | Mr. Shunli SHAO | 0.6% | |
| 145. | Ms. Yi HOU | 0.6% | |
| 146. | Mr. Zhongwei LI | 0.6% | |
| 147. | Mr. Qi YANG | 0.6% | |
| 148. | Mr. Yong ZHANG | 0.6% | |
| 149. | Mr. Mingquan LI | 0.6% | |
| 150. | Ms. Xiaoshen WANG | 0.6% | |
| 151. | Ms. Meirong HUANG | 0.6% | |
| 152. | Ms. Yuan QIAO | 0.6% | |
| 153. | Mr. Zhangang LI | 0.6% | |
| 154. | Ms. Jianru ZHENG | 0.6% | |
| 155. | Ms. Yuzhen WANG | 0.6% | |
| 156. | Ms. Xiaoling LI | 0.6% | |
| 157. | Mr. Jun LI | 0.6% | |
| 158. | Mr. Lei ZHANG | 0.6% | |
| 159. | Ms. Hiu Kit Wong | 0.6% | |
| 160. | Mr. Dianwen Cui | 0.6% | |
| 161. | Mr. Qiu LI | 0.6% | |
| 162. | Mr. Herong HUANG | 0.6% | |
| 163. | Mr. Yunxia LIU | 0.6% | |
| 164. | Ms. Hongbian Ge | 0.6% | |
| 165. | Mr. Jun XIE | 0.6% | |
| 166. | Colorado Regional Center | 1.00% | |

§ 204.6 Petitions for employment creation aliens., 8 C.F.R. § 204.6

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter I. Department of Homeland Security (Refs & Annos)
      Subchapter B. Immigration Regulations
        Part 204. Immigrant Petitions (Refs & Annos)
          Subpart A. Immigrant Visa Petitions (Refs & Annos)

8 C.F.R. § 204.6

§ 204.6 Petitions for employment creation aliens.

Effective: December 23, 2016 to November 20, 2019
Currentness

<Text of section effective until Nov. 21, 2019.>

(a) General. A petition to classify an alien under section 203(b)(5) of the Act must be filed on Form I–526, Immigrant Petition by Alien Entrepreneur. The petition must be accompanied by the appropriate fee. Before a petition is considered properly filed, the petition must be signed by the petitioner, and the initial supporting documentation required by this section must be attached. Legible photocopies of supporting documents will ordinarily be acceptable for initial filing and approval. However, at the discretion of the director, original documents may be required.

(b) [Reserved by 74 FR 26937]

(c) Eligibility to file. A petition for classification as an alien entrepreneur may only be filed by any alien on his or her own behalf.

(d) Priority date. The priority date of a petition for classification as an alien entrepreneur is the date the petition is properly filed with the Service or, if filed prior to the effective date of these regulations, the date the Form I–526 was received at the appropriate Service Center.

(e) Definitions. As used in this section:

Capital means cash, equipment, inventory, other tangible property, cash equivalents, and indebtedness secured by assets owned by the alien entrepreneur, provided that the alien entrepreneur is personally and primarily liable and that the assets of the new commercial enterprise upon which the petition is based are not used to secure any of the indebtedness. All capital shall be valued at fair market value in United States dollars. Assets acquired, directly or indirectly, by unlawful means (such as criminal activities) shall not be considered capital for the purposes of section 203(b)(5) of the Act.

Commercial enterprise means any for-profit activity formed for the ongoing conduct of lawful business including, but not limited to, a sole proprietorship, partnership (whether limited or general), holding company, joint venture, corporation, business trust, or other entity which may be publicly or privately owned. This definition includes a commercial enterprise consisting of a holding company and its wholly-owned subsidiaries, provided that each such subsidiary is engaged in a for-profit activity formed for the ongoing conduct of a lawful business. This definition shall not include a noncommercial activity such as owning and operating a personal residence.

EXHIBIT 3

Employee means an individual who provides services or labor for the new commercial enterprise and who receives wages or other remuneration directly from the new commercial enterprise. In the case of the Immigrant Investor Pilot Program, "employee" also means an individual who provides services or labor in a job which has been created indirectly through investment in the new commercial enterprise. This definition shall not include independent contractors.

Full-time employment means employment of a qualifying employee by the new commercial enterprise in a position that requires a minimum of 35 working hours per week. In the case of the Immigrant Investor Pilot Program, "full-time employment" also means employment of a qualifying employee in a position that has been created indirectly through revenues generated from increased exports resulting from the Pilot Program that requires a minimum of 35 working hours per week. A job-sharing arrangement whereby two or more qualifying employees share a full-time position shall count as full-time employment provided the hourly requirement per week is met. This definition shall not include combinations of part-time positions even if, when combined, such positions meet the hourly requirement per week.

High employment area means a part of a metropolitan statistical area that at the time of investment:

(i) Is not a targeted employment area; and

(ii) Is an area with an unemployment rate significantly below the national average unemployment rates.

Invest means to contribute capital. A contribution of capital in exchange for a note, bond, convertible debt, obligation, or any other debt arrangement between the alien entrepreneur and the new commercial enterprise does not constitute a contribution of capital for the purposes of this part.

New means established after November 29, 1990.

Qualifying employee means a United States citizen, a lawfully admitted permanent resident, or other immigrant lawfully authorized to be employed in the United States including, but not limited to, a conditional resident, a temporary resident, an asylee, a refugee, or an alien remaining in the United States under suspension of deportation. This definition does not include the alien entrepreneur, the alien entrepreneur's spouse, sons, or daughters, or any nonimmigrant alien.

Regional center means any economic unit, public or private, which is involved with the promotion of economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment.

Rural area means any area not within either a metropolitan statistical area (as designated by the Office of Management and Budget) or the outer boundary of any city or town having a population of 20,000 or more.

Targeted employment area means an area which, at the time of investment, is a rural area or an area which has experienced unemployment of at least 150 percent of the national average rate.

Troubled business means a business that has been in existence for at least two years, has incurred a net loss for accounting purposes (determined on the basis of generally accepted accounting principles) during the twelve- or twenty-four month period prior to the priority date on the alien entrepreneur's Form I–526, and the loss for such period is at least equal to twenty percent of the troubled business's net worth prior to such loss. For purposes of determining whether or not the troubled business has been in existence for two years, successors in interest to the troubled business will be deemed to have been in existence for the same period of time as the business they succeeded.

(f) Required amounts of capital—

EXHIBIT 3

§ 204.6 Petitions for employment creation aliens., 8 C.F.R. § 204.6

(1) General. Unless otherwise specified, the amount of capital necessary to make a qualifying investment in the United States is one million United States dollars ($1,000,000).

(2) Targeted employment area. The amount of capital necessary to make a qualifying investment in a targeted employment area within the United States is five hundred thousand United States dollars ($500,000).

(3) High employment area. The amount of capital necessary to make a qualifying investment in a high employment area within the United States, as defined in section 203(b)(5)(C)(iii) of the Act, is one million United States dollars ($1,000,000).

(g) Multiple investors—

(1) General. The establishment of a new commercial enterprise may be used as the basis of a petition for classification as an alien entrepreneur by more than one investor, provided each petitioning investor has invested or is actively in the process of investing the required amount for the area in which the new commercial enterprise is principally doing business, and provided each individual investment results in the creation of at least ten full-time positions for qualifying employees. The establishment of a new commercial enterprise may be used as the basis of a petition for classification as an alien entrepreneur even though there are several owners of the enterprise, including persons who are not seeking classification under section 203(b)(5) of the Act and non-natural persons, both foreign and domestic, provided that the source(s) of all capital invested is identified and all invested capital has been derived by lawful means.

(2) Employment creation allocation. The total number of full-time positions created for qualifying employees shall be allocated solely to those alien entrepreneurs who have used the establishment of the new commercial enterprise as the basis of a petition on Form I–526. No allocation need be made among persons not seeking classification under section 203(b)(5) of the Act or among non-natural persons, either foreign or domestic. The Service shall recognize any reasonable agreement made among the alien entrepreneurs in regard to the identification and allocation of such qualifying positions.

(h) Establishment of a new commercial enterprise. The establishment of a new commercial enterprise may consist of:

(1) The creation of an original business;

(2) The purchase of an existing business and simultaneous or subsequent restructuring or reorganization such that a new commercial enterprise results; or

(3) The expansion of an existing business through the investment of the required amount, so that a substantial change in the net worth or number of employees results from the investment of capital. Substantial change means a 40 percent increase either in the net worth, or in the number of employees, so that the new net worth, or number of employees amounts to at least 140 percent of the pre-expansion net worth or number of employees. Establishment of a new commercial enterprise in this manner does not exempt the petitioner from the requirements of 8 CFR 204.6(j) (2) and (3) relating to the required amount of capital investment and the creation of full-time employment for ten qualifying employees. In the case of a capital investment in a troubled business, employment creation may meet the criteria set forth in 8 CFR 204.6(j)(4)(ii).

EXHIBIT 3

(i) State designation of a high unemployment area. The state government of any state of the United States may designate a particular geographic or political subdivision located within a metropolitan statistical area or within a city or town having a population of 20,000 or more within such state as an area of high unemployment (at least 150 percent of the national average rate). Evidence of such designation, including a description of the boundaries of the geographic or political subdivision and the method or methods by which the unemployment statistics were obtained, may be provided to a prospective alien entrepreneur for submission with Form I–526. Before any such designation is made, an official of the state must notify the Associate Commissioner for Examinations of the agency, board, or other appropriate governmental body of the state which shall be delegated the authority to certify that the geographic or political subdivision is a high unemployment area.

(j) Initial evidence to accompany petition. A petition submitted for classification as an alien entrepreneur must be accompanied by evidence that the alien has invested or is actively in the process of investing lawfully obtained capital in a new commercial enterprise in the United States which will create full-time positions for not fewer than 10 qualifying employees. In the case of petitions submitted under the Immigrant Investor Pilot Program, a petition must be accompanied by evidence that the alien has invested, or is actively in the process of investing, capital obtained through lawful means within a regional center designated by the Service in accordance with paragraph (m)(4) of this section. The petitioner may be required to submit information or documentation that the Service deems appropriate in addition to that listed below.

(1) To show that a new commercial enterprise has been established by the petitioner in the United States, the petition must be accompanied by:

(i) As applicable, articles of incorporation, certificate of merger or consolidation, partnership agreement, certificate of limited partnership, joint venture agreement, business trust agreement, or other similar organizational document for the new commercial enterprise;

(ii) A certificate evidencing authority to do business in a state or municipality or, if the form of the business does not require any such certificate or the State or municipality does not issue such a certificate, a statement to that effect; or

(iii) Evidence that, as of a date certain after November 29, 1990, the required amount of capital for the area in which an enterprise is located has been transferred to an existing business, and that the investment has resulted in a substantial increase in the net worth or number of employees of the business to which the capital was transferred. This evidence must be in the form of stock purchase agreements, investment agreements, certified financial reports, payroll records, or any similar instruments, agreements, or documents evidencing the investment in the commercial enterprise and the resulting substantial change in the net worth, number of employees.

(2) To show that the petitioner has invested or is actively in the process of investing the required amount of capital, the petition must be accompanied by evidence that the petitioner has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk. Evidence of mere intent to invest, or of prospective investment arrangements entailing no present commitment, will not suffice to show that the petitioner is actively in the process of investing. The alien must show actual commitment of the required amount of capital. Such evidence may include, but need not be limited to:

(i) Bank statement(s) showing amount(s) deposited in United States business account(s) for the enterprise;

EXHIBIT 3

(ii) Evidence of assets which have been purchased for use in the United States enterprise, including invoices, sales receipts, and purchase contracts containing sufficient information to identify such assets, their purchase costs, date of purchase, and purchasing entity;

(iii) Evidence of property transferred from abroad for use in the United States enterprise, including United States Customs Service commercial entry documents, bills of lading, and transit insurance policies containing ownership information and sufficient information to identify the property and to indicate the fair market value of such property;

(iv) Evidence of monies transferred or committed to be transferred to the new commercial enterprise in exchange for shares of stock (voting or nonvoting, common or preferred). Such stock may not include terms requiring the new commercial enterprise to redeem it at the holder's request; or

(v) Evidence of any loan or mortgage agreement, promissory note, security agreement, or other evidence of borrowing which is secured by assets of the petitioner, other than those of the new commercial enterprise, and for which the petitioner is personally and primarily liable.

(3) To show that the petitioner has invested, or is actively in the process of investing, capital obtained through lawful means, the petition must be accompanied, as applicable, by:

(i) Foreign business registration records;

(ii) Corporate, partnership (or any other entity in any form which has filed in any country or subdivision thereof any return described in this subpart), and personal tax returns including income, franchise, property (whether real, personal, or intangible), or any other tax returns of any kind filed within five years, with any taxing jurisdiction in or outside the United States by or on behalf of the petitioner;

(iii) Evidence identifying any other source(s) of capital; or

(iv) Certified copies of any judgments or evidence of all pending governmental civil or criminal actions, governmental administrative proceedings, and any private civil actions (pending or otherwise) involving monetary judgments against the petitioner from any court in or outside the United States within the past fifteen years.

(4) Job creation—

(i) General. To show that a new commercial enterprise will create not fewer than ten (10) full-time positions for qualifying employees, the petition must be accompanied by:

(A) Documentation consisting of photocopies of relevant tax records, Form I–9, or other similar documents for ten (10) qualifying employees, if such employees have already been hired following the establishment of the new commercial enterprise; or

EXHIBIT 3

(B) A copy of a comprehensive business plan showing that, due to the nature and projected size of the new commercial enterprise, the need for not fewer than ten (10) qualifying employees will result, including approximate dates, within the next two years, and when such employees will be hired.

(ii) Troubled business. To show that a new commercial enterprise which has been established through a capital investment in a troubled business meets the statutory employment creation requirement, the petition must be accompanied by evidence that the number of existing employees is being or will be maintained at no less than the pre-investment level for a period of at least two years. Photocopies of tax records, Forms I–9, or other relevant documents for the qualifying employees and a comprehensive business plan shall be submitted in support of the petition.

(iii) Immigrant Investor Pilot Program. To show that the new commercial enterprise located within a regional center approved for participation in the Immigrant Investor Pilot Program meets the statutory employment creation requirement, the petition must be accompanied by evidence that the investment will create full-time positions for not fewer than 10 persons either directly or indirectly through revenues generated from increased exports resulting from the Pilot Program. Such evidence may be demonstrated by reasonable methodologies including those set forth in paragraph (m)(3) of this section.

(5) To show that the petitioner is or will be engaged in the management of the new commercial enterprise, either through the exercise of day-to-day managerial control or through policy formulation, as opposed to maintaining a purely passive role in regard to the investment, the petition must be accompanied by:

(i) A statement of the position title that the petitioner has or will have in the new enterprise and a complete description of the position's duties;

(ii) Evidence that the petitioner is a corporate officer or a member of the corporate board of directors; or

(iii) If the new enterprise is a partnership, either limited or general, evidence that the petitioner is engaged in either direct management or policy making activities. For purposes of this section, if the petitioner is a limited partner and the limited partnership agreement provides the petitioner with certain rights, powers, and duties normally granted to limited partners under the Uniform Limited Partnership Act, the petitioner will be considered sufficiently engaged in the management of the new commercial enterprise.

(6) If applicable, to show that the new commercial enterprise has created or will create employment in a targeted employment area, the petition must be accompanied by:

(i) In the case of a rural area, evidence that the new commercial enterprise is principally doing business within a civil jurisdiction not located within any standard metropolitan statistical area as designated by the Office of Management and Budget, or within any city or town having a population of 20,000 or more as based on the most recent decennial census of the United States; or

(ii) In the case of a high unemployment area:

EXHIBIT 3

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

(A) Evidence that the metropolitan statistical area, the specific county within a metropolitan statistical area, or the county in which a city or town with a population of 20,000 or more is located, in which the new commercial enterprise is principally doing business has experienced an average unemployment rate of 150 percent of the national average rate; or

(B) A letter from an authorized body of the government of the state in which the new commercial enterprise is located which certifies that the geographic or political subdivision of the metropolitan statistical area or of the city or town with a population of 20,000 or more in which the enterprise is principally doing business has been designated a high unemployment area. The letter must meet the requirements of 8 CFR 204.6(i).

(k) Decision. The petitioner will be notified of the decision, and, if the petition is denied, of the reasons for the denial and of the petitioner's right of appeal to the Associate Commissioner for Examinations in accordance with the provisions of part 103 of this chapter. The decision must specify whether or not the new commercial enterprise is principally doing business within a targeted employment area.

(l) [Reserved by 76 FR 53782]

(m) Immigrant Investor Pilot Program—

(1) Scope. The Immigrant Investor Pilot Program is established solely pursuant to the provisions of section 610 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriation Act, and subject to all conditions and restrictions stipulated in that section. Except as provided herein, aliens seeking to obtain immigration benefits under this paragraph continue to be subject to all conditions and restrictions set forth in section 203(b)(5) of the Act and this section.

(2) Number of immigrant visas allocated. The annual allocation of the visas available under the Immigrant Investor Pilot Program is set at 300 for each of the five fiscal years commencing on October 1, 1993.

(3) Requirements for regional centers. Each regional center wishing to participate in the Immigrant Investor Pilot Program shall submit a proposal to the Assistant Commissioner for Adjudications, which:

(i) Clearly describes how the regional center focuses on a geographical region of the United States, and how it will promote economic growth through increased export sales, improved regional productivity, job creation, and increased domestic capital investment;

(ii) Provides in verifiable detail how jobs will be created indirectly through increased exports;

(iii) Provides a detailed statement regarding the amount and source of capital which has been committed to the regional center, as well as a description of the promotional efforts taken and planned by the sponsors of the regional center;

EXHIBIT 3

(iv) Contains a detailed prediction regarding the manner in which the regional center will have a positive impact on the regional or national economy in general as reflected by such factors as increased household earnings, greater demand for business services, utilities, maintenance and repair, and construction both within and without the regional center; and

(v) Is supported by economically or statistically valid forecasting tools, including, but not limited to, feasibility studies, analyses of foreign and domestic markets for the goods or services to be exported, and/or multiplier tables.

(4) Submission of proposals to participate in the Immigrant Investor Pilot Program. On August 24, 1993, the Service will accept proposals from regional centers seeking approval to participate in the Immigrant Investor Pilot Program. Regional centers that have been approved by the Assistant Commissioner for Adjudications will be eligible to participate in the Immigrant Investor Pilot Program.

(5) Decision to participate in the Immigrant Investor Pilot Program. The Assistant Commissioner for Adjudications shall notify the regional center of his or her decision on the request for approval to participate in the Immigrant Investor Pilot Program, and, if the petition is denied, of the reasons for the denial and of the regional center's right of appeal to the Associate Commissioner for Examinations. Notification of denial and appeal rights, and the procedure for appeal shall be the same as those contained in 8 CFR 103.3.

(6) Continued participation requirements for regional centers.

(i) Regional centers approved for participation in the program must:

(A) Continue to meet the requirements of section 610(a) of the Appropriations Act.

(B) Provide USCIS with updated information annually, and/or as otherwise requested by USCIS, to demonstrate that the regional center is continuing to promote economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment in the approved geographic area, using a form designated for this purpose; and

(C) Pay the fee provided by 8 CFR 103.7(b)(1)(i)(XX).

