## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02443

Jun Li, Qi Qin, Yi Liu, Jie Yang, et al.

        Plaintiffs,

                                      Hon. Judge Moore

        v.                                  Hon. Magistrate Varholak

Colorado Regional Center Project Solaris LLLP,
Colorado Regional Center I, LLC, et al.

                Defendants.

---

## LI PLAINTIFFS' RESPONSE TO SPO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT

### Response to ECF 224 motion to dismiss ECF 222

---

The SPO Defendants ("SPO") and the CRC Defendants have the unmitigated gall to tell the Asian limited partners that "nothing has happened to their investment." [ECF 224; p. 5][ECF 229; p. 1].

Ok, then, the limited partners will sell their investment back to SPO. If "nothing has happened," SPO can repay the $82.5 million they borrowed plus interest, and SPO can keep the illiquid, overpriced, unsellable condos they purported to convey as collateral equal in value to the loan balance. If "nothing happened," SPO should be indifferent to changing places with the Asian investors. Let SPO see how much they like being stuck in an interminable holding pattern to get perhaps fifty cents on the dollar for undesired condos that are selling at a pace slower than 1 unit per year [ECF 222; ¶103], and then let them tell this Court that "nothing has happened." They talk the talk, but they can't walk the walk.

If "nothing has happened," then why did SPO's co-defendant Colorado Regional Center I LLC ("CRCI") sent a letter to every limited partner on May 30, 2019 informing them that something *horrible* had happened to their investment? [ECF 222; ex. 7]. CRCI told the limited partners they would *never* get a return of their $82.5 million with interest in cash. CRCI told the limited partners to get into a 152-person line to receive meager proceeds from units that were impossible to sell at the valuations SPO assigned to them. CRCI revealed to Asian investors that the first condo sold as collateral relieved SPO of paying back $4 million and was estimated by SPO to have a collateral value of $3.7 million but it sold for $2.7 million - further reduced by commissions and "management fees" to CRCI before investors saw a penny of their money [ECF 222; ¶103]. 152 of 165 investors are literally trapped in this deal and can look forward to only getting maybe - maybe - half of their 5-year investment returned after nearly a decade. Does that sound like "nothing has happened to their investment?"

But the insults and arrogance continue. SPO provocatively refers to the limited partners as "disappointed investors" who naively demand a guaranteed return and refuse to accept the ordinary market fluctuations they were warned about [ECF 224; p. 1]. That's another lie. The Plaintiffs are not **disappointed investors**, they are **defrauded investors**. Vail real estate did not lose 50% from 2013 to 2017, so how did the limited partners lose $40 million out of $82.5 million in this same time period? Of course, as in every deal, the offering materials had warnings of market risk, but there were no warnings that the lender and borrower would commit breach of duty, fraud, theft, and securities fraud. There was no risk warning that SPO would breach the loan contract, that it would lie about prepaying the loan, that they would lie to investors about the loan being adequately

collateralized, or that they would never replenish collateral to equal the loan balance.[1]  There was no warning that the loan-to-value ratio would be a freakishly low 1:1, which violates every fundamental rule of non-recourse lending.

**This was a scam.  But like all scams, there was a fatal mistake: SPO never properly prepaid the loan by special warranty deed, nor paid it with collateral transfer at maturity, so the loan remains outstanding.**  Both sets of Defendants claim that SPO "prepaid the loan advances by conveying Collateral Units" under the Agreement Regarding Collateral Units ("ARCU") [ECF 224; p. 29], which is attached hereto as Exhibit 1 for the Court's reference.  But all the deal documents including the ARCU (as we shall see), require that a conveyance be in the form of a special warranty deed filed in the Recorder's Office. In this case, there was no actual transfer of any collateral title to pay the loan, so the entire balance with interest is now due.

## Introduction

Presently, SPO seeks to dismiss the Li Plaintiffs' 50-page, 250-paragraph Third Amended Complaint ("TAC") under Rule 12(b)(6) for failure to state a plausible claim for relief. But the TAC contains extreme factual details showing every nuance of this unfolding financial fraud.  The TAC debunks the Defendants' five-and-dime store posturing about 'options theory' or 'the market' causing the Plaintiffs' losses. That is smoke and mirrors.  This was a zero-sum game where tens of millions of dollars was moved from the Asians' pockets into the Defendants' pockets.

