```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF COLORADO

 3
    Civil Action No. 19-cv-02443-STV
 4

 5   JUN LI, QI QIN, YI LIU, JIE YANG,
     YUQUAN NI, ZHONGZAO SHI, FANG SHENG,
 6   SHUNLI SHAO, KAIYUAN WU, ZHIJIAN WU,
     ZHONGWEI LI, SA WU, FAN ZHANG, LIN QIAO,
 7   JINGE HU, RUJUN LIU, YING XU, LU LI, and
     YUWEI DONG, individually, as well as
 8   derivatively for COLORADO REGIONAL CENTER
     PROJECT SOLARIS LLLP,
 9
           Plaintiffs,
10
           vs.
11
     WAVELAND VENTURES LLC,
12   COLORADO REGIONAL CENTER PROJECT SOLARIS
     LLLP, COLORADO REGIONAL CENTER,
13   COLORADO REGIONAL CENTER I LLC,
     SOLARIS PROPERTY OWNER LLC,
14   SOLARIS PROPERTY OWNER I LLC, and
     PETER KNOBEL,
15
           Defendants.
16
    -----------------------------------------------------------
17
          TRANSCRIPT OF ELECTRONICALLY RECORDED PROCEEDINGS
18                          MOTION HEARING

19  -----------------------------------------------------------

20         Proceedings before the HONORABLE SCOTT T. VARHOLAK,
    Magistrate Judge, United States District Court for the
21  District of Colorado, commencing at 9:22 a.m. on the 22nd day
    of October, 2019, in Courtroom A402, Alfred A. Arraj United
22  States Courthouse, Denver, Colorado.

23
    Transcriber:   JULIE H. THOMAS
24                 901 19th Street, Room A256
                   Denver, CO 80294
25                 (303)335-2111

         Proceedings recorded by electronic recording device;
                transcription produced via computer.
```

Exhibit A

19-cv-02443-STV                                                   10/22/19   19

1   you've said, the investors would make an equity investment, in
2   other words, they would be purchasing a limited partnership
3   interest in the entity CRCPS.  That entity in turn would enter
4   into a debt instrument with SPO.  Is that correct?
5   A.  Correct.
6   Q.  So let's talk -- when I say "debt instrument," I just mean
7   a loan.
8        We'll go through documents here in a second, but on a
9   high level can you describe the features of the loan that
10  CRCPS intended to enter into with SPO?
11  A.  Okay.  The loan from CRCPS to SPO I, you know, the basic
12  terms were a five-year original security deed.  The interest
13  rate was 5 percent.  The loan could be prepaid, um, after
14  three years either in cash or the tendering of the underlying
15  collateral to the loan.  And we, as the lender, also had the
16  ability to reject cash payment or prepayment and have the
17  units or, excuse me, have the collateral put to us in lieu of
18  a cash payment.
19  Q.  In your affidavit I think you referred to this as the
20  put/call mechanism --
21  A.  Right.
22  Q.  -- is that right?
23  A.  So, in essence, the borrower had the right to put the
24  collateral to us, and we had the ability to call the
25  collateral away.  Um, the basic economics of that would be if

Exhibit A

19-cv-02443-STV                                              10/22/19    20

1  the value of the collateral went down, more than likely it
2  would be put to us.  If the value of the collateral went up,
3  you know, we would call it away in lieu of cash.
4  Q.   So let's talk about the time frame we're in.  The private
5  placement memorandum date is in March of 2011.  Is that your
6  recollection?
7  A.   Correct.
8  Q.   What was CRC and CRCPS's view of the state of the real
9  estate market in Vail on this topic of whether it was going to
10 go up or down?  Give us the context of this PPM.
11 A.   Well, another feature that I should -- that I didn't
12 mention -- that I didn't mention was one of the reasons for us
13 taking the project on is that, as the general partner, we had
14 a 70 percent carry in the upside of the real estate.  So if
15 the value of the real estate went up, in addition to the
16 coupon that the investors were receiving that was being passed
17 through from the loan, you know, the investors would receive
18 30 percent of any upside appreciation of the real estate, you
19 know, and we would receive 70 percent in the form of carry in
20 the upside of the real estate.
21          Um, you know, this was, you know, probably -- you
22 know, I think Vail, you know, started to get developed in the
23 mid-'60s.  This was kind of, you know, a small place, but if
24 there were outskirts, this was it.  Peter, who was a long-term
25 resident of New York and developed properties there both for

Exhibit A

```
19-cv-02443-STV                                          10/22/19    40
```

1   been totally unencumbered.
2   Q.  Let's -- before we get there -- I'll get to that, but
3   we've now referenced the put right and call right.  What
4   happened at the three-year mark when the parties,
5   borrower/lender, each had that put and call right?  What
6   actually happened?
7   A.  The lender notified us of their intent to tender the units
8   to us.
9   Q.  In what time period is that?
10  A.  That would have been three years after -- well, it was
11  probably a few months before the third anniversary of the
12  first loan advance.
13  Q.  Okay.  March, April 2015?  Does that time frame sound
14  right?
15  A.  Correct.
16  Q.  So the borrower puts the properties to the lender.  The
17  Court has seen, through the filings, that the title to the
18  properties didn't go to CRCPS.  Is that accurate?
19  A.  That is accurate.
20  Q.  Why?  First tell us why, and then tell us how we got
21  there.
22  A.  Um, it's really just a question of cost and what we felt
23  was in the best interest of the investors.  Um, were we to
24  transfer title, um, to the limited partnership versus holding
25  a deed of trust, the cost of that exercise would have

