# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

**Civil Action No. 19-cv-02443**
**Consolidated with Civil Action No. 19-cv-02637**

Jun Li, Qi Qin, Yi Liu, et al.,
                    Plaintiffs,

            v.                                   Hon. Magistrate Scott Varholak

Waveland Ventures LLC,
Colorado Regional Center Project Solaris LLLP,
Colorado Regional Center I, LLC,
Solaris Property Owner LLC,
Solaris Property Owner LLC I, and
Peter Knobel,
                    Defendants.

---

## Declaration of Brian P. Stewart

---

I, Brian P. Stewart, am over the age of eighteen and have personal knowledge of the facts stated herein and hereby to state as follows:

1.      I am an attorney at The Ardent Law Group, attorneys of record for the Plaintiff's in Civil Action No. 19-cv-02637.

**2.**      This declaration is offered in support of Plaintiffs Unopposed Motion for Leave to File 4th Amended Complaint.  The Cui Plaintiffs seek to amend the current operative pleading to clarify the Claims for Fraud, Breach of Fiduciary Duty and Declaratory Relief and to add an alternative claim against the general partner CRC I for Breach of Contract.  The proposed 4th Amended Complaint **does not add any new parties, and adds a single claim for breach of contract which is plead in the alternative to the breach of fiduciary duties claim**  (a true and correct copy of

the proposed 4th Amended Complaint, in the form required by Local rule 15.1(b) is attached hereto as Exhibit "A")

3.      This office filed the Plaintiff's original Complaint on September16, 2019.  Thereafter, on November 8, 2019 we filed the 1st Amended Complaint, adding an action for specific performance based upon SPOI's many offers to exercise its right to convey title to the Collateral Units, while continuing to retain title to and possession of the Collateral Units.

4.      On November 19, 2019 this case was consolidated with *Li v. Waveland Ventures, LLC* case No. 1:19-cv-02443-STV.

5.      On January 31, 2020 I filed a Motion for leave to file 2nd Amended Complaint herein.  The Court set the Motion for hearing on March 2, 2020, three days after the hearing on the CRC Defendants OSC Pursuant to C.R.S. § 38-35-204 on February 27, 2020.

6.      During the hearing on the OSC Re Lis Pendens on February 27, 2020 defects in the Cui Plaintiffs' Complaint were brought to light, specifically that in order to plead derivative claims, the Complaint was required to be verified and that the titles of 6th and 7th Claims for relief incorrectly named SPO instead of SPOI.

7.      On March 2, 2020 the Cui Plaintiffs' Motion for Leave to file 2nd Amended Complaint was granted.   A discussion was held on the record concerning the clerical errors and the lack of verifications, and the Court indicated that it understood the issues and that they would have to be dealt with, most likely at the Defendants proposed F.R.C.P. Rule 15 Motions.

8.      On March 2, 2020. The Court issued an order granting the Cui Plaintiffs' Motion for Leave to file the Second Amended Complaint [ECF 166] and indicating that a further Order would be issued regarding the Second Amended Complaint.

9.      On March 3, 2020, the Court issued another Minute Order [ECF 167] instructing the Cui Plaintiffs to file a clean copy of the 2nd Amended Complaint, there was no mention of the issues

related to the verifications and clerical error in the title of the 6th and 7th Claims for Relief or amendments to the Pleadings.

10.     Thereafter, I filed an Unopposed Motion for Leave to File 3rd Amended Complaint, which was granted by the Court on April 23, 2020 [ECF 185].

11.     On August 31, 2020 THE Court heard among other things, F.R.C.P Rule 12 (b) (6) Motions to Dismiss the Cui Plaintiffs Complaint from the CRC Defendants [ECF 203] and the SPO Defendants [ECF 224].  The Court took the matters under submission and entered its Order on the Motions to Dismiss on March 2, 2021 [ECF 271].

12.     The Cui Plaintiffs respectfully feel that confusion was created, either intentionally or inadvertently, by the two different Complaints and the manner in which the Defendants prepared their Motions to Dismiss.  The Cui Plaintiffs believe that they should be given leave to amend to cure any perceived deficiencies in their pleadings.

13.     It would be unjust to have the Cui Plaintiffs' claims suffer because of pleading errors of their counsel.  Therefore, the Cui Plaintiffs respectfully request that the Court grant the present motion.

///

///

///

///

///

///

///

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 11th day of June, 2021.

*/s/ Brian P. Stewart*
Brian P. Stewart
**Ardent Law Group**
4340 Von Karman Ave.,
Suite 290
Newport Beach, California 92660
Telephone: (949) 299-0188
Facsimile:  (949) 299-0127
bstewart@ardentlawgroup.com
Attorney for Plaintiffs Dianwen Cui, Lei Gu, Sufen Leng, Xue Mei, Zhou Mei, Yan Song, Lu Wang, Yue Wu, Zhuo Yang, Jingwen Zhang, Lei Zhang, Ling Zhang, Xiaohong Zhang, Qin Zhou Chunyu Zou, individually, and on behalf of Colorado Regional Center Project Solaris LLLP

# EXHIBIT  A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Civil Action No.  1:19-cv-02443-STV;
Consolidated with Civil Action No. 1:19-cv-02637**

**JUN LI, et al., individually and derivatively for Colorado Regional Center
Project Solaris LLLP,
 Plaintiffs,**

**v.**

**WAVELAND VENTURES LLC, et al., Defendants.**

---

**THIRD FOURTH AMENDED VERIFIED COMPLAINT AND JURY TRIAL DEMAND**

---

Plaintiffs Dianwen Cui, Lei Gu, Sufen Leng, Xue Mei, Zhou Mei, Yan Song, Lu Wang,

Yue Wu, Zhuo Yang, Jingwen Zhang, Lei Zhang, Ling Zhang, Xiaohong Zhang, Qin Zhou, Xun

Zhu, Chunyi Zou (collectively "EB-5 Investors" or "Plaintiffs") by their undersigned attorneys,

allege the following:

**INTRODUCTORY STATEMENT**

1.     "EB-5 investors 'are not return-driven – they're return-agnostic.' 'From that

standpoint, it's a cheap source of capital for developers.'[1]  – Rick Hayes, the Chief Financial

---

[1] https://www.cobizmag.com/Articles/Fast-track-to-US-residency/

1

Officer of Waveland Ventures, LLC ("Waveland") and Managing Partner of Colorado Regional Center ("CRC").

2.     The above statements sum up the way defendants view EB-5 investors, a source of cheap capital that do not care about their returns.  Based on this principle, defendants structured a complicated scheme to induce Chinese investors to fork over approximately half a million dollars each.  This scheme financially benefited all but the EB-5 Investors.

3.     This case involves sixteen of 165 Chinese nationals who each invested $500,000[2] to help fund the completion of a condominium project located in Vail, Colorado aptly called The Residences at Solaris-Vail ("Solaris").  The developer of Solaris is Solaris Property Owner ("SPO").

4.     The 165 Chinese investors collectively invested $82.5[3] million into a Colorado limited partnership, Colorado Regional Center Project Solaris LLLP ("LLLP") that Waveland, and CRC created.  CRC's subsidiary, Colorado Regional Center I, LLC ("GP") would be the general partner of the LLLP and received a 1% of partnership interest.  The LLLP would then lend the EB-5 Investors' money to SPO.  In exchange, SPO was supposed to pay an annual 5% interest to the LLLP.   The loan between the LLLP and SPO (the "Loan") was supposed to be 100% collateralized and the interest on the Loan guaranteed by SPO's principal, Peter Knobbel. The Loan was due within 5 years from the date of the advancement.

