# EXHIBIT A

| | |
|---|---|
| **DISTRICT COURT, DENVER COUNTY, STATE OF COLORADO**<br>1437 Bannock St.<br>Denver, CO 80202 | DATE FILED: September 15, 2021 6:07 PM<br>FILING ID: 226D148744796<br>CASE NUMBER: 2021CV32918 |
| **Plaintiffs:** HSIN-YI WU and QI QIN, individually and similarly situated limited partners derivatively for **COLORADO REGIONAL CENTER PROJECT SOLARIS LLLP,** a nominal Defendant<br><br>v.<br><br>**Defendants:** **SOLARIS PROPERTY OWNER I, LLC and PETER KNOBEL** | |
| | ▲ **COURT USE ONLY** ▲ |
| *Attorneys for Plaintiff:*<br>Jakob Norman, Atty. No. 35612<br>**JORDAN HERINGTON & ROWLEY**<br>5445 DTC Parkway, Suite 1000<br>Greenwood Village, CO 80111<br>Phone: (303) 766-8153<br>Fax: (303) 766-5568<br>jakob@trialbyhuman.com | **Case Number:**<br><br>**Division:** |
| **DERIVATIVE COMPLAINT FOR BREACH OF CONTRACTS AND JURY DEMAND** | |

Plaintiffs, Hsin-Yi Wu and Qi Qin, individually and similarly situated limited partners derivatively for Colorado Regional Center Project Solaris LLLP, ("Plaintiff"), by and through their attorneys, **JORDAN HERINGTON & ROWLEY**, for their Derivative Complaint for Breach of Contracts against Defendants, Solaris Property Owner I, LLC and Peter Knobel, states and alleges as follows:

This is a derivative action by the owners of a lender to stand in the shoes of that lender to collect an overdue loan and a guaranty.

This claim was originally brought in the Federal District of Colorado as *Li et al. v. Colorado Regional Center I, et al.*, No. 19-cv-02443 (the "Federal Case"). Count III of the Federal Case was entitled "Derivative Colorado Regional Center Project Solaris LLC against SPOI for Breach

of a Loan Agreement." That Count was challenged by the defendants and upheld under Rule 12(b)(6) by Judge Moore of the District of Colorado. However, the Judge declined to exercise supplemental jurisdiction over this claim because it was essentially a matter of state law, so it was dismissed without prejudice for refiling in state court.

The right of limited partners to sue derivatively is encoded at Colo. Rev. Stat. §7-62-1001. Normally, Colorado law (in mirror of federal law) requires a pre-suit demand on the general partners per Colo. R. Civ. P. 23.1 before initiating a lawsuit on behalf of the limited partnership. This was already accomplished in conformity with Fed. R. Civ. P. 23.1: the limited partners made a pre-suit derivative demand on the general partner to take action for the benefit of the limited partnership, and this request was denied by the general partner without setting up an independent special litigation committee. So, the derivative demand required by the federal rule of civil procedure has already been made.

That should suffice for the demand requirement under Colo. R. Civ. P. 23.1, but a further reason in excuse of a second derivative demand is that during the pendency of the Federal Case the limited partners voted to remove the general partner, leading the Judge to conclude that no party has authority to run the limited partnership:

> CRCPS [Colorado Regional Center Project Solaris LLLP] requires a general partner in order to function. And, here, Plaintiffs claim to have removed CRCI [Colorado Regional Center I LLC] as general partner while CRC I contends it is still the general partner. That issue remains unresolved. . . What is apparent is that, until the issue is resolved, CRCPS remains in an indeterminate state. For example, CRCPS's counsel has withdrawn in this case and no new counsel has entered its appearance because of the dispute over who has authority to retain new counsel on its behalf. This means that there is no one acting on behalf of CRCPS . . . [Federal Case, ECF 271: 48].

Given that no one is acting for the limited partnership, there is no party on whom the plaintiffs can make a demand as required by Colo. R. Civ. P. 23.1, and as noted above, such demand was already made once in conformity with the federal rules. Under these circumstances, plaintiffs believe that Colo R. Civ. P. 23.1 has been satisfied and that the case may proceed on a derivative basis.

### Parties

1. The plaintiffs bring this derivative action on behalf of, and for the recovery by, Colorado Regional Center Project Solaris LLLP, which is a Colorado entity with its registered office in Denver ("CRCPS" or "Lender").

2. Plaintiff Hsin-Yi Wu is a permanent resident of the United States who is a citizen of New York and a limited partner in CRCPS.

