| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY<br>STATE OF COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202 | DATE FILED: March 30, 2022 4:29 PM<br>FILING ID: 87938D7A5C73E<br>CASE NUMBER: 2022CV30877 |
| **QINFANG YU,**<br>　　Plaintiff,<br><br>　　v.<br><br>**COLORADO REGIONAL CENTER PROJECT SOLARIS LLLP,**<br>　　Defendant. | ▲ COURT USE ONLY ▲ |
| Attorney for Plaintiff:<br><br>　Deborah Yim, Colorado Bar No. 54388<br>　Primera Law Group, LLC<br>　1240 South Parker Road, Suite 103<br>　Denver, CO 80231<br>　(720) 239-2567<br>　dyim@primeralaw.com | Case No:<br><br>Division:<br><br>Courtroom: |
| **COMPLAINT FOR JUDICIAL DISSOLUTION** ||

　　This is an action under the "Judicial Dissolution" section of the Colorado Uniform Limited Partnership Act, Colo. Rev. Stat. §7-62-802. The factors weighing in favor of judicial dissolution were set forth in *Mahon v. Harst*, 738 P.2d 1190 (Colo. App. 1987): (i) removal of the general partner by vote of limited partners or extreme discord between them; (ii) failure to furnish limited partners accurate financial information; (iii) misconduct by the general partner; and (iv) breach of the limited partnership agreement. All of these factors are satisfied.

## PARTIES

1.　Plaintiff is a permanent resident of California.

2.　Defendant Colorado Regional Center Project Solaris LLLP ("CRCPS") is a Colorado limited liability limited partnership having a principal place of business and registered agent at 280 Detroit Street, Suite 200, Denver, CO 80206.

///

## JURISDICTION AND VENUE

1

Exhibit A

3. Subject matter jurisdiction lies in this Court because Colo. Rev. Stat. §7-62-802 allows a court to judicially dissolve a Colorado limited partnership.

4. Personal jurisdiction lies in the Court because the Defendant is a Colorado-chartered business entity.

5. Venue lies in this Court because the Defendant has its place of business and registered agent in this County.

## STATEMENT OF FACTS

6. Plaintiff and 164 other limited partners each invested $500,000 in CRCPS, approximately ten (10) years ago.

7. This investment gave CRCPS total assets of $82.5 million dollars in cash to invest.

8. By this investment, all 165 limited partners became parties to the Limited Liability Limited Partnership Agreement of CRCPS (the "LPA"), which is attached as Exhibit 1.

9. The LPA appointed Colorado Regional Center I LLC, a Colorado company ("CRCI"), as the general partner of CRCPS, for an annual compensation of 2% of CRCPS' assets.

10. The LPA at Sections 8.04 and 8.06 required CRCI to comply with specific contractual fiduciary duties including the duty to act with "reasonable skill, care, and business judgment" and "safekeeping of all funds."

11. The LPA at Sections 9.06, 9.07(5), and 12.02 empowered the limited partners to remove CRCI as general partner for cause (including 'fraud') by a 66% vote by written consents.

12. The LPA at Section 13.01(4) provides that removal of the general partner causes dissolution of CRCPS.

13. The LPA at Section 13.06 sets forth a specific protocol for the return of each partner's $500,000 capital contribution in a single lump sum by having CRCPS offer a 'put option' (a security) whereby a limited partner can exchange their unit for a pro rata distribution of a sale of all partnership property.

14. CRCI (as general partner) caused CRCPS to loan the entire $82.5 million dollars to Solaris Property Owner I LLC ("SPOI"), the developer of Solaris Vail condominium complex (the "Loan").

15. The Loan consisted of nineteen (19) loan advances, each with a 5-year maturity, each bearing interest at 5%, and each secured by a condominium unit at Solaris Vail complex that was

    picked by SPOI and CRCI from a condominium pool agreed by CRCI and SPOI without any notice or feedback by limited partners.

