## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02443

Li, et al,

Plaintiffs,

Hon. Judge Moore
Hon. Magistrate Varholak

v.

Colorado Regional Center Project Solaris LLLP,
Nominal Defendant

v.

Colorado Regional Center I, LLC, et al.
Defendants.

---

**Notice of D.C.Colo. LAttyR 2(a) Violation by Defendants
in Fabricating and Backdating a Contract Integral
to this Case, and Requesting an Evidentiary Hearing**

---

D.C.Colo. LAttyR 2(a) makes the Colorado Rules of Professional Conduct applicable in this Court. Rules 3.3, 3.4, and 8.4 prohibit an attorney from presenting false evidence. The Defendants, both prior-Defendant SPOI and current-Defendant CRCI, presented a false document to this Court – and not just any document, but a key document at the core of their defense which has turned out to be fabricated and backdated.  This is a clear violation of the Rules of Professional Conduct and it has adversely affected this Court and opposing counsel.

**Introduction**

This case revolves around 19 loan advances totaling $82.5 million dollars from lender CRCPS to borrower SPOI, with each advance secured by a collateral unit at the Solaris Vail

complex.  The loan advances had 5-year maturity dates and could be prepaid in years 3-5 by cash or by special warranty deed.  Virtually all loan advances were made in 2012/2013, reached 5-year maturity in 2017/2018, and had a prepayment window in 2015-2018. The Plaintiffs' core allegations were that SPOI failed to pay the loan advances after maturity in 2017/2018 when they were due in cash (thereby breaching the loan agreement) and that CRCI failed to collect the loan advances (thereby breaching their fiduciary duties to maximize the loan value).

Both SPOI and CRCI justified their failure by referring to a certain Agreement Regarding Collateral Units ("ARCU") that was supposedly agreed upon and signed by SPOI and CRCI in 2015, midway through the loan term.  According to them, the ARCU amended the underlying loan agreement by providing instead that the prepayment method of payment by deed was extended indefinitely so that it outlasted the actual maturity date; that is, there would no longer be any cash due at the 5-year maturity dates, nor would there be any defaults for failure to repay loan advances, and repayment by deed could take place at any time decided by any party.  The ARCU was the cornerstone of their defenses against allegations of breach.

Such were the Defendants' arguments.  The Court took the Defendants seriously, spending untold hours analyzing the ARCU on the premise that it was signed in 2015 *prior* to the maturity dates.  This Court's ruling under Rule 12(b)(6) cited and analyzed the ARCU twenty-nine (29) times, even repeating that the ARCU was drafted and signed in 2015, and assuming for purposes of its ruling that the ARCU amended and modified the underlying loan agreement:

> **On April 17, 2015, about three years after the first loan advance was completed, CRC I (as general partner of CRCPS) and SPOI entered into the Agreement Regarding Collateral Units ("ARCU")**. The ARCU stated that SPOI gave notice that it intended to pay the loan advances with the Collateral Units. However, under the ARCU, SPOI would "temporarily" refrain from transferring title to the Collateral Units to CRCPS, the title to the Collateral Units would continue to be held in the

name of SPO I but CRCPS would be responsible for paying fees and costs associated with the Collateral Units. But, "for purposes of calculating interest under the Loan Documents," SPO I would be deemed to have tendered the Collateral Units in repayment of the loan advances. (Doc. 271: 6)(emphasis added).

CRC Defendants contend that, with the ARCU, there is no breach of the loan agreement and, therefore, there could be no breach of fiduciary duty in not collecting on the loan. (Doc. 271: 27).

SPOI counters that this claim [breach of loan agreement] is barred based on the ARCU. . . **For purposes of this claim the Court assumes the loan was modified or supplemented by the ARCU** (Doc. 271: 35)(emphasis added).

SPO Defendants contend Li Plaintiffs fail to state a claim and the ARCU is still in effect. (Doc. 271: 41).

If the loan was not modified or supplemented by the ARCU, then it appears SPOI would clearly be in breach. (Doc. 271: 35 fn. 63).

Clearly, this Court relied on Defendants' claim that the ARCU was signed April 17, 2015, and so did the 10th Circuit since they repeated the claim that the ARCU was signed April 17, 2015.

**The Truth Comes Out**

After this Court dismissed the Li Plaintiffs' claim against SPOI on jurisdictional grounds, it was refiled in Colorado state court as 2021CV32918 (Denver County). That case has progressed to document production, and the first set of documents released by SPOI contain emails between SPOI and CRCI where they exchanged redlined drafts of the ARCU -- in February 2019. See Exhibit A. It now appears that the ARCU was drafted in 2019 by SPOI's in-house attorney Ryan Smith -- a Colorado licensed lawyer -- and signed by him for SPOI and by Johan Segerdahl for CRCI.

This makes the "2015 ARCU" a pure fabrication. It was drafted, negotiated, and signed on or about February 8, 2019 and deliberately backdated to April 17, 2015.

3

This means that the Defendants and their lawyers knowingly or recklessly deceived this Court (and opposing counsel) that the ARCU was signed when loan advances were outstanding and the parties still had the power to push back the maturity dates.  In reality, the ARCU was signed *after* SPOI had breached the 5-year maturity dates set forth in the loan agreement and *after* CRCI had breached its obligation to pursue collection of the loan advances.  The fabrication and backdating of the ARCU was a dishonest attempt at rewriting history.

This deception fooled everyone.  It fooled the Plaintiffs.  It fooled this Court, the Appellate Court, and the State Court.  We do not yet know – and this is why a hearing is warranted – whether the Defendants' lawyers had *actual* knowledge that the ARCU was fabricated and backdated, nor when they had *constructive* knowledge of this, since they worked closely with the Defendants for 3 years and had exclusive access to internal records. An investigation and remedial action are warranted.

