# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02443

Jun Li, Qi Qin, Yi Liu, Jie Yang, et al.
     Plaintiffs,

                                   Hon. Judge Moore

        v.                           Hon. Magistrate Varholak

Colorado Regional Center Project Solaris LLLP,
Colorado Regional Center I, LLC, et al.
     Defendants.

---

### Li Plaintiffs' Motion for Rule 11 Sanctions against CRCI for Misrepresenting a Material Fact (the actual date of the ARCU) That Permeates the Entire Case and This Court's Rulings

---

**STATEMENT OF CONFERRAL PER LOCAL RULE 7.1: PLAINTIFFS' COUNSEL HAS CONFERRED WITH COUNSEL FOR COLORADO REGIONAL CENTER I LLC AND THEY OPPOSE THIS MOTION. COUNSEL FOR THE CUI PLAINTIFFS DO NOT OPPOSE THIS MOTION.**

Plaintiffs hereby move for sanctions against defendant Colorado Regional Center I LLC ("CRCI") and their counsel of record, James Kilroy and Stephanie Kanan, and for this motion state as follows:

The central fact of this case is that 165 immigrants invested $82.5 million in Colorado Regional Center Project Solaris LLLP (CRCPS), and its general partner CRCI loaned the entire sum in 19 installments to Solaris Property Owner I LLC (SPOI) in 5-year advances that could be prepaid either in cash or collateral (condominium units) in years 3-5. $80 million of the advances had a 5-year maturity date in 2017/2018. Yet on those maturity dates there was no prepayment and CRCI refused to call the advances for repayment in cash. When sued in this Court, CRCI

1

invoked a 'secret agreement' from 2015 between CRCPS and SPOI called the Agreement Regarding Collateral Units (ARCU) that was supposedly signed on April 17, 2015 and somehow altered or nullifyied the 2017/2018 maturity dates, and somehow (according to CRCI) prevented them from calling the overdue loan advances for repayment in cash. They made this assertion to the Court in writing, and in a sworn statement a managing member of CRCI.

It now turns out that this was a fabrication. The ARCU was actually signed in February 2019, not April 2015. Because the ARCU did not occur prior to the maturity dates, it could not have altered those maturity dates or altered the obligation of SPOI to repay the advances in cash or the fiduciary obligation of CRCI to demand repayment in cash. CRCI and their lawyers have violated Rule 11(b)(3) by offering fabricated documentation to mislead this Court, a fateful decision that led this Court to misstate the facts of the case and take blind alleys of reasoning based on the fabrication.

I.    **This Court accepted the Defendants' assertion that the ARCU was entered into in 2015 and thus addressed the issue of whether it could modify maturity dates falling afterwards in 2017-2018.**

This Court's analysis of the merits is contained largely in its decision on motions to dismiss, styled as *Order on Pending Motions* (Doc. 271). The *Order on Pending Motions* mentions the ARCU twenty-nine (29) times and spends quite a bit of time analyzing the effect of that document, always on the assumption that it was signed in 2015. In the Court's statement of facts, the Court stated:

> On April 17, 2015, about three years after the first loan was completed, CRCI (as general partner of CRCPS) and SPOI entered into the Agreement Regarding Collateral Units ("ARCU"). The ARCU stated that SPOI gave notice that it intended to pay the loan advances with the Collateral Units. [Doc. 271: 6].

The *Order on Pending Motions* then frames the parties' dispute based on the premise that the ARCU was signed in 2015.  For example, the Court said,

> CRC Defendants contend that, with the ARCU, there is no breach of the loan agreement and, therefore, there could be no breach of fiduciary duty in not collecting on the loan.  [Doc. 271: 27]

> [A]bsent the ARCU no timely conveyance occurred under the Loan Agreement and Promissory Note.  Thus it would appear that SPOI may be in default.  [Doc. 271: 38]

> At a minimum, the parties have placed the ARCU into issue in this case and how it affects the Loan. [Doc. 271: fn. 74]

The Plaintiffs were equally deceived.  The ARCU provided to the limited partners by CRCI and then attached to the Li Plaintiffs' complaint was styled "Execution Version" and says on page 1 that it is "dated as of the 17th day of April, 2015."  The signature page says, "Borrower and Lender have executed this Agreement as of the date first above set forth."

CRCI repeatedly implied that the ARCU was signed in 2015.  They claimed that because the ARCU predated the maturity dates of the loan advances it  somehow constituted a repayment of the loan advances in year 3 even though no titles to the collateral units were submitted in repayment at that time.  This somehow nullified CRCI's breach of fiduciary duty to call an overdue loan advance for repayment in cash:

> Consistent with the terms of the loan agreement, SPOI exercised its right to transfer the Property in lieu of cash payment with respect to each condominium unit after three years following each loan advance. Pursuant to the terms of an Agreement Regarding Collateral Units ("ARCU") between CRCPS and SPOI, CRCPS has not yet been assigned title to the remaining units . . . Under terms of the ARCU, which incorporates the underlying loan documents, SPOI is expressly authorized and required to hold record title to the Property. Thus, its failure to repay the Loan or convey title to CRCPS does not – and cannot – constitute a breach. [Doc. 184:5, 14-15].

This was drawn directly and uncritically from the affidavit or Rick Hayes, a managing member of CRCI [Doc. 51-1:1], so both the client and their counsel propagated a fabrication to this Court.

