EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  1:19-cv-02443-RM-STV;
Consolidated with Civil Action No. 1:19-cv-02637

Li, *et al*.,

      Plaintiffs,

v.

Waveland Ventures, LLC, *et al*.,

      Defendants.

---

## DECLARATION OF ROBERT GLUCKSMAN

---

I, Robert Glucksman, being of lawful age, and with personal knowledge of all matters described herein declare under penalty of perjury that the foregoing is true and correct:

1.     I am Managing Director of Colorado Regional Center, LLC and an authorized representative of Colorado Regional Center I, LLC ("CRC"), which is the general partner of Colorado Regional Center Project Solaris LLLP ("CRCPS"). I have held this position continuously since May 2014.

2.     I am familiar with loan documents in connection with a loan transaction between CRCPS and Solaris Property Owner LLC ("SPO"), including a Loan Agreement and Promissory Note. *See* Attachment 1, Loan Agreement; Attachment 2, Promissory Note.

3.     The Promissory Note states that the loan to SPO was non-recourse with the exception of interest payments. To secure the loan, SPO would grant a lien, evidenced by a deed

of trust to CRCPS for each of certain condominium units designated as collateral. *See* Attachment 2-3.

4.      CRCPS's loan to SPO was to be funded in multiple advances over a period of time, with a term of five years for each loan advance. *See* Attachment 1, Section 7; Attachment 2, p. 1.

5.      Prior to the first loan advance, SPO assigned its rights and obligations under the Loan Agreement to Solaris Property Owner I LLC ("SPO I").

6.      The Loan Agreement states that notwithstanding anything to the contrary set forth herein, in the Note, Deed of Trust or any other Loan Documents, at any time after the expiration of thirty-six (36) months following a Loan Advance, Borrower shall have the absolute right to prepay the portion of the Note attributable to such Loan Advance by repaying Lender the amount of such Loan Advance or tendering to Lender the Collateral Unit(s) securing such Loan Advance. *See* Attachment 1, Section 11.

7.      The parties called Borrower's right to prepay each loan advance three years following a Loan Advance SPO I's "put right."  *See* Attachment 1.

8.      CRCPS, as the lender, also had a "call right," to refuse cash payment and require SPO I to convey the condominium units, which CRCPS would presumably do if the condominium units materially appreciated in value. CRCPS's call right was documented in a Yield Enhancement Agreement, which was part of the overall loan documents.

9.     The thirty-six month (3 year) anniversary of each Loan Advance was thirty-six months (3 years) from the "Date Loan Advance Complete" in Exhibit A of the Promissory Note [Attachment 2]:

**EXHIBIT A**
(Promissory Note)

| A | B | C | D | E |
|---|---|---|---|---|
| Property | Collateral Unit Value | Loan Advance | Date Loan Advance Complete | Maturity Date |
| Unit 6E West | $3,707,982 | $4,000,000 | April 18, 2012 | April 17, 2017 |
| Unit 2A South | $6,439,950 | $6,500,000 | April 25, 2012 | April 24, 2017 |
| Pent E West | $3,084,124 | $3,000,000 | May 3, 2012 | May 2, 2017 |
| Unit 6E East | $3,707,485 | $3,500,000 | May 30, 2012 | May 29, 2017 |
| Pent E East | $3,084,683 | $3,000,000 | June 15, 2012 | June 14, 2017 |
| Unit 5E West | $3,581,090 | $4,000,000 | August 2, 2012 | August 1, 2017 |
| Unit 4G West | $6,420,861 | $6,500,000 | August 24, 2012 | August 23, 2017 |
| Unit 7E West | $4,556,554 | $4,500,000 | September 7, 2012 | September 6, 2017 |
| Pent C East | $2,355,248 | $2,000,000 | September 13, 2012 | September 12, 2017 |
| Unit 6D East | $7,832,070 | $8,000,000 | October 2, 2012 | October 1, 2017 |
| Unit 5C West | $3,555,668 | $3,500,000 | November 6, 2012 | November 5, 2017 |
| Unit 6C West | $3,605,715 | $3,500,000 | November 27, 2012 | November 26, 2017 |
| Unit 5G West | $6,521,940 | $6,500,000 | January 24, 2013 | January 23, 2018 |
| Unit 3E East | $2,578,042 | $3,000,000 | January 29, 2013 | January 28, 2018 |
| Unit 7E East | $4,043,190 | $4,000,000 | January 30, 2013 | January 29, 2018 |
| Unit 4D East | $7,831,977 | $7,500,000 | March 6, 2013 | March 5, 2018 |
| Pent G West | $4,737,891 | $4,500,000 | May 20, 2013 | May 19, 2018 |
| Pent C West | $2,355,530 | $2,500,000 | May 30, 2013 | May 29, 2018 |
| Unit 3C East | $2,500,000 | $2,500,000 | January 30, 2015 | January 29, 2020 |

10.     The first 3-year anniversary date, or Prepayment Date, to occur was on April 17, 2015, which correlated to the Loan Advance collateralized by Unit 6E West. Per the terms of the Promissory Note, each 3-year anniversary date was defined as a "Prepayment Date."

3

11.     As the Prepayment Date approached for the 6E West Loan Advance, I had conversations with SPO I whereby SPO I informed CRCPS that it intended to tender all units to CRCPS, on a rolling basis upon each Prepayment Date, in satisfaction of the indebtedness. SPO I had the unilateral right to do this under Section 11 of the Loan Agreement and the Term section of the Promissory Note. *See* Attachment 1 and 2.

12.     The Loan Agreement and Promissory Note are silent as to the mechanics of an actual transfer, regardless of whether initiated by Borrower (i.e., exercise of put right) or Lender (i.e., exercise of call right).

13.     The Promissory Note states that "…Borrower shall have the absolute right to prepay the portion [of] the Note attributable to any Loan Advance by repaying Lender the amount of such Loan Advance in cash or conveying Lender the Collateral Unit(s) securing such Loan Advance" and the Section 11 of the Loan Agreement contains similar, if not identical, language. *See* Attachment 2, p. 1.

14.     At each Prepayment Date, nothing would have prevented SPO I from delivering a Special Warranty Deed and then demanding that the corresponding Deed of Trust be released or initiating a legal action to do so, which SPO I also had the ability to do in the event that CRCPS had notified SPO I of an event of default for non-payment or non-tender under the Loan Agreement and Promissory Note. CRCPS and SPO I agreed that each Prepayment Date would be treated as the date of an effective prepayment and transfer of the corresponding unit, with all aspects of ownership transferring to CRCPS. Accordingly, CRCPS and SPO I began to work on the mechanics of transfer of the collateral. Subsequent to the first Prepayment Date, the interest rate on the corresponding loan advances stopped accruing and Operating Payments were triggered.

4

Invoices exchanged between SPO I and CRCPS reflect the reduced Operating Payment which SPO I paid through the 5-year maturity date of each loan advance.

15.     Because the loan documents were silent as to the mechanics of effectuating a unit transfer upon either SPO I exercising its put right or CRCPS exercising its call right, between approximately April 2015 and March 2016, CRCPS and SPO I negotiated and worked on a process and document set to effectuate the transfers. I was part of that process on behalf of CRCPS and Ryan Smith was part of that process on behalf of SPO I.

16.     Forms of transfer agreements, bills of sale, special warranty deeds were drafted in this time frame. By late 2015, a formal put notice had been drafted in addition to the aforementioned documents and the parties were working with Land Title to facilitate the transfers. Attachment 3, SPO-0000817-25.

17.     On March 2, 2016, Rick Hayes of CRC I and Peter Knobel of SPO I met and agreed that SPO I would continue to hold title to the units in order to potentially save CRCPS expenses. *See* Attachment 4, SPO-0000970-74.

18.     On March 15, 2016, CRCPS notified SPO I that CRCPS would continue to move forward with the unit transfers as initially indicated by SPO I's exercise of its put right. *See* Attachment 5, SPO-0000986-87. The parties continued to work on draft documents, including further drafts of a Transfer Agreement.

19.     In late 2016 and early 2017, the parties revisited the discussion of having SPO I continue to hold title while effectively transferring all rights of ownership to CRCPS. In order to potential save up to $1 million or so of expenses, CRCPS desired and agreed to that structure.

5

20.     Critically, SPO I had its "put right" – the right to prepay the loan advances - at all times referenced above.  The first maturity date for the first advance was April 17, 2017.  Well before this date, SPO I had exercised the put right and consistently maintained that position. All of the above references establish that the parties understood and accepted SPO I's exercise of this put right before the first maturity date.

21.     The first draft of the document that ultimately became the ARCU appears to have been circulated on August 1, 2017. *See* Attachment 6, SPO-0003406-15.

22.     The parties continued negotiating on the ARCU and related documents, which moved along slowly because, although units were listed for sale, there was not a pending transaction and no reasonable offers had been submitted to CRCPS. *See* Attachment 7, SPO-000316-17.

23.     When the 6E West transaction was slated to close in early February 2019, the parties worked expeditiously to finalize the documents. The ARCU and the Transfer Agreement related to the 6E West loan advance were executed on or about February 8, 2019, memorializing the parties' positions, behavior and practice over the prior years and was intended to be effective as of April 17, 2015, which was the Prepayment Date of the first loan advance to SPO I – the 6E West loan advance.

24.     As CRC I has maintained throughout this lawsuit, the rationale for proceeding in the manner that CRCPS and SPO I did as outlined above was based, at least in CRCPS's part, on the benefits that would inure to CRCPS by having SPO I retain title, while CRCPS maintained all aspects of ownership of the condominium units, including the right to market and direct the sale of such units.  Specifically, the dynamic established by CRCPS and SPO I was designed to avoid

a Town of Vail, Colorado transfer tax of one percent on real estate transfers. It is and has been my understanding that any transfer of units by SPO I to CRCPS would be exempt from the transfer tax, but the transfer tax would apply to any subsequent transfer to a third-party buyer.  According to Town of Vail Code Section 2-6-5(L), the transfer tax did not apply to transfers securing a debt or other obligation, or releases on real property which is security for a debt or other obligation. Thus, a transfer from SPO I to CRCPS, which released the deed of trust and satisfied the loan advance on a particular unit was exempt, but the subsequent sale or transfer to a third-party buyer was not exempt. By allowing SPO I to hold title and transfer it to a third-party buyer at the direction of CRCPS, CRCPS would benefit from a reduction or elimination of the one percent transfer tax while not incurring any additional cost to CRCPS.

25.     The contemplated benefit to CRCPS of proceeding in the manner described above has been borne out by recent events.  In December 2020, SPO I conveyed title to all 16 remaining condominium units to CRCPS. Real estate transfer taxes were not due in that transaction, as the exemption applied and real estate transfer tax exemption forms were approved by the Town of Vail. But for each of the subsequent sales from CRCPS to a third-party buyer, the one percent transfer tax applied.  CRCPS attempted to reduce this liability by negotiating a split in the transfer tax with each buyer.  Sales to third-party buyers that occurred after the transfer by SPO I to CRCPS in December 2020 have cost CRCPS $243,300 in aggregate transfer tax payments and would have cost CRCPS $486,600 had CRCPS not been able to negotiate a split with the third-party buyers.

26.     CRCPS has continued to market and sell the condominium units, and CRCPS has been issuing distributions to CRCPS limited partners accordingly.  Attached hereto is CRCPS's April 21, 2023, Solaris Project Update. *See* Attachment 8.

I hereby swear, under penalty of perjury of the laws of the State of Colorado and the United States of America, that the statements in this Declaration are true and accurate.

Executed on May /8 , 2023.

Robert Glucksman

8

## LOAN AGREEMENT

THIS LOAN AGREEMENT (this "**Agreement**" or "**Loan Agreement**") is made into and entered into this 5th day of November 2010 between Borrower and Lender (as such terms are defined below).

**1.     AGREEMENT TO LEND.** Subject to all of the terms, conditions and provisions set forth below and in the Loan Documents (as hereinafter defined) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, (i) Lender has agreed to lend to Borrower and (ii) Borrower has agreed to borrow from Lender, certain funds not to exceed the Loan Amount (as hereinafter defined).

**2.     TERM.** This Agreement shall become effective as of the date first written above and remain in effect until the parties respective obligations hereunder have been performed in full or this Agreement is terminated as provided below.

**3.     UNITED STATES DOLLARS.** All references to dollar amounts shall mean amounts in lawful money of the United States of America.

**4.     DEFINITIONS.** Terms not otherwise defined in this Agreement or the other Loan Documents (as hereinafter defined) shall have the meanings attributed to such terms in the Uniform Commercial Code. The following terms shall have the meanings set forth below:

"**Agreement**" or "**Loan Agreement**" means this Agreement, as the same may be amended or modified from time to time, together with any and all exhibits and schedules attached to this Agreement from time to time.

"**Borrower**" means Solaris Property Owner, LLC, a Delaware limited liability company, its successors and assigns.

"**Closing**" means the date on which each Loan Advance is made to Borrower.

"**Collateral**" means the Property, as hereinafter defined.

"**Collateral Unit(s)**" shall have the meaning set forth below in Section 8 of this Loan Agreement.