(ii) USCIS will issue a notice of intent to terminate the designation of a regional center in the program if:

(A) A regional center fails to submit the information required in paragraph (m)(6)(i)(B) of this section, or pay the associated fee; or

(B) USCIS determines that the regional center no longer serves the purpose of promoting economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment.

EXHIBIT 3

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

§ 204.6 Petitions for employment creation aliens., 8 C.F.R. § 204.6

(iii) A notice of intent to terminate the designation of a regional center will be sent to the regional center and set forth the reasons for termination.

(iv) The regional center will be provided 30 days from receipt of the notice of intent to terminate to rebut the ground or grounds stated in the notice of intent to terminate.

(v) USCIS will notify the regional center of the final decision. If USCIS determines that the regional center's participation in the program should be terminated, USCIS will state the reasons for termination. The regional center may appeal the final termination decision in accordance with 8 CFR 103.3.

(vi) A regional center may elect to withdraw from the program and request a termination of the regional center designation. The regional center must notify USCIS of such election in the form of a letter or as otherwise requested by USCIS. USCIS will notify the regional center of its decision regarding the withdrawal request in writing.

(7) Requirements for alien entrepreneurs. An alien seeking an immigrant visa as an alien entrepreneur under the Immigrant Investor Pilot Program must demonstrate that his or her qualifying investment is within a regional center approved pursuant to paragraph (m)(4) of this section and that such investment will create jobs indirectly through revenues generated from increased exports resulting from the new commercial enterprise.

(i) Exports. For purposes of paragraph (m) of this section, the term "exports" means services or goods which are produced directly or indirectly through revenues generated from a new commercial enterprise and which are transported out of the United States;

(ii) Indirect job creation. To show that 10 or more jobs are actually created indirectly by the business, reasonable methodologies may be used. Such methodologies may include multiplier tables, feasibility studies, analyses of foreign and domestic markets for the goods or services to be exported, and other economically or statistically valid forecasting devices which indicate the likelihood that the business will result in increased employment.

(8) Time for submission of petitions for classification as an alien entrepreneur under the Immigrant Investor Pilot Program. Commencing on October 1, 1993, petitions will be accepted for filing and adjudicated in accordance with the provisions of this section if the alien entrepreneur has invested or is actively in the process of investing within a regional center which has been approved by the Service for participation in the Pilot Program.

(9) Effect of termination of approval of regional center to participate in the Immigrant Investor Pilot Program. Upon termination of approval of a regional center to participate in the Immigrant Investor Pilot Program, the director shall send a formal written notice to any alien within the regional center who has been granted lawful permanent residence on a conditional basis under the Pilot Program, and who has not yet removed the conditional basis of such lawful permanent residence, of the termination of the alien's permanent resident status, unless the alien can establish continued eligibility for alien entrepreneur classification under section 203(b)(5) of the Act.

EXHIBIT 3

**Credits**

[41 FR 55849, Dec. 23, 1976; 56 FR 60910, Nov. 29, 1991; 57 FR 1860, Jan. 16, 1992; 58 FR 44608, 44609, Aug. 24, 1993; 59 FR 17921, April 15, 1994; 74 FR 26937, June 5, 2009; 75 FR 58990, Sept. 24, 2010; 76 FR 53782, Aug. 29, 2011; 81 FR 73332, Oct. 24, 2016]

AUTHORITY: 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1182, 1184, 1186a, 1255, 1324a, 1641; 8 CFR part 2.

Notes of Decisions (34)

Current through October 17, 2019; 84 FR 55509.

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT 3

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

## AGREEMENT REGARDING COLLATERAL UNITS

This Agreement Regarding Collateral Units (this "**Agreement**"), dated as of the 17th day of April, 2015, is by and among **Colorado Regional Center Project Solaris, LLLP** (the "**Lender**" or "**CRCPS**"), a Colorado limited liability limited partnership, **Solaris Property Owner I, LLC** ("**Borrower**"), a Delaware limited liability company, and, with respect to Section 2 only, **P.B.K. Real Estate, LLC d/b/a Solaris Real Estate LLC** ("**Broker**"), a Colorado limited liability company.

### Recitals

A.     Reference is hereby made to that certain Promissory Note dated April 18, 2012, executed by Borrower, as assignee of Solaris Property Owner, LLC, a Delaware limited liability company ("**Original Borrower**") pursuant to that certain Assignment of Loan Agreement dated October 12, 2011 by and between Original Borrower and Borrower, and payable to the order of Lender ("**Lender**") in the original maximum principal amount of One Hundred Million and No/100 Dollars ($100,000,000.00), as amended by that certain Allonge to Promissory Note dated of even date therewith by and between Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, collectively the "**Note**"), Borrower has become indebted to Lender with respect to a loan ("**Loan**") made pursuant to that certain Loan Agreement dated November 5, 2010 between Original Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), which Loan is secured by one or more Deeds of Trust recorded against the Collateral Units in the real property records of Eagle County, Colorado (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, each a "**Deed of Trust**" and collectively, the "**Deeds of Trust**"), and further evidenced, secured or governed by other instruments and documents executed in connection with the Loan, including, but not limited to (i) that certain Operating Payment Agreement dated November 5, 2010 by and between Borrower, as successor in interest to Original Borrower, and Lender (the "**Operating Payment Agreement**"), (ii) that certain Yield Enhancement Agreement dated November 5, 2010 by and between Borrower and Lender, (iii) that certain Memorandum of Understanding dated April 1, 2011 by and between Borrower, as successor in interest to Original Borrower, and Lender (the "**MOU**"), and (iv) that certain Guaranty Agreement dated April 18, 2012 by Peter Knobel for the benefit of Lender (the "**Guaranty**"), and as such loan documents were amended pursuant to that certain Omnibus Amendment to EB-5 Investment Documents dated March 8, 2012 by and between Original Borrower and Lender (the "**Omnibus Amendment**") (such other instruments and documents, Operating Payment Agreement, MOU, Guaranty, and Omnibus Amendment, together with the Note, the Loan Agreement and Deeds of Trust, as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, collectively, the "**Loan Documents**"). All capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Loan Documents.

B.     Pursuant to the Loan Documents, Borrower has the right to tender any Collateral Unit (as defined therein) to Lender in repayment of a corresponding Loan Advance commencing

EXHIBIT 4

on the applicable Prepayment Date, as more particularly set forth in the Loan Documents (each, a "**Collateral Unit Distribution**").

      C.     Borrower has duly notified Lender that it intends to cause the occurrence of a Collateral Unit Distribution with respect to each of the Collateral Units on the applicable Prepayment Date. From and after the Prepayment Date for a Collateral Unit, such Collateral Unit may hereinafter be referred to each as an "**Eligible Unit**" and collectively as the "**Eligible Units.**"

      D.     In lieu of accepting the conveyance of title to the Eligible Units pursuant to a Collateral Unit Distribution, the Lender and Borrower have determined that it is desirable for Borrower to continue to hold record title to the Eligible Units.

      E.     The effective date of each Collateral Unit Distribution is as follows:

|  |  |  |
| --- | --- | --- |
| 6E West | April 18, 2012 | April 17, 2015 |
| 2A South | April 25, 2012 | April 24, 2015 |
| Penthouse E West | May 3, 2012 | May 2, 2015 |
| 6E East | May 30, 2012 | May 29, 2015 |
| Penthouse E East | June 15, 2012 | June 14, 2015 |
| 5E West | August 2, 2012 | August 1, 2015 |
| 4G West | August 24, 2012 | August 23, 2015 |
| 7E West | September 7, 2012 | September 6, 2015 |
| Penthouse C East | September 13, 2012 | September 12, 2015 |
| 6D East | October 2, 2012 | October 1, 2015 |
| 5C West | November 6, 2012 | November 5, 2015 |
| 6C West | November 27, 2012 | November 26, 2015 |
| 5G West | January 24, 2013 | January 23, 2016 |
| 3E East | January 29, 2013 | January 28, 2016 |
| 7E East | January 30, 2013 | January 29, 2016 |
| 4D East | March 6, 2013 | March 5, 2016 |
| Penthouse G West | May 20, 2013 | May 19, 2016 |
| Penthouse C West | May 30, 2013 | May 29, 2016 |
| 3C East | January 30, 2015 | January 29, 2018 |

      F.     Borrower has agreed to temporarily refrain from conveying title to the Eligible Units to Lender pursuant to a Collateral Unit Distribution on the condition that, for purposes of calculating interest under the Loan Documents, Borrower shall be deemed to have caused a Collateral Unit Distribution as of the Prepayment Date corresponding to each Eligible Unit and associated Loan Advance.

      The parties desire to set forth their mutual understanding concerning certain matters related to the listing and sale of the Eligible Units as more particularly described below.

EXHIBIT 4

**Agreement**

Now, therefore, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Lender and Borrower agree as follows:

1.     Collateral Unit Distribution. For purposes of calculating interest (including any default interest) under the Loan Documents, with respect to each Eligible Unit and associated Loan Advance, Borrower shall be deemed to have caused a Collateral Unit Distribution as of the corresponding "Effective Date of Collateral Unit Distribution" set forth in Recital E above. Notwithstanding the occurrence of a Collateral Unit Distribution with respect to an Eligible Unit and anything in the Loan Documents to the contrary, the principal amount of the associated Loan Advance shall continue to constitute Indebtedness under the Loan; provided, however, (i) no interest (including default interest) shall accrue with respect to such Loan Advance from and after the applicable Effective Date of Collateral Unit Distribution (except as required by the Operating Payment Agreement) and (ii) in the event that a Loan Advance remains outstanding after the applicable Maturity Date, no default or Event of Default shall be deemed to have occurred as a result of a failure of Borrower to repay such Loan Advance on or before such Maturity Date, and Lender may not exercise any rights or remedies with respect to a default or Event of Default, unless and until it shall have provided Borrower with a notice and cure period in accordance with Section 17 of the Loan Agreement.

2.     Listing of Eligible Units.

a.     Upon Lender's written request, Lender may authorize Borrower to enter into certain Listing Agreements with its affiliate, P.B.K. Real Estate, LLC, a Colorado limited liability company (d/b/a Solaris Real Estate, LLC) ("**Broker**") to market an Eligible Unit(s) for sale for a total commission of five percent (5%) and on such other terms and conditions as are set forth in the Exclusive Right-To-Sell Listing Contract attached hereto as Exhibit B (each, a "**Listing Agreement**" and the Eligible Unit to which it pertains, a "**Listed Unit**"). The term of the Listing Agreement shall be defined therein. In no event shall Lender, Borrower, or Broker be obligated to enter into a Listing Agreement. The Listing Agreement shall provide that either party has the right to terminate the Listing Period (as defined in the Listing Agreement) upon ten (10) day's written notice to the other. Upon Lender's written request, Borrower shall exercise its right to terminate the Listing Period on the date set forth in Lender's written request that is no sooner than ten (10) days from the date of Borrower's receipt of such notice.

b.     Upon Closing on a Listed Unit, Broker agrees to pay to Lender an amount equal to fifty percent (50%) of the Sale Commission (as defined in the Listing Agreement), net of any Cooperative Broker Compensation (as defined in the Listing Agreement), earned by Broker from the sale of such Listed Unit.

c.     Borrower agrees that Lender shall have authority to make all decisions otherwise granted to Borrower in a Listing Agreement and Borrower shall consult Lender on all matters pertaining to the sale of the Eligible Units.

d.   Upon Lender's written request, Lender may authorize Borrower to enter into listing or co-listing agreements with third-party real estate brokers to market Eligible Unit(s). In no event shall Lender or Borrower be obligated to enter into such a listing agreement. Borrower agrees that Lender shall have authority to make all decisions otherwise granted to Borrower in such listing agreement and Borrower shall consult Lender on all matters pertaining to the sale of the Eligible Units.

3.   Listing of Borrower's Units. During the Listing Period (as defined in the Listing Agreement) for a Listed Unit, Borrower agrees that it will not cause Broker or any other third-party real estate broker to initiate an MLS listing for the sale of any residential unit in Solaris that is owned by Solaris Property Owner, LLC, a Delaware limited liability company, Solaris Property Owner II, LLC, a Delaware limited liability company, or other related entities other than Borrower (collectively, the **"Affiliated Solaris Owners"**) and (ii) is like-kind to an Eligible Unit. Borrower also agrees that any like-kind units owned by the Affiliated Solaris Owners that are currently listed on MLS shall be removed.

4.   Conveyance of Eligible Units.

a.   Sale to Third-Party. In the event that Borrower enters into a contract for the purchase and sale of an Eligible Unit that is approved by Lender (a "Purchase Agreement"), Borrower and Lender shall promptly execute and deliver to the other party a Transfer Agreement with respect to such Eligible Unit substantially in the form attached hereto as Exhibit A (each, a "Transfer Agreement"). The Closing Date under the Transfer Agreement shall be the date set forth in the Purchase Agreement.

b.   Tender to Lender. In the event that Borrower notifies Lender in writing that it intends to tender or otherwise convey any Eligible Unit to Lender or Lender notifies Borrower in writing that an Eligible Unit is to be tendered or otherwise conveyed to Lender, Borrower and Lender shall promptly execute and deliver to the other party a Transfer Agreement with respect to such Eligible Unit substantially in the form of the Transfer Agreement attached hereto as Exhibit A. The Closing Date under the applicable Transfer Agreement shall be the date set forth in the notice from Borrower to Lender that it intends to tender or otherwise convey the Eligible Unit to Lender or notice from Lender to Borrower that requests than the Eligible Unit be tendered or otherwise conveyed to Lender, as the case may be.

c.   Tender to Limited Partners of the Lender. In the event that Lender notifies and instructs Borrower to enter into a contract for the sale or conveyance of an Eligible Unit to an individual limited partner or group of limited partners of the Lender, the parties agree that any Sale Commission shall be waived.

5.   MISCELLANEOUS. This Agreement represents the entire and complete agreement between the parties. The Amendment shall not be amended or modified, except by an instrument in writing, signed by all parties. All terms and provisions hereof shall inure to the benefit of, and being binding upon the parties, and their respective successors and assigns. Wherever used in this Agreement, the singular shall include the plural, and the masculine shall include the feminine and neuter grammatical forms. Captions are included for convenient

reference only, and shall not be construed to alter or affect any terms or provisions of this Agreement. This Agreement has been executed by the parties after discussions and negotiation, and shall be construed as having been drafted by both parties. If any term of this Agreement is held to be invalid or unenforceable, such term shall be construed as being valid and enforceable to the fullest extent permitted by law, and all remaining terms shall remain full force and effect. This Agreement shall be construed and enforced in accordance with the laws of the State of Colorado. Each party hereto waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or any related document. If a party initiates any action to enforce or interpret this Agreement, the party determined by the court or arbiter, as the case may be, to be the prevailing party in such action will be entitled to receive from the non-prevailing party all reasonable costs and expenses, including all reasonable attorneys' fees incurred by the prevailing party in such action. This Agreement may be executed in electronic or facsimile counterparts, each of which when so executed shall be deemed to be an original, and all of which when taken together shall constitute one original signed agreement.

[SIGNATURE PAGE FOLLOWS]

5

EXHIBIT 4

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the date first above set forth.

BORROWER:

SOLARIS PROPERTY OWNER I, LLC,
a Delaware limited liability company

By: _____
    Ryan A. Smith, its Authorized Signatory

LENDER:

COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP,
a Colorado limited liability limited partnership

By: _____
Name: _____ Jans Seyensun _____
Its: _____ Manager _____

With respect to Section 2 only.

BROKER:

P.B.K. REAL ESTATE, LLC d/b/a SOLARIS REAL ESTATE LLC,
a Colorado limited liability limited partnership

By: _____
Name: _____
Its: _____

EXHIBIT 4

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the date first above set forth.

BORROWER:

SOLARIS PROPERTY OWNER I, LLC,
a Delaware limited liability company


By: _____
    Ryan A. Smith, its Authorized Signatory


LENDER:

COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP,
a Colorado limited liability limited partnership

By: _____
Name: _____
Its: _____

With respect to Section 2 only.

BROKER:

P.B.K. REAL ESTATE, LLC d/b/a SOLARIS REAL ESTATE LLC,
a Colorado limited liability limited partnership

By: _____
Name: _____
Its: _____

EXHIBIT 4

Case No. 1:19-cv-02443-STV-MSTV Document 320-1 filed 06/18/20 USDC Colorado pg 241
Case 1:19-cv-02443-STV Document 31-5 Filed 10/18/19 USDC Colorado Page 8 of 23
of 293

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the date first above set forth.

BORROWER:

SOLARIS PROPERTY OWNER I, LLC,
a Delaware limited liability company

By: _____
    Ryan A. Smith, its Authorized Signatory

LENDER:

COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP,
a Colorado limited liability limited partnership

By: _____
Name: _____
Its: _____

With respect to Section 2 only.

BROKER:

P.B.K. REAL ESTATE, LLC d/b/a SOLARIS REAL ESTATE LLC,
a Colorado limited liability limited partnership

By: _____
Name: _____
Its: _____

# EXHIBIT A

## FORM OF TRANSFER AGREEMENT

(Attached)

## TRANSFER AGREEMENT

This TRANSFER AGREEMENT (this "**Agreement**") is executed this _____ day of _____, 20__, by and between SOLARIS PROPERTY OWNER I, LLC, a Delaware limited liability company ("**Borrower**") and COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP, a Colorado limited liability limited partnership ("**Lender**")

## Recitals

A.    Reference is hereby made to that certain Promissory Note dated April 18, 2012, executed by Borrower, as assignee of Solaris Property Owner, LLC, a Delaware limited liability company ("**Original Borrower**") pursuant to that certain Assignment of Loan Agreement dated October 12, 2011 by and between Original Borrower and Borrower, and payable to the order of Lender ("**Lender**") in the original maximum principal amount of One Hundred Million and No/100 Dollars ($100,000,000.00), as amended by that certain Allonge to Promissory Note dated of even date therewith by and between Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, collectively the "**Note**"), Borrower has become indebted to Lender with respect to a loan ("**Loan**") made pursuant to that certain Loan Agreement dated November 5, 2010 between Original Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), which Loan is secured by one of more Deeds of Trust recorded against the Collateral Units in the real property records of Eagle County, Colorado (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, each a "**Deed of Trust**" and collectively, the "**Deeds of Trust**"), and further evidenced, secured or governed by other instruments and documents executed in connection with the Loan, including, but not limited to (i) that certain Operating Payment Agreement dated November 5, 2010 by and between Borrower, as successor in interest to Original Borrower, and Lender (the "**Operating Payment Agreement**"), (ii) that certain Memorandum of Understanding dated April 1, 2011 by and between Borrower, as successor in interest to Original Borrower, and Lender (the "**MOU**"), and (iii) that certain Guaranty Agreement dated April 18, 2012 by Peter Knobel for the benefit of Lender (the "**Guaranty**"), and as such loan documents were amended pursuant to that certain Omnibus Amendment to EB-5 Investment Documents dated March 8, 2012 by and between Original Borrower and Lender (the "**Omnibus Amendment**") (such other instruments and documents, Operating Payment Agreement, MOU, Guaranty, and Omnibus Amendment, together with the Note, the Loan Agreement and Deeds of Trust, as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, collectively, the "**Loan Documents**"). All capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Loan Documents.