---

[1] There is no way for SPO to disclaim their own wrongdoing. *Grossman v. Novell*, 120 F.3d 1120, 1123 (10th Cir. 1997)(disclaimers can only protect against reasonable forward-looking projections, not against factual misrepresentations or omissions such as lying about valuations or accounting negligence).

Before this deal was created, defendant SPO and Peter Knobel already had a construction loan of $140 million borrowed from real banks, so it had to be paid back in real money [ECF 222; ¶24]. By 2010, Knobel saw the writing on the wall that his condos were not going to sell fast enough to support repayment of his debts to real banks, so he set about finding a new lender that could be paid back with overpriced unsellable condos instead of cash. In furtherance of this plan, he repaid the real banks on October 8, 2010, and immediately joined forces with CRC to build a rat trap for Asian investors who could be easily fooled due to poor English skills and not being professional investors. SPO and CRC together set up a structure in November 2010. The structure gave the appearance to Asians that they were funding a loan from CRCPS as lender (managed by CRC's subsidiary CRCI) to SPO as borrower that was fully collateralized by an unstated number of condo units and the Project itself (i.e. collateralized by whatever it took to equal the value of the loan balance). SPO and CRC never told the Asian investors that they had a secret Memorandum of Understanding document that allowed SPO to designate the collateral (*by the way, it is lender negligence for a borrower to pick its own collateral*) so the loan was radically under-collateralized with inflated values based on SPO's listing prices from 2009 (3-4 years before the loan advances), with no mechanism to 're-up' the collateral (that is, no 'margin call' to add collateral if the existing collateral lost value), and hence SPO had license to surreptitiously assign massively overrated valuation to condos in exchange for loan advances. By December 2010, SPO and Knobel announced publicly that they would replace the bank financing with EB-5 financing, or as SPO itself says: "SPO sought a loan to help pay off a construction loan." [ECF 224; p. 4].

It is stomach-turning for SPO to sit in Vail and say "nothing happened" when their pockets are bulging with $82.5 million of Asian cash, and their buddies CRCI took some $13 million in 'management fees' (what a joke) for earning a *negative 50%* return on investment, while Asians

whose money made the whole thing possible have not been paid back a penny at year eight of a five year loan.  While the owners of SPO and CRCI are living large on Asian money, they lack the ability to speak a coherent sentence to the Asians, and never apologized for the loss they caused.

**Standard of Proof**

Dismissal under Rule 12(b)(6) is a "harsh remedy" that cannot override the interests of justice. *Detroit Street Partners, Inc. v. Lustig*, 404 F. Supp. 3d 934, 939 (D. Colo. 2019). The TAC easily satisfies the standard of pleading to survive a motion to dismiss, which requires alleging sufficient factual matter to make the claims 'plausible.' *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955 (2007). 'Plausible' means only that the complaint states sufficient facts to inform defendants of the claims against them. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)("The allegations must be enough that, if assumed to be true, the plaintiff plausibly, not just speculatively, has a claim for relief.").  The Court must "accept the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiffs." *Zartner v. City and County of Denver*, 242 F. Supp. 3d 1168, 1172 (D. Colo. 2017), quoting *Alvarado v. KOB-TC, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007). On a Rule 12(b)(6) motion the Court is not charged with deciding if the allegations are in fact true; rather, it must determine if the complaint alleges sufficient factual matter that, when taken as true, raises the right to relief above the speculative level.  *Dias v. City and County of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007). To see how this is satisfied, let's start with Count

**Count III (Breach of Loan Agreement) States a Claim**

Using the *Iqbal* and *Twombly* standard, the Court must decide if the following factual allegations give rise to a *plausible* claim for breach of loan agreement assuming the allegations are true and reading them in a light favorable to the Plaintiffs:

> TAC ¶31: SPO executed a document entitled "Loan Agreement" dated November 5, 2010, for borrowing up to $100 million with repayment to be secured by a pledge of titles of condominium units, and this paragraph lists the supporting "Loan Documents";
>
> TAC Ex. 1 is a copy of the Loan Agreement, signed by defendant Peter Knobel for defendant SPO;
>
> TAC ¶32: explains the process set out in the Loan Documents for creating a collateral pool of units;
>
> TAC ¶33: explains the five-year maturity date and interest rate of each loan advance;
>
> TAC ¶34: explains the prepayment option available to SPO, which was transfer of title during years three to five of each loan advance;
>
> TAC ¶77: explains that Asian investors gave $82.5 million to CRCPS, and that CRCPS used that money to fund the loan to SPO under the Loan Agreement;
>
> TAC ¶79: states that the CRCPS loaned SPO an aggregate loan balance of $82.5 million under the Loan Agreement;
>
> TAC ¶78: states that the Loan Documents were updated and initialed in 2015 to show each loan advance, each date of borrowing, each maturity date, and each collateral unit securing the loan advance;
>
> TAC ¶87: quotes the Loan Documents setting forth SPO's obligation to repay each loan advance at maturity;
>
> TAC ¶151: cites Section 11 of the Loan Agreement as requiring SPO to make payment of cash at maturity for each loan advance that was not prepaid by tender of collateral during years 3-5;
>
> TAC ¶152: alleges that SPO did not repay $82.5 million plus interest at the 5-year mark of each loan advance;

> TAC ¶153: alleges that SPO did not prepay during years 3-5 of any loan advance;
>
> TAC ¶164: alleges that SPO's nonpayment "harms each of the limited partners equally, making this a derivative claim."

These are well-pleaded facts that contain all elements of a claim for breach of contract under Colorado law. *Matthys v. Narconon Fresh Start*, 104 F. Supp. 3d 1191, 1204 (D. Colo. 2015). In *Matthys*, the court upheld a breach of contract count against a Rule 12(b)(6) motion to dismiss where the complaint merely alleged that the plaintiff entered into a contract with the defendants to provide drug and alcohol treatment, he paid for it, and instead of treatment he was instructed in Scientology, causing a loss of money and emotional damage (the elements being: a contract, performance by plaintiffs, breach by defendants, and damages). Here, the allegations give the date of the contract, its parties, the consideration paid by the plaintiffs, and the failure of the defendants to perform, with resultant damages. There is no element of unfair surprise since the Defendants possess the same documents and are aware of the same facts. Assuming the well-pleaded allegations to be true, as the Court must, the TAC sets forth a breach of contract claim.

SPO disputes the *truth* of the allegations (i.e., by saying that SPO did *in fact* repay the loan), but this ignores that a Rule 12(b)(6) motion must *assume* the truth of all well-pleaded allegations, not decide whether they are true. And on closer examination, SPO's story falls apart like a house of cards.

**First**, they say in the past tense that each collateral unit "was tendered" [ECF 224; 5]. Yet there is no record of any such tender in the Eagle County Recorder's Office. **Second** they say that in 2015, before the first prepayment date arrived, "SPO intended [in the future] to prepay each loan advance by conveying title" [ECF 224; 11]. This is a statement about future *intention* so it is purely executory and is not a current transfer, and further there is no record of any transfers in the

Eagle County Recorder's Office. **Third** they say that the 2015 "intention" somehow transmogrified into an actual prepayment of every loan advance in the future, "by conveying to CRCPS title to the Collateral Units." [ECF 222; 26]. In other words, a statement of intention to convey titles in the future is the same legally as actual future conveyances of such titles; this would overturn centuries of legal precedents by requiring the Court to hold that real estate can be conveyed by 'intentions.' **Fourth**, after proclaiming that they already made conveyances, they take it all back and say they were merely following instructions to "temporarily refrain from convey[ing] title" [ECF 222; 26]. So let's get this straight: SPO tendered the collateral titles already; no, SPO *intended* to convey the titles in the future; no, their statement of intention is itself a present actual conveyance; and no, they *never* conveyed titles. Got all that?

The same ball of confusion was in the CRC Defendants' motion to dismiss. There, CRCI claimed that SPO as borrower exercised its 'put option' to convey the collateral titles to CRCPS in 2015, but this 'put exercise' did not happen in the real world where conveyances must be recorded [ECF 204; p. 38]. Then for year-end 2018, CRCI told the Internal Revenue Service that SPO had not conveyed a single title to CRCPS and still owed it $82.5 million [ECF 222; ¶160]. Now, after telling the Federal Government that they have zero property titles in their name, and only have one asset consisting of an overdue note for $82.5 million, CRCI claims that they are powerless to call the loan because it was already repaid with property titles: "CRC1 has no legal right to demand repayment of the loan from SPO1" [ECF 204 counterclaim at ¶52(a)]. This is contradictory nonsense. If no properties were conveyed to them to reduce the loan balance - as they told the IRS and reported in their financial statements - then they have every right to call the loan. Preceding this mess, CRCI sent emails to limited partners saying that the properties had been transferred in 2013 [ECF 222; ¶96]. As late as 2019, CRCI referred to the collateral units as