1  approximated a million dollars.  Um, there's a 1 percent
2  transfer tax in the Town of Vail.  We would have had to pay --
3  you know, prepay three months of HOA dues.  In fact, it would
4  have caused us then to go out and insure the various units
5  which, you know, which was being insured at the time -- you
6  know, was being insured by SPO.
7         So we made a business judgment that, um, basically
8  entailed not incurring a million dollars of partnership
9  expenses to take title versus holding a first deed of trust,
10 that our security position was such that it just simply didn't
11 merit taking title of the properties.
12 Q.   In other words, the security position remains the first
13 position.
14 A.   Correct.
15 Q.   Let me restate it to make sure we've got it.
16         SPO entered into an agreement with CRCPS that,
17 notwithstanding the put, SPO would retain title; correct?
18 A.   Correct.
19 Q.   And ultimately the objective was to liquidate or sell
20 these units; correct?
21 A.   The objective never changed.  It was just basically, in
22 our opinion, form over substance in taking title to the units
23 and burdening the partnership with a million dollars of
24 expenses that given that we held a first security interest in
25 the real estate underlying the loan, it simply didn't make any

1  sense to incur that expense.
2  Q.  Let me make it really simple.  If SPO had transferred
3  title to CRCPS, CRCPS then transfers title to a third-party
4  purchaser, there would be a $1 million consequence?
5  A.  Correct.
6  Q.  If SPO holds title and conveys to the ultimate purchaser,
7  there would not be a million-dollar hit?
8  A.  Correct.
9  Q.  And that's why you did it?
10 A.  Correct.
11 Q.  For the first time you've used the term "business
12 judgment."  Tell us why that decision was in the best
13 interests of the limited partnership.
14 A.  Well, ultimately when a unit is sold, it doesn't --
15 there's no creation of more risk for the partnership relative
16 to the spending of a million dollars of monies that, in our
17 judgment, was not necessary.
18 Q.  Who would have taken that million-dollar hit had you just
19 gone ahead and taken title?
20 A.  All the investors.
21 Q.  To the tune of a million dollars?
22 A.  Correct.
23 Q.  As we sit here today, is SPO willing to transfer the
24 properties directly to a final purchaser so that that million
25 dollars is not incurred?

1   Wakefield, which if they're not the largest, they're one of
2   the top five commercial real estate brokers in the world.
3   And, um, they basically went out worldwide to solicit offers,
4   um, on a bulk sale basis.  And, um, you know, again we weren't
5   really comfortable with the discount factors that were being
6   put on ultimately [audio interference] determine what the
7   price was.
8           And so shortly thereafter I think we moved our
9   listing from, um -- they were originally listed with Solaris
10  Real Estate.  We moved the listing to Slifer, and -- which is
11  I believe the biggest real estate brokerage firm in Vail, and
12  they listed four of our units.  And through that we were able
13  to obtain an offer from a large commercial real estate
14  developer in Colorado and that we've ultimately signed a
15  letter of intent with.
16  Q.   Okay.  We're going to get to that, we'll call it the
17  LOI --
18  A.   Correct.
19  Q.   -- in a moment.
20          Let me break that down again.  You are describing a
21  number of different efforts to unload the property, in
22  colloquial terms.  Correct?
23  A.   Correct.
24  Q.   Has it been CRC I's objective to sell all the units in the
25  best way to maximize the investment for the investors?

Exhibit A

19-cv-02443-STV                                                10/22/19   47

1   A.   Correct.
2   Q.   Since that put happened in the spring of 2015?
3   A.   Correct.
4   Q.   You identified, as I understood it, listings of individual
5   units, listings of bulk sale opportunities, hiring brokers
6   where there [inaudible] selling the property?
7   A.   Yes.
8   Q.   So let me break that down even further.  If I have 17
9   units, condominium units in Vail, Colorado, there's many ways
10  I could liquidate those.
11  A.   Mm-hmm.
12  Q.   And let me take you through them.  Um, one would involve
13  putting all of them as individual units on the market.  Has
14  CRC I done that?
15  A.   No.
16  Q.   Why not?
17  A.   I don't believe --
18  Q.   Why not?
19  A.   It's basically supply and demand.  Um, you know,
20  there's -- there was originally 77 units in the building.  I
21  believe SPO has sold 19 units.  You know, we acquired 19
22  units.  So there's, you know, in essence, 58 units still for
23  sale in the building.  You know, were you to list every one of
24  them and create that kind of supply, it would completely
25  destroy any price integrity in the building.

Exhibit A