5.     The loan has been collateralized with deeds of trust recorded in the County Recorder's Office of Eagle County Colorado.  The property securing the loan is commonly designated as 141 East Meadow Drive # G West Vail CO 81657 and legally described as

---

[2] Some investors paid $550,000 and some paid $535,000 depending on whether the investor paid for his/her's own immigration attorney.
[3] Not including "administrative fees" which vary between $50,000 to $35,000 for each investor.

follows:

> "CONDOMINIUM UNIT NUMBERS: 2A SOUTH; PENTHOUSE E WEST; 6E EAST; PENTHOUSEEEAST; 5EWEST; 4GWEST; 7E WEST; PENTHOUSE C EAST; 6D EAST; 5C WEST; 6C WEST; 5G WEST; 3E EAST; 7E EAST; 4D EAST; PENTHOUSE G WEST; PENTHOUSE C WEST; 3C EAST TITLE HOLDER LUCKY 5 LLC), THE RESIDENCES AT SOLARIS-VAIL, ACCORDING TO THE CONDOMINIUM PLAT FOR THE RESIDENCES AT SOLARIS-VAIL RECORDED ON APRIL 26, 2010 AT RECEPTION NO. 201007818 AND AMENDMENTRECORDED APRIL 25, 2012 AT RECEPTION NO. 201208075, IN THEN OFFICE OF THE CLERK AND RECORDER OF EAGLE COUNTY, COLORADO, AND THE CONDOMINIUM DECLARATIONFOR THE RESIDENCES AT SOLARIS – VAIL RECORDED ON APRIL 25, 2010 AT RECPETION NO. 201007819 IN THE OFFICE OF THE CLERK AND RECORDER OF EAGLE COUNTY, COLORADO"

6.      On paper, Solaris seemed like the ideal investment.  CRC would collect a 2% annual management fee, SPO would receive the ~~much needed~~much-needed funding at a low interest rate to complete Solaris, without the rigid underwriting protocols required by banks, GP would obtain a 1% ownership interest of the LLLP, the LLLP would receive rental income and an annual 5% interest from the SPO, and the EB-5 Investors would earn a 2% return based on the Loan that was 100% collateralized and obtain a green card to boot.  When Solaris is completed, the LLLP would have multiple exit strategies that would allow each EB-5 Investor to receive the return of their capital plus any residual from the dissolution of the LLLP.

7.      In reality, each of the defendants have reaped and continue to reap financial benefits from the scheme while the EB-5 Investors receive nothing.

8.      While any "investment" by its definition carries risk, this particular one was intentionally concocted by the defendants to benefit themselves at the expense of the EB-5 Investors.

9.      In order to seek needed additional financing for Solaris, SPO and Waveland

established the various business entities to raise EB-5 capital.  To induce the EB-5 Investors to invest in Solaris, Waveland through the various entities it owned and controlled, colluded with SPO to defraud the EB-5 Investors by misrepresenting to them that the Loan was 100% collateralized and safe.

10.     In fact, the defendants and each of them knew that the Loan would not and in fact did not provide the promised 100% security to the EB-5 Investors, let alone the promised 2% return.

11.     On or about November 5, 2010 the GP and SPO executed: the Loan Agreement, which is very ordinary; the Operating Payment Agreement which establishes that Peter Knobbel will personally guaranty the loan; and something entitled Yield Enhancement Agreement, which purports to provide the LLLP with the right to refuse cash repayment of the Note and instead require Solaris to convey the Collateral Units to the LLLP, additionally it entitles the LLLP to receive rental proceeds collected on the Collateral Units, less any management expense, including taxes, HOA Dues, management fees, housekeeping fees administrative fees and furnishing costs.

12.     No legitimate lender would ever agree to such a thing.  Lenders look for a return that is certain.  Rents, let alone rents less expenses, is far too speculative.  This "agreement" absolved SPOI of covering all sorts of costs and ensured that the GP and/or its affiliates were paid fees from the rents collected and interest payments.  This insider deal has resulted in the LLLP owing considerable money to the GP and its affiliates while it is no longer collecting interest on the loan.  The "agreement" also allows SPOI to control the inventory at Solaris that is for sale.

13.     The Yield Enhancement Agreement states that "In addition to the Interest

4

Payments set forth in the Note **and as a material inducement** for CRCPS to make the Loan, Solaris hereby agrees to allow each Limited Partner (as hereinafter defined) to use a two (2) bedroom Collateral Unit for up to twenty-one (21) nights each calendar year during the term of the Loan (the "Use Rights")." [emphasis added].  Following an audit by the United States Citizenship and Immigration Services ("USCIS").  Thereafter the USCIS instructed the parties to remove the Use Rights from the agreements, which brings into question the validity of the Yield Enhancement Agreement.

14.     On or about April 11, 2011 the GP and SPO executed the Memorandum of Understanding, which limited the interest rate to be paid by Solaris to no more that 5.5%; and calculations for Carry Shortfall, in the event that Carrying Costs exceed Net Rental Proceeds. The Rental Proceeds have never exceeded the Carrying Costs associated with the Collateral Units.  The Carrying Costs include Commission; Management Fees; Real Estate Taxes; HOA Dues; and Maintenance and Repairs among others.

15.     At some point prior to April of 2019 SPO assigned its rights under the agreements to SPOI.  On or about April 18, 2012 SPO I executed the Promissory Note, which, despite the guaranty language in the Operating Payment Agreement, indicated that with the exception of interest payments due under the Note, the entire loan was to be non-recourse.  The Promissory Note was due in five years but provided that the borrower could prepay after 3 years.  The Promissory Note additionally allowed the borrower the option to tender title to the collateral Units in repayment of the Loan.

16.     On April 17, 2015, one day before the prepayment option became available. The GP and SPOI entered into the Collateral Unit Agreement. The Collateral Unit Agreement states that "In lieu of accepting the conveyance of title to the Eligible Units pursuant to a Collateral

5

Unit Distribution, the Lender and Borrower have determined that it is desirable for Borrower to continue to hold title to the Eligible Units."  The Collateral Unit Agreement then lays out numerous ways that the LLLP will be responsible for virtually every fee or cost associated with the Collateral Units, all to the benefit of SPOI and the GP.

17.    While most if not all of the EB-5 Investors have received their green cards, their investments have been stuck in limbo.  The $82.5 million loan to SPO was never paid back as SPO opted to tender title to 19 of its condominium units to the LLLP *three years before their respective maturity dates*.   Despite SPO's election, title to the 19 (now 17) units remained with SPO, who assigned it to Solaris Property Owners I, LLC ("SPO I").

18.    Although the GP has repeatedly maintained that the 19 condominium units' fair market value equaled to the Loan amount, the truth is that the Loan was intentionally under collateralized.  It has become apparent that the value of the collateral is roughly one-half the amount of the loan, which explains why SPOI is not interested in repaying the loan.  But even worse than that, SPOI and the GP have conspired to ensure that whatever value exists in the Collateral Units will be paid in every fee imaginable to either the GP, SPOI or one of their affiliates.

19.    By all means, this is *not* a textbook case of fraud.  The Loan, the Private Placement Memorandum and related documents ("Offering Documents") were structured by sophisticated real estate and investment professionals to take advantage of the EB-5 Investors. Defendants took advantage of the language and distance barriers to intentionally deceive the EB-5 Investors by inflating the value of the collateral and under collateralizing the collateralizing the Loan. The EB-5 Investors were never told the entire story.  As a result, the EB-5 Investors, through the use of counsel and corroboration with other professionals, were only recently in the

6

~~past few months~~ able to decipher the scheme used to deceive the Plaintiffs.