3. Plaintiff Qi Qin is a permanent resident of the United States who is a citizen of Florida and a limited partner in CRCPS.

2

4.      Defendant Solaris Property Owner I LLC ("SPOI" or "Borrower") is a Delaware limited liability company registered as a foreign company in Colorado, with a principal place of business in Vail, Colorado. Therefore, all references to SPOI will include its predecessor entities.

5.      Defendant Peter Knobel ("Knobel" or "Guarantor") is a citizen of Colorado. He controls SPOI and it is an alter ego for him, so Plaintiffs reserve the right to seek collection from him under a veil-piercing theory.

## Jurisdiction and Venue

6.      Subject matter jurisdiction lies under Article VI of the Colorado Constitution because this is a court of general jurisdiction and the Plaintiff seeks damages in in excess of $25,000.

7.      Personal jurisdiction lies over Defendant SPOI because it is a Delaware limited liability qualified to do business in Colorado and having its principal place of business in Colorado.

8.      Venue is proper in this District because the loan agreement at issue in this lawsuit has a forum selection clause specifying Denver as the location for litigation.

## Facts Common to All Counts

**Structure of the Loan Transaction**

9.      Lender and Borrower entered into a loan agreement dated November 5, 2010 (the "Loan Agreement").

10.     The Loan Agreement contemplated that Lender would make a series of loan advances to Borrower up to $100,000,000.

11.     The exact amount of the loan advances would depend on how much money the Lender could raise from foreign investors who would invest in the Lender for limited partnership units, and then the Lender would turn around and loan this money to Borrower.

12.     The Loan Agreement contemplated that each advance had a 5-year maturity and bore interest at 5%.

13.     The Loan Agreement contemplated that Borrower would sign a Promissory Note which would be updated with each new loan advance, and that Borrower would deliver a Deed of Trust as collateral for each advance, naming a condominium unit at Solaris Vail as collateral for the associated loan advance.

14.     As it turned out, the Lender raised $82,500,000 from foreign investors, all of which was loaned to the Borrower in 19 advances: 18 in 2012/2013, and one in 2015 (collectively, the "Loan"), and the Borrower designated 19 condominiums as collateral.

3

15.     The Promissory Note as finalized with an exhibit showing $82,500,000 loaned and each unit of collateral, along with an allonge changing the interest rate to 5.55%.

16.     The definition section of the Loan Agreement defined "Maturity Date" as 5 years after each advance.

17.     Section 11 of the Loan Agreement granted the Borrower a prepayment right during a window of years 3 through 5 (the "Prepayment Window") when a loan advance could be prepaid by transfer of the associated collateral unit:

> Notwithstanding anything to the contrary set forth herein, in the Note, Deed of Trust, or any other Loan Documents, at any time after the expiration of thirty-six (36) months following a Loan Advance, Borrower shall have the absolute right to prepay the part of the Note attributable to such Loan Advance by repaying Lender the amount of such Loan Advance or tendering to Lender the Collateral Unit(s) securing such Loan Advance. If Borrower conveys any Collateral Unit(s) in repayment of a Loan Advance, the principal balance of the Note shall be reduced by the amount of the Loan Advance secured by such Collateral Unit(s).

18.     The Loan Agreement did not allow payment by collateral transfer *after* the Prepayment Window closed.

19.     The Promissory Note contains identical language for a 5-year Maturity Date and a prepayment window in years 3 through 5:

> With respect to each Loan Advance, this note shall be deemed to mature, and (if not sooner repaid in accordance with the provisions hereof) the unpaid principal balance attributable to such Loan Advance, together with all accrued interest attributable to the same (if any), shall be due and payable on the date that is exactly sixty (60) months from Closing on such Loan Advance (each, a "Maturity Date"); provided however, that . . . Borrower shall have the absolute right to prepay the portion of the Note attributable to any Loan Advance by repaying Lender the amount of such advance in cash or conveying Lender the Collateral Unit(s) in repayment of a loan advance . . With respect to each Loan Advance, the term "Prepayment Date" means a date that is exactly thirty-six (36) months from the Closing on such Loan Advance.