16. A list of Loan advances, maturity dates, and units chosen as collateral for advances is attached as <u>Exhibit 2.</u>

17. The Loan was memorialized in a loan agreement and related documents requiring repayment in cash at the 5-year maturity with one exception, to wit: there was a 'prepayment window' from years 3-5 of each Loan advance when SPOI could **_pre_**pay a Loan advance by conveying title to CRCPS of the collateral unit securing such advance -- but this **_pre_**payment 'in kind' as opposed to in cash was only during years 3-5 and it was a **_pre_**payment mechanism exercisable only prior to maturity.

18. Exercise of the prepayment window required "conveyance" of the collateral unit securing each advance.

19. Colorado law provides that a "conveyance" must take the form of a deed filed at the County recorder's office.  Colo. Rev. Stat. §38-20-101; *Ford v Summertree Land LLC*, 56 P.3d 1206, 1208 (Colo. App. 2002)("A 'conveyance' is a transfer of title to land by a deed"), quoting *Stagecoach Prop. Owners Ass'n v. Young's Ranch*, 658 P.2d 1378 (Colo. App. 1982).

20. CRCI gave Plaintiff and other limited partners a Confidential Information Memorandum dated March 31, 2011, which said at page 1 that it would make the Loan with a **_pre_**payment window requiring transfer of the collateral unit by "special warranty deed":

> After three years following a Loan Advance, upon 60 days prior written notice to the Company (the "Prepayment Notice Period") SPOI shall have the right to prepay all or certain minimum amounts of the outstanding principal balance [] by tendering to the Company either (i) a special warranty deed to a condominium unit . . . . or (ii) cash in the amount of the principal amount of the prepayment plus all accrued interest.

21. The Confidential Information Memorandum described the way that investors would get back their money at page 16 ("Monetization/Exit Strategy"). CRCI represented that it intended to provide investors an exit in approximately five years, but would take longer only if the collateral units were transferred during the prepayment window in years 3-5:

> The Company intends to monetize the investment in the Project within approximately five years. While there can be no assurance that this can be accomplished in that time frame, SPOI is required to pay the [Loan] on the fifth anniversary of each loan advance . . . *If, however, SPOI exercises its rights to prepay* all or some portion of the principal balance due under the [Loan] by transfer to the Company of one or more condominium units located in the Project, or if SPOI pays the [Loan] at maturity by the transfer of

3

Exhibit A

> one or more condominium units, then the ability to monetize the investment will be dependent in part on the ability of the Company to sell or otherwise dispose of the condominium units. (emphasis added).

22. Plaintiff relied on CRCI's representation that the investment would be monetized in approximately 5 years since the investment took the form of a 5-year loan.

23. Plaintiff relied on CRCI's contractual fiduciary duties to CRCPS and its limited partners, assuming that CRCI would collateralize the $82.5 million dollar Loan with units exceeding the Loan principal, so that even if the collateral lost some value it be sold to pay back the investors in full.

24. 18 Loan advances were made in 2012 and 2013, and 1 in 2015, so the first prepayment window arrived in April 2015.

25. In April 2015, a day before the first prepayment window, CRCI and SPOI entered into a secret agreement styled "Agreement Regarding Collateral Units" (the "ARCU") whereby CRCI (acting in secret for CRCPS) claimed that the collateral units would be 'deemed' surrendered for the purposes of calculating interest on the Loan, but that the principal of the Loan (referred to as its "Indebtedness") would remain due on each 5-year maturity date.

26. CRCI entered into the ARCU without telling limited partners, without asking for a vote, and without giving notice.

27. To this day, CRCI refuses to provide information on how much money it lost for CRCPS by entering into this secret agreement.

28. The ARCU did not relieve SPOI paying the Loan principal at maturity, nor did it prevent CRCI from collecting the Loan principal at maturity, expressly saying in Section 1 that "the principal amount of the associated Loan Advance shall continue to constitute Indebtedness under the Loan."