In hindsight, it is interesting that the Court even noted how the Li Plaintiffs referred to the ARCU as "the secret agreement" (Doc 271: 6 fn 17) since it was supposedly kept secret from the limited partners from its execution in 2015 until 2019.  Now we know that the 2015 ARCU was not a secret: it simply did not exist.  In summary, the Defendants based their defense on a massive lie, and forced the Court and the other lawyers to react to this lie.

**The ARCU Does not Have an "Effective Date."**

The face of the ARCU does not say that it is effective as of April 17, 2015, or signed February 8, 2019 but effective April 17, 2015, or memorializing an agreement reached April 17, 2015. It simply is dated April 17, 2015 and contains a signature pages saying it was *signed* as of that date. The Defendants offered no clue that the date was other than April 17, 2015.

It is black-letter law that a contract without an "effective as of" clause is deemed to be effective when actually signed. *Bublitz v. State Bank of Alcester*, 369 N.W.2d 137, 140 (S.D. 1985)(relying on cases from many other states to conclude that "Having no retroactive clause, the contract will be given effect as of the date it is executed or delivered.")  Just so, the ARCU has no retroactivity language, so its effective date is 2019, the date of signature.  As such, it could never change maturity dates that already passed.  And needless to say, it is not industry standard for a lender and borrower to fabricate documents and backdate them 4 years to paper over a breach.

Nor can the Defendants revert to some rear-guard stance that the ARCU was 'really' agreed upon informally in 2015.  There is no evidence of this, and it also likely violates the Colorado statute of frauds, Colo. Rev. Stat. 38-10-108, which requires that any agreement involving land must be set forth in writing.

**Rules of Professional Conduct**

Colorado RPC 3.3 ("Candor to the Tribunal") provides as follows:

> (a)    A lawyer shall not knowingly:
> (1)    make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer. . .
> (2)    offer evidence that the lawyer knows to be false.  If a lawyer, the lawyer's client, or witness called by the lawyer has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.

Colorado RPC 3.4 ("Fairness to Opposing Party and Counsel") provides:

> A lawyer shall not:
> (b)    falsify evidence . . .

Colorado RPC 8.4 ("Misconduct") provides:

> It is professional misconduct for a lawyer to:

(c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentations . . .
(d) engage in conduct that is prejudicial to the administration of justice.

The ARCU was fabricated and backdated for a nefarious purpose. The Defendants needed a pretext for excusing their defaults of not paying nor collecting the loan advances that came due in 2017/2018.  To paper over this default, they relied on a ruse that the ARCU had supposedly been signed in 2015 and pushed back the maturity dates, thereby relieving them of responsibility for breach.

But this was not a harmless backdating between two parties that affected only them: it prevented the Plaintiffs (and the Court) from learning the truth and responding to it.  If the Defendants sought to erase/forgive a breach of contract after-the-fact, they could have attempted this openly and honestly in 2019 by signing a contract dated 2019 that acknowledged the breaches and explained the grounds and consideration for forgiving them. That would have afforded opposing counsel and the Court with the truth to which they could have responded.  Instead, Defendants took the low road of tricking opposing counsel and the Court, which is simply not permissible under the Rules of Professional Conduct.


**Note on Backdating and Fabrication**

Backdating a contract can be a legitimate business practice between two parties -- if they both consent and no third parties are affected.  *SEC v. Solucorp Indus., Ltd.*, 197 F. Supp. 2d 4, 11-12 (S.D.N.Y. 2002)("We do not dispute that certain contracts can be legitimately backdated. However, the SEC alleges that the License Agreement at issue here was backdated pursuant to an effort to defraud investors . . . such conduct falls squarely within the ambit of [securities fraud]").

Backdating becomes deceptive when it negatively affects third parties who are not made aware and do not give their consent. This is why the backdating of stock options in the late 1990s and early 2000s led to criminal convictions and disbarment of lawyers: because the backdating was not simply a two-party agreement between executives and the company, but impacted third-party shareholders by reducing the value of their company without getting their prior consent:

> [T]he backdating scandal has caused more in-house general counsel to lose their jobs than any event in recent memory, and while many of these individuals are already targets of the SEC and the plaintiffs' bar, the most serious consequence is clearly their exposure to criminal prosecution.

"Backdating options—Effects upon Lawyers," 7 Bromberg & Lowenfels on Securities Fraud § 17:11 (May 2023 update). The logic is simple: if only two parties are involved, they have freedom of contract to set whatever date they want on a contract, but if backdating has implications for third parties then it becomes deceptive and potentially illegal unless the third parties give their consent. This doctrine goes all the way up to the Supreme Court. See *Stoneridge Inv. Partners LLC v. Scientific-Atlanta*, 552 U.S. 148, 158 (2008)(noting that conduct included the backdating of contracts is deceptive).

Here, the fabrication and backdating of the ARCU was not a simple two-party arrangement between SPOI and CRCI. Rather, it was intended to prevent CRCI from declaring SPOI to be in default and enforcing CRCPS' right to collect loan advances in cash. In other words, it was intended to harm CRCPS and, indirectly, the limited partners of CRCPS. The whole point of the ARCU was to harm third parties by forgiving SPOI of its debt and forgiving CRCI of the obligation to pursue this debt. That makes the ARCU deceptive at its essence.

Backdating of contracts has often led to suspension. *In re Disciplinary Proceeding Against Poole*, 125 P.3d 954, 962 (Wash. 2006)(holding that backdating is a violation of RPC 3.4 and 8.4);

*Matter of Spear*, 774 P.2d 1335 (Ariz. 1989)(five-year suspension for failing to disclose risks inherent in backdating of contract); *In re Cohen*, 831 N.Y.S. 141, 144 (NY App. 2007)(attorney suspended for backdating of documents submitted to government agency).  Naturally, fabrication of evidence is worse than backdating of evidence, and in this case it appears that the ARCU was fabricated from whole cloth in 2019 and simply didn't exist at the time Defendants claimed it was signed and effective.