Nor did CRCI or their counsel speak up when co-defendant SPOI said that the ARCU was signed right after SPOI gave notice that it would repay with collateral at the future maturity dates. Here is what SPOI said, to which CRCI had no objection or correction:

> In accordance with the loan agreement, SPOI notified CRCPS it intended to exercise its right to discharge its loan repayment obligation by tendering to CRCPS the collateral (condominium units) securing the loan. CRCPS and SPOI then entered into an agreement, Agreement Regarding Collateral Units ("ARCU") under which SPOI agreed to "temporarily refrain" from conveying the units to CRCPS . . [Doc. 186: 1-2].

Simply put, CRCI and their lawyers fooled the Plaintiffs and this Court into thinking that the ARCU was signed in 2015 and thus executed prior to the maturity dates.

## II. The ARCU was Actually Signed in February 2019.

This Court held that Li Plaintiffs derivatively stated a claim for CRCPS that SPOI breached the Loan Agreement by not repaying the loan advances in cash at their maturity dates. Months later, the Court held that it lacked subject matter jurisdiction to continue hearing this claim. Accordingly, two of the Li Plaintiffs asserted the same derivative claim for CRCPS in Denver District Court as Case No. 2021CV32918.

Recent disclosures from the SPO Defendants in the Denver District Court show that the ARCU was negotiated and signed in February 2019, not 2015.

Exhibit A to this Motion contains emails in February 2019 between SPOI and CRCPS exchanging redline drafts of the ARCU, plus an email where SPOI's representative declares that he signed all agreements on February 8, 2019. The document they were negotiating was called

4

Agreement Regarding Collateral Units and had the stamp "00316124.DOX/1" which is the same stamp as the "Execution Version" of the ARCU they claimed was signed April 17, 2015 in this Court.

### III.    This Court Wasted Time and Treasure on a Backdated Fabrication.

The CRCI Defendants and their lawyers have placed this Court in the unenviable position of having written at least one opinion based on fraudulent information about the date of a document, when CRCI knew (as signatories) that the Court was operating under false information.

This fabrication was perpetuated to enable the Defendants' argument that since the ARCU was signed in 2015 it had the power to push back maturity dates falling in 2017 and 2018.   This was easier than admitting the truth to this Court, namely that their clients backdated the ARCU 4 years to achieve the desired effect.  Their misrepresentation made its way into a single written opinion of a Federal Court nearly thirty times.  It is not an exaggeration to call this document fraud, and/or a failure by elite Denver attorneys to investigate and verify their factual statements from Denver clients.

### IV.    Appropriate Sanctions

Fed. R. Civ. P. 11(b)(3) requires a lawyer to make reasonable inquiry as to factual assertions:

> By presenting to the Court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . .

The penalty for violating Rule 11 can fall on the attorneys (in this case attorneys Kilroy and Kanan), their firm (Snell & Wilmer) or the client (CRCI).  See *Notes of Advisory Committee on Rules - 1993 Amendment* ("Absent exceptional circumstances, a law firm is to be held also responsible when, as a result of a motion under subdivision (c)(1)(A), one of its partners, associates, or employees is determined to have violated the rule").

The sanction for a Rule 11 violation lies in the discretion of the Court.

Given that the ARCU was NOT effective until 2019 and could NOT have altered the maturity dates of loan advances falling due in 2017/2018, the Plaintiffs ask for the following sanctions:

(i)     A finding that the loan advances matured and were callable for repayment in cash at their 5-year maturities in 2017 and 2018;

(ii)    A finding that CRCI's failure to collect loan advances in cash at their 5-year maturities was a breach of their contractual fiduciary duties under the CRCPS LLLP Agreement to safeguard the assets of CRCPS and act for benefit of CRCPS;

(iii)   An award of attorney fees incurred by the Plaintiffs to date; and

(iv)    A finding that opposing counsel violated CPR 3.3 ("Candor to the Tribunal") by making a false statement of material fact to the Court without taking "reasonable remedial measures including, if necessary, disclosure to the tribunal"; and

(v)     Referral of this matter to the State Bar of Colorado for disciplinary proceedings.

WHEREFORE, Plaintiffs request that this Honorable Court impose the sanctions set forth above against CRCI and their attorneys James Kilroy, Stephanie Kanan, and the law firm of Snell & Wilmer, and make the findings set forth above which flow naturally from a correction of the fabrication.

Dated: April 30, 2023                  Respectfully submitted,

                                       *s/ Doug Litowitz*
                                       Douglas Litowitz
                                       413 Locust Place
                                       Deerfield, IL 60015
                                       312-622-2848
                                       litowitz@gmail.com

# EXHIBIT A

Emails between SPOI and CRCPS negotiating the ARCU in February 2019, and copies of the 2019 ARCU and the supposed 2015 ARCU.

| From: | Ryan Smith |
|---|---|
| Sent: | Thursday, February 7, 2019 6:20 PM MST |
| To: | Rob Glucksman |
| Subject: | RE: Agmt Regarding Collateral Units and Transfer Agmt |
| Attachments: | Exhibit B - Listing Agreement.pdf |

Attached is a form of Listing Agreement to be attached as Exhibit B to the Agreement Regarding Collateral Units. It is based on the previously executed listing agreements entered into by the parties.

Let me know if it is acceptable, and, if so, please add it into the form of Agreement Regarding Collateral Units that you send to the title company for signature at closing.

---

**From:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Sent:** Thursday, February 7, 2019 5:36 PM
**To:** Ryan Smith <ryan@solarisvail.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

Thanks, Ryan. These look good. We'll get these to the title company

Confirming I do not have a 'blank' listing agreement with just the business terms included.

Best,
Rob

---

**From:** Ryan Smith <ryan@solarisvail.com>
**Sent:** Thursday, February 7, 2019 4:45 PM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

Looks good, thanks. I accepted the insertion of Section 2.d. (changed "a" to "such" in the second sentence to try to pickup co-listing agreements from the first sentence).