"**Collateral Unit Value**" means the estimated market value of each Collateral Unit as set forth in the Condominium Pool.

"**Condominium Pool**" means certain Condominium Units listed on Exhibit A hereto.

"**Condominium Unit(s)**" or "**Unit(s)**" means the individual condominiums in the Condominium Pool.

"**Deed of Trust**" means the deed of trust (in a form and substance materially similar to the form attached hereto as Exhibit B) to be recorded against each Collateral Unit in connection with Closing on the Loan Advance secured by such Collateral Unit.

"**Event of Default**" means any one of the Events of Default (as hereinafter defined).

"**Grantor**" means each and all of the persons or entities (including, without limitation, a Borrower) granting a Security Interest in the Collateral.

1

**ATTACHMENT 1**

CRC 000230

"**Indebtedness**" means and includes without limitation the Loan, together with all other obligations, debts and liabilities of Borrower to Lender, or any one or more of them.

"**Lender**" means Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership, its successors and assigns.

"**Loan**" means the loan or loans made to Borrower under this Agreement and the Loan Documents as described below.

"**Loan Advance**" means the amount of each advance of principal from Lender to Borrower under this Agreement.

"**Loan Amount**" means the sum of all Loan Advances made, from time to time, pursuant to the terms hereof.

"**Loan Documents**" shall have the meaning set forth in the Deed of Trust..

"**Material Adverse Effect**" or "**Material Adverse Change**" means a condition or event that materially and adversely affects (i) the business, assets, results of operations, financial condition or prospects of the parties, or (ii) the ability of the parties to perform their respective obligations under the Loan Documents.

"**Maturity Date**" means a date that is exactly sixty (60) calendar months from the date of each Closing hereunder.

"**Note**" or "**Promissory Note**" means the promissory note (in form and substance substantially the same as the form attached hereto as Exhibit C) to be executed by Borrower in connection with the first Closing, as the same may be amended from time to time.

"**Prepayment Date**" shall have the meaning set forth in the Note.

"**Property**" means the Collateral Unit(s) together with all fixtures and other articles of personal property now or subsequently located in or affixed to the Collateral Unit(s), and all proceeds (including, without limitation, all insurance proceeds and refunds of premiums) from any sale or other disposition of such property.

"**Security Agreement**" means any agreements executed by the parties for the purpose of evidencing and/or creating Lender's Security Interest in the Collateral.

"**Security Interest**" means on any type of collateral security, whether in the form of a lien, charge, mortgage, deed of trust, assignment, pledge, chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

"**Solaris Lenders**" means any and all lenders previously or hereafter advancing funds in connection with the construction and/or refinancing of all or any portion of Solaris.

"**Solaris Project**" means certain real estate in Eagle County Colorado, generally located at 141 East Meadow Drive, Vail, Colorado 81657 and commonly known as "The Residences at Solaris" and "The Shops at Solaris."

2

**ATTACHMENT 1**

CRC 000231

5.      **LOAN.** Lender intends to raise the maximum amount of funds permitted pursuant to the EB-5 Immigrant Investor Program ("**EB-5**"), the proceeds of which will be loaned to Borrower pursuant to the terms and conditions set forth in the Loan Documents. Borrower understands and agrees that Lender is unable to guarantee that it will be successful in raising funds from investors pursuant to the EB-5 program. Consequently, if by December 31, 2012, Lender is unable to raise funds to enable it to make a Loan Advance, the Loan Documents shall automatically and without further action by the parties terminate and neither party shall have any further rights or obligations hereunder. If Lender is successful in raising funds pursuant to the terms and conditions of this Agreement, (i) Borrower shall be obligated to accept all such funds raised by Lender and made available to Borrower on the terms set forth herein, and (ii) Lender shall be obligated to lend to Borrower all such sums raised by Lender on the terms set forth herein. Borrower recognizes and agrees that Lender will expend significant funds to raise capital from EB-5 investors pursuant to the EB-5 program, and Lender is relying on Borrower's obligation to accept each Loan Advance made by Lender in accordance with the terms and conditions set forth in this Agreement. Lender recognizes and agrees that Borrower will also expend significant funds to raise capital from EB-5 investors pursuant to the EB-5 program, and Borrower is relying on Lender's obligation to lend to Borrower all such amounts raised by Lender in accordance with the terms and conditions set forth in this Agreement.

6.      **INTEREST.** Each Loan Advance shall bear interest at the rate of five percent (5%) per annum from and after the date Borrower receives such Loan Advance until such Loan Advance is repaid pursuant to and in accordance with the Note.

7.      **LOAN ADVANCES GENERALLY.** Lender shall advance all invested sums to Borrower as soon as reasonably practicable in accordance with the terms, conditions, provisions and restrictions of EB-5. The parties agree to use good faith best efforts and take all reasonable steps necessary to ensure that the EB-5 proceeds are advanced to Borrower as soon as reasonably practicable within the parameters of EB-5. Without limiting the generality of the foregoing, the parties agree to establish procedures and modify the Loan Documents as necessary to accomplish the foregoing.

8.      **COLLATERAL UNITS.** Without limiting the generality of Section 7 above, at the time of each Loan Advance, Borrower shall select one or more Condominium Units from the Condominium Pool that will serve as security for the Loan Advance (each, a "**Collateral Unit**" and collectively, the "**Collateral Units**"). Borrower shall execute a separate Deed of Trust for each Collateral Unit in connection with Closing on the Loan Advance secured by such Collateral Unit.

9.      **CONDOMINIUM POOL; SALES OF UNITS.** Borrower may sell any Unit in the Condominium Pool to a third party at any time prior to such Unit's designation as a Collateral Unit; *provided, however*, that Borrower and Lender shall jointly select a replacement Unit reasonably comparable in size, price, and location to the Unit sold. The parties agree to use good faith best efforts to select the replacement Unit for the Condominium Pool.

10.      **FEES AND EXPENSES.** Except as may be specifically set forth in this Agreement, each party shall pay its own legal and related expenses incurred in connection with the preparation and review of Loan Documents and the making of the Loan. Any fees incurred in connection with the transfer of any Condominium Units pursuant to a Security Agreement shall be paid as set forth herein.

11.      **PREPAYMENT OF NOTE.** Notwithstanding anything to the contrary set forth herein, in the Note, Deed of Trust or any other Loan Documents, at any time after the expiration of thirty six (36) months following a Loan Advance, Borrower shall have the absolute right to prepay the portion of the Note attributable to such Loan Advance by repaying Lender the amount of such Loan Advance or

3

**ATTACHMENT 1**

CRC 000232

tendering to Lender the Collateral Unit(s) securing such Loan Advance. If Borrower conveys any Collateral Unit(s) in repayment of a Loan Advance, the principal balance of the Note shall be reduced by the amount of the Loan Advance secured by such Collateral Unit(s).

**12.     REPRESENTATIONS AND WARRANTIES OF BORROWER.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each Loan Advance, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**(i)     Organization.** Borrower is a limited liability company duly organized, validly existing, and in good standing under the laws of Delaware and is validly existing and in good standing in Colorado. Borrower has the full power and authority to own its properties and to transact the businesses in which it is presently engaged or presently proposes to engage.

**(ii)     Authorization.** Except as expressly set forth below, the execution, delivery, and performance of this Agreement by Borrower, to the extent to be executed, delivered or performed by Borrower, have been duly authorized by all necessary action by Borrower; and do not conflict with, result in a violation of, or constitute a default under (a) any provision of its Articles of Organization or Operating Agreement, or, any agreement or other instrument binding upon Borrower (unless such violation or default of such agreement or instrument has been waived in writing), or (b) any law, governmental regulation, court decree, or order applicable to Borrower.

**(iii)     Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may Materially Adversely Affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing. Lender acknowledges and agrees that Borrower has disclosed the existence of the litigation involving Borrower, The Weitz Company and Richard Joseph & Company for purposes of the foregoing sentence.

**(iv)     Title to Property.** Borrower has good and marketable title to the Condominium Units free and clear of all defects, liens, and encumbrances, excepting only those set forth on the title commitment furnished to Lender in connection any Loan Advance, liens for taxes, assessments or governmental charges or levies not yet delinquent or payable without penalty or interest and such liens and encumbrances as may be approved in writing by the Lender.

**(v)     Hazardous Substances.** The terms "hazardous waste," "hazardous substance," "disposal," "release," and "threatened release," as used in this Agreement, shall have the same meanings as set forth in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act at 1988, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing. Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (a) During the period of Borrower's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any hazardous waste or substance by any person on, under, about or from any of the properties; (b) Borrower has no knowledge of, or reason to believe that there has been (i) any use, generation, manufacture, storage, treatment, disposal, release, or threatened release of any hazardous waste or substance on, under, about or from the properties by any prior owners or occupants of any of the properties, or (ii) any actual or threatened litigation or claims of any kind by any person relating to such matters; (c) neither Borrower nor any

-4-

**ATTACHMENT 1**

CRC 000233

tenant, contractor, agent or other authorized user of any of the properties shall use, generate, manufacture, store, treat, dispose of, or release any hazardous waste or substance on, under, about or from the Property (except for commercial products that are stored in standard commercial containers); and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation those laws, regulations and ordinances described above. Borrower authorizes Lender and its agents to enter upon the properties to make such inspections and tests as Lender may deem appropriate to determine compliance of the properties with this section of the Agreement. The representations and warranties contained herein are based on Borrower's due diligence in investigating the properties for hazardous waste and hazardous substances. Borrower hereby (a) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence or any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the properties. The provisions of this section of the Agreement, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the properties, whether by foreclosure or otherwise.

   (vi)    **Assessment of Condominium Units.**  Each Condominium Unit is and will continue to be assessed and taxed as an independent parcel by all governmental authorities.

   (vii)   **Compliance with Governing Authorities.**  Borrower has examined and is familiar with all the easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements affecting the Property.  The Property was constructed in compliance with the requirements of such easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements.

   (viii)  **Legal Effect.**  This Agreement constitutes, and any instrument or agreement required hereunder to be given by Borrower when delivered will constitute, legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

   (ix)    **Binding Effect.**  This Agreement, the Note and all Security Agreements directly or indirectly securing repayment of Borrower's Loan and Note are binding upon Borrower as well as upon Borrower's successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

   (x)     **Survival of Representation and Warranties.**  Borrower understands and agrees that Lender is relying upon the above representations and warranties in extending Loan Advances to Borrower. Notwithstanding anything to the contrary set forth herein, Borrower and Lender agree that the representations, warranties and covenants of Borrower hereunder shall automatically terminate and cease to apply to any Condominium Unit(s) tendered in repayment or prepayment of all or any portion of the Indebtedness.

   13.    **CONDITIONS PRECEDENT TO INITIAL ADVANCE.**  Lender's obligation to make the initial Loan Advance shall be subject to the reasonable fulfillment of the following:

   (i)     **Borrower's Authorization.**  Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of the Loan Documents.

5

**ATTACHMENT 1**

CRC 000234

      **(ii)**    **Environmental Report.** Borrower has furnished to Lender an environmental report in form and substance reasonably satisfactory to Lender.

      **(iii)**    **Lender's Title Insurance.** Borrower shall have provided to Lender (at Lender's sole cost and expense) an ALTA Lender's extended coverage policy of title insurance with such endorsements as Lender may require, issued by the Land Title Guarantee Company in a form, amount, and content satisfactory to Lender, insuring or agreeing to insure that Lender's Mortgage or Deed of Trust on the Property is or will be upon recordation a valid first lien on the Property free and clear of all defects, liens, encumbrances, and exceptions except those listed on Exhibit F hereto or specifically accepted by Lender in writing (the **"Permitted Exceptions"**).

    **14.**    **AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, while this Agreement is in effect, Borrower will:

      **(i)**    **Litigation.** Promptly inform Lender in writing of (a) all Material Adverse Changes in Borrower's financial condition, and (b) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions which could result in a Materially Adverse Change to the financial condition of Borrower. Lender acknowledges and agrees that Borrower has disclosed the existence of the litigation involving Borrower, The Weitz Company and Richard Joseph & Company for purposes of the foregoing sentence.

      **(ii)**    **Additional Information.** Furnish such additional information with respect to Borrower's business operations as they relate to the Solaris Project as Lender may request from time to time. Such information shall include but not be limited to, information concerning the number of jobs created at the Project, a description of the types of jobs created, including salary ranges, sales figures for the commercial tenants, and all other information reasonably requested by Lender that Lender deems reasonably necessary to fulfill its reporting requirements under EB-5. Borrower shall use all commercially reasonable efforts to cause all commercial tenants to cooperate with Lender and to timely furnish the information outlined above.

      **(iii)**    **Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans with Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as Lender's interests in the Property are not jeopardized.

      **(iv)**    **Payment of Claims and Removal of Liens.** (a) Cause all valid claims for labor done and materials and services properly furnished in connection with the Property to be fully paid and discharged in a timely manner, (b) diligently file or procure the filing of a valid notice of completion of the Property, or such comparable document as may be permitted under applicable lien laws, (c) diligently file or procure the filing of a notice of cessation, or such comparable document as may be permitted under applicable lien laws, upon the happening of cessation of labor on the Property for a continuous period of 30 days or more, and (d) take all commercially reasonable steps necessary to remove all valid claims of liens properly recorded against the Property, or any rights or interests appurtenant to the Property or improvements.