B.    Pursuant to that certain Agreement Regarding Collateral Units dated April 17, 2015, by and between Borrower and Lender, Borrower and Lender desire to provide for the conveyance of Collateral Unit _____ (the "**Tendered Unit**") from Borrower to Lender or its designee in full or partial satisfaction of that certain Loan Advance made _____, 20__ in the initial principal amount of $_____ against the Tendered Unit (the "**Tendered Unit**

EXHIBIT 4

**Loan Advance"**), as more particularly set forth on <u>Exhibit A</u> of the Note. The initial principal amount of the Tendered Unit Loan Advance together with all accrued interest and other amounts due from Borrower to Lender under the Loan Documents in connection with the Tendered Unit or Tendered Unit Loan Advance is hereafter referred to as the **"Tendered Unit Indebtedness."** The legal description of the Tendered Unit is set forth in the Deed (as defined below).

## Agreement

Now, therefore, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Lender and Borrower agree as follows:

1.     <u>Acknowledgments.</u>     The parties hereto each affirm the foregoing Recitals and reincorporate them herein as covenants.

a.     Borrower further acknowledges that:

i.     This Agreement is entered into without force or duress and as an act of the free will of Lender and Borrower, and the transfers of the Tendered Unit and Personal Property (defined below) to Lender or its designee are voluntary and absolute conveyances given with all knowledge of the circumstances;

ii.     The satisfaction of the Tendered Unit Indebtedness under the Loan Documents, as more particularly described below, constitutes good, adequate and valuable consideration for the conveyance of the Tendered Unit and Personal Property to Lender or its designee;

iii.     Upon conveyance of the Tendered Unit and Personal Property to Lender or its designee, Borrower will have no rights with respect to the Tendered Unit or Personal Property, including, without limitation, rights of redemption, rights to cure or reinstatement under the Colorado Revised Statutes, as they may be amended from time to time, or under any other applicable law;

iv.     Borrower will hereafter be estopped from asserting any claim or right of redemption as to the Tendered Unit or Personal Property; and

v.     Upon conveyance of the Tendered Unit and Personal Property to Lender or its designee, Borrower has no equity in the Tendered Unit or Personal Property.

b.     Lender further acknowledges that:

i.     This Agreement is entered into without force or duress and as an act of the free will of Lender and Borrower, and the releases and satisfactions given to Borrower are voluntary and absolute releases and satisfactions given with all knowledge of the circumstances;

EXHIBIT 4

ii.    The transfer of the Tendered Unit and Personal Property, as more particularly described below, constitutes good, adequate and valuable consideration for the releases and satisfactions granted to Borrower hereunder;

iii.    Upon conveyance of the Tendered Unit and Personal Property to Lender or its designee, Lender will have no rights with respect to the Tendered Unit Indebtedness except for any Remaining Loan Advance (as defined below); and

iv.    If the Tendered Unit and Personal Property are conveyed to Lender, Lender accepts the Tendered Unit and Personal Property "as is" and "where is" in its condition on the date of Closing subject only to the express provisions of this Agreement.

2.    Conveyance of Tendered Unit

a.    Conveyance to Lender. If a Tendered Unit is conveyed to Lender, then on or before the Closing Date (as defined in Section 4 below), Borrower will execute and deliver to Lender a special warranty deed for the Tendered Unit in the form attached hereto as **Exhibit "A"** (the "**Deed**"). Upon delivery of the Deed for the Tendered Unit from Borrower to Lender, the Tendered Unit will be subject only to (A) those encumbrances and exceptions to title, if any, (i) listed in Schedule B attached to the Deed, (ii) listed in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with the Tendered Unit, or (iii) arising by, through or under Lender, and (B) the Deed of Trust (collectively, the "**Permitted Exceptions**").

b.    Conveyance to Lender's Designee. If a Tendered Unit is conveyed to a designee (i.e., unrelated third-party) of Lender, the form of the deed shall be in form reasonably acceptable to Borrower, Lender, and Lender's designee but in no event shall Borrower be obligated to convey greater rights in a Tendered Unit to a designee of Lender than it would otherwise be required to convey to Lender pursuant to Section 2.a. above.

3.    Conveyance of Personal Property. On or before the Closing Date, Borrower will execute and deliver to Lender or its designee a bill of sale in the form attached hereto as **Exhibit "B"** (the "**Bill of Sale**") or such other form as the parties may hereafter mutually agree, conveying all personal property owned by Borrower and used in connection with the ownership, development, maintenance and operation of the Tendered Unit ("**Personal Property**"), which is described with more detail in the Bill of Sale, free and clear of all liens and claims arising by, through or under Borrower.

4.    Closing Date. The "**Closing Date**" shall mean _____, 20___. "**Closing**" shall be deemed to have occurred upon delivery of the Deed and Bill of Sale from Borrower to Lender or upon delivery of a deed and Bill of Sale to Lender's designee in form provided in Section 2.b. above.

5.    Real Property Taxes. Lender or its designee shall be solely responsible for payment of all real property taxes and assessments on the Tendered Unit for the year of closing and

EXHIBIT 4

subsequent years, provided any amounts for property taxes and assessments pre-paid by Lender to Borrower for the Tendered Unit for the year of Closing shall be credited to Lender at Closing.

6. <u>Closing Costs; Net Proceeds</u>. Lender and/or its designee shall pay (i) any escrow agent's fee, (ii) any applicable transfer or recording taxes, (iii) any costs incurred in recording the Deed or any other instruments, (iv) any title insurance premiums, (v) any brokerage commissions, and (vii) any other costs customarily paid by a transferee of real property in Eagle County, Colorado. Any net proceeds resulting from a sale of a Tendered Unit to a third-party shall be paid to Lender at Closing. Each party shall pay their own attorneys' fees.

7. <u>Satisfaction of Loan Advance</u>. Effective upon Closing and subject to <u>Section 12</u> below: (i) the Tendered Unit Indebtedness shall be paid, satisfied, discharged and released in an amount equal to $_____ (the "<u>Satisfaction Amount</u>") (ii) the principal balance of the Note shall be reduced by the Satisfaction Amount, (iii) the Loan Documents shall be deemed to be amended by deleting all references to the Tendered Unit and/or Tendered Unit Loan Advance, and (v) all security interests, mortgages (including the Deed of Trust), guaranties (including the Guaranty), pledges and other liens granted to or held by Lender and any other secured parties under the security documents with respect only to the Tendered Unit and Tendered Unit Indebtedness shall be forever satisfied, released and discharged without further action by the parties. Any difference between the Satisfaction Amount and the Tendered Unit Indebtedness is hereinafter referred to as the "**Remaining Loan Advance**." Notwithstanding anything herein to the contrary, the Remaining Loan Advance shall continue to constitute Indebtedness under the Loan; provided, however, in no event shall interest (including default interest) accrue on the Remaining Loan Advance. The Remaining Loan Advance shall be deemed to have been paid, satisfied, discharged and released upon the earlier to occur of Borrower's conveyance of the final Collateral Unit to Lender or its designee or the date on which all other Loan Advances, excluding any Remaining Loan Advances, are satisfied in full or deemed satisfied in full. The provisions of this Section 7 shall survive Closing.

8. <u>Mutual Releases</u>.

a. <u>Release of Lender</u>. Effective upon Closing, subject to <u>Section 12</u> below, Borrower, and its affiliates, general partners, limited partners, employees, managers, members, and other representatives and agents, hereby, unconditionally and forever discharge and release Lender, its affiliates, designees, general partners, limited partners, employees, attorneys, lenders, and other representatives from any and all claims and/or liabilities of every nature and kind, whether known or unknown, arising out of or related to the Tendered Unit and/or Tendered Unit Loan Advance, except for claims against Lender which may arise from a breach of this Agreement or the documents executed in connection herewith. Nothing in this release shall be meant to release the Lender from the obligations and rights stated in this Agreement. The provisions of this <u>Section 8.a.</u> shall survive Closing.

b. <u>Release of Borrower</u>. Effective upon Closing, subject to <u>Section 12</u> below, Lender, and its affiliates, general partners, limited partners, employees, managers, members, and other representatives and agents, hereby, unconditionally and forever

EXHIBIT 4

discharge and release Borrower, its affiliates, designees, general partners, limited partners, employees, attorneys, lenders, and other representatives from any and all claims and/or liabilities of every nature and kind, whether known or unknown, arising out of or related to the Tendered Unit and/or Tendered Unit Loan Advance, except for (i) the Remaining Loan Advance, if any, and (ii) claims against Borrower which may arise from a breach of this Agreement or the documents executed in connection herewith. Nothing in this release shall be meant to release the Borrower from the obligations and rights stated in this Agreement. The provisions of this Section 8.b. shall survive Closing.

9.     Representations and Warranties of Borrower.  Borrower hereby represents and warrants to Lender, as of the date hereof and Closing, as follows:

a.     Borrower owns good, marketable and fee simple title in the Tendered Unit and the Personal Property, free and clear of any and all liens, security interests, charges and encumbrances, except for the Permitted Exceptions;

b.     Borrower does not have any knowledge of any material physical, structural, mechanical or electrical defect affecting any of the Personal Property and/or the improvements attached to or made a part of the Tendered Unit;

c.     Borrower is not currently insolvent, and none of Borrower's property is subject to any bankruptcy proceedings, assignment for benefit of creditors or similar proceedings, nor has Borrower committed any act of bankruptcy;

d.     To the knowledge of Borrower and except as otherwise set forth in any reports delivered from Borrower to Lender, (i) there are no and have never been any Hazardous Materials (as that term is defined below) located, generated or stored in, on or under the Tendered Unit in violation of any Hazardous Materials laws, (ii) Borrower has received no notice of any violation or claim of violation of any law, rule, ordinance or regulation relating to any Hazardous Materials.  Borrower hereby warrants and represents that it has not taken any measures to remove, clean-up or abate any Hazardous Materials at the Tendered Unit.  As used in this subparagraph, the term **"Hazardous Materials"** shall include any substance, liquid or gas in any quantity or manner which violates any Hazardous Materials laws:

(1)     the presence of which requires investigation or remediation under any federal, state or local statute, regulation, ordinance, order, action, policy or common law; or

(2)     which is defined as a hazardous waste, hazardous substance, pollutant or contaminant under any federal, state or local statute, regulation, rule or ordinance, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act; or

(3)     which is toxic, explosive, corrosive, flammable, infectious, radioactive, mutenogenic, or otherwise hazardous or toxic and is regulated by any

EXHIBIT 4

government or authority, agency, department, commission, board, agent or instrumentality of the United States, the state where the Tendered Unit is located, or any political subdivision thereof; or,

     (4)    the presence of which in the Tendered Unit causes or threatens to a cause a nuisance upon the Tendered Unit or to adjacent properties, or which poses a hazard to the health or safety of personas on or about the Tendered Unit. Without limiting the generality of the foregoing, the term "Hazardous Materials" shall include asbestos, gasoline, diesel fuel, petroleum hydrocarbons, polychlorinated biphenyls (PCBs), urea formaldehyde foam insulation and radon gas.

     e.    Borrower has not incurred any obligations to any real estate broker or sales person or similar party for the payment of a commission, fee or similar charge in connection with the conveyance of the Tendered Unit and/or the Personal Property;

     f.    There are no leases, subleases, tenancies, occupancy agreements or other agreements granted by Borrower to any party other than Lender for the possession or use of all or any portion of the Tendered Unit or the Personal Property ("**Leases**"), except those Leases attached hereto as **Exhibit "C"**. At Closing, Borrower shall deliver to Lender or its designee any and all original Leases, and, if applicable, Borrower shall execute the Assignment and Assumption of Lease and Rents, in the form attached hereto as **Exhibit "D,"** conveying all of Borrower's right, title and interest in, to and under any Leases, including, without limitation any and all rents prepaid as of the Closing and security deposits held by Borrower in connection with the Leases (the "**Rent**"). At Closing, Borrower shall deliver the Rent to Lender or its designee (to the extent not previously delivered to Lender or its designee);

     g.    Borrower warrants that there are no other deposits or prepaid rental arrangements with any tenants or occupants of the Tendered Unit to which Borrower is a party other than the Rent;

     h.    To Borrower's knowledge and except as set forth in the Permitted Exceptions, there are neither special improvement assessments nor municipal assessments outstanding and owing against the Tendered Unit;

     i.    Except for the Loan Documents, the Permitted Exceptions, and any agreements, commitments, guarantees, undertakings and arrangements, or privileges arising out of Borrower's membership in any homeowner's association governing the Tendered Unit, Borrower warrants that there are no warranties, service and maintenance contracts, agreements with respect to utilities, accounts receivable and other contracts, agreements, commitments, guarantees, undertakings and arrangements, and privileges to which Borrower is a party that are currently in effect with respect to the Tendered Unit, oral or written;

EXHIBIT 4

j.      There is no pending lawsuit or arbitration, or, to Borrower's knowledge, there is no threatened lawsuit or arbitration, which would relate to or affect the Tendered Unit, other than claims identified as Permitted Exceptions;

k.      Borrower has not taken, or permitted any person or entity under its control to take, any action which could result in any of the following:

(1)      Any lien for labor, equipment or materials against the Tendered Unit or the Personal Property which has not been paid; or

(2)      Any lien against, exception to, or claim against the title to the Tendered Unit or the Personal Property, except the Permitted Exceptions;

(3)      Any modification to zoning or other restrictions affecting the use of the Tendered Unit; or,

(4)      Any leases or other rights to occupy the Tendered Unit, except the Leases.

l.      The representations and warranties of Borrower in this Section 9 shall survive the Closing for a period of one (1) year.

10.      Representations and Warranties of Lender. Lender hereby represents and warrants to Borrower, as of the date hereof and Closing, as follows:

a.      Lender has full power and authority, and has been duly authorized, to consummate the transaction contemplated herein; and the transaction contemplated herein does not conflict with, result in a violation of, or constitute a default under any agreement or instrument binding upon Lender or any law, governmental regulation, court decree, or order applicable to Lender.

b.      Lender is not currently insolvent, and none of Lender's property is subject to any bankruptcy proceedings, assignment for benefit of creditors or similar proceedings, nor has Lender committed any act of bankruptcy;

c.      Lender has not incurred any obligations to any real estate broker or sales person or similar party for the payment of a commission, fee or similar charge in connection with the conveyance of the Tendered Unit and/or the Personal Property;

d.      Lender is the sole owner of all of the claims, rights, counts, causes of action, obligations, debts, and demands which are intended to be released or deemed satisfied by Lender pursuant to this Agreement, and no other persons or entities have any interest, by assignment or otherwise, in any of the claims, rights, counts, causes of action, obligations, debts, and demands referred to herein;

{00316124.DOCX / 1}                              7

EXHIBIT 4

e.    The conveyance of the Tendered Unit from Borrower to Lender is exempt from the Town of Vail Real Estate Transfer Tax, and the Lender has received from the Town of Vail a duly executed exemption therefrom; and

f.    The representations and warranties of Lender in this <u>Section 10</u> shall survive the Closing for a period of one (1) year.

11.    <u>Indemnification</u>.

a.    <u>Indemnification of Lender</u>.  Borrower shall indemnify, defend, and hold harmless Lender, its officers, managers, directors, governors, employees, shareholders, members, affiliates, partners, agents, successors, assigns, professionals, and each of them, from and against and in respect of any and all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries, and deficiencies, including reasonable attorneys' fees, interest and penalties, which Lender actually incurs or suffers arising out of the breach of any representation or warranty or breach of any covenant of Borrower in this Agreement. Subject to <u>Section 9.l.</u>, the provisions of this <u>Section 11.a.</u> shall survive Closing.

b.    <u>Indemnification of Borrower</u>.  Lender shall indemnify, defend and hold harmless Borrower, its officers, managers, directors, governors, employees, shareholders, members, affiliates, partners, agents, successors, assigns, professionals, and each of them, from and against and in respect of any and all claims, damages, losses, costs, expenses, obligations, liabilities, damages, recoveries, and deficiencies including reasonable attorneys' fees, interest and penalties, which Borrower actually incurs or suffers arising out of (i) the breach of any representation or warranty or breach of covenant of Lender in this Agreement, or (ii) the conveyance of the Tendered Unit and/or Personal Property to any person or entity other than Lender.  Subject to <u>Section 10.f.</u>, the provisions of this <u>Section 11.b.</u> shall survive Closing.

12.    <u>Operating Payment Agreement</u>. Notwithstanding anything to the contrary set forth herein, this Agreement shall not be construed to release Borrower or Lender from their rights and obligations under the Operating Payment Agreement, including, but not limited to, any obligation of Borrower to make the Operating Payments to Lender.

13.    <u>Additional Information</u>. Borrower affirms its continued obligation to provide to Lender the information required by Section 14(ii) of the Loan Agreement.

14.    <u>Construction of Agreement</u>.  Time is of the essence in the performance of this Agreement.  This Agreement represents the entire and complete agreement between the parties. The Agreement shall not be amended or modified, except by an instrument in writing, signed by all parties. All terms and provisions hereof shall inure to the benefit of, and being binding upon Lender, Borrower, and their respective successors and assigns.  Wherever used in this Agreement, the singular shall include the plural, and the masculine shall include the feminine and neuter grammatical forms.  Captions are included for convenient reference only, and shall not be construed to alter or affect any terms or provisions of this Agreement.  This Agreement has been

{00316124.DOCX / 1}

8

EXHIBIT 4

executed by the parties after discussions and negotiation, and shall be construed as having been drafted by both parties. If any term of this Agreement is held to be invalid or unenforceable, such term shall be construed as being valid and enforceable to the fullest extent permitted by law, and all remaining terms shall remain full force and effect. This Agreement shall be construed and enforced in accordance with the laws of the State of Colorado. Each party hereto waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or any related document.

15. <u>Legal Expenses.</u> If Borrower or Lender initiates any action to enforce or interpret this Agreement, the party determined by the court or arbiter, as the case may be, to be the prevailing party in such action will be entitled to receive from the non-prevailing party all reasonable costs and expenses, including all reasonable attorneys' fees incurred by the prevailing party in such action.

16. <u>Legal Counsel.</u> All parties hereto have been represented by competent legal counsel who has explained the legal significance of this Agreement to their respective clients, or they have had ample opportunity to consult with legal counsel.

17. <u>Survival of Agreement.</u> Unless otherwise expressly herein stated to survive, the terms, covenants and conditions of this Agreement shall not survive the delivery of the Deed and the Bill of Sale from Borrower to Lender or its designee, and shall be merged into the Deed for the conveyance of the Tendered Unit and the Bill of Sale for the conveyance of the Personal Property.

18. <u>Rights to Equitable and Legal Relief.</u> Notwithstanding any other provision contained herein or in any document executed in connection with this Agreement, and in addition to the other remedies set for the in the Loan Documents, this Agreement and the documents executed in connection with this Agreement, each party shall have the right to seek all remedies available at law or in equity in the event of the other party's default or breach hereunder. Without limiting the generality of the foregoing, the non-defaulting or non-breaching party shall be entitled to seek all or any of the following remedies in the event of a default or breach by the other party hereunder: (a) specific performance; and/or (b) injunctive relief; and/or (c) seek the recovery from the other party, on a joint and several basis, all damages, costs, fees (including, without limitation, reasonable attorney fees), losses, and expenses associated with or caused by the breach or default. Notwithstanding the foregoing, in no event shall any party hereto be liable for special, incidental, indirect, exemplary, consequential or punitive damages arising under or in connection with this Agreement.

[SIGNATURE PAGE FOLLOWS]

EXHIBIT 4

IN WITNESS WHEREOF, Borrower and Lender have executed this Transfer Agreement as of the date first above set forth.