"partnership property" even though their financial statements and tax returns do not list any units owned by the partnership. Want more confusion? CRCI told the limited partners in 2018 and 2019 that they were working with SPO to transfer titles to CRCPS [ECF 222; ¶88, 89], which contradicts their claim that the units are already "partnership property," on the theory that the term "partnership property" does not mean property owned by the partnership. This is a Gordian Knot that no rational human can untangle. It is a "just so story" that SPO and CRCI make up after the fact to justify any statement or behavior that benefits them.

The source of all this nonsense from SPO and CRCI is a strange, hidden contract that SPO and CRCI surreptitiously signed in 2105 called Agreement Regarding Collateral Units ("ARCU") [ECF 203-7]. This oddball agreement was kept in the crypts until this case began, when it was dragged out by SPO and CRCI as a kind of child's Magic Genie Lamp that purportedly says whatever SPO and CRC want it to say, however contradictory. But legally-speaking, this Agreement cannot tender, convey, or transfer any condo title in repayment of the loan, and it is probably unenforceable to boot.

**The ARCU Transfers Nothing**

The ARCU -- the backbone of SPO and CRC's entire defense - is riddled with 5 insoluble flaws that render it ineffectual to make any prepayment, transfer, or conveyance of title.

**First**, the ARCU says expressly that its purpose is only to calculate interest due under the loan, not to make any *actual* transfer of titles. It expressly says that transfers of collateral units are merely "deemed" to have hypothetically occurred for the purposes of calculating interest. Section 1 says: "For the purposes of calculating interest under the loan documents. . . Borrower shall be deemed to have caused a Collateral Unit Distribution." The conditional language ("[f]or the

purpose of calculating interest") and the word "deemed" show that the real purpose of the agreement is not to make a *real* transfer of title, which requires a Transfer Agreement and a special warranty deed filed at the County Recorder's Office.  The Promissory Note for the loan says that for SPO to make a *real* Collateral Unit Distribution it must give the Lender 20 calendar days written notice [ECF 222; ex. 3 p. 32].  There is no evidence that such notice was ever given, and no record of any title transfers.  A contract must be construed in light of the purpose stated in the agreement.  *In re Dodart*, 577 B.R. 406, 410 (D. Utah 2017)(in a trust dispute, the section expressing "the purpose of the trust" controlled the other provisions).  The intent of the parties is determined from the written contract itself. *USI Props. East, Inc. v. Simpson*, 938 P.2d 168, 173 (Colo. 1997). If the ARCU says that it is only "for the purpose of calculating interest," then we must take that seriously and rule out that it is any kind of transfer document.

**Second**, the ARCU has an express Section 4b titled "Tender to Lender" which says that if a unit is going to be conveyed to CRCPS as prepayment or as payment at maturity, the parties must sign a Transfer Agreement in the form of Exhibit A attached to the ARCU, which provides that "Borrower will execute and deliver to Lender a special warranty deed for the Tendered Unit." The form of special warranty deed is attached to Exhibit A to the ARCU. In other words, the ARCU explains the protocol for how a real tender/conveyance can work which is only by signing *other documents*, meaning that the ARCU *itself* cannot make any transfer.  The language of Section 4b and Exhibit A of the ARCU comport with the language in the PPM that prepayment can only be made by conveying a special warranty deed in years 3-5 and otherwise must be paid in cash [ECF 222; ex. 3, p. 1].  The ARCU must be read to harmonize with the PPM, which does not allow "deemed" transfers (whatever that means) to count as a real transfer by special warranty deed.

**Third**, as a matter of timing, any supposed transfer by the ARCU was untimely. The prepayment date for each loan advance started three years after the loan advance: "After three years following a loan advance, upon 60 days prior written notice to the Company (the "Prepayment Notice Period"), SPO shall have the right to prepay. . ." [ECF 222, ex. 3, p. 1]. There is was no right to prepay before that date, and as we have seen, no way to prepay other than to execute a Transfer Agreement and a special warranty deed. The date of the ARCU is April 17, 2015, one day *before* the first loan advance became eligible for repayment by transfer of special warranty deed. On the day the ARCU was signed, none of the 19 loans (or arguably only one) was eligible for prepayment by transfer of title, and no Transfer Agreements and Special Warranty Deeds were submitted at that time any time thereafter, so the loan advances could not have been prepaid on that date, nor were they repaid later.