20.      Waveland, CRC, LLLP and SPO retained agents in China for the express purpose of soliciting EB-5 investors.  They provided these agents with written and video materials to use to induce Chinese nationals to invest in the Solaris scheme.  The identities of these agents are intimately known to Waveland, CRC, LLLP and SPO who retained and paid them to solicit investors.  Although Waveland, CRC, LLLP and SPO targeted wealthy Chinese investors, they did not provide all investors with Chinese versions of the Offering Documents.  At least, they left it up to their agents as to what materials to show the prospective investors.  In fact, most of the Chinese Investors were never even provided with full sets of the Offering Documents before they were asked to sign them.  Those that did receive the densely written ~~165 page~~165-page document did not receive any of the exhibits.  Some were only provided with the signature pages, incredibly, with one of the pages acknowledging that the investor was proficient in English. Most investors also were not provided with any meaningful time to review what documents they were signing.

21.      Through defendants' paid agents, the EB-5 Investors were misled into investing into the LLLP believing that their investment had a 2% return and was fully secured by collateral.  They believed that at the maturity date of the ~~Loan, the~~Loan, the EB-5 Investors would be able to exit from the LLLP with the return of their investment in its entirety.

22.      During the pendency of their investment, the GP repeatedly concealed pertinent information from the EB-5 Investors and fed countless excuses as to why the LLLP was unable to pay the "*preferred return"* and why the EB-5 Investors were unable to pull their investments from the LLLP.  They even encouraged the EB-5 Investors to exit the LLLP by exercising a "put option" and withdrawal of their investments at less than 50 cents on the dollar.

7

23.   ~~Within the past few months, through the retention of~~After retaining counsel, the Plaintiffs were able to uncover defendants' scheme and violations.

**<u>PARTIES</u>**

**A.    Plaintiffs**

24.   Plaintiff Dianwen Cui ("Cui") is a citizen of the People's Republic of China who ~~resides~~ is domiciled in the State of Washington.

25.   Plaintiff Lei Gu ("Gu") is a citizen of the People's Republic of China who is domiciled ~~resides~~ in the State of California.

26.   Plaintiff Sufen Leng ("Leng") is a citizen of the United States who is domiciled ~~resides~~ in the State of California.

27.   Plaintiff Xue Mei ("X. Mei") is a citizen of the People's Republic of China who is domiciled  ~~resides~~ in the State of California.

28.   Plaintiff Zhou Mei ("Z. Mei") is a citizen of the People's Republic of China who is domiciled ~~resides~~ in the State of California.

29.   Plaintiff Yan Song ("Song") is a citizen of the People's Republic of China who is domiciled ~~resides~~ in California.

30.   Plaintiff Lu Wang ("Wang") is a citizen of the People's Republic of China who is domiciled ~~resides~~ in the State of Connecticut.

31.   Plaintiff Yue Wu ("Wu") is a citizen of the People's Republic of China who is domiciled ~~resides~~ in the State of Minneapolis

32.   Plaintiff Zhuo Yang ("Yang") is a citizen of the People's Republic of China who is domiciled ~~resides~~ in the State of California.

33.   Plaintiff Jingwen Zhang ("J. Zhang") is a citizen of the People's Republic of

China who is domiciled resides in the State of California.

34.     Plaintiff Lei Zhang ("Lei Zhang") is a citizen of the People's Republic of China who is domiciled resides in the State of California.

35.     Plaintiff Ling Zhang ("Ling Zhang") is a citizen of the People's Republic of China who is domiciled resides in the State of California.

36.     Plaintiff Xiaohong Zhang ("X. Zhang") is a citizen of the People's Republic of China who is domiciled resides in the State of California.

37.     Plaintiff Qin Zhou ("Zhou") is a citizen of the People's Republic of China who is domiciled resides in the State of California.

38.     Plaintiff Xun Zhu ("Zhu") is a citizen of the People's Republic of China who is domiciled resides in the State of New York.

39.     Plaintiff Chunyi Zou ("Zou") is a citizen of the People's Republic of China who is domiciled resides in California.

**B.     Defendants**

40.     Defendant Waveland Ventures, LLC is a Texas limited liability company doing business in the State of Colorado.  Plaintiffs are informed and believe that the owners of Waveland are domiciled in the states of Texas, Colorado and Wisconsin.

41.     Defendant Colorado Regional Center, LLC is a Colorado limited liability company.  CRC is a wholly owned subsidiary of Waveland. Plaintiffs are informed and believe that the owners of Colorado Regional Center, LLC are domiciled in the states of Texas, Colorado and Wisconsin,

42.     Defendant Colorado Regional Center I, LLC is a Colorado limited liability company.  CRC I is a wholly owned subsidiary of CRC.  Plaintiffs are informed and believe that

9

the owners of Colorado Regional Center I, LLC are domiciled in the states of Texas, Colorado and Wisconsin.

Formatted: Font: (Default) Times New Roman

43.    Defendant Colorado Regional Center Project Solaris LLLP, is a Colorado limited liability limited partnership.  The LLP's general partner is CRC I.   Plaintiffs are informed and believe that the owners of Colorado Regional Center Project Solaris, LLP are domiciled in the state of Colorado.

Formatted: Font: (Default) Times New Roman

44.    Defendant Solaris Property Owner LLC, is a Delaware limited liability company with its principal place of business in Vail, Colorado. Plaintiffs are informed and believe that the owners of Solaris Property Owner, LLC are domiciled in the state of Colorado.

Formatted: Font: (Default) Times New Roman

45.    Defendant Solaris Property Owner I LLC, is a Colorado limited liability company.  SPO I is a wholly owned subsidiary of SPO.  Plaintiffs are informed and believe that the owners of Solaris Property Owner I, LLC are domiciled in the state of Colorado.

Formatted: Font: (Default) Times New Roman

46.    Defendant Rick Hayes is a resident of the State of Texas.

47.    Defendant Peter Knobbel is a resident of the State of Colorado.

48.46.  John Does 1-10 are additional parties who participated in the scheme to defraud the EB-5 Investors.  Plaintiffs will name these defendants once they have had an opportunity to conduct relevant discovery to identify them.

49.47.  Defendants Waveland, CRC, GP, SPO, SPO I, RICK HAYES, PETER KNOBBEL and Doe Defendants are collectively referred to as "Defendants."

**JURISDICTION AND VENUE**

50.48.  Plaintiffs bring their Complaint under federal diversity jurisdiction, 28 U.S.C. 1332, as the parties are completely diverse in citizenship and the amount in controversy exceed $75,000.

10

51.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1331, in that this action arises under federal law, namely 15 U.S.C. §78(b) and Rule 10b-5 thereunder.

52.49.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' state-law claim that is related to, and form parts of, the same controversy.

53.50.  This Court has personal jurisdiction over the defendants herein because they maintain a principal place of business in this judicial district, the lawsuit arises out of defendants' activities in this district, and defendants consented to personal jurisdiction in the State of Colorado for any action in connect with the Offering Documents.

54.51.  Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) (1) and (b) (2) because all Defendants have their principal place of business in which this judicial district is located.  Furthermore, this judicial district is where a substantial part of the events or omissions giving rise to the claim occurred and a substantial part of the property that is the subject of this action is situated.

<u>**GENERAL ALLEGATIONS**</u>

A.      **The Employment Based Fifth Preference**

55.52.  The United States Congress created the EB-5 program in 1990 to stimulate the United States economy through job creation and capital investment by foreign investors.  The EB-5 investor immigration program allows foreign investors seeking to immigrate to the United States to obtain permanent residency by investing at least $500,000 in a company or project located in the United States that generates at least ten jobs per foreign investor.

56.53.  Foreign investors may invest directly in a new commercial enterprise or through a new commercial enterprise affiliated with a regional center approved by the United States Citizenship and Immigration Services ("USCIS").  An EB-5 Regional Center is an organization

11

designated by the USCIS that sponsors capital investment projects for investment by EB-5 investors.  The benefits of investing through a regional center isare that it offers the advantages of indirect and induced job creation, the freedom to invest in any project located within the United States, and not having to manage the day-to-day operations of the business.