20.     One anomalous feature of the Promissory Note is that it contains *both* the standard language above from Loan Agreement (which was also in the marketing materials given to the investors), but it also contains a provision saying that CRCPS can look only to the collateral units for collection of principal:

4

> Except as expressly provided below, subject to any applicable cure rights set forth in any Loan Document, if an Event or Default has occurred and is continuing, Lender agrees to proceed solely against the Collateral, it being the parties' mutual understanding and intent that the principal amount of the Loan secured by this Note is entirely non-recourse to Borrower. Notwithstanding the foregoing, subject to any applicable cure rights set forth in any Loan Document, if Borrower fails to make any Interest Payment(s) due hereunder, the amount of such Interest Payment(s) plus the Collection Costs directly related to collecting the same shall be fully recourse to Borrower.

This makes the Promissory Note somewhat ambiguous due to contradictory terms, although a promissory note is not a bilateral agreement enforceable against the lender, and in this case was not signed by CRCPS, and is further controlled by the supremacy language in the Loan Agreement (highlighted above) that the Loan Agreement controls all other Loan Documents, and it does not have this language.

**Default by the Borrower**

21.  As the loan advances reached their payment dates, the Borrower defaulted on every single loan advance.

22.  The borrower never repaid any loan advances in cash.

23.  The borrower did not prepay any loan advances by conveyance of a collateral unit.

24.  One day before the Prepayment Window on the first loan advance, the Borrower signed an agreement with the Lender called Agreement Regarding Collateral Units (the "ARCU").

25.  The ARCU says expressly that its sole purpose is to compute interest due on the Loan and that it does not lessen the "Indebtedness" - the loan principal.

26.  The ARCU literally says that for computing interest, a prepayment by collateral will be "deemed" in an imaginary hypothetical sense that does not affect the principal owed: "For purposes of calculating interest under the Loan Documents . . . Borrower shall be deemed to have caused a Collateral Unit Distribution."

27.  The ACRCU is not a conveyance document since Colorado law says that a property transfer can only be accomplished by a deed filed at the County Recorder's office. Colo. Rev. Stat. §38-20-101.

28.  The ARCU left untouched the *principal* owned by the Borrower: "Notwithstanding the occurrence of a [deemed] Collateral Unit Distribution, and anything in the Loan Documents to the contrary, the principal amount of the associated Loan Advance shall continue to constitute Indebtedness under the Loan . . ."

5

29. By 2019 all of the loan advances were past due except a tiny advance of a few million dollars, so the limited partners contacted the general partner and demanded that it initiate collection.

30. The general partner refused to take any action and continued to draw fees from the limited partners (2% of the loan principal each year plus all interest on the loan).

31. In 2019, the limited partners learned of the failure of the general partner to call the Loan and made a formal derivative demand that it do so.

32. The general partner refused the relief requested in the derivative demand.

33. Thereafter, the limited partners brought a derivative lawsuit in the name containing a Count on behalf of Lender claiming that Borrower breached the Loan Agreement and was obligated to repay the loan principal and interest in cash ("Count III").

34. The District Court upheld Count III (Breach of Loan Agreement against SPOI) as stating a claim over the defendant SPOI's motion to dismiss it for failure to state a claim.

35. The District Court stated as follows:

> Plaintiffs contend SPOI has defaulted because it did not transfer (convey title to) the Collateral Units after the three-year mark and did not repay the loan at maturity, i.e., the five-year mark.... Further, [their] additional argument that the ARCU does not constitute a transfer – because it was done only for the purposes of calculating interest – and therefore does not satisfy the terms of the loan, also supports they have plausibly stated a claim. The ARCU specifically states that, "[f]or purposes of calculating interest ... Borrower shall be deemed to have caused a Collateral Unit Distribution." However, "[n]otwithstanding the occurrence of a Collateral Unit Distribution...the principal amount of associated Loan Advance shall continue to constitute Indebtedness under the Loan." Thus, on the current record, Li Plaintiffs plausibly allege a claim for breach of contract. [Federal Case ECF 271: 41].

36. However, the District Court cut loose this Count III to state court on the grounds that it only had supplemental jurisdiction of it, so that the matter was more appropriately heard in a state court. See Federal Case at ECF 334, 335.

37. A strange thing happened during the pendency of the Federal Case that is relevant to this lawsuit.

6

38. In December of 2020, Borrower filed special warranty deeds with the Eagle County Recorder's Office transferring the remaining collateral units to Lender, in contradiction to its earlier claims that the ARCU constituted prepayment of the Loan by conveying titles to the Lender.

39. There is a dispute as to the current value of the collateral units, but the most that has ever been offered by a third party is in the range of $45-49 million, and there is currently no market for a sale of all the units.