29. The Loan was not *pre*paid with collateral units during the 'prepayment window' by any deed or transfer document.

30. The Loan was not *pre*paid in cash.

31. The Loan was **not paid** at maturity by units or cash.

32. Every single Loan advance passed its 5-year maturity date in any unpaid and uncollected condition.

33. CRCI informed the limited partners that it would never call the Loan - ever - because it interpreted the ARCU which it voluntarily drafted as preventing itself from calling the Loan

4

Exhibit A

principal of $82.5 million -- sort of how an octopus might cut off its own head with a stray tentacle.

34. CRCI's refusal to call the Loan breached its fiduciary duty to maximize return to the limited partners and to safeguard partnership assets as required by the LPA, which is a breach of contract.

35. CRCI breached its representation in the Confidential Information Memorandum that it would aggressively seek to "monetize" the Loan and provide an "exit strategy" in approximately 5 years if the Loan was not prepaid, which it wasn't.

36. In lieu of calling the Loan, CRCI took possession of the collateral units and started running a makeshift money-losing hotel with the units -- something that it is still doing as of the date of this lawsuit.

37. CRCI is giving itself an additional and supplemental 'management fee' for running this makeshift hotel -- without notice or approval by limited partners.

38. CRCI is double-dipping management fees, taking both a 2% fee on CRCPS' assets **plus** millions of dollars for "managing" a makeshift hotel consisting of the units that it took in lieu of collecting the Loan, while it uses its other hand to attempt with little success to sell the units that were overvalued as collateral and which cannot be sold at the prices they were assigned by CRCI.

39. During this time that CRCI told Plaintiff and limited partners that it was powerless to call the Loan, it submitted tax returns to the IRS saying that the principal of the Loan was still receivable, i.e. still owed to it: telling the IRS that it held a "Note Receivable" of $82.5 million in 2017, $82.5 million in 2018, $76 million in 2019, and $76 million all through December 2020.

40. CRCI has never explained how it could have a "Note Receivable" at these values if the Note in question could not be called for collection; that is like a person saying that they have a tremendous seashell collection that they keep spread all over the beaches of the world.

41. Finally in December 2020-- some 8 years into the loan, and some 3 years after the 'prepayment window' closed-- CRCI wrongfully and crazily allowed SPOI to 'repay' the Loan principal with special warranty deeds to the collateral units, long after this was allowed under any Loan document.

42. CRCI then informed the IRS in 2020 that the Note Receivable of $76 million was now worth $0 and instead it owned condo units worth $72 million.

43. CRCI has never explained-- and now refuses to explain-- why CRCPS allowed the Loan to be 'repaid' by special warranty deed in year 8 when the prepayment window closed in year 5.

Exhibit A

44. CRCI has never explained-- and now refuses to explain-- why it reported that CRCPS had received $72 million in collateral units when it cannot sell the units for $72 million, and has told investors that the units can only be sold for about half or two-thirds the value that CRCI assigned to them, not even accounting for inflation.

45. Ten (10) years into this transaction, CRCI has not collected a penny of cash in repayment of the Loan, and instead has been trying to sell the collateral units with little success, having sold 11 of the 19 units for prices far below what they estimated to limited partners, and still running a makeshift hotel with the remaining collateral units and still double dipping on management fees.

46. Ten (10) years into this transaction, CRCI has returned capital to limited partners of $80,000 each of their $500,000 investment, even though roughly 50% of the partnership assets have been sold.

47. CRCI is on track to lose half of the limited partner's investment (not even adjusting for inflation) due to their refusal to call the Loan that they made with the money from the limited partners.

48. In 2019, two groups of limited partners sued CRCI in the Federal District of Colorado, alleging breach of contractual fiduciary duties, fraud, and negligence. *Li et al. v. Colorado Regional Center I LLC et al.*, Case No. 2019-cv-2443, appeal pending in the Tenth Circuit, Case No. 21-1232 (the "Federal Case").

49. The presiding judge in the Federal Case ruled that the limited partners asserted a colorable derivative claim for CRCPS to collect the Loan principal from SPOI, but the Court found it lacked jurisdiction on this claim so it was refiled in Denver County. *Ni v. Solaris Property Owner I LLC*, Case No. 2021CV32918 (the "State Case").