**Request for Hearing**

The Li Plaintiffs ask this Court to call an evidentiary hearing where CRCI and SPOI, and their lawyers, can inform the Court how they allowed a fabricated and backdated 2019 document to be misrepresented as a 2015 document.  They should outline the remedial steps that they think are necessary, and the Court should be free to take such action as it deems appropriate in recompense.

Dated: May 17, 2023                                     Respectfully Submitted,

                                                        /s/ Douglas Litowitz
                                                        413 Locust Place
                                                        Deerfield, IL 60015
                                                        312-622-2848
                                                        Litowitz@gmail.com

**Certificate of Service**

This document was filed on the ECF system for the District of Colorado on May 17, 2023.

# EXHIBIT A

Emails between SPOI and CRCPS negotiating the ARCU in February 2019, and copies of the 2019 ARCU and the supposed 2015 ARCU.

| From: | Ryan Smith |
|---|---|
| Sent: | Thursday, February 7, 2019 6:20 PM MST |
| To: | Rob Glucksman |
| Subject: | RE: Agmt Regarding Collateral Units and Transfer Agmt |
| Attachments: | Exhibit B - Listing Agreement.pdf |

Attached is a form of Listing Agreement to be attached as Exhibit B to the Agreement Regarding Collateral Units. It is based on the previously executed listing agreements entered into by the parties.

Let me know if it is acceptable, and, if so, please add it into the form of Agreement Regarding Collateral Units that you send to the title company for signature at closing.

**From:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Sent:** Thursday, February 7, 2019 5:36 PM
**To:** Ryan Smith <ryan@solarisvail.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

Thanks, Ryan. These look good. We'll get these to the title company

Confirming I do not have a 'blank' listing agreement with just the business terms included.

Best,
Rob

**From:** Ryan Smith <ryan@solarisvail.com>
**Sent:** Thursday, February 7, 2019 4:45 PM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

Looks good, thanks. I accepted the insertion of Section 2.d. (changed "a" to "such" in the second sentence to try to pickup co-listing agreements from the first sentence).

Attached please what should be final, executable versions of the following agreements:
 1. Agreement Regarding Collateral Units
 2. Transfer Agreement (form to be attached as Exhibit A to the Agreement Regarding Collateral Units)
 3. Transfer Agreement (completed for 6E West)

For purposes of Exhibit B to the Agreement Regarding Collateral Units, do you have a copy of the form of Listing Agreement that we had previously agreed to? I only have the ones that we executed specific to PH C East and PH G West. If not, I can ask Josh to try to generate a form that mirrors those terms but without a reference to any specific unit.

**From:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Sent:** Thursday, February 7, 2019 3:42 PM
**To:** Ryan Smith <ryan@solarisvail.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

SPO_0008954

Hi Ryan,

That works. Here is a redline with the language inserted.

Best,
Rob

**From:** Ryan Smith <ryan@solarisvail.com>
**Sent:** Thursday, February 7, 2019 3:01 PM
To: Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

Hi Rob. We could add the language with the additions shown in red below.

"Upon Lender's written request, Lender may authorize Borrower to enter into listing <span style="color:red">or co-listing</span> agreements with third-party real estate brokers to market Eligible Unit(s). <span style="color:red">In no event shall Lender or Borrower be obligated to enter into a Listing Agreement.</span> Borrower agrees that Lender shall have authority to make all decisions otherwise granted to Borrower in such listing agreement and Borrower shall consult Lender on all matters pertaining to the sale of the Eligible Units."

**From:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Sent:** Wednesday, February 6, 2019 6:46 PM
**To:** Ryan Smith <ryan@solarisvail.com>
**Cc:** 'Raul Abad' <rabad@fostergraham.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

Yes, I think that is OK.

In the Agmt Regarding Collateral Units, would you be ok with adding 2d: "Upon Lender's written request, Lender may authorize Borrower to enter into listing agreements with third-party real estate brokers to market Eligible Unit(s). Borrower agrees that Lender shall have authority to make all decisions otherwise granted to Borrower in such listing agreement and Borrower shall consult Lender on all matters pertaining to the sale of the Eligible Units."

Would like to make sure we are able to contract with other brokers if needed, unless you think this is already covered in the document.

**From:** Ryan Smith <ryan@solarisvail.com>
**Sent:** Wednesday, February 6, 2019 4:05 PM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Cc:** 'Raul Abad' <rabad@fostergraham.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

Looks good. At the end of Section 7 in this and the form Transfer Agreement, would you agree to add the following: "The provisions of this Section 7 shall survive Closing." With the addition of the Remaining Loan Advance concept, I would like to make clear that this section survives.

SPO_0008955

**From:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Sent:** Wednesday, February 6, 2019 3:47 PM
**To:** Ryan Smith <ryan@solarisvail.com>
**Cc:** 'Raul Abad' <rabad@fostergraham.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

Ryan,

Attached is the Transfer Agreement with the blanks filled out.

Best,
Rob

**From:** Ryan Smith <ryan@solarisvail.com>
**Sent:** Tuesday, February 5, 2019 6:35 PM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Cc:** 'Raul Abad' <rabad@fostergraham.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

Hi Rob,

I am following up on a voicemail that I just left for you. The changes to the Agreement Regarding Collateral Units are fine. I accepted your changes and attached a clean, executable version.

With respect to the Transfer Agreement, it is unnecessary to add the caveat in Section 7 with respect to interest on any Remaining Loan Advance. In the Agreement Regarding Collateral Units you wanted to retain the rights under the loan documents to foreclose on a Collateral Unit as an additional remedy in case borrower failed to transfer the Collateral Unit to CRC in accordance with the Agreement Regarding Collateral Units. However, under the Transfer Agreement, we will have already conveyed the Collateral Unit to CRC, and it is not appropriate to open the door to interest on the Remaining Loan Advance.