Attached please what should be final, executable versions of the following agreements:
1. Agreement Regarding Collateral Units
2. Transfer Agreement (form to be attached as Exhibit A to the Agreement Regarding Collateral Units)
3. Transfer Agreement (completed for 6E West)

For purposes of Exhibit B to the Agreement Regarding Collateral Units, do you have a copy of the form of Listing Agreement that we had previously agreed to? I only have the ones that we executed specific to PH C East and PH G West. If not, I can ask Josh to try to generate a form that mirrors those terms but without a reference to any specific unit.

---

**From:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Sent:** Thursday, February 7, 2019 3:42 PM
**To:** Ryan Smith <ryan@solarisvail.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

SPO_0008954

Hi Ryan,

That works. Here is a redline with the language inserted.

Best,
Rob

---

**From:** Ryan Smith <ryan@solarisvail.com>
**Sent:** Thursday, February 7, 2019 3:01 PM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

Hi Rob. We could add the language with the additions shown in red below.

"Upon Lender's written request, Lender may authorize Borrower to enter into listing or co-listing agreements with third-party real estate brokers to market Eligible Unit(s). In no event shall Lender or Borrower be obligated to enter into a Listing Agreement. Borrower agrees that Lender shall have authority to make all decisions otherwise granted to Borrower in such listing agreement and Borrower shall consult Lender on all matters pertaining to the sale of the Eligible Units."

---

**From:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Sent:** Wednesday, February 6, 2019 6:46 PM
**To:** Ryan Smith <ryan@solarisvail.com>
**Cc:** 'Raul Abad' <rabad@fostergraham.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

Yes, I think that is OK.

In the Agmt Regarding Collateral Units, would you be ok with adding 2d: "Upon Lender's written request, Lender may authorize Borrower to enter into listing agreements with third-party real estate brokers to market Eligible Unit(s). Borrower agrees that Lender shall have authority to make all decisions otherwise granted to Borrower in such listing agreement and Borrower shall consult Lender on all matters pertaining to the sale of the Eligible Units."

Would like to make sure we are able to contract with other brokers if needed, unless you think this is already covered in the document.

---

**From:** Ryan Smith <ryan@solarisvail.com>
**Sent:** Wednesday, February 6, 2019 4:05 PM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Cc:** 'Raul Abad' <rabad@fostergraham.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

Looks good. At the end of Section 7 in this and the form Transfer Agreement, would you agree to add the following: "The provisions of this Section 7 shall survive Closing." With the addition of the Remaining Loan Advance concept, I would like to make clear that this section survives.

SPO_0008955

**From:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Sent:** Wednesday, February 6, 2019 3:47 PM
**To:** Ryan Smith <ryan@solarisvail.com>
**Cc:** 'Raul Abad' <rabad@fostergraham.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

Ryan,

Attached is the Transfer Agreement with the blanks filled out.

Best,
Rob

---

**From:** Ryan Smith <ryan@solarisvail.com>
**Sent:** Tuesday, February 5, 2019 6:35 PM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Cc:** 'Raul Abad' <rabad@fostergraham.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

Hi Rob,

I am following up on a voicemail that I just left for you. The changes to the Agreement Regarding Collateral Units are fine. I accepted your changes and attached a clean, executable version.

With respect to the Transfer Agreement, it is unnecessary to add the caveat in Section 7 with respect to interest on any Remaining Loan Advance. In the Agreement Regarding Collateral Units you wanted to retain the rights under the loan documents to foreclose on a Collateral Unit as an additional remedy in case borrower failed to transfer the Collateral Unit to CRC in accordance with the Agreement Regarding Collateral Units. However, under the Transfer Agreement, we will have already conveyed the Collateral Unit to CRC, and it is not appropriate to open the door to interest on the Remaining Loan Advance.

I added the one-year survival for the representations and warranties because the parties' representations and warranties are typical of those in a purchase and sale agreement. It is market for those provisions to survive closing for a period of 6 months to 1 year. I suspect that you want to ensure that Borrower's affirmation in Section 9.l., which ties back to the loan agreement, does not expire one year after closing. It was not my intent to cause it to do so. As 9.l. is not really a representation or warranty, but rather an affirmation of an existing covenant, I suggest that we move it to a new section and retain the one year limitation on the survival of both parties' representations and warranties. I have revised the Transfer Agreement accordingly and attached a redline to your draft.

Happy to discuss any remaining issues.

Thanks,

Ryan

SPO_0008956

**From:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Sent:** Tuesday, February 5, 2019 12:36 PM
**To:** Ryan Smith <ryan@solarisvail.com>
**Cc:** 'Raul Abad' <rabad@fostergraham.com>
**Subject:** re: Agmt Regarding Collateral Units and Transfer Agmt

Ryan,

Attached are redlines to the Agreement Regarding Collateral Units and Transfer Agreement. Made a comment in the transfer agreement to tie default back to the Loan Agreement as well. Also removed the 1 year measuring period on the reps/warranties as didn't quite understand which you were concerned about and those that would tie back to the Loan Agreement. Happy to discuss though.

Best,
Rob

Rob Glucksman
Authorized Representative
New York State Empire Outlet Fund I, LLC
Mobile: 303.888.9052
rglucksman@coloradoregionalcenter.com



IRS CIRCULAR 230 DISCLOSURE: To comply with U.S. Treasury regulations, we advise you that any U.S. federal tax advice included in this communication is not intended or written to be used, and can not be used, to avoid any U.S. federal tax penalties or to promote, market, or recommend to another party any transaction or matter addressed herein.