      **(v)**    **Taxes and Claims.** Pay and discharge when due all of Borrower's indebtedness, obligations, and claims that, if unpaid, might become a lien or charge upon the Property or Improvements which would be senior to the Security Interest of Lender; provided, however, that Borrower shall not be required to pay and discharge any such indebtedness, obligation, or claim so long as (a) its legality shall

6

CRC 000235

**ATTACHMENT 1**

be contested in good faith by appropriate proceedings, and (b) the indebtedness, obligation, or claim does not become a lien or charge upon the Property or Improvements(unless Borrower provides appropriate security, procures a bond or causes the title company to insure over the such a lien or charge). If the indebtedness, obligation, or claim does become a lien or charge upon the Property or Improvements, Borrower shall remove the lien or charge as provided in the preceding paragraph.

(vi)   **Performance.**  Perform and comply with all terms, conditions, and provisions set forth in this Agreement and in all other instruments and agreements between Borrower and Lender, and in all other loan agreements now or hereafter existing between Borrower and any other party.

(vii)   **Additional Assurances.**   Make, execute, and deliver to Lender such Security Agreements, instruments, documents, and other agreements reasonably necessary to document and secure the Loan and to protect Lender's Security Interests in the Property and Improvements.

15.   **REPRESENTATIONS, WARRANTIES AND COVENANTS OF LENDER.**  Lender represents and warrants to Borrower, as of the date of this Agreement, as of the date of each Loan Advance, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

(i)   **Organization.**   Lender is a limited liability limited partnership duly organized, validly existing, and in good standing under the laws of Colorado and is validly existing and in good standing in Colorado. Borrower has the full power and authority to transact the businesses in which it is presently engaged or presently proposes to engage.

(ii)   **Authorization.**  The execution, delivery, and performance of this Agreement by Lender, to the extent to be executed, delivered or performed by Lender, have been duly authorized by all necessary action by Lender; and do not conflict with, result in a violation of, or constitute a default under (a) any provision of its organizational documents, or, any agreement or other instrument binding upon Lender (unless such violation or default of such agreement or instrument has been waived in writing), or (b) any law, governmental regulation, court decree, or order applicable to Lender.

(iii)   **Legal Effect.**  This Agreement constitutes, and any instrument or agreement required hereunder to be given by Lender when delivered will constitute, legal, valid and binding obligations of Lender enforceable against Lender in accordance with their respective terms.

(iv)   **Binding Effect.**  This Agreement is binding upon Lender as well as upon Lender's successors, representatives and assigns, and is legally enforceable in accordance with its terms.

(v)   **Invested Funds.**  Lender shall advance all invested sums to Borrower as soon as reasonably practicable in accordance with the terms, conditions, provisions and restrictions of EB-5. The parties agree to use good faith best efforts and take all reasonable steps necessary to ensure that the EB-5 proceeds are advanced to Borrower as soon as reasonably practicable within the parameters of EB-5. Without limiting the generality of the foregoing, the parties agree to establish procedures and modify the Loan Documents (including, without limitation, Section 8 above) as necessary to accomplish the foregoing.   Further, without limiting the generality of the foregoing, Lender shall in no event unreasonably withhold or delay the advance of any funds secured from investors in connection with the transactions contemplated hereunder.

(vi)   **Survival of Representation, Warranties and Covenants.**  Lender understands and agrees that Borrower is relying upon the above representations, warranties and covenants in agreeing to enter into the transaction contemplated in the Loan Documents.

7

CRC 000236

**ATTACHMENT 1**

**(vii)   Performance.**   Lender shall perform and comply with all terms, conditions, and provisions set forth in this Agreement and in all other instruments and agreements between Borrower and Lender.

**(viii)   Additional Assurances.**   Lender shall make, execute, and deliver to Borrower such instruments, documents, and other agreements reasonably necessary to document and effectuate the purposes of this Agreement.

**16.      EVENTS OF DEFAULT BY BORROWER.**   Subject to any applicable cure periods set forth in any Loan Document, each of the following shall constitute an Event of Default by Borrower under this Agreement:

**(i)      Default on Indebtedness.**   Failure of Borrower to make any payment when due on the Loan.

**(ii)     Other Defaults.**   Failure of Borrower to comply with or to perform when due any other material term, obligation, covenant or condition contained in this Agreement or in any of the Loan Documents, or failure of Borrower to comply with or to perform any other material term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or between Borrower and any other party that is not cured within applicable cure periods and which, if not cured, would have a Material Adverse Effect on the Collateral.

**(iii)    False Statements.**   Any warranty, representation or statement made or furnished to Lender by or on behalf of Borrower under this Agreement or the Loan Documents is false or misleading in any material respect at the time made or furnished, or becomes false or misleading in any material respect at any time thereafter.

**(iv)     Insolvency.**   The insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**17.      EFFECT OF AN EVENT OF DEFAULT BY BORROWER; LENDER'S REMEDIES.**   Upon the occurrence of any Event of Default and at any time thereafter, Lender shall give written notice to Borrower which notice shall describe the nature of the Event of Default. Borrower shall have ten (10) days after receipt of written notice in which to cure any default that can be cured by the payment of money and thirty (30) days in which to cure any default that cannot be cured solely by the payment of money (which thirty (30) day period may be extended for such time as may be reasonably necessary if the default cannot reasonably be cured in the initial thirty (30) day period, provided that Borrower is making reasonable efforts to cure such default during such period). Upon the expiration of the applicable cure period, Lender may, at its option, but without any obligation to do so, and in addition to any other right Lender may have, do any one or more of the following without further notice to Borrower: (a) cancel this Agreement; (b) institute appropriate proceedings to enforce the performance of this Agreement; (c) withhold further disbursement of Loan Advances; (d) expend funds necessary to remedy the default; (e) take possession of the Property; (f) foreclose Lender's Mortgage or Deed of Trust, if any, on the Property in any manner available under law; and (h) exercise any other right or remedy which it has under the Note or Loan Documents, or which is otherwise available at law or in equity or by statute.

8

**ATTACHMENT 1**

CRC 000237

**18.   EVENTS OF DEFAULT BY LENDER.**  Subject to any applicable cure periods set forth in any Loan Document, each of the following shall constitute an Event of Default by Lender under this Agreement:

**(i)   Failure of Performance.**  Failure of Lender to comply with or to perform when due any other material term, obligation, covenant or condition contained in this Agreement or in any of the Loan Documents.

**(ii)   False Statements.**  Any warranty, representation or statement made or furnished to Borrower by or on behalf of Lender under this Agreement or the Loan Documents is false or misleading in any material respect at the time made or furnished, or becomes false or misleading in any material respect at any time thereafter.

**19.   EFFECT OF AN EVENT OF DEFAULT BY LENDER; BORROWER'S REMEDIES.**  Upon the occurrence of any Event of Default by Lender and at any time thereafter, Borrower shall give written notice to Lender which notice shall describe the nature of the Event of Default.  Lender shall have ten (10) days after receipt of written notice in which to cure any default that can be cured by the payment of money and thirty (30) days in which to cure any default that cannot be cured solely by the payment of money (which thirty (30) day period may be extended for such time as may be reasonably necessary if the default cannot reasonably be cured in the initial thirty (30) day period, provided that Lender is making reasonable efforts to cure such default during such period).  Upon the expiration of the applicable cure period, Borrower may, at its option, but without any obligation to do so, and in addition to any other right Borrower may have, do any one or more of the following without further notice to Borrower:  (a) cancel this Agreement; (b) institute appropriate proceedings to enforce the performance of this Agreement; (b) expend funds necessary to remedy the default; and (c) exercise any other right or remedy which it has under the Note or Loan Documents, or which is otherwise available at law or in equity or by statute.

**20.   MISCELLANEOUS PROVISIONS.**  The following miscellaneous provisions are a part of this Agreement:

**(i)   Agency.**  Nothing in this Agreement shall be construed to constitute the creation of a partnership or joint venture between Lender and Borrower or any contractor.  Lender is not an agent or representative of Borrower.  This Agreement does not create a contractual relationship with and shall not be construed to benefit or bind Lender in any way with or create any contractual duties by Lender to any contractor, subcontractor, materialman, laborer, or any other person.

**(ii)   Amendments.**  This Agreement, together with any Loan Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement.  No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**(iii)   Applicable Law.**  This Agreement has been delivered to Lender and accepted by Lender in Colorado. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of the City and County of Denver, Colorado. This Agreement shall be governed by and construed In accordance with the laws of Colorado.

**(iv)   Assignment by Borrower.** Notwithstanding to the contrary set forth in any of the Loan Documents, Borrower shall have the absolute right to assign this Loan Agreement, the Promissory Note and the other Loan Documents to Borrower's wholly-owned, single-purpose subsidiary (the "**SPE**"). Upon such assignment, all of Borrower's rights and obligations under the Loan Documents shall automatically

9

CRC 000238

**ATTACHMENT 1**

and forever terminate and, thereafter, Borrower shall have no further obligation of any kind whatsoever with respect to the Loan or Loan Documents. A condition precedent to any such assignment shall be that any assignee of Borrower shall continue to operate the Solaris Project, as defined in the Loan Agreement, to assure full construction expenditure to project completion and subsequent operation of the retail businesses, all in satisfaction of the factual assumptions set forth in the EB-5 Econometric Report prepared in connection with the Solaris Project. The purpose of this condition precedent is to assure the Lender that the related EB-5 investors' ability to obtain removal of conditions on their U.S. permanent residency will not be impaired by any such assignment of the Borrower's rights and obligations under the Loan Documents. The Lender shall have sole discretion to determine satisfaction of this condition precedent prior to any assignment by Borrower.

      (v)    **Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

      (vi)    **Costs and Expenses.** Borrower and Lender shall each be responsible for its own expenses, including without limitation attorneys' fees, incurred in connection with the preparation, execution, enforcement, modification and collection of this Agreement or in connection with the Loans made pursuant to this Agreement. In the event of any litigation arising out of this Loan, the prevailing party, in addition to any other rights or remedies to which it may be entitled, shall be awarded its reasonable expenses incurred in enforcing or defending such action. This includes, subject to any limits under applicable law, attorneys' fees and legal expenses, whether or not there is a lawsuit, including attorneys' fees for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the prevailing party also will be entitled to recover any court costs, in addition to all other sums provided by law.

      (vii)    **Entire Agreement.** This Agreement and the Loan Documents constitute all of the agreements between the parties relating to the Property and supersede all other prior or concurrent oral or written agreements or understandings relating to the Property.

      (viii)    **Notices.** All notices required to be given under this Agreement shall be given in writing, may be sent by facsimile (unless otherwise required by law) or by electronic mail, and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address shown below. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.

| | |
|---|---|
| *If to Borrower*: | **Solaris Property Owner, LLC**<br>Attention: Legal Department<br>141 East Meadow Drive, Suite 211<br>Vail, Colorado 81657<br>P: 970.479.7566<br>F: 970.479.6666 |
| *If to Lender*: | **Colorado Regional Center Project Solaris, LLLP**<br>4643 S. Ulster Street, Suite 950<br>Denver, Colorado 80237<br>P: 720.554.9704<br>F: 720.554.9905 |

**ATTACHMENT 1**

(ix)   **Successors and Assigns.**  All covenants and agreements contained by or on behalf of either party shall bind such party's successors and assigns and shall inure to the benefit of the other party, its successors and assigns. Neither party shall have the right to assign its rights under this Agreement or any interest therein, without the prior written consent of Lender.

(x)   **Severability.**  If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

(xi)   **Survival.**  All warranties, representations, and covenants made by a party in this Agreement or in any certificate or other instrument delivered by a party under this Agreement shall be considered to have been relied upon by the other party and will survive the making of the Loan and delivery to the other of the Loan Documents, regardless of any investigation made by such party or on such party's behalf.

(xii)   **Time is of the Essence.**  Time is of the essence in the performance of this Agreement.

(xiii)   **Waiver.**  Neither party shall be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by such party. No delay or omission on the part of either party in exercising any right shall operate as a waiver of such right or any other right. A waiver by one party of a provision of this Agreement shall not prejudice or constitute a waiver of such party's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by either party, nor any course of dealing between Lender and Borrower, shall constitute a waiver of either party's rights or of any obligations as to any future transactions. Whenever the consent of either party is required under this Agreement, the granting of such consent by such party in any instance shall not constitute continuing consent in subsequent instances where such consent is required, and in all cases such consent may be granted or withheld in the sole discretion of the party from whom consent is required.