BORROWER:

SOLARIS PROPERTY OWNER I, LLC,
a Delaware limited liability company

By:_____
Name:_____
Its:_____

LENDER:

COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP,
a Colorado limited liability limited partnership

By:_____
Name:_____
Its:_____

EXHIBIT 4

# EXHIBIT A

## FORM OF DEED

(Attached)

**EXHIBIT B**

**FORM OF BILL OF SALE**

(Attached)

EXHIBIT 4

**EXHIBIT C**

**LEASES**

(Attached)

EXHIBIT 4

**EXHIBIT B**

**FORM OF LISTING AGREEMENT**

(Attached)

{00316124.DOCX / 1}                    8

EXHIBIT 4

**From:** General Partner ("GP") of Colorado Regional Center Project Solaris, LLLP ("CRCPS" or the "Partnership")

**To:** Limited Partners ("LPs") of the Partnership

**Date:** March 15, 2016

**Re:** Notice of Fair Market Value of the Partnership Property (this "Notice") and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions

**Definitions:**

"Administrative Expenses" means those expenses incurred by the GP in connection with the sale of LP Interests including specifically and without limitation, certain marketing, travel, legal and accounting fees, referral and related fees, and the legal fees of a LP incurred in preparation of such LP's I-526 petition.

"Appraisal(s)" means the good faith estimate of the Fair Market Value of each Unit performed by the independent third party firm Pack Appraisal Company.

"Capital Contribution" means the total amount of money or property contributed to the Partnership by each Partner (excluding any amounts contributed for Administrative Expenses).

"Fair Market Value" means the total liquidation value (as determined pursuant to a good faith market analysis conducted by qualified third-parties engaged by the GP) of all of the Partnership Property or an individual Unit after deduction of all usual and customary selling expenses, pro rations, and other similar matters.

"Loan" means the loan made from CRCPS to the Solaris developer in the aggregate amount of $82,500,000.

"Loan Advance" means the amount of each advance of principal from CRCPS to the developer per terms of the Loan.

"LP Interest" means a limited partnership interest in CRCPS.

"Partnership Property or Units" means the 19 individual properties presently held by the developer which collateralize the Loan.

"Put Exercise Notice" means written notice provided by a LP to the Partnership of his or her intent to exercise the Put Right. A Put Exercise Notice must be provided to the Partnership within 45 days following the receipt of this Notice.

"Put Right" means for each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, such LP may elect to sell his or her LP Interest to the Partnership and receive a return of capital.

"Partnership Agreement" means the Limited Liability Limited Partnership Agreement of Colorado Regional Center Project Solaris, LLLP.

"Put Purchase Price" means the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance amount multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses.

1

EXHIBIT 5

"Section 13.06" means Section 13.06 of the CRCPS Partnership Agreement entitled "Rights of Limited Partners to Return of Capital Contributions.

"U.S. Immigration Legal Requirements" means the GP's understanding that only LPs who have either received adjudication of their I-829 petition or who are foregoing permanent residency in the United States would be eligible to receive a return of capital and sell their LP Interest to the Partnership.

**Notice of Fair Market Value of the Partnership and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions:**

As previously discussed, per the terms of the Loan, the developer has the right to transfer each Unit to the Partnership in lieu of cash payment at maturity of the Loan. The developer has indicated its desire to do so for each Unit as each Loan Advance reaches its 3-year anniversary mark. Accordingly, we are working with the developer to transfer title to the Partnership on the Units which Loan Advances have reached or surpassed the 3-year anniversary mark. The Partnership has been in the process of developing a comprehensive plan to permit the transfer and orderly sale of Units presently held by the developer. We have obtained valuations (see summary below) on each of the Units and are continually performing an overall assessment of the real estate market in an effort to maximize value on the sale of each of the Units which in turn maximizes value to the Partnership and to all LPs.

In accordance with Section 13.06, we engaged an independent third party, Pack Appraisal Company, to prepare a good faith estimate of the Fair Market Value of the Partnership Property. The Appraisals do not account for customary selling expenses, which the Partnership will incur as it pursues the strategy set forth in this Notice. We are hereby providing notice to the LPs of the estimated Fair Market Value, which has been determined to be $66,360,000 in the aggregate. Upon request, we will provide copies of the Appraisals for your review. The Appraisal amount compares to the aggregate amount of the Loan made to the Solaris developer in the amount of $82,500,000, representing approximately eighty percent (80%) of the Loan amount, although we believe the value of the Partnership Property to be higher based on reasons set forth below.

EXHIBIT 5

The following is a summary of the appraised Fair Market Value of the Partnership Property:

| Unit | Appraised Fair Market Value | Loan Advance Date | Prepayment Date | Loan Advance Amount | Ratio of Fair Market Value to Loan Advance Amount |
|---|---|---|---|---|---|
| 6E West | $2,650,000 | 4/18/2012 | 4/18/2015 | $4,000,000 | -33.8% |
| 5E West | $2,650,000 | 8/2/2012 | 8/2/2015 | $4,000,000 | -33.8% |
| Pent E West | $2,125,000 | 5/3/2012 | 5/3/2015 | $3,000,000 | -29.2% |
| Pent E East | $2,150,000 | 6/15/2012 | 6/15/2015 | $3,000,000 | -28.3% |
| 2A South | $4,700,000 | 4/25/2012 | 4/25/2015 | $6,500,000 | -27.7% |
| 7E East | $2,960,000 | 1/30/2013 | 1/30/2016 | $4,000,000 | -26.0% |
| 7E West | $3,350,000 | 9/7/2012 | 9/7/2015 | $4,500,000 | -25.6% |
| 5C West | $2,620,000 | 11/6/2012 | 11/6/2015 | $3,500,000 | -25.1% |
| 6C West | $2,630,000 | 11/27/2012 | 11/27/2015 | $3,500,000 | -24.9% |
| 6E East | $2,640,000 | 5/30/2012 | 5/30/2015 | $3,500,000 | -24.6% |
| Pent C West | $2,020,000 | 5/30/2013 | 5/29/2016 | $2,500,000 | -19.2% |
| Pent G West | $3,700,000 | 5/20/2012 | 5/19/2015 | $4,500,000 | -17.8% |
| 3E East | $2,525,000 | 1/29/2013 | 1/29/2016 | $3,000,000 | -15.8% |
| 4G West | $5,500,000 | 8/24/2012 | 8/24/2015 | $6,500,000 | -15.4% |
| 5G West | $5,545,000 | 1/24/2013 | 1/24/2016 | $6,500,000 | -14.7% |
| 6D East | $7,150,000 | 10/2/2012 | 10/2/2015 | $8,000,000 | -10.6% |
| 3C East | $2,280,000 | 1/30/2015 | 1/29/2018 | $2,500,000 | -8.8% |
| 4D East | $7,150,000 | 3/6/2013 | 3/5/2016 | $7,500,000 | -4.7% |
| Pent C East | $2,015,000 | 9/13/2012 | 9/13/2015 | $2,000,000 | 0.8% |
| **Total** | **$66,360,000** | | | **$82,500,000** | **-19.6%** |

Pursuant to Section 13.06, each LP who has held his or her limited partnership interest in CRCPS ("LP Interest") for at least three years is entitled to receive notice of the Fair Market Value of Partnership Property and to give notice to the GP of his or her election to sell their LP Interest to the Partnership. The purchase price for the LP Interest would be equal to the LPs pro rata share of the amount the Partnership actually receives from a sale, which may be greater or less than the Fair Market value as estimated by the third party appraiser. The Put Purchase Price is further described below.

Even if the Partnership was able to liquidate Partnership Property at this time, the GP does not believe it would be prudent to attempt to liquidate now, but rather to do so on a unit-by-unit basis in an orderly, market driven manner which seeks to create the most value for each LP. While the Appraisals indicate the Partnership Property is valued below the face value of the Loan, we believe this is attributable to the lack of adequate comparable sales within the Solaris building and the lack of adequate comparable properties in the greater Vail, Colorado area. Additionally, since the date of the Appraisal, there has been a higher sale within the Solaris building. Furthermore, as title to the Units is transferred to the Partnership, we expect higher sales prices will be established for the Solaris building. Another factor that will contribute to what we believe to be increased value in the future is supply and demand for the building. For example, the Partnership has control over the only two remaining mountain facing four-bedroom units that will be available for sale. As fewer properties in Solaris are available for sale, we anticipate demand will continue to increase the sales price of each Unit.

**Put Rights:**

We have set forth our good faith interpretation of Section 13.06 which we believe conforms with the original intent and provides qualifying LPs with an equitable exit strategy, while protecting the overall

3

EXHIBIT 5

economic viability of the Partnership. We advise each LP to seek advice from his or her immigration attorney with respect to the U.S. Immigration Legal Requirements and any early exit procedure.

Each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, may elect to sell his or her LP Interest to the Partnership. By exercising his or her Put Right, the LP is seeking a return of capital earlier than other LPs in the Partnership may be permitted to. For those LPs first electing to exercise his or her Put Right, the Put Purchase Price for an LP Interest will be based on the Appraisals. To restate, the Put Purchase Price is equal to the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance as compared to the other Units multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses. However, the Partnership will not attempt to sell a Unit(s) until the number of LPs exercising their Put Right is equal to the number of LPs investments that were necessary to make the Loan Advance for such Unit.

For example, Unit 6E West was appraised at a Fair Market Value of $2,650,000, while the Loan Advance collateralized by this unit was in the amount of $4,000,000. The ratio of Fair Market Value to the Loan Advance amount on 6E West is -33.8% and represents the lowest ratio (along with 5E West) amongst the Units. Eight (8) LPs equity contributions to the Partnership were required in order to make the Loan Advance for which Unit 6E West serves as collateral. Therefore, once eight (8) LPs have exercised his or her Put Right, the Partnership will use reasonable business efforts to market and liquidate Unit 6E West once the Partnership has obtained title to the unit. The Partnership shall not be entitled to sell a Unit(s) for less than the then appraised Fair Market Value without the consent of all LPs who will receive a return of capital from such sale. Thus, the Put Purchase Price for the first eight (8) LPs electing to exercise his or her Put Right would be equal to his or her pro rata share from realizable value of the sale of Unit 6E West less customary transaction expenses, i.e., 1 / 8 multiplied by at least $2,650,000 less customary transaction expenses, unless a sale at a lower price is approved by all participating LPs. Should the Partnership be able to sell the Unit for greater than the Fair Market Value, the benefit shall go to those eight investors who have exercised their Put Right, but in no event would the Put Purchase Price be greater than the actual LP Capital Contribution. Subsequently, the next Unit that would be sold would be 5E West, which has the second lowest ratio of Fair Market Value to Loan Advance amount amongst the remaining Units in the portfolio.

In order to exercise his or her Put Right, such LP must provide written notice (the "Put Exercise Notice") to the Partnership within 45 days following the date of this Notice expressly stating his or her exercise of the Put Right. By delivering the Put Exercise Notice, the LP represents and warrants to the Partnership that (A) the LP has full right, title and interest in and to the LP Interest, (B) the LP has all the necessary power and authority and has taken all necessary action to sell such LP Interest as contemplated herein, and (C) the LP Interest is free and clear of any and all mortgages, pledges, security interests, options, rights of first offer, encumbrances or other restrictions or limitations of any nature whatsoever other than those arising as a result of or under the terms of this Partnership Agreement. The delivery of a Put Exercise Notice by a LP to the Partnership shall create a binding and irrevocable obligation to sell his or her LP Interest at the Put Purchase Price as set forth in this Notice. Failure of an LP to deliver the Put Exercise Notice within such 45-day period shall constitute a waiver of such LPs Put Right with respect to the specific Put Purchase Price formula as set forth in this Notice, but shall not affect their respective rights with respect to any future Put Rights.

EXHIBIT 5

Upon the Partnership's receipt of such Put Exercise Notice, the Partnership will use commercially reasonable efforts to sell a Unit or Units in its possession at the Fair Market Value as identified in the Appraisals or at a higher amount.  As described above, the Partnership shall not undertake such efforts until enough LPs have submitted their Put Exercise Notice that matches the number of investor's whose capital supported the Loan Advance on such Unit.  The Partnership may, with the consent of all participating LPs, sell such Unit or Units below the Fair Market Value.  The Partnership shall pay the Put Purchase Price no later than thirty (30) days following the closing of the sale of the applicable Unit or Units. The Partnership will pay the Put Purchase Price for the LP Interest by check or wire transfer of funds.  At the closing of the sale of the LP Interest to the Partnership, the LP shall deliver to the Partnership (a) an assignment and all other transfer documents to consummate the sale and assignment of the LP Interest to the Partnership, and (b) waiver and release of the Partnership from any and all future claims, each in a form acceptable to the Partnership.  Upon the LPs receipt of the Put Purchase Price at the closing, the LP shall have no further right, interest or claim to distributions in or from the Partnership and shall no longer be an LP in the Partnership.

On each one-year (1) anniversary of this Notice, the General Partner shall provide to the remaining LPs a new notice setting forth the then applicable Fair Market Value of the remaining Partnership Property and each LP shall then have 45 days from the date of such new notice to deliver a Put Exercise Notice to the Partnership.  The Put Purchase Price would continue to be based on the formula described above, only using the new Fair Market Value of the remaining Units, and would otherwise be payable upon and subject to the same terms set forth above.

**General Provisions for LPs Who Do Not Provide a Put Exercise Notice:**

As each Unit is transferred to the Partnership and to the extent the Unit(s) are not required to be put on the market to satisfy prior Put Exercise Notices, we will explore opportunities to put them on the market when market conditions are deemed to be favorable for sale.  The sale of Units will be conducted in an orderly, market driven manner that seeks to maximize value to the Partnership and the LPs.  As such, there can be no definitive timeline for which all of the Units will be sold.  To sell prematurely would likely mean selling units at a significant discount to the original amount of each Loan Advance, which would mean LPs would receive less than the full amount of their capital contributions returned.  The Partnership seeks to avoid this.

As each Unit is sold, a pro rata return of capital will be made to those LPs who have received their adjudication of their I-829 Petitions and have not otherwise exercised their Put Rights (as set forth above). The remainder of the proceeds shall remain with the Partnership and shall be returned on a pro rata basis to the rest of the LPs as their I-829 petitions are approved, subject to the distribution provisions in the Partnership Agreement.  We intend such returns of capital to be made until all LPs (other than the LPs who have exercised their Put Rights (as set forth above)) have received a return of their capital contribution.  All capital returns shall be made on a pro rata basis, treating each LP equal to one another.  Once all of the Partnership Property has been sold, the Partnership shall wind down.  To the extent there is Available Cash Flow (as defined in the Partnership Agreement) after the sale of all Partnership Property and return of LP capital, it shall be paid out in accordance with Article VI of the Partnership Agreement.

The strategy outlined above was developed in good faith with the LPs best interests in mind and seeks to provide a path toward maximizing value to each and every LP, while still providing the LPs with an early

EXHIBIT 5

exit alternative as contemplated under Section 13.06.  The Partnership will strive to execute this strategy as quickly as is economically feasible.

EXHIBIT 5

**From:** General Partner ("GP") of Colorado Regional Center Project Solaris, LLLP ("CRCPS" or the "Partnership")

**To:** Limited Partners ("LPs") of the Partnership

**Date:** October 27, 2016

**Re:** 2nd Notice of Fair Market Value of the Partnership Property (this "Notice") and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions

**Definitions:**

"Administrative Expenses" means those expenses incurred by the GP in connection with the sale of LP Interests including specifically and without limitation, certain marketing, travel, legal and accounting fees, referral and related fees, and the legal fees of a LP incurred in preparation of such LP's I-526 petition.

"Appraisal(s)" means the good faith estimate of the Fair Market Value of each Unit performed by the independent third party firm Pack Appraisal Company.

"Capital Contribution" means the total amount of money or property contributed to the Partnership by each Partner (excluding any amounts contributed for Administrative Expenses).

"Fair Market Value" means the total liquidation value (as determined pursuant to a good faith market analysis conducted by qualified third-parties engaged by the GP) of all of the Partnership Property or an individual Unit after deduction of all usual and customary selling expenses, pro rations, and other similar matters.

"Loan" means the loan made from CRCPS to the Solaris developer in the aggregate amount of $82,500,000.

"Loan Advance" means the amount of each advance of principal from CRCPS to the developer per terms of the Loan.

"LP Interest" means a limited partnership interest in CRCPS.

"Partnership Property or Units" means the 19 individual properties presently held by the developer which collateralize the Loan.

"Put Exercise Notice" means written notice provided by a LP to the Partnership of his or her intent to exercise the Put Right. A Put Exercise Notice must be provided to the Partnership within 45 days following the receipt of this Notice.

"Put Right" means for each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, such LP may elect to sell his or her LP Interest to the Partnership and receive a return of capital.

"Partnership Agreement" means the Limited Liability Limited Partnership Agreement of Colorado Regional Center Project Solaris, LLLP.

"Put Purchase Price" means the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance amount multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses.

1

EXHIBIT 5

"Section 13.06" means Section 13.06 of the CRCPS Partnership Agreement entitled "Rights of Limited Partners to Return of Capital Contributions.

"U.S. Immigration Legal Requirements" means the GP's understanding that only LPs who have either received adjudication of their I-829 petition or who are foregoing permanent residency in the United States would be eligible to receive a return of capital and sell their LP Interest to the Partnership.

**Notice of Fair Market Value of the Partnership and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions:**

As previously discussed, per the terms of the Loan, the developer has the right to transfer each Unit to the Partnership in lieu of cash payment at maturity of the Loan. The developer has indicated its desire to do so for each Unit as each Loan Advance reaches its 3-year anniversary mark. Accordingly, we are working with the developer to transfer title to the Partnership on the Units which Loan Advances have reached or surpassed the 3-year anniversary mark. The Partnership has been in the process of developing a comprehensive plan to permit the transfer and orderly sale of Units presently held by the developer. The Partnership has a final draft of the transfer agreements and is awaiting issuance of an owner's title policy from Land Title Guaranty Company.

In September 2015, the Partnership obtained valuations of each of the Units from the independent third party firm, Pack Appraisal Company. Subsequently, the Partnership has obtained valuations (see summary below) on each of the Units from the independent appraisal firm Angelo's Appraisal Inc. and we are continually performing an overall assessment of the real estate market in an effort to maximize value on the sale of each of the Units which in turn maximizes value to the Partnership and to all LPs.

In accordance with Section 13.06, we engaged an independent third party appraisal firm to prepare a good faith estimate of the Fair Market Value of the Partnership Property. The Appraisals do not account for customary selling expenses, which the Partnership will incur as it pursues the strategy set forth in this Notice and estimates to be approximately six percent (6.0%) of the sales price. We are hereby providing notice to the LPs of the estimated Fair Market Value as of July/August 2016, which has been determined to be $67,510,000 in the aggregate. Upon request, we will provide copies of the Appraisals for your review. The Appraisal amount compares to the aggregate amount of the Loan made to the Solaris developer in the amount of $82,500,000, representing approximately eighty two percent (82%) of the Loan amount, although we believe the value of the Partnership Property to be higher based on reasons set forth below and in accompanying materials (if applicable).