**Fourth**, the ARCU expressly says that it doesn't reduce the "Indebtedness" [the loan balance] owed by SPO. Section 1 provides, "Notwithstanding the occurrence of a Collateral Unit Distribution with respect to an Eligible Unit [i.e. notwithstanding a 'deemed' transfer for calculating interest] and anything in the Loan Documents to the contrary, the principal amount of the associated Loan Advance shall continue to constitute Indebtedness under the Loan . . ." In other words, the ARCU is true to its stated purpose of only playing around with the interest rates and leaving the principal (the "Indebtedness") untouched. Toward this end, the ARCU further says that CRCPS can call a default for nonpayment of Indebtedness by notice under Section 17 of the Loan Agreement, a provision that would be nonsensical if the ARCU operated to extinguish all Indebtedness. So the ARCU itself says that it cannot reduce the principal that SPO owes, it is not an actual real prepayment. This means the principal - at the minimum - is due and payable.

**Fifth**, and most bizarrely, SPO and CRC see the ARCU as creating some kind of fairytale magical rubber band transfer of collateral titles from SPO to CRCPS back to SPO "temporarily," while ignoring all the ARCU's own requirements for collateral transfers. But just as you cannot check out a library book and 'deem' it returned and 'deemed' it rechecked out without involving the library itself as an intermediary to memorialize the transaction, there is no way for SPO to tender/convey title and then for CRCPS to reconvey it back, without using the Recorder's Office as an intermediary to put the matter on record.  As we have shown, the ARCU has a specific protocol for transfer of titles, and that protocol was not followed, so there was no effective transfer of titles to CRCPS and no transfer back to SPO to be held 'temporarily.' Indeed, the whole claim of *hypothetical* transfer concedes that no *actual* transfer took place as required.

SPO and CRC say that a goal of the ARCU was to save transfer taxes, but they cannot have their cake and eat it too -- they cannot avoid transfer taxes by not making a transfer and then claim credit for making a transfer.  That is as illogical as someone saying, "I saved the cost of a marriage license by not getting one when I got married" -- the end result being that the person is not legally married, i.e. the transaction was a nullity.  Same here: the parties saved on transfer taxes by not making a transfer, but they have to live with the failure to make a transfer.  Anyway, if the goal of the ARCU was to save transfer taxes for CRCPS, then the same thing could have been accomplished legally by an actual transfer of title to CRCPS and a separate agreement for SPO to indemnify the transfer taxes.

Knowing that they blew the years 3-5 deadlines for prepayment by transfer of titles, SPO and CRC now make the desperate claim that they have been in a 'temporary' holding prepayment

period for 5+ years, when the loan itself was only 5 years and the prepayment period only 2 years.[2] This requires SPO to take the laughable position that "temporary" has no time limit, even though the dictionary definition is "during a limited time." [ECF 222; p. 27].   There is no getting around it by bending the English language with linguistic plyers: SPO screwed up and missed their contractual deadline for prepaying the loan advances by transfer of title by special warranty deed. The real dispute here is between SPO and CRCI about why SPO blew the deadlines.  But that is not the Plaintiffs' fight.  SPO and CRCI can and should fight each other on that by crossclaims and leave the Plaintiffs out of it.

In a final rearguard move, SPO claims that the ARCU 'modifies' or 'amends' the Loan Documents but they don't say how [ECF 224; p. 23]; presumably they mean that the ARCU amends the time limits of 5 year maturity and 3-5 years for payment of the loan by transfer of title. This is the same claim that everyone who breaches a contract makes, namely that the contract was 'amended' to permit their breach.  But there is nothing in the ARCU to indicate any amendment of any *transfer* provisions: precisely the opposite, since it says expressly that it only amends the *interest* calculation and gives detailed protocol on how transfers must occur. The ARCU says nothing about amending the deadlines of principal payments.  Assuming it is enforceable (more on that below), we should take the ARCU at its own statement that it only meant to amend the interest provisions.

---

[2] SPO cites a case that did NOT deal with the word "temporary." Oddly, it was a 1943 divorce proceeding about an alimony and child support agreement that was missing a termination date; the court equitably apportioned the child support to end when the child reached emancipation, but allowed the alimony to continue. *Miller v. Miller*, 134 F.2d 583 (10th Cir. 1943). This case in inapposite on the meaning of 'temporary' because alimony payments can go on indefinitely, whereas the contracts here had a strict time limit.  They reached back 80 years to find nothing.