57.54.  The EB-5 program has been exceptionally popular amongst immigrants from the People's Republic of China, where thousands of Chinese nationals have been able to obtain U.S. permanent residency (green cards) since the program's inception.  In fact, statics show that, at one point, approximately 85% of EB-5 green cards have been issued to Chinese nationals.

58.55.  Due to the job creation component, the EB-5 projects have also generated countless jobs and boosted the local U.S. economies.

59.56.  Unfortunately, as much good as this program has created, there has been rampant fraud in the program as well.  There have attempts to misuse the EB-5 program as a means to carry out fraudulent acts.  EB-5 investors are most susceptible to fraud because English is almost always a second language, if they speak or read the language at all.  Moreover, typically, the larger U.S. projects are promoted through overseas immigration consultants, who are not licensed broker-dealers.  The immigration consultants are usually paid a commission fee by a developer or a regional center for each investor and have little incentive, experience or ability to thoroughly vet a project.  Even once they invest in a project through a regional center, because they entrust the management of their investment to fiduciaries, the investors are taken advantage of because of the language and distance barriers.

**B.      The Solicitation and Purported Investment**

60.57.  Since most EB-5 investors are from China, defendants targeted China for the Solaris project.

61.58.  To attract investors, CRC entered into "Agency Agreements" with multiple foreign immigration consultants ("Consultants").   These consultants are not licensed broker-dealers.

62.59.  Within the Agency Agreements, the immigration consultant or "Agent" would agrees to promote CRC's Solaris project by using various advertising, promotional and marketing means as the Agent deem necessary and approved by CRC.

63.60.  In return, the Agent would receive an average fee of $35,000 for each investor that subscribes to the Solaris project.  In some cases, CRC would provide an additional 1% of the investment to the Agent.

64.61.  In order to sell Solaris, or for that matter any investment, the prospects of the return of investment and return on investment must be strong.  Here, Waveland, the controlling member of CRC, through its ownership group: Rick Hayes; Paul Delongchamps; and Johan Sergerdahl, provided various marketing materials to their agents to sell the Solaris project.

65.62.  One of the PowerPoint presentation provided through Waveland and CRC's agents, for example, had the following selling points for the Solaris investment:

- It is a safe, well-structured real estate investment that will allow investors and their immediate families to obtain permanent green cards and residency in the United States.

- It is collateralized by Deeds of Trust

- Waveland claims it manages $750 million in investment capital.

- It lists various successful projects, to taut experience.

- Its track record includes the issuance of several AAA rated secured promissory notes varying from 8% to double digits.

13

- It claims that Waveland has a proven track record of financing large, complex transactions, with some of the largest investment banks in the world.

- It claims that they have an experienced management team with over 110 years combined real-estate and investment experience.  – exposure to both up and down market cycles.  The management consists of: Rick Hayes who has 30 years in financial services industry and manages in excess of $600 million in private equity and real estate investments; Charles Schwartz as having 35 years of corporate and real estate law experience; Paul Deslongchpas as having 20 years of operational and investment experience; Johan Segerdahl of having 30 years in financial services industry.

- It claims that they employ a conservative investment philosophy.  "Investment 100% collateralized with real property at closing."  Multiple exit strategies available to monetize investment.

- It says they are "committed to each investor's success~~";~~";

- It says that they have "ongoing monitoring and compliance."

- It says that they perform "quarterly reporting of project status"

- It says that "[t]he note will be 100% secured by condominium units in the project."

- It says the "return" will be guaranteed by the developer for 5 years.

- It says that LLLP will have the right to rent the condo units and receive all of the associated revenue."

- It says that each investor would have access to use one of Solaris' units, free of charge, for a ~~seven days~~seven-day period during the peak months and 14 days the

14

remainder of the year.

- It says that a "2.0% limited partner preferred return" would be given to the investor.

- It says that investors would have use of condo units.

- It says there is a "100% Return of Principal"

- It says this is an "[i]nvestment secured with first deeds of trust. No leverage, ability to convert loan for full value of secured properties."

- It says that the developer would pay interest quarterly for 5 years.

- It says that "5 years from closing [of the Loan], the GP will pursue the monetization of the investors principal balance ($500,000)."

- The foregoing representations shall be hereinafter referred to as the "Representations."

63. Based on these clear The Rrepresentations by were made by Waveland and Waveland, CRC and SPOthrough their contracted agents located throughout China in Beijing, Shanghai, Zhejiang, Jiangsu to each of the EB-5 Investors. The representations were made throughout the year from 2011 through 2012 or as specified in greater detail below:

a. Waveland and CRC through their agent made the Representations to Zou in or around the last quarter of 2011 at their agent's office located in Beijing;

b. Waveland and CRC through their agent made the Representations to Cui in or around the summer of 2011 at their agent's office located in Beijing;

c. Waveland and CRC through their agent made the Representations to J. Zhang in or around the last quarter of 2011 at their agent's office located in Shanghai;

d. Waveland and CRC through their agent made the Representations to Lei Zhang in

15

or around the first quarter of 2012 at their agent's office located in Shanghai;

e.   Waveland and CRC through their agent made the Representations to Gu in or around the last quarter of 2010 at their agent's office located in Zhejiang;

f.   Waveland and CRC through their agent made the Representations to Ling Zhang in or around the fourth quarter 2011, at their agent's office located in Shanghai;

g.   Waveland and CRC through their agent made the Representations to Lu Wang in or around the second quarter 2012, at their agent's office located in Beijing;

h.   Waveland and CRC through their agent made the Representations to Q. Zhou in or around the first quarter of 2012 at their agent's office located in Jiangsu;

i.   Waveland and CRC through their agent made the Representations to Leng in or around the second quarter of 2012 at their agent's office located in Jiangsu;

j.   Waveland and CRC through their agent made the Representations to X. Zhang in or around the last quarter of 2011 at their agent's office located in Shanghai;

k.   Waveland and CRC through their agent made the Representations to X. Mei in or around the second quarter of 2012 at their agent's office located in Jiangsu;

l.   Waveland and CRC through their agent made the Representations to Zhu in or around the second quarter of 2012 at their agent's office located in Zhejian;

m.   Waveland and CRC through their agent made the Representations to Song in or around the first quarter of 2012 at their agent's office located in Jiangsu;

n.   Waveland and CRC through their agent made the Representations to Wu in or around the first quarter of 2012 at their agent's office located in Jiangsu;

o.   Waveland and CRC through their agent made the Representations to Z. Mei in or around the last quarter of 2011 at their agent's office located in Shanghai;

16

66. p.     Waveland and CRC through their agent made the Representations to Zhuo Yang in or around the second quarter of 2012 at their agent's office located in Beijing., the EB-5 Investors reasonably thought that should SPO incur a default on the Loan, the LLLP would at least be able to foreclose on the collateral, which was supposed to secure 100% of the Loan amount.

64.     As a result of the Representations, the EB-5 Investors reasonably thought that should SPO incur a default on the Loan, the LLLP would at least be able to foreclose on the collateral, which was supposed to secure 100% of the Loan amount.  What Waveland and CRC intentionally failed to disclose to the EB-5 Investors was that the collateral value was based on Waveland, CRC and SPO's self-valuation and not done by any professional or licensed appraiser.  Additionally, Waveland and CRC failed to disclose to the EB-5 Investors that SPO could elect to return the collateralized units in lieu of the borrowed cash.

67. 65.   The Agent then employs strong sales pressure and threats that the subscription would run out to entice the investor to sign up.  The Offering Documents stated very clearly that only amount raised would be limited to $80 million. Yet, Defendants raised more than the allotted amount.