40. The principal and interest due on the Loan is in the range of $100,000,000.

41. As such, the limited partners of the Plaintiffs insist that the Plaintiff is best served by having the loan repaid in cash and not by collateral, especially since the Prepayment Window for repayment by collateral is closed.

42. Accordingly, Lender now sues for payment of the Loan principal balance and applicable interest in cash, in return for which it will reconvey the wrongfully conveyed collateral back to the Borrower.

43. The Plaintiffs were named in the Federal Case and fairly and adequately represent the limited partners of CRCPS.

## Count I
## Against Defendant CRCI
## Breach of Loan Agreement (Contract)

44. Plaintiff realleges and reincorporates the foregoing paragraphs as through fully set forth in this Count.

45. The Loan Agreement is a binding contract.

46. The Lender lent money to the Borrower under the Loan Agreement in consideration of the Borrower's promise to repay all outstanding amounts.

47. The Loan Agreement allowed for repayment by collateral units only during the Prepayment Window of year 3-5 of each loan advance.

48. The Borrower breached the Loan Agreement by not paying the principal and interest in cash at maturity.

49. The Borrower breached the Loan Agreement by not paying the default interest rate.

50. Currently the Loan principal amount of $76,000,000 is outstanding and unpaid (the principal is lower than the full loan of $82,500,000 because subsequent to maturity a few collateral units were transferred to limited partners of the Lender).

7

51. Interest has been accruing on each advance at the default rate of 14% set forth in the Loan Agreement.

52. The owners of the Lender (the limited partners) gave Borrower notice of default and called the Loan for full payment in cash.

53. The remedy language in the Loan Agreement allows the Borrower to bring suit for breach of the Loan Agreement to demand repayment of the loan.

54. The Loan Agreement further provides that no delay in enforcement of any right shall work a waiver.

55. The principal amount of the loan ($76,000,000) and applicable default interest is now due.

56. In the Promissory Note, Borrower waived presentment, demand for payment, protest, and notice of dishonor in any action to enforce the Loan.

57. Therefore, the Loan principal and interest is now on demand.

58. Lender has fulfilled all conditions and performed all obligations under the Loan Agreement, and there is no set-off, counterclaim, adjustment, or excuse for any delay in payment.

WHEREFORE, Lender seeks a judgement that Borrower breached the Loan Agreement and must repay the outstanding $76,000,000 Loan principal plus applicable interest, and since the transfer of collateral units is not an effective method of repayment, they shall be conveyed back to Borrower.

### Count II
### Against Peter Knobel
### Breach of Guaranty Agreement

59. Plaintiffs reallege and reincorporate the foregoing paragraphs as through fully set forth in this Count.

60. On April 18, 2012, Peter Knobel (as "Guarantor") signed a Guaranty Agreement with Lender.

61. By Section 1.2 of the Guaranty Agreement, Knobel personally guaranteed performance by Borrower of the "Guaranteed Obligations" which includes interest payments due.

62. By Section 1.5, Knobel waived the requirement that the Lender proceed against the Borrower first or resort to any other means of obtaining payment before demanding that Knobel pay under the Guaranty Agreement.

8

63. The Guaranty Agreement is a valid and binding contract in which Knobel represents that the Loan will constitute a substantial economic benefit to him, and this is consideration for his Guaranty.

64. The Guaranty Agreement obligates Knobel to pay the interest unpaid on the Loan, which is 14% from the date of each unpaid loan advance (unless otherwise determined to be different by this Court).

65. The Guaranty Agreement says at Sections 1.6 and 4.9 that the Lender shall not have been deemed to waive its right to invoke the guaranty by delay or any other action.

66. Guarantor has failed to make payments of default interest after the Loan has come due as required in Section 1.2 of the Guaranty Agreement.

67. Guarantor has breached the Guaranty Agreement.

68. Lender hereby invokes the breach of the Guaranty Agreement and demands payment thereunder in an amount to be determined by the Court, by otherwise at 14% from the maturity date of each loan advance.

WHEREFORE, Plaintiffs ask this Court to declare that the Guaranty Agreement was breached by Knobel, and that he is liable to Lender for all interest due on unpaid principal under the Loan. If the parties cannot agree on this amount, the Court shall appoint a third-party administrator.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

DATED this 15th day of September 2021.

Respectfully submitted,

**JORDAN HERINGTON & ROWLEY**

*s/ Jakob Norman*
Jakob Norman

*Attorney for Plaintiffs*