50. Currently there are at least 5 different groups of limited partners represented by 5 different law firms across the nation (Chicago, New York, California, Massachusetts, Washington) who are trying to get their clients out of this nightmare. They all agree that CRCI has acted wrongfully and breached the agreements, and that CRCI should not receive a penny more in compensation.

## COUNT ONE
## JUDICIAL DISSOLUTION

51. Colo. Rev. Stat. §7-62-802 vests this court with power to declare judicial dissolution of a limited partnership "whenever it is not reasonably practicable to carry on the business in conformity with the partnership agreement."

52. The factors justifying judicial dissolution of a limited partnership were set forth in *Mahon v. Harst*, 738 P.2d 1190 (Colo. App. 1987) as follows:

| | |
|---|---|
| Factor 1: | Removal of the general partner by the limited partners (or extreme discord between the partners); |
| Factor 2: | Misconduct by the general partner; |
| Factor 3: | Failure to furnish accurate financial information; |
| Factor 4: | Breach of the partnership agreement. |

**Factor 1: Removal of General Partner (and Extreme Discord)**

53. In Spring 2020, more than 106 limited partners out of 152 signed written consents removing CRCI as general partner for cause - fraud - and demanding that the Loan be called and the company dissolved. The number of consents eventually went up to 111 limited partners.

54. This vote to oust CRCI was conducted by 'snail mail' because CRCI refused to supply email addresses, so due to the use of snail mail there were many limited partners who could not be reached, meaning that the number of limited partners voting for removal of CRCI would have been even higher if CRCI had allowed the vote by email.

55. But even through snail mail, a sufficient number responded to remove CRCI, and not a single vote was cast in favor of retaining CRCI as general partner.

56. After getting 105 signed proxies and written consents to remove CRCI, the investors filed a status report in the Federal Case attaching the consents, as well as a letter that their representative sent to CRCPS demanding that CRCI be removed, a letter to SPOI demanding that the Loan principal be repaid in cash, and demanding that the limited partnership dissolve. Attached as <u>Exhibit 3</u> are the file-stamped status report, file-stamped letter of removal, and 35 consents to provide this Court with an idea of what transpired.

57. This vote to remove CRCI exceeded the 66% required to remove the general partner.

58. Removal of the general partner is an event of dissolution under §13.01(4) the LPA.

59. The judge in the Federal Case never ruled on the merits of CRCI's removal, so it is being raised here for the first time.

60. Removal for 'cause' was due to fraud: CRCI committed fraud by misrepresenting that it would aggressively monetize the investment in 5 years; by double dipping on management fees without telling the limited partners; by misrepresenting that it lacked the power to call the Loan; by misrepresenting the value of the collateral units; by misrepresenting to the IRS the value of its assets; by structuring the transaction to under-collateralize the Loan so that the collateral was insufficient and then taking collateral as repayment; and by failing to disclose the material fact that it waived collection of interest payments without any offsetting benefit.

7

Exhibit A

61. There is irreparable discord between the limited partners and CRCI.  The limited partners hold CRCI accountable for negligently structuring this investment; negligence in conduct as a lender; wrongdoing as a custodian of the limited partners' money; breaching the fiduciary duties owned to limited partners under Colorado statutes and under the LPA; engaging in fraudulent self-dealing at the expense of the limited partners by perpetuating themselves in office solely to earn management fees instead of monetizing the investment as promised.

62. Under circumstances where the limited partners feel robbed by the general partner, it is inequitable to allow the general partner to continue drawing massive fees after a decade into an investment that was supposed to be "monetized" in 5 years.

63. Like any business organization, the equity holders (in this case the limited partners) are the *principal* and the managers (in this case, the general partner) is the *agent* -- so ultimate control of the entity lies in the limited partners, and they want CRCPS dissolved and placed into a receivership or similar situation where CRCI can no longer profit at their expense.