I added the one-year survival for the representations and warranties because the parties' representations and warranties are typical of those in a purchase and sale agreement. It is market for those provisions to survive closing for a period of 6 months to 1 year. I suspect that you want to ensure that Borrower's affirmation in Section 9.l., which ties back to the loan agreement, does not expire one year after closing. It was not my intent to cause it to do so. As 9.l. is not really a representation or warranty, but rather an affirmation of an existing covenant, I suggest that we move it to a new section and retain the one year limitation on the survival of both parties' representations and warranties. I have revised the Transfer Agreement accordingly and attached a redline to your draft.

Happy to discuss any remaining issues.

Thanks,

Ryan

SPO_0008956

**From:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Sent:** Tuesday, February 5, 2019 12:36 PM
**To:** Ryan Smith <ryan@solarisvail.com>
**Cc:** 'Raul Abad' <rabad@fostergraham.com>
**Subject:** re: Agmt Regarding Collateral Units and Transfer Agmt

Ryan,

Attached are redlines to the Agreement Regarding Collateral Units and Transfer Agreement. Made a comment in the transfer agreement to tie default back to the Loan Agreement as well. Also removed the 1 year measuring period on the reps/warranties as didn't quite understand which you were concerned about and those that would tie back to the Loan Agreement. Happy to discuss though.

Best,
Rob

Rob Glucksman
Authorized Representative
New York State Empire Outlet Fund I, LLC
Mobile: 303.888.9052
rglucksman@coloradoregionalcenter.com



IRS CIRCULAR 230 DISCLOSURE: To comply with U.S. Treasury regulations, we advise you that any U.S. federal tax advice included in this communication is not intended or written to be used, and can not be used, to avoid any U.S. federal tax penalties or to promote, market, or recommend to another party any transaction or matter addressed herein.

CONFIDENTIALITY NOTICE: This e-mail is confidential and is intended only for the named recipient(s) and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you have received this message in error, or are not the named recipient(s), please immediately notify the sender and delete this e-mail message from your computer.

SPO_0008957

| | |
|---|---|
| **From:** | Ryan Smith |
| **Sent:** | Friday, February 8, 2019 12:59 PM MST |
| **To:** | Rob Glucksman |
| **Subject:** | RE: Agmt Regarding Collateral Units and Transfer Agmt |

FYI, I signed all of Solaris' documents at the title company this morning.

---

**From:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Sent:** Friday, February 8, 2019 10:04 AM
**To:** Ryan Smith <ryan@solarisvail.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

Thanks. Will send this to the title company.

Best,
Rob

---

**From:** Ryan Smith <ryan@solarisvail.com>
**Sent:** Friday, February 8, 2019 9:58 AM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

A revised Listing Agreement is attached. The only change was the addition of Section 28.1.

---

**From:** Ryan Smith
**Sent:** Friday, February 8, 2019 9:36 AM
**To:** 'Rob Glucksman' <rglucksman@coloradoregionalcenter.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

I'll ask Josh to add language to the listing agreement and recirculate for your approval.

---

**From:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Sent:** Friday, February 8, 2019 7:52 AM
**To:** Ryan Smith <ryan@solarisvail.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

That works. Thanks.

---

**From:** Ryan Smith <ryan@solarisvail.com>
**Sent:** Thursday, February 7, 2019 9:56 PM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Subject:** Re: Agmt Regarding Collateral Units and Transfer Agmt

I'm fine with the early termination concept. However, rather than the right to "cancel" the contract altogether, the parties should have the right to early terminate the Listing Period upon no less than 10 days written notice to the other.

SPO_0008998

*EXECUTION VERSION*

## AGREEMENT REGARDING COLLATERAL UNITS

This Agreement Regarding Collateral Units (this "**Agreement**"), dated as of the 17th day of April, 2015, is by and among **Colorado Regional Center Project Solaris, LLLP** (the "**Lender**" or "**CRCPS**"), a Colorado limited liability limited partnership, **Solaris Property Owner I, LLC** ("**Borrower**"), a Delaware limited liability company, and, with respect to Section 2 only, **P.B.K. Real Estate, LLC d/b/a Solaris Real Estate LLC** ("**Broker**"), a Colorado limited liability company.

## <u>Recitals</u>

A.       Reference is hereby made to that certain Promissory Note dated April 18, 2012, executed by Borrower, as assignee of Solaris Property Owner, LLC, a Delaware limited liability company ("**Original Borrower**") pursuant to that certain Assignment of Loan Agreement dated October 12, 2011 by and between Original Borrower and Borrower, and payable to the order of Lender ("**Lender**") in the original maximum principal amount of One Hundred Million and No/100 Dollars ($100,000,000.00), as amended by that certain Allonge to Promissory Note dated of even date therewith by and between Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, collectively the "**Note**"), Borrower has become indebted to Lender with respect to a loan ("**Loan**") made pursuant to that certain Loan Agreement dated November 5, 2010 between Original Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), which Loan is secured by one of more Deeds of Trust recorded against the Collateral Units in the real property records of Eagle County, Colorado (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, each a "**Deed of Trust**" and collectively, the "**Deeds of Trust**"), and further evidenced, secured or governed by other instruments and documents executed in connection with the Loan, including, but not limited to (i) that certain Operating Payment Agreement dated November 5, 2010 by and between Borrower, as successor in interest to Original Borrower, and Lender (the "**Operating Payment Agreement**"), (ii) that certain Yield Enhancement Agreement dated November 5, 2010 by and between Borrower and Lender, (iii) that certain Memorandum of Understanding dated April 1, 2011 by and between Borrower, as successor in interest to Original Borrower, and Lender (the "**MOU**"), and (iv) that certain Guaranty Agreement dated April 18, 2012 by Peter Knobel for the benefit of Lender (the "**Guaranty**"), and as such loan documents were amended pursuant to that certain Omnibus Amendment to EB-5 Investment Documents dated March 8, 2012 by and between Original Borrower and Lender (the "**Omnibus Amendment**") (such other instruments and documents, Operating Payment Agreement, MOU, Guaranty, and Omnibus Amendment, together with the Note, the Loan Agreement and Deeds of Trust, as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, collectively, the "**Loan Documents**"). All capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Loan Documents.