CONFIDENTIALITY NOTICE: This e-mail is confidential and is intended only for the named recipient(s) and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you have received this message in error, or are not the named recipient(s), please immediately notify the sender and delete this e-mail message from your computer.

SPO_0008957

| From: | Ryan Smith |
|---|---|
| Sent: | Friday, February 8, 2019 12:59 PM MST |
| To: | Rob Glucksman |
| Subject: | RE: Agmt Regarding Collateral Units and Transfer Agmt |

FYI, I signed all of Solaris' documents at the title company this morning.

**From:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Sent:** Friday, February 8, 2019 10:04 AM
**To:** Ryan Smith <ryan@solarisvail.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

Thanks. Will send this to the title company.

Best,
Rob

**From:** Ryan Smith <ryan@solarisvail.com>
**Sent:** Friday, February 8, 2019 9:58 AM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

A revised Listing Agreement is attached. The only change was the addition of Section 28.1.

**From:** Ryan Smith
**Sent:** Friday, February 8, 2019 9:36 AM
**To:** 'Rob Glucksman' <rglucksman@coloradoregionalcenter.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

I'll ask Josh to add language to the listing agreement and recirculate for your approval.

**From:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Sent:** Friday, February 8, 2019 7:52 AM
**To:** Ryan Smith <ryan@solarisvail.com>
**Subject:** RE: Agmt Regarding Collateral Units and Transfer Agmt

That works. Thanks.

**From:** Ryan Smith <ryan@solarisvail.com>
**Sent:** Thursday, February 7, 2019 9:56 PM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Subject:** Re: Agmt Regarding Collateral Units and Transfer Agmt

I'm fine with the early termination concept. However, rather than the right to "cancel" the contract altogether, the parties should have the right to early terminate the Listing Period upon no less than 10 days written notice to the other.

## AGREEMENT REGARDING COLLATERAL UNITS

This Agreement Regarding Collateral Units (this "**Agreement**"), dated as of the 17th day of April, 2015, is by and among **Colorado Regional Center Project Solaris, LLLP** (the "**Lender**" or "**CRCPS**"), a Colorado limited liability limited partnership, **Solaris Property Owner I, LLC** ("**Borrower**"), a Delaware limited liability company, and, with respect to Section 2 only, **P.B.K. Real Estate, LLC d/b/a Solaris Real Estate LLC** ("**Broker**"), a Colorado limited liability company.

## <u>Recitals</u>

A.      Reference is hereby made to that certain Promissory Note dated April 18, 2012, executed by Borrower, as assignee of Solaris Property Owner, LLC, a Delaware limited liability company ("**Original Borrower**") pursuant to that certain Assignment of Loan Agreement dated October 12, 2011 by and between Original Borrower and Borrower, and payable to the order of Lender ("**Lender**") in the original maximum principal amount of One Hundred Million and No/100 Dollars ($100,000,000.00), as amended by that certain Allonge to Promissory Note dated of even date therewith by and between Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, collectively the "**Note**"), Borrower has become indebted to Lender with respect to a loan ("**Loan**") made pursuant to that certain Loan Agreement dated November 5, 2010 between Original Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), which Loan is secured by one of more Deeds of Trust recorded against the Collateral Units in the real property records of Eagle County, Colorado (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, each a "**Deed of Trust**" and collectively, the "**Deeds of Trust**"), and further evidenced, secured or governed by other instruments and documents executed in connection with the Loan, including, but not limited to (i) that certain Operating Payment Agreement dated November 5, 2010 by and between Borrower, as successor in interest to Original Borrower, and Lender (the "**Operating Payment Agreement**"), (ii) that certain Yield Enhancement Agreement dated November 5, 2010 by and between Borrower and Lender, (iii) that certain Memorandum of Understanding dated April 1, 2011 by and between Borrower, as successor in interest to Original Borrower, and Lender (the "**MOU**"), and (iv) that certain Guaranty Agreement dated April 18, 2012 by Peter Knobel for the benefit of Lender (the "**Guaranty**"), and as such loan documents were amended pursuant to that certain Omnibus Amendment to EB-5 Investment Documents dated March 8, 2012 by and between Original Borrower and Lender (the "**Omnibus Amendment**") (such other instruments and documents, Operating Payment Agreement, MOU, Guaranty, and Omnibus Amendment, together with the Note, the Loan Agreement and Deeds of Trust, as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, collectively, the "**Loan Documents**"). All capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Loan Documents.

B.      Pursuant to the Loan Documents, Borrower has the right to tender any Collateral Unit (as defined therein) to Lender in repayment of a corresponding Loan Advance commencing

on the applicable Prepayment Date, as more particularly set forth in the Loan Documents (each, a "**Collateral Unit Distribution**").

C.      Borrower has duly notified Lender that it intends to cause the occurrence of a Collateral Unit Distribution with respect to each of the Collateral Units on the applicable Prepayment Date. From and after the Prepayment Date for a Collateral Unit, such Collateral Unit may hereinafter be referred to each as an "**Eligible Unit**" and collectively as the "**Eligible Units**."

D.      In lieu of accepting the conveyance of title to the Eligible Units pursuant to a Collateral Unit Distribution, the Lender and Borrower have determined that it is desirable for Borrower to continue to hold record title to the Eligible Units.