(xiv)   **Confidentiality; Publicity.**  Lender understands, acknowledges and agrees that Borrower has certain legitimate and material business reasons for keeping the Loan confidential.  Borrower understands, acknowledges and agrees that it is essential to Lender's marketing efforts that Lender be allowed to market the Loan in a manner designed to facilitate the successful completion of the offering. The parties therefore agree that Lender may refer on its Public Website (as hereinafter defined) to a generic description of the project (e.g., by reference to a "high-end, luxury mixed-use condominium/retail project located in Vail" and similar general wording).  **Public Website**" means the basic website maintained by Lender to provide general information concerning Lender's projects to the public at large. Notwithstanding the foregoing or anything to the contrary set forth herein, Lender's Public Website shall in no event disclose the following: (i) the name of the Project; (ii) the address and/or precise location of the Project; (iii) the exact number of units in the Project; (iv) the names of specific individuals, business, types of businesses, tenants, or others affiliated with or connected to the Project; or (v) or any other such information that identifies the Project as Borrower or leads to the unavoidable conclusion that the Project is Borrower.  The parties further agree that the Public Website will include a secure area created to provide certain parties to get specific details concerning the Project (including the name) and the Investment (the "**Secure Website**").  In order to gain access to the Secure Website, all users must first register with Lender by providing Lender with their name and contact information.  Lender will make a reasonable inquiry into the validity of the party seeking such information (each, an "**Inquiring Party**"

11

**ATTACHMENT 1**

CRC 000240

and collectively, the "**Inquiring Parties**") prior to providing any such Inquiring Party with a password to the Secure Website (the "**Secure Password**").

Borrower agrees that any such system will be susceptible to deception by a potential user, but that the parties intend to provide commercially reasonable means to deter anyone not having a legitimate interest in making an EB-5 investment from gaining access to this information. Lender agrees to utilize a further more detailed filtering system on its website prior to allowing access to offering materials (including the Private Placement Memorandum) about the Project. Lender shall be free to distribute marketing materials about the Project using the Borrower's name to targeted investment prospects including without limitation, immigration attorneys, brokers and agents specializing in EB-5 investor referrals, wealth managers, individual foreign investors seeking to make an EB-5 investment, and other professionals who are likely to make a targeted referral to Lender. Except as expressly set forth above, Lender shall be prohibited from disclosing to anyone any specific information concerning the Project. The foregoing sentence shall in no event preclude Lender from disclosing the general information available on the Public Website in response to specific inquiries from the media and others. The parties agree to work together to reasonably respect each other's reasonable business interests regarding these issues. Lender and Borrower will cooperate in preparing information about the Project for inclusion in the PPM and other related materials and Borrower agrees that Lender shall have the right to include such materials in the PPM (subject to appropriate non-disclosure agreements and other such standard protections).

     **20.**    **EXHIBITS.** All exhibits attached to this Loan Agreement are incorporated herein by this reference.

     **21.**    **LENDER APPROVAL; DISCLAIMER.** NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH HEREIN, THE EFFECTIVENESS OF THIS AGREEMENT AND THE LOAN DOCUMENTS IS EXPRESSLY CONDITIONED UPON THE APPROVAL OF THE SOLARIS LENDERS. WITHOUT LIMITING THE FOREGOING, THE PARTIES AGREE TO MODIFY THIS AGREEMENT AND THE LOAN DOCUMENTS AS NECESSARY TO ACCOMMODATE THE REQUESTS OF THE SOLARIS LENDERS SO LONG AS SUCH MODIFICATIONS NEITHER (1) MATERIALLY ALTER THE SUBSTANCE OF THE BUSINESS DEAL AGREED UPON BY THE PARTIES NOR (2) DISQUALIFY THE TRANSACTION FROM EB-5 ELIGIBILITY.

[Signature Page Follows]

12

**ATTACHMENT 1**

CRC 000241

THIS LOAN AGREEMENT is made effective as of the date first above written by and between:

**BORROWER:**

**Solaris Property Owner, LLC,** a Delaware limited liability company

By: Solaris Mezz, LLC, a Delaware limited liability company

By: _____

Peter Knobel, Manager

**LENDER:**

**Colorado Regional Center Project Solaris, LLLP,** a Colorado limited liability limited partnership

By: Colorado Regional Center I, LLC, a Colorado limited liability company, general partner

By: _____

Chester Schwartz, Manager

13

**ATTACHMENT 1**

CRC 000242

## PROMISSORY NOTE

Original Principal Amount: **$100,000,000.00**                                    Date: April 18, 2012

**PROMISE TO PAY**: Solaris Property Owner I, LLC, a Delaware limited liability company ("**Borrower**") promises to pay to Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership ("**Lender**"), or order, in lawful money of the United States of America, the principal amount of One Hundred Million and No/100 United States Dollars ($100,000,000.00) together with interest at the rate of five and seven-tenths percent (5.7%) per annum (the "**Interest Rate**") on the terms and conditions set forth below (the "**Loan**"). Notwithstanding anything contained herein to the contrary (including, without limitation, the Original Principal Amount set forth above), the maximum principal balance due hereunder at any point in time shall equal the total principal balance of all Loan Advances made to Borrower as set forth in Exhibit A attached hereto and incorporated herein by this reference. It is the express intent of the parties hereto that the Original Principal Amount of this Note is intended to reflect the maximum amount of principal to be loaned by Lender to Borrower from the various Loan Advances made from time to time.

**DEFINED TERMS**: Initially capitalized terms used but not otherwise defined below shall have the meanings ascribed to such terms under the provisions of that certain Loan Agreement dated effective November 5, 2010, by and between Borrower and Lender (the "**Loan Agreement**").

**INTEREST PAYMENTS**: Commencing on the date Lender makes the first Loan Advance to Borrower in accordance with the Loan Agreement (the "**Commencement Date**"), the outstanding principal of the loan shall bear interest at the Interest Rate. Borrower shall make interest-only payments on the outstanding principal balance of the Loan (each, an "**Interest Payment**") on the first business day of each month following the Commencement Date until the Loan is repaid in full. Each Interest Payment shall include interest on all sums outstanding at the time such Interest Payment is due (including a pro-rated amount of interest for any Loan Advances that took place during the previous month). Borrower will pay Lender at Lender's address as Lender shall designate in writing. Any and all payments made hereunder shall be applied first to any unpaid collection costs and late charges pursuant to this Note, second to accrued unpaid interest, and third in reduction of the outstanding principal balance of the Loan.

**TERM**: With respect to each Loan Advance, this note shall be deemed to mature, and (if not sooner repaid in accordance with the provisions hereof) the unpaid principal balance attributable to such Loan Advance, together with all accrued interest attributable to the same (if any), shall be due and payable on the date that is exactly sixty (60) months from Closing on such Loan Advance (each, a "**Maturity Date**"); _provided, however_, that (notwithstanding anything to the contrary set forth in this Note or any other Loan Documents) at any time after the Prepayment Date (as hereinafter defined), Borrower shall have the absolute right to prepay the portion the Note attributable to any Loan Advance  by repaying Lender the amount of such Loan Advance in cash or conveying Lender the Collateral Unit(s) securing such Loan Advance. If Borrower tenders to Lender any Collateral Unit(s) in repayment of a Loan Advance, the principal balance of the Note shall be reduced by the amount of the Loan Advance secured by such Collateral Unit(s). With respect to each Loan Advance, the term "**Prepayment Date**" means a date that is exactly thirty six (36) months from and after the Closing on such Loan Advance.

**PREPAYMENT**: Except as otherwise set forth in this Note, Borrower shall not be allowed to pay all or a portion of the Loan prior to the Prepayment Date.

**NOTICE OF PREPAYMENT**: Borrower shall give Lender (i) at least sixty (60) calendar days prior written notice of any Cash Prepayment and (ii) at least twenty (20) calendar days prior written notice of any Collateral Unit Distribution.

1

**DEFAULT**: Subject to any applicable cure rights set forth in any Loan Document, each of the following shall constitute an **"Event of Default"** hereunder:

      (i)     if Borrower fails to make any payment when such payment is due;

      (ii)     if Borrower fails to comply with or to perform when due any other material, obligation, covenant, representation, warranty or condition contained in this Note or any other Loan Document;

      (iii)     if Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement in favor of any other creditor or person that results in a Material Adverse Affect; or

      (iv)     if any material representation or statement made or furnished to Lender by Borrower is false or misleading at the time made or furnished.

**NON-RECOURSE LOAN; EXCEPTION FOR INTEREST PAYMENTS**:

      (i)     **Non-Recourse Loan**. Except as expressly provided below, subject to any applicable cure rights set forth in any Loan Document, if an Event of Default has occurred and is then continuing, Lender agrees to proceed solely against the Collateral, it being the parties' mutual understanding and intent that principal amount of the Loan secured by this Note is entirely non-recourse to Borrower. Notwithstanding the foregoing, Lender may name Borrower or any of its successors or assigns or any person or entity holding under or through them as parties to any actions, suits or other proceedings initiated by Lender to enforce any remedies set forth herein against the Collateral, including without, limitation, any action, suit or proceeding to foreclose the lien of the Deed of Trust against the Collateral.

      (ii)     **Exception for Interest Payments**. Notwithstanding the foregoing, subject to any applicable cure rights set forth in any Loan Document, if Borrower fails to make any Interest Payment(s) due hereunder, the amount of such Interest Payment(s) plus the Collection Costs directly related collecting to the same shall be fully recourse to Borrower. Except as expressly set forth in the immediately preceding sentence, the Loan evidenced by this Note is and shall remain entirely non-recourse to Borrower.

**LENDER'S RIGHTS**: Subject to any applicable cure rights set forth in any Loan Documents, if an Event of Default under this Note has occurred and is then continuing: (i) Lender may declare the entire unpaid principal balance of this Note and all accrued interest, if any, immediately due and, upon receipt of written notice of such acceleration, Borrower shall convey the Collateral Unit(s) to Lender in full satisfaction of Borrower's obligations under this Note and the other Loan Documents; (ii) Lender, at its option, may also, if permitted under applicable law, increase the Interest Rate on this Note to the lesser of fourteen percent (14.00%) or the maximum amount permitted by law (the **"Default Rate"**); and (iii) Borrower shall be responsible for any and all Collection Costs directly related to the Event of Default. **"Collection Costs"** means, to the extent permitted by law, Lender's reasonable legal expenses (whether or not there is a lawsuit), including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, any post-judgment collection services, and any court costs and fees associated with the foregoing.

**CHOICE OF LAW**: This Note has been delivered to Lender and accepted by Lender in Colorado. Borrower and Lender agree to submit to the jurisdiction of the courts of the City and County of Denver, Colorado. Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or

counterclaim brought by either Lender or Borrower against the other. This Note shall be governed by and construed in accordance with the laws of Colorado.

**COLLATERAL:** In order to secure payment of this Note, Borrower has granted to Lender security interests in certain real and personal property owned by Borrower (the "**Collateral**"). These security interests are evidenced by a Deed of Trust and Security Agreement and certain other documents (collectively, the "**Collateral Documents**"). Reference is made to the Collateral Documents for various rights and remedies of the parties to those documents.

**ASSIGNMENT BY BORROWER.** Notwithstanding to the contrary set forth in any of the Loan Documents, Borrower shall have the absolute right (in Borrower's discretion) to assign this Promissory Note, the Loan Agreement and the other Loan Documents to Borrower's wholly-owned, single-purpose subsidiary (the "**SPE**"). Upon such assignment, all of Borrower's rights and obligations under the Loan Documents shall automatically and forever terminate and, thereafter, Borrower shall have no further obligation of any kind whatsoever with respect to the Loan or Loan Documents. If Borrower so assigns Borrower's interest in the Loan Documents to Borrower's SPE prior to the execution of this Promissory Note, Borrower's SPE shall be substituted for Borrower as the signatory hereof and construed to mean "Borrower" for all purposes hereunder and under the other Loan Documents. A condition precedent to any such assignment shall be that any assignee of Borrower shall continue to operate the Solaris Project, as defined in the Loan Agreement, to assure full construction expenditure to project completion and subsequent operation of the retail businesses, all in satisfaction of the factual assumptions set forth in the EB-5 Econometric Report prepared in connection with the Solaris Project. The purpose of this condition precedent is to assure the Lender that the related EB-5 investors' ability to obtain removal of conditions on their U.S. permanent residency will not be impaired by any such assignment of the Borrower's rights and obligations under the Loan Documents. The Lender shall have sole discretion to determine satisfaction of this condition precedent prior to any assignment by Borrower.

**GENERAL:** Lender may delay or forego enforcing any of its rights or remedies under this Note or under the Collateral Documents without losing them. Borrower understands and agrees that, with or without any notice to anyone other than Borrower, Lender may (i) make one or more additional secured or unsecured loans or otherwise extend additional credit and (ii) apply any security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreements, as Lender in its discretion may determine. Borrower, to the extent allowed by law, waives presentment, demand for payment, protest and notice of dishonor.