EXHIBIT 5

The following is a summary of the appraised Fair Market Value of the Partnership Property:

| Unit | Appraised Fair Market Value | Loan Advance Date | Prepayment Date | Loan Advance Amount | Ratio of Fair Market Value to Loan Advance Amount |
|---|---|---|---|---|---|
| 4G West | $4,300,000 | 8/24/2012 | 8/24/2015 | $6,500,000 | -33.8% |
| 5G West | $4,400,000 | 1/24/2013 | 1/24/2016 | $6,500,000 | -32.3% |
| 6E West | $2,990,000 | 4/18/2012 | 4/18/2015 | $4,000,000 | -25.3% |
| 5E West | $2,990,000 | 8/2/2012 | 8/2/2015 | $4,000,000 | -25.3% |
| 2A South | $4,950,000 | 4/25/2012 | 4/25/2015 | $6,500,000 | -23.8% |
| 3E East | $2,335,000 | 1/29/2013 | 1/29/2016 | $3,000,000 | -22.2% |
| 7E East | $3,300,000 | 1/30/2013 | 1/30/2016 | $4,000,000 | -17.5% |
| Pent E West | $2,500,000 | 5/3/2012 | 5/3/2015 | $3,000,000 | -16.7% |
| Pent E East | $2,500,000 | 6/15/2012 | 6/15/2015 | $3,000,000 | -16.7% |
| 6C West | $2,940,000 | 11/27/2012 | 11/27/2015 | $3,500,000 | -16.0% |
| 6E East | $2,980,000 | 5/30/2012 | 5/30/2015 | $3,500,000 | -14.9% |
| 7E West | $3,835,000 | 9/7/2012 | 9/7/2015 | $4,500,000 | -14.8% |
| 5C West | $2,990,000 | 11/6/2012 | 11/6/2015 | $3,500,000 | -14.6% |
| 6D East | $6,840,000 | 10/2/2012 | 10/2/2015 | $8,000,000 | -14.5% |
| 4D East | $6,500,000 | 3/6/2013 | 3/5/2016 | $7,500,000 | -13.3% |
| Pent G West | $3,960,000 | 5/20/2013 | 5/19/2016 | $4,500,000 | -12.0% |
| 3C East | $2,220,000 | 1/30/2015 | 1/29/2018 | $2,500,000 | -11.2% |
| Pent C West | $2,490,000 | 5/30/2013 | 5/29/2016 | $2,500,000 | -0.4% |
| Pent C East | $2,490,000 | 9/13/2012 | 9/13/2015 | $2,000,000 | 24.5% |
| **Total** | **$67,510,000** | | | **$82,500,000** | **-18.2%** |

Pursuant to Section 13.06, each LP who has held his or her limited partnership interest in CRCPS ("LP Interest") for at least three years is entitled to receive notice of the Fair Market Value of Partnership Property and may also, depending on U.S. Immigration Legal Requirements, be entitled to give notice to the GP of his or her election to sell their LP Interest to the Partnership.  The purchase price for the LP Interest would be equal to the LPs pro rata share of the amount the Partnership actually receives from a sale, which may be greater or less than the Fair Market value as estimated by the third party appraiser. The Put Purchase Price is further described below.

Even if the Partnership was able to liquidate Partnership Property at this time, the GP does not believe it would be prudent to attempt to liquidate now, but rather to do so on a unit-by-unit basis in an orderly, market driven manner which seeks to create the most value for each LP.  While the Appraisals indicate the Partnership Property is valued below the face value of the Loan, we believe this is attributable to the lack of adequate comparison to sales within the Solaris building and the lack of adequate comparable properties in the greater Vail, Colorado area. Furthermore, as title to the Units is transferred to the Partnership, we expect higher sales prices will be established for the Solaris building.  Another factor that will contribute to what we believe to be increased value in the future is supply and demand for the building.

EXHIBIT 5

For example, the Partnership has control over the only two remaining mountain facing four-bedroom units that will be available for sale.  As fewer properties in Solaris are available for sale, we anticipate demand will continue to increase the sales price of each Unit.

**Put Rights:**

We have set forth our good faith interpretation of Section 13.06 which we believe conforms to the original intent and provides qualifying LPs with an equitable exit strategy, while protecting the overall economic viability of the Partnership.  The GPs understanding is that only LPs who have either received adjudication of their I-829 and received an unconditional green card or who are foregoing permanent residency in the U.S. would be eligible to receive a return of capital without jeopardizing the EB-5 process. We advise each LP to seek advice from his or her immigration attorney with respect to the U.S. Immigration Legal Requirements and any early exit procedure.

Each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, may elect to sell his or her LP Interest to the Partnership.  By exercising his or her Put Right, the LP is seeking a return of capital earlier than other LPs in the Partnership may be permitted to.  For those LPs first electing to exercise his or her Put Right, the Put Purchase Price for an LP Interest will be satisfied by the sale of a unit(s), while the order of unit sales is to be based on the Appraisals.  To restate, the Put Purchase Price is equal to the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance as compared to the other Units multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses.  However, the Partnership will not attempt to sell a Unit(s) until the number of LPs exercising their Put Right is equal to the number of LPs investments that were necessary to make the Loan Advance for such Unit.

For example, Unit 4G West was appraised at a Fair Market Value of $4,300,000, while the Loan Advance collateralized by this unit was in the amount of $6,500,000.  The ratio of Fair Market Value to the Loan Advance amount on 4G West is -33.8% and represents the lowest ratio amongst the Units.  Thirteen (13) LPs equity contributions to the Partnership were required in order to make the Loan Advance for which Unit 4G West serves as collateral.  Therefore, once thirteen (13) LPs have exercised his or her Put Right, the Partnership will use reasonable business efforts to market and liquidate Unit 4G West once the Partnership has obtained title to the unit.  The Partnership shall not be entitled to sell a Unit(s) for less than the then appraised Fair Market Value without the consent of all LPs who will receive a return of capital from such sale.  Thus, the Put Purchase Price for the first thirteen (13) LPs electing to exercise his or her Put Right would be equal to his or her pro rata share from realizable value of the sale of Unit 4G West less customary transaction expenses, i.e., 1 / 13 multiplied by at least $4,300,000 less customary transaction expenses, unless a sale at a lower price is approved by all participating LPs.  Should the Partnership be able to sell the Unit for greater than the Fair Market Value, the benefit shall go to those thirteen investors who have exercised their Put Right, but in no event would the Put Purchase Price be greater than the actual LP Capital Contribution.  Subsequently, the next Unit that would be sold would be 5G West, which has the second lowest ratio of Fair Market Value to Loan Advance amount amongst the remaining Units in the portfolio.

In order to exercise his or her Put Right, such LP must provide written notice (the "Put Exercise Notice") to the Partnership within 45 days following the date of this Notice expressly stating his or her exercise of the Put Right.  By delivering the Put Exercise Notice, the LP represents and warrants to the Partnership

4

EXHIBIT 5

that (A) the LP has full right, title and interest in and to the LP Interest, (B) the LP has all the necessary power and authority and has taken all necessary action to sell such LP Interest as contemplated herein, and (C) the LP Interest is free and clear of any and all mortgages, pledges, security interests, options, rights of first offer, encumbrances or other restrictions or limitations of any nature whatsoever other than those arising as a result of or under the terms of this Partnership Agreement. The delivery of a Put Exercise Notice by a LP to the Partnership shall create a binding and irrevocable obligation to sell his or her LP Interest at the Put Purchase Price as set forth in this Notice. Failure of an LP to deliver the Put Exercise Notice within such 45-day period shall constitute a waiver of such LPs Put Right with respect to the specific Put Purchase Price formula as set forth in this Notice, but shall not affect their respective rights with respect to any future Put Rights. An LP who has previously provided a Put Exercise Notice but has not yet received a capital distribution shall continue to be treated as having provided a Put Exercise Notice, unless the LP informs the Partnership of his or her desire to remain in the Partnership and withdraw their prior Put Exercise Notice.

Upon the Partnership's receipt of such Put Exercise Notice, the Partnership will use commercially reasonable efforts to sell a Unit or Units in its possession at the Fair Market Value as identified in the Appraisals or at a higher amount. As described above, the Partnership shall not undertake such efforts until enough LPs have submitted their Put Exercise Notice that matches the number of investor's whose capital supported the Loan Advance on such Unit. The Partnership may, with the consent of all participating LPs, sell such Unit or Units below the Fair Market Value. The Partnership shall pay the Put Purchase Price no later than thirty (30) days following the closing of the sale of the applicable Unit or Units. The Partnership will pay the Put Purchase Price for the LP Interest by check or wire transfer of funds. At the closing of the sale of the LP Interest to the Partnership, the LP shall deliver to the Partnership (a) an assignment and all other transfer documents to consummate the sale and assignment of the LP Interest to the Partnership, and (b) waiver and release of the Partnership from any and all future claims, each in a form acceptable to the Partnership. Upon the LPs receipt of the Put Purchase Price at the closing, the LP shall have no further right, interest or claim to distributions in or from the Partnership and shall no longer be an LP in the Partnership.

On each six (6) month anniversary of this Notice or within a reasonable time thereafter, the General Partner shall provide to the remaining LPs a new notice setting forth the then applicable Fair Market Value of the remaining Partnership Property and each LP shall then have 45 days from the date of such new notice to deliver a Put Exercise Notice to the Partnership. The Put Purchase Price would continue to be based on the formula described above, only using the new Fair Market Value of the remaining Units, and would otherwise be payable upon and subject to the same terms set forth above.

**General Provisions for LPs Who Do Not Provide a Put Exercise Notice:**

As each Unit is transferred to the Partnership and to the extent the Unit(s) are not required to be put on the market to satisfy prior Put Exercise Notices, we will explore opportunities to put them on the market when market conditions are deemed to be favorable for sale. The sale of Units will be conducted in an orderly, market driven manner that seeks to maximize value to the Partnership and the LPs. As such, there can be no definitive timeline for which all of the Units will be sold. To sell prematurely would likely mean selling units at a significant discount to the original amount of each Loan Advance, which would mean LPs would receive less than the full amount of their capital contributions returned. The Partnership seeks to avoid this.

EXHIBIT 5

As each Unit is sold, a pro rata return of capital will be made to those LPs who have received their adjudication of their I-829 Petitions and have not otherwise exercised their Put Rights (as set forth above). The remainder of the proceeds shall remain with the Partnership and shall be returned on a pro rata basis to the rest of the LPs as their I-829 petitions are approved, subject to the distribution provisions in the Partnership Agreement. We intend such returns of capital to be made until all LPs (other than the LPs who have exercised their Put Rights (as set forth above)) have received a return of their capital contribution. All capital returns shall be made on a pro rata basis, treating each LP equal to one another. Once all of the Partnership Property has been sold, the Partnership shall wind down. To the extent there is Available Cash Flow (as defined in the Partnership Agreement) after the sale of all Partnership Property and return of LP capital, it shall be paid out in accordance with Article VI of the Partnership Agreement.

The strategy outlined above was developed in good faith with the LPs best interests in mind and seeks to provide a path toward maximizing value to each and every LP, while still providing the LPs with an early exit alternative as contemplated under Section 13.06. The Partnership will strive to execute this strategy as quickly as is economically feasible.

EXHIBIT 5

**From:** General Partner ("GP") of Colorado Regional Center Project Solaris, LLLP ("CRCPS" or the "Partnership")

**To:** Limited Partners ("LPs") of the Partnership

**Date:** June 19, 2017

**Re:** 3rd Notice of Fair Market Value of the Partnership Property (this "Notice") and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions

---

**Definitions:**

"Administrative Expenses" means those expenses incurred by the GP in connection with the sale of LP Interests including specifically and without limitation, certain marketing, travel, legal and accounting fees, referral and related fees, and the legal fees of a LP incurred in preparation of such LP's I-526 petition.

"Appraisal(s)" means the good faith estimate of the Fair Market Value of each Unit performed by the independent third party firm Pack Appraisal Company.

"Capital Contribution" means the total amount of money or property contributed to the Partnership by each Partner (excluding any amounts contributed for Administrative Expenses).

"Fair Market Value" means the total liquidation value (as determined pursuant to a good faith market analysis conducted by qualified third-parties engaged by the GP) of all of the Partnership Property or an individual Unit after deduction of all usual and customary selling expenses, pro rations, and other similar matters.

"Loan" means the loan made from CRCPS to the Solaris developer in the aggregate amount of $82,500,000.

"Loan Advance" means the amount of each advance of principal from CRCPS to the developer per terms of the Loan.

"LP Interest" means a limited partnership interest in CRCPS.

"Partnership Property or Units" means the 19 individual properties presently held by the developer which collateralize the Loan.

"Put Exercise Notice" means written notice provided by a LP to the Partnership of his or her intent to exercise the Put Right.  A Put Exercise Notice must be provided to the Partnership within 45 days following the receipt of this Notice.

"Put Right" means for each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, such LP may elect to sell his or her LP Interest to the Partnership and receive a return of capital.

"Partnership Agreement" means the Limited Liability Limited Partnership Agreement of Colorado Regional Center Project Solaris, LLLP.

"Put Purchase Price" means the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance amount multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses.

EXHIBIT 5

Case No. 1:19-cv-02443-RM-STV  Document 31-1  filed 06/18/20  USDC Colorado  pg 1 of 27
Case No. 1:19-cv-02443-STV  Document 51-6  Filed 10/18/19  USDC Colorado  Page 14 of 27
of 293

"Section 13.06" means Section 13.06 of the CRCPS Partnership Agreement entitled "Rights of Limited Partners to Return of Capital Contributions.

"U.S. Immigration Legal Requirements" means the GP's understanding that only LPs who have either received adjudication of their I-829 petition or who are foregoing permanent residency in the United States would be eligible to receive a return of capital and sell their LP Interest to the Partnership.

**Notice of Fair Market Value of the Partnership and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions:**

As previously discussed, per the terms of the Loan, the developer has the right to transfer each Unit to the Partnership in lieu of cash payment at maturity of the Loan. The developer has indicated its desire to do so for each Unit as each Loan Advance reaches its 3-year anniversary mark. Accordingly, we are working with the developer to transfer title to the Partnership on the Units which Loan Advances have reached or surpassed the 3-year anniversary mark. The Partnership has been in the process of developing a comprehensive plan to permit the transfer and orderly sale of Units presently held by the developer. Further, the Partnership has approved a listing agreement with the brokerage firm, Solaris Real Estate, LLC, and is coordinating the marketing plan for unit(s) to be introduced to the market for sale.

In September 2015, the Partnership obtained valuations of each of the Units from the independent third party firm, Pack Appraisal Company. Subsequently, the Partnership has obtained valuations (see summary below) on each of the Units from the independent appraisal firm Angelo's Appraisal Inc. and we are continually performing an overall assessment of the real estate market in an effort to maximize value on the sale of each of the Units which in turn maximizes value to the Partnership and to all LPs.

In accordance with Section 13.06, we engaged an independent third party appraisal firm to prepare a good faith estimate of the Fair Market Value of the Partnership Property. The Appraisals do not account for customary selling expenses, which the Partnership will incur as it pursues the strategy set forth in this Notice and estimates to be approximately six percent (6.0%) of the sales price. We are hereby providing notice to the LPs of the estimated Fair Market Value as of February - April 2017, which has been determined to be $76,425,000 in the aggregate, a 13.2% increase in the aggregate appraisal from the prior appraisal. Upon request, we will provide copies of the Appraisals for your review. The Appraisal amount compares to the aggregate amount of the Loan made to the Solaris developer in the amount of $82,500,000, representing approximately ninety three percent (93%) of the Loan amount, although we continue to believe the value of the Partnership Property to be higher based on reasons set forth below and in accompanying materials (if applicable).

EXHIBIT 5

The following is a summary of the appraised Fair Market Value of the Partnership Property:

| Unit | Appraised Fair Market Value | Loan Advance Date | Prepayment Date | Loan Advance Amount | Ratio of Fair Market Value to Loan Advance Amount |
|------|-----------------------------|-------------------|-----------------|---------------------|---------------------------------------------------|
| 6E West | $3,215,000 | 4/18/2012 | 4/18/2015 | $4,000,000 | -19.6% |
| 5E West | $3,215,000 | 8/2/2012 | 8/2/2015 | $4,000,000 | -19.6% |
| 2A South | $5,650,000 | 4/25/2012 | 4/25/2015 | $6,500,000 | -13.1% |
| 7E East | $3,525,000 | 1/30/2013 | 1/30/2016 | $4,000,000 | -11.9% |
| 6D East | $7,125,000 | 10/2/2012 | 10/2/2015 | $8,000,000 | -10.9% |
| 3E East | $2,690,000 | 1/29/2013 | 1/29/2016 | $3,000,000 | -10.3% |
| 7E West | $4,075,000 | 9/7/2012 | 9/7/2015 | $4,500,000 | -9.4% |
| 6C West | $3,185,000 | 11/27/2012 | 11/27/2015 | $3,500,000 | -9.0% |
| 3C East | $2,290,000 | 1/30/2015 | 1/29/2018 | $2,500,000 | -8.4% |
| 6E East | $3,210,000 | 5/30/2012 | 5/30/2015 | $3,500,000 | -8.3% |
| 5C West | $3,225,000 | 11/6/2012 | 11/6/2015 | $3,500,000 | -7.9% |
| Pent G West | $4,150,000 | 5/20/2013 | 5/19/2016 | $4,500,000 | -7.8% |
| 5G West | $6,050,000 | 1/24/2013 | 1/24/2016 | $6,500,000 | -6.9% |
| Pent E West | $2,800,000 | 5/3/2012 | 5/3/2015 | $3,000,000 | -6.7% |
| Pent E East | $2,800,000 | 6/15/2012 | 6/15/2015 | $3,000,000 | -6.7% |
| 4D East | $7,450,000 | 3/6/2013 | 3/5/2016 | $7,500,000 | -0.7% |
| 4G West | $6,530,000 | 8/24/2012 | 8/24/2015 | $6,500,000 | 0.5% |
| Pent C West | $2,620,000 | 5/30/2013 | 5/29/2016 | $2,500,000 | 4.8% |
| Pent C East | $2,620,000 | 9/13/2012 | 9/13/2015 | $2,000,000 | 31.0% |
| **Total** | **$76,425,000** | | | **$82,500,000** | **-7.4%** |

Pursuant to Section 13.06, each LP who has held his or her limited partnership interest in CRCPS ("LP Interest") for at least three years is entitled to receive notice of the Fair Market Value of Partnership Property and may also, depending on U.S. Immigration Legal Requirements, be entitled to give notice to the GP of his or her election to sell their LP Interest to the Partnership.  The purchase price for the LP Interest would be equal to the LPs pro rata share of the amount the Partnership actually receives from a sale, which may be greater or less than the Fair Market value as estimated by the third party appraiser. The Put Purchase Price is further described below.

Even if the Partnership was able to liquidate Partnership Property at this time, the GP does not believe it would be prudent to attempt to liquidate now, but rather to do so on a unit-by-unit basis in an orderly, market driven manner which seeks to create the most value for each LP.  While the Appraisals indicate the Partnership Property is valued below the face value of the Loan, we believe this is attributable to the lack of adequate comparison to sales within the Solaris building and the lack of adequate comparable properties in the greater Vail, Colorado area. Another factor that will contribute to what we believe to be increased value in the future is supply and demand for the building.  For example, the Partnership has control over the only two remaining mountain facing four-bedroom units that will be available for sale. As fewer properties in Solaris are available for sale, we anticipate demand will continue to increase the sales price of each Unit.

**Put Rights:**

We have set forth our good faith interpretation of Section 13.06 which we believe conforms to the original intent and provides qualifying LPs with an equitable exit strategy, while protecting the overall economic viability of the Partnership.  The GPs understanding is that only LPs who have either received adjudication of their I-829 and received an unconditional green card or who are foregoing permanent residency in the

EXHIBIT 5

U.S. would be eligible to receive a return of capital without jeopardizing the EB-5 process. We advise each LP to seek advice from his or her immigration attorney with respect to the U.S. Immigration Legal Requirements and any early exit procedure.