There is a disputed factual issue whether the ARCU is supported by *mutual* consideration. Although the language is far from clear, Section 1 appears to give SPO massive amnesty from interest payments.  It seems the loan is reduced to 0% interest from the date of the 'deemed' transfers and default interest (14%) is removed unless the Lender invokes section 17 of the Loan Agreement. In return CRCPS gets an estimated savings of $1 million in transfer taxes and fees. SPO and CRC robotically repeat the $1 million savings figure for CRCPS, but they never - never - mention how much SPO got in reduced interest. Why don't they mention that?  Let's compare the numbers. Supposing SPO was relieved of two years of interest on the five year term of each loan advance due to prepayment, plus several years of default interest: (5.55% interest on $82.5 million x 2 years = $9,075,000; 14% on $82.5 million x 2 years = $23,100,000). **That is $32,175,000 in interest savings to SPO.  In return, CRCPS saved $1,000,000.** Assuming these figures are ballpark correct - and no defendant has dared reveal the actual numbers - it is clear that something very strange is going on.  No lender in its right mind would agree to eat a $30 million loss, when CRCPS as a *lender* is in the dominant position to demand concessions from a *borrower*, not vice versa. SPO tries to get this Court to look away by saying that an agreement can have asymmetrical consideration [ECF 224; p. 29], but this Court does not have to bless a contract that cuts off tens of millions in interest to limited partners.  The Defendants' failure to step forward with the numbers stinks to high heaven.  In the end, the only true and solemn fact is that SPO never properly prepaid the loan nor paid it at maturity.  The limited partners cannot be held hostage to a contract they didn't know about, did not (and would not) approve, and which is being used as an excuse to rob them of tens of millions.

The Li Plaintiffs must inform the Court of a further nefarious possibility that is unlikely, but we wouldn't put it past the Defendants. It's this: perhaps they purposely blew the timeline for

14

transferring collateral as prepayment.  Since the loan is labeled non-recourse, SPO and CRC could claim that the limited partners have no right to the money (their $82.5 million) and no right to the property since the transfers were not properly made.  This would leave the limited partners with absolutely nothing - no return of money and no collateral.

**Count II states a Claim for Civil Theft**

Civil theft is defined as the permanent deprivation of another person's property by deception.  Colo. Rev. Stat. 18-4-101(a).  The basic allegation of Count II is that SPO and Knobel set up an investment scheme that deceived investors with a promise that their investment was fully secured, when in fact it was under-collateralized, and that this was not realizable until 2018.

Just as we did with Count III, let's look at the allegations of the TAC for Count II and judge them by the standard of pleading in *Iqbal*, *Twombly*, and *Dias*, which state that the plaintiffs must allege facts which raise their claim above the speculative level, viewing the facts and inferences in favor of the plaintiffs.

> TAC ¶29: In November 2010, Knobel set up a series of loan documents including a Loan Agreement dated November 5, 2010 between SPO as borrower and CRC as sponsor of a lending entity;
>
> TAC¶30: the loan was "non-recourse" to replace SPO's "recourse" financing, so SPO could pay it back with condominium units that could be sold to raise the cash owed on the loan at maturity;
>
> TAC¶30: SPO overvalued the collateral units, assigning them values from 2009, securing loan with old collateral valuations;
>
> TAC¶32: alleges the obvious point (which could be on judicial notice) that letting a borrower assign value to its own collateral is not industry standard, nor is a non-recourse loan without a 'make whole' provision requiring the borrower to add collateral;

TAC¶61: SPO hid from investors a Memorandum of Understanding whereby SPO was allowed to designate the collateral units and assign them a value of its choosing, and further specified that units must have the value of units not facing Vail mountain;

 TAC¶34: SPO drew up the loan documents and oversaw the PPM which deceived limited partners into thinking that the collateral would be kept sufficient to cover the entire loan balance;

TAC fn 14: the first unit sold was assigned a collateral value of $3,707,982 by SPO, but was actually sold for $2,780,000 after 7 years into a five-year loan, and this amount was further reduced by commissions and management fees and then divided among 8 limited partners, so they received under 50 cents on the dollar, thereby proving that the loan was deceptively under-collateralized;