68. 66.   Moreover, Waveland, CRC and SPO prepared, reviewed and approved the marketing materials including but not limited to the PowerPoint and other promotional materials and disseminated them to potential investors to solicit investments.

**C.      The Bait and Switch**

69. 67.   While the PowerPoint is presented in both English and Chinese, the Offering Documents are usually only provided in English.

70. 68.   While the Agent spends a great deal of time selling Solaris, the Agent does very

17

little to explain the complexities of the Offering Documents.  The Agent usually provides no guidance as to the meaning of the Offering Documents.  There is usually little to no time to review, let alone have a professional review the Offering Documents.

71.69.  In some instances, the Agent only provides signature pages to the investor.

72.70.  In all instances, the Agent promises to provide a complete and fully executed Offering Documents to the investor, but in no instance did any of them receive them.

73.71.  In no instance did the Agent talk about risk.  They only dangle green cards, 2% returns and 100% return of investment to the investors.

74.72.  In reality, the Offering Documents are riddled with disclaimers, risk factors, and complex legal jargons and terms that most U.S. born individuals would find perplexing.

75.73.  There are some key differences between the Offering Documents and the PowerPoint presentations.  For example: 1)  the marketing materials gave the impression that the investment was safe and well-structured that would return all of the investor's money, but the Offering Documents contained countless disclaimers and risks; 2) in one set of marketing materials, there is no mention of the developer's ability to repay the Loan with condominium units in lieu of cash – it gave the false impression that the Loan was a standard loan secured by collateral but hidden as an Exhibit to the Offering Documents was a statement that the developer had the option of paying back the loan with condominium units; 3) in one set of marketing materials, there was no disclosure of the developer's right to prepay the loan in two years, but hidden in the voluminous Offering Documents was a statement that the developer could prepay within three years; 4) The marketing materials indicated that the Loan was fully collateralized, but none of the materials including the Offering Documents indicated that the developer and the GP had already agreed to preset the value of the collateral to match with  the developer's own

18

sales price instead of fair market value; 5) the marketing materials promised the investors with an annual 2% interest, whereas the Offering Documents indicate that the preferred return was subject to the availability of funds and subordinate to expenses and the CRC's management fee.

76.74.  Had the investors been made aware that their funds would essentially be used to purchase condominium units at inflated prices set by the developer, they never would have invested their funds.

77.75.  Further evidencing the collusion amongst the defendants is the fact that although the underlying documents required SPO or its assignee SPO I to transfer title of the 19 units to the LLLP upon SPO's election to repay the Loan with equity, all title to the 19 units remained and continues to remain with SPO I.  From 2016 through 2018, Defendant GP repeatedly and in each and every notice, state that they were working with SPO to transfer title of the 19 units to the LLLP.  In reality, as early as April 2015, the SPO and the GP had already agreed that the SPO would hold onto title to each of the 19 collateralized units.

78.   All told, the EB-5 Investors were duped into believing they would receive 100% of their investment back upon receipt of their green card and repayment of the Loan.

76.

**D.     Excuses and Concealment**

D.     Excuses and Concealment
79.   Pursuant to the executed version of the Offering Documents, which none of the EB-5 Investors received despite being promised, the GP was required to periodically provide notice of the fair market value of the collateral to eligible investors.  Beginning in 2016 and continuing through 2019, there have been six such notices.  The notices were sent only to investors who have held their investment in the LLLP for at least three years, thus some of the Plaintiffs received all six notices and some of them received much less.  In the Notices, the GP offered "put rights" as an exit

strategy. Those who received the Notices became aware that the fair market value of the collateral was at one point almost 20% below the Loan amount. In each of the Notices, the GP also indicated that it was exercising its right to transfer title of the condominium units to the LLLP as the maturity dates for all of the loan advances have all expired. The representation that the units would be transferred to the LLLP were made on: February 25, 2016; October 27, 2016; June 19, 2017; December 26, 2017; July 18, 2018; and May 30, 2019. The latest of such Notices (Notice of Fair Market Value Number 6), showed that the bulk value of the 18 units[4] was a meager $43 million, which is almost 50% less than the Plaintiffs' investment. In each of the Notices, the GP provided several excuses why the units were below the face value of the Loan. For example, the GP explained that the low value was attributed to the lack of adequate comparable sales within the Solaris building and the lack of comparable properties in the greater Vail area and the appraisers having the penchant for being very conservative because of the Great Recession. The GP also opined that the value of the units would increase over time. All of the excuses were meant to appease and conceal the EB-5 Investors.

77.

80. 78. As the fair market value of the units continued to allegedly increase, the number of EB-5 Investors seeking to exercise their "Put Rights" also increased. Even though the number of EB-5 Investors sought to exit the LLLP increased dramatically, the GP made little effort to sell the units for sale.

81. 79. Only within the past few months through counsel did the EB-5 Investors discover the relevancy of a 2015 secret agreement between the LLLP (signed by the GP) and the SPO wherein it was agreed that despite representing to the EB-5 Investors that title of the units were being transferred, the secret agreement was for SPO or its assignee, SPO I to continue to hold onto title. Furthermore, there was an agreement for SPO's own in-house broker, Solaris Real Estate, LLC, to sell the units and that all sales commission would be split with the LLLP. Moreover, the secret agreement forbade the listing of any units on the MLS. As a result, only one of the LLLP's units was sold between 2016 and 2019. Upon information and belief, recently

---

[4] One of the unit units was sold by eight limited partners exercising their put option.

one additional unit was sold but the GP has not released any of the details.

82.80.  It was recently discovered, after retention of counsel in the past several months, that back in 2011, SPO and CRC had previously agreed to use pre-determined overinflated prices for the purposes of determining the collateral value of the units.  Documents uncovered showed that the collateral was mainly limited to units facing north, which are considerably less in value than the South facing units which have glorious mountain views.  None of the Defendants disclosed to the then-potential investors that the 100% collateral was based on the self-serving SPO sales price rather than fair market value.

83.81.  It was also recently discovered, after retention of counsel within the past couple of months, that many of the EB-5 Investors were forced to ratify the GP's authority to amend the Offering Documents, without consideration, waiving the Plaintiffs' usage rights of the Solaris condos.  The Defendants, through their Agents, misrepresented that the investors needed to sign the ratification in order for them to receive their final green cards.  This was blatantly false and was done so to deprive the Plaintiffs of their use of the condo units so that the units could be rented out for fees instead, which would ultimately inured to the benefit of CRC as it would collect the management fees.  The right to use Solaris' units was not relevant to the Plaintiffs' ability to obtain their final green cards.

E.      **Conflicts of Interest**

82.      Besides the fraud and concealment uncovered through counsel, tThe EB-5 Investors have also discovered significant conflicts of interest.  First, CRC was supposed to make sure that the investment was sound.  CRC along with its parent company, Waveland, touted their real estate and financial industry experience in making profitable loans, real estate projects and financial investments.  The LLLP also purportedly conducted extensive due diligence and hired

21

third parties to assist in its due diligence on the Solaris project.    With their sophistication, the defendants never should have recommended the Loan to any of the EB-5 Investors.  However, CRC stood to benefit financially as it was to receive an annual 2% management fee.  This fee amounts to $1.65 million annually.  Meanwhile, GP received a 1%[5] partnership interest for simply being the GP.  The GP then paid other vendors which were either owned by the SPO or other entities which are partially or wholly owned through Waveland.  For example, the broker entrusted to sell the units for the LLLP, Solaris Real Estate Broker, LLC ("SRE") was a wholly owned subsidiary of SPO.  SSRE not only had to promote and sell the LLLP's condominium units, it had to sell SPO's own units.    During the time frame that Solaris Real Estate Broker, LLC was entrusted to sell the collateral units, it sold none, meanwhile it deferred all buyers to SPO's own units.  As a result, there was a log jam of EB-5 Investors who patiently waited to get their investment back.  Additionally, SPO had a right of first refusal rendering the sale of any of the LLLP's units unfeasible and unlikely.  In the meantime, ~~while~~ due to a purported lack of funds, CRC had halted its collection on the annual 2% management fee, but according to a memo dated January 12, 2019, the LLLP owed $4,291,336 as of that date, which egregiously includes penalty interest.  The LLLP recently borrowed $7,275,000 and promptly used it to pay the GP $5,560,223 for delinquent management fees.  Accordingly, as long as the EB-5 Investors remain in the LLLP, CRC will continue to be eligible for the ~~seven figure~~seven-figure annual management fee *plus penalty interest.*