64. CRCI has refused - and still refuses - to meet publicly with the limited partners on camera. They are in hiding, and the refuse to disclose to the limited partners the identity of the owners of CRCI.  Let Plaintiff repeat that.  The owners of CRCI who have been taking the limited partners' money for 10 years refuse to identify themselves, hiding behind the LLC form. The limited partners have no idea who human individuals are taking their money.

**Factor 2: Misconduct by the General Partner**

65. CRCI committed misconduct by failing to call the Loan at maturity which would have obtained for CRCPS at least $82.5 million in repayment from the borrower, which would have been sufficient to return $500,000 capital contribution of each limited partner.

66. CRCI has never given a coherent legal reason it didn't call the Loan.

67. CRCI has never explained why - in violation of every basic principal of lending - it allowed the borrower to choose its own collateral for the Loan and why it refused to insist on Loan collateral with a cushion in case the collateral went down in value.

68. CRCI committed misconduct by allowing SPOI to repay the Loan with collateral units in 2020 many years after the prepayment window was shut.

69. CRCI committed misconduct by their utter failure as a money manager, illustrated by the simple fact that ten years into this $82.5 million dollar investment, the Plaintiff and other limited partners have been received a capital return of approximately $12 million dollars, while CRC (owned by 3 or 4 men who refuse to disclose their identity and refuse to meet with limited partners) has given itself well over $15 million.

70. CRCI - ultimately owned by three men - have harmed 165 investors, engaged in blatant self-dealing, failed to collect on a loan, and compounded the problem by taking insufficient collateral in the first place.

71. CRCI committed misconduct by allowing 13 of the 165 limited partners to exit this investment by obtaining title to several collateral units which they then sold; this unequal treatment of limited partners is impermissible because the duty of fair dealing requires that all limited partners be treated equally; the preferential treatment of the 13 investors has never been explained but has instead been hidden and CRCI behind LLCs, and they refuse to provide any information surrounding this unequal treatment.

**Factor 3: Failure to Furnish Adequate Information**

72. In January 2022, Plaintiff asked to inspect the books of the company and asked CRCI to provide information about the financial history and current condition of the company, which CRCI is required to provide under Colo. Rev. Stat. §7-62-305.

73. CRCI produced a few documents at their lawyers' office but refused to meet with counsel for the Plaintiff.

74. Among the few documents produced was a statement where CRCI admitted taking $15,044,227 in management fees under the LPA and at least $4 million dollars of extra management fees for running a makeshift hotel with the units, during the same period it has given the limited partners only $12 million in capital return.

75. This is not a market-driven loss; it is a human-driven loss caused by the failure of CRCI to act as a prudent lender to protect the best interests of CRCPS and the limited partners by collecting the Loan, and by agreeing to take collateral as repayment after wrongfully under-collateralizing the Loan in the first place.  Any transaction in which a manager is given $82.5 million to manage and then gives itself at least $19 million in management fees (not to mention an unknown amount of interest payments) to create a loss for 165 investors is absurdly bad conduct and is prima facie evidence of greed and neglect.

76. Plaintiff asked for complete information on why certain investors (13 to be exact) were allowed to exit the investment ahead of the others, what the economic effect of failure to collect interest, why CRCI was double charging management fees, and to provide pro forma financial statements, breakdowns of how the interest payments were taken, but CRCI refused to provide any of these pivotal pieces of information on the pretext that it was Plaintiffs' counsel -- not CRCI -- who was motivated by greed.  See letters from Plaintiff's counsel and reply by CRCI at <u>Exhibit 4</u>.

77.  Neither CRCI nor their counsel will explain why CRCI refused to call the Loan, why CRCI took so much money in double-dipped management fees, why CRCI refused to abdicate as general partner when voted out, why CRCI refuses to say where the interest payments have gone, and why CRCI refuses to say how much the existing assets of CRCPS are worth.

9

Exhibit A

78. CRCI violated the inspection statute Colo. Rev. Stat. §7-62-305 by failing to provide adequate information to Plaintiff and other limited partners.