B.       Pursuant to the Loan Documents, Borrower has the right to tender any Collateral Unit (as defined therein) to Lender in repayment of a corresponding Loan Advance commencing

SPO_0008913

on the applicable Prepayment Date, as more particularly set forth in the Loan Documents (each, a "**Collateral Unit Distribution**").

        C.      Borrower has duly notified Lender that it intends to cause the occurrence of a Collateral Unit Distribution with respect to each of the Collateral Units on the applicable Prepayment Date. From and after the Prepayment Date for a Collateral Unit, such Collateral Unit may hereinafter be referred to each as an "**Eligible Unit**" and collectively as the "**Eligible Units**."

        D.      In lieu of accepting the conveyance of title to the Eligible Units pursuant to a Collateral Unit Distribution, the Lender and Borrower have determined that it is desirable for Borrower to continue to hold record title to the Eligible Units.

        E.      The effective date of each Collateral Unit Distribution is as follows:

| Unit | Note Date | Effective Date of Collateral Unit Distribution |
|---|---|---|
| 6E West | April 18, 2012 | April 17, 2015 |
| 2A South | April 25, 2012 | April 24, 2015 |
| Penthouse E West | May 3, 2012 | May 2, 2015 |
| 6E East | May 30, 2012 | May 29, 2015 |
| Penthouse E East | June 15, 2012 | June 14, 2015 |
| 5E West | August 2, 2012 | August 1, 2015 |
| 4G West | August 24, 2012 | August 23, 2015 |
| 7E West | September 7, 2012 | September 6, 2015 |
| Penthouse C East | September 13, 2012 | September 12, 2015 |
| 6D East | October 2, 2012 | October 1, 2015 |
| 5C West | November 6, 2012 | November 5, 2015 |
| 6C West | November 27, 2012 | November 26, 2015 |
| 5G West | January 24, 2013 | January 23, 2016 |
| 3E East | January 29, 2013 | January 28, 2016 |
| 7E East | January 30, 2013 | January 29, 2016 |
| 4D East | March 6, 2013 | March 5, 2016 |
| Penthouse G West | May 20, 2013 | May 19, 2016 |
| Penthouse C West | May 30, 2013 | May 29, 2016 |
| 3C East | January 30, 2015 | January 29, 2018 |

        F.      Borrower has agreed to temporarily refrain from conveying title to the Eligible Units to Lender pursuant to a Collateral Unit Distribution on the condition that, for purposes of calculating interest under the Loan Documents, Borrower shall be deemed to have caused a Collateral Unit Distribution as of the Prepayment Date corresponding to each Eligible Unit and associated Loan Advance.

        The parties desire to set forth their mutual understanding concerning certain matters related to the listing and sale of the Eligible Units as more particularly described below.

### Agreement

SPO_0008914

Now, therefore, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Lender and Borrower agree as follows:

1.      <u>Collateral Unit Distribution</u>. For purposes of calculating interest (including any default interest) under the Loan Documents, with respect to each Eligible Unit and associated Loan Advance, Borrower shall be deemed to have caused a Collateral Unit Distribution as of the corresponding "Effective Date of Collateral Unit Distribution" set forth in <u>Recital E</u> above. Notwithstanding the occurrence of a Collateral Unit Distribution with respect to an Eligible Unit and anything in the Loan Documents to the contrary, the principal amount of the associated Loan Advance shall continue to constitute Indebtedness under the Loan; provided, however, (i) no interest (including default interest) shall accrue with respect to such Loan Advance from and after the applicable Effective Date of Collateral Unit Distribution (except as required by the Operating Payment Agreement) and (ii) in the event that a Loan Advance remains outstanding after the applicable Maturity Date, no default or Event of Default shall be deemed to have occurred as a result of a failure of Borrower to repay such Loan Advance on or before such Maturity Date, and Lender may not exercise any rights or remedies with respect to a default or Event of Default, unless and until it shall have provided Borrower with a notice and cure period in accordance with Section 17 of the Loan Agreement.

2.      <u>Listing of Eligible Units</u>.

a.      Upon Lender's written request, Lender may authorize Borrower to enter into certain Listing Agreements with its affiliate, P.B.K. Real Estate, LLC, a Colorado limited liability company (d/b/a Solaris Real Estate, LLC) ("**Broker**") to market an Eligible Unit(s) for sale for a total commission of five percent (5%) and on such other terms and conditions as are set forth in the Exclusive Right-To-Sell Listing Contract attached hereto as <u>Exhibit B</u> (each, a "**Listing Agreement**" and the Eligible Unit to which it pertains, a "**Listed Unit**").  The term of the Listing Agreement shall be defined therein. In no event shall Lender, Borrower, or Broker be obligated to enter into a Listing Agreement. The Listing Agreement shall provide that either party has the right to terminate the Listing Period (as defined in the Listing Agreement) upon ten (10) day's written notice to the other. Upon Lender's written request, Borrower shall exercise its right to terminate the Listing Period on the date set forth in Lender's written request that is no sooner than ten (10) days from the date of Borrower's receipt of such notice.

b.      Upon Closing on a Listed Unit, Broker agrees to pay to Lender an amount equal to fifty percent (50%) of the Sale Commission (as defined in the Listing Agreement), net of any Cooperative Broker Compensation (as defined in the Listing Agreement), earned by Broker from the sale of such Listed Unit.

c.      Borrower agrees that Lender shall have authority to make all decisions otherwise granted to Borrower in a Listing Agreement and Borrower shall consult Lender on all matters pertaining to the sale of the Eligible Units.

d.      Upon Lender's written request, Lender may authorize Borrower to enter into listing or co-listing agreements with third-party real estate brokers to market Eligible Unit(s).