E.      The effective date of each Collateral Unit Distribution is as follows:

| Unit | Note Date | Effective Date of Collateral Unit Distribution |
| --- | --- | --- |
| 6E West | April 18, 2012 | April 17, 2015 |
| 2A South | April 25, 2012 | April 24, 2015 |
| Penthouse E West | May 3, 2012 | May 2, 2015 |
| 6E East | May 30, 2012 | May 29, 2015 |
| Penthouse E East | June 15, 2012 | June 14, 2015 |
| 5E West | August 2, 2012 | August 1, 2015 |
| 4G West | August 24, 2012 | August 23, 2015 |
| 7E West | September 7, 2012 | September 6, 2015 |
| Penthouse C East | September 13, 2012 | September 12, 2015 |
| 6D East | October 2, 2012 | October 1, 2015 |
| 5C West | November 6, 2012 | November 5, 2015 |
| 6C West | November 27, 2012 | November 26, 2015 |
| 5G West | January 24, 2013 | January 23, 2016 |
| 3E East | January 29, 2013 | January 28, 2016 |
| 7E East | January 30, 2013 | January 29, 2016 |
| 4D East | March 6, 2013 | March 5, 2016 |
| Penthouse G West | May 20, 2013 | May 19, 2016 |
| Penthouse C West | May 30, 2013 | May 29, 2016 |
| 3C East | January 30, 2015 | January 29, 2018 |

F.      Borrower has agreed to temporarily refrain from conveying title to the Eligible Units to Lender pursuant to a Collateral Unit Distribution on the condition that, for purposes of calculating interest under the Loan Documents, Borrower shall be deemed to have caused a Collateral Unit Distribution as of the Prepayment Date corresponding to each Eligible Unit and associated Loan Advance.

The parties desire to set forth their mutual understanding concerning certain matters related to the listing and sale of the Eligible Units as more particularly described below.

**Agreement**

SPO_0008914

Now, therefore, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Lender and Borrower agree as follows:

1.      <u>Collateral Unit Distribution</u>. For purposes of calculating interest (including any default interest) under the Loan Documents, with respect to each Eligible Unit and associated Loan Advance, Borrower shall be deemed to have caused a Collateral Unit Distribution as of the corresponding "Effective Date of Collateral Unit Distribution" set forth in <u>Recital E</u> above. Notwithstanding the occurrence of a Collateral Unit Distribution with respect to an Eligible Unit and anything in the Loan Documents to the contrary, the principal amount of the associated Loan Advance shall continue to constitute Indebtedness under the Loan; provided, however, (i) no interest (including default interest) shall accrue with respect to such Loan Advance from and after the applicable Effective Date of Collateral Unit Distribution (except as required by the Operating Payment Agreement) and (ii) in the event that a Loan Advance remains outstanding after the applicable Maturity Date, no default or Event of Default shall be deemed to have occurred as a result of a failure of Borrower to repay such Loan Advance on or before such Maturity Date, and Lender may not exercise any rights or remedies with respect to a default or Event of Default, unless and until it shall have provided Borrower with a notice and cure period in accordance with Section 17 of the Loan Agreement.

2.      <u>Listing of Eligible Units</u>.

a.      Upon Lender's written request, Lender may authorize Borrower to enter into certain Listing Agreements with its affiliate, P.B.K. Real Estate, LLC, a Colorado limited liability company (d/b/a Solaris Real Estate, LLC) ("**Broker**") to market an Eligible Unit(s) for sale for a total commission of five percent (5%) and on such other terms and conditions as are set forth in the Exclusive Right-To-Sell Listing Contract attached hereto as <u>Exhibit B</u> (each, a "**Listing Agreement**" and the Eligible Unit to which it pertains, a "**Listed Unit**").  The term of the Listing Agreement shall be defined therein. In no event shall Lender, Borrower, or Broker be obligated to enter into a Listing Agreement. The Listing Agreement shall provide that either party has the right to terminate the Listing Period (as defined in the Listing Agreement) upon ten (10) day's written notice to the other. Upon Lender's written request, Borrower shall exercise its right to terminate the Listing Period on the date set forth in Lender's written request that is no sooner than ten (10) days from the date of Borrower's receipt of such notice.

b.      Upon Closing on a Listed Unit, Broker agrees to pay to Lender an amount equal to fifty percent (50%) of the Sale Commission (as defined in the Listing Agreement), net of any Cooperative Broker Compensation (as defined in the Listing Agreement), earned by Broker from the sale of such Listed Unit.

c.      Borrower agrees that Lender shall have authority to make all decisions otherwise granted to Borrower in a Listing Agreement and Borrower shall consult Lender on all matters pertaining to the sale of the Eligible Units.

d.      Upon Lender's written request, Lender may authorize Borrower to enter into listing or co-listing agreements with third-party real estate brokers to market Eligible Unit(s).

SPO_0008915

In no event shall Lender or Borrower be obligated to enter into such a listing agreement. Borrower agrees that Lender shall have authority to make all decisions otherwise granted to Borrower in such listing agreement and Borrower shall consult Lender on all matters pertaining to the sale of the Eligible Units.

3.    <u>Listing of Borrower's Units</u>. During the Listing Period (as defined in the Listing Agreement) for a Listed Unit, Borrower agrees that it will not cause Broker or any other third-party real estate broker to initiate an MLS listing for the sale of any residential unit in Solaris that is owned by Solaris Property Owner, LLC, a Delaware limited liability company, Solaris Property Owner II, LLC, a Delaware limited liability company, or other related entities other than Borrower (collectively, the **"Affiliated Solaris Owners"**) and (ii) is like-kind to an Eligible Unit. Borrower also agrees that any like-kind units owned by the Affiliated Solaris Owners that are currently listed on MLS shall be removed.