BORROWER:

**Solaris Property Owner I, LLC,** a Delaware limited liability company

By: _____

Name: _____

Title: _____

3

Case No. 1:19-cv-02443-RM-STV   Document 481-3   filed 05/19/23   USDC Colorado   pg 26
of 55
Case 1:19-cv-02443-RM-STV   Document 223-25   Filed 06/10/20   USDC Colorado   Page 4 of 4

**EXHIBIT A**
(Promissory Note)

| A | B | C | D | E |
|---|---|---|---|---|
| Property | Collateral Unit Value | Loan Advance | Date Loan Advance Complete | Maturity Date |
| Unit 6E West | $3,707,982 | $4,000,000 | April 18, 2012 | April 17, 2017 |
| Unit 2A South | $6,439,950 | $6,500,000 | April 25, 2012 | April 24, 2017 |
| Pent E West | $3,084,124 | $3,000,000 | May 3, 2012 | May 2, 2017 |
| Unit 6E East | $3,707,485 | $3,500,000 | May 30, 2012 | May 29, 2017 |
| Pent E East | $3,084,683 | $3,000,000 | June 15, 2012 | June 14, 2017 |
| Unit 5E West | $3,581,090 | $4,000,000 | August 2, 2012 | August 1, 2017 |
| Unit 4G West | $6,420,861 | $6,500,000 | August 24, 2012 | August 23, 2017 |
| Unit 7E West | $4,556,554 | $4,500,000 | September 7, 2012 | September 6, 2017 |
| Pent C East | $2,355,248 | $2,000,000 | September 13, 2012 | September 12, 2017 |
| Unit 6D East | $7,832,070 | $8,000,000 | October 2, 2012 | October 1, 2017 |
| Unit 5C West | $3,555,668 | $3,500,000 | November 6, 2012 | November 5, 2017 |
| Unit 6C West | $3,605,715 | $3,500,000 | November 27, 2012 | November 26, 2017 |
| Unit 5G West | $6,521,940 | $6,500,000 | January 24, 2013 | January 23, 2018 |
| Unit 3E East | $2,578,042 | $3,000,000 | January 29, 2013 | January 28, 2018 |
| Unit 7E East | $4,043,190 | $4,000,000 | January 30, 2013 | January 29, 2018 |
| Unit 4D East | $7,831,977 | $7,500,000 | March 6, 2013 | March 5, 2018 |
| Pent G West | $4,737,891 | $4,500,000 | May 20, 2013 | May 19, 2018 |
| Pent C West | $2,355,530 | $2,500,000 | May 30, 2013 | May 29, 2018 |
| Unit 3C East | $2,500,000 | $2,500,000 | January 30, 2015 | January 29, 2020 |

Borrower Initials 
Date

| | |
|---|---|
| **From:** | Ryan Smith |
| **Sent:** | Monday, October 19, 2015 4:26 PM MDT |
| **To:** | Rob Glucksman |
| **CC:** | mhayes@wavelandventures.com; Mike Murray |
| **Subject:** | RE: 1:00 call |
| **Attachments:** | CRCPS Put Notice_Borrower Draft 10.19.15.docx |

Rob,

Good speaking with you last week. Attached is a draft of the letter agreement that we discussed. It serves as the "put notice" and addresses several other matters arising in connection with the transfers, such as the distinction between the Lender and the transferee of the unit. Once finalized, I will duplicate for each Collateral Unit.

Katie Kuchler at LTGC said they couldn't prepare the deeds because they do not have an open file on the transaction. So, we could either prepare them ourselves or, depending on whether or not LTGC is involved in the closings, which I believe you are addressing with Gail, have them open files and prepare deeds and related documents, such as settlement statements. While it would be nice to have them handle the closings, if they are going to charge us, we ought to consider doing everything ourselves and limiting LTGC's function to recording the deeds.

Please let me know your thoughts.

Thanks,

Ryan

**From:** Rob Glucksman [mailto:rglucksman@coloradoregionalcenter.com]
**Sent:** Monday, October 12, 2015 10:35 AM
**To:** Ryan Smith <ryan@solarisvail.com>
**Cc:** Meagan Hayes <mhayes@wavelandventures.com>; Mike Murray <mike.murray@solarisvail.com>
**Subject:** Re: 1:00 call

Let's do 4pm today. Would you guys mind calling me? 303.888.9052.

Thanks,
Rob

Sent from my iPhone

On Oct 12, 2015, at 10:18 AM, "Ryan Smith" <ryan@solarisvail.com> wrote:

> I could do 4pm today. Early Wednesday morning also works for me.
>
> **From:** Meagan Hayes [mailto:mhayes@wavelandventures.com]
> **Sent:** Monday, October 12, 2015 10:12 AM
> **To:** Mike Murray <mike.murray@solarisvail.com>; Rob Glucksman

**ATTACHMENT 3**

SPO_0000817

<rglucksman@coloradoregionalcenter.com>
**Cc:** Ryan Smith <ryan@solarisvail.com>
**Subject:** RE: 1:00 call

I have class at 5pm tonight as well – you guys can go ahead with the call and I can catch up with Rob afterwards if that's more convenient

**From:** Mike Murray [mailto:mike.murray@solarisvail.com]
**Sent:** Monday, October 12, 2015 11:11 AM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>; Meagan Hayes <mhayes@wavelandventures.com>
**Cc:** Ryan Smith <ryan@solarisvail.com>
**Subject:** RE: 1:00 call

I can do early Wednesday morning, but I have another meeting at 10:00. Can we do 4:00 today?

Mike Murray

*Solaris Management & Consulting, LLC*
141 E. Meadow Drive, Suite 211
Vail, CO 81657
(970) 476-7893
www.solarisvail.com

**From:** Rob Glucksman [mailto:rglucksman@coloradoregionalcenter.com]
**Sent:** Monday, October 12, 2015 10:09 AM
**To:** Meagan Hayes <mhayes@wavelandventures.com>
**Cc:** Ryan Smith <ryan@solarisvail.com>; Mike Murray <mike.murray@solarisvail.com>
**Subject:** Re: 1:00 call

Wednesday morning works for me.

Thanks,
Rob

Sent from my iPhone

On Oct 12, 2015, at 9:53 AM, "Meagan Hayes" <mhayes@wavelandventures.com> wrote:

Would Wednesday morning work for you guys instead? The times below will interfere with my classes tomorrow.

**From:** Ryan Smith [mailto:ryan@solarisvail.com]
**Sent:** Monday, October 12, 2015 10:35 AM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>; Mike Murray <mike.murray@solarisvail.com>

**ATTACHMENT 3**

SPO_0000818

**Cc:** Meagan Hayes <mhayes@wavelandventures.com>
**Subject:** RE: 1:00 call

I just learned that my other conference call is going to conflict with ours. Can we push our call from 2:30 to 4:00 or later?

**From:** Rob Glucksman [mailto:rglucksman@coloradoregionalcenter.com]
**Sent:** Friday, October 9, 2015 11:42 AM
**To:** Ryan Smith <ryan@solarisvail.com>; Mike Murray <mike.murray@solarisvail.com>
**Cc:** Meagan Hayes <mhayes@wavelandventures.com>
**Subject:** RE: 1:00 call

No problem. Thanks.

**From:** Ryan Smith [mailto:ryan@solarisvail.com]
**Sent:** Friday, October 09, 2015 11:41 AM
**To:** Mike Murray <mike.murray@solarisvail.com>; Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Cc:** Meagan Hayes <mhayes@wavelandventures.com>
**Subject:** RE: 1:00 call

That works for me, though I am currently in the process of scheduling a court-ordered conference call on Tuesday. In the event that that call conflicts with ours, I will have to reschedule.

**From:** Mike Murray
**Sent:** Friday, October 9, 2015 11:38 AM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>; Ryan Smith <ryan@solarisvail.com>
**Cc:** Meagan Hayes <mhayes@wavelandventures.com>
**Subject:** RE: 1:00 call

Works for me.

Mike Murray

*Solaris Management & Consulting, LLC*
141 E. Meadow Drive, Suite 211
Vail, CO 81657
(970) 476-7893
www.solarisvail.com

**From:** Rob Glucksman [mailto:rglucksman@coloradoregionalcenter.com]
**Sent:** Friday, October 09, 2015 11:34 AM
**To:** Mike Murray <mike.murray@solarisvail.com>; Ryan Smith <ryan@solarisvail.com>
**Cc:** Meagan Hayes <mhayes@wavelandventures.com>
**Subject:** RE: 1:00 call

**ATTACHMENT 3**

SPO_0000819

How about Tuesday afternoon at 2:30pm?

Thanks,
Rob

**From:** Mike Murray [mailto:mike.murray@solarisvail.com]
**Sent:** Friday, October 09, 2015 11:33 AM
**To:** Ryan Smith <ryan@solarisvail.com>; Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Cc:** Meagan Hayes <mhayes@wavelandventures.com>
**Subject:** RE: 1:00 call

I have meetings Tuesday and Wednesday mornings, but available otherwise.

Mike Murray

*Solaris Management & Consulting, LLC*
141 E. Meadow Drive, Suite 211
Vail, CO 81657
(970) 476-7893
www.solarisvail.com

**From:** Ryan Smith
**Sent:** Friday, October 09, 2015 11:31 AM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>; Mike Murray <mike.murray@solarisvail.com>
**Cc:** Meagan Hayes <mhayes@wavelandventures.com>
**Subject:** RE: 1:00 call

Yes, I am pretty flexible on Monday and Tueday.

**From:** Rob Glucksman [mailto:rglucksman@coloradoregionalcenter.com]
**Sent:** Friday, October 9, 2015 10:53 AM
**To:** Ryan Smith <ryan@solarisvail.com>; Mike Murray <mike.murray@solarisvail.com>
**Cc:** Meagan Hayes <mhayes@wavelandventures.com>
**Subject:** RE: 1:00 call

Hey guys,

We're pretty much all set on the insurance. Can we schedule a call next week to discuss moving forward?

Thanks,
Rob

**ATTACHMENT 3**

**From:** Ryan Smith [mailto:ryan@solarisvail.com]
**Sent:** Wednesday, September 02, 2015 9:48 AM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Subject:** RE: 1:00 call

Rob, Do you have time today to touch base on these unit transfers? If so, let me know your phone number and a good time to call. Alternatively, give me a call at 303-888-0969. Thanks, Ryan

**From:** Rob Glucksman [mailto:rglucksman@coloradoregionalcenter.com]
**Sent:** Tuesday, August 11, 2015 1:25 PM
**To:** Ryan Smith <ryan@solarisvail.com>; Mike Murray <mike.murray@solarisvail.com>; Meagan Hayes <mhayes@wavelandventures.com>
**Subject:** RE: 1:00 call

Hi Ryan,

Sorry for the delay. The name and address are:

Solaris Property Owner III, LLC
280 Detroit Street
Denver, CO 80206

Best,
Rob

**From:** Ryan Smith [mailto:ryan@solarisvail.com]
**Sent:** Monday, August 03, 2015 7:37 AM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>; Mike Murray <mike.murray@solarisvail.com>; Meagan Hayes <mhayes@wavelandventures.com>
**Subject:** RE: 1:00 call

I will have Land prepare the deed.

What is the name and address of the grantee?

**From:** Rob Glucksman [mailto:rglucksman@coloradoregionalcenter.com]
**Sent:** Thursday, July 30, 2015 5:12 PM
**To:** Ryan Smith <ryan@solarisvail.com>; Mike Murray <mike.murray@solarisvail.com>; Meagan Hayes <mhayes@wavelandventures.com>
**Subject:** RE: 1:00 call

Sorry for the land. I think we're fine with using Land Title to facilitate.

Thanks,
Rob

**ATTACHMENT 3**

**From:** Ryan Smith [mailto:ryan@solarisvail.com]
**Sent:** Wednesday, July 29, 2015 2:34 PM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>; Mike Murray <mike.murray@solarisvail.com>; Meagan Hayes <mhayes@wavelandventures.com>
**Subject:** RE: 1:00 call

Great. Are we going to be using Land Title to conduct the transfers? I ask because, if so, I will have them prepare the deed.

**From:** Rob Glucksman [mailto:rglucksman@coloradoregionalcenter.com]
**Sent:** Wednesday, July 29, 2015 1:27 PM
**To:** Mike Murray; Meagan Hayes
**Cc:** Ryan Smith
**Subject:** RE: 1:00 call

Hi all,

I think we're getting somewhat close to actually being able to transfer these. Please remind me, were you guys going to have a Special Warranty Deed drafted for these?

Hope you both are well.

Thanks,
Rob

**From:** Mike Murray [mailto:mike.murray@solarisvail.com]
**Sent:** Friday, June 12, 2015 12:31 PM
**To:** Meagan Hayes <mhayes@wavelandventures.com>
**Cc:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>; Ryan Smith <ryan@solarisvail.com>
**Subject:** 1:00 call

Meagan,

Could you circulate the call-in information for the 1:00 MST call?