Each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, may elect to sell his or her LP Interest to the Partnership. By exercising his or her Put Right, the LP is seeking a return of capital earlier than other LPs in the Partnership may be permitted to. For those LPs first electing to exercise his or her Put Right, the Put Purchase Price for an LP Interest will be satisfied by the sale of a unit(s), while the order of unit sales is to be based on the Appraisals. To restate, the Put Purchase Price is equal to the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance as compared to the other Units multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses. However, the Partnership will not attempt to sell a Unit(s) until the number of LPs exercising their Put Right is equal to the number of LPs investments that were necessary to make the Loan Advance for such Unit.

For example, Unit 6E West was appraised at a Fair Market Value of $3,215,000, while the Loan Advance collateralized by this unit was in the amount of $4,000,000. The ratio of Fair Market Value to the Loan Advance amount on 6E West is -19.6% and represents the lowest ratio amongst the Units. Eight (8) LPs equity contributions to the Partnership were required in order to make the Loan Advance for which Unit 6E West serves as collateral. Therefore, once eight (8) LPs have exercised his or her Put Right, the Partnership will use reasonable business efforts to market and liquidate Unit 6E West once the Partnership. The Partnership shall not be entitled to sell a Unit(s) for less than the then appraised Fair Market Value without the consent of all LPs who will receive a return of capital from such sale. Thus, the Put Purchase Price for the first eight (8) LPs electing to exercise his or her Put Right would be equal to his or her pro rata share from realizable value of the sale of Unit 6E West less customary transaction expenses, i.e., 1 / 8 multiplied by at least $3,215,000 less customary transaction expenses, unless a sale at a lower price is approved by all participating LPs. Should the Partnership be able to sell the Unit for greater than the Fair Market Value, the benefit shall go to those eight investors who have exercised their Put Right, but in no event would the Put Purchase Price be greater than the actual LP Capital Contribution. Subsequently, the next Unit that would be sold would be 5E West, which has the second lowest ratio of Fair Market Value to Loan Advance amount amongst the remaining Units in the portfolio.

In order to exercise his or her Put Right, such LP must provide written notice (the "Put Exercise Notice") to the Partnership within 45 days following the date of this Notice expressly stating his or her exercise of the Put Right. By delivering the Put Exercise Notice, the LP represents and warrants to the Partnership that (A) the LP has full right, title and interest in and to the LP Interest, (B) the LP has all the necessary power and authority and has taken all necessary action to sell such LP Interest as contemplated herein, and (C) the LP Interest is free and clear of any and all mortgages, pledges, security interests, options, rights of first offer, encumbrances or other restrictions or limitations of any nature whatsoever other than those arising as a result of or under the terms of this Partnership Agreement. The delivery of a Put Exercise Notice by a LP to the Partnership shall create a binding and irrevocable obligation to sell his or her LP Interest at the Put Purchase Price as set forth in this Notice. Failure of an LP to deliver the Put Exercise Notice within such 45-day period shall constitute a waiver of such LPs Put Right with respect to the specific Put Purchase Price formula as set forth in this Notice, but shall not affect their respective rights with respect to any future Put Rights. **An LP who has previously provided a Put Exercise Notice but has not**

EXHIBIT 5

**yet received a capital distribution shall continue to be treated as having provided a Put Exercise Notice, unless the LP informs the Partnership of his or her desire to remain in the Partnership and withdraw their prior Put Exercise Notice.**

Upon the Partnership's receipt of such Put Exercise Notice, the Partnership will use commercially reasonable efforts to sell a Unit or Units in its possession at the Fair Market Value as identified in the Appraisals or at a higher amount. As described above, the Partnership shall not undertake such efforts until enough LPs have submitted their Put Exercise Notice that matches the number of investor's whose capital supported the Loan Advance on such Unit. The Partnership may, with the consent of all participating LPs, sell such Unit or Units below the Fair Market Value. The Partnership shall pay the Put Purchase Price no later than thirty (30) days following the closing of the sale of the applicable Unit or Units and receipt of the sales proceeds. The Partnership will pay the Put Purchase Price for the LP Interest by check or wire transfer of funds. At the closing of the sale of the LP Interest to the Partnership, the LP shall deliver to the Partnership (a) an assignment and all other transfer documents to consummate the sale and assignment of the LP Interest to the Partnership, and (b) waiver and release of the Partnership from any and all future claims, each in a form acceptable to the Partnership. Upon the LPs receipt of the Put Purchase Price at the closing, the LP shall have no further right, interest or claim to distributions in or from the Partnership and shall no longer be an LP in the Partnership.

On each six (6) month anniversary of this Notice or within a reasonable time thereafter, the General Partner shall provide to the remaining LPs a new notice setting forth the then applicable Fair Market Value of the remaining Partnership Property and each LP shall then have 45 days from the date of such new notice to deliver a Put Exercise Notice to the Partnership. The Put Purchase Price would continue to be based on the formula described above, only using the new Fair Market Value of the remaining Units, and would otherwise be payable upon and subject to the same terms set forth above.

**General Provisions for LPs Who Do Not Provide a Put Exercise Notice:**

To the extent the Unit(s) are not required to be put on the market to satisfy prior Put Exercise Notices, we will explore opportunities to put them on the market when market conditions are deemed to be favorable for sale. The sale of Units will be conducted in an orderly, market driven manner that seeks to maximize value to the Partnership and the LPs. As such, there can be no definitive timeline for which all of the Units will be sold. To sell prematurely would likely mean selling units at a significant discount to the original amount of each Loan Advance, which would mean LPs would receive less than the full amount of their capital contributions returned. The Partnership seeks to avoid this.

As each Unit is sold, a pro rata return of capital will be made to those LPs who have received their adjudication of their I-829 Petitions and have not otherwise exercised their Put Rights (as set forth above). The remainder of the proceeds shall remain with the Partnership and shall be returned on a pro rata basis to the rest of the LPs as their I-829 petitions are approved, subject to the distribution provisions in the Partnership Agreement. We intend such returns of capital to be made until all LPs (other than the LPs who have exercised their Put Rights (as set forth above)) have received a return of their capital contribution. All capital returns shall be made on a pro rata basis, treating each LP equal to one another. Once all of the Partnership Property has been sold, the Partnership shall wind down. To the extent there is Available Cash Flow (as defined in the Partnership Agreement) after the sale of all Partnership Property and return of LP capital, it shall be paid out in accordance with Article VI of the Partnership Agreement.

EXHIBIT 5

The strategy outlined above was developed in good faith with the LPs best interests in mind and seeks to provide a path toward maximizing value to each and every LP, while still providing the LPs with an early exit alternative as contemplated under Section 13.06.  The Partnership will strive to execute this strategy as quickly as is economically feasible.

Authorized Representative

Colorado Regional Center Project Solaris, LLLP

EXHIBIT 5

**From:** General Partner ("GP") of Colorado Regional Center Project Solaris, LLLP ("CRCPS" or the "Partnership")

**To:** Limited Partners ("LPs") of the Partnership

**Date:** December 26, 2017

**Re:** 4th Notice of Fair Market Value of the Partnership Property (this "Notice") and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions

---

**Definitions:**

"Administrative Expenses" means those expenses incurred by the GP in connection with the sale of LP Interests including specifically and without limitation, certain marketing, travel, legal and accounting fees, referral and related fees, and the legal fees of a LP incurred in preparation of such LP's I-526 petition.

"Appraisal(s)" means the good faith estimate of the Fair Market Value of each Unit performed by the independent third party firm Pack Appraisal Company.

"Capital Contribution" means the total amount of money or property contributed to the Partnership by each Partner (excluding any amounts contributed for Administrative Expenses).

"Fair Market Value" means the total liquidation value (as determined pursuant to a good faith market analysis conducted by qualified third-parties engaged by the GP) of all of the Partnership Property or an individual Unit after deduction of all usual and customary selling expenses, pro rations, and other similar matters.

"Loan" means the loan made from CRCPS to the Solaris developer in the aggregate amount of $82,500,000.

"Loan Advance" means the amount of each advance of principal from CRCPS to the developer per terms of the Loan.

"LP Interest" means a limited partnership interest in CRCPS.

"Partnership Property or Units" means the 19 individual properties presently held by the developer which collateralize the Loan.

"Put Exercise Notice" means written notice provided by a LP to the Partnership of his or her intent to exercise the Put Right. A Put Exercise Notice must be provided to the Partnership within 45 days following the receipt of this Notice.

"Put Right" means for each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, such LP may elect to sell his or her LP Interest to the Partnership and receive a return of capital.

"Partnership Agreement" means the Limited Liability Limited Partnership Agreement of Colorado Regional Center Project Solaris, LLLP.

"Put Purchase Price" means the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance amount multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses.

EXHIBIT 5

"Section 13.06" means Section 13.06 of the CRCPS Partnership Agreement entitled "Rights of Limited Partners to Return of Capital Contributions.

"U.S. Immigration Legal Requirements" means the GP's understanding that only LPs who have either received adjudication of their I-829 petition or who are foregoing permanent residency in the United States would be eligible to receive a return of capital and sell their LP Interest to the Partnership.

**Notice of Fair Market Value of the Partnership and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions:**

As previously discussed, per the terms of the Loan, the developer has the right to transfer each Unit to the Partnership in lieu of cash payment at maturity of the Loan.  The developer has indicated its desire to do so for each Unit as each Loan Advance reaches its 3-year anniversary mark.  Accordingly, we are working with the developer to transfer title to the Partnership on the Units which Loan Advances have reached or surpassed the 3-year anniversary mark as is practicable for all parties.  The Partnership has been in the process of developing a comprehensive plan to permit the transfer and orderly sale of Units presently held by the developer.  Further, the Partnership has approved a listing agreement with the brokerage firm, Solaris Real Estate, LLC, and is coordinating the marketing plan for unit(s) to be introduced to the market for sale.

In September 2015, the Partnership obtained valuations of each of the Units from the independent third party firm, Pack Appraisal Company.  Subsequently, the Partnership has obtained valuations (see summary below) on each of the Units from the independent appraisal firm Angelo's Appraisal Inc. and we are continually performing an overall assessment of the real estate market in an effort to maximize value on the sale of each of the Units which in turn maximizes value to the Partnership and to all LPs.

In accordance with Section 13.06, we engaged an independent third party appraisal firm to prepare a good faith estimate of the Fair Market Value of the Partnership Property. The Appraisals do not account for customary selling expenses, which the Partnership will incur as it pursues the strategy set forth in this Notice and estimates to be approximately six percent (6.0%) of the sales price. We are hereby providing notice to the LPs of the estimated Fair Market Value as of October 2017, which has been determined to be $78,450,000 in the aggregate, a 2.6% increase in the aggregate appraisal from the prior appraisal. Upon request, we will provide copies of the Appraisals for your review. The Appraisal amount compares to the aggregate amount of the Loan made to the Solaris developer in the amount of $82,500,000, representing approximately ninety five percent (95%) of the Loan amount, although we continue to believe the value of the Partnership Property to be higher based on reasons set forth below and in accompanying materials (if applicable).

EXHIBIT 5

The following is a summary of the appraised Fair Market Value of the Partnership Property:

| Unit | Appraised Fair Market Value | Loan Advance Date | Prepayment Date | Loan Advance Amount | Ratio of Fair Market Value to Loan Advance Amount |
|---|---|---|---|---|---|
| 6E West | $3,345,000 | 4/18/2012 | 4/18/2015 | $4,000,000 | -16.4% |
| 5E West | $3,345,000 | 8/2/2012 | 8/2/2015 | $4,000,000 | -16.4% |
| 6D East | $7,150,000 | 10/2/2012 | 10/2/2015 | $8,000,000 | -10.6% |
| 2A South | $5,850,000 | 4/25/2012 | 4/25/2015 | $6,500,000 | -10.0% |
| 7E East | $3,660,000 | 1/30/2013 | 1/30/2016 | $4,000,000 | -8.5% |
| 3E East | $2,770,000 | 1/29/2013 | 1/29/2016 | $3,000,000 | -7.7% |
| 4G West | $6,075,000 | 8/24/2012 | 8/24/2015 | $6,500,000 | -6.5% |
| 6C West | $3,310,000 | 11/27/2012 | 11/27/2015 | $3,500,000 | -5.4% |
| Pent G West | $4,275,000 | 5/20/2013 | 5/19/2016 | $4,500,000 | -5.0% |
| 6E East | $3,335,000 | 5/30/2012 | 5/30/2015 | $3,500,000 | -4.7% |
| 4D East | $7,175,000 | 3/6/2013 | 3/5/2016 | $7,500,000 | -4.3% |
| 5C West | $3,350,000 | 11/6/2012 | 11/6/2015 | $3,500,000 | -4.3% |
| 5G West | $6,275,000 | 1/24/2013 | 1/24/2016 | $6,500,000 | -3.5% |
| Pent E West | $2,940,000 | 5/3/2012 | 5/3/2015 | $3,000,000 | -2.0% |
| Pent E East | $2,945,000 | 6/15/2012 | 6/15/2015 | $3,000,000 | -1.8% |
| 7E West | $4,570,000 | 9/7/2012 | 9/7/2015 | $4,500,000 | 1.6% |
| 3C East | $2,590,000 | 1/30/2015 | 1/29/2018 | $2,500,000 | 3.6% |
| Pent C West | $2,745,000 | 5/30/2013 | 5/29/2016 | $2,500,000 | 9.8% |
| Pent C East | $2,745,000 | 9/13/2012 | 9/13/2015 | $2,000,000 | 37.3% |
| **Total** | **$78,450,000** | | | **$82,500,000** | **-4.9%** |

Pursuant to Section 13.06, each LP who has held his or her limited partnership interest in CRCPS ("LP Interest") for at least three years is entitled to receive notice of the Fair Market Value of Partnership Property and may also, depending on U.S. Immigration Legal Requirements, be entitled to give notice to the GP of his or her election to sell their LP Interest to the Partnership. The purchase price for the LP Interest would be equal to the LPs pro rata share of the amount the Partnership actually receives from a sale, which may be greater or less than the Fair Market value as estimated by the third party appraiser. The Put Purchase Price is further described below.

Even if the Partnership was able to liquidate Partnership Property at this time, the GP does not believe it would be prudent to attempt to liquidate all of the Partnership Property at once, but rather to do so on a unit-by-unit basis in an orderly, market driven manner which seeks to create the most value for each LP. While the Appraisals indicate the Partnership Property is valued below the face value of the Loan, we believe this is attributable to the lack of adequate comparison to sales within the Solaris building and the lack of adequate comparable properties in the greater Vail, Colorado area. Another factor that will contribute to what we believe to be increased value in the future is supply and demand for the building. For example, the Partnership has control over the only two remaining mountain facing four-bedroom units that will be available for sale. As fewer properties in Solaris are available for sale, we anticipate demand will continue to increase the sales price of each Unit.

**Put Rights:**

We have set forth our good faith interpretation of Section 13.06 which we believe conforms to the original intent and provides qualifying LPs with an equitable exit strategy, while protecting the overall economic viability of the Partnership. The GPs understanding is that only LPs who have either received adjudication of their I-829 and received an unconditional green card or who are foregoing permanent residency in the

EXHIBIT 5

U.S. would be eligible to receive a return of capital without jeopardizing the EB-5 process. We advise each LP to seek advice from his or her immigration attorney with respect to the U.S. Immigration Legal Requirements and any early exit procedure.

Each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, may elect to sell his or her LP Interest to the Partnership. By exercising his or her Put Right, the LP is seeking a return of capital earlier than other LPs in the Partnership may be permitted to. For those LPs first electing to exercise his or her Put Right, the Put Purchase Price for an LP Interest will be satisfied by the sale of a unit(s), while the order of unit sales is to be based on the Appraisals. To restate, the Put Purchase Price is equal to the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance as compared to the other Units multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses. However, the Partnership will not attempt to sell a Unit(s) until the number of LPs exercising their Put Right is equal to the number of LPs investments that were necessary to make the Loan Advance for such Unit.

For example, Unit 6E West was appraised at a Fair Market Value of $3,345,000, while the Loan Advance collateralized by this unit was in the amount of $4,000,000. The ratio of Fair Market Value to the Loan Advance amount on 6E West is -16.4% and represents the lowest ratio amongst the Units. Eight (8) LPs equity contributions to the Partnership were required in order to make the Loan Advance for which Unit 6E West serves as collateral. Therefore, once eight (8) LPs have exercised his or her Put Right, the Partnership will use reasonable business efforts to market and liquidate Unit 6E West once the Partnership. The Partnership shall not be entitled to sell a Unit(s) for less than the then appraised Fair Market Value without the consent of all LPs who will receive a return of capital from such sale. Thus, the Put Purchase Price for the first eight (8) LPs electing to exercise his or her Put Right would be equal to his or her pro rata share from realizable value of the sale of Unit 6E West less customary transaction expenses, i.e., 1 / 8 multiplied by at least $3,345,000 less customary transaction expenses, unless a sale at a lower price is approved by all participating LPs. Subsequent to the 3rd Notice, Unit 6E West was listed for sale and the first eight (8) LPs who provided an executed Put Exercise Notice were assigned to that Unit. Should the Partnership be able to sell the Unit for greater than the Fair Market Value, the benefit shall go to those eight investors who have exercised their Put Right, but in no event would the Put Purchase Price be greater than the actual LP Capital Contribution. Subsequently, the next Unit that would be sold would be 5E West, which has the second lowest ratio of Fair Market Value to Loan Advance amount amongst the remaining Units in the portfolio.

In order to exercise his or her Put Right, such LP must provide written notice (the "Put Exercise Notice") to the Partnership within 45 days following the date of this Notice expressly stating his or her exercise of the Put Right. By delivering the Put Exercise Notice, the LP represents and warrants to the Partnership that (A) the LP has full right, title and interest in and to the LP Interest, (B) the LP has all the necessary power and authority and has taken all necessary action to sell such LP Interest as contemplated herein, and (C) the LP Interest is free and clear of any and all mortgages, pledges, security interests, options, rights of first offer, encumbrances or other restrictions or limitations of any nature whatsoever other than those arising as a result of or under the terms of this Partnership Agreement. The delivery of a Put Exercise Notice by a LP to the Partnership shall create a binding and irrevocable obligation to sell his or her LP Interest at the Put Purchase Price as set forth in this Notice. Failure of an LP to deliver the Put Exercise Notice within such 45-day period shall constitute a waiver of such LPs Put Right with respect to the specific

EXHIBIT 5

Put Purchase Price formula as set forth in this Notice, but shall not affect their respective rights with respect to any future Put Rights. **An LP who has previously provided an executed Put Exercise Notice form but has not yet received a capital distribution shall continue to be treated as having provided an executed Put Exercise Notice, unless the LP informs the Partnership of his or her desire to remain in the Partnership and withdraw their prior Put Exercise Notice.**

Upon the Partnership's receipt of such Put Exercise Notice, the Partnership will use commercially reasonable efforts to sell a Unit or Units in its possession at the Fair Market Value as identified in the Appraisals or at a higher amount, but will take consideration of listing too many Units at the same time. As described above, the Partnership shall not undertake such efforts until enough LPs have submitted their Put Exercise Notice that matches the number of investor's whose capital supported the Loan Advance on such Unit. The Partnership may, with the consent of all participating LPs, sell such Unit or Units below the Fair Market Value. The Partnership shall pay the Put Purchase Price no later than thirty (30) days following the closing of the sale of the applicable Unit or Units and receipt of the sales proceeds. The Partnership will pay the Put Purchase Price for the LP Interest by check or wire transfer of funds. At the closing of the sale of the LP Interest to the Partnership, the LP shall deliver to the Partnership (a) an assignment and all other transfer documents to consummate the sale and assignment of the LP Interest to the Partnership, and (b) waiver and release of the Partnership from any and all future claims, each in a form acceptable to the Partnership. Upon the LPs receipt of the Put Purchase Price at the closing, the LP shall have no further right, interest or claim to distributions in or from the Partnership and shall no longer be an LP in the Partnership.