TAC¶48: alleges there was never any proof that the collateral chosen by SPO ever had a market value of $82.5 million;

TAC¶58: alleges that SPO/Knobel claims to have supposedly prepaid the entire loan via the ARCU;

TAC¶52: alleges that the supposed prepayment by SPO resulted in a loss to the limited partners of $40 million;

TAC¶82: alleges that "SPO knew that every fish in the collateral barrel was rotten. [A]ll loan advances were undercollateralized . .";

TAC¶138: alleges that Knobel actively participated in meetings setting the structure of this transaction;

TAC¶139,¶144: alleges that Knobel controls SPO and that SPO and SPO1 are shells and alter-egos for Knobel;

TAC¶103: alleges that the limited partners could not have known until 2018 that the collateral assigned by Knobel was worth only $43 million if sold in bulk;

TAC ¶134: alleges that SPO/Knobel gave the deceptive impression of the loan being fully collateralized;

TAC ¶135: alleges that this deception caused the limited partners to part with their money to SPO and Knobel;

TAC¶143: alleges that SPO is a pass-through entity so that any profits made by deception are passed through to Knobel personally.

TAC ¶146: alleges that the deception was intentional.

The PPM said that Asian money would fund the entire "Project consisting of 79 high-end condominium units and 70,000 square feet of commercial space." [ECF 224; p. 5]. No wonder the Asian investors believed that their money was secured by the entire Project and not by - as they later found out - only 19 north-facing-value units.  SPO asserts that condominium values were agreed in 2010, but such agreement was never shown to the investors. Still today, most investors believe that they have a security interest in the whole Project, and their first question was where SPO came up with the number (19) units, when their understanding was that SPO would fund however many units or commercial space were necessary to repay the loan.

The two year statute of limitations on civil theft runs from when the victim learns of the deception, not from the actual date of deception, so courts have allowed lawsuits as far away from the deception as 12 years.  *Tisch v. Tisch*, 439 P.3d 89 (Colo. App. 3rd Div. 2019).  In *Tisch*, the fraud was as far back as 2003 but the deception was not uncovered until an inspection in 2015, so the court allowed the lawsuit in 2016, saying that investors do not have a duty to examine corporate records to root out violations until they are readily apparent to a reasonable investor.  *Id.* at 100-101. Here, the limited partners first came to attorney Litowitz in 2019 after getting a notice from CRCI dated May 30, 2019 that they would not get paid back 100% or even 93% of the loan (the 'estimate' of value), but only 50% over decades. It was only at the evidentiary hearing that Litowitz got CRCI to concede that the current pace of sales would require 57 years to sell the collateral [ECF 222; ¶103].[3]

---

[3] Because the timing of discovery is difficult to pin down under the civil theft statute, some courts have ruled that such a fact-specific analysis cannot be decided on a motion to dismiss. *Wagner v. Grange*

**Count VI States a Claim under the Colorado Securities Act**

There is no privity requirement under the Colorado Securities Act, so SPO can be liable to limited partners without direct contract, *In re Qwest Communications Int'l Securities*, 387 F. Supp. 2d 1130, 1152 (D. Colo. 2005), so long as SPO gave "substantial assistance" in creating a scheme to defraud the limited partners. Colo. Rev. Stat.11-51-604(5). There is no reliance requirement either, so the plaintiff must only prove a scheme to defraud in connection with the sale of a security and that the defendant provided substantial assistance. *FDIC v. RBS Acceptance Inc.*, 2020 WL 491202 *5 (D. Colo. 2020).

Here, the TAC explains that SPO was intensely involved in preparing and negotiating the loan documentation for this deal and it had reason to know the deception in the PPM implying that it would always be fully collateralized. SPO never told the investors the material fact that it had signed a Memorandum of Understanding with CRC which allowed SPO to select collateral restricted to less desirable north-facing units or units with similar (lesser) value. SPO was also aware the PPM kept referring to the Project and to 79 units and commercial space, giving the false impression that this was collateral. SPO never disclosed to limited partners the material information that the values it assigned to collateral for loans in 2012/2013 were based on 2009 prices. SPO acted with scienter, intent to deceive, and to the detriment of the limited partners [ECF 222; ¶209]. SPO also perpetuated the lie that it had conveyed the title to the units, even though - as we have seen - no such transfer ever took place. In effect this was a disguised sale

---

*Ins. Assn.,* 166 P.3d 304, 307 (Colo. App.4[th] Div. 2007)(noting that civil theft cases tend to be fact-specific as to the date of discovery, unlike a personal injury case where the injury took place on a date certain).

where the limited partners thought they were investing in a loan that SPO that would pay back, when in reality they were buying the collateral at overstated prices. The question of when the fraud was discoverable is fact-specific and precludes a motion to dismiss. *FDIC*, 2020 WL 491202 *9.