~~84.~~83.  Plaintiffs are ~~Upon~~ inform~~ed~~ation and ~~belief~~believe that , another example is Elevation Resorts, the property management company that GP and SPO use to manage the rental of units at Solaris.  Plaintiff is ~~Upon~~ inform~~ed~~ation and belie~~ves~~f that , Elevation Resorts is

---

[5] Each EB-5 Investor, on the other hand, despite investing $535,000 to $550,000 each, was only entitled to 0.6% of the LLLP.

owned by Waveland.

85.84.  Additionally, the principals of Waveland, CRC, GP and Elevation Resorts are essentially run by the same group of people, Rick Hayes, Johan Segerdahl, Paul Deslongchaps, and Lacey Tomczuk.  Mr. Hayes' daughter, Megan Hayes, also wears multiple hats for CRC, GP, Waveland and even Elevation Resorts, the rental and property management agency for Solaris.

86.      Through counsel, the EB-5 Investors discovered that the defendants violated a number of securities violations.  They include the LLLP's failure to register as an investment company; the use of unregistered broker-dealers; violation of section 10b of the Exchange Act to name a few.

87.85.  It has also become apparent that the GP and SPOI have continually conspired to amend the loan agreements in order to assure that SPOI would never actually need to repay the loan, but would instead convey title to the Collateral Units to the LLLP and ensure that any revenues realized from the sale of the units would either pay Management Fees to the GP or GP related entities, Commissions to entities related to the GP or SPOI and or cover carrying costs that would always be the obligation of SPOI in any normal loan transaction.

**E.      Conspiracy, Aiding and Abetting and Concerted Action**

88.86.  In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Defendants caused the Company to conceal the true facts as alleged herein. The Defendants further aided and abetted and/or assisted each other in breaching their respective duties.  The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to:

(i) facilitate and disguise the Defendants' ~~violations of law, including~~ breaches of fiduciary duty~~, securities violations and fraud~~; (ii) to conceal adverse information concerning the LLLP's operations, financial condition; and (iii) to artificially inflate the value of the collateral.  The Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the LLLP too purposefully, recklessly, or negligently ~~to~~ conceal material facts, make materially misleading statements, fail to correct such misrepresentations, and violate applicable laws.  Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of its overall contribution to and furtherance of the wrongdoing.  At all times relevant hereto, each of the Defendants was the agent of each of the other Defendants and was at all times acting within the course and scope of such agency.

## F.  Derivative Allegations

~~89.~~87.  Plaintiffs brings this action individually and derivatively and for the benefit of the LLLP to redress injuries suffered, and to be suffered, as a result of the Defendants' breaches of their fiduciary duties, ~~fraud~~, ~~securities violations~~ and waste of corporate assets as well as the aiding and abetting thereof.

~~90.~~88.  The LLLP is named as a defendant and as a nominal party in this action because of the derivative portion of the Complaint.

~~91.~~89.  Plaintiffs are, and at all relevant times have been, limited partners of the LLLP. Plaintiffs will adequately and fairly represent the interests of the LLLP in enforcing and

24

prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

92.90.  A pre-suit demand on the GP is futile and, therefore, excused. At the time of filing of this action, the GP of the LLLP consist of GP's parent company, CRC.  Plaintiffs need only to allege demand futility was commenced.  In complete abdication of its fiduciary duties, the GP either intentionally participated in causing the LLLP to issue the materially false and misleading statements or did so recklessly.  As a result of the foregoing, the GP breached its fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

## COUNT I

**(By Plaintiffs Individually for Fraud – Misrepresentation against All**

**~~Defendants~~Waveland and CRC)**

93.91.  Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully set forth herein.

94.92.  Defendants, and each of them, conspired to induce the Plaintiffs to invest into the LLLP by, among other things, making material misrepresentations and omissions as set forth in detail above in paragraphs, *inter alia*, ~~56, 66, 68, 70, 73 and 74~~12, 13, 15, 16, 2, 21, 22, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 78, 79, 80 and 81.

95.93.  Throughout 2012 and continuing through the date of its last notice in 2019, Defendants repeatedly provided false and misleading materials to induce the Plaintiffs into investing their funds with the LLLP.

96.94.  Defendants conveyed the initial misleading information to the EB-5 Investors

25

through their authorized Agents in China.  Defendants allowed their Agents to provide the false information through PowerPoint presentations, brochures and other written materials. Once the EB-5 Investors had already invested their funds with the LLLP, the Defendants, through their employees, continuously sent out false and misleading notices concerning the value of the collaterals to quell the investors' fears and placate them and let their guards down.

97.95.  Defendants' representations to the Plaintiffs were materially false and were done in order to induce the Plaintiffs to invest their money with the LLLP.  At the time Defendants made the representations, they knew them to be false.

98.96.  Defendants' active concealment of and knowing failure to disclose material facts deprived the Plaintiffs of information critical to their decision to invest their money into the LLLP.

99.97.  Defendants' representations and concealments induced the Plaintiffs to sign the Offering Documents and the Plaintiffs specifically relied on the representations in entering into the Offering Documents, and they were justified in doing so.

100.  Defendants made the representations knowing that the information was false.

98.

101.99.      Defendants made the representations with the intent that the Plaintiffs rely on such representations.

102.100.      If the Plaintiffs had known the true facts, the Plaintiffs would not have entered into the Offering Documents.

103.101.      As a result of Defendants' conduct, Plaintiffs have been damaged by Defendants' fraudulent inducement in an amount to be determined at trial.

104.102.      Plaintiffs were harmed by Defendants' deceptive and fraudulent acts and

26

thus are entitled to rescission of the Offering Documents and a return of their full investment, administrative fees and prejudgment interest, punitive damages in the amount according to proof.

105.103.	Defendants' conduct in concealing material facts such as their failure to transfer title to the collateral units and their continued concerted effort to mislead the Plaintiffs in believing that their investment was fully secured caused Plaintiffs to rely on these false representations to their detriment.

## COUNT II

**(By Plaintiffs Individually and Derivatively on Behalf of the LLLP for Breach of Fiduciary Duty against CRC and GP)**

106.104.	Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully set forth herein.

107.105.	As the regional center entrusted by the Plaintiffs to oversee their investment into Solaris, CRC owed Plaintiffs the duty to exercise candor, good faith, and loyalty in the oversight of the management and administration of the EB-5 Investors investment by the LLLP.

108.106.	As the general partner of the LLLP entrusted by the Plaintiffs to manage the EB-5 Investor's investmentLLLP, GP owed Plaintiffs and the LLLP the duty to exercise candor, good faith, and loyalty in the management and administration of the EB-5 Investors investmentLLLP, and to negotiate all agreements in good faith and in the best interests of the LLLP.

109.107.	CRC and GP's violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight and supervision as set forth herein in paragraphs, *inter alia*, 56, 66, 68, 70, 73 and 74 81, 82, 83, 84, 85, 86, 112, 113, 116, 123, 124,

27

and 125.  Their conduct was ~~due to their~~ intentional and/or reckless ~~conduct~~.