79. Plaintiff and other limited partners have no idea how to value their unit in CRCPS because they have no idea how long CRCI will take to sell the collateral units or the amount of management fees that CRCI will award itself. It is very possible that CRCI will continue to hold properties into perpetuity and charge management fees to the limited partners until they have drained all value from the investors.

80. CRCI - or any lender of any kind in any situation - should never take repayment in collateral unless they have anticipated this possibility and structured the transaction to ensure that the collateral exceeds the value of the Loan.

81. Plaintiff and other limited partners have been kept in the dark as to financial machinations of the general partner CRCI, and this is another reason they fired CRCI.

**Factor 4: Breach of the Limited Partnership Agreement**

82. CRCI breached its contractual fiduciary obligations in Sections 8.04 and 8.06 of the LPA by refusing to call the Loan, by under-collateralizing the Loan, by not insisting on full payment of interest by the borrower, by not safeguarding the capital, by double dipping on management fees, and by running a money-losing hotel for their own benefit at the expense of the limited partners.

83. CRCI's breached Section 13.06 of the LPA which sets forth the protocol for return of capital contributions and requires CRCI to conduct appraisals every six months, to provide estimates of fair market value, and to offer 'put exercise notices' and make a single distribution to those limited partners who wish to obtain a return of capital; and then to repeat this process every six months.

84. In violation of Section 13.06 of the LPA, CRCI has not provided a current appraisal in the last 6 months, they have not estimated fair market value, they have not arranged a single distribution to return capital contributions. Nor does the Plaintiff or any limited partners have any trust in the appraisals that CRCI provided in the past, since their May 2019 appraisal said that the collateral was worth 93% of the Loan principal but this number was based on a sale over many years or decades (hence this was an inaccurate appraisal) -- and they admitted that if the collateral was sold immediately it was only worth half of the Loan principal, a clear indication that CRCI was hiding the truth, shading the losses it created, and misleading the limited partners.

85. Exhibit 5 sets forth the last appraisal provided to investors - dated May 2019. It says bizarrely and in a self-contradiction that the Loan balance at the time was $78.5 million and the collateral units were worth $73.1 million but $43 million if sold as a group. This is fraudulent misrepresentation because real estate cannot be worth $73.1 million dollars in some bizarre abstract sense but if actually sold will return only $43 million dollars.

**Not "Reasonably Practicable" to Carry On**

86. The current path of CRCI is to continue draining partnership assets indefinitely by drawing massive undeserved management fees by perpetuating itself.

87. The limited partnership CRCPS is in a state of total chaos amid an investor revolt, lawsuits against CRCI, and groups of limited partners represented by lawyers around the country united in their shock at CRCI's misconduct. In an atmosphere of total hatred, misinformation, and lawsuits, there is no reason for CRCI to continue as general partner, and its removal triggers a dissolution under the LPA.

88. On its face - without more - it is preposterous that a manager of $82.5 million dollars makes more money than it returns to investors.

89. Plaintiff and the limited partners are the owners of CRCPS.  They have indicated their desire to terminate CRCI as general partner for cause, and they have the final say as owners.

90. There is no reason to allow CRCI to continue earning fees from the Plaintiff and the limited partners who hate them and have already voted them out.

91. All of the elements of judicial dissolution set forth in Colorado statutory and case law have been satisfied.

WHEREFORE, Plaintiff seeks judicial dissolution of CRCPS and placement of its assets into a constructive trust for the limited partners, and the appointment of a neutral manager to collect and liquidate all assets, perform an accounting, and provide full and fair information to the limited partners.

Dated: March 30, 2022                                  Primera Law Group, LLC

                                                  s/ Deborah Yim
                                                  Deborah Yim
                                                  1240 S. Parker Road, Suite 103
                                                  Denver, Colorado 80231
                                                  Telephone: (720) 239-2567
                                                  Facsimile: (720) 515-8259
                                                  E-mail: dyim@primeralaw.com

Exhibit A