SPO_0008915

In no event shall Lender or Borrower be obligated to enter into such a listing agreement.  Borrower agrees that Lender shall have authority to make all decisions otherwise granted to Borrower in such listing agreement and Borrower shall consult Lender on all matters pertaining to the sale of the Eligible Units.

3.      Listing of Borrower's Units. During the Listing Period (as defined in the Listing Agreement) for a Listed Unit, Borrower agrees that it will not cause Broker or any other third-party real estate broker to initiate an MLS listing for the sale of any residential unit in Solaris that is owned by Solaris Property Owner, LLC, a Delaware limited liability company, Solaris Property Owner II, LLC, a Delaware limited liability company, or other related entities other than Borrower (collectively, the **"Affiliated Solaris Owners"**") and (ii) is like-kind to an Eligible Unit.  Borrower also agrees that any like-kind units owned by the Affiliated Solaris Owners that are currently listed on MLS shall be removed.

4.      Conveyance of Eligible Units.

a.      Sale to Third-Party. In the event that Borrower enters into a contract for the purchase and sale of an Eligible Unit that is approved by Lender (a "Purchase Agreement"), Borrower and Lender shall promptly execute and deliver to the other party a Transfer Agreement with respect to such Eligible Unit substantially in the form attached hereto as Exhibit A (each, a "Transfer Agreement"). The Closing Date under the Transfer Agreement shall be the date set forth in the Purchase Agreement.

b.      Tender to Lender. In the event that Borrower notifies Lender in writing that it intends to tender or otherwise convey any Eligible Unit to Lender or Lender notifies Borrower in writing that an Eligible Unit is to be tendered or otherwise conveyed to Lender, Borrower and Lender shall promptly execute and deliver to the other party a Transfer Agreement with respect to such Eligible Unit substantially in the form of the Transfer Agreement attached hereto as Exhibit A. The Closing Date under the applicable Transfer Agreement shall be the date set forth in the notice from Borrower to Lender that it intends to tender or otherwise convey the Eligible Unit to Lender or notice from Lender to Borrower that requests than the Eligible Unit be tendered or otherwise conveyed to Lender, as the case may be.

c.      Tender to Limited Partners of the Lender. In the event that Lender notifies and instructs Borrower to enter into a contract for the sale or conveyance of an Eligible Unit to an individual limited partner or group of limited partners of the Lender, the parties agree that any Sale Commission shall be waived.

5.      MISCELLANEOUS.  This Agreement represents the entire and complete agreement between the parties.  The Amendment shall not be amended or modified, except by an instrument in writing, signed by all parties. All terms and provisions hereof shall inure to the benefit of, and being binding upon the parties, and their respective successors and assigns. Wherever used in this Agreement, the singular shall include the plural, and the masculine shall include the feminine and neuter grammatical forms.  Captions are included for convenient reference only, and shall not be construed to alter or affect any terms or provisions of this Agreement.  This Agreement has been executed by the parties after discussions and negotiation,

SPO_0008916

and shall be construed as having been drafted by both parties.  If any term of this Agreement is held to be invalid or unenforceable, such term shall be construed as being valid and enforceable to the fullest extent permitted by law, and all remaining terms shall remain full force and effect. This Agreement shall be construed and enforced in accordance with the laws of the State of Colorado. Each party hereto waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or any related document. If a party initiates any action to enforce or interpret this Agreement, the party determined by the court or arbiter, as the case may be, to be the prevailing party in such action will be entitled to receive from the non-prevailing party all reasonable costs and expenses, including all reasonable attorneys' fees incurred by the prevailing party in such action. This Agreement may be executed in electronic or facsimile counterparts, each of which when so executed shall be deemed to be an original, and all of which when taken together shall constitute one original signed agreement.

[SIGNATURE PAGE FOLLOWS]

SPO_0008917

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the date first above set forth.

BORROWER:

SOLARIS PROPERTY OWNER I, LLC,
a Delaware limited liability company

By: _____
    Ryan A. Smith, its Authorized Signatory

LENDER:

COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP,
a Colorado limited liability limited partnership

By:_____
Name: _____
Its: _____

With respect to Section 2 only.

BROKER:

P.B.K. REAL ESTATE, LLC d/b/a SOLARIS REAL ESTATE LLC,
a Colorado limited liability limited partnership

By:_____
Name: _____
Its: _____

SPO_0008918

# AGREEMENT REGARDING COLLATERAL UNITS

This Agreement Regarding Collateral Units (this "**Agreement**"), dated as of the 17th day of April, 2015, is by and among **Colorado Regional Center Project Solaris, LLLP** (the "**Lender**" or "**CRCPS**"), a Colorado limited liability limited partnership, **Solaris Property Owner I, LLC** ("**Borrower**"), a Delaware limited liability company, and, with respect to Section 2 only, **P.B.K. Real Estate, LLC d/b/a Solaris Real Estate LLC** ("**Broker**"), a Colorado limited liability company.

## Recitals

A.     Reference is hereby made to that certain Promissory Note dated April 18, 2012, executed by Borrower, as assignee of Solaris Property Owner, LLC, a Delaware limited liability company ("**Original Borrower**") pursuant to that certain Assignment of Loan Agreement dated October 12, 2011 by and between Original Borrower and Borrower, and payable to the order of Lender ("**Lender**") in the original maximum principal amount of One Hundred Million and No/100 Dollars ($100,000,000.00), as amended by that certain Allonge to Promissory Note dated of even date therewith by and between Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, collectively the "**Note**"), Borrower has become indebted to Lender with respect to a loan ("**Loan**") made pursuant to that certain Loan Agreement dated November 5, 2010 between Original Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), which Loan is secured by one of more Deeds of Trust recorded against the Collateral Units in the real property records of Eagle County, Colorado (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, each a "**Deed of Trust**" and collectively, the "**Deeds of Trust**"), and further evidenced, secured or governed by other instruments and documents executed in connection with the Loan, including, but not limited to (i) that certain Operating Payment Agreement dated November 5, 2010 by and between Borrower, as successor in interest to Original Borrower, and Lender (the "**Operating Payment Agreement**"), (ii) that certain Yield Enhancement Agreement dated November 5, 2010 by and between Borrower and Lender, (iii) that certain Memorandum of Understanding dated April 1, 2011 by and between Borrower, as successor in interest to Original Borrower, and Lender (the "**MOU**"), and (iv) that certain Guaranty Agreement dated April 18, 2012 by Peter Knobel for the benefit of Lender (the "**Guaranty**"), and as such loan documents were amended pursuant to that certain Omnibus Amendment to EB-5 Investment Documents dated March 8, 2012 by and between Original Borrower and Lender (the "**Omnibus Amendment**") (such other instruments and documents, Operating Payment Agreement, MOU, Guaranty, and Omnibus Amendment, together with the Note, the Loan Agreement and Deeds of Trust, as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, collectively the "**Loan Documents**"). All capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Loan Documents.