4.    <u>Conveyance of Eligible Units.</u>

a.    <u>Sale to Third-Party</u>. In the event that Borrower enters into a contract for the purchase and sale of an Eligible Unit that is approved by Lender (a "<u>Purchase Agreement</u>"), Borrower and Lender shall promptly execute and deliver to the other party a Transfer Agreement with respect to such Eligible Unit substantially in the form attached hereto as <u>Exhibit A</u> (each, a "<u>Transfer Agreement</u>"). The Closing Date under the Transfer Agreement shall be the date set forth in the Purchase Agreement.

b.    <u>Tender to Lender</u>. In the event that Borrower notifies Lender in writing that it intends to tender or otherwise convey any Eligible Unit to Lender or Lender notifies Borrower in writing that an Eligible Unit is to be tendered or otherwise conveyed to Lender, Borrower and Lender shall promptly execute and deliver to the other party a Transfer Agreement with respect to such Eligible Unit substantially in the form of the Transfer Agreement attached hereto as <u>Exhibit A</u>. The Closing Date under the applicable Transfer Agreement shall be the date set forth in the notice from Borrower to Lender that it intends to tender or otherwise convey the Eligible Unit to Lender or notice from Lender to Borrower that requests than the Eligible Unit be tendered or otherwise conveyed to Lender, as the case may be.

c.    <u>Tender to Limited Partners of the Lender.</u> In the event that Lender notifies and instructs Borrower to enter into a contract for the sale or conveyance of an Eligible Unit to an individual limited partner or group of limited partners of the Lender, the parties agree that any Sale Commission shall be waived.

5.    <u>MISCELLANEOUS</u>. This Agreement represents the entire and complete agreement between the parties. The Amendment shall not be amended or modified, except by an instrument in writing, signed by all parties. All terms and provisions hereof shall inure to the benefit of, and being binding upon the parties, and their respective successors and assigns. Wherever used in this Agreement, the singular shall include the plural, and the masculine shall include the feminine and neuter grammatical forms. Captions are included for convenient reference only, and shall not be construed to alter or affect any terms or provisions of this Agreement. This Agreement has been executed by the parties after discussions and negotiation,

SPO_0008916

and shall be construed as having been drafted by both parties. If any term of this Agreement is held to be invalid or unenforceable, such term shall be construed as being valid and enforceable to the fullest extent permitted by law, and all remaining terms shall remain full force and effect. This Agreement shall be construed and enforced in accordance with the laws of the State of Colorado. Each party hereto waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or any related document. If a party initiates any action to enforce or interpret this Agreement, the party determined by the court or arbiter, as the case may be, to be the prevailing party in such action will be entitled to receive from the non-prevailing party all reasonable costs and expenses, including all reasonable attorneys' fees incurred by the prevailing party in such action. This Agreement may be executed in electronic or facsimile counterparts, each of which when so executed shall be deemed to be an original, and all of which when taken together shall constitute one original signed agreement.

[SIGNATURE PAGE FOLLOWS]

SPO_0008917

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the date first above set forth.

BORROWER:

SOLARIS PROPERTY OWNER I, LLC,
a Delaware limited liability company


By: _____
    Ryan A. Smith, its Authorized Signatory


LENDER:

COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP,
a Colorado limited liability limited partnership

By:_____
Name: _____
Its: _____

With respect to Section 2 only.

BROKER:

P.B.K. REAL ESTATE, LLC d/b/a SOLARIS REAL ESTATE LLC,
a Colorado limited liability limited partnership

By:_____
Name: _____
Its: _____

SPO_0008918

## AGREEMENT REGARDING COLLATERAL UNITS

This Agreement Regarding Collateral Units (this "**Agreement**"), dated as of the 17ᵗʰ day of April, 2015, is by and among **Colorado Regional Center Project Solaris, LLLP** (the "**Lender**" or "**CRCPS**"), a Colorado limited liability limited partnership, **Solaris Property Owner I, LLC** ("**Borrower**"), a Delaware limited liability company, and, with respect to Section 2 only, **P.B.K. Real Estate, LLC d/b/a Solaris Real Estate LLC** ("**Broker**"), a Colorado limited liability company.

### <u>Recitals</u>

A.        Reference is hereby made to that certain Promissory Note dated April 18, 2012, executed by Borrower, as assignee of Solaris Property Owner, LLC, a Delaware limited liability company ("**Original Borrower**") pursuant to that certain Assignment of Loan Agreement dated October 12, 2011 by and between Original Borrower and Borrower, and payable to the order of Lender ("**Lender**") in the original maximum principal amount of One Hundred Million and No/100 Dollars ($100,000,000.00), as amended by that certain Allonge to Promissory Note dated of even date therewith by and between Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, collectively the "**Note**"), Borrower has become indebted to Lender with respect to a loan ("**Loan**") made pursuant to that certain Loan Agreement dated November 5, 2010 between Original Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), which Loan is secured by one or more Deeds of Trust recorded against the Collateral Units in the real property records of Eagle County, Colorado (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, each a "**Deed of Trust**" and collectively, the "**Deeds of Trust**"), and further evidenced, secured or governed by other instruments and documents executed in connection with the Loan, including, but not limited to (i) that certain Operating Payment Agreement dated November 5, 2010 by and between Borrower, as successor in interest to Original Borrower, and Lender (the "**Operating Payment Agreement**"), (ii) that certain Yield Enhancement Agreement dated November 5, 2010 by and between Borrower and Lender, (iii) that certain Memorandum of Understanding dated April 1, 2011 by and between Borrower, as successor in interest to Original Borrower, and Lender (the "**MOU**"), and (iv) that certain Guaranty Agreement dated April 18, 2012 by Peter Knobel for the benefit of Lender (the "**Guaranty**"), and as such loan documents were amended pursuant to that certain Omnibus Amendment to EB-5 Investment Documents dated March 8, 2012 by and between Original Borrower and Lender (the "**Omnibus Amendment**") (such other instruments and documents, Operating Payment Agreement, MOU, Guaranty, and Omnibus Amendment, together with the Note, the Loan Agreement and Deeds of Trust, as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, collectively the "**Loan Documents**"). All capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Loan Documents.