Mike Murray

*Solaris Management & Consulting, LLC*
141 E. Meadow Drive, Suite 211
Vail, CO 81657
(970) 476-7893
www.solarisvail.com

**ATTACHMENT 3**

SPO_0000822

SOLARIS PROPERTY OWNER I, LLC
141 East Meadow Drive, Suite 211
Vail, Colorado 81657

---

[_____, 2015]

Colorado Regional Center Project Solaris, LLLP
300 W. 6th Street, Suite 1810
Austin, TX 78701

Re: Collateral Unit Distribution – Unit _____

To Whom It May Concern,

Reference is hereby made to that certain Promissory Note dated April 18, 2012, executed by Solaris Property Owner I, LLC, a Delaware limited liability company ("**Borrower**"), as assignee of Solaris Property Owner, LLC, a Delaware limited liability company ("**Original Borrower**") pursuant to that certain Assignment of Loan Agreement dated October 12, 2011 by and between Original Borrower and Borrower, and payable to the order of Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership ("**Lender**") in the original maximum principal amount of One Hundred Million and No/100 Dollars ($100,000,000.00), as amended by that certain Allonge to Promissory Note dated of even date therewith by and between Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, collectively the "**Note**"), Borrower has become indebted to Lender with respect to a loan ("**Loan**") made pursuant to that certain Loan Agreement dated November 5, 2010 between Original Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), which Loan is secured by one or more Deeds of Trust recorded against the Collateral Units in the real property records of Eagle County, Colorado (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, each a "**Deed of Trust**" and collectively, the "**Deeds of Trust**"), and further evidenced, secured or governed by other instruments and documents executed in connection with the Loan, including, but not limited to, that certain Guaranty Agreement dated April 18, 2012 by Peter Knobel for the benefit of Lender (the "**Guaranty**"), and as such loan documents were amended pursuant to that certain Omnibus Amendment to EB-5 Investment Documents dated March 8, 2012 by and between Original Borrower and Lender (the "**Omnibus Amendment**") (such other instruments and documents, Guaranty, and Omnibus Amendment, together with the Note, the Loan Agreement and Deeds of Trust, collectively, the "**Loan Documents**"). All capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Loan Documents.

Pursuant to the Loan Documents, Borrower hereby notifies Lender that it intends to cause the occurrence of a Collateral Unit Distribution by tendering Collateral Unit _____ (the "**Tendered Unit**") to Lender, or its designee, in satisfaction of that certain Loan Advance made _____ in the principal amount of $_____ against the Tendered Unit (the "**Satisfied Loan Advance**"), as such Satisfied Loan Advance is more particularly set forth on Exhibit A of the Note.

**ATTACHMENT 3**

A time and place for closing on the Collateral Unit Distribution will be mutually agreed upon by Borrower and Lender; provided, however, notwithstanding anything herein or in the Loan Documents to the contrary, for purposes of calculating interest and any other amounts owing between the parties under the Loan Documents in connection with the Tendered Unit, the Collateral Unit Distribution shall be deemed to have occurred on the Prepayment Date corresponding to the Tendered Unit. The closing of the transfer shall be completed pursuant to the standard closing documents used by Borrower for the closing of condominium sales to third parties in transactions outside of the Loan Agreement.

Lender has designated Solaris Property Owner III, LLC, a Colorado limited liability company and subsidiary of Lender ("*Solaris III*"), as the transferee of the Tendered Unit. Lender hereby represents, warrants and covenants that (i) Solaris III is a wholly owned subsidiary of Lender, (ii) Lender has full power and authority, and has been duly authorized, to consummate the transaction contemplated herein, including designating Solaris III as the transferee of the Tendered Unit and releasing Borrower as provided herein, (iii) the transaction contemplated herein does not conflict with, result in a violation of, or constitute a default under any agreement or instrument binding upon Lender (including the EB-5 documents) or any law, governmental regulation, court decree, or order applicable to Lender, (iv) Lender has not assigned its rights or obligations under the Loan Documents to any other person or entity, and (iv) Lender has, or prior to closing will have, obtained a duly executed exemption from the Town of Vail Real Estate Transfer Tax with respect to the transfer. Lender shall indemnify, defend and forever hold Borrower harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including reasonable attorneys' fees) arising from breach of any representation, warranty or covenant of Lender hereunder, which indemnification obligation shall survive closing on the Tendered Unit.

Effective upon closing on the Tendered Unit, Lender and Solaris III acknowledge and agree that (i) all Indebtedness and any other obligations of Borrower under the Loan Documents with respect to the Tendered Unit, including, without limitation, the principal, interest, premium and any other amounts whatsoever due with respect to the Tendered Unit, shall be fully paid, satisfied, discharged and released, (ii) the principal balance of the Note shall be reduced by the amount of the Satisfied Loan Advance, and Exhibit A of the Note shall be deemed to be amended by deleting all references to the Tendered Unit and/or Satisfied Loan Advance; and (iii) all security interests, mortgages, guaranties (including the Guaranty), pledges and other liens granted to or held by Lender and any other secured parties under the security documents securing the Satisfied Loan Advance shall be forever satisfied, released and discharged without further action.

Except as set forth herein, the Loan Documents shall remain in full force and effect in accordance with their terms.

Very truly yours,

SOLARIS PROPERTY OWNER I, LLC,
a Delaware limited liability company

**ATTACHMENT 3**

SPO_0000824

By: _____
     Ryan A. Smith, its General Counsel

Accepted and Agreed:

Colorado Regional Center Project Solaris, LLLP,
a Colorado limited liability limited partnership

By:_____
Name: _____
Its: _____

3

**ATTACHMENT 3**

SPO_0000825

| From: | Ryan Smith |
|---|---|
| Sent: | Wednesday, March 2, 2016 6:11 PM MST |
| To: | Rob Glucksman (rglucksman@coloradoregionalcenter.com); Mark F. Bell |
| CC: | Rick Hayes; Peter Knobel |
| Subject: | CRC/Solaris Unit Transfer Update |
| Attachments: | Letter Agreement re Collateral Unit Distributions_SPO Draft 3.2.16.docx |

Rob and Mark,

Peter and Rick met yesterday and I understand that they agreed that the parties would hold off on actually transferring the eligible units until further notice but continue to perform as if the transfers happened on the respective 3-year Prepayment Dates. The rationale is to save CRC potential transaction costs.

Accordingly, at Peter's and Rick's request, I have drafted a letter agreement to document that arrangement. I have tried to keep it as simple as possible but the fact that CRC will be in possession of units that continue to be owned by Solaris does give rise to some issues that need to be addressed. The attached letter agreement is my attempt to do so in a manner that is fair to both parties and consistent with the parties' performance.

Please review and let me know your comments.

Thanks,

Ryan

*SOLARIS*

RYAN SMITH
GENERAL COUNSEL
141 EAST MEADOW DRIVE, SUITE 211
VAIL, COLORADO 81657

M: 303.888.0969
F: 970.479.6666

**ATTACHMENT 4**

SOLARIS PROPERTY OWNER I, LLC
141 East Meadow Drive, Suite 211
Vail, Colorado 81657

March 17, 2015

Colorado Regional Center Project Solaris, LLLP
300 W. 6th Street, Suite 1810
Austin, TX 78701

Re: Letter Agreement Regarding Collateral Unit Distributions ("Letter Agreement")

To Whom It May Concern,

Reference is hereby made to that certain Promissory Note dated April 18, 2012, executed by Solaris Property Owner I, LLC, a Delaware limited liability company ("Borrower"), as assignee of Solaris Property Owner, LLC, a Delaware limited liability company ("Original Borrower") pursuant to that certain Assignment of Loan Agreement dated October 12, 2011 by and between Original Borrower and Borrower, and payable to the order of Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership ("Lender") in the original maximum principal amount of One Hundred Million and No/100 Dollars ($100,000,000.00) (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, collectively the "Note"), pursuant to which Borrower has become indebted to Lender with respect to a loan ("Loan") made pursuant to that certain Loan Agreement dated November 5, 2010 between Original Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, the "Loan Agreement"), which Loan is further evidenced, secured or governed by other instruments and documents executed in connection with the Loan, including, but not limited to, that certain Operating Payment Agreement dated November 5, 2010 by and between Borrower, as successor in interest to Original Borrower, and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, the "Operating Payment Agreement") (such other instruments and documents and Operating Payment Agreement, together with the Note and the Loan Agreement, as each have been amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, including by this Letter Agreement, collectively, the "Loan Documents"). All capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Loan Documents.

Pursuant to the Loan Documents, commencing on the date that is three (3) years from the date of a Loan Advance (the "Prepayment Date"), Borrower has the right to transfer the Collateral Unit by which such Loan Advance is secured to Lender in full satisfaction of such Loan Advance (each, a "Collateral Unit Distribution"). Borrower has duly notified Lender of its intent to effect a Collateral Unit Distribution of each Collateral Unit, in each case on the Prepayment Date corresponding to such Collateral Unit.

In order to reduce the transaction costs that Lender would incur in connection with such Collateral Unit Distributions, Lender desires for Borrower to refrain from causing such Collateral Unit

{00254048.DOCX / 2 }

**ATTACHMENT 4**

SPO_0000971

Distributions, and Borrower has agreed to refrain from causing such Collateral Unit Distributions, on the terms and conditions more particularly set forth in this Letter Agreement.

Therefore, Lender and Borrower hereby agree that, with respect to each Collateral Unit:

(i)  No Collateral Unit Distributions. Borrower shall not cause a Collateral Unit Distribution until on or after the earlier to occur of (i) the date that is thirty (30) days from written notice from Borrower to Lender of Borrower's intent to cause a Collateral Unit Distribution, or (ii) the Maturity Date of the Loan Advance corresponding to such Collateral Unit;

(ii)  Interest Calculation. Notwithstanding the foregoing, for purposes of calculating interest and any other amounts owing by and between Lender and Borrower pursuant to the Loan Documents in connection with such Collateral Unit, a Collateral Unit Distribution shall be deemed to have occurred on the Prepayment Date corresponding to such Collateral Unit (the "Effective Collateral Unit Distribution Date");

(iii)  Operating Payment Calculation. For purposes of calculating the Operating Payments attributable to such Collateral Unit pursuant to the Operating Payment Agreement, the Operating Payment Commencement Date shall be deemed to be the Effective Collateral Unit Distribution Date;

(iv)  Lender Possession; Lender Responsibilities. Commencing on the Prepayment Date corresponding to such Collateral Unit, Lender shall (a) be entitled to possession of the Collateral Unit and all revenue from such Collateral Unit; (b) maintain, manage, and operate such Collateral Unit in the manner presently conducted by it and timely pay all costs and expenses thereof; (c) pay all taxes and other charges now or hereafter levied or assessed or imposed against the Collateral Unit, or any part thereof, or the furnishings as the same become due and payable (subject to paragraph v. below); (d) keep the Collateral Unit and furnishings in good working order and repair; (e) obtain and maintain insurance for Lender and the Collateral Unit providing at least comprehensive "all-risk" property insurance on the Collateral Unit and furnishings and commercial general liability insurance, including a broad form comprehensive general liability endorsement and coverage against claims for personal injury, bodily injury, death or property damage occurring upon, in or about such Collateral Unit, each subject to the reasonable approval of Borrower as to insurance companies, amounts, deductibles, loss payees and insureds; (f) not create, incur, assume or suffer to exist any lien on any portion of the Collateral Unit or permit any such action to be taken; (g) bear all risk of loss with respect to the Collateral Unit and furnishings except to the extent caused by the willful misconduct of Borrower; and (h) hold harmless and indemnify Borrower from and against any and all costs, expenses, damages, claims, demands and liabilities of every kind or character relating to such Collateral Unit except to the extent caused by the willful misconduct of Borrower; and

(v)  Escrow of Taxes and HOA Assessments.

**ATTACHMENT 4**

SPO_0000972

a.  Initial Deposits. On or before April 1, 2016, Lender shall deposit with Borrower (i) an amount equal to the ad valorem property taxes ("Taxes") estimated to be next coming due (i.e., April 30, 2016) for the 2015 tax year less all amounts previously escrowed by Lender with Borrower on account of Taxes for the 2015 tax year, and (ii) an amount equal to the homeowner's association assessments (the "HOA Assessments") next coming due less all amounts previously escrowed by Lender with Borrower on account of such HOA Assessments.

b.  Monthly Deposits. On each Settlement Date, Lender shall pay to Borrower (i) the pro-rata portion of the Taxes that Borrower estimates will be coming due in the immediately succeeding year in order to accumulate with Borrower sufficient funds to pay all such Taxes prior to their respective due dates, and (ii) the pro-rata portion of the HOA Assessments that Borrower estimates will next be coming due in order to accumulate with Borrower sufficient funds to pay all such HOA Assessments prior to their respective due dates (the foregoing amounts so deposited with Lender are hereinafter called the "Escrow Funds" and the account in which such amounts are held shall hereinafter be referred to as the "Escrow Account").

c.  Application of Escrow Funds. Borrower will apply the Escrow Funds to payments of Taxes and HOA Dues required to be made by Lender hereunder.  If the amount of the Escrow Funds shall exceed the amounts due for Taxes and HOA Dues, Borrower shall credit such excess against future payments to be made to the Escrow Funds.  If at any time Borrower reasonably determines that the Escrow Funds are not or will not be sufficient to pay Taxes and HOA Dues by the due dates thereof, Borrower shall notify Lender of such determination and Lender shall deposit with Borrower the amount that Borrower estimates is sufficient to make up the deficiency prior to the due date of the Taxes and/or HOA Assessments.

(vi)  Transfers. Upon any transfer by deed of a Collateral Unit from Borrower to Lender in accordance with the Loan Documents, as amended by this Letter Agreement, Lender shall accept the transfer of such Collateral Unit in full satisfaction of the corresponding Loan Advance (a) in "as-is, where-is" condition and subject to any and all wear and tear or damage caused, permitted, or suffered by, through, or under Lender or its permittees, and (b) subject to all liens or other encumbrances caused, permitted, or suffered by, through, or under Lender or its permittees. Any amount remaining in the Escrow Funds after the transfer by deed of a Collateral Unit from Borrower to Lender shall be returned to Lender.