On each six (6) month anniversary of this Notice or within a reasonable time thereafter, the General Partner shall provide to the remaining LPs a new notice setting forth the then applicable Fair Market Value of the remaining Partnership Property and each LP shall then have **45 days** from the date of such new notice to deliver a Put Exercise Notice to the Partnership. The Put Purchase Price would continue to be based on the formula described above, only using the new Fair Market Value of the remaining Units, and would otherwise be payable upon and subject to the same terms set forth above.

**General Provisions for LPs Who Do Not Provide a Put Exercise Notice:**

To the extent the Unit(s) are not required to be put on the market to satisfy prior Put Exercise Notices, we will explore opportunities to put them on the market when market conditions are deemed to be favorable for sale. The sale of Units will be conducted in an orderly, market driven manner that seeks to maximize value to the Partnership and the LPs. As such, there can be no definitive timeline for which all of the Units will be sold. To sell prematurely would likely mean selling units at a significant discount to the original amount of each Loan Advance, which would mean LPs would receive less than the full amount of their capital contributions returned. The Partnership seeks to avoid this.

As each Unit is sold, a pro rata return of capital will be made to those LPs who have received their adjudication of their I-829 Petitions and have not otherwise exercised their Put Rights (as set forth above). The remainder of the proceeds shall remain with the Partnership and shall be returned on a pro rata basis to the rest of the LPs as their I-829 petitions are approved, subject to the distribution provisions in the Partnership Agreement. We intend such returns of capital to be made until all LPs (other than the LPs who have exercised their Put Rights (as set forth above)) have received a return of their capital contribution. All capital returns shall be made on a pro rata basis, treating each LP equal to one another based on ownership percentage. Once all of the Partnership Property has been sold, the Partnership shall

EXHIBIT 5

wind down. To the extent there is Available Cash Flow (as defined in the Partnership Agreement) after the sale of all Partnership Property and return of LP capital, it shall be paid out in accordance with Article VI of the Partnership Agreement.

The strategy outlined above was developed in good faith with the LPs best interests in mind and seeks to provide a path toward maximizing value to each and every LP, while still providing the LPs with an early exit alternative as contemplated under Section 13.06. The Partnership will strive to execute this strategy as quickly as is economically feasible.

_Robert Glucksman_

Authorized Representative

Colorado Regional Center Project Solaris, LLLP

EXHIBIT 5

**From:** General Partner ("GP") of Colorado Regional Center Project Solaris, LLLP ("CRCPS" or the "Partnership")

**To:** Limited Partners ("LPs") of the Partnership

**Date:** July 18, 2018

**Re:** 5th Notice of Fair Market Value of the Partnership Property (this "Notice") and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions

---

**Definitions:**

"Administrative Expenses" means those expenses incurred by the GP in connection with the sale of LP Interests including specifically and without limitation, certain marketing, travel, legal and accounting fees, referral and related fees, and the legal fees of a LP incurred in preparation of such LP's I-526 petition.

"Appraisal(s)" means the good faith estimate of the Fair Market Value of each Unit performed by the independent third party firm Pack Appraisal Company.

"Capital Contribution" means the total amount of money or property contributed to the Partnership by each Partner (excluding any amounts contributed for Administrative Expenses).

"Fair Market Value" means the total liquidation value (as determined pursuant to a good faith market analysis conducted by qualified third-parties engaged by the GP) of all of the Partnership Property or an individual Unit after deduction of all usual and customary selling expenses, pro rations, and other similar matters.

"Loan" means the loan made from CRCPS to the Solaris developer in the aggregate amount of $82,500,000.

"Loan Advance" means the amount of each advance of principal from CRCPS to the developer per terms of the Loan.

"LP Interest" means a limited partnership interest in CRCPS.

"Partnership Property or Units" means the 19 individual properties presently held by the developer which collateralize the Loan.

"Put Exercise Notice" means written notice provided by a LP to the Partnership of his or her intent to exercise the Put Right.  A Put Exercise Notice must be provided to the Partnership within 45 days following the receipt of this Notice.

"Put Right" means for each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, such LP may elect to sell his or her LP Interest to the Partnership and receive a return of capital.

"Partnership Agreement" means the Limited Liability Limited Partnership Agreement of Colorado Regional Center Project Solaris, LLLP.

"Put Purchase Price" means the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance amount multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses.

EXHIBIT 5

"Section 13.06" means Section 13.06 of the CRCPS Partnership Agreement entitled "Rights of Limited Partners to Return of Capital Contributions.

"U.S. Immigration Legal Requirements" means the GP's understanding that only LPs who have either received adjudication of their I-829 petition or who are foregoing permanent residency in the United States would be eligible to receive a return of capital and sell their LP Interest to the Partnership.

**Notice of Fair Market Value of the Partnership and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions:**

As previously discussed, per the terms of the Loan, the developer has the right to transfer each Unit to the Partnership in lieu of cash payment at maturity of the Loan. The developer has indicated its desire to do so for each Unit as each Loan Advance reaches its 3-year anniversary mark. Accordingly, we are working with the developer to transfer title to the Partnership on the Units which Loan Advances have reached or surpassed the 3-year anniversary mark as is practicable for all parties. The Partnership has been in the process of developing a comprehensive plan to permit the transfer and orderly sale of Units presently held by the developer. Further, the Partnership has approved a listing agreement with the brokerage firm, Solaris Real Estate, LLC, and continues to coordinate a marketing plan for unit(s).

In September 2015, the Partnership obtained valuations of each of the Units from the independent third party firm, Pack Appraisal Company. Subsequently, the Partnership has obtained valuations (see summary below) on each of the Units from the independent appraisal firm Angelo's Appraisal Inc. and we are continually performing an overall assessment of the real estate market in an effort to maximize value on the sale of each of the Units which in turn maximizes value to the Partnership and to all LPs.

In accordance with Section 13.06, we engaged an independent third party appraisal firm to prepare a good faith estimate of the Fair Market Value of the Partnership Property. The Appraisals do not account for customary selling expenses, which the Partnership will incur as it pursues the strategy set forth in this Notice and estimates to be approximately six percent (6.0%) of the sales price. We are hereby providing notice to the LPs of the estimated Fair Market Value as of April 2018, which has been determined to be $75,460,000 in the aggregate, a 3.8% decrease in the aggregate appraisal from the prior appraisal. Upon request, we will provide copies of the Appraisals for your review. The Appraisal amount compares to the aggregate amount of the Loan made to the Solaris developer in the amount of $82,500,000, representing approximately ninety one percent (91%) of the Loan amount, although we continue to believe the value of the Partnership Property to be higher based on reasons set forth below and in accompanying materials (if applicable).

EXHIBIT 5

The following is a summary of the appraised Fair Market Value of the Partnership Property:

| Unit | Appraised Fair Market Value | Loan Advance Date | Prepayment Date | Loan Advance Amount | Ratio of Fair Market Value to Loan Advance Amount |
|------|------|------|------|------|------|
| 6E West | $3,295,000 | 4/18/2012 | 4/18/2015 | $4,000,000 | -17.6% |
| 5E West | $3,295,000 | 8/2/2012 | 8/2/2015 | $4,000,000 | -17.6% |
| 2A South | $5,400,000 | 4/25/2012 | 4/25/2015 | $6,500,000 | -16.9% |
| 4G West | $5,490,000 | 8/24/2012 | 8/24/2015 | $6,500,000 | -15.5% |
| 6D East | $6,825,000 | 10/2/2012 | 10/2/2015 | $8,000,000 | -14.7% |
| 4D East | $6,500,000 | 3/6/2013 | 3/5/2016 | $7,500,000 | -13.3% |
| 5G West | $5,780,000 | 1/24/2013 | 1/24/2016 | $6,500,000 | -11.1% |
| 7E East | $3,570,000 | 1/30/2013 | 1/30/2016 | $4,000,000 | -10.8% |
| 3E East | $2,725,000 | 1/29/2013 | 1/29/2016 | $3,000,000 | -9.2% |
| 6E East | $3,285,000 | 5/30/2012 | 5/30/2015 | $3,500,000 | -6.1% |
| 6C West | $3,300,000 | 11/27/2012 | 11/27/2015 | $3,500,000 | -5.7% |
| 5C West | $3,300,000 | 11/6/2012 | 11/6/2015 | $3,500,000 | -5.7% |
| Pent G West | $4,310,000 | 5/20/2013 | 5/19/2016 | $4,500,000 | -4.2% |
| 7E West | $4,400,000 | 9/7/2012 | 9/7/2015 | $4,500,000 | -2.2% |
| Pent E West | $2,945,000 | 5/3/2012 | 5/3/2015 | $3,000,000 | -1.8% |
| Pent E East | $2,950,000 | 6/15/2012 | 6/15/2015 | $3,000,000 | -1.7% |
| 3C East | $2,550,000 | 1/30/2015 | 1/29/2018 | $2,500,000 | 2.0% |
| Pent C West | $2,770,000 | 5/30/2013 | 5/29/2016 | $2,500,000 | 10.8% |
| Pent C East | $2,770,000 | 9/13/2012 | 9/13/2015 | $2,000,000 | 38.5% |
| **Total** | **$75,460,000** | | | **$82,500,000** | **-8.5%** |

Pursuant to Section 13.06, each LP who has held his or her limited partnership interest in CRCPS ("LP Interest") for at least three years is entitled to receive notice of the Fair Market Value of Partnership Property and may also, depending on U.S. Immigration Legal Requirements, be entitled to give notice to the GP of his or her election to sell their LP Interest to the Partnership. The purchase price for the LP Interest would be equal to the LPs pro rata share of the amount the Partnership actually receives from a sale, which may be greater or less than the Fair Market value as estimated by the third party appraiser. The Put Purchase Price is further described below.

Even if the Partnership was able to liquidate Partnership Property at this time, the GP does not believe it would be prudent to attempt to liquidate all of the Partnership Property at once, but rather to do so on a unit-by-unit basis in an orderly, market driven manner which seeks to create the most value for each LP. While the Appraisals indicate the Partnership Property is valued below the face value of the Loan, we believe this is attributable to the lack of adequate comparison to sales within the Solaris building and the lack of adequate comparable properties in the greater Vail, Colorado area. Another factor that will contribute to what we believe to be increased value in the future is supply and demand for the building. For example, the Partnership has control over the only two remaining mountain facing four-bedroom units that will be available for sale. As fewer properties in Solaris are available for sale, we anticipate demand will increase the sales price of each Unit.

**Put Rights:**

We have set forth our good faith interpretation of Section 13.06 which we believe conforms to the original intent and provides qualifying LPs with an equitable exit strategy, while protecting the overall economic viability of the Partnership. The GPs understanding is that only LPs who have either received adjudication of their I-829 and received an unconditional green card or who are foregoing permanent residency in the U.S. would be eligible to receive a return of capital without jeopardizing the EB-5 process. We advise each

EXHIBIT 5

LP to seek advice from his or her immigration attorney with respect to the U.S. Immigration Legal Requirements and any early exit procedure.

Each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, may elect to sell his or her LP Interest to the Partnership. By exercising his or her Put Right, the LP is seeking a return of capital earlier than other LPs in the Partnership may be permitted to. For those LPs first electing to exercise his or her Put Right, the Put Purchase Price for an LP Interest will be satisfied by the sale of a unit(s), while the order of unit sales is to be based on the Appraisals. To restate, the Put Purchase Price is equal to the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance as compared to the other Units multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses. However, the Partnership will not attempt to sell a Unit(s) until the number of LPs exercising their Put Right is equal to the number of LPs investments that were necessary to make the Loan Advance for such Unit.

For example, Unit 6E West was appraised at a Fair Market Value of $3,295,000, while the Loan Advance collateralized by this unit was in the amount of $4,000,000. The ratio of Fair Market Value to the Loan Advance amount on 6E West is -17.6% and represents the lowest ratio amongst the Units. Eight (8) LPs equity contributions to the Partnership were required in order to make the Loan Advance for which Unit 6E West serves as collateral. Therefore, once eight (8) LPs have exercised his or her Put Right, the Partnership will use reasonable business efforts to market and liquidate Unit 6E West once the Partnership. The Partnership shall not be entitled to sell a Unit(s) for less than the then appraised Fair Market Value without the consent of all LPs who will receive a return of capital from such sale. Thus, the Put Purchase Price for the first eight (8) LPs electing to exercise his or her Put Right would be equal to his or her pro rata share from realizable value of the sale of Unit 6E West less customary transaction expenses, i.e., 1 / 8 multiplied by at least $3,295,000 less customary transaction expenses, unless a sale at a lower price is approved by all participating LPs. Should the Partnership be able to sell the Unit for greater than the Fair Market Value, the benefit shall go to those eight investors who have exercised their Put Right, but in no event would the Put Purchase Price be greater than the actual LP Capital Contribution. Subsequently, the next Unit that would be sold would be 5E West, which has the second lowest ratio of Fair Market Value to Loan Advance amount amongst the remaining Units in the portfolio.

In order to exercise his or her Put Right, such LP must provide written notice (the "Put Exercise Notice") to the Partnership within 45 days following the date of this Notice expressly stating his or her exercise of the Put Right. By delivering the Put Exercise Notice, the LP represents and warrants to the Partnership that (A) the LP has full right, title and interest in and to the LP Interest, (B) the LP has all the necessary power and authority and has taken all necessary action to sell such LP Interest as contemplated herein, and (C) the LP Interest is free and clear of any and all mortgages, pledges, security interests, options, rights of first offer, encumbrances or other restrictions or limitations of any nature whatsoever other than those arising as a result of or under the terms of this Partnership Agreement. The delivery of a Put Exercise Notice by a LP to the Partnership shall create a binding and irrevocable obligation to sell his or her LP Interest at the Put Purchase Price as set forth in this Notice. Failure of an LP to deliver the Put Exercise Notice within such 45-day period shall constitute a waiver of such LPs Put Right with respect to the specific Put Purchase Price formula as set forth in this Notice, but shall not affect their respective rights with respect to any future Put Rights. **An LP who has previously provided an executed Put Exercise Notice form but has not yet received a capital distribution shall continue to be treated as having provided an**

EXHIBIT 5

**executed Put Exercise Notice, unless the LP informs the Partnership of his or her desire to remain in the Partnership and withdraw their prior Put Exercise Notice.**

Upon the Partnership's receipt of such Put Exercise Notice, the Partnership will use commercially reasonable efforts to sell a Unit or Units in its possession at the Fair Market Value as identified in the Appraisals or at a higher amount, but will take consideration of listing too many Units at the same time as well as guidance from brokerage in terms of a listing and marketing strategy. As described above, the Partnership shall not undertake such efforts until enough LPs have submitted their Put Exercise Notice that matches the number of investor's whose capital supported the Loan Advance on such Unit. The Partnership may, with the consent of all participating LPs, sell such Unit or Units below the Fair Market Value. The Partnership shall pay the Put Purchase Price no later than thirty (30) days following the closing of the sale of the applicable Unit or Units and receipt of the sales proceeds. The Partnership will pay the Put Purchase Price for the LP Interest by check or wire transfer of funds. At the closing of the sale of the LP Interest to the Partnership, the LP shall deliver to the Partnership (a) an assignment and all other transfer documents to consummate the sale and assignment of the LP Interest to the Partnership, and (b) waiver and release of the Partnership from any and all future claims, each in a form acceptable to the Partnership. Upon the LPs receipt of the Put Purchase Price at the closing, the LP shall have no further right, interest or claim to distributions in or from the Partnership and shall no longer be an LP in the Partnership.

On each six (6) month anniversary of this Notice or within a reasonable time thereafter, the General Partner shall provide to the remaining LPs a new notice setting forth the then applicable Fair Market Value of the remaining Partnership Property and each LP shall then have **45 days** from the date of such new notice to deliver a Put Exercise Notice to the Partnership. The Put Purchase Price would continue to be based on the formula described above, only using the new Fair Market Value of the remaining Units, and would otherwise be payable upon and subject to the same terms set forth above.

**General Provisions for LPs Who Do Not Provide a Put Exercise Notice:**

To the extent the Unit(s) are not required to be put on the market to satisfy prior Put Exercise Notices, we will explore opportunities to put them on the market when market conditions are deemed to be favorable for sale. The sale of Units will be conducted in an orderly, market driven manner that seeks to maximize value to the Partnership and the LPs. As such, there can be no definitive timeline for which all of the Units will be sold. To sell prematurely would likely mean selling units at a significant discount to the original amount of each Loan Advance, which would mean LPs would receive less than the full amount of their capital contributions returned. The Partnership seeks to avoid this.

As each Unit is sold, a pro rata return of capital will be made to those LPs who have received their adjudication of their I-829 Petitions and have not otherwise exercised their Put Rights (as set forth above). The remainder of the proceeds shall remain with the Partnership and shall be returned on a pro rata basis to the rest of the LPs as their I-829 petitions are approved, subject to the distribution provisions in the Partnership Agreement. We intend such returns of capital to be made until all LPs (other than the LPs who have exercised their Put Rights (as set forth above)) have received a return of their capital contribution. All capital returns shall be made on a pro rata basis, treating each LP equal to one another based on ownership percentage. Once all of the Partnership Property has been sold, the Partnership shall wind down. To the extent there is Available Cash Flow (as defined in the Partnership Agreement) after

EXHIBIT 5

the sale of all Partnership Property and return of LP capital, it shall be paid out in accordance with Article VI of the Partnership Agreement.

The strategy outlined above was developed in good faith with the LPs best interests in mind and seeks to provide a path toward maximizing value to each and every LP, while still providing the LPs with an early exit alternative as contemplated under Section 13.06.  The Partnership will strive to execute this strategy as quickly as is economically feasible.


_____

_____

Authorized Representative

Colorado Regional Center Project Solaris, LLLP

EXHIBIT 5

**From:** General Partner ("GP") of Colorado Regional Center Project Solaris, LLLP ("CRCPS" or the "Partnership")

**To:** Limited Partners ("LPs") of the Partnership

**Date:** May 20, 2019

**Re:** 6th Notice of Fair Market Value of the Partnership Property (this "Notice") and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions

## Notice of Fair Market Value of the Partnership and the Partnership's Exit Strategy and Plan for Return of LP Capital Contributions:[1]

As previously discussed, per the terms of the Loan and as described in the Partnership's offering memorandum (as amended to date, the "Offering Memorandum"), the developer held the right to transfer each Unit to the Partnership in lieu of cash payment at maturity of the Loan.  The developer previously indicated its desire to do so for each Unit as each Loan Advance reached its 3-year anniversary mark.  Accordingly, the Partnership entered into an Agreement Regarding Collateral Units to address the relationship between the developer and the Partnership.