**Final Matters**

**SPO engages in the Group Pleading it Decries**. SPO's motion to dismiss is itself a group pleading that alternates Sybil-like between the Li and Cui Complaints, making it nearly impossible to follow (the same was true of the CRC Defendants' motion to dismiss). SPO claims that **their** group pleadings which smoosh the plaintiffs together are magically justified by the holy grail of 'efficiency' [ECF 224; 5], but the same thing is verboten when the plaintiffs do it. There is only one standard for everyone in this District: SPO cannot file a group document bemoaning the evils of group documents.  SPO and CRC used shell companies so there are a lot of parties; that is not the Plaintiffs' fault and they should not be made to suffer for it.  The TAC does a sufficient job of explaining each person and entity's role in this deal, using the discoverable facts at hand. As this Court knows, the Defendants have purposely hidden the identities of ultimate owners or where they reside, and they kept the ARCU secret from Li Plaintiffs' counsel, nor have they ever said how much SPO saved by the ARCU.  It is inequitable for SPO to hide information and then demand pinpoint pleadings that cite facts they have been hiding; that catch-22 is the worst trick in the book. The proof of the pleadings is in the pudding: SPO and CRC respond to the Li Plaintiffs by saying that the *facts* are wrong, even though a Rule 12(b)(6) motion is directed only to sufficiency of allegations. This is proof that the pleadings are sufficient to notify the Defendants of the claims.

**The Parent Companies and Owners Must Stay as Parties.**  As set forth more fully in the Response to the CRC Defendants' motion to dismiss, the parent companies and ultimate

owners must be parties because they controlled the lower-level parties, and the owners were beneficiaries of wrongdoing since the lower level businesses pass-through all profits to these individuals.  As the TAC says, "the borrower group SPO/SPOI/Knobel got $82.5 million in cash in return for probably less than $40 million in condominium units"  [EFC 222; ¶140].

SPO claims that Knobel is not involved here [ECF 224; 12], but his signature is on the Loan Agreement, Operating Payment Agreement, Guaranty Agreement, Memorandum of Understanding, and he owns and manages and gets the profits of SPO. Colorado law allows piercing of an LLC that is an instrument of the owners. *Griffith v. SSC Pueblo Belmont Operating Co.,* 381 P.3d 308, 313 (Colo. 2016); *Stockdale v. Ellsworth*, 407 P.3d 571, 576 (Colo. 2017). The determination of whether a court should pierce the veil is a "mixed question of law and fact" which should not be decided on a motion to dismiss addresses solely the pleadings.  *Id.* at 576; *Lester v. Career Bldg. Acad.*, 338 P.3d 1054, 1062 (Colo. App. 1st Div. 2014). Further, the pleading standard for veil piercing is liberal. *Wichita Destination Developers, Inc. v. Focus Hospitality Services, LLC*, 365 F. Supp. 3d 1172, 1181 (D. Kan. 2019). Accordingly, the pleadings of veil piercing and the listing of owners as defendants is reasonable at this juncture.

**Conclusion**

The Li Plaintiffs' tell a clear and linear story of SPO's breach, deceit, and omission of material facts to the limited partners as buyers of securities.  SPO disputes the *facts*, but to prevail on a motion to dismiss, SPO has to show that no material issue of fact remains to be resolved. *Tegu v. Vestal Design Atelier LLC*, 407 F. Supp. 3d 1171,1177 (D. Colo. 2019).  SPO and CRC's entire defense falls with the ARCU, which doesn't have the effect they claim it does. The existence of these factual disputes make both Rule 12(b)(6) motions unripe for decision.

Dated: June 21, 2020                    Respectfully Submitted,

                                        /s/ Douglas Litowitz
                                        413 Locust Place,
                                        Deerfield, IL 60015
                                        312-622-2848
                                        Litowitz@gmail.com

**Certificate of Service:**

This document was filed on the ECF system for the District of Colorado on June 21, 2020 and thereby sent to all counsels of record.