~~110.~~108.        As a direct and proximate result of their breaches of their fiduciary obligations, the Plaintiffs have sustained and continue to sustain significant damages. As a result of the misconduct alleged herein, the defendants CRC and GP are liable to the Plaintiffs.

**COUNT III**

**(By Plaintiffs Individually for Violations of the Colorado Consumer Protection Act – C.R.S. §6-1-105(1) against All Defendants)**

111.   Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully set forth herein.

112.   The Colorado Consumer Protect Act ("CCPA") was designed to deter and punish deceptive trade practices by businesses that deal with the public.  The act allows private rights of action.

113.   Defendants engaged in an unfair and deceptive trade practice as described in paragraphs, *inter alia*, 56, 66, 68, 70, 73 and 74.

114.   The practice occurred in the course of the Defendants' business.

115.   The practice significantly impacts the public as actual or potential customers of Defendants' services or property.

116.   As a result of Defendants' unfair and deceptive practices, Plaintiffs suffered injury in fact, which was caused by Defendants.  Plaintiffs are entitled to restitution.


**COUNT IV**

**(By Plaintiffs Individually for Violations of 15 U.S.C. 80a against the LLLP and the GP)**

117.   Plaintiffs incorporate the allegations contained in the preceding paragraphs as if

28

fully set forth herein.

118.    The Offering Documents stated that it was exempted from registration because it had fewer than 100 investors.  The Offering Documents on its face indicated that it was seeking $80 million with a minimum subscription fee of $500,000, which rendered the total number of investors to exceed 100.

119.    Because the offering by the LLLP and orchestrated by the GP exceeded the maximum number of investors, the LLLP and GP were required to register as an investment company.  As a result, the Plaintiffs are entitled to a rescission of their investment.

## COUNT V

**(By Plaintiffs Individually for Violations of the Federal Securities Exchange Act - 15 U.S.C. 78o and 78j against All Defendants)**

120.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully set forth herein.

121.    15 U.S.C. §78o makes it unlawful for any broker or dealer to make use of any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security unless such broker or dealer is registered.

122.    The Defendants, and each of them, aided and abetted in the use of Agents to solicit investment and sell limited partnership interest in the LLLP, which constitutes as securities.  The Defendants continue to sell securities when they offered "put" options to the Plaintiffs in order to unload their interest in the LLLP.  Neither Defendants, nor, their Agents were registered brokers or dealers.  Accordingly, Defendants are in violation of 15 U.S.C. §78o.

123.    15 U.S.C. §78j makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce to use or employ any manipulative or

deceptive devices in connection with the purchase or sale of any security.  As set forth above in paragraphs, *inter alia, 11, 12, 13, 14, 15, 16,* 56, 66, 68, 70, 73 and 74, Defendants used manipulative and deceptive devices to induce the Plaintiffs into purchasing limited partnership interest in the LLLP.  Accordingly, Defendants are in violation of 15 U.S.C. §78j.

124.   Accordingly, the LLLP, is required to fully refund the EB-5 Investors' investment of $500,000 plus the administrative fees they paid.

**COUNT ~~IV~~I**

**(By Plaintiffs Individually and Derivatively on Behalf of the LLLP for Breach of Contract and Specific Performance against SPOI)**

~~125.~~109.      Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully set forth herein.

110.   As more fully detailed above, the LLLP and SPO entered into an agreement wherein LLLP loaned SPO $82.5 million secured by specific units in Solaris.  SPO and/or SPO I was to pay 5% interest on the loan annually, or $4,125,000 and the loan was to be repaid within 5 years.

111.   The LLLP's financial statements indicate that SPO and/or SPO I paid $4,025,879 of interest in 2013; $4,440,000 of interest in 2014; $3,979,363 of interest in 2015; $2,093,665 of 2016; $1,432,138 of interest in 2017; and $212,456 of interest in 2018.  SPO and/or SPO I have never made any principal payments on the loan.

112.   Pursuant to the terms of the agreement, payment of the loan has come due.  The Defendants have attempted to exercise their right to transfer title to the security to the LLLP, by giving the Plaintiffs notice of their intent on: February 25, 2016; October 27, 2016; June 19, 2017; December 26, 2017; July 18, 2018; and May 30, 2019.

30

113.    SPO I has not repaid the loan. Only after five years of providing the initial notice and following two years of litigation, have they transferred title to the units to LLLP, despite their frequently stated intention to do so.

126.    As more fully detailed above, the LLLP and SPO entered into an agreement wherein LLLP loaned SPO $82.5 million secured by specific units in Solaris.  The loan was to be repaid within 5 years.

127.    As alleged in paragraph 15 herein, in April of 2019 SPO assigned its rights under the agreements to SPOI.

128.    Pursuant to the terms of the agreement, payment of the loan has come due.  The Defendants have exercised their right to transfer title to the security to LLLP, by giving the Plaintiffs notice of their intent on: February 25, 2016; October 27, 2016; June 19, 2017; December 26, 2017; July 18, 2018; and May 30, 2019.

129.    The defendants have not repaid the loan, nor have they transferred title to the units to LLLP, despite their frequently stated intention to do so.

130.114.    Plaintiffs have performed all conditions, covenants and promises required by them on their part to be performed in accordance with the terms of the agreements.

131.    Defendants have failed and refuse, and continue to fail and refuse to transfer tile title to the units to LLP as required under the terms of the contract and their frequently stated intention to exercise their right to satisfy their obligations under the terms of the contract in this manner.  Defendants have refused and continue to refuse to execute a conveyance to transfer title to the units securing the loan to LLLP.

132.115.    A pre-suit demand on the GP is futile and, therefore, excused. At the time of filing of this action, the GP of the LLLP consists of GP's parent company, CRC.  Plaintiffs

31

need only to allege the futility of such a demand.  In complete abdication of its fiduciary duties, the GP not only actively negotiated agreements with SPOI to the detriment of the LLLP, but has continually objected to the filing of any lis pendens in this action and the *Li Action*, to protect SPOI at the expense of the LLLP.  As a result of the foregoing, the GP breached its fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

133.116.     Plaintiffs have suffered damages in that they have neither not received payment of the obligations under the terms of the notes and loan agreement nor have they received title to the real property.

134.117.     The contracts between the parties contains an attorney's fees clause. Plaintiffs have been forced to retain counsel to protect their rights to title to the units securing the loan to LLLP, and therefore is entitled to an award of attorney's fees and costs.

**COUNT VIII**

**(By Plaintiffs Individually and Derivatively on Behalf of the LLLP for Declaratory Relief against GP, SPO and SPO SPOI)**

135.118.     Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully set forth herein.

119.   As more fully detailed above, the LLLP and SPO entered into an agreement wherein LLLP loaned SPO $82.5 million secured by specific units in Solaris.  SPO and/or SPO I was to pay 5% interest on the loan annually, or $4,125,000 and Tthe loan was to be repaid within 5 years.

136.120.     The LLLP's financial statements indicate that SPO and/or SPO I paid $4,025,879 of interest in 2013; $4,440,000 of interest in 2014; $3,979,363 of interest in 2015;

$2,093,665 of 2016; $1,432,138 of interest in 2017; and $212,456 of interest in 2018.  SPO and/or SPO I have never made any principal payments on the loan.

137. 121.     Pursuant to the terms of the agreement, payment of the loan has come due. The Defendants have attempted to exercised their right to transfer title to the security to the p LLLP, by giving the Plaintiffs notice of their intent on: February 25, 2016; October 27, 2016; June 19, 2017; December 26, 2017; July 18, 2018; and May 30, 2019.

138. 122.     The defendants SPO I has ve not repaid the loan., nor Only after five years of providing the initial notice and following two years of litigation, have they transferred title to the units to LLLP, despite their frequently stated intention to do so.