B.     Pursuant to the Loan Documents, Borrower has the right to tender any Collateral Unit (as defined therein) to Lender in repayment of a corresponding Loan Advance commencing

on the applicable Prepayment Date, as more particularly set forth in the Loan Documents (each, a "**Collateral Unit Distribution**").

      C.    Borrower has duly notified Lender that it intends to cause the occurrence of a Collateral Unit Distribution with respect to each of the Collateral Units on the applicable Prepayment Date. From and after the Prepayment Date for a Collateral Unit, such Collateral Unit may hereinafter be referred to each as an "**Eligible Unit**" and collectively as the "**Eligible Units.**"

      D.    In lieu of accepting the conveyance of title to the Eligible Units pursuant to a Collateral Unit Distribution, the Lender and Borrower have determined that it is desirable for Borrower to continue to hold record title to the Eligible Units.

      E.    The effective date of each Collateral Unit Distribution is as follows:

| | | |
|---|---|---|
| 6E West | April 18, 2012 | April 17, 2015 |
| 2A South | April 25, 2012 | April 24, 2015 |
| Penthouse E West | May 3, 2012 | May 2, 2015 |
| 6E East | May 30, 2012 | May 29, 2015 |
| Penthouse E East | June 15, 2012 | June 14, 2015 |
| 5E West | August 2, 2012 | August 1, 2015 |
| 4G West | August 24, 2012 | August 23, 2015 |
| 7E West | September 7, 2012 | September 6, 2015 |
| Penthouse C East | September 13, 2012 | September 12, 2015 |
| 6D East | October 2, 2012 | October 1, 2015 |
| 5C West | November 6, 2012 | November 5, 2015 |
| 6C West | November 27, 2012 | November 26, 2015 |
| 5G West | January 24, 2013 | January 23, 2016 |
| 3E East | January 29, 2013 | January 28, 2016 |
| 7E East | January 30, 2013 | January 29, 2016 |
| 4D East | March 6, 2013 | March 5, 2016 |
| Penthouse G West | May 20, 2013 | May 19, 2016 |
| Penthouse C West | May 30, 2013 | May 29, 2016 |
| 3C East | January 30, 2015 | January 29, 2018 |

      F.    Borrower has agreed to temporarily refrain from conveying title to the Eligible Units to Lender pursuant to a Collateral Unit Distribution on the condition that, for purposes of calculating interest under the Loan Documents, Borrower shall be deemed to have caused a Collateral Unit Distribution as of the Prepayment Date corresponding to each Eligible Unit and associated Loan Advance.

      The parties desire to set forth their mutual understanding concerning certain matters related to the listing and sale of the Eligible Units as more particularly described below.

## Agreement

Now, therefore, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Lender and Borrower agree as follows:

1.  <u>Collateral Unit Distribution</u>. For purposes of calculating interest (including any default interest) under the Loan Documents, with respect to each Eligible Unit and associated Loan Advance, Borrower shall be deemed to have caused a Collateral Unit Distribution as of the corresponding "Effective Date of Collateral Unit Distribution" set forth in Recital E above. Notwithstanding the occurrence of a Collateral Unit Distribution with respect to an Eligible Unit and anything in the Loan Documents to the contrary, the principal amount of the associated Loan Advance shall continue to constitute Indebtedness under the Loan; provided, however, (i) no interest (including default interest) shall accrue with respect to such Loan Advance from and after the applicable Effective Date of Collateral Unit Distribution (except as required by the Operating Payment Agreement) and (ii) in the event that a Loan Advance remains outstanding after the applicable Maturity Date, no default or Event of Default shall be deemed to have occurred as a result of a failure of Borrower to repay such Loan Advance on or before such Maturity Date, and Lender may not exercise any rights or remedies with respect to a default or Event of Default, unless and until it shall have provided Borrower with a notice and cure period in accordance with Section 17 of the Loan Agreement.

2.  <u>Listing of Eligible Units</u>.

    a.  Upon Lender's written request, Lender may authorize Borrower to enter into certain Listing Agreements with its affiliate, P.B.K. Real Estate, LLC, a Colorado limited liability company (d/b/a Solaris Real Estate, LLC) ("**Broker**") to market an Eligible Unit(s) for sale for a total commission of five percent (5%) and on such other terms and conditions as are set forth in the Exclusive Right-To-Sell Listing Contract attached hereto as <u>Exhibit B</u> (each, a "**Listing Agreement**" and the Eligible Unit to which it pertains, a "**Listed Unit**"). The term of the Listing Agreement shall be defined therein. In no event shall Lender, Borrower, or Broker be obligated to enter into a Listing Agreement. The Listing Agreement shall provide that either party has the right to terminate the Listing Period (as defined in the Listing Agreement) upon ten (10) day's written notice to the other. Upon Lender's written request, Borrower shall exercise its right to terminate the Listing Period on the date set forth in Lender's written request that is no sooner than ten (10) days from the date of Borrower's receipt of such notice.

    b.  Upon Closing on a Listed Unit, Broker agrees to pay to Lender an amount equal to fifty percent (50%) of the Sale Commission (as defined in the Listing Agreement), net of any Cooperative Broker Compensation (as defined in the Listing Agreement), earned by Broker from the sale of such Listed Unit.

    c.  Borrower agrees that Lender shall have authority to make all decisions otherwise granted to Borrower in a Listing Agreement and Borrower shall consult Lender on all matters pertaining to the sale of the Eligible Units.

d.     Upon Lender's written request, Lender may authorize Borrower to enter into listing or co-listing agreements with third-party real estate brokers to market Eligible Unit(s). In no event shall Lender or Borrower be obligated to enter into such a listing agreement. Borrower agrees that Lender shall have authority to make all decisions otherwise granted to Borrower in such listing agreement and Borrower shall consult Lender on all matters pertaining to the sale of the Eligible Units.