B.        Pursuant to the Loan Documents, Borrower has the right to tender any Collateral Unit (as defined therein) to Lender in repayment of a corresponding Loan Advance commencing

on the applicable Prepayment Date, as more particularly set forth in the Loan Documents (each, a "**Collateral Unit Distribution**").

C.    Borrower has duly notified Lender that it intends to cause the occurrence of a Collateral Unit Distribution with respect to each of the Collateral Units on the applicable Prepayment Date. From and after the Prepayment Date for a Collateral Unit, such Collateral Unit may hereinafter be referred to each as an "**Eligible Unit**" and collectively as the "**Eligible Units.**"

D.    In lieu of accepting the conveyance of title to the Eligible Units pursuant to a Collateral Unit Distribution, the Lender and Borrower have determined that it is desirable for Borrower to continue to hold record title to the Eligible Units.

E.    The effective date of each Collateral Unit Distribution is as follows:

|  |  |  |
|---|---|---|
| 6E West | April 18, 2012 | April 17, 2015 |
| 2A South | April 25, 2012 | April 24, 2015 |
| Penthouse E West | May 3, 2012 | May 2, 2015 |
| 6E East | May 30, 2012 | May 29, 2015 |
| Penthouse E East | June 15, 2012 | June 14, 2015 |
| 5E West | August 2, 2012 | August 1, 2015 |
| 4G West | August 24, 2012 | August 23, 2015 |
| 7E West | September 7, 2012 | September 6, 2015 |
| Penthouse C East | September 13, 2012 | September 12, 2015 |
| 6D East | October 2, 2012 | October 1, 2015 |
| 5C West | November 6, 2012 | November 5, 2015 |
| 6C West | November 27, 2012 | November 26, 2015 |
| 5G West | January 24, 2013 | January 23, 2016 |
| 3E East | January 29, 2013 | January 28, 2016 |
| 7E East | January 30, 2013 | January 29, 2016 |
| 4D East | March 6, 2013 | March 5, 2016 |
| Penthouse G West | May 20, 2013 | May 19, 2016 |
| Penthouse C West | May 30, 2013 | May 29, 2016 |
| 3C East | January 30, 2015 | January 29, 2018 |

F.    Borrower has agreed to temporarily refrain from conveying title to the Eligible Units to Lender pursuant to a Collateral Unit Distribution on the condition that, for purposes of calculating interest under the Loan Documents, Borrower shall be deemed to have caused a Collateral Unit Distribution as of the Prepayment Date corresponding to each Eligible Unit and associated Loan Advance.

The parties desire to set forth their mutual understanding concerning certain matters related to the listing and sale of the Eligible Units as more particularly described below.

## Agreement

Now, therefore, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Lender and Borrower agree as follows:

1.    <u>Collateral Unit Distribution</u>. For purposes of calculating interest (including any default interest) under the Loan Documents, with respect to each Eligible Unit and associated Loan Advance, Borrower shall be deemed to have caused a Collateral Unit Distribution as of the corresponding "Effective Date of Collateral Unit Distribution" set forth in <u>Recital E</u> above. Notwithstanding the occurrence of a Collateral Unit Distribution with respect to an Eligible Unit and anything in the Loan Documents to the contrary, the principal amount of the associated Loan Advance shall continue to constitute Indebtedness under the Loan; provided, however, (i) no interest (including default interest) shall accrue with respect to such Loan Advance from and after the applicable Effective Date of Collateral Unit Distribution (except as required by the Operating Payment Agreement) and (ii) in the event that a Loan Advance remains outstanding after the applicable Maturity Date, no default or Event of Default shall be deemed to have occurred as a result of a failure of Borrower to repay such Loan Advance on or before such Maturity Date, and Lender may not exercise any rights or remedies with respect to a default or Event of Default, unless and until it shall have provided Borrower with a notice and cure period in accordance with Section 17 of the Loan Agreement.

2.    <u>Listing of Eligible Units</u>.

a.    Upon Lender's written request, Lender may authorize Borrower to enter into certain Listing Agreements with its affiliate, P.B.K. Real Estate, LLC, a Colorado limited liability company (d/b/a Solaris Real Estate, LLC) ("**Broker**") to market an Eligible Unit(s) for sale for a total commission of five percent (5%) and on such other terms and conditions as are set forth in the Exclusive Right-To-Sell Listing Contract attached hereto as <u>Exhibit B</u> (each, a "**Listing Agreement**" and the Eligible Unit to which it pertains, a "**Listed Unit**"). The term of the Listing Agreement shall be defined therein. In no event shall Lender, Borrower, or Broker be obligated to enter into a Listing Agreement. The Listing Agreement shall provide that either party has the right to terminate the Listing Period (as defined in the Listing Agreement) upon ten (10) day's written notice to the other. Upon Lender's written request, Borrower shall exercise its right to terminate the Listing Period on the date set forth in Lender's written request that is no sooner than ten (10) days from the date of Borrower's receipt of such notice.

b.    Upon Closing on a Listed Unit, Broker agrees to pay to Lender an amount equal to fifty percent (50%) of the Sale Commission (as defined in the Listing Agreement), net of any Cooperative Broker Compensation (as defined in the Listing Agreement), earned by Broker from the sale of such Listed Unit.

c.    Borrower agrees that Lender shall have authority to make all decisions otherwise granted to Borrower in a Listing Agreement and Borrower shall consult Lender on all matters pertaining to the sale of the Eligible Units.

      d.     Upon Lender's written request, Lender may authorize Borrower to enter into listing or co-listing agreements with third-party real estate brokers to market Eligible Unit(s). In no event shall Lender or Borrower be obligated to enter into such a listing agreement. Borrower agrees that Lender shall have authority to make all decisions otherwise granted to Borrower in such listing agreement and Borrower shall consult Lender on all matters pertaining to the sale of the Eligible Units.