In the event of conflict between the terms and conditions of this Letter Agreement and the Loan Documents, the terms and conditions of this Letter Agreement shall control in point of conflict. Except as expressly amended hereby, the Loan Documents shall remain in full force and effect in accordance with their terms.

[SIGNATURE PAGE FOLLOWS]

{00254048.DOCX / 2 }

**ATTACHMENT 4**

SPO_0000973

Accepted and agreed effective as of the date first set forth above:

**<u>BORROWER</u>**

SOLARIS PROPERTY OWNER I, LLC,
a Delaware limited liability company

By: _____
     Ryan A. Smith, its General Counsel

**<u>LENDER</u>**

COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP,
a Colorado limited liability limited partnership

By: _____
Name: _____
Its: _____

{00254048.DOCX / 2 }

4

**ATTACHMENT 4**

SPO_0000974

| From: | Ryan Smith |
|---|---|
| Sent: | Tuesday, March 15, 2016 5:20 PM MDT |
| To: | Peter Knobel; Rob Glucksman |
| CC: | Mark F. Bell; Rick Hayes |
| Subject: | RE: CRC/Solaris Unit Transfer Update |

Rob,

In that case, let's finalize the transfer agreement and related documents that we exchanged drafts of last month. Mark and I had a productive conversation with respect to those documents earlier this month, and, prior to the temporary change in plan, Mark was going to send me updated drafts of those documents. So, let's pickup where we left off and finalize the documents with the goal of closing a unit next week.

Thanks,

Ryan

**From:** Peter Knobel
**Sent:** Tuesday, March 15, 2016 4:08 PM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Cc:** Ryan Smith <ryan@solarisvail.com>; Mark F. Bell <mbell@fostergraham.com>; Rick Hayes <rhayes@wavelandventures.com>
**Subject:** Re: CRC/Solaris Unit Transfer Update

Great let's start

Best regards,

Peter Knobel

On Mar 15, 2016, at 4:54 PM, Rob Glucksman <rglucksman@coloradoregionalcenter.com> wrote:

Ryan,

After discussing with Rick, I believe the plan will be to move ahead with the transfers as we initially intended. Please let us know if you have any questions.

Thanks,
Rob

**From:** Ryan Smith [mailto:ryan@solarisvail.com]
**Sent:** Wednesday, March 02, 2016 6:11 PM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>; Mark F. Bell <mbell@fostergraham.com>

**ATTACHMENT 5**

SPO_0000986

**Cc:** Rick Hayes <rhayes@wavelandventures.com>; Peter Knobel <peter@solarisvail.com>
**Subject:** CRC/Solaris Unit Transfer Update

Rob and Mark,

Peter and Rick met yesterday and I understand that they agreed that the parties would hold off on actually transferring the eligible units until further notice but continue to perform as if the transfers happened on the respective 3-year Prepayment Dates. The rationale is to save CRC potential transaction costs.

Accordingly, at Peter's and Rick's request, I have drafted a letter agreement to document that arrangement. I have tried to keep it as simple as possible but the fact that CRC will be in possession of units that continue to be owned by Solaris does give rise to some issues that need to be addressed. The attached letter agreement is my attempt to do so in a manner that is fair to both parties and consistent with the parties' performance.

Please review and let me know your comments.

Thanks,

Ryan

SOLARIS

RYAN SMITH
GENERAL COUNSEL
141 EAST MEADOW DRIVE, SUITE 211
VAIL, COLORADO 81657

M: 303.888.0969
F: 970.479.6666

**ATTACHMENT 5**

SPO_0000987

| | |
|---|---|
| **From:** | Rob Glucksman |
| **Sent:** | Tuesday, August 1, 2017 11:52 AM MDT |
| **To:** | Ryan Smith |
| **CC:** | Johan Segerdahl; Rick Hayes |
| **Subject:** | Omnibus Agreement to Listing Agreements_Solaris Draft 8.1.17 v2 |
| **Attachments:** | Omnibus Agreement to Listing Agreements_Solaris Draft 8.1.17 v2.docx |

Ryan,

Attached is a draft of the omnibus agreement. I attempted to simplify it a bit and again, I don't think we want to be modifying or amending any of the loan documents. Reference is made to them, but I think this should be an omnibus agreement to the listing agreements rather than the loan documents. Let me know if you would like to discuss. Look forward to your thoughts.

Best,
Rob

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

**ATTACHMENT 6**

<u>SECOND FIRST</u> OMNIBUS <s>AMENDMENT</s> <u>AGREEMENT</u> TO LISTING AGREEMENTS FOR
<u>COLLATERAL UNITS</u><s>EB-5 INVESTMENT DOCUMENTS</s>

  This <s>SECOND</s> <u>FIRST</u> OMNIBUS <u>AGREEMENT</u><s>AMENDMENT</s> (this "**Agreement**")
<s>To</s><u>to</u> the LISTING AGREEMENT(S) for collateral units (as defined herein) in the Solaris Residences ("Solaris") located in Vail, Colorado equitably owned and/or controlled by Colorado Regional Center Project Solaris, LLLP <s>EB-5 INVESTMENT DOCUMENTS</s> (this <s>"**Amendment**")</s>
is made effective as of the ____ day of _____, 20__ by and between SOLARIS
PROPERTY OWNER I, LLC, a Delaware limited liability company ("**Borrower**"), <u>P.B.K. REAL ESTATE, LLC (d/b/a (SOLARIS REAL ESTATE LLC), a Colorado limited liability company ("**Broker**"),</u> and COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP, a Colorado limited liability limited partnership ("**Lender**").

**Recitals**

  A.  Reference is hereby made to that certain Promissory Note dated April 18, 2012, executed by Borrower, as assignee of Solaris Property Owner, LLC, a Delaware limited liability company ("**Original Borrower**") pursuant to that certain Assignment of Loan Agreement dated October 12, 2011 by and between Original Borrower and Borrower, and payable to the order of Lender ("**Lender**") in the original maximum principal amount of One Hundred Million and No/100 Dollars ($100,000,000.00), as amended by that certain Allonge to Promissory Note dated of even date therewith by and between Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, collectively the "**Note**"), Borrower has become indebted to Lender with respect to a loan ("**Loan**") made pursuant to that certain Loan Agreement dated November 5, 2010 between Original Borrower and Lender (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), which Loan is secured by one of more Deeds of Trust recorded against the Collateral Units in the real property records of Eagle County, Colorado (as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, each a "**Deed of Trust**" and collectively, the "**Deeds of Trust**"), and further evidenced, secured or governed by other instruments and documents executed in connection with the Loan, including, but not limited to (i) that certain Operating Payment Agreement dated November 5, 2010 by and between Borrower, as successor in interest to Original Borrower, and Lender (the "**Operating Payment Agreement**"), (ii) that certain Memorandum of Understanding dated April 1, 2011 by and between Borrower, as successor in interest to Original Borrower, and Lender (the "**MOU**"), and (iii) that certain Guaranty Agreement dated April 18, 2012 by Peter Knobel for the benefit of Lender (the "**Guaranty**"), and as such loan documents were amended pursuant to that certain Omnibus Amendment to EB-5 Investment Documents dated March 8, 2012 by and between Original Borrower and Lender (the "**Omnibus Amendment**") (such other instruments and documents, Operating Payment Agreement, MOU, Guaranty, and Omnibus Amendment, together with the Note, the Loan Agreement and Deeds of Trust, as amended through the date hereof and as the same may be further amended, restated, replaced, supplemented, or otherwise modified from time to time, collectively the "**Loan Documents**").

{00316124.DOCX / 1}

**ATTACHMENT 6**

All capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Loan Documents.

B.      Pursuant to the Loan Documents, Borrower has the right to tender any Collateral Unit (as defined therein) to Lender in repayment of a corresponding Loan Advance commencing on the applicable- Prepayment Date, as more particularly set forth in the Loan Documents (each, a "**Collateral Unit Distribution**").

C.      Borrower has duly notified Lender that it intends to cause the occurrence of a Collateral Unit Distribution with respect to each of the Collateral Units on the applicable Prepayment Date. From and after the Prepayment Date for a Collateral Unit, such Collateral Unit may hereinafter be referred to each as an "**Eligible Unit**" and collectively as the "**Eligible Units**."

D.      In lieu of accepting the conveyance of title to the Eligible Units pursuant to a Collateral Unit Distribution, the Lender and Borrower has have determined that it is desirable for Borrower to continue to hold record title to the Eligible Units, while Lender shall, for all other purposes, exert control and management over the Eligible Units.

E.      Borrower has agreed to refrain from conveying title to the Eligible Units to Lender pursuant to a Collateral Unit Distribution on the condition that, the Loan Documents be amended to, effective as of the Prepayment Date corresponding to any Eligible Unit, reduce the Interest Rate is adjusted in accordance with the Operating Payment Agreementapplicable to the Loan Advance secured by such Eligible Unit, and as otherwise set forth herein and other Loan Documents as may be applicable.

F.      The parties desire to set forth their mutual understanding concerning certain matters related to the listing and sale of the Eligible Units and to expound upon the Listing Agreements.Loan Documents and to modify certain provision of the Loan Documents as more particularly described below.

### Agreement

Now, therefore, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Lender and Borrower agree as follows:

1.      The terms and conditions of this Agreement do not modify or otherwise alter the terms and conditions of the Loan Documents.

Listing of Collateral Units.

1.      Amendments to Defined Terms in Loan Documents.

a.      Interest Rate. For all purposes under the Loan Documents, the term "**Interest Rate**" shall mean (i) for the period commencing on the Closing of a Loan Advance and ending on the Prepayment Date, the rate of 5.5%, and (ii) for the period commencing on the date

{00316124.DOCX / 1}                                    2

immediately succeeding the Prepayment Date of a Loan Advance and ending on the Maturity Date, the rate of 0.00%.

b.   Maturity Date. For all purposes under the Loan Documents, the term "**Maturity Date**" shall mean with respect to each Loan Advance the later to occur of (i) the date that is exactly sixty (60) months from Closing on such Loan Advance, or (ii) ninety (90) days of Borrower's receipt of written notice from Lender. Notwithstanding the foregoing or anything in the Loan Documents to the contrary, the Maturity Date for purposes of determining the Operating Payment Termination Date (as defined in the Operating Payment Agreement) shall be the date that is exactly sixty (60) months from Closing on such Loan Advance.

2.   Amendments to Note.

a.   Interest Payments. The third full paragraph of the Note titled "Interest Payments" is hereby amended and restated in its entirety as follows:

"Commencing on the date of Closing of a Loan Advance (the "**Commencement Date**"), the outstanding principal of such Loan Advance shall bear interest at the Interest Rate. Borrower shall make interest-only payments on the outstanding principal balance of each Loan Advance (each, an "**Interest payment**") on the first business day of each month following the Commencement Date until such Loan Advance is repaid in full. Borrower will pay Lender at Lender's address as Lender shall designate in writing. Any and all payments made hereunder shall be applied first to any unpaid collection costs and late charges pursuant to this Note, second to accrued unpaid interest, and third in reduction of the outstanding principal balance of the Loan."

3.   Amendments to MOU.

a.   The following definitions are added to or replace existing definitions, as applicable, contained in Section 2 of the MOU:

i.   "**Carrying Costs**" shall mean Taxes and Operating Costs.

ii.   "**Operating Costs**" shall mean all costs, charges and expenses payable by Borrower that are attributable to the ownership, operation, management, maintenance and repair of a Collateral Unit, including, but not limited to, assessments by any homeowner's association governing the Property, but expressly excluding any Indebtedness under the Loan.

iii.   "**Taxes**" means all general and special real estate taxes, assessments, special assessments for improvements, special district or improvement district assessments, water charges, sewer charges, vault charges and other ad valorem taxes, rates, levies and assessments levied upon or with respect to a Collateral Unit all personal property owned by Borrower and used in connection with the ownership, development, maintenance and operation of

**ATTACHMENT 6**   SPO_0003409

~~the Collateral Unit (the "**Personal Property**"), by any governmental or quasi-governmental authority and all taxes specifically imposed in lieu of any such taxes.~~

~~b.      Indemnification. Lender shall indemnify, defend and hold harmless Borrower, its officers, managers, directors, governors, employees, shareholders, members, affiliates, partners, agents, successors, assigns, professionals, and each of them, from and against and in respect of any and all claims, damages, losses, costs, expenses, obligations, liabilities, damages, recoveries, and deficiencies including reasonable attorneys' fees, interest and penalties, which Borrower actually incurs or suffers arising out of the use or occupancy of a Collateral Unit or Personal Property by Lender or Rental Manager (as defined in Section 5 of the MOU) or their respective permittees.~~

2.      Upon Lender's written request, Lender may authorize Borrower to enter into certain Listing Agreements with its affiliate, P.B.K. Real Estate, LLC, a Colorado limited liability company (d/b/a Solaris Real Estate, LLC) to market an Eligible Unit(s) for sale for a commission of five percent (5%) and on such other terms and conditions as are set forth in the Exclusive Right-To-Sell Listing Contract attached hereto as Exhibit B (each, a "**Listing Agreement**" and the Eligible Unit to which it pertains, a "**Listed Unit**"). The term of the Listing Agreement shall be defined therein.

3.      Broker agrees that fifty percent (50%) of commissions and/or fees derived from the sale of a Listed Unit shall be owed to Lender.

4.      Listing of Borrower's Units. During the Listing Period (as defined in the Listing Agreement) for a Listed Unit, Borrower agrees that it will not permit Broker or any other third-party real estate broker to initiate an MLS listing for the sale of any unit in Solaris that (i) is owned by Solaris Property Owner, LLC, a Delaware limited liability company, Solaris Property Owner II, LLC, a Delaware limited liability company, or Solaris Property Owner IV, a Colorado limited liability company, or other related entities (collectively, the "**Affiliated Solaris Owners**") and (ii) is like-kind to an Eligible Unit.  Borrower also agrees that any like-kind units owned by the Affiliated Solaris Owners that are currently listed on MLS shall be removed.

5.      Borrower agrees that Lender shall have authority to make all decisions otherwise granted to Borrower in a Listing Agreement and Borrower shall consult Lender on all matters pertaining to the sale of the Eligible Units.

6.      Lender is the sole beneficiary of net proceeds from the sale of an Eligible Unit.

~~4.      Additional Provisions~~

~~a.      Conveyance of Eligible Unit. In the event that Borrower exercises any right under the Loan Documents to tender or otherwise convey any Eligible Unit to Lender, each party shall promptly, but in no event later than the Closing Date (as established pursuant to the following sentence), execute and deliver to the other party a Transfer Agreement with respect to such Eligible Unit substantially in the form attached hereto as Exhibit A (each, a "Transfer Agreement"). The~~

**ATTACHMENT 6**

SPO_0003410

Closing Date under the applicable Transfer Agreement shall be the date set forth in the notice from Borrower to Lender that it intends to tender or otherwise convey the Eligible Unit to Lender.

b.    Listing of Collateral Units. Upon Lender's written request made on or before [_____], Borrower shall cause its affiliate, P.B.K. Real Estate, LLC, a Colorado limited liability company (d/b/a Solaris Real Estate, LLC) ("**Solaris Real Estate**") to market a Eligible Unit for sale for a reduced commission of five percent (5%) and on such other terms and conditions as are set forth in the Exclusive Right-To-Sell Listing Contract attached hereto as Exhibit B (each, a "**Listing Agreement**" and the Eligible Unit to which it pertains, a "**Listed Unit**"). Lender acknowledges and agrees that the foregoing commission represents a discount relative to prevailing market rates. The term of the Listing Agreement shall be as determined by Borrower, but in no event less than six (6) months or greater than twelve (12) months unless otherwise mutually agreed by the Parties.

c.    Listing of Borrower's Units. During the Listing Period (as defined in the Listing Agreement) for a Listed Unit, Borrower agrees that that it will not permit Solaris Real Estate to initiate an MLS listing for the sale of any residential condominium within the condominium project known as The Residences at Solaris-Vail that (i) is owned by Solaris Property Owner, LLC, a Delaware limited liability company, Solaris Property Owner II, LLC, a Delaware limited liability company, or Solaris Property Owner IV, a Colorado limited liability company (collectively, the "**Affiliated Solaris Owners**"), and (ii) is like-kind to the Listed Unit.

d.    Insurance. At all times from and after Closing on a Loan Advance on a Collateral Unit, Tenant shall carry and maintain, at Tenant's sole cost and expense commercial general liability insurance, including coverage for bodily injury, property damage, death and personal injury (employee and contractual liability exclusions deleted), products and completed operations, contractual liability (including coverage for the contractual liability of Tenant for performance of the indemnification provisions of this Lease); owner's protective liability, independent contractors and broad form property damage, with limits of not less than One Million Dollars ($1,000,000.00) each occurrence combined single limit for bodily injury, property damage, business interruption, independent contractors and personal injury and Two Million Dollars ($2,000,000.00) aggregate for bodily injury and property damage for product and completed operations. Such policy of insurance shall (a) specifically insure performance by Tenant of the indemnity obligations of Lender hereunder, (b) be with insurance companies and on forms reasonably satisfactory to Borrower, and (c) name Borrower as an additional insured.

e.    Liens. Lender covenants and agrees that shall not create, incur, assume or suffer to exist any lien on any portion of a Collateral Unit or the Personal Property or permit any such action to be taken. Lender shall indemnify, defend and hold harmless Borrower, its officers, managers, directors, governors, employees, members, shareholders, members, affiliates, partners, agents, successors, assigns, professionals, and each of them, from and against and in respect of any and all claims, damages, losses, costs, expenses, obligations, liabilities, damages, recoveries, and deficiencies including reasonable attorneys' fees, interest and penalties, which Borrower actually incurs or suffers arising out of any lien created, incurred, assumed or suffered to exist by Lender on any portion of a Collateral Unit or the Personal Property except for the lien arising pursuant to any Deed of Trust securing the Loan.

**ATTACHMENT 6**

SPO_0003411

f. ~~Waiver. Lender hereby waives and releases all claims against Borrower for non-performance or breach of any representation or warranty or breach of covenant, condition, agreement, and promise to be performed of Borrower in the Loan Documents to the extent that such non-performance breach arises out of the acts or omissions of Lender, including, but not limited to, those set forth in Sections 12 and 14 of the Loan Agreement.~~

~~5.~~7.   MISCELLANEOUS. This ~~Amendment~~ Agreement represents the entire and complete agreement between the parties.  The Amendment shall not be amended or modified, except by an instrument in writing, signed by all parties. All terms and provisions hereof shall inure to the benefit of, and being binding upon the parties, and their respective successors and assigns.  Wherever used in this ~~Amendment~~Agreement, the singular shall include the plural, and the masculine shall include the feminine and neuter grammatical forms.  Captions are included for convenient reference only, and shall not be construed to alter or affect any terms or provisions of this ~~Amendment~~Agreement.  This ~~Amendment~~ Agreement has been executed by the parties after discussions and negotiation, and shall be construed as having been drafted by both parties.  If any term of this ~~Amendment~~ Agreement is held to be invalid or unenforceable, such term shall be construed as being valid and enforceable to the fullest extent permitted by law, and all remaining terms shall remain full force and effect. This ~~Amendment~~ Agreement shall be construed and enforced in accordance with the laws of the State of Colorado. Each party hereto waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this ~~Amendment~~ Agreement or any related document. If a party initiates any action to enforce or interpret this ~~Amendment~~Agreement, the party determined by the court or arbiter, as the case may be, to be the prevailing party in such action will be entitled to receive from the non-prevailing party all reasonable costs and expenses, including all reasonable attorneys' fees incurred by the prevailing party in such action. This ~~Amendment~~ Agreement may be executed in electronic or facsimile counterparts, each of which when so executed shall be deemed to be an original, and all of which when taken together shall constitute one original signed agreement.

[SIGNATURE PAGE FOLLOWS]

{00316124.DOCX / 1}                                    6

SPO_0003412

IN WITNESS WHEREOF, Borrower and Lender have executed this ~~Transfer~~ Agreement as of the date first above set forth.

BORROWER:

SOLARIS PROPERTY OWNER I, LLC,
a Delaware limited liability company

By: _____
    Ryan A. Smith, its Authorized Signatory

LENDER:

COLORADO REGIONAL CENTER PROJECT SOLARIS, LLLP,
a Colorado limited liability limited partnership

By: _____
Name: _____
Its: _____

BROKER:

P.B.K. REAL ESTATE, LLC d/b/a SOLARIS REAL ESTATE LLC,
a Colorado limited liability limited partnership

By: _____
Name: _____
Its: _____

**ATTACHMENT 6**

SPO_0003413

**EXHIBIT A**

**FORM OF TRANSFER AGREEMENT**

(Attached)

**ATTACHMENT 6**

SPO_0003414

**EXHIBIT B**

**FORM OF LISTING AGREEMENT**

(Attached)

**ATTACHMENT 6**

SPO_0003415

| | |
|---|---|
| **From:** | Ryan Smith |
| **Sent:** | Tuesday, November 7, 2017 3:34 PM MST |
| **To:** | Rob Glucksman |
| **Subject:** | RE: Agreement Draft |
| **Attachments:** | Agreement Regarding Collateral Units_11.7.17 (red).docx, |
| | Agreement Regarding Collateral Units_11.7.17 (clean).docx, Exhibit A - Transfer Agreement_11.7.17 (clean).docx, |
| | Exhibit A - Transfer Agreement_11.7.17 (red).docx |

Rob,

Sorry for the delay in getting back to you on this. A revised draft is attached in clean and redline to your prior draft. Also attached is the previously negotiated Transfer Agreement, which I have adapted to serve as Exhibit A to the main agreement. The Transfer Agreement provides the mechanics for actually transferring the unit to CRCPS or the third-party buyer when the obligation to do so is triggered under the main agreement.

Please let me know your comments. If it would be more efficient, I'd be happy to get on a call to discuss the outstanding items.

Thanks,

Ryan

**From:** Rob Glucksman [mailto:rglucksman@coloradoregionalcenter.com]
**Sent:** Thursday, September 28, 2017 9:09 AM
**To:** Ryan Smith <ryan@solarisvail.com>
**Subject:** RE: Agreement Draft

Should still be against the first draft you had sent.

Best,
Rob

**From:** Ryan Smith [mailto:ryan@solarisvail.com]
**Sent:** Wednesday, September 27, 2017 6:08 PM
**To:** Rob Glucksman <rglucksman@coloradoregionalcenter.com>
**Subject:** RE: Agreement Draft

Thanks, Rob. To what version was this draft redlined?

**From:** Rob Glucksman [mailto:rglucksman@coloradoregionalcenter.com]
**Sent:** Wednesday, September 27, 2017 4:48 PM
**To:** Ryan Smith <ryan@solarisvail.com>
**Subject:** re: Agreement Draft

Ryan,

**ATTACHMENT 7**

SPO_0003616

Apologies it has taken so long to get a draft back to you. Please find it attached. You'll see some of the items have been reincorporated, while others I think are covered/governed by the Loan Documents including, rental revenue, cleaning expenses, taxes, etc.

Best,
Rob

Rob Glucksman
Colorado Regional Center
Cell: 303.888.9052
rglucksman@coloradoregionalcenter.com



IRS CIRCULAR 230 DISCLOSURE: To comply with U.S. Treasury regulations, we advise you that any U.S. federal tax advice included in this communication is not intended or written to be used, and can not be used, to avoid any U.S. federal tax penalties or to promote, market, or recommend to another party any transaction or matter addressed herein.

CONFIDENTIALITY NOTICE: This e-mail is confidential and is intended only for the named recipient(s) and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you have received this message in error, or are not the named recipient(s), please immediately notify the sender and delete this e-mail message from your computer.

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

**ATTACHMENT 7**

SPO_0003617



From: Colorado Regional Center I, LLC (the "General Partner") on behalf of Colorado Regional Center Project Solaris, LLLP (the "Partnership")

To: Limited Partners ("LPs") of the Partnership

Date: April 21, 2023

Re: Solaris Project Update

CRCPS Limited Partners:

We are pleased to inform you that the Partnership has sold three units in the past three months: Penthouse E West, 6D East and Penthouse C West. Each of these three units sold for a gross purchase price which was above both the last appraised value and the collateral value allocated to each unit.

| Unit: | Gross Purchase Price | Last Appraised Value | Collateral Value |
|---|---|---|---|
| Penthouse E West | $3,175,000 | $2,230,000 | $3,084,124 |
| 6D East | $8,150,000 | $7,630,000 | $7,832,070 |
| Penthouse C West | $3,050,000 | $2,350,000 | $2,355,530 |

After paying closing costs and Partnership expenses, as well as maintaining adequate capital reserves, the Partnership has made a distribution of approximately $12,616,000 to all Limited Partners, or $83,000 per Limited Partner, which you should have now received. Due to the daily wire limit at the bank, a batch of wires are scheduled to be sent today and a second batch of wires will be sent Monday, April 22nd. All distributions were wired to the respective Limited Partner accounts based on wire instructions we have previously received.

Each Limited Partner has now received approximately $279,000 in total distributions. The Partnership has three units remaining in the portfolio: 4G West, 5G West, and 4D East. These units have a combined collateral value of approximately $20,800,000 and are expected to generate sales proceeds to make additional and material distributions to all Limited Partners. Two of the units are currently listed for sale.

Notwithstanding the progress made on selling the units, the total distributions made to date, the fact that the Partnership still retains assets with an estimated market value greater than $20 million, and our opinion that the litigation is unlikely to provide any benefit to the limited partners, counsel to the Li Plaintiffs and the derivative Plaintiffs continues to prosecute the litigation in both state and federal court. The Partnership has spent significant amounts of money defending the litigation (including cross claims brought by SPO), and such expenses will continue to escalate, further eroding the amounts available for future distributions to each Limited Partner.

Sincerely,

Colorado Regional Center Project Solaris, LLLP, a Colorado limited liability limited partnership

By:   Colorado Regional Center I, LLC, a Colorado limited liability company

      its General Partner

**ATTACHMENT 8**