The Partnership had listed units with Solaris Real Estate as broker as it believed that Solaris Real Estate previously had the most experience marketing, listing and selling units in the building.  However, as there has not been a transaction for a Partnership unit through Solaris Real Estate, the Partnership has recently engaged Slifer Smith & Frampton Real Estate to market units. Slifer Smith & Frampton Real Estate is the largest real estate company in Eagle County and has indicated to us that it has sold more property than any other real estate firm in the valley. They currently have listed Units 7E West, 5G West, 4D East, and 7E East.

The Partnership has additionally entered into a listing agreement with Cushman & Wakefield U.S., Inc. for the sale of the six mountain facing units; 6D East, 4D East, 4G West, 5G West, 2A South, and Penthouse G West. Collectively, these six units are the premium, mountain-facing units in the portfolio and represent $39.5 million of the Loan. The term of the engagement commenced February 18, 2019 and will expire on May 31, 2019. The expected cost is 1% commission on the total sales price payable to Cushman & Wakefield, which is expected to be the only brokerage expense and will only be payable if a sale is finalized. The Partnership received an update from Cushman & Wakefield that they have set a formal "Call for Offers" date of Thursday, May 9th and anticipate receiving a couple indications of interest for the entire portfolio. An update will be provided once they receive the offers.

In September 2015, the Partnership obtained valuations of each of the Units from the independent third-party firm, Pack Appraisal Company.  Subsequently, the Partnership has obtained valuations (see summary below) on each of the Units from the independent appraisal firm Angelo's Appraisal Inc. and we are continually performing an overall assessment of the real estate market in an effort to maximize value on the sale of each of the Units which in turn maximizes value to the Partnership and to all LPs.

In accordance with Section 13.06, we engaged an independent third party appraisal firm to prepare a good faith estimate of the Fair Market Value of the Partnership Property. The Appraisals do not account

---

[1] See Exhibit A for definitions.

EXHIBIT 5

for customary selling expenses or accrued and unpaid Partnership liabilities, which the Partnership will incur as it pursues the strategy set forth in this Notice and estimates customary selling expenses to be approximately six percent (6.0%) of the sales price while the balance of the accrued and unpaid management fee is approximately $4.5 million as of April 30, 2019 (after deducting the amount to be paid from the 6E West transaction described below).

On February 8, 2019, the transaction for unit 6E West closed. In exchange for ownership of 6E West, eight LPs transferred their ownership interests back to the Partnership, ceased to be LPs, and have no further rights or claims upon the Partnership. Unit 6E West had the lowest ratio of individual appraised value to the amount of the loan advance amongst all of the units. The 8 LPs were also responsible for their respective share of the accrued management fee through the date of the transaction, and accordingly executed a promissory note for their share in the amount of $210,074. Thus, there are now 157 Limited Partners remaining and 18 Units left in the portfolio which collateralized $78.5 million of Loan advances. The 8 LPs sold Unit 6E West on April 30, 2019 for a purchase price of approximately $2.78mm and made a payment of $210,074 to satisfy the promissory note to the Partnership.

The Partnership is hereby providing notice to the LPs of the estimated Fair Market Value as of November 2018, which has been determined to be $73,130,000 in the aggregate for the remaining 18 Units in the portfolio. Upon request, we will provide copies of the Appraisals for your review. The Appraisal amount compares to the aggregate amount of the loan advances made to the Solaris developer and collateralized by the remaining 18 units in the amount of $78,500,000, representing approximately ninety three percent (93%) of the Loan amount.

The following is a summary of the appraised Fair Market Value of the Partnership Property:

| Unit | Appraised Fair Market Value | Loan Advance Date | Prepayment Date | Loan Advance Amount | Ratio of Fair Market Value to Loan Advance Amount |
|------|------|------|------|------|------|
| 5E West | $3,300,000 | 8/2/2012 | 8/2/2015 | $4,000,000 | -17.5% |
| 6D East | $6,850,000 | 10/2/2012 | 10/2/2015 | $8,000,000 | -14.4% |
| 3E East | $2,650,000 | 1/29/2013 | 1/29/2016 | $3,000,000 | -11.7% |
| 4G West | $5,780,000 | 8/24/2012 | 8/24/2015 | $6,500,000 | -11.1% |
| 5G West | $5,780,000 | 1/24/2013 | 1/24/2016 | $6,500,000 | -11.1% |
| 7E East | $3,575,000 | 1/30/2013 | 1/30/2016 | $4,000,000 | -10.6% |
| 2A South | $5,875,000 | 4/25/2012 | 4/25/2015 | $6,500,000 | -9.6% |
| 4D East | $6,865,000 | 3/6/2013 | 3/5/2016 | $7,500,000 | -8.5% |
| 6E East | $3,300,000 | 5/30/2012 | 5/30/2015 | $3,500,000 | -5.7% |
| 6C West | $3,300,000 | 11/27/2012 | 11/27/2015 | $3,500,000 | -5.7% |
| 5C West | $3,300,000 | 11/6/2012 | 11/6/2015 | $3,500,000 | -5.7% |
| Pent G West | $4,350,000 | 5/20/2013 | 5/19/2016 | $4,500,000 | -3.3% |
| Pent E West | $2,900,000 | 5/3/2012 | 5/3/2015 | $3,000,000 | -3.3% |
| 7E West | $4,400,000 | 9/7/2012 | 9/7/2015 | $4,500,000 | -2.2% |
| Pent E East | $2,950,000 | 6/15/2012 | 6/15/2015 | $3,000,000 | -1.7% |
| 3C East | $2,475,000 | 1/30/2015 | 1/29/2018 | $2,500,000 | -1.0% |
| Pent C West | $2,740,000 | 5/30/2013 | 5/29/2016 | $2,500,000 | 9.6% |
| Pent C East | $2,740,000 | 9/13/2012 | 9/13/2015 | $2,000,000 | 37.0% |
| **Total** | **$73,130,000** | | | **$78,500,000** | **-6.8%** |

Pursuant to Section 13.06, each LP who has held his or her limited partnership interest in CRCPS ("LP Interest") for at least three years is entitled to receive notice of the Fair Market Value of Partnership

EXHIBIT 5

Property and may also, depending on U.S. Immigration Legal Requirements, be entitled to give notice to the GP of his or her election to sell their LP Interest to the Partnership. The purchase price for the LP Interest would be equal to the LPs pro rata share of the amount the Partnership actually receives from a sale, which may be greater or less than the Fair Market value as estimated by the third-party appraiser. The Put Purchase Price is further described below.

The GP also engaged independent, unrelated appraiser, BBG, Inc. to appraise the remaining 18-unit portfolio for a bulk purchase. BBG, Inc. has no relationship to either the Partnership or Angelo's Appraisals. This provides the Partnership a better sense of the value of the portfolio if sold to a financial buyer as a bulk purchase. The BBG appraised value indicates the appraised fair market value assuming a sale of all 18-units and incorporates the amount of time to re-sell each unit individually, risk factors associated with doing so, and the time value of money (i.e., a dollar today is worth more than a dollar in the future). The 'Bulk Value' for the 18-unit portfolio was determined by BBG, Inc. to be $43,320,000.

| MARKET VALUE CONCLUSION(S) - AS IS | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| Bulk Value "As Is" (18 Units) - All | Fee Simple | February 20, 2019 | $43,320,000 |
| Bulk Value "As Is" (6 Units) - Mtn Views | Fee Simple | February 20, 2019 | $28,180,000 |

BBG's appraisal incorporates a number of assumptions, including a sales period of approximately 7 years. Per BBG, the indicated rate of return for this type of investment is between 16% and 17%. The 'Bulk Value' appraisal is not materially different from some of the indications of interest received by the Partnership. The Partnership also asked BBG to appraise the six-unit mountain facing portfolio which was determined to be $28,180,000, which represents approximately 71% of the Loan amount for those units.

**Put Rights:**

We have set forth our good faith interpretation of Section 13.06 which we believe conforms to the original intent and provides qualifying LPs with an equitable exit strategy, while protecting the overall economic viability of the Partnership. The GPs understanding is that only LPs who have either received adjudication of their I-829 and received an unconditional green card or who are foregoing permanent residency in the U.S. would be eligible to receive a return of capital without jeopardizing the EB-5 process. We advise each LP to seek advice from his or her immigration attorney with respect to the U.S. Immigration Legal Requirements and any early exit procedure.

Each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, may elect to sell his or her LP Interest to the Partnership. By exercising his or her Put Right, the LP is seeking a return of capital earlier than other LPs in the Partnership may be permitted to. For those LPs first electing to exercise his or her Put Right, the Put Purchase Price for an LP Interest will be satisfied by the sale of a unit(s), while the order of unit sales is to be based on the Appraisals. To restate, the Put Purchase Price is equal to the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance as compared to the other Units multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses and accrued and unpaid Partnership expenses. Per Section 13.06 of the Partnership Agreement, notwithstanding, if the actual unit sales price is less than 70% of the Fair Market

EXHIBIT 5

Value set forth herein, the participating LPs shall have the right, exercisable within 10 days following written notice of the amount of the sales, to rescind their Put Right exercise. The Partnership will not attempt to sell a Unit(s) until the number of LPs exercising their Put Right is equal to the number of LPs investments that were necessary to make the Loan Advance for such Unit.

For example, Unit 5E West was appraised at a Fair Market Value of $3,300,000, while the Loan Advance collateralized by this unit was in the amount of $4,000,000. The ratio of Fair Market Value to the Loan Advance amount on 5E West is -17.5% and represents the lowest ratio amongst the Units. Eight (8) LPs equity contributions to the Partnership were required in order to make the Loan Advance for which Unit 5E West serves as collateral. Therefore, once eight (8) LPs have exercised his or her Put Right, the Partnership will use reasonable business efforts to market and liquidate Unit 5E West, as market dynamics may permit. Thus, the Put Purchase Price for the first eight (8) LPs electing to exercise his or her Put Right would be equal to his or her pro rata share from realizable value of the sale of Unit 5E West less customary transaction expenses, i.e., 1 / 8 multiplied by at least $2,310,000 (i.e., at least 70% of the Fair Market Value Appraisal of $3,300,000) less customary transaction expenses and accrued but unpaid Partnership expenses, unless a sale at a lower price is approved by all participating LPs. Should the Partnership be able to sell the Unit for greater than the Fair Market Value, the benefit shall go to those eight investors who have exercised their Put Right, but in no event would the Put Purchase Price be greater than the actual LP Capital Contribution. Subsequently, the next Unit that would be sold would be 6D East, if practicable, which has the second lowest ratio of Fair Market Value to Loan Advance amount amongst the remaining Units in the portfolio. The Partnership may continue to engage in customary business practices in terms of listing and selling Units in any order and pro rata distributions may occur as well.

If an LP is redeemed out through the early exit process, such LP would receive a return of capital, including any proceeds received through pro rata distributions made from the sale of Units in the ordinary course of business and preferred return amounts received to date, of an amount no greater than the ratio of the net proceeds available for distribution (after transaction and accrued but unpaid Partnership expenses are satisfied) after the sale of the particular early exit Unit to the Loan Advance amount for such Unit. As an example, if the net proceeds after transaction and accrued expenses are paid from the sale of Unit 5E West is $2,500,000, then each investor would receive no more than $2,500,000 divided by 8, or $312,500. If those 8 LPs had each received $100,000 from prior preferred return distributions and the sale of other Units, then each LP would received $212,500 from the sale of 5E West which would net the LP $312,500. Such LP would then be fully redeemed out of the Partnership. Any surplus capital would be available for Partnership expenses and distribution to the remaining LPs.

Each LP initially invested $500,000 as their initial capital basis for an equal share in the 99% of the Partnership owned by LPs. Since the first Loan Advance was made to the Borrower in April 2012, and as cash flow has permitted, LPs have earned a blended annual rate of return of approximately 2.10%, or approximately $10,500 per year, on their initial investment. Over a five-year period, this would have generated an aggregate return of approximately $52,500.[2] This implicitly offsets a portion of each LP's initial capital investment, leaving approximately $450,000 of that initial investment remaining. This is in addition to permanent residency already received by most LPs.

---

[2] The actual amount received may differ for each LP depending upon time of investment and Loan advances.

EXHIBIT 5

In order to exercise his or her Put Right, such LP must provide written notice (the "Put Exercise Notice") to the Partnership within 45 days following the date of this Notice expressly stating his or her exercise of the Put Right.  By delivering the Put Exercise Notice, the LP represents and warrants to the Partnership that (A) the LP has full right, title and interest in and to the LP Interest, (B) the LP has all the necessary power and authority and has taken all necessary action to sell such LP Interest as contemplated herein, and (C) the LP Interest is free and clear of any and all mortgages, pledges, security interests, options, rights of first offer, encumbrances or other restrictions or limitations of any nature whatsoever other than those arising as a result of or under the terms of this Partnership Agreement.  The delivery of a Put Exercise Notice by a LP to the Partnership shall create a binding and irrevocable obligation to sell his or her LP Interest at the Put Purchase Price as set forth in this Notice.  Failure of an LP to deliver the Put Exercise Notice within such 45-day period shall constitute a waiver of such LPs Put Right with respect to the specific Put Purchase Price formula as set forth in this Notice, but shall not affect their respective rights with respect to any future Put Rights.  **An LP who has previously provided an executed Put Exercise Notice form but has not yet been fully redeemed shall continue to be treated as having provided an executed Put Exercise Notice, unless the LP informs the Partnership of his or her desire to remain in the Partnership and withdraw their prior Put Exercise Notice.**

Upon the Partnership's receipt of such Put Exercise Notice, the Partnership will use commercially reasonable efforts to sell a Unit or Units in its possession at the Fair Market Value as identified in the Appraisals or at a higher amount, but will take consideration of listing too many Units at the same time as well as guidance from brokerage in terms of a listing and marketing strategy.  As described above, the Partnership shall not undertake such efforts until enough LPs have submitted their Put Exercise Notice that matches the number of investor's whose capital supported the Loan Advance on such Unit.  The Partnership may, with the consent of all participating LPs, sell such Unit or Units below the Fair Market Value.  The Partnership shall pay the Put Purchase Price no later than thirty (30) days following the closing of the sale of the applicable Unit or Units and receipt of the sales proceeds.  The Partnership will pay the Put Purchase Price for the LP Interest by check or wire transfer of funds.  At the closing of the sale of the LP Interest to the Partnership, the LP shall deliver to the Partnership (a) an assignment and all other transfer documents to consummate the sale and assignment of the LP Interest to the Partnership, and (b) waiver and release of the Partnership from any and all future claims, each in a form acceptable to the Partnership.  Upon the LPs receipt of the Put Purchase Price at the closing, the LP shall have no further right, interest or claim to distributions in or from the Partnership and shall no longer be an LP in the Partnership.  As of April 30, 2019, the Partnership has received executed Put Exercise Notices from approximately 82% of LPs remaining in the Partnership.

On or about each six (6) month anniversary of this Notice or within a reasonable time thereafter, the General Partner shall provide to the remaining LPs a new notice setting forth the then applicable Fair Market Value of the remaining Partnership Property and each LP shall then have **45 days** from the date of such new notice to deliver a Put Exercise Notice to the Partnership.  The Put Purchase Price would continue to be based on the formula described above, only using the new Fair Market Value of the remaining Units, and would otherwise be payable upon and subject to the same terms set forth above.

**General Provisions for LPs Who Do Not Provide a Put Exercise Notice:**

The Partnership will continue to explore opportunities to put Units on the market when market conditions are deemed to be favorable for sale.  The sale of Units will be conducted in an orderly,

EXHIBIT 5

Case 1:19-cv-02443-STV   Document 31-6   Filed 10/16/19   USDC Colorado   Page 36 of 37

market driven manner that seeks to maximize value to the Partnership and the LPs. As such, there can be no definitive timeline for which all of the Units will be sold. To sell prematurely would likely mean selling units at a significant discount to the original amount of each Loan Advance, which would mean LPs would receive less than the full amount of their capital contributions returned. The Partnership seeks to avoid this.

As each Unit is sold, a pro rata return of capital will be made to those LPs who remain in the Partnership. The remainder of the proceeds shall remain with the Partnership and shall be returned on a pro rata basis to the rest of the LPs as their I-829 petitions are approved, subject to the distribution provisions in the Partnership Agreement. We intend such returns of capital to be made until all LPs (other than the LPs who have exercised their Put Rights (as set forth above)) have received a return of their capital contribution as Available Cash Flow permits. All capital returns shall be made on a pro rata basis, treating each LP equal to one another based on ownership percentage. Once all of the Partnership Property has been sold, the Partnership shall wind down. To the extent there is Available Cash Flow (as defined in the Partnership Agreement) after the sale of all Partnership Property and return of LP capital, it shall be paid out in accordance with Article VI of the Partnership Agreement.

The strategy outlined above was developed in good faith with the LPs best interests in mind and seeks to provide a path toward maximizing value to each and every LP, while still providing the LPs with an early exit alternative as contemplated under Section 13.06. The Partnership will strive to execute this strategy as quickly as is economically feasible.

_____

_____

Authorized Representative

Colorado Regional Center Project Solaris, LLLP

EXHIBIT 5

## Exhibit A - Definitions

"Administrative Expenses" means those expenses incurred by the GP in connection with the sale of LP Interests including specifically and without limitation, certain marketing, travel, legal and accounting fees, referral and related fees, and the legal fees of a LP incurred in preparation of such LP's I-526 petition.

"Appraisal(s)" means the good faith estimate of the Fair Market Value of each Unit performed by an independent third-party firm.

"Capital Contribution" means the total amount of money or property contributed to the Partnership by each Partner (excluding any amounts contributed for Administrative Expenses).

"Fair Market Value" means the total liquidation value (as determined pursuant to a good faith market analysis conducted by qualified third-parties engaged by the GP) of all of the Partnership Property or an individual Unit after deduction of all usual and customary selling expenses, pro rations, and other similar matters.

"Loan" means the loan made from CRCPS to the Solaris developer in the aggregate amount of $82,500,000 or the remaining outstanding balance if a portion of the Loan has been repaid.

"Loan Advance" means the amount of each advance of principal from CRCPS to the developer per terms of the Loan.

"LP Interest" means a limited partnership interest in CRCPS.

"Partnership Property or Units" means the remaining individual properties presently held by the developer which collateralize the Loan.

"Put Exercise Notice" means written notice provided by a LP to the Partnership of his or her intent to exercise the Put Right.  A Put Exercise Notice must be provided to the Partnership within 45 days following the receipt of this Notice.

"Put Right" means for each LP who has held his or her LP Interest for at least three years and meets the U.S. Immigration Legal Requirements, such LP may elect to sell his or her LP Interest to the Partnership and receive a return of capital.

"Partnership Agreement" means the Limited Liability Limited Partnership Agreement of Colorado Regional Center Project Solaris, LLLP.

"Put Purchase Price" means the realizable value obtained by the sale of the Unit with the lowest ratio of Fair Market Value to the Loan Advance amount multiplied by one over the number of LPs receiving a return of capital from the sale of such Unit, less customary transaction expenses and accrued and unpaid Partnership expenses.

"Section 13.06" means Section 13.06 of the CRCPS Partnership Agreement entitled "Rights of Limited Partners to Return of Capital Contributions.

"U.S. Immigration Legal Requirements" means the GP's understanding that only LPs who have either received adjudication of their I-829 petition or who are foregoing permanent residency in the United States would be eligible to receive a return of capital and sell their LP Interest to the Partnership.

EXHIBIT 5