139. 123.     Defendants have now stated that they will transfer title to the Collateral Units however that any the transfer will may require LLLP to pay for the transfer taxes, HOA Dues and other fees and costs associated with the transfer of the Collateral Units, in excess of $1 million, even though there is nothing in the loan documents requiring the LLLP to do so.  The Defendants are expected to claim that the LLLP is responsible for these charges pursuant to the terms of Yield Enhancement Agreement and Agreement Regarding Collateral Units.

140. 124.     In violation of its fiduciary duties, GP conspired with SPO I to entered into the Yield Enhancement Agreement and Agreement Regarding Collateral Units with SPOI without receiving any consideration whatsoever, to allow SPO I to avoid actually repaying the loan.  Both of these one sided "agreements" modify the loan by conferring tremendous benefits to both GP and SPOI while providing no benefits to LLLP.

141. 125.     The LLLP contends that Yield Enhancement Agreement and Agreement Regarding Collateral Units are unenforceable because they are not supported by consideration. GP and SPOI presumably will attempt to argue that adequate consideration was provided for the

33

Yield Enhancement Agreement and Agreement Regarding Collateral Units.

142.126.    A genuine dispute exists as to the enforceability of the Yield Enhancement Agreement and Agreement Regarding Collateral Units, and whether the GP acted in a manner that favored the rights of SPO I over the rights of the LLLP.   and Plaintiff'sPlaintiffs seek a determination from the Court as to the actions of the GP and the enforceability of these agreements.

143.127.    A pre-suit demand on the GP is futile and, therefore, excused. At the time of filing of this action, the GP of the LLLP consisted of GP's parent company, CRC.  Plaintiffs need only to allege demand futility was commenced.  In complete abdication of its fiduciary duties, the GP actively negotiated agreements with SPOI to the detriment of the LLLP.  As a result of the foregoing, the GP breached its fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

128.    The contracts between the parties contains an attorney's fees clause.   Plaintiffs have been forced to retain counsel to protect their rights to title to the units securing the loan to LLLP, and therefore is entitled to an award of attorney's fees and costs.

## COUNT IV

144.    (By Plaintiffs Individually and Derivatively on Behalf of the LLLP for Breach of Contract against GP)

COUNT VIII

(By Plaintiffs Individually to pierce the corporate veils of GP and SPOI to hold their owners/members liable for Fraud Breach of Contract and Securities Violations)

145.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully set forth herein.

34

129.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully set forth herein.

130.    As more fully detailed in paragraphs 3 through 6 the Plaintiff's and the other Chinese investors entered into a Limited Partnership Agreement.

131.    Plaintiffs have performed all conditions, covenants and promises required by them on their part to be performed in accordance with the terms of the agreements.

**Formatted:** Font: (Default) Times New Roman

132.    Pursuant to the terms of the Limited Partnership Agreement, and the Uniform Limited Partnership Act of Colorado, as the general partner of the LLLP entrusted by the Plaintiffs to manage the LLLP, GP owed Plaintiffs and the LLLP the duty to exercise candor, good faith, and loyalty in the management and administration of the LLLP.  As part of these duties, the GP maintained a fiduciary responsibility to conduct all negotiations in the best interests of the LLLP.

133.    The GP breached the Limited Partnership Agreement by violating and breaching its fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight and supervision as set forth herein in paragraphs, *inter alia*, 81, 82, 83, 84, 85, 86, 112, 113, 116, 120, 121, 122 and 123.

134.    A pre-suit demand on the GP is futile and, therefore, excused. At the time of filing of this action, the GP of the LLLP consists of GP's parent company, CRC.  Plaintiffs need only allege the futility of such a demand.  In complete abdication of its fiduciary duties, the GP not only actively negotiated agreements with SPOI to the detriment of the LLLP, but has continually objected to the filing of any lis pendens in this action and the *Li Action*, to protect SPOI at the expense of the LLLP.  As a result of the foregoing, the GP breached its duties under the Limited Partnership Agreement, face a substantial likelihood of liability, are not disinterested, and

35

demand upon them is futile, and thus excused.

135.   Plaintiffs have suffered damages in that as a result of the GP's breaches of the Limited Partnership Agreement as identified above, they have not received payment of the obligations under the terms of the notes and loan agreement, in an amount to be determined at trial.

146.   Under Colorado Revised Statutes 7-60-153 and 7-80-107, the Court may pierce the veil of a limited liability limited partnership or limited liability company, to hold the owners personally liable, under the same principles of piercing of the veil of a corporation [e.g. under-capitalization, fraud, alter ego, absence of formalities, or the interests of justice).

147.   LLC's acting through their owners and members—fraudulently set up these transactions to rob the limited partners by under collateralizing the Loan so that the owners and members of GP and SPOI would personally benefit, without informing the limited partners that the Loan they were funding was not guaranteed, required huge payments from the LLLP for unusual fees costs that a lender would never be responsible for and was undercapitalized based upon false estimates of the actual values of the Collateral Units.

148.   Not only have the Limited Partners lost at least $40 million dollars in this fraud, the GP and SPOI continue to siphon of whatever equity remains in the Collateral Units by charging the LLLP fort a variety of fees and costs including but not limited to management fees, sales commissions, HOA Dues, maintenance fees, taxes, insurance most of which are paid to the GP and SPOI or one of their affiliated entities.

149.   In the interests of justice and in order to provide an adequate remedy for the fraudulent conduct which directly benefited the members of GP and SPOI, the Court should

36

enter an order piercing the corporate veils of the limited liability company defendants to allow

for recovery from the individual members of the limited liability company defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1.  For compensatory damages to be proven at trial, but not less than the full amount
    invested by the EB-5 Investors;

2.  Rescission of the Offering Documents including but not limited to: Subscription
Agreement and Limited Partnership Agreement;

3.  Prejudgment interest at the legal rate since the date the Plaintiffs were entitled to
the return of their investment;

4.  Restitution;

5.  For an order directing Defendants to execute and deliver Plaintiffs a sufficient
conveyance to title to the real property which secures payment of the loan described herein;

6.  Award of reasonable attorneys' fees and costs;

7.5.  Any such other and further relief as the Court may deem just and proper.

8.6.  For punitive damages according to proof;

9.7.  For attorney's fees and costs as permitted by statute or law;

10.8.  For such equitable, injunctive or other relief in Plaintiffs' favor as the Court may
deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all claims and issues so triable.

ARDENT LAW GROUP, PC

/s/ Brian P. Stewart

Brian P. Stewart

Ardent Law Group

4340 Von Karman Ave.,
Suite 290
Newport Beach, California 92660
Telephone: (949) 299-0188
Facsimile:  (949) 299-0127
bstewart@ardentlawgroup.com
Attorney for Plaintiffs Dianwen Cui, Lei Gu,
Sufen Leng, Xue Mei, Zhou Mei, Yan Song,
Lu Wang, Yue Wu, Zhuo Yang, Jingwen
Zhang, Lei Zhang, Ling Zhang, Xiaohong
Zhang, Qin Zhou Chunyu Zou, individually,
and on behalf of Colorado Regional Center
Project Solaris LLLP /s/ Hubert Kuo

Hubert Kuo
Brian P. Stewart
**Ardent Law Group**
4340 Von Karman Ave.,
Suite 290
Newport Beach, California 92660
Telephone: (949) 299-0188
Facsimile:  (949) 299-0127
hkuo@ardentlawgroup.com

38

## <u>CERTIFICATION OF SERVICE</u>

This is to certify that on June 11, 2021, a true and correct copy of the above and foregoing **Declaration of Brian P. Stewart** has been electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

*/s/ Brian P. Stewart*
For Ardent Law Group, P.C.