3.      Listing of Borrower's Units. During the Listing Period (as defined in the Listing Agreement) for a Listed Unit, Borrower agrees that it will not cause Broker or any other third-party real estate broker to initiate an MLS listing for the sale of any residential unit in Solaris that is owned by Solaris Property Owner, LLC, a Delaware limited liability company, Solaris Property Owner II, LLC, a Delaware limited liability company, or other related entities other than Borrower (collectively, the **"Affiliated Solaris Owners"**) and (ii) is like-kind to an Eligible Unit. Borrower also agrees that any like-kind units owned by the Affiliated Solaris Owners that are currently listed on MLS shall be removed.

4.      Conveyance of Eligible Units.

a.      Sale to Third-Party. In the event that Borrower enters into a contract for the purchase and sale of an Eligible Unit that is approved by Lender (a "Purchase Agreement"), Borrower and Lender shall promptly execute and deliver to the other party a Transfer Agreement with respect to such Eligible Unit substantially in the form attached hereto as Exhibit A (each, a "Transfer Agreement"). The Closing Date under the Transfer Agreement shall be the date set forth in the Purchase Agreement.

b.      Tender to Lender. In the event that Borrower notifies Lender in writing that it intends to tender or otherwise convey any Eligible Unit to Lender or Lender notifies Borrower in writing that an Eligible Unit is to be tendered or otherwise conveyed to Lender, Borrower and Lender shall promptly execute and deliver to the other party a Transfer Agreement with respect to such Eligible Unit substantially in the form of the Transfer Agreement attached hereto as Exhibit A. The Closing Date under the applicable Transfer Agreement shall be the date set forth in the notice from Borrower to Lender that it intends to tender or otherwise convey the Eligible Unit to Lender or notice from Lender to Borrower that requests than the Eligible Unit be tendered or otherwise conveyed to Lender, as the case may be.

c.      Tender to Limited Partners of the Lender. In the event that Lender notifies and instructs Borrower to enter into a contract for the sale or conveyance of an Eligible Unit to an individual limited partner or group of limited partners of the Lender, the parties agree that any Sale Commission shall be waived.

5.      MISCELLANEOUS. This Agreement represents the entire and complete agreement between the parties. The Amendment shall not be amended or modified, except by an instrument in writing, signed by all parties. All terms and provisions hereof shall inure to the benefit of, and being binding upon the parties, and their respective successors and assigns. Wherever used in this Agreement, the singular shall include the plural, and the masculine shall include the feminine and neuter grammatical forms.  Captions are included for convenient

reference only, and shall not be construed to alter or affect any terms or provisions of this Agreement. This Agreement has been executed by the parties after discussions and negotiation, and shall be construed as having been drafted by both parties. If any term of this Agreement is held to be invalid or unenforceable, such term shall be construed as being valid and enforceable to the fullest extent permitted by law, and all remaining terms shall remain full force and effect. This Agreement shall be construed and enforced in accordance with the laws of the State of Colorado. Each party hereto waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or any related document. If a party initiates any action to enforce or interpret this Agreement, the party determined by the court or arbiter, as the case may be, to be the prevailing party in such action will be entitled to receive from the non-prevailing party all reasonable costs and expenses, including all reasonable attorneys' fees incurred by the prevailing party in such action. This Agreement may be executed in electronic or facsimile counterparts, each of which when so executed shall be deemed to be an original, and all of which when taken together shall constitute one original signed agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the date first above set forth.

BORROWER:

SOLARIS PROPERTY OWNER I, LLC,
a Delaware limited liability company


By: _____
    Ryan A. Smith, its Authorized Signatory


LENDER:

COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP,
a Colorado limited liability limited partnership

By: _____
Name: _____ Jarvis Seyenanz
Its: _____ Manager

With respect to Section 2 only.

BROKER:

P.B.K. REAL ESTATE, LLC d/b/a SOLARIS REAL ESTATE LLC,
a Colorado limited liability limited partnership

By: _____
Name: _____
Its: _____

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the date first above set forth.

BORROWER:

SOLARIS PROPERTY OWNER I, LLC,
a Delaware limited liability company


By: _____
     Ryan A. Smith, its Authorized Signatory


LENDER:

COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP,
a Colorado limited liability limited partnership

By: _____
Name: _____
Its: _____

With respect to Section 2 only.

BROKER:

P.B.K. REAL ESTATE, LLC d/b/a SOLARIS REAL ESTATE LLC,
a Colorado limited liability limited partnership

By: _____
Name: _____
Its: _____

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the date first above set forth.

BORROWER:

SOLARIS PROPERTY OWNER I, LLC,
a Delaware limited liability company

By: _____
Ryan A. Smith, its Authorized Signatory

LENDER:

COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP,
a Colorado limited liability limited partnership

By: _____
Name: _____
Its: _____

With respect to Section 2 only.

BROKER:

P.B.K. REAL ESTATE, LLC d/b/a SOLARIS REAL ESTATE LLC,
a Colorado limited liability limited partnership

By: _____
Name: _____
Its: _____