      3.     <u>Listing of Borrower's Units</u>. During the Listing Period (as defined in the Listing Agreement) for a Listed Unit, Borrower agrees that it will not cause Broker or any other third-party real estate broker to initiate an MLS listing for the sale of any residential unit in Solaris that is owned by Solaris Property Owner, LLC, a Delaware limited liability company, Solaris Property Owner II, LLC, a Delaware limited liability company, or other related entities other than Borrower (collectively, the **"Affiliated Solaris Owners"**) and (ii) is like-kind to an Eligible Unit. Borrower also agrees that any like-kind units owned by the Affiliated Solaris Owners that are currently listed on MLS shall be removed.

      4.     <u>Conveyance of Eligible Units.</u>

      a.     <u>Sale to Third-Party</u>. In the event that Borrower enters into a contract for the purchase and sale of an Eligible Unit that is approved by Lender (a "<u>Purchase Agreement</u>"), Borrower and Lender shall promptly execute and deliver to the other party a Transfer Agreement with respect to such Eligible Unit substantially in the form attached hereto as <u>Exhibit A</u> (each, a "<u>Transfer Agreement</u>"). The Closing Date under the Transfer Agreement shall be the date set forth in the Purchase Agreement.

      b.     <u>Tender to Lender</u>. In the event that Borrower notifies Lender in writing that it intends to tender or otherwise convey any Eligible Unit to Lender or Lender notifies Borrower in writing that an Eligible Unit is to be tendered or otherwise conveyed to Lender, Borrower and Lender shall promptly execute and deliver to the other party a Transfer Agreement with respect to such Eligible Unit substantially in the form of the Transfer Agreement attached hereto as <u>Exhibit A</u>. The Closing Date under the applicable Transfer Agreement shall be the date set forth in the notice from Borrower to Lender that it intends to tender or otherwise convey the Eligible Unit to Lender or notice from Lender to Borrower that requests than the Eligible Unit be tendered or otherwise conveyed to Lender, as the case may be.

      c.     <u>Tender to Limited Partners of the Lender.</u> In the event that Lender notifies and instructs Borrower to enter into a contract for the sale or conveyance of an Eligible Unit to an individual limited partner or group of limited partners of the Lender, the parties agree that any Sale Commission shall be waived.

      5.     <u>MISCELLANEOUS</u>. This Agreement represents the entire and complete agreement between the parties. The Amendment shall not be amended or modified, except by an instrument in writing, signed by all parties. All terms and provisions hereof shall inure to the benefit of, and being binding upon the parties, and their respective successors and assigns. Wherever used in this Agreement, the singular shall include the plural, and the masculine shall include the feminine and neuter grammatical forms. Captions are included for convenient

reference only, and shall not be construed to alter or affect any terms or provisions of this Agreement. This Agreement has been executed by the parties after discussions and negotiation, and shall be construed as having been drafted by both parties. If any term of this Agreement is held to be invalid or unenforceable, such term shall be construed as being valid and enforceable to the fullest extent permitted by law, and all remaining terms shall remain full force and effect. This Agreement shall be construed and enforced in accordance with the laws of the State of Colorado. Each party hereto waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or any related document. If a party initiates any action to enforce or interpret this Agreement, the party determined by the court or arbiter, as the case may be, to be the prevailing party in such action will be entitled to receive from the non-prevailing party all reasonable costs and expenses, including all reasonable attorneys' fees incurred by the prevailing party in such action. This Agreement may be executed in electronic or facsimile counterparts, each of which when so executed shall be deemed to be an original, and all of which when taken together shall constitute one original signed agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the date first above set forth.

BORROWER:

SOLARIS PROPERTY OWNER I, LLC,
a Delaware limited liability company

By: _____
    Ryan A. Smith, its Authorized Signatory

LENDER:

COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP,
a Colorado limited liability limited partnership

By:_____
Name: _____
Its: _____

With respect to Section 2 only.

BROKER:

P.B.K. REAL ESTATE, LLC d/b/a SOLARIS REAL ESTATE LLC,
a Colorado limited liability limited partnership

By:_____
Name: _____
Its: _____

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the date first above set forth.

BORROWER:

SOLARIS PROPERTY OWNER I, LLC,
a Delaware limited liability company


By: _____
    Ryan A. Smith, its Authorized Signatory


LENDER:

COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP,
a Colorado limited liability limited partnership

By: _____
Name: _____
Its: _____

With respect to Section 2 only.

BROKER:

P.B.K. REAL ESTATE, LLC d/b/a SOLARIS REAL ESTATE LLC,
a Colorado limited liability limited partnership

By: _____
Name: _____
Its: _____

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the date first above set forth.

BORROWER:

SOLARIS PROPERTY OWNER I, LLC,
a Delaware limited liability company

By: _____
Ryan A. Smith, its Authorized Signatory

LENDER:

COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP,
a Colorado limited liability limited partnership

By: _____
Name: _____
Its: _____

With respect to Section 2 only.

BROKER:

P.B.K. REAL ESTATE, LLC d/b/a SOLARIS REAL ESTATE LLC,
a Colorado limited liability limited partnership

By: _____
Name: _